# IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF MISSISSIPPI
## JACKSON DIVISION

JERMAINE DOCKERY, DAVID THOMPSON,
JEFFERY COVINGTON, JOSEPH OSBORNE,
COURTNEY GALLOWAY, PHILLIP
FREDENBURG, JOHN BARRETT,
TAFFOREST CHANDLER, DERRICK HAYES,
ERIC WARD, CHRISTOPHER LINDSEY,
DEXTER CAMPBELL, ALVIN LUCKETT,
JAMES VANN, BENJAMIN McABEE, and
ANTHONY EVANS on behalf of themselves and
all others similarly situated,

                                    Plaintiffs,

v.

CHRISTOPHER EPPS, in his official capacity as
Commissioner of the Mississippi Department of
Corrections, GLORIA PERRY, in her official
capacity as Chief Medical Officer for the
Mississippi Department of Corrections, and
ARCHIE LONGLEY, in his official capacity as
Deputy Commissioner for Institutions of the
Mississippi Department of Corrections,

                                    Defendants.



**CLASS ACTION COMPLAINT**

Civil Action No. 3:13CV326 TSL-JMR

## INTRODUCTION

1.    This is a class action filed on behalf of prisoners confined at the East Mississippi

Correctional Facility (EMCF) near Meridian, Mississippi. EMCF was designed as the facility

intended to provide treatment for Mississippi's seriously mentally ill prisoners in a safe, humane,

and therapeutic environment. Today, EMCF is an extremely dangerous facility operating in a

perpetual state of crisis, where prisoners live in barbaric and horrific conditions and their basic

human rights are violated daily. Grossly inhumane conditions have cost many prisoners their

health, and their limbs, their eyesight, and even their lives. Defendants, high-ranking officials of the Mississippi Department of Corrections (MDOC), who are responsible for the health and safety of these prisoners, have known of these conditions for years but have failed to take reasonable steps to protect the prisoners in their charge.

2.     EMCF's solitary confinement zones house dozens of seriously mentally ill prisoners who are locked down in filthy cells for days, weeks, or even years at a time. Many cells lack functioning toilets; prisoners defecate into Styrofoam trays or plastic trash bags and have no way of ridding their cells of the waste other than tossing it onto the housing unit through the slots in their cell doors, where it remains. It is commonplace for cells to lack working lights, leaving prisoners with barely enough light to see during the day and in total darkness at night. One of EMCF's solitary confinement areas is widely known by prisoners as "the Dead Man's Zone," or "Dead Area," because the prisoners are virtually unsupervised and their basic needs are ignored: Correctional officers seldom appear on the housing zones and prisoners are left to fend for themselves, sealed behind solid-front doors. Because there is insufficient officer staffing, prisoners are frequently left in the grime-covered shower stalls, wet, naked and cold for hours at a time. Setting fires is often the only way to get medical attention in emergencies.

3.     Rats climb over prisoners' beds in the dark and mice crawl out of broken toilets. The extreme deprivations and extraordinarily harsh conditions at EMCF have even fostered commerce in rats: Some prisoners capture rats, put them on improvised leashes, and sell them as pets to the seriously mentally ill.

4.     Among the hundreds of mentally ill prisoners at EMCF are many whose untreated illnesses lead to extreme behaviors such as screaming, babbling, throwing excrement, and starting fires. Suicide attempts are frequent; some are successful. Other prisoners engage in

gross acts of self-mutilation, including electrocution, swallowing shards of glass and razors, and tearing into their flesh with sharp objects. Defendants deny prisoners even rudimentary mental health treatment and, last year, reduced access to psychiatric care.

5.      Medical staff has ignored gangrenous wounds. One prisoner's scrotum swelled to the size of a softball before revealing a hard knot on his testicle. He was denied timely proper care for weeks and was later diagnosed with testicular cancer that had spread to his abdomen. Another prisoner is now legally blind after being denied treatment for glaucoma. Last month, staff placed a prisoner with a large, open wound in a cell in a filth-ridden solitary confinement unit. He developed a life-threatening infection and required emergency surgery.

6.      Rapes, stabbings, beatings, and other acts of violence are rampant. Security staff is far too few in number and far too ill-trained and ill-supervised to protect prisoners at EMCF from violence. Management and Training Corporation (MTC), the private for-profit corporation with which MDOC currently contracts to operate EMCF,[1] provides only minimal training and places raw recruits on the job after a mere three-week training course. Some security officers are complicit or otherwise involved in prisoner-on-prisoner violence.

7.      Poorly trained security staff rely heavily on excessive force to control prisoners, including mentally ill prisoners, even when no threat is posed. Officers fire Mace, pepper spray, and other incapacitating chemical agents into cells, including the cells of asthmatics and other medically-vulnerable prisoners, and then deny prisoners the opportunity to decontaminate or receive medical care.

8.      MDOC frequently transfers prisoners between EMCF and the Walnut Grove Correctional Facility ("Walnut Grove"), a prison currently under judicial supervision and

---

[1] Prior to July 2012, EMCF was operated by the GEO Group, Inc. ("GEO"), another for-profit private prison corporation.

monitoring by court-appointed experts following findings of unconstitutional conditions of confinement.[2] Teenagers with mental illness who "age out" of MDOC's Youthful Offender Unit ("YOU") on their 18th birthday are also at risk of being transferred to EMCF.

9.      Some youthful prisoners are transferred to EMCF long before their 18th birthdays: Defendants have housed children as young as 16 at EMCF. Defendants housed one 16-year-old prisoner in a cell with an adult who sexually assaulted him. Another youth, who is seriously mentally ill, was sent to EMCF at the age of 16, where he was housed in solitary confinement. Many prisoners are severely malnourished and chronically hungry. MDOC is well aware that the prisoners are being underfed: In 2011, a correctional health expert reported to MDOC that she observed significant weight loss—in some cases, 20 or 30 pounds—in her review of prisoners' medical records.[3]

10.      Each of these conditions, by itself, places prisoners at a substantial risk of serious harm. Taken together, these conditions create an environment so toxic that they threaten the physical and mental health of all the prisoners exposed to them.

11.      Defendants have the duty and responsibility to provide safe and humane conditions for the prisoners in their charge. They have abdicated this responsibility by turning MDOC facilities over to private for-profit contractors and then failing to monitor the contractors' performance or hold them accountable. Defendants are fully aware that their private contractors —who have a strong incentive to maximize profits at the expense of prisoner wellbeing— routinely subject the prisoners to unconscionably harsh and dangerous conditions.

---

[2] Order Approving Settlement, *DePriest v. Walnut Grove Corr. Auth.,* No. 3:10-cv-00663-CWR-FKB (S.D. Miss. Mar. 28, 2012) (Doc. No. 75) and Consent Decree (Doc. No. 75-3) attached thereto.

[3] Expert Report of Madeleine L. LaMarre, MN, FNP-BC, on East Mississippi Correctional Facility, Presley v. Epps, No. 4:05-cv-00148-DAS (N.D. Miss. Nov. 8, 2011), (Doc. No. 151-8).

## JURISDICTION

12.     This action arises under the United States Constitution and 42 U.S.C. § 1983. Jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3).

## VENUE

13.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to the claims of the Plaintiff class occurred in this district.

## PARTIES

## NAMED PLAINTIFFS

14.     All of the Plaintiffs are currently incarcerated at EMCF and, as set forth in the factual and class action allegations herein, bring this action on behalf of themselves and a class and subclasses of prisoners currently confined or who will be confined at EMCF.

15.     Plaintiffs BENJAMIN McABEE, CHRISTOPHER LINDSEY and JAMES VANN, like all prisoners in the EMCF Class as defined below, have suffered or are at risk of suffering irreparable injury as a result of Defendants' deliberate indifference to their serious medical needs.

16.     Plaintiffs DERRICK HAYES, JEFFERY COVINGTON, COURTNEY GALLOWAY, and DAVID THOMPSON, like all prisoners in the EMCF Class as defined herein, are subjected to excessive force by officers and are at a substantial risk of serious harm, including death.

17.     Plaintiffs PHILLIP FREDENBURG and ERIC WARD, like all prisoners in the EMCF Class as defined herein, are at a substantial risk of serious harm in the form of being attacked by other prisoners.

18.     Plaintiff JOHN BARRETT, like all prisoners in the EMCF Class as defined herein, is at a substantial risk of serious harm from malnutrition.

19.     Plaintiffs ANTHONY EVANS, DEXTER CAMPBELL, and JOSEPH OSBORNE, like all prisoners in the Mental Health Subclass as defined herein, are placed at a substantial risk of serious harm by being denied care to meet their serious mental health needs.

20.     Plaintiffs TAFFOREST CHANDLER, COURTNEY GALLOWAY, and ALVIN LUCKETT, like all prisoners in the Units 5 and 6 Subclass as defined herein, are forced to live in filthy, dangerous, and degrading conditions that place them at a substantial risk of serious harm.

21.     Plaintiffs JERMAINE DOCKERY and DERRICK HAYES, like all prisoners in the Isolation Subclass as defined herein, are placed at a substantial risk of serious harm by being housed in solitary confinement where, in addition to the risks posed to their mental health, they are forced to live in dangerous conditions.

## DEFENDANTS

22.     Defendant CHRISTOPHER EPPS is Commissioner of the Mississippi Department of Corrections.  By statute, MDOC is "vested with the exclusive responsibility for management and control of the correctional system, and all properties belonging thereto, subject only to the limitations of this chapter, and shall be responsible for the management of affairs of the correctional system and for the proper care, treatment, feeding, clothing and management of the offenders confined therein."  Miss. Code Ann.  § 47-5-23.  The Commissioner has the duty and authority to do the following: "Establish the general policy of the Department" (§47-5-20); "implement and administer laws and policy related to corrections. . ." (§47-5-28(a)); and "establish standards. . . . and exercise the requisite supervision as it relates to correctional programs over all state-supported adult correctional facilities[.]" (§47-5-28(b)).     As

Commissioner, Defendant Epps has the ultimate responsibility for ensuring that all prisons under the jurisdiction of MDOC operate in compliance with state and federal law. Prisoners at EMCF have sent numerous complaints to Defendant Epps, and Defendant Epps has personally inspected EMCF on multiple occasions. At all times relevant hereto, he has acted under color of state law. Defendant Epps is sued in his official capacity. Additional allegations regarding Defendant Epps' conduct are set forth herein.

23. Defendant ARCHIE LONGLEY is Deputy Commissioner for Institutions (DCI). He replaced DCI Emmitt Sparkman on May 1, 2013. By law, the Deputy Commissioner for Institutions "...shall administer institutions, reception and diagnostic centers, pre-release centers and other facilities and programs provided therein, and shall serve as the chief executive officer of the division of institutions..." (Miss. Code Ann. §47-5-26). The DCI's responsibilities extend to all MDOC facilities, including EMCF. Defendant Longley's predecessor described the DCI as being "responsible for classification, records, training, agriculture, food service department, the training department, just entirely almost everything as far as it goes in the institution division." The DCI position involves conducting inspections of facilities, reviewing incident and use-of-force reports, and other oversight and direct management functions. Defendant Longley is aware of the problems at EMCF and has failed to take reasonable measures to abate the substantial risks of serious harm set forth herein. At all times relevant hereto, Defendant Longley has acted under color of state law. Defendant Longley is sued in his official capacity.

24. Defendant GLORIA PERRY is Chief Medical Officer for the Mississippi Department of Corrections and leads MDOC's Office of Medical Compliance. She is a board-certified family medicine physician and is the most senior medical officer in MDOC, reporting

directly to Commissioner Epps. Dr. Perry's duties include being responsible for all specialty care provided to prisoners in MDOC custody, investigating and responding to complaints of inadequate care, and reviewing summaries of the deaths of prisoners who die in custody. Dr. Perry reviews and signs MDOC policies related to health care. At all times relevant hereto, she has acted under color of state law. Defendant Perry is sued in her official capacity. Additional allegations regarding Defendant Perry are set forth herein.

## FACTUAL ALLEGATIONS

### SOLITARY CONFINEMENT

25.     Prisoners in EMCF's solitary confinement units are locked behind solid-front doors for a minimum of 23 hours per day. They rarely see sunlight. So-called "yard time"—prisoners' only exposure to the outdoors—is provided to prisoners in solitary confinement only occasionally and then only inside enclosures that block out most natural light.

26.     In theory, prisoners in solitary confinement are permitted one hour of out-of-cell time per day, to exercise in the enclosures or to shower. In practice, they routinely go for days without being permitted to leave their cells at all—even for exercise or to shower. And during institutional lockdowns, which are frequent occurrences at EMCF, prisoners are often not permitted to leave their cells for weeks at a time.

27.     At best, prisoners in solitary confinement at EMCF are subject to the following regime:

| | |
|---|---|
| **Mondays:** | One hour out of cell for showers *or* recreation |
| **Tuesdays:** | Locked in cell all day |
| **Wednesdays**: | One hour out of cell for showers *or* recreation |
| **Thursdays:** | Locked in cell all day |
| **Fridays:** | One hour out of cell for showers *or* recreation |
| **Saturdays**: | Locked in cell all day |
| **Sundays:** | Locked in cell all day |

28.     In reality, showers and recreation are provided much less frequently.   For example, in May-June 2012, Leo Laurent did not get a shower for weeks—until the day before a visit from Plaintiff's Counsel.   In September 2012, prisoners on Unit 5C had no showers for three weeks—until the day before a visit from Plaintiffs' Counsel.   Conditions worsened considerably during the most recent lockdown, which began in April 2013 and lasted for three weeks following a deadly riot at another MDOC facility.

29.     Toilets are left broken for long periods of time.  Plaintiff Courtney Galloway was forced to use a trash bag for a toilet for over a month; Leo Laurent had to do so as well.  Many of the toilets in Galloway's current unit, considered the "honor pod," leak feces.  Bobby Trotter, who lives in Unit 5, has a "ping-pong" toilet: When a prisoner in another cell flushes the toilet, feces appear in Mr. Trotter's toilet.

30.     Rats and other vermin infest the units.  V'nell Miskell and Plaintiff Tafforest Chandler have had to place items like bed sheets under their doors to keep rats out.

31.     At any given time, large numbers of prisoners live in cells without functioning lights.  One prisoner's cell has been so dark that he needs to stand near the small window in the cell door to eat, read, or write. Plaintiff Benjamin McAbee lived in near darkness, without a working light in his cell, for a month.  The only illumination came from a narrow window to the outside and the small window in his solid cell door.  Many cells have exposed live wires, creating a risk of electrocution and fires.  In May 2013, there was no electrical power on the top tier of Plaintiff Covington's zone for several days; prisoners lived in near darkness by day and total darkness by night.  When Plaintiff Chandler complained about living in darkness, staff accused him of breaking his light and he was disciplined.  He was later moved to another cell in another zone where, as of mid-May 2013, the light in his cell had been inoperable for a month.

32.     Some prisoners in Units 5 and 6 are subjected to constant bright artificial light around the clock.

33.     The noise in these units is often deafening. Prisoners bang and kick the metal cell doors. Many do so because it is the only effective way to summon help in emergencies. Others do so as a result of untreated mental illness.

34.     Feces, urine, debris from fires, and other waste cover the floors. The floors in Unit 5 are black with grime; the walls and floors are covered with dried food and soot. The air is so contaminated from frequent fires that some prisoners expel black mucous from their noses. Prisoners with serious mental illness exacerbated by solitary confinement throw feces and urine. Other prisoners defecate into bags and food trays and throw them onto the zone because their toilets do not work, creating a cesspool. Plaintiff McAbee's cell has flooded with water carrying feces and trash. One prisoner described the result: "The smell just kills you, there is feces all around."

35.     Cells and showers in Units 5 and 6 are filthy; some are infested with roaches. Security officers refuse to provide cleaning supplies to the prisoners and prison employees seldom, if ever, clean the units. Danyel Richardson has had to use his body soap to clean the black grime from the shower walls before showering. Plaintiff Tafforest Chandler has endured disgusting conditions including having to use the same bar of soap to clean both his cell and his body.

**The "Dead Area"**

36.     The solitary confinement areas of Unit 5 are commonly known as the "Dead Area," or "Dead Zone," because officers do their best to avoid the area. Security officers and medical staff rarely come on the unit to check on the welfare of prisoners. One prisoner

described it as "no man's land." Prisoners resort to setting fires to try to get staff attention, though security officers often simply ignore the fires and allow them to burn themselves out.

