## IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF MISSISSIPPI
## JACKSON DIVISION

| | |
|---|---|
| JERMAINE DOCKERY, DAVID THOMPSON, JEFFERY COVINGTON, JOSEPH OSBORNE, COURTNEY GALLOWAY, PHILLIP FREDENBURG, JOHN BARRETT, TAFFOREST CHANDLER, ERIC WARD, DERRICK HAYES, CHRISTOPHER LINDSEY, DEXTER CAMPBELL, ALVIN LUCKETT, JAMES VANN, BENJAMIN McABEE, and ANTHONY EVANS on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> CHRISTOPHER EPPS, in his official capacity as Commissioner of the Mississippi Department of Corrections, GLORIA PERRY, in her official capacity as Chief Medical Officer for the Mississippi Department of Corrections,  and ARCHIE LONGLEY, in his official capacity as Deputy Commissioner for Institutions of the Mississippi Department of Corrections, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br> Civil Action No. 3:13cv326-TSL-JMR |

### PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PROTECTIVE ORDER AGAINST RETALIATION, INTIMIDATION, AND COERCION

Plaintiffs ask the Court to enter a Protective Order pursuant to Federal Rule of Civil Procedure 23(d)(1), the All Writs Act, 28 U.S.C. § 1651, and its inherent authority to manage the administration of justice, restraining Defendants' agents, contractors, and employees from retaliating against, threatening, coercing, assaulting, or otherwise punishing prisoners in the

custody of the Mississippi Department of Corrections (MDOC) at the East Mississippi Correctional Facility (EMCF) in order to thwart or chill their participation in the above-captioned lawsuit. Plaintiffs also ask the Court to require Defendants to take all necessary and reasonable measures to prevent such wrongful conduct by their agents, contractors, and employees.

On May 30, 2013, 16 prisoners confined at EMCF filed the instant action on behalf of themselves and all others similarly situated. They allege that Defendants' policies and practices subject them to unconstitutional conditions of confinement, including deliberate indifference to their serious medical and mental health needs; failure to protect them from violence; dangerous living conditions, including filth, vermin, and human waste; substantial risks of serious harm from solitary confinement; failure to provide proper nutrition; and excessive force and brutality by staff.

During counsel's investigation of this action, many prisoners informed Plaintiffs' Counsel that prison staff were threatening, punishing, intimidating, violently abusing and otherwise retaliating against them for meeting with Plaintiffs' Counsel, filing grievances, or otherwise complaining about the conditions of their confinement. A court order is necessary to protect witnesses from violence, intimidation and retaliation by Defendants' employees, agents and contractors, and all those acting in concert with them and to defuse the atmosphere of threats and coercion so as to allow the orderly progress of this litigation, and prevent the material impairment of the Court's fact-finding.

## I.     A PATTERN OF VIOLENT RETALIATION, COERCION AND INTIMIDATION AT EMCF WARRANTS THE REQUESTED ORDER

There is a long-standing and pervasive pattern at EMCF of excessive force and violence by security staff, as well as intimidation, punishment, retaliation and coercion by prison employees and contractors against prisoners who seek to redress for grievances concerning the conditions of their confinement.  By means of violence, threats, punishments, misrepresentations, and other forms of interference, Defendants' agents and employees actively seek to chill the exercise by prisoners at EMCF of their rights to submit grievances to prison officials, to meet with counsel, to seek redress in the federal courts, or otherwise to assert their rights under the United States Constitution and federal law.

### A.     Defendants' Agents and Employees Physically Abuse and Threaten Prisoners Who Complain about Conditions of Confinement

EMCF is a hyper-violent prison.  The use of excessive force against prisoners by security staff is commonplace, especially against prisoners who make complaints about the conditions of their confinement.

Plaintiff Anthony Evans suffers from a long history of serious mental illness and seizure disorder.  While in solitary confinement, Mr. Evans felt a seizure coming on and threw his tray out of the tray slot to catch officers' attention so that he could receive medical care.  An officer who was busy spraying another prisoner with Mace stopped what he was doing and emptied the remainder of the gas canister into Mr. Evans' cell.  The officer called him a "bitch," closed the tray slot, and left Mr. Evans in a Mace-filled cell with no ventilation. Mr. Evans went into a seizure and passed out.[1]

---

[1] Ex. 1, Evans Decl. ¶¶3-6.

