# EXHIBIT 4
# DECL. OF TORRIE ELLIS

I, Torrie Ellis, declare the following under penalty of perjury pursuant to 28 U.S.C. §1746

1. I am in prisoner in the custody of MDOC. I have been at EMCF since June of 2011.
2. I am currently being held in administrative segregation, in unit 6D and have been there since April 10, 2014. Before that time, I was housed in general population in housing unit 1D.
3. Unit Manger Banks has retaliated against me for my participation in this lawsuit and my discussion with the Southern Poverty Law Center (SPLC) and the American Civil Liberties Union, by having me falsely accused and convicted of a disciplinary violation for possession of contraband cell phone.
4. On April 1, 2014, I met with representatives from the Southern Poverty Law Center and the American Civil Liberties Union and an expert of theirs to discuss the conditions at EMCF.
5. At that time I was living in general population, Unit 1D, and I had a work assignment as a hall porter. As a hall porter I worked in the segregation units.
6. The following day, April 2, 2014, Unit Manager Banks asked me what I had discussed with SPLC and the ACLU. He asked why I was talking to the ACLU and SPLC since I am not housed in segregation. Mr. Banks said that Warden Buscher believes that I was the mastermind behind the SPLC and ACLU lawsuit. Mr. Banks said that for that reason the warden didn't want me to work on housing units 5 and 6.
7. I explained to Mr. Banks that the ACLU was investigating the prison back in 2010 before I was even moved to EMCF. I also told him that I live here and that I would talk to whomever I needed to help the prison get on the right track.
8. After that conversation, sometime later that week, Unit Manager Banks had a conversation with me about another prisoner, Robert Barkley. Mr. Banks questioned me about Barkley. Mr. Banks told me to go talk to Mr. Barkley and tell him that the reason he hasn't been taken for an x-ray is because Mr. Barkley "talks to them lawyers." I understood this to mean SPLC because they are the only lawyers that come to the prison regularly.
9. I told Mr. Barkley about my conversation with Mr. Banks and that Mr. Banks was delaying him from getting to medical because he meets with SPLC.
10. On the morning of April 10, I was doing my work as a hall porter. I picked up the trash on housing unit 6 and then began to cut hair on housing unit 5A. Around 2:00 in the afternoon, I swept up in the hallway in between housing units 5 and 6 and began to prepare to clean later that evening.
11. Around 3:00 that afternoon, I helped Officers Thomas, Adams, McCullough and Caples feed the prisoners on housing unit 6.
12. After I helped feed everyone on housing unit 6, Unit Manager Banks called me into his office. Dr. Davis, a mental health counselor, was also present.
13. Mr. Banks asked me had my lawyer been to see me this week. When he said my lawyer I understood him to mean the representatives from because they are the only legal visits I receive in addition to the visit previous week with the ACLU. I told him no, that I had not seen my lawyers this week.
14. Mr. Banks looked at Dr. Davis and said, "I thought Torrie was just loyal to me." I replied that I was loyal to whoever would make the prison run the right way.
15. Mr. Banks said that he came back to make the prison run the right way but he couldn't do that if we kept talking to the lawyers.
16. I then left his office and returned to my zone to prepare for Jumah the following Friday. It was almost 4:00 pm when I returned to my zone.



