# EXHIBIT 42

# East Mississippi Correctional Facility (EMCF) Report

Submitted
February 25, 2011

Submitted by
Madeleine L. LaMarre MN, FNP-BC

# Contents

**Qualifications**.................................................................................................................. 3

**Document Review**........................................................................................................... 4

**Overview** ......................................................................................................................... 5

**Findings**............................................................................................................................ 6

    Access to Care................................................................................................................. 6

    Health Records ............................................................................................................... 8

    Policies and Procedures ................................................................................................. 9

    Chronic Disease Management ...................................................................................... 10

    Health Care Staffing .................................................................................................... 12

    Pharmacy Services and Medication Administration.................................................... 13

    Quality Improvement and Clinical Performance Reviews .......................................... 16

**Patient Record Review** .............................................................................................. 17

**Executive Summary** .................................................................................................... 32

**Recommendations**....................................................................................................... 33

    **Appendix A – Patient ID Numbers** ...................................................................... 37

# Qualifications

I, Madeleine LaMarre, MN, FNP-BC have been retained by Plaintiffs' counsel as a correctional and nurse practitioner expert to review health care services at the East Mississippi Correctional Facility. Compensation for my work is being billed at $175 per hour and ½ my hourly rate for travel time, and $250 per hour for deposition or court appearances. In the following paragraphs I have summarized my background and experience in correctional health care as a prelude to this report. (Complete resume available at http://home.comcast.net/~mlamarre/resume_mlamarre.doc.)

I have practiced nursing for 30 years. I am a registered nurse and certified family nurse practitioner. Since 2005, I have been self-employed as a correctional health care consultant primarily involved in monitoring prison and jail compliance with settlement agreements, and providing technical assistance to correctional agencies to improve the quality of health care services and clinical outcomes.

My experience in corrections began in 1982, when I worked as a nurse practitioner/ administrator at the Atlanta Transitional Center, which is a Georgia Department of Corrections (GDC) facility. In 1984, I joined the GDC Office of Health Services full-time as a Nurse Consultant. My responsibilities within the agency grew over time and in 1995, I became the Statewide Clinical Services Manager. My responsibilities included the development of administrative policies regarding health care delivery; clinical guidelines including the treatment of HIV infection, hepatitis C, and other communicable and chronic diseases; and providing training to GDC health care staff. I was also responsible for a clinical auditing process that surveyed health care at over 40 correctional institutions, providing consultation to clinicians and nurses to improve health care delivery and patient outcomes. I have authored or coauthored a number of publications, and was an associate editor for a textbook on correctional medicine, Clinical Practice in Correctional Medicine, 2nd edition by Michael Puisis published in 2006. I am a member of the American Nurses Association, American Academy of Nurse Practitioners, and the Academy of Correctional Health Professionals.

In 2002, I was appointed by Judge Thelton Henderson to be a medical expert in the Plata v. Schwarzenegger case. This was followed by appointments as a health care monitor for other cases and at the end of 2004, I left the Georgia Department of Corrections to pursue this work full time. I am familiar with standards of nursing practice and correctional health care.

# Document Review

I reviewed the following documents for this report.

1. Agreement of the Parties to Seek Order of Dismissal Without Prejudice, Presley v. Epps, No. 4:05-cv-00148.
2. GEO Corporate Policies and Procedures.
3. EMCF site specific policies on medication administration and crushing medications.
4. GEO Continuous Quality Improvement (CQI) studies January-September 2010
5. Report on Mental Health Issues at MSP Unit 32 by Terry Kupers MD, January 2010.
6. Memorandum from Gabe Eber and Carl Takei to Presley v. Epps Litigation team dated December 16, 2010 regarding Recent Visit to East Mississippi Correctional Facility
7. Memorandum from Gabe Eber to Presley v. Epps Litigation team dated November 30, 2009 regarding Mental Health Care-Unit 32-October 2009.
8. Chronic disease rosters

# Overview

On January 25-27, 2011 I visited the East Mississippi Correctional Facility (EMCF) in Meridian, Mississippi. The purpose of the visit was to monitor compliance with the medical and mental health terms of the order of dismissal entered in *Presley v. Epps* (See Attachment 1).

I was accompanied by Terry Kupers, MD, psychiatrist and mental health expert and Margaret Winters, Gabriel Eber, and Carl Takei of the ACLU.

I performed the following activities in preparation for and during the site visit:

- Reviewed the medical and mental health requirements found in the order of dismissal
- Toured inmate housing units, main and satellite medical clinics
- Interviewed health care and custody staff
- Observed medication administration by nursing personnel
- Reviewed health records and other medically related documents
- Spoke with inmates

I would like to thank Warden Kenneth Reagans and GEO staff for their assistance in conducting this review.

EMCF is a privately owned facility operated by the GEO Corporation and which has an authorized capacity of 1360 inmates, expandable to 1500 inmates. The facility has a specialized mission of providing psychiatric services and individualized and group counseling.

# Findings

## Access to Care

*The order of dismissal requires that the Mississippi Department of Corrections provides access to care that is timely and adequate to meet prisoners serious medical needs, and to ensure that services meet generally accepted community standards. It also requires that sick call services include adequate patient assessments, physical examinations, and treatment plans; and that referrals to mid-level or advanced level providers be made timely as clinically indicated.*

*To review this provision, I toured housing units and medical clinics, reviewed medical records, interviewed custody and health care staff, and spoke with inmates. Following my review, I found that at each step of the process, access to care services was not timely or adequate. Based upon the findings of this review, I conclude that this standard was not met.*

The primary means for EMCF inmates to access health services is to submit a health services request (HSR) form to health care staff. During our tour of housing units 1, 3 and 5, HSR forms were not available to be distributed to inmates. In housing unit 5, inmates in long term segregation specifically complained to us of not having access to HSRs. Although correctional staff advised us that HSRs were available in the correctional officer control room, staff could not locate the forms in the control room.

Moreover, inmates have no opportunity to confidentially and securely submit their HSRs to health care staff. In housing unit corridors, lockable metal boxes were installed for inmates to deposit health service requests, mail, and grievances in the designated boxes. In several housing units the box for inmates to submit health care requests had no lock, thus anyone could access the box. Discussions with correctional staff revealed that instead of using the boxes, inmates typically give their written requests directly to custody staff, which does not provide confidential and direct access to health care staff.

Once health care request forms have been received by health care staff, nurses do not triage the forms and assess inmates in a timely manner. In a review of 33 health care requests in ten health records, we found that the average length of time for a nurse to see a patient once the HSR was received was 7.5 days. In 10 (30%) of 33 HSRs reviewed a nurse did not see the patient at all. This resulted in inmates submitting multiple requests to try to obtain access to medical or dental services.

Licensed practical nurses (LPNs) are assigned to triage HSRs and conduct patient assessments. Conducting patient assessments requires extensive knowledge of biological, physical, behavioral, psychological and sociological sciences for which LPNs are not prepared; have demonstrated competence; or are properly supervised.

It is therefore not surprising that we found the quality of the LPN assessments to be universally inadequate, even when performed according to a standardized procedure. For example, a 46 year old inmate submitted a request complaining of weight loss, constipation and needing a change in his diet. The LPN evaluated the patient using the constipation protocol. The LPN failed to take

an adequate history or address the patient's primary complaint which included a 30 lbs. weight loss in a 3 month period. The LPN failed to recognize that the patient may have a serious medical condition and instead treated the patient for simple constipation.

In addition, nurses did not refer patients when clinically indicated, and when they did make referrals to the physician, the appointments did not consistently take place in a timely manner, if at all. In several cases, nurses obstructed access to care by refusing to schedule appointments with the physician if he had recently seen the patient, even if complaint that was worsening, or was of a different nature. Record review also showed that inmates do not have timely access to dental care.

Once the physician saw the patient, we found that the quality of clinical evaluations was highly variable, and that in records we reviewed, the physician did not appropriately evaluate, treat, and monitor patients with potentially serious medical conditions.

An egregious example is a 46 year-old patient who presented with 35 lbs weight loss, abdominal pain and constipation for which the physician performed no meaningful history or physical examination other than to describe the patient as being emaciated.  His only plan was to increase the calories in his diet.  He did not consider the possibility that the patient may have a serious medical condition such as colon cancer (See Record Reviews Patient #2).

In another case, a 45 year-old patient presented to the physician with a 4 year history of heartburn and a 22 lbs. weight loss that the physician also performed no medical work-up of any kind. Further review of his record revealed that in May 2010 a thyroid screening test showed that the patient likely has hyperthyroidism.  Neither the doctor nor the psychiatrist who ordered the test noticed or addressed this abnormality. The patient likely has had undiagnosed and untreated hyperthyroidism for at least 7 months (See Record Reviews Patient #4).

