# EXHIBIT 6

# EXPERT REPORT OF ELDON VAIL
*Dockery, et al. v. Epps, et al.*
June 16, 2014

**ASSIGNMENT**

I have been retained by Plaintiffs' counsel to evaluate and offer my opinion regarding the safety and security of prisoners confined at the East Mississippi Correctional Facility (EMCF).

**QUALIFICATIONS**

1.      I am a former corrections administrator with nearly thirty-five years of experience working in and administering adult institutions.

2.      Before becoming a corrections administrator, I held various line and supervisory level positions in a number of prisons and juvenile facilities in Washington, in addition to serving as a Juvenile Parole Officer and pre-release supervisor.  I have served as the Superintendent (Warden) of three adult institutions, including two facilities with maximum-security inmates.

3.      I served for seven years as the Deputy Secretary for the Washington State Department of Corrections (WDOC), responsible for the operation of prisons and community corrections.  I briefly retired, but was asked by the former Governor of Washington, Chris Gregoire, to come out of retirement to serve as the Secretary of the Department of Corrections in the fall of 2007.  I served as the Secretary for four years, until I retired in 2011.  A complete copy of my resume, detailing my work experience, is attached as Exhibit 1.

4.      My experience as a prison and corrections administrator included responsibility for, and a focus on, the mentally ill population and their custody, housing, and treatment.  My opinions are based upon my substantial experience running correctional

1

institutions and presiding over a statewide prison system for more than a decade, a system that successfully addressed the challenge created by the rapid influx of the mentally ill into the prison environment.  In my 35 years of work in corrections, I have spent considerable time working to provide for the proper custody and care of the mentally ill sentenced to prison.

5.      Like other states, Washington saw an influx of the mentally ill into the prison system, the result of the downsizing of mental hospitals that began in the 1980s.  Political and agency leadership understood the need to provide treatment for this growing population and that simply housing them in a maximum-security environment was counter-productive.

6.      When I was the Superintendent of McNeil Island Corrections Center, the Secretary of the Department at the time, Chase Riveland, charged me with designing and opening a new program for mentally ill inmates within the WDOC.  I did so in collaboration with leaders from a number of departments from the University of Washington (UW), who informed the design and operation of the two units, one medium security and one maximum security, devoted to this population.[1]  That collaboration continued for nearly twenty years as UW staff came to assist the Department in improving our treatment of mentally ill inmates throughout the system, with a focus on moving them out of high security bed placement whenever possible.

7.      My charge was to lead the conversation about what changes needed to be made and what environment could be created within a prison to provide quality treatment to the mentally ill inmate population.  For this program, we created a new job series, "Correctional Mental Health" workers.  About two-thirds of the line staff were former correctional officers and the other third had little or no correctional experience, but did have undergraduate or Master's degrees in psychology or other social services majors.  The leadership of the program was also a

---

[1] McNeil Island was a 1,700-bed facility with five medium security living units, one maximum custody unit, and a minimum-security unit outside the secure perimeter.

hybrid of correctional and mental health staff, including psychiatrists and psychologists.  This allowed the program to blend the two disciplines to make the program safe as well as effective in providing treatment to the mentally ill.

8.       We provided psycho-educational treatment.  Along with treatment from the primary clinicians, inmates were offered classes in areas such as anger management, symptom recognition, and medication management.  The living unit itself was used as an environment to practice the skills being learned by the mentally ill inmates away from the pressures they may experience in a general population prison.  We expected staff and inmates alike to model pro-social behavior.   The design was proven effective.   According to researchers at UW, "[p]articipants were substantially less symptomatic when they left the program than when they entered . . . [T]here was a significant improvement in major infractions and use of expensive resources following program stays . . . and, the pattern of work and school assignments is one of improvement."[2]

9.       As Assistant Director for Prisons in Washington, my responsibilities included oversight of mental health programs for all prisons in the State of Washington.  Part of this assignment was to oversee the design of a capital project that more than doubled the size of Washington's largest program for the mentally ill in order to accommodate the growing number of mentally ill inmates arriving in Washington prisons.  Taking what I had learned from my experience on McNeil Island, my primary focus was to design a housing continuum for the mentally ill that did not rely on over-classifying individuals as maximum security, and instead moved them through less restrictive levels of prison housing.  We developed a design that

---

[2] D. Lovell, D. Allen, C. Johnson and R. Jemelka, *Evaluating the Effectiveness of Residential Treatment for Prisoners with Mental Illness*, Criminal Justice and Behavior, Vol. 28 February 2001, 83-104.

allowed inmates to move through progressive custody levels from maximum to minimum and to avoid segregation whenever possible.

10.    During my tenure as the Deputy Secretary, we created a specialized high security treatment unit for the mentally ill inmates who ended up in segregation, separate and apart from a regular segregation unit, where the inmates could be safely housed without significant levels of isolation and receive robust treatment from mental health professionals.

11.    As Deputy Secretary and later as Secretary, I focused on providing proper treatment for the mentally ill in prison on a system-wide basis.  The pioneering work of the McNeil program and Washington's correctional programs for inmates placed in isolation have been extensively studied and guided by researchers from UW.[3]

12.    Since my retirement, I have served as an expert witness and correctional consultant for cases and issues in ten different states.  Most recently, I testified as an expert in *Coleman v. Brown*, in the United States District Court for the Eastern District of California, and in *Graves v. Arapio*, pending in the United States District Court for the District of Arizona, both class action lawsuits regarding the use of force and disciplinary procedures for mentally ill prisoners.  I was also appointed as Special Master in *Corbett v. Branker*, and testified before the United States District Court for the Eastern District of North Carolina regarding the use of force in the correctional environment.  Finally, I also have submitted an expert report in *Parsons v. Ryan*, a statewide class action pending in the United States District Court for the District of

---

[3] For examples, see Lovell, *A Profile of Washington Inmates on Intensive Management Status*, University of Washington-Department of Corrections Behavioral Health Collaboration, October 2010, (unpublished, attached as **Exhibit 3**); Lovell, *Patterns of Disturbed Behavior in a Supermax Population*, Criminal Justice and Behavior, 2008, 985; D. Lovell and R. Jemelka, *Coping With Mental Illness in Prison*, Family and Community Health, 1998.

Arizona, concerning among other things, the conditions of confinement for prisoners in segregation units.

13.      Attached hereto as Exhibit 1 is a true and correct copy of my resume.  It details my work experience and lists the current cases for which I have been retained as an expert.

**COMPENSATION**

14.      My billing rate for work on this case is $150 per hour.

**FOUNDATION FOR EXPERT OPINION**

15.      In forming my opinion I considered documents provided by the parties; court filings; the deposition testimony of Captain Matthew Naidow; and policies of the Mississippi Department of Corrections (MDOC).  I also reviewed a variety of documents, logs, and reports generated by the facility.  I reviewed information related to approximately 382 use of force events in the prison.  Ninety-five of those incidents were on video, with the accompanying written Unusual Occurrence Report (UOR) for all but 26, for which I have been unable to locate the related written report.  I reviewed the remaining incidents using the UOR only.  I have also reviewed the available monitoring and inspections reports regarding the prison's operations.

16.      A complete list of the materials I relied upon in this matter is attached hereto as Exhibit 2, and may be referred to in footnotes and/or other references within this report.

17.      In addition to the documents reviewed, I visited EMCF from March 31 through April 3, 2014, and conducted inspections and interviews in the various living units in the prison with an emphasis and focus on those in the segregation and mental health units.  I viewed

the physical design and condition of the living units, including cells, fixtures, shower areas, and recreation areas, and I observed correctional staff perform their duties in those units.   During these tours, I spoke with over 80 inmates, including 7 whom I interviewed in a confidential setting.   The Warden or other high-ranking members of his administration escorted me on the tour.

18.     My work on this matter is ongoing.   This report summarizes my current opinions given the available information I have reviewed to date.   It is my understanding that a number of relevant documents requested by Plaintiffs' counsel have just recently been received and it has not been possible for me to review them in such a short amount of time.   I reserve the right to modify or supplement my analyses and opinions accordingly.


### SUMMARY OF OPINIONS

19.     East Mississippi Correctional Facility is an extraordinarily dangerous prison. All prisoners confined there are subjected on a daily basis to significant risk of serious injury.

20.     The conditions of confinement in the segregation units, Units 5 and 6D, are shockingly inhumane and dangerous for all prisoners, but especially so for the many prisoners with serious mental illness who are confined there.   Prisoners in Units 5 and 6D can get attention for their most basic human needs only by setting fires, flooding their cells, cutting themselves, or violating rules by refusing to remove their arms from the food slots in their cell doors, thereby knowingly subjecting themselves to being gassed with pepper spray. The result is an overwhelming number of unnecessary and dangerous use of force events and abusive practices, putting prisoners at significant risk of injury.

21.     Moreover, the entire inmate population at EMCF – as well as staff at the facility – is constantly at significant risk of serious harm due to multiple gross defects in basic security measures, both in the physical plant and in the training and supervision of security staff. This is a prison awash in contraband and easily accessible weapons, where severely chaotic conditions of confinement and no rational, functional way for prisoners to get legitimate issues addressed, put all prisoners as well as staff at ongoing risk of serious harm.

22.     The deep and systemic problems with the operation of EMCF that I describe in this report have been known at the highest levels of the Mississippi Department of Corrections for a considerable period of time.  Those problems were identified and described over two years ago in a letter from the ACLU to Defendant Christopher Epps.[4]  MDOC has failed to take reasonable remedial measures and to put in place effective monitoring mechanisms to end the degrading, dangerous, and abusive practices at the facility.

**OPINION 1: THE CONDITIONS OF CONFINEMENT IN THE SEGREGATION UNITS AT EMCF SUBJECT ALL THE INMATES CONFINED THERE, AND ESPECIALLY THOSE WITH SERIOUS MENTAL ILLNESS, TO SIGNIFICANT RISK OF SERIOUS HARM**

23.     The conditions of confinement for inmates in segregation at EMCF are deplorable.  They are the worst I have ever seen in 35 years as a corrections professional. It is my opinion that all inmates confined to the segregation units at EMCF, and most especially those with serious mental illness, are subjected to an ongoing substantial risk of serious harm from the dangerous, filthy, and degrading conditions there.

**I.A.   Filthy and dehumanizing conditions in Units 5 and 6.**

24.     I spent most of my time at EMCF in units 5 and 6.  Each unit is divided into four pods, sometimes called zones.  Pod 5A-D is for long-term segregation; 6D is for short-term

---

[4] DKT #46 Exhibit 1 Email exchange between Winter, Epps and Vincent May 15, 2012.

segregation; and 6A-C is purportedly for general population. However, during my tour, cells in 6A-C were functioning very similar to segregation.  These units are dirty and very dark.

### I.A.1. Profound isolation, idleness, darkness, and filth.

25.        Inmates in the isolation units are confined almost around the clock to a cell that is about the size of a small bathroom, behind a solid metal door with a small narrow glass window and a narrow port for the passing of food trays.  Human contact is limited to the few times during the day that staff come to the front of the cell to provide a service, such as delivering a food tray or for brief mental health or medical rounds. Conversations with inmates in other cells are possible only by shouting.  Many of the cells are without functioning light fixtures, and are extremely dark.  It is commonplace for prisoners to be deprived for days at a time of the opportunity to shower.  Out-of-cell time for exercise occurs at best only for an hour a day a few times a week.  A TV is mounted on a wall at a distance across the dayroom, and is oftentimes impossible to see or hear.  Access to the telephone is almost nonexistent.

26.        Confined to a cell, in essentially unremitting isolation and idleness, it is no surprise that they begin to act out and find themselves in a spiral of behavior that will keep them in segregation for longer periods of time.  This kind of environment puts great stress on almost all inmates, and especially those—and there are many in the segregation units at EMCF—who have pre-existing serious mental illness.

27.        Some of that stress could be alleviated by providing group or individual therapy with mental health providers, but most inmates have little or no access to such programs. Inmates are left in their cells and what contact they do have with mental health staff is when they are in crisis, often during a use of force event.

28.       Even before arriving in these units, the first thing I noticed was the smell of soot and smoke.  Upon entering a pod, it is striking how many of the cell doors are scorched from previous fires. The first day I was at the prison, as I got closer to the segregation units, the smell of smoke became quite strong.  As I walked into unit 5A, there was still a smoldering pile of debris in the middle of the day room floor.

29.       I observed water running off the upper tier to the floor below in the 5A pod, either from an intentional act of an inmate or because a toilet was broken and overflowing.

30.       The filth on the day room floor was striking.  Inmates are instructed to throw their finished Styrofoam trays out of the tray slot in their cells doors onto the floor of the day room.  Being in and out of these pods for a few days, it was clear from my personal observation that these trays are not promptly picked up for disposal.  This practice may well contribute to what many inmates describe as a problem of rats in the pods.  One prisoner in 6C showed me how he reached out of his cell through the tray slot to block with newspaper a hole in the wall so that the rats could not get out.  Others told me they block the bottom of their cells with clothing or towels so that rats cannot get in.  One told me he fed them.

31.       There is no evidence that the common areas in the units are routinely cleaned or ever cleaned very well.  An inmate porter told me that the day rooms in units 5 and 6 are sometimes swept, but to his knowledge never mopped.  From my own observations, that appeared to be the case.  I saw caked on food (or maybe feces) stuck on one of the pillars in the living unit.  It had clearly been there for a long time.  Since the prisoners in segregation units are almost never in those common areas, unless they are passing through in restraints, there is no excuse for them not to be routinely cleaned.  In my experience, segregation units are often the cleanest in a prison facility because they have so little unrestrained inmate access.

32.        The shower areas on each tier were in disrepair and extremely dirty.  In some there was standing water; in all, caked up soap and grime on the walls.  Some showers had no functional lights; others had exposed fixtures, both plumbing and electric.  In my experience as a prison administrator, such conditions can lead to health problems for the inmate population.  Some inmates told me they cleaned themselves in their cells rather than face the risk of trying to shower in such unhygienic conditions.

33.        I spent most of my time in the units going cell to cell and talking with the prisoners at the cell front.  The cells are very dark with only a small window to the outside and a narrow slit in the door looking into the dayroom.  I personally witnessed lights that did not work, exposed wiring in the cells, dysfunctional water faucets, and toilets that would not flush.  Many prisoners expressed great frustration at their inability to get staff's attention in an effort to fix such problems.  One inmate told me he had not had water in his sink for three weeks.  Another said he had been without water for four or five days.  Another told me his toilet had not functioned for two weeks. Whether or not a prisoner had a current problem in his cell, many others shared they had similar problems in the past.

34.        Such poor condition of the basic utilities of the cells is inconceivable in my experience.  It is a well-established axiom in corrections that facility cleanliness is fundamental to prison safety and security.  A problem with the basic utilities in a cell should be identified and corrected immediately.  To allow such problems to linger unattended will predictably create inmate unrest and make the unit much more dangerous and difficult for the staff to manage.

35.        It is not unusual – in fact it is typical – for prison administrators to do extra cleaning in advance of inspection tours of any kind, and especially when conditions at the facility have been challenged in litigation.  So it confounded me to find these units in such filthy

conditions, even with the prison aware that Plaintiffs' experts were coming to inspect. I can only conclude that EMCF lacks the ability to get their segregation units clean and maybe even the understanding of how important cleanliness is for safety and security. The level of filth and disrepair I observed in Units 5 and 6 at EMCF shows a profound disrespect for the inmates confined there and for the corrections profession itself.

**I.A.2. Lack of cleaning supplies.**

36.      Inmates consistently complained that they do not have access to basic supplies in order to clean their cells. I witnessed one inmate trying to clean his cell with a filthy towel that had been reduced to a rag. He dipped it into his toilet and tried to mop his floor. The lack of attention to the issue of cleaning supplies for inmates in segregation is in direct violation of MDOC policy, which has an extensive and thorough list of required cleaning supply access for inmates in segregation:[5]

> Staff will ensure that adequate cleaning supplies and equipment are provided to offenders and will instruct/supervise those offenders in proper cell maintenance.
>
> The following cleaning items will be issued to each offender a minimum of three (3) times per week:
> - Mop
> - Mop bucket (to remain outside of the cell)
> - Broom
> - Dust pan
> - Toilet bowl brush
> - Toilet bowl cleaner
> - All purpose cleaner
> - Germicide

The policy goes on to say that clean cells are to be documented each day. In the logs I have reviewed, I can find no mention of cleaning supplies regularly and routinely being made available to inmates in segregation.

---

[5] MDOC 19-01-01, Offender Segregation, pages 8 and 9.

37.     The EMCF administration appears to be well aware of these problems.   In minutes from the Security Meeting of November 14, 2012, it was reported: "MTC President toured the institution and all went well.   He stated that Long Term segregation was very concerning, the living conditions were awful and showers on all Units need some attention."[6] The corporate president was correct.   Conditions in segregation are still awful today.   It is tragic that nearly a year and a half later, those units and the showers are still in that condition.

38.     MDOC is also no doubt well aware of these problems.   MDOC employs a facility monitor who is stationed onsite at EMCF.   Additionally, pursuant to its contract with the facility, it has the authority to inspect EMCF at will.[7]   Furthermore, the scorched and dirty walls, as well as the food and other debris left on the floor of the unit, are evident in the videos of use of force events, which, pursuant to contract, are available to MDOC.

**I.A.3. Grossly inadequate access to showers and exercise.**

39.     The most common complaint from the prisoners is that they do not get access to out of cell exercise or to showers according to policy.   The policy requires out of cell exercise five days a week and access to showers three days a week.[8]   MTC produces a weekly report that documents and verifies the claims of the prisoners regarding recreation.   For example, during the week of May 13, 2013, pod 5A received one hour out of cell, 5B received two hours, 5C one hour, 5D zero hours, 6A-C zero hours, and 6D one hour.[9]   I received seventeen such reports.[10]   I could only find compliance with the policy requirement of five days of recreation in four out of

---

[6] MTC069212.
[7] AG 39 Residential Services Agreement between MDOC and EMCFA.
[8] MDOC 19-01-01, Offender Segregation, pages 10 and 12.
[9] MTC079663.
[10] MTC079552, 558, 565, 572, 587, 593, 600, 628, 635, 642, 649, 663, 670, 698, 705, 712, 719, 726, 732, 740 (duplicate of 732), 747, 750, 757, 765, 771, 777, 784.

the seventeen weekly reports.  Even then, there appears to be no individual record to see if each inmate in each pod actually received the opportunity for out of cell exercise.

40.     The lack of an individual log for each inmate in segregation is problematic in that it makes it impossible to determine if each individual inmate has actually received his opportunity for exercise.  In the unit logs that I have reviewed, exercise and showers are logged by cell number and not the inmate's name or number.  Inmates come and go in these units and cell assignments change.  Accordingly, EMCF has no way to verify that individual inmates receive an opportunity for exercise as required by MDOC policy.  This is a violation of MDOC policy, which requires that "[i]ndividual records, Isolation/Segregation Log, . . . be maintained for each offender in order to provide daily activity documentation."[11]  When I asked about such individual logs during my tour, the warden told me that they did not use them at EMCF because the inmates would rip them off the wall – a stunning admission of the lack of basic control in these high security units.

