# EXHIBIT 7

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION


JERMAINE DOCKERY, ET AL.

                                        PLAINTIFFS


V.            CIVIL ACTION NO.3:13CV326-TSL-JMR


CHRISTOPHER EPPS, ET AL.

                                        DEFENDANTS



***************************************************
   VIDEO DEPOSITION OF CAPTAIN MATTHEW NAIDOW
***************************************************

Taken at Phelps Dunbar,
4270 I-55 North,
Jackso, Mississippi,
on Thursday, March 13, 2014
beginning at approximately 9:13 a.m.



**************************************

KELLY M. POWELL, CCR
Certified Court Reporter #1692
Notary Public



MERRILL CORPORATION
4400 Old Canton Road, Suite 160
Jackson, Mississippi 39211
601.366.9676
scheduling.mississippi@merrillcorp.com

```
 1        A.    I'm a shift captain, ma'am.

 2        Q.    Shift captain?

 3        A.    Yes.

 4        Q.    Where is that?

 5        A.    East Mississippi Correctional Facility.

 6        Q.    Could you describe your duties as shift

 7   captain?

 8        A.    Duties as a shift captain are basically

 9   daily roster management of your staff and showing

10   that you had the proper staff at -- on shift daily

11   to cover the assignments that are mandated by MDOC

12   I'm involved in handling inmate situations, which

13   could be inmate uprisings or simple medical

14   problems or transports or handling employee

15   discipline, time and attendance issues, payroll,

16   scheduling.  It's a whole realm of things that

17   happen during the day, responding to incidents.

18        Q.    When did you start working at East

19   Mississippi?  I'm going to refer to it as EMCF --

20        A.    That's fine.

21        Q.    -- if that's okay.

22        A.    I started with EMCF in November of 2011.

23        Q.    And when you started working at EMCF, who

24   was your employer?

25        A.    GEO Corporation.
```

1     Q.    And there came a time when EMCF was no

2  longer managed by GEO, but began to be managed by

3  MTC?

4     A.    Correct.

5     Q.    Was that in July of 2012?

6     A.    Yes, it was.

7     Q.    In -- when you started working at EMCF,

8  what was your position?

9     A.    I actually came down as a temporary --

10  temporary duty officer from Michigan.  I became the

11  tool control officer when I first started at EMCF.

12     Q.    What's a tool control officer?

13     A.    Tool control puts together all of your

14  inventory procedures and accounts for all of the

15  equipment at the facility, whether it be radios and

16  handcuffs and various things like that.

17     Q.    And when you came down, I -- was -- did

18  you say it was in November 2011?

19     A.    Yes, ma'am.

20     Q.    Could you tell me what positions you've

21  held at EMCF since you began in November 2011?

22     A.    I came as, like I said, an officer, tool

23  control officer.  When GEO sent pretty much all of

24  the TDY staff back to their various states that

25  they were there, I stayed as a sergeant.  Within a

1  couple of weeks, I was made a captain due to my

2  past experience.  Shortly after that, I was the

3  training director.  Then I went back to being the

4  shift captain, and then I went to be the

5  administrative captain, and then back to shift

6  captain.

7       Q.   Could you describe to me what each of

8  these positions entail?  I think you've already --

9  well --

10      A.   Sure.

11      Q.   -- tell me what -- and if you -- and to

12 the best that you can recall, tell me the date when

13 you started each position.

14      A.   Okay.  That's tough to recall, but I will

15 do my best.

16      Q.   Okay.

17      A.   I started, like I said, in November '11,

18 November 2011, as the tool control officer.

19 Somewhere around January of 2012, like I said, they

20 were sending most of the people back to their

21 states.  That's when I became -- I accepted a

22 position as a sergeant at the facility.

23      Q.   When you say they were sending people

24 back to their states, you mean GEO?

25      A.   GEO was, yes.

1      Q.   Do you believe that EMCF would be a safer

2   place if there were more security staff?

3      A.   I would say yes to that question.

4      Q.   What about the training of security staff

5   --

6      A.   Uh-huh (affirmative response).

7      Q.   -- do you feel that security staff are

8   adequately trained for the sake of safety?

9      A.   I believe they're trained in MDOC based

10  on the requirements of what MDOC has us train them

11  on.  That's about the best answer I can give for

12  that because...

13     Q.   Do you believe that the --

14          MS. WINTER:  Could you read back that

15  answer?

16          (Record read.)

17     Q.   (By Ms. Winter)  In your opinion, could

18  MDOC's training requirements be improved?

19     A.   In my opinion, yes.

20     Q.   In what way could they be improved?

21     A.   It's hard for me to put that into

22  perspective coming from a different state that

23  requires much, much more training.

24     Q.   Well, we understand that Michigan is a

25  different state from Mississippi, but in your

1  experience, in your long experience as a

2  corrections professional with a lot of experience

3  in security, what do you think might be the

4  deficiencies in training that could improve safety

5  if they were addressed?

6      A.  I think it starts from outside, not

7  inside.  I think it's about qualifications to get

8  the jobs in the first place.

9      Q.  Could you expand on that?  What do you

10  mean by qualifications?

11     A.  Again, it's a -- for me, it's a

12  comparison, because in Michigan, your civil service

13  jobs, your union, you have to go through a lengthy

14  civil service examination and application to even

15  get onto the roster to become a correctional

16  officer, and then you have to have college

17  education, a certificate in corrections, and then

18  once you -- then you might -- you might not get

19  hired, and if you do get hired, you go through a

20  rigorous 16 week academy, so my comparison to what

21  we train is -- yeah, I believe it's -- I believe

22  it's deficient.

23     Q.  Deficient?

24     A.  Uh-huh (affirmative response).

25     Q.  And the deficiency is in the

1    qualifications of the people who are hired?

2        A.    In some ways, yes.

3        Q.    And what sort of deficiencies are we

4    talking about?

5        A.    It's tough to put that in -- in

6    perspective.  I mean, the training that we do at

7    the facility, based on the requirements of MTC, and

8    based on -- which is based on the requirements of

9    MDOC, is a fairly good training program.  It's --

10   it covers all of the policies and procedures that

11   are necessary to work on the job.  I just don't

12   think it's lengthy enough and the -- the criteria

13   to get the job is too low.

14       Q.    Looking at the training, there's a

15   training academy?

16       A.    Yes, ma'am.

17       Q.    That's run by MDOC?

18       A.    It's run by us, but it's based on MDOC

19   standards.

20           MR. FRIEDMAN:  You probably need to stop

21   going side to side.

22           THE WITNESS:  Sorry, I'm messing the

23   camera up.

24           MR. FRIEDMAN:  You're a moving target.

25           THE WITNESS:  I will put my hands up and

1    that will stop it.

2              MR. FRIEDMAN:  Yeah, that will probably

3    be better.

4         Q.   (By Ms. Winter)  So the training academy

5    is run by MTC?

6         A.   Yes, ma'am.

7         Q.   But is the curriculum created by MDOC or

8    by MTC?

9         A.   The majority of the curriculum is our

10   curriculum, but it's based on MDOC training

11   requirements and policies and procedures, and that

12   would depend -- that would depend on what the

13   subject matter was.  If it was use of force, it's

14   based off the MDOC use of force policy.

15        Q.   I believe you mentioned that you didn't

16   think that the length of the training was adequate.

17   How long is the -- and I'm talking right now about

18   pre-service training.  How long does an employee

19   train before actually becoming a correctional

20   officer at EMCF?

21        A.   The training program is a three week

22   training program with a -- a one week of on-the-job

23   training after the program has been completed, so

24   four weeks total.

25        Q.   Did you say that it was 16 weeks in

1    contribute -- are a contributing factor to staff

2    turnover?

3         A.   I would say yes.

4         Q.   You mentioned a few minutes ago that

5    there was staff corruption.  Does that corruption

6    entail, in part, cooperating in some ways with

7    prison gang members?

8         A.   Yes.

9         Q.   And it involves deals being made between

10   prison gangs and correctional staff to bring

11   contraband into the facility?

12        A.   Sure, gangs or individual inmates.  It

13   just depends on who.

14        Q.   And does the corruption also sometimes

15   involve extortion either by staff or inmates of

16   other inmates?

17        A.   Yes, ma'am.

18        Q.   Could you give an example of how that

19   extortion might work?

20        A.   We actually -- that's one of the classes

21   we teach in our academy is extortion.  It's easy

22   for an inmate to be after another inmate and try

23   and extort them by threatening them and telling

24   them to contact your family or we're going to --

25   we're going to kill you or stab you or beat you up

Page 38

1    or whatever if you don't have your family send in

2    some green dot money or collude with somebody on

3    the outside and meet them to bring in contraband or

4    things like that.  That's a type of extortion, and

5    that can also be transferred over to staff members

6    who could be extorted or with the promises of great

7    amounts of money, what they think is great amounts

8    of money to bring in certain items.

9         Q.   Well, when you say extorted, the staff

10   members aren't extorted so much as bribed, wouldn't

11   that be fair to say?

12        A.   At times, they would be extorted.

13        Q.   And how can they be extorted after all of

14   the staff members can walk out of the prison?

15        A.   Well, by -- by giving in to certain

16   things, an inmate can start you off very small,

17   bringing in something very little.  It could be

18   candy; it could be an article of clothing; it could

19   be something like that, and at that point, they

20   believe that they have you, and they begin trying

21   to extort you and telling you we're going to tell

22   on you; you're going to lose your job if you don't

23   do this for us, things like that, and that's a

24   method of extorting inmates to bring in -- or staff

25   to bring in more and higher and more illegal

1   things.

2        Q.   And that happens at EMCF?

3        A.   That happens at every prison, ma'am.

4        Q.   Does it happen a lot at EMCF?

5        A.   A higher concentration of staff than I've

6   seen in other places, yes.

