# EXHIBIT 30

# Eastern Mississippi Correctional Facility (EMCF) Report

Submitted
June 16, 2014

Submitted by
Madeleine L. LaMarre MN, FNP-BC

# Contents

**Qualifications**.................................................................................................... **3**

**Document Review**............................................................................................... **4**

**Overview** ............................................................................................................. **5**

**Executive Summary** ........................................................................................... **6**

    Policies and Procedures ..................................................................................... 8

    Access to Care.................................................................................................... 9

    Chronic Disease Management ........................................................................... 14

    Specialty Services.............................................................................................. 25

    Pharmacy Services and Medication Administration........................................ 27

    Medical Observation/Infirmary Care ............................................................... 33

    Health Records .................................................................................................. 37

    Quality Improvement and Clinical Performance Reviews ............................... 38

**Signature Page**.................................................................................................. **40**

**Appendix A – Patient ID Numbers** ................................................................ **41**

# Qualifications

I, Madeleine LaMarre, MN, FNP-BC have been retained by Plaintiffs' counsel as a correctional and nurse practitioner expert to review health care services at the Eastern Mississippi Correctional Facility. Compensation for my work is being billed at $250 per hour and ½ my hourly rate for travel time, and $250 per hour for deposition or court appearances. In the following paragraphs I have summarized my background and experience in correctional health care as a prelude to this report.

I have practiced nursing for 30 years. I am a registered nurse and certified family nurse practitioner. Since 2005, I have been self-employed as a correctional health care consultant primarily involved in monitoring prison and jail compliance with settlement agreements, and providing technical assistance to correctional agencies to improve the quality of health care services and clinical outcomes.

My experience in corrections began in 1982, when I worked as a nurse practitioner/ administrator at the Atlanta Transitional Center, which is a Georgia Department of Corrections (GDC) facility. In 1984, I joined the GDC Office of Health Services full-time as a Nurse Consultant. My responsibilities within the agency grew over time and in 1995, I became the Statewide Clinical Services Manager. My responsibilities included the development of administrative policies regarding health care delivery; clinical guidelines including the treatment of HIV and hepatitis C infection and other communicable and chronic diseases. I providing training to GDC health care staff regarding policies and clinical guidelines. I was also responsible for a clinical auditing process that surveyed health care at over 40 correctional institutions, providing consultation to clinicians and nurses to improve health care delivery and patient outcomes. I have authored or coauthored a number of publications, and was an associate editor for a textbook on correctional medicine, <u>Clinical Practice in Correctional Medicine, 2nd</u> <u>edition</u> by Michael Puisis published in 2006. I am a member of the American Nurses Association, American Association  of Nurse Practitioners, and the Academy of Correctional Health Professionals.

In 2002, I was appointed by Judge Thelton Henderson to be a medical expert in the Plata v. Schwarzenegger case. This was followed by appointments as a health care monitor for other cases and at the end of 2004 I left the Georgia Department of Corrections to pursue this work full time. I am familiar with standards of nursing practice and correctional health care.

# Document Review

I reviewed the following documents for this report.

1. Class Action Complaint. Jermaine Dockery et al. v. Christopher Epps et al. Civil Action No: 3:13CV326TSL-JMR. United States District Court. Southern District of Mississippi, Jackson Division. May 30, 2013.
2. MDOC Health Care Policies and Procedures
3. Health Assurance LLC (HALLC) Medical Services Policies and Procedures, 2009.
4. National Commission on Correctional Health Care (NCCHC) Standards for Health Care Services in Prisons. 2008.
5. Eastern Mississippi Correctional Facility Report. Madeleine L. LaMarre MN, FNP-BC. Presley v. Epps, No. 4/05-c-00148-DAS-(ND. Miss. Nov 8, 2011). DOC. No. 151-8.
6. HALLC Staffing Matrix, as of 11/12/2012. HALLC Staff 2-3.
7. Sick Call Request Log. HALLC Med Care 2.
8. Sick Call Request Log-Eye Complaints-HALLC Eye 2.
9. Sick Call Request Log-Dental Complaints. HALLC 2-33.
10. Medical Admission Infirmary Log. HALLC Adm Log 1-42.
11. Hospital Admissions. HALLC ER 2-17.
12. Hospital Admissions. HALLC ER 18-23.
13. Health Assurance Employees. July 19, 2012 to present. HALLC Emp 2-5.
14. Listing of Inmates who Engaged in Self Harm. EMCF. HALLC SH 2.
15. EMCF Deaths in Custody 1/1/2011 thru 10/2/2013.
16. MDOC Use of Force Policy SOP 16-13-01. 7/19/2013.
17. Expert report of Marc Stern MD. Eastern Mississippi Correctional Facility.
18. Expert report of Terry Kupers MD. Eastern Mississippi Correctional Facility
19. West Mississippi's Administrative Code. Advanced Practice Registered Nurses Practice Requirements. 30-18-2840:2.3.
20. Titus Snell Resume and Certificates.
21. Ophthalmology Technician Service Agreement.
22. Health Assurance Job Descriptions.

# Overview

On April 22- 25, 2014 I visited the East Mississippi Correctional Facility (EMCF) in Meridian, Mississippi. The purpose of the visit was to assess whether EMCF inmates received adequate health care for their serious medical and mental health conditions.

I was accompanied by Marc Stern, MD, correctional medical expert, Terry Kupers, MD, correctional psychiatric expert, Bart Alplanalp, mental health consultant,  Margaret Winters, Gabriel Eber of the ACLU, Jody Owens, Elissa Johnson and Alesha Judkins of the Southern Poverty Law Center (SPLC).

I performed the following activities in preparation for and during the site visit:

- Reviewed the class action complaint alleging inadequate medical and mental health care at EMCF
- Toured EMCF inmate housing units, main and satellite medical clinics
- Interviewed health care and custody staff
- Observed medication administration by nursing personnel
- Reviewed health records and other medically related documents
- Spoke with inmates

I would like to thank Warden Jerry Buscher and HALLC staff for their assistance in conducting this review.

EMCF is a privately owned facility operated by Management Training Corporation (MTC). The facility has an authorized capacity of 1362 inmates, expandable to 1500 inmates.[1]    Medical Care is provided by Health Assurances, LLC (HALLC) The facility has a specialized mission of providing psychiatric services and individualized and group counseling.

---

[1] Mississippi Department of Corrections website. Updated 5/1/2014.

# Executive Summary

The Mississippi Department of Corrections has chosen to concentrate a large population of seriously mentally ill inmates, many of whom also have serious medical illnesses, at Eastern Mississippi Correctional Facility (EMCF).  Providing adequate health care for this high-acuity medically and mentally ill population requires that EMCF have an adequate structure for providing health care services, including health care policies and procedures; adequate numbers and types of staff; staff training; and a quality improvement program designed to identify, study and implement strategies to correct problems.  In addition, an adequate health care delivery system requires that the components of a health care system function in an integrated manner.

However, my review of EMCF shows that virtually all EMCF health care systems are broken or dysfunctional, resulting in actual and ongoing risk of harm to patients. These systems include access to care, medication administration, chronic disease management, specialty services and infirmary care.  My review of health records shows that medical provider and nursing evaluations are grossly inadequate, and in some cases demonstrate deliberate indifference to the serious medical needs of patients.  My findings show that harm is pervasive and includes the following examples:

- A 25 year-old patient with metastatic testicular cancer that did not have timely access to a urologist following an abnormal ultrasound that show testicular mass.
- A 31 year-old patient with a brain tumor who has not received timely CT scan and referral to a neurosurgeon.
- A 64 year-old patient with undiagnosed and untreated diabetes who reports losing his vision and has not received an ophthalmological evaluation and referral to a retinal specialist.
- A 28 year old patient with bilateral glaucoma who was blind in his left eye, and lost vision in his right eye because he did not receive his glaucoma medications.
- A 40 year-old asthma patient sent to the emergency department and/or hospitalized 7 times in 3 months partly due to not receiving his medication.
- A 33 year-old asthma patient hospitalized three times from January to June 2013. The patient also has left eye blindness  and blurriness and pain in his right eye and has not received an ophthalmological evaluation.
- A 36 year-old patient diagnosed with early glaucoma in May 2012 who had not received glaucoma medications and as of April 2014 has had no further follow-up.
- A 53 year-old poorly-controlled diabetic with diabetic retinopathy and glaucoma who has not received ophthalmological follow-up or glaucoma medications.
- A 55 year-old patient with subdural hematoma following correctional officer use of force who did not received recommended MRI and neurology follow-up.
- A 70 year-old patient with prostate cancer who did not receive urology follow-up and for whom EMCF providers are unaware of August 2013 bone scan and oncology radiation recommendations.

Two cases warrant particular comment. In the case of a 25 year old with metastatic testicular cancer, the physician was aware of the patient's ultrasound showing a testicular mass, but did not

respond to the patient's requests to discuss the ultrasound report despite the patient's repeated requests. I find this to be shocking and cruel.

In the second case, a 55 year old patient with long standing psychosis and delusions was subject to a use of force by correctional officers that resulted in head trauma and bleeding in the brain. Following the use of force, the physician did not document any examination of the patient. He placed the patient in a medical observation room that did not have a toilet where he remained for 6 days before being moved to an infirmary bed. Over the course of 10 days the patient's mental and physical condition deteriorated until he was unable to feed himself and was incontinent of bladder and bowels. The physician and nurses did not monitor the patient for neurological changes at any point during this time, and it was not until he had repeated seizures that he was sent to the hospital and diagnosed with a subdural hematoma from head trauma. Following the patients' return to the facility, the physician did not see the patient.

Patients with serious eye disease are not being evaluated and treated by a qualified health care provider and are not receiving adequate treatment and follow-up. HALLC has contracted with an optician to perform optometry services. An optician is not trained and licensed to evaluate and treat patients with eye diseases. Staff refers to him as "Doctor" yet review of his credentials does not show he is licensed as any kind of doctor. We found multiple cases of patients with glaucoma and other serious eye diseases who are not receiving appropriate care and have lost vision.

In 2011, I prepared a report on health care at EMCF pursuant to the provisions of the settlement agreement in Presley v. Epps, No. 4:05-cv-00148. At that time, I found pervasive deficiencies in health care at EMCF that I would have expected MDOC to address the profound problems I found. Apparently the officials of the Mississippi Department of Corrections did not challenge my conclusions about health care at EMCF, as I understand that they cited it in informing the previous contractor that these deficiencies violated their contract to operate the facility.

Unfortunately, as this report makes obvious, my previous review with accompanying recommendations did not lead to reform of the systemic deficiencies in medical care at EMCF. I found then, as I find now, that responses to inmate health requests are not timely and often result in no meaningful care. Similarly, then and now I found deficiencies in the performances of health care staff resulted in actual and ongoing risk of harm to patients. Then and now I found problems with insufficient numbers of staff, some lacking necessary training and credentialing to treat patients, resulting in grave harm. Then and now I found that medication administration does not follow standards of nursing practice required for patient safety and patients with serious medical conditions do not receive their medications. Then and now I found problems with chronic disease management, including provider failure to perform adequate assessments and monitor patients in accordance with their disease control. Then and now I found serious problems with the maintenance of the medical records. Disturbingly there is no evidence of MDOC ownership and oversight of health care provided to patients at this facility, as shown by the lack of any meaningful quality improvement or  external monitoring program; if there were such oversight, these problems could not exist to this magnitude.

The most significant difference between my review in 2011 and now are that conditions are worse, and the risk of harm to patients has increased.

The problems I found are common to the system as a whole. Thus, the deficiencies in the health care system at EMCF place all patients at risk regardless of their diagnosis, acuity, or health status.


## Policies and Procedures

*MDOC and Health Assurances policies and procedures are neither current nor specific to EMCF and therefore do not provide adequate operational guidance to health care staff.*

I reviewed MDOC and HALLC policies and procedures. The MDOC health care policies were last reviewed in 2004 and 2008. The HALLC medical policies and procedures were last reviewed in October 2009. This is prior to HALLC providing health care services at EMCF and the policies do not provide operational guidance to EMCF staff.

Moreover, MDOC and HALLC corporate health care policies and procedures reference American Correctional Association (ACA) standards and National Commission on Correctional Health Care (NCCHC) Standards for Health Services in Prisons as the applicable standards but their policies and procedures do not meet the standards, and even when they do meet NCCHC standards, they are not compliant with their own policy.

For example, the NCCHC standard regarding Policies and Procedures (P-A-05) requires that responsible health authority review the policies annually and revise them as necessary. The policy manual is to bear the date of the most recent review and the signatures of the facility responsible health authority and responsible physician. The MDOC and HALLC policy and procedures also require annual policy review and revision, but neither set of policies has been reviewed in the past 4 years, and thus they are not compliant with their own policy.

Among MDOC and HALLC policies and procedures that are not compliant with NCCHC standards are those regarding Access to Care, Chronic Disease Management and Infirmary Care.

HALLC policy and procedure regarding Access to Care is based upon two NCCHC standards (P-A-01 and P-E-07) but in fact is not in compliance with the standards. The applicable NCCHC standard (P-E-07) states that staff reviews health requests within 24 hours of receipt and schedules nonemergency requests within the next 24 hours (72 hours on weekends). The HALLC policy states that if an appointment is required it will be scheduled within 7 days of triage. This is not timely care.

The HALLC chronic disease policy does not provide any guidelines for timeliness of scheduling initial and follow-up appointments. The policy states that the frequency of visits will be based upon the severity of the patient's condition and whether it is improving, stable or deteriorating but there are no procedures specific to EMCC to provide staff guidance to implement the policy.

## Access to Care

*To review access to care, I toured housing units; main and satellite medical clinics, reviewed health records, interviewed custody and health care staff, and spoke with inmates. My review showed that at EMCF inmates do not have timely or appropriate access to care. A registered nurse conducts sick call two times per week for each housing unit which does not meet NCCHC standards to schedule patients within 24 hours of when nurses triage health requests. In addition I found that nursing assessments were almost universally inadequate and referrals to providers do occur in a timely manner. I also found that nurses exceed their scope of practice by ordering x-rays without a physician order. The frequency of sick call, lack of successful referrals, combined with nurses exceeding their scope of practice suggests lack of adequate nurse and clinical staffing at EMCF.*

For routine access to care EMCF inmates submit a medical services request (MSR) form in secure boxes accessed only by health care staff. Health care staff is to collect and date-stamp the forms daily. A registered nurse is to triage the urgency of each request (urgent or routine) and schedule the patient to see a nurse in accordance with the urgency of the request. Following evaluation, the nurse may treat according to a nursing protocol or refer the patient to a physician or nurse practitioner.

