## REPORT OF DR. MICHAEL REDDIX

**QUALIFICATIONS**

I am a board certified, internal medicine physician, who has practiced medicine in Mississippi since 1988. I am also co-owner and medical director for Health Assurance. I graduated from Tougaloo College with a BS in chemistry in 1979. I later attended Tufts University School of Medicine in Boston, Massachusetts where I completed a combined degree of MD/MPH in 1984. The Masters in Public Health degree was received from Harvard University. I completed my internship in internal medicine at the University of Texas in Galveston in 1985, and completed my residency in internal medicine at Henry Ford Hospital (University of Michigan Affiliate) in Detroit, Michigan in 1988. I have had an internal medicine private practice continually since 1992 in Jackson, Mississippi. See resume attached for further information.

My involvement in correctional medicine began in about 1996 when I became a clinic doctor at the Hinds County Detention Center in Jackson. I soon became the Medical Director there and continued in that capacity until August 2012. In addition, I became the Medical Director of Health Assurance upon its inception in 2001. I have been the supervising physician making the medical decisions for our sites since that inception, including:

1. Harrison County Detention Center in Gulfport, Mississippi;

2. Madison County Detention Center in Huntsville, Alabama;

3. Jefferson County Detention Center in Birmingham, Alabama;

4. Rankin County Detention Center in Brandon, Mississippi;

5. Scott County Detention Center in Forrest, Mississippi;

6. Pearl River County Detention Center in Picayune, Mississippi;

7. Hancock County Detention Center in Bay St. Louis, Mississippi;

8. Jackson County Detention Center in Pascagoula, Mississippi;

9. Walnut Grove Prison in Walnut Grove, Mississippi;

10. East Mississippi Correctional Facility in Meridian, Mississippi;

11. Marshall County Prison in Hollandale, Mississippi; and

12. Wilkinson County Prison in Woodville, Mississippi.

**EXHIBIT "23"**

My job at Health Assurance has been and continues to be the daily supervisor of over 5,000 inmates in jails and prisons throughout the State of Mississippi. My job duties include the supervision of staffing providers; review of medications; hospital admissions; deaths; cancer treatments, from arranging outpatient specialty doctors, to deciding which x-ray or lab equipment is my weekly routine. In addition, I visit each site regularly to thoroughly review health statistics with the dentists/doctors/nurses and security staff to look for sources to improve our health care delivery.

Health Assurance has been a health provider at corrections facilities for the State of Mississippi and Alabama for more than 12 years. Our contracts have been for small and large jails, with populations of 100 individuals, to over 1,000. We have had the medical contract for a Mississippi state prison since 2002. We provided a range of services, including dental, mental health, nursing and other services. We did so well that we were awarded contracts for servicing three other private prisons (total almost 5,000 inmates) in the State, including East Mississippi Correctional Facility. Since being at East Mississippi in the past two years (since July 2012), there have been only two deaths (one cardiac arrest and one homicide), and no suicides. East is also unique because it is comprised of the vast majority of mentally ill inmates in the State of Mississippi. Nearly 70% of the 1,200 inmates are on psychotropic meds, and they have severe mental illness diagnoses such as Schizophrenia or Bipolar.

In addition to medical records on the named Plaintiffs, my review of materials includes all of the following:

1. The complaint;

2. Expert witness reports;

    a. Marc Stern, M.D.;

    b. Terry Kupers, M.D.;

    c. Madeleine L. LaMarre, MN, FNP-BC; and

    d. Bart Abplanacp, Ph.D.

3. Medical Audit Committee Reports from 2012, 2013 and 2014;

4. Health Assurance, LLC Policy and Procedures Manual;

5. EMCF Medication Report from Independent Health Services Pharmacy;

6. Pharmacy Audits of Larry Calvert, R, Ph;

7. Chronic Care Logs;

8. Medical Records and Collective Information on Named Plaintiffs and other Inmates;

9.    Standards for Health Services in Prison, 2014 – National Commission on Correctional Health Care; and

10.    Standards for Adult Correctional Institutions, 4th Edition – American Correctional Association.

What follows, in my report, is an evaluation of the medical and mental health services provided and/or available to the named plaintiffs in this case.  I reviewed the medical records on each of them, and that source of information forms the basis of many of the conclusions reached.

**NAME:**      Anthony Evans

**MDOC:**      L4838

**ALLEGATIONS IN COMPLAINT:**

p. 28-107.  Mr. Evans receives only minimal mental health care.  He reports that visits with the psychiatrist are infrequent and last only a minute or so.  During a recent mental health encounter, Mr. Evans wanted to discuss his symptoms.  The clinician told him that his medications would be reordered and then sent him away without allowing him to discuss his problems.

p. 28-108.  Mr. Evans reports that the mental health counselors provide little help.  He has asked for one-on-one counseling on two or three occasions but those requests never resulted in his receiving treatment.  At times, he says, the counselors laugh at patients and tell them that there is nothing wrong with them.

