IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

**JERMAINE DOCKERY, et al**                                    **PLAINTIFFS**

v.                                              Civil Action No. 3:13cv326-WHB-JCG

**RICHARD D. MCCARTY,[1] et al**                                **DEFENDANTS**

<u>**AFFIDAVIT OF EMLEE WOODARD NICHOLSON**</u>

**STATE OF MISSISSIPPI**
**COUNTY OF HINDS**

  **PERSONALLY APPEARED BEFORE ME**, the undersigned authority in and for the county and state aforesaid, EMLEE WOODARD NICHOLSON, who having been duly sworn stated on her oath as follows:

  1. My name is Emlee Woodard Nicholson and I am an adult resident citizen of the state of Mississippi.

  2. I am over the age of 21 years of age and competent to testify with regard to the matters stated herein. I have personal knowledge of the facts and information contained in this affidavit.

  3. I earned a BBA in Actuarial Science from Georgia State University where I received the award for excellence in my field. I worked as an actuary for two years before earning my Masters and PhD in mathematics from the University of Mississippi where I received the award for excellence in my field.

---

[1] Pursuant to F.R.C.P. 25(d), Richard D. McCarty, Interim Commissioner, is substituted for Christopher Epps, who resigned as Commissioner on November 5, 2014.

# EXHIBIT A

4.       I am currently an Assistant Professor of Mathematics at Millsaps College in Jackson, Mississippi. Over the past 12 years, I have taught statistics many times both at the University of Mississippi and at Millsaps College. My course includes sampling techniques, research bias and how to avoid it, and statistical study design among many other topics in statistics. My current *Curriculum Vitae* is attached to my affidavit.

## INTRODUCTION

5.       Dr. Terry Kupers was at the East Mississippi Correctional Facility for three days. During those three days, Dr. Kupers toured the facility and interviewed selected inmates and he reviewed medical records or the summaries of medical records for certain selected inmates. Based on information from the tour, interviews and medical records, Dr. Kupers makes conclusions about the group of selected inmates or sample. Dr. Kupers then generalizes the conclusions he made for the inmates in the sample and projects those conclusions onto two inmate populations: (1) All inmates in the segregation units at East Mississippi Correctional Facility (EMCF) and (2) all inmates at EMCF who have serious mental health needs. (Kupers at 3). That is to say, Dr. Kupers takes the conclusions he made for the inmates in the sample and applies those same conclusions to all inmates in the segregation units or to all inmates who have serious mental health needs.

6.       Dr. Kupers' conclusions should not be projected from the sample of inmates to the two populations of inmates because he did not use mathematics and statistics to standardize the generalization process. Because Dr. Kupers did not use this process, there is no way to confirm the trustworthiness of his generalizations. Scientific techniques have been well established for collecting evidence in support of scientific claims to ensure objectivity. Dr.

Kupers' conclusions were not built upon scientific evidence and cannot be tested by others. Instead, his conclusions are based on his subjective experience and whims.

7. Dr. Kupers used biased sampling when he selected the inmates in the sample, he did not take care to ensure that the inmates in the sample were representative of the two inmate populations so he can make only biased conclusions about the two inmate populations.

8. Additionally, Dr. Kupers did not use a scientifically recognized method called statistical inference to analyze the information he obtained from the inmate sample. Statistical inference is the process of making decisions about a population based on information contained in a sample from that population. Dr. Kupers' report contains no evidence that he applied statistical inference. Instead, Dr. Kupers' methodology uses biased samples and anecdotal evidence, but such information is not scientific evidence and should not be used to validate conclusions for the two inmate populations.

### STATISTICAL INFERENCE AND HYPOTHESIS TESTING OF A PARAMETER OF A POPULATION

9. Statistical inference is the process of using data from a sample of a population to make conclusions (called inferences) about the same population.

10. Statistical inference requires that certain procedures be followed.

11. Statistical inference in the form of hypothesis testing is used when a scientist seeks evidence for suspected truths about a parameter of a population. One must state hypotheses, collect representative samples, test the information gleaned from those samples, and make appropriate conclusions in context.

12. A parameter is a numerical attribute of the population that describes some aspect of the population. Statistical inference is applicable when the parameter is unknown. A

hypothesis test based on sample data should be conducted to test a claim about a parameter of a population.

13. A hypothesis test can be run to seek evidence for a claim about a single parameter of a population or a hypothesis test can be run to compare the same parameter for two or more different populations.

