IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION


JERMAINE DOCKERY, ET AL.                          PLAINTIFFS


MICHAEL COMBS, EDDIE PUGH, DERRICK LANE,
HENRY MOORE, TAVARES FLAGG                       INTERVENORS


VS.                    CIVIL ACTION NO. 3:13-cv-326-WHB-JCG


MARSHALL L. FISCHER, ET AL.                       DEFENDANTS


<u>OPINION AND ORDER</u>

This cause is before the Court on two related Motions.  Having considered the pleadings, the attachments thereto, as well as supporting and opposing authorities, the Court finds:

The Motion of Defendants to Exclude Plaintiffs' Medical and Mental Health Expert Witnesses is not well taken and should be denied.

The Motion of Plaintiffs for Class Certification is well taken and should be granted.


### I.  Factual Background and Procedural History

The subject lawsuit was filed on behalf of prisoners confined at the East Mississippi Correctional Facility ("EMCF") in Meridian, Mississippi, which is designed to provide treatment and housing for mentally ill prisoners.  Plaintiffs, who seek class certification, allege that the conditions under which they are confined violate

their Eighth Amendment right to be free from cruel and unusual punishment.   As relief, Plaintiffs request that Defendants be ordered to "eliminate the substantial risks of serious harm" that have allegedly resulted from, *inter alia,* inadequate medical and mental health care, unsanitary environmental conditions, the use of excessive force by EMCF personnel, and the use of isolated confinement.

The factual allegations in the Complaint are divided into several categories, the first of which is labeled "Solitary Confinement".   As regards this category, Plaintiffs allege that although prisoners who are placed in solitary confinement should be permitted one hour of out-of-cell time per day to shower or have yard time, they often go days, and sometimes weeks, without being permitted any out-of-cell time.  <u>See</u> Compl., ¶¶ 25-27.  Plaintiffs also complain that numerous problems allegedly exist in the units in which they are housed including: (1) the toilets in the solitary confinement units do not function for long periods of time; and that feces, urine, food, and other debris covers the floors and walls, (2) the units are infested with vermin, (3) some prisoners do not have working light bulbs in their cells, while others are subjected to "bright artificial light around the clock," and (4) the noise in the units "is often deafening".  <u>Id.</u> at ¶¶ 29-35. Plaintiffs further allege that prisoners in solitary confinement are beaten and/or ignored by EMCF personnel, and are at risk of

2

prisoner-to-prisoner violence.   Id. at ¶¶ 36-37.   Plaintiffs complain that placement in solitary confinement exacerbates the symptoms of pre-existing mental illnesses and can cause suicidal thoughts, thoughts upon which a few prisoners have acted.   Id. at ¶¶ 38-74.

The second category in the Complaint is labeled "Mental Health Care".   As regards this category, Plaintiffs allege: (1) they receive little, if any, individual or group mental health treatment, (2) they are over-medicated with tranquilizing anti-psychotic medications, (3) the symptoms of their mental diseases are exacerbated by the conditions under which they are housed, and (4) they are subjected to disciplinary actions if they attempt to seek help from the medical staff.   Id. at ¶¶ 79-82.   Plaintiffs further allege: (1) they have de minis contact with psychiatrists, (2) they are given little to no opportunity to discuss their symptoms or problems with mental health care providers, and (3) that psychiatric medications are often prescribed by psychiatrists who have not evaluated or assessed the prisoners but, instead, are simply rubber-stamping recommendations made by insufficiently trained personnel.   Id. at ¶¶ 75-112.

The third category in the Complaint is labeled "Medical Care". As regards this category, Plaintiffs allege: (1) EMCF has insufficient staff to provide adequate medical treatment for prisoners, (2) they are often required to wait long periods of time

before being seen by a healthcare provider, and (3) prisoners are often treated by nurses regardless of the nature or seriousness of their medical problems.  Id. at ¶¶ 113-20.  Plaintiffs further allege that they do not always receive their prescribed medications, and that there is insufficient documentation to determine whether their medications are being given or taken as prescribed.  Id. at ¶¶ 121-23.  Finally, Plaintiffs allege that (1) they are denied treatment for acute or chronic pain and other medical conditions including diabetes and hypertension; (2) they receive untimely and insufficient dental and other medical care; (3) they are required to wait extended periods of time to see specialists, for example ophthalmologists; and (4) recommended treatment plans and corrective surgeries are often denied by prisoner officials.  Id. at ¶¶ 124-89.

The fourth category in the Complaint is labeled "Abuse and Excessive Force by Staff".  As to this category, Plaintiffs allege that security officers at EMCF often "use excessive force with impunity and with no oversight."  Id. at ¶ 190. Plaintiffs further allege that EMCF security officers and staff (1) receive insufficient training; (2) frequently use chemical agents and physical force without warning and in the absence of immediate threat of danger or resistence from the prisoners; and (3) deny requests for medical care by prisoners who have been subjected to physical force or chemical agents.  Id. at ¶¶ 191-202.  According

4

to Plaintiffs, EMCF personnel use chemical agents and force against prisoners regardless of their pre-existing medical or psychiatric problems.  Id. at ¶¶ 203-08.

The fifth category in the Complaint is labeled "Failure to Protect Prisoners From Violence".  As to this category, Plaintiffs allege that EMCF fails to protect prisoners from extortion, bodily and sexual assaults, and other threats of violence from other inmates.  Id. at ¶ 209.  Plaintiffs allege that in some cases, EMCF personnel have actively arranged and enabled prisoner-on-prisoner violence.  Id. at ¶¶ 210-20.  In other cases, EMCF personnel have allegedly acted with deliberate indifference to that violence by (1) failing to ensure the proper function of safety equipment; (2) failing to maintain adequate staff; (3) failing to remove weapons and dangerous objects from prisoners; and (4) failing to remove prisoners from potentially dangerous situations.  Id. at ¶¶ 221-32.

The sixth category in the Complaint is labeled "Sanitation and Environmental Conditions".  In this section, Plaintiffs allege that (1) there are multiple broken toilets, sinks, and showers throughout EMCF; (2) food, excrement, and other debris litter the inmate cells and units; (3) there is soot, and often smoke, from fires that have been started by prisoners; (4) they are required to wear clothing and sleep on bedding that has become saturated because of faulty water pipes; and (5) there is poor ventilation throughout the facility and air ducts and vents are not routinely

cleaned.  Id. at ¶¶ 234-43.   As to the seventh category in the Complaint, which is labeled "Nutrition and Food Safety", Plaintiffs allege that they are "being deliberately underfed and malnourished."  Nearly sixty percent of reviewed medical records purportedly indicate significant weight loss in patients after their arrival at EMCF.  Id. at ¶¶ 244-50.