37. Some security staff beat and Mace prisoners in solitary confinement even when prisoners are fully restrained. Prisoner-on-prisoner stabbings and beatings are frequent because the locking mechanisms on the cell doors can readily be defeated, and some officers are complicit in unlocking doors to allow violence to occur. Many prisoners in solitary confinement bear scars as a consequence.

**"Some Guys Can't Take It Anymore."**

38. Years of study have demonstrated the adverse impact of long-term solitary confinement on prisoners' mental health. Prisoners who enter solitary confinement free of symptoms may develop anxiety, panic attacks, paranoia, cognitive impairment, social withdrawal, somatic symptoms, hypersensitivity to external stimuli, and perceptual disturbances. Plaintiff Hayes reports that "some guys can't take it anymore." Defendant Epps recently remarked that prisoners in solitary confinement "change physically...It is my belief it affected them mentally."[4]

39. Prisoners with pre-existing mental illnesses are at risk for exacerbation of symptoms and decompensation. Prolonged solitary confinement can cause excruciating psychic pain.

40. In recent weeks, one prisoner set his clothes on fire; another tried to overdose on pills. Plaintiff Thompson, who suffers from symptoms of serious mental illness, has been in solitary confinement for more than two years. Plaintiff Covington reports that solitary confinement "drives [him] crazy at times." He believes that solitary confinement exacerbates his

---

[4] CBS Evening News, May 18, 2013, http://www.cbsnews.com/8301-18563_162-57585177/mississippi-rethinks-solitary-confinement/ (accessed May 26, 2013).

paranoid schizophrenia. One prisoner is reported not to have left his cell in months; others scream, bang on doors, or talk to themselves. As discussed below, there is little access to mental health care for these prisoners. Mental health counselors come through the solitary confinement units once a week, but all they do is ask if anyone has "any issues." There is no privacy and, if a prisoner does have issues, there is no follow-up. As prisoners' mental health deteriorates, some mutilate their bodies and others take their own lives.

**Jermaine Dockery**

41. Plaintiff Jermaine Dockery has spent months at EMCF in solitary confinement locked behind a solid steel door surrounded by the stench of feces. He has been beaten by staff and denied meaningful mental health care.

42. Mr. Dockery has near-constant suicidal thoughts due to hopelessness about his conditions of confinement. He sometimes "thinks about committing suicide just to see how long it would take for [staff] to come, to let people know that stuff isn't right—[we get] no yard, rec, showers as [we are] supposed to do."

43. In late 2012, Mr. Dockery hanged himself until he lost consciousness. Staff cut him down and gave him oxygen before stripping him naked and locking him in an isolation cell. He was not taken to the emergency room. He reports that he was not seen by a psychiatrist while he was under suicide precautions.

44. Several months ago, Mr. Dockery met with a mental health staff member, who was not a psychiatrist, who recommended that his medication dosage be increased. Although he did not see a psychiatrist, his dose was, indeed, increased.

45.     The light is constantly on in Mr. Dockery's cell and has been so since February 2013. The flush-button on his toilet is missing. Mice crawl out of the toilet and into his cell at night.

46.     Fires are a common occurrence in solitary and the air is thick with smoke. In March 2013, Mr. Dockery told an officer that he could not breathe due to the smoke. The officer responded that he "didn't give a fuck" and slammed the tray slot closed on Mr. Dockery's wrist. Mr. Dockery asked for medical attention without success. On or about December 28, 2012, a senior officer came into Mr. Dockery's cell and ordered him to stand against the wall. The officer roughly grabbed Mr. Dockery and brought him to the floor. Mr. Dockery started to defend himself. Other officers arrived, jumped him, and grabbed him. By this point, he was bleeding. Officers cuffed his hands and ankles so tightly that they left scars on his ankles and his right hand remains numb.

**John Doe, Jr.: A Child in Solitary Confinement**

47.     John Doe, Jr.[5] turned 16 years old during the summer of 2011 and was housed at the Central Mississippi Correctional Facility (CMCF). He is of small stature and appears young for his age. He has a long history of being physically and sexually abused in addition to suffering from a traumatic brain injury, limited intellectual functioning, self-harm, and psychosis. On August 29, 2011, Doe Jr. obeyed the voices in his head and stuck a wire into his penis. Despite his age, the psychiatrist ordered that he be transferred to EMCF.

48.     EMCF was never intended to house children and is completely unfit for housing them. Defendants nevertheless approved the transfer and, four days later, Doe Jr. arrived at

---

[5] This prisoner is under the age of 18. Accordingly, a pseudonym will be used.

EMCF. A mental health clinician noted that he appeared to be 14 years old and that he reported getting very little sleep since arriving at the facility.

49.     Despite his age and vulnerability, Doe Jr. was housed in a cell with a foul-smelling 34-year-old man. Doe Jr. was later moved to an intake cell, where conditions resemble those in the solitary confinement units. Later, he was moved to a single cell in general population. Because the facility was in the midst of a series of extended institution-wide lockdowns, Doe Jr. remained isolated in his cell. At times, like other prisoners during the lockdown, he did not receive his medication.

50.     On January 10, 2012, when Doe Jr. had been at EMCF for more than four months, much of that time in isolation, he was housed in a cell behind a door with a broken lock mechanism. Five or six older prisoners entered his cell and beat him. He was then moved to a solitary confinement unit, where two days later he threatened to hang himself because he could not endure solitary confinement and was not permitted to contact his parents. Doe Jr. asked to see a "psych Dr." but did not see one until the following day, when a psychologist dismissed his suicidal gesture as "manipulating to be moved."

51.     The following week, Doe Jr. told a nurse that he was having suicidal thoughts. Although there was a mental health provider on site that day, he was not seen until the next day when a provider described Doe Jr. has having "oppositional deviance [sic] about being in Administrative Segregation."

52.     The next day, staff found Doe Jr. with a bed sheet tied around his neck. He told staff that he did not belong in administrative segregation and that he wanted to be around people he knew. He was told that no beds were available and that he would remain at EMCF until "he can show MDOC that he is trying to get better so that he can be moved to Walnut Grove."

53.     Doe Jr. remained at EMCF in administrative segregation for another 12 days before Defendants transferred him to Walnut Grove.

54.     Upon information and belief, Defendants have periodically housed other juveniles at EMCF.

**Timothy Hogan**

55.     Timothy Hogan has spent eight out of the past 12 years in solitary confinement. Except for short interludes, until recently, he had been in solitary confinement for the past two years. About the conditions in solitary confinement, he says, "You're going to die over there."

56.     Mr. Hogan suffers from serious mental illness. He hears voices that tell him bad things and curse at him. He feels physically paralyzed when he has visual hallucinations, which include deceased family members and scenes from his past.

57.     Mr. Hogan's hallucinations become worse whenever he is placed in solitary confinement.

58.     Mr. Hogan is hungry much of the time because food portions are too small. He has untreated dental pain, which makes it difficult for him to eat. He has submitted multiple requests for dental care but remains without proper treatment.

**V'nell Miskell**

59.     V'nell Miskell has an established history of serious mental illness including needed to take antipsychotic medications. Despite his illness, Mr. Miskell was housed in long-term solitary confinement for much of the past three years. At times, he has gone for two months without receiving out-of-cell recreation time.

60.     The light in his former cell was on 24 hours per day. His current cell has no working light and so he lives in near darkness during the day and total darkness at night.

61.     The unit is dangerously understaffed.  He has been left wet and naked in the shower for hours at a time because no officers were available to escort him back to his cell.

**Rotheleo Dixon**

62.     Rotheleo Dixon has symptoms of serious mental illness.  His cell wall and toilet leaked and formed a puddle that bred worms and bugs.  He has not received any supplies to clean his cell since October 2012.  He reports that most of the time there is no staff on his unit, especially between 6pm and 7am.  When problems arise, prisoners set fires to try to get the officers' attention.  However, frequently, staff will ignore the fires; fires sometimes burn for 20 minutes before being extinguished.  The resulting smoke makes it hard to breathe and security officers refuse to ventilate the unit.  There is no programming available to him and he has nothing to do except sit idly in his cell.

**Derrick Hayes**

63.     Plaintiff Derrick Hayes has a documented history of serious mental illness.  He has been locked in long-term solitary confinement at various MDOC facilities for approximately eight years.  There is no mirror in his cell and the light in his cell has not worked for over seven months.  During the day, there is barely enough light to read.  At night, his cell is pitch black. He related that "I haven't seen my face in months" and the darkness makes him "miserable."

**Michael Williams**

64.     Michael Williams has been in solitary confinement for approximately three months and has a history of needing psychotropic medications to treat his symptoms.  He has a seizure disorder and suffers periodic petit mal seizures.  Other than one hour of recreation two times per week and showers, he is locked in his cell all day. He does not have regular access to the shower and at times he must bathe in his toilet to keep clean.  He does not have access to

books. He reports that he does not do well isolated with nothing to do and experiences significant stress. He barely ever sees the sun; out-of-cell "yard time" is rare and the mesh roof over the yard enclosure blocks out most of the sun. Sometimes at night he breaks down and cries.

65. Mr. Williams lived for a month in a dark cell without a working light, with only bare live wires hanging from the ceiling. Once, his cell flooded with toilet water for two weeks before it was fixed.

66. Mr. Williams was formerly housed in general population. On his last day in general population, he was severely beaten by two other prisoners. No officers were on the zone to intervene and his attackers told him that he would be beaten even worse if he did not assist them with illegal acts. Because EMCF does not offer protective custody, staff locked him in solitary confinement.

67. Later, staff ordered Mr. Williams to return to a housing unit where he would be in grave danger. He has been threatened repeatedly and his enemies have his mother's address. Mr. Williams refused to be transferred to the new unit and received a Rule Violation Report (RVR). He remains in solitary confinement.

**Van "Peyton" Kendrick**

68. Peyton Kendrick has been in solitary confinement for much of the past two years. He has spent a total of five years in solitary confinement throughout his 15 years in MDOC custody. He receives time in the outside enclosures only rarely, approximately three times per month. He rarely has anything to read; access to books is limited. Mr. Kendrick believes that, should he be released from solitary, his future will be bleak: "If I don't have [mental health] problems when I come [in], I will when I get out."

**The Death of Richard Roe[6]**

69.     Richard Roe had an established history of serious mental illness, self-injurious behavior, and seizure disorder.   He also suffered from bowel incontinence and neurogenic bladder and, as a result, had to catheterize himself and wear adult diapers.   In order to maintain his personal hygiene, he needed daily showers.   Mr. Roe was locked down in solitary confinement and officers refused his requests to shower.   When Mr. Roe complained or flooded his cell in protest, officers sprayed him with Mace.   Officers would taunt him, as is reflected in a sick call request he submitted on June 7, 2010, in which he wrote:

> I need to see Dr. --- bad[.]   Officer --- said I was sick and needed to go ahead and kill myself.[7]

He received a written response stating:

> You are scheduled.   You may talk with your mental health counselor and he/she will refer you sooner if needed.

70.     On July 29, 2010, Mr. Roe told mental health staff that he experienced depression, mood swings, and suicidal ideation and the psychologist noted signs of abnormal mental status.   The psychologist's treatment plan consisted of only three words: "Encourage behavioral compliance."

71.     Later that day, according to other prisoners in his zone, an officer asked Mr. Roe to provide a urine specimen which, because of his bladder condition, Mr. Roe could not provide. Mr. Roe began banging on his door, smeared blood on the cell door window, threatened to commit suicide, and tied a rope around his neck.   Officers sprayed excessive amounts of Mace in his cell.   According to witnesses, officers waited approximately 20 minutes before pulling Mr.

---

[6] A pseudonym.

[7] Names of the doctor and officer have been omitted.

Roe out of his cell. By that time, he was non-responsive and cyanotic. He was taken, his hands and feet bound by zip-ties, to the hospital where he was pronounced dead.

72.     For several days after Mr. Roe's death, medical staff continued to "document" in the daily segregation log that Mr. Roe appeared to be "in good health and mood."

**The Death of Victor Voe[8]**

73.     On February 11, 2011, Victor Voe told mental health staff:

They gone kill me I seen it… Please don't let them kill me… please don't… what you going to tell my family?... Everybody's going to do it now… Don't let them kill me… I be hearing them say they going kill me. I am hearing voices that others don't hear…

74.     Eight days later, a visiting church group found Mr. Voe hanging in his cell in a solitary confinement unit. Upon information and belief, the night before his death, Mr. Voe was reading the Bible out loud, repeating that he did not feel safe, and explaining how the steel door of his cell affected him.

## MENTAL HEALTH CARE

75.     EMCF is intended to be the state's psychiatric prison that provides intensive mental health care to the state's most seriously mentally ill prisoners.

76.     In reality, MDOC uses EMCF as a warehouse for its mentally ill prisoners. In 2007, following the *Presley v. Epps* litigation challenging conditions at the Mississippi State Penitentiary's (Parchman) Unit 32, Defendant Epps and the *Presley* class entered into a Supplemental Consent Decree that prohibited the housing of seriously mentally ill prisoners in long-term solitary confinement in Unit 32 for more than 14 days. The Supplemental Consent Decree also required that prisoners in Unit 32 who needed an inpatient level of care were to be housed at EMCF or another facility "where they can receive the full range of appropriate

---

[8] A pseudonym.

treatment programs and the level of care consistent with their individualized treatment plans."[9]

Defendant Epps described EMCF as "the only correctional facility that I've found in the country that handles nothing but special needs mentally ill" and that the quality of the facility was "number one." Mentally ill prisoners were to receive treatment and be housed in general population rather than lockdown.[10]

**Extreme Isolation, Idleness, and Lack of Access to Basic Mental Health Care**

77.     Following the entry of the *Presley* Supplemental Consent Decree, MDOC transferred dozens of seriously mentally ill prisoners from Unit 32 to EMCF where, in a 2011 report submitted to Defendants, mental health expert Dr. Terry Kupers found large numbers of seriously mentally ill transferees housed in "extreme isolation" behind solid metal doors that ensured sensory deprivation.   He concluded that mental health care at EMCF was "entirely inadequate."[11]

78.     Dr. Kupers reported that the atmosphere in solitary confinement was chaotic, with the unit filled with the din of screaming and prisoners banging on cell doors requesting assistance from staff.

---

[9] Supplemental Consent Decree on Mental Health Care, Use of Force and Classification, Presley v. Epps, No. 05-cv-00148-JAD, Doc. No. 88-2 (N.D. Miss. Nov. 13, 2007).

[10] Dep. Tr. of Christopher Epps at 49:2-18, Mar. 22, 2007, Presley v. Epps, No. 4:05-CV-00148 (N.D. Miss.).

[11] In 2009, as part of an order dismissing the Presley v. Epps litigation pursuant to the Prison Litigation Reform Act, Plaintiffs' Counsel was permitted to visit and monitor conditions in the various prisons to which members of the Unit 32 class had been transferred.   In October 2010, the ACLU conducted a multi-day site visit at EMCF to meet with prisoners, review health care charts, and assess compliance with the remedial provisions set forth in the Order of Dismissal.  In January 2011, the ACLU conducted another site visit accompanied by nationally-recognized experts in correctional health care, psychiatrist Dr. Terry Kupers, MD, MSP and nurse practitioner Madeleine LaMarre, MN, FNP-BC.

79. Dr. Kupers described Unit 3, which is intended to provide the highest level of psychiatric care available in the MDOC system:

> …[T]here is almost no mental health treatment going on, and the men are mostly idle . . . It is depressing to walk into the dayrooms on the pods and see inactive men, many with the kind of blank stares that result from over-medication with tranquilizing anti-psychotic medications such as Haldol.

Few prisoners assigned to Unit 3 were receiving group or individual therapy, and those who did received only a few sessions.[12]

80. The stress of locking up seriously mentally ill prisoners in a chaotic, isolated environment where their basic human needs were often ignored created a dynamic that exacerbated their symptoms, as prisoners desperately attempted to attract staff attention by kicking the doors, flooding their cells, or setting fires.