When Marcus Davis refused to speak with a mental health counselor and requested instead to speak with a psychiatrist, the counselor called the emergency response team which slammed Mr. Davis to the ground while punching him and stripping him of his clothing.[2]

Larry Walker suffers from symptoms of serious mental illness.  He also suffers from hypertension and kidney dysfunction.  He has been told that he will need dialysis soon.  On April 5, 2013, when Mr. Walker was locked in a cell behind a solid door in long-term solitary confinement, he developed pain in his kidney area and began to feel sick.  He tried to get the attention of an officer but there were none on his zone.  Other prisoners began kicking on their doors, hoping that the noise would summon help.  But no help came.  In a last attempt to attract the attention of an officer, Mr. Walker set a milk carton on fire.  A high-ranking officer came to Mr. Walker's cell carrying a fire extinguisher, aimed it at Mr. Walker through his tray slot, and sprayed Mr. Walker while yelling "Die, I want you to die.  I'm a [sic] make sure I kill you before I leave here" and "I am going to help you die." When he was done spraying, the officer closed the tray slot and left.  Mr. Walker passed out.  As of April 16, he had not left his cell out of fear for his safety and was afraid to eat; residue from the fire extinguisher remained in his cell.[3]

In January 2013, Plaintiff Jeffrey Covington was confined in a cell soaked with water from a flood in an adjacent cell.   Mr. Covington asked that the water be cleaned up.   A ranking security officer put Covington in a choke hold, even though Covington's hands were cuffed behind his back and he posed no threat.  Mr. Covington told the officer, "You know you're not supposed to grab me like that," to which the officer replied, "I can do what the fuck I want."  The officer slammed Mr. Covington's head into the wall, threw him to the floor, put his foot on Mr.

---

[2] Ex. 2, Davis Decl. ¶¶3-4.

[3] Ex. 3, Walker Decl.  ¶¶3-8.

Covington's face, leaned his knee on Mr. Covington's back and placed him in full restraints.  Mr. Covington asked to be taken to medical and was denied.[4]

In March 2013, Plaintiff Jermaine Dockery had trouble breathing inside his solitary confinement cell due to the smoke from uncontrolled fires burning on the unit.  He complained to an officer who responded that he "didn't give a fuck" and slammed the tray slot closed on Mr. Dockery's wrist.[5]

In December 2012, Plaintiff Derrick Hayes, who suffers from asthma, refused to close his tray slot to protest not having received his inhaler.  Although Mr. Hayes presented no current threat, an officer sprayed Mace into Mr. Hayes' cell and then closed the tray flap, closing off ventilation to the cell.  As a result, Mr. Hayes suffered an asthma exacerbation.  He was later examined by a nurse but was not permitted to decontaminate or wash the Mace from his skin or eyes.  The officer who sprayed Mr. Hayes with Mace asked him if he was planning to tell his lawyers.[6]

James Kendrick has a serious and excruciatingly painful deep, open wound on his arm that was inadequately treated by prison medical staff.  His wound worsened due to filthy conditions in the solitary confinement unit and by the active interference of a correctional officer in Mr. Kendrick's prescribed wound care.  When Mr. Kendrick didn't receive his prescribed medication he put his arm through his tray slot to show the officer the wound.  The officer kicked his arm.[7]

---

[4] Ex. 4, Covington Decl. ¶¶3-6.

[5] *See* Ex. 5, Dockery Decl. ¶¶5-6.

[6] *See* Ex. 6, Hayes Decl. (May 23, 2013) ¶¶3-6.

[7] *See* Ex. 7, Kendrick Decl. ¶¶3-4.

After intervention by Plaintiffs' counsel, Mr. Kendrick was moved from solitary confinement to a medical observation cell. In the medical unit, an officer came to his cell saying "what's up bitch?" and "can't wait for you to come back to [the solitary unit], I've got a treat for you." A senior officer warned Mr. Kendrick that if he stopped talking to "certain people" (meaning Plaintiffs' counsel) he might get the care he needs.[8]

In March 2012, security staff sprayed Lindsey Johnson with chemicals and told him that "there were no limits" to what they could do to him. One officer has told prisoners that he will "bust a cap in [their] ass," and threatens to poison their food, telling them "I'm the motherfucker who has to feed you."