EXHIBIT 4

17. I was only on my zone for about 5-10 minutes before Officer Harris came and told me that Unit Manager Banks wanted me to report back to housing unit 5 and 6. Warden Hogan escorted me back to housing units 5 and 6.
18. I reported to Mr. Banks' office. Mr. Banks asked if I had finished cutting hair on 5A. I explained that I had not finished but Captain Wooten said that we would resume the haircuts the following day.
19. Mr. Banks then asked me to help another hall porter finish cleaning up on housing unit 5.
20. The hall porter was on housing unit 5D with several other officers including Officers Jenkins and Strickland.
21. While I was waiting for the tower officer to open the door so I could go enter unit 5D.
22. Mr. Banks stepped outside of his office and asked me to pick up some trash and to bring him the cleaning cart. By this time, the tower officer opened the door to 5D and the hall porter and officers on the zone all came out. We all walked towards Mr. Banks' office. Captain Wooten was in an office across the hall and came out. He stepped inside Mr. Banks office and asked him what was up. I was standing in the hallway.
23. I heard Mr. Banks tell Captain Wooten to "take them in there and strip them." Mr. Banks wanted me and the other hall porter strip searched.
24. Captain Wooten, Officer Smith and Officer Winston took the other hall porter into the bathroom and searched him first. Once they were finished with him, I was strip searched next in the bathroom.
25. Captain Wooten, Officer Smith and Officer Winston did not find any contraband on me. Once the search was complete, Captain Wooten asked me to clean the clippers so that they would be ready for the next day. Captain Wooten then handed me a big black, canvas bag that contained the hair clippers. I placed the bag on top of the cleaning cart in the hallway and began to clean the clippers.
26. Officers Smith and Winston, who had gone back into Unit Manager Banks' office, both quickly ran out and grabbed the black canvas bag that had the hair clippers in it. Winston and Smith searched the black bag and searched the trash bag that was on top of the cart.
27. While they were searching the bags, I explained that the black canvas bag belonged to Captain Wooten. Officer Winston told me that Mr. Banks told him to search it.
28. Nothing was found in either bag.
29. Lieutenant Wren came out of Mr. Banks office and she tore into the trash bag and pulled what was part of a cell phone charger. I was still standing outside in the hallway and I could see Lt. Wren. She turned it in to Mr. Banks in his office.
30. Mr. Banks then came out of his office and told me to stop cleaning the hair clippers. About this time, Captain Wooten came out of the lieutenant's office and asked for the bag the clippers were in. I gave Wooten the bag with the clipper and pushed the cleaning cart back towards the main hallway.
31. Mr. Banks then asked me to go to housing unit 6 and make sure it was clean. I walked towards housing unit 6. Mr. Banks stopped me and asked me to grab the plastic bag that was still on the cleaning cart and place it inside of a big trash bag. The plastic bag was torn and trash was hanging out of it. I walked back towards the cleaning cart and took torn bag and placed it inside of a big trash bag.
32. Mr. Banks instructed me to leave the trash bag there and go on to make sure housing unit 6 was clean. I headed back to housing unit 6 and began to clean.
33. While I was cleaning, Officers Winston and Smith came and said that Mr. Banks wanted me to clean the empty cells on housing unit 6D. I went to go get my work cart and started cleaning the empty cells on 6D.

34. Approximately ten minutes after I began cleaning, Winston and Smith approached me in cell 214 as I began to clean it. Officer Winston grabbed his radio and told the control tower officer to close the door.
35. I tried to step outside of the cell and asked Winston why he was trying to lock the door. Winston replied, "Man I'm just gone be real, Banks told us to trick you over here and lock you in a cell."
36. I told them they couldn't lock me inside of a cell and left the zone to return to Mr. Banks' office.
37. Once I was back in Banks office I asked Mr. Banks what was going on. Mr. Banks told me that he was placing me in segregation. I asked him why and Banks said that Warden Buscher told him to lock me down. I asked for what reason I was being locked down.
38. Then Mr. Banks opened up his desk drawer and pulled out a black cell phone and lay it on his desk. I told Mr. Banks I did not know anything about that phone.
39. Mr. Banks said, "Torrie I know you, just go ahead and lockdown and let me investigate the situation. I'll review the cameras and come let you out tomorrow." Then Mr. Banks said, "See if they're going to wiggle you out of this." I understand him to mean the representatives from the SPLC.
40. I said I wasn't going to segregation and asked where the phone came from. Banks said that he found the phone in the trash bag. I asked him, "So you about to lock me down for something you found in a trash bag?" Banks replied, "Just go over there [segregation] and I will talk to you tomorrow." I told him no and asked him to call Warden Buscher to come and explain what was going on.
41. Mr. Banks asked me to step outside of his office so that he could call Warden Buscher. I stepped out of his office. I looked through the window and Mr. Banks was on the phone but I could not hear who he was speaking with.
42. Once Mr. Banks was off of the phone he came out of his office and said he was walking up front to get Warden Buscher.
43. Approximately 5-10 minutes later, Mr. Banks returned with Captain Donald.
44. I asked Captain Donald what was going on. Captain Donald said that I was about to go to segregation. Then Captain Donald along with Officers Smith, Thomas, Adams, Winston and a few other officers grabbed me and pushed me against the wall while Captain Donald cuffed my hands behind my back. They then placed me inside of a cell in segregation.
45. Mr. Banks told me he would go and get my property out of my cell on housing unit 1D. He brought me back only the items you are allowed to have in segregation and the rest of my property would remain in storage until I was released.
46. Later that evening, I was brought a rule violation report or RVR for possessing a cell phone.
47. Mr. Banks brought me pants, shirts, boxers, toothpaste, and toothbrush. He did not give me any of my other personal property.
48. On April 11, 2014, Banks told Dr. Davis that I was threatening suicidal ideation because I asked him if he was trying to provoke me or make me harm myself by placing me in segregation for an offense I did not commit. I was not suicidal. Dr. Davis came to my cell with a "No-Harm Agreement." I refused to sign it because I am not suicidal. However, Mr. Banks took all of my clothing, bedding, and hygiene items. I was left completely naked in my cell until April 16, 2014. During that time, the only time I saw a mental health counselor was on Saturday, April 17, 2014. On that day, I was kicking my door because I was cold without any clothing and bedding. Ms. Naylor came that day and then Nurse Dunn came later that day and said she would document the issue.
49. My property was not returned until April 16, 2014 and I only received clothing, bedding, toothpaste, and toothbrush. Before I was moved to segregation, I had numerous legal