In another example, a 33 year year-old patient housed in long term segregation was brought to the clinic in August 2010 with head injuries following reported dizziness and fainting. He was sent out to the hospital and diagnosed with a skull fracture.  Upon his return to the facility, the physician did not appropriately evaluate the patient's symptoms that led to his injuries; including questioning whether the patient's history matched the severity of the trauma. The physician doubted the diagnosis of skull fracture even though the diagnosis was documented in the hospital discharge papers; and he did not monitor the patient after his release from the infirmary. When the patient returned 3 weeks later with neurological symptoms (e.g., headaches, numbness, etc) that may have indicated complications related to his skull fracture (e.g. slow intracranial bleeding), the physician did not acknowledge his recent history of skull fracture in his evaluation of the patient. Following another incident in October 2010 which the patient was sent to the hospital, the physician did not see the patient for follow-up (See Record Reviews Patient #6).

In another case, a 45 year-old patient with a history of GERD and hepatitis C complained of a history of weight loss, ulcers and rectal bleeding. The physician confirmed that the patient had rectal bleeding but ordered no medical work-up. Over the next 3 months the patient continued to complain of vomiting and/or rectal bleeding and was not medically evaluated. (See Record Reviews Patient #5)

The medical care in each of these cases is below the standard of care. The physician is a retired neurosurGEOn who is not trained and credentialed in primary care, thus it is not surprising that he does not provide patients adequate primary care. However, even in the case of the patient who suffered neurological trauma, which is within the physicians' area of expertise as a neurosurGEOn, the physician did not adequately evaluate, treat and monitor the patient. In each of these cases, the physician's care was indifferent to the patient's potentially serious medical conditions.

I discussed these cases and concerns with Cassandra Newkirk MD, GEO Chief Medical Officer. Dr. Newkirk acknowledged that their internal peer review had shown that the physician's care was below the standard of care; and for the past several months had sought to replace him. However, because the physician's practice is dangerous to patients, he should be immediately removed from the facility and replaced with a physician who is trained and credentialed as a primary care physician (i.e., family practice, internal medicine).

Of particular concern is that inmates in segregation do not have access to health care request forms and health care staff does not consistently perform segregation rounds. It also a concern that when we toured the long term segregation housing unit, there were no correctional officers on 2 of the 4 housing pods for at least 20-30 minutes. Inmates we interviewed reported that there were periods of several hours in which no correctional officers were on the unit.  If an inmate experienced a medical emergency, he would be unable to alert staff to the need for medical assistance.

An incidental, but significant finding was that in 6 of 10 records reviewed, inmates experienced significant weight loss, ranging from 13-30 lbs. The average weight loss among this group of inmates was 21 lbs. In a seventh record, the inmate was 6' feet tall and weighed 148 lbs. Although in some patients weight loss may be due to undiagnosed and untreated medical conditions, inmates also reported that they were not provided enough food and it was often served cold.  If food is a scarce commodity, it also raises the questions of whether inmates prey on vulnerable inmates to give up their food.

# Health Records

*The order of dismissal requires that all health care will be properly documented in the medical record in accordance with community standards. To evaluate this area, I reviewed the availability and organization of health records, and timeliness of filing health record documents.*

*We found that in some cases MDOC did not transfer all volumes of the inmate's health record to EMCF and that health care staff did not have access to relevant medical information.  We also found that health records were disorganized with documents out of chronological order. There is a backlog of document filing; lab and hospital reports are not tracked, reviewed and filed in a timely manner.  Staff does not document all clinically relevant information in the record. Based upon the findings of this review, I find that this standard is not met.*

Through record review and staff interviews, it was apparent that when inmates were transferred from MDOC to EMCF, not all volumes of the health record were forwarded with the inmate. This results in EMCF staff not having access to relevant clinical information necessary to provide adequate health care. For example, one patient was known to staff to have a history of seizure disorder, however, only the 5th volume of his health record was transferred to from MDOC to EMCF. This volume contained no information about the patient's history of seizure disorder, and the patient had not been evaluated for his history of seizure disorder since his arrival (see Record Reviews Patient #6).

The records are disorganized. Health documents are filed in more than one location in the record. There is no designated dental section and we found that dental records were not kept in a single location in chronological order. Diabetic flow sheets are scattered throughout the records.

Medication administration records (MARs) are not filed in the record in a timely manner. For MARs, the back log of filing goes back to September 2010. This does not enable clinicians to know whether patients are compliant with their medications, and to address issues of medication noncompliance.

We found that diagnostic and hospital reports are not obtained, clinically reviewed and filed in a timely manner. For example, the physician ordered an EKG on that was performed on 10/10/2010, but the doctor did not review it until 11/29/10.

Of significant concern is that staff does not contemporaneously document important clinical events in the record. For example, a 47 year-old patient with a history of hypertension experienced chest pain during medication administration and was sent out to the local hospital. There was no documentation in the record as to when the patient was actually sent out to the hospital or when he returned to the facility. In addition, there were no hospital reports in the record. The patient has not been seen for any reason since this event. We discussed this case with staff and learned that the patient was indeed admitted to Anderson hospital. Following our discussion, staff obtained the hospital admission report. In essence, this patient was lost to follow-up following his hospital admission and did not receive timely care.

## Policies and Procedures

*The order of dismissal requires that MDOC develops procedures to provide sufficient operational guidance to staff providing health care services including a written set of physician-approved nursing protocols. We evaluated this area by reviewing GEO corporate policies and procedures and selected nursing protocols found in the record. We requested that the complete set of nursing protocols be sent to us, but this has not yet occurred. Our findings revealed that this standard is not met.*

I reviewed GEO's corporate health care policies and procedures. Although comprehensive, these policies and procedures were not specific to EMCF, and provided insufficient operational guidance to staff. Almost none of the corporate policies have been reviewed and updated on an annual basis; in fact most policies were last reviewed in 2008 or prior to this, some as long as 2004.

We were provided selected specific policies for review including medication administration and crushing of medications.  The medication administration policy did not accurately reflect the actual times of medication administration.  The policy related to crushing of medications is in conflict with the corporate policy states that medications will only be crushed in certain patient specific circumstances; whereas the EMCF policy requires crushing of all medications for every patient at EMCF.

## Chronic Disease Management

*The order of dismissal requires that patients with chronic conditions are seen in chronic care clinics in accordance with their level of disease control and in accordance with nationally accepted guidelines. This area was evaluated by reviewing health records with respect to timeliness and appropriateness of chronic disease care.*

*We found that following their arrival, that patients are scheduled to see the physician in a timely manner. However, the quality of the physician's evaluations is variable and in many cases inadequate.  The physician also does not evaluate patients for clinical findings that may be unrelated to the chronic disease, but are clinically significant such as weight loss and GI bleeding.  There are significant problems with lab tests being performed as ordered and the physician has not taken any effective action to resolve the issue. As a result, the physician does not have important information necessary to manage the patient's chronic disease. Based upon the findings of this review, this standard is not met.*

On a positive note, for newly arriving inmates nurses complete a receiving screening/transfer form to identify their health needs and arrange for continuity of care.  With respect to patients with chronic diseases, we found that these patients were enrolled in the chronic disease program and seen by the physician in a timely manner. Generally, the first chronic disease appointments were scheduled 5-10 days following the patient's arrival.

However, review of records showed that the physician does not take appropriate baseline and interval histories related to the patients' chronic disease. For example, for asthma patients the physician did not ask baseline history questions such as date of onset, precipitating factors, frequency of symptoms, or history of hospitalization and intubation.  For patients with hypertension the physician did not consistently inquire about cardiovascular symptoms at each visit. In one case, the physician did not ask these questions and the following month the patient experienced chest pain and was sent emergently to the hospital (See Record Reviews Patient #7). One patient reported having a history of diabetes, but the physician did not explore this history (See Record Reviews Patient #1).

At each visit, the physician did not address all chronic diseases. For example, one patient had diabetes, GERD and hepatitis C, but the physician never evaluated the patient's hepatitis C. This patient was presenting through sick call with complaints of ulcers and rectal bleeding, but the physician did not attempt to evaluate his symptoms in light of his history of having hepatitis C (See Record Reviews Patient #5).

The physician did not note, evaluate and address other symptoms of potentially serious medical conditions, especially weight loss. In 6 of 10 records reviewed, patient weight loss ranged from 13 to 30 lbs (average weight loss was 21 lbs.), and the physician never performed any medical evaluation. In one case a patient also had GI symptoms that raised a concern about malignancy, and in another case the patient thyroid tests suggested hyperthyroidism (See Record Reviews Patient #2 and #4).

The physician did not schedule patients for follow-up in accordance with their disease control. One patient with poorly controlled hypertension was scheduled for follow-up in 3 months when this should have occurred sooner (See Record Reviews Patient #5).