41.     Prolonged denial of outdoor exercise violates both domestic and international correctional standards, and is harmful to inmates' physical and mental well-being.  The United Nations Standard Minimum Rules for the Treatment of Prisoners requires "Every prisoner who is not employed in outdoor work . . . have at least one hour of suitable exercise in the open air daily if the weather permits."[12]  The U.S. State Department created a handbook to provide embassy officials around the world with a basic understanding of international standards for correctional systems.  That handbook states, "[P]risoners should have access to recreation for no less than one

---

[11] MDOC Offender Segregation Policy, 19-01-01, page 9.
[12] *Standard Minimum Rules for the Treatment of Prisoners,* Adopted by the First United Nations Congress on the Prevention of Crime and the Treatment of Offenders, Standard 21(1).

hour per day."[13]  The American Correctional Association has extensive standards on inmate recreation in prisons.[14]  Those standards require, even for prisoners otherwise confined to their cell, "that inmates receive a minimum of one hour of exercise per day outside their cells, five days per week, unless safety or security considerations dictate otherwise."  The MDOC policy is in compliance with the ACA standard.  The practice at EMCF is not.

### I.A.4.  Inadequate access to telephones.

42.     I could find no evidence that prisoners in segregation at EMCF have regular access to phones.  In my experience, phone calls to family and friends often serve as a protective factor for inmates in segregation or in general population.  Phones are available in the unit but are not being put to use.[15]  During my inspection, I observed that some of these phones were damaged and broken and unavailable for use by the prisoners.  Allowing prisoners in segregation to have an occasional phone call, increasing access as behavior improves, can be safely done, and is done in other prisons around the country.

### I.B.     Additional impact of inhumane conditions on prisoners with serious mental illness.

43.     There is no question that mentally ill inmates are regularly and routinely housed in segregation units at EMCF.  There is little evidence that the prison administration takes into consideration the potential harmful effects that the conditions of confinement in those units are having on all inmates, but especially the mentally ill, and the problems created in managing the prison that result.  Inmates need a coherent structure, living conditions that recognize the extreme stress social isolation segregation creates, a staff that not only controls but

---

[13] *A Practical Guide to Understanding and Evaluating Prison Systems*, United States Department of State, page 23.
[14] *Standards for Adult Correctional Institutions*, 4th edition, American Correctional Association (2012), Standard No. 4-4270.
[15] MDOC Policy Offender Segregation, 19-01-01 makes reference to telephone calls on page 10 but has no affirmative statement that such calls     must be allowed. It should.

respects them, and robust programs to help them learn what behaviors have brought them into segregation and what changes in conduct they need to make in order to get out and stay out. The EMCF segregation units fail this challenge in every respect.

44.     The barbaric conditions of confinement in the segregation units at EMCF are particularly injurious to the many prisoners in segregation who suffer from severe mental illness.

45.     There is broad consensus in the corrections and mental health community that housing mentally ill inmates in segregation subjects them to a heightened risk of serious harm. In 2012, the American Psychiatric Association issued the following position statement:

> Prolonged segregation of adult inmates with serious mental illness, with rare exceptions, should be avoided due to the potential for harm to such inmates. If an inmate with serious mental illness is placed in segregation, out-of-cell structured therapeutic activities (i.e., mental health/psychiatric treatment) in appropriate programming space and adequate unstructured out-of-cell time should be permitted. Correctional mental health authorities should work closely with administrative custody staff to maximize access to clinically indicated programming and recreation for these individuals.[16]

A preeminent expert in the field, Dr. Craig Haney, has noted that "[t]here is not a single published study of solitary or supermax like-confinement . . . that failed to result in negative psychological effects. The damaging effects ranged in severity and included such clinically significant symptoms as hyper-tension, uncontrollable anger, hallucinations, emotional breakdowns, chronic depression, and suicidal thoughts and behavior.[17]" Dr. Haney has further stated:

> As I and many other researchers and knowledgeable mental health professionals have observed, segregated housing places prisoners at grave risk of psychological harm. This is especially true when prisoners are confined in especially harsh and deprived conditions for very long periods of time. There is widespread agreement

---

[16] APA Official Actions, Position Statement on Segregation of Prisoners with Mental Illness (2012).

[17] Haney, C., Mental *Health Issues in Long Term Solitary and "Supermax" Confinement*, Crime & Delinquency, 49, 2003.

that mentally ill prisoners are particularly susceptible to this risk of harm.  There are many studies of the effects of isolation in general that underscore the ways that it can undermine psychological well-being, and even more substantial evidence of its negative psychological effects in prison settings.  This evidence comes from a variety of sources, including personal accounts, descriptive studies, and systematic research on solitary and supermax-type units.  As I have noted in previously published reviews, the data that establish these harmful effects have been collected in studies conducted over a period of several decades, by researchers from several different continents with diverse backgrounds and a wide range of professional expertise.[18]

**I.C.   Failure of basic security systems in segregation.**

46.      It is my opinion that inmates in the segregation units at EMCF are in constant danger because custody officers do not have basic control of these units.  The doors to their cells are not secure, custody officers do not check on them regularly, and staff do not engage in effective security practices to stop the introduction and flow of contraband within the prison.

**I.C.1.  Nonfunctioning locks on cell doors.**

47.      Adding enormously to the dangers and stress experienced by those are confined to the segregation units at EMCF—and also to the dangers and stress experienced by those who work in those units—is the fact that the doors to the individual cells in the segregation units are not secure.  Inmates can successfully block their full closure.  I have reviewed approximately forty Unusual Occurrence Reports that document multiple cell doors that show as unsecure on a particular shift.[19]

48.      I discussed this issue with prison officials during my inspection of the facility and was allowed access to one of the control booths where the electronic door controls are located.  The officer on duty in the booth acknowledged the problem, as did the Warden

---

[18] Expert Declaration of Craig Haney, *Coleman v. Brown*, Doc. No. 4378, at No. 38 (E.D. Calif. Mar. 14, 2013).

[19] MTC009163, 09170, 09171, 09173, 09225, 09253, 09289, 09921, 09385, 09400, 09462, 09463, 09511, 09546, 09634, 09511, 09546, 09633, 09634, 09639, 09653, 09747, 09795 (3 reports), 09851 (5 reports), 09907 (5 reports), 10014, 19928 and 19950 (4 reports).

accompanying me on the tour.  The officer told me that the problem was "constant" and that work orders are routinely submitted.  When I asked if it was a design problem or a maintenance problem, the lawyer representing the state instructed staff not to answer that question.

49.      The problem is apparently one of design, and knowledge of this very dangerous situation exists at the highest levels of MDOC.  In a meeting in Jackson, Mississippi that I attended on May 19, 2014 to discuss another MDOC facility operated by MTC (Walnut Grove Youth Correctional Facility), the Deputy Commissioner for MDOC acknowledged this is a problem in a number of their prisons and said they were working on it.

50.      "Working on it" is not good enough.  It is astonishing to me that this enormous gap in security is not being treated as an emergency.  It is a basic and fundamental necessity for prisoners, staff, and the community to know that a prison can actually keep its prisoners locked in their cells.  A solution cannot come too soon.  Not having confidence that the cell doors in a segregation unit are secure can be terrifying to both staff and inmates and creates a severe risk of significant injury for the prisoners.  This is a problem that demands an immediate solution.

51.      During my tour, I interviewed a prisoner who whispered through his cell door to me that he wanted to speak, but did not feel safe doing so at the cell front.  The next day I called him out for a confidential interview.  He explained that both of the dominant gangs within the prison were out to get him and that his life was in danger.  I asked him how they could get at him while he was in segregation and he told me about the door problem.  He feared that inmates could get out of their assigned cell and come after him.  He related a version of this precise thing happening to another person in the recent history of the prison.  The story he shared parallels the information available from MTC's own records where just such an assault occurred at the prison

in September of 2012.[20]   Other inmates shared with me this concern about the cell doors during my interviews.

52.        In a video from December of 2013, an inmate was escorted back to his unit following a trip to medical after a use of force event.[21]   The officers placed him in a cell that the inmate tells them has a broken door.  The officers place the prisoner, still in restraints, in the cell, and he immediately opens the cell door.  They put him in a second cell and its door has the same problem.  They attempt to place him in a third cell and the tape ends with the comment that there is a problem with that cell door as well.  This sequence would almost be comical were it not for the serious risk of harm unsecure cell doors present to the prisoners.

53.        In his deposition, Captain Naidow acknowledged there is a problem with the locks on the cell doors, allowing prisoners to open them.  He goes on to say, "It is, and it is at every prison I've worked at, though."[22]   I believe this leaves the impression that this is a common occurrence in prisons.  In my experience, it is not.  I have seen problems with cell door electronics during the punch list process in receiving a new unit from a contractor, but when it is identified, it is corrected before inmates are ever housed in the unit.  I have experienced a situation where an officer opens the wrong cell door, but that is a human mistake and not a systemic design flaw.  If a cell door fails to function properly, it is my experience that the cell is taken off line until the door is fixed.  Until the cell doors at EMCF are fixed, they will continue to operate in a state of perpetual emergency, creating a significant risk of serious harm.

---

[20] DEF-OO134-139.
[21] ████████ ████
[22] Naidow deposition, page 49, lines 7-16.

**I.C.2.  Failure to make security checks in the segregation units.**

54.     It is also a very serious security problem that correctional staff at EMCF do not make regular checks of inmates in segregation.  MDOC policy requires checks of inmates in segregation as follows:

> Security inspections will be conducted on each and every offender in each cell every 30 minutes and documented in the Unit Register and Tower Logs in red ink indicating the date and time of the observation and the staff conducting the inspection.[23]

During my inspection, I had the opportunity to inspect these logs. I did not find that these checks, to the degree that they occur, are routinely logged consistent with this policy requirement.  Typically, in my experience, these checks are documented on a form for each individual inmate, but that is not a requirement of MDOC policy, nor is it the practice at EMCF.

55.     The lack of these routine checks on the welfare of each inmate in the segregation units is a source of constant concern by the prisoners. Repeatedly, prisoners told me that officers often are not on the zones.  Inmates are well aware that other inmates can and sometimes do get out of their cells due to the problem with the cell doors and, as a result, assaults have occurred.  Multiple times during my inspection, I visited segregation pods where no staff were present prior to my arrival.  Given the uncertain security of the cell doors, this increases the risk to both prisoners and the staff and may even make staff reluctant to enter the pods.

56.     When questioned during his deposition about whether or not staff at EMCF have expressed that their working conditions are dangerous, Captain Naidow responded by saying, "Yes.  More or less, staff at EMCF, there's fear of the population at EMCF.  There's fear

---

[23] MDOC 19-01-01, Offender Segregation, page 19.

of working in the high security units."[24]  This fear is evident in the operation of these units and explains the reluctance of staff to stay on the pods.

57.     Sometimes the lack of security checks is due to a shortage of staff.  In a logbook for unit 6 from May of 2013, an officer on duty recorded the following language, "Be advice (sic) C/O Colenberg is the only floor officer for HU6 and (I) C/O McConnell is the picket officer."[25]  A comment on the next page in the logbook states, "There was no count/security checks on HU6.  Due to lack of staff.  I C/O McConnell picket officer and C/O Colenberg floor officer[.]"[26]

### I.C.3.   Nonfunctional emergency call buttons.

58.     Several inmates in these units shared with me that their emergency button in the cell did not work and that they had to resort to groups of inmates banging on the doors to get the attention of staff when a true emergency occurred.  The combination of cell doors that do not shut securely, officers not routinely checking on inmates in the units, and emergency call buttons that do not work make for a very dangerous prison environment.  Among the resulting dangers are the lack of timely responses to medical emergencies and an increased risk of assault and suicide.[27]

### I.C.4.  Prevalence of contraband and lack of adherence to basic security practices.

59.     Compounding the problems at EMCF is the lack of attention to basic security detail by the corrections staff.  Many cells I observed in the segregation units had paper or cloth covering their windows, making it impossible for staff to see into their cells when they were on

---

[24] Naidow deposition, page 27, lines 20-25.
[25] MTC055394.
[26] MTC055395.
[27] Raymond Patterson and Kerry Hughes, Review of Completed Suicides in the California Department of Corrections and Rehabilitation, 1999-2004, <u>Psychiatric Services 59</u>, 676-682 (2008), at p. 678.

the tier.  I witnessed many staff walk by these cells and not instruct the inmates to take these window coverings down.  Such a practice is absolutely unacceptable in any prison environment, but especially in a segregation unit.  You cannot check on the welfare of an inmate in his cell if you cannot see into it.  I have to conclude this dangerous practice is accepted at EMCF based upon the behavior of the staff I observed.

60.     Another similar and basic security violation is routinely allowed inside the cells as well.  The interior of some cells were draped with pieces of cloth so that even if you could look into the cell through the window in the cell door, you could not view its complete contents or activities.  It is common in some systems to allow for a drape to temporarily block the view of the toilet when the inmate is using it, but this is not what I am talking about.  I saw cells with drapes on the outside of the bunks and others blocking the view to the back half of the cell, nowhere near where the toilet is located. Officers must be able to see inside the cell when doing routine security checks and that is simply not possible when their views are regularly and routinely obstructed.

61.     "Fishing" is also tolerated in the segregation units at EMCF.  Fishing is a way for inmates to pass materials (or contraband, including weapons) from cell to cell.  Usually clothing is woven into slender strips of considerable length with a small weight or package on the end.  They are then thrown from under one cell door to another to pass the material.  Some inmates are quite adept at this and can fish across a living unit and sometimes even to other tiers. This is an issue in many prison systems, but there are ways to reduce and even eliminate the practice.  In my inspection of the segregation units at EMCF, the fish lines lay openly on the tiers without any reaction by the staff.  I even saw fishing occur while we were in the unit.  Again, I must conclude staff condones this practice since they failed to act when we were in the unit and

they could observe the same evidence as I did.  In every other jurisdiction I have ever been in, if these lines were witnessed they would be confiscated and the behavior would cease in the presence of staff.  That is not the case at EMCF.  The danger in allowing fishing is that contraband, including weapons, can be passed from one inmate to another.

62.     EMCF has a serious and significant problem with contraband and some of that contraband, especially weapons, makes it into the segregation units.  For example, in a contraband report from EMCF for the month of August of 2013, 62 weapons were found within the prison, 20 of them in units 5 and 6.[28]  In July of 2013, 17 weapons were found in the prison, 9 of them in units 5 and 6, and five more in areas in close proximity to the unit.[29]  In my own experience, operating and inspecting segregation units, both in the state of Washington and in other jurisdictions, it is very rare for a blade to make it into a segregation unit, and never the numbers and types of blades that I observed in the records of EMCF for their segregation units.[30]

63.     EMCF employees bring some of this contraband into the facility.  Captain Naidow acknowledged this in his deposition when talking about the high rate of turnover of officers at EMCF.  He stated, "Corruption, you've got officers easily corrupted by manipulative inmates who get talked into either bringing in contraband or money or colluding with inmates in some way or form."[31]  He goes on to say:

---

[28] AG 2585-87.
[29] AG 2508.
[30] Photos of these weapons are routinely attached to UOR and Rule Violation Reports.
[31] Naidow deposition, page 35, lines 11-15.

Q. You mentioned a few minutes ago that there was staff corruption. Does that corruption entail, in part, cooperating in some ways with prison gang members?

A. Yes.

Q. And it involves deals being made between prison gangs and correctional staff to bring contraband into the facility?

A. Sure, gangs or individual inmates. It just depends on who.

Q. And does the corruption also sometimes involve extortion either by staff or inmates of other inmates?

A. Yes, ma'am.[32]

64.     From my own observations, security at the front entrance to the prison is very lax. This allows an increased likelihood that contraband can enter the institution. On our first day of arrival, security put the items we were carrying, our jackets and shoes through an x-ray machine, but security staff did not look at the x-ray screen to examine the contents, nor did they actually look at the identification I handed to them. It was not until the third day of our visit that the officer at the front desk asked me for my car keys, an item apparently prohibited from entering the prison. The main entry to the facility is a prime place to stop the contraband flow. The procedures that I witnessed were not conducive to that goal nor were they consistent with procedures from other prisons I have visited.

65.     On my third day inside the prison, I stood back and watched officers pat search a group of about ten or twelve inmates. At no time during these searches did any of the officers touch the inmates below the waist. Such a cursory search makes a mockery of the search process and sends a clear signal to prisoners that moving contraband within the facility is unlikely to be detected.

66.     This problem is further illustrated by my interviews with inmates, many of whom are in segregation for possession or use of weapons. At least twelve inmates in Units 5

---

[32] Naidow deposition, page 37, lines 4-17.

and 6 told me that use of a weapon was involved in their segregation placement.  After reviewing reports related to use of force events and various prisoners' institutional files, I know now that even more of the inmates in those units have had some involvement with weapons after being placed in segregation.  When I asked the prisoners why they felt the need to pick up a weapon, some of their responses were "to defend myself," "there is no help from the officers," and "you can't rely on the officers."  It is clear that prisoners do not feel safe at EMCF.  I asked a few of them how the issue of safety compared to other prisons they have been in and the universal response was that EMCF was far more dangerous.

67.     The Occupational Health and Safety Administration (OSHA) identified some of the most critical of the life-threatening problems at EMCF in a report dated June 11, 2012.[33] OSHA directed that the following remedial actions, among others, were required:

- Repair or replace defective cell door lock systems throughout the facility.
- Repair or replace defective picket door indicator system in the housing unit(s).
- Assure continued maintenance of all door lock systems throughout the facility. Institute a policy prohibiting inmates from placing items on cell doors that obstruct corrections officers' view into cells.

It is astonishing to me that a full two years later these problems have yet to be addressed. As an experienced corrections administrator, I would have treated them as a life-threatening emergency. It is clear that MDOC is indifferent to the safety of the prisoners at EMCF and unresponsive to the previous direction they have received from the United States government. Once again, I do not believe they have the capacity or the willingness to address the multitude of problems at EMCF.

68.     It is my opinion that as a result of Defendants' policies and procedures relating to basic institutional security, inmates at EMCF are subjected to a substantial risk of

---

[33] OSHA Inspection-The_GEO_Group_Inc_315306803_06_11_2012.

serious harm in the form of attacks from other inmates.  Defendants are aware of the danger, but have failed to take reasonable measures to abate the risks.