7        Q.   Do you have any views on why that might

8   be?

9        A.   Pretty much everything we've talked about

10  so far, the quality of staff, the -- the local pool

11  of staff that we have to draw from, the local area

12  that we have to draw from.

13       Q.   And the low wages?

14       A.   And the low wages.

15       Q.   I believe you testified that you didn't

16  see the whole complaint, the plaintiffs' complaint

17  or you didn't go through it; is that correct?

18       A.   I haven't seen the whole complaint.  I've

19  probably seen versions or smaller pieces of it,

20  but, no, not the whole complaint.

21       Q.   So did you look at the smaller pieces of

22  it that involve the environmental issues?

23       A.   I have seen some things that involved

24  environmental issues, yes.

25       Q.   You testified that when you came to EMCF

Page 46

1    accurate to say that in those cells in segregation

2    that if you don't have a working light that it is

3    very dim in those cells during the day?

4         A.   Yes, ma'am, it is.

5         Q.   Barely enough light to see?

6         A.   Especially if they cover their windows

7    with whatever they cover them with, then it's

8    really hard to see.

9         Q.   And what if they don't, is there still

10   very little light?

11        A.   It's dim, yeah, it's not quality

12   lighting.

13        Q.   And total darkness at night?

14        A.   It would be pretty dark in there at

15   night, yes.

16        Q.   Have you -- have you ever heard of

17   prisoners being left in shower stalls for many

18   hours at a time?

19        A.   I have, yes.

20        Q.   And why does that happen?

21        A.   No good reason, in my opinion, unless we

22   had a unruly offender, and we had to take him out

23   of his cell to place him in a shower for possible

24   decontamination or stuff like that.  Sometimes it's

25   more or less a cool-down period to place them in an

1    area away from their cell while it decontaminates

2    so...

3        Q.    Can you think of a good reason why an

4    inmate would be left in a shower stall for hours at

5    a time?

6        A.    No, I cannot.

7        Q.    Do you know whether that ever happens?

8        A.    Happens or happened, I've seen it happen,

9    yes.

10       Q.    When you say you've seen it happen, how

11   did that come to your attention?

12       A.    Usually advised as a shift manager or

13   supervisor that when -- could be you came on shift

14   and someone says, hey, we've got so and so down in

15   6 Delta still in the shower and something like

16   that, and we would go down and remove that inmate

17   and put him back where he belongs.

18       Q.    After hours sometimes?

19       A.    I believe so, yes.

20       Q.    Have you ever been aware of a vermin

21   problem at EMCF of rats or mice?

22       A.    Yes, I've seen issues -- situations where

23   there have been rats or mice or insects or

24   whatever, but to the extent that it says in

25   paragraph 3, another gross exaggeration.

1      Q.    Does it occur during prolonged lockdowns

2   that some prisoners don't get out of their cell to

3   exercise for many days at a time?

4      A.    I think so, yes.

5      Q.    And sometimes for weeks at a time,

6   correct?

7      A.    I've seen -- if you want to call it

8   recreation, really, it's out of cell time, and

9   sometimes we include their shower time and things

10   like that as part of that out of cell time.

11      Q.    I'm not sure I understand that answer.

12   Let me try again.  Prisoners are, in general,

13   entitled to go to an outdoor exercise yard; is that

14   true?

15      A.    Most of the time if they're in a general

16   population area, yes.

17      Q.    And, in general, they are entitled to go

18   to an outdoor exercise yard a number of times every

19   week; is that correct?

20      A.    Yes, ma'am.

21      Q.    Would that be every day?

22      A.    For, like I said, our segregation

23   population, the policy is one hour a day, five days

24   a week.

25      Q.    During a lockdown, does it sometimes

1  happen that prisoners don't get out of their cell

2  to the exercise yard, I believe you testified, for

3  days at a time?

4       A.   Yes.

5       Q.   And sometimes for weeks at a time,

6  correct?

7       A.   I can't stipulate the amount of time that

8  they did not get out, but a lengthy period of time,

9  yes.

10      Q.   So as far as you know, it could be for

11 weeks at a time, correct?

12      A.   It could be, ma'am.

13      Q.   What about legal visits during lockdowns,

14 do prisoners get to go to a -- if their lawyer

15 wants to talk to them, for example, about their

16 criminal case, would they get to have a legal

17 visit?

18      A.   Attorney visits are something that we

19 have to provide, yes.

20      Q.   So if I wanted to meet with one of the

21 plaintiffs during a lockdown, I would be able to do

22 that?

23      A.   Yes, ma'am.

24      Q.   What about family visits, are they

25 permitted during lockdowns -- prolonged lockdowns?

1        A.    Most of the time, no.   That shouldn't --
2   that shouldn't happen --
3        Q.    Does that --
4        A.    -- although we do have some of the same
5   inmates cause the same problems every day.
6        Q.    Understood, yeah.   So the reason --
7   looking then at the -- at the causes of why, in
8   segregation, prisoners might not get out of their
9   cells to shower or exercise for days at a time, is
10  the -- is -- could part of the reason be not enough
11  adequately trained security staff?
12       A.    Sure.
13       Q.    Have you ever observed prisoners at EMCF
14  who appear to suffer from serious mental illness?
15       A.    Yes, ma'am.
16       Q.    Can you describe some of the situations
17  you've seen where a prisoner appeared to be
18  suffering from serious mental illness?
19       A.    Well, I believe that we have a -- just
20  describing the prison itself, 92 percent of our
21  prison population is on some type of medication,
22  and 76 percent of that is on psychotropic drugs, so
23  we have a large population of mentally ill, or
24  whatever level they're on, from maybe an anger
25  management person to a highly schizophrenic person,

1    and we have various units where these prisoners are

2    housed for more mental health treatment than

3    others.  And to be honest with you, when I first

4    came to EMCF and walked on one of our housing

5    units, I kind of joke about it a little bit, but

6    most of us here are old enough to have seen One

7    Flew Over the Cuckoo's Nest, and sometimes those

8    units look like that.  Some of the guys are in high

9    states of psychosis and don't really know how to

10   talk to you or what's going on and are stumbling

11   around the unit or banging their heads against the

12   wall, but more than that, we have a high

13   concentration of self-mutilators at that prison.

14        Q.   So have you ever actually observed a

15   prisoner who has self-mutilated?

16        A.   Yes, ma'am.

17        Q.   Have you ever observed prisoners who

18   appear to be hallucinating?

19        A.   Yes.

20        Q.   Have you observed prisoners who appear to

21   be prisoners who are unkempt and malodorous --

22        A.   Yes.

23        Q.   -- who have not been --

24        A.   Yes.

25        Q.   Yes?

1      A.   Yes.

2      Q.   Have you observed prisoners where this

3  goes on for a long time, days or weeks where they

4  are unkempt and malodorous?

5      A.   Yes.

6      Q.   Is dealing with mentally ill prisoners

7  part of the staff training?

8      A.   They do get mental health training, some

9  mental health training, yes.

10     Q.   Do all officers at EMCF, is that part of

11 the academy curriculum --

12     A.   It is.

13     Q.   -- before they're --

14     A.   Yes.

15     Q.   Do you recall how -- how many hours in

16 the curriculum the training is?

17     A.   I don't know what the actual hours are,

18 not extensive enough.

19     Q.   Okay.  And why do you believe that the

20 hours are not extensive enough?

21     A.   I just -- it's just -- it's because I

22 have to revert back to where I come from.  In

23 Michigan, we had staff who were specifically

24 trained to work in units like that, and they

25 were -- they were -- they weren't even called

1      Q.    As far as you can see, are there any

2   seriously mentally ill prisoners who are housed in

3   the long-term segregation unit?

4      A.    Based on their activities and actions,

5   probably, yes.

6      Q.    What kind of activities and actions make

7   you believe that seriously mentally ill prisoners

8   are housed in segregation in Unit 5?

9      A.    Well, their -- their actions of

10  self-mutilation, anger management issues, lack of

11  cooperation with anything.  Like you said, some of

12  them are, you know, unkempt and don't take care of

13  themselves, so --

14     Q.    Any --

15     A.    -- you know, and there's -- there's a

16  fine line between a mental health issue and a

17  behavioral problem.  We have a lot of serious

18  behavioral problems who might be classified as

19  mental ill -- mentally ill as well and still be on

20  medication, but medication for different reasons.

21     Q.    As far as you are able to tell or to

22  know, are there prisoners who are delusional in

23  Unit 5?

24     A.    Sure.  I would think so, yes.

25     Q.    Are there prisoners who -- who appear to

1    be behaving psychotically, that is in some way that

2    is a break with reality?  And just for example of

3    ceaselessly talking to themselves?

4         A.   Yes.

5         Q.   Or inappropriately making inappropriate

6    noises?

7         A.   We have -- we have it all.  Where they're

8    definitely housed, we have all of that type of

9    behavioral --

10        Q.   And right now --

11        A.   -- situations.

12        Q.   -- I'm talking about prisoners in Unit 5

13   in segregation, long-term segregation.

14        A.   I think in Unit 5 particularly, yes, I

15   believe we have some highly mentally ill inmates

16   there, but I believe we have more of a behavioral

17   management problem there than anything else.

18        Q.   But you've observed psychotic and

19   delusional behavior?

20        A.   Yes, I have, yes.

21        Q.   And what about in -- in 6 Delta, do you

22   believe that there are ever prisoners with serious

23   mental illness being housed in 6 Delta in

24   segregation?

25        A.   Occasionally, but we also take, you know,

Page 76

1        Q.    No, no, I'm not asking for that.

2        A.    I just think they degrade, yeah.

3        Q.    Do you mean mentally?

4        A.    Sure.

5        Q.    Emotionally?

6        A.    Yes.

7        Q.    Behaviorally?

8        A.    Definitely.

9        Q.    Do you believe that under any prolonged

10   segregation, that people -- that they feel a lot --

11   that they feel pain from that, that they suffer

12   from that?