During tours of the housing units I found that inmates were aware of the procedure for accessing sick call and correctional officers had blank health service request forms, except in Unit 6D. However, although inmates report having access to medical request forms, they report that staff does not see them in a timely manner following submission of their request. This was substantiated by record reviews.

For access to urgent care, inmates are to inform an officer who is to notify health care staff to evaluate the patient. If inmates are locked in their cells they are supposed to be able to push an alert button to notify the officer in the control station (the picket) of the need for assistance. However, we found that not all rooms had functional alert buttons. In housing unit 3A we found that two of three cells had non-functional buttons. In housing unit 3C two of two cells had functioning buttons. In housing unit 6D we found that one room (104) did not have a button; two rooms functioned properly (102 and 109) and in two rooms (101 and 107) the light kept flashing and the officer could not turn it off. When we discussed the nonfunctioning alert buttons with staff, they reported that inmates yell to get the attention of correctional staff. A Captain reported that it was a very old system that sometimes malfunctions. This is not a reliable system to ensure timely access for inmates with urgent conditions and inmates report that correctional officers do not respond when they push alert buttons.[2]

Record review also demonstrated that EMCF patients do not have timely access to care for their serious medical conditions and in accordance with NCCHC standards, HALLC policies and procedures and as clinically indicated. Examples of delayed access to care are described below.

---

[2] Terry Kupers MD Expert Report.

A 25 year-old man arrived at MDOC through CMCF on 9/17/2010 and transferred to EMCF on 10/29/10.[3]    His medical diagnoses include spina bifida, syncope versus seizure disorder, substance abuse and depression. His admission history and physical was unremarkable but did not include a genital examination.

On 8/8/12 the physician saw the patient noting that he had progressive pain in his right testicle for over two months.[4]  According to the physician's note, the patient was seen by another physician and ultrasound was ordered but not completed. His examination showed tenderness of the right testicle with radiation to the inguinal area with soft mass-like effect. His diagnosis was epididymitis and he treated the patient with doxycycline and ibuprofen. He planned to have the patient return in one week and schedule the ultrasound on the next visit.  However, it appears that the physician did not enter and authorize the medications in the EMR so that the order could be forwarded to the pharmacy and filled. On 8/10/12 a RN reentered the medications but the order was not countersigned by the physician.  On 8/15/12 another nurse entered the medication orders but again it was not countersigned by a physician.  The patient did not receive his medications.

On 8/20/12 the physician saw the patient and noted that he had not received his medications and still had intermittent pain.  He did not document an examination other than to note "no change". Epididymitis. Will start medications as ordered.

On 9/5/12 the patient submitted a health care request regarding his testicle and a RN saw the patient. The patient reported that he was seen in July for swelling of his testicles and completed medications but his testicles are still swollen. The nurse did not examine the patient but referred him to the physician.

On 9/6/12 the physician saw the patient noting that he has had testicular pain and swelling since June 1, 2012. The patient was not improved after antibiotics and has continued swelling. He noted that his left testicle was firm and tender on the left side. He did not examine the right, affected testicle. He planned to schedule the ultrasound and to have the patient return when completed.

On 9/24/12 the patient underwent scrotal ultrasound for right testicular pain and a mass that was consistent with a neoplastic process. The radiologist contacted the EMCF physician the same day and discussed the findings but the physician did not see the patient or document the phone call with the radiologist.

On 9/26/12 the physician electronically signed the ultrasound report. Another copy was signed on 10/17/12.

On 10/3/12 the patient submitted a request stating that he had an ultrasound on 9/24/12 and had not yet received results. On 10/4/12 a nurse documented referral to the physician. The physician did not see the patient.

---

[3] Patient #17.
[4] The patient's medical record appears to be incomplete as the physician references encounters that are not in the provided medical records.

On 10/13/12 the patient submitted another request stating that he had an ultrasound and had not seen the doctor. He was experiencing extreme pain. The form is not signed and dated as being received by EMCF health care staff and no plan is documented on the form.

On 10/14/12 the patient wrote to the Warden stating that he had been having problems getting medical treatment. He has had an enlarged testicle with "knots on it" since June 1, 2012. He was finally able to get an ultrasound on 9/24/12 but despite constant pain had not been able to see the doctor to find out the results. He felt that he was getting "the runaround' and he feared losing his right testicle "because now over ¾ of it was hard as a rock". He asked the warden for help. A note at the bottom of the form indicated that he was scheduled for surgery.

On 10/17/12 an LPN received a complaint (ARP) from the patient regarding not getting his ultrasound test results. The nurse documented she could not find the report in the record and contacted the radiologist on 10/16/12 and noted the findings suggesting neoplasm. The nurse reported this to the physician. In a separate note the LPN said that she found the report in the record but that the physician did not electronically sign the report until that day. The patient was upset because he has not received pain medication. The nurse added ultram and ibuprofen to the order that was electronically signed by the physician.

On 10/26/12 the patient underwent a right radical orchiectomy and the pathology report confirmed cancer. On 10/29/12 the physician wrote a note that the patient had surgery and it was uncomplicated. There is no subjective or objective documentation to suggest he saw the patient.

On 11/1/12 the patient saw the urologist for follow-up and a follow-up CT scans showed that he had an enlarged retroperitoneal lymph node. The physician did not date and sign the report.

On 11/7/12 the physician wrote a progress note but it is unclear whether he saw the patient There are no objective data except: good, no distress at this time.

In December 2012 the patient started chemotherapy and on 12/26/14 he transferred to CMCF.

**Assessment:** It appears that documents are missing from this patient's health record, including any health requests that the patient forwarded after he found a right testicular mass and from the other physician who ordered an ultrasound. However, the available documentation shows that the physician was shockingly and deliberately indifferent to the patient's symptoms and diagnosis of testicular cancer. The patient's care was delayed and he has metastasis requiring chemotherapy. On 9/24/12 the radiologist called Dr. Faulks to inform him of the ultrasound report and thereafter, medical record documentation suggests that the physician never saw the patient to discuss the ultrasound results and plan of care. It is unclear from the physician's scanty documentation whether he saw the patient after his surgery to ensure that the patient was healing properly.

In another case, a 36 year-old man transferred to EMCF on 11/5/13.[5] His medical history includes psychosis and alcohol abuse. Of concern is that the patient has documented 25 lbs.

---

[5] Patient #4.

weight loss (145 lbs to 119 lbs.) over two years, but has not been medically evaluated for weight loss. Shortly after arrival the patient complained of a severe cold. On two separate occasions, nurses did not perform any assessment of the patient but treated him with over-the-counter medication. The patient did not improve and a month later the physician saw him but did not note or address the patient's weight loss or respiratory symptoms lasting a month. He treated the patient with an antibiotic but ordered no follow-up to determine if he improved. A cough lasting >3 weeks plus weight loss warrants a medical evaluation for tuberculosis and other serious medical conditions. Another potential cause of the patient's weight loss is his dental condition. On 11/15/13 the dentist documented that the patient was missing 15 of 32 teeth and noted he needed upper and lower partials. On 12/10/13 the patient reported being unable to chew his food due to missing teeth and he requested partial plates. On 1/12/14 the dentist documented that partials were "not indicated" although the patient is missing half of his teeth. The dentist did not clinically evaluate the patient to even assess his ability to chew food and whether he had weight loss that may have medically justified partial plates or a soft diet. The dentist also did not meet with or communicate with the patient regarding his decision. Having heard nothing, the patient submitted another health request; however the dentist did not see the patient but simply charged him $6.00. Charging the patient without seeing him is callous disregard.

**Assessment:**  This patient has not had timely and appropriate evaluation of his 25 pound weight loss.

In another case a 31 year-old man arrived at CMCF on 9/4/13 and transferred to EMCF on 10/3/13.[6] His medical history includes mild mental retardation, seizure disorder, brain tumor, asthma, diabetes, a "heart condition", psychosis and depression. Upon arrival at CMCF staff noted that he had a brain tumor and obtained copies of his medical records that were scanned into the record on 9/5/13. When he transferred to EMCF the patient requested to see the physician about his brain tumor. The patient submitted a request to see the doctor for a brain tumor, blood clots in legs and arms and also needing a snack bag, because he was hungry. On 10/9/13 the nurse saw the patient. The nurse did not take any history of the patient's complaint. His weight was 146 lbs. and vital signs were normal. The patient reported: "I have a brain tumor and blood clots in my arms and legs. I got hit by a truck." Under objective the nurse documented, "This inmate has a wild story to tell and I am not sure what happened or when. He does have several physical issue and some mental issues." The plan was muscle rub, ibuprofen and shampoo. The nurse did not perform a review of systems (e.g., headache, weakness, etc.) or explore the patient's history to obtain more information about the patient's reported history of blood clots; or document a referral to the provider. This was not an appropriate assessment. On 10/11/13 the physician saw the patient but did not inquire about neurological symptoms or address the patient's other chronic diseases. He planned to obtain his previous medical records, not realizing the patient's South Central Hospital records were already in the medical record. The physician did not see the patient again for follow-up of his brain tumor until 3/3/14, almost five months after the initial visit. At that time the patient reported intermittent headaches with facial numbness and balance problems. The physician again documented a plan to obtain previous medical records and order a brain CT.

---

[6] Patient #2.

On 3/14/14 the patient submitted a request for abdominal pain. On 3/17/17 the nurse saw the patient. The nurse noted medical history that indicated that he had abdominal surgery and that the patient "states that he had his hemorrhoids removed and half his colon in 2010 in Hattiesburg". The nurse documented that she was unable to verify the information in the EMR. The nurse performed no examination. The nurse planned to request x-rays of his abdomen and colon; and informed him to eat small bites and chew his food well. The nurse did not document notifying a provider and did not obtain an order for an abdominal x-ray. On 3/19/14 the radiologist performed an abdominal x-ray noting that there was no ordering provider information or reason for x-ray.

**Assessment:** As of the time of our visit on 4/23/14, the patient had not had the CT scan or further medical follow-up for his brain tumor. The nurse performed an inadequate assessment for abdominal pain and ordered an x-ray without a physician order which exceeds the nurses' scope of practice. The radiologist performed the x-ray without a physician order.

We also found cases in which patients are not provided timely access for conditions that threaten life and limb. A 25 year-old man transferred to EMCF in 2011.[7] On Friday, 6/21/13 a nurse practitioner saw the patient who complained of waking up the day before with a painful, hot, swollen left hand. The patient had a fever of $100.4^0$F. His hand was warm, edematous and he was unable to move all five fingers. The NP ordered antibiotics but we found no documentation in the record to show he received the antibiotics. On Sunday 6/23/13 a different NP saw the patient noting that the patient's hand infection had extended to the patient's elbow. He had a fever (T=$102.3^0$F) and rapid pulse (Pulse=125/minute). The NP sent the patient to the hospital where a surgeon found severe infection involving at least three separate areas: the left upper extremity hand, forearm and elbow. The surgeon discussed with the patient the possibility of losing a limb and he underwent two surgeries while hospitalized. On 6/28/13 the patient was transferred directly to MSP for continued care with antibiotics.

**Assessment:** This patient did not have timely care for a serious infection that put him at risk for losing his arm.

I also found that patients' did not receive timely care for dental pain and infection. I reviewed a sick call log of dental complaints from July 2012 to October 2013.[8] The log includes the date of the request, inmates name and ID, nature of complaint, and date the patient was scheduled and the date the patient was seen. From January 2013 to October 2013 the majority of entries have no date scheduled and no date seen. For all intents and purposes, the dental sick call log is not an effective tool for tracking and ensuring that patients with dental pain and infection are seen in a timely manner.

A 54 year-old man transferred from CMCF to EMCF on 10/9/13. His medical history includes schizophrenia, depressive disorder, diabetes mellitus, and hypertension. He submitted the following requests:

- On 10/31/13 he submitted a request complaining of severe dental pain that was received the next day. A nurse did not see the patient to assess the severity of his pain and

---

[7] Patient #3.
[8] HALLC dental 2-33.

determine the urgency of the dental referral.  On 11/20/13, three weeks, later the dentist saw the patient and extracted his tooth.

- On 12/1/13 the patient submitted a request indicating he had his tooth pulled and now he had a jaw infection. He requested antibiotics.  On 12/4/13 a RN received and triaged the form and referred the patient to a provider but the appointment did not take place.

- On 12/9/13 the patient submitted another request complaining of needing another tooth pulled. A nurse did not see the patient.  On 12/15/13 (15 days from his initial complaint) the dentist saw the patient and extracted tooth #4.  The dentist ordered antibiotics and analgesia.

- On 2/1/14 the patient submitted a MSRF for a facial cyst "as big as a baseball". A nurse did not see the patient. In the meantime, on 2/5/14 the physician saw the patient urgently and performed incision and drainage on the facial cyst.  He did not order a follow-up visit to determine if the patient if the patient's condition improved. When a nurse did see the patient on 2/11/13 the patient reported fluid collected in the same location as the I&D. The nurse did not take vital signs or describe the patient's wound.

**Assessment:** This patient did not receive timely care for his dental pain and infection.

Patients also do not receive timely care for treatment of skin and wound infections.[9]

# Chronic Disease Management

*Chronic disease management was evaluated by reviewing applicable HALLC policies and procedures, tracking logs and health records.*

*My review showed that chronic disease tracking systems are inadequate and physicians and nurse practitioners do not see EMCF patients in a timely manner following their arrival at the facility and on an ongoing basis. When providers see patients they do not perform adequate evaluations including review of systems (e.g., chest pain, shortness of breath) that are pertinent to the patient's chronic diseases; reference and address laboratory tests; assess the patient's disease control; and document a plan specific to the patient's needs, including follow-up appointments. Physical examinations are almost always documented as being completely normal which raises questions about the thoroughness and accuracy of the examinations. Medical record documentation and poor disease control suggest that patients are not receiving their medications, but medication administration records have not been scanned into the record since October 2013 and it is not possible to accurately evaluate the extent to which medication discontinuity contributes to poor disease control. Cases describing these problems are documented below.*

---

[9] Patient #10.