**RESPONSE:**

Mr. Evans' case serves as an example of allegations that were not factually verified from his medical records.  This inmate states he was not seen by the medical or mental health staff adequately.  As mentioned above, the patient was in fact seen by multiple medical staff since his arrival at East Mississippi.  Any medical or mental health staff can refer the patient to the psychiatrist if needed.  This patient was seen nearly 40 times by our medical and/or mental health staff between 7/12/12 - 6/12/13, by multiple mental or medical, including medical doctor, psychiatrist, nurse practitioner, nurse or mental health officers.  (Below is a list of each visit).  During this period the patient was never placed on suicide watch/precautions in our Psych Unit, even though the plaintiffs complain he was placed on suicide precaution frequently.

| Date | Staff | Date | Staff | Date | Staff |
|------|-------|------|-------|------|-------|
| 7/27/12 | Mental Health Officer | 12/11/12 | Medical Doctor | 5/18/13 | Psych Doctor |
| 8/1/12 | Medical Doctor | 12/13/12 | Medical Doctor | 5/24/13 | Mental Health Officer |
| 8/12/12 | LPN | 12/14/12 | Registered Nurse | 6/13/13 | LPN |
| 9/13/12 | Nurse Practitioner | 12/16/12 | Medical Doctor | 6/5/13 | Nurse Practitioner |
| 9/14/12 | Registered Nurse | 12/17/12 | Medical Doctor | 6/5/13 | Mental Health Officer |
| 9/19/12 | LPC | 12/30/12 | Psych Doctor | 6/6/13 | Nurse Practitioner |
| 10/12/12 | PhD. Social Worker | 12/31/12 | Medical Doctor | 6/6/13 | Registered Nurse |
| 10/20/12 | Nurse Practitioner | 1/2/13 | Medical Doctor | 6/8/13 | Nurse Practitioner |
| 11/2/12 | Nurse Practitioner | 1/22/13 | Registered Nurse | 6/10/13 | LPN |
| 12/5/12 | PhD. Social Worker | 3/29/13 | Nurse Practitioner | 6/15/13 | Registered Nurse |
| 12/8/12 | Mental Health Officer | 4/2/13 | PhD. Social Worker | 6/16/13 | Registered Nurse |
| 12/9/12 | Mental Health Officer | 4/2/13 | Medical Doctor | 6/18/13 | Mental Health Officer |
| 12/11/12 | Registered Nurse | 4/6/13 | Psych Doctor | 6/30/13 | Psych Doctor |

4

**NAME:**      John Barrett

**MDOC:**      27578

**ALLEGATIONS IN COMPLAINT:**

p. 32-122.   On July 19, 2012, Plaintiff John Barrett, age 58, submitted a request to health services stating that he had not received his blood pressure or pain medications in three days.  He received a response that he should send another request if he had not received his medications by July 31 – 12 days later.  Ultimately, Mr. Barrett went without his medications for approximately four weeks.

**RESPONSE:**

It is critical to an understanding of this inmate's stated issues that review is made of his medical records and the outcomes of his treatment.  In Mr. Barrett's case, it is claimed he went four weeks without his blood pressure medications.  However, his blood pressures were then and continue to be completely normal as indicated by BP readings of 8/13/12: 126/88; 9/14/12: 120/80; 10/19/12: 110/78; 4/4/14: 128/88.

In addition, this inmate alleged no one evaluated or healed his chronic arthritic or abdominal hernia pain.  Patient had an Ultra Sound that did not show a hernia.  His arthritic pain was treated with Motrin-like meds and was referred to our chronic pain clinic.  He was placed on Neurontin.  In a prison setting there are a vast number of inmates who have a history of narcotic and alcohol dependency.  Therefore, it is important to screen those and offer the appropriate meds tailored to each inmate.  This inmate was placed on NSAIDS (Motrin-type meds used extensively for routine arthritis, which this patient had).  The inmate was seen at the pain clinic on 11/20/12 and again 5/20/13, at which time the patient had all of his previous x-rays and old records reviewed and other meds were added (Neurontin) to his existing meds.  At no time was patient in any grave danger.  It is also important to note many of these inmates are on multiple psych meds so that close observation and review is needed to be done prior to addressing more sedative meds for pain.

**NAME:**       Dexter Campbell

**MDOC:**       K5513

**ALLEGATIONS IN COMPLAINT:**

p. 64-65; 270.  In June 2012, Plaintiff Campbell submitted an emergency grievance ("ARP") seeking mental health care.  In mid-October, during a medical appointment, the facility physician asked Mr. Campbell about his involvement with Plaintiff's Counsel.  The physician said that he would give Mr. Campbell whatever he wanted, referring to medical care.  Mr. Campbell insisted that he would not discuss his legal affairs.  The doctor became very angry, left the room, and did not return to treat Mr. Campbell.  During a subsequent encounter, the doctor denied having asked about his legal matters, yet asked to see the legal and medical papers that Mr. Campbell was carrying.  Mr. Campbell, once again, declined.  The doctor became angry and told him that he "didn't give a rat's ass" about any lawsuit.  He then told Mr. Campbell that there was nothing medically wrong with him.