14. A hypothesis test is conducted as follows: First, a researcher must state a measurable claim about a parameter of a population. Second, determine two competing hypotheses for the measurable claim: (1) the null hypothesis and (2) the alternate hypothesis. These hypotheses are the two possibilities. Third, gather data from a representative sample. Fourth, compute the sample statistic that estimates the parameter of the population in the claim. Fifth, determine how probable that statistic would be if the null hypothesis were true. If the observed statistic is determined to be highly unlikely if the null hypothesis were true, that is strong evidence that the null hypothesis is, in fact, not true. If the observed statistic is determined not to be highly unlikely, then the results are not statistically significant and the test was inconclusive.

## **RANDOM SAMPLING**

15. Statistical inference will produce valid inferences only when the sample of the population is representative of the population.

16. Representative sampling is the foundation of inferential statistics. Random sampling is the most reliable way to collect a representative sample because the random sampling process ensures that every member of the population has an equal chance of being in the sample. A formal random sampling technique must be used.

17. The best and most common way to approach randomness is with technology. There are programs (Microsoft Excel, Minitab, etc.) capable of quickly selecting a random sample from a list of the population or from a list of numbers where each member of the population is represented by a number. This can be done in a few seconds. Generally speaking, prison populations are well suited for random sampling because the inmates are all contained in one location and contacting the members of the sample would not be cost prohibitive. The inmates in the population to be sampled can be given a number and the number is then entered into a program which randomly selects the inmates who are to be in the sample.

18. Dr. Kupers did not use any formal random sampling technique to select the inmates he interviewed or to select the medical records he reviewed even though random sampling could easily have been used in a prison population setting.

## EXAMPLE OF STATISTICAL INFERENCE

19. Assume we wanted to know whether inmates on average spend less than 5 hours in the common areas of their cell blocks in a given week. The parameter for the claim is "average amount of time in a given week spent by the inmates in the common areas of their cell block." That parameter is unknown, it is a fixed value that can be expressed in a measurement of time and it represents a characteristic of the inmate population.

20. The null hypothesis would be "the average amount of time spent by the inmates in a given week in the common areas of their cell blocks is greater than or equal to 5 hours." The alternate hypothesis would be that "the average amount of time spent by the inmates in a given week in the common areas of their cell blocks is less than 5 hours." All inmates in the cell blocks are given a number and a program is used to randomly select 30 inmates from those in the

cell blocks. Those 30 inmates are monitored to determine the length of time each of them spends in the common areas in a given week. The average length of time the inmates in the sample spend in the common areas that week is computed from this data. The result for the random sample is an estimate for the average amount of time in a given week all inmates in the population spent in the common areas of their cell block and can be used to test the claim.

## BIASED SAMPLING

21. If a sample is collected in any way that causes meaningful differences between the sample and the population, then the sample is biased. A biased sample can produce misleading results so no inferences can be made about a population from a biased sample. Sampling in a way that introduces bias eliminates the possibility of making any meaningful inference about the population from which the sample was drawn.

22. Haphazardly selecting a sample on one's own will likely produce a biased sample. Dr. Kupers' report has findings that are based on this type of biased sampling.

23. Allowing individuals to "volunteer" to be in the sample or relying on answers that may not be truthful will likely produce a biased sample. Dr. Kupers relied on this type of biased sampling for some of his findings.

24. Selecting individuals to be in the sample because they are examples of a claim's truth is the most egregious form of sampling bias and is unacceptable in a scientific study. Some of Dr. Kupers' findings are based on this type of biased sampling.

## DR. KUPERS' METHODOLOGY

25. Dr. Kupers makes claims about two inmate populations based on a subgroup of the total inmate population but does not use hypothesis tests to validate the claims. Dr. Kupers

also avoids expressing his findings in objective precise mathematical terms. Instead, he states that his observations are "frequent" or "likely" or are in the "vast majority." These are estimations based on personal experience and are completely unreliable and unsupported by his evidence.

26.     Dr. Kupers claims that "At EMCF, the requirement of obtaining informed consent is frequently ignored" but makes no effort to determine the frequency with which informed consent is ignored. He supports his claim with prisoner testimony including "more than a few prisoners complain about involuntary medications…", a video of a prisoner who was involuntarily medicated and what he describes as "far from adequate" documentation in the Emergency Medical Records. (Kupers at 45-47). He did not use random sampling or statistical inference for these findings.