Next, in their Complaint, Plaintiffs allege that Mississippi prison officials have been indifferent to the problems that exist at EMCF.  First, Plaintiffs allege that the officials have known of the problems existing at EMCF for several years, but have failed to take action to remedy them.  Id. at ¶¶ 251-53. Second, Plaintiffs allege that prison officials have continued to renew and/or enter additional contracts with private prison vendors even though the management and health care services provided by those vendors have been criticized, and the new contracts further reduce the medical and mental health care services received by EMCF prisoners. According to Plaintiffs, the prison officials do not monitor or engage in any oversight of the private prison vendors.  Id. at ¶¶ 254-62.  Third, Plaintiffs allege that their grievances regarding the care and conditions at EMCF have generally been either (1) answered with intimidation, coercion, obstruction, or threats from the staff, or (2) have not been answered at all because the prison officials either lose or ignore grievances filed by prisoners under the Administrative Remedy Program.  Id. at ¶¶ 263-83.

6

Based on these allegations, Plaintiffs filed a Complaint in this Court seeking relief under 42 U.S.C. § 1983 against the Commissioner, the Chief Medical Officer, and the Deputy Commissioner for Institutions of the Mississippi Department of Corrections ("MDOC"). In their Complaint, Plaintiffs first request that they be permitted to proceed as a "class of all persons who are currently, or will be confined at the EMCF." Id. at ¶ 284. The proposed class of all current and future EMCF prisoners is referred to as the "EMCF Class". Id. Plaintiffs also seek to proceed under the following three subclasses:  the Isolation Subclass, the Mental Health Subclass, and the Units 5 and 6 Subclass.[1] Id. at ¶¶ 293-312. As to the EMCF Class and identified subclasses, Plaintiffs request relief under Section 1983 on claims that their constitutional rights, as protected by the Eighth and Fourteenth Amendments, have been violated as follows:

> Claim One – The policies and practices at EMCF subject members of the EMCF Class to a substantial risk of serious harm and injury from inadequate medical care, including dental care, optical care, and other health-related services.

> Claim Two - The policies and practices at EMCF subject members of the Mental Health Subclass to a substantial

---

[1] Unit 5 houses inmates in long-term segregation, and Unit 6 houses inmates in short-term segregation.

risk of serious harm and injury from inadequate mental
health care.

Claim Three - The policies and practices at EMCF subject
members of the Isolation Subclass to a substantial risk
of serious harm and injury from housing them in
conditions that amount to solitary confinement, including
risks of harm from inadequate physical exercise, filthy
and unsafe environmental conditions, inadequate
nutrition, inadequate mental health treatment, and
conditions of extreme social isolation and sensory
deprivation.

Claim Four - The policies and practices at EMCF subject
members of the EMCF Class to a substantial risk of
serious harm and injury from the infliction of excessive
force.

Claim Five - The policies and practices at EMCF subject
members of the EMCF Class to a substantial risk of
serious harm and injury by failing to protect them from
violence, ignoring emergency situations, and enabling
violent attacks on prisoners.

<u>Claim Six</u> - The policies and practices at EMCF subject members of the Units 5 and 6 Subclass to a substantial risk of serious harm and injury from dangerous environmental conditions, including vermin, exposure to smoke and other toxic substances, filthy cells and fixtures, broken plumbing, inoperable lighting, constant illumination, and inadequate ventilation.

<u>Claim Seven</u> - The policies and practices at EMCF subject members of the EMCF Class to a substantial risk of serious harm and injury by providing inadequate nourishment to maintain health, and by serving food in an unsanitary and unsafe manner.

Through these claims, Plaintiffs seek a declaration that the current policies and practices at EMCF have violated their constitutional rights as protected under the Eighth Amendment. Plaintiffs also request that the named prison officials be enjoined from continued use of the policies and practices now being implemented at EMCF, and that they be required to implement a plan to eliminate the substantial risks of harm that result from (1) inadequate medical and mental health care, (2) unsanitary and dangerous environmental conditions, (2) the use of excessive force by EMCF staff, (4) prisoner-on-prisoner violence, (5) malnutrition

9

and unsanitary food preparation and delivery, and (6) the use of isolated confinement.  At a minimum, Plaintiffs request that the court-ordered plan: (1) prohibit solitary confinement under conditions of social isolation and sensory depravation; (2) provide timely and adequate treatment for both mental and physical illness; (3) protect prisoners from excessive force at the hands of EMCF staff and from harm from other prisoners; (4) require that prisoners be housed in safe, clean, and sanitary conditions; (5) provide prisoners nutritionally adequate, and safely prepared and served meals; and (6) require that prison officials monitor the performance of all private prison contractors. Finally, Plaintiffs request costs and attorneys' fees under 42 U.S.C. § 1988.

Plaintiffs have now moved for certification of the general class and subclasses identified in the Complaint.  In response, Defendants have moved to exclude Plaintiffs' medical and mental health expert witnesses.  As the Motions have now been fully briefed, they will be decided by the Court.

## II.  Analysis

### A.  Motion to Exclude Plaintiffs' Medical and Health Expert Witnesses

Defendants have moved, under <u>Daubert</u> and its progeny, to exclude the expert reports and testimony of Plaintiffs' medical and mental health experts Dr. Terry A. Kupers ("Kupers"), Dr. Marc Stern ("Stern"), Dr. Bart Abplanalp ("Abplanalp"), and Nurse

10

Practitioner Madeleine LaMarre ("LaMarre").  The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Before permitting an expert to testify, the trial court "must perform a screening function to ensure that the expert's opinion is reliable and relevant to the facts at issue in the case." Watkins v. Telsmith, Inc., 121 F.3d 984, 988-89 (5th Cir. 1997)(citing Daubert v. Merrill Dow Pharms., Inc., 509 U.S. 579, 589 (1993)). Whether an expert's opinion is reliable is determined by assessing "whether the reasoning or methodology underlying the testimony is scientifically valid." Daubert, 509 U.S. at 592-93. To be admissible, the "expert's testimony must be reliable at each and every step", in other words, "[t]he reliability analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, *et alia*." Knight v. Kirby Inland Marine Inc., 482 F.3d 347, 355 (5th Cir. 2007)(internal quotations omitted).  The issue of relevance focuses upon "whether [that] reasoning or methodology properly can be applied to the facts in issue." Id. at 593.

In moving to exclude Plaintiffs' experts, Defendants first challenge the methodologies they applied in formulating their opinions. See e.g. Mem. in Supp. of Mot. to Exclude [Docket No. 224], 2 (arguing that Plaintiffs' experts "could have and should have used established, recognized and universally accepted principles and methods of statistical sampling and analysis to evaluate and forecast the inmate population's medical and mental health care need."). Specifically, Defendants contend that the experts' opinions, which are based on "judgment sampling"[2] and "qualitative studies" of a few "unrepresentative samples" of medical records and prisoner interviews, are invalid because such samplings and studies cannot be used to derive inferences as to the EMCF prisoner population at large. See [Docket No. 237] (Nicholson Aff.) at ¶ 32 (Defendants' statistics expert opining that "the inferences the experts made from the sample of medical records and prisoner interviews to all medical records and all prisoners are invalid."). See also id. at ¶ 30 (arguing that for "their respective samples", Plaintiffs' experts "passed around the records of the sick whom they subjectively believed the system failed and then concluded that the system fails all of the sick.").