81. Prisoners with mental health needs were reluctant to seek help from the psychiatrist, who provoked them during their encounters, wrote disciplinary reports against them for raising their voices or cursing, and accused them of lying about taking their medications.

82. Defendants delegated the task of responding to this damning report to MDOC's private contractor at the time, The GEO Group, Inc. (GEO), which never remedied the egregious conditions documented in the report.

**From Bad to Worse to Deadly**

83. Beginning in the fall of 2011 and continuing for nearly a year, Defendants instituted a series of unit-wide and institution-wide lockdowns, each lasting weeks or months. During these lockdowns, prisoners remained in their cells for 24 hours a day with little access to showers or health care services. Defendants instituted these lockdowns without regard for their

---

[12] Expert Report of Dr. Terry Kupers, MD, MSP on the East Mississippi Correctional Facility, Presley v. Epps, No. 4:05-cv-00148-DAS (N.D. Miss.), Nov. 8, 2011 (Doc. No. 151-7), at 6.

adverse effect on seriously mentally ill prisoners. The consequences were an epidemic of self-mutilation, routine suicide attempts, psychological decompensation, and several completed suicides.

84.    On October 14, 2011, staff found prisoner D.C.[13] dead, hanging from a braided bed sheet in his solitary confinement cell. Prisoners reported that, the night before his suicide, D.C. told staff that he was suicidal. He had given possessions away to other prisoners and told an officer that he feared for his life, adding that he would get out of the housing unit any way he could. On the day he died, D.C. submitted a sick call request stating "I'm depressed and I am going to kill myself I can't handle this anymore." Staff did not discover this request until three days later. An investigation concluded that on the day of D.C.'s death, officers had not been conducting counts and security checks as frequently as they should.

85.    Two weeks later, on October 31, 2011, staff found prisoner B.W.[14] hanging from a braided bed sheet tied to a sprinkler head. B.W.'s Bible had a written note: "Read me." Inside, he had circled verses from Psalm 28 and wrote "Fam, Got to go. Can't given em 8 more of my years. Happy Hollween! This is the best day of the year."

86.    Another suicide occurred on New Year's Day 2012. Prisoner T.H.[15] suffered from a serious mental illness. According to a nurse, he had been the victim of multiple rapes while at EMCF. In December 2011, T.H. was housed in Unit 3 which is supposed to provide the highest level of care to MDOC's most acute mental health patients. Although T.H. was actively suicidal, a mental health provider cleared T.H.'s placement in solitary confinement after he was

---

[13] A pseudonym.

[14] A pseudonym.

[15] A pseudonym.

caught climbing the fence of a recreation cage. According to one witness, T.H. threatened to kill himself if moved to solitary.

87. On January 1, 2012, T.H. hanged himself in his cell in solitary confinement. Security videos contradict the written log books and show that officers were absent for most of the morning. A resulting incident report describes the events following the discovery of his body:

> Upon my arrival to housing unit six I was informed by Officer J--[16] that an inmate on two row housing, unit six D-pod had hung himself. He also informed me that the officer assigned to six-D-pod had not been making their security checks. I entered housing unit six D-pod and checked the log book. The last noted security check was 0747 and it was now approximately 1105am. I left the pod and entered the area leading to six building housing control as I entered the door at the top of the stairs Sgt. H-- was seated at the left side eating what appeared to be a breakfast meal...

88. Security videos also show staff response to the discovery of his body to be casual; one officer can be seen fanning herself with her papers for several minutes, ostensibly waiting for additional officers to arrive.

**Defendants Cut Access to Psychiatric Care for Seriously Mentally Ill Prisoners**

89. In April 2012, after GEO announced that it would cease operations at EMCF, MDOC selected another for-profit private contractor, Health Assurance LLC, to replace GEO in providing mental health and psychiatric services. On March 26, 2012, a federal judge severely chastised both MDOC and Health Assurance, which was already providing health services at Walnut Grove, for being deliberately indifferent to the needs of children and youth incarcerated there. The Court found that Health Assurance's failure to provide adequate care to the youth at Walnut Grove contributed to "a picture of such horror as should be unrealized anywhere in the civilized world" and that MDOC had been "derelict in their duties and remain deliberately

---

[16] Officer names abbreviated.

indifferent to the serious medical and mental health needs of the offenders."[17]  However, only a few weeks after the Court's sharp criticism, MDOC awarded Health Assurance the contract to provide medical and mental health care services to prisoners at EMCF.

90.     The contract signed by Defendant Epps with Health Assurance dramatically reduced the amount of psychiatric care available to patients.  GEO had provided one full-time psychiatrist to treat the entire EMCF population: A level that  Dr. Kupers had warned Defendants was inadequate.  Yet, in the new contract with Health Assurance, Defendants reduced psychiatric staffing to require that a psychiatrist be on-site only twice a week.  Not surprisingly, one prisoner was told by staff that there is an "outrageous" list of prisoners waiting to see the psychiatrist.

91.     Upon information and belief, Health Assurance has no prior experience operating a psychiatric prison or providing an inpatient level of care to seriously mentally ill prisoners. Defendants were aware of this deficiency in experience when they selected Health Assurance as the health services contractor for EMCF.

92.     Furthermore, the new contract with Health Assurance requires MDOC to exclude prisoners designated as Levels of Care "D" and E"—that is, the most acutely mentally ill prisoners in the state—from being housed at EMCF; the contract further requires Defendants to immediately remove such prisoners from EMCF.   These provisions allow for no consideration of prisoners' health, safety, or continuity of care and appear in the contract following a recital of Health Assurance's responsibility to pay for psychiatric medications for EMCF prisoners.

93.     Thus, Defendant Epps knowingly entered into an agreement with a new for-profit medical contractor that excluded the neediest, most seriously mentally ill prisoners from the facility designed specifically for their care.  Nevertheless, Defendants continue to house many

[17] Order Approving Settlement, DePriest v. Walnut Grove Corr. Auth., No. 3:10-cv-00663-CWR-FKB (S.D. Miss.), Ma. 28, 2012 (Doc. No. 75).

seriously mentally ill prisoners at EMCF. Upon information and belief, Defendants' current practice is to transfer seriously mentally ill prisoners back and forth between EMCF and other MDOC prisons, even though there is no prison in Mississippi that currently provides constitutionally adequate mental health care.

94.    Upon information and belief, medication management at EMCF is often provided by a psychologist who lacks a license to practice psychiatry and prescribe medications. The psychologist meets with the patient, reviews his medications, asks a few questions, and makes recommendations for changes to the patient's regimen. Upon information and belief, a licensed physician—who may never have met the patient for the purpose of providing mental health care— prescribes medications based on the psychologist's recommendations.

95.    There are few opportunities for one-on-one therapy. Mental health counselors of unknown credentials come onto housing units, announce their presence, ask if prisoners are OK, and then move on. Prisoners who ask for help may or may not receive follow-up care. In solitary confinement units, these encounters occur through solid-front doors.[18] Upon information and belief, some of the mental health counselors were promoted from being correctional staff. When visits do occur, interactions with mental health staff are not confidential. Correctional officers are present, chilling communication between patient and clinician.

96.    There are few opportunities for group therapy or activities. Prisoners in solitary confinement units are categorically denied access to group therapy or activities, although very few prisoners in the general population have access to these services either. Instead, prisoners in

---

[18] Communication through the solid-front metal doors is difficult; the ambient noise on the zones makes communication even more difficult. The only means of speaking with prisoners is through the tray slot toward the bottom of the door or through the narrow space between the edge of the door and the door jamb. Neither is conducive to mental health counseling or therapeutic alliance.

solitary confinement occasionally receive workbooks to complete in isolation and a video to watch without interaction with a live instructor or other prisoners.

97. Prisoners deemed to be suicidal are stripped naked, given a "suicide smock," and locked alone in dirty observation cells. These prisoners, who should be receiving intensive psychiatric crisis intervention, are generally ignored and receive only cursory care. Because there is usually no psychiatrist on site, no psychiatric care can be provided.

98. Plaintiff Eric Ward was placed on suicide watch after cutting open his arm to avoid being transferred to a unit where his life would be in danger. However, there was nothing therapeutic about suicide watch. Mr. Ward was locked behind a solid-front door without a working light. He was not monitored regularly and received no mental health treatment. A week later, he was finally seen by mental health. The encounter lasted approximately 15 minutes.

**Steven Pierce**

99. Steven Pierce has been a psychiatric patient for most of his life. He has been hospitalized many times. He experiences auditory and visual hallucinations. Sometimes colors speak to him; other times he sees holographic images that remind him of the past. He hears voices every day and most of the time stays in his cell and tries to avoid contact with others due to their spirits.

100. Despite his history and symptoms, Mr. Pierce receives minimal treatment. He reports that asking to see the psychiatrist is futile; the last time he submitted a request, it took three months. Occasionally, he has the opportunity to speak for a few minutes with a psychologist or a "mental health counselor" of uncertain credentials but no meaningful one-on-one therapy is available. He reports that his medications are stopped, started, and changed without his speaking to a psychiatrist first.

101.    Mr. Pierce has a history of attempting to electrocute himself.  In September 2012, while in Unit 3 Mr. Pierce stood at the top of the stairs asking for help.  Mr. Pierce suffers from agoraphobic symptoms and the other prisoners were causing him stress.  He was given a "no-harm contract" to sign but, officers refused to come to his aid.    Mr. Pierce pulled two wires out of a light socket and grabbed the bare ends, feeling the electricity that he says takes him to a "heavenly place."

102.    Officers responded by spraying him with Mace.  While officers held him down he was given a forced injection of medication and was then stripped naked, allowed to shower, and thrown into an observation cell where he believes he remained for more than two weeks.  He was allowed to shower only twice during this period and recalls seeing counselors, but saw a psychiatrist only once.

103.    Mr. Pierce has seen others attempt to hang themselves, cut themselves, and jump over railings.

**Anthony Evans**

104.    Before being transferred to EMCF, Plaintiff Anthony Evans was housed in general population at Parchman, where he was beaten by staff with a broom handle on multiple occasions due to his being "slow."  He was frequently placed on suicide precautions.

105.    In 2011, Defendants transferred Mr. Evans to EMCF.  Despite his serious mental illness and vulnerability, Defendants placed Mr. Evans in long-term solitary confinement, where he remained for approximately a year.  Because this period overlapped with several of the extended institution-wide lockdowns, Mr. Evans remained locked alone behind a solid-front door for days or weeks at a time without leaving his cell.

106. Mr. Evans experiences troubling auditory and visual hallucinations. He sees smoke, flying objects, and formless beings that eventually take on a human form. He has conversations with these beings, sometimes disagreeing with them when they tell him not to do things. At times, he sees deceased family members and talks with them. Often he experiences paranoia and lives in fear.

107. Mr. Evans receives only minimal mental health care. He reports that visits with the psychiatrist are infrequent and last only a minute or so. During a recent mental health encounter, Mr. Evans wanted to discuss his symptoms. The clinician told him that his medications would be reordered and then sent him away without allowing him to discuss his problems.

108. Mr. Evans reports that the mental health counselors provide little help. He has asked for one-on-one counseling on two or three occasions but those requests never resulted in his receiving treatment. At times, he says, the counselors laugh at patients and tell them that there is nothing wrong with them.

**Joseph Osborne**

109. Plaintiff Joseph Osborne suffers from a history of bipolar disorder and depression. He also suffers from anxiety attacks during which he has difficulty breathing, breaks into sweats, and has heart palpitations. He reports that, prior to March 2013, he had not seen a psychiatrist in nearly two years even though he was taking psychotropic medications throughout that period. The psychiatrist told him that staff had been renewing his medication orders without seeing him in person to determine the appropriateness of the prescriptions. Mental health counselors, some of whom he believes are former correctional officers, visit the unit every week but provide little care. Counselors knock on the small window of his cell door, yell "mental health," and then

walk on to the next cell. At one point, after not being able to see a psychiatrist to discuss his symptoms, Mr. Osborne spoke with a counselor in her office. He recalls that it was "like talking to a wall. They just chuck you off." Mr. Osborne continues to suffer from anxiety attacks.

**Dexter Campbell**

110.    Plaintiff Campbell is a veteran of the United States Air Force and has carried multiple Axis-I diagnoses over the years, including post-traumatic stress disorder as a result of events that he witnessed while in the military. In the community, he received mental health care on a regular basis at the Veteran's Administration (VA) hospital in Tuscaloosa, AL. Prior to his arrest, he was scheduled to enter a VA residential mental health treatment facility. Since his arrival at EMCF, he has received only cursory care with little, if any, opportunity for therapy with an appropriately credentialed clinician.

**Tracey Brewer**

111.    Tracey Brewer has an established history of serious mental illness, including diagnoses of paranoid schizophrenia and bipolar disorder. Despite his serious mental health needs, Mr. Brewer receives minimal care. Following the death of his mother, Mr. Brewer felt suicidal. However, knowing that prisoners in psychiatric observation are subjected to degrading and punitive conditions, Mr. Brewer did not report his feelings to mental health staff. Instead, he disclosed his suicidal impulses to a prison chaplain, who warned him that if he committed suicide he would not go to heaven and would be unable to see his mother.

112.    In early December 2012, after months of not receiving meaningful care from a *psychiatrist*, [19] Mr. Brewer was brought to see a *psychologist*. The psychologist told Mr. Brewer

---

[19] Psychiatrists are licensed physicians authorized to prescribe medications.

29

that he would start receiving two new psychotropic medications. Mr. Brewer did not see a medical doctor or psychiatrist before receiving these new medications.

## MEDICAL CARE

**Dangerously Inadequate Medical Care: A Deliberate Choice to Ignore Warnings**

113.    Medical care at EMCF is provided by a for-profit contractor and has long been so grossly substandard as to put prisoners at grave risk of loss of limbs and of death. Defendants fail to take responsibility for providing adequate medical care to the prisoners in their custody, for overseeing the care provided by the private contractors, or for holding those contractors accountable.

114.    Correctional health expert Madeleine LaMarre visited EMCF in January 2011 to evaluate medical care pursuant to the Order of Dismissal in *Presley v. Epps*. At the time, medical care was provided by GEO. In nearly every aspect of care assessed, she found gross deficiencies. Ms. LaMarre found care by the on-site physician to be so poor that she recommended that he be "immediately removed from the facility and replaced…"

115.    Ms. LaMarre also found inadequate levels of staffing as well as major deficiencies in medical record-keeping.[20]

116.    In her report she wrote: "I found that at each step of the process, access to care services was not timely or adequate." For example, she observed:

> In a review of 33 health care requests in ten health records, we found that the average length of time for a nurse to see a patient once the HSR was received was 7.5 days. In 10 (30%) of 33 HSRs reviewed a nurse did not see the patient at all.

---

[20] Over the past year, Plaintiffs' Counsel has requested copies of their clients' medical records. To the extent that MDOC has produced records in response, the records are often incomplete.

117. Ms. LaMarre's report was submitted directly to Defendants. Defendants did not respond to the deficiencies she identified or to her detailed recommendations. Instead, Defendants had GEO respond.

**Patients at EMCF Lack Access to Necessary Medical Care**

118. The problems identified by Ms. LaMarre in 2011 persist at EMCF despite the transition to a new for-profit vendor, Health Assurance, in 2012.

119. As was documented in Ms. LaMarre's report, patients still submit request after request for health care services without receiving any response or being seen. As of May 2013, staff were telling prisoners in Unit 6 that they could not submit sick call requests because no forms were available. The facility remains understaffed and most patients are seen by nurses, regardless of the seriousness of their condition. Medical records show that patients with serious health needs go for long periods of time without seeing a doctor.

120. Further hindering access to care is MDOC's "co-payment" policy. MDOC charges patients $6.00 for each request they submit for medical, dental, or mental health care. Prisoners report that this fee is charged at the time that the request is submitted, regardless of whether they ever get to see a clinician. If a prisoner must submit three requests before being seen for a serious medical problem, he will be charged $18.00. This policy deters prisoners from seeking care, including mental health care, and places them at a substantial risk of serious harm.

**Lack of Access to Critical Medications**

121. During the lockdowns of 2012, patients went for days or longer without receiving critical medications. Patients reported that, at times, nurses would roll their pills under their cell doors for them to take. Upon information and belief, when GEO ceased operations at EMCF, the company removed its entire stock of medications from the facility. Defendants made no

arrangements to assure medication continuity during the transition. Even during the recent multi-week lockdown in April 2013, staff told prisoners in Unit 6 that they would not receive their evening medications on a particular day due to the lockdown.