In mid-September 2012, Plaintiff Tafforest Chandler's toilet had been broken for months. He had not been offered a shower in three weeks or given cleaning supplies in months. The light in Mr. Chandler's cell had been broken for months; his tray slot was the only source of light sufficient to read and write by. Otherwise, he lived in the dark. Three officers came onto the zone and began closing the prisoners' tray slots. When Mr. Chandler told officers that he wanted his tray slot to remain open, a high-ranking officer ordered him to "shut up and back up from the tray slot." Another officer stuck his pepper ball gun through the slot and aimed it at Mr. Chandler, who grabbed his pillow in attempt to shield himself. Officers fired several rounds of pepper balls into his cell before removing him and slamming his face into a wall and against the floor.[9]

Mr. Chandler could not breathe and his skin felt like it was on fire. He asked for medical help. He was refused. He asked to decontaminate and wash off the pepper ball residue from his

---

[8] Ex. 7, Kendrick Decl. ¶¶5-6.

[9] *See* Ex. 8, Chandler Decl. ¶¶3-8.

skin.  He was refused.  Later, back in his cell, he continued to have trouble breathing.  Other prisoners banged on their doors to get help.  Mr. Chandler had to break a fire sprinkler to wash the pepper residue off of his skin and out of his cell.[10]   Later, a nurse completed a "body sheet" but did not provide medical care.

In another instance, an officer physically assaulted Garrick Woods, then threatened to "punch him in his dumb mouth" if he reported the incident.  Upon information and belief, officers enlist other prisoners to intimidate and extort prisoners who file grievances.[11]

### B.    Abuse, Coercion, and Intimidation as Consequences of Communicating with Counsel and Other Attempts to Exercise Constitutional Rights

In addition to intimidating and coercing prisoners through violence, officials at EMCF obstruct and interfere with prisoners who exercise their constitutional rights. Particularly egregious is the interrogations of prisoners about their privileged communications with putative class counsel.

On March 6, 2013, minutes after speaking with Plaintiffs' Counsel, officers took Plaintiff Dockery into a room where he was interrogated by several officers, a mental health counselor, and other staff.  They asked Mr. Dockery to divulge the contents of his meeting with Plaintiffs' Counsel and to tell them what Plaintiffs' Counsel was doing at EMCF.[12]

Similarly, a few days after Plaintiff Fredenburg's first meeting with Plaintiffs' Counsel, a security officer entered Mr. Fredenburg's cell, hand-cuffed him, and demanded to know "what

---

[10] *See* Ex. 8, Chandler Decl. ¶¶9-10.

[11] *See generally,* Ex. 9, Campbell Decl. ¶¶9-10.

[12] *See* Ex. 5, Dockery Decl. ¶¶3-4.

those ACLU people want to know."  When Mr. Fredenburg asserted his right to maintain the confidentiality of his legal matters, the officer confiscated and read some of his legal papers.[13]

Likewise, after Plaintiff Hayes met with Plaintiffs' Counsel, a security officer demanded that Mr. Hayes tell him what he had told his attorneys, taunting "whatcha gonna do, snitch to your lawyer?"

Even the physician at EMCF intimidates and coerces prisoners who seek proper medical care.  On a number of occasions he has instructed his patients at EMCF not to speak with Plaintiffs' Counsel.  In June 2012, Plaintiff Dexter Campbell submitted an emergency ARP (grievance) seeking mental health care.  In mid-October, EMCF's physician met with Mr. Campbell and questioned him about his communications with Plaintiffs' Counsel.  EMCF's physician told Mr. Campbell that he would provide whatever care he wanted.  When Mr. Campbell refused to discuss his legal affairs, the doctor became very angry, and abruptly left the appointment without treating Mr. Campbell.

During a subsequent encounter, EMCF's physician denied having questioned Mr. Campbell about his legal matters, yet asked to see the legal papers that Mr. Campbell was carrying.  Mr. Campbell declined, and the doctor again became angry and stated that he "didn't give a rat's ass" about any lawsuit.  He then told Mr. Campbell that there was nothing medically wrong with him.[14]

EMCF's physician (who is neither a psychiatrist nor a mental health clinician) met with another prisoner, Merlin Hill, about an ARP related to mental health care, interrogated him about his involvement with the ACLU, and sought to intimidate him from working with the ACLU.

---

[13] *See* Ex. 10, Fredenburg Decl. ¶¶3-4.

[14] Ex. 9, Campbell Decl. ¶¶2-5.