documents in my cell, including but not limited to cases, transcripts related to my criminal case, and legal documents given to me by SPLC that were marked on the outside as "Confidential Attorney-Client Privileged." As of May 1, 2014, the only legal documents that have been returned to me are some of the cases I printed from the law library. I have asked officers several times about my other legal and personal property, but they have told me that they do not know where it is. When I asked Mr. Banks about my property, he responded by saying, "You have what you are supposed to have down there."

50. On Tuesday, April 15, 2014, Investigative Officer Cotton came onto 6D to see another prisoner. When I saw her I asked her to come to my cell door. Officer Cotton asked me what I was doing in segregation. I explained to her what happened. Officer Cotton said she had not seen a RVR with my name on but said that she will look for it.

51. Officer Cotton returned to my cell later that same day and said she had the rvr and would begin her investigation. She asked me if I had any witnesses. I told her the camera and gave her the names of Officers Winston, Thomas, Jenkins, Strickland and Adams along with Captain Wooten.

52. Officer Cotton said that she'd already spoken with Captain Wooten and he said the same thing I said and agreed to write a statement. Officer Cotton then left.

53. As soon as Officer Cotton left, Captain Naidow came to see me. I asked Captain Naidow what was going on. Captain Naidow responded that when I was asked to work on housing units 5 and 6 he knew that I would either do something or get framed. I asked Captain Naidow to explain what he meant by "do something." Captain Naidow said that he was just joking; he said he meant that when I was asked to work on Unit 5 and 6 he knew then that I would be framed. I asked him why he had thought that and Captain Naidow replied that "they" were corrupt. I knew he was referring to the administration such as the wardens.

54. I did not have my hearing within seven days. My disciplinary hearing was held on the morning of April 22, 2014.

55. Lieutenant Jones conducted the hearing. Mr. Banks also came to the hearing. I began to explain to Lt. Jones what happened. She asked me to stop talking and then asked Mr. Banks if he had anything to add. Mr. Banks then explained his theory of what happened.

56. I asked Mr. Banks if the phone was actually found on me. Mr. Banks did not respond to that question but said that I shouldn't have moved the cart. I reminded Mr. Banks that the only reason I moved the cart was because he asked me to.

57. Mr. Banks didn't reply to me and left the hearing.

58. I asked Lieutenant Jones if she had received any officer statements corroborating my version of the events. Lt. Jones said that a couple of officers did not want to write statements but she did have a statement from Captain Wooten and Captain Wooten's statement corroborated my statement that I was not found in possession of a cell phone.