A significant issue is that the physician ordered appropriate lab tests but these tests were rarely completed as ordered, and the physician never took any effective action to obtain the tests other than to reorder them, and in many cases with the same outcome. As a result, the physician lacked key information to appropriately evaluate and treat patients.  For example, for hypertension patients, the physician ordered lipid panels, but these tests were often not completed and the physician was unable to evaluate and treat patients with high cholesterol.

As the physician is ultimately responsible for the patients care, he should have taken effective action to ensure that the tests were completed.  This would have included documenting that he addressed the problem with the health care administrator and planned to have the patient return again following successful completion of the tests; however in none of the records I reviewed did this take place.

The physician did not address the role of medication adherence in whether the patient's disease was well controlled or not.  In the case of a patient whose hypertension was poorly controlled, medication records showed that he frequently did not take his medication. However the physician did not inquire about or address the reasons for the patient's nonadherence, instead simply adding another medication to his regimen. This strategy is not likely to achieve better disease control (See Record Reviews Patient #9).

The physician did provide all aspects of care in accordance with national guidelines. One diabetic patient had not had an eye examination since 2008 (See Record Reviews Patient #5).

Finally, an incidental finding was that the physician delegated reordering of chronic disease medications to nurses at each chronic disease visit. When we inquired about this, we were told that the physician refuses to write his own orders. This increases the risk of transcription errors resulting in medication errors, and should not be done.

# Health Care Staffing

*The order of dismissal requires MDOC to maintain sufficient numbers of qualified health care professionals to meet prisoners' medical needs and sufficient security to ensure timely patient escorts to clinics. MDOC will ensure that all persons providing medical treatment possess licensure and/or certification that permit them to practice within the state of Mississippi and that such persons practice only within the scope of their training and licensure.*

*I evaluated this provision by reviewing staffing patterns, staffing assignments, timeliness of access to care, and physician training and credentialing. I found that the current staffing pattern is insufficient for a facility of its size and specialized medical and custody missions; and find that the physician is not practicing within his scope of training and certification. Based upon our review, this standard is not met.*

Ms. Teresa Shepherd RN, HSA is the health care administrator who has been at the facility for approximately one month. She previously worked at EMCF and has experience as a correctional health care administrator. We were very impressed with Ms. Sheperd's conscientiousness and interest in providing care to the patient population.

The facility does not have a budgeted Director of Nurses position.

With respect to clinical staffing, currently there is a 1.0 clinical FTE occupied by a retired neurosurgeon. He is scheduled to work 0730 to 1600, Monday through Friday. He is also on-call 24 hours per day, 7 days per week for 365 days per year. Staff reported that when the physician is on vacation, the corporate Medical Director is on-call for the facility. With respect to patient volume, it was reported that the physician sees approximately 25-30 patients per day depending on the demand.

With respect to nurse staffing, currently there are a total of 7.0 FTE registered nurses and 17 FTE licensed practical nurses.

The nurses work 12 hours shifts, 0700 to 1900. There are 4 nurses assigned to each shift, 7 days a week. Each shift typically has 1 RN and 3 LPNs. In addition, there is a chronic disease and psychiatric nurse; and an LPN assigned to the pharmacy.

Prior to October 2009 the facility was staffed with a full time physician for 800-900 inmates. Subsequently housing units 5 and 6 were opened increasing the population by 400-500 high custody inmates, many of whom were mentally ill. However, clinical staffing was not increased, and record review shows serious problems with access to the physician.

In addition, there are insufficient numbers of budgeted registered nurse positions. As a result, LPNs are assigned to perform nursing sick call, for which they are not properly educated, trained, competent nor supervised.

# Pharmacy Services and Medication Administration

*The order of dismissal requires the MDOC to provide inmates their ordered medications in a timely manner, without interruption; and to administer and document medications in accordance with accepted nursing standards.*

*I evaluated this provision by observing a nurse administer medications in the housing unit; reviewing health care records, interviewing staff, and reviewing applicable policies. We found that there are serious issues with medication services at EMCF. This includes incomplete physician orders; lack of medication continuity upon arrival, interruption of medications; medication administration practices that do not meet generally accepted nursing practice; and frequent medication errors.*

## Pharmacy Services

At EMCF, pharmacy services are provided by CorrectRx.  According to staff, if medication orders are faxed to the pharmacy before 3 pm, medications usually arrives the following day. The facility also has a contract with a local pharmacy and a limited stock supply of medications which includes antibiotics and psychotropic medications.

The only controlled substances kept at the facility are Tylenol #3 and Phenobarbital. This is a very restricted formulary of narcotic medications.  Record review shows that the physician underutilizes narcotics to manage acute, severe pain.

## Medication Administration Process

Medication administration takes place twice daily, at 0400 and 1600. In general population (Housing units 1-4 and half of unit 6) inmates come up to a window to receive their medications. In segregation (housing unit 5 and 6D) nurses go cell to cell.  A correctional officer is assigned to each nurse. The officer is supposed to provide general security and conduct oral cavity checks.

Typically, there are 3 nurses assigned to administer medication to the six housing units.  Each nurse is assigned 2 housing units to administer medications. Generally medication administration takes 1.5 to 2.0 hours per housing unit if there are no interruptions. However, often medication administration is interrupted for inmate counts, feeding and other unplanned activities. Thus, it typically takes 3-4 hours for each nurse to administer medications. This is not in compliance with accepted nursing practice to administer medications within a one hour window before or after a set time. Using the current medication administration times, this would mean that nurses would administer medications between 0300 and 0500 for the designated 0400 administration; and between 1500 and 1700 for the 1600 medication administration. This is not occurring. Moreover, it is not reasonable to begin medication administration before 0400 because it negatively impacts inmates sleeping patterns and would likely increase medication noncompliance.

At EMCF nurses administer *all* medications. This includes psychotropics, narcotics, antibiotics, chronic disease medications, as well as over-the-counter medications.  The facility does not

permit inmates to maintain possession of any medications, except inhalers and creams. This is highly unusual, as in many correctional facilities around the country inmates are permitted to maintain medications in their possession except psychotropics, narcotics, and selected medications that should be closely monitored (e.g., warfarin). Staff explained that this has been a long standing policy from the time the facility was first established as a mental health facility. The policy increases the volume of nurse administered medications and the length of time to administer medications.

In addition, there is a policy that medications are to be crushed and floated in water prior to administration to the patient, except for sustained-release and a limited number of exceptions. Even antihypertensives, diabetic, and over the counter medications are to be crushed.

This practice is problematic for several reasons:

- When medications are crushed, invariably the patient does not receive the full dose of medication as some of the medication remains as residue in the container that the medication is crushed in as well as the patient's medication cup.

- Crushing and mixing of several medications together is unpalatable to most patients and negatively impacts medication adherence. Nursing staff reported that inmates refuse their medications on a regular basis because of the policy of crushing medications.

- Inmates are not able to identify what medications they are receiving or not receiving and cannot participate in identification of medication errors (e.g. wrong medication, missing medications, etc). One mental health inmate stated that he was not aware his mental health medications had been discontinued and that he was only receiving medications for his medical condition because he was unable to identify the missing medication in a crushed mixture.

For these reasons, the wholesale crushing of medications is unreasonable. In most correctional facilities with which I am familiar, medications, including psychotropic medications are only crushed based upon a patient specific order to do so and for a sound reason, such as inability to swallow medications, known hoarding, etc. This practice should be discontinued.

I observed a nurse administer medications on housing unit 1 and found it to be very problematic.

- The correctional officer did not control inmate movement to and from the medication window to ensure that medication administration occurred in a smooth and orderly manner. In addition, more than one inmate was often standing at the window which reduces privacy and increases the risk of error.
- The nurse did not positively identify inmates using an inmate identification badge. Staff reported that inmates have badges but rarely carry them on their person.
- The nurse maintained cups full of *unlabeled medications* in the medication cart including Prozac, Aleve, Tylenol, Ducolax, etc. *This is an illegal and dangerous practice.*

- The nurse crushed each medication and poured it into a medication cup per institutional policy, which left significant amounts of residue in the envelope that it was crushed in as well as the medication cup.
- Neither the nurse nor the officer watched each inmate take his medication at the window. One inmate walked away from the window with the medication in the cup.

## Health Record Documentation

I reviewed medication administration records (MARs) to assess nursing documentation. The pharmacy company, CorrectRx automatically prints medication administration records. However, electronically printed MARs do not capture any new prescriptions written after the 20th of each month. This results in nurses having to manually transcribe any new medication orders after the 20th of each month. This is a time consuming process that increases the likelihood of medication transcription errors. It would be more reasonable to have the cutoff period closer to the end of the month (e.g. 25th of each month). Some MARs show an incorrect medication start date (See Record Reviews Patient #1).

Review of the health record revealed a number of medication related documentation issues, including medication errors. This includes the following:

- In 2 of 10 records the physician did not sign medication orders that were written upon the inmate's arrival at the facility. Thus, the medication order was not legal but the pharmacy filled the order regardless. In other records, medications were not reordered by the physician but continued by the pharmacy.