**I.D. Lack of problem-solving mechanisms in segregation.**

69.     Prisoners held in solitary confinement are completely dependent on the staff running the units to meet their every need.  Food, medical attention, access to information such as mail, reading material, and what is happening in the world beyond the cell are brokered at the cell door through the food port and narrow window looking out into the unit.  For that reason, it is absolutely critical that staff working in those units understand this reality and respond accordingly to assist the inmates in meeting their needs.  While this is true for all inmates in solitary, in my experience, it is especially true for the mentally ill.  There is a complete absence of that understanding exhibited in the operation of the segregation units at EMCF and the result is constant turmoil.  If officers are not in the zones regularly checking on the inmates—and at EMCF, they are not—then problems are not identified and are not solved.  Instead, frustration builds and inmates are forced to search for other means to gain enough attention to bring their issues forward.

70.     Case managers and mental health staff ought to be another available avenue to help address individual prisoners' concerns, but I did not see that happening at EMCF.  Instead, what I heard from the inmate population is that they have access to their case managers "once in a blue moon."

71.     One inmate I spoke with was asking for a copy of the minutes of his treatment team meeting held in February of 2014.  He shared with me the written response he received from Mr. Nixon, a mental health counselor: "You will not be provided a copy of anything.  We are following policies and procedures.  If you weren't so scary, we would release you to another

unit." Whether or not the inmate had a right to the material is not even the question: the tone of the response was so unprofessional, so demeaning and degrading, that at best it would be demoralizing and at worst could result in the prisoner acting out.

72.     Critical to the operation of any prison is an internal grievance system. When legitimate complaints and concerns are raised – and legitimate issues exist in every prison – there must be a way for those issues to be brought forward and addressed. If the prisoners do not believe the grievance system is effective, they will not believe the authority the prison administration is legitimate, and they will find other ways to express their frustration, often by acting out.

73.     At EMCF, the grievance program is called the Administrative Remedy Program (ARP). I had the opportunity to briefly interview the coordinator for that program. Having relied on information from the grievance office throughout my career as a Superintendent and agency head, I asked specific, but rudimentary questions that should be easily answered. The number of grievances in certain areas and the trend lines of the number being filed is critical information to running an institution. The coordinator informed me that most of the grievances she receives are for disciplinary and classification actions, regarding conditions of confinement in the prison and issues related to medical and mental health care. I asked her if she produced any reports to show the frequency, the nature, or the trends of those complaints, and she told me she did not have that information. Without the use of such aggregate data available to prison administrators, they lack a valuable resource to know what the common complaints are within their facility. Without that knowledge, strategies to address those issues can never be determined or implemented. Whatever collective frustration the inmate

population is experiencing will then build and manifest itself in other fashions, often in activities that disrupt the facility's operation.

74.     Analysis as to the nature of grievance complaints would be the typical activity of an experienced and competent corrections administrator.  It appears that such analysis is not done at EMCF.  I have reviewed approximately 210 ARPs in the materials I received.  Through my own analysis, I broke the complaints down into three broad categories: I found 125 of the complaints to be about medical or mental health care; 75 of the complaints were about issues related to conditions of confinement or protection from harm; and the remaining 10 complaints were in the category of "other" addressing a variety of individual issues.

75.     One of the most frequent complaints is about access to recreation and showers in the segregation units.  For example, in January of 2013, an inmate in segregation complained that he was not receiving his recreation five days a week as required by MDOC policy.  He received his final answer three months later in April of 2013.   He received the following response:

> Your request for Administrative Remedy request concerning recreation time and showers five days a week was received in this office February 21, 2013, and has been investigated.
>
> As stated in the first step response from Capt. Young, recreation and showers are given by staff daily. Although you may not receive recreation yard daily, due to the limited rec space available, you are afforded to shower according to MDOC policy 19-01 segregation offender are provided the opportunity to shave and shower at least three (3) time per week.
>
> Therefore, based upon the facts outlined above your request for relief is granted.[34]

The final line of the response is nonsensical.  The inmate was not granted relief; he was told that MTC was not going to follow MDOC policy about required recreation time for inmates in segregation due to limited space.  Plus, from my own observation, there is no shortage of

_____

[34] MTC004222.

recreation space at EMCF, only an unwillingness or inability to properly organize a schedule so that inmates receive their required opportunity for exercise.

76.     Other prisoners raised the same concern about recreation time in their grievances.  Just the day before the above example was signed by an MTC official, another inmate received this response to the same issue:

> As stated to you in the first step response from Major Smith, this matter has been investigated and the procedures are in place to ensure ALL privileges, and service are met in accordance with MDOC policy for the SMU (special management unit).

> Therefore, I trust your request has been satisfied and consider this matter closed.[35]

These responses lead one to wonder—which is it? One day prison staff state they have solved the problem and will comply with MDOC policy and the next day they state they can't follow the policy because they don't have enough space.  It is no wonder the inmates struggle at EMCF.

77.      In another grievance, an inmate in unit 5 writes that he is not receiving his nitroglycerin pills as scheduled.  He says that officers are rarely on the zone and he is concerned that no one will be there if or when he has chest pains.  He recounts having those pains and having to bang on the door when an officer came through to do count to get someone's attention. The response he receives to his grievance is for him to write the warden if he wants a change in living unit, a response that completely misses the point of his complaint.  He did not ask for a change in his housing unit, only that he receive his medication in a timely fashion.[36]

78.     Another inmate grieves the frequency of fires set in unit 5 and the impact on his health since he has asthma.  He explains that the fires are set by other inmates who are upset because they do not get their recreation or showers according to policy and that there often is a

---

[35] MTC004301.
[36] MTC004671.

problem with the food trays.  He suggests that the problem could be solved if those in charge of the unit would follow the policy.  The response he received was as follows:

> Captain Thomas and Lieutenant Mason have undergo (sic) Management Training have been made aware of MDOC Policy.  The Facility Management is also ensuring all MDOC Policy and Procedures are been (sic) met.  Security equipment has been Placed (sic) on the zones to prevent inmates from setting fires, and to keep staff and inmates safe.[37]

This response is simply not true.  The fires continue, the problems with recreation continue, and the inmates know that first hand.  A response like this to a legitimate grievance eviscerates any meaning the grievance system might have to the inmate population and makes it a meaningless avenue to address a legitimate complaint.

79.	These examples of responses to legitimate grievances are not outliers.  There are numerous examples of the same in the grievance files I reviewed.  In fact, I was impressed from the samples I reviewed with how seldom the prisoners at EMCF are grieving frivolous issues.  The problems with the operation of the facility are glaring, obvious, and significant, and the inmates are simply asking that the administration follow the policies of MDOC.  They find little relief through the mechanisms that are in place today.

**I.E.  Use of force in segregation.**

80.	Due to the deplorable conditions in the segregation units and without any means to resolve real complaints, the inmate population has turned in another direction to bring attention to their suffering at EMCF.  Some inmates start fires in their cells, flood their cells, or cut on themselves, but their primary means of registering their frustration and complaints about living conditions is to place their arms through the food tray slots in their cell doors and refuse to remove them until someone addresses their issue(s)—putting themselves and other prisoners in the unit at significant risk of injury.

---

[37] MTC004867.

81.     These behaviors are embedded in the culture of the prisoner population at EMCF as a result of their collective frustration at finding any rational means to bring their problems forward for effective resolution.  Tragically, these behaviors result in an overwhelming number of unnecessary use of force events, often executed with a glaring lack of skill and training that brings further suffering and risk of injury to the prisoners.  While some of my concerns expressed in this section apply to other non-segregation units in EMCF, here I focus on what I have seen from segregation unit use of force videos and UOR reports.

82.     As of this writing, I have reviewed approximately 382 UORs and/or videos describing use of force events at EMCF.  Of that total number, 100 involved inmates refusing to remove their arms from their tray slot in their cell door, over a quarter of the total events.  Considering that the UORs I reviewed were for the entire facility, not just the segregation units, such a high percentage of videos related to the tray slot clearly indicate how central this is to the recurring use-of-force drama in those units.  It is clear that this is a primary means that inmates in segregation use to seek urgently needed assistance, despite the consequences, which almost always means being subjected to pepper spray.

83.     A video from January of 2013 illustrates several of these points. [38]  The prisoner refused to allow the tray slot on his cell door to be closed.  Security staff implements a planned use of force (PUOF) and documents it with a hand held video camera.  You can see some of the usual debris I previously described across the floor of the day room.  You can also see the scorched cell doors from previous fires in the unit.  The noise in the unit makes it nearly impossible to hear, as many other prisoners are yelling from their cells.  As the officers get close to the cell door you can clearly hear the inmate say he is not going to allow the tray slot to be closed until he gets access to sick call and the medications that he needs.  His request is refused

---

[38] ███████ █ ███████.MPG.

and he makes it clear he is willing to pay the price for his refusal to follow their orders to close his tray slot.  The dialogue with the staff continues as the inmate explains that he also needs a haircut and would like to take a shower.  In the middle of the dialogue, the officer surprises the inmate and sprays him directly in the face.

84.      While it was likely clear to the inmate that if he didn't comply force would eventually be used, it was not made clear to him that the conversation was over and the use of force would immediately proceed.  None of the staff were wearing gas masks and had to back away from the door to keep from being impacted by the spray.  It did not completely work, as I saw and heard the officers coughing, clearly experiencing the impacts of the chemical agent. Some continued to cough throughout the entire video.  They continued to stay away from the cell, but finally realized the inmate is ready to submit to restraints so that he could be removed from the cell.  Staff were able to cuff the inmate, but then had to back away from the cell to get relief from the impact of the spray. They returned and escorted the prisoner out.  The inmate dropped to his knees in the dayroom and then staff lifted him and took him outside for exposure to fresh air.  He appeared to be in great distress and kneeled on the ground, spitting from the impacts of the spray.  The inmate's body quivered and shook as he continued to spit.  As he regained his composure, he asked to go to medical.  The nurse present denied his request.  The prisoner then told the staff that this was his first time being sprayed, but from here on out he intends to become a problem for the staff.  Rather than let that go as the expression of frustration that it was, one of the officers began to argue with him and escalated the tension of the situation. They then placed the inmate in the shower to finish the decontamination process.  That should have been the end of the incident, but the officer continued to argue with the inmate after he was

in the shower, inappropriately adding tension to the situation. The video then ends abruptly without documenting the inmate's safe return to his cell.

85.     The officer's behavior in arguing with the inmate, who was in cuffs and was experiencing the effects of the chemical spray, was completely inappropriate and unprofessional. It added tension to a situation that was completely unnecessary.

86.     In this incident, the inmate was still talking about his concerns when the officer abruptly moved his spray canister from the side of the cell door and sprayed it directly into the inmate's face. This essentially changed the incident from a planned use of force to a spontaneous use of force (SUOF). There was nothing in this inmate's behavior that justified the immediate and spontaneous use of force. He was locked in his cell in the presence of officers. He presented no imminent threat. When the officer decided to spray the inmate, the conversation was still ongoing.

87.     This failure to respond appropriately was the result of more than a staff member's poor choice. It was also the result of the insufficiency of MDOC's Use of Force Policy. Missing from the MDOC Use of Force policy is any clear instruction in how a planned use of force should proceed. After all efforts at verbal intervention have failed, the inmate should be given clear and final warning of that fact and before force is used.

88.     Officers went into the planned use of force situation described above knowing that they may have to use force, including chemical agents. They were not prepared, as they did not have gas masks or any other protective equipment available for themselves. This is important because, as was evidenced by this incident, the spray impacted them and their ability to respond in a timely manner to the inmate, making the situation less safe for everyone involved. Had the inmate become combative, without protective gear, the officers' ability to

respond and control the situation may well have been compromised.  This practice is in direct violation of MTC's own training plan, which appropriately states: [39]

- When chemical agents are used, all personnel in the area are subject to the agent's effects
- You will be unable to perform in a tactical situation if you do not use your mask:
  --In a timely manner
  --Properly

In a later section of the same training material instructing when the mask is to be worn it says, "Participating in tactical operations in which there is potential for chemical agents to be used." The lack of gas masks for officers in this one example represents the practice in the vast majority of the planned use of force videos I reviewed from EMCF.[40]

89.    MDOC policy states: "The Mental Health staff and security staff will be utilized to employ verbal intervention strategies to gain voluntary compliance from the disruptive offender."[41]  This is good policy and I have oftentimes seen this approach used successfully. Mental health staff did respond in this incident, but it does not appear that the efforts at verbal intervention were meaningful.  The language that appears on the related UOR report states: "The offenders (sic) was not displaying any type of mental issues.  The aggression that was displayed was behavioral."[42]  In every use of force report I reviewed, the same canned language appears. MDOC's policy requiring a verbal intervention is appropriate, but the practice at EMCF fails to meet the standard.

90.    In this incident, it is entirely possible that force could have been avoided entirely if the staff had continued to engage the prisoner in conversation and make an effort to

---

[39] MTC077224.

[40] In videos from late 2013 and 2014, it appears that the CERT team has been equipped with masks and when they are called upon put them to use. It is also clear this equipment is not available to other staff members when they participate in PUOF events and the problem remains.

[41] MDOC Use of Force, 16-13-01, page 6.

[42] MTC071427.

respond to his concerns.  Absent a serious attempt to do so, it is my opinion that the use of force in this incident was premature and unnecessary.

91.     The UOF report has a section called "Incident Debriefing Form" that includes a query whether there are any "Plans for Improvement" from the event.  In this case, and in nearly every other report I reviewed, the response entered was "None needed."[43]  The multiple obvious problems—the lack of gas masks, the unnecessary arguing with the prisoner, the inappropriate conversion of the incident from a planned use of force to a spontaneous use of force, and the lack of any meaningful effort at verbal intervention—are all ignored and accepted as the common practice.

92.     Other videos from EMCF further demonstrate how staff lack a basic understanding of the value or the purpose of a mental health intervention in a potential use of force situation.  I will offer a few examples.

93.     In a video from January of 2014, the mental health staff person spends about 30 seconds talking to the prisoner where he complains about lack of medical attention before she turns her face to the camera and reports it is a security issue.[44]  The use of force then proceeds.

94.     In another example from March of this year, the mental health staff person spends less than ten seconds on the required intervention before turning to the camera to report, "No mental health issues."[45]  The use of force then proceeds.

95.     In a third example from this year, the door to the prisoner's cell is surrounded by fully suited up CERT team members when the mental health counselor approaches the door to talk.  The counselor asks the inmate if he has any mental health issues and then turns to the

---

[43] Ibid.
[44] ███████ ████████████
[45] ██████ ████████████████.

camera and reports that he does not.[46]  The entire exchange takes about five seconds, and the use of force then proceeds.

96.     In my experience, no meaningful intervention can occur in a period of a few seconds.  The counselor needs the opportunity to establish communication, sort out the inmate's issues, and try to find a way to avoid force being used.  EMCF staff show no awareness of the purpose of the intervention; the "interventions" they employ are empty formalities since they do not allow sufficient time for a meaningful conversation to occur.

97.     In another use of force incident, the video shows custody officers taking advantage of the inmate's conversation with a person who appears to be from mental health.  The camera shows the inmate with his face fully exposed in the tray slot expressing his frustration with the treatment he has received in segregation, saying that he has been "treated like a dog." Without warning, an officer appears at the side of the cell and sprays the inmate directly in his face.  Such a "sneak attack" completely destroys any trust the inmate might have in speaking with mental health staff and will likely make the prisoner much harder to manage in the future.[47]

98.     These incidents again stem in part from inadequate policy.  MDOC's policy defines a Spontaneous Use of Force as "[a] use of force employed as an immediate response to a specific act."[48]  Left out of this definition is any language regarding the seriousness or imminent nature of the "specific act."  There must be a level of threat present to justify the immediate use of force.  Otherwise, officers are authorized to use force anytime an inmate refuses or fails to follow any order, no matter how trivial.

99.     The decision to utilize the planned use of force approach as opposed to spontaneous use of force is one of the most critical factors in keeping both prisoners and staff

---

46  ██████████
47  ██████████ ██████████████
48  MDOC Use of Force, 16-13-01, page 2.

safe.  A planned use of force takes advantage of both the physical security of the prison and time, which provides an opportunity to work to try and avoid force altogether.  EMCF is not placing nearly enough, if any, emphasis on this issue for their custody officers or their mental health staff.  In the tray slot videos and UOR reports I have reviewed related to use of force in the segregation units, there has been a practice of justifying spontaneous uses of force simply because the inmate has refused to close his tray slot and not because the inmate's behavior presented any imminent threat.  Even when it is called a "planned use of force," EMCF fails to meet the requirements for a planned use of force.

100.     One of the main advantages of a planned use of force is that it allows the opportunity to use a hand-held video camera to document the events, providing protection for both staff and inmates.  MDOC policy on use of force fails to give adequate direction to staff about what should be recorded.  The video should capture everything from the team identifying themselves at the very beginning of the event (this is in MDOC policy) to the final and safe return of the inmate to the cell (this is not in MDOC policy), with a clear expectation that all activities in between be preserved on the video camera.  At EMCF, it is apparent from videos I have reviewed that this is not the standard practice.

101.     For example, in the beginning of a video of a planned use of force from April 2014 of an inmate refusing to close his tray slot, the officers give a third warning prior to spraying the inmate.  The video abruptly ends with the sound of much coughing from the staff, likely caused because they were not equipped with masks.[49]  There is no record of the beginning or the end of the planned use of force. This is a problem with many of the videos I reviewed.

---

[49] 2014-01-05 Johnny Ailes#M7355.

102.     In yet another example of a planned use of force from March 2014, stemming from an inmate's refusal to close the tray slot,[50] the officer in charge of the event warns the inmate that he will be sprayed if he does not comply.  The mental health counselor then leans in to talk to the prisoner.  The prisoner spends about thirty seconds listing his concerns about the conditions of his confinement.  Ten seconds later, the officer in charge turns to the camera and reports that the inmate has no mental health issues.  Then a different custody staff member spends less than twenty seconds talking to the inmate with no results.  Such meager effort to de-escalate a potential use of force situation makes a mockery of MDOC policy.

103.     But this same incident illustrates another, even more serious concern.  After two minutes and fifty seconds from the time this incident begins (which includes the rote efforts at de-escalation), the inmate is sprayed.  Less than twenty seconds after being sprayed, he backs up to the cuff port and puts both hands through, the universal signal in corrections that he has given up and is willing to comply with staff orders.  Instead of cuffing him and removing him from this cell, the officers back away from the cell door and leave the inmate to suffer the effects of the spray.  It is not until nearly twelve minutes later that they approach the door and remove the inmate from the cell.  In this situation, the force used by letting the inmate sit with the pepper spray was not only unnecessary, but also was excessive, if not abusive.

104.     The drama over tray slots can result in serious injury to prisoners.  A named plaintiff in this case had his finger fractured when officers shut his hand in the tray slot.[51]  A use of force event involving another inmate resulted in a necessary escorted hospital visit because his index finger was crushed so severely in the tray slot that the bone could be seen.[52]

---

[50] ██████  ██████     █████.

[51] Medical record of ███████████, page 142.

[52] MTC073120.