13        A.    I would think so.

14        Q.    Are some of the other disturbed behaviors

15   that you've seen in long-term solitary, does it

16   include -- have you ever seen or heard of prisoners

17   smearing themselves with excrement?

18        A.    Yes, ma'am.

19        Q.    And I think you've mentioned

20   self-mutilation.  Does that ever become a

21   repetitive -- a repetitive behavior?

22        A.    Most self-muti -- if they're real

23   self-mutilators, they are repetitive, yes, ma'am.

24        Q.    Have you ever seen a prisoner who appears

25   to be badly scarred from -- or with open wounds

1       A.    Most of the time, we can, yes.

2       Q.    And then you have the opportunity to

3    involve mental and medical --

4       A.    Yes, ma'am.

5       Q.    -- staff?  And would you agree that it's

6    important to use that opportunity to -- for mental

7    health staff to try to persuade the inmate to

8    voluntarily comply with orders?

9       A.    I 100 percent agree with you, yes.

10      Q.    And you would agree that actual force

11   should only be used as a last resort after those

12   efforts have failed?

13      A.    Yes, ma'am.

14      Q.    Suicide attempts in segregation --

15      A.    Uh-huh (affirmative response).

16      Q.    -- at EMCF are not uncommon, are they?

17      A.    They're not common, either.  They've

18   happened.

19      Q.    They happen?

20      A.    Yes.

21      Q.    Have you known -- we've talked a little

22   bit about self-mutilation.  Have you ever heard of

23   prisoners trying to electrocute themselves in

24   segregation?

25      A.    I've seen it before, but not here in

1      A.    I believe that in some cases, some staff

2  were afraid to go on those pods, and we didn't get

3  accurate rounds from those people.

4      Q.    What makes you believe that staff were

5  not actually consistently making those rounds in

6  long-term segregation?

7      A.    Documentation would show that they

8  weren't.

9      Q.    What sort of documentation?

10     A.    If they failed to do their -- their

11  logbook rounds.

12     Q.    Sometimes staff fill in -- it can happen,

13  can't it, that staff fill in logbook rounds when

14  they haven't actually made a round?

15     A.    Yes, they -- yes, they can.

16     Q.    And that does, in fact, happen, doesn't

17  it?

18     A.    Yes, it happens.

19     Q.    It has happened at EMCF, right?

20     A.    Yes, it has.

21     Q.    It's happened more than once, hasn't it?

22     A.    Probably.

23     Q.    It's probably happened a lot, hasn't it?

24     A.    I can't stipulate to a lot, but I do know

25  that we have methods of finding out if people went

Page 87

1  on those housing units or not, and when we find

2  that they didn't, they are put through a

3  disciplinary action.

4      Q.   But you, yourself, believe that it

5  happened -- it has happened a lot in Unit 5 that

6  those rounds were not --

7      A.   I believe it's happened.

8      Q.   Even though the logbooks would show that

9  rounds were being made, correct?

10     A.   Correct.

11     Q.   If it should happen that security staff

12  isn't doing their rounding, I'm talking now the

13  period before 24/7 staffing --

14     A.   Right.

15     Q.   -- that happened -- that started two

16  months ago.

17     A.   Right.

18     Q.   If that rounding didn't, in fact, happen

19  and staff were missing their rounds --

20     A.   Uh-huh (affirmative response).

21     Q.   -- how would an inmate in that prolonged

22  long-term segregation unit summon help in case of

23  emergency?  What could they do?

24     A.   Scream and yell and bang on their door.

25     Q.   Did that happen?

1    investigations done on instances like that, yes.

2         Q.   In your view, does that happen?

3         A.   It has happened, yes.

4         Q.   And do you have information that that no

5    longer happens?

6         A.   As far as staff aiding inmates to get

7    away with things, I don't have any factual

8    information on that right now, no.

9         Q.   You talked earlier about staff

10   corruption.

11        A.   Uh-huh (affirmative response).

12        Q.   That is an ongoing problem at EMCF, isn't

13   it?

14        A.   Well, I believe so, yes.

15        Q.   And part of that staff corruption

16   involves staff having improperly close

17   relationships with some inmates, and by that, I

18   mean doing them favors; isn't that correct?

19        A.   Yes.

20        Q.   And the favors would include allowing

21   inmates who are locked down in one area to go to

22   another area in order to injure another prisoner;

23   isn't that correct?

24        A.   It could be.

25        Q.   Or in order to extort another prisoner;

1  isn't that correct?

2      A.   Yes.

3      Q.   And isn't it a fact that some staff take

4  bribes from prisoners or, put another way, extort

5  prisoners for money in order to see to it that a

6  prisoner does not get a rules violation conviction?

7      A.   I don't -- I don't have any facts on

8  that, no.

9      Q.   Have you ever heard of that happening?

10     A.   I've heard of it, yes, but I've had no

11 facts.

12     Q.   Have any inmates ever complained to you

13 that they've been told that a rules violation

14 charge would go away if they paid --

15     A.   Yes.

16     Q.   -- staff?

17     A.   Yes, I've had inmates tell me that.

18     Q.   Can you remember when the last time you

19 had heard an inmate say that was?

20     A.   I can't remember an actual frame of time.

21 Inmates have told me that many times.

22     Q.   Did you -- did you rule out that that

23 could have happened?

24     A.   No.  I've never ruled out.  I don't rule

25 out anything.

1      A.    Yes.

2      Q.    And have you known that to happen

3   sometimes?

4      A.    I believe that they've set fires for all

5   sorts of reasons and sometimes probably just to get

6   attention, yes.

7      Q.    And sometimes because there's a medical

8   emergency, correct?

9      A.    It could be.  I don't -- I don't have the

10  facts on that, but it could be.

11     Q.    If a cell door pops open because, as

12  we've -- as you've agreed, those cell doors can be

13  manipulated by prisoners, and another inmate, say

14  an enemy, enters that -- that segregation cell and

15  assaults them, how would that prisoner summon help?

16  I'm talking about before the 24/7 surveillance.

17     A.    Basically, he would -- if there was

18  nobody on that pod or nobody near there, he would

19  try and alert the control tower of the situation.

20  Usually, if that door pops open, there's an alarm

21  that goes to that officer that that door is open,

22  so they would know that a door was open.

23     Q.    Yes, but it's often happened or it --

24  let's put it this way:  It's not at all unknown, is

25  it, that those cell doors do open and that

1    prisoners enter a cell where they're supposed to

2    be, and they extort other prisoners sometimes at

3    knifepoint; isn't that correct?

4        A.    Yes, ma'am.  It's happened.

5        Q.    And sometimes they enter those cells

6    where the door has been popped open, and they

7    sexually assault the inmate in that cell, correct?

8        A.    I believe it's happened.

9        Q.    And that's despite the fact that when the

10   door pops open, somebody in the control tower knows

11   that the cell has been popped, right?

12       A.    It's happened.  As far -- if you're

13   talking about Housing Unit 5, in 5, the likelihood

14   of somebody not knowing that that door is opened is

15   not -- not feasible.  I mean, it -- in your other

16   housing units where the inmates are all out, it's

17   more feasible to happen there, but not in Housing

18   Unit 5.  Those are really by far the safest units

19   even though they're the most high -- highly secure

20   units.

21       Q.    So just to make sure that we're

22   understanding each other, it does happen, it has

23   happened --

24       A.    It has happened.

25       Q.    -- in Unit 5, correct?

1      A.    It has happened.

2      Q.    But it also happens, and perhaps more

3   frequently, in other units, correct?

4      A.    It happens easier there.

5      Q.    In fact, it's happened a lot of times,

6   hasn't it, that in other units at EMCF that some

7   prisoner will go to another prisoner's cell and get

8   the door opened somehow and go in and sexually

9   assault that prisoner, correct?

10     A.    Did you say a lot?

11     Q.    All right.  Well, let's not say a lot.

12     A.    I will say it's happened.

13     Q.    It happens, okay.

14     A.    It has not happened a lot.  Sexual

15  assaults are not prevalent.

16     Q.    Okay.  Let's leave apart whether

17  they're -- they're prevalent.  Would it be fair to

18  say that it's not really rare -- sexual assault is

19  not a rare happening at EMCF, is it?

20        MR. FRIEDMAN:  Object to the form.

21     A.    In -- I would answer that it -- it is

22  rare.

23     Q.    (By Ms. Winter)  Okay.

24     A.    Our records would show those are

25  considered PRIs, and they're rare.

1     Q.    Are you confident that all or most sexual

2     assaults are reported?

3     A.    That just came through my head before you

4     said that, probably not.

5     Q.    And in units other than Unit 5 long-term

6     segregation, it happens, doesn't it, that prisoners

7     go to housing areas where they don't belong?  They

8     manage to open another prisoner's cell, and they

9     extort them for money, correct?

10    A.    It has happened, yes.

11    Q.    And --

12    A.    In most cases, ma'am, they don't go and

13    open the other prisoner's cell.  It was probably

14    opened already.

15    Q.    Opened by whom?

16    A.    Probably the prisoner who lives in it.

17    Q.    And do you mean that the prisoner who

18    lived in it opens it illegally, so to speak?

19    A.    Yes, ma'am.

20    Q.    Sometimes it happens that the staff

21    facilitate that, right?

22    A.    I believe if they're -- they were caught

23    doing that, and we've had staff who have been

24    probably caught doing that, yes.

25    Q.    Caught doing it so that another prisoner

1    can go in and assault somebody in that cell,

2    correct?

3         A.    I have been involved in an incident like

4    that, yes.