## Inadequate Diabetes and Hypertension Care

In an egregious example, a 64 year-old man with schizophrenia and TB infection arrived at EMCF in 2011.[10]   On 9/9/12 a physician[11] performed a physical examination and ordered labs that showed the patient had previously undiagnosed and poorly controlled diabetes. [12] The physician did not review the patient's lab reports or see the patient for follow-up, and as of our review in April 2014 the patient's diabetes is undiagnosed and untreated.  Moreover, on 1/29/13 the patient submitted a health request stating he was going blind.  Health care staff documented no response to him other than to note that he was being charged $6.00.  On 3/7/13 an optician performed an optometry examination.[13]   The patient's visual acuity was so severely decreased that he was only able to count fingers.  The optician referred the patient to an ophthalmologist but the appointment did not occur and he has had no further medical follow-up.

**Assessment:** Poorly controlled diabetes leads to heart attack and kidney failure. It is also the leading cause of blindness.  This patient has had undiagnosed and untreated diabetes for at least 18 months and is losing his vision. We reported this case to the Health Services Administrator prior to leaving the institution on 4/25/14. However As of 5/15/14 there is no documentation in the record that the patient has been medically evaluated.

In another case, a 47 year-old man transferred from CMCF to EMCF on 2/10/14.  His medical history included diabetes, hypertension, asthma, latent TB infection, and adjustment disorder. A EMCF nurse did not medically screen the patient on the day of arrival. His chronic disease medications were not renewed. That night at 0025 a nurse checked the patient's blood sugar. It was so high the glucometer machine could not measure it. The nurse called the physician three times for insulin orders to lower the patient's blood sugar.  The patient's hypertension was also poorly controlled (BP=152/90 mmHg).

On 2/11/14 a nurse medically screened the patient. The nurse did not recheck the patient's blood sugar or perform peak expiratory flow rate (PEFR) measurements to assess the patient's asthma. The nurse entered the patient's chronic disease medications into the EMR but the physician did not electronically sign the order and it's unclear when or whether the patient received medications because no MARs have been scanned into the EMR to show what medication the patient is receiving.

On 2/11/14, the physician saw the patient noting that he has blurry vision, his blood sugar was greater than 500 the previous night, and his diabetes was difficult to control at his previous facility. The patient's blood pressure was not at goal (BP=141/91 mmHg). The physician ordered labs, referral for podiatry and eye examination, and enrollment in the chronic disease program. He planned to begin lantus and regular insulin per sliding scale but apparently did not authorize

---

[10] Patient #15.
[11] This physician no longer works at the facility.
[12] On 9/12/12 the patient's blood sugar was 345, a random sugar >200 is diagnostic for diabetes. On 9/26/12 the patient's hemoglobin A1C showed his diabetes was poorly controlled (HbA1C=11.1%, nondiabetic =<6.5%). These lab reports were reviewed on-site but not provided in requested medical records.
[13] An optician is a technical practitioner who designs, fits and dispenses corrective lens, but does not diagnose and treat eye diseases.

the medication orders in the EMR until 2/18/14. The physician did not document what sliding scale insulin doses that the patient was supposed to receive according to his blood sugar values.[14]

Over the following weeks the patient's blood sugars were in the high 200 to 400 range but nurses did not document taking any action, including notifying the physician to obtain orders for sliding scale insulin when it appears none were authorized. Even when the physician rewrote orders on 2/18/14 for Lantus and regular insulin on a sliding scale, nurses did not consistently document doses of administered to the patient. As a result, the EMR shows that when the patient's blood sugar was extremely elevated, nurses did not administer insulin to the patient.

For example, I found the following entries in the EMR for which there was <u>no documentation that the nurse administered scheduled or sliding scale insulin</u>:

3/4/14 am BS=402.

3/9/14 am BS=457.

4/13/14 am BS=299

4/17/14 am BS=237

4/19/14 pm BS=503

4/23/14 am BS=330

Thus, the record shows that the patient did not receive ordered medical care his poorly controlled diabetes.

On 2/24/14 labs confirmed that the patient's diabetes was poorly controlled (hemoglobin A1C=12.5%, goal<7.0%). The physician reviewed the report on 3/3/14 and added another type of insulin to the patient's regimen but did not see the patient to discuss the lab results and reason for changing his treatment. As of 5/15/14 a provider has not seen this patient for management of his diabetes, hypertension and asthma. I find no documentation that the patient has received the physician-ordered eye and foot examinations. Based on the patient's current medication profile, the oral medications he was taking at CMCF (glucophage and glipizide) were not continued at EMCF.

**Assessment:** This record shows that at each step of the process, the patient's medical care is inadequate. He was not screened timely upon arrival, his medications were not renewed timely, nurses do not consistently document administration of scheduled or sliding scale insulin doses in the medical record; medication orders do not include sliding scale insulin orders so there is no documentation of what insulin dose the patient is <u>supposed to receive;</u> and in many cases there is no documentation of what insulin dose, if any, that he actually receives. This is extremely dangerous for the patient. In addition, the physician does not clinically evaluate the patient in

---

[14] The term "sliding scale" refers to the progressive increase in the pre-meal or night time insulin dose, based upon predefined blood glucose ranges. For example, if the blood glucose is 150-199, give 1 unit of regular insulin; if the blood glucose is 200-249 give 2 units of regular insulin, etc.

accordance with his disease control and makes changes to the patient's treatment regimen without discussing the changes with the patient. It appears that the patient has not had medication continuity for his oral diabetes medications, but there are no medication administration records in the EMR to confirm this. The patient has not received ordered eye and foot examinations. The patient also should be considered for a statin drug in accordance with new cholesterol guidelines.

In another case, a patient has not received appropriate and timely care for rheumatoid arthritis and has not been diagnosed with hypertension that he has had for at least 18 months. This is a 65 year-old transferred to EMCF on 2/6/13.[15] His medical history includes rheumatoid arthritis, delusional disorder and adjustment disorder.

On 5/8/13 a NP saw the patient for multiple complaints including swelling of his hand joints and a black mole on his thigh. The NP did not take a history of his joint complaints but ordered referred the patient to dermatology for removal of the mole. On 6/24/13 the mole was removed but I find no documentation that the pathology report was received, reviewed and addressed with the patient.

On 10/19/13 the NP saw the patient again for having "staph all over his body" and swollen joints. The NP noted swelling and deformity to the patient's hands, wrists, and ankle. His blood pressure was elevated (BP=145/67 mmHg). The NP ordered labs for rheumatoid arthritis that were not completed for a month. These tests were consistent with rheumatoid arthritis and signed by the nurse practitioner (11/24/13) and physician (11/25/13) but neither provider scheduled the patient for follow-up.

Four months later, on 2/13/14 the physician saw the patient for a reported staph infection and recent elevated rheumatoid level. He noted the patient had multiple bilateral joint deformities including ulnar deviation of the fingers. The patient's blood pressure was elevated (BP=157/85 mmHg) The physician's diagnosis was rheumatoid arthritis without active synovitis and eczema. His plan was nonsteroidal anti-inflammatory medications (NSAIDs) as needed and cream/lotion for his skin. The provider did not address the patient's elevated blood pressure. The provider did not request follow-up.

On 4/16/14 the physician saw the patient for an erythematous and swollen left elbow as well as a boil on his right chest wall. He noted the patient has a long history of bacterial skin infections and that the patient had a large, edematous and erythematous right olecranon bursa[16] and a small draining ulcer on right chest wall. The physician drained the patient's right elbow and sent the fluid for culture. He ordered Bactrim DS twice daily for 14 days, Motrin for pain and inflammation, and that staff wrap the elbow with sterile gauze daily. On 4/22/14 the physician again drained the patient's elbow and planned to refer him to a rheumatologist.

---

[15] Patient #9.

[16] The bursae are sacs located throughout the body that act as cushions between bone and soft tissues. The olecranon bursa is located at the elbow.

Review of the patient's electronic medical record flow sheet shows that he has hypertension for over 18 months for which he had not been diagnosed or treated. His blood pressures have been as follows:

| | |
|---|---|
| 10/19/12 | BP=167/88 mmHg |
| 10/24/12 | BP=163/85 mmHg |
| 2/27/13 | BP=160/87 mmHg |
| 8/19/13 | BP=150/98 mmHg |
| 2/13/14 | BP=157/85 mmHg |

**Assessment:** This patient did not receive timely evaluation, diagnosis and treatment for his rheumatoid arthritis and he has undiagnosed and untreated hypertension that places him at risk for heart attack, stroke and kidney disease. The patient did not have any follow-up for the black mole on this thigh and I find a no pathology report in the record.

## Inadequate Asthma Treatment

A 40 year-old man with severe asthma, TB infection and weight loss arrived at EMCF on 12/31/13.[17]   He was sent to the emergency department and/or was hospitalized for poorly controlled asthma 7 times in the next five weeks, including ICU admission for respiratory failure.[18]  In addition, From March 2013 to April 2014 the patient had. a documented weight loss of 45 lbs (195 lbs.→150 lbs.). EMCF providers have not noted or addressed his weight loss.

On 12/31/13 when the patient transferred to EMCF, a nurse entered medication orders into the electronic medical record (EMR) but these orders were not cosigned by the physician until 1/6/14. The next day the patient developed respiratory distress and was sent to the hospital. The patient told the admitting physician that he had not received his medications following his arrival to EMCF and also had weight loss.[19] The following day the patient was discharged from the hospital back to EMCF with antibiotic orders; however the EMCF physician did not review and address the medication order until 1/6/14. By this time, the patient had been readmitted to the hospital for a second time.

At the time of our site visit, none of the patient's MARs had been scanned into the EMR, however following our onsite review, the patient's February 2014 MAR showed that he did not receive his asthma medication (Singulair) from 2/1 to 2/5/14. On 2/6/14 he presented to medical in respiratory distress and was sent to the hospital where he was admitted to the intensive care unit.

Each time the patient discharged back to the facility, he was placed in the infirmary for medical observation.  However, the physician did not formally admit the patient to the infirmary and write admission orders for the monitoring that should be provided while he was in the infirmary,

---

[17] Patient #12.

[18] The patient was sent to the emergency department and or hospitalized on 1/1/14, 1/5/14, 1/17/14, 2/6/14, 2/7/14, 3/10/14 and 3/30/14.

[19] The patient's medication administration records from January to April 2014 are not scanned into the medical record at the time of our review. .

such as vital signs and peak expiratory flow rates.[20]. The physician also did not include orders for notifying the physician if the patient's condition was deteriorating (e.g., Temperature above $101^0$F, PEFR below 200, and oxygen saturation below 90%, etc.). The lack of appropriate medical orders contributed to inadequate monitoring by the nurses while the patient was in the infirmary. Moreover, independent of physician orders, nursing assessments were completely inadequate. Nurses did not assess the patient in any meaningful way, and did not recognize that the patient's condition was deteriorating until the patient was in full-blown respiratory distress and had to be sent back to the hospital. [21]

**Assessment:** This patient has not had adequate treatment of his asthma resulting in multiple hospitalizations. Factors contributing to the patient's poor control include not receiving ordered medications, failure to intensify the patient's baseline treatment by increasing the dose of inhaled steroids, inadequate infirmary care resulting in inadequate assessments of the patient and failure to recognize his deteriorating condition until the patient was in full-blown respiratory distress. Finally, this patient's asthma is of such severity that he should be under the care of a pulmonologist, but this has not been considered. In addition to not receiving adequate treatment for asthma, The EMCF medical providers' have also not medically evaluated the patient for his 45 pound weight loss. Given the patient's history of TB infection, ruling out tuberculosis in paramount not only for the patient, but to prevent transmission of this highly infectious disease to staff and other inmates.

In a second case, a 33 year-old man transferred to EMCF in 2011.[22] At the time of my review, his medical history included severe bipolar disorder, hypertension, asthma with hospitalization and intubation, pulmonary embolus in August 2003, pulmonary aspergillosis[23] and gastrointestinal bleeding. While at EMCF he was hospitalized 3 times for asthma from January 2013 to June 2013, but his medication administration records show that the patient did not receive ordered asthma medications. Health care staff documented that the patient was a "No Show" and noncompliant with his medications. When he was seen at chronic disease clinics and urgently, providers and nurses did not adequately assess the patient by asking about the frequency of asthma symptoms, including nighttime awakening, frequency of inhaler use, among others. The providers did not collect objective data to assess disease control such as the patient's baseline peak expiratory flow rates (PEFRs) either at chronic disease visits; and before and after routine and/or urgent nebulizer treatments. Instead, staff used oxygen saturation to assess the patient's asthma. This is problematic because by the time a patient's oxygen saturation drops below normal (<95%), the patient is in severe respiratory distress, whereas PEFRs measure the degree of airflow obstruction before decompensation occurs. Health care staff did not provide adequate treatment and monitoring when the patient was in respiratory distress. On more than one occasion the provider ordered that the patient be placed in the infirmary for observation, but did not order appropriate clinical monitoring (e.g., vital signs, PEFRs) in accordance with the severity of the patient's condition. Nor did the physician instruct the nurses when to notify him

---

[20] Peak expiratory flow rate (PEFR) is a test that measures how quickly patients can expel air. It is measured with a small hand-held device called a peak flow meter and is used in the evaluation of patients with asthma and COPD.
[21] A disconcerting finding is that a mental health counselor documented rounding on the patient and stating that he was without complaints at the same time the patient was hospitalized. This raises questions about the credibility of the medical record.
[22] Patient #5.
[23] Aspergillosis is a disease caused by a fungal infection.

of changes in the patient's condition. This resulted in delays in sending the patient to the hospital. In addition, upon the patient's return from the hospital, providers did not see him in a timely manner, if at all. Neither did providers see this patient for chronic disease management more frequently and intensify his asthma regimen when it was apparent that his condition was poorly controlled.[24] Thus, the primary means by which this patient received medical treatment was to present to medical with an urgent condition. . This places the patient at increased risk of preventable morbidity and mortality. It is no wonder that the patient requested a transfer so that he could get adequate treatment.