**RESPONSE:**

It is alleged that this inmate had only cursory mental care with appropriately credentialed health care workers.  This patient in fact saw either a mental health officer, psychiatrist, psych nurse practitioner, medical nurse practitioner, or Ph.D. for mental health 31 times from 7/2012-12/2012 (five months).  All of these individuals are credentialed in their respective fields.

It is alleged that the medical doctor harassed and denied the inmate health care services because of his involvement in this lawsuit.  His clinic encounter with the doctor in mid-October is supposedly representative of this.  However, in review of the medical clinics note (it is apparent that the inmate came to the clinic with all of his VA hospital medical records in his hands requesting a review by the doctor of his file and x-rays), the doctor spent nearly one hour to discuss his case and records.  Despite the doctor's explanation, the patient adamantly requested potentially addictive meds for his claimed chronic arthritic pain.  He was offered Motrin-like meds and referred to the chronic pain clinic.  Because the Neurontin and Ultram meds were not given, the inmate became aggressive and stormed out of the clinic.  He was seen in the chronic pain clinic 1/23/13; 3/26/13 and is continued to be followed by the doctor there.

**NAME:**        Jermaine Dockery

**MDOC:**        K2538

**ALLEGATIONS IN COMPLAINT:**

p. 12-13, 63-64.  Solitary confinement; risk to mental health; dangerous conditions; beaten by staff; denied meaningful mental health care; 2012 purportedly hanged self without a visit to ER or being seen by psychiatrist; under suicide precautions; mental health staff changed dosage without consulting psychiatrist; December 2012, cuffs tight with right hand numb; March 2013, slammed tray slot on wrist, no med attention.

**RESPONSE:**

What is most interesting about this inmate, while is that he is the lead plaintiff in this law suit and should be representative of the seriousness of the succeeding plaintiffs, he did not fill out a grievance on medical any time prior to this lawsuit.

The most egregious allegation: an attempted suicide by hanging.  In fact, there is no evidence that this inmate had ever told any medical or mental health staff about any significant psych problems suggesting severe depression.  There has been no evidence found of any suicide attempt by hanging or any other means since this inmate has been at East Mississippi.  Before this lawsuit was filed this inmate was seen 35 times by medical or mental health staff.  This period was between 7/20/12 – 12/30/12, and he was seen by Physician/NP/psychiatrist/mental health officers/and mental health PhD.  He was treated with mild antidepressants (Prozac then Zoloft) and was stable through the spring 2013.  He has some adjustments of his meds doses but there was never any evidence of any wrist injury.

7

**NAME:**      Derrick Hayes

**MDOC:**      101554

**ALLEGATIONS IN COMPLAINT:**

p. 16-63.  Plaintiff Derrick Hayes has a documented history of serious mental illness.

p-48-49.  Plaintiff Derrick Hayes suffers from asthma.  In December 2012 Mr. Hayes refused to close his tray slot to protest not having received his asthma inhaler.  Although Mr. Hayes was not presenting any current threat, an officer sprayed Mace into his cell and then closed the tray flap, eliminating the only source of ventilation.  As a result, Mr. Hayes suffered an asthma exacerbation.  Mr. Hayes was examined by a nurse but was not permitted to decontaminate or wash the Mace from his skin or eye.  The officer who sprayed Mr. Hayes with Mace asked if he was planning to tell his lawyers.  In 2011, Plaintiff's Counsel notified Defendant Perry that Mr. Hayes' asthma put him at high medical risk from chemical sprays.

**RESPONSE:**

Patient has a history of asthma which occasionally was treated with asthma inhalers.  This type of medication is usually kept in the inmate's cell and is used as needed without having to see the doctor or nurse each time.  However, this inmate's asthma had previously been stable without meds or inhalers for months at a time.  It is alleged on or about 12/20/12 this inmate refused asthma treatment and medical treatment by the nursing staff.

In fact, the patient had an altercation with the security staff on 12/10/12 because his Zantac (anti reflux med) had run out.  The usual procedure is to fill out a request to see a Doc/Nurse and, after an evaluation, that medication can be restarted if determined it is needed by the provider.  This was not done by this inmate.  Instead the patient had an altercation with the security staff and was sprayed with mace and the nurse was called.  She evaluated the patient, and he was escorted to the shower.  Her assessment showed that the patient did not have any life threatening injuries (including shortness of breath associated with asthma).  He was escorted back to his cell.  His pulse oximeter and a portable breathing test were normal as well as her examination of him.  No inhaler was indicated and patient was told to fill out request to see medical staff if further treatment was needed.  This inmate had never filled out a grievance prior to this lawsuit.