27.     Dr. Kupers includes the following as evidence for the claim that the prisoners were malnourished: "I…noticed that many prisoners appeared malnourished and several prisoners told me they were always hungry…" and "Ms. LaMarre found that significant weight loss, of up to twenty or thirty pounds, was documented in the medical records of a number of prisoners" (Kupers at 20). Some individuals who "appear malnourished" and "a number" of records indicating a weight loss of "up to" 20 or 30 pounds is anecdotal evidence and valid conclusions about the two inmate populations are not possible from this type of evidence. To support a claim that the prisoners are losing weight, randomly sample 30 prisoners. For each prisoner in the sample, record the weight on the form from their original intake screening and weigh each one now. Subtract the current weight from the weight at intake for each prisoner and average the 30 differences. This average, the sample mean of the differences, can be used in a

hypothesis test against the null hypotheses that the prisoners have not lost weight (the mean weight loss for the prisoners is 0.)

      28.    Dr. Kupers states that "many, perhaps most, of the prisoners housed there…are forced to live in the dark for weeks or months on end." He describes no effort to estimate the actual proportion of prisoners who were in a dark cell at the time of his visit. He makes no effort to determine if the cells he did discover were dark at any other time. His support of this claim is the fact that the cells are secured with solid doors as opposed to bars, "in most cells I visited on Unit 5 and 6D…the light bulb …is broken or entirely missing" and "the small horizontal window on the exterior wall of the cell…does not provide significant light" (Kupers at 16). Dr. Kupers did not determine the proportion of prisoners who are in the dark at any moment much less how long the cells remained dark. According to his methodology statement, Dr. Kupers visited an unrepresentative sample of cells in Units 5 and 6D on one occasion. Furthermore he had no established basis for comparison. The existence of broken light bulbs does not indicate a systemic problem. Dr. Kupers makes no mention of how these cells were selected, how many cells were visited, what portion of the total number of cells that was, or precisely how many is "most." Dr. Kupers also does not revisit the cells later to determine if the bulbs are being replaced or at any other time of day. He only considers what he observed at that moment on that day without regard for other variables. It is not valid to use that evidence supporting a claim about "many, perhaps most" prisoners and "for weeks or months on end."

      29.    Dr. Kupers claims that "…prisoners in segregation at EMCF are denied telephone contact with loved ones" but seeks no support from reliable evidence like phone records. Instead, he supports the claim with prisoner testimony including "prisoners in segregation

8

universally told me that they are denied phone calls..." (Kupers at 18). Dr. Kupers reported that some of the prisoners told him they were denied phone calls. This is not scientific evidence. When hard evidence, like phone records, is available, there is no reason to rely on prisoner testimony which could be unreliable. Not to mention the prisoners were never randomly sampled and the group Dr. Kupers spoke with cannot be assumed to represent the population.

30.     Dr. Kupers reports that "often the officers do not even take the prisoners to yard for their allotted recreation time, or to showers, for weeks on end" (Kupers at 21). Dr. Kupers offers no evidence to support this claim.

## DR. KUPERS' OPINIONS

31.     Dr. Kupers' claims, conclusions, and opinions stated in his report are about EMCF as an institution and its populations. However, Dr. Kupers did not conduct a study of EMCF as an institution or of its populations. His report contains none of the components that a study of this nature would entail. Dr. Kupers asks no specific questions, defines no variables and establishes no technique for measuring them, states no hypotheses, collects no representative samples, and conducts no hypothesis tests. Scientific support for claims about populations using sample data requires hypothesis tests. Dr. Kupers did not conduct a single hypothesis test, but made the inferences anyway.

32.     Instead, he says that his previous experiences put him in a position to determine that instances he and the other Plaintiffs' experts found were evidence that his claims pertaining to the whole population or institution are true. No one has the sort of prior experience that would allow such subjective findings for a few inmates to be generalized for and projected onto the inmate population. His conclusions are subject to his intuition and personal experience. Dr.

Kupers does not even make measurable claims about the prison conditions, staff or inmates. Instead, he says things like "often", "frequently", or "a number of" (Kupers at 3). But he does not define any of these terms or phrases in a way that anyone else could measure them.

33. Dr. Kupers asks us to rely on his expertise studying prisons. He explains that "in forming my opinions I have relied on my training…, my decades of experience as a clinician…, my experience as an expert in other cases…, my experience as a clinician…, my familiarity with the literature…, my experience as a trainer…, my extensive clinical practice…, and my familiarity with position statements…" (Kupers at 10). None of his experiences equip him to be a substitute for the statistical tests required to accurately determine the validity of claims about populations based on sample data.

34. Dr. Kupers' conclusions are based on personal experience and intuition. These types of conclusions are biased by motivation. Problems with this include "focusing on the evidence we like best: when we look at evidence, we may only seek out the information we like. Because we don't want to let go of our beliefs, we "cherry-pick" the information we take in-seeking and accepting only the evidence that supports what we already think and what we want to think" (Research Methods in Psychology, page 33). "When we think intuitively rather than scientifically, we make mistakes. Because of our cognitive and motivational biases, we tend to notice and actively seek information that confirms our ideas" (Research Methods in Psychology, page 36).