In response, Plaintiffs argue that the qualitative research methods used by their experts are both "accepted and mainstream in

---

[2]   A "judgment sample" is explained as a sample that is "chosen based on the expertise and judgment of a subject matter expert with knowledge of the system or process being assessed." See Resp. to Mot. to Exclude [Docket No. 229], 4-5.

the scientific community" and are "more applicable to a proper
evaluation of the delivery of health care at a prison."  Pls.'
Resp. to Mot. to Exclude [Docket No. 229], 4.  As explained by
Plaintiffs' expert Stern:

> When sampling from people (patients, staff) and documents
> in qualitative research, random samples are to be
> avoided.  Instead, the gold standard for sampling is
> "judgment sampling" or "purposeful sampling".  Instead of
> using random number generators to select samples, a
> judgment sample is chosen based on the expertise and
> judgment of a subject matter expert with knowledge of the
> system or process being assessed.  The goal is to obtain
> a sample which is as broad, rich, and representative of
> the diversity of operational conditions as possible.
> Such a process for collection of data usually requires
> appropriate expertise in the relevant disciple: "At the
> same time, the choice of which data to examine, or how
> best to model a particular process, could require subject
> matter expertise that a statistician lacks."  Judgment
> samples are appropriate because ensuring that all
> potential observational units in a population and
> sampling time frame have equal probability of selection
> is often not the most desired or beneficial strategy.
> Rather, we look to the subject matter experts to guide
> which areas, times of day, or segments of the population
> are most important to study and understand.

See Pls.' Resp. to Mot. to Exclude, Ex. 2 (Stern Decl.), ¶ 31.
(alterations in original)(citations to treatises and journals
omitted).

Having reviewed the pleadings, the Court finds there is a
stark disagreement as to whether qualitative methodologies (as
urged by Defendants) or quantitative methodologies (as urged by
Plaintiffs) are the more proper standard to be applied in this
case.  Although Defendants have shown that the qualitative
methodologies used by Plaintiffs' experts raise questions regarding

13

bias, and whether it is scientifically permissible to make inferences as to the whole EMCF prisoner population based on a selective sampling of the medical records of only a few inmates, the Court finds these issues go more to the credibility of the expert opinions as opposed to undermining the methodologies used by Plaintiffs' experts in formulating those opinions. See e.g. Daubert, 509 U.S. at 596 (explaining that "[v]igorous cross-examination [and] presentation of contrary evidence," are the "appropriate means of attacking" disputed evidence relied upon by experts, and that "in the event the trial court concludes that the scintilla of evidence presented supporting a position is insufficient to allow a reasonable juror to conclude that the position more likely than not is true, the court remains free to direct a judgment ... and likewise to grant summary judgment." See also Pipitone v. Biomatrix, Inc., 288 F.3d 239, 250 (5th Cir. 2002)("The fact finder is entitled to hear [the expert's] testimony and decide whether it should accept or reject the testimony after considering all factors that weigh on credibility, including whether the predicate facts on which [the expert] relied are accurate."); Nova Consulting Grp., Inc. v. Eng'g Consulting Srvs., Ltd., 290 F. App'x 727, 733 (5th Cir. 2008)(relying on Daubert, and noting that it is not the role of the trial court to evaluate whether the facts underlying the expert's opinion are correct); Viterbo v. Dow Chem. Co., 826 F.2d 420, 422 (5th Cir. 1987)("As a

general rule, questions relating to the bases and sources of an
expert's opinion affect the weight to be assigned that opinion
rather than its admissibility and should be left for the jury's
consideration."). In addition, as this case will be decided by a
bench trial, "[m]ost of the safeguards provided for in Daubert are
not as essential." Gibbs v. Gibbs, 210 F.3d 491, 500 (5th Cir.
2000). Ultimately, the Court will be called to decide whether the
evidence presented by Plaintiffs is sufficient to show that the
complained of conditions at EMCF, as determined by their experts'
qualitative studies, apply to the prisoner population as a whole.
If the evidence is found insufficient, class-wide relief will be
denied.

Second, Defendants argue that LaMarre (a nurse practitioner)
and Abplanalp (a psychologist) are not qualified, and hence should
not be permitted, to offer ultimate opinions with respect to
whether the alleged deficiencies in the conditions, or in the
medical/mental care provided, at EMCF subject all inmates to a
substantial risk of harm. See Rebuttal [Docket No. 237], 11
(arguing that "[w]hile it might certainly be appropriate for these
non-doctors to offer opinions about certain aspects of nursing or
psychological care, an ultimate opinion to the effect that alleged
deficiencies are presently subjecting every inmate to a *substantial*
risk of injury, i.e. a medical or mental injury, inherently
requires a medical assessment factoring in the unique medical

15

circumstances of each inmate."). The Court finds that Defendants' objection as to whether LaMarre and/or Abplanalp should be permitted to offer an ultimate opinion is one that should be raised, and considered, at trial.

After considering the pleadings, the Court finds Defendants have failed to show that the methodologies used by Plaintiffs' expert witnesses in formulating their opinions requires that their opinions be excluded under <u>Daubert</u>. Defendants' Motion to Exclude Plaintiffs' Medical and Mental Health Expert Witnesses will, therefore, be denied.


**B.  Plaintiffs' Motion for Class Certification**

**1.  Standards**

Plaintiffs have moved for class action certification under Rule 23(b)(2) of the Federal Rules of Civil Procedure. It is well settled that the district court must conduct a "rigorous analysis" of all of the requirements for certification under Rule 23, <u>see</u> <u>Castano v. American Tobacco Co.</u>, 84 F.3d 734, 740 (5th Cir. 1996)(citing <u>General Tel. Co. of Southwest v. Falcon</u>, 457 U.S. 147 (1982)), and that Plaintiffs bear the burden of proving that those requirements are satisfied. <u>See</u> <u>e.g.</u> <u>Wal-Mart Stores, Inc. v. Dukes</u>, --- U.S. ---, 131 S.Ct. 2541, 2551 (2011)("Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with

16

the Rule — that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc.").  As a general rule, a district court has broad discretion when deciding a motion for class certification.  See Allison v. Citgo Petroleum Corp., 151 F.3d 402, 408 (5th Cir. 1998).  In exercising its discretion, the court may not consider the merits of the plaintiffs' claims at the certification stage, see Eisen v. Carlisle & Jacquelin, 417 U.S. 156 (1974), but may permissibly look past the pleadings to the record and any other completed discovery when deciding whether a class should be certified.