122. On July 19, 2012, Plaintiff John Barrett, age 58, submitted a request to health services stating that he had not received his blood pressure or pain medications in three days. He received a response that he should send another request if he had not received his medications by July 31 – 12 days later. Ultimately, Mr. Barrett went without his medications for approximately four weeks.

123. Contrary to accepted nursing practice, nurses do not contemporaneously document medication administration on Medication Administration Records (MARs). As a result, there is no reliable means of determining whether a patient is adhering to his medication regimen, or whether he is receiving his medications at all. It also allows health care staff to deny prisoners' claims that they are not receiving their medications. At times, nurses refuse to administer medications in some of the solitary confinement zones when they are in a state of disarray.

124. Staff at EMCF do not adequately treat severe pain. James Kendrick requires regular dressing changes for a large, bloody open wound several square inches in size. The nurse often rips the dry bandage off his wound, causing him excruciating pain. He receives no meaningful pain relief. Prisoners with chronic pain are referred to a "pain doctor" who may or may not see them timely. When Plaintiff Barrett asked for pain relief for his arthritis and abdominal hernia, he received a written response from the facility physician *a month later* stating

"your problems are all chronic. Please follow up with Dr. -- on the next visit. I no longer manage pain."[21] As of three months later, Mr. Barrett had yet to see the "pain doctor."

**Failure to Care for Serious Medical Needs: Oral and Eye Care**

125.   In her 2011 report, Ms. LaMarre concluded "...that inmates do not have timely access to dental care." Her finding remains true. Patients with severe dental pain suffer long waits before seeing a dentist. When they are seen, because there is no hygienist present, prisoners must hold dental instruments for the dentist during procedures.

126.   One prisoner was told that "[a]t this time our company does not provide dentures." Such a categorical denial of a particular treatment places prisoners at risk for malnutrition.

127.   Prisoners do not receive proper eye care. When one prisoner reported that his vision was very bad and that he needed to be seen, he was told that he had been "placed on the list to see the eye Dr." but that the list was "lengthy." When he was ultimately seen, the patient reported that the eye doctor diagnosed him with a cataract and that corrective surgery was needed. However, his surgery was denied. The following month, he submitted a request to Defendant Perry, stating: "I have had someone else write this request because I have cataracts so bad I can't see well enough to write it."

**James Vann**

128.   Plaintiff James Vann is 49 years old and suffers from diabetes. He requires insulin and other medications to control his blood sugar level.

129.   Many of the complications of diabetes are life-threatening or can result in permanent disability. Proper glycemic control (control of one's blood sugar level) and routine

---

[21] Name of physician removed.

screening and prevention are key factors in avoiding these complications. At EMCF, Mr. Vann's efforts to maintain his health are routinely thwarted.

130. Glycemic control requires the proper coordination between (1) the administration of insulin and (2) a diet designed to meet the special needs of diabetics. Mr. Vann gets neither. Sometimes, his medications run out. As noted above, because nurses do not follow accepted nursing practices when documenting medication administration, it is difficult for prisoners to convince health care staff that they are *not* receiving their medications as ordered. The diet provided to Mr. Vann, although purportedly tailored to meet the needs of diabetics, is full of starches and sugars. He reports that, if he were to eat all of the food given to him at any given meal, his blood sugar would rise to two or three times the normal level.

131. Diabetic patients are at risk for diabetic retinopathy, an eye condition that can result in permanent blindness. A few years ago, Mr. Vann had surgery to prevent the blood vessels in his eye from bursting, a phenomenon consistent with diabetic retinopathy. However, while at EMCF, Mr. Vann does not have periodic dilated retinal examinations, considered to be the standard of care, to determine the need for additional treatment. This is particularly troubling as Mr. Vann reports blurry vision when reading in low light as well as dark and light spots in his field of vision. He reports that his right eye, which was the site of his previous surgery, is worse than the other. He has not been referred to an eye specialist and is at risk for irreversible blindness.

132. Mr. Vann reports intermittent shooting and stabbing pains in his toes and numbness in his legs. In diabetics such symptoms may be signs of neuropathy, or nerve damage, placing him at risk for infections that can result in a need for amputation. Properly fitting shoes

are critical to the prevention of such infections. Mr. Vann's shoes do not fit his feet. He has repeatedly asked for new shoes over the past two years but has not received them.

**Christopher Lindsey**

133.     Plaintiff Christopher Lindsey is 27 years old and confined at EMCF. He has a history of serious mental illness. Mr. Lindsey was diagnosed with glaucoma when he was nine years old. At one point, he had eye surgery to relieve some of the pressure in his eyes. Since then, he has had to use multiple eye drops each day and see a glaucoma specialist every six months in order to keep from going blind.

134.     When Mr. Lindsey came to EMCF in 2009, his vision was good.

135.     During the summer of 2011, his vision began to deteriorate. He began to lose his peripheral vision and color perception and his field of vision began to darken. He was not taken to see the glaucoma specialist despite submitting multiple sick call requests.

136.     That fall, Defendants began instituting a series of institution-wide lockdowns that lasted for weeks or longer. During this period, Mr. Lindsey stopped receiving the eye drops he needed to keep from going blind. Staff told him that, due to the lockdowns, he would not be taken offsite for his regular six-month visits with the glaucoma specialist.

137.     Glaucoma can cause intense pain and, during the summer of 2011, Mr. Lindsey would cry in his cell – from the pain and from the anguish caused by knowing that he was going blind.

138.     Because, upon information and belief, MDOC made no provision for medication continuity during the transition from GEO to Health Assurance, prisoners, including Mr. Lindsey, went without critical medications for weeks or more. From July 2012 to November

2012, he received no eye drops whatsoever. In late 2012, Mr. Lindsey began receiving his eye drops again, but only on an intermittent basis.

139.     In February 2012, he was taken to an eye doctor who told him that he needed to see a glaucoma specialist. He was not taken to one. In November 2012, he was taken to an eye doctor who, once again, told him that he needed to see a glaucoma specialist.

140.     Mr. Lindsey was not taken to a specialist and his vision continued to worsen. In February 2013, Mr. Lindsey informed medical staff three weeks in advance that he was running out of eye drops. On February 25, 2013, he was told that more drops were being ordered. As of March 12, 2013, he had run out of drops. As of mid-May 2013, he was receiving only one of the multiple eye drops prescribed for him.

141.     Mr. Lindsey is now legally blind in both eyes. He can perceive a little light but no images.

142.     As a result of his disability, Mr. Lindsey became a target. In July 2012, he was robbed. This happened again in January 2013, and in April 2013 his radio – one of the few amenities he can still enjoy – was stolen.

143.     It is difficult for Mr. Lindsey to navigate the prison or perform daily activities on his own. At one point, he was assigned an inmate caretaker to assist him. This privilege was recently withdrawn when Defendants reclassified Mr. Lindsey to close custody.

**Benjamin McAbee**

144.     Plaintiff Benjamin McAbee has serious medical needs including HIV and hypertension. He has spent much of his time at EMCF in solitary confinement.

145.     Patients with HIV require periodic blood work to monitor their CD4 cell counts and viral loads. When health staff draws his blood, he is usually not informed of the results.

Consequently, Mr. McAbee is often not aware of how close he is to developing full-blown AIDS.

146. When he finally did see an outside specialist, he was prescribed antiretroviral medications, including Norvir and Prezista. After starting on these medications, Mr. McAbee developed a painful, boil-like rash on his body. He submitted three or four requests to medical seeking help but received no response. Finally, Mr. McAbee decided to stop taking the medications and told the medication nurse his reasons. He has received no medical follow-up to address his refusals. This falls well below the standard of care.

147. In August 2012, Mr. McAbee reported that he received his blood pressure medication only once per week. The left side of his body would go numb and he developed headaches, dizziness, and double vision, all of which are symptoms of dangerously high blood pressure.

148. By September 2012, he would pass out once or twice a month. For example, on or about September 7, Mr. McAbee lost consciousness due to hypertension after developing chest pain, sweating, and headaches. A nurse came to check on him but walked away without taking his blood pressure, despite Mr. McAbee's heightened risk for stroke or heart attack. During lockdowns, Mr. McAbee was not allowed out of his cell to go to medical to receive necessary care.

**Brian Neihaus**

149. Brian Neihaus is 24 years old. He had no serious health problems prior to coming to EMCF. In early June 2012, when EMCF was in the midst of a months-long period of multiple lockdowns, Mr. Neihaus developed excruciating pain in his scrotum. His right testicle swelled up to the size of a softball.

150.    Over the next several weeks, Mr. Neihaus submitted multiple sick call requests but received no response.  He personally asked officers, case managers, and unit managers to get him medical help, but he received none.  When the swelling subsided, Mr. Neihaus noticed a hard knot on his right testicle about the size of a marble.  On July 2, MDOC representatives were on site at EMCF to tour the facility.  Mr. Neihaus asked them for help, but he received none.  By this time, the pain had become so intense that he could barely get out of bed.

151.    Finally, in an attempt to get medical attention, Mr. Neihaus refused an order to return to his cell after recreation, risking being sprayed with Mace for his disobedience.  However, Mr. Neihaus's strategy worked and he finally saw a physician on July 13, six weeks after his problem first arose.

152.    The doctor ordered pain medication, a urine test, and an ultrasound.  Mr. Neihaus never received the pain medication.  After GEO ceased operations at EMCF, Health Assurance staff told Mr. Neihaus that they would not honor the GEO doctor's order for the ultrasound.  Mr. Neihaus filed a grievance but, ultimately, had to once again refuse to return to his cell and risk being Maced before getting medical attention.  The new Health Assurance physician told him that he did not need an ultrasound and that he would be treated with antibiotics.

153.    Mr. Neihaus did not receive his first dose of antibiotics until two weeks later.  His condition did not improve.  His mother called the prison asking for help for her son on three consecutive days and, on the third day, the Health Assurance doctor finally agreed to order an ultrasound and a urology consult.  He told Mr. Neihaus that it might be six months before the test would be performed and added, "This is a prison, what do you expect?"

154.    On September 24, Mr. Neihaus finally received an ultrasound.  By this time, the knot on his testicle had grown larger.  The ultrasound technician noticed an abnormality and was

so concerned that he called the prison to see if Mr. Neihaus could see a doctor right away. Prison officials refused.

155. Anxious and in pain, over the next three weeks, Mr. Neihaus repeatedly asked prison officials to show him the results. Nothing happened. On October 17, Mr. Neihaus saw the prison physician, who told him that the knot on his testicle appeared to be cancer. A urologist confirmed the diagnosis of testicular cancer. By now, the cancer had metastasized and spread into his abdomen.

156. On October 26, his testicle was surgically removed. Two weeks later, the Health Assurance doctor attempted to convince Mr. Neihaus to withdraw his grievance because all of his problems had been addressed.

157. On December 10, Mr. Neihaus received his first dose of chemotherapy. The prison failed to regularly provide him with the anti-nausea medication he needed to combat the side effects. On January 4, 2013, Mr. Neihaus was transferred to the South Mississippi Correctional Institution (SMCI). Fortunately, he recently completed chemotherapy.

**Earnest McWilliams**

158. Earnest McWilliams has an established history of serious mental illness, and has taken antipsychotic medications such as Prolixin. Despite his mental illness, he has been housed for extended periods of time in long-term solitary confinement.

159. On September 28, 2011, four prisoners attacked Mr. McWilliams, stabbing him repeatedly while in a recreation cage. His officer escorts abandoned him, leaving Mr. McWilliams, who was in full restraints, at the mercy of his assailants. When medical staff found him, he was non-responsive.

160. He sustained multiple stab wounds to his head, neck, back, and both hands. At the emergency room, a trauma surgeon was called in to repair and suture his hands. Additional sutures were required the following day.

161. For the next two months, Mr. McWilliams was isolated in a cell by himself. He was locked down for 24 hours per day without out-of-cell recreation. He was not given a mattress; he slept on the floor with only two blankets and a pillow. Medical records strongly suggest that his mental health suffered dramatically. Although housed near the medical unit, medical records show that Mr. McWilliams received only minimal care. His bandages were changed infrequently.

162. By mid-October, Mr. McWilliams' wounded fingers had deteriorated. In order to obtain medical care, he passed a note to a mental health staff member threatening to cut himself with a razor. Two days later, Mr. McWilliams was visited by a psychiatrist, who ordered another staff member to obtain a written statement from Mr. McWilliams admitting that he had manipulated the system for the purpose of receiving medical care. The written statement obtained from Mr. McWilliams included a plea for help: "All I need is help for my hands that nothing more." Mr. McWilliams continued to receive inaccurate care and reports having to threaten to set fires and flood his cell in order to get attention.

163. On November 30, a physician examined Mr. McWilliams for the first time in weeks. By this time, Mr. McWilliams' left middle finger had begun to turn black and smell. The physician suspected gangrene. A trip to the hospital confirmed that Mr. McWilliams would need part of his finger amputated.

164. A few days later, Mr. McWilliams was transferred to another facility where medical staff was horrified by his condition. The surgeon who performed the amputation told Mr. McWilliams that the amputation would have been unnecessary had he received proper care.

165. On two occasions, Mr. McWilliams reports being solicited and threatened by senior correctional staff to waive his legal rights, including the right to attorney-client privilege by divulging the contents of his conversations with Plaintiffs' Counsel.

166. Mr. McWilliams was transferred from EMCF to Parchman in February 2013. Shortly after his arrival at Parchman, he was severely beaten by staff.

**Pheliphae Coleman**

167. Pheliphae Coleman's health care records show a history of delusions, hallucinations, and suicidal ideation. He has set his clothes on fire on multiple occasions. His medical history also includes difficult-to-control hypertension. During 2011 and 2012, Mr. Coleman suffered from frequent hypertensive crises. For example, on November 28, 2011, while in solitary confinement, staff found Mr. Coleman on the floor, disoriented and next to vomit. His blood pressure was 197/109. He was given medication, placed in a medical holding cell for two hours, and then sent back to solitary. On January 15, 2012, his blood pressure reached 204/120. He was given medication which moderately reduced his blood pressure and once again returned to solitary. At times, these crises were accompanied by severe headaches, dizziness, and chest pain. Neither these symptoms nor his elevated blood pressures resulted in emergency care.

168. On February 23, 2012, Mr. Coleman stabbed himself in the abdomen; the facility physician described him as acting "psychotic." This time, Mr. Coleman was sent to the emergency room, where testing revealed cardiomegaly (enlarged heart) and multiple renal hilar

arterial aneurysms, or bulges of the artery that serves the kidneys. Renal artery aneurysms, if ruptured, are fatal. Trauma and elevated blood pressure can cause ruptures.

169.    Staff at the hospital told Mr. Coleman that he needed surgery and should be housed in a medical environment. The facility physician advised him to avoid stress. However, upon return to EMCF, Mr. Coleman was sent to solitary.

170.    The EMCF physician's treatment plan stated "refer to vascular surgeon as an emergency." An appointment was available for the following Monday but the appointment had "not been approved by GEO at this time."

171.    Mr. Coleman was later moved to a medical isolation cell and then back to solitary confinement. In both environments, he suffered from nearly complete social isolation. At no time was he transferred to a facility with an infirmary equipped to address his medical needs.

172.    A month passed and, on March 20, the physician reiterated that Mr. Coleman "needs surgery as soon as we can arrange it[,]" although an outside consultant apparently disagreed. Mr. Coleman continued to live in solitary confinement.

173.    Two months later, the facility physician wrote that removal of Mr. Coleman's kidney might address Mr. Coleman's medical problems and that surgery should be considered.

174.    On May 14, 2012, Plaintiffs' Counsel emailed Defendant Perry with concerns about Mr. Coleman's medical care and continued housing in solitary confinement, where he was regularly subjected to Mace and smoke from fires and lacked ready access to staff should an emergency arise. Only after this email was Mr. Coleman removed from solitary confinement.

175.    Although the facility physician had issued a standing order that staff should not use chemical agents on Mr. Coleman, officers sprayed him with Mace on two occasions, placing him at a fatal risk of rupture of his aneurysms.