EMCF's physician asked the prisoner if he was involved with the ACLU, to which the prisoner responded:

> I told him that I had met with the ACLU and that they had helped me with the ARP. [The doctor] told me that I should not speak with the ACLU and that if I had problems with medical that I should come straight to him and that he would take care of it immediately. He was pretty strong in the way he was talking and implied that I shouldn't take problems out of medical [and] that he would have twenty minutes of paperwork unless I dropped [the] ARP.[15]

EMCF's physician asked yet another prisoner:

> …if I was one of the inmates who had been talking to the ACLU. I told him "no" even though I had met with [Southern Poverty Law Center]. I was scared that if I told the truth I would be sent to Parchman or locked down. [The doctor] told me that I should stop talking to the ACLU and to give him a chance to help him.[16]

### C. Prison Officials Actively Thwart Prisoners' Access to the Administrative Remedy Program at EMCF.

MDOC and EMCF officials actively thwart prisoners' efforts to exhaust their administrative remedies, effectively baring access to the federal courts by prisoners who seek to challenge conditions at EMCF.[17]

Large numbers of ARPs submitted by prisoners at EMCF either "disappear" or are simply ignored.[18]   But in addition, Defendants and their agents and contractors at EMCF,

---

[15] Ex. 11, Hill Decl. ¶¶7-8.

[16] Ex. 12, Brewer Decl ¶7.

[17] Prisoner grievances in Mississippi are referred to as "ARPs," short for Administrative Remedy Program.  According to official policy:

> The MDOC has established the Administrative Remedy Program through which an inmate may seek formal review of a complaint which relates to any aspect of his incarceration if less formal methods have not resolved the matter.  Through this procedure, inmates shall receive reasonable responses and where appropriate, reasonable remedies.

Administrative Remedy Procedure, attached as Ex. A to Agreed Order to Amend Administrative Remedy Program, *Gates v. Barbour*, No. 4:71-cv-00006-DAS (N.D. Miss. Aug. 9, 2010).

individually and in concert, mislead, harass, coerce, and retaliate against prisoners who attempt to follow the rules by bringing complaints through the ARP process.

In November 2012, Plaintiffs' Counsel asked MDOC to investigate multiple ARPs to which responses were long overdue.[19]  MDOC promptly dispatched an Administrative Remedy Program Investigator to EMCF to determine the cause of the delays.[20]

The "investigation" that ensued, however, seems to have consisted largely of questioning the prisoners about their privileged conversations with Plaintiffs' Counsel.  The investigator demanded to know, for example, their litigation plans, if the prisoners were speaking with the Plaintiffs' Counsel, if they had filed their grievances before or after meeting with the Plaintiffs' Counsel, the names of their lawyers, whether the prisoners were still contacting Plaintiffs' Counsel, and when they had last met with the Plaintiffs' Counsel.[21]  The investigator told one prisoner who had submitted a grievance about denial of proper dental care that if he did not keep quiet about his teeth he could be sent to Parchman.[22]  The investigator subsequently reported to his superiors that this prisoner – and another – were working with Plaintiffs' Counsel – although the prisoners never told this to the investigator.[23]

---

[18] In 2009, MDOC's ARP coordinator for EMCF admitted "lately some ARPs have been lost in the Commissioner's office."  As the Court noted, "A prisoner cannot realistically exhaust a special issue ARP if it is lost by MDOC." *Rivers v. Caskey*, No. 4:09–CV–79–CWR–LRA, 2012 WL 4508002, at *3 (S.D. Miss. Sept. 28, 2012).

[19] *See* Ex. 13 at 4-5, Winter/Sparkman email correspondence (Nov. 28, 2012).

[20] *See* Ex. 13 at 1, Winter/Sparkman email correspondence (Dec. 8, 2012).

[21] *See* Ex. 14, Miskell Decl. ¶5; Ex. 12, Brewer Decl. ¶¶3-4; Ex. 15, Hughes Decl. ¶2; Ex. 16, McAbee Decl. ¶¶2, 5.

[22] Ex. 12, Brewer Decl.  ¶5.

[23] *Id.* ¶5; Ex. 15,  Hammil Decl. ¶2.  *See* Ex. 12 at 3, Winter/Sparkman email correspondence (Dec. 8, 2012) at 3.