59. I had a feeling that she was going to find me guilty so I told her, " I know what you're about to do but I don't see how you can find me guilty when you have an officer statement saying they didn't find me in possession of a cell phone."

60. Lt. Jones then mumbled she was just doing her job and what she was told to do. Lt. Jones then found me guilty. After she found me guilty, Lt. Jones handed me the Administrative Remedy Program (ARP) paper and instructed me to fill out and return by officer Jenkins since Captain Donald was busy running behind Unit Manager Banks.

61. I was sitting in the chair in disbelief. I couldn't believe that she'd actually found me guilty. Lt. Jones repeatedly called my name but I didn't answer. Lt. Jones must have noticed that the tape recorder was still on and reached over to turn it off. She then took Officer Jenkins into her office.

62. I overheard Lt. Jones tell Officer Jenkins to get me to fill out the ARP paper to appeal the RVR and return it to her.
63. Before I left Lt. Jones' office, I asked her if I would have to remain in segregation. Lt. Jones told me she would release me that same day.
64. Officer Jenkins took me back to my cell on 6D. I didn't immediately fill out the ARP but I did turn it in the following day. I sent it to Lt. Jones.
65. In addition to the conversations described above, on at least 5 other occasions, Unit Manager Banks has made comments about why I and other prisoners speak to SPLC and ACLU. On multiple occasions, he has stated that prisoners talking to SPLC and ACLU prevents him from improving the conditions at EMCF.
66. On Thursday, April 24, 2014, at around 4:00 p.m., Sgt. Deloach and Lt. Grady came to my cell to get me to move me to Housing Unit 2-C. When they called over the radio to have my door opened, Mr. Banks, told the picket officer "negative, do not access that door." He told Sgt. Deloach and Lt. Grady to come to his office. Sgt. Deloach came back to my cell after the conversation with Mr. Banks to tell me that Mr. Banks said I could not be moved until I met with him.
67. On Friday, April 25, 2014, Sgt. Deloach came to my cell again and I asked him to check on when I would be moved. He told me that I was on the movement list and they were going to move me soon. When Sgt. Deloach returned, he was with Lt. Hodges and he told me that Mr. Banks said that I could not move until I talked to him.
68. On April 26, 2014, Unit Manager Banks called me to his office. I asked him if he was going to release me from segregation. He told me no. He began asking me questions about staff members that he said he suspected were corrupt. He then asked me why I keep running to mental health counselors and captains for assistance.
69. Unit Manager Banks said that I had those lawyers at my door. I understood him to mean SPLC because I had spoken to SPLC representatives earlier in the week when they were at the prison. He told me that Major Smith was present on the zone when I was talking to SPLC and was standing close to the door to try to listen to the conversation. Mr. Banks stated that he knew I called out to them when they came on the zone. He played the camera back and saw that I showed them my ARP and other paperwork. He then asked me, "What are they (SPLC) supposed to do?"
70. I told him I wasn't there to talk about that, but I wanted to know when I would be moved from segregation. Mr. Banks told me he would move me when he gets ready. I left Mr. Banks' office and asked the officers to take me back to the zone.
71. On April 30, 2014, Capt. Wooten called me to his office. He told me to pack my property because I was moving. I then went back to my cell to pack my property. Officer Donald escorted me to my cell and I heard Mr. Kelly, a case manager, say over the radio that Mr. Banks had said not to move that offender, which I understood to mean me.
72. Officer Donald brought me back to the front to go to Mr. Banks' office. I asked Mr. Banks why he didn't let me out and he said, "Nope. Get out of my office. We are talking." I left and went back to my cell.
73. Based on my knowledge of MDOC policies, prisoners are only allowed to be kept in segregation for disciplinary reasons for 20 days unless the hearing officer orders additional time. According to that policy, I should have been moved from segregation at the latest on April 30, 2014. As of May 1, 2014, I remain in segregation.

I declare under penalty of perjury that the statements above are true and correct to the best of my knowledge.

Signature _Torrie Ellis_ #67519
Dated this 13th day of May, 2014

Torrie Ellis, MDOC#657519
East Mississippi Correctional Facility