- The physician does not write his own medication orders when seeing chronic disease patients; instead, he delegates this to a nurse. This increases the likelihood of medication transcription errors and should not be done. The physician should write his own orders.

- Review of MARs showed that it took 2-5 days for the inmate to receive his medication following his arrival at the facility, including inmates taking insulin.

- MARs showed that there were frequent interruptions in medications being available to inmates. Interviews with staff revealed that nurses do not consistently order refills from the pharmacy in time to prevent disruptions in medication continuity.

- Medication orders were sometimes changed without clinical documentation. For example, one newly arrived diabetics order for insulin was changed from Humulin to Lantus without a clinical evaluation or progress note.

- MARs show patterns of inmate no shows and refusals of medication that are not addressed by nursing or the physician.

- Finally, record review showed that the psychiatrist routinely discontinues or changes psychotropic medication for newly arriving patients. The psychiatrist's rationale for

discontinuing the medication focused primarily on his belief that the inmate was malingering, not mentally ill, was refusing his medications or was noncompliant. While certainly there are patients who may meet these criteria, the fact that almost every patient met one of these criteria raises serious questions about his therapeutic approach.  This is addressed further in Dr. Kupers' report.

In summary, the medication delivery system at EMCF does not ensure that patients receive their medications in a timely manner, without interruption, and according to generally accepted nursing practices.

# Quality Improvement and Clinical Performance Reviews

*The order of dismissal requires MDOC to conduct quality improvement activities and adequate clinical performance reviews and to supervise all clinical staff. We evaluated this by reviewing CQI documentation for January to September 2010 and interviewing the current health care administrator.  We found that although CQI studies were consistently performed from January to September 2010, no studies have been performed for the past 4 months. Although we did not review clinical performance documents of the physician that were performed by the GEO regional medical director, we were informed that these reviews have been conducted, identifying serious physician performance issues. Based upon this review, the standard is not met.*

Staff reported that the previous health care administrator was personally responsible for conducting all CQI studies. From January to September 2010 areas that were studied included access to care, chronic care, physician records, laboratory services, pre-segregation evaluations, radiology, pharmacy and nursing documentation.

We reviewed the results of studies conducted from January-September 2010. Almost all studies showed extremely high compliance. In some cases there were discordant findings with our results. For example, the May 2010 quality improvement study on laboratory tests showed that for 10 charts, 100% of labs were completed within 7 days. Our review of records which approximated the same period of review showed that in almost all cases labs were not drawn as ordered.  For access to care studies, in a sample of 8 records, the results showed a compliance level of 92-96%. A June 2010 review of physician medical records the physician scored 100%. Given the findings of our review, these findings of high CQI compliance raises questions about the criteria used to achieve compliance.

No studies have been performed since September 2010.

Dr.  Newkirk reported that GEO has performed clinical performance for the physician, and that they have determined that there are significant clinical issues with his care. They plan to replace him but have not yet found a replacement.

We are unaware of whether any peer review has been performed for the psychiatrist, whose care was found to be extremely problematic (See Dr. Kupers report).

# Patient Record Review

**Patient #1**

This 33 year-old arrived at EMCF on 3/3/10. His medical history included hypertension, depression, delusions and personality disorder. Upon arrival his medications were Celexa and Clonidine.

Transfer Screening

On 3/3/10 a nurse performed transfer screening for the patient that including renewing his medications. The patient did not receive his Clonidine for 5 days after his arrival and his Celexa 4 days after his arrival.

Mental Health

On 3/4/10 mental health staff performed an assessment and noted that at MSP he was treated for delusions, depression, anxiety and anger management. On 3/15/10 the psychiatrist saw the patient and documented that he provided no credible information regarding his symptoms. He stopped the patient's Celexa.

Chronic Disease Management

On 3/16/10 the physician saw him for chronic disease management. He obtained the patient's family and social history, but did not obtain any cardiac history (e.g. chest pain, shortness of breath, etc). The patient stated that he was diabetic but the physician did not explore this further. The physician performed an appropriate physical examination, however he did not assess the patient's hypertension disease control. The physician plan included changing his blood pressure medications, ordering labs and diagnostic tests, and a plan to follow-up the patient in 3 months.

The patient's medications were documented as being administered in a timely manner. The chest x-ray was performed on 4/2/10 but the report was not reviewed until 4/19/10. An EKG was obtained on 4/17/10 and reviewed 4/19/10. Lab tests (lipid panel and biochemical profile) were not done. On 6/15/10 the physician saw the patient for follow-up but did not address that labs were not performed as ordered.

Medication Administration Records

His April 2010 medication administration record (MAR) showed that he was grossly noncompliant (many documented no shows) for his blood pressure medication. The nurse who documented the no shows (NS) did not document her initials. His May 2010 MAR showed 5 days in which his medication was not available. Discussions with staff indicated that there has been a problem with nurses ordering medication refills from CorrectRx. This has resulted in disruptions in medication continuity.

His July MAR showed that the pharmacy had an incorrect start date for the medication (6/23/10 versus actual date of 61/5/10). MARs through September 2010 are in the record. Staff reported that they are behind in filing medical records.

September 2010 MAR shows that some nurses use a single initial (S) instead of two initials.

Sick call (Housed in 5A)

1. On 6/6 the patient submitted a HSR complaining of abdominal pain and gas from being served cold food trays. He was requesting refill of medication for gas. It was received the following day. On 6/14/10 an LPN saw the patient (7 days after the HSR was received). She measured vital signs but no temperature. The only subjective data collected was c/o headache, back pain, gas. No objective data, nursing assessment or plan was documented.

2. On 6/18/10 he submitted a HSR form complaining of "harsh breathing problems due to being forced to live in cruel conditions due to inmates setting fires, throwing body fluids, and officers using mace in large amounts". He also complained of migraine headaches. It was received 6/19/10. On 6/24/10 (5 days after the HSR was received) an LPN saw the patient. The only subjective information was that the patient was short of breath. The LPN measured vital signs and obtained an oxygen saturation level that was abnormally low (87%, normal >95%). The assessment was "no signs and symptoms noted". The nurses' plan was to routinely refer the patient to the physician for evaluation of oxygen saturation.

On 6/29 the physician saw the patient and noted that he said he has shortness of breath because he was sprayed with chemical agents. The patient's vital signs and oxygen saturation were normal and his lungs were clear without wheezing. The diagnosis was no pathology and his plan was to monitor the patient.

3. On 11/7/10 the patient submitted an HSR complaining of blood from his penis, neck pain and swelling, fever, cold symptoms and gas. It was received on 11/8/10. An LPN did not address the HSR until 11/16/10 (9 days) noting that another nurse saw the patient on 11/12 (however only a urine dipstick was performed at that time). The LPN referred the patient to a clinician however this referral did not take place.

4. On 1/20/2011 the patient submitted an HSR complaining of headaches, runny nose, and low back pain. He requested to see a nurse or doctor. An LPN collected the form and saw him the following day (0 days). The LPN completed the subjective and objective portions of the upper respiratory protocol, but did not document a nursing diagnosis. The nurse treated the patient for an upper respiratory infection. The nurse did not evaluate the patient's back pain.

In November 2010 he submitted a written complaint stating that the nurses refused to give him his medication because he disrespected him. The HSA said they had a right to refuse him medical care if they see you as dangerous. This is not appropriate.

Segregation Rounds

Medical staff is supposed to make daily rounds in segregation, stopping by each cell and asking inmates how they are doing. His September 2010 Segregation Daily Evaluation form was not completely filled out with respect to the date he was admitted and discharged, whether he was on a special diet and or taking medications. The first rounds were documented on 9/14 and 9/15/10, no rounds documented on 9/16 and 9/17 then rounds documented on 9/18/10 and 9/19/10. Staff signed the form.

**Summary:** This record showed numerous problems included delays in receipt of medications following arrival at the facility; delayed access to nursing sick call; inadequate nursing assessments by LPNs; delays or unsuccessful physician referrals; discontinuity of medications; pharmacy documentation errors; and lack of segregation rounds.

## Patient #2

This 46 year-old arrived at EMCF on 8/19/09. His medical history included depression and bipolar disorder with self mutilation. He is currently taking lithium carbonate.

Transfer Screening

On 8/19/09 a nurse completed a transfer screening and noted that he was taking Remeron and Lithium. The intake orders were not signed, thus it was not a legal order. His intake weight was 152 lbs.

On 8/20/09 the psychologist saw the patient and noted that his mental health diagnoses were antisocial personality and bipolar disorder.

On 9/10/09 the psychiatrist saw the patient and stated that he was malingering to obtain a transfer to EMCF and he doubted diagnosis of bipolar disorder. He ordered labs and follow-up in 3 months. He continued the Lithium. He saw him periodically.