105.     In another use of force video from January 2014, the prisoner is sprayed through his tray slot with no warning.  Officers then attempt to force the tray slot closed while the inmate's fingers are in the hinge area between the tray and the cell door.  As they do so, the inmate screams in pain.  They do it a second time and the inmate screams in pain again, and staff spray him again.  It is hard to see this event as anything other than physical torture.[53]

106.     EMCF seems utterly unconcerned with the frequency of problems with the tray slots, as their reports do not include information about why the inmates choose this route to complain.  However, sometimes the reasons can be discerned from the video.  Some of the other similar tray slot use of force events can be found at:

1.16.13 J. Ailes1.MTS—No electricity in the cell

1.04.13 J. Ailes1.MTS—Asking for a shower

12.5.12 D. Hayes.MTS—Asking to speak to higher authority

10.11.12 G. Jones.MTS—Asking for a toothbrush

9.30.12 T. Johnson1.MTS—Arguing about food tray

—Asking to see "psych doc"

9.25.12 V. McGee1.MTS—Complaints about breakfast tray

107.     In a graphic example from January 2014, several inmates in Unit 6D refused to close their tray slots.[54]  The officers entered the unit and went to the cell door of one of the prisoners.  They gave him a roll of toilet paper and he closed his slot.  The officers then proceeded to walk and talk to other prisoners about such things as problems with light bulbs and sheets.  As the officers communicated and demonstrated a willingness to resolve problems, the prisoners allowed their tray slots to be closed.  The last prisoner complained about a food issue

---

[53] ████████ ████████████.

[54] 2014-01-13 Willie Russell #166527.

and unfortunately the officers were not able to solve his problem, and force was used to get him to close his tray slot.   What is significant about this video is that it illustrates the deeply embedded culture at EMCF by which prisoners and staff at EMCF rely and respond to requests for basic assistance.   It is tragic, absurd, and dangerous that prisoners should have to resort to behavior that puts them at risk of punishment and physical harm in order to get simple problems identified and resolved.

108.     I have identified 100 incidents where prisoners in segregation have refused to allow their tray slot to be closed, and I am certain many of them could have been resolved without the use of force if prison staff had simply listened and responded to the valid issues raised by the inmate.   Better yet, if the staff had a different orientation to problem solving on a daily basis and the grievance system worked, it is very likely many of these tray slot confrontations could have been avoided altogether.

109.     Sometimes inmates in segregation at EMCF resort to harming themselves in order to bring attention to a serious problem.   In July 2013, an inmate was brought to the medical area of the prison after making cuts to his arm, which resulted in a spontaneous use of force. After being treated for his wounds, he was allowed to speak to a mental health staff person, and he shared that he was not really suicidal, but that he wanted to be moved out of his housing unit because someone had thrown feces into his cell and he needed his cell to be cleaned.   It was reported that he had already been given chemicals and extra towels to clean his cell.   The inmate reported that he did not have running water in his cell.   The mental health staff asked to have his water fixed and was told by custody staff (who also informed the inmate) that it could not be fixed until the next day.   The inmate was then told he would be receiving a Rule Violation Report (RVR) for his self-harm attempt.   The inmate's behavior then escalated and he resisted

39

going back to his housing unit.  He was restrained and put on a gurney and returned to the same cell in his housing unit.[55]

110.     Most fundamentally inappropriate with the way this incident was handled was the unwillingness of staff to assist the inmate in finding a way to get his cell clean so that he would not have to live in a cell that had been contaminated by human feces.  First of all, it should have been handled at the unit level so that the inmate would not have had to resort to harming himself in order to go to medical in the hopes that he may find someone to solve the problem. He could have been moved to another cell or brought a bucket of water since the water in his own cell was not working.  Once he did make it to medical, it was poor judgment to confront the inmate with an RVR, upon his arrival.  There is no reason that the notice of an RVR could not have waited until after more investigation to better understand the situation.  Furthermore, the RVR was inappropriate.  The incident was caused by the poor condition of the living unit and the clumsy way it was handled by the staff.  An apology to the prisoner and a caution to not engage in self-harm behavior again would have been appropriate.  Instead, the staff went "hands on" with the inmate to get him restrained and placed on the gurney.  In my experience, this use of force was unnecessary and could have been avoided all together.

111.     In my own career, after I left McNeil Island as the Superintendent and went to the central office in Washington, every facility over which I had supervision had segregation units.  At one of my facilities, we were having a great deal of acting out by the inmates.  Having had success at McNeil at managing this population, I decided to re-assign one of my McNeil deputies to the problematic prison to see what he could do to improve conditions.  He went in and found that the inmates in the unit felt stuck, had very little to do, and were subjected to a great deal of staff disrespect rather than being managed professionally.  Problems were being

---

[55] MTC073963.

40

escalated instead of being resolved, and use of force had become a daily occurrence.  The deputy began to solve legitimate individual inmate problems and taught the staff that he expected them to do the same.  The result was a unit that calmed down and became the model for other isolations units in the Department.  The other result was a book, *Total Confinement: Madness and Reason in the Maximum Security Prison*, written by an anthropologist attached to our collaboration with UW.[56]  In the book, the author documents our work with this very difficult population including our struggles, our successes, and our failures.  It is difficult work, but it is not impossible work.


## OPINION 2:   DANGEROUS AND ABUSIVE USE OF FORCE PRACTICES THROUGHOUT EMCF SUBJECT ALL PRISONERS CONFINED THERE TO SIGNIFICANT RISK OF SERIOUS HARM

112.     While many of the use of force events occur in units 5 and 6 at the prison, many occur in the other units as well.  There is a pattern of dangerous and abusive practices by custody staff at EMCF that appears in many of the events putting the prisoner population at significant risk of serious harm.   Although these dangerous and abusive practices are commonplace at EMCF, facility administration hardly acknowledge them in their written reports on use of force events.  I will illustrate with a few examples here.

**II.A.   Dangerous practices regarding use of chemical sprays**.

113.     MTC's training plan for decontaminating an inmate after being exposed to pepper spray establishes requirements that are not followed in practice.   For example, "Personnel, detainees, property and buildings *will* become decontaminated from direct or

---

[56] Lorna A. Rhodes, *Total Confinement: Madness and Reason in the Maximum Security Prison*, University of California Press, 2004.

residual exposure to chemical agents" (emphasis in original).[57]  The training material goes on to say, "Flush the face with cool water."[58]  For exposed areas, the guidelines say, "Thoroughly wash down the area with water[,]" and "Use soapy water to mop contaminated areas."[59]  These are good instructions and typical of those in other jurisdictions.  Once staff gains control of a situation and the inmate is in restraints, the next step is to immediately take that inmate to a shower and begin the process of decontamination by allowing him access to cool, running water.

114.      That is not the practice in the use of force videos I viewed or the UORs I read. Typically at EMCF, once the prisoner has been placed in restraints he is either taken outside (a good but not sufficient practice) to wait for medical attention or to be escorted on a long walk to the medical clinic.  If access to a shower is allowed, it comes after a relatively long wait (often 20 to 30 minutes) for medical to respond to the prisoner.   The shower should happen immediately after the inmate is safely restrained.

115.      Pepper spray inflames the tissues.  The spray burns the skin, making it feel like it is on fire.  It can cause temporary blindness; the eyes feel like they are bubbling and boiling.   The spray restricts the airways and makes it difficult to breathe.   Some people experience choking, leading to panic.  Some cough so convulsively that they are brought to their knees.  Some people get headaches.  The effects of the spray last from about forty-five minutes to up to four hours, depending on how great the exposure.

116.      Exposure to pepper spray is a very painful and difficult experience to endure, and for that reason, it is critical to begin the decontamination process as quickly as possible. Failing to do so inflicts unnecessary and gratuitous pain on the prisoner and is likely to make him

---

[57] DEF 111 Chemical Agents, Decontamination (Powerpoint slides)-MTC product, page 2.
[58] Ibid, page 2.
[59] Ibid, page 4.

more difficult to manage in the future.  There is a complete absence of that understanding at EMCF.

117.    A video from January 2013 is just one of many examples illustrating this point.[60]  The prisoner refused to close his tray slot and was sprayed in the face and then inappropriately chained to his cell door.  The cell door is opened and the signs of distress on the inmate's face are obvious.  He was left chained to the cell door and used a piece of a food tray to fan his face in an attempt to alleviate the pain of the spray.  An officer snatched the piece of the food tray from his hand, ending any relief the fanning may have provided to the prisoner.  About four minutes after being sprayed, he was escorted off the tier, walking past three shower stalls. He was taken to a hallway outside the unit and was sat on a bench, still suffering obvious impacts of the spray.  The video(s) of the event end abruptly with the inmate still not provided access to the shower, nearly a half-hour after he was subjected to the spray.  Leaving the inmate for twenty or thirty minutes without access to effective decontamination techniques inflicts gratuitous and unnecessary pain on the inmate long past the point where he has been effectively controlled, turning an unnecessary use of force event into one that is also excessive.  The irony of this event is that the reason the prisoner gave for refusing to take his arm out of the food port was because he wanted a shower.  There is nothing in the written record to indicate whether the prisoner was ever allowed to shower to decontaminate from the spraying, nor was there any identification of the multiple other errors evidenced on the video.  It is clear that EMCF officials ignore their own training and inflict unnecessary pain on prisoners subjected to pepper spray.

118.    In another video,[61] an inmate not in segregation according to the written report[62] was waiving his fist and making threats to an officer when he was sprayed.  The video

---

[60] ███████ █████ .MTS and ██████ ██████ .MTS.
[61] ████████ █ █ .MTS.

43

opens after the inmate had been sprayed and was taken to the medical clinic. The nurse examining him appears to be kind and tries to help the prisoner, who is in obvious distress, from the effects of the spray. The inmate repeatedly begs for access to a shower. The video is five minutes and twenty seconds long and ends with the inmate being placed in the shower. The written report is insufficient to determine how much time elapsed between the time he was sprayed and when he was finally placed in the shower but is was very likely at least 20 or 30 minutes. However long it took, staff reversed the appropriate sequence of events. He should have first been allowed shower access and then been examined by medical. Instead, the inmate suffered the pain of the spray longer than necessary to control the situation.

119.     In one more example from the videos,[63] the inmate refused to remove his arm from the tray slot and explained his frustration to the mental health counselor at spending four months in segregation. He was then sprayed and after a few minutes was escorted directly to the shower—but it was used as a holding cell and the water was not turned on. The inmate was told he is going to be returned to his cell; he became angry and told the officers that he was willing to be sprayed again. They left him in the cell for the duration of the three videos covering this event. The last video ends about thirty-eight minutes after he was sprayed, with no opportunity for decontamination. The officer said the inmate was refusing to come out of the shower (which is accurate) and they planned to leave him there for another couple of hours until he "cools down." If staff had turned the shower on immediately after placing the inmate in the shower, they could have avoided this second confrontation altogether. Leaving the inmate without proper decontamination or access to medical for nearly forty minutes would likely cause any person to

---

[62] MTC070526.
[63] ██████  ████████████.

44

become angry at such harsh and degrading treatment.  It is not surprising that he was refusing to comply with the direction of the officers.

120.     In a final example regarding the lack of proper decontamination procedures, a video from November 2013 showed a prisoner in the medical clinic asking for a shower.  He was screaming, singing, shouting, and saying he cannot breathe.  He appeared to be in severe distress. The response from the medical staff to his request for a shower was that she "doesn't think he deserves it right now."[64]

121.     Finally, regarding EMCF's lack of attention to their own training materials, there are very few examples in the record that EMCF staff make any effort to "use soapy water to mop contaminated areas" after pepper spray is used.  Inmates are almost always simply placed back into their contaminated cells.  In touring the facility and even on the videos I viewed, this is obvious from the orange colored stains at the edges of the cell doors.  The result is that the exposure to the effects of the spray continues long after the use of force event has been completed when the inmate is placed back in the same cell where the spraying occurred.

**II.B.     Dangerous practices regarding other kinds of use of force.**

122.     Another serious problem is that EMCF staff appear to have not been properly trained to move a resisting inmate.

123.     In a UOR from December 2012,[65] the description of the incident says the prisoner began to yell because the mental health counselor would not put him on suicide watch. He is then said to have become combative.  Staff then used, "soft empty hand techniques and placed him on the ground."  This bland description (the same language used in innumerable other UORs) does not to begin to describe the mishandling of the inmate that is revealed on the

---

[64] ███████████████████████.
[65] MTC070732.

video.[66]  The video began with the inmate being held on the ground in a hallway of the prison.

The inmate's right hand was bandaged and it appeared he had three fingers taped together in a

splint from a previous injury.  This hand was repeatedly twisted and sometimes pressed against

the ground with the weight of the staff during the ensuing struggle.   The officer also used his

hand to press the inmate's head into the concrete.  The inmate was cuffed but there was a leg-

iron only on one leg, attached to the cuffs on one of his hands, likely because of the bandage on

the other hand.  Officers began to try and walk with the inmate, but he successfully resisted the

officer's efforts to get him to move.  They tried to carry him, but that was also unsuccessful.  He

was placed back on the floor.  This time flex cuffs were applied to both of his ankles.  The

inmate was then dragged across the ground until he made spitting noises.  The officers stopped to

try and put a spit mask on him, but that effort failed.  They again returned to dragging him down

the hallway, but when he threatened to spit on them again they inexplicably let go of him and

backed off, allowing the inmate to get back to his feet on his own.  The inmate held them at bay

for several minutes, screaming incoherently that he wanted them to kill him or spray him.

Officers put their hands on him again and attempted unsuccessfully to place a surgical mask on

him.

> 124.      The inmate appeared to be terrified.  His injured hand was twisted behind his

back while he was on the ground crying out that he could not breathe.  The officers got both of

his hands cuffed behind his back, including his injured hand and then, again inexplicably, took

their hands off of him, which allowed the inmate to get to his feet on his own where he

threatened to spit on them again.  One officer demonstrated a different approach and put the

inmate in a bear hug, which the inmate allowed.  The inmate continued to argue with someone

out of range of the camera with whom he was upset.  This person should have exited the scene to

---

[66] ████████  ██████████ .MTS.

de-escalate the situation, especially once the officer using the bear hug began to slowly, but successfully, move the inmate down the hall. The inmate was then picked up and carried and this time cooperated. The inmate was placed in a chair in the medical area of the prison until he saw the person he was mad at and then began to again resist and the officers had to hold him to the chair. They attempted to once again put a surgical mask on him and wound up back on the floor, where he was given an injection. He was held on the ground for several minutes until it appeared the injection had a calming effect. He was then carried again and placed on the floor of a cell where the restraints were removed.

125.     This video is deeply disturbing to watch and reveals the profound level of incompetence of the multiple custody staff (I counted at least ten) involved. Once the inmate was placed on the floor the first time, the simplest way to have moved the inmate safely, especially given the pre-existing injury to his hand, would have been to get a gurney, or better yet a restraint chair, and move him to the medical clinic strapped to either device. But what is even more startling is the absence in the written report of an accurate description of the event, topped off by the block for "Plans for Improvement" left blank. The absence of any supervisory review giving an honest critique of all that went wrong with this escort, sets the stage for repetition of this kind of incompetent and dangerous management of inmates.

126.     In three videos of another incident,[67] this time from Unit 4, the inmate is first shown on the ground as officers are applying restraints. When the inmate was rolled off of his back, you see he was bleeding from his mouth. He refused to walk and was carried down the hallway. The officers attempted to drag him for a bit, but then raised him to his feet. They set him on a bench where he babbled, sang, and yelled, and was eventually given an injection. He

---

[67] ███████     █     ███████.MPG, ██████ ████████████.MPG and ███████ ██████     ███.MPG.

was then placed on a gurney and rolled down the hallway with his legs hanging out over the end. At no point was he properly secured to the gurney to prevent the possibility of him falling off in his apparently delirious state.   He waved his feet around during the gurney transport and was eventually taken back to his cell.   The gurney would not fit into the cell so he was lifted by his restraints and carried inside.   The inmate was left lying on the floor of his cell by the staff.   Once again, the supervisory critique of the event on the Incident Debriefing Form leaves the block for "Plan for Improvement" blank.   The dangerous practices of carrying or dragging the inmate, placing him on a gurney but not securing him to it, and lifting him by restraints, are not identified as dangerous so no lessons are learned and the behaviors are allowed to continue, putting the entire inmate population at needless risk of injury in the future.

127.      In another video,[68] an officer knelt down in front of the inmate in order to place him in leg irons.   This is a very dangerous practice, not one I have witnessed in my own or other jurisdictions.   I witnessed it in other videos from EMCF as well.   If the inmate took the opportunity to kick the officer while the officer was in this vulnerable position, it is very likely that what would happen next is another unnecessary "hands on" use of force as the officer reactd in self-protection, putting the inmate and the staff at risk of further injury.   Also in this video, once again, a surgical mask was utilized instead of a spit mask.   Predictably, it did not work. There is nothing in the written record of this event that points out or attempts to correct the dangerous practices that occurred.[69]

128.      In a different video, an inmate was in restraints in the hallway in medical, waiting to be examined after a use of force event.[70]   He was allowed to converse with another inmate who was not in restraints and apparently moving freely in the area.   Later, that inmate

---

[68] 11.21.12 J. Woodraff.MPG.
[69] MTC070260.
[70] ███████ ██████ .MTS.

48

returned and the inmate in restraints was allowed to wander, including moving out of sight of the camera and around a corner to talk with the same inmate.  A number of things could happen from this unsupervised contact, not the least of which is that a weapon could have been passed between them.  In this case, the restrained inmate was on his way to segregation for possession of a weapon.  Once again, there is nothing in the written record of this event that points out or attempts to correct the dangerous practice that occurred.[71]

129.     Officers repeatedly argue with prisoners, usually after the prisoner has been placed in restraints.  Besides being simply unprofessional, such conduct is likely to escalate an already tense situation creating further risk for everyone involved.  Some of several examples can be found in 9.28.12 C. Conrad.MPG, 1.28.13 M. Armstrong.MPG and 2014-03-20 James Milsap #109456.

130.     Over and over again in the videos, you can see staff put themselves at risk by putting their faces in front of the tray slots of the cell doors trying to talk to an inmate during a potential use of force situation.  This should not happen and is a fundamental caution at every prison I have ever been in.  Not following this basic security precaution is inconceivable to me.

**II.C.  Failure to properly employ video documentation of use of force events.**

131.     The next example clearly illustrates the problem with the practice at EMCF of not starting the video-taping of planned use of force events until after the event begins, and ending the taping before the incident is over (I discuss this problem earlier in my report, in the section on the conditions in the segregation units).  The video shows a named plaintiff in this case in his cell; he will not return the cuffs that had been placed on him earlier.[72]  A four-person team, fully suited in protective gear (I assume the CERT team) is assembled outside his cell.

---

[71] MTC070147.
[72] 2014-01-10-Derrick Hayes #101554.