5         Q.    Could you tell us about that incident?

6         A.    It's a particular inmate and two staff

7    were terminated because they allowed two inmates to

8    go into his cell and assault him.

9         Q.    When did that happen?

10        A.    Oh, early on in MTC.  Oh, September,

11   October of 2012, somewhere around then.

12        Q.    Who were the staff that were involved in

13   that incident?

14        A.    One of them's name was K. Green and

15   another one was -- it was Kendrick Green and T.

16   Brewster.  I can't think of his first name.

17        Q.    It was -- were those -- Kendrick Green

18   and Brewster, were those male or female officers?

19        A.    Male officers.

20        Q.    Do you know whether -- were they -- was

21   their employment terminated?

22        A.    Yes, ma'am.

23        Q.    Are -- can they ever be rehired by MDOC

24   to your -- to the best of your knowledge?

25        A.    MDOC, I don't know what their background

1  checks are like, but I would believe not.

2      Q.   Do you know what kind of interviewing was

3  done of them before they were terminated?

4      A.   I don't know anything about the

5  disciplinary process that went on with them.  I

6  just know that I was partial to the investigation

7  that happened.

8      Q.   How did you become involved in the

9  investigation?

10     A.   I was captain on that shift during the

11  time that it occurred.  I don't believe I was there

12  that day, but, really, my involvement came much

13  later when I did an investigation on the inmate who

14  was being released from long-term segregation and

15  was afraid of being moved back to general

16  population.

17     Q.   In connection with that incident?

18     A.   He was the inmate involved with that

19  incident, yes.

20     Q.   When you say involved, was he the victim

21  or the perpetrator?

22     A.   He was the victim.

23     Q.   The victim?  Do you recall what that

24  inmate's name was?

25     A.   Yes, I do, it was Phillip Fredenburg.

1      Q.   So did that incident come to your

2   attention because Mr. Fredenburg came to you and

3   asked for your help?

4      A.   No, I believe it came to my attention

5   through a request to investigate the incident.  I

6   don't know who he channeled it through, whether it

7   was our contract monitor or came down from MDOC for

8   somebody to look into it, and it was assigned to

9   me.  Now, yes, I've had many conversations with

10  that inmate particularly regarding that

11  investigation when it happened, but, now, that

12  instance, he didn't come to me with that, no.

13     Q.   I see.  Did Mr. Fredenburg accuse

14  security staff of being involved in the incident?

15     A.   Yes, he did.

16     Q.   Were his allegations validated?

17     A.   Like I said, I wasn't really partial to

18  the investigation or discipline on the two staff.

19  I just know that they were terminated.  And to be

20  honest with you, I don't even know if it was for

21  that.

22     Q.   Have you ever been involved in any

23  similar investigations either formally or

24  informally involving inmate allegations of staff

25  complicity in that kind of misconduct?

Page 104

1      A.    That type of stuff, no, not really, no.

2      Q.    Or any other kind of staff misconduct,

3   for example, contraband?

4      A.    I've been involved in instances of staff

5   bringing in contraband, but not as the

6   investigator, not as the investigative party, no.

7      Q.    Would it be fair to say that there is a

8   great deal of contraband in EMCF?

9      A.    Yes.

10      Q.    And that contraband includes cell phones?

11      A.    Yes, ma'am.

12      Q.    What else?

13      A.    A lot of weaponry that's made by the

14   inmates, drugs, tobacco, marijuana, things like

15   that.

16      Q.    Would it be fair to say that some kinds

17   of contraband, like cell phones, that there is at

18   least a strong possibility that that contraband is

19   brought into the prison by staff?

20      A.    I would say some of it, but I would say

21   more of it, in the past, had come over the fence

22   probably.

23      Q.    But it doesn't come over the fence

24   anymore?

25      A.    We're cutting down on that big time.

1      A.    Sure.

2      Q.    So how many times has that happened, more

3  or less, in 2414, as far as you know?

4      A.    As far as not staffing mandatory posts, I

5  can't give you an accurate display of that.  I just

6  know that it happens, and I know the shift

7  commanders do their best to staff their shifts and

8  sometimes it just falls short.

9      Q.    And when that happens, could that be a

10  cause, for example, of a prisoner being locked in a

11  shower for many hours because there just isn't

12  staff to take him back to his cell?

13      A.    No, that would not be a valid reason why

14  that would happen.

15      Q.    But is that a reason why it might happen?

16      A.    I suppose they could make that excuse,

17  but that's not a valid excuse.

18      Q.    Well, why isn't it valid?

19      A.    Because regardless of how many staff we

20  have there, we have a job to do, and you still have

21  to do your job.

22      Q.    So you would agree that there's something

23  wrong with a prisoner being left in a shower for

24  hours?

25      A.    I would agree with that, yes.

Page 111

1    Q.   Have you ever been aware of correctional

2    staff who are present in the facility and assigned

3    to a particular housing unit who leave that area

4    for an unauthorized purpose?

5    A.   Yes.

6    Q.   Are you aware of prisoners complaining

7    that sometimes housing units are left without any

8    staff coverage for significant periods of time?

9    A.   Yes, I've had inmates complain about

10   that.

11   Q.   Have you ever -- have you found -- have

12   you ever looked into those complaints to see

13   whether they are valid or not?

14   A.   Yes.

15   Q.   Are they ever valid?

16   A.   Yes, there's been times it's been valid.

17   Q.   Can you give me any examples?  Well, let

18   me ask you this:  Has this occurred in 2014?

19   A.   I think that it occurs -- it's hard to

20   say when it occurs or why it occurs, but staff do

21   crazy things.  Staff leave their posts, and without

22   authorization, they don't tell their supervisors

23   that they walked up front for a half hour.  It's

24   something as supervisors and managers and wardens

25   and deputy wardens that we check on on a daily

1  basis and make sure those staff are where they're

2  supposed to be, and when they're not, they get held

3  accountable for leaving their posts, but does it

4  happen, yes.

5      Q.   Can you recall any occasions when that

6  happened when there was an emergency in an area

7  where prisoners were not able to summon staff?  And

8  when I say an emergency, what I mean is maybe a

9  prisoner was down or having a medical emergency, an

10  asthma attack that there was --

11      A.   I've seen incidents where prisoners have

12  to bang on their doors to get attention of staff to

13  a medical emergency, yes, I have.

14      Q.   What sort of medical emergency?

15      A.   Very recently, you just -- you said an

16  asthma attack.  We did have an asthma attack

17  recently where staff had to be alerted by the

18  inmates on the pod.

19      Q.   And staff was not present on the unit, I

20  take it?

21      A.   Not -- not on the pod at that time

22  because they weren't required to be there at the

23  time.

24      Q.   They were not required?

25      A.   They were required to do half hour

1    rounds, and the fact that they might have been on

2    another pod doing their half hour rounds, they had

3    to alert.

4         Q.   Okay.  Are you aware of any incident in

5    which staff was not present and should have been

6    present and was sort of absent without leave, shall

7    we say, and an emergency arose?

8         A.   Offhand, not -- not at this time, I can't

9    recall a situation like that.

10        Q.   Apart from whether you can recall any

11   specifics, do you recall that that has happened?

12        A.   Well, I believe it's happened and

13   probably know that it's happened, and it's more or

14   less the instance that I just stated, that in the

15   absence of having one officer to every inmate,

16   there's going to be inmates having problems that

17   are not seen immediately by staff, and they have to

18   be alerted by other inmates to get to that

19   situation.

20        Q.   Yeah, but right now, I was asking a more

21   narrow question.  When the emergency arises --

22        A.   Uh-huh (affirmative response).

23        Q.   -- and staff is not present, not simply

24   because they're making their appointed rounds and

25   happen to be --

```
 1              VIDEOGRAPHER:  We're back on the record.
 2    The time is approximately 1:10 p.m.  This is the
 3    beginning of tape 3.
 4              MS. WINTER:  Gary, I just wanted to let
 5    you and other counsel know that during the break,
 6    we called the chambers of Judge Ball and left a
 7    message.  We couldn't reach him, though.  We would
 8    like to raise this question of the warden -- of
 9    Warden Buscher's presence at the deposition.
10    During the break, we did have an opportunity to
11    look for authorities, and we think that there is
12    grounds for asking that he be excluded, so -- but
13    we don't want to stop the deposition to wait for
14    the magistrate, if he calls, he calls, if he
15    doesn't, he doesn't.
16              MR. FRIEDMAN:  All right.
17         Q.   (By Ms. Winter)  Captain Naidow, am I
18    pronouncing your name right, is it Naidow?
19         A.   Naidow, yes, ma'am.
20         Q.   Captain Naidow, before the break, we were
21    talking about staffing and vacancies.  Apart from
22    the question of whether positions are filled, is
23    absenteeism a problem at the prison?  That is are
24    there staff members who sometimes just don't show
25    up for work or don't show up on time?
```

Page 120

1       A.    Yes.

2       Q.    Does that create a staffing problem --

3       A.    Yes.

4       Q.    -- for you?  Would you say that that's a

5  significant problem at the facility?

6            MR. FRIEDMAN:  Object to the form.

7       A.    I would say on certain days, yes, it is.

8       Q.    (By Ms. Winter)  Is the lack of

9  consistent staff attendance worse at EMCF than at

10  some other prisons you've worked in?

11      A.    I've had time and attendance issues

12  pretty much everywhere.  I would say yes, it is.

13      Q.    Would you know what to attribute that to?

14      A.    Probably a lot of things we've talked

15  about today, your -- your -- your pay rate, your

16  quality of staff that you have, work ethic.

17      Q.    Do -- and I believe you testified earlier

18  that staff sometimes does have to work a double

19  shift, and that happens sometimes because other

20  security staff don't show up to work when they're

21  supposed to; is that correct?