In addition, this patient transferred to CMCF in June 2013 and transferred back to EMCF in April 2014. While at CMCF he was hospitalized 5 times, twice in respiratory failure requiring intubation. During these admissions he was diagnosed with pulmonary embolus and aspergillosis. In February 2014 the hospital physicians attributed his deterioration to lack of medication continuity despite personal communication with staff at CMCF. When he transferred back to EMCF in April 2014, neither the physician or nurse practitioner documented an awareness of the patient's medical history while he was at CMCF, the importance of ensuring that he receives his medications, or that the patient requires close monitoring due to the severity of his disease.

A second condition for which the patient is not receiving adequate treatment is right eye blurriness and pain. Review of the health record shows that he lost his vision due to chronic retinal detachment in 2009. Following left eye trauma in 2011 he experienced increased left intraocular pressure that caused eye pain for which he was treated with glaucoma medications. In January 2013 when the patient was hospitalized for asthma, hospital physicians discharged the patient on glaucoma medications that were not renewed at EMCF. In March 2013 the EMCF physician documented that the patient had left eye blindness due to unknown reasons. The physician did not perform an adequate evaluation or establish a medical diagnosis. Instead he deferred to the "optometrist" but did not monitor the patient to determine if the evaluation took place or what the results were.

**Assessment:** This patient has not received timely and appropriate care of the patient's asthma, and the physician and nurse practitioner appear to be unaware of the patient's other serious pulmonary diagnoses. Lack of medication continuity and inadequate asthma evaluations and treatment are contributing factors to hospitalizations. The patient has also not received timely evaluation of his right eye. Since the patient has lost sight in his left eye, it is even more critical that he receive timely ophthalmological evaluation and treatment.

## Inadequate Care of Patients with HIV Infection

This 28 year old man transferred to EMCF on 8/1/11. His medical history includes HIV infection, latent TB infection, schizophrenia, and impulse control disorder. The patient is housed in Unit 6.

---

[24] The patient is on a low dose of inhaled steroid, which could be increased in accordance with asthma guidelines and FDA medication labeling instructions.

**Assessment:** This patient is receiving routine monitoring for his HIV infection and his disease is well-controlled. However, there are problems regarding his care. First the medical history information appears at the top of each chronic disease visit is either unclear or not contemporaneously accurate. For example, the medical history states that only the right lung functions well, but this has not been further explored or clarified. In addition, the medical history indicates that the patient has shingles with an open wound on his right side. This is old historical information and not current. This may be a provider documentation issue if the provider copies and pastes this clinical information into the note at each chronic disease visit; or it may be a medical records issue if the EMR automatically populates the note with this information. In either case, the provider should document whether each problem mentioned in the medical history is a current problem. This is not occurring.

The nurse practitioner does not perform an appropriate HIV or TB review of systems. For example, at the 4/4/14 visit the patient complained of weight loss that the NP did not evaluate. This is clinically significant because the patient has a history of TB exposure and documented 24 lbs. weight loss since July 2013 (180 lbs.→156 lbs).

The NP did not evaluate new symptoms such as when the patient complained of his mouth feeling "locked-up" and having an open wound. The NP should have evaluated the patient for tetanus and oral infections. The NP does not evaluate medication adherence or document labs values in her notes and comment on trends (improving, stable, or worsening). The patient has not received all HIV recommended care such as a lipid profile and immunizations.

Another issue is that the Problem List notes that the patient is tuberculin skin test positive but according to a mental health counselor note the patient was exposed to a TB case but did not test positive. Therefore the patient should be tested annually for TB infection but has not been tested since 2010. The patient should be evaluated for TB now because of weight loss.

Finally, the nursing evaluation for the patient with chest pain was inadequate as the nurse did not perform any meaningful assessment or address the patient's abnormally low pulse. The physician initiated blood pressure medication without discussing it with the patient. Providers should not initiate medications without meeting with the patient to discuss the reasons for the medication, frequency of dosing, side effects and to answer any patient questions.

In another case, the patient has received routine HIV care but one of his HIV medications that contains two antiretroviral drugs was not renewed and he is now receiving only two of four prescribed HIV medications. This is a 55 year old man who transferred to EMCF in late 2010 or early 2011.[25] His medical history includes paranoid schizophrenia, HIV infection and hip pain. His current medications are boosted Kaletra, Haldol Decanoate, benztropine, artane, levetiracetam, and naproxen.

Prior to his transfer to EMCF the patient was taking Truvada, Reyataz and Norvir. Apparently his medication adherence has been good and his HIV disease has been generally well-controlled. In August 2009 his weight was 171.

---

[25] Patient #18.

At the time of his transfer to EMCF his weight was 141 pounds and by 5/11/2011 his weight is 135 lbs.  Medical staff did not address his weight loss.

In August 2011 the patient was withdrawn and did not come to treatment team and was given an RVR.  On 10/15/11 the patient was in the infirmary with mitts on. The psychologist saw him for daily rounds. The patient who asked why the mitts could not come off. The psychologist reported that the Warden ordered that the patient had to have the mitts on. It was decided by the head staff and there is nothing the psychologist could do to change that decision.

On 11/27/2012 an LPN saw the patient for a "chronic disease" visit. The patient's weight was 140 lbs. and his vital signs were normal.  No other assessment was performed.

On 3/8/13 a nurse practitioner saw the patient but documented that she was unable to obtain information from the patient because he was too drowsy.  Nevertheless, the NP documented a complete physical examination. His weight was 143 pounds. The NP did not reference the patient's HIV labs. His Dilantin level was subtherapeutic and her plan is to make sure he gets his snack and Dilantin.

On 8/6/13 the physician documented that the patient had HIV and was on treatment. He did not perform an assessment of the patient but planned to refer him to the HIV clinic. On 8/13/13 the only HIV medication noted on his list of current medications is Kaletra.

On 10/13/13 an NP saw him for HIV care. The NP performed no review of systems and from the note it appears she did not even speak with the patient. Labs were not referenced. Exam was documented as being completely normal including neurological exam. The NP made no reference to recent head trauma and subdural hematoma. A follow-up appointment was requested

On 10/22/13 the ID provider saw the patient noting that he was familiar with him having seen him during his hospitalization for seizure. He noted that the patient had a history of seizure and was found to have a subdural hematoma after being beaten up at the prison.  Labs showed his HIV disease was well-controlled. He indicated that he needed follow-up with neurosurgery and to return in 3 months.

On 12/23/14 his CD4 count was 325 and viral load was undetectable. His lipids were elevated (LDL =134). The increased LDL was not addressed.

On 3/12/14 his medications are Truvada and Kaletra.  On 3/24/14 his cholesterol was higher (LDL=152) and HIV labs showed he was well-controlled (CD4=341 and viral load <20).

On 3/28/14 the patient was found lying on the floor with a laceration to his head. He was incontinent of bladder. Because of a possible seizure he was sent out to the hospital. There were no acute findings on CT. The staff placed sutures and then returned him to EMCF.  I find no documentation that the new physician saw the patient upon his return from the hospital.

On 3/31/14 the physician wrote an order to remove the sutures on 4/2/14, but they were not removed for two more weeks (4/15/14).

On 4/7/14 an RN documented a return from off-site note from a (?) ID specialist but she does not appear to have seen the patient. She noted that the patient was to have follow-up on 7/17/14.

On 5/9/14 a NP saw him for chronic disease follow-up. There is no documentation of any discussion with the patient. Vital signs were taken but no temperature. No scale present to weigh the patient.  No labs,  assessment of disease control, or documentation of what medications the patient was taking were ordered or performed. No did the NP note  the patient's elevated LDL.

As of 4/19/14 the only HIV medication the patient is taking is Reyataz, and Truvada appears to have fallen off the medication list,   but I found  no MARs in the record to show what medications the patient is receiving.

**Assessment:**  HIV treatment is unacceptably deficient because the nurse practitioners who see the patient do not perform an HIV review of systems,  document any discussion with the patient, note current labs, or document the patient's disease control.  Fortunately, an ID specialist saw the patient in October 2013 and January 2014 and his HIV disease is well-controlled on the current regimen. However, in March 2014 his Truvada, a combination of two HIV medications, does not appear to have been renewed and he is now taking only a boosted protease inhibitor. Current MARs are not scanned into the record, so I cannot confirm if Truvada has been actually discontinued with resulting effects on his viral suppression. If left off Truvada this will quickly lead to viral resistance and deterioration of his HIV disease.

## Inadequate Care of Patients with Serious Eye Disease

Patients have a right to a medical professional -who can diagnose and treat their serious medical conditions.  For patients with diseases that involve the eyes, providers trained and licensed to diagnose and treat eye diseases include optometrists and ophthalmologists. HALLC has contracted with an optician to perform optometry services.  The optician performs examinations that he is not qualified to perform.

I reviewed a Sick Call Log that contained eye complaints and requests for glasses dated from 11/12/12 to 11/7/13.[26] The log shows the date the request was received, inmate name and ID, type of complaint, date scheduled and date seen.  The log shows that the majority of entries have no date scheduled and no date seen, even for patients complaining of inability to see and blurred vision, which may represent a change in visual acuity or a more serious eye disease such as glaucoma.  This suggests that the tracking system to  ensure that the  optometry appointments are conducted timely is not being maintained. This evidence of inadequate services was supported by my record review in which I found that patients with serious eye disease do not have timely access to a qualified medical professional and are not receiving adequate treatment and medical follow-up.
One such example involves a 50 year-old man transferred to EMCF in 2012 and transferred to CMCF in October 2013. His medical history included hypertension, hyperlipidemia, focal retinitis and retinochoroiditis[27] and bipolar disorder or antisocial personality.

---

[26] HALLC Eye 2.134.
[27] Retinochoroiditis is a disease of the retina.

On 5/30/13, the optician performed a complete optometry examination noting intraocular pressure and retinal findings in both eyes.[28] He described the disc, margins, macula, vessels, background and vitreous for both eyes as being normal. He diagnosed him with dry eye and a cataract and wrote a prescription for glasses.

On 8/8/13 Dr. McMillan saw the patient for focal retinitis and retinochoroiditis, left eye decreased visual acuity and dry eye syndrome. Dr. McMillan did not describe the retina for the right eye because it could not be visualized due to a cataract. In the left eye there was retinal scarring inferiorly. In his note he referred to the optician as "Dr. Snell" who diagnosed his cataract. Dr. McMillan recommended cataract extraction to improve visual function. The patient has not had further follow-up for removal of his cataract at EMCF. He transferred to CMCF in October 2013 and on 3/26/14 underwent removal of a right eye cataract

**Assessment:** The optician documented a completely normal optometric examination of both eyes when the patient had a right eye cataract that precluded visualization of the retina. There was no documentation in the record while the patient was at EMCF that Dr. McMillan's recommendations were addressed.

In other cases, I found that patients with glaucoma and other eye diseases did not receive ordered medications. Earlier in this report, I described a patient who was blind in his left eye due to a chronic detached retina for which glaucoma medications were prescribed but not received; and who was having pain and blurriness in his right eye and had not had adequate evaluation and treatment by an optometrist or ophthalmologist. [29]

In another example, a 53 year-old man transferred to EMCF on 12/27/11.[30] His medical history included diabetes. The patient also had glaucoma but this diagnosis was not documented on the problem list. We interviewed the patient who reported that he had glaucoma but was not receiving medication for it. I reviewed the record and noted there is there was not an active medication order for glaucoma medications.

His record shows that on 3/15/12 the optician saw the patient who reported that "things look dark". The optician diagnosed the patient with cataracts and recommended referral to UMC for cataract and diabetic consultation. On 4/3/12 the optician saw the patient again who reported he was "going blind". The patient had significantly decreased visual acuity and his intraocular pressure was borderline elevated. The optician noted the patient had nonproliferative diabetic retinopathy and was a [glaucoma suspect (POAG) suspect] suspected to have glaucoma?. The plan was to refer to the patient to the ophthalmologist ASAP in less than a month. The optician recommended Alphagan eye drops (for glaucoma), glucose and blood pressure control.[31]

On 4/24/12 the ophthalmologist saw the patient for diabetic retinopathy and treated the right eye with laser therapy and planned to schedule the patient for treatment of his left eye. I do not find

---

[28] This report was not scanned into the electronic medical records that were forwarded to me.
[29] Patient #5.
[30] Patient #8.
[31] There is no clear documentation that the optician spoke with or obtained an order from a provider licensed to prescribe medications for this medication.

documentation that the patient returned to him for treatment of the left eye. On 10/18/12 the ophthalmologist saw the patient for diabetic retinopathy follow-up. He noted that the patient "declined presence of any drops since left here last, seen any eye doctor." He noted that the patient had stable macular diabetic edema and severe nonproliferative diabetic retinopathy , bilateral cataracts that did not require surgery and primary open angle glaucoma for which he recommended Xalatan drops at bedtime in both eyes. The ophthalmologist recommended follow-up in four months, but that did not occur. Seven months later, on 5/21/13 the patient was sent to another ophthalmologist who wrote only a brief note that the patient's vision was less than 20/200 and he unable to improve vision. He recommended continuing eye drops for glaucoma. The patients' diabetes remained poorly controlled. On 9/13/13 the optician saw the patient and performed what appears to be a limited exam, not measuring visual acuity or intraocular pressure.  The patient has not been seen by an ophthalmologist since.

**Assessment:** This patient has diabetic retinopathy, macular edema, glaucoma, and cataracts but is not receiving timely and appropriate care for these conditions.  Most urgently, the patient is not receiving glaucoma medication.  I am concerned that the optician is performing examinations outside his scope of practice as an optician.