8

**NAME:**      Christopher Lindsey

**MDOC:**      150780

**ALLEGATIONS IN COMPLAINT:**

p. 35-133.  He has a history of serious mental illness.

p. 35-135.  During the summer of 2011, his vision began to deteriorate.  He began to lose his peripheral vision and color perception and his field of vision began to darken.  He was not taken to see the glaucoma specialist despite submitting multiple sick call requests.

p. 35-36 – 138.  Because, upon information and belief, MDOC made no provision for medication continuity during the transition from GEO to Health Assurance, prisoners, including Mr. Lindsey went without critical medications for week or more.  From July 2012 to November 2012, he received no eye drops whatsoever.  In later 2012, Mr. Lindsey began receiving his eye drops again, but only on an intermittent basis.

p. 36-140.  Mr. Lindsey was not taken to a specialist and his vision continued to worsen.  In February 2013, Mr. Lindsey informed medical staff three weeks in advance that he was running out of eye drops.  On February 25, 2013, he was told that more drops were being ordered.  As of March 12, he had run out of drops.  As of mid-May 2013, he was receiving only one of the multiple eye drops prescribed for him.

**RESPONSE:**

According to his medical records, this inmate has had glaucoma (a painless cause of blindness associated with increased pressure inside the eyes) since he was a child.  He was told by his eye doctor he was blind in the right eye in 2008, and that there was advanced disease in the left eye. The plaintiff reported he did not get his 3 types of eye drops off/on over the past 2 years.  He in fact received these meds as keep on person meds, which allowed him to keep them in his cell to use whenever he needed.  He was told to simply notify the nurse staff (who make med pass rounds at least twice/day every day, 7 days/week, 365 day/year), when his eye drops ran out or before, so that new bottles could be given to him.  It is recorded in the records that he received drops, upon request, on 7/16/12; 9/14/12; 10/30/12; 11/14/12; 2/22/13; 3/28/13; 6/28/14.

This inmate was documented by standard out-patient testing by our eye care professional to be blind in the right eye and 20/200 in the left.  The left eye was therefore legally blind on 8/1/12. This was less than 2 weeks after Health Assurance had started at the prison.  In fact, the patient saw Dr. Moore (eye surgeon) on 2/12/12, which was before Health Assurance started at East.  He also stated patient was blind in the right eye and had severe advanced disease in the left.  Patient was later seen by Dr. McGee (eye surgeon) who also made the same conclusion on 6/25/13.  He was continued on the same eye drops he had previously used.  His condition has progressed along the expected natural history for this disease category.

**NAME:**        Benjamin McAbee

**MDOC:**

**ALLEGATIONS IN COMPLAINT:**

p. 36-144.    Plaintiff Benjamin McAbee has serious medical needs including HIV and hypertension.  He has spent much of his time at EMCF in solitary confinement.

p. 36-37-145.    When health staff draws his blood, he is usually not informed of the results. Consequently, Mr. McAbee is often not aware of how close he is to developing full-blown AIDS.

p. 37-146.    After starting on these medications, Mr. McAbee developed a painful, boil-like rash on his body.  He submitted three or four requests to medical seeking help but received no response.  Finally, Mr. McAbee decided to stop taking the medications and told the medication nurse his reasons.  He has received no medical follow-up to address his refusal.

p. 37-147.    In August 2012, Mr. McAbee reported that he received his blood pressure medication only once per week.  The left side of his body would go numb and he developed headaches, dizziness, and double vision, all of which are symptoms of dangerously high blood pressure.

p. 37-148.    By September 2012, he would pass out once or twice a month.  For example, on or about September 7, Mr. McAbee lost consciousness due to hypertension after developing chest pain, sweating, and headaches.  A nurse came to check on him but walked away without taking his blood pressure, despite Mr. McAbee's heightened risk for stroke or heart attack.

p. 67-280.    For example in September 2012, Plaintiff McAbee submitted an ARP seeking proper care for his HIV infection and hypertension.

**RESPONSE:**

The plaintiffs have alleged that he was not informed of the status of his HIV while on meds/he was not evaluated about a rash he developed after starting new HIV meds/he went without his blood pressure meds which caused him to pass out 1-2/moth.

In reference to his HIV, this inmate was seen by the East Miss Health Assurance doctor on 8/16/12 (approximately 2-3 weeks after Health Assurance starting).  He asked to start HIV meds. In review of the medical records by the doctor then it was found that he had never been on HIV meds since he was diagnosed in 2008.  His labs had been normal then.  The fact he did not want meds, they were never started per chart review.  A repeat blood test on 8/16/12 showed that the HIV was unchanged.  He was again seen by the clinic on 11/6/12.  The inmate wanted further testing and the doctor and patient agreed that a second opinion evaluation be set up at the HIV clinic at the University Hospital in Jackson.  The inmate saw Dr. Penice on 1/15/13 who

suggested that despite the normal levels, prophylactic treatment of his HIV would be beneficial and those meds (Norvir/Pregsta/Truvada) were started with his permission.