35. Basing conclusions on personal experience is not a scientifically valid method. The results of science should be independent of the researcher and not dependent upon the researcher's previous experiences. The conclusions about EMCF and its populations in Dr.

10

Kupers' study are based largely on his personal experiences and not science.

36. Dr. Kupers' evidence is a collection of examples. This type of evidence is called anecdotal. Anecdotal evidence is not scientific evidence and should not be used to validate conclusions.

37. Determination of the prevalence of an experience requires statistical evidence.

38. Memorable anecdotal evidence should not be misinterpreted as scientific evidence and is not used to validate scientific conclusions. This is exactly as meaningful as going to EMCF and finding some shining examples of a prison system operating exactly as it should and declaring, based on your experience, that since those individuals are doing so well, the entire population of prisoners must be too.

39. Furthermore, much of Dr. Kupers' evidence is based on prisoner interviews. Using individual's responses as data in a situation where the subject is motivated in any way to be untruthful is a good way to bias the sample. Even assuming the prisoners' statements are entirely truthful and accurate, Dr. Kupers can only speak to the experience of those particular prisoners interviewed as they were not randomly selected and do not represent the population.

40. Dr. Kupers' study was not designed as an institutional study or study of populations and the evidence he provides for his conclusions consists of a collection of observations that do not tell us much of anything about the two inmate populations. This is to say nothing of the fact that Dr. Kupers did not control for other variables that might explain his observations and no conclusions about EMCF being the cause of the prisoners' conditions can be made. One has to consider the condition the prisoners were in when they got there and whether or not exceptional circumstances were present during the experts' visit. For instance, while the

individual is still mentally ill, perhaps he is in better shape than when he got there.

41.   Dr. Kupers made observations and declared them typical and caused by EMCF, but he did not use appropriate statistical techniques when gathering information from and drawing conclusions about the prison population at EMCF. Dr. Kupers' methods deny anyone else the chance to independently attempt to replicate his results. There were no measurable results. This is a misuse of anecdotal evidence to validate conclusions.

42.   Finally, there has to be some basis for comparison. "There are many reasons not to base beliefs solely on personal experience. Research, by contrast, asks the critical question: "Compared to what?" (Research Methods in Psychology, page 25). "Basing conclusions on systematic data collection has the simple but tremendous advantage of providing a comparison group" (Research Methods in Psychology, page 27). Dr. Kupers' methodology includes no comparison group.

43. Dr. Kupers did not use a formal or scientific procedure at all when making inferences about EMCF and its populations. Instead, he claims to have enough previous experience to allow him to make these conclusions without the assistance of science. He has used no procedure to support his claims about the populations that can be tested. The mechanisms he used to draw conclusions about the populations at EMCF exist only in his head. His procedure could not be peer reviewed.

44. Dr. Kupers employed no reliable principles or methods when making conclusions about the populations. There are reliable principles and methods for supporting the types of conclusions he makes but these are not even mentioned in Dr. Kupers' report much less utilized. There is no way to know the potential rate of error but it is reasonable to suspect it is quite high.

Dr. Kupers took anecdotal evidence and concluded that these anecdotes are applicable to the whole population. There are no standards or controls in Dr. Kupers' procedure. In fact, he used no formal procedure at all.

45. Dr. Kupers' technique is not accepted to any degree in the scientific community. The type of evidence he provides is called anecdotal and is used in the scientific community to mean the opposite of scientific evidence. There are only two ways to demonstrate sufficient scientific evidence exists to support claims about populations. One is to study the entire population. The other is to take a representative sample and apply statistical inference to make conclusions about the population. There is no other accepted technique. Dr. Kupers did not study every individual in the populations about which he made conclusions. Nor did he take a representative sample and use statistical inference. Therefore, the conclusions about the populations are not based on sufficient facts or data. Dr. Kupers misused anecdotal evidence to validate conclusions that can only be validated with scientific evidence.

And further affiant sayeth not.

_____
EMLEE W. NICHOLSON, Ph.D.

SWORN TO AND SUBSCRIBED BEFORE ME, this the 15th day of December, 2014.