For a lawsuit to proceed as a class action, all of the requirements of Rule 23(a) and at least one of the alternative requirements of Rule 23(b) must be satisfied.  See Allison, 151 F.3d at 411.  Rule 23(a) of the Federal Rules of Civil Procedure provides:

> (a) Prerequisites.  One or more members of a class may sue or be sued as representative parties on behalf of all only if:
>
> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

17

FED. R. CIV. P. 23(a).  As Plaintiffs have moved for certification

under Rule 23(b)(2), they also bear the burden of showing:

> (b)  Types  of  Class  Actions.   A  class  action  may  be
> maintained if  Rule 23(a) is satisfied and if:
>
>      ...
>
> (2) the party opposing the class has acted or refused to
> act on grounds that apply generally to the class, so that
> final  injunctive  relief  or  corresponding  declaratory
> relief is appropriate respecting the class as a whole.

FED. R. CIV. P. 23(b)(2).

The Rule 23(a) requirements were as discussed in length in

M.D. v. Perry, 294 F.R.D. 7 (S.D. Tex. 2013).  That discussion is

reprinted here in abridged form.

### Rule 23(a) Requirements

### Numerosity

Rule 23(a)(1) "requires examination of the specific
facts of each case and imposes no absolute limitations."
General Tel. Co. of the NW., Inc. v. EEOC, 446 U.S. 318,
329 (1980).  There is no magic number: "The proper focus
is not on numbers alone, but on whether joinder of all
members is practicable in view of the numerosity of the
class and all other relevant factors." Phillips v. Joint
Legislative Comm., 637 F.2d 1014, 1022 (5th Cir. 1981).
Courts must consider "the geographical dispersion of the
class, the ease with which class members may be
identified, the nature of the action, and the size of
each plaintiff's claim." Zeidman v. J. Ray McDermott &
Co., Inc., 651 F.2d 1030, 1038 (5th Cir. 1981).

## Commonality

Commonality was the main issue in the Supreme Court's Wal-Mart decision, 131 S.Ct. at 2550 ("The crux of this case is commonality"), and is the most complex part of Rule 23(a) analysis. "Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury.'" Id. at 2551 (quoting Falcon, 457 U.S. at 157). It is not enough that class members suffer the same type of injury or have been subject to a violation of the same law. Id.; Lightfoot v. District of Columbia, 273 F.R.D. 314, 325 (D.D.C. 2011)(citing Love v. Johanns, 439 F.3d 723, 729 (D.C.Cir. 2006)). Rather, a plaintiff must identify a unified common policy, practice, or course of conduct that is the source of their alleged injury.

The policy or practice that a plaintiff identifies need not be formal or officially-adopted. Lightfoot v. District of Columbia sets out various ways plaintiffs can establish the existence of government policies. The most straightforward of these is express adoption by the relevant entity, either through a legislative or administrative act (e.g., a local ordinance) or by an actor who possesses policymaking authority (e.g., a chief executive). Lightfoot, 273 F.R.D. at 320-21. Absent official sanction, a policy can be identified on the basis of custom or consistent practice. Id. at 321. Or, closely-related to custom, a uniform policy can be based on the defendant's deliberate indifference: "The critical question here is whether the government has failed to respond to a need ... in such a manner as to show 'deliberate indifference' to the risk that not addressing

the need will result in constitutional violations." Id.
(internal quotation marks omitted)(citing Baker v.
District of Columbia, 326 F.3d 1302, 1306 (D.C. Cir.
2003)). While using the same phrasing as the substantive
due process deliberate indifference standard, the
requirements for demonstrating the existence of a policy
are less demanding. "The inquiry is an objective one ...
Mere negligence does suffice: the doctrine does not
require the [official actor, in this case a city] to take
reasonable care to discover and prevent constitutional
violations, but simply means that, faced with actual or
constructive knowledge that its agents will probably
violate constitutional rights, the [official actor] may
not adopt a policy of inaction." Id. (emphasis in
original) (internal quotation marks removed)(citing
Warren v. District of Columbia, 353 F.3d 36, 39 (D.C.
Cir. 2004)).

A plaintiff also bears the burden of connecting the
policy or practice to the alleged harm, especially in
cases where this connection is not readily apparent. Cf.
Ross v. RBS Citizens, N.A., 667 F.3d 900 (7th Cir. 2012)
cert. granted, judgment vacated, --- U.S. ---, 133 S.Ct.
1722 (2013)(certifying a class based on being denied
overtime compensation due to unofficial company
policies); In re Whirlpool Corp. Front-Loading Washer
Prods. Liab. Litig., 678 F.3d 409, 414 (6th Cir. 2012)
cert. granted, judgment vacated sub nom. Whirlpool Corp.
v. Glazer, --- U.S. ---, 133 S.Ct. 1722 (2013) aff'd 722
F.3d 838 (6th Cir. 2013)(certifying a class based on the
purchase of washers with design defects); Gray v. Hearst
Commc'ns, Inc., 444 F. App'x 698 (4th Cir.

2011)(certifying a class based on breach of a sufficiently similar contract). In doing so, "the party seeking class certification may rely on reasonable, common-sense assumptions and inferences to satisfy the requirements for class certification." <u>Kase v. Salomon Smith Barney, Inc.</u>, 218 F.R.D. 149, 152 (S.D. Tex. 2003)(citing <u>Zeidman</u>, 651 F.2d at 1039).

<u>McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.</u>, 672 F.3d 482 (7th Cir. 2012) cert. denied, --- U.S. ---, 133 S.Ct. 338 (2012), involved a somewhat complicated connection between the defendant's policies and the alleged harm.  Plaintiffs had filed a Title VII class action on the basis of two company-wide policies: a "teaming" policy that permitted brokers in the same office to form their own teams, and an "account distribution" policy that transferred accounts from brokers who left the company largely on the basis of past performance.  The plaintiffs alleged that these policies exacerbated racial discrimination.  The theory of the claim was that, all else being equal, brokers tend to form teams of like members, so teams tend to be formed along racial lines. Members of a racial minority may therefore find it harder to find teams at all, or at least good ones, and are thus denied the advantages of the teaming policy.  The account distribution policy is alleged to aggravate this disadvantage; brokers on good teams do better in the competition for account distributions, leading to a "vicious cycle" for minority (in this case African-American) brokers. <u>McReynolds</u>, 672 F.3d at 488-90.

It is important to note, as the Seventh Circuit did, that class certification does not require the plaintiffs to establish that the harm actually occurred, i.e., they do not need to prove that the policies they identified did, in fact, cause the harm they are alleging. Consistent with Amgen and EPJ Fund, the only consideration at the class certification stage is whether the issues are appropriate for classwide litigation. That is, whether the plaintiffs have satisfied Rule 23's requirements.

> If the teaming policy causes racial discrimination and is not justified by business necessity, then it violates Title VII as 'disparate impact' employment discrimination — and whether it causes racial discrimination and whether it nonetheless is justified by business necessity are issues common to the entire class and therefore appropriate for class-wide determination.
>
> ...
>
> We are not suggesting that there is in fact racial discrimination at any level within Merrill Lynch, or that management's teaming and account distribution policies have a racial effect. The fact that black brokers have on average lower earnings than white brokers may have different causes altogether.

Id. at 489-90 (emphasis added).