**Willie Hughes**

176. Willie Hughes suffers from diabetes. As a diabetic, Mr. Hughes is at risk for infected, non-healing ulcers on his extremities. These wounds can lead to the need to amputate entire limbs, especially if proper care is not provided. In addition, improper podiatric care can result in infected foot ulcers, which create an additional risk for amputation.

177. In the summer of 2012, Mr. Hughes developed a laceration from leg irons that were too tight.

178. The following month, Mr. Hughes was evaluated for symptoms that led the EMCF physician to suspect a possible deep vein thrombosis, a potentially lethal blood clot in his leg. He sent Mr. Hughes out to be evaluated at the emergency room.

179. The day after the emergency room visit, the physician entered a note stating "[inmate] gave phony history to go to the ER and this is the second occasion. *[Inmate] will not be given serious consideration in the future with his complaints*." (emphasis added).

180. The laceration on Mr. Hughes' leg never healed properly. By the time that Plaintiffs' Counsel learned of his condition in early October 2012, Mr. Hughes had developed a large, foul-smelling infected ulcer that leaked pus. His treatment had been limited to Band-Aids and he had received no meaningful medical attention. The wound had never been assessed according to established wound assessment protocols. Mr. Hughes feared that the ulcer would worsen and he would require amputation.

181. Mr. Hughes continued to receive no treatment until Plaintiffs' Counsel intervened. The following day, the EMCF physician saw Mr. Hughes, documented only a cursory physical examination, concluded that Mr. Hughes needed to be referred to a wound care specialist "ASAP," ordered labs to be drawn, and prescribed the antibiotic Bactrim. Mr. Hughes was not

seen again by the doctor until several days later and had still not yet seen a wound care specialist. The doctor ordered another round of Bactrim even though one of the wound cultures indicated that the infection was resistant to that particular antibiotic.

**James Kendrick**

182. James Kendrick is held in long-term solitary confinement.

183. On Thursday March 21, 2013, he noticed a pimple on his arm. By the next day, the pimple had turned black and grown to the size of a nickel. He informed correctional officers but received no medical care. By the following day, the wound was the size of a silver dollar and had become raised, hot, and crusted, with rough edges. The part of the wound that turned black did not hurt. He asked for help again on the following day but was again denied by officers. This time, he set a fire in order to get staff to take him seriously. The tactic worked and he was taken to medical. The nurse practitioner who examined him told him that he should go to the hospital, but he was not sent. Instead, he was given an injection of antibiotics.

184. On the following day, Saturday, Mr. Kendrick returned to medical. Once again, the nurse practitioner wanted to send him to the hospital and contacted the on-call physician. Mr. Kendrick was not sent. Although Mr. Kendrick is allergic to the antibiotic Bactrim, he reports that the physician prescribed it anyway. Mr. Kendrick reports that he suffered an allergic reaction.

185. By Monday, the wound had worsened and he was finally sent to the emergency room. The emergency physician did her best to debride, or remove, the necrotic (dead) tissue but said that he would need additional surgery due to the depth of the wound. Mr. Kendrick reports that the surgeon at the hospital refused to treat him because the surgeon had a history of not being paid for the care of MDOC patients.

186. Mr. Kendrick saw the EMCF physician for the first time on Tuesday. The following day, a specialist in Jackson confirmed his need for surgery and wanted to admit him to the hospital but was denied.

187. On Thursday, Mr. Kendrick had not yet received his prescribed injection and dressing change and stuck his arm through his tray slot to show the officer his wound. Mr. Kendrick reports that the officer kicked his arm and told him that, if it were up to him, Mr. Kendrick "wouldn't have an arm."

188. On Friday, Mr. Kendrick underwent surgery under general anesthesia. He was told that he would need a skin graft and that he should be housed in a medical environment. Instead, upon return to EMCF, Mr. Kendrick was returned to solitary confinement where his wounds were at risk for infection from the feces and other filth on the unit. He did not receive the antibiotic ordered by the surgeon until nearly a week after the surgery.

189. On April 17, Mr. Kendrick developed a fever and a life-threatening infection that required emergency surgery. After intervention by Plaintiffs' Counsel, Mr. Kendrick was moved from solitary confinement to a medical observation cell. He is afraid to return to solitary confinement. Even in the medical unit, an officer has come to his cell saying "what's up bitch?" and "can't wait for you to come back to [Unit] 5, I've got a treat for you." A senior officer told Mr. Kendrick that if he stopped talking to "certain people"—Plaintiffs' Counsel—he might get what he needs.

## ABUSE AND EXCESSIVE FORCE BY STAFF

### Unchecked Systemic Brutality

190. Defendants are aware that staff at EMCF sadistically brutalizes prisoners. Officers use excessive force with impunity and with no oversight by Defendants.

191. Upon information and belief, newly hired staff at EMCF receives only three weeks of training before starting on the job. MDOC does not supervise this training. Upon information and belief, MDOC has allowed MTC to rehire staff who have been terminated for misconduct at EMCF and other Mississippi prisons.

192. In March 2012, after spraying Lindsey Johnson with chemicals while delivering him his meal, security staff told Johnson that "there were no limits" to what they could do to him. One officer has told prisoners that he will "bust a cap" in them. He also threatens to poison their food, telling them "I'm the motherfucker who has to feed you."

**Excessive Force: The Institutionalized and Wanton Infliction of Pain**

193. Correctional officers at EMCF frequently use chemical agents and physical force on prisoners without warning and in the absence of an immediate threat of danger. Officers routinely Mace prisoners for making minor requests for assistance or expressions of frustration—for example, complaining that they did not receive a meal tray or requesting to speak with the warden.

194. Officers shoot barrages of pepper balls and spray multiple bursts of pepper spray at prisoners regardless of prisoners' level of resistance —and even when prisoners offer no resistance at all. For example, on September 7, 2012, officers entered Unit 5C with the purpose of locking prisoners into cells. They did so by shooting pepper ball guns and spraying prisoners with Mace. Once they had completed spraying, several officers proceeded to beat prisoners, including Plaintiff Thompson.

195. In solitary confinement, correctional officers spray prisoners through the tray slots in their cell doors, and then close the slots, trapping the prisoners in their cells with no

ventilation to provide any relief from the burning. Prisoners needing medical care following assaults or use-of-force incidents do not routinely receive assessment or treatment.

196.    On March 16, 2013, officers walked through Karl Williams' cell block closing the tray slots on each prisoner's door.   Mr. Williams asked if he could leave his tray slot open for ventilation as he is asthmatic. Without explanation, the officers refused his request.   When Williams asked again, the officers slammed the slot shut on his hand.

197.    In mid-September 2012, Plaintiff Chandler's cell was in a state of disrepair.   The light and toilet in Mr. Chandler's cell had been broken for months. His tray slot was broken and would not close properly.   Three officers came onto his zone and began closing the prisoners' tray slots.  Unable to close Mr. Chandler's broken tray slot, a high-ranking officer ordered him to "shut up and back up from the tray slot."  Another officer stuck his pepper ball gun through the tray slot and aimed it at Mr. Chandler.  After firing several rounds into the cell, officers removed him, slammed his face into a wall and then against the floor.

198.    Mr. Chandler could not breathe and his skin felt like it was on fire.   He asked for medical help.  He was refused.  He asked to decontaminate and wash off the pepper ball residue from his skin.  He was again refused.  Back in his cell, he continued to have trouble breathing. Other prisoners banged on their doors to get help.  Mr. Chandler had to break a fire sprinkler to wash the pepper residue off of his skin and out of his cell.  Later, a nurse completed a "body sheet" but did not provide medical care.

199.    In recent weeks, officers have begun using pressurized fire extinguishers to inflict painful and toxic punishments on prisoners.   Officers spray prisoners at close range, covering them and filling the air with harsh chemicals that linger in the poorly ventilated cells.   Earlier this month, for example, when a prisoner set a fire in order to obtain medical attention, an officer

sprayed him. Some prisoners cough up "black stuff" for days after being sprayed with fire extinguishers.

200.    When Marcus Davis refused to speak with a mental health counselor and requested instead to speak with a psychiatrist, the counselor called the emergency response team which slammed Davis to the ground while punching him and then stripped him of his clothing.

201.    On January 25, 2013, Plaintiff Jeffrey Covington asked to have his cell cleaned. The officer responded by choking him, saying "I can do what the fuck I want," slamming Mr. Covington to the ground and putting his foot on Covington's face.

202.    Even medical staff has sadistically inflicted violence on prisoners. On July 1, 2012, a correctional officer witnessed a nurse assault a prisoner with "a shiny chrome tool with spirs [sic] on it." The officer reported that he saw the nurse:

> [W]alk up to [the inmate] and drive the tool into his arm and run it down the backside of his arm. She started this in his [left] tricep and run the tool all the way down to his wrist, leaving both marks on his arm and drawing blood. [The nurse] then turned to me and said, "[--][22] bring his ass down to medical; I got something else for his ass." The inmate was behind his cell door at all times with his arm out of the food slot. He posed no threat of any kind to medical or to custody staff.

**Use of Force against Medically or Psychiatrically Vulnerable Prisoners**

203.    During their tours of EMCF in 2010 and 2011, Plaintiffs' Counsel and their experts expressed deep concerns directly to Defendants about chemical agents such as Mace being used on medically fragile prisoners. Defendants Epps and Perry were put on personal notice of these risks.

**Derrick Hayes**

204.    Plaintiff Derrick Hayes suffers from asthma. In December 2012, Mr. Hayes refused to close his tray slot to protest not having received his asthma inhaler. Although Mr.

---

[22] Officer's name removed.

Hayes was not presenting any current threat, an officer sprayed Mace into his cell and then closed the tray flap, eliminating the only source of ventilation. As a result, Mr. Hayes suffered an asthma exacerbation. Mr. Hayes was examined by a nurse but was not permitted to decontaminate or wash the Mace from his skin or eyes. The officer who sprayed Mr. Hayes with Mace asked him if he was planning to tell his lawyers. In 2011, Plaintiffs' Counsel notified Defendant Perry that Mr. Hayes' asthma put him at high medical risk from chemical sprays.

**Larry Walker**

205. Larry Walker suffers from symptoms of serious mental illness. He also suffers from hypertension and kidney dysfunction; he has been told that he will need dialysis soon. On April 5, 2013, Mr. Walker was locked in a cell behind a solid door in long-term solitary confinement when he felt pain in his kidney and began to feel sick. He tried to get the attention of an officer but there were none on his zone. Other prisoners began kicking on their doors, hoping that the noise would summon help. But no help came. In a last attempt to attract the attention of an officer, Mr. Walker set a milk carton on fire.

206. Mr. Walker's efforts succeeded and a high ranking officer came to his cell door carrying a fire extinguisher. The officer aimed the fire extinguisher at Mr. Walker through his tray slot and sprayed Mr. Walker while yelling "Die, I want you to die. I'm a [sic] make sure I kill you before I leave here" and "I am going to help you die." When he was done spraying, the officer closed the tray slot and left. Mr. Walker passed out. As of April 16, he had not left his cell out of fear for his safety and was scared to eat solid food. Residue from the fire extinguisher remained in his cell. Because there is no functioning light in his cell, he lives in near darkness.

**Anthony Evans**

207.    Plaintiff Anthony Evans suffers from a long history of serious mental illness and seizure disorder. While in solitary confinement he felt a seizure coming on and threw his tray through the tray slot in an effort to get officers' attention. An officer, who was in the process of spraying another prisoner with Mace, stopped what he was doing and emptied the remainder of the gas canister into Mr. Evans' cell. The officer called him a "bitch" before closing the tray slot and leaving Mr. Evans in the cell behind the solid door with no ventilation. Moments later, Mr. Evans passed out while having a seizure.

**Eric Ward**

208.    Plaintiff Eric Ward has an established history of serious mental health needs, and has been prescribed antipsychotic and antidepressant medications. On October 3, 2012, Mr. Ward was transferred back to EMCF from the Central Mississippi Correctional Facility. After arriving, Mr. Ward informed staff that he had not eaten and needed food. When he did not receive food, Mr. Ward threatened to cut himself with a razor. When Mr. Ward refused to give the razor to staff, a mental health counselor arrived and watched as an officer sprayed Mace into Mr. Ward's cell. Mr. Ward was not permitted to wash the Mace off his skin and eyes until two hours later.

## FAILURE TO PROTECT PRISONERS FROM VIOLENCE

### An Overt Culture of Violence, Threats, and Fear

209.    Defendants fail to protect prisoners at EMCF from routine extortion, threats of violence, and brutal assaults, including sexual assaults. Stabbings are commonplace. Even in lock-down units, some prisoners can disable the locks in their cell doors and come and go as they please without interference by staff. Prisoners are extorted for money with threats of violence

against the prisoner and against his family members in the community. Family members of prisoners are also extorted by use of threats of violence against prisoners at EMCF.

**Staff Actively Facilitate and Promote Violent Attacks**

210.    Some correctional staff at EMCF actively arrange and enable attacks on prisoners.

**Phillip Fredenburg**

211.    On September 5, 2012, Mr. Fredenburg was brutally assaulted. Several officers were complicit in or facilitated the assault.

212.    That morning, two officers escorted Mr. Fredenburg from the showers and locked him in his cell. Shortly after, the officers escorted another prisoner to Mr. Fredenburg's cell. This second prisoner disabled the locking mechanism in Mr. Fredenburg's cell door. Six other prisoners on the zone also disabled their locks, allowing them to come and go as they pleased (a common occurrence at EMCF).

213.    The officers then exited the zone for the day, leaving the zone unattended.

214.    The prisoner that staff escorted into Mr. Fredenburg's cell took him to another cell where four prisoners viciously beat him and stomped on his face.

215.    An officer remained in the control tower throughout the assault on Mr. Fredenburg. This officer had full access to the security cameras monitoring the zone and the electronic system that indicates which cell doors are open. However, this officer allowed the beating to proceed. Security camera footage documented much of the incident.

216.    Mr. Fredenburg remained seriously injured in his cell without help all day. That evening, an officer told him that he would return and take him to medical. This never happened.

217.    By the following morning, 24 hours following the beating, Mr. Fredenburg had still not received medical attention for his wounds and injuries. Mr. Fredenburg set multiple

fires in front of his cell to get help. Finally, he was taken to see the doctor, who ordered x-rays of his skull to check for a broken nose.

218.    On June 19, 2012, in another example of officer involvement in prisoner violence, an officer in the solitary confinement unit escorted four prisoners into a vestibule area between housing zones and opened a door allowing ten rival prisoners into the vestibule. Predictably, a mass altercation erupted and one prisoner was stabbed in the spine before the fight was quelled. Security footage shows the officer laughing and possibly offering instructions to one group of prisoners before the attack began.

219.    A subsequent investigation concluded that "the preponderance of evidence" showed that the officer "voluntarily accessed pod doors on a lockdown unit to allow an assault to take place."

220.    In yet another example, on April 1, 2012, prisoners were drinking homemade alcohol on one of the housing zones when several rival prisoners from another housing unit arrived and gave one of the other prisoners until midnight to pay off a $50 debt. The two groups of prisoners began fighting each other and throwing chairs. An internal investigation noted that several witnesses reported that a correctional officer allowed the rival prisoners members onto the zone on which the fight took place. One prisoner was stabbed in the back with a knife and required hospitalization in a critical care unit.

**Gross Failures to Protect Prisoners from Violence**

221.    Even when officers do not actively facilitate violence, they are deliberately indifferent to its regular occurrence.

222.    Conditions at EMCF were so dangerous that, in June 2012, the Occupational Safety and Health Administration (OSHA) proposed a $104,000 fine for the multiple safety

violations that placed correctional staff at risk. OSHA characterized the violations as "willful." The most egregious violation was a failure to furnish "employment and a place of employment which were free from recognized hazards that were causing or likely to cause death or serious physical harm to employees." These same deficiencies place prisoners at risk of death and injury. Staff and prisoners face exposure to violence due to the failure to maintain adequate levels of staff and properly functioning locks on cell doors.

223. But faulty equipment and understaffing are not the only failures that place prisoners at risk of violence. Staff regularly turn their backs on threats, with tragic results.