In the case of Plaintiff Hayes, it appears that prison officials went even further to suppress a grievance.  Mr. Hayes submitted an ARP in September 2012, complaining that he suffered asthma exacerbations when prison officials sprayed Mace in the solitary confinement unit.[24]  After more than two months without a response, the ACLU asked MDOC to investigate and report on the status of his ARP.[25]  Shortly after this request, an MDOC official – apparently the MDOC ARP investigator – visited Mr. Hayes and asked him if he was "ready to drop" his ARP.  Mr. Hayes told him no.[26]  A few more months passed without a response to Mr. Hayes' ARP.  Once again, the ACLU asked MDOC to investigate.[27] MDOC responded by providing a copy of a document purportedly signed by Mr. Hayes stating, "My complaint has been satisfied and I voluntarily drop the above named cause [sic] number."[28]  Mr. Hayes had never seen the document before and had never agreed to withdraw his ARP.[29]  The signature on the document was not his, but a crude forgery. *Id*.

Officials and staff also mislead prisoners about the rules of the ARP program causing prisoners to withdraw their ARPs.  For example, in September 2012 Plaintiff McAbee submitted an ARP seeking proper care for HIV infection and hypertension.  At the time, Mr. McAbee had another ARP pending.  A staff member told Mr. McAbee that policy prohibited prisoners from submitting a new ARP when another ARP is pending, and that Mr. McAbee would have to

---

[24] Ex. 16, Hayes Decl. (Dec. 12, 2012) ¶1.

[25] *See* Ex. 13 at 1, Winter/Sparkman email correspondence (Dec. 8, 2012).

[26] Ex. 16, Hayes Decl. (Dec. 12, 2012) ¶¶2-3.

[27] *See* Ex. 17, Winter/Sparkman email correspondence (Feb. 28, 2013).

[28] Ex. 17, Winter/Sparkman email correspondence (March 1, 2013); Ex. 18, Document attached to email Sparkman/Winter correspondence of March 1, 2013.

[29] Ex. 18, Hayes Decl. (March 6, 2013) ¶¶4-7.

withdraw one of the two ARPs.  Though MDOC refuses to process more than one grievance at a time, there is no policy requiring inmates to withdraw a pending grievance before submitting another.  Mr. McAbee, however, believing what he was told by staff, withdrew one of the ARPs.[31]

The protective order Plaintiffs seek is well within the Court's authority under the Federal Rules of Civil Procedure, All Writs Act, and the Court's inherent authority to manage lawsuits pending before it.  Several courts have issued similar orders when class members or potential class members faced coercion or intimidation.  The requested order is necessary because prisoners at EMCF reasonably fear retaliation for challenging their conditions of confinement with good reason in the absence of a protective order this Court's ability to conduct fact-finding may be materially impaired.

## II.     THE COURT HAS AMPLE AUTHORITY TO ENTER THE REQUESTED PROTECTIVE ORDER

**The Court may Enter the Order Requested Pursuant to Fed. R. Civ. P. 23(d)**

District courts have wide discretion to enter orders to manage class actions such as the instant matter.  Federal Rule of Civil Procedure 23(d)(1) provides that, in conducting class actions, courts may issues orders that "impose conditions on the representative parties," Fed. R. Civ. P. 23(d)(1)(C), and "deal with similar procedural matters."  Fed. R. Civ. P. 23(d)(1)(E). The Supreme Court explains this authority in the context of the policy goals underlying class actions:

> Class actions serve an important function in our system of civil justice.  They present, however, opportunities for abuse as well as problems for courts and counsel in the management of cases.  Because of the potential for abuse, a district court has both the duty and the broad authority to exercise control over a class

---

[31] *See, e.g.,* Ex. 19, McAbee Decl. ¶3.

action and to enter appropriate orders governing the conduct of counsel and parties.

*Gulf Oil Co. v. Bernard,* 452 U.S. 89, 99-100 (1981).  Courts have invoked this authority to enter orders protecting class members and putative class members in actions brought pursuant to Rule 23 as well as collective actions brought under the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201 *et seq.*  In such cases, courts have restricted interactions with absent class members by an opposing party's agents "where communications were misleading, coercive, or an improper attempt to undermine Rule 23 by encouraging class members not to join the suit."  *Belt v. EmCare Inc.*, 299 F. Supp. 2d 664, 667 (E.D. Tex. Dec. 18, 2003).  *See also Longcrier v. HL-A Co., Inc.*, 595 F. Supp. 2d 1218, 1227 (S.D. Ala. Dec. 10, 2008) (restricting communications when a party has engaged in "coercive behavior with respect to prospective class members.").  Defendants' agents and contractors have engaged in misleading communications and coercive behavior as well as much more egregious conduct.