Sick Call and Medical Care

On 11/17/09 the physician saw the patient for complaints of weight loss. The patient had lost 35 lbs (152 lbs→117 lbs) in 3 months.  The doctor did not obtain any subjective history at all. His diagnosis was that the patient had weight loss and was emaciated and he placed him on an increased calorie diet. He did not plan any follow-up.

5. On 2/2/10 the patient submitted a health service request (HSR) complaining of serious weight loss (30 lbs) and change in diet. On 2/3/09 the form was received. On 2/8/09 (5 days) an LPN saw the patient and noted that he complained of dry skin and constipation. He was 5' 5" and 121 lbs. No other objective data was collected. Her plan was to not treat the patient's dry skin. She did not refer the patient for evaluation of weight loss.

6. On 2/18/10 the patient submitted another HSR complaining of having a bad case of constipation and Miralax not working. The form was not date stamped regarding receipt. On 2/23/10 an LPN triaged the form and referred him directly to the doctor. On 2/23/10 the doctor saw the patient noting that he was constipated and wants snacks. His body mass index (BMI) was 13% his assessment was emaciated. His plan was hypercaloric diet and a stool softener.

7. On 3/20/10 the patient submitted an HSR complaining of abdominal pain and being bloated for more than a month. The form was collected on 3/21/10 and on 3/23 (2 days) and LPN saw the patient using a nursing protocol.  The nurse treated him for constipation and did not refer the patient. Chronic Disease Management

On 3/25/10 his TSH was elevated (31, normal 0.45-4.5) indicating hypothyroidism. The psychiatrist reviewed the report the same day and referred the patient to the physician.

On 3/30/10 the physician saw the patient for evaluation. He did not take any history related to hypothyroidism. He noted that he was taking Lithium. He planned to obtain a thyroid panel and see the patient in 2 weeks.  On 4/13/10 the physician saw the patient and started him on levothyroxine 0.50 mcg daily.  There are no MARs from September-November 2010 in the record; his January and December MARs show good medication compliance.

On 4/13/10 the doctor saw the patient for follow-up of labs. His TSH was elevated (24.4). The physician did not address the patient's weight loss. His plan was to see the patient in 3 months. By August his TSH was approaching normal (approximately TSH=7).

8. On 4/19/10 the patient submitting an HSR requesting to see the physician for his thyroid problem that affected his metabolism and appetite. The LPN wrote to the patient that on 4/13/10 the doctor saw him should have discussed it with him at that time.

9. On 4/21/10 the patient complained of flu-like symptoms chills and fever. On 4/26/10 the nurse documented "No s/s of cold visual (sic) at cell door.

On 7/13/10 the physician saw him for chronic care. He did not obtain any interval history other than to note medication adherence.  The patient's weight was 129 lbs.

On 10/29/10 the patient told the psychiatrist that "the only thing I want to talk about is that fainting, I feel weak".

10. On 11/3/10 he submitted another HSR complaining of weight loss and wanting to see the doctor about his diet. An LPN saw the patient the following day and weighed him (135 lbs) and indicated no treatment for the patient.

11. On 11/4/10 he submitted another HSR stating that he needed to see the doctor about his diet, and that he felt weak and sick. This HSR was received on 11/8/10 and an LPN saw him on 11/15/10 (7 days). His weight was 133 lbs.

12. On *illegible* date he submitted another request for the same problem that was received on 11/17/10. On 11/23/10 (6 days) an LPN saw the patient and said he had already been seen.  He kept submitting repeated requests that the nurses did not adequately address.

13. On 12/6/10 he submitted another HSR. His weight was 123 lbs. The nurse did not refer the patient.

**Summary:**  This record shows multiple problems; the most egregious is the physician's repeated failure to address the patients documented 30 lbs weight loss, constipation, and abdominal pain which are suspicious for GI malignancy. We discussed and referred this record with Dr. Cassandra Newkirk MD, GEO Chief Medical Officer for further follow-up. Other problems included persistent delays in access to care; inadequate LPN nursing assessments and failure to refer the patient back to the physician. At the transfer screening, a physician did not sign the order to continue his medications.

**Patient #3**

This 23 year-old arrived at EMCF on 4/9/10. His medical history included asthma, hypertension, seizure disorder and latent TB infection. His current medications are HCTZ, Dilantin, ASA and Albuterol MDI.

Transfer Screening

On 4/9/10 a nurse completed a receiving screening form. His medications were reordered upon arrival and initiated on 4/11/10.

Chronic Disease Management

 On 4/13/10 the physician saw the patient for chronic disease management. His blood pressure was 130/77 mm/hg. He did not document the patient's level of disease control. He ordered labs, medications and requested follow-up in 6 months.  The labs were not obtained.

On 10/12/10 the physician saw the patient again for chronic disease management. The patient was in good control which was documented by the physician. He requested CBC with differential, chemical profile, Dilantin level and urinalysis.  The labs were not obtained.

14. On 1/23/11 the patient submitted an HSR complaining of penile problems. The form was collected the following day and on 1/25/11 (2 days) an LVN saw the patient. The patient's blood pressure was elevated (143/95 mm/hg) but the nurse did not note or address this finding. The assessment consisted only of "penis is irritated". No additional subjective or objective data was documented. The nurse gave the inmate triple antibiotic cream.

**Summary:**  The patient's medications were continued upon arrival. Labs for chronic disease visits were not obtained as ordered. The LVNs assessment was inadequate and did not address the incidental finding of an elevated blood pressure.

**Patient #4**

This 42 year-old arrived at EMCF on 4/19/10. His medical history included bipolar disorder with psychosis; and 3 previous suicide attempts. Prior to his arrival at EMCF he was prescribed Risperdal, Tegretol and Wellbutrin.

Transfer Screening

On 4/29/10 the psychologist interviewed him and found him to be grandiose, narcissistic with difficulty focusing.

On 5/6/10 the psychiatrist saw the patient and his assessment was "rule out malingering and doubt a history of bipolar disorder". He stopped his medication due to patient refusal.

Undiagnosed illness

On 5/6/10 the psychiatrist orders labs tests including a TSH which is abnormally low (0.18) indicating that the patient is hyperthyroid. The psychiatrist reviewed the lab report but did not address his abnormal thyroid test result and it has not yet been noted or addressed. Review of his

record showed that as of December 2010 the patient has had 24 lbs. weight loss in 3 years, which is consistent with hyperthyroidism.

Sick call

15. On 5/21/10 the patient complained that a tooth needed to be filled or pulled. A nurse did not see the patient.

16. On 6/11/10 he submitted a second HSR repeating his complaint. A nurse did not see the patient.

17. On 7/27/10 he submitted a similar request. A nurse did not see the patient.

18. On 8/26/10 he submitted a fourth request.

19. On 9/28/10 he submitted another request. The dentist saw the patient on 10/3/10 and noted that he had cavities. His plan was RTC for fillings with no time frame. He had not been seen since.

Dental records are mixed in with other records under the first tab. There is no dental section of the record.

20. On 9/20/10 he submitted an HSR complaining of left sided rib and chest pain. The form was received the same day. On 9/23/10 an LPN (3 days) saw the patient. The history consisted of "bad pain in left side unrelieved by Tylenol". The nurse measured vital signs but did not examine the patient. The plan was to refer the patient to a physician. On 10/12/10 (19 days) the physician saw the patient.

21. On 10/18/10 he submitted an HSR complaining of acid reflux and stating he needed Prilosec. On 10/20/10 the HSA wrote that he did not have an order for the medication.

22. On 10/23/10 the patient submitted another request stating that he had severe reflux and needed to see the doctor.  The form was collected the following day. On 11/16/10 (23 days) an LVN saw the patient and noted that he was having severe heartburn and his medication was not working. The nurse measured vital signs (except temperature) and weight (150 lbs), but did not examine the patient. The nurse referred the patient to the physician.

On 11/23/10 (7 days) the doctor saw the patient. He noted that the patient complained of heartburn for 4 years and weight loss but did not quantify the weight loss (22 lbs, 168→146 lbs). He asked no questions about fever, chills, night sweats, anorexia, nausea, vomiting, diarrhea, constipation, abdominal pain or blood in stools. An abdominal examination was normal. His BMI was 19%. His diagnosis was acid reflux and he prescribed Prilosec and a high calorie diet.

23. On 11/1/10 the patient submitted an HSR complaining of having a runny nose and cough. It was received on 11/4/10. On 12/1/10 (27 days) an RN saw the patient and completed a nursing assessment protocol. (Afebrile, BP=141/85 mm/hg, pulse=45 beats/minute, respirations=18 breaths/minute. His weight was 144 lbs. The nurse did not document an assessment, note the patients continued weight loss, extremely low pulse, elevated blood pressure.

**Segregation**

Segregation records showed that in September that segregation rounds were made on 9/14 and 9/15/10, no rounds were made on 9/16 and 17 and rounds made on 9/18 and 9/19/10. The form was not filled out as to when the patient was admitted and released from segregation.