The cell door is opened and the team rushes in.  You cannot see into the cell because there is no light, either because it was broken or because the officers did not turn it on.  After a few minutes of struggling with the inmate, one of the officers bursts out of the cell, clearly angry and upset, throws his protective vest into the dayroom, shouts "you want to do it like that," and then charges back into the cell looking like he is ready for a fight.  It is my opinion that this officer had lost self-control and went back into the cell to harm the prisoner.  After the officer charges back in, the video abruptly ends.  Of course, I do not know what happened in the cell; there is no record of that.  But the behavior of the officer that did make it onto the video was deeply disturbing and should have been investigated further.  I do not know if EMCF administration ever did so.

132.    In another example, regarding a planned use of force of two inmates, the camera is focused on the cell front of the first inmate for almost fifteen minutes.[73]  He comes out of his cell willingly and is escorted to an exercise cage where he is searched and his restraints are removed.  The camera then returns to the pod to remove the second inmate.  His try slot is closed.  You can hear a third inmate telling the officers that the second inmate has asthma, but they sprayed him anyway.  You can see inmate two through the cell window coughing and leaning against the cell wall.  Restraints are applied and the cell door is opened.  Inside, you can see blood on the wall of his cell.  The inmate is visibly in distress gasping for air.  He walks across the pod under escort, and then collapses on the day room floor.  He is wheezing uncontrollably.  His white t-shirt is stained with multiple blood splatters and he coughs up a large amount of blood on the floor.  The officers pick him up and get him through the door to the exercise area, and he collapses again. The tape then abruptly ends.

---

[73] 2013-1-28, unidentified inmate.

133.     This video illustrates the danger of not being organized and prepared to remove an inmate from his cell once gas has been administered as well as the lack of proper use of the video record. It is safe to assume that this inmate, who is said to have asthma, was left in his contaminated cell with the tray slot closed with apparently no one left to observe him for a minimum of fifteen minutes. It could have been much longer. The dangerous effects from doing so are obvious from the blood and his extreme distress evidenced in the video. In addition, the camera stops abruptly, well before the incident concluded so there is no record of what happened once he collapsed for the second time. This incident illustrates a complete callous disregard for the health and safety of the inmate who was suffering from the effects of the gas and illustrates the risk of substantial harm for every prisoner in the facility.

134.     It is clear from the information made available to me that the incompetence of the custody staff at EMCF, and the lack of sufficient supervisory review, is profound and deeply troubling and places the inmates, as well as staff, at risk of serious and significant injury.

135.     It is my opinion that as a result of Defendants' policies and procedures, prisoners at EMCF are subjected to unnecessary, dangerous, and excessive force by officers and are at substantial risk of serious harm, including death.

## OPINION 3:  LACK OF EFFECTIVE SELF- MONITORING

136.     As I have previously stated in this report, there is essentially no effective internal monitoring of the behavior and attitudes of the correctional staff at EMCF.  Based on the totality of the information available to me in this case, it is my opinion that the administration at EMCF does not have the capacity or willingness to properly monitor the staff in the daily performance of their duties.

137.     Nor is there effective external monitoring by MDOC.  MDOC employs a contract monitor on-site at EMCF that files a monthly report regarding compliance with the contract by MTC.  The monitor uses a check-the-box format that never addresses the larger issues that I have raised in this report.  While often times, several boxes are checked to indicate noncompliance with some standard, there appears to be no effective actions by MDOC to bring those areas into compliance.

138.     In other cases, the MDOC monitor's check-marks indicate compliance when that is simply not true.  For example, in August 2013, the box entitled "Facility subscribes to prescribed confrontation avoidance procedures" is checked as compliant;[74] the box is checked as compliant in all the monitoring reports available for 2013.  My findings are to the contrary.

139.     The monthly report also includes a standard form, signed by the warden and compliance monitor, containing such statements as "Inmates morale show tremendous improvement" and "EMCF staff are talking to offenders and resolving issues as they arise."[75] Similar rosy comments are in every available report for 2013 that I reviewed.  No statements about the operation of EMCF could be further from the truth.

140.     An unsettling example of a use of force incident that should have been, but apparently was not, the subject of serious investigation and analysis by MDOC can be found in video 1.16.13 J. Penden.MPG.  According to the UOR, this video shows a prisoner resisting a TB test.[76]  He was taken to the floor in a dayroom in unit 3, a unit that houses mentally ill inmates.  There were several custody and medical staff present.  The inmate was clearly terrified at what was about to happen to him.  A nurse then proceeded to give him what appeared to be an injection, although I suppose it could have been a TB test.  The staff present began to smirk and

---

[74] AG 2596 On Site Contract Monitoring Worksheet Aug 2013.
[75] AG 2541 Comments Section for Monthly Report August 2103.
[76] MTC071183.

giggle.  The inmate was lying on the floor and his entire body quivered.  The mood turned solemn for a few seconds as those present wondered if the inmate was having a seizure.  After he yelled out and stopped quivering, the concern about a possible seizure seemed to pass and they attempted to give him another injection.  As the nurse approached him, the inmate cried out in fear.  The second injection was eventually administered, but several of the staff again responded with amusement.  For whatever reason, the inmate was terrified of what the staff was trying to do to him.  I suspect he did not even understand what was going on.  Particularly in a prison devoted to the care and custody of prisoners with serious mental illness, it is deeply disturbing to observe the reaction of staff to this man's obvious terror and distress.  But nothing in the written record documents any concern about the behavior of staff in this incident.

141.      Any serious examination of the use of force videos and reports or even a simple tour through the segregation area of the prison reveals the depth of dysfunction at the facility.  It is clear that MDOC's monitoring process is not effective to the tremendous risk of serious harm to the prisoners currently housed at EMCF.

**CONCLUSION**

142.      I believe that in his deposition Captain Naidow, an experienced prison worker from another state, offers some useful observations about why EMCF is such a troubled facility. He notes that the facility has significant problems with staff turnover and staff corruption.[77]  He goes on to say that he believes staff turnover could be improved and staff corruption could be reduced if the pay was better.[78]  Later, he opines that the training new officers receive for

---

[77] Naidow deposition, page 35.
[78] Ibid, pages 36-37.

working with the mentally ill population is "not extensive enough."[79]  He then compares it to what he saw in the Michigan prison system where those performing custody functions in mental health units received "specialized training" to work in those units.[80]  It sounds similar to what we did in the State of Washington.  He also says that staff at EMCF are not properly trained to deal with inmate-on-inmate violence."[81]  I believe that Captain Naidow is correct on all those counts.

143.     Ultimately the dangerous conditions of confinement at EMCF are the responsibility of MDOC.  Unless dramatic changes are made at the facility, inmates will continue to be subjected to a significant risk of serious harm.  Captain Naidow lays out a path for a good start.  First, pay officers a wage sufficient to attract employees who want to make corrections a career and then provide them adequate training to do their jobs as correctional professionals.  Then, train them in effective de-escalation techniques and the basics of good correctional practices.  For those assigned to work with the seriously mentally ill, provide them with specialized training to work in those units.

144.     In my experience, custody officers that are assigned, or better yet, who choose to work with the mentally ill need intensive and specialized training to be successful at their jobs.  Such intensive training will not only improve treatment outcomes, but also improve the overall conditions of confinement for the mentally ill.  As custody officers learn more about the limitations of mentally ill inmates responding to the typical prison environment, they evolve more effective techniques and daily routines better suited to that population.  Unless officers understand that inmates who are mentally ill cannot always respond to orders in the same manner as the non-mentally ill and that they need to be approached and managed differently in cooperation with quality treatment providers, the suffering at EMCF will continue.

---

[79] Ibid, page 67
[80] Ibid.
[81] Ibid, page 184.

145.     For the reasons stated above, it is my opinion that Defendants subject all prisoners at EMCF to a substantial risk of serious harm from the infliction of unnecessary and excessive force and the failure to protect them from inmate-on-inmate violence due to the lack of the most basic and rudimentary security practices common in prisons throughout the country. Further, prisoners confined to segregation at EMCF are subjected to conditions that are so inhumane, filthy, and dangerous as to subject all of them, and especially those with serious mental illness, to significant risks of serious harm.   All of these injurious and dangerous conditions and practices are pervasive, longstanding, and obvious, and it is plain that MDOC is well aware of these problems and has not taken reasonable measures to remediate them.


Submitted by Eldon Vail


_____

Eldon Vail


June 16, 2014

# Exhibit 1

ELDON VAIL
1516 8th Ave SE
Olympia, WA. 98501
360-349-3033
Nodleliav@comcast.net

## WORK HISTORY

Nearly 35 years working in and administering adult and juvenile institutions, and probation and parole programs, starting at the entry level and rising to Department Secretary. Served as Superintendent of 3 adult institutions, maximum to minimum security, male and female. Served as Secretary for the Washington State Department of Corrections (WADOC) from 2007 until 2011.

- Secretary                       WADOC                              2007-2011
- Deputy Secretary                WADOC                              1999-2006
- Assistant Deputy Secretary      WADOC                              1997-1999
- Assistant Director for Prisons  WADOC                              1994-1997
- Superintendent                  McNeil Island Corrections Center   1992-1994
- Superintendent                  WA. Corrections Center for Women   1989-1992
- Correctional Program Manager    WA. Corrections Center             1988
- Superintendent                  Cedar Creek Corrections Center     1987
- Correctional Program Manager    Cedar Creek Corrections Center     1984-1987
- Juvenile Parole Officer         Division of Juvenile Rehabilitation 1984
- Correctional Unit Supervisor    Cedar Creek Corrections Center     1979-1983
- Juvenile Institution Counselor  Division of Juvenile Rehabilitation 1974-1979

## SKILLS AND ABILITIES

- Ability to analyze complex situations, synthesize the information and find practical solutions that are acceptable to all parties.

- A history of work experience that demonstrates how a balance of strong security and robust inmate programs best improves institution and community safety.

- Leadership of a prison system with very little class action litigation based on practical knowledge that constitutional conditions are best achieved through negotiation with all parties and not through litigation.

- Extensive experience as a witness, both in deposition and at trial.

- Experience working with multiple Governors, legislators of both parties, criminal justice partners and constituent groups in the legislative and policymaking process.

- Skilled labor negotiator for over a decade. Served as chief negotiator with the Teamsters and the Washington Public Employees Association for Collective Bargaining Agreements. Chaired Labor Management meetings with Washington Federation of State Employees.

- Excellent public speaking and writing abilities.

## HIGHLIGHTS OF CAREER ACCOMPLISHMENTS

- Reduced violence in adult prisons in Washington by over 30% during my tenure as Secretary and Deputy Secretary even though the prison population became much more violent and high risk during this same time period.

- Achieved dramatic reduction in escapes, including from minimum-security facilities.

- Increased partnerships with non-profits, law enforcement and community members in support of agency goals and improved community safety.

- Implemented and administered an extensive array of evidence based and promising programs:

  - Education, drug and alcohol, sex offender and cognitive treatment programs.
  - Implemented risk based sentencing via legislation and policy, reducing the prison populations of non-violent, low risk offenders, including the Drug Offender Sentencing Alternative and, as the Secretary, the Family and Offender Sentencing Alternative. http://www.doc.wa.gov/community/fosa/default.asp
  - Pioneered extensive family based programs resulting in reductions in use of force incidents and infractions and improved reentry outcomes for program participants.
  - Established Intensive Treatment Program for mentally ill inmates with behavioral problems.
  - Established step down programs for long-term segregation inmates resulting in significant reduction in program graduate returns to segregation. http://www.thenewstribune.com/2012/07/10/2210762/isolating-prisoners-less-common.html

- Initiated the Sustainable Prison Project; http://blogs.evergreen.edu/sustainableprisons/

- Administered the only state agency that bent the curve on health care costs while improving treatment outcomes.

- Focused the department on becoming a better asset to the community by expanding inmate and community supervision work programs.

- Improved efficiency in the agency by administrative consolidation, closing 3 high cost institutions and eliminating over 1,200 positions. Housed inmates at lowest possible custody levels, also resulting in reduced operating costs

- Successful settlement of the Jane Doe class action law suit, a PREA case regarding female offenders in the state's women's' prisons.

- Avoided class action lawsuit regarding religious rights of Native Americans. http://seattletimes.nwsource.com/html/opinion/2015464624_guest30galanda.html

- Led the nation's corrections directors to support fundamental change in the Interstate Compact as a result of the shooting of 4 police officers in Lakewood, WA.

- Dramatically improved media relations by being aggressively open with journalists, challenging them to learn the difficult work performed by corrections professionals on a daily basis.

- Long term collaboration with the University of Washington focusing on the mentally ill in prison and management of prisoners in and through solitary confinement.

## EDUCATION AND OTHER BACKGROUND INFORMATION

- Post graduate work in Public Administration - The Evergreen State College, Washington - 1980 and 1981

- Bachelor of Arts - The Evergreen State College, Washington – 1973

- National Institute of Corrections and Washington State Criminal Justice Training Commission - various corrections and leadership training courses

- Member of the American Correctional Association

- Associate member, Association of State Correctional Administrators (ASCA)

- Guest Speaker, Trainer and Author for the National Institute of Corrections (NIC)

- Commissioner, Washington State Criminal Justice Training Commission 2002-2006, 2008-2011

- Member, Sentencing Guidelines Commission 2007-2011

- Instructor for Correctional Leadership Development for the National Institute of Corrections

- Advisory Panel Member, *Correctional Technology—A User's Guide*

- Author of *Going Beyond Administrative Efficiency—The Budget Crisis in the State of Washington*, published in Topics of Community Corrections by NIC, 2003

- Consultant for *Correctional Leadership Competencies for the 21st Century*, an NIC publication

- Consultant for Correctional Health Care Executive Curriculum Development, an NIC training program, 2012

- Co-chair with King County Prosecutor Dan Satterberg, *Examining the Tool Box: A Review of Supervision of Dangerous Mentally Ill Offenders* http://www.dbhds.virginia.gov/documents/Adm/080101-KingCountyReport.pdf

- Guest lecturer on solitary confinement at University of Montana Law School in 2012

- Guest Editorial, Seattle Times, February 22, 2014 http://seattletimes.com/html/editorialsopinionpages/2022966008_should-death-penalty-be-abolished.html

## CURRENT ACTIVITIES

- On retainer with Pioneer Human Services http://www.pioneerhumanservices.org/

- Registered Agent for ASCA in Washington

- Serve on the Board of Advisors for Huy, a non-profit for supporting Native American Prisoners

- Retained as an expert witness in the following cases:

    - *Mitchell v. Cate*,
      No. 08-CV-1196 JAM EFB
      United States District Court, Eastern District of California,
      Declarations, March 4, 2013, May 15, 2013 and June 7, 2013
      Deposed on July 9, 2013
    - *Parsons, et al v. Ryan*,
      No. CV 12-06010 PHX-NVW
      United States District Court of Arizona
      Declarations, November 8, 2013, January 31, 2014,
      February 24, 2014 and June 12, 2014
      Deposed February 28, 2014
    - *Gifford v. State of Oregon*,
      No. 6:11-CV-06417-TC
      United States District Court, For the District of Oregon,
      Eugene Division,
      Expert report March 29, 2013
      Case settled, May 2013
    - *Ananachescu v. County of Clark*,
      No. 3:13-cv-05222-BHS
      United States District Court, Western District of Tacoma
      Case settled, February 2014
    - *Coleman et al v. Brown, et al,*
      No. 2:90-cv-0520 LKK JMP P
      United State District Court, Eastern District of California,
      Declarations, March 14, 2013, May 29, 2013, August 23, 2013
      and February 11, 2014
      Deposed on March 19, 2013 and June 27, 2013
      Testified on October 1, 2, 17 and 18, 2013
    - *Peoples v. Fischer*,
      No. 1:11-cv-02694-SAS
      United States District Court, Southern District of New York
      Interim settlement agreement reached February 19, 2014,
      negotiations ongoing
    - *Dockery v. Epps*,
      No. 3:13-cv-326 TSL JMR
      United States District Court for the Southern District of Mississippi,
      Jackson Division

- *C.B., et al v. Walnut Grove Correctional Authority et al,*
      No. 3:10-cv-663 DPS-FKB,
      United States District Court for the Southern District of Mississippi,
      Jackson Division
- *Graves v. Arpaio,*
      No. CV-77-00479-PHX-NVW,
      United States District Court of Arizona
      Declaration, November 15, 2013
      Testified on March 5, 2014
- *Wright v. Annucci, et al,*
      No. 13-CV-0564 (MAD)(ATB)
      United States District Court, Northern District of New York
- *Corbett v. Branker,*
      No. 5:13 CT-3201-BO
      United States District Court, Eastern District of North Carolina,
      Western District
      Special Master appointment November 18, 2013
      Expert Report to the court January 14, 2014
      Testified March 21, 2014
- *Fontano v. Godinez,*
      No. 3:12-cv-3042
      United States District Court, Central District of Illinois,
      Springfield Division
- *Atencio v. Arpaio,*
      No. CV12-02376-PHX-PGR
      United States District Court of Arizona
      Report to the court February 14, 2014
- *State of Oregon v. James DeFrank*
      Case # 11094090C
      Malheur County, Oregon
- *Disability Rights, Montana, Inc. v. Richard Opper,*
      No. CV-14-25-BU-SHE
      United State District Court for the District of Montana,
      Butte Division
- *Larry Heggem v. Snohomish County,*
      No. cv-01333-RSM
      United States District Court, Western District of Washington at Seattle
      Report to the court May 29, 2014
- *Padilla v. Beard, et al*
      Case 2:14-at-00575
      United States District Court, Eastern District of California,
      Sacramento Division


**SAMPLE REFERENCES:** contact information available upon request:

Chris Gregoire, former Governor, State of Washington
Tom McBride, Executive Secretary, Washington Association of Prosecuting Attorneys
Chase Riveland, Riveland Associates
Rowland Thompson, Executive Director, Allied Daily Newspapers

# Exhibit 2

## EXHIBIT 2

1. EMCF Complaint Filed 5.30.13

2. PART 3 of Defendants_Pre-Discovery Disclosure Documents, Bate Stamped DEF-00401 to DEF-00457 (2)

3. Deposition of Captain Naidow, March 13, 2014

4. AG 5748 HALLC SH2-4, 2012-2013 Listing of Inmates who Engaged in Self-Harm

5. OSHA Inspection 2012

6. Medical Record of ███████████, page 141-143

7. DKT #46-1 Exhibit 1 Email exchange between Winter, Epps and Vincent May 15, 2012

8. D. Lovell, D. Allen, C. Johnson and R. Jemelka, *Evaluating the Effectiveness of Residential Treatment for Prisoners with Mental Illness*, Criminal Justice and Behavior, Vol. 28 February 2001, 83-104

9. *A Profile of Washington Inmates on Intensive Management Status*, University of Washington-Department of Corrections Behavioral Health Collaboration, October 2010

10. Lovell, *Patterns of Disturbed Behavior in a Supermax Population*, Criminal Justice and Behavior, 2008, 985; D. Lovell and R. Jemelka, *Coping With Mental Illness in Prison*, Family and Community Health, 1998