22      A.    That's true.

23      Q.    Isn't it a fact that when someone has to

24  work a double shift at such a difficult position as

25  a security staff in a prison like EMCF that that

1  puts a lot of stress on the officers who are

2  working?

3        A.   Sure, I would think so.  It's a stressful

4  job.

5        Q.   And when they have to work a double shift

6  involuntarily because somebody doesn't show up,

7  that can put some strain on their temper, can't it?

8        A.   Yeah, I believe each individual is

9  different, so some manage it well and some probably

10  don't.

11        Q.   So you think it's fair to say that when

12  security staff in a -- in a prison like EMCF are

13  involuntarily working double shifts that it could

14  affect their ability to do their job well?

15        A.   Just talking in my opinion about human

16  nature, yes, it affects your -- it affects your

17  life.  It affects your ability to go home to be

18  with your family and to do all sorts of things, so

19  it makes people upset, yes.

20        Q.   And sometimes that might make them not as

21  responsive to the prisoners' needs as they ought to

22  be; isn't that fair to say?

23        A.   That's possible.

24        Q.   Wouldn't it be fair to say that today,

25  you have an ongoing problem with being

1   short-staffed at EMCF?

2        A.   At this moment, we are short-staffed, so

3   it's -- but we have classes in progress to fix that

4   situation.

5        Q.   Not only from vacancies in authorized

6   positions, but also periodically short-staffed

7   because, as we were just talking about, people

8   don't show up for the job?

9        A.   Yes, ma'am.

10       Q.   And are you aware that plaintiffs'

11  counsel in this case has been complaining that

12  they -- when they go to interview clients in

13  connection with this case, they sometimes have to

14  wait for hours in between each interview?

15       A.   I've been aware of that in the past, yes.

16       Q.   And are you aware that the -- the

17  justification or the explanation that's provided to

18  counsel is that there just is not enough security

19  staff to -- to -- to arrange the meetings with

20  clients and that's what explains waits of hours

21  between interviews?

22       A.   I believe that that's what some staff may

23  be telling you.

24       Q.   Do you believe that that might not be the

25  real explanation?

1      Q.   I'm going to read aloud to you from an

2    e-mail that was provided to us.  I believe it's

3    from Freedom -- Open Records Act request, and I

4    will -- if I don't -- actually, I have extra

5    copies.

6           MS. WINTER:  Let me give one to you,

7    Gary.

8      Q.   (By Ms. Winter)  And let me give one to

9    you, Captain.  So this is an e-mail chain, and the

10   bottom e-mail, which is the first in time, is from

11   Tyeasa Evans.  Do you know a Tyeasa Evans?

12     A.   Yeah, Tyeasa Evans.

13     Q.   Tyeasa Evans.

14     A.   Tyeasa Evans, she's the contract monitor.

15     Q.   So is she -- she's MDOC's --

16     A.   Yes, ma'am.

17     Q.   -- monitor of MTC?

18     A.   Yes, and GEO.

19     Q.   And GEO, so this bottom e-mail is dated

20   April 12th, 2012, so that was after several

21   months -- MTC -- when did MTC take over?

22     A.   Not until July of 2012.

23     Q.   July, so this is still under GEO.  So

24   Tyeasa Evans says -- is talking to Michael White

25   and Tony Compton.  Are they -- are they MDOC

Page 135

1    employees from the central office?

2          A.    Yes, ma'am.

3          Q.    And are they also contract monitors?

4          A.    No.   Tony Compton is now the -- his

5    official title is something about the chief of

6    private prisons or something like that.

7          Q.    And what about Michael White?

8          A.    He was the former chief over the private

9    prisons.   He moved to a new location.   I'm not sure

10   where.

11         Q.    So at the time that Tyeasa Evans, as the

12   contract monitor for MDOC, communicated with

13   Michael White and Tony Compton --

14         A.    Uh-huh (affirmative response).

15         Q.    -- in this e-mail, Mr. Compton and

16   Mr. White, they had responsibility in MDOC

17   regarding the private prisons --

18         A.    Yes, ma'am.

19         Q.    -- in the MDOC systems?   Yes?

20         A.    Yes.

21         Q.    Sorry, I know I'm guilty of this myself,

22   but we are supposed to try to let the other one

23   finish before --

24         A.    I apologize.

25         Q.    Okay.   I'm probably doing that more than

1    you, but we have to --

2        A.    I apologize.

3        Q.    So here's what Tyeasa Evans says.  "This

4    offender" -- the subject is unsanitary conditions.

5    "This offender has been in the shower since 15:45

6    hours yesterday," and I note that the e-mail is

7    dated 12/23 p.m.  "I spoke with him, and he stated

8    that he is still there because he refused to go in

9    the cell.  The window on the door is burned and has

10   a big hole in it.  The cell stinks of urine.

11   Offender states the toilet does not work, and from

12   the smell in the cell, I would agree with him.

13   Flies are all over the door because feces is in the

14   hole on the front of the door.  The cell needs to

15   be cleaned immediately.  Trays are in the cell, he

16   states, from the last offender that was there.

17   This is inexcusable.  Another offender was placed

18   in the shower at 15:25 hours and was not taken out

19   until 20:35 hours."  And then you will see at the

20   top at 4:30 p.m. that Tyeasa Evans again e-mails

21   Tony Compton and Michael White and says this

22   offender was still in the shower at 3:59.

23       A.    Uh-huh (affirmative response).

24       Q.    Do you by any chance recollect this

25   incident?  Did this come to your attention either

Page 138

1    under control.

2         Q.   But it -- but is your testimony that

3    prisoners are still sometimes kept in showers for

4    hours at a time, correct?

5         A.   I wouldn't say kept there, but sometimes

6    it takes a long time to get them back out and into

7    their cells, yes.

8         Q.   So left for hours at a time?

9         A.   Okay.

10        Q.   Yes?

11        A.   Yes.

12        Q.   And they are naked essentially except for

13   a towel?

14        A.   No, they take their clothes with them to

15   the shower, and they dress.

16        Q.   Okay.  Is -- if an officer notes that

17   there's something wrong with a cell like a hole on

18   a cell door or feces on the floor or on the wall,

19   how is the officer expected to respond?

20        A.   If you notice it -- excuse me.  If he

21   sees something like that, he's supposed to report

22   it to a supervisor, who would then handle that

23   situation and take care of the problem.  If there

24   was a hole in the cell or something like that,

25   that's a security issue, and we would have to deal

1  completed.

2      Q.   Who is the person who has responsibility

3  for ensuring that conditions in a unit -- that a

4  reasonable degree of sanitation is maintained?

5      A.   That would be your unit manager.

6      Q.   And is it also the unit manager who would

7  be responsible for making sure that mechanical or

8  structural problems are addressed in a timely way?

9      A.   Yeah, and I put that off on basically all

10  of us.  We all have a responsibility to report

11  mechanical or security failures or things like

12  that.

13      Q.   What are the rules for prisoners'

14  possession of matches or lighters on Units 5 and 6

15  Delta?

16      A.   Prohibited in the whole facility.

17      Q.   So it's the same rule throughout the

18  housing units, correct?

19      A.   Yes, ma'am.

20      Q.   Isn't it a fact that sometimes when

21  prisoners set fire, those fires are allowed to burn

22  themselves out rather than being proactively put

23  out by the staff?

24      A.   I've seen it both ways.  I have seen

25  fires burn out.  I have seen staff immediately

1    respond and put them out.

2        Q.   It has happened pretty often in the

3    segregation unit at EMCF that fires are allowed to

4    just burn themselves out; isn't that true?

5        A.   Not -- not now, it's not, no.  Our staff

6    respond to them with fire extinguishers.

7        Q.   But before, is it true that at a previous

8    time, that fires were --

9        A.   I've seen fires take a long time to be

10   put out or burn themselves out, yes, I have.

11       Q.   When -- if you say that that does not

12   happen now, when did the change occur?

13       A.   Presently, I mean, not -- not just now,

14   it's been ongoing for a lengthy period of time.

15       Q.   So is this another example of a change

16   that has been gradually occurring over the time

17   that MTC took over from GEO?

18       A.   Sure.  It's -- it's a continuous

19   improvement.  My -- one director always told me

20   it's a marathon, it's not a sprint.

21       Q.   Where are we on the continuum now in this

22   marathon today?  How close are we to making sure

23   that fires get put out instead of being allowed to

24   burn out?

25       A.   I think we're pretty close to the finish

Page 143

1    line, because with the staffing in those areas to a

2    higher level, with staff being on the housing units

3    down on Housing 5 and 6, they're readily available

4    should a fire start, so we're -- we're pretty close

5    to handling that situation.

6         Q.   And -- and this is -- and so would you

7    say then that you are near the finish line of

8    what's been a long sort of slow process that's been

9    going on since MTC came in?

10        A.   Sure.

11        Q.   And would the same thing be true of

12   sanitation more generally, not just fires but --

13        A.   Yes.

14        Q.   -- cleaning?

15        A.   It's been a continuum of getting better

16   and improving and responding and...

17        Q.   Have you -- have you ever seen anyone at

18   EMCF have trouble breathing because of burning

19   fires?

20        A.   Yes.

21        Q.   Prisoners?

22        A.   Yes.

23        Q.   Staff?

24        A.   Yes.

25        Q.   And when fires burn -- burn for an

1      Q.   A staff member telling you that a

2   prisoner had to use or was issued a garbage bag to

3   use for their waste because the toilet wasn't

4   working?

5      A.   Yes.

6      Q.   And so the prisoner was supposed to

7   defecate into the trash bag?

8      A.   No, negative.  I -- ma'am, I can't

9   elaborate on that.  All I'm telling you is that I

10   heard that.

11      Q.   And you've heard it from staff?

12      A.   I did hear it from staff.

13      Q.   When were you last on Unit 5 or 6 Delta?

14      A.   Yesterday.

15      Q.   And at that time, were you aware of any

16   non-working toilets or sinks on the unit?