# Specialty Services

*At EMCF patients do not have timely access to specialty services and follow-up of specialist recommendations resulting in a risk or actual harm to the patient. I found lack of timely access to be the case in eleven of eighteen records I performed for this review.*

This includes:

- A 25 year old patient with metastatic testicular cancer who did not have timely access to a urologist following an abnormal ultrasound showing a right testicular mass.[32]
- A 31 year old patient with a brain tumor who has not received timely CT scan and referral to a neurosurgeon.[33]
- A 64 year old patient with undiagnosed and untreated diabetes who has reported losing his vision and has not received an optometry evaluation and referral to a retinal specialist.[34]
- A 33 year old patient with left eye blindness present with blurriness and pain in his right eye who has not received ophthalmological evaluation.[35]
- A 36 year old patient diagnosed with early glaucoma in May 2012 who had not received glaucoma medications and as of April 2014 has had no further follow-up.[36]
- A 53 year old poorly controlled diabetic with diabetic retinopathy and glaucoma who has not received ophthalmological follow-up or glaucoma medications.[37]

---

[32] Patient#17.
[33] Patient #2.
[34] Patient #15.
[35] Patient #5.
[36] Patient #13.
[37] Patient #8.

- A 47 year old poorly controlled diabetic who has not received optometry and podiatry examinations.[38]
- A 50 year old patient with retinochoroiditis and right eye cataract for whom the retinal specialist recommendation removal. The patient had no further follow-up at EMCF.[39]
- A 65 year old patient with rheumatoid arthritis who presented with symptoms in May 203 and was diagnosed in November 2013  whose request for rheumatology referral was not made until April 2014.[40]
- A 55 year old patient with subdural hematoma following correctional officer use of force who did not received recommended MRI and neurology follow-up.[41]
- A 70 year old patient with prostate cancer  who did not receive urology follow-up and for whom the EMCF providers are unaware of August 2013 bone scan and oncology radiation recommendations.  The patient also did not receive a CT scan for blackout spells. This patient is described below.[42]

This 70 year-old man arrived at EMCF on 2/13/14. He had previously been housed at EMCF but transferred to a county facility in April 2013. His medical conditions included hypertension, CAD with stents in 2008, atrial fibrillation, COPD, degenerative joint disease (DJD), prostate cancer since 2006 and urinary tract infection.

Prior to arrival at EMCF the patient was under the care of a urologist for prostate cancer. While he was at another correctional facility, on 8/13/13 the patient had a bone scan for generalized bone pain and history of prostate cancer that showed increased activity in the cervical, lumbar spine, wrists and knees that was associated with DJD [explain] although metastatic disease could not be completely ruled out. On 12/19/13 the patient had an oncology radiation consultation at Gulfport Memorial Hospital. The oncologist discussed Lupron therapy with the patient who declined treatment at that time but was told to let him know if he changed his mind.  On 1/22/14 a health transfer summary from Harrison County Detention Center noted that the patient had a radiation oncology referral pending at Gulfport Memorial Hospital although it had actually taken place in December.

On 2/13/14 the patient transferred to EMCF and medical and mental health screening were performed upon arrival.

On 2/19/14 the physician saw the patient for a history and physical. The physician did not address the patient's history of prostate cancer and recent oncology consultation. On 2/20/14 labs were essentially within normal limits except his PSA was significantly elevated, and on 2/21/14 the physician referred the patient to urology.  On 3/18/14 a urologist saw the patient and noted that he had previously been lost to follow-up.  He had complaints of urinary frequency, nocturia, urgency, and incomplete bladder emptying, and was recently started back on Flomax.  Urinalysis showed blood and nitrites. Bladder scan post voiding residual (PVR) showed 570 cc of urine. He recommended increasing Flomax to twice daily. The urologist planned to get records of Dr.

---

[38] Patient #6.
[39] Patient #14.
[40] Patient #9.
[41] Patient #18.
[42] Patient #11.

Mathews, and have the patient return in 2 weeks to check PVR (post void urine residual). Upon return to EMCF an RN noted the urologist's recommendations, including follow-up in two weeks. The patient's flomax was increased the same day.

On 3/11/14 the physician saw the patient for blackout spells . He ordered a CT scan with and without contrast. As of 5/15/14 the procedure had not been completed and the patient had no further follow-up for this condition.

On 3/20/14 the physician reviewed the report but did not see the patient.  Requested follow-up with the urologist was due on 4/1/14 but as of 5/15/14 had not taken place.

On 3/21/14 an NP saw the patient for chronic disease management.  The NP referenced the patient's prostate cancer and that he had dysuria, but did not ask about obstructive urinary tract symptoms or note the urology appointment that occurred 3 days earlier.  The NP made no reference on the status of the patient's prostate cancer treatment or follow-up.

**Assessment:** This patient did not receive timely and appropriate continuity of care for his prostate cancer and black-out spells.  We reported this case to the Health Services Administrator prior to leaving the institution. On 6/10/14 the patient died, reportedly a possible suicide.

# Pharmacy Services and Medication Administration

*I evaluated pharmacy and medication services by interviewing staff, and reviewing applicable policies, reviewing medical records including medication administration records, observing nurses administer medications in general population and restricted housing units. Following this review I have determined  that medication policies and procedures are inadequate, nurses do not follow nursing practice standards when administering medications, and health records do not show that patients receive medications for serious medical conditions.*

## Pharmacy Services

HALLC policy and procedure on Pharmaceutical Operations is dated October 1, 2009. The policy is not site-specific and does not provide sufficient operational detail regarding pharmacy services.  The policy states that medication services will be addressed in the following policies and procedures:
- Medication Administration
- Prescribing Authority and Stop Dates
- Transcription of Medical Orders
- Medication Administration Record
- Medication Errors
- Psychotropic Medications
- Monitoring Psychotropic Medications

However, HALLC policies only include the first medication administration policy and not the other six policies. Nor do the HALLC policies reference other applicable policies, such as MDOC, to be adhered to in the absence of HALLC policies.

The Health Services Administrator reported that that pharmacy services are provided by IHS an off-site pharmacy service. HIS packages medications in single containers that may include multiple medications for the nurse to administer at a medication line. Each container is labeled with the names of the medications, the color and shape of the medication, and the medication instructions.

To initiate a medication order, a provider enters a medication into the electronic medical record, electronically signs the order, and staff prints and faxes the order to the pharmacy. The medications are usually delivered the next day. In some instances, such as at intrasystem transfer or when the patient returns from the hospital, a nurse enters the patient's medication orders into the EMR and the provider is supposed to review and electronically sign the order. However we found problems with documentation of medication orders in the medical record. In some cases, the provider does not electronically sign his own order and the pharmacy does not fill the prescription. In other cases, a nurse enters the order but the provider does not sign the order in a timely manner, if at all. These issues resulted in medications not being received in a timely manner following intrasystem transfer or hospitalizations, and contributed to patient's poorly-controlled chronic diseases and re-hospitalizations of patients.[43]

Although I observed variances in how nurses and providers entered and signed medication orders in multiple records, I was not able to assess whether or not patients received medications timely if at all because medication administration records (MARs) had not been scanned into electronic health records for six month, since October 2013. Thus it was not possible to assess medication timeliness or continuity because of the incomplete health record.

This is not simply a medical records issue; it negatively impacts care. The failure to scan MARs into the medical record in a timely manner results in an incomplete health record that can result in harm to patients. It does not permit providers to know whether or not the patient is receiving ordered medical treatment. It does not permit staff to assess whether the patient is refusing medications or whether there are other reasons that the patient is not receiving medication such as failure to renew a chronic disease medication, or the medication not being available from the pharmacy.

It is critical to know whether patients are taking their prescribed medications so the treatment plan can be adjusted accordingly. For example, if a patient with diabetes or high blood pressure is taking his medication, but the patient's disease is not well-controlled, the provider should adjust medication dosage or add a new medication. However, if the patient is refusing his medication the provider should explore the reasons with the patient, including medication side effects or lack of understanding of the reason for the medication. This is important in any patient setting, but particularly so in a facility treating seriously mentally ill patients, many of whom have serious medical conditions.

---

[43] Patients #5, #6 and #12.

I also found that in the record of diabetics, physicians do not write medication specific orders for sliding scale insulin in the patient's record. The term "sliding scale" refers to the progressive increase in the pre-meal or night time insulin dose, based upon predefined blood glucose ranges. For example, an order may state that, if the blood glucose is 150-199, give 1 unit of regular insulin; if the blood glucose is 200-249 give 2 units of regular insulin, etc. As noted earlier in this report, physicians do not document in each patient record the scale of insulin doses to be given to the patient based upon blood glucose ranges. Apparently, insulin sliding scales are considered a standing order. This practice is not in compliance with NCCHC standards.

Moreover, nurses do not document administration of scheduled and sliding scale insulin with corresponding dosages onto to MARs. Instead, the health services administrator informed us that nurses are to document administration of schedule and sliding scale insulin in the same electronic notes that nurses document blood sugar checks, which is usually done twice daily. However, I found cases nurses in which nursing documentation of  scheduled or sliding scale insulin was deficient, or not documented at all, even when glucose levels are extremely abnormal.[44] For example, nurses documented "Humulin insulin per s/s protocol". Therefore, not only is there no medication order in the record for sliding scale insulin, nurses are not documenting how much insulin they have given the patient. The lack of documentation of insulin administration means that patients have not received the medical care that was ordered.

Another serious problem is patients with glaucoma not receiving their medications to reduce intraocular pressure that can lead to vision loss Review of one record showed a multitude of contributing factors including the ophthalmologists recommendations not being ordered by EMCF physician, failure of the nurse or pharmacy to transcribe the medication order onto the MAR, and lapses of medication orders.  Another glaring issue is nurses' failing to review the patient's MAR and note that the patient has not received the ordered glaucoma medication. The following case is a shocking example of this.
This is a 28 year old man who transferred to EMCF on 8/25/09.  His medical history includes and glaucoma from age 9. On 9/11/09 an optician/optometrist saw the patient. He noted that the patient was taking intraocular pressure drops (for glaucoma) and started the patient on Timolol that he received timely in September and October of 2009.

The patient did not receive his glaucoma medication for the following months: 11/2009, 12/2009, 1/2010, 2/2010, 3/2010, 7/2010, 8/2010, 9/2010, 11/2010, 1/2011, 3/2011.

In April 2011 the optometrist added another medication because the patient's glaucoma was not - controlled and his vision was worsening. The planned to see him in a month.  However the medication was not ordered.

The pattern of missed medications continued and the patient did not receive his glaucoma medications for the following months: 06/2011, 07/2011, 08/2011, 09/2011, and 10/2011.

On 11/11/11 the optometrist saw the patient again and believed that he was taking Xalatan and Timolol his glaucoma was still uncontrolled. He noted that he last saw the patient on 4/1/11. He

---

[44] Patients #6,  #13 and #20.

added a third medication, Combigan to Xalatan and Timolol and referred him to an ophthalmologist. He requests to see him in one month.

On 2/2/12 the patient was seen by an ophthalmologist who noted advanced glaucoma in both eyes and elevated intraocular pressures despite being on Xalatan. The medication record from the prison indicates that the patient is only getting one IOP drug but the patient claimed he was getting three drugs. The consultant recommended aggressive lowering of intraocular pressures. Given his advanced glaucoma he should see a glaucoma specialist. He recommended 3 IOP medications (Xalatan, Combigan and Trusopt. Return to clinic in 3 weeks if a glaucoma specialist could not be found). The patient was not referred to a glaucoma specialist or to the ophthalmologist.

His February 2012 MAR showed that he received only the Lantanoprost per order of Dr. Faulks and not Trusopt or Combigan.

The pattern of the patient not receiving his glaucoma medication continued until June 2013 when he received all three medications. By this time, vision in his right eye had significantly deteriorated. He was transferred from EMCF in July 2013.

**Assessment:** This case is shocking for a number of reasons. The physician did not monitor the patient to ensure that he received timely ophthalmological care, and did not ensure that the specialists recommendations were implemented once received. In addition, it appears that the patient receiving the glaucoma medications from the pharmacy was dependent on the medication nurses ordering the medication from the pharmacy. The patient was also receiving psychotropic medication on a daily basis. Therefore, medication nurses saw the patient day after day after day, seeing the order for KOP glaucoma medication on the MAR, and each month took no action to ensure that the patient received medications for a serious medical condition. This is the epitome of deliberate indifference. Finally, it was only the month before the patient left EMCF that the medication was changed from KOP to nurse administered, a change that could have easily been made in the preceding years if anyone had cared to notice.


## Medication Administration Process

Medication administration takes place twice daily, at 0900 and 2100, although there are some medications given at 1300 when ordered three times daily. In general population a nurse takes a medication cart to the housing units. Inmates come to a window to receive their medications. In segregation nurses administer medications cell to cell. A correctional officer is assigned to each nurse. The officer is supposed to provide general security and conduct oral cavity checks.

I observed three nurses administer medications on general population housing units 3 and 4 and found that nurses do not follow standards of nursing practice.

- None of the nurses asked the patient to state his name when he came to the window.
- Nurses asked each inmate to present their identification (ID) badge, however, when inmates presented their ID badge none of the nurses consistently looked at the name on

the  badge to ensure that it was the correct patient. One nurse simply tapped the ID badge when the inmate presented it.

- All nurses had the medication administration record book with them at the time they administered medications.  Two nurses did not document on the MAR at the time they administered the medication to the patient.  The third nurse checked the MAR and compared it to the medication package and documented administration of the medication on the MAR immediately <u>before</u> she gave the medication to the patient.
- Inmates are provided a small soufflé cup with water that in some cases likely does not provide enough water to swallow pills.
- Neither the nurse nor correctional officers consistently performed oral cavity checks to ensure that the inmate swallowed his medication.

I also observed nurses administer medications in segregation units 5A and 5D. These nurses also did not adhere to standards of nursing practice when administering medications.

- Nurses did not ask inmates to verbally identify themselves when they came to the door. There is no identifying information on the inmates' cell.
- Nurses requested identification badges from inmates when the presented to the door, but did not consistently look at the name on the badge to ensure it was the correct inmate.
- Some cell doors had a fine mesh metal grate covering the window so that it was not possible for the nurse to read the ID badge.
- Nurses administered medications by passing the medication package through a slot in the cell door.
- The nurses made no attempt to observe the inmate swallow the medication by requesting that the officer open the door to perform oral cavity checks, or even to look through the cell door window.
- Nurses did not document administration of medications at the time they administered the medications to the patient.

See Skipworth's report. We found piles of piles in many cells.