After the start of these meds he did develop diarrhea but quickly resolved with over counter diarrhea meds.  His HIV meds were then given with food only and he did not have these problems again.

On 7/25/12 (the 1st day or so that Health Assurance started at East Miss) the inmate had a dizziness episode.  His BP was 130/74 and his other vital signs and exam was negative.  His symptoms quickly resolved with a cool towel.  No other injuries were found.  The patient did develop a rash at some time in late spring 2012.  He was seen by the nurse practitioner who felt his boils were related to an infection not a drug reaction. He was given Bactrim (antibiotic) and Motrin and this resolved it.

In reference to hypertension and his passing out, patient was seen on 8/16/12 and found to have a BP of 146/111.  His BP meds were adjusted and told to follow up with the doctor in 2 wks. – there was no mention to the doctor of any left-sided weakness or stroke like symptoms.  Because the blood pressure was slightly decreased at 98/58 his meds were adjusted again.  At no point was his BP high enough to cause neurological symptoms (above 180/120).

**NAME:**    Joseph Osborne

**MDOC:**    M2916

**ALLEGATIONS IN COMPLAINT:**

p. 28, 29-109.    Plaintiff Joseph Osborne suffers from a history of bipolar disorder and depression.  He also suffers from anxiety attacks during which he has difficulty breathing, breaks into sweats, and has heart palpitations.  He reports that, prior to March 2013, he had not seen a psychiatrist in nearly two years even though he was taking psychotropic medications throughout that period.  The psychiatrist told him that staff had been renewing his medication orders without seeing him in person to determine the appropriateness of the prescriptions.  Mental health counselors, some of whom he believes are former correctional officers, visit the unit every week but provide little care.  Counselors knock on the small window of his cell door, yell "mental health," and then walk on to the next cell.  At one point, after not being able to see a psychiatrist to discuss his symptoms, Mr. Osborne spoke with a counselor in her office.  He recalls that it was "like talking to a wall.  They just chuck you off."  Mr. Osborne continues to suffer from anxiety attacks.

**RESPONSE:**

The plaintiff alleged that he was not followed for his mental illness and that he had not seen a psychiatrist in 2 years.  This patient was never diagnosed with Bipolar Disorder.  He was diagnosed with major depression.  He was treated with Zoloft and Buspar (mild antidepression meds) and was stable without complications.  Once Health Assurance started in July 2012, the inmate was evaluated by the medical doctor/mental health staff and nurse staff along with the mental health certified nurse practitioner.  He was seen by nurse practitioner or doctor on 7/2/12 (GEO); 10/5/12; 12/24/12; 12/4/12; 1/30/13.  At no point did he elicit any problems suggesting a worsening of his depression.  On 3/23/13, the patient was referred to the psychiatrist.  This was within a short time of the inmate finding out his sister had died.  His existing med (Zoloft) was adjusted, and he was continued on the follow up with the other mental health staff and remained stable.  The psychiatrist suggested follow up with him again and was found to be stable on 6/5/13.  He was continued on the same med he had taken for several years.

**NAME:**      Eric Ward

**MDOC:**      111389

**ALLEGATIONS IN COMPLAINT:**

p. 26-98.  Plaintiff Eric Ward was placed on suicide watch after cutting open his arm to avoid being transferred to a unit where his life would be in danger.  However, there was nothing therapeutic about suicide watch.  Mr. Ward was locked behind a solid-front door without a working light.  He was not monitored regularly and received no mental health treatment.  A week later, he was finally seen by mental health.  The encounter lasted approximately 15 minutes.

p. 50-208.  On October 3, 2012, Mr. Ward was transferred back to EMCF from the Central Mississippi Correctional Facility.  After arriving Mr. Ward informed staff that he had not eaten and needed food.  When he did not receive food, Mr. Ward threatened to cut himself with a razor.  When Mr. Ward refused to give the razor to staff, a mental health counselor arrived and watched as an officer sprayed Mace into Mr. Ward's cell.  Mr. Ward was not permitted to wash the Mace off his skin and eyes until two hours later.

**RESPONSE:**

The plaintiff alleged that mental health neglect caused him to act out by cutting himself repeatedly.  It is suggested that he was seen by the mental health staff once and no treatment was given.

In general, we see three types of self-injurious patterns: 1) suicide attempt; 2) psychoses (unusual); 3) manipulation (attention seeking).  Health Assurance takes all of these issues seriously.  In fact, at the arrival of Health Assurance to East in 7/20/12, there were multiple ambulance transfers each week to the local ER to stitch up and remove foreign objects from self-inflicted wounds.  A self-injury program and unit was started to concentrate on 10-12 persons.  We have had no ambulance transfers for self-injury behavior in the past 1½ years.