_____
NOTARY PUBLIC



My Commission Expires:
_____

13

# Emlee W. Nicholson

*Curriculum Vitae*

email: emlee.nicholson@millsaps.edu

## Education

**University of Mississippi,** University, MS
*Doctor of Philosophy in Mathematics,* May 2007

**University of Mississippi,** University, MS
*Master of Science in Mathematics,* May 2004

**Georgia State University,** Atlanta, GA
*Bachelor of Business Administration in Actuarial Science,* May 2000
Cum Laude

**Mississippi State University,** Starkville, MS
June 1995 - May 1998

## Professional Experience

**Assistant Professor,** Millsaps College, Department of Mathematics, August 2010-present

**Assistant Professor,** Winthrop University, Department of Mathematics, August 2007 - July 2009

**NSF North Mississippi Grades K-8 Fellow and Administrator,** University of Mississippi, June 2006 - May 2007

**NSF NMGK-8 Fellow and Elementary Team Leader,** University of Mississippi,
June 2005-June 2006

**NSF NMGK-8 Fellow,** University of Mississippi, June 2004-June 2006

**Graduate Instructor,** University of Mississippi, June 2003- May 2006

**Graduate Teaching Assistant,** University of Mississippi, August 2002-May 2003

**Actuarial Associate,** Acuff & Associates, Nashville, TN, July 2001-July 2002

**Actuarial Associate,** Towers Perrin, Atlanta, GA, June 2000-June 2001

## Publications

**Nicholson, E.W.**, & Wei, B. Degree Sum Condition for k-ordered Hamiltonian Connected Graphs. *Graphs and Combinatorics,* 2014, 10.1007/s00373-013-1393-x

**Nicholson, E.W.**, & Wei, B. (2014) Long paths containing k-ordered vertices in graphs. *Ars Combinatoria,* 114, 437-448.

**Nicholson, E.W.**, & Strickland D.M. (2009) Making connections to mathematics beyond high school: An exploration of graph colorings. *The MathMate, 32(3).*

**Nicholson, E.W.**, & Wei, B. (2008). Long cycles containing k-ordered vertices in graphs. *Discrete Mathematics,* 308(9), 1563-1570.

**Nicholson, E.W.** (2008). Making connections to mathematics beyond high school: An exploration of graph connectivity. *The MathMate, 31(2).*

## Presentations

E.W. Nicholson and B. Wei. *Degree conditions for weakly geodesic pancyclic graphs and their exceptions.* MAA/AMS Joint Mathematics Meeting, Baltimore, MD, January, 2014.

E.W. Nicholson and B. Wei. *Degree sum conditions for k-ordered hamiltonian connected graphs.* Invited talk at the American Mathematical Society Southeastern Sectional Meeting, Oxford, MS, March, 2013.

E.W. Nicholson and B. Wei. *Degree sum conditions for k-ordered hamiltonian connected graphs.* Invited talk at the University of Mississippi as one of their series of Combinatorics Seminars, Oxford, MS, April, 2012.

E.W. Nicholson and B. Wei. *Degree sum conditions for k-ordered hamiltonian connected graphs.* Session conducted at the Louisiana/Mississippi Sectional MAA meeting, Oxford, MS, February, 2011.

E.W. Nicholson. *Bringing Higher Mathematics into the High School Classroom: An Introduction to Graph Connectivity.* Session conducted at the Annual Meeting of the South Carolina Council of Teachers of Mathematics, Charleston, SC. October 2008.

B. Wei and E.W. Nicholson. *Long Paths containing k-ordered vertices in Graphs.* Session conducted at the SIAM conference on Discrete Mathematics, Victoria, Canada. June 2006.

E.W. Nicholson and B. Wei. *Long Paths containing k-ordered vertices in Graphs.* Session conducted at the Combinatorics Seminar at The University of Mississippi, University, MS. November 2005.

B. Wei and E.W. Nicholson. *Long Cycles containing k-ordered vertices in Graphs.* Presentation given at the MIGHTY XLI conference at Middle Tennessee State University. Murfreesboro, TN. September 2005.

## Awards

W. Charles Sallis Award for distinguished service to Millsaps College, 2014

Graduate Student Achievement Award: M.S. in Mathematics, University of Mississippi, 2004

Eli A. Zubay Award for Excellence in Actuarial Science, Georgia State University, 1999

## Courses Taught

Math 1130 - Elementary Functions

Math 1150 - Elementary Statistics

Math 1220 - Calculus I

Math 2230 - Calculus II

Math 2310 - Introduction to Advanced Math

Math 3620 - Number Theory

Math 3650 - Linear Algebra

Math 4800 - Graph Theory

## Professional Memberships

Mathematical Association of America

Mathematical Association of America Louisiana/Mississippi Section

LA/MS Sectional Project NEXT Fellowship