As the court indicated, failure to act can also constitute a policy or practice. Young v. Nationwide Mutual Insurance, Co. affirmed the certification of a class based on the defendants' miscalculations of local taxes that they were authorized to collect. Young, 693 F.3d, 532, 535 (6th Cir. 2012). Despite the defendants' contentions that they had no uniform policy or practice

22

that resulted in these errors — asserting instead that
each was the product of unique circumstances like
misspelling a name — the Sixth Circuit concluded that
there was a common policy since defendants opted not to
use available geocoding verification procedures that
would have, plaintiffs alleged, avoided the errors. Id.
at 542-43. The Young plaintiffs were, therefore, able to
point to a discrete policy or practice of the defendants
— not using these procedures — and the availability of
something like geocoding technology served to highlight
the defendants' choice.   Cf. Wal-Mart, 131 S.Ct. at
2555-56 ("respondents have identified no 'specific
employment practice' — much less one that ties all their
1.5 million claims together."); In re Countrywide Fin.
Corp. Mortg. Lending Practices Litig., 708 F.3d 704, 708
(6th Cir. 2013).

     The common practice or policy does not have to
injure every class member or injure them in exactly the
same manner: "Class certification is appropriate 'if
class members complain of a pattern or practice that is
generally applicable to the class as a whole.  Even if
some class members have not been injured by the
challenged practice, a class may nevertheless be
appropriate.'" Whirlpool, 678 F.3d at 420 (citing Gooch
v. Life Investors Ins. Co. of Am., 672 F.3d 402, 428 (6th
Cir. 2012)).   In Whirlpool plaintiffs complained of
defective front-loading washers, and though not all
members of the class had suffered the actual injuries of
mold and mildew growing in their washers, they shared a
common legal injury in having purchased a defective
washer. Id.; accord Butler v. Sears, 702 F.3d at 362

23

("If, as appears to be the case, the defect in a Kenmore-brand washing machine can precipitate a mold problem at any time, the defect is an expected harm, just as having symptomless high blood pressures creates harm in the form of an abnormally high risk of stroke.")(emphasis added); Daffin v. Ford Motor Co., 458 F.3d 549 (6th Cir. 2006).

In addition, a plaintiff must demonstrate that there are common questions of fact or law. Not any questions will do, however.  The plaintiff must show that the class' claims are based on a common contention that is "capable of classwide resolution — which means that determination of its truth or falsity will resolve an issue that is central to the validity of each of one of the claims in one stroke." Wal-Mart, 131 S.Ct. at 2551; see also Ealy v. Pinkerton Gov't Servs., Inc., 514 F. App'x 299, 303–04 (4th Cir. 2013). In short, the common questions identified must be dispositive of the claims. If they are not — if, for instance, after the common questions are answered one way or another individualized inquiries to determine liability would be needed — then commonality has not been established. Ahmad v. Old Republic Nat. Title Ins. Co., 690 F.3d 698, 704 (5th Cir. 2012); see also Luiken, 705 F.3d at 377; Forte v. Wal-Mart Stores, Inc., 2012 WL 2886711, at *2 (S.D. Tex. July 13, 2012). The number of common questions does not matter, one will suffice, provided it is critical to resolving the class members' claims. Wal-Mart, 131 S.Ct. at 2556; In re Am. Med. Sys., Inc., 75 F.3d 1069, 1080 (6th Cir. 1996)(internal citations omitted).

The Fifth Circuit emphasized this requirement in its

MD decision. MD, 675 F.3d at 837, 841.  Similarly, the
Fifth Circuit held that the potential defenses against
the plaintiff's claims should also be considered as they
may undermine the dispositive, "one stroke" nature of the
proposed common questions. Id. at 843-44; see also Witt
v. Chesapeake Exploration, L.L.C., 276 F.R.D. 458, 468-69
(E.D. Tex. 2011); cf. Schumacher v. AK Steel Corp. Ret.
Accumulation Pension Plan, 711 F.3d 675, 683-84 (6th Cir.
2013). In order to determine whether there are common
questions of law or fact, a court must trace the class
claims and conclude that the common questions will
resolve them without the need for additional extensive
individualized inquiry.

The existence of some variations within the class or
individualized defenses do not necessarily make class
certification improper.  "It is not necessary that
members of the proposed class 'share every fact in
common.'"  Evon v. Law Offices of Sidney Mickell, 688
F.3d 1015, 1030 (9th Cir. 2012)(quoting Rodriguez v.
Hayes, 591 F.3d 1105, 1122 (9th Cir. 2010)). In re
Heartland Payment Sys., Inc. Customer Data Sec. Breach
Litig., 851 F. Supp. 2d 1040, 1054 (S.D. Tex. 2012). So
long as the common questions linking the putative class
members are dispositive of their claim and the claim
arises out of a single course of conduct and on a single
theory of liability, Rule 23(a)'s commonality requirement
is satisfied. Young, 693 F.3d at 543; Evon, 688 F.3d at
1029-30; Wang v. Chinese Daily News, Inc., 709 F.3d 829,
834 (9th Cir. 2013).

Post-Wal-Mart, establishing commonality entails two

things: that there exists a common policy or practice, possibly an implicit one, that is the alleged source of the harm to class members, and that there are common questions of law or fact that will be dispositive of the class members' claim.

### Typicality

There is significant overlap between typicality and commonality. Wal-Mart, 131 S.Ct. at 2551 n.5 (quoting Falcon, 457 U.S. at 157-58 n. 13). Like commonality,

> [t]ypicality does not require a complete identity of claims. Rather the critical inquiry is whether the class representative's claims have the same essential characteristics of those of the putative class. If the claims arise from a similar course of conduct and share the same legal theory, factual differences will not defeat typicality.

James v. City of Dallas, 254 F.3d 551, 571 (5th Cir. 2001), abrogated on other grounds by MD, 675 F.3d at 832 (quoting 5-23 Moore's Federal Practice — Civil § 23.24); In re Heartland Payment Sys., 851 F. Supp. 2d at 1055 (holding that typicality was satisfied "[d]espite possible state-by-state variations in the elements of these claims," because "they arise from a single course of conduct by [the defendant] and a single set of legal theories."); Wright & Miller, 7A Fed. Prac. & Proc. Civ. § 1764 (3d ed.)("a number of courts have noted that typical claims need not be identical to one another").

Typicality requires a showing that the claims of the named plaintiffs are in fact those asserted as the common class claims. In this sense, typicality is commonality addressed from the perspective of the named plaintiffs.

Commonality requires showing that, in fact, all members of the proposed class share a common claim, the validity of which can be determined on a classwide basis. Typicality requires showing that, in fact, the proposed representatives have that claim. Often, once commonality is shown typicality will follow as a matter of course. See, e.g., Frey v. First Nat'l Bank Sw., 2013 U.S. Dist. LEXIS 37153 (N.D. Tex. Feb. 20, 2013).