224. In April 2013, a prisoner in solitary confinement was being taken from the shower to his cell when he was stabbed in the thigh with a homemade spear. Later, an officer told the victim that staff were aware of the spear and had even discussed it during a morning briefing but had failed to do anything about it.

225. An example an internal investigation dated February 20, 2012 concluded that two officers "…were aware multiple offenders intended to harm [another prisoner] and they both made the decision to exit the zone without any attempt to ensure that the offender was not harmed." The prisoner they left behind was subsequently assaulted. Defendant Epps attached this investigation to his letter to GEO as evidence of their deficiencies. However, he has failed to take action sufficient to ensure that events such as these did not recur. As a result, prisoners at EMCF continue to be subjected to harm without intervention by staff.

226. Also in February 2012, Lindsey Johnson was stabbed while being escorted out of the shower in handcuffs. Another prisoner approached him and his two officer escorts left him alone to be stabbed. Two months later, he was stabbed again.

**William Easterwood: A Victim of Robbery, Rape, and Beatings**

227. William Easterwood arrived at EMCF on February 23, 2012. Over the next 24 hours, Mr. Easterwood was beaten, held at knife-point, and repeatedly raped.

228. When Mr. Easterwood arrived on the zone, he was met by eight prisoners who escorted him into an empty cell where they beat and robbed him. His assailants told him that if he reported the beatings, they would place him on KOS (kill-on-sight) status. Later, he was taken to a different cell where he was forced to perform oral sex on one of his assailants. He was later anally raped four or five times by an attacker who held Mr. Easterwood captive with a store-bought butcher knife while snorting lines of cocaine between the rapes to help maintain an erection.

229. When Mr. Easterwood attempted to get help from an officer, his assailant intervened and told the officer that everything was OK. The officer left and the violence continued.

230. The following morning, staff noticed that Mr. Easterwood's face was bruised and swollen. He was found to have anal trauma and was taken to the hospital. Staff later recovered a pair of blood-stained pants in Mr. Easterwood's cell, and a 15-inch butcher knife hidden behind an emergency exit sign. Mr. Easterwood's assailant tested positive for cocaine and marijuana. An investigation concluded that Mr. Easterwood's allegations "appear to be consistent with the footage reviewed."

**Eric Ward**

231. Plaintiff Eric Ward has an established history of serious mental illness. On October 11, 2012, staff planned to transfer Mr. Ward to Unit 6. Mr. Ward explained that he had "red tags" on that unit and that his life would be in danger if moved there. Staff refused to listen.

In an attempt to forestall the move, Mr. Ward cut open his arm. He was subsequently transferred to a different housing unit, where he is being extorted for money with threats of bodily harm.

**Staff Endanger Prisoners by Ignoring Fires and Medical Emergencies**

232. As noted elsewhere in this Complaint, officers make their rounds infrequently. At times, they block up the holes in the control tower with paper to avoid noise from the unit. This also prevents them from hearing – and responding to – emergencies. One prisoner remarked that you "have to act like you're passed out, having a heart attack" before getting attention. Plaintiff Tafforest Chandler reports that there is simply not enough staff to keep prisoners and correctional officers safe. Banging on doors and setting fires is sometimes the only way to get help. Security video footage of one unit shows that during the course of a single morning, two fires were allowed to burn out of control for several minutes before staff responded.

## SANITATION AND ENVIRONMENTAL CONDITIONS

233. As discussed in detail above, prisoners in Units 5 and 6 live in filth and often without working lights or toilets and without access to showers or cleaning supplies. They are locked in their cells without daylight or exercise for days or weeks at a time. These conditions threaten their health, their sanity, and even their lives.

234. During his January 2011 site visit, Dr. Kupers observed prisoners screaming and waving their arms, desperate for attention; they had been locked in shower stalls, naked, for two hours without any response by staff. Prisoners described these incidents as routine. Dr. Kupers reported:

> I asked to enter an empty cell, and found it to be filthy with human excretions (blood or feces that had been there for some time) on the walls - I concluded the officers could not have been cleaning the cell while it was inhabited.

235.    MDOC has long been aware of these conditions.  Results of a March 28, 2011 inspection by the Mississippi Department of Health show broken toilets, sinks, pipes, and showers throughout the facility.

236.    In a memorandum summarizing an October 12, 2011 site visit, a MDOC manager documented that he had observed debris thrown on the floor including "burned insulated food trays thrown in the area" and that at least three of these trays were set on fire while he was touring the housing area.    He also noted that "it is evident that there is no Housekeeping/Sanitation Plan in effect in these pods."  He added that "Many of these issues have been repeated and identified as deficient with minimal progress being made to correct." This memorandum was sent to former DCI Sparkman.

237.    Conditions in these units are aptly described in an email by an MDOC employee to her managers dated April 12, 2012 with the subject line "Unsanitary conditions."

> This offender has been in the shower since 1545 hrs yesterday.  I spoke with him and he stated he is still there because he refused to go in the cell.  The window on the door is burned and has a big hole in it.  The cell stinks of urine [and the] offender states the toilet does not work.  And from the smell in the cell I would agree with him.  Flies are all over the door because feces is in the hole on the front of the door.  The cell needs to be cleaned immediately[.]  [T]rays are in the cell he states from the last offender that was there.  This is inexcusable.  Another offender was placed in the shower at 1525 hours and was not taken out until 2035 hrs[the following day].

238.    Despite this email, the prisoner remained in the shower for an additional three hours, for a total of twenty-four.

**Staff Indifference Exacerbates the Dangers**

239.    On January 6, 2013, in Unit 5-B, the sprinkler system malfunctioned and a black oily substance and water sprayed into Stephen Harris' cell.  Officers left him in the dirty wet cell the entire night.  His clothes, mattress, and sheets were soaked with the foul substance.  Harris

became ill and began to vomit. He asked for dry clothing and a dry mattress but did not receive them until more than two days later. He also asked for cleaning supplies, which he did not receive, to clean the black oily substance. Because there was no working light in his cell, he spent much of this time in darkness. Later, he slipped on the water in his cell causing a head injury and bleeding; he was not seen by medical until three or four days later. He is now experiencing spells of dizziness and forgetfulness.

240.    Security officers allow fires to burn and do not take measures to protect asthmatic and other vulnerable prisoners. The housing areas fill with smoke from the uncontrolled fires, making it difficult for the prisoners to breathe.    Plaintiff Courtney Galloway has had trouble breathing during these incidents and cannot get medical attention. There has never been a fire drill. In the last week of July 2012, after MDOC installed MTC as the new vendor-operator, a prisoner in Unit 2 set a fire. Other prisoners were locked in their cells, unable to escape the smoke. Marquise Greene had a severe asthma attack as a result. He was denied medical attention.

241.    Ventilation in the cells in Unit 5 is so poor that prisoners, especially those with respiratory illnesses, have difficulty breathing. Air vents are never cleaned and the air is full of dust and lint.

242.    Many prisoners lack blankets. Danyel Richardson had to purchase one to keep warm.

243.    Each of the conditions described above, individually and taken together, creates a substantial risk of serious harm.    Many prisoners suffer significant medical injuries and exacerbation of mental illness as a result of being subjected to this toxic combination of grossly inhumane environmental conditions.

## NUTRITION AND FOOD SAFETY

244.    Defendants, regardless of the contractor, are responsible for providing adequate nutrition to prisoners. They have not—and do not—fulfill this responsibility at EMCF.

245.    In their 2011 expert reports, Dr. Kupers and Ms. LaMarre confirmed the near-universal reports from prisoners that they were being deliberately underfed and malnourished.

246.    Ms. LaMarre found significant weight loss in 60 percent of the medical records she reviewed. Weight loss in these records ranged from 13 to 30 pounds with an average loss of 21 pounds. Some prisoners reported losing 40 to 60 pounds since arriving at EMCF. In one case, Ms. LaMarre documented a prisoner who was six feet tall and weighed 148 pounds. Dr. Kupers wrote that "…from my direct observation it is clear that all the men are much thinner, almost emaciated, in comparison to old snapshots that I viewed in their charts on their identity cards showing them much heavier."

247.    Plaintiffs' Counsel and the experts promptly brought this pattern of extreme malnourishment at EMCF to Defendants' personal attention. In its written response to Ms. LaMarre's findings, GEO admitted that EMCF "recognizes there have been significant weight loss issues throughout the facility and is taking a multifaceted approach to resolving this concern." Two years have passed. The problem remains and may have worsened. Prisoners report that portion sizes, already tiny under GEO's operation of the prison, have decreased even further in the months since MTC took over from GEO. Many prisoners appear gaunt and severely malnourished.

248.    Prisoners in solitary confinement may suffer the worst since they have nothing to distract themselves from their hunger. Plaintiff Fredenburg explains that, in solitary

confinement, "there is nothing to look forward to, nothing to do except look forward to the next tray."

249. Months after Plaintiff Barrett had filed a grievance regarding inadequate food portions, he received the following response: "According to MDOC approved menu of 2900 calories a day, *policy* provide [sic] that all meals are nutritionally adequate and served in a manner that meets established governmental health and safety codes... Therefore, I trust your request has been satisfied and consider this matter closed." Whatever MDOC *policy* may require, the reality is that many prisoners at EMCF are malnourished.

250. Food preparation and delivery are unsanitary. One prisoner described the trays as smelling like feces. The kitchen and food trays are dirty, putting prisoners at risk for food-borne illnesses. Trays are left out for extended periods of time before being distributed, causing the food to accumulate dirt and dust. Moreover, staff do not wear sanitary gloves or hair nets while serving food to prisoners.

## A LONG HISTORY OF DELIBERATE INDIFFERENCE

251. Defendants are fully aware of the conditions of confinement at EMCF and the grave risks posed to prisoners' health and safety. In 2003, a federal court condemned the broken plumbing and "ping-pong toilets" on the death row unit at Parchman, stating, "No one in a civilized society should be forced to live under conditions that force exposure to another person's bodily wastes. No matter how heinous the crime committed, there is no excuse for such living conditions."[23] Ten years later, prisoners in Units 5 and 6 at EMCF live in similarly foul and toxic conditions. In 2011, Plaintiffs' Counsel and two of the nation's top correctional health experts identified dangerously inadequate medical and mental health care at EMCF and three

---

[23] Russell v. Johnson, No. 1:02CV261-JAD, 2003 WL 22208029, at *3 (N.D. Miss. May 21, 2003).

other MDOC facilities, including EMCF. The resulting reports, findings, and recommendations were submitted to Defendants and filed with a federal court but were largely ignored.[24]

252.  On May 15, 2012, Plaintiffs' Counsel sent Defendant Epps a nine-page letter describing in detail conditions at EMCF. Plaintiffs' Counsel offered to retain correctional experts at their own expense to offer recommendations to fix the problems at EMCF, with those recommendations to be later memorialized.  The offer was refused and the conditions outlined in the letter have since worsened.

253.  Defendants have failed to provide the resources necessary to fulfill their statutory duties and have failed to provide a prison that complies with constitutional standards.  During his tenure as Commissioner, Defendant Epps has reduced staffing by 600 persons and streamlined the agency "down to bare essentials."[25]   However, these savings have come at a cost to the prisoners in his care.  On August 21, 2012, when EMCF was in a state of chaos as described above, a MDOC press release declared that Mississippi "'has one of the lowest costs-per-inmate-day in the country.'"[26]

254.  MDOC's deliberate indifference is further evidenced by its decisions to continue to contract with—and offer new contracts to—private prison vendors with poor records of performance.  After GEO terminated its contract with MDOC, Defendants contracted with MTC, a for-profit, private prison contractor, to operate and manage EMCF, as well as Walnut Grove.

---

[24] The reports of the experts were filed with the Court as Doc. No. 151 in Presley v. Epps, No. 4:05-CV-00148 (N.D. Miss.)  The experts' reports on conditions at EMCF are Doc. Nos. 151-7 and 151-8.

[25] *Epps Becomes Longest Serving MDOC Commissioner* (MDOC Press Release), http://www.mdoc.state.ms.us/PressReleases/2009NewsReleases/MDOC%20News-Epps%20is%20Longest%20Serving%20MDOC%20Commissioner.pdf (accessed May 24, 2013).

[26] *MDOC Saves $11 Million Annually* (MDOC Press Release), http://www.mdoc.state.ms.us/PressReleases/2012NewsReleases/MDOC%20Cost%20Avoidances.pdf (accessed May 24, 2013).

Recently, the court-appointed monitors overseeing the implementation of the consent decree governing Walnut Grove found that the MTC-operated facility "continues to be plagued with clear signs of instability as evidenced by, among other things, high rates of inmate assaults, lockdowns, contraband control issues, and management of special populations."[27]

255.     Despite these findings, Defendant Epps shortly thereafter signed a new multi-million dollar contract with MTC to operate another MDOC facility, the Wilkinson County Correctional Facility (WCCF).  Two weeks ago, Defendant Epps stated that MDOC was pleased with its relationship with MTC and that he felt "extremely confident that MTC will do a great job" operating WCCF.[28]

256.     As discussed in detail above, MDOC awarded a new contract to Health Assurance to provide care at EMCF weeks after Health Assurance was sharply criticized by a federal court. The new contract significantly reduced the amount of psychiatric care available to EMCF's seriously mentally ill prisoners.

257.     Defendants have been repeatedly notified of the pervasive pattern of unchecked violence at EMCF; the private prison companies that operate EMCF are contractually obligated to send all incident reports to MDOC within a week.  However, Defendants have provided no oversight of staff and have failed to take reasonable measures to protect prisoners from the obvious risks of serious harm.   By the end of October 2011, violent incidents at EMCF had become so common that that the Lauderdale County Sheriff announced that he wanted to speak

---

[27] Second Report of Monitors, DePriest v. Walnut Grove Corr. Auth., No. 3:10-cv-00663-CWR-FKB (S.D. Miss.), April 4, 2013 (Doc. No. 86), at 2.

[28] Vershal Hogan, *Wilkinson County Prison to Get New Management Company*, Natchez Democrat, May 18, 2013.

with state officials about assigning a full-time investigator to investigate incidents at EMCF, as the facility was exhausting his resources.[29]

## MDOC Fails to Monitor and Hold its Health Care Contractors Accountable

258.    Ms. LaMarre evaluated the medical care MDOC provides at three other MDOC prisons besides EMCF.  In her reports to Defendants, Ms. LaMarre emphasized that MDOC needs to take responsibility for the care of patients by exercising proper oversight of its contractors.  In one report following her assessment of care at SMCI, she wrote that MDOC must:

> ...[D]evelop and implement a meaningful clinical oversight and monitoring program that holds medical vendors accountable to provide adequate health care to the population... [U]ntil MDOC implements such a program the medical and mental health problems noted in this report are likely to persist; resulting in preventable harm, including deaths at SMCI.[30]

259.    Following her assessment of care at Parchman, she emphasized:

> ...[T]he need for the Mississippi Department of Corrections to have a meaningful clinical oversight and monitoring program that holds the medical vendor accountable for improving the medical and mental health care programs. Until this occurs, these findings are likely to persist; resulting in preventable harm to patients.[31]

260.    Neither Defendant Perry nor any of the other Defendants responded to Ms. LaMarre's findings and recommendations.   Instead, Defendants simply deferred to their contractors—who made no meaningful response.

---

[29] Sollie on Prison Problems, Oct. 31, 2011, http://www.wtok.com/news/headlines/Sollie_on_Prison_Problems.html#.UZwc68i3J8E (accessed May 26, 2013).

[30] Expert Report of Madeleine L. LaMarre, MN, FNP-BC, on the South Mississippi Correctional Institution, Presley v. Epps, No. 4:05-cv-00148-DAS (N.D. Miss.), Nov. 8, 2011 (Doc. No. 151-13), at 7.

[31] Expert Report of Madeleine L. LaMarre, MN, FNP-BC, on the Mississippi State Penitentiary, Presley v. Epps, No. 4:05-cv-00148-DAS (N.D. Miss.), Nov. 8, 2011 (Doc. No. 151-15), at 6.

261. Further, the contract Defendant Epps entered into with Health Assurance in 2012 incorporates all the faults and deficiencies of MDOC's contract with GEO. Despite Ms. LaMarre's warnings about the need for MDOC to implement a strong system of oversight, the auditing provisions in the new contract with Health Assurance are weak, substandard, and incapable of providing an accurate picture of the care actually provided.