Officers have physically assaulted prisoners who have asked to have their basic human needs met.  The denial of such human needs is at the heart of the instant litigation.   Security officers have threatened prisoners with death and serious injury.  Such violence and threats should, on their face, justify the entry of an order enjoining Defendants' agents and contractors from such conduct.  *See Recinos-Recinos v. Express Forestry, Inc.*, No. Civ. A 05-1355, 2006 WL 197030, at *7 (E.D. La. Jan. 24, 2006) (entering a protective order when defendants engaged in a campaign to threaten, intimidate, and coerce potential class members).  In such a situation, "a protective order is necessary to halt any improper communications and to diffuse the atmosphere of threats and coercion so as to allow the orderly progress of this litigation."  *Id.* at *8.

While such orders should be made on specific findings based on a clear record and a weighing of interests, *Gulf Oil*, 452 U.S. at 101-102, courts should consider the nature of the challenged conduct or communications as well as the context in which they occur. *Stransky v. HealthOne of Denver, Inc.*, No. 11–cv–02888, 2013 WL 856520, at *7 (D. Colo. March 7, 2013). In-person contacts with prospective class members are inherently more coercive than written communications and other vehicles through which intimidation and threats may be conveyed. *Kleiner v. First Nat'l Bank of Atlanta,* 751 F.2d 1193, 1206 (11th Cir. 1985); *Ojeda-Sanchez v. Bland Farms*, 600 F. Supp. 2d 1373, 1380 (S.D. Ga. 2009). Likewise, protective orders are particularly appropriate when there is a power differential between the parties. Prospective class members who rely on defendants for business or employment are particularly vulnerable to coercion. *Ojeda-Sanchez*, 600 F. Supp. 2d at 1379-80 (heightened likelihood of coercion because migrant workers depend on defendants for future employment); *Belt,* 299 F. Supp. 2d at 668 (heightened potential for coercion when defendants were "preying on the fears and concerns" of absent class members regarding employment); *Hampton Hardware*, *Inc. v. Cotter & Co.*, *Inc.*, 156 F.R.D. 630, 633 (N.D. Tex. Feb. 9, 1994) (potential for coercion when potential class members and defendants are in "ongoing business relationship").

Here, the power differential between Plaintiffs and correctional staff creates an environment immeasurably more coercive than the business and employer-employee relationships that were the subjects of the above-cited cases. Correctional officers literally have the power of life and death over prisoners. They have the power to physically restrain prisoners, spray them with Mace, assault them, deny them necessary medical and mental health care, expose them to attacks by other prisoners, and otherwise exercise complete power over their bodies. If "speech between parties with an ongoing business relationship is inherently conducive

to coercive influence," *Castillo v. Hernandez*, No. EP–10–CV–247–KC, 2011 WL 1528762, at *3 (W.D. Tex. April 20, 2011), then threats and physical violence represent coercion on a far greater order of magnitude.   In such cases, when conduct is "inherently conducive to overreaching and duress," a party need not show current, actual harm.   Rather, a "likelihood of serious abuse" is sufficient to support entry of a protective order.  *Id.  See also Kleiner*, 751 F.2d at 1206 (in the context of restricting commercial speech, no particularized findings of abusive conduct are necessary when speech is "inherently conducive to overreaching and duress").

Conduct need not reach the level of physical abuse and threats of bodily harm to be enjoined.   Plaintiffs may be protected from misleading in-person communications when those communications "would threaten the ability of plaintiffs and potential plaintiffs to assert their rights through this litigation."   *Ojeda-Sanchez*, 600 F. Supp. 2d at 1381 (holding that coercion need not be intentional to be enjoined).   In the instant action, forging a withdrawal of a prisoner's grievance and providing misleading information about the grievance process to seriously mentally ill prisoners are clearly the kinds of communications that the Court in *Gulf Oil* contemplated being enjoined.[32]   Other examples of coercive conduct that should be enjoined are the EMCF's physician statements to Merlin Hill and Tracy Brewer.   The physician instructed them not to talk with Plaintiffs' Counsel but rather to bring problems directly to him.  *See Belt*, 299 F. Supp. 2d at 667 (enjoining conduct when defendants "tapped into the fears and concerns perhaps held" by prospective opt-in class members).

Courts may likewise safeguard the policy goals of Federal Rule of Civil Procedure 23 by shielding class members from communications that may dissuade class members from participating in a class action or that would adversely affect their desire to cooperate with

---

[32] *See* Ex. 11, Hill Decl. ¶¶7-8. Ex. 11, Brewer Decl.  ¶5.