**Summary:** The record shows numerous problems including physician failure to address abnormal thyroid function tests and weight loss indicative of hyperthyroidism; delays in access to care; inadequate nursing evaluations; delayed physician referrals.  Lack of daily segregation rounds.

## <u>Patient #5</u>

This 45 year-old arrived at EMCF on 4/27/10. His medical history included diabetes, hypertension, GERD, constipation and hepatitis C.  Upon arrival his medications were Risperdal, Humulin R and Humulin N, aspirin, Mylanta, Ranitidine and Colace.

Transfer Screening

Upon arrival a nurse performed a transfer assessment. The patients' blood pressure was 144/99 mm/hg, pulse=109 beats/minute, respirations 20 breaths/minute, afebrile. His weight was 177 lbs. His medications were renewed upon arrival however the nurse did not write an order to continue the patient's aspirin and Mylanta; and inexplicably changed the insulin orders from Humulin to Lantus 40 units. His aspirin was not ordered but was continued anyway.

His Lantus and Risperdal were not started for 4 days until 5/1/10.

On 4/27/10 the psychologist saw the patient and noted his history of paranoid schizophrenia. On 5/19/10 he told a psychologist that he heard voices telling him to kill himself.

On 5/27/10 the saw the psychiatrist saw the patient. His diagnosis was rule out malingering and rule out psychosis. He discontinued the patients' Risperdal, ordered labs and planned to follow him in the infirmary.

On 1/17/11 the psychiatrist saw the patient who stated that he needed to be placed back on Remeron and Risperdal. He stated that he never knew he had been taken off of it. The psychiatrist wrote that there was no current indication for renewing his medication.

Chronic disease management

On 5/4/10 the doctor saw the patient for chronic disease management. He noted that the patient had diabetes for one year and was on insulin only. The patients BP= 144/104 mm/hg and his weight was 174 lbs. He did not assess the patient's disease control. He ordered a chemical profile, lipid, hemoglobin A1c, microalbumin, and urinalysis (none that were done), started the patient on HCTZ and Lisinopril, continued Lantus 40 units and put the patient on ASA 81 mg. However the transcribing nurse did not note the change in dosage from 325 to 81 mg and he has been continued on 325 mg. (medication error). The physician planned to see the patient in 3 months which was not appropriate given that his blood pressure was poorly controlled and he was starting the patient on a new medication.

On 8/12/10 he saw the patient for follow-up documenting that he had no chest pain or shortness of breath. He did not obtain a diabetes interval history. His blood pressure=130/82, pulse= 83 beats/minute and respirations 16 breaths/minute. The patient's weight was recorded as 257 lbs which is an increase of 75 lbs and most likely a documentation error but the doctor did not note or address this finding. He did not assess disease control for any disease. He did not address his hepatitis C infection or recent complaints of rectal bleeding. The physician documented that previously ordered labs were not done, however they were done and signed by the physician on 8/9/10. The patient's HbA1c was 5.9%. LFTs normal, LDL was 96.  He did not review fingerstick blood sugars. He ordered more labs and continued the same medications. He requested follow up in 3 months. The doctor did not write his own medication orders, delegating this to the nurses. This increases the risk of medication transcription errors.

On 11/10/10 the doctor saw him for follow-up. The patient denied chest pain or SOB. The physician did not inquire about hypoglycemia. The patients blood pressure=130/90 mm/hg and his weight was 166 lbs. The doctor noted that no labs were obtained. He did not assess the patient's disease control although his blood pressure was above goal (<130/80 mm/hg). He continued medications, ordered labs and requested follow-up in 3 months. The doctor did not write his own medication orders. He wrote an order to draw labs but this was not done. The patient has not had a diabetic eye exam since 2008.

Diabetic flow sheets are all over the chart.

Sick call

24. On 5/17/10 he submitted an HSR complaining of having problems with his ulcers bleeding again from not being able to use the bathroom. The HSR was received on 5/19. Nurse saw the patient on 5/21/10 (2 days). The patient's weight was 172 lbs, afebrile, BP 98/70, pulse 88 and respirations 18. The nurse c/o bleeding ulcers, "dark red there when wipe clots on tissue". The nurse referred the patient to the physician.

On 5/25/10 (4 days) the physician saw the patient who complained of weight loss and bleeding ulcers. He documented: "I/M said he had ulcers before 2-3 months while at Parchman when he move his bowels red blood in stools." His weight was 165 lbs (↓12 lbs, BMI 24%). His vital signs were otherwise normal.  He examined his abdomen which was soft with no masses and no hemorrhoids noted. He documented that the patient's fecal occult blood test was positive. His assessment was "? Ulcer" and his plan was to order Prilosec and return in week for another rectal examination.

On 6/2/10 the physician saw him again for follow-up. He documented that the patient had no abdominal pain or tarry stools and a rectal examination was negative for occult blood. His diagnosis was questionable PUD (peptic ulcer disease) and to continue Prilosec.

25. On 6/26/10 he submitted an HSR complaining of continued problems with bleeding ulcers from the rectum when using the bathroom. The form was received on 7/27/10 the nurse documented no treatment indicated already on Prilosec. The nurse did not refer the patient to the doctor.

26. On 8/24/10 the patient submitted an HSR complaining of vomiting and still bleeding when he used the bathroom. The form was received the following day. On 8/27/10 the nurse documented that the physician saw the patient on 8/12/10 no further treatment indicated, even though the physician did not address the patient's symptoms. His weight was 164 lbs.  BP=142/80 mm/hg. Nurse did not address his elevated blood pressure.

27. On 8/30/10 he submitted an HSR complaining of severe testicular pain. A staff member responded wrote that the patient had been seen on 8/12/10 and nurse sick call on 8/27/10 and no further treatment is indicated. The HSR was not signed by the staff member. We found no 8/27/10 sick call note in the record.

On 9/30/10 at 1530 the patient was in medical requesting his morning insulin dose which was not given due to syringes not being available. The nurse notified the physician who ordered that the full dose of insulin be given.

**Summary:**  This record demonstrates multiple problems including lack of medication continuity upon arrival, medication transcription errors, lack of timely access to nursing sick call, nurses obstructing access to care by failing to evaluate or refer the patient to the doctor, failure of the doctor to recognize symptoms of serious medical conditions and initiate an appropriate work-up; the medical record is in disarray; lack of medical supplies (e.g. syringes) to administer essential medications; the psychiatrist discontinuing medications upon arrival.  The patient had lost 13 lbs since his arrival at the facility.

### **Patient #6**

This 33 year-old arrived at EMCF on 4/15/10. His medical history included a history of mental health and seizure disorder. His medications were Remeron, Wellbutrin, Colace and Fibercon.

Transfer Screening

Upon arrival the receiving screening form was not completed and his medical history is not documented in the record. Staff reported that the patient was known to have a seizure disorder but MDOC did not forward all medical record volumes to EMCF and the current volume (5 of 5) did not contain any information about the patient's history of seizure disorder.  It was not apparent that any effort was being made to contact MDOC and have the medical record forwarded to EMCF.  The nurse renewed the patient's medications and they were started on 4/17/10.

Mental health

On 5/3/10 the psychiatrist saw the patient and stopped his Wellbutrin and Remeron.

Sick call

28. On 7/20/10 the patient submitted an HSR complaining of having painful breathing, weight loss, lack of energy and numbness. It was received on 7/21/10. On 7/28/10 (7 days) an LPN saw the patient and measured his weight and vital signs. (Wt=151.8 lbs., Temp= 98.6°F, BP=138/84

mm/hg, pulse= 72 beats per minute, his oxygen saturation was abnormally low (93%, normal=>95%. The nurses' plan was to refer to the doctor. This referral did not take place.

On 8/7/10 at 1350 the inmate was brought to medical by security with swelling on the left side of his face and ear swollen and red. He reported that he was dizzy when he stood up and passed out falling to the floor. The dentist saw the patient and believed that his jaw was broken and he was sent to Anderson hospital where he was diagnosed with an occipital skull fracture. He refused further care and at 1745 was discharged back to EMCF where he was admitted to the infirmary. He was prescribed Lortab for pain and it was recommended that the facility physician see him in 24-48 hours.

A nurse initiated an infirmary admission history and physical form with a chief complaint of dizziness and passing out. The nurse also noted the hospital discharge diagnosis of skull fracture.

The physician gave orders that included vital signs every 2 hours and a liquid diet. He discontinued the order for Lortab for pain and wrote an order for Ibuprofen 400 mg twice daily for 3 days. At 2000 the patient complained of severe pain and requested medication. When he learned that the physician had changed his medication from a narcotic to Ibuprofen, he became irate.