11. APA Official Actions, Position Statement on Segregation of Prisoners with Mental Illness (2012)

12. Haney, C., Mental *Health Issues in Long Term Solitary and "Supermax" Confinement*, Crime & Delinquency, 49, 2003

13. Expert Declaration of Craig Haney, *Coleman v. Brown*, Doc. No. 4378, at No. 38 (E.D. Calif. Mar. 14, 2013).

14. *Standard Minimum Rules for the Treatment of Prisoners,* Adopted by the First    United Nations Congress on the Prevention of Crime and the Treatment of Offenders, Standard 21(1)

15. *A Practical Guide to Understanding and Evaluating Prison Systems*, United States Department of State, page 23

16. *Standards for Adult Correctional Institutions*, 4th edition, American Correctional Association (2012), Standard No. 4-4270

17. DEF-OO134-139

18. Raymond Patterson and Kerry Hughes, Review of Completed Suicides in the California Department of Corrections and Rehabilitation, 1999-2004, Psychiatric Services 59, 676-682 (2008), at p. 678

19. Lindsay M. Hayes, Prison Suicide: An Overview and Guide to Prevention 55, U.S. Department of Justice, National Institute of Corrections (1995)

20. Lorna A. Rhodes, *Total Confinement: Madness and Reason in the Maximum Security Prison*, University of California Press, 2004

21. December 2012, January 2013 Video Summaries

22. MDOC POLICIES

AG 930 MDOC Contraband Control Policy
AG 2644 MDOC Monitoring and Assessment Policy
AG 2996 MDOC Orientation and In-Service Training Policy
AG 3249 MDOC Security Manual Policy
AG 3281 MDOC Control of Contraband—Body Searches—Offenders Policy
AG 5649 MDOC Grievance Procedures, effective Aug 2012
AG 5718 MDOC Protection From Harm
AG 5459 MDOC Offender Segregation Policy
AG 5529 MDOC Administrative Segregation Long-term Status Policy
AG 120 MDOC Use of Force Policy
AG 4910 MDOC Use of Restraints Policy
AG 3333 MDOC Use of Oleoresin Capsicum or Chemical Agents Policy

23. MONITORING REPORTS

AG 1623
AG 1624
AG 1643
AG 1666
AG 1667
AG 1700
AG 1716
AG 1733
AG 1734
AG 1775
AG 1806
AG 1807
AG 1864
AG 1880
AG 1881

AG 1925
AG 1928
AG 1943
AG 1944
AG 1980
AG 1983
AG 2001
AG 2002
AG 2053
AG 2070
AG 2071
AG 2119
AG 2122
AG 2127
AG 2139
AG 2140
AG 2206
AG 2209
AG 2213
AG 2214
AG 2216
AG 2228
AG 2246
AG 2250
AG 2251
AG 2296
AG 2298
AG 2301
AG 2314
AG 2327
AG 2328
AG 2386
AG 2394
AG 2395
AG 2441
AG 2454
AG 2460
AG 2461
AG 2522
AG 2539
AG 2541
AG 2596

24. HEALTH INSPECTION REPORTS

3.20.12

3.28.11
4.17.13

25. CONTRACT RELATED MATERIAL

AG 1
AG 3
AG 22
AG 39
AG 65
AG 66
AG 67
AG 69
AG 98
AG 99
AG 101

26. DAILY FACILITY LOCKDOWN REPORTS

AG 6807
AG 6861
AG 6913
AG 6957
AG 6969
AG 7011
AG 7069
AG 7138
AG 7158
AG 7188
AG 7240
AG 7284
AG 7311
AG 7328

27. CONTRABAND MONTHLY TRACKING SHEETS

AG 2445
AG 2508
AG 2585

28. COMMON AREA SEARCHES

AG 1067
AG 1160
AG 1184
AG 1214

AG 1254
AG 1317
AG 1348
AG 1393
AG 1441
AG 1516
AG 1574
AG 1743
AG 1891
AG 1953
AG 2082
AG 2265
AG 2337
AG 2410
AG 2471
AG 2549

29. GRIEVANCES

MTC009881
PLID0000357
PLID0000354
MTC004913
MTC004905
MTC004896
MTC004892
MTC004884
MTC004875
MTC004867
MTC004860
MTC004849
MTC004845
MTC004840
MTC004833
MTC004826
MTC004814
MTC004809
MTC004800
MTC004793
MTC004783
MTC004778
MTC004771
MTC004766
MTC004759
MTC004754
MTC004745

MTC004739
MTC004731
MTC004725
MTC004720
MTC004714
MTC004709
MTC004703
MTC004698
MTC004693
MTC004688
MTC004683
MTC004676
MTC004671
MTC004666
MTC004657
MTC004649
MTC004642
MTC004637
MTC004629
MTC004624
MTC004609
MTC004600
MTC004594
MTC004587
MTC004582
MTC004577
MTC004571
MTC004565
MTC004558
MTC004553
MTC004546
MTC004540
MTC004532
MTC004528
MTC004523
MTC004517
MTC004510
MTC004503
MTC004498
MTC004487
MTC004476
MTC004469
MTC004461
MTC004452
MTC004446
MTC004441

MTC004433
MTC004421
MTC004416
MTC004409
MTC004387
MTC004380
MTC004375
MTC004369
MTC004361
MTC004356
MTC004348
MTC004343
MTC004336
MTC004331
MTC004323
MTC004309
MTC004301
MTC004295
MTC004290
MTC004283
MTC004277
MTC004269
MTC004260
MTC004254
MTC004248
MTC004242
MTC004235
MTC004229
MTC004222
MTC004216
MTC004210
MTC004202
MTC004196
MTC004183
MTC004191
MTC004177
MTC004171
MTC004163
MTC004155
MTC004149
MTC004140
MTC004132
MTC004127
MTC004118
MTC004110
MTC004099

MTC004092
MTC004088
MTC004081
MTC004075
MTC004071
MTC004065
MTC004058
MTC004050
MTC004046
MTC004040
MTC004033
MTC004026
MTC004021
MTC004014
MTC004009
MTC004004
MTC003997
MTC003993
MTC003987
MTC003983
MTC003975
MTC003970
MTC003965
MTC003959
MTC003952
MTC003945
MTC003936
MTC003940
MTC003932
MTC003925
MTC003918
MTC003914
MTC003910
MTC003892
MTC003886
MTC003880
MTC003875
MTC003870
MTC003800
MTC003679
MTC003675
MTC003666
MTC003865
MTC003860
MTC003850
MTC003839

MTC003832
MTC003827
MTC003822
MTC003818
MTC003814
MTC003806
MTC003796
MTC003788
MTC003778
MTC003772
MTC003768
MTC003763
MTC003759
MTC003755
MTC003748
MTC003744
MTC003736
MTC003722
MTC003715
MTC003708
MTC003701
MTC003693
MTC003687
MTC003659
MTC003653
MTC003647
MTC003640
MTC003635
MTC003628
MTC003624
MTC003617
MTC003611
MTC003607
MTC003602
MTC003598
MTC003592
MTC003587
MTC003577
MTC003573
MTC003565
MTC003556
MTC003546

30. UNUSUAL OCCURRENCE REPORTS--DOORS

MTC019950

MTC019928
MTC010014
MTC009907
MTC009851
MTC009795
MTC009747
MTC009653
MTC009639
MTC009634
MTC009633
MTC009546
MTC009511
MTC009463
MTC009462
MTC009400
MTC009385
MTC009291
MTC009289
MTC009253
MTC009225
MTC009173
MTC009171
MTC009170
MTC009163

31. OUT OF CELL RECREATION TIME MEMORANDOM

MTC079784
MTC079777
MTC079771
MTC079765
MTC079757
MTC079750
MTC079747
MTC079740
MTC079732
MTC079726
MTC079719
MTC079712
MTC079705
MTC079698
MTC079670
MTC079663
MTC079649
MTC079642
MTC079635

MTC079628
MTC079600
MTC079593
MTC079587
MTC079572
MTC079565
MTC079558
MTC079552

## 32. RULE VIOLATION REPORTS

MTC009778
MTC009883
MTC101117
MTC010018
MTC009930
MTC009878
MTC009776
MTC009159

## 33. FACILITY LOGS

AG 1469
AG 1544
AG 1599
AG 1799
AG 1855
AG 1914
AG 1971
AG 2040
AG 2102
AG 2192
AG 2193
AG 2281
AG 2286
AG 2360
AG 2364
AG 2429
AG 2434
AG 2494
AG 2571

## 34. UNIT LOGS

MTC063465-Unit 5 July 12

MTC057429-Unit 6 March 13
MTC057186-Unit 6 May 13
MTC056922-Unit 6 March 13
MTC056753-Unit 6 Dec 13
MTC056671-Unit 6 April 13
MTC056422-Unit 6 Jan 13
MTC056169-Unit 6 July 13
MTC055968-Unit 6 Sept 13
MTC055944-Unit 6 May 13
MTC055691-Unit 6 May 13
MTC055504-Unit 6 Jan 13
MTC055377-Unit 6 May 13
MTC055122-Unit 6 April 13
MTC054869-Unit 6 Aug 13
MTC054664-Unit 6 Aug 13
MTC055691-Unit 6 July 13
MTC055504-Unit 6 Jan 13
MTC055377-Unit 6 May 13
MTC055122-Unit 6 April 13
MTC054869-Unit 6 Aug 13
MTC054664-Unit 6 Aug 13
MTC054413-Unit 6 July 13
MTC054162-Unit 6 Jan 13
MTC053913-Unit 6 Feb 13
MTC053893-Unit 6 Mar 13
MTC053782-Unit 6 Feb 13
MTC053662-Unit 6 Feb 13
MTC053507-Unit 6 Dec 12
MTC053353-Unit 6 Nov 12
MTC053198-Unit 6 Oct 12
MTC052738-Unit 5 Dec 12
MTC052582-Unit 5 Nov 12
MTC052424-Unit 5? Sept 12
MTC029357-Unit 5 Jan 13
MTC029068-Unit 5 May 13
MTC028817-Unit 5 May 13
MTC028565-Unit 5 March 13
MTC028314-Unit 5 July 13
MTC027360-Unit 5 Sept 13
MTC027159-Unit 5 Sept 13
MTC026907-Unit 5 June 13


35. UNUSUAL OCCURRENCE REPORTS—USE OF FORCE

MTC009750

MTC009729
MTC009685
MTC009527
MTC009514
MTC009513
MTC009380
MTC009438
MTC009515
MTC009516
MTC009439
MTC009318
MTC075187
MTC075174
MTC075136
MTC075124
MTC075114
MTC075089
MTC075074
MTC075062
MTC075045
MTC075023
MTC074993
MTC074982
MTC074974
MTC074954
MTC074934
MTC074921
MTC074910
MTC074899
MTC074887
MTC074873
MTC074856
MTC074834
MTC074822
MTC074798
MTC074777
MTC074740
MTC074718
MTC074705
MTC074691
MTC074677
MTC074663
MTC074645
MTC074633
MTC074622
MTC074592

MTC074562
MTC074551
MTC074525
MTC074500
MTC074490
MTC074475
MTC074438
MTC074422
MTC074406
MTC074387
MTC074360
MTC074344
MTC074326
MTC074309
MTC074275
MTC074255
MTC074244
MTC074160
MTC074122
MTC074103
MTC074059
MTC074040
MTC074018
MTC073999
MTC073963
MTC073959
MTC073932
MTC073867
MTC073841
MTC073763
MTC073709
MTC073679
MTC073625
MTC073608
MTC073559
MTC073528
MTC073504
MTC073461
MTC073442
MTC073432
MTC073414
MTC073395
MTC073374
MTC073120
MTC073356
MTC073337

MTC073282
MTC073268
MTC073258
MTC073220
MTC073178
MTC073059
MTC073003
MTC072984
MTC072967
MTC072949
MTC072932
MTC072907
MTC072850
MTC072833
MTC072801
MTC072777
MTC072729
MTC072707
MTC072691
MTC072664
MTC072645
MTC072605
MTC072582
MTC072566
MTC072533
MTC072517
MTC072491
MTC072453
MTC072416
MTC072376
MTC072344
MTC072230
MTC072187
MTC072163
MTC072138
MTC072057
MTC07204
MTC072014
MTC071990
MTC071934
MTC071920
MTC071896
MTC071818
MTC071789
MTC071768
MTC071756

MTC071659
MTC071628
MTC071592
MTC071566
MTC071549
MTC071513
MTC071482
MTC071464
MTC071427
MTC071419
MTC071394
MTC071380
MTC071365
MTC071353
MTC071334
MTC071294
MTC071257
MTC071230
MTC071205
MTC071183
MTC071160
MTC071041
MTC070939
MTC070924
MTC070868
MTC070847
MTC070804
MTC00766
MTC070732
MTC070687
MTC070672
MTC070657
MTC070628
MTC070594
MTC070553
MTC070526
MTC070509
MTC070503
MTC070460
MTC070441
MTC070427
MTC070408
MTC070398
MTC070384
MTC070286
MTC070276

MTC070260
MTC070244
MTC070216
MTC070164
MTC070147
MTC070136
MTC070105
MTC070020
MTC069946
MTC069888
MTC069860
MTC069787
MTC069770
MTC069749
MTC069733
MTC069721
MTC069708
MTC069697
MTC069625
MTC069612
MTC069600
MTC069557
MTC069536
MTC069518
MTC069508
MTC069496
MTC069471
MTC069427
MTC069415
MTC069399
MTC069351
MTC069297
MTC069287
MTC069260
MTC069250
MTC069240
MTC069221
MTC069193
MTC069183
MTC069173
MTC069163
MTC069152
MTC069140
MTC069130
MTC069117
MTC069087

MTC069077
MTC069069
MTC069055
MTC069045
MTC069031
MTC069021
MTC068984
MTC068965
MTC068945
MTC068932
MTC068914
MTC068899
MTC068884
MTC068873
MTC068835
MTC068814
MTC068751
MTC068738
MTC068713
MTC068700
MTC068672
MTC068642
MTC068590
MTC068574
MTC068533
MTC068510
MTC068489
MTC068477
MTC068465
MTC068432
MTC068415
MTC068407
MTC068370
MTC068355
MTC068335
MTC068296
MTC068279
MTC068262
MTC068245
MTC068229
MTC068220
MTC068207
MTC068195
MTC068186
MTC068174
MTC068163

MTC068144
MTC068137
MTC068129
MTC068126
MTC068109
MTC002450

36. USE OF FORCE VIDEOS

9/23/12-Derrick Lee, R6758 EMCF 12-914
9/25/12-Derrick Hayes, 101554 EMCF 12-919
9/25/12-Vincent McGee, 122412 EMCF 12-920
9/26/12-Isaiah Sanders, 122488 EMCF 12-922
9/27/12-Jonathon Taylor, L7561 EMCF 12-806
9/27/12 Derrick Davis, R0086 EMCF 12-923
9/28/12 Charles Conrad, 173974 EMCF 12-807
9/28/12 Anthony Thomas, 142903 EMCF 12-926
9/28/12 Derrick Hayes, 101553
9/29/12 Demetrias Reed, 79748 EMCF 12-930
9/29/12 Johnny Ailes, M7355
9/30/12 Terrance Johnson, L135 EMCF 12-937
10/5/12 Howard Alexander, K6335 EMCF 12-945
10/9/12 Idris Imin, 163358 EMCF 12-952
10/9/12 Felipe Cook, 77958 EMCF 12-953
10/9/12 Kenny Barber, R6091 EMCF 12-954
10/10/12 Jerry Gilmore, 63824 EMCF 12-955
10/10/12 Eric Ward, 111389 EMCF 12-957
10/11/12 Johnny Ailes, M7355/Bobby Trotter, L4136 EMCF 12-960
10/11/12 Alexis Jones, 140439 EMCF 12-961
10/11/12 Gregory Jones, R7254 EMCF 12-961
10/11/12 Cody Tutor, 110451 EMCF 12-961
10/11/12 Vincent McGee, 122412 EMCF 12-961
10/16/12 Wiley Wedgeworth, 144574 EMCF 12-961
10/17/12 James Jordan, 129915/Billy Lester, 134245/Richard Morgan, 167285/Byron Norris,
        L1923—disc labeled incorrectly 12-972
10/22/12 Cedric Butler, K3060
10/28/12 Robert Campbell 42885 EMCF 12-989
11/12/12 Earl Blue, 67042 EMCF 12-1014
11/13/12 Samuel Reed, L1977 EMCF 12-1015
11/13/12 Joshua Clay, 151757 EMCF 12-1016
11/15/12 Bilethon Autry, 133725 12-1023
11/17/12 Marquise Green, K0146, EMCF 12-1027
11/20/12 Joseph Woodruff, 173595 EMCF 12-1031
11/21/12 Joseph Woodruff, 173595 EMCF 12-1035
11/22/12 Jimmy Collier, R2780/Hillman Clemons, 116472 EMCF 12-1097
11/27/12 Adam Swor, N6506 EMCF 12-1046

12/3/12 Derrick Hayes, 101554 EMCF 12-1050
12/3/12 Jonathon Taylor, L7561 EMCF 12-1051
12/4/12 Randy Marshall, 134595 EMCF 12-1053
12/5/12 Devan Fullington, 137287 EMCF 12-1054
12/5/12 Derrick Hayes, 101554 EMCF 12-1056
12/6/12 Anthony Austin, 124015 EMCF 12-1057
12/6/12 Gregory Jones, 124015 EMCF 12-1058
12/9/12 Chancellor Christmas 130719 EMCF 12-1061
12/10/12 Travis Davis, 148986/Orlando Thomas, 152932/Christopher Willis, K3323 EMCF 12-
         1064
12/10/12 Jermaine Duffy, 100164 EMCF 12-1063
12/10/12 Marcus Mallet, 144049 EMCF 12-1064
12/12/12 Derrick Hayes, 101554 EMCF 12-1065
12/12/12 Michael Smith, 126420 EMCF 12-1067
12/15/12 Jimmy Johns, 111190/Michael Campbell, K5070 12-1071
12/17/12 Thomas Hall, 128236, EMCF 12- 1074
12/20/12 Howard Ford, 139664, EMCF 12-1080
12/25/12 Kendrick Keys, K5701/Terry Petty, K5701 EMCF 12-1088
12/26/12 Robert Anderson, 153440 EMCF 12-1090
12/26/12 Demarcus Jefferson, 166255 EMCF 12-1095
12/28/12 Idris Imin, 163358 EMCF 12-1079
12/28/12 Jermaine Dockery, K2538/Jerry Covington, 171478 EMCF 12-101
12/28/12 Emile Collins, 91933 EMCF 12-1103
12/31/12 Louis Eason, 149912 EMCF 12-100
12/31/12 Phillip Knickel, R6871 EMCF 12-1108
1/4/13 Darryl Donald, 126763 EMCF 13-0003
1/4/13 Johnny Ailes, M7355 EMCF 13-0005
1/8/13 Derrick Hayes, 101554/Cody Tutors, 100451 EMCF 13-0044
1/10/13 Willie Russell, 166527 EMCF 13-0024
1/11/13 John Kennedy, 122945 EMCF 13-0027
11/16/13 Johnny Ailes, M7355 EMCF 13-0041
1/16/13 Joseph Penden, 100048 EMCF 13-0039
1/20/13 Joshua Southard, 142912 EMCF 13-0052
1/21/13 Brandon Chamblee, 104283/Stephen Gross, 151410 EMCF 13-0047
1/22/13 Joshua Southard, 142912 EMCF 13-0049
1/22/13 Joseph Woodruff, 173595 EMCF 13-0053
1/23/13 Richard Lewis, 136889 EMCF 13-0054
1/24/13 Karl Williams, 168684 EMCF 13-0056
1/24/13 Rico Lyons, 128270 EMCF 13-055
1/28/13 Maxie Armstrong, T3773 EMCF 13-0062
1/28/13 Bobby Trotter, L4136 EMCF 13-0062
1/30/13 Billy Hamilton, 143121 EMCF 13-0067
10/13/13 Cody Tutor
10/22/13 Derrick Hayes
11/06/13 Robert Moss
11/15/13 James Gardner