17      A.   Nobody reported any to me, no.

18      Q.   You've testified earlier that there are

19   some times prisoners at EMCF who are in cells

20   without functioning lights for some period of time,

21   correct?

22      A.   Yes.

23      Q.   And sometimes that's for days at a time?

24      A.   That has happened, yes.

25      Q.   And sometimes it's been weeks at a time,

1  necessary under the circumstances to maintain or

2  restore order or safety or security?

3      A.   Yes, that would be pretty much basic

4  policy language.

5      Q.   Have you ever witnessed a correctional

6  officer at EMCF use force on a prisoner, whether by

7  chemical agent or physical force, in the absence of

8  any immediate threat of danger?

9      A.   Yes, I have.

10     Q.   Can you -- and is it -- the use -- the

11  occasions when you've witnessed this, was that --

12  was the -- this use of force that you observed, was

13  it approved under policy?

14     A.   No.

15     Q.   Would you describe an example of a use of

16  force that you've observed that would not be

17  approved by policy?

18     A.   I've seen inmates -- excuse me, not

19  inmates, staff get themselves to a point where they

20  retaliate against an inmate and gas them

21  inappropriately or possibly strike them

22  inappropriately when the threat really wasn't

23  there, and they had the options to do other things.

24     Q.   Does that sometimes happen when staff get

25  stressed out because they are, for example,

Page 160

1    whatever, spray it through a tray slot and then

2    close the slot?

3         A.    No, that's not the way use of force is

4    supposed to be done.

5         Q.    In fact, that would needlessly subject a

6    prisoner to -- to pain and possible medical injury

7    without any legitimate purpose; isn't that true?

8         A.    I would think so.

9         Q.    In your view, is it acceptable

10   correctional practice for an officer to spray a

11   prisoner with immobilizing gas or pepper spray for

12   making a request for assistance?

13        A.    Absolutely not.

14        Q.    What about for expressing a complaint?

15        A.    No.

16        Q.    What, for example -- what about, for

17   example, if an inmate complains to an officer that

18   he did not receive a food tray?

19        A.    There would be no justifying --

20   justification for spraying an inmate for that.

21        Q.    Would there be a justification for

22   spraying an inmate for asking to speak with the

23   warden?

24        A.    No.

25        Q.    Would there be a justification for

Page 169

1   planned, yes.

2        Q.   Can you think of any other instances

3   where you have some information from any source

4   about an unjustified use of force at EMCF?

5        A.   I know there's a lot of -- like I said,

6   there's a lot of allegations.  As far as me having

7   direct knowledge of what happened or when it

8   happened, I do not know.

9        Q.   And are there a lot of instances where

10  those allegations are actually corroborated?

11       A.   Sometimes they're investigated and

12  corroborated, yes.

13       Q.   Prisoner-on-prisoner violence at EMCF is

14  fairly commonplace, isn't it?

15       A.   It is.

16       Q.   Stabbings are fairly common?

17       A.   Not fairly common, isolated, but there

18  are stabbings, yes.

19       Q.   What about beatings inmate-on-inmate?

20       A.   They happen.

21       Q.   And sexual assaults happen?

22       A.   Rarely, but they do.  The ones, like you

23  said, that are reported.

24       Q.   And extortion happens?

25       A.   Yes.

Page 173

1        Q.    Do you know whether the other one is

2   still working for MDOC?

3        A.    I -- I don't know, ma'am.

4        Q.    Did the investigation, as far as you

5   know, vindicate these officers?  That is did the

6   internal investigation conclude that they had not?

7        A.    I do not know that.

8        Q.    Have you ever heard about an incident in

9   2012 when an officer in the segregation unit

10  escorted prisoners into a vestibule area between

11  housing zones and opened a door allowing prisoners

12  from a rival organization into the vestibule?

13       A.    I've heard of that, yes.

14       Q.    How did you hear about that?

15       A.    Through film and investigation processes.

16       Q.    Were you actually involved in that

17  investigation?

18       A.    No.

19       Q.    But you did review the --

20       A.    I have seen the video.

21       Q.    How did you happen to see those videos?

22       A.    I can't really remember to be honest with

23  you.  I've been involved in a lot of things at the

24  management level at the facility, so I do have the

25  opportunity or have had the opportunity to see

1    things.  Even when I first came there as an

2    officer, I was involved in the management team of

3    the facility so...

4          Q.   And did the investigation in that case

5    conclude that the officer had voluntarily accessed

6    pod doors in a lockdown unit to allow an assault to

7    take place?

8          A.   I would be speculating to tell you what

9    the outcome was.  I don't know what the outcome

10   was.

11         Q.   You have no idea?  You never heard?

12         A.   I -- really, it's speculation.  I can't

13   remember.

14         Q.   Do you remember the name of the officer

15   involved in that?

16         A.   I am not sure because I just -- I can't

17   remember.

18         Q.   Do you remember any of the prisoners who

19   were --

20         A.   I do not, no.  No.

21         Q.   Did you ever hear anything about an

22   incident, and this would have been in 2012, when a

23   prisoner in segregation at EMCF, while in

24   handcuffs, and actually being escorted by

25   correctional officers was stabbed by other

```
 1   prisoners?

 2        A.   Yes.

 3        Q.   How do you know about that incident?

 4        A.   It just depends on which one it was

 5   because I was involved in one of them.

 6        Q.   Do you remember such an incident

 7   involving ███████████?

 8        A.   Names of inmates, I just don't know.  I

 9   don't remember.

10        Q.   Do you recall an incident when an inmate

11   was stabbed while being escorted out of the shower

12   in handcuffs?

13        A.   I don't recall.

14        Q.   If I understood you correctly, you said

15   you were aware of a couple such incidents.  Taking

16   them one by one of incidents of inmates in cuffs

17   and actually being escorted by correctional staff

18   --

19        A.   Uh-huh (affirmative response).

20        Q.   -- being stabbed by other prisoners --

21        A.   Uh-huh (affirmative response).

22        Q.   -- could you, taking them one by one,

23   tell me everything you know about each such

24   incident taking them one at a time?

25        A.   It's hard to tell you about specifics
```

1    both inmates.  The staff who had the one inmate

2    that was going to be stabbed took him back on the

3    unit.  The two staff escorting the inmate who tried

4    to do the stabbing struggled with him on the

5    ground, and myself and the deputy warden came down

6    and assisted them in controlling the inmate.

7        Q.   And the other incident involving a

8    prisoner in handcuffs actually being escorted being

9    stabbed by another prisoner, what do you know about

10   that other incident?

11       A.   That incident, at that time, on those

12   units, there's an area where you enter into those

13   units, and you either go this way (indicating) or

14   that way (indicating) to Housing Unit 5 or 6, and

15   it's kind of an office area, and this inmate was

16   being escorted to one of the segregation units, and

17   there were workers in that area, cleaners and stuff

18   like that.

19       Q.   Inmate cleaners?

20       A.   Yes.  And when that inmate came down

21   under escort, a couple -- I think it was a couple

22   of those inmates jumped on him and stabbed him

23   while he was under escort.

24       Q.   What happened to the assailants, the

25   inmate assailants?

1    the 1980s to really go into --

2        Q.    I see.

3        A.    -- that.

4        Q.    So you're talking about a -- a particular

5    prison in Michigan 30 years ago?

6        A.    Exactly.

7        Q.    But talking about prisons in our era,

8    let's say in the 21st century, did you ever see a

9    prison, of the seven other prisons that you worked

10   in, that compared to East Mississippi for

11   prisoner-on-prisoner violence?

12            MR. FRIEDMAN:  When he first got there?

13            MS. WINTER:  Yes.

14       A.    When I first got there, you know, to

15   qualify that a little bit, I've been involved in

16   many, many, many different incidents at all prisons

17   --

18       Q.    (By Ms. Winter)  Uh-huh (affirmative

19   response).

20       A.    -- from riots to stabbings to deaths to

21   escapes to just about everything you can think of,

22   so there have been some more severe incidents at

23   other prisons I worked at.  In fact, much more

24   severe, but as a -- as a whole in the

25   prisoner-on-prisoner violence and lack of control

1    of that, it was worse.  When I first got here, it

2    was worse.

3         Q.   And -- and is it your testimony that that

4    has -- has the level of violence at EMCF gradually

5    ebbed during the -- since the take over by MTC?

6         A.   I think -- I think it's ebbed.  I think

7    it's had fluctuations.  I think it's gone up and

8    down and up and down sometimes.

9         Q.   So I want you to try to leave aside in

10   your mind, if you can, really extraordinary

11   incidents that are, you know, worse than anything

12   you've ever seen.  Leaving aside those, but just

13   looking at a whole at the day-to-day prison life,

14   and taking into account that the level of violence

15   at EMCF ebbs and flows, how would you compare that

16   level of inmate-on-inmate violence to the level at

17   the Michigan prisons that you've worked at?  And,

18   again, let's leave aside that one from 30 years ago

19   in south Michigan.

20              MR. FRIEDMAN:  Object to the form.

21         A.   The level of violence is higher.  It's

22   higher.

23         Q.   (By Ms. Winter)  It's higher at EMCF?

24         A.   Higher at EMCF, yes.

25         Q.   And is that based on the number of

1    incidents, how -- how frequently they occur?

2        A.    Yeah, I would say yes.

3        Q.    And what else do you take into

4    consideration when you -- when you arrive at the

5    view that it's worse at EMCF than it was at the

6    seven prisons you worked at in Michigan?

7        A.    I -- I would equate a lot of it to the

8    level of gang activity at the prison.

9        Q.    Does a lot of the prisoner-on-prisoner

10   violence at East Mississippi Correctional Facility

11   involve -- is there a gang involvement?