By this medication administration process there is virtually no way for nurse to ensure that they have administered the right medication to the right patient and that the patient has taken the medication.  In some records, it was later shown that patients did not take their medications.[45]

We interviewed inmates who reported that a nurse asking for an ID badge at the time of medication administration was a new practice.  Some inmates reported that it had occurred for the past week and others said several weeks. One inmate reported that he has not had an ID badge for a year and a half and never had problems getting his medication until recently. On the day we observed medication administration, he reported that the nurse would not give it to him.

I spoke to an officer on the unit and asked when nurses started requesting ID badges while administering medications and she reported about 2-3 weeks.  I also asked what procedure

---

[45] Patient #11.

should be followed for an inmate to obtain a new ID badge.  She responded that she did not know the process for obtaining a new ID badge.

Following medication administration, I returned to the medical unit.  Later that afternoon I observed 3 nurses documenting on medication administration records (MARs).    One medication administration record book had a divider that indicated they were MARs from 5D.

Nurses must ensure that they administer the right medications to the intended patient, , at the right dose at the right time, by the correct route.   The standard of practice for nursing administration is to positively identify patients at the time of administration using two identifiers, to ensure that the pharmacy-prepared medication has the correct medication and dosage, and to  observe the patient taking the medication.  Following these steps, the nurse document administering the medication.

# Medical Observation/Infirmary Care

*To evaluate this area, I toured the medical observation/infirmary unit, reviewed an Infirmary Log, and reviewed records of patients placed in medical observation/infirmary.*

*EMCF staff report that they have a medical observation unit and not an infirmary. However my review showed that physicians place inmates requiring higher level care into the medical observation unit/infirmary. This includes patients with poorly controlled asthma, chest pain, head trauma, facial burns and post-operatively following surgery.[46] Record review showed that these patients suffered preventable morbidity and mortality due to inadequate policies and procedures, as well as deficient monitoring and treatment by health care staff.*

I reviewed the HALLC policy and procedure regarding Sheltered Housing dated October 1, 2009. This policy is based upon ACA and NCCHC standards regarding health services in prisons. The policy states that:

"Sheltered housing will be provided for inmates who, though not requiring admission to an outside hospital, still require care for an illness, injury or condition or diagnosis that requires medical management."

The categories of sheltered housing include:

- Sheltered Housing-For inmates whose medical conditions restrict their activities and inhibits their access to medical care from their housing area. This care is also reserved for inmates who require a more protective environment <u>but do not require twenty-four hour nursing care:</u>
- Extended Care-For inmates who are terminally ill, have impaired mobility, and/or are in the final stages of a chronic disease
- Medical Observation-For inmates who require short term observation, <u>usually less than 24 hours.</u>

The policy also states that the Medical Director will be responsible for monitoring the care of sheltered housing patients, that nurses will make rounds a minimum of once per shift or more often as required by the patient's needs, conditions and clinical orders and that these rounds will be documented in the medical record; and that significant changes will be reported to the responsible practitioner. Patients will be within sight or sound of a qualified health care professional through visual or auditory requirements.

Although based upon the NCCHC Infirmary Care Standard (P-G-03) the policy is not compliant with the standard. The NCCHC standard requires that a complete inpatient record is kept for each patient and that the record includes::

---

[46] Medical Admission Infirmary Log. HALLC Adm Log 1-42.

- admitting order that includes the admitting diagnosis, medication, diet, activity restrictions, diagnostic tests required, and frequency of vital sign monitoring and other follow-up;
- complete documentation of care and treatment given;
- the medication administration record; and
- A discharge plan and discharge notes.

At EMCF there are 10 cells in the infirmary that are used for mental health or medical patients. Health care leadership reported that the beds are used primarily for mental health patients on suicide precautions and few beds are used for medical purposes. The cells have no call system for patients to contact staff if they are in distress. Staff reported that correctional officer conduct 30 minute checks. Thus, patients are not within sight or sound of staff at all times as required by NCCHC standards and by HALLC policy.

We observed one cell used for psychiatric observation cell that is not equipped with an in-cell camera. On the day tour there was a patient in this room. The glass of the cell is so obscured that even standing right outside the door it was difficult to see the patient unless he moved. Although used for patients on suicide precautions, the cells are not suicide proof as there are metal bars on the beds from which patients could attempt to hang themselves.

Although leadership reported that the rooms are primarily used for mental health purposes and short term medical observation (i.e. less than 24 hours), my review showed that physicians and nurses place patient's with serious medical conditions, such as poorly controlled asthma and head injuries, in the infirmary for up to a week at a time without formal admission and without??? accompanying medical orders for activity, diet, vital signs and other clinical monitoring appropriate to the patient's condition; as well as clinical criteria for notifying the physician when the patient's condition is deteriorating.

Medical providers do not perform rounds and document examinations for patients in the infirmary in accordance with the severity of their conditions. In one egregious case described below, a physician placed a patient in a medical observation cell with a head injury following a use of force by correctional officers. The physician did not document any medical evaluation of the patient or perform any neurological assessment during the 10 days the patient was in medical observation or the infirmary. [47] The patient's condition progressively deteriorated until he developed seizures and when sent by ambulance to the hospital was found to have a subdural hematoma from trauma.

The patient is a 55 year old man who transferred to EMCF in late 2010 or early 2011. His medical history includes paranoid schizophrenia, HIV infection and hip pain.

On Thursday 8/29/13 at 1336 a mental health counselor (MHC) saw the patient at the request of security because he refused to remain housed with his cellmate who he said pushed him. The MHC interviewed the cellmate who reported being unaware of any problems and the MHC

---

[47] This physician is no longer employed at EMCF.

advised the patient to contact his treatment team regarding cellmate issues. He documented that the patient was referred to the NP for evaluation after becoming combative with a lieutenant.

I observed a videotape of the post-altercation care in the medical unit. The videotape shows the officers escorting the patient to the medical section with his hands cuffed behind his back. The patient's face and shirt were bloody. Two nurses approached the patient but did not identify themselves or advise the patient what evaluations or treatment they were about to provide the patient. The nurses began wiping blood from his face and their only direction to him was to "sit still". They did not perform complete vital signs or conduct a neurological assessment.[48] A nurse placed a steri-strip over a laceration above his right eye. The physician was notified and came into the room after the nurses cleaned the patient's face.[49] The physician performed a cursory evaluation, asking the patient to stick out his tongue, whether he had double vision and how many fingers the patient could see. He palpated the patient's scalp and above his eye. He told the officers that he planned to keep the patient in medical observation and that he would see the patient in the morning and determine whether to send him out for an orbital CT. Neither the physicians nor nurses documented an assessment of the patient in the record. The physician did not write any medical orders regarding what the nurses were to observe the patient for and what circumstances were to be reported to the physician (e.g. deterioration in level of consciousness, etc.). The physician did not see the patient in the morning.

On 8/29/13 at 2205 the psychiatric NP assessed the patient following a use of force. The NP documented that the patient was severely agitated with rambling disorganized speech, but also noted that he was alert and oriented. The patient reported auditory hallucinations encouraging him to hurt himself and others. The NP prescribed Haldol 10 mg IM now, to increase Haldol Decanoate to 200 mg IM monthly, Cogentin 2 mg twice daily and Artane 5 mg twice daily. The NP planned to monitor the patient in the medical holding tank for psychiatric observation and follow-up in the morning.

At 2240 an RN documented that the patient would be housed in holding area 541 for the night for psychiatric and medical observation.

On 8/30/13 at 0745 a psychologist saw the patient noting that a "code black" was called yesterday because the inmate was "threatening and spit on an officer". The psychologist described the patient as dirty, drowsy, disoriented, and paranoid with auditory hallucinations and inappropriate affect. He recommended that the patient be placed in medical observation.

On 8/30/13 at 2106 the NP saw the patient who was lying on a mat in the holding room. She described him as catatonic and unable to respond to questions but was rocking on the mattress. The NP's plan was to continue to monitor in medical and may admit to the infirmary when a bed is available.

On 9/1/13 MH staff noted the patient was unkempt and dirty and must be allowed to shower and the room cleaned and disinfected.

---

[48] Later a nurse measured the patient's blood pressure but took no other vital signs.
[49] The physician came into the room briefly while the nurse's cleaned blood from the patient's face, left and then returned.

On 9/1/13 the physician documented that the patient has purulent drainage coming from his right eye. The patient was "unable to give history due to mental impairment". Lacerations above eye were not draining.  The physician's assessment was post-traumatic discharge from right eye and laceration not draining. He ordered Rocephin and Bactrim and noted that he may need to get orbital CT. He ordered that the patient be kept on the unit as inmate is mentally unable to take care of himself and noted an intent to see the patient in the morning This did not occur.

Over the next 8 days the patient's condition continued to deteriorate.  He was left in a "medical observation cell that had no bathroom and he began urinating on the floor and then on himself. Staff noted that he was having difficulty eating foods but he remained in the medical observation room because an infirmary bed was not available.  Mental health staff made rounds and documented that the patient was not in distress.

On 9/4/13 NP sees the patient noting that he is still being monitored in a holding cell awaiting a medical bed. He continues urinating on the floor on several occasions and, on others, knocks on the door to go to the bathroom. Today he appears to have decompensated urinating on the floor. The NP admitted the patient to an infirmary bed and ordered 15 minute checks by security.  The following day the MHC documents that the patient has symptoms of (tardive) dyskinesia.

On 9/8/13 at 1125 the patient was taken to the shower and assisted by a medical orderly; the patient slid out of the chair and had a ½" laceration on his forehead. The patient was unable to sit up by himself, to ambulate or perform activities of daily living.  He was incontinent of bowel and bladder. The nurse did not take vital signs or notify anyone.

On 9/9/13 the patient had three seizures, one witnessed by the NP. The NP notified the physician who ordered the patient sent to the hospital by ambulance. At the hospital a CT scan showed fluid accumulation that was initially thought to be infectious, but later determined to be a subdural hematoma from trauma.[50]  On 9/18/13 the patient was discharged back to EMCF with a recommendation for repeat MRI in 3 weeks. The physician did not see the patient upon his return. On 9/26/13 the physician wrote a note stating that the patient was discharged from the hospital in stable condition. He performed no examination. He noted that the patient had an abnormal MRI and was to see Dr. Malloy three days after repeat MRI was completed. I find no documentation that the MRI was performed or that the physician ever saw the patient again.

**Assessment:** For years this 55 year-old man with paranoid schizophrenia, seizure disorder and HIV infection has had poorly controlled schizophrenia whose treatment consisted primarily of Haldol, Cogentin, Artane and Risperdal.  He frequently had symptoms of auditory hallucinations and agitation.  On 8/29/13 the record suggests that he was having conflict with his roommate and instead of moving the inmate to another location, this mentally ill patient was advised to take it to the treatment team. Then because the patient "became threatening and spit on an officer" correctional staff used force that resulted in head trauma sufficient to cause subdural hematoma.

---

[50] On 10/22/13 the Infectious Disease provider saw the patient at the hospital saw him for follow-up for HIV care He noted that the patient had a history of seizure and was found to have a subdural hematoma after being beaten up at the prison.

The videotape shows that correctional staff continued to remain in control of the situation. The physician and nurses did not instruct the officers to uncuff the patient to perform any meaningful examination. They did not document an examination in the EMR or monitor the patient following head trauma. When the patient was placed in medical observation/infirmary, neither medical nor mental health staff adequately monitored and intervened on behalf of the patient, even after he was unable to take care of himself as evidenced by his urinating on himself, inability to feed himself, or to bathe. The lack of appropriate evaluation, treatment and monitoring by the physician is the epitome of indifference and extended after the patient returned from the hospital.

## Health Records

MDOC has implemented an electronic medical record (EMR) Centricity throughout the system. Staff is to document all clinical encounters either in the EMR or on paper that is scanned into the EMR in a timely manner so the information is readily available to all staff caring for the patient. Timely scanning of health documents into the correct location decreases the risk of medical errors.

My review showed that EMCF health records are not complete. In some records, providers and nurses either did not document clinical encounters or the information was never scanned or imported into the EMR.[51] In addition, electronic medical record notes and other entries are not filed in chronological order or are in the wrong location, making care difficult to follow.[52] This increases the risk that providers and nurses will miss important clinical information that should be addressed and increases the risk of harm to patients.

Providers do not ensure that the Problem List is complete and updated. As a result, the problem list of diagnoses and the list of medications on the Summary Sheet routinely differ from those listed in progress notes created after the problem list. the Problem List and current medications is different depending on whether a summary form is opened in the record, or individual progress notes. For example, in one patient record reviewed the summary sheet noted that the patient's medications were atenolol and tums, but progress notes that contained his current list of medications had other medications, including metformin, lisinopril and norvasc.[53] This practice defeats the purpose of having a Problem List and the summary sheet.

Many notes in the record are derived from templates (e.g., chronic disease notes) that are designed to ensure that medical providers obtain an adequate past medical history, review of systems, physical examination and document an assessment and plan. However, in practice EMCF providers do not document adequate notes for the following reasons: a section on past medical history either automatically populates the chronic disease note, or providers copy and paste previous notes into the chronic disease note. In some cases, the information documented in the note is not contemporaneously accurate but is not corrected by the provider. This was demonstrated in a record of an HIV patient for whom a provider documented in November 2012

---

[51] Patient #17 and Patient #18.
[52] These findings were also noted in Marc Stern's MD report.
[53] Patient #1.

that the patient had "shingles and an open wound on the right side".  At each subsequent chronic disease visit, this information appeared in the note without being addressed or amended by the provider. Second, under review of systems (ROS), providers are supposed to ask the patient if he is having symptoms of his chronic diseases (e.g., chest pain, shortness of breath, seizures, etc.). Yet documentation showed that providers did not obtain adequate ROS, but simply documented what chronic disease the patient was being evaluated for. Providers did not reference labs in the note, and plans of care appear to be autopopulated or copied and pasted in the note, and did not bear a relationship to the actual plan of care ordered for the patient. In this sense, the design of the note contributes to poor care.

As noted earlier in this report, MARs have not been scanned into the record since October 2013 and it is not possible for health care staff to contemporaneously determine if patients receive their medications.