This inmate had a long history of self-injury behavior for years prior to 7/2012.  These behaviors had previously included: swallowing razor blades and other sharp objects, swallowing multiple pills, and cutting himself.  In 10/2012, this inmate cut himself.  The medical records suggest he did this in order to stay in the housing unit with his lover.  His wound was treated, and he was placed on the self-injury observation unit from 10/12 – 10/15/12.  He was monitored 24 hours per day by the medical staff who were well familiar with this inmate from previous episodes over the years.  He was diagnosed with a personality disorder and malingering by the psychiatrist.  On 10/16/12, he was followed by the psych staff.

It is of significant interest that his inmate had never completed a Grievance prior to this law suit.

13

**NAME:**      James Vann

**MDOC:**      137404

**ALLEGATIONS IN COMPLAINT:**

p. 33-128.  Plaintiff James Vann is 49 years old and suffers from diabetes.  He requires insulin and other medications to control his blood sugar level.

p. 34-129.  At EMCF, Mr. Vann's efforts to maintain his health are routinely thwarted.

p. 34-130.  Glycemic control requires the proper coordination between (1) the administration of insulin and (2) a diet designed to meet the special needs of diabetics.  Mr. Vann gets neither. Sometimes his medications run out.  The diet provided to Mr. Vann, although purportedly tailored to meet the needs of diabetics, is full of starches and sugars.  He reports that, if he were to eat all of the food given to him at any given meal, his blood sugar would rise to two or three times the normal level.

p. 34-131.  A few years ago, Mr. Vann had surgery to prevent the blood vessels in his eye from bursting, a phenomenon consistent with diabetic retinopathy.  However, while at EMCF, Mr. Vann does not have periodic dilated retinal examinations, considered to be the standard of care, to determine the need for additional treatment.  This is particularly troubling as Mr. Vann reports blurry vision when reading in low light as well as dark and lights spots in his field of vision.  He reports that his right eye, which was the site of his previous surgery, is worse than the other.  He has not been referred to an eye specialist and is at risk for irreversible blindness.

p. 34-35–132.  Mr. Vann reports intermittent shooting and stabbing pains in his toes and numbness in his legs.  Mr. Vann's shoes do not fit his feet.  He has repeatedly asked for new shoes over the past two years but has not received them.

**RESPONSE:**

The plaintiffs allege, for this inmate, the following:  Meds were not given properly, therefore his long standing diabetes was out of control/that his diabetes was uncontrolled because of the poor diet given to him/ that his diabetes was so poorly controlled that his vision had worsened and no routine eye doctor evaluations had been done/that he had developed diabetic neuropathy and he had not received his diabetic shoes.

This case serves as another good example that the allegations were never confirmed and verified.

This inmate had been a diabetic for a number of years.  Based on his HGB A1C lab tests, which measure how good or bad a patient's glucose has been over the previous 3 months, it is evident his diabetes had gotten better since Health Assurance started – a good value is less than 7 and a bad one is greater than 10.

This inmate's HGB A1C was greater than 10.2 on average prior to 7/2012, and ranged from 7.4 to 10.2 (average of 8.8) since Health Assurance started. His last HGC A1C was taken on 6/14/14, and was 8.11. This would suggest (but not perfect) moderate control. It does suggest, as with any disease, adequate control necessitates that the patient is compliant with his diet and meds – this is especially true with diabetes. This inmate claims his glucose has been elevated by the high starch diet. This is important because elevated starches cause elevated glucose. What is interesting is that the inmate demanded a (potentially moderately high starch) vegetarian diet despite a discussion with the medical doctor. The inmate had previously been on a diabetic diet but wanted to lose weight. In addition, a review of the canteen orders showed this inmate had not been compliant with his diet. It showed he ordered nearly 40 ramen packs of noodles since 1/2014. The Canteen is an in-prison store from which inmates can purchase toilet items such as soap/lotion/creams as well as cookies/crackers/soda/cakes. These Ramen noodles are also high in sodium and can aggravate patient's blood pressures. This inmate has been on a vegetarian diet since 1/2013 (per his request), despite knowing this is not a preferred diet for a diabetic, and he has not asked for it to be changed in the last 1½ years.

The medical records show where the inmate was counseled on weight loss, exercise and diet. It also shows the patient lost weight over the past 1½ years, from 182 lbs. to 175 lbs. He is still overweight for his height, but is improving.

This inmate was on multiple meds in the past, not just for diabetes, and has been on Metformin (pill) along with two types of insulin for his diabetes. There was no evidence he has been without his meds. This was proved evident by the fact his glucose levels have been under moderate control. His blood pressure has ranged from 105/69 (1/24/14) to 138/73 (4/24/2014). Normal is below 140/90. His cholesterol total has ranged from 198 (1/24/13) to 161 (3/31/14). An ideal cholesterol should be below 200. In fact such good control of all three of his medical problems would suggest he is very compliant with his meds.