### Adequacy of Representation

Like typicality, adequacy of representation also tends to merge with commonality, though it "also raises concerns about the competency of class counsel and conflicts of interest." Wal-Mart, 131 S.Ct. at 2551 n.5 (quoting Falcon, 457 U.S. at 157-58 n.13). Adequacy of representation "'encompasses class representatives, their counsel, and the relationship between the two.'" Stirman v. Exxon Corp., 280 F.3d 554, 563 (5th Cir. 2002)(quoting Berger v. Compaq Computer Corp., 257 F.3d 475, 479 (5th Cir. 2001)). In evaluating this requirement, a court "must consider '[1] the zeal and competence of the representatives' counsel and ... [2] the willingness and ability of the representatives to take an active role in and control the litigation and to protect the interests of absentees.'" Id. (alterations in original)(quoting Berger, 257 F.3d at 479). Class counsel are fiduciaries of the class and the court must be satisfied that they are prosecuting the case in the interest of the class. See e.g., Culver v. City of Milwaukee, 277 F.3d 908, 913 (7th Cir. 2002).

### B.  Rule 23(b)(2) Requirements

In the Fifth Circuit, Rule 23(b)(2) has been interpreted to have three components. First, "class members must have been harmed in essentially the same way." Maldonado, 493 F.3d at 524 (citing Bolin v. Sears, Roebuck & Co., 231 F.3d 970, 975 (5th Cir. 2000)); see also MD, 675 F.3d at 845 (citing Maldonado). This understanding of the Rule is reinforced by Wal-Mart:

> Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class. It does not authorize class certification when each individual class member would be entitled to a different injunction or declaratory judgment against the defendant ... the relief sought must perforce affect the entire class at once.

131 S.Ct. at 2557-58. Given the threshold requirement of commonality, if a plaintiff has satisfied the requirements of Rule 23(a), then the conditions of Rule 23(b)(2) will tend to follow. In establishing commonality the plaintiff will have identified a common practice or policy that is the source of the class members' harm. So, if she prevails on the merits, a single injunction barring or modifying that course of that behavior will, in the ordinary course of things, provide relief to the members of the class. In contrast, if the requested relief requires particular relief tailored to each class member, then certification under Rule 23(b)(2) is inappropriate. MD, 675 F.3d at 846-47; Shook v. Bd. of Cnty. Comm'rs, 543 F.3d 597, 604 (10th Cir. 2008).

Second, "injunctive relief must predominate over monetary damage claims." Maldonado, 493 F.3d at 524 (citing Bolin, 231 F.3d at 975); accord Wal-Mart, 131 S.Ct. at 2558-59.  Damages can be awarded under Rule

23(b)(2), but they must be "incidental," meaning that they do "not require additional hearings to resolve the disparate merits of each individual's case," nor do they "introduce new legal or factual issues, nor entail complex individualized determinations." Wal-Mart, 131 S.Ct. at 2560 (citing Allison, 151 F.3d at 415).

Third, the injunctive relief must be specific. Maldonado, 493 F.3d at 524 (citing Bolin, 231 F.3d at 975). This requirement is derived from Rule 65(d), which requires that all injunctions be stated specifically and describe in reasonable detail the act or acts restrained or required. FED. R. CIV. P. 65.(d). In MD, the court of appeals held that a plaintiff must "make an effort" to describe the injunctive relief they request "so that final injunctive relief may be crafted to describe in reasonable detail the acts required." 675 F.3d at 848 (internal quotation marks omitted)(citing Shook, 543 F.3d at 605-06). The precise terms of the injunction need not be decided at class certification, only that the class members' claim is such that a sufficiently specific injunction can be conceived; a plaintiff must present evidence and arguments "sufficient to allow the district court to see how it might satisfy Rule 65(d)'s constraints and thus conform with Rule 23(b)(2)'s requirement." Shook, 543 F.3d at 605 n.4 (emphasis added); accord Morrow v. Washington, 277 F.R.D. 172, 198 (E.D. Tex. 2011)("Plaintiffs have set forth facts suggesting that Defendants' behavior was generally applicable to the class as a whole, making injunctive relief appropriate. The precise terms of the injunction need not be decided at this stage, only that the

allegations are such that injunctive and declaratory relief are appropriate and that the class is sufficiently cohesive that an injunction can be crafted that meets the specificity requirements of Rule 65(d).") (emphasis added).

**2. Discussion**

**a. Proposed Class and Subclasses**

Plaintiffs seek certification of one general class and three subclasses, which are defined as follows:

1. The "EMCF Class", which is defined as a "class of all persons who are currently, or will be, confined at the [EMCF]."

2. The "Isolation Subclass", which is defined as a "class of all persons who are currently, or will be, subjected to Defendants' policies and practices of confining prisoners in conditions amounting to solitary confinement at the [EMCF]."

3. The "Mental Health Subclass", which is defined as a "subclass of all persons who are currently, or will be, subjected to Defendants' mental health care policies and practices at the [EMCF]."

4. The "Units 5 and 6 Subclass", which is identified as a "class of all persons who are currently, or will be, housed in Units 5 and 6 at the [EMCF]."

Reviewing the class and subclass definitions, the Court finds there is overlap as any member of one or more of the subclasses would, necessarily, also be a member of the general EMCF Class.

The Court additionally finds that the class and subclass definitions are unambiguous, and that membership in the class and subclasses could easily be ascertained.

**b. Class Claims**

All of the claims alleged by Plaintiffs are based on the same legal theories.  Specifically, Plaintiffs assert that the policies and practices implemented by Defendants at EMCF have subjected them to a "substantial risk of serious harm and injury" and have violated their Eighth Amendment right to be free from cruel and unusual punishment as well as their Fourteenth Amendment rights. The claims alleged by the EMCF Class include: Claim One -  The policies and practices at EMCF subject them to a substantial risk of serious harm and injury from inadequate medical care, including dental care, optical care, and other health-related services; Claim Four - The policies and practices at EMCF subject them to a substantial risk of serious harm and injury from the infliction of excessive force; Claim Five - The policies and practices at EMCF subject them to a substantial risk of serious harm and injury by failing to protect them from violence, ignoring emergency situations, and enabling violent attacks on prisoners; and Claim Seven - The policies and practices at EMCF subject them to a substantial risk of serious harm and injury by providing inadequate nourishment to maintain health, and serving food in an unsanitary

and unsafe manner.

The claim alleged by the Mental Health Subclass is that the policies and practices at EMCF subject members of that subclass to a substantial risk of serious harm and injury from inadequate mental health care. See Compl., ¶¶ 315-16. (Claim Two). The claim alleged by the Isolation Subclass is that the policies and practices at EMCF subject members of that subclass to a substantial risk of serious harm and injury from housing them in conditions that amount to solitary confinement, including risks of harm from inadequate physical exercise, filthy and unsafe environmental conditions, inadequate nutrition, inadequate mental health treatment, and conditions of extreme social isolation and sensory deprivation. See Compl., ¶¶ 317-18. (Claim Three). The claim alleged by the Units 5 and 6 Subclass is that the policies and practices at EMCF subject members of that subclass to a substantial risk of serious harm and injury from dangerous environmental conditions, including vermin, exposure to smoke and other toxic substances, filthy cells and fixtures, broken plumbing, inoperable lighting, constant illumination, and inadequate ventilation. See Compl., ¶¶ 323-24 (Claim Six).