262. For example, the Health Assurance contract specifies that "sick call referrals shall be evaluated by a physician or mid-level practitioner within seven (7) calendar days of the original complaint." Even if Health Assurance were to comply with this provision, the provision itself falls far below the accepted standard of care. Health Assurance could delay evaluating a patient with acute chest pain for seven days and still comply with the contract.

## RETALIATION FOR SEEKING REDRESS OF GRIEVANCES

263. MDOC and EMCF staff actively intimidate, coerce, mislead, obstruct, and threaten prisoners who file grievances, meet with their attorneys, seek redress in the federal courts, or otherwise complain about conditions of confinement.

### Direct Intimidation and Retaliation by Correctional and Medical Staff

264. In March 2013, Plaintiff Dockery had trouble breathing inside his solitary confinement cell due to smoke from the fires that had been burning on the unit. He complained to an officer who was passing by. The officer responded that he "didn't give a fuck" and slammed the tray slot closed on Mr. Dockery's wrist.

265. Prisoners are told that "what happens on the zone, stays on the zone." An officer assaulted Garrick Woods, then threatened that he would "punch him in his dumb mouth" if he reported the incident.

266. Upon information and belief, some officers enlist other prisoners to intimidate and extort prisoners who make complaints.

267. An officer entered Plaintiff Fredenburg's cell a few days after Mr. Fredenburg met with the Plaintiffs' counsel, told him to cuff up, and demanded to know "what those ACLU people want." When Mr. Fredenburg asserted his right to maintain the confidentiality of his legal matters, the officer read and confiscated some of his legal papers. An officer approached Plaintiff Hayes after Mr. Hayes met with Plaintiffs' Counsel, and demanded that Mr. Hayes tell him what he had told his attorneys, taunting "whatcha gonna do, snitch to your lawyer?" Another officer recently told a prisoner that the ACLU was not going to be able to protect him.

268. On March 6, 2013, minutes after speaking with Plaintiffs' Counsel, Plaintiff Dockery was taken into a room by several officers, a mental health counselor, and other staff who interrogated him about his meeting with Plaintiffs' Counsel. Later that day, Plaintiff Fredenburg was brought into the same room and similarly interrogated about his meeting with Plaintiffs' Counsel.

269. Some health care staff similarly intimidate, threaten, or retaliate against prisoners who raise concerns about their medical care.

270. In June 2012, Plaintiff Campbell submitted an emergency grievance ("ARP") seeking mental health care. In mid-October, during a medical appointment, the facility physician asked Mr. Campbell about his involvement with Plaintiffs' Counsel. The physician said that he would give Mr. Campbell whatever he wanted, referring to medical care. Mr. Campbell insisted that he would not discuss his legal affairs. The doctor became very angry, left the room, and did not return to treat Mr. Campbell. During a subsequent encounter, the doctor denied having asked about his legal matters, yet asked to see the legal and medical papers that Mr. Campbell was

carrying. Mr. Campbell, once again, declined. The doctor became angry and told him that he "didn't give a rat's ass" about any lawsuit. He then told Mr. Campbell that there was nothing medically wrong with him.

271.   The same physician met with a prisoner who had submitted an ARP relating to mental health care. The physician instructed the prisoner not to speak with Plaintiffs' Counsel:

> [The doctor] asked me if I was involved with the ACLU. I told him that I had met with the ACLU and that they had helped me with the ARP. [The doctor] told me that I should not speak with the ACLU and that if I had problems with medical that I should come straight to him and that he would take care of it immediately. He was pretty strong in the way he was talking and implied that I shouldn't take problems out of medical [and] that he would have twenty minutes of paperwork unless I dropped [the] ARP.

272.   Another prisoner who submitted a health-care related ARP had a similar encounter with the same physician:

> [The doctor] asked me if I was one of the inmates who had been talking to the ACLU. I told him "no" even though I had met with SPLC. I was scared that if I told the truth I would be sent to Parchman or locked down. [The doctor] told me that I should stop talking to the ACLU and to give him a chance to help him.

273.   These prisoners never received the proper care that they sought in their ARPs.

## MDOC Avoids Accountability by Abusing the Administration Remedies Program

274.   Prisoner grievances in Mississippi are referred to as "ARPs," short for Administrative Remedy Program. According to its official policy:

> The MDOC has established the Administrative Remedy Program through which an inmate may seek formal review of a complaint which relates to any aspect of his incarceration if less formal methods have not resolved the matter. Through this procedure, inmates shall receive reasonable responses and where appropriate, reasonable remedies.[32]

---

[32] Administrative Remedy Program, filed as Doc. 1242-1, Gates v. Barbour, No. 4:71-cv-00006-DAS (N.D. Miss. Aug 19, 2010).

275.     MDOC and EMCF officials actively thwart prisoners who seek help through the Administrative Remedy Program.  Defendants' conduct is even more egregious in that successful completion of the two-step ARP process is a prerequisite under the Prison Litigation Reform Act (PLRA) to filing a prisoner lawsuit in federal court.  MDOC routinely moves to dismiss cases of prisoners whose efforts to exhaust their administrative remedies have been thwarted by MDOC's agents, contractors, and employees. With only a few exceptions, MDOC has outsourced the adjudication of ARPs to its private prison contractors.  Staff at EMCF determine whether ARPs are meritorious and whether relief should be granted.  Prisoners unsatisfied with the results may appeal, but the appeals are also adjudicated by staff at the facility.  ARPs complaining about medical care are commonly adjudicated by the staff member who provided the allegedly substandard care.

276.     ARPs submitted by prisoners at EMCF routinely "disappear" or are simply ignored. This phenomenon is not new.  As noted in a recent judicial opinion, in 2009, Defendants' ARP coordinator for EMCF admitted "lately some ARPs have been lost in the Commissioner's office."[33]

277.     One prisoner submitted an ARP stating that "I am afraid to tell staff here about thoughts of harming myself…I want to get proper mental health care."  The prisoner clearly identified the document as an ARP, but MDOC refused to process it because it did not contain the phrase "this is a request for administrative remedy."

---

[33] As Judge Reeves noted, "A prisoner cannot realistically exhaust a special issue ARP if it is lost by MDOC." Rivers v. Caskey, No. 4:09–CV–79–CWR–LRA, 2012 WL 4508002, at *3 (S.D. Miss Sept. 28, 2012).

278. MDOC and the contractors at EMCF, individually and in concert, mislead, harass, coerce, and retaliate against prisoners who attempt to follow the rules by bringing complaints through the ARP process.

279. It appears that at least one official has even resorted to forgery to interfere with a prisoner's right to use the grievance system. In September 2012, Plaintiff Derrick Hayes submitted an ARP regarding the asthma exacerbation he suffered when Mace is sprayed in the solitary confinement unit. Despite the urgency of the subject matter, he received no response. After more than two months had elapsed, Plaintiffs' Counsel asked MDOC to report on the status of his ARP. Shortly after, an MDOC official visited Mr. Hayes and asked him if he "was ready to drop" his ARP. Mr. Hayes told him "no." A few more months passed without Mr. Hayes receiving a reply to his ARP. Once again, Plaintiffs' Counsel asked MDOC to investigate. This time, MDOC responded by sending a copy of a document stating, "My complaint has been satisfied and I voluntarily drop the above named cause [sic] number" with a signature that purported to be Mr. Hayes'. Mr. Hayes had never seen the document before and had never agreed to withdraw his ARP. The document was a crude forgery.

280. Officials and staff mislead prisoners about the rules of the ARP program. For example, in September 2012, Plaintiff McAbee submitted an ARP seeking proper care for his HIV infection and hypertension. Mr. McAbee already had another ARP pending at that time. Mr. McAbee was told that he would have to withdraw the ARP seeking medical care because the staff member responsible for processing ARPs told him that there was a policy that he could only submit one ARP at a time. No such policy exists in the Mississippi Department of Corrections. However, Mr. McAbee, believing what he was told by staff, withdrew one of the ARPs but had

no means of determining which one he withdrew. Multiple prisoners have been similarly misled and forced to withdraw ARPs.

281. Similarly, when prisoners finally complete the ARP process and have received a second-step response, they are told in writing that they are "eligible to seek judicial review within 30 days of receipt of the Second Step Response." There is no requirement in federal statutes or rules that mandates that prisoners must file their civil actions within 30 days of completing a prison's grievance process.

282. In November 2012, after Plaintiffs' Counsel asked MDOC to investigate multiple ARPs that had yet to receive responses, MDOC sent an Administrative Remedy Program Investigator to the facility in an effort to determine the cause of the delays in processing grievances. The investigator persisted in asking prisoners about their confidential legal affairs, privileged conversations, and relationship with Plaintiffs' Counsel. In one such instance:

> The man from MDOC asked me a lot of questions about my lawyers. He asked me if I was speaking with the ACLU and if I filed my ARP before or after I met with the ACLU. He wanted to know the name of my lawyer and who came to see me. He asked if I was still contacting the ACLU and when was the last time I met with them. He asked me a lot of questions. I asked him why he was asking all these questions about my lawyers. He told me that these were standard questions to ask.

Other prisoners similarly report being asked about their involvement with Plaintiffs' Counsel and/or had incorrect information about their conversations reported back to MDOC by the investigator.

283. Prisoners are fearful of coming forward as witnesses because of the strong risk of retaliation. As described above, at best, MDOC will ignore their grievances or use them as an opportunity to gather intelligence about potential litigation. At worst, prisoners who raise concerns are subject to threats, retaliation, and bodily harm.

# CLASS ACTION ALLEGATIONS

**The EMCF Class**

284.    Pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(1), and 23(b)(2), Plaintiffs Vann, Dockery, Thompson, Covington, Osborne, Galloway, Fredenburg, Barrett, Chandler, Hayes, Ward, Lindsey, Campbell, Luckett, McAbee, and Evans (collectively, the "EMCF Class Plaintiffs") bring this action on behalf of themselves and a class of all persons who are currently, or will be, confined at the East Mississippi Correctional Facility (hereinafter, the "EMCF Class").

285.    As described more fully above, Plaintiff McAbee has HIV and hypertension. Plaintiff Lindsey has glaucoma; he is now legally blind because of Defendants' failure to provide him adequate medical care. Plaintiff Vann has diabetes. Despite having direct knowledge of the substantial risk of serious harm Plaintiffs face as a result of receiving poor medical care, Defendants continue to endanger them through their policies and practices.

286.    Plaintiffs Hayes, Covington, Galloway, and Thompson all have long histories of serious mental illness. As described more fully above, as a result of Defendants' policies and practices, they are subjected to excessive force by officers and are at a substantial risk of serious harm, including death. Defendants are aware of the dangers posed by their policies and practices but have failed to take reasonable steps to abate those risks.

287.    Plaintiffs Fredenburg and Ward are confined at EMCF in solitary confinement. As described more fully above, Mr. Fredenburg has been in solitary confinement for over a year and lives in the "Dead Zone," or "Dead Area." As a result of Defendants' policies and practices, Mr. Fredenburg was viciously beaten by other prisoners while security officers were either absent or did nothing to intervene. Mr. Ward has a long history of serious mental illness and

self-harm. As discussed more fully below, as a result of Defendants' policies and practices, Mr.

Ward has been placed at a substantial risk of serious harm in the form of being attacked by other

prisoners. Defendants are aware of the threats posed by their failure to protect prisoners like

Plaintiffs Fredenburg and Ward from violence but have failed to abate those risks.

**Fed. R. Civ. P. 23(a)(1): Numerosity**

288. EMCF currently houses more than 1,110 prisoners and has a capacity of 1,500.

The proposed class also includes prisoners who will be confined at EMCF in the future.

Therefore, the Class is so numerous that joinder of all class members is impracticable.

**Fed. R. Civ. P. 23(a)(2): Commonality**

289. There are multiple questions of law and fact common to the entire EMCF Class,

including:

a. Whether the lack of adequate medical care provided at EMCF constitutes deliberate indifference in violation of the Eighth and Fourteenth Amendments to the United States Constitution;

b. Whether the lack of adequate nutrition provided to prisoners at EMCF violates the Eighth and Fourteenth Amendments to the United States Constitution;

c. Whether insufficient staffing at EMCF and resulting unsafe conditions violate the Eighth and Fourteenth Amendments to the United States Constitution;

d. Whether officers' use of excessive force, including force used against prisoners with serious mental illnesses, violates the Eighth and Fourteenth Amendments to the United States Constitution; and

e. Whether Defendants' failure to protect prisoners from being harmed by other prisoners constitutes a violation of the Eighth and Fourteenth Amendments to the United States Constitution.

**Fed. R. Civ. P. 23(a)(3): Typicality**

290. Each of the EMCF Class Plaintiffs, like all putative EMCF Class members, is

subject to Defendants' failure to provide adequate medical and mental health care, sufficient

staffing, and a safe environment.  The EMCF Class Plaintiffs' claims, therefore, are typical of the EMCF Class' claims.

**Fed. R. Civ. P. 23(a)(4): Adequacy of Representation**

291.    Each of the EMCF Class Plaintiffs will fairly and adequately represent the interests of the EMCF Class and will diligently serve as class representatives.  Their interests are co-extensive with those of the EMCF Class and they have retained a team of counsel experienced with class actions alleging constitutional violations at correctional facilities. Putative Class Counsel possess the experience and resources necessary to fairly and adequately represent the Class.

**Fed. R. Civ. P. 23(b)(2)**

292.    Defendants have acted, or failed to act, on grounds generally applicable to the entire EMCF Class.  Specifically, Defendants are deliberately indifferent to the serious medical and mental health needs of EMCF Class members and continually and knowingly ignore the substantial risk of serious harm posed by conditions at EMCF.   Defendants' acts and omissions make final injunctive relief and corresponding declaratory relief appropriate as to the EMCF Class as a whole.

**The Isolation Subclass**

293.    Pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(1), and 23(b)(2), Plaintiffs Dockery and Hayes (the "Isolation Subclass Plaintiffs") bring this action on behalf of themselves and a class of all persons who are currently, or will be, subjected to Defendants' policies and practices of confining prisoners in conditions amounting to solitary confinement at the East Mississippi Correctional Facility (hereinafter, the "Isolation Subclass").

294. As described more fully above, the Isolation Subclass Plaintiffs have long histories of serious mental illness. Defendants are aware of their serious mental illnesses and continue to place the Isolation Subclass Plaintiffs at a substantial risk of serious harm by housing them in solitary confinement where, in addition to the risks posed to their mental health, they are forced to live in filthy, dangerous, and degrading conditions. Defendants know, and have known, of these risks but have failed to abate those risks.

**Fed. R. Civ. P. 23(a)(1): Numerosity**

295. Approximately 125 prisoners are currently subject to Defendants' policies and practices of confining prisoners in conditions that amount to solitary confinement at EMCF. During periods of extended lockdown, that number can increase by several hundred. The proposed subclass also includes prisoners who will be subject to Defendants' policies and practices of confining prisoners in conditions that amount to solitary confinement at EMCF in the future. Therefore, the Subclass is so numerous that joinder of all Subclass members is impracticable.

**Fed. R. Civ. P. 23(a)(2): Commonality**

296. There are multiple questions of law and fact common to the entire Subclass, including:

a. Whether the placement of seriously mentally ill prisoners in solitary confinement violates the Eighth and Fourteenth Amendments to the United States Constitution;

b. Whether forced idleness, sensory deprivation, and the lack of recreation, exercise, and programming in solitary confinement violates the Eighth and Fourteenth Amendments to the United States Constitution; and

c. Whether the lack of adequate medical and mental health services provided to prisoners held in conditions amounting to solitary confinement constitutes deliberate indifference in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

**Fed. R. Civ. P. 23(a)(3): Typicality**

297. The Isolation Subclass Plaintiffs, like all putative Isolation Subclass members, are subject to Defendants' policies and practices of confining prisoners in conditions that amount to solitary confinement. The Isolation Subclass Plaintiffs' claims, therefore, are typical of the Isolation Subclass' claims.

**Fed. R. Civ. P. 23(a)(4): Adequacy of Representation**

298. The Isolation Subclass Plaintiffs will fairly and adequately represent the interests of the Isolation Subclass and will diligently serve as Subclass representatives. Their interests are co-extensive with those of the Subclass and they have retained a team of counsel experienced with class actions alleging constitutional violations at correctional facilities. Putative Class Counsel possess the experience and resources necessary to fairly and adequately represent the Subclass.