Plaintiffs' Counsel. *Hampton Hardware*, 156 F.R.D. at 632. The instructions by EMCF physician's to his patients that they should stop talking to Plaintiffs' Counsel falls well within this category. Meetings with plaintiffs and class members to discuss litigation are coercive and misleading when a party misleads or engages in improper conduct. *Quezada v. Schneider Logistics Transloading & Distrib.,* No. CV 12–2188, 2013 WL 1296761, at *5-6 (C.D. Cal. March 25, 2013) (finding deceptive interviews with class members to gather evidence without proper disclosure).

As noted above, several prisoners have declared that an MDOC investigator improperly inquired into their relationship and communications with Plaintiffs' Counsel during encounters that were supposed to resolve pending grievances. Indeed, when one prisoner asked the reason for such questions, he was told that they were "standard" to ask. This is overt deception and there can be no explanation for such behavior except to gather information about planned litigation against MDOC. These communications were inherently coercive, and in some circumstances, prisoners can be disciplined for refusing to answer questions. *See Quezada*, 2013 WL 1296761, at *2 (employees were told by defendants' attorneys a discussion about issues in litigation was "just an interview.").

**The All Writs Act and Court's Inherent Powers Provide Additional Bases for the Order**

In addition to their authority to enter orders to manage class actions pursuant to Federal Rule of Civil Procedure 23(d), courts may enter protective orders by exercising the "'equitable powers of courts of law over their own process, to prevent abuses, oppression, and injustice'" *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 35 (1984) (quoting *Gumbel v. Pitkin*, 124 U.S. 131, 144 (1888)). Indeed, in the prisoner class action *Madrid v. Gomez,* the district court relied upon "the Court's inherent powers" to enter a protective order prohibiting retaliation against or

16

interference with the plaintiff class.  Order, *Madrid v.Gomez*, No. C90-3094, (N.D. Cal. Sept. 17, 1993).[33]

These inherent powers derive from common law and are similar to the powers conferred by the All Writs Act, 28 U.S.C. § 1651, which confers similar powers but whose derivation is statutory.[34]   *See ITT Cmty. Dev. Corp. v. Barton*, 569 F.2d 1351, 1359 (5th Cir. 1978) (comparing the All Writs Act with the inherent powers doctrine and noting that the All Writs Act provides courts with "various common law equity devices").  The power to issue orders under the All Writs Act may even extend to non-parties who are "in a position to frustrate the implementation of a court order or the proper administration of justice." *United States v. N.Y. Tel. Co.*, 434 U.S. 159, 174 (1977).  The scope of orders issued under the Act is not limitless; orders must be "'directed at conduct which, left unchecked would have had the practical effect of diminishing the court's power to bring the litigation to a natural conclusion.'"  *Williams v. McKeithen,* 939 F.2d 1100, 1104-05 (5th Cir. 1991) (quoting *Barton*, 569 F.2d at 1359). *See also Cinel v. Connick,* 792 F. Supp. 492, 497 (E.D. La. 1992) (conduct of non-parties may be enjoined if such conduct could "inhibit a court's ability to correctly manage the case").  The Court's inherent powers and the All Writs Act both justify the entry of the requested protective order in order to "prevent abuses, oppression, and injustice." *Rhinehart*, 467 U.S. at 35.

The findings necessary to support such an order are distinguishable from those required for a preliminary injunction or a discovery-related protective order issued under Federal Rule of Civil Procedure 26(c).  In *Ben David v. Travisono*, prison inmates brought a class action

---

[33]Attached as Ex. 20.

[34] The All Writs Act provides, *inter alia*, that "[A]ll courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a).

challenging their conditions of confinement. 495 F.2d 562, 563 (1st Cir. 1974). At the plaintiffs'
request and following a hearing, the district court noted that prisoners had testified to "beatings,
gassing and 'strip' lockups, and that they feared further harassment and beatings." *Id*.  The court
entered an order enjoining prison officials, state police, and their agents from taking any
retaliatory action against plaintiffs or class members and from depriving them of "any and all
rights and privileges on account of plaintiffs and members of their class participating, assisting,
or volunteering any facts or circumstances in the furtherance of this lawsuit." *Id.*