The physician later documented that the patient had swelling to the left jaw area and had a *questionable* skull fracture. He wrote that his past medical history was noncontributory. He did not address the precipitating symptoms that led to his fall (e.g. dizziness and syncope) or explore the possibility that his injuries were due to other causes, such as trauma due to excessive force. He wrote that he doubted that the patient had a skull fracture despite the documented discharge diagnosis from the hospital. The doctor discharged the patient from the infirmary without any plans for follow-up.

Although the doctor questioned the patient's diagnosis, the patients CT report that showed he had a skull fracture was faxed to the facility on 8/12/10 and the physician reviewed and signed it on 9/1/10. He did not see the patient following review of the report.

Sick call

29. On 8/28/10 the patient submitted an HSR complaining of having shortness of breath, numbness down his left side, blackouts and migraine headaches. No documentation of when it was received. On 8/31/10 a LVN did not evaluate the patient but referred him directly to the doctor.

On 8/31/10 the doctor saw the patient who complained of headaches, blackouts, left sided numbness and shortness of breath. The doctor did not reference the patients' history of skull fracture or take a history of onset of symptoms. The patient's vital signs and neurological examination were normal. His assessment was no neurological deficit and he prescribed Excedrin for headaches.

On 8/31 his weight was 148 lbs he is 6 feet.

30. On 9/7/10 he submitted an HSR complaining of bad coughing spells, SOB and migraine headaches and passing out. He requested to see a specialist. The form was collected the same day. The nurse wrote that they were out of cough syrup but would be ordered.

On 10/18/10 at 1934 a code blue was called for the inmate.  A nurse found him lying on floor and measured his vital signs [BP=176/100 mm/hg, pulse= 78 beat/minute, respirations= 20 breaths/minute, afebrile]. The patient stated complained of dizziness and stated that he fell and hit his head and it felt like something popped in his ear. The patient's left face and jaw area was swollen and red. No other injury noted. The nurse received orders to send the inmate to the local hospital.

At 2300 the patient returned from ARMC; discharge diagnosis was soft tissue injury to his face.

Upon his return it was documented that he refused medical care but would not sign the refusal. The patient was returned to his housing unit.  The physician did not see him following his return.

Segregation Rounds

The top portion of his August 2010 segregation round sheet is not completed with respect to admission and discharge dates (as applicable), special diet or medications. Rounds began on 8/27/10, 8/28, none were documented on 8/29-8/31, they were restarted on 9/1 and 9/2 and none thereafter.

**Summary:**  This record is disturbing for many reasons. The patients previous medical records were not transported from MDOC to EMCF and important information such as the patient's history of seizure disorder were not in the current volume.  The receiving nurse did not complete the medical transfer form; the psychiatrist discontinued the patient's medications.

The doctor did not appropriately evaluate the patient's symptoms leading to his fall; or consider that the findings of a skull fracture were not consistent with his symptoms.  We interviewed this inmate who reported that his injuries were a result of custody staff assaulting him.  If it has not already occurred facility leadership and/or MDOC should be investigate this allegation. The doctor also did not monitor the patient at all following his skull fracture.  When the patient returned 3 weeks later with neurological symptoms, the physician did not even consider the previous diagnosis of skull fracture in his evaluation of the patient. Following another incident in which the patient was sent to the hospital, the physician did not see the patient.

Segregation rounds are not consistently made and documented in the health record.

## Patient #7
This 47 year-old arrived in EMCF on 5/19/10. His medical history included hypertension. His medications include Amlodipine, Enalapril, Atenolol, Lasix, Potassium, Prozac, ASA, Ibuprofen and Colace.

Transfer screening

On 5/19/10 a nurse performed transfer screening and renewed the patient's medications. The medications were started on 5/21/10. Review of the record shows continuity of medications. His weight on arrival is 170 lbs.

Mental Health

On 6/28/10 the psychiatrist saw the patient and discontinued his Prozac.

Chronic disease management

On 5/25/10 the physician saw the patient for chronic disease management. He took a brief medical history. The patient's weight was 164 lbs. His vital signs were normal. He planned to continue medications, ordered labs, EKG, CXR, lipid, CMP and to see the patient 6 months.  No labs were drawn. The CXR was obtained on 6/18/10 and reviewed on 6/20/10. The EKG was not obtained as ordered.

On 10/10/10 an EKG was performed showing sinus rhythm and right bundle branch block. The physician reviewed the report on 11/29/10.

On 11/23/10 the physician saw the patient again for chronic disease management. He did not obtain any interval cardiac history (chest pain, shortness of breath). He noted that no labs were available. The patient's vital signs were normal, but his weight was 148 lbs, a loss of 22 lbs since his arrival in May. The doctor assessed the patient's disease as being in good control. He did not address the patient's weight loss. He reordered labs and planned to see the patient in six months. The physician did not write his own orders for renewal of medications, delegating this to the nurses.

Urgent Event

On 12/5/10 at 1845 the patient presented with chest pain during pill call and correctional officers escorted him to the medical section.  A nurse obtained 2 serial EKGs showing atrial flutter and QRS contour abnormality consistent with septal infarct. At 1906 a repeat EKG showed sinus rhythm and QRS (T) consistent with septal infarct. The nurse notified the physician who advised to send the patient to the emergency department for evaluation.

There is no further documentation as to when he was sent out to the hospital or when he returned. The patient has not been seen since.

We discussed this case with staff who reported that the patient was sent and admitted to Anderson hospital.  There was no medical information related to this admission in the record and the patient has not received appropriate follow-up.

Segregation Rounds

We reviewed a September 2010 Segregation form. The top portion of the form indicating the dates of admission and discharge, diet and medications was not completed.

Segregation rounds began on 9/2/10. Staff did not document rounds on 9/3, 9/7, 9/8, 9/11, 9/12, 9/13, 9/16, 9/17 or 9/17.

### Patient #8

This 26 year-old arrived in EMCF on 4/20/10. His medical history included Asthma. He was not taking any medications.

Transfer Screening

Upon arrival a nurse completed the transfer screening process.

Chronic disease management

On 4/27/10 the doctor saw him for chronic disease management. He did not obtain a history of the frequency of asthma symptoms, including most recent episodes; history of hospitalizations or intubation. He noted that the patient used one Albuterol MDI per month and was also taking QVAR. The patient's peak expiratory flow rate (PEFR) was 350 and his weight was 197 lbs. The physician did not assess the patient's level of disease control.   His therapeutic goal was "Less asthma". He requested follow-up in 6 months.

On 10/26/10 the doctor saw the patient for follow-up. He noted that he had had 3 asthma attacks since he was last seen and used one albuterol inhaler per month. He did not determine how recent the patient's symptoms occurred, nighttime symptoms or precipitating factors, if any. The patient's PEFR was 400. His weight had declined 16 lbs. (197→181 lbs), but the physician did not note or address this.  The physician He inaccurately assessed the level of disease control as being fair and status unchanged from the previous visit.

On 1/25/2011 the doctor saw the patient. He documented that the patient had no noted no asthma attacks since October. He did not inquire about inhaler use. The patient PEFR was 350 and his oxygen saturation was borderline at 95%.  He assessed the patient as being in good control. He requested follow-up in 3 months.  The doctor delegated writing of medication orders to the nurse.

Sick Call

31. On 11/20/10 the patient submitted an HSR complaining of being sprayed with chemical agents and burning his skin off. He requested help.  The form was received on 11/24/10. On 12/1/2010 (4 days) an RN saw the patient and filled out the pepper spray or chemical exposure protocol and ordered triple antibiotic ointment that was not on the protocol. The patient's weight was now 178 lbs., a loss of 19 lbs since his arrival

**Summary:**  The doctor did not obtain adequate baseline or interval asthma histories. He did not address the patient's significant weight loss.  This asthma patient was exposed to chemical agents and did not receive timely care.

**Patient #9**

This 35 year-old arrived at EMCF on 3/30/10. His medical history included asthma and hypertension. His medications were QVAR, Albuterol MDI, Atenolol, HCTZ, and Risperdal.

Transfer screening

Upon arrival a nurse saw the patient and performed intake screening. His medications were reordered upon arrival. The medications were started on 4/2/10 (3 days). His weight was 193 lbs.

Chronic Disease Management

On 4/1/10 the doctor saw him for chronic disease management. He did not perform a review of symptoms related to cardiac disease. His vital signs and PEFR were within normal limits. His weight was 188 lbs (↓ 5 lbs). The physician ordered lab tests (biochemical profile, lipids and urinalysis). He reordered medications and requested follow-up in 6 months.

On 10/5/10 the doctor saw the patient again for chronic disease management. The patient denied chest pain and shortness of breath. He did not inquire about frequency of asthma symptoms or inhaler use. He did not address the patient's medication adherence, however our review of his MARs from April to December show multiple no shows and refusals of medications. The patient's blood pressure was elevated (144/91 mm/hg).  Ordered labs were not obtained. The physician accurately assessed patient's poor disease control and added Lisinopril to his medication regimen. However this does not address the primary factor contributing to his poor disease control which was medication noncompliance. The physician ordered labs and requested follow-up in 3 months.