11/15/13 Howard Alexander
11/18/13 Jonathan Ruttley
11/02/13 James Milsap
01/07/14 Antonio Wright
01/18/2014 Antonio Wright
1/04/14 Johnny Ailes
1/09/14 Johnny Ailes
1/9/14 Derrick Hayes
3/17/14 James Milsap
3/20/14 James Milsap
1/28/14 Clifton Wallace
3/11/14 Henry Moore
1/13/14 Willie Russell
1/9/14 Derrick Lane
1/10/14 Derrick Hayes
3/25/14 David Johnson
12/5/13 Earl Blue
3/7/13 John Kennedy #122945
3/12/13 Kenneth Watson #117543
1/28/13 Armstrong, #T3773/Trotter #73773

37. TRAINING

MTC079827
MTC077446
MTC077431
MTC077406
MTC077299
MTC077279
MTC077262
MTC077241
MTC077224
MTC075666
MTC075650
MTC076630
MTC079827
MTC079791
MTC077588
MTC077536
MTC077523
MTC077504
MTC077466
MTC077406
MTC077337
MTC077299
MTC077279

MTC077262
MTC077241
MTC077224
MTC077181
MTC077135
MTC077099
MTC077061
MTC077057
MTC077004
MTC076991
MTC076936
MTC076933
MTC076889
MTC076811
MTC076792
MTC076787
MTC076682
MTC076510
MTC076461
MTC076455
MTC076373
MTC076368
MTC076334
MTC076333
MTC076331
MTC076328
MTC076424
MTC076308
MTC076290
MTC076266
MTC076223
MTC076158
MTC076122
MTC076098
MTC076083
MTC076015
MTC075990
MTC075965
MTC075937
MTC075904
MTC075814
MTC075758
MTC075737
MTC075668
MTC075666
MTC075650

MTC075611
MTC075580
MTC075564
MTC075508
MTC075426
MTC075341
MTC068082
MTC068064
MTC068096
MTC068090
MTC067997
MTC067932
MTC067896
MTC067872
MTC067857
MTC067837
MTC067240
MTC067613
MTC067579
MTC067557
MTC067500
MTC067536
MTC067764
MTC067789
DEF 41
DEF 59
DEF 70
DEF 76
DEF 83
DEF 91
DEF 97
DEF 104
DEF 111
DEF 128
DEF 380
DEF 382

38. SIGNIFICANT INCIDENT SUMMARIES

AG 200
AG 1625
AG 1668
AG 1732
AG 1735
AG 1808
AG 1945

AG 2003
AG 2073
AG 2141
AG 2252
AG 2396
DEF 165
AG 2329
AG 2540

# EXHIBIT 3

A Profile of Washington Inmates on Intensive Management Status

David Lovell

University of Washington-Department of Corrections Behavioral Health

Collaboration

October, 2010

Profile of IMS Inmates

## Executive Summary

This description covers 520 inmates on Intensive Management Status (IMS) at two different points in time—2000 and 2006—referred to as the *index IMS assignment* from which infraction rates and return to IMS are calculated. To assist in planning policies and programs, the following topics are covered:

- General characteristics of IMS vs. general population (GP) inmates;
- Security threat group involvement;
- Mental health issues;
- Assaults on staff;
- Return to IMS;
- Policy directions.

**General Characteristics.** Intensive Management Status is the assignment of inmates to extended administrative segregation to reduce serious threats to institutional security or to the safety of inmates and staff. Many differences between IMS and GP offenders are predictable:

- Leaving aside sex offenders, 71% of IMS inmates are serving terms of homicide or violent offenses against persons, vs. 42% of GP inmates;
- Half of IMS inmates are serving terms of 10 years or more, vs. 33% among GP inmates.
- The average annual infraction rate among IMS inmates was 6.8 per year, compared to 1 per year for general population inmates;
- IMS inmates are similar in racial classification to GP inmates, but a rising percentage—14% in 2000, 23% in 2006—are identified as Hispanic, vs. 10% of GP inmates, reflecting increasing activity of Latino gangs in Washington's prisons.

Despite these unsurprising patterns, there was great variation among IMS inmates in length of prison and IMS terms and rates of prison misbehavior. The average length of the IMS term decreased between 2000 and 2006, from 26 months to 21 months.

**STG Involvement.** Over half of IMS inmates have been identified as STG-affiliated. White supremacists predominated in 2000 (37% of all STG members on IMS); between then and 2006, the Latino share of STG affiliates among IMS STG members rose from 18% to 39%, with a concomitant decline in the share of white supremacists.

- Among IMS inmates, STG affiliates and non-affiliates showed similar infraction rates;
- Non-affiliates were more likely to show increased infraction rates after IMS assignment (25% vs. 18%), and served longer IMS terms: 28 months vs. 20 months.

**Mental Illness.** *Serious mental illness* (SMI) is defined as a major thought or mood disorder that significantly impairs functioning, causes substantial pain or disability, and requires continuing

Profile of IMS Inmates

treatment. Given the vagaries of mental health diagnosis and documentation in DOC records, a variety of sources must be used to provide reliable estimates of rates of serious mental illness.

- A sample of IMU residents in 2000 found 20% with documented evidence of SMI;
- A systematic survey of all prisoners in 2002 identified 17% of IMU residents as SMI.

For the 2006 IMS group, data from OBTS covered the entire population but were limited to two useful indicators: (1) assessment by a mental health professional as seriously mentally ill; (2) diagnosis with one of a group of severe illnesses. Those meeting either indicator were counted as showing *mental health problems;* those meeting both criteria were counted as *SMI.*

- Excluding inmates at SOU, 18% of IMS inmates in 2006 were counted as SMI.
- Inmates with mental health problems had longer IMS terms (21 months vs. 12 months). This discrepancy is only partly accounted for by their higher rates of infractions on IMS.
- STG affiliates showed higher rates of mental illness than expected: excluding people at SOU, mental health problems were found in 25% of IMS STG cases.

Several federal court rulings have required prison systems in other states to avoid long-term placement of SMI offenders in the equivalent of IMUs. The *Madrid v. Gomez* court in California also excluded persons with borderline personality disorders, brain damage or mental retardation, or impulse-ridden personalities, This description evokes the offenders—not necessarily SMI, but with repetitive patterns of disruptive, irrational, or egregious conduct in a variety of prison settings—who, in Washington, are called *behaviorally disturbed.*

- As noted above, a detailed sample of IMU residents in 2000 documented strong evidence of SMI in 20% of cases.
- With the addition of clinical symptom ratings in interviews, OBTS records of psychotic episodes or self-injury, and evidence of development disability or traumatic brain injury, the percentage of IMU residents with mental health-related issues—a broader concept than mental illness, including those called behaviorally disturbed—rose to 45%.
- Both the 2000 study and patterns of behavior found in the current study raise questions about the effectiveness of the IMU regime in deterring disruptive behavior among offenders with mental health problems.

**Staff Assaults.** There were 158 IMS offenders (30%) who had assaulted staff: 356 incidents, 23 aggravated. Of inmates who assaulted staff after the index term, 95% returned to IMS.

- Only one-quarter of inmates with previous staff assaults did so again after IMS, but this rate was twice that of those with no previous staff assaults.

We may infer that IMS deters staff assaults only if the correlation between previous and subsequent assaults is explained in terms of an underlying predisposition.

- STG members assaulted staff at a slightly lower rate than other IMS inmates.

Profile of IMS Inmates

- IMS inmates with mental health problems, however, were far more likely to commit staff assaults: 40%, compared to 18% of other inmates.

If sanctions are less likely to deter offenders with mental illness, this factor may explain their disproportionate representation on IMS, as well as their proclivity for infractions on IMS.

**Return to IMS.** *IMS Recidivism* is defined as return to IMS within 3 years of release from the index term in 2000 or 2006. Overall, offenders returned to IMS at a rate of 55%, but the rate increased from 49% for the 2000 group to 60% for the 2006 group.

- The length of the IMS term made no difference to recidivism when other variables such as STG membership were taken into account.
- Inmates with mental health problems returned to IMS at about the same rate as others..
- Recidivism rates were higher among STG offenders (66%), especially members of Latino STGs (70%); the increasing presence of Latino STG members, therefore, may explain the increase in recidivism between the 2000 and 2006 groups.
- Among STG affiliates, Norteños returned to IMS at the high rate of 80%, probably because they were relatively low in number and subject to attack on sight by their rivals.

Return to IMS differs from recidivism in the community in that no set of official record variables has been found that predicts IMS recidivism with reasonable accuracy. The apparent success of IMS stepdown programs at WSP and CBCC, however, suggests that there are causes of IMS recidivism that may be addressed by intervention. These factors are not regularly assessed or documented in official records.

**Policy Directions.** Most offenders affiliated with STGs are unlikely to reject an allegiance central to their identity. They may be encouraged to modify their behavior, however, by programs that help them recognize an interest in freedom that outweighs the short-term gains of violence and racketeering.

- The effectiveness of incapacitation and deterrence through IMS is limited by the continuing influx of new gang members.
- Behavioral incentives and offender change programs in general population, IMU-based stepdown programs, and transfers to less intense settings may all be used, depending on circumstances, to reduce levels of violence associated with STG affiliation.

Legal and ethical concerns about protection from harm, as well as the evident failure of IMS to deter misbehavior by inmates with mental health problems, suggest that the Department should formalize policies and procedures to divert inmates with mental illness from IMS.

- Diversion from IMS requires mental health professionals to assess clinical status and needs of mentally ill inmates at administrative segregation hearings.
- Diversion also requires reliable systems for identifying inmates with mental illness and safe alternative programs for those whose behavior warrants maximum custody.

## Introduction

Intensive Management Status (IMS) may be defined as the assignment of inmates to extended administrative segregation, a preventive measure to address substantial threats to institutional security or to the safety of inmates or staff. This description of IMS inmates in Washington is intended to help the Department address policy issues about the use of IMS to control security threat groups (STGs), rates of mental illness in IMS, and the problem of "behaviorally disturbed" inmates. At this point, no systematic data are available about another major challenge facing DOC, the use of IMS for protective custody.

This profile relies on DOC's administrative datasets, in particular the offender tracking data in OMNI and mental health data collected from OBTS, to describe two groups of IMS inmates:

- IMS inmates identified and described in studies conducted in 2000 (N=227);

- Inmates on IMS as of January 1, 2006 (N=293);[1]

The *index IMS* assignment is the term an inmate was serving when, in 2000 or 2006, he appeared in a snapshot of all IMS inmates. The index assignment is the point that defines two distinct *cohorts* and from which previous IMS assignments and return to IMS are measured.

## Demographics and Criminal History

IMS inmates are roughly comparable to general population (GP) inmates in racial classification..



Chart 1. Racial Affiliations of IMS Inmates

Among IMS inmates, 14% were identified as Hispanic in 2000 and 23% in 2006, compared to 10% among GP inmates (2008).

[1] Because 11 inmates were in both cohorts, this analysis actually covers 509 different individuals, but 520 IMS cases, who are referred to throughout this report as "inmates" to simplify the presentation.

David Lovell, UW                                                                IMS Inmates

Given the purpose of IMS, it is not surprising that, as in our past studies, it was found that IMS inmates have been convicted of more violent crimes, serve longer sentences, and have much higher rates of infractions.





Leaving aside sex offenders, who are under-represented on IMS, 71% of IMS inmates are serving terms of homicide or violent offenses against persons, vs. 42% of GP inmates. There were 5 IMS inmates under sentence of death, and 41 (8%) serving terms of life without parole.

**Diversity**. Although of course IMS inmates have more violent records, longer prison terms, and higher infraction rates than GP inmates, it is critical to acknowledge the wide variation among IMS inmates. Because there is no typical IMS offender, DOC faces the challenge of making

David Lovell, UW                                                                    IMS Inmates

programs and policies consistently serve the principal security objectives of IMS while bringing about change among inmates with diverse histories, capabilities, and attitudes.

**Table 1.  Variability Among IMS Inmates\***

| Statistic | Prison Term (years) | Index IMS Term (months) | Annual Major Infraction Rate\*\* |
|---|---|---|---|
| Mean | 9.3 | 24 | 4.0 |
| Median | 8.3 | 17 | 2.6 |
| Standard Deviation | 5.8 | 21 | 5.0 |
| Minimum | 0.4 | 1 | 0.0 |
| Maximum | 35.7 | 192 | 52.5 |

\*The maximum prison term reflects those inmates sentenced to life without parole, whose prison terms are presumed to end when they reach 75 years of age.

\*\*The average among GP inmates was measured at 1 per year in an earlier study.

Variability among IMS inmates is shown by the broad range from minimum to maximum values, high standard deviations, and the differences between the means and the medians, reflecting the influence of a small number of inmates on the extreme high end of each variable.

**Infractions, IMS Terms, and Release to the Community.**  The average length of an IMS term decreased from 2000 to 2006, from 26 months to 21 months.

- The number of IMS assignments per inmate ranged from 1 to 11, with an average of 2.3.
- The average annual infraction rate before the index IMS assignment was 6.8;
- In 68% of cases, infraction rates went down after the index IMS term; in 21% of cases, infraction rates went up after the index IMS term; the remaining 11% maintained approximately the same rate.

The most common or significant infractions—comprising almost two-thirds of the 15,000 infractions committed by these 520 inmates—were divided into categories:

- *Violent*, following DOC's criteria for violent incidents;
- *Racket-related*, consisting of STG activities and possession of controlled substances;
- *Disobedient*, such as refusing orders and endangering safety;
- *Disturbed,* consisting of threatening, throwing objects, setting fires, and flooding;\

Over 300 inmates were infracted for fighting, averaging 2.5 incidents apiece; inmates infracted for threatening, an equally prevalent infraction, were even more repetitious, averaging 4.5 incidents apiece. Infractions classified as disobedient were the most common, comprising over 5,000 incidents, partly because so many types of infractions were included under this heading. There were 6 inmates infracted for an infraction labeled "homicide," which covers both attempted and successful deadly assaults: though not for lack of effort by the perpetrators, in these instances the victim did not die. Assaults on staff were singled out for separate analysis, presented below after discussions of security threat groups and mental illness.

**Release to the Community.** If prisoners with violent records re-enter society directly from IMU, we may be concerned that long-term isolation would render them even less able to cope with the behavior of others. These concerns were supported by a UW study showing that IMU offenders released directly to the community re-offended sooner and at higher rates than comparable IMS offenders with three months or more in less restrictive settings before release.[2]

- Of 250 IMS offenders in this study who had been released from prison, there were 66 (26%) released directly from IMU.

- Given discussions of this problem and the UW study's preliminary findings during 2003-2006,, it was surprising to find that the percentage released directly to the community *increased* between the 2000 and 2006 cohorts, from 19% to 33%.

One obstacle to transitioning IMS offenders through less restrictive settings is the risk they pose in general population, and some factors may have changed between 2000 and 2006. In the next two sections, we consider the risks associated with STG status and mental illness.

## Security Threat Group Involvement

Security threat group (STG) activities are a major source of violence in prisons. Just over half of IMS inmates were identified as active STG members:

- Among IMS inmates in 2000, 57% have been identified as active STG members;

- Among IMS inmates in 2006, 52% have been identified;

- The apparent decrease may only reflect the longer period for intelligence collection about the 2000 group;

- Among IMS inmates affiliated with STGs, the percentage active in Latino groups increased dramatically between 2000 and 2006, with a concomitant reduction in the predominance of white supremacists among active STG members on IMS.

[2] Lovell, D., Johnson, L.C., & Cain, K.C.. 2007. Recidivism of Supermax Prisoners in Washington State. *Crime and Delinquency,* 53(4): 633-656.

David Lovell, UW                                              IMS Inmates



**STG Involvement, Infractions, and IMS Terms.** Given the attention drawn by the behavior of inmates identified as active in STGs, some observations were unexpected:

- Affiliated and non-affiliated IMS inmates showed no difference in annual infraction rates.
- STG-affiliated inmates were *more* likely to improve their infraction rates after their index IMS assignments:
  - o Among affiliates, 73% showed lower rates, 18% higher;
  - o Among non-affiliates, 60% showed lower rates, 25% higher.
- STG-affiliated inmates had shorter average index IMS stays:: 20 months vs. 28 months for non-affiliates, but averaged more IMS terms: 2.6 vs. 2.

In addition to STG involvement, mental illness—which is more highly concentrated among non-STG affiliates—also affects outcomes such as length of stay and infraction rates.

## Mental Health Issues in IMS Inmates

The concept of *serious mental illness* (SMI) is intended to capture those prisoners for whom mental health treatment is medically necessary by virtue of the obligation to protect persons from harm while they are wards of the state. These are the critical elements in DOC's definition of mental illness, following the standard set in Ohio as part of a federal court consent decree:

- Major thought or mood disorder, causing
- Significant impairment of functioning in prison (judgment, behavior, capacity to recognize reality), and

- Substantial pain or disability, so that
- Continuing treatment is necessary.

**Counting SMI**. Identification of inmates as SMI has been problematic for a variety of reasons: insufficient psychiatric staffing at key facilities such as the reception center and WSP; different understandings of SMI among mental health professionals; reliance on contract psychiatrists who do not always document diagnosis in DOC records; unreliable entry and updating of electronic records; and contention about ascribing SMI to offenders with severe behavior problems. In 1998, the UW collaborated with DOC, DSHS, and the Washington Institute for Mental Health Research and Training to document SMI among offenders who had been released as part of a large-scale community transition study which has served as a baseline for subsequent program evaluation efforts. A variety of indicators were combined in an algorithm that has since been refined in subsequent studies: a random sample of IMU residents in UW's 2000 study, and a 2003 study that identified all inmates with SMI as of June, 2002 and found rates of 10% among all prisoners, 13% among residents of major institutions.[3] Because the current study of IMS residents was limited to electronic records, mental health status was measured only for the 2006 cohort because, by then, two relatively useful indicators were commonly documented:

1. Certification of Serious Mental Illness by a mental health professional, recorded in the OBTS DT86 screen ("Interview Confirms SMI"); or

2. Diagnosis of Schizophrenia, Schizoaffective Disorder, Psychosis unspecified, Bipolar Disorder, Major Depression, Organic Thought or Mood Disorder, or Borderline Personality Disorder (these diagnoses are selected because treatment is usually medically necessary).