12       A.    In the majority of them, yes.

13       Q.    In your view, is there a certain element

14   of facilitation of gang activity by prison staff?

15       A.    No.

16       Q.    Is there any involvement?

17       A.    Probably.

18       Q.    If you are comparing staffing ratios --

19       A.    Uh-huh (affirmative response).

20       Q.    -- at East Mississippi to staffing ratios

21   at the seven prisons in Michigan where you worked

22   at --

23       A.    Uh-huh (affirmative response).

24       Q.    -- is it possible for you to make a

25   comparison there?

Page 184

 1      A.   Fairly equal.

 2      Q.   I think you've testified that the level

 3  of training is significantly less, staff training;

 4  is that correct?

 5      A.   Yes.

 6      Q.   And would it be fair to say that the --

 7  the level of pay is significantly less?

 8      A.   Yes.

 9      Q.   And the qualifications that are required

10  to become a security staff member are significantly

11  less --

12      A.   Yes.

13      Q.   -- is that correct?  Very significantly

14  less?

15      A.   Yes.

16      Q.   In your view, are staff at EMCF properly

17  trained to deal with inmate-on-inmate violence?

18      A.   I would say they are trained.

19      Q.   But in your view, are they adequately

20  trained?

21      A.   In my view, no.

22      Q.   What would be needed to more adequately

23  train the staff to deal with inmate-on-inmate

24  violence?

25      A.   I think I stated earlier that whether you

Page 185

 1   had 16 weeks of training or three weeks of

 2   training, it's really time and experience and being

 3   able to retain your job for a lengthy period of

 4   time to learn how to deal with offenders.  So it's

 5   more of an experience and time thing than it is a

 6   training thing.

 7        Q.   So in your view, is part of the problem

 8   that there are -- staff retention is not very good

 9   at East Mississippi?

10        A.   Correct.

11        Q.   And do you have any views on what the

12   root of that problem is of staff retention?

13        A.   If you're asking for personal views, I

14   have personal opinions on that.

15        Q.   What is your personal view?

16        A.   I mentioned it earlier that part of the

17   pool of people that you're dealing with in a small

18   area, some of the prisons are in small rural areas.

19   Meridian is not a small rural area, but it's the

20   most relatively small town.  You've been there for

21   14 years.  The prison has been there.  You are

22   fishing out of the same pond, so to speak, for the

23   same type of staff for a $10 an hour job, and

24   sometimes you're even rehiring previous staff that

25   had been terminated before for things or you're

1  just -- you're not -- the recruiting is not wide

2  enough to bring in, and the pay is not good enough

3  to bring in quality staff, and so that -- that has

4  a lot to do with retention.

5      Q.   So in order to have experienced staff,

6  you have to be able to retain staff over a period

7  of time?

8      A.   Correct.

9      Q.   And in order to retain staff, you would

10  have to fish from a bigger pool and offer better --

11  better pay or benefits; is that fair to say?

12      A.   That's my opinion, yes.

13      Q.   Is the Lauderdale County Sheriff

14  sometimes called to the facility?

15      A.   Yeah.  Yes.

16      Q.   Is the Sheriff or the -- is the Sheriff

17  or the Sheriff's people called to the facility --

18  facility with -- when there is criminal

19  investigation needed regarding assaults or

20  contraband issues like that?

21      A.   Usually, they are called when it's a

22  criminal investigation involving a staff member.

23      Q.   Has the Lauderdale County Sheriff been

24  called in from time to time while you've been at

25  EMCF?

Page 187

1      A.   Many times, yes.

2      Q.   And have they been called in many times

3 during GEO -- during MTC's tenure as the operator?

4      A.   Yes.

5      Q.   You've mentioned that there were staff

6 who were fired, but then rehired.  Have there been

7 staff who were fired under GEO and then rehired by

8 MTC?

9      A.   Yes.

10      Q.   Could -- you mentioned, I believe it was

11 a Lieutenant Mason who was --

12      A.   Yes.

13      Q.   -- a Lieutenant Mason was involved in the

14 incident involving excessive force, was it?

15      A.   Yes, ma'am.

16      Q.   Was -- do you know whether Lieutenant

17 Mason was one of those people who was fired under

18 GEO and then retired by MTC?

19      A.   Yes, he was.

20      Q.   Do you know of any other such incidents

21 where there were officers who were fired by GEO for

22 some sort of impropriety and then retired by MTC?

23      A.   I do, yes.

24      Q.   Can you -- do you recall any of their

25 names?

Page 188

1       A.   Yes.

2       Q.   Could you name them, please?

3       A.   Frederick Young, Patrick Thomas, Mattie

4   Collins, Lieutenant Lee, who I mentioned earlier.

5   There -- there's a laundry list of people who have

6   been retired.  I can't remember all of their names,

7   officers, lieutenants, captains.

8       Q.   Do you have a problem with that?  Do you

9   personally have any problem with that?

10      A.   I do.

11      Q.   The staff that you've mentioned or other

12  staff who were fired by GEO and then retired by

13  under MTC, do you know whether any of the offenses

14  for which they were fired involved, let's say,

15  dishonesty or lack of integrity?

16      A.   I -- I'm not really sure what the

17  instances of their termination were with GEO --

18      Q.   But some of the --

19      A.   -- but something happened.

20      Q.   Yes.  Do -- do you happen to know whether

21  there are staff who were security staff who were

22  let go at other MDOC institutions for some

23  impropriety, just for an example somebody who was

24  terminated at South Mississippi Correctional

25  Institute --

1    observed some mental health emergencies, for

2    example, suicide attempts?

3        A.   I have been there for -- when I first

4    started, there was one successful suicide since

5    I've been at EMCF.  There were others suicide

6    attempts.  There's a lot of mock attempts by mental

7    health prisoners to get attention.

8        Q.   Have you -- and I believe that you say

9    that you have witnessed prisoners who've engaged in

10   self-harm?

11       A.   Kind of on a daily basis.

12       Q.   And you've observed prisoners who appear

13   to be acutely psychotic?

14       A.   Yes, ma'am.

15       Q.   And that happens on a daily basis?

16       A.   Fairly routinely.

17       Q.   And when you observe these prisoners who

18   are in mental health emergencies of the kind we

19   just described, does this happen -- do you observe

20   this in general population?

21       A.   Oh, yes.

22       Q.   And also during lockdowns?

23       A.   Sure.

24       Q.   And also in segregation?

25       A.   Uh-huh (affirmative response).

Page 220

1        A.    Yes, ma'am.

2        Q.    -- less close confinement?

3        A.    Yes, ma'am.  But I'm fairly positive he's

4   been moved back to long-term segregation.

5        Q.    I want to ask you now about

6   Mr. Fredenburg.  You mentioned earlier that you

7   know some things about Mr. Fredenburg, and I'd like

8   for you to turn to paragraph 20 -- 211 of the

9   complaint, which is the page --

10       A.    Page 22?

11       Q.    Page 51.

12       A.    Page 51?

13       Q.    I'd like to go through those allegations

14   here with you and ask you if you know anything one

15   way or the other about these allegations.

16   Paragraph 2011 says, "On September 5th, 2011,

17   Mr. Fredenburg" --

18            MR. FRIEDMAN:  2012?

19            MS. WINTER:  Pardon?

20       A.    Yeah, 2012.

21       Q.    (By Ms. Winter)  Excuse me.

22   "September 5th, 2012, Mr. Fredenburg was brutally

23   assaulted.  Several officers were complicit it in

24   or facilitated the assault."  Do you have any

25   knowledge of Mr. Fredenburg being assaulted in

1  September 2012?

2      A.   I do know of this incident, yes.

3      Q.   And how is it that you know about this

4  incident?

5      A.   Like I testified earlier, I was involved

6  in doing an investigation on Mr. Fredenburg when he

7  was going to be released from long-term segregation

8  to general population, and he was in fear of his

9  life coming off of a lockdown unit going to general

10 population.  He said he feared staff as well as

11 they were going to put him on Housing Unit 6 where

12 other inmates who were involved in this were

13 housed.

14     Q.   I see.  So when this incident that Mr.

15 Fredenburg says happened on September 5th, 2012,

16 when that incident occurred, it wasn't until

17 sometime later that you found --

18     A.   Uh-huh (affirmative response).

19     Q.   -- out about that incident?

20     A.   I knew of this incident when it happened,

21 but I wasn't directly involved --

22     Q.   I see.

23     A.   -- in that capacity to investigate it.  I

24 knew of the staff that were involved in it and the

25 discipline that was taken against the staff.

Page 222

1      Q.    So if you knew about it at the time that

2   it happened?

3      A.    Uh-huh (affirmative response).

4      Q.    How did it come to your attention that on

5   September 5th, 2012, he was assaulted by staff?

6      A.    Because there was an ongoing

7   investigation about it, and two of my staff were

8   involved in that incident, and just by being a

9   captain there, I knew about it.

10     Q.    I see.  So reading you paragraph 2012, it

11  says, "That morning," that is September 5th, 2012,

12  "two officers escorted Mr. Fredenburg from the

13  showers and locked him in his cell."

14     A.    Uh-huh (affirmative response).

15     Q.    Do you know those two officers?

16     A.    Yes, I do.

17     Q.    What were their names?

18     A.    Kendrick Green and the other guy's name

19  was T. Brewster.  Terry or something.  I'm not sure

20  of his actual first name.

21     Q.    And -- but the paragraph goes on to say,

22  "Shortly after, the officers escorted another

23  prisoner to Mr. Fredenburg's cell."  Were these the

24  same officers, T. Brewster and --

25     A.    To my knowledge, they were the only two

1    that were involved in this incident.

2         Q.    Continuing with the -- with paragraph

3    2012, "This second prisoner disabled the locking

4    mechanism in Mr. Fredenburg's cell.  Six other

5    prisoners on the zone also disabled their locks

6    allowing them to come and go as they pleased."