I also found that providers do not review and address laboratory reports in a timely manner that results in harm to patients.   As noted earlier in this report a physician ordered labs for a patient in September 2012 and the labs showed that the patient had undiagnosed and poorly controlled diabetes, but the physician did not review the report or follow-up with the patient and as of our visit had undiagnosed and untreated diabetes.

My review also showed that when patients transfer to EMCF, providers do not adequately review previous medical treatment, including reports of previous hospitalizations[54] and specialty services.  Moreover, EMCF providers do not review and follow-up specialist reports in a timely manner, if at all, that has resulted in systemic delays of care for patients with serious medical conditions and harm to patients.[55]

## Quality Improvement and Clinical Performance Reviews

*To assess this area I reviewed HALLC policy and procedure on Continuous Quality and Improvement Program and reports of EMCF quality improvement activities .  My review showed that for all intents and purposes there is virtually no meaningful quality improvement program at EMCF.*

HALLC has a policy on Continuous Quality and Improvement Program dated 10/1/2009.  It is based upon the NCCHC standards and is comprehensive with respect to the types of activities that should be occurring to identify, and correct problems that may negatively impact the delivery and quality of health care services at EMCF. However, I found no documentation of continuous quality improvement meeting minutes that demonstrated compliance with the policy.

I reviewed one report entitled Quarterly Performance Review of Onsite Inmate Health Services Provided by Health Assurance LLC at Private Institutions.  Dated April 1 through June 30, 2013. This report was prepared on behalf of the Mississippi Department of Corrections, Office of Medical Compliance by AdminPros, LLC.

---

[54] Patient #2.
[55] Patient #11.

This report reflects how well HALLC is meeting compliance measures required by the contract between MDOC and HALLC at the four prisons that HALLC provides health care services. There are 8 compliance standards that HALLC must achieve greater than 90% in order to be compliant with the contract.  These include:

- Non-Emergent Health Requests (Sick Call) triaged within 24 hours for which EMCF scored 97.5%
- Sick Call referrals shall be evaluated by a physician or mid-level practitioner within 7 days of the original complaint for which EMCF scored 96.7%
- All inmates will have routine dental prophylaxis no less than every two years, for which EMCF scored 97.3%.
- Inmates referred by a physician or nurse shall be seen by an optometrist within 30 days of referral. Wexford could not produce data for EMCF for reasons not stated.
- A licensed radiologist shall interpret all radiographs the next workday and provide written results within 48 hours after reading. Wexford could not produce data for EMCF for reasons not stated.
- Emergent medications are filled and administered within 24 hours after being prescribed. The EMR is unable to provide reports that can be audited.
- Inmates referred for psychiatric evaluation in all cases except upon intake shall be seen by a psychiatrist within 14 calendar days of referral. The EMR is unable to provide reports that can be audited.
- Inmates who are on psychotropic medications shall be seen by a psychiatrist at least every 90 calendar days, to include telemedicine where appropriate. The EMR is unable to provide reports that can be audited.

Thus, out of 8 compliance measures, EMCF was compliant for 3 measures that could be audited. However, based upon my review, I find these data to be  not credible.   There is no evidence that EMCF has a meaningful quality improvement program,

Respectfully Submitted,

_____                    June 16, 2014
Madeleine LaMarre FNP-BC                  Date

The opinions expressed in this report are based on the information currently available to me. If additional information is brought to my attention (for example, additional documents or depositions), I may amend or supplement my opinions.

# Appendix A – Patient ID Numbers

| Patient Number | Name | Inmate ID |
|---|---|---|
| ███████ | ██████████ | ████ |
| ███████ | ███████████ | ████ |
| ███████ | █████████ | ████ |
| ███████ | █████████ | ████ |
| ███████ | █████████████ | ████ |
| ███████ | ████████ | ████ |
| ███████ | █████████ | ████ |
| ███████ | █████████ | ███ |
| ██████ | ███████ | ████ |
| ███████ | █████████ | ████ |
| ███████ | ██████████ | ████ |
| ███████ | ██████████ | ████ |
| ███████ | █████████ | ████ |
| ███████ | █████████ | ████ |
| ███████ | ██████████ | ████ |
| ███████ | ██████████ | ████ |
| ███████ | █████████ | ████ |
| ███████ | ███████████ | ████ |
| ███████ | ██████████ | ████ |
| ███████ | ███████ | ████ |

# Exhibit 1

**Madeleine LaMarre, MN, FNP-BC**
**1143 Citadel Drive N.E.**
**Atlanta, Georgia 30324**
(404) 694-0655
mlamarre55@gmail.com

## EDUCATION

Master of Nursing. Emory University, Atlanta, Georgia. March 1982.
Bachelor of Science in Nursing. Russell Sage College, Troy, New York. May 1977.

## EXPERIENCE

**Correctional Health Care Consultant            May 2003 - Present**
**Madeleine LaMarre PC**
Provides technical assistance to correctional agencies regarding correctional health
care delivery systems. Assists agencies with the development of health care
policies, protocols, training, and clinical auditing processes to ensure compliance
with generally accepted professional standards.  Serves as an independent
correctional expert monitoring compliance with settlement agreements and/or
remedial plans in state and county correctional agencies (see Appointments).  Also
serves in a consulting role to assist health care providers in achieving patient/client
goals with emphasis on patients with acute, chronic, and infectious diseases.

**Family Nurse Practitioner                      January 2005 to April 2007**
**Medical College of Georgia**
Provided clinical care to women with HIV infection at Georgia Department of
Corrections facilities. Works in collaboration with an infectious disease trained
physician to provide HIV consultation services regarding HIV infected patients to
physicians, nurse practitioners, nurses and other health care providers.

**Statewide Clinical Services Manager           January 1995 - December 2004**
**Georgia Department of Corrections**
Assessed, monitored, and evaluated the quality of health services within state
correctional facilities. Assisted in the development of health care policy, clinical
guidelines and standards for the agency. Conducted site visits to correctional
facilities to provide consultation and technical assistance to health care providers in
meeting clinical, professional standards, and state law. Served in a consulting role to
assist health care providers in achieving patient/client goals with emphasis on
patients with acute, chronic, and infectious diseases. Monitored the performance of
contract vendors by conducting health care evaluations at correctional facilities.
Collaborated with agencies to obtain grant monies and resources to advance the

goals and objectives of health service delivery. Coordinated responses to communicable disease outbreaks with the Georgia Department of Human Resources (DHR) and Centers for Disease Control and Prevention (CDC). Represented the Department of Corrections at interagency task forces and planning councils.

**Nursing Director/Nurse Practitioner          November 1984-December 1994**
**Georgia Department of Corrections**
Provided expert clinical assistance in the planning, implementation and evaluation of nursing services within the state correctional system. Coordinated the development of statewide policies and procedures for nursing services. Evaluated nursing practice at the approximately 65 state institutions, transitional and detention centers. Provided technical assistance in meeting professional standards, state, and federal laws. Provided primary care services to offender/clients at correctional institutions, exercising skills of assessment, diagnosis, and plans of care in collaboration with the health care team. Directly supervised two professional nursing staff and an epidemiologist to implement nursing and public health programs. Coordinated the development of statewide policies and procedures related to the diagnosis and management of offenders with HIV infection, tuberculosis, and chronic illnesses. Provided training regarding clinical and administrative topics. Represented the agency through participation in various interagency task forces and planning councils.

**Family Nurse Practitioner                    March 1982 - October 1984**
**Atlanta Advancement Center**
**Georgia Department of Corrections**
Administrator of the health clinic and primary health care provider to the adult male population at the transitional center. Exercised skills of patient assessment, diagnosis, and implementation of therapeutic measures in collaboration with a physician consultant and other appropriate health care personnel. Coordinated health care referrals and consultations for all residents. Supervised clinical experiences for nurse practitioner students from local universities. Collaborated closely with the superintendent of the transitional center to ensure organized, systematic operation of the clinic while maintaining quality standards of health care.

**Family Medicine, Philip Cohen, M.D., Marietta Georgia**
Collaborated with Philip Cohen M.D. in a private practice sitting in the management of acute and chronic illness in adults and children. Actively encouraged individual responsibility for personal health, and strategies to promote health and prevent illness among clients.

**Lawrenceville Regional Youth Development Center, Lawrenceville Georgia**
Clinician/administrator of health clinic for a 300-bed capacity adolescent detention facility. Provided physical examination services and evaluation of acute illness in collaboration with the physician consultant. Provided phone consultation for the center. Referred to local agencies when appropriate.

**Staff Nurse, Level II**                                    **October 1978-September 1980**
**Emory University Hospital**
Developed expertise in the pre- and post-operative care of adults requiring cardiovascular surgery. Provided teaching and counseling prior to discharge to the home setting. Oriented new staff to the cardiovascular unit. Frequently acted as charge nurse of the unit.

## EXPERT WITNESS

In the past 4 years I have testified as a health care expert in court or by deposition, or provided an opinion in the following cases:

*Michael Campbell v. Boyd County et al.,* USDC Eastern District of Kentucky. Case No. 10-00062-HRW. January 2012 (Deposition).

*Joyce Christie, Individually, and On Behalf of the Estate and Next of Kin of Nicholas T. Christie, Deceased vs. Lee County Sheriff's Office, et al.* United States District Court, Middle District of Florida. Case No. 2:10-CV-420-FTM-36-DNF. March 2012 (Deposition).

*Louis Henderson et al. v. Kim Thomas et al.* United States District Court for the Middle District of Alabama, Northern Division. Civil Action No.: 2:11-CV—00224. July 2012 (Deposition).

*Gregory Johnson et al. v. City of Philadelphia and Prison Health Services, Inc.* United States District Court, Eastern District of Pennsylvania .Case No. 09-6097. July 2012 (Videotaped testimony for trial).

*Louis Henderson et al. v Kim Thomas et al.* United States District Court for the Middle District of the Alabama Northern Division. Civil Action No: 2:11-CV-00224. September 2012. (Trial)

## CORRECTIONAL HEALTH CARE EXPERT

I have been qualified in State and Federal Courts as a medical/nursing/correctional health care expert, assisting in the monitoring of remedial plans or settlement agreements in the following cases:

*Plata v. Brown*, USDC/Northern District of California, Case No. C-01-1351, TEH, re: Prisoner medical care in the California Department of Corrections and Rehabilitation (CDCR).

*Farrell v. Cate*, Superior Court of California, Case No. RG03079344, re: Medical care in the Division of Juvenile Justice, CDCR.

*Fussell v. Wilkinson*, USDC/Southern District of Ohio, Western Division, Case No. C-1-03-704.

United States Department of Justice and the State of Delaware Memorandum of Agreement to Monitor 4 Delaware Correctional Facilities.

United States Department of Justice versus Dallas County Jail. Memorandum of Agreement. Civil No. 307CV 1559-N.

United States Department of Justice versus Cook County Jail. Memorandum of Agreement. Civil No. 10 C 2946.

Colon et al. v Passaic County et al. Memoranda of Agreement. Case No. 2:08-cv-04439.


## CONSULTATION SERVICES

Provided consultation services regarding correctional health care delivery to the following agencies:

- US Territory of the Virgin Islands-August 2007

- Department of Homeland Security-January 2007 to present

- DeKalb County Jail. Atlanta, Georgia. January-April 2002.

- Fulton County Jail. Atlanta, Georgia. April-May 2000.

- Minnesota Department of Corrections. January 2000.

- Vermont Department of Corrections. January 1997.

- District of Columbia Detention Facility. June 1996.

## PROFESSIONAL MEMBERSHIPS

- American Association of Nurse Practitioners
- Academy of Correctional Health Professionals
- American Nurses Association
- Georgia Nurses Association

## CERTIFICATIONS

Family Nurse Practitioner. American Nurses Credentialing Center. January 1, 2013-December 31, 2017. #0035518

Registered Nurse/Nurse Practitioner. State of Georgia. License Number RN053008. Exp. 1/31/2016.

National Provider Identifier No. 1851372452.

## PROFESSIONAL ACTIVITIES

**Appointments**:

Advisory Board Member for Plata v. Brown. Appointed by Judge Thelton Henderson May 2010-2012

Affiliate Faculty. Nell Hodgson Woodruff School of Nursing. Emory University. May 2002-2007 and September 2009 to August 2012.

National Prison Rape Elimination Commission. Medical and Mental Health Standards Committee Member. 2007-2009.

Federal Court Appointed Expert for Plata v. Schwarzenegger. United States District Court-Northern District of California. June 2002-Present.

Publication Advisory Board. Correctional Health Care: Guidelines for the Management of an Adequate Delivery System. National Commission on Correctional Health Care. 2001- 2002.

Reviewer for the American Journal of Public Health-2001.

NIDA-Emory Men's Prison Initiative Advisory Committee-1999.

Distinguished Faculty in Correctional HIV Medical Services. Bristol-Myers Squibb. 1998-present.

Advisory Board Member-Center for Crime, Communities, and Culture. Open Society Institute. 1996-2000.

Human Investigations Committee, Emory University School of Medicine. 1997-2000.

Clinical Associate Faculty. Nell Hodgson Woodruff School of Nursing, Emory University, Atlanta, GA. 1984-1991.

Chairperson. Institutional Review Board. AIDS Research Consortium of Atlanta. October 1991-September 1994.

Editorial Advisory Board. Correctional Health Care Management. July 1993-94.

Georgia Statewide HIV Prevention Community Planning Council 1994-95.

**Publications:**

Jafa, K, McElroy P, Fitzpatrick, L. Borkowf CB, MacGowan R. et. al (2009) HIV Transmission in a State Prison System 1988-2005. *PLoS ONE* 4 (5): e5416. doi:10.137/journal.pone.0005416

Centers for Disease Control and Prevention. HIV Testing Implementation Guidance for Correctional Settings. Co-Author. January 2009.

LaMarre, M. Point-Counterpoint: What are the Implications of the Study Conducted in the Georgia Department of Corrections For HIV Prevention in Prisons? Infectious Diseases in Corrections Report. May 2006. Vol. 9, Issue 5.

CDC. "HIV Transmission Among Male Inmates in a State Prison System-Georgia 1992-2005.*" Centers for Disease Control and Prevention. Morbidity and Mortality Weekly Report,* April 21, 2006, Vol. 55, No 15. Reported by Taussig, J., Shouse, L., LaMarre, M., et. al.