In reference to this inmate's vision, it is very true that a periodic dilated retinal exam should be done by a specialized eye surgeon. This patient was treated for diabetic eye damage with laser surgery on his right eye in 2011, at the University of Mississippi Medical Center. A follow-up visit in 2011, showed eye disease had improved to 20/20 on the right (where the surgery was done) and the left was unchanged at 20/20. Once Health Assurance started at East in 7/2012, an eye care professional was asked to screen all the patients there on a regular basis, and this inmate was followed up by him. His exam as well as that of the clinic medical doctor, suggested his condition was unchanged from that described in the 2011 eye surgeon's exam. However, because of the inmate's complaints of blurry vision and need for a periodic dilated retinal exam, he was sent to Dr. McMillian in Jackson (eye surgeon) on 8/1/2013, who wrote the patient's vision was still good. It was 20/20 (right) and 20/25 (left). His complaints there stated he had some worsening vision with prolonged reading. His glasses were adjusted for reading. There was no mention by the surgeon of worsening diabetic eye damage. The adjustment of glasses would be very common for anyone near or over 50 years old (as this patient was).

On 5/9/14, the inmate was referred back to Dr. McMillian (eye surgeon in Jackson) for a two-month history of claimed worsening vision. It was also time for his periodic dilated retinal exam. At that time he was found to have 20/25 on right and 20/30 on left. In addition, some

moderate amount of diabetic retinal (eye) damage was present and a more closely follow-up schedule was recommended.  No surgery was indicated then.

In reference to the possible diabetic neuropathy, it is relatively common for diabetics (over time) to develop lower leg numbness and pain and tingling.  This is especially true in those diabetics who have a long history of poor control.  It is caused by the elevated glucose damaging the nerves transmission to the legs and spine.  It is not life-threatening but can be debilitating.  Even though this inmate's Hgb AIC, (and therefore diabetes) has not been under perfect control, it has gotten better.  With that being said, no provider, including those at East (two internal medicine doctors and several nurse practitioners), has confirmed a neuropathy diagnosis in this inmate.  In addition, he has been seen by a podiatry doctor who sees the inmates at the prison on a regular basis.  The podiatrist saw inmate on at least two occasions on 3/27/13 and 9/11/13, and on both times no pain was elicited during the exam, and the neuro exam and testing was negative for neuropathy.  This is very important because in the regular community outside of prison, podiatry doctors are the provider of choice for diagnosing and treatment of all diabetic-related foot and ankle diseases – especially neuropathy.  Lastly, the patient last had his Filament testing done for Neuropathy on 6/7/14, and the results were normal.  This Neuropathy test was done during his last chronic care clinic visit by a nurse practitioner.

Finally, there is no MDOC mandatory schedule for renewing diabetic shoes.  It is tailored to the individual inmate.  However, Health Assurance has strived to renew them as needed.  This inmate was followed up by the podiatry and on 3/27/13, new shoes were ordered and delivered.

16

## SUMMARY

Chronic medical problems which are difficult to control in the regular community are even harder to control in a prison setting. Moreover, the challenges faced at East Mississippi prison include the assessment, screening, and treatment of not only many, many individuals with mental illnesses, but also those who act out in agitation, those with suicide gestures, people who engage in self-harm, and malingerers. Health Assurance takes a great deal of pride in rising to meet all of these challenges. Clinical outcomes used as health care markers at the prison (as they are in the regular community), the inmates at East Mississippi are being treated as well or better than others in the State of Mississippi and, in the vast majority of cases, much better than they were cared for prior to their incarceration. In house, ready access to medical, dental, mental health, eye care, and other specialized needs performed by qualified professional staff are things that seem forgotten and belittled by the plaintiffs. Indeed, the impact of the quality level of care that Health Assurance has provided at East Mississippi is easily seen by comparison of the clinical outcome data – such as blood pressures, diabetic control, HIV, hospitalizations, ambulance transfers, self-cutters and suicide attempts – from before Health Assurance provided care.

In summary, the care delivered by Health Assurance comports with the standards of care applicable in the prison setting. No acts or acts of Health Assurance rise to the level of deliberate indifference to the rights of inmates at East Mississippi. No such acts rise to the level of a breach of the standard of care of reasonably prudent health care providers in this setting either. Health Assurance has not caused or contributed to any damages alleged or described by the named plaintiffs. Moreover, in addressing these name plaintiffs, the care they have been provided, and their health care outcomes – demonstrates that not only are the named plaintiffs receive quality medical and mental health care. Class certification is not.

Dated: __8/25/14__

Sincerely,

MICHAEL A. REDDIX, M.D., M.P.H.