The United States Supreme Court has held that the Eighth Amendment prohibition against cruel and unusual punishment imposes an obligation on the States to provide medical care for its prisoners. Estelle v. Gamble, 429 U.S. 97, 103 (1976). As

explained by the Court in <u>Estelle</u>:

> An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met. In the worst cases, such a failure may actually produce physical torture or a lingering death, ... [i]n less serious cases, denial of medical care may result in pain and suffering which no one suggests would serve any penological purpose.... We therefore conclude that deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment. This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs, or by prison guards in intentionally denying or delaying access to medical care, or intentionally interfering with the treatment once prescribed. Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983.

<u>Estelle</u>, 429 U.S. at 103-05. Likewise, the Eighth Amendment requires that prison officials "provide humane conditions of confinement; they must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measure to ensure the safety of the inmates." <u>Gates v. Cook</u>, 376 F.3d 323, 332 (5th Cir. 2004)(citing <u>Farmer v. Brennan</u>, 511 U.S. 825, 832 (1994). Thus, courts have found that prison conditions including inadequate lighting, non-functional plumbing, the presence of vermin, inadequate ventilation, the presence of fire and other safety hazards, inadequate cleaning supplies, and forced segregation and isolation have violated prisoners' Eighth Amendment rights. See <u>e.g.</u> <u>Hoptowit v. Spellman</u>, 753 F.2d 779, 783-85 (9th Cir. 1985)(and cases cited therein).

33

## c.  Class Certification Analysis

### i. Numerosity

The first prerequisite for class certification under Rule 23(a)(1) is numerosity, i.e. that the class is so numerous that joinder of all members is impracticable.  Here, the pleadings show that membership in the EMCF Class could range between 1,200 (approximate current prisoner population) and 1,500 (maximum prisoner population).  The pleadings also show that membership in the Mental Health Subclass would include approximately 850-1000 prisoners, while membership in the Isolation Subclass and the Units 5 and 6 Subclass would include a minimum of 150 prisoners in each. In addition to the number of potential class members, the Court finds joinder would not be practical in this case because the population at EMCF is subject to change as prisoners are transferred into and out of that facility.  Based on the evidence before it, the Court finds the numerosity requirement of Rule 23(a)(1) is satisfied with respect to both Plaintiffs' class action and subclass action claims.  See e.g. In re Rodriguez, 695 F.3d 360, 365 (5th Cir. 2012)(affirming certification of a class consisting of 125 members).

### ii.  Commonality

As discussed above, in order to prove commonality, Plaintiffs

must establish that there is a policy or practice on the part of the defendants that is the source of the putative class members's alleged injuries, and also that the claims arising out of those injuries depends on common questions of law and fact.  Again, a policy or practice for the purposes of establishing commonality need not be officially adopted.  Instead, such policy can be established through custom or through failing to act in the face of actual or constructive knowledge that there is likely to be a violation of constitutional rights.

Here, the Court finds there is sufficient evidence that Defendants have failed to act in the face of actual or constructive knowledge that prisoners housed at CMCF were being denied humane conditions of confinement, including adequate food, shelter, medical and mental health care, and safety.  For example, Plaintiffs have submitted affidavits, deposition testimony, and expert reports to substantiate their claim that deficiencies in the security policies and practices at EMCF subject members of the EMCF Class to an unreasonable risk of serious harm from other inmates and from prison staff who routinely use excessive force.  In support of these allegations, Plaintiffs submitted an expert report from Eldon Vail who found, *inter alia*, that: (1) EMCF "is awash with contraband and weapons", (2) staff is not trained to handle prisons with mental illnesses, (3) locking mechanisms do not secure prisoners in their cells, (4) staff does not conduct the routine

safety and cell checks as required under EMCF operating policies, and (5) staff is not properly trained as to the manner in which to respond to inmates who are resisting staff direction and, therefore, abuse other control tactics including the use of pepper spray. See Mot. for Class Cert, Ex. 6 (Vail Report), at 7, 16, 19, 32, 33-37, 41-43. Plaintiffs also submit the deposition of Matthew Naidow, who is the captain of security at EMCF, and who testified, inter alia, that prisoner-on-prisoner violence is common place, that security officers are poorly trained, and that staff has aided inmate violence by opening cell doors and by failing to intervene when prisoners are being assaulted. Id., Ex. 7 (Naidow Dep.), 29-32, 92-93, 100-01, 104, 173-75, 220-32.

Plaintiffs have also submitted evidence with respect to their Eighth Amendment claims that they are at substantial risk of serious harm and injury from inadequate medical care and mental health care. For example, Plaintiffs have submitted evidence showing, inter alia, that they lack access to both urgent and non-urgent health care, that emergency kits do not include necessary medical equipment, that medical complaints are treated through correspondences, and there is insufficient security staff to escort prisoners to their medical appointments. Id. Ex. 5 (Stern Report), 6-7, 17-18, 19. Plaintiffs also submitted evidence to show that they lack access to medical specialists including urologists and ophthalmologists, as well as to in-house infirmary and

observational care; that medical treatment is provided by health care personnel who lack the requite training and/or are working outside the limits of their licenses; and that the medical examinations and treatment they are provided is inadequate. Id. Ex. 30 (LaMarre Rep.), 6-7, 13, 25-26. Other evidence shows that medical treatment is often delayed or denied; that prisoners are not given all of their prescribed medications; and that the record keeping and oversight of medical care providers is deficient. Id. Ex. 5 (Stern Rep.) 2-3, 11-13, 30; (LaMarre Rep.), 6-7, 13, 25-26.

To prevail on the merits of their class action claims, Plaintiffs will have to prove a causal connection exists between the alleged systematic failure on the part of prison officials to act in the face of actual or constructive knowledge regarding the conditions existing at EMCF, and the unconstitutional risk of harm about which they complain. Thus, the Court finds that all of Plaintiffs' claims will have, at their core, common issues regarding (1) the physical conditions under which prisoners at EMCF are being housed and the type and quality of health and mental health care they are receiving or to which they have access, and (2) whether those conditions and health care have either subjected prisoners to an unconstitutionally unreasonable risk of harm or, conversely, were sufficient to provide humane conditions of confinement. If it is shown, for example, that the physical conditions and health care as provided are sufficient to maintain

humane conditions of confinement, all of Plaintiffs' claims will resolved at once.

In sum, the Court finds that Plaintiffs have satisfied the Rule 23(a)(2) commonality requirement with respect to their class action and subclass action claims. With respect to the EMCF Class and the proposed subclasses, Plaintiffs have alleged that their Eighth Amendment Rights have been violated, they have identified a common policy or practice on the part of the prison officials - namely that the officials have failed to take any action in the face of actual or constructive knowledge regarding the allegedly unconstitutional conditions existing at EMCF, and there are common questions of law or fact that will resolve all of their claims.