**Fed. R. Civ. P. 23(b)(2)**

299. Defendants have acted, or failed to act, on grounds generally applicable to the entire Isolation Subclass. Specifically, Defendants are responsible for the promulgation of policies and practices related to the confinement of prisoners in conditions of solitary confinement. All Isolation Subclass members are subject to these same policies and practices. Defendants' acts and omissions make final injunctive relief and corresponding declaratory relief appropriate as to the Subclass as a whole.

**The Mental Health Subclass**

300. Pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(1), and 23(b)(2), Plaintiffs Evans, Campbell, and Osborne (collectively, "the Mental Health Subclass Plaintiffs") bring this action on behalf of themselves and a subclass of all persons who are currently, or will

be, subject to Defendants' mental health care policies and practices at the East Mississippi Correctional Facility (hereinafter, the "Mental Health Subclass").

301.    As described more fully above, Plaintiffs Evans, Campbell, and Osborne are confined at EMCF and have long histories of paranoid schizophrenia and psychosis. As a result of Defendants' policies and practices, they are denied care to meet their serious mental health needs. As described more fully herein, Defendants are aware of the substantial risk of serious harm posed by failing to adequately treat prisoners' serious mental illnesses.

**Fed. R. Civ. P. 23(a)(1): Numerosity**

302.    Several hundred prisoners are currently subject to Defendants' mental health care policies and practices at EMCF. The proposed subclass also includes (1) prisoners currently confined at EMCF who will be subject to these policies and practices in the future; and (2) prisoners who will be confined at EMCF in the future and who will be subject to these policies and practices. Therefore, the Mental Health Subclass is so numerous that joinder of all Subclass members is impracticable.

**Fed. R. Civ. P. 23(a)(2): Commonality**

303.    There are multiple questions of law and fact common to the entire Mental Health Subclass, including whether Defendants' mental health care policies and practices constitute deliberate indifference to serious mental health needs by creating a substantial risk of serious harm in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

**Fed. R. Civ. P. 23(a)(3): Typicality**

304.    Each of the Mental Health Subclass Plaintiffs, like all putative Subclass members, are subject to Defendants' mental health care policies and practices. The Mental Health Subclass Plaintiffs' claims, therefore, are typical of the Mental Health Subclass' claims.

**Fed. R. Civ. P. 23(a)(4): Adequacy of Representation**

305.    Each of the Mental Health Subclass Plaintiffs will fairly and adequately represent the interests of the Mental Health Subclass and will diligently serve as subclass representatives. Their interests are co-extensive with those of the Mental Health Subclass and they have retained a team of counsel experienced with class actions alleging constitutional violations at correctional facilities.  Putative Class Counsel possess the experience and resources necessary to fairly and adequately represent the Subclass.

**Fed. R. Civ. P. 23(b)(2)**

306.    Defendants have acted, or failed to act, on grounds generally applicable to the entire Subclass.  Specifically, Defendants are responsible for the promulgation of policies and practices related to mental health care.  All Mental Health Subclass members are subject to these same policies and practices.  Defendants' acts and omissions make final injunctive relief and corresponding declaratory relief appropriate as to the Mental Health Subclass as a whole.

**The Units 5 and 6 Subclass**

307.    Pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(1), and 23(b)(2), Plaintiffs Luckett, Chandler, and Galloway (collectively, "the Units 5 and 6 Subclass Plaintiffs") bring this action on behalf of themselves and a class of all persons who are currently, or will be, housed in Units 5 and 6 at the East Mississippi Correctional Facility (hereinafter, the "Units 5 and 6 Subclass").

**Fed. R. Civ. P. 23(a)(1): Numerosity**

308.    Approximately 250 prisoners are currently housed in Units 5 and 6 at EMCF. The proposed Subclass also includes all prisoners who will be housed in these units in the future. Therefore, the Subclass is so numerous that joinder of all Subclass members is impracticable.

**Fed. R. Civ. P. 23(a)(2): Commonality**

309.    There are multiple questions of law and fact common to the entire Units 5 and 6 Subclass, including:

a. Whether Defendants' policies and practices of failing to maintain toilets, light fixtures, and showers in clean and working order constitute violations of the Eighth and Fourteenth Amendments to the United States Constitution; and

b. Whether Defendants' policies and practices of housing prisoners in filthy conditions, including subjecting them to an infestation of rodents, constitute violations of the Eighth and Fourteenth Amendments to the United States Constitution.

**Fed. R. Civ. P. 23(a)(3): Typicality**

310.    Each of the Units 5 and 6 Subclass Plaintiffs, like all putative Subclass members, are subject to Defendants' policies and practices of failing to maintain a clean and safe environment.   The Units 5 and 6 Subclass Plaintiffs' claims, therefore, are typical of the Units 5 and 6 Subclass' claims.

**Fed. R. Civ. P. 23(a)(4): Adequacy of Representation**

311.    Each of the Units 5 and 6 Subclass Plaintiffs will fairly and adequately represent the interests of the Units 5 and 6 Subclass and will diligently serve as subclass representatives. Their interests are co-extensive with those of the Units 5 and 6 Subclass and they have retained a team of counsel experienced with class actions alleging constitutional violations at correctional facilities.   Putative Class Counsel possesses the experience and resources necessary to fairly and adequately represent the Subclass.

**Fed. R. Civ. P. 23(b)(2)**

312.    Defendants have acted, or failed to act, on grounds generally applicable to the entire class.   Specifically, Defendants are responsible for the promulgation of policies and practices governing the environmental conditions in Units 5 and 6 to which all prisoners housed

therein are subject. All Units 5 and 6 Subclass members are subject to these same policies and practices. Defendants' acts and omissions make final injunctive relief and corresponding declaratory relief appropriate as to the Units 5 and 6 Subclass as a whole.

## CLAIMS FOR RELIEF

### First Claim for Relief
### (Eighth Amendment and 42 U.S.C. § 1983: Health Care)

313. By their policies and practices described herein, Defendants subject the EMCF Class Plaintiffs and the EMCF Class to a substantial risk of serious harm and injury from inadequate medical care, including dental care, optical care, and other health-related services. These policies and practices have been and continue to be implemented by Defendants and their agents, officials, employees, and all persons acting in concert with them under color of state law, in their official capacities, and are the cause of the EMCF Class Plaintiffs' and the EMCF Class' ongoing deprivation of rights secured by the United States Constitution under the Eighth and Fourteenth Amendments and federal law.

314. Defendants have been and are aware of all of the deprivations complained of herein, and have condoned or been deliberately indifferent to such conduct.

### Second Claim for Relief
### (Eighth Amendment and 42 U.S.C. § 1983: Mental Health Care)

315. By their policies and practices described herein, Defendants subject the Mental Health Subclass Plaintiffs and the Mental Health Subclass to a substantial risk of serious harm and injury from inadequate mental health care. These policies and practices have been and continue to be implemented by Defendants and their agents, officials, employees, and all persons acting in concert with them under color of state law, in their official capacities, and are the cause of the Mental Health Subclass Plaintiffs' and the Mental Health Subclass' ongoing deprivation of

rights secured by the United States Constitution under the Eighth and Fourteenth Amendments and federal law.

316.    Defendants have been and are aware of all of the deprivations complained of herein, and have condoned or been deliberately indifferent to such conduct.

### Third Claim for Relief
### (Eighth Amendment and 42 U.S.C. § 1983: Isolation)

317.    By their policies and practices described herein, Defendants subject the Isolation Subclass Plaintiffs and the Isolation Subclass to a substantial risk of serious harm and injury from housing them in conditions that amount to solitary confinement, including risks of harm from inadequate physical exercise, filthy and unsafe environmental conditions, inadequate nutrition, inadequate mental health treatment, and conditions of extreme social isolation and sensory deprivation. These policies and practices have been and continue to be implemented by Defendants and their agents, officials, employees, and all persons acting in concert with them under color of state law, in their official capacities, and are the cause of Isolation Subclass' Plaintiffs and the Isolation Subclass' ongoing deprivation of rights secured by the United States Constitution under the Eighth and Fourteenth Amendments and federal law.

318.    Defendants have been and are aware of all of the deprivations complained of herein, and have condoned or been deliberately indifferent to such conduct.

### Fourth Claim for Relief
### (Eighth Amendment and 42 U.S.C. § 1983:  Excessive Force)

319.    By their policies and practices described herein, Defendants subject the EMCF Class Plaintiffs and the EMCF Class to a substantial risk of serious harm and injury from the infliction of excessive force.   These policies and practices have been and continue to be implemented by Defendants and their agents, officials, employees, and all persons acting in

concert with them under color of state law, in their official capacities, and are the cause of the EMCF Class' Plaintiffs and the EMCF Class' ongoing deprivation of rights secured by the United States Constitution under the Eighth and Fourteenth Amendments and federal law.

320.    Defendants have been and are aware of all of the deprivations complained of herein, and have condoned or been deliberately indifferent to such conduct.

### Fifth Claim for Relief
### (Eighth Amendment and 42 U.S.C. § 1983: Protection from Harm)

321.    By their policies and practices described herein, Defendants subject the EMCF Class Plaintiffs and the EMCF Class to a substantial risk of serious harm by failing to protect them from violence, ignoring by act or omission, emergency situations, and enabling violent attacks on prisoners.  These policies and practices have been and continue to be implemented by Defendants and their agents, officials, employees, and all persons acting in concert with them under color of state law, in their official capacities,  and  are  the  cause of the EMCF Class Plaintiffs' and the EMCF Class' ongoing deprivation of rights secured by the United States Constitution under the Eighth and Fourteenth Amendments and federal law.

322.    Defendants have been and are aware of all of the deprivations complained of herein, and have condoned or been deliberately indifferent to such conduct.

### Sixth Claim for Relief
### (Eighth Amendment and 42 U.S.C. § 1983: Environmental Conditions)

323.    By their policies and practices described herein, Defendants subject the Units 5 and 6 Subclass Plaintiffs and the Units 5 and 6 Subclass to a substantial risk of serious harm and injury from dangerous environmental conditions, including, but not limited to, vermin, exposure to smoke and other toxic substances that endanger health, filthy cells and fixtures, broken plumbing, inoperable lighting, constant illumination, and inadequate ventilation.  These policies

and practices have been and continue to be implemented by Defendants and their agents, officials, employees, and all persons acting in concert with them under color of state law, in their official capacities, and are the cause of the Units 5 and 6 Subclass Plaintiffs' and the Units 5 and 6 Subclass' ongoing deprivation of rights secured by the United States Constitution under the Eighth and Fourteenth Amendments and federal law.

324.   Defendants have been and are aware of all of the deprivations complained of herein, and have condoned or been deliberately indifferent to such conduct.

**Seventh Claim for Relief**
**(Eighth Amendment and 42 U.S.C. § 1983: Nutrition and Food Safety)**

325.   By their policies and practices described herein, Defendants subject the EMCF Class Plaintiffs and the EMCF Class to a substantial risk of serious harm and injury by providing inadequate nourishment to maintain health and serving food in an unsanitary and unsafe manner. These policies and practices have been and continue to be implemented by Defendants and their agents, officials, employees, and all persons acting in concert with them under color of state law, in their official capacities, and are the cause of the EMCF Class Plaintiffs' and the EMCF Class' ongoing deprivation of rights secured by the United States Constitution under the Eighth and Fourteenth Amendments and federal law.

326.   Defendants have been and are aware of all of the deprivations complained of herein, and have condoned or been deliberately indifferent to such conduct.

**<u>PRAYER FOR RELIEF</u>**

327.   Plaintiffs and the class and subclasses they seek to represent have no adequate remedy at law to redress the wrongs suffered as set forth in this complaint.  Plaintiffs and the class and subclasses they seek to represent have suffered and will continue to suffer irreparable injury as a result of the unlawful acts, omissions, policies, and practices of Defendants Epps,

Longley, and Perry, as alleged herein, unless this Court grants the relief requested. The need for relief is critical because the rights at issue are paramount under the United States Constitution and the laws of the United States.

328. **WHEREFORE**, Plaintiffs pray that this Honorable Court grant the following relief:

A. Declare that the suit is maintainable as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2);

B. Adjudge and declare that the acts, omissions, policies, and practices of Defendants, and their agents, employees, officials, and all persons acting in concert with them under color of state law or otherwise as described herein are in violation of the rights of the Plaintiffs and the classes and subclasses they seek to represent under the Cruel and Unusual Punishments Clause of the Eighth Amendment to the United States Constitution and federal law;

C. Preliminarily and permanently enjoin Defendants, their agents, employees, officials, and all persons acting in concert with them under color of state law, from subjecting Plaintiffs and the class and subclasses they seek to represent to the illegal and unconstitutional conditions, acts, omissions, policies, and practices set forth above;

D. Order Defendants to develop and implement, as soon as practical, a plan to eliminate the substantial risks of serious harm that Plaintiffs and members of the class and subclasses suffer due to inadequate medical (including dental and optical) and mental health care, filthy and dangerous environmental conditions, excessive force used by prison staff, failure to protect prisoners from violence, malnutrition and unsanitary food preparation and delivery, and use of isolated confinement. Defendants' plan shall include at a minimum the following:

    i. **Isolation:** Prohibition against confining the Isolation Named Plaintiffs and the Isolation Subclass in solitary confinement under conditions of social isolation

and sensory deprivation that put prisoners at substantial risk of serious physical and psychological harm and pain;

ii. **Mental Health Care:** Provision of timely access to adequate treatment for serious mental illness, including, but not limited to, medication, therapy, inpatient treatment, suicide prevention, and suicide watch in a manner that abates a substantial risk of serious harm;

iii. **Medical Care:** Provision of timely access to adequate medical care, including services such as dental and optical care, to treat serious health needs and to abate a substantial risk of serious harm;

iv. **Excessive Force:** Protection of prisoners from the use of excessive force by prison staff;

v. **Protection from Harm:** Protection of prisoners from harm by other prisoners and failing to timely respond to emergency conditions by, *inter alia*, assuring an adequate level of properly trained staff;

vi. **Environmental Conditions:** Housing prisoners in safe and clean conditions free from filth and vermin and with adequate access to exercise, outdoor recreation, showers, lighting, sanitation, plumbing, ventilation, and other basic human needs required by dignity, civilized standards, humanity, and decency;

vii. **Nutrition and Food Safety:** Provision to prisoners of nutritionally adequate meals prepared and served in a safe and sanitary manner; and

viii. **Accountability, Oversight, and Monitoring:** Adequate monitoring and timely remediation of the performance of any and all private prison contractors, including health contractors, to whom Defendants delegate the operation of EMCF.

E. Award Plaintiffs the costs of this suit, and reasonable attorneys' fees and litigation expenses pursuant to 42 U.S.C. § 1988, and other applicable law;

F. Retain jurisdiction of this case until Defendants have fully complied with the orders of this Court, and there is a reasonable assurance that Defendants will continue to comply in the future absent continuing jurisdiction; and

G. Award such other and further relief as the Court deems just and proper.

RESPECTFULLY SUBMITTED, this 30th day of May, 2013.

Jody E. Owens, II, MS Bar No. 102333
Elissa Johnson, MS Bar No. 103852
Southern Poverty Law Center
111 East Capitol Street, Suite 280
Jackson MS 39201
Phone: 601-948-8882
Fax: 601-948-8885
jody.owens@splcenter.org
elissa.johnson@splcenter.org


Gabriel B. Eber (*pro hac vice* to be filed)
Margaret Winter (*pro hac vice* to be filed)
Ajmel Quereshi (*pro hac vice* to be filed)
National Prison Project of the ACLU
915 15th St., NW, 7th Floor
Washington, DC 20005
Phone: 202-393-4930
Fax: 202-393-4931
geber@npp-aclu.org
mwinter@npp-aclu.org
aquereshi@npp-aclu.org


Elizabeth Alexander (*pro hac vice* to be filed)
Law Offices of Elizabeth Alexander
Law Offices of Elizabeth Alexander
1416 Holly St., NW
Washington, DC 20012
Phone: 202-291-3774
ealexander@lawofficesofelizabethalexander.com