   The court of appeals upheld this order, and approved the district court's determination
that, under the authority of the All Writs Act, the plaintiffs did not need to meet the usual criteria
for preliminary injunctions (e.g., likelihood of success on the merits and balancing of interests)
or ordinary Federal Rule of Civil Procedure 26(c) protective orders.  Given the circumstances of
the case, it was sufficient that the district court found that "serious accusations have been made"
that the plaintiffs reasonably feared retaliation for participating in the litigation and that the order
prohibiting retaliatory action was necessary to ensure a "'fair and meaningful evidentiary
hearing'" and an 'adequate inquiry' into plaintiffs' claims."   *Ben David,* 495 F.2d at 563.
Further, the court of appeals held that "[t]he findings necessary to support such a protective order
are simply that the plaintiffs reasonably fear retaliation and that the court's fact-finding may be
materially impaired unless there is provided the tangible protection of a suitable court order." *Id.*
at 564.  The court also acknowledged the uniqueness of the prison environment when assessing
the reasonableness of plaintiffs' fears of retaliation; the "rumor, suspicion, and the dependency
of the inmate might parlay even a low objective probability of misconduct into a substantial
subjective fear." *Id.*

In the case at bar, Plaintiffs' fears are reasonable and derive from a pattern of coercion, intimidation, misleading information, and physical force.   Such conduct has consequences beyond instilling fear in the individual victim.   Other prisoners witness the consequences of speaking up, thus multiplying the chilling effect of intimidating a single prisoner.   And, it is clearly counter to the sound administration of justice for prison staff, especially those charged with providing health care, to instruct prisoners to refrain from communicating with Plaintiffs' Counsel, or for an MDOC investigator to collect information about Plaintiffs' Counsel's activities under the guise of investigating prisoner grievances.   Particularly in light of the legal significance of successfully completing the ARP process, forgery or otherwise obstructing exhaustion of administrative remedies is egregious.   *See Davis v. Goord*, 320 F.3d 346, 353-54 (2d Cir. 2003) (inference with prison grievance process could constitute adverse action to support retaliation claim).

## CONCLUSION

Prisoners at EMCF have good reason to fear that they will suffer retaliation, intimidation or coercion if they come forward as witnesses or otherwise participate in this lawsuit. In the absence of the requested protective order, witnesses will be reluctant to come forward to testify and this Court's ability to conduct fact-finding may be materially impaired.   Plaintiffs therefore respectfully request that the Court enter an order:

> (1)     prohibiting Defendants, their officers, agents, contractors, employees, and all those acting in concert with them from retaliating against, physically abusing, punishing, intimidating, coercing or harassing prisoners at EMCF who complain about the conditions of their confinement;

(2)     prohibiting Defendants, their officers, agents, contractors, employees, and all those acting in concert with them from attempting to thwart and obstruct the efforts of prisoners at EMCF to participate in a legal challenge or to communicate with attorneys about the conditions of their confinement;

(3)     prohibiting Defendants, their officers, agents, contractors, employees, and all those acting in concert with them from providing deceptive or misleading information about the Administrative Remedy Program, forging documents related to the program, or otherwise obstructing prisoners seeking remedies through the program;

(4)     prohibiting Defendants, their officers, agents, contractors, employees, and all those acting in concert with them including, interrogating prisoners about their participation in this lawsuit, their conversations with Plaintiffs' Counsel, or otherwise attempting to deter prisoners from participating in this lawsuit;

(5)     requiring Defendants to post a copy of the requested Protective Order in all housing and common areas at EMCF and to distribute the policy to all prisoners held in segregation at EMCF; and requiring Defendants to take all necessary and reasonable measures to prevent such wrongful conduct by their agents, contractors, and employees.

RESPECTFULLY SUBMITTED, this 30th day of May, 2013.

s/Jody E. Owens, II
Jody E. Owens, II, MS Bar # 102333
Elissa Johnson, MS Bar #103852
Southern Poverty Law Center
111 E. Capitol Street, Suite 280
Jackson, MS39201
Phone: 601-948-8882
Fax: 601-948-8885
jody.owens@splcenter.org
elissa.johnson@splcenter.org


Gabriel B. Eber (*pro hac vice* to be filed)
Margaret Winter (*pro hac vice* to be filed)
Ajmel Quereshi (*pro hac vice* to be filed)
National Prison Project of ACLU
915 15th Street, NW, 7th Floor
Washington, DC 20005
Phone: 202-393-4930
Fax: 202-393-4931
geber@npp-aclu.org
mwinter@npp-aclu.org
aquereshi@npp-aclu.org


Elizabeth Alexander (*pro hac vice* to be filed)
Law Offices of Elizabeth Alexander
1416 Holly St., NW
Washington, DC 20012
Phone: 202-291-3774
ealexander@lawofficesofelizabethalexander.com