On 1/4/11 the physician saw the patient for follow-up. The patient's weight was 172 lbs. (↓ 21 lbs.). Te patient's labs were not performed as ordered. The physician delegated writing of medication orders to the nurse.

**Summary:**  The physician did not address the primary reason for the patient's poor hypertension disease control and his 21 lbs. weight loss. The physician has not adequately addressed the problem of labs not being available. One of the consequences is that the physician has not evaluated and addressed important cardiovascular risk factors such as cholesterol.

**Patient #10**

This 25 year-old arrived at EMCF on 10/20/09. His medical history included mental health issues. His medications were Risperdal, Depakote and Cogentin. The medication order was not cosigned by the doctor. His medications were started the following day.

Transfer Screening

Upon arrival a nurse completed the screening process. His blood pressure was elevated (BP=146/95 mm/hg.) His weight was 169 lbs. on 10/5/2010.

Mental Health

On 12/14/09 the psychiatrist stopped his medication due to noncompliance.

32. On 5/14/2010 he submitted an HSR complaining of not being able to eat anything because his right jaw locks up and he could not chew. The form was received on 5/16/2010. On 5/27/10 an LVN saw the patient and noted that the right side of his jaw appeared to pop out of place at will. The nurse referred the patient to the physician but it did not take place.

33. On 11/1/10 the patient submitted an HSR complaining of needing to have surgery on his wisdom and another tooth that is decaying. He requested dental services. This was received the same day and on 11/4/10 the nurse saw the patient, noting his bottom wisdom tooth had a hole in it. No infection noted. The dentist saw the patient on 11/13/10 and prescribed Clindamycin and Motrin. He has not been seen since.

On 12/12/10 the patient wrote to the HSA stating that it had been over a year since he was to have surgery on his wisdom tooth and he has been unable to eat due to pain. He requested that something be done.

Summary: When the nurse referred the patient to the physician, the referral did not take place. Dental services have not been provided in a timely manner.

# Executive Summary

In summary, following my review of selected areas of the EMCF health care program I make the following conclusions:

- Inmates do not have timely access to appropriate medical care.

- Staff does not document medical care in the health record in accordance with community standards.

- Health care policies and procedures do not provide sufficient operational guidance with staff.

- Patients with chronic illnesses are not being monitored in accordance with recognized guidelines and the frequency of monitoring does not occur in accordance with the patient's degree of disease control (i.e. poorly controlled patients are monitored at greater frequency than well controlled patients).

- Based upon its the size and health care and security missions, the facility has insufficient numbers of health care staff to provide appropriate and timely health are to inmates with serious medical conditions.

- There are serious problems with medication administration including lack of continuity of medications for serious medical conditions; medication errors; inappropriate crushing of medications; and medication administration process that fails to meet accepted nursing practice standards.

- The physician does not have the requisite training and credentialing to provide primary care to the patient population demonstrated by his failure to recognize and treat patients with symptoms of serious medical conditions. The physician also does not adequately treat patients with moderate to severe, acute pain.

- The facility does not have an adequately functioning CQI program at this time. GEO's clinical performance review program has not resulted in the removal of physicians who provide inappropriate medical and mental health care.

- Based upon our findings, inmates are subject to significant, undesired weight loss due to inadequate medical evaluation and insufficient caloric needs.

- Record reviews suggest that correctional officers exert excessive force through the use of chemical restraints (e.g. pepper spray) and/or physical force.

# Recommendations

## Access to Care

1. MDOC/GEO should ensure that inmates have continuous access to health care request forms.

2. Inmates must be able to confidentially submit health care request forms into locked boxes that are accessed only by health care staff.

3. Health care staff should collect the forms 7 days a week. Registered nurses should triage the forms within 24 hours of receipt to assess the nature and urgency of the complaint.

4. Following triage, nurses should schedule patients to be seen at sick all within 24 hours (72 hours on weekends).

5. Only a registered nurse or higher level provider should perform patient assessments. LPNs should not be assigned this responsibility due to their lack of training.

6. The physician should be immediately removed from the facility and replaced with a physician trained and credentialed in primary care (e.g., family practice, internal medicine).

7. Health care staff should conduct and document daily rounds in segregation.

8. Health care leadership should ensure more timely access to dental services. Nursing staff should triage dental health requests and assess patients who complain of pain and/or infection.

9. Facility leadership should ensure adequate correctional officer staffing on segregation units so that inmates can notify them in the event of a medical emergency.

10. Health care leadership should conduct CQI studies of the access to care process to identify issues and develop strategies for improvement.

## Health Records

11. When MDOC transfers inmates to EMCF, all volumes of the health record should be forwarded at the time of transfer.

12. MDOC/GEO should ensure that policies adequately address health record organization and that the facility adheres to the policy. Policy should clarify where dental records and diabetic flow sheets should be filed.

13. Health care leadership should ensure that there is a system for tracking, reviewing and filing hospital reports and other health record documents.

14. GEO should assess health record staffing to ensure that there are adequate resources to file health records in a timely manner.

15. Health care staff should contemporaneously document all clinical encounters.

## Policies and Procedures

16. GEO should update its corporate policies and procedures.

17. EMCF should develop site specific policies to provide sufficient operational guidance to staff. These policies should be reviewed and updated annually or as needed when policy changes are made.

18. The site specific policy of crushing all medications should be changed so that crushing medications is patient specific, and in response to a legitimate clinical basis, such as difficulty swallowing or hoarding medications.

## Chronic Disease Management

19. GEO should only hire primary care trained and credentialed clinicians to treat patients with chronic diseases.

20. Clinicians should provide medical care that meets nationally recognized clinical guidelines, including ordering appropriate labs, performing eye examinations for diabetics and offering recommended vaccinations.

21. The health care administrator should that a system for ordering and completing laboratory tests is functional as well as the system for reviewing and filing of laboratory reports.

22. Clinicians should review medication administration records at each clinic visit to evaluate the role of adherence in whether patients are well or poorly controlled.

## Staffing

23. Clinician staffing should be increased to meet the unmet clinical demands at the facility. GEO should consider adding a full time nurse practitioner.

24. Nurse staffing should be adjusted to add sufficient number of registered nurses to perform sick call and other responsibilities that involve making independent nursing assessments. LPN staffing should be adjusted to enable medications to be administered in a timely manner. Consider adding a Director of Nurses position

25. Ancillary staffing should be evaluated and adjusted to provide adequate support services.

26. Dental staffing should be assessed to ensure timely and appropriate access to care.

## Pharmacy and Medication Services

27. GEO should negotiate the order cutoff date with CorrectRx to reduce the volume of nurse transcribed medication orders.

28. Physicians should write their own medications orders except when nurses accept verbal and or telephone orders. All medications orders should be signed by a physician in a timely manner.

29. Nurses should request, and inmates should be required to present identification badges to receive medications.

30. Nurses should administer medications only from properly labeled pharmacy dispensed packages. No loose medications should be kept in the medication cart.

31. Medication administration should be a collaborative effort between nurses and correctional officers. Officers should ensure the orderly flow of inmates to the window; that inmates have their identification badges with them; that inmates take their medications immediately; and perform oral cavity checks with a penlight to ensure that medications have been swallowed.

32. Health care leadership should evaluate and address the reasons for lack of medication continuity.

33. Nurses should report patient medication noncompliance to the physician in a timely manner.

## Quality Improvement Studies and Clinical Performance Review

34. The Health Care Administrator should initiate a multidisciplinary CQI program focusing on problematic areas of health care delivery.

35. Following clinical performance review, GEO should immediately remove clinicians who are identified as dangerous or providing care that is well below the community standard of care.

## Excessive Force and Unintended Weight Loss

36. Facility leadership should investigate reports of excessive force identified in this report including excessive use of chemical restraints.

37. Custody staff should contact health care staff prior to the use of chemical restraints to identify patients for whom chemical restraints are contraindicated.

38. MDOC/GEO Leadership should initiate an evaluation of dietary/nutritional requirements and ensure that inmate menus are adequate to meet inmate daily caloric requirements. In addition, food should be served at proper temperatures.

Respectfully Submitted,

_February 25, 2011_

Madeleine LaMarre                Date

The opinions expressed in this report are based on the information currently available to me. If additional information is brought to my attention (for example, additional documents or depositions), I may amend or supplement my opinions.

# Appendix A – Patient ID Numbers

| Patient Number | Name | Inmate ID |
|---|---|---|
| Patient #1 | | |
| Patient #2 | | |
| Patient #3 | | |
| Patient #4 | | |
| Patient #5 | | |
| Patient #6 | | |
| Patient #7 | | |
| Patient #8 | | |
| Patient #9 | | |
| Patient #10 | | |