Inmates meeting either indicator are described in this report as showing *mental health problems* or as *mental health cases*; those meeting both criteria are classified as *SMI*. Chart 5 presents rates of SMI, conservatively defined, in the 2000 IMU sample, the IMU inmates in the 2003 prevalence study, and the 2006 IMS cohort (excluding inmates at SOU).



---

[3] Lovell, D. 2003. Identification of offenders with serious mental illness in Washington Department of Corrections facilities. Olympia, WA: Department of Corrections.

These estimates are not fully comparable because of differences in population and sources of evidence; furthermore, the 2000 and 2006 estimates are likely both to miss some undocumented SMI inmates and count others (false positives) whom a more detailed examination would exclude. Nevertheless, the rough similarity of the estimates provides a measure of the presence in IMUs of offenders for whom DOC is obligated to provide medically necessary treatment.

**SMI, Disturbed Offenders, and IMS Policy.** Several federal court rulings—*Madrid v Gomez* (California) and *Jones'El v Berge* (Wisconsin) have found it a constitutional violation to assign prisoners with serious mental illness to their states' supermax facilities. The *Madrid* court also listed further factors, highlighted below, that characterize prisoners who, in Washington, are often labeled *behaviorally disturbed*:

> Such inmates consist of the already mentally ill, as well as persons with borderline personality disorders, brain damage or mental retardation, impulse-ridden personalities, or a history of prior psychiatric problems or chronic depression. For these inmates, placing them in the SHU is the mental equivalent of putting an asthmatic in a place with little air to breathe. The risk is high enough, and the consequences serious enough, that we have no hesitancy in finding that the risk is plainly "unreasonable." ... Such inmates are not required to endure the horrific suffering of a serious mental illness or major exacerbation of an existing mental illness before obtaining relief.

Most DOC staff can identify the prisoners to whom the concept *behaviorally disturbed* applies: those who have shuttled back and forth between prisons and between disciplinary and treatment settings, disrupting living units, and engaging in desperate or egregious behavior for incomprehensible or seemingly trivial reasons. While the term is sometimes used to distinguish "behavioral" inmates from those with mental illness, many of them are eventually recognized as mentally ill. Nevertheless, *disturbed* is not a clinical term; it refers not to an underlying disposition but to a pattern of behavior, conditioned by prison settings, which has defied understanding and intervention.

Our 2000 study included a 40% random sample of IMU inmates who were interviewed and whose charts were reviewed. Table 2 summarizes the prevalence of indicators of psychological disturbance similar to those described in the *Madrid* ruling:

- Serious Mental Illness, defined operationally by DOC classification, diagnosis, medications, and housing records;
- Marked or severe psychiatric symptoms shown in interviews, measured by BPRS scores;
- Psychotic or self-injurious episodes described in OBTS and medical chart notes;
- Indications of brain damage in medical charts.

Chart 6 displays the rising prevalence of mental health issues with the addition of each indicator. These four measures have been presented roughly in descending order, in terms of the reliability of the evidence we were able to gather and their relationship to serious mental illness. Taken together, they point to a high rate of mental health issues.

David Lovell, UW

Table 2.  Forms of Disturbance or Impairment in IMU Residents
(N=131)

| Measure | Number | Percent |
|---|---|---|
| Official record evidence of SMI | 26 | 20% |
| BPRS Symptoms | 19 | 15% |
| Self-Injury or Psychotic Episodes | 32 | 24% |
| Brain Damage | 36 | 30% |



In addition to legal and ethical concerns, one may question whether housing either mentally ill or behaviorally disturbed prisoners is compatible with the mission of Intensive Management:  to contain inmates committed to violence, rackets, or organized power struggles with authorities and other groups of prisoners.  The commitment to organized power struggles with prison authorities has been explicit in our interviews with IMS prisoners associated with STGs, especially white supremacist groups, but many non-affiliated inmates have also chosen violent or exploitative prison careers.  In addition to a high degree of surveillance and physical security, IMUs attempt to control behavior through a combination of incentives and disincentives that presume that IMS prisoners will improve their behavior in order to gain more freedom or avoid further restrictions and long-term isolation.  Our studies have cast doubt on the effectiveness of this regime for both inmates with serious mental illness and the behaviorally disturbed.[4]

Rates of mental illness were significantly lower among STG members, but still high:

---

[4] Lovell, D. 2008. Patterns of disturbed behavior in a Supermax population. *Criminal Justice and Behavior,* 35(8), 985-204.

- With SOU inmates removed, the respective percentages of mental health problems were 25% among STG affiliates and 36% among non-affiliates.

- Even with the stricter standard of *SMI*, requiring both certification and a qualifying diagnosis, over 14% of STG members, not in SOU, were mentally ill.

From these findings one may infer either (1) that the qualifications for STG membership are relatively low, requiring a less organized, willful set of aptitudes than one might have expected; or (2) that impulsive or disorganized STG members are more likely than others to incur IMS.

Inmates with mental health problems generally spend longer time on IMS:

- Mental health cases spent far more time in their index IMS term (21 months vs. 12 months), and more total IMS time: 50 months vs. 23 months.

- Inmates with mental health problems also committed *infractions on IMS* at almost 3 times the rate of the non-mentally ill (4 vs. 1.4 per year). Although, for obvious reasons, this factor is highly correlated with longer IMS stays, it does not completely explain the longer stays of inmates with mental illness.

- IMS inmates classified as SMI were less likely than those without mental illness to lower their infraction rates after the index IMS assignment (51% vs. 68%).

We have distinguished between serious mental illness and mental health problems, more broadly defined. Many of those with mental health problems who don't meet criteria for SMI would qualify as disturbed. In either case, there is a high proportion of IMS offenders whose behavior hasn't responded well to sanctions. The next section goes into detail about a behavior that poses the question of the deterrent function of IMS in its most acute form: assaults by inmates on staff.

## Assaults on Staff

We found that 30% of IMS offenders have assaulted staff. Whatever the numerical significance of this rate, prevention of staff assault—for reasons so obvious it would be insulting to state them—looms large among objectives of the IMS institution.

There were 158 offenders (30%) who assaulted staff: 356 incidents, 23 of them aggravated. There is a clear relationship between staff assault and IMS assignment:

- Of 53 offenders who committed staff assault after their index IMS term, 45 (85%) returned to IMS.

It is less clear, however, whether IMS deters future staff assaults. Of those who committed staff assault, half did so before their first IMS assignment, half afterwards. Table 2 compares post-index staff assaults for inmates with and without previous staff assaults.

**Table 2.  Relationship of Pre-IMS to Post-IMS Staff Assaults**

|                |       | Previous Staff Assault | | |
|----------------|-------|------|------|-------|
|                |       | Yes | No | Total |
| Post-Index Staff Assault | Yes | 25<br>26% | 54<br>13% | 79<br>15% |
|                | No | 73<br>74% | 368<br>87% | 441<br>85% |
|                | Total | 98<br>100% | 422<br>100% | 520<br>100% |

*Note.* N=520; $\chi^2$=9.978, df=1, p=.002, odds ratio=2.33.

- Offenders with a previous staff assault were twice as likely to commit assaults after IMS.

- On the other hand, only one-quarter of those with previous staff assaults committed new ones after their index IMS assignment.

If we assume that some inmates are intrinsically more prone than others to custodial assault, then the higher rate of post-index assaults among previous offenders may be explained by that fact.  If this explanation is accepted, then the lower rate *after* IMS suggests that IMS may deter future assaults.  This explanation requires that we identify a condition or disposition that inclines inmates to assault staff.  How is this behavior related to the two main topics of this report:  STG involvement and mental illness?

- Among IMS inmates there is no significant relationship between STG involvement—not even white supremacist allegiance—and staff assault.  Indeed, the rate of staff assault is slightly lower, though not significantly so, among STG members.

- Inmates with mental health problems, however, did commit far more than their share of staff assaults: 42% of SMI inmates and 40% of the broader group with mental health problems assaulted staff, compared to 18% of other inmates..

- Aggravated staff assaults were comparatively rare (21 offenders, 23 incidents), and no more common among inmates with mental illness than among others.[5]

If mental illness, broadly defined, qualifies as a condition or disposition that inclines inmates to commit staff assaults, how susceptible is this behavior to deterrence?

- Prisoners with mental illness comprised 36% of the 2006 cohort and over half of those with staff assaults before their index IMS assignment;

---

[5] These statistics only cover IMS inmates; in the whole inmate population, one might well find that staff assault is directly related to STG involvement, or more weakly related to mental illness.

- Of 13 previous assaulters with new assaults after the index IMS term, 11 (85%) were mental health cases.

#### Table 3.  Mental Illness and New Staff Assaults After IMS Among Offenders with Previous Staff Assaults

|  |  | Mental Health Problems | |  |
|---|---|---|---|---|
|  |  | Yes | No | Total |
| Post-Index Staff Assault | Yes | 11 | 2 | 13 27% |
|  | No | 14 | 22 | 36 73% |
|  | Total | 25 | 24 | 49 |

*Note.* N=49 offenders with previous staff assaults in 2006 cohort; $\chi^2$=8, p=.005, odds ratio=8.6.

Evidently, IMS offenders who assault staff are less likely to be deterred by the prospect of renewed solitary confinement if they are mentally ill. The numbers, however, are low; furthermore, among the mentally ill as among all IMS inmates, a substantial majority—61% among those with mental health problems, 82% among others—have committed no staff assaults. Moreover, as we shall see in the next section, inmates with mental illness appear no more likely than others to return to IMS once released. For these reasons, the greater proclivity for staff assaults among inmates with mental illness doesn't wholly explain their disproportionate presence on IMS.

The legal constraints on the use of IMS for inmates with serious mental illness (and, perhaps, those with irrationally impulsive tendencies) have been described. The challenge of living up to the principle embodied in these constraints—not to harm the mentally ill by subjecting them to prolonged solitary confinement—is at its highest with staff assaults. On the other hand, if IMS assignment is a weaker deterrent to staff assault among the mentally ill, the Department has all the more reason to find more creative ways of addressing the relationship between mental illness and this major institutional safety issue.

### Return to IMS

In this analysis, *IMS Recidivism* is defined as return to IMS status within 3 years of release from the index term in 2000 or 2006.

- Of 520 inmates, 169 were removed from analysis because they left prison within 3 years without return to IMS.

- An additional 3 inmates were removed from analysis because they had not been released from their index IMS term, leaving a total of 348 cases for recidivism analysis.

- The overall rate of IMS recidivism—return to IMS within 3 years—was 55%.

**SMI and Recidivism.** Because comprehensive data on the two primary mental illness measures were available only for the 2006 cohort, the association between mental illness and IMS recidivism is analyzed only for this cohort..

- In the 2006 cohort, mentally ill inmates—broadly or narrowly defined—and others showed the same rate of IMS recidivism (60%).

- IMS inmates at SOU were less likely to return to IMS than others (7 out of 16, 43%) but the numbers are too low to permit interpretation.

Because no significant association between mental illness and IMS recidivism was found in the 2006 cohort—despite higher rates of staff assault among the mentally ill—subsequent analysis uses the entire sample of 348 cases and omits mental illness.



**Factors Associated with Recidivism.** Comparative rates of IMS Recidivism for various groups of IMS inmates are displayed in Chart 7. Noteworthy in this chart is the increased rate of IMS recidivism between the 2000 and 2006 cohorts, and the high rate of IMS recidivism among Latino STG affiliates, especially Norteños. It was noted earlier that between 2000 and 2006, the proportion of Latino STG members rose by 20 points, from 18% of all STG members on IMS to 39%. The proclivity of these offenders for returning to IMS may well explain the increase in IMS recidivism between 2000 and 2006.

- The especially high rate among Norteños may be due to the intense rivalry between the two Latino groups for "control of the yard," with orders to attack on sight. Since there

are over twice as many Sureños as Norteños, the practice of assigning both fight participants to IMS, if gang-affiliated, leaves Norteños disproportionately likely to incur IMS: an equation well understood by their rivals.

**Prediction of recidivism.** One policy issue requiring assessment of recidivism is the duration of the initial IMS assignment, now set at 6 months. Would it make any difference to IMS recidivism if this presumptive term were shortened or lengthened?

- Very few inmates (3%) served 4 months or less. Those who served less than 6 months or 6-12 months returned at a rate of 50%; those who served longer terms at 60%.

- The duration of the IMS term made no contribution to predicting IMS recidivism when other relevant factors were included such as STG affiliation, previous IMS terms, and types of infractions.

If the length of IMS stay doesn't affect recidivism, what does? In the case of recidivism in the community, reasonably accurate probabilities can be derived from a limited set of official record variables: age at first offense and release from prison, number of past misdemeanors and past felonies, types of past offenses (e.g., drug offenses), low vs. high infraction rates, mental health and treatment status. The following measures were compiled to assess whether similarly accurate probabilities could be derived from correctional records:

- Past infraction rates, categories of common infractions, and custodial assault;

- Number of IMS assignments, length of index assignment, cumulative IMS time;

- STG status;

- Whether the index offense was violent;

- Demographic characteristics such as age and racial or ethnic classification.

Exploratory analysis was conducted on variables associated with IMS recidivism, selecting those with the highest contributions to logistic regression equations, testing for spurious correlations, and recoding variables to increase predictive power. The results were not encouraging.

- Predictive accuracy was assessed through ROC analysis, in which a score of 0.5 represents random prediction, 1.0 perfect. Straining ingenuity to analyze available variables, the best equation produced a mediocre ROC of 0.703, an insufficient improvement over chance to warrant policy or programmatic use of this set of variables.

- Furthermore, the variables included in the best equation were repetitive (three variables for STG affiliation) or theoretically mysterious: for example, violent index offenses and previous involvement in rackets were included as factors that *reduced* the probability of recidivism, probably as an artifact of the weakness of the prediction model.

- Custodial assault did contribute to predicting IMS recidivism, but only when assaults committed after the index IMS assignment were included. In that case, however,

custodial assaults are a *reason* for IMS assignment, not a factor that would assist advance prediction of who was likely to return to IMS.

The failure to generate a set of reliable IMS predictors, by means of the official record variables available for this study, does not mean IMS recidivism has no patterns. If not, there would be no place to intervene; results of stepdown programs, however, demonstrate the promise of systematic efforts to help IMS inmates redirect their attitudes and goals and test prosocial behaviors in safe social situations. Therefore, if interventions are to be guided by risk factors for recidivism, we would have to develop reliable indicators of the unmeasured attitudes and habits which, among the diversity of inmates in IMS, distinguish those most likely to continue endangering themselves or others.

## Policy Directions

It has been said that three main groups of offenders comprise those on IMS: inmates with mental illness, STG affiliates, and inmates needing protection. These groups are not exclusive: some STG affiliates are mentally ill, and both mental illness and STG involvement may provide reasons to seek protection. The self-protection motive is often disguised, and violence against staff or other inmates may be a means of obtaining protection without admitting as much. Partly for this reason, official record data are lacking on protective custody issues among IMS inmates. Concluding, suggestions, therefore, are limited to STG and mental illness issues in IMS.

**STG Involvement**. The substantial expansion of IMS beds since 2000 has been matched by an increase in IMS placements, largely attributable to conflicts between Latino groups. The Department appears to recognize that it cannot manage STG-related violence through IMS alone.

- Due to external social factors, STG affiliation prevails in many neighborhoods and is established long before most inmates come to prison. Unless the Department pursues the costly policy of proliferating IMU beds, the influx of new affiliates with incentives to attack each other exceeds the rate at which they can be incapacitated through IMS.

- Reports from staff and administrators at WSP suggest that separating rival groups in different close custody quadrants helps reduce violence; such gains are precarious, however, since STG incentives may lead allied groups, e.g., different sets of Sureños, to attack each other.

- For many offenders, STG identity is so deeply rooted that a frontal assault—whether through sanctions or positive incentives—is unlikely to succeed: A gang unit detective asked, "what alternative can you offer to integrity?" And a stepdown program graduate declared, "I'm always going to have this. The gang is going to be in my heart, it's such a big part of my life. That doesn't mean I'm going to be gang-banging."

The last comment holds the key to the Department's strategy. Interviews with administrators, staff, and inmates indicate that a variety of techniques may encourage affiliated offenders to

refrain from STG-related rackets and violence without directly challenging their loyalty to their comrades. What is effective will depend on an inmate's affiliation (since rules vary among STGs), his status, and his sentence structure. To the limited extent that the interest of gangs in the well-being of their members outweighs their interest in exploiting them, they may support offender change programs.

> There have so many high-ranking guys from all the "cars" through this program that it's now accepted.

Some offenders can be brought to a new understanding of where their interests lie:

> Fighting for power in prison makes no sense; we should make freedom the goal.

For those serving long sentences, freedom may consist in transfers to settings with fewer restrictions and more options for personal development while in prison; for others, it may mean release to the community with enhanced prospects for remaining outside. Methods of strengthening members' interest in freedom, as opposed to the interests of those who exploit them, include incapacitation, deterrence, incentives for better behavior such as the level system in WSP close custody units, transfers to settings in which the pressure to participate is reduced, and IMU-based offender change programs—such as the promising IMS stepdown interventions mounted at WSP and CBCC.

**Mental Illness.** Legal and ethical concerns about protection from harm, as well as the evident failure of IMS to deter misbehavior by inmates with mental illness, indicate it is time for the Department to formalize policies to decrease the use of IMS for inmates with mental illness. The principle that IMS is a last resort—the exception, not the rule—should be embodied in procedures to divert those with serious mental health problems.

- Whether or not an inmate is mentally ill, if a dangerous situation develops on a living unit, prison authorities are perfectly justified, indeed obliged, to prevent injury. If the first response is to remove the apparent source or target of danger from general population, there is no point in second-guessing.

- Intervention should be focused, therefore, on the decision to formalize an emergency segregation action through hearings to assess the need for administrative segregation and, eventually, intensive management status. If an inmate has been classified as mentally ill, a mental health professional should participate and provide an assessment of the inmate's clinical status, the consequences of extended segregation, and steps needed to reduce the danger the inmate poses to himself or others.

- Diversion from IMS is not accomplished simply by writing policies and procedures, but by developing or expanding alternatives to IMS—such as Intensive Treatment programs for maximum custody inmates with mental illness.

- Diversion from IMS for those with mental illness requires that an inmate's clinical status *matters* in the IMS decision. If so, continuing efforts to systematize mental health evaluation and treatment are required so that an inmate's clinical status is *known* when housing and classification decisions are made.