7    These allegations -- were these allegations like

8    these ever confirmed in the investigation of this

9    incident?

10        A.    I believe they were.  I mean, they could

11   have been confirmed by videotape, and we would

12   know.  Those are lockdown units, if inmates came

13   out, it would have been confirmed, but do I have

14   direct knowledge of whether it was or not, I do

15   not.

16        Q.    But through the course of the

17   investigation, you believe that these allegations

18   were confirmed?

19        A.    Yes, I do.

20        Q.    And then it goes on to say that other

21   prisoners -- it says, "Other prisoners also

22   disabled their locks allowing them to come and go

23   as they please, a common occurrence at EMCF."  You

24   agree that that does happen at EMCF, correct?

25        A.    And at that time much more prevalent than

 1    it does now.

 2         Q.    But it still happens now, correct?

 3         A.    Yes, it does.

 4         Q.    The complaint at paragraph 2013 then

 5    says, "The officers then exited the zone for the

 6    day leaving the zone unattended."  Did that happen?

 7         A.    I do not know.

 8         Q.    Do you know whether the investigation

 9    confirmed that that happened?

10         A.    I'm sure it would have.

11               MR. FRIEDMAN:  Do you know?

12               THE WITNESS:  Do I know, no.

13               MR. FRIEDMAN:  Just testify what you

14    know.

15               THE WITNESS:  Yes, sir.

16         Q.    (By Ms. Winter)  Do you believe that the

17    investigation corroborated that allegation?

18         A.    I don't know.

19         Q.    I understand that you don't know

20    firsthand.

21         A.    Do I believe it, yes, I think it would

22    have.

23         Q.    It then says, "The prisoner that staff

24    escorted into Mr. Fredenburg's cell took him to

25    another cell where four prisoners viciously beat

1    him and stomped on his face."  Do you have any idea

2    whether the investigation corroborated that

3    allegation?

4         A.   I -- I do not know.

5         Q.   I understand that you -- you don't know,

6    but is it your understanding or your belief that

7    that -- it was corroborated that the prisoners that

8    staff escorted into Mr. Fredenburg's --

9         A.   I honestly -- you really can't even

10   speculate it.  I don't know what the extent of the

11   issue or the attack was, and so I really don't

12   know.

13        Q.   Okay.

14        A.   I know there was an investigation and

15   officers were disciplined.  That's basically what I

16   know.

17        Q.   Do you know that Mr. Fredenburg was

18   injured?

19        A.   I believe he was beat up pretty good.

20        Q.   And then the next allegation is:  "An

21   officer remained in the control tower throughout

22   the assault on Mr. Fredenburg.  The officer had

23   full access to the security monitoring -- to the

24   security cameras monitoring the zone and the

25   electronic system that indicates which cell doors

Page 226

1    are open."  Do you have any information as to

2    whether that happened?

3         A.    Whether -- say it again for me, please.

4         Q.    Uh-huh (affirmative response).  That an

5    officer was in the control tower throughout the

6    assault on Mr. Fredenburg.

7         A.    There would have been an officer in the

8    control tower, yes.

9         Q.    And this officer would have had full

10   access to the security cameras that were monitoring

11   the zone?

12        A.    At that time, we had a multiple camera

13   monitors there, which showed every zone, yes.

14        Q.    And this officer would also have had

15   access to the electronic system that indicates

16   which cell doors are open --

17        A.    Correct.

18        Q.    -- correct?  Correct?

19        A.    Correct.

20        Q.    And this officer nevertheless allowed the

21   beating to proceed, correct?

22        A.    It -- it proceeded.  I don't know if that

23   officer allowed it or not.

24        Q.    Is it your understanding that Mr.

25   Fredenburg remained seriously injured in his cell

1    without help?

2        A.   I don't know the aftermath of -- of what

3    happened to Mr. Fredenburg as far as when he got to

4    medical, did he get to medical.  I don't know.

5        Q.   So then there came a time when Mr.

6    Fredenburg was going to be moved to a -- was that

7    to a --

8        A.   General population.

9        Q.   -- general population?  And how much

10   later was it that you had a communication with Mr.

11   Fredenburg about that move?

12       A.   It was -- it was quite a bit later.  I

13   know Warden Shaw was still the warden there because

14   he's the one who directed me to do the

15   investigation on it, so -- and he didn't leave

16   until Warden Buscher came until about six, seven

17   months ago, so this happened in March.

18       Q.   It was in March that Mr. Fredenburg was

19   going to be moved, in March of --

20       A.   No, that's when this -- when did the

21   incident happen?

22       Q.   The incident happened on --

23       A.   On September 5th.

24       Q.   -- September 5th, 2012.

25       A.   No, that was much later than March, I

1   believe.

2       Q.   So sometime much later than September

3   5th, 2012, Mr. Fredenburg was going to be moved,

4   and you became aware of that, correct?

5       A.   Yes, ma'am.

6       Q.   Had -- had you already done your

7   investigation of the September 5th, 2012 incident?

8       A.   No, ma'am.

9       Q.   No?  Had anybody investigated that

10  incident at that point that you know of?

11      A.   The September 5th assault?

12      Q.   Pardon?

13      A.   Well, that would have been investigated

14  for the staff to be disciplined for it, yes.

15      Q.   So do you know when that investigation

16  occurred?

17      A.   No, I do not.  It had to have happened

18  fairly simultaneously to the incident.

19      Q.   Okay.  So then sometime months later --

20      A.   Right.  I'm not sure exact time frame.

21      Q.   -- but you think it might have been later

22  than March of 2013?

23      A.   Yes.

24      Q.   Mr. Fredenburg was going to be moved into

25  general population?

1      A.    March 2012, so --

2      Q.    March?

3      A.    -- it was sometime in --

4      Q.    Well, March, wouldn't it have been March

5   2013, if he was going to -- the incident occurred

6   in September of 2012?

7      A.    Yes, yes.  Yes, exactly, you're right.

8      Q.    So March 2013 or later, he -- he wanted

9   to talk to you?

10      A.    He didn't really approach me at all.  I

11   was approached through formal channels to

12   investigate this inmate being moved to -- he had

13   filed a complaint to somebody.

14      Q.    Saying that he didn't want to be moved?

15      A.    Yes.

16      Q.    Saying that he was afraid to be moved?

17      A.    Yes.

18      Q.    And you were assigned to look into that

19   complaint?

20      A.    Correct.

21      Q.    So what happened when you were assigned

22   to look into that complaint?

23      A.    Well, usually, when I do an

24   investigation, I first look up the facts, so I went

25   and looked up the facts of was there an incident in

Page 230

1    the first place, which I was aware there was one,

2    but I wanted the facts.  I wanted were there -- was

3    there an investigation, were there any RVRs, you

4    know, rule violation reports written, discipline,

5    so I could -- when I did talk to the prisoner, I

6    could verify his -- you know, his account of the

7    incident.

8         Q.   Would you have reviewed the videos, if

9    there were any?

10        A.   I -- I didn't review any videos.

11        Q.   Do you know if there were any?

12        A.   I do not know to be honest with you, and

13   I -- then I interviewed the inmate.  I wrote a

14   report, and I turned it in to Warden Shaw for

15   processing through, you know, MDOC, et cetera, and

16   my recommendation was, no, that he not be housed on

17   Housing Unit 6.  I do believe that Mr. Fredenburg

18   did not file any red tags against some of these

19   inmates as he wasn't sure of their identities, but

20   knew who they were by name or nickname or gang name

21   or whatever, and where they locked.  He also stated

22   that he was in fear of his own gang.  He is a Simon

23   City Royal, and was in fear of his gang because he

24   violated some of their rules and procedures as

25   well, so -- the whole thing was he didn't want to

Page 231

1    be on Housing Unit 6.  He wanted to go to Housing

2    Unit 1.

3        Q.    Housing Unit 6, what is the significance

4    of him being moved to Housing Unit 6?  Would it

5    have been to 6 Delta --

6        A.    No.

7        Q.    -- the -- so it would not have been -- it

8    was not being posed that he go to segregation in 6

9    Delta, it was into a general population area --

10       A.    Correct.

11       Q.    -- of 6?

12       A.    Yes, ma'am.

13       Q.    And he was afraid that the assailants

14   were housed there?

15       A.    Yes.

16       Q.    What -- you recommended that he not be

17   moved to 6 Delta -- I mean, to Unit 6 --

18       A.    Correct.

19       Q.    -- correct?

20       A.    (Witness nods head affirmatively.)

21       Q.    Did you recommend where he should be

22   moved?

23       A.    I recommended that he was a good

24   candidate to be moved to Housing Unit 1, which was

25   our next closed security unit, which was still in

1    general population, closed security just like 6 A,

2    B and C, but a -- considered a more safer area.

3         Q.    Safer area, that's what he had requested?

4         A.    Yes, ma'am.

5         Q.    In your investigation, did you make any

6    findings about whether he had, in fact, been

7    assaulted?

8         A.    I did verify that there was an incident.

9    I verified with our investigators.  I verified all

10   of the paperwork, and it said that this inmate was

11   involved in an incident that occurred, that two

12   staff were terminated because of it.  There's --

13   there's a full report on it somewhere, but, yes, I

14   did determine all of that, that it would not be in

15   his best interest to be housed in those areas.

16        Q.    What -- to your -- to the best of your

17   information or things you might have heard, was it

18   ever determined why security staff would have

19   allowed a beating to proceed?

20        A.    I believe extortion was involved,

21   collusion or whatever you want to call it, inmates

22   and staff being involved with each other.

23        Q.    At paragraph 218 on Page 52 --

24        A.    Uh-huh (affirmative response).

25        Q.    -- there's another example.  There are no