Puisis, Michael. Associate Editor, Madeleine LaMarre. *Clinical Practice in Correctional Medicine.* Second Edition. Mosby. 2006

LaMarre, Madeleine. "Nursing Role and Practice in Correctional Facilities" in *Clinical Practice in Correctional Medicine*. Second Edition. Puisis, M. Mosby, 2006.

Khan, A., Simard, E., Bower, W., Wurtzel, H., Khristova, M., Wagner, K., Arnold, K., Nainan, O., LaMarre, M., Bell, B. "Ongoing Transmission of Hepatitis B Virus

Infection Among Inmates at a State Correctional Facility." *American Journal of Public Health,* Vol. 95, No 10. October 2005.

DeRavello, L., Brantley, M., LaMarre, M. Qayad, M., Aubert, H. and Beck-Saug, C. "Sexually Transmitted Infections and Other Health Conditions of Women Entering Prison in Georgia 1998-1999." *Sexually Transmitted Diseases*. Vol. 32, April 2005. pg. 247-251.

Arnold, K., LaMarre, M., Taussig, J. et. al. "Transmission of Hepatitis B Virus in Correctional Facilities-Georgia, January 1999-June 2002*." Centers for Disease Control and Prevention. Morbidity and Mortality Weekly Report,* August 6, 2004, Vol. 53, No 30.

Wootton, S., Arnold, K., Hill, H., McAllister, S., Ray, M., MS, Kellum, M., BS, LaMarre, M., Lane, M., Chaitram, J., Lance-Parker, S., DVM, Kuehnert, M. "Interventions to Reduce the Incidence of Methicillin Resistant Staphylococcus Aureas (MRSA) in a Georgia Correctional Facility." *Infection Control and Hospital Epidemiology*, Vol. 25, No. 5. May 2004.

Tobin-D'Angelo, M., LaMarre, M., Lane, M.E. "MRSA Outbreak in a State Prison: Implications for Prevention and Control." Oral Presentation. 131st American Public Health Association Meeting. November 15-19, 2003.

W. Bower, A. Khan, E. Simard, M. Khristova2, H. Wurtzel, K. Arnold, M. LaMarre, O. Nainan, B. Bell. "Molecular Epidemiology of Hepatitis B Virus Transmission in a United States Correctional Facility." ISDA Abstract.

Barrett, KL. Braithwaite, R. , Krane, KM, LaMarre, M. Creagh, T., Moore, W. "Women's Transition to Health and Healing: HIV Correctional Health Care/Education/Transition (CET) Team." Poster and Oral Presentation. ACA Conference, San Antonio, Texas, August 12-17, 2000.

Barrett, KL. Braithwaite, R. , Krane, K., M. LaMarre, M. Creagh, T., Moore, W. "Women's Transition to Health and Healing: HIV Correctional Health Care/Education/Transition (CET) Team." The XIII International AIDS Conference, Durban, South Africa. July 9-14, 2000.

Bock, N., Reeves, M., and LaMarre, M. "Tuberculosis Case Detection in a State Prison System." *Public Health Reports.* July/August 1998. Vol. 113.

Uhl, Gary., Schwartz, I., Emshoff, J., Swift, R., LaMarre, M. & Lavinghouze, R., (1996). "Medical Chart Audit: A Tool to Assess Critical Care," Provided to Inmates with HIV/AIDS. Poster presented at the meeting of the American Evaluation Association, Atlanta, GA.

Nursing Protocols. Georgia Department of Corrections. October 1996. Co-author.

Hipkens, J., LaMarre M., Paris, J. , Shansky, R. "How To: a Manual of Essential Elements for a CQI-driven Correctional Health Care Program." Georgia Department of Corrections. March 1996. Co-author.

Health Education and HIV Risk Reduction Program for Inmates at Correctional Institutions. Co-author. Revised January 1992.

LaMarre, M. "AIDS Inmates: A Dilemma for Management." *Corrections Today,* June 1988 50 (3) pp. 98, 100, 103, 127.

**Presentations:**

"Out of Sight: Out of Mind: Introduction to Correctional Health". Nell Hodgson Woodruff School of Nursing. Graduate Nursing Program. Atlanta, Georgia. July 18, 2012.

"Out of Sight: Out of Mind: Introduction to Correctional Health". Nell Hodgson Woodruff School of Nursing. Graduate Nursing Program. Atlanta, Georgia. July 21, 2010.

"Out of Sight: Out of Mind: Introduction to Correctional Health". Nell Hodgson Woodruff School of Nursing. Graduate Nursing Program. Atlanta, Georgia. July 1, 2009.

"Out of Sight: Out of Mind: Introduction to Correctional Health". Nell Hodgson Woodruff School of Nursing. Graduate Nursing Program. Atlanta, Georgia. July 16, 2008.

"Out of Sight: Out of Mind: Introduction to Correctional Health". Nell Hodgson Woodruff School of Nursing. Graduate Nursing Program. Atlanta, Georgia. August 3, 2006.

"Health Care Provider Role in the Prevention and Response to Prison Rape". American University. Washington DC. July 11, 2006.

"The Role of Health Care Providers in Prevention and Treatment of Prison Rape." Association of State Correctional Administrators Directors Training Program. Charleston, South Carolina. November 20, 2004.

"The Public Health Implications of Prison Rape: National Videoconference regarding the Prison Elimination Rape (PREA) Act." National Institute of Corrections. July 21, 2004.

"Incarcerated Women and Infectious Diseases. International Conference on Women and Infectious Diseases: From Science to Action." Centers for Disease Control and Prevention. February 28, 2004.

"Update on the Prevention and Management of Hepatitis A, B and C: New Recommendations from the Centers for Disease Control and Prevention (CDC)". American Correctional Association Conference. Nashville, TN. August 9-11, 2003.

"Prevention and Control of MRSA Infections in Correctional Facilities." Infection Control Conference. Georgia Department of Corrections. Forsyth GA. May 13, 2003.

"Improving the Health of Incarcerated Women Transitioning into the Community." Georgia Department of Human Resources, Division of Public Health. Forsyth, Georgia. May 12, 2003.

"Improving the Health of Incarcerated Women through Collaboration with Public Health." Centers for Disease Control and Prevention. Advancing the Health of Women: Prevention, Practice and Policy Conference. Atlanta, Georgia. October 7, 2002.

"Vulnerable Populations: Prisons and Aftercare." Georgia Chapter of Nurses in AIDS Care Conference, Atlanta, GA. October 12, 2001.

"Improving Collaboration Between Corrections and Public Health." National Hepatitis Coordinators Conference. Centers for Disease Control and Prevention, Richmond, Virginia. July 29-August 2, 2001.

"Improving the Collaboration Between Corrections and Public Health." Georgia Department of Human Resources (DHR) TB Nurses Coordinator Meeting. Stone Mountain, GA. July 19, 2001.

"The Legal Basis for Health Care in Correctional Settings." CDC Consultants Meeting: Recommendations for Prevention and Control of Viral Hepatitis Among Incarcerated Persons. Mach 5-7, 2001.

An Introduction to Correctional Health Care. "Why the Public Health Must Go To Jail" Series. Centers for Disease Control, Atlanta, GA. January 12, 2000.

"An Introduction to Correctional Health Care." National Hepatitis Coordinators Conference. Centers for Disease Control. Tucson, AZ. May 24-27, 1999.

"Are People Behind Bars Part of the Community?" Panel Presentation. Fourth Annual Georgia Nurses Tuberculosis Conference. December 1-2, 1998.

"Profiling Special Needs Patients in the Correctional Setting: A Case Study of Process." Panel Presentation. 22nd National Conference on Correctional Health Care. Long Beach, California November 2-4, 1998,.

"Clinical Update on Medical Management of HIV Disease-Initial Patient Workup and Treatment Plan." SPNS/HIV Training Series, Forsyth, GA., November 22, 1996.

"TB Control in Institutional Settings: Prisons, Hospitals and Long-Term Care Facilities." First Georgia Nurses' Tuberculosis Conference, Atlanta, GA. December 5, 1995.

"Chronic Care Clinics in Correctional Settings." GDC Health Services Clinical and Administrative Conference, Dillard, GA. November 30, 1995.

"Perspectives on Health Assessment and Classification Criteria." Co-presenter. 19th National Conference on Correctional Health Care, Washington D.C. November 14, 1995.

"Correctional Health Care: Improving Systems of Delivery." American Public Health Association, San Diego, CA. October 30, 1995.

"Primary Oral Management of the Patient with HIV Disease." Satellite Teleconference Series on HIV Care in Correctional Settings. National AIDS Education and Training Centers Program, Columbus, OH. April 26, 1995.

"Caring for Populations in Alternative Settings--The Incarcerated Client." Georgia State University School of Nursing, Atlanta, GA. March 9, 1995.

"Risk Assessment for HIV Infection and HIV Antibody Testing and Counseling: Implications for Corrections." Pennsylvania AIDS Training Network, Edinboro, PA. August 29, 1994.

"The Urethral Connection: Male Genitourinary Assessment." Georgia Nurses Association, Atlanta, GA. June 4, 1994.

"Management of HIV Infection." North Carolina AIDS Training Network, Durham, N.C. May 5, 1994.

"Psychosocial Issues for the Inmate." Pennsylvania AIDS Education and Training Center. Cresson Correctional Institution, PA. October 8, 1993.

"Management of HIV Infection." Metro Correctional Institution, Atlanta, GA. August 12, 1993.

"Tuberculosis." Metro Correctional Institution, Atlanta, GA. August 10, 1993.

"Psychosocial Issues for the Inmate." Pennsylvania AIDS Education and Training Center. Mercer State Regional Correctional Facility, Mercer, PA. June 24, 1993.

"Tuberculosis/HIV Update. Meeting Standards: County Health Care Staff." Georgia Public Safety Training Center, Forsyth, GA. April 15, 1993.

"Correctional Institutions: Linking the HIV Positive Client with Community Resources." The 1993 Middle Georgia Conference on HIV/AIDS, Fort Valley, GA. March 31, 1993.


## CONTINUING EDUCATION ACTIVITIES (2000-2014)

The 17th Annual Update and Review of Internal Medicine 2013. University of New Mexico School of Medicine. Santa Fe, New Mexico. October 20-25, 2013.

The 16th Annual Update and Review of Internal Medicine 2012. University of New Mexico School of Medicine. Santa Fe, New Mexico. October 21-26, 2012.

National Nurse Practitioner Symposium. Annenberg Center for Health Sciences. Copper Mountain, Colorado. July 11-15, 2012.

20th Annual Improving the Management of HIV Disease Advanced CME Course. Washington DC. June 19, 2012.

Diabetes in Depth. Pri-Med. Atlanta, Georgia. December 9, 2009.

34th National Primary Care Nurse Practitioner Symposium. Copper Mountain Colorado. July 15-19, 2009.

Legal Aspects of Nursing Documentation. PESI, LLC. Atlanta Georgia. June 16, 2008.

32nd National Primary Care Nurse Practitioner Symposium. Keystone Colorado. July 12-15, 2007.

The Pain Management Dilemma: From Persistent Pain to Palliative Care. At the 32th National Primary Care Nurse Practitioner Symposium. Keystone Colorado. July 13, 2007

Community-Acquired Pneumonia: Treatment Strategies in the Age of Resistant Pathogens. At the 32th National Primary Care Nurse Practitioner Symposium. Keystone Colorado. July 12, 2007.

National Conference on Correctional Health Care. October 28-November 1, 2006.

30th National Primary Care Nurse Practitioner Symposium. Keystone Colorado. July 20-24, 2005.

Dietary Supplements 2005: What's Hot, What's Not. At the 30th National Primary Care Nurse Practitioner Symposium. Keystone Colorado. July 21, 2005.

New Dynamics in Health Care: Hormone Therapy and Menopause Care. At the 30th National Primary Care Nurse Practitioner Symposium. Keystone Colorado. July 20 2005.

Improving the Management of HIV Disease: Pathogenesis, Antiretrovirals and Other selected Issues in HIV Disease Management. International AIDS Society-USA. Atlanta, Georgia. February 20, 2004.

Effectively Timing the Treatment of Hypertension. Atlanta, GA. December 3, 2003.

Thyroid Disease Management-Putting the Pieces Together: Levothyroxine Therapy, Challenging Case Management, and Issues of Cardiovascular Risk. Atlanta, Georgia. July 19, 2003.

Medical Management of the HIV-Infected Inmate. Southeast AIDS Training and Education Center. Macon, Georgia. July 16, 2003.

27th Nurse Practitioner Symposium. Keystone Colorado. July 10-14, 2002.

Pain Management: A Challenge for the Nurse Practitioner. Keystone, Colorado. July 11, 2002.

NIH Consensus Development Conference on Management of Hepatitis C: 2002. Bethesda, MD. June 10-12, 2002.

Improving the Management of HIV Disease: An Advanced Course in HIV Pathogenesis, Antiretrovirals, and Other Selected Issues in HIV Disease Management. Atlanta, Georgia. March 18, 2002.

Seizures and Epilepsy: Demystifying a Common Disorder. Atlanta, Georgia. Wesley Woods Hospital of Emory University. February 22, 2002.

Massachusetts General Hospital HIV Resistance Preceptorship. Boston, MA. June 15, 2001.

Management of HIV/AIDS in 2001: The Role of Nevirapine. Atlanta, GA. March 24, 2001.

Improving the Management of HIV Disease: An Advanced Course in HIV Pathogenesis, Antiretrovirals, and Other Selected Issues in HIV Disease Management. Atlanta, Georgia. February 14, 2001.

"Take Charge of Your Heart: Reducing Cardiovascular Risks in Women". Georgia Department of Community Health-Office of Women's Health. September 28, 2000.

25th National Primary care Nurse Practitioner Symposium: NP's Caring for the Global Community in the 21st Century. July 13-16, 2000.

Hepatitis Coordinators Meeting. Centers for Disease Control and Prevention. Tucson, Arizona. May 24-27, 2000.

Improving the Management of HIV Disease: An Advanced Course in HIV Pathogenesis, Antiretrovirals, and Other Selected Issues in HIV Disease Management. Atlanta, Georgia. February 11, 2000.