# REDDIX MEDICAL GROUP

5903 RIDGEWOOD ROAD
SUITE 310
JACKSON, MS 39211
(601) 899-3310
FAX: (601) 899-3314

MICHAEL A. REDDIX, M.D., M.P.H.
DIPLOMATE OF AMERICAN BOARD OF
INTERNAL MEDICINE

## MICHAEL A. REDDIX, M.D., M.P.H.

### Business Address

5903 Ridgewood Road, Suite 310
Jackson, MS 39211
(601) 899-3310

### Home Address

106 Southern Ridge Drive
Madison, MS 39110
(601) 605-2712

### Personal Information:

| | |
|---|---|
| Born: | Meridian, MS |
| Date of Birth: | May 21, 1957 |
| Health: | Excellent |
| Marital Status: | Sandra; 4 Daughters |

### Educational Background

| | |
|---|---|
| May, 1979 - BS, | Chemistry; Tougaloo College, Jackson, MS Magna Cum Laude |
| May, 1984 - MD | Tufts University School of Medicine, Boston, MA |
| May, 1984 - M.P.H. | Harvard University School of Public Health, Boston, MA |
| July, 1984 - Internship: | Department of Internal Medicine Galveston Medical Center, Galveston, TX |
| July, 1985 - 1987:Residency: | Henry Ford Hospital, Department of Internal Medicine, Detroit, Michigan |

### Board Certifications

Diplomat of American Board of Internal Medicine
Certified Correctional Health Care Provider; National Commission for Correctional
Health Care

*page 2*

### *Employment*

| | | |
|---|---|---|
| *March 1997 -* | *2002* | *Principal Investigator for ALLHAT (HTN/CHOL) STUDY* |
| *July 2002 -* | *July 2003* | *GOAL A-1 Study* |
| *June 1992 -* | *Present* | *Medical Director, Reddix Medical Group, Jackson, MS* |
| *February 1991 - May 1997* | | *Medical Director, Bienville Medical Group, Inc., Morton, MS* |
| *July 1991 - May 1997* | | *Medical Director, MS Methodist Rehabilitation Home Health Morton, MS* |
| *Nov. 1991 - June 1992* | | *Consultant physician, MS Foundation for Medical Care Inc., Jackson, MS* |
| *March 1989 - August 1991* | | *Staff Physician, MS Job Corps Center, Inc. Crystal Springs, MS* |
| *October 1988 - 1992* | | *Staff Physician, MS Family Health Center, Jackson, MS* |
| *December 1988 - January 1991* | | *Clinic Manager and Consultant, MS State Dept. of Health, Hypertension Division, Hinds County, Jackson, MS* |
| *January 1996 - present* | | *Hinds County Detention Center, Medical Director, Raymond, MS* |
| *December 1996 - June 1997* | | *Jackson State University Student Health Center Staff Physician, Jackson, MS* |
| *May 1994 - present* | | *Chief Medical Examiner for Jackson Police and Fire Dept.* |
| *June 2001 - Present* | | *Medical Director, Health Assurance, Jackson, MS* |

### *Awards and Honors*

| | | |
|---|---|---|
| *Chief of Medicine - 1994 - 1995* | | *Methodist Medical center, Jackson, MS* |
| *Treasurer for Medical Staff* | *1995 - 1996* | *Methodist Medical Center, Jackson, MS* |
| *Who's Who Among Students and Universities* | *1979* | |
| *Outstanding Young Men in America* | *1979* | |
| *Alpha Kappa Mu National Honor Society* | *1977 - 1979* | |

*Mississippi Methodist Rehabilitation Center, Board of Trustees 2000 - present*

*Medical Assurance of MS, Ins. Company (Malpractice)*

*Page 3*

*Member of Claims Committee  2005 - 2006*

*Greater Jackson Chamber – Partnership Board of Directors   Member 2012*

**Organizations**

*Alpha Phi Alpha Fraternity, Inc. 1997 - present*

*Mississippi Medical & Surgical Association, 1989 - present*

*Central Mississippi Medical Society, 1988 - present*

*Jackson Medical Society, 1988 - 2000*

*American Medical Association, 1987 - present*

*National Medical Association,  1987 - present*

*. 100 Black Men of Jackson, Mississippi, Inc., 1991 - 1998*

*Knight's of Peter Claver, 1994 - 2001*

*Association of Black Cardiologist, 1987 - 2000*

*Society of Correctional Health Care, 1999 - present*

*National Commission of Correctional Health care, 1999 - present*

*Kincheloe Society at Tougaloo College – President – 2006 – Present*

**Hospital Affiliations**

*Active Staff, St Dominic/Jackson Memorial Hospital, Jackson, MS, 1989 - present*

*Active staff, MS Baptist Medical Center, Jackson, MS  1989 - 2004*

*Active Staff, Methodist Medical Center (Now Central MS Medical Center)*
*Jackson, MS , 1989 - present*

*Consulting Staff, Scott Regional Hospital, Morton, MS, 1993 - 1997*

*Consulting Staff, MS Methodist Hospital & Rehabilitation, Jackson, MS  1991 - 1997*

*Health Choice of Methodist Medical Center, Credentials Committee, Jackson, MS  1995 - 1998*