### iii.  Typicality

To establish typicality under Rule 23(a)(3), Plaintiffs must show that the claims of the representative parties are typical of the claims of the class. Here, the prison officials' alleged failure to take any action in the face of actual or constructive knowledge regarding the allegedly unconstitutional conditions existing at EMCF affect all prisoners housed at that facility. As discussed above, typicality under Rule 23(a)(3) does not require that each class member's claim be identical, but only that the claims have the same essential characteristics of those of the putative class. As the claims of each putative class and subclass

member (1) arise from the same policy or practice, i.e. the prison officials' alleged failure to take corrective action, and the same defect, i.e. the existence of inhumane conditions of confinement, and (2) are based on the same legal theory, i.e. the alleged violation of the Eighth Amendment right to be free from cruel and unusual punishment, the Court finds that Plaintiffs have satisfied the Rule 23(a)(3) typicality commonality requirement with respect to the general EMCF Class and each of the subclass.

### iv.  Adequacy of Representation

To satisfy Rule 23(a)(4), Plaintiffs must show that the representative parties will fairly and adequately protect the interests of the class.  As discussed above, when evaluating this requirement, courts consider "the zeal and competence" of the representatives' counsel, and the willingness and ability of the representatives to take an active role in and control the litigation and to protect the interests of class members.  Here, based on the volume and thoroughness of the pleadings, the Court finds Plaintiffs' counsel have shown themselves to be both zealous and competent.  Second, although Defendants argue that the medical records do not support the claims alleged by the putative class and subclass representatives, the Court finds no evidence that the proposed representatives are unwilling or unable to participate in the litigation and seek to protect the interests of class members.

Accordingly, the Court finds that Plaintiffs have satisfied the Rule 23(a)(4) adequacy of representation requirement with respect to their class action and subclass action claims.


**v.  Rule 23(b)(2)**

As discussed above, Rule 23(b)(2) has been interpreted to have three components.  First, "class members must have been harmed in essentially the same way." <u>Maldonado</u>, 493 F.3d at 524.  The Court finds this component is satisfied because Plaintiffs all allege that their Eighth Amendment rights have been violated based on the conditions under which they are housed at EMCF, and based on the medical and mental health treatment they have received (or failed to receive) at that facility. Thus, any injunction ordered by the Court would provide relief to each member of the class.  Second, injunctive relief clearly predominates over monetary damages claims in this case because Plaintiffs do not seek any monetary judgments on their claims.  Third, the Court finds that specific injunctive relief could be ordered in this case to, *inter alia*, clean and repair the plumbing and other housing problems at EMCF, ensure that there is adequate staff and training of staff, and policies are implemented to govern the access to, as well as types of medical and mental health care being provided to, inmates at EMCF.  As the types of injunctive relief requested by Plaintiffs would not require that the Court adjudicate the individual class members'

40

needs or circumstances, the Court finds the injunctive relief requested by Plaintiffs satisfies Rule 23(b)(2).

## vi.  Conclusion

After reviewing the pleadings, and having found that Plaintiffs have shown that the Rule 23(a) and Rule 23(b)(2) prerequisites are satisfied with respect to the EMCF Class as well as the identified subclasses, the Court finds Plaintiff's Motion for Class Certification should be granted.

## C. Appointment of Class Counsel

Plaintiffs also request that their current attorneys be appointed class counsel pursuant to Rule 23(g) of the Federal Rules of Civil Procedure.  Under this Rule, "a court that certifies a class must appoint class counsel" and, in so doing, must consider: (1) the work counsel has done in identifying or investigating potential claims in the action; (2) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class.  FED. R. CIV. P. 26(g)(1)(A)(i-iv).  The Rule also requires that "[c]lass counsel must fairly and adequately

41

represent the interests of the class." Fed. R. Civ. P. 23(g)(4).

The Court finds that counsel for the named Plaintiffs fulfill the requirements of Rule 23(g). The record shows that the attorneys currently representing Plaintiffs have investigated EMCF, have engaged in voluminous discovery in this case, and have experience litigating similar cases in this and other jurisdictions. The proposed class counsel, which includes attorneys from the National Prison Project of the ACLU and the Southern Poverty Law Center have extensive experience handling complex litigation and class actions. Plaintiffs' counsel have demonstrated, as evidenced by the pleadings before the Court, their familiarity with the applicable law, and appear dedicated to this case. They have also shown they will devote substantial resources to representing the classes, and pursuing this litigation, as evidenced by the number of expert witnesses they have already designated. In sum, the Court concludes that counsel for named Plaintiffs will fairly and adequately represent the interests of the class. The Court, therefore, will appoint them as class counsel for both the general class and subclasses certified by this Opinion and Order.

### IV.  Conclusion

IT IS THEREFORE ORDERED that Defendants' Motion to Exclude Plaintiffs' Medical and Mental Health Expert Witnesses [Docket No. 222] is hereby denied.

IT IS FURTHER ORDERED that Plaintiff's Motion for Class Certification [Docket No. 179] is hereby granted.  This action shall proceed as a class action with one General Class, the EMCF Class, and three Subclasses: the Isolation Subclass, the Mental Health Subclass, and the Units 5 and 6 Subclass.

IT IS FURTHER ORDERED that Membership of the certified General Class and each of the three certified Subclasses is defined as follows:

1.  The EMCF Class: All persons who are currently, or will be, confined at the East Mississippi Correctional Facility.

2.  The Isolation Subclass: All persons who are currently, or will be, subjected to Defendants' policies and practices of confining prisoners in conditions amounting to solitary confinement at the East Mississippi Correctional Facility.

3.  The Mental Health Subclass: All persons who are currently, or will be, subjected to Defendants' mental health care policies and practices at the East Mississippi Correctional Facility.

4. The Units 5 and 6 Subclass: All persons who are currently, or will be, housed in Units 5 and 6 at the East Mississippi Correctional Facility.

IT IS FURTHER ORDERED that the following named Plaintiffs are appointed as class representatives for the General EMCF Class: James Vann, Derrick Hayes, Jeffery Covington, Phillip Fredenburg,

Eric Ward, and John Barrett.

The following named Plaintiffs are appointed as class representatives for the Isolation Subclass: Jermaine Dockery and Derrick Hayes.

The following named Plaintiff is appointed as class representative for the Mental Health Subclass: Joseph Osborne.

The following named Plaintiff is appointed as class representative for the Units 5 and 6 Subclass:  Alvin Luckett.

IT IS FURTHER ORDERED that Plaintiffs' current attorneys re appointed as counsel for the certified General Class and each of the three certified Subclasses.

IT IS FURTHER ORDERED that counsel for Plaintiffs shall, on or before October 15, 2015, contact Chambers of United States Magistrate Judge John C. Gargiulo and request the scheduling of a Case Management Conference.

SO ORDERED this the 29th day of September, 2015.


                                    s/ William H. Barbour, Jr
                                    UNITED STATES DISTRICT JUDGE