# Exhibit 1

**EXPERT REPORT OF TERRY A. KUPERS, M.D., M.S.P.**

**Dockery *et al.* v. Fisher *et al.*, No. 3:13-CV-00326-WHB-JCG**

Submitted December 29, 2016

# TABLE OF CONTENTS

I.    SUMMARY OF OPINIONS ............................................................. 1

    A.    OPINION 1: Many EMCF prisoners are subjected to serious and lasting psychological harm due to solitary confinement lasting longer than 14 days. ..................................................................... 1

    B.    OPINION 2: Prisoners suffering from serious mental illness are especially vulnerable to the effects of solitary confinement and other harsh prison conditions and must be excluded from solitary confinement. ................................ 1

    C.    OPINION 3: The conditions in isolated confinement housing at EMCF are so shockingly harsh and inhumane as to subject all prisoners housed there to great pain and suffering as well as a significant risk of serious psychiatric symptoms, emotional breakdown and suicide. .................................... 1

    D.    OPINION 4: The conditions in the Medical Unit and the Intake Unit at EMCF, especially when prisoners remain confined there for more than a few days, are as harsh and damaging as the conditions in Unit 5. ......................... 1

    E.    OPINION 5: Taken as a whole, the conditions in solitary confinement at EMCF are the worst I have witnessed in my 40 years as a forensic psychiatrist investigating jail and prison conditions. ................................. 2

II.    BACKGROUND AND QUALIFICATIONS ..................................... 3

    A.    Educational and Professional Background ............................. 3

    B.    Expertise in Solitary Confinement and Prison Conditions .................... 3

    C.    Prior Expert Witness Experience ...................................... 5

    D.    Compensation ..................................................... 6

III.    FACTS AND DATA CONSIDERED IN FORMING OPINIONS ................... 7

    A.    Methodology ...................................................... 7

    B.    Overview ......................................................... 8

Opinion 1 ..................................................................... 11

I.    Research on Isolated Confinement .......................................... 11

II.    Conditions at EMCF ..................................................... 16

    A.    EMCF Prior to 2014 ................................................ 16

B.      EMCF in 2014......................................................................................... 17

C.      EMCF in May 2016 ................................................................................ 22

D.      Illustrative Prisoner Interviews ........................................................... 29

Opinion 2 ............................................................................................................................. 32

I.      Research on Prisoners with Serious Mental Illness in Isolated Confinement ................. 32

II.      Standards in the Field and an Evolving Consensus ........................................... 36

A.      An Evolving Consensus ......................................................................... 37

III.      Illustrative Prisoner Interviews ..................................................................... 41

Opinion 3 ............................................................................................................................. 47

I.      Conditions at EMCF Unit 5 are Reprehensible ................................................ 47

II.      A Vicious Cycle of Increasing Abuse and Increasingly Bizarre Responses ................... 49

III.      Illustrative Cases ...................................................................................... 51

Opinion 4 ............................................................................................................................. 56

I.      The Medical Unit ........................................................................................ 56

II.      A Case From the Medical Unit ...................................................................... 58

III.      The Intake Unit .......................................................................................... 58

Opinion 5 ............................................................................................................................. 60

## I.    SUMMARY OF OPINIONS

I have been retained by Plaintiffs' counsel to render opinions on the psychiatric effects of conditions of confinement in the segregation units (Unit 5) and other sites of solitary confinement (including the Medical Unit and Intake Unit) at East Mississippi Correctional Facility (EMCF).

A.    OPINION 1: Many EMCF prisoners are subjected to serious and lasting psychological harm due to solitary confinement lasting longer than 14 days.

Many prisoners on Unit 5 are classified "long-term segregation" and languish in solitary confinement entirely idle, often in the dark, with shocking neglect by staff. Human beings require social connection and meaningful activities to maintain psychiatric stability. Absent these basic human needs, emotional symptoms emerge in even seemingly stable prisoners, including severe anxiety, disordered thinking that can become paranoia, problems with concentration and memory, growing anger, despair, and very high risk for self-harm and suicide. Over time, there is increasing isolation and emotional numbing, making the post-release adjustment of prisoners who have been in solitary confinement for significant amounts of time very problematic. There is permanent damage, including a high recidivism rate and poor adjustment in the community after release from prison.

B.    OPINION 2: Prisoners suffering from serious mental illness are especially vulnerable to the effects of solitary confinement and other harsh prison conditions and must be excluded from solitary confinement.

The conditions of isolation and idleness that cause severe symptoms and disability in relatively stable prisoners are well known to exacerbate any underlying or evolving mental illness, often resulting in permanent damage or suicide. Individuals with serious mental illness who are subjected to long stints in solitary confinement become refractive to treatment and chronically severely impaired. Because EMCF serves as the designated site for mental health services within the Mississippi Department of Corrections, the harm suffered by prisoners with serious mental illness is especially egregious.

C.    OPINION 3: The conditions in isolated confinement housing at EMCF are so shockingly harsh and inhumane as to subject all prisoners housed there to great pain and suffering as well as a significant risk of serious psychiatric symptoms, emotional breakdown and suicide.

Solitary confinement for longer than fourteen days causes great harm, but when there are aggravating conditions such as neglect by staff, non-functioning lights, inadequate medical and mental health treatment, the ever-present risk of assault, or a lack of cleaning supplies – all very present abuses in Unit 5 of EMCF – the human damage is much greater.

D.    OPINION 4: The conditions in the Medical Unit and the Intake Unit at EMCF, especially when prisoners remain confined there for more than a few days, are as harsh and damaging as the conditions in Unit 5.

The Medical Unit and Intake Unit have become sites of long-term isolative confinement. Instead of moving prisoners out of the Medical Unit after they are properly assessed to a needed therapeutic environment such as an intermediate care or inpatient psychiatric unit (which do not exist at EMCF or within the MDOC system), or from the Intake Unit to a prison setting where they can take part in treatment and programs, prisoners are retained in the Medical Unit and Intake Unit for unacceptably long stints, and while confined there they are mostly isolated and idle and do not even have access to a recreation yard. Great damage results.

E.   OPINION 5: Taken as a whole, the conditions in solitary confinement at EMCF are the worst I have witnessed in my 40 years as a forensic psychiatrist investigating jail and prison conditions.

As discussed in this report and as my CV shows, I have spent much of my professional life investigating prison conditions, including segregation units and entire facilities in twenty states. Overall, the segregation conditions at EMCF are the worst I have encountered. The conditions of confinement on Unit 5 at EMCF certainly press the outer bounds of what most humans can psychologically tolerate, and cause a huge amount of psychiatric illness and lasting disability.

## II.    BACKGROUND AND QUALIFICATIONS

### A.    Educational and Professional Background

1.    I am a medical doctor and have been licensed to practice medicine in the State of California since 1968. I am a Diplomate of the American Board of Psychiatry & Neurology (Psychiatry, 1974, for life).

2.    I received a B.A. in Psychology from Stanford University with distinction and a Masters in Social Psychiatry degree from UCLA. I received my degree in medicine from UCLA School of Medicine where I was elected to Alpha Omega Alpha Honor Society. I completed an Internship in Medicine/Pediatrics/Surgery at Kings County Hospital/Downstate Medical Center in New York, a Residency in Psychiatry at UCLA NPI (Los Angeles) and Tavistock Institute (London), and a Fellowship in Social and Community Psychiatry at UCLA NPI. Between 1974 and 1977, I was Assistant Professor in the Department of Psychiatry and Co-Director of the Psychiatry Residency Training Program of the Charles Drew Postgraduate Medical School in Los Angeles, and I was a staff psychiatrist and Co-Director of the Outpatient Clinic at Martin Luther King, Jr. Hospital in Los Angeles. From 1977 to 1981, I was staff psychiatrist and Co-Director of the Partial Hospital Program at the Richmond (California) Community Mental Health Center.

3.    I am on the staff of the Alta Bates Medical Center in Berkeley. I am Institute Professor in the Graduate School of Psychology at Wright Institute in Berkeley, and have been on the faculty of the Wright Institute since 1981.

4.    I am Distinguished Fellow of the American Psychiatric Association and a member of the American Academy of Psychiatry and the Law. I have served as President of the East Bay Psychiatric Association (local branch of the American Psychiatric Association) and I served for several years as Co-Chair of the Committee on Persons with Mental Illness Behind Bars of the American Association of Community Psychiatrists. I have conducted a private practice of psychiatry since 1974 and I currently maintain a clinical practice in Oakland, California.

### B.    Expertise in Solitary Confinement and Prison Conditions

5.    I have published extensively on the subject of conditions of confinement and mental illness in correctional settings. I have published more than two dozen articles in scholarly journals including: "Beyond Supermax Administrative Segregation: Mississippi's Experience Rethinking Prison Classification and Creating Alternative Mental Health Programs," *Criminal Justice and Behavior*, 36, 1037-1050 (2009); "What To Do With the Survivors?: Coping With the Long-Term Effects of Isolated Confinement," *Criminal Justice and Behavior*, Vol. 35 No. 8, August 2008, pp. 1005-1016); "Malingering in Correctional Settings," *Correctional Mental Health Report, 5*, 81 (2004); and "A Community Mental

Health Model in Corrections," *Stanford Law & Policy Review, 26*, 119-158 (2015).

6.     I have written approximately a dozen book chapters, including "Posttraumatic Stress Disorder (PTSD) in Prisoners" and "Schizophrenia, its Treatment and Prison Adjustment," (two chapters) in *Managing Special Populations in Jails and Prisons*, ed. Stan Stojkovic (Kingston, NJ: Civic Research Institute, 2005); "Preparing an Expert's Report," in *Practical Guide to Correctional Mental Health and the Law*, by Fred Cohen (with Terry Kupers) (Kingston, NJ: Civic Research Institute, 2011); and "Isolated Confinement: Effective Method for Behavior Change or Punishment for Punishment's Sake?," in *The Routledge Handbook of International Crime and Justice Studies*, eds. Bruce Arrigo & Heather Bersot (Oxford: Routledge, 2013), 213-232.  I was a contributing member of the committee of GAP (Group for the Advancement of Psychiatry) that wrote *People With Mental Illness in the Criminal Justice System: A Cry for Help* (Washington, D.C.: American Psychiatric Association Press, 2016).

7.     I have written two books on the subject of conditions of confinement, solitary confinement and mental illness in prison: *Prison Madness: The Mental Health Crisis Behind Bars and What We Must Do About It* (Jossey-Bass/Wiley, 1999); and *Solitary: The Inside Story of Supermax Isolation and How We Can Abolish It* (University of California Press, forthcoming in 2017). I co-edited the book *Prison Masculinities* (Temple University Press, 2003). I wrote the Foreword for *Working with Dangerous People: The Psychotherapy of Violence*, ed. David Jones (Oxon, UK: Radcliffe Medical Press Ltd., 2004). I am Contributing Editor of *Correctional Mental Health Report*.

8.     I have served as a consultant regarding prison conditions and the quality of correctional mental health care to the U.S. Department of Justice, Civil Rights Division. I have conducted trainings for correctional and mental health staff in several departments of corrections. I serve as consultant to several public mental health agencies, including Progress Foundation.

9.     I testified as an invited expert to the National Prison Rape Elimination Commission, which was created by Act of Congress to investigate the problem of rape in U.S. prisons and jails and make recommendations for its elimination.

10.     I have lectured and presented on mental illness in prison at many professional meetings, including a Symposium Presentation, "The Experience of Individuals with Mental Illness in the Criminal Justice System," at the May 20, 2013 Annual Meeting of the American Psychiatric Association in San Francisco.

11.     I received the Exemplary Psychiatrist Award from the National Alliance on Mental Illness (NAMI) at the annual meeting of the American Psychiatric Association in 2005; and the William Rossiter Award for "global contributions made to the field of forensic mental health" from the Forensic Mental Health Association of California in 2009.

C.    **Prior Expert Witness Experience**

12.    I have testified as an expert in over thirty criminal and civil proceedings in federal and state courts regarding jail and prison conditions, their effects on prisoners, the quality of mental health services, and the problem of sexual assault and abuse in correctional settings.

13.    I have extensive experience investigating the treatment of mentally ill prisoners in Mississippi, and in collaborating with the Mississippi Department of Corrections in efforts to ameliorate those conditions. I testified as an expert in two class action cases involving treatment of mentally ill prisoners and the psychiatric effects on prisoners of solitary confinement and other conditions in Mississippi prisons. In *Russell v. Johnson*, No. 1:02-cv-00261-JAD (N.D. Miss. 2003), I testified about the psychiatric effects of the conditions of confinement on Mississippi's Death Row at Mississippi State Penitentiary in Parchman. In *Presley v. Epps*, 4:05-cv-00148-DAS (N.D. Miss. 2007), I testified about the abuse of mentally ill prisoners in Unit 32, the 1,000 bed supermax unit at Mississippi State Penitentiary. In both cases, the Court entered remedial decrees.

14.    In *Presley v. Epps*, I assisted MDOC in the implementation of a consent decree that reduced the population in solitary confinement from 1,000 to 150 prisoners and reformed treatment of prisoners with serious mental illness. In 2009, in collaboration with officials from Mississippi Department of Corrections (MDOC) and MDOC's private health contractor, Wexford, I published an article about this experience, "Beyond supermax administrative segregation: Mississippi's experience rethinking prison classification and creating alternative mental health programs."[1]

15.    I have also had prior experience at EMCF in connection with my work in implementing the decrees in *Presley v. Epps*. In 2008, I toured EMCF and met with the mental health program director for The GEO Group ("GEO," the private company then running EMCF on contract with MDOC), in an attempt to understand the resources available for prisoners with serious mental illness in Unit 32 at Parchman who, under the terms of the consent decree in *Presley*, were to be transferred to EMCF for treatment. In January 2011, under the terms of a later decree whereby Unit 32 was to be permanently shuttered and all prisoners with serious mental illness who had been housed there were to be transferred to EMCF absent exceptional circumstances, I investigated the conditions of confinement and mental health treatment at EMCF and consulted with MDOC officials and their mental health contractor, GEO, in collaborative efforts to improve mental health treatment at EMCF. I again toured EMCF, conducted interviews with staff and prisoners, and met with custody and mental health administrators from MDOC and GEO, including MDOC's Deputy Commissioner

---

[1]    Kupers, T., Dronet, T., et al. (2009). Beyond supermax administrative segregation: Mississippi's experience rethinking prison classification and creating alternative mental health programs. *Criminal Justice and Behavior, 36*, 1037-1050.

Emmitt Sparkman and GEO regional Medical Director for Psychiatry, Dr. Cassandra Newkirk, to make specific recommendations to them. In October 2011, I reviewed and responded with specific recommendations to the MDOC/GEO proposal for a Special Management Unit (SMU) at EMCF, designed for prisoners on Unit 5.

16.     In addition to the Mississippi cases in which I have testified as an expert, I have testified in the following cases, among others: *Hadix v. Caruso*, No. 4:92-cv-00110-RAE (W.D. Mich. 2008), regarding mental health care in Michigan prisons; *DAI, Inc. v. NY OMH*, No. 1:02-cv-04002-GEL (S.D.N.Y. 2006), regarding mental health care and the psychiatric effects of solitary confinement in the New York Department of Correctional Services; *Austin v. Wilkinson*, No. 4:01-cv-71-JG (N.D. Ohio 2005), regarding the proposed transfer of Ohio death row prisoners to Ohio State Penitentiary (a supermax facility); *Jones 'El v. Berge*, No. 00-C-421-C (W.D. Wisc. 2001 and 2002), regarding the effects of isolated confinement on Wisconsin prisoners suffering from serious mental illness in Wisconsin; *Everson et al., v. Mich. Dep't of Corr.*, No. 2:00-cv-73133-AC (E.D. Mich. 2001), regarding sexual abuse in correctional facilities; *Westchester Cnty. Corr. v. County of Westchester*, No. 7:99-cv-11685-SCR (S.D.N.Y. 2002), regarding sexual abuse in correctional facilities; *Bazetta v. McGinnis*, No. 95-CV-73540-DT (E.D. Mich. 2000), regarding the effect of visitation and its restriction on Michigan prisoners; *Cain v. Mich. Dep't of Corr*, No. 239116 (Mich. 1998) 239116 1998, regarding conditions of confinement, solitary confinement and their effect on the mental health of prisoners; *Coleman v. Wilson*, No. S-90-0520-LKK-JFM (E.D. Cal. 1993), regarding conditions of confinement, solitary confinement, and the quality of mental health treatment for prisoners with mental illness in the California Department of Corrections; *Gates v. Deukmejian*, No. 2:87-cv-01636-LKK-JFM (E.D. Cal. 1989), regarding the availability and quality of mental health services at the California Medical Facility in Vacaville; *Thompson v. Enomoto*, No. C-79-1630-SAW (N.D. Cal. 1983), regarding conditions of confinement and effects of double-ceiling in the Security Housing Units of the California Department of Corrections; and *Neal v. Mich. Dep't of Corr.*, No. 966-6986-CZ (Mich. 2008), regarding custodial misconduct and sexual abuse of women prisoners.

17.     I attach to this Report as Exhibit A a copy of my current curriculum vitae, which includes a list of all the publications I have authored in the past 10 years and a list of all the cases in which I have testified at trial or deposition during the past four years.

**D.     Compensation**

18.     My rate of compensation in this case is $225/hour for all work except deposition and testimony at trial, for which my rate is $450/hour.

### III.    FACTS AND DATA CONSIDERED IN FORMING OPINIONS

#### A.    Methodology

19.    In forming my opinions, I have relied on my training in general psychiatry, social and community psychiatry and forensic psychiatry; my decades of experience as a clinician, educator, researcher, and consultant in the areas of the delivery of mental health services in prisons and jails, and on the effect on mental health of solitary confinement and other conditions of confinement; my experience as an expert in other cases, including in the Mississippi Department of Corrections and my earlier investigations regarding the treatment of prisoners with serious mental illness at EMCF; my experience as a clinician who has visited correctional facilities and interviewed many administrators, staff and prisoners in numerous states; my familiarity with the literature of psychiatry and the social sciences; my experience as a trainer and consultant in correctional settings; and my extensive clinical practice in my office and in public agencies where I have treated and trained others to treat patients who have been imprisoned; my familiarity with position statements by and guidelines and standards of professional organizations.

20.    The method I employed in establishing the basis for opinions expressed in this report is widely accepted among the community of experts who assess the psychological consequences of prison conditions and the provision of health care in correctional facilities. In fact, I wrote the chapter on preparing an expert's report in a major textbook on corrections and the law.[2] I have testified in state and federal court dozens of times (see my c.v., Exhibit A to this report), and I have never been presented for *voir dire* in court and failed to be seated as an expert witness.  In all of these cases, I used a similar methodology to the one I employed in this matter. The central components of my methodology -- visual inspection of the facility, reliance upon policies, rosters, logs and other documents provided by the defendants, expert judgment based on years of experience to identify prisoners to interview, interviews with prisoners and with staff (to the extent interviews with staff are permitted by defense counsel), comparison of departmental policies and daily practices, and review of clinical charts or electronic medical records -- are comparable to methods used by me and other experts in equivalent cases as well as by the National Commission on Correctional Health Care, an independent non-profit organization that accredits correctional facilities. Then, I constantly check one component of my findings with all others, for example checking if prisoners' reportage is consistent with what is recorded on their electronic medical records, what is registered on logs for the specific type of data, what policies require and what all other relevant documents reflect. Then, I carefully compare the testimony of all the individuals I interview. If there are disagreements or contradictions, I pursue them to discover why one informant tells me one thing and another tells me the opposite. What is extraordinary about

---

[2]    Kupers, T. Preparing an Expert's Report. (2011). In *Practical Guide to Correctional Mental Health and the Law*, by Fred Cohen (with Terry Kupers) (Kingston, NJ: Civic Research Institute).  Attached as Exhibit B.

my findings in the present matter is that all informants agreed upon a large number of phenomena, including unhygienic conditions, inattention from staff, fears for safety, unavailability of cleaning supplies and light bulbs, etc. Since I am using a multi-modality approach for my investigation, I generate a list of prisoners I will interview from various sources. Depending on what part of life on Unit 5 I am examining, I find prisoners who can provide the data I need. I do not exactly do a random study, that would not be appropriate for this kind of investigation, but there is a certain amount of random collection of data involved. For example, I interview the prisoners who happen to be locked in showers, in Observation cells or in recreation areas at the time I am on tour. There are some deficiencies that are so serious that even a few cases evidence a seriously flawed system that places patients at risk. Determining which deficiencies fall into this category requires extensive familiarity with prison conditions and correctional mental health care systems.

**B.      Overview**

21.     In forming my opinions in this Report, in addition to the background and method outlined in II and III.A, above, I considered the information I gathered during two visits to EMCF, in April, 2014 and in May, 2016, plus documents reviewed.

22.     I spent three days at EMCF, April 23 – April 25, 2014, and three additional days, May 24 – May 26, 2016. On both visits I toured the facility, reviewing electronic medical and mental health records, discussed various practices and policies with staff, and interviewed prisoners.

23.     From April 23 through April 25, 2014, I conducted individual interviews of 28 prisoners in a private meeting room and conducted an additional 27 individual interviews of prisoners who were located in their cells while touring the prison's housing units. In addition, I conducted group interviews of more than 25 other prisoners in groups that I assembled by entering general population units and asking several prisoners, randomly selected, to sit with me and discuss their prison experience and programs. I also met for approximately a half hour with six prisoners, most from Unit 4, in the waiting room of the medical clinic.

24.     I toured EMCF in 2014 in order to gather evidence to support my expert opinions regarding mental health, not solely regarding segregation. As a result, not all prisoners with whom I met in 2014 were held in segregation. However, my tour in 2014 included visits to Units 5 and 6 on April 23, 2014. At that time Unit 6 was designated for short-term segregation and conditions were approximately equivalent to conditions on Unit 5. I spent approximately an hour and a half entering zones, speaking with staff and with prisoners locked in their cells or the showers. I returned to Unit 5 on April 24, 2014 and visited the day room on one zone and the control booth. I visited the Medical Department (Observation Cells) and spoke with the prisoners in Observation. I toured Unit 3C and talked with approximately 20 prisoners individually and in groups in the dayroom. In addition, I toured Units 1A, 2A, 2B, 3A, 3B, 4A, and 4C.

25.    During my 2014 visit to EMCF I reviewed medical and mental health charts for over a dozen prisoners. In preparing my 2014 expert report, I reviewed a number of additional documents. These included: summaries of 20 additional medical and mental health charts prepared by Dr. Bart Abplanalp based upon his review; a transcript of the deposition of Capt. Naidow; the July 19, 2012 Contract for Medical Services at EMCF between MDOC and Health Assurance, LLC; numerous policies of MDOC and Health Assurance, LLC; lists of prisoner grievances; incident reports; audits; email correspondence; MDOC monitor reports; expert reports in this matter by Eldon Vail and Dr. Marc Stern; sworn prisoner declarations; photographs taken of the facility in April 2014 by environmental health expert Diane Skipworth and by the ACLU and SPLC; and numerous Memos, Logs, Incident Reports and ARPs (Administrative Remedy Program) forms provided in discovery.

26.    I described my 2014 findings in my Report in this matter, submitted on June 16, 2014.

27.    In May 2016, I conducted a second tour of EMCF in order to gather additional evidence upon which to base the opinions reflected in this report, which relate to the conditions of solitary confinement on Unit 5 and other locations of isolated confinement and the effects of those conditions on prisoners. Between May 24, 2016 and May 26, 2016 I toured Unit 5, the Medical Unit and the Intake Unit and I interviewed 23 prisoners. Unit 6 was no longer a site of solitary confinement.

28.    During my visit on May 24 – May 26, 2016, I interviewed 23 prisoners in an office or classroom setting. Twenty of the prisoners were housed in Unit 5, one in the Medical Unit and two in the Intake Unit. I reviewed electronic medical records for all 23 of the prisoners I interviewed. I visited the recreation yard of unit 5, where I spoke briefly to several additional prisoners. I visited the control room, also referred to as the picket, of Unit 5 from which I could observe all four of the "zones" — that is, clusters of individual cells — contained within Unit 5 (5A, 5B, 5C and 5D). I entered the common areas of several zones. In the common area of 5D, I spoke briefly with several more prisoners. I also reviewed dozens of ARP forms reflecting prisoners' complaints, as well as numerous logs of prisoners on the mental health caseload, prisoners on Observation (in Medical or in the Intake Unit) status and so forth. I reviewed Centurion of Mississippi, Healthcare Policies and Procedures, Policy # E-09, "Segregated Inmates," Pol. 19-01 and 19-01-01 on Offender Segregation, Pol. 10-01-03 on Administrative Segregation, and Policy #19-01-02 on Protective Custody. I reviewed Incident Reports, complaints lodged by family members, logs, census reports and so forth.

29.    Since my two most recent visits to EMCF were separated by two years, when I interviewed in 2016 prisoners who had been in Unit 5 in 2014, I inquired whether certain problems and conditions I identified during my 2014 tour of the facility had improved, deteriorated, or stayed the same since that time.

10

30.     Exhibit C to this Report contains a complete list of the documents I considered in preparing this report. I have also reviewed and relied on my prior report and underlying documents filed in this action, and have attached that report hereto as Exhibit I.

31.     I have created a numbered Name Key, Exhibit D. I will refer to prisoners throughout this declaration by their number on that Name Key.

32.     The opinions herein are based on currently available evidence and documentation. I reserve the right to modify or expand these opinions if additional information becomes available.

**OPINION 1**

**MANY EMCF PRISONERS ARE SUBJECTED TO SERIOUS AND LASTING PSYCHOLOGICAL HARM
DUE TO SOLITARY CONFINEMENT LASTING LONGER THAN 14 DAYS.**

**I.    Research on Isolated Confinement**

33.    For the purpose of this Report, I will utilize the following definition of "isolated confinement" or "solitary confinement":

> Segregation from the mainstream prisoner population in attached housing units or free-standing facilities where prisoners are involuntarily confined in their cells for upwards of 22 hours a day or more, given only extremely limited or no opportunities for direct and normal social contact with other persons (i.e., contact that is not mediated by bars, restraints, security glass or screens, and the like), and afforded extremely limited if any access to meaningful programming of any kind.[3]

34.    Long-term confinement (greater than fourteen days) in an isolated confinement unit is well known to cause severe psychiatric morbidity, disability, suffering and mortality.[4] It has been known for as long as solitary confinement has been practiced that human beings suffer a great deal of pain and mental deterioration when they remain in solitary confinement for a significant length of time. In 1890, the U.S. Supreme Court found that in isolation units, "[a] considerable number of prisoners fell, after even a short confinement, into a semi-fatuous condition, from which it was next to impossible to arouse them, and others became violently insane; others still, committed suicide; while those who stood the ordeal better were not generally reformed, and in most cases did not recover sufficient mental activity to be of any subsequent service to the community."[5]

35.    It has been known for decades that suicide is approximately twice as prevalent in prison as in the community. Long-term consignment to segregation is a major factor in the high suicide rate among prisoners. Recent research confirms that of all successful suicides that occur in a correctional system, approximately fifty

---

[3]    Haney, C. (2009). The Social Psychology of Isolation: Why Solitary Confinement is Psychologically Harmful. *Prison Service Journal, 181,* 12 n.1.

[4]    For reviews of this research, *see* Smith, P.S. (2006).  The Effects of Solitary Confinement on Prison Inmate: A Brief History and Review of the Literature. *Crime & Justice, 34,* 488-90; Arrigo, B. & Bullock, J.L. (2008).  The Psychological Effects of Solitary Confinement on Prisoners in Supermax Units: Reviewing What We Know and Recommending What We Should Change. *International Journal of Offender Therapy and Comparative Criminology, 52,* 622-40.

[5]    *In re Medley*, 134 U.S. 160, 168 (1890).

percent involve the 3 to 8 percent of prisoners who are in some form of isolated confinement at any given time.[6]

36.    In 2005, in an amicus brief to the United States Supreme Court, leading mental health experts summarized the clinical and research literature about the effects of prolonged isolated confinement and concluded: "No study of the effects of solitary or supermax-like confinement that lasted longer than 60 days failed to find evidence of negative psychological effects."[7]

37.    It has been my experience, from prison tours and clinical interviews of prisoners held in long-term, near-24-hour cell confinement similar to the segregation zones on Units 5 at EMCF and the conditions that exist in the Medical and Intake Units, that isolated confinement is very likely to cause psychiatric symptoms such as severe anxiety, depression and aggression even in relatively healthy prisoners. In prisoners with histories of serious mental illness, or who are prone to mental illness, it causes psychotic breakdowns, severe affective disorders and suicide crises.

38.    There is a rich research literature on the effects of long-term solitary confinement in prison.[8] Hans Toch provided early narrative reports from prisoners at the

[6]    Mears, D.P. & Watson, J. (2006). Towards a fair and balanced assessment of supermax prisons. *Justice Quarterly, 23(2)*, 232-270; Way, B., Miraglia, R., Sawyer, D., Beer, R., & Eddy, J. (2005). Factors related to suicide in New York state prisons. *International Journal of Law and Psychiatry, 28(3)*, 207-221; Patterson, R.F. & Hughes, K. (2008). Review of completed suicides in the California Department of Corrections and Rehabilitation, 1999 to 2004. *Psychiatric Services, 59(6)*, 676-682.

[7]    *Wilkinson v. Austin*, Brief of Professors and Practitioners of Psychology and Psychiatry as Amicus Curiae in Support of Respondent, No. 04-495 (U.S. 2005).

[8]    For an overview of supermaximum security and isolated confinement, see Rhodes, Lorna. (2004). *Total Confinement: Madness and Reason in the Maximum Security Prison.* Berkeley: University of California Press, 2004; and Shalev, Sharon. (2009). *Supermax: Controlling Risk Through Solitary Confinement.* Portland, Oregon: Willan Publishing. For examples of clinical research, see Grassian, S. (1983). Psychopathological effects of solitary confinement. *American Journal of Psychiatry, 140*, 1450-1454; Haney, C. (2003). Mental health issues in long-term solitary and "supermax" confinement. *Crime & Delinquency, 49(2)*, 124-156; Grassian, S., & Friedman, N. (1986). Effects of sensory deprivation in psychiatric seclusion and solitary confinement. *International Journal of Law and Psychiatry, 8(1)*, 49-65; Cloyes, K., D. Lovell, D. Allen, & L. Rhodes (2006). Assessment of psychosocial impairment in a supermaximum security unit sample. *Criminal Justice and Behavior, 33*, 760-781; Grassian, S. (2006). Psychiatric effects of solitary confinement. *Washington University Journal of Law and Policy, 22*, 325-336; *see also* American Friends Service Committee of Arizona. (2012). *Lifetime lockdown: How isolation conditions impact prisoner reentry*. Phoenix: AFSC. http://afsc.org/sites/afsc.civicactions.net/files/documents/AFSC-Lifetime-Lockdown-Report_0.pdf; Guy, A. (2016). *Locked Up and Locked Down, Segregation of Inmates with Mental Illness.* (2016). Amplifying Voices of Inmates with Disabilities Prison Project. September 8. http://avidprisonproject.org/; and *Wilkinson v. Austin*, Brief of Professors and

highest levels of security and Isolation.[9] Craig Haney has researched the detrimental effects of long-term isolation.[10] They include: feelings of anxiety and nervousness, headaches, troubled sleep, lethargy or chronic tiredness, and over half complained of nightmares, heart palpitations, obsessive ruminations confused thinking, irrational anger, chronic depression, and fear of impending nervous breakdowns. Nearly half of persons studied suffered from hallucinations and perceptual distortions, and a quarter experienced suicidal ideation.

39.    Stuart Grassian has conducted similar research.[11] He describes a particular psychiatric syndrome resulting from the deprivation of social, perceptual, and occupational stimulation in solitary confinement. This syndrome has basically the features of a delirium. Many of the prisoners Dr. Grassian studied experienced massive free floating anxiety, perceptual disturbances, paranoia, hallucinations, memory loss, difficulty concentrating and confused thinking. For some, these symptoms included hallucinations and perceptual illusions; half of the prisoners complained of cognitive difficulties such as confusional states, difficulty concentrating, and memory lapses.[12] Grassian has also demonstrated in numerous cases that the prisoners who end up in solitary confinement are generally not, as is often claimed, "the worst of the worse"; they include, instead, the sickest, most emotionally labile, impulse-ridden and psychiatrically vulnerable among the prison population.

40.    It is predictable that prisoners' mental state deteriorates in isolation. Human beings are social animals and require at least some social interaction and productive activities to establish and sustain a sense of identity and to maintain a grasp on reality. In the absence of social interactions, unrealistic ruminations and beliefs cannot be tested in conversation with others. Instead, they build up inside and are transformed into unfocused and irrational thoughts, including paranoia. Disorganized behaviors emerge. Internal impulses linked with anger, fear, despair and other strong emotions grow to overwhelming proportions.

41.    Prisoners do what they can to cope. Many pace relentlessly or clean their cells repetitively, as if this non-productive action will relieve the emotional tension. Research shows that social isolation and idleness, as well as the near absolute lack

Practitioners of Psychology and Psychiatry as Amicus Curiae in Support of Respondent, No. 04-495 (U.S. 2005).

[9]    Toch, H. (1975, 1992). *Mosaic of Despair: Human Breakdown in Prison*. Washington, D.C.: American Psychological Association.

[10]    Haney, C. (2003). Mental health issues in long-term solitary and "supermax" confinement. *Crime & Delinquency, 49*(2), 124-156.

[11]    Grassian, S., & Friedman, N. (1986). Effects of sensory deprivation in psychiatric seclusion and solitary confinement. *International Journal of Law and Psychiatry, 8*(1), 49-65.

[12]    Lovell, D., Johnson, L.C., & Cain, K.C. (2007). Recidivism of supermax prisoners in Washington. *Crime & Delinquency, 52*(4), 633-56.

of control over most aspects of daily life, very often lead to serious psychiatric symptoms and breakdown. Isolated prisoners develop massive free-floating anxiety that can trigger panic; their thinking becomes increasingly disorganized, including paranoid ideas; they become angry and then they are very fearful that their anger will lead to more disciplinary problems and worse punishments.

42.    Prisoners in isolation units around the country have told me that they cannot concentrate and experience memory problems. If one is in an isolation cell, the most important activity that supports sanity is reading. But many prisoners in isolation who can read tell me they quit reading. I ask why and they explain they can't remember what they read three pages back. (Just imagine how difficult this symptom alone makes life for a condemned man who would like to work on his legal appeals.) There are other symptoms very widely reported by the denizens of solitary confinement units, including: hypersensitivity to external stimuli; perceptual distortions and hallucinations; fears of persecution; lack of impulse control; severe and chronic depression; appetite loss and weight loss; heart palpitations; social withdrawal; blunting of affect and apathy; talking to oneself; headaches, problems sleeping; confused thought processes; nightmares; dizziness; self-mutilation; and decreased levels of brain function, including a decline in EEG activity.[13] In fact, it is quite clear that isolated confinement, like PTSD, brings about complicated changes in brain structure and neural pathways. All of these symptoms and disabilities occur in prisoners who have been in solitary confinement for weeks or months. When they are consigned to solitary confinement for longer periods, even more chronic and lasting damage occurs.

43.    Prisoners who have been in solitary confinement for many years report that they have become severely cut off from their own feelings and have turned inward so they hardly engage in any social activity at all, even considering their very limited options within the isolation unit. The damage is cumulative and severe, and of course bodes poorly for adjustment after release from solitary in a general population prison setting or in the community.[14]

44.    I have discovered a "SHU Post-Release Syndrome" afflicting long-term denizens of solitary confinement after they are released from solitary to go to a general population prison setting or home to the community. They tend to hide out in their cell or room, feel very anxious and hyperaware, are unable to open up

---

[13]    Haney, C. (2003). Mental Health Issues in Long-Term Solitary and "Supermax" Confinement. *Crime & Delinquency* 49, 130-34; Grassian, S. (1983). Psychopathological Effects of Solitary Confinement. *American Journal of Psychiatry*, 140, 1450-52; Scharff-Smith, P. (2006). The effects of solitary confinement on prison inmates: A brief history and review of the literature. In M. Tonry (Ed.), *Crime & Justice 34* (pp. 441-528). Chicago: University of Chicago Press; Kupers, T. (2013). Isolated Confinement: Effective Method for Behavior Change or Punishment for Punishment's Sake? In B. Arrigo & H. Bersot (Eds.), *The Routledge Handbook of International Crime and Justice Studies* (pp. 213-232). Oxford: Routledge.

[14]    See my report in *Ashker v. Governor of California*, Exhibit E to this report.

emotionally with others and lack initiative.[15] The syndrome can result in permanent disability.

45.     In this type of very high security unit there evolves a "vicious cycle" of worsening hostility and misunderstanding between staff and prisoners. No doubt, rule violations do occur in such units, and an appropriate and fair disciplinary system must be maintained. But when human beings are subjected to extremes of isolation and idleness, and deprived of every vestige of control over their environment, and in addition are denied social contact and all means to express themselves in a constructive manner; then it is entirely predictable that they will resort to increasingly desperate acts to achieve some degree of control of their situation and to restore some modicum of self-respect. The prisoners are driven to small acts of resistance, which in turn are likely to be perceived by officers as disrespectful or rule-breaking; the officers, in turn, become increasingly insensitive, punitive or even abusive toward the identified troublemakers.

46.     Dr. Philip Zimbardo, Professor of Social Psychology at Stanford University and primary investigator for the "Stanford Prison Experiment," made the following statement after touring the "Adjustment Center" at San Quentin (an isolative confinement unit) in 1974: "I cannot recall being in a situation which conveyed such a total atmosphere of intimidation, fear, control, domination, anonymity and absence of any semblance of human values. It must be a psychologically debilitating environment for any person to work in – as Correction Officer. To be forced to live there for years on end…. is unimaginable to anyone with even a trace of compassion for his fellow human beings. That men survive, cope and even adapt to such circumstances of living is a testimony to the endurance and resiliency of the human spirit, but, as I argue, they pay a significant psychological price for that day-to-day survival."[16]

47.     The harmful effects of solitary confinement are often very long-lasting or permanent. The recidivism and parole violation rates for prisoners who "max out" their sentences in isolated confinement, as well as for those who spent considerable time in isolation, is extremely dire.[17]

48.     The evidence of harm from solitary confinement is so persuasive, and with no credible evidence that solitary confinement does not cause great human damage, that the National Commission on Correctional Health Care, the credentialing body for correctional health care, includes in its stated positions that: "1. Prolonged (greater than 15 consecutive days) solitary confinement is cruel, inhumane, and degrading treatment, and harmful to an individual's health; 2. Juveniles, mentally ill individuals, and pregnant women should be excluded from solitary

---

[15]     Kupers, T. (2016).  The SHU Post-Release Syndrome. *Correctional Mental Health Report, 17*(6).

[16]     Zimbardo, Z. (1974).  Declaration in *Spain v. Procunier*, No. C-431293 (N.D. Cal.), at 7.

[17]     Lovell, Johnson & Cain 2007, op. cit.

confinement of any duration; 3. Correctional health professionals should not condone or participate in cruel, inhumane, or degrading treatment of adults or juveniles in custody; and 4. Prolonged solitary confinement should be eliminated as a means of punishment."[18]

## II.    Conditions at EMCF

### A.    EMCF Prior to 2014

49.    Mississippi DOC is well aware of the damaging effects of prolonged isolated confinement on all people, and especially on persons with serious mental illness. I testified to those effects in 2003 in the Mississippi death row trial, *Russell v. Epps*, and again in 2006 in the Unit 32 supermax case, *Presley v. Epps*. The *Presley* case resulted in a consent decree reducing the solitary confinement population in Unit 32 at Mississippi State Penitentiary by 85% and the creation of a mental health step-down unit. In 2009, MDOC leadership, its mental health providers, and I jointly authored a published article recounting the need for and the success of these reforms.[19]

50.    I toured EMCF again in 2011, and met with and made recommendations to MDOC's Deputy Commissioner and GEO's regional Medical Director for Psychiatry concerning the treatment of prisoners at EMCF. I recommended that no prisoner should be consigned to the segregation units, Unit 5 and Unit 6D (then in operation as a segregation unit) indefinitely; all prisoners must be provided a series of incremental phases they can traverse to gain transfer out of segregation; the phases must be very brief, and the rate of movement of prisoners out of Unit 5 would be the measure of success for the program. I recommended removing prisoners with serious mental illness from long-term segregation on Unit 5 altogether. I pointed out problems with the Crisis Intervention component of mental health services. (Crisis Intervention is the program set up to respond to psychiatric emergencies, usually that involves prisoners exhibiting acute psychosis or a high risk of suicide. Crisis Intervention should be very brief, and if a patient requires longer, more intensive treatment he must be transferred to an appropriate mental health treatment setting instead of spending more than a few days in the Crisis Intervention area.) Specifically, "recycling" occurred, in which prisoners would be transferred from segregation to observation, and after a brief tenure there would be transferred back to segregation, where the absence of follow-up treatment and the harsh isolative conditions would cause them again to become acutely suicidal, and then to be returned to the Crisis Intervention program (i.e. an Observation Cell in the medical department).

---

[18]    Solitary Confinement (Isolation) | National Commission on Correctional Health Care. May 27, 2016. http://www.ncchc.org/solitary-confinement.

[19]    Kupers, T., Dronet, T. et al. (2009). Beyond supermax administrative segregation: Mississippi's experience rethinking prison classification and creating alternative mental health programs. *Criminal Justice and Behavior, 36*, 1037-1050.

51.     In October 2011, after reviewing a remedial proposal submitted by GEO and
        MDOC, I responded with recommendations, which were well received. There was
        consensus among all parties (including John Wright, warden of EMCF, Dr.
        Ricardo Gillispie, warden and director of mental health, and Emmitt Sparkman,
        Associate Commissioner of the Mississippi Department of Corrections) to that
        discussion that no prisoner should be consigned indefinitely to Unit 5, that
        incremental rewards and advancement to greater freedom and eventually general
        population should be built into each phase of the program on Unit 5, and that the
        phases be quite short (I recommended 60 days each). Because of that consensus, I
        was hopeful that EMCF might become a model facility for the housing and
        treatment of prisoners with serious mental illness.

**B.     EMCF in 2014**

52.     It was with great shock that I witnessed the actual conditions at EMCF in April
        2014 for prisoners housed in isolated confinement, and the treatment of those with
        serious mental illness. The situation at EMCF had deteriorated badly since my
        visits in 2011. A large group of prisoners were consigned to long-term
        segregation in Unit 5 for very long periods (Prisoner #2 had been in Unit 5 for a
        year, many others for longer periods) and seemingly had no exit route. The
        conditions on Unit 5 were inexcusably horrid. Very many prisoners with serious
        mental illness were trapped in isolated confinement with seemingly no way out,
        and the conditions as well as the lack of hope made their psychiatric condition,
        disability and prognosis much worse.

53.     A large proportion of prisoners consigned to long-term segregation at EMCF were
        suffering from serious mental illness. Security and mental health staff at EMCF
        were well aware that there were many prisoners with serious mental illness
        consigned to the solitary confinement units at EMCF.[20] In fact, since EMCF is the
        designated mental health treatment facility for the MDOC and a large majority of
        the population at EMCF suffer from serious mental illness, it was clear that the
        facility was functioning in 2014 as if there was a plan to subject a significant
        proportion of prisoners with serious mental illness to long-term solitary
        confinement on Unit 5. Every resident of Unit 5 who I interviewed had on his
        electronic medical records a current diagnosis of serious mental illness. This flies
        in the face of a national consensus in corrections that individuals with serious
        mental illness should be excluded from solitary confinement because it
        exacerbates their mental illness, worsens their disability and prognosis, and there
        is too high a risk of suicide (see Opinion 2 below).

54.     One of the most shocking conditions in the isolated confinement cells in Units 5
        in 2014 was the deprivation of light. Many of the prisoners housed there were
        forced to live in the dark. The solid metal cell doors have a small "window" that
        does not open and a food port. A prisoner in the cell is isolated behind the solid

---

[20]     *Dockery v. Fisher*, Video Deposition of Captain Matthew Naidow, No. 3:13-CV-326-
TSL-JMR, at 69:1-72:2 (N.D. Miss. Mar. 13, 2014) ("Naidow Deposition").

door even from people passing by on the tier, more so than he would be if the door was constructed of bars. Then, in many cells I visited on Unit 5, and in the cells of prisoners I interviewed, the light bulb, which is supposed to be screwed in the ceiling of the cell, was broken or entirely missing. The small horizontal external window is more than six feet high on the exterior wall and does not provide significant light in the cell. (See 2014 photograph of cell, Exhibit F.) Thus the cells without light bulbs were in near total darkness 24 hours per day. I had never, in my 40 years touring prisons, seen anything like this.

55.     Captain Matthew Naidow, who worked as a captain of security in 2014 at EMCF, confirmed that many cells lack light, but explained that the prisoners break the light bulbs.[21] But many prisoners told me that they spent weeks or months in total darkness because their light bulb had been missing since they moved into the cell, or it broke because there were no light switches in the cell and they had to screw and unscrew the bulb in order to turn it off or on, and staff either ignored their requests for a replacement or told them that bulbs were not available. Even if some prisoners break light bulbs on purpose, many others are forced to live in a cell without light for extended periods through no fault of their own. The absence of functioning light switches in cells is entirely unacceptable according to all standards in the field, as is the failure of staff to replace light bulbs in a timely fashion.

56.     Depression and paranoid thinking are severely exacerbated by excessive darkness. The prisoner consigned to a dark cell is left entirely alone to ruminate about self-deprecating or paranoid themes, and there his psychiatric condition is almost certain to deteriorate on account of the stark isolation and idleness. Living in excessive darkness also results in loss of diurnal rhythm (the steady alternation of day and night that provides human beings with orientation as to time). Human beings require diurnal changes in lighting to maintain their sanity. These changes foster the rhythm of night and day that provides not only a sense of orientation, but also makes possible the physiological processes that we require to function as human beings. Individuals suffering from mental illness are especially harmed by a lack of diurnal cycles of light and dark.

57.     Another consequence of the loss of diurnal rhythm is sleep deprivation, which greatly exacerbates the tendency to suffer psychiatric breakdown and become suicidal. Loss of sleep creates fatigue and magnifies cognitive problems, memory deficits, confusion, anxiety, and sluggishness. All of the prisoners I interviewed from the segregation zones on Unit 5 in 2014 (and those I would interview in May, 2016) reported great difficulty sleeping at night.

58.     Most of the prisoners in isolated confinement at EMCF with serious mental illness were prescribed relatively high doses of psychotropic medications in 2014; this was confirmed both by interviews of the prisoners and review of their medical records. The prescription of psychotropic medications, when there is little or no

---

[21]     Naidow Deposition, at 19:11-21, 45:14-22.

psychotherapy, group treatment, psychiatric rehabilitation or general rehabilitation programming in conjunction with the medications, can have the effect of masking the damage typically observed in prisoners in isolated confinement, while at the same time exacerbating the long-term damage. Drugged and sedated, they spend their days in a dark cell, sleeping much of daytime, and not able to engage in productive activities of any kind. This combination of factors is well known to worsen mental illnesses of all kinds.

59.    In the short-run, these heavily-sedated prisoners in isolated confinement may be relatively quiet and docile, but in the long-term, the extended period of sedation results in the withering away of their social skills and ability to engage in meaningful and productive pursuits. The possibility of their adjusting to life in the general population or the community at the end of their stint in isolated confinement is greatly diminished.

60.    Some of the prisoners told me in 2014 that they were glad to be drugged so they could sleep all day as a way of escaping the despair produced by their environment. But the drugging and sleeping all day have very damaging effects on the prisoners' psychiatric condition and their long-term prognosis. For example, when we psychiatrists treat patients suffering from severe depression, we try very hard to encourage the patient not to isolate himself and not to become inactive. Social connections and meaningful productive endeavors are a big part of the treatment for depression, even while psychotropic medications are prescribed. If a depressed patient is left to isolate himself and become increasingly immobile, the depression will become much worse and more debilitating. Endless time alone in a dark cell with no meaningful activities is extremely damaging to the psychiatric status of prisoners, especially those suffering from mental illness.

61.    As I toured the segregation zones on Unit 5 in April, 2014, I observed portable telephones stored outside the door to the zones. They seemed to be phones that could be wheeled to the cells. Yet prisoners in segregation universally told me that they were not often permitted phone calls, and those phones were rarely wheeled onto the zones and made available to the prisoners (in May 2016, I was told that phone calls are still mainly absent or occur infrequently, except they are relatively more available to prisoners on zone 5D). Contact with loved ones is one of the most effective measures to support the mental health and eventual rehabilitation of prisoners. Prisoners who have maintained quality contact with loved ones (parents, partners, children and so forth) throughout a prison term have an impressively lower recidivism rate than those who have lost or been denied contact with family and friends. When a patient in a psychiatric hospital experiences an acute crisis, the staff make every effort to contact the family and involve them in the treatment. The contact with familiar family, absent domestic violence and other toxic factors, tends to help alleviate the crisis. It makes no sense at all that prisoners in segregation at EMCF are provided so little telephone contact with loved ones. Cutting them off from family and friends in the community has the effect of worsening their psychiatric condition.

62.     I was disgusted by the shocking level of filth and lack of sanitation I witnessed in the common areas of the segregation zones and in very many cells in the segregation zones of Unit 5 in April 2014. (Though the floors would be cleaner during my May 2016 visit, I was told by every prisoner I interviewed in May, 2016, that they were usually still as filthy as in 2014 but the staff had cleaned just before my visit.) When I walked onto the zone in 2014, I saw Styrofoam trays and food waste scattered all around, mixed with large puddles of water and what appeared to be excrement and/or blood. There was a stench of garbage and excrement. The prisoners I interviewed reported that overflowing toilets were a very common problem. Many reported that staff do not respond when they press their emergency call buttons. They reported that the electricity and water to their cells were often shut off for weeks or longer.

63.     The prisoners I interviewed from the segregation pods in 2014 without exception reported to me that they did not receive basic cleaning materials to keep their cells clean. Prisoners were issued a small bar of soap each week, by their report not even enough soap to clean their bodies. But many prisoners reported using that tiny bar of soap to clean their unbearably filthy toilets and cells.

64.     Typically, in prison segregation units a tray of food is passed by officers to each prisoner through the food port of their cell door, and then the officers come around again to collect the trays after the meal is done. On segregation pods on Unit 5 at EMCF, however, officers pass the food to prisoners in Styrofoam containers and do not collect the dirty containers until the next time they deliver a meal, or even the next day. This was true in 2014 and in 2016. Meanwhile, the prisoners must keep the dirty containers and food waste in their cells, or are told to throw them out through the food port and leave the food tray and food scraps lie in the walkway and common area. When the officers open the food ports to deliver the next meal, the prisoners are supposed to throw the dirty container through the food port. The prisoners reported to me that the dirty food containers remain in the walkways for long periods of time, and in April 2014 I witnessed for myself the foul mess strewn about on the walkways and open floor area (see 2014 photos, Exhibit G).

65.     I do not believe I have ever witnessed in a prison the level of neglect on the part of staff that I witnessed at EMCF in 2014. The level of neglect by line staff in the segregation pods on Unit 5 was incredible, abhorrent, and far beneath all standards of correctional care and decency.

66.     The prisoners in segregation unanimously reported that staff rarely came by to check on them, and they were unable to get the staff to pay attention to their basic needs, whether for a light bulb for a dark cell, cleaning supplies, toilet paper, repair of a toilet that is backing up and flooding their cell with excrement, or to see a doctor or mental health clinician for an urgent medical or mental health need. Even the buzzer in their cells, which was designed to call staff for help,

either did not work or was ignored by staff. Eldon Vail documented in his 2014 report an unconscionable lack of regular 30-minute cell checks.[22]

67.    Often, the officers did not even take the prisoners to yard for their allotted recreation time, or to showers, for weeks on end. Furthermore, quite a few prisoners reported that when officers did take them to the shower or yard, they sometimes left them locked in the cubicles or the caged area for hours. During my tour of Unit 5 in 2014 I talked to three men locked in the tiny shower cubicles, who told me they had been locked in the shower for a couple of hours. Captain Naidow confirmed that prisoners could be left locked in the showers for hours.[23]

68.    Quite a few prisoners told me that not only were the officers absent from the segregation pods most of the time, but also that security was so lax on the pods that it put them at risk of grave danger. Many prisoners reported, and Captain Naidow confirmed,[24] that inmates could manipulate the locks on their cell doors, and that in addition, inmate-on-inmate attacks occur when staff permit certain prisoners in the segregation pods to be out of their cells and unsupervised. Prisoners also told me that staff were so inattentive that when they escorted a prisoner back to his cell after showers or yard, the prisoner could simply stop in front of a cell that was not his and the officer would unlock that cell door and let him enter, without checking if it was his cell and whether there was another prisoner in that cell. After the officer left, the prisoner who had gained entry to another's cell could assault or obtain coerced sex from the inmate who lived there. Prisoners #3, #9 and #11 independently told me about staff leaving prisoners free on the Pod where they could harm other prisoners.[25] Prisoner #26 reported in 2014 that while he was being escorted in handcuffs by an officer from his cell in segregation on Unit 5 to the showers, he was forced to walk very close to the cells along the way, and that another prisoner reached through the food port and stabbed him multiple times. Quite a few prisoners told me that they were forced to take sedating psychotropic medications (referring to involuntary intramuscular injections, usually of Haldol) and then, in a "doped up" state, they were more vulnerable to attack and less able to defend themselves. This fact, added to the lack of security in their segregation cells, made them quite anxious about their safety. Eldon Vail documents in his 2014 Report the fact that senior officials in the MDOC are aware of the security problems both the prisoners and Captain

---

[22]    Eldon Vail Report, 2014, ¶¶ 42-43.

[23]    Naidow Deposition, at 46:16-47:19, 232:5-235:20.

[24]    Ibid, at 49:7-50:6.

[25]    Captain Naidow testified that some officers are corrupt, some are involved with the gangs or with individual prisoners in illegal smuggling of contraband and drugs and in extortion, prisoners can defeat the locks on their cell doors in segregation and get loose on the segregation pods to harm other prisoners, and some corrupt officers do let certain prisoners out and collude with their assaults on other prisoners. He believed that sexual assaults happen and they can involve collusion by officers. (Naidow Deposition, at 35:9-25, 37:4-39:1, 232:5-235:20).

Naidow report.[26] Eldon Vail also notes that the contraband report for August, 2013 reflects that 62 weapons were found by staff, 20 of them in Units 5 and 6.[27] So the prisoners' perceptions were frighteningly accurate, EMCF was a very dangerous place in 2014. This fact weighed very heavily on prisoners with serious mental illness, for example they needed to think seriously about how their tranquilizing medications would slow them down and make them more vulnerable to attack, and this concern played into many prisoners' reluctance to cooperate with the administration of their psychotropic medications.

### C.    EMCF in May 2016

69.    I was very surprised and disappointed to find, after I wrote a report documenting the dreadful deficiencies and abuses at EMCF in 2014, that when I returned in May 2016, very little had changed in terms of the conditions on Unit 5. There do seem to have been some changes in other regards. I was told by staff that Unit 6 is no longer utilized for segregation, so the overall population in segregation has decreased somewhat, and Warden Frank Shaw informed me he is pursuing a plan to transfer prisoners out of Unit 5 through Pod 5D. In other words, prisoners on other pods in Unit 5 are transferred to 5D, where they are permitted some time out of cell and in congregate activities in the day room, and from there they are eventually transferred to general population. According to prisoners I spoke with, there are fewer Haldol (antipsychotic agent) injections and the psychiatrist is somewhat more available. But the many problems I described in my 2014 Report remain significant issues at the facility.

70.    My tour in May 2016 focused on conditions and their effects on prisoners in Unit 5 as well as in the Medical and Intake Units. I found Unit 5 to be essentially unchanged from how I had found it in April 2014, with a few minor exceptions. Many of the cells were dark. Some had paper obstructing the "window" in the cell door. There was evidence of strings extending from one cell door to the next (a rule-violating method for prisoners to send each other messages down the line). There were Styrofoam trays and food waste on the floor in the common areas, Quite a few cells had evidence of recent fires, for example charred doors. The exceptions were that the floor was actually quite a bit cleaner than I had found it in 2014, a greater proportion of prisoners had light bulbs in their cells, and there were officers on the pods as I toured. There had been a change of the Medical and Mental Health Provider, and at the time of my May 2016 visit Centurion was the provider.

71.    Since my tour in May 2016 focused on conditions and their effects on prisoners in Unit 5 as well as in the Medical and Intake Units, the next question I had to consider was whether there had been significant changes since my tour in April, 2014. When I asked prisoners about these conditions at the prison facility, I was

---

[26]    Eldon Vail Report, 2014, ¶¶ 47-49.

[27]    Ibid, ¶ 62.

told by several that involuntary injections of Haldol seemed less frequent with Centurion as the provider, and they believed that the psychiatrist was on site more hours during the week. I did not pursue that line of questioning because Dr. Bruce Gage is providing an expert report on the current mental health service delivery. Instead, I compared what each prisoner told me during my 2016 visit to EMCF with the problematic conditions on Unit 5 I had identified during my visit in April, 2014.

72.    The problems I had identified from my 2014 visit include:

a.    Staff are very rarely present on the pods.

b.    The lights are often out in the cells because the bulb is broken or not functional and officers fail to timely replace it.

c.    There are a large number of fires set by prisoners.

d.    There are frequent incidents of self-harm involving cutting of the arm or some other part of the body and bleeding.

e.    Prisoners "flood the zone," clogging their toilet or otherwise causing water to overflow and pour out on the common area.

f.    The common area of the pod is usually filthy and unhygienic, the prisoners are required to throw their Styrofoam food trays with food scraps out on the floor, the many fires char the walls and cell doors, and there is even human waste and blood in evidence. Staff rarely clean the common area of the pods.

g.    Staff do not clean cells and do not provide adequate cleaning materials for prisoners to clean their own cells.

h.    Staff use a lot of pepper spray, often spraying prisoners through the port in their cell door.

i.    Staff use force often, and in many cases, the protocol for use of force and immobilizing gas is not followed.

j.    Telephones are not provided to prisoners very often.

k.    The buzzers in the prisoners' cells either do not work or the staff do not respond to them.

l.    Prisoners feel unsafe because cell doors can be opened easily by other prisoners, there are rarely staff on the pod to supervise.

m.    Many prisoners in segregation have weapons, and staff do not search cells and confiscate them.

n.    Officers will not arrange visits with medical and mental health staff on a timely basis, even in emergencies.

o.    Prisoners are left locked in a shower for hours.

p.    Prisoners are not allotted time on the recreation yard (individual cubicles separated by link fencing), and then when some are permitted on the "yard" they are left there for a long period.

q.    Prisoners are permitted to put paper over the window of their cell doors, and officers often do not make them take them down.

r.    Prisoners use string or rope to devise a communication system, and officers often leave the string and do not supervise.

s. Food portions are inadequate and prisoners lose significant weight while in Unit 5.

t. Prisoners have a very difficult time sleeping, in part because of the noise from other prisoners yelling at night, the filth, the fear that someone will enter their cell and harm them and so forth.

73. It was quite striking how the prisoners I interviewed who had knowledge of conditions on Unit 5 as of two years earlier (April 2014) stated in May 2016 that each of these problems continued to exist with no improvements. And each of the 23 prisoners I interviewed in May 2016 who had not been in the facility or the segregation unit in April 2014 averred experiencing the very problems I had identified in 2014. The prisoners have no way to communicate with prisoners on other pods, they do not all know each other, and they do not know why I ask particular questions. Therefore, the fact that they unanimously aver that these problems exist, and expand upon them in their reportage, verifies that their responses are valid and reliable. No prisoner contradicted the others about the continuing problems, and I saw much corroborating evidence of the very same problems with my own eyes.

74. During my tour in 2016 I visited a yard in the early afternoon and heard from the prisoners locked in single-occupancy caged areas that they had been brought out there at 8:30 that morning. I have great concern here. First, these prisoners are stuck on the yard with nothing to do for many hours, and are vulnerable to weather conditions. In addition, their being in these caged hours means other prisoners are denied access to recreation. In fact, many prisoners tell me that they are able to get to "the yard" much less often than they are entitled to be there. And finally, the long sequestering of prisoners in the enclosed recreation areas is yet another bit of evidence about how inattentive staff are to prisoners' needs.

75. An exception was that the floors on the pods in Unit 5 were considerably cleaner than they had been when I observed and photographed the pods in 2014. The prisoners universally informed me that in fact the floors and walls of the pods were still filthy much of the time and the staff still fail to clean them and to provide the prisoners with supplies for cleaning their cells; but the day before my tour the pods were thoroughly cleaned. They had never seen the staff clean the floors any other time.

76. Similarly, many prisoners mentioned that they had finally been given light bulbs just prior to my tour, but it was still the case that except for the provision of light bulbs in advance of my tour, they often found themselves in a dark cell and had to wait weeks for staff to replace a broken or missing bulb.

77. Every prisoner I interviewed reported that the call button or "buzzer" in his cell either does not work or the officers ignore it when it is set off by a prisoner in need. When I toured the pods, I asked and was granted a visit to the control booth overlooking the pods of Unit 5, and while I was there I asked Warden Shaw and counsel to enter several cells and press the call button. In fact, from the booth, I

could see that the button registered on the control officer's computer screen. There was no sound in the control booth when the prisoner's button was pressed, and if the officer in the booth did not have that zone open on the computer, no indication registered that the prisoner had pressed the button. The prisoners have no way of knowing whether the call button actually works — whether the officer in the control booth can see that a prisoner is pressing the call button in his cell. Prisoners universally tell me that officers never respond to their pressing the call button. Whether because the button fails to function, or the technology is set up in such a way that officers are unaware of the alert (no sound registers when the button is pressed, and the indication on the computer in the control booth only shows if the officer has that zone open on the screen), or calls are simply ignored by staff, one hundred percent of the prisoners I interviewed say that there is no staff response when they press the call button for help. This is another graphic example of complaints universally made by prisoners on Unit 5, and the universality of their complaints, when they do not know each other, makes the evidence of inattention quite reliable and compelling.

78.    The final difference between what I observed and what the prisoners universally told me was that the prisoners universally report that officers are almost never present on the pods except to pass out food trays, and they are very slow to respond or do not respond at all to urgent needs on the part of prisoners. During my May 2016 tour, there were several officers present on every pod that I visited. Again, the universality of prisoners' reports lends a great deal of credibility to what they all tell me. I can only conclude that in preparation for my tour many more officers than usual were sent to the pods of Unit 5 to make it appear they are present and attentive to prisoners' needs.

79.    The prisoners' reports of custodial staff's indifference to the most basic prison security were also corroborated by the extraordinary amount of contraband openly strewn about the Unit. When I toured Unit 5 in 2014 and again in 2016, I saw improvised strings or ropes – "fishing lines" – that are used by prisoners to communicate from cell to cell, and quite a few of the windows on cell doors were completely covered. Both practices are against the rules as a security risk. Staff on the pod at the time I visited seemed entirely unconcerned about the fishing lines and the covered windows, as if they are a frequent occurrence. Among others, I reviewed a February 22, 2016 incident report reflecting that Prisoner ███ had in his possession a handcuff key, and told officers that he got the handcuff key from another prisoner who had it because an officer left it in a cell door.[28] Officers' inattention to contraband, and the ease with which prisoners can obtain a handcuff key, merely add to the prisoners' reality-based fear that they are not safe. Several prisoners reported that they are frightened in Unit 5 because other prisoners have homemade knives (shanks) or can either defeat the locks of their cells or have keys. An August 18, 2015 memo from Patrick Thomas to Norris Hogan and others does reflect that a prisoner defeated the lock of his cage and attacked

---

[28]    DEF-031932.

another prisoner who was being escorted by an officer.[29] There is much objective basis for the prisoners' fear, even their panic, that nobody will heed their cries for help and they will die of a stabbing, or a heart attack.

80. The treatment of prisoners in isolated confinement at EMCF is likely to cause them significant psychiatric damage. They are subjected to profound isolation from human contact and sensory deprivation and they are deprived of access to any meaningful activity. Staff are shockingly inattentive to the prisoners' basic human needs. Furthermore, the toll that isolated confinement takes on these prisoners is enormously exacerbated by appallingly cruel features of the segregation pods at EMCF that cause further psychiatric damage.

81. The many prisoners in segregation on Unit 5 whom I interviewed gave me consistent accounts of the classic symptoms of long-term isolated confinement. For prisoners who had not previously suffered significant symptoms of mental illness prior to being housed in isolated confinement, the conditions of their confinement, especially the profound, unremitting isolation and idleness, the dark cells, the filth, and the neglect by staff caused profound depression and anxiety and in many cases repetitive, disordered thinking including paranoid delusions, and compulsive acts of self-harm such as cutting. The same symptoms are reflected in many of the ARP forms I reviewed. For example, prisoner ███ writes on his ARP complaint dated October 13, 2015: "These long terms of solitary confinement, seclusion and isolation are causing me to mentally decompensate & deteriorate. I have a loss of appetite, a loss of interest, a loss of weight and I am delusional. I stay depressed all the time and I am losing control of my voluntary actions."[30] (Interestingly, the response this prisoner received noted he was in short term segregation for fighting, but did not comment about his psychiatric symptoms, not even to recommend he talk to mental health staff.) For those who had pre-existing serious mental illness, the conditions in segregation at EMCF greatly exacerbate their psychiatric disorder and worsen their disability and prognosis. Without exception, these prisoners exhibit many of the psychiatric symptoms that are widely understood to be induced by extended time in isolated confinement, and meanwhile their serious mental illness has worsened during their tenure in isolation.

82. The locations of isolated confinement at EMCF include prisoners in segregation in Unit 5, several more prisoners consigned to the Medical Unit and the Intake Unit who are not necessarily designated segregation but who must endure conditions that are essentially equivalent to or worse than solitary confinement (see Opinion 4, below), and any or all housing units at EMCF when they are on lock-down status, which occurs typically when prison officials deem that a security problem exists requiring round-the-clock cell confinement of all prisoners, including those in general population. When there is a violent incident,

---

[29]    DEF_ESI_0010723.

[30]    MTC-CON-00073125.

27

an escape attempt or a threat of intergroup violence, the units involved, and prisoners tell me even units that were not involved, are locked down, all prisoners remain in their cells nearly 24 hours per day and eat their meals in their cells. In general population units during lockdowns, prisoners are almost entirely isolated and idle and often are not even permitted to go to the yard for recreation. Lockdowns occur frequently at EMCF and can last weeks or even months at a time. For example, prisoner ██, on an ARP form, dated November 10, 2015, requests a transfer from Unit 6D to Unit 6A because 6D is on lockdown.[31] And prisoner ██, on an ARP dated September 19, 2014, asks why he is on lockdown on Unit 2 when he has not done anything wrong: "I was wondering why we are being locked down when there is no problems on this unit, we all follow the rules (mostly), but I understand that someone tried to escape on Unit 3 and the stabbing on Unit 1, but why are we all being punished?"[32] Staff responds to Mr. ██'s ARP on September 30, 2015 that the lockdown is until further notice, and it is not punishment, it is for safety. Thus, a significant number of prisoners at EMCF experience isolated confinement even on general population units.

83.    Many prisoners during my 2016 tour, including but not limited to Prisoner # 61 and Prisoner # 62, below, tell me that they have no idea what they need to do to be transferred out of Unit 5 segregation. Some tell me that they have been told that if they remain free of disciplinary write-ups for six months (some think the relevant period is a year), they will be transferred out of segregation and back to General Population. But then, they add, either they, or other prisoners, achieve six months or a year free of RVRs, and still they are not transferred out of segregation. So, they give up, despair of never being released from solitary, and their behavior deteriorates as their mental condition worsens (for example, the despair about getting out of solitary exacerbates their depression and suicide inclination), or they engage in foolhardy self-destructive activities such as cutting themselves or setting fires, feeling that they "have nothing to lose." Mr. ██, on an ARP form dated July 6, 2015, writes that he has been in segregation for two months longer than he should be and requesting transfer to general population. A First Level Response dated August 26, 2015 states, "offender will be reviewed for release to population." On August 31, 2015 Mr. ██ writes that he is not satisfied with this response and will proceed to a second level ARP because by now he has been in segregation four months longer than he should have been.[33] Mr. ██ writes on an ARP form dated May 29, 2015 that he is requesting transfer out of segregation on Unit 5 because he has been "RVR free" (has received no rule violation reports) for over two years, and the first level response is they "will look into his classification."[34] There is a consensus in corrections, reflected in standards by the various accrediting bodies, that prisoners in restricted housing or

---

[31]    MTC-CON-00077416.

[32]    MTC-CON-00074662.

[33]    MTC-CON-00072402.

[34]    MTC-CON-00053000.

solitary confinement must be given due process, must know what they have to do to regain their freedom from solitary confinement, and must be fairly treated; but the failure of staff at EMCF to respect the prisoners due process rights, and fairly grant release from segregation when the prisoners accomplish the assigned task of remaining RVR free, contributes greatly to the self-destructive acts that plague the solitary confinement pods of EMCF's Unit 5.

84.     Several of the prisoners I interviewed in May, 2016 are in solitary confinement in Unit 5 due to safety concerns in general population. For example, they might be on "pending placement on PC." This is entirely unacceptable and reprehensible. According to all standards in the field, prisoners who are granted protection or deemed by staff to require protection must be housed separately from the prisoners from whom they are in danger of assault, but must be provided all the amenities and programs, including congregate activities and rehabilitation programs (that are not available on Unit 5 at EMCF), but in a separate place where they will be safe. A protective custody unit does not exist at EMCF, but meanwhile I have met several prisoners who are forced to suffer the stressful conditions and deprivations of Unit 5 solitary confinement merely because they seek or need protection.

85.     A few examples: Prisoner #73 tells me during an interview in May, 2016 that he is not aware of receiving a disciplinary write-up (RVR) and believes he is only in segregation for safety reasons. Prisoner ▮▮▮ writes an ARP form on August 24, 2015, indicating he is in solitary confinement on Unit 5 merely for protection, but he does not wish to be transferred to general population where he fears he will be attacked, rather he requests a transfer to another institution where he would be safe.[35] Indeed, prisoners who are placed in segregation for safety reasons, and subsequently are forced to return to general population, may be in danger in general population, but, if they refuse the housing they are assigned they are written an RVR and wind up in segregation; it is a no-win dilemma for them. Prisoner ▮▮▮ writes an ARP form on July 9, 2015, appealing his consignment to long-term segregation on Unit 5, arguing that it is protection he needs and he is afraid to go to general population because gang members will assault him, but the response is that he has received RVRs for refusing to go to general population and therefore must stay in long-term segregation.[36] An August 14, 2014 email from Christopher Dykes to Norris Hogans contains a list of 6 prisoners consigned to segregation on Unit 6D who are being processed for protective custody.[37] If these prisoners are accurately reporting events, Mississippi D.O.C Policy #19-01-02[38] contains a number of provisions that would seem to be violated by these occurrences. For example, the policy states: "The warden/superintendant or shift

---

[35]     MTC-CON-00077080.

[36]     MTC-CON-00070258.

[37]     DEF_ESI_0000694.

[38]     AG5550

supervisor can order immediate segregation when it is necessary to protect the inmate and others. The action is reviewed within 72 hours by appropriate authority," or "Consistent with safety and security, the following conditions for offenders assigned to each Protective Custody Housing Unit will reasonably resemble the living conditions provided to general population offenders…."

### D.    Illustrative Prisoner Interviews

86.    I include here, and in support of my other opinions later in this report, brief summaries of several of my interviews with individual prisoners conducted in May 2016. Because nearly every prisoner attested to the existence of each problem I have identified at EMCF, nearly each interview lends support to each of my opinions. As a result, my inclusion of these summaries here and not in support of my other opinions in the report is primarily to introduce the information early in my report and not intended to indicate the information is not equally supportive of the opinions made in this report. These cases, however, reflect the kinds of emotional problems that prisoners in solitary confinement regularly report, as reflected in the research literature.

87.    Prisoner #65. This 27-year-old African American man has been on 5B for a month, and in Unit 5 for 3 years when I interviewed him in 2016.[39] His left eye is covered by a patch and he is wearing sun glasses. He says he was "jumped on" in his cell and beaten. It is easy for prisoners to attack other prisoners because the officers are absent from the unit. The officers also are not careful about securing cells, and it is easy to defeat the lock anyway. Prisoners have weapons in the Unit 5 segregation pods. He feels that the disciplinary system is entirely unfair, and he does not know how long he will be in Unit 5 nor what he has to do to gain transfer to general population. He reports concentration problems, anxiety, paranoia and otherwise disturbed thinking as well as mounting anger. Some of these symptoms were present before he came to Unit 5, but all of them have definitely grown much worse while he has been on Unit 5. His Electronic Medical Record (EMR) contains diagnoses of Uveitis in the left eye; Bipolar Disorder, most recent episode mixed with psychosis, GERD and Asthma. His prescribed medications include Risperdal (a new generation anti-psychotic agent) 2 mg. twice a day; Benadryl (an antihistamine often used in psychiatry for its sedative effect) 1 mg. twice a day; and a few others.

88.    Prisoner #72. This 30-year-old African American man had been on Unit 5B for three or four weeks in 2016. He complains that on Unit 5 he is not fed enough and is losing weight. Some time prior to our interview he was sprayed by officers with immobilizing gas because he would not return his food tray, because officers refused to provide medical attention that he had requested several times. After he was sprayed, prison staff did not decontaminate his cell, and he had to sit with the fumes. He has asthma and often has trouble breathing in general, a problem that is

---

[39]    Unless otherwise noted, all prisoner interviews summarized in this report occurred during my May 2016 visit to EMCF.

much worse on Unit 5 because of the fires other prisoners set and the officers using immobilizing gas. He has frequent episodes where he cannot catch his breath, and experiences chest pain at such times. He has not been permitted phone calls, nor has he seen anyone use the phone. He reports there are fires on his pod almost every night; usually officers do not respond but simply allow the fires to burn out. He has never seen staff clean a cell, even after a fire or after spraying a prisoner with immobilizing gas. He reports a number of symptoms that he only experiences when he is in segregation. These include severe anxiety: he paces compulsively, and becomes paranoid. He cannot read well and nobody helps him read things. He reports that light bulbs break often and are replaced infrequently. He is often not permitted to take showers nor access the yard. On his EMR are diagnoses Bipolar Disorder, recent episode mixed, severe with psychosis (entered in January 2016), Asthma, and Major Depressive Disorder, single episode, severe with psychosis. Prescribed medications in the past include Remeron (an antidepressant medication), no psychiatric medications currently.

89.     I interviewed Prisoner #63 in 2016. This 30-year-old white man with tattoos is agitated and intermittently angry during the interview. He has been in prison for 13 years, at EMCF for a year "this time" (he had been at EMCF in the past). He has been in segregation for the last three years, including his entire year at EMCF. Officers are supposed to check on prisoners every 30 minutes, but he estimates they come once every four hours, primarily to pass out food trays. He has cut himself and set fire to his cell many times. Usually, officers do not even come to check on him or other prisoners who cut or set fires, leaving the prisoners to bleed and fires to burn out. The floor is often covered in trash, human waste, blood, or water from prisoners flooding their cells. The call button in his cell evokes no response from officers. He has been in a dark cell for weeks at a time because the officers do not replace broken light bulbs. He estimates mental health rounds occur once a month, though they are supposed to occur once a week and are perfunctory. Prisoners only receive medical attention for severe injuries or emergencies, and still need to wait two weeks to be seen. He has asthma, and the frequent fires and use of pepper spray by the staff cause him difficulty breathing. He has been told that he will be transferred off Unit 5 if he commits no rule violations for 10 months, but believes this is untrue and has gone that long with no violations before without being removed from segregation. He does not know what he has to do to be transferred out of segregation. The lack of identifiable criteria and goals makes him very depressed. The longer he is in isolation, the more he withdraws, not even relating to his immediate neighbors. He is not an angry or violent person by nature but finds that in segregation his anger mounts. He is constantly trying to suppress his anger so he will not get into trouble; the net effect is to make him emotionless, numb and out of touch with all feelings. He reads compulsively to try to maintain his sanity, and he works out in his cell. His EMR contains current diagnoses of Hepatitis, Antisocial Personality Disorder; and Bipolar Disorder most recent episode depressed, moderate. His medications include Tegretol (a seizure medication with a mood stabilizing effect in Bipolar Disorder), 400 mg. at bedtime.

90.    Prisoner #60, I interviewed in 2016. This 45-year-old man has been in prison for 18 years and at EMCF for 26 months, all spent on Unit 5. He is supposed to return to general population, but does not believe it will happen because many others on his zone have waited for months to return to general population. The fact that he sees so many prisoners remaining in the "high risk" unit (5D), where they are supposed to be transferred to general population, but instead staying on the unit for years without being transferred, causes him to despair. In segregation he is angry all the time. He suffers a lot of depression while in segregation, much more severe than he experiences anywhere else. He is permitted to go outside to the yard only approximately twice a week. The unit is always filthy with food on the floor as well as human waste, but they cleaned the floors in preparation for my visit. He has had neighbors on both sides who repeatedly set fires, which often causes him to inhale smoke. He is unable to sleep very much because of the constant noise on the zone. The staff do not come to the unit except to deliver food trays, but he sees them faking the logs so it will appear they do regular rounds. The buzzers do not work. He finds himself cutting himself off from his neighbors, though he is usually very social and interested in others. He is diagnosed with bipolar disorder; he does not agree that he suffers from mental illness, but he takes the medications they give him because they have the effect of calming him and without them he would be always agitated and angry. He does not think the mental health staff care about prisoners, and they come around infrequently and then only for a very short chat at cell-front. In the EMR he is diagnosed Bipolar, most recent episode manic, severe; plus asthma and hypertension. He is prescribed Olanzapine (a new generation anti-psychotic agent) 10 mg. at bedtime and Depakote (a seizure medication with mood stabilizing effects in Bipolar Disorder), 500 mg. twice per day.

OPINION 2

PRISONERS SUFFERING FROM SERIOUS MENTAL ILLNESS ARE ESPECIALLY VULNERABLE TO THE EFFECTS OF SOLITARY CONFINEMENT AND OTHER HARSH PRISON CONDITIONS AND MUST BE EXCLUDED FROM SOLITARY CONFINEMENT. BECAUSE EMCF SERVES AS THE DESIGNATED SITE FOR MENTAL HEALTH SERVICES WITHIN THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, THE HARM SUFFERED BY PRISONERS WITH SERIOUS MENTAL ILLNESS IS ESPECIALLY EGREGIOUS.

**I.    Research on Prisoners with Serious Mental Illness in Isolated Confinement**

91.    Extensive research illustrates that a substantial proportion of prisoners in isolated confinement suffer from serious mental illness. Sheilagh Hudgins and Gilles Cote performed a research evaluation of penitentiary inmates in a Supermaximum Security Housing Unit and discovered that 29% suffered from severe mental disorders, notably schizophrenia.[40] David Lovell has described typical disturbed behavior.[41] I have reported my own findings from litigation-related investigations.[42]

92.    There is a strong consensus in correctional psychiatry that prisoners with serious mental illness suffer exacerbations of their mental illness and/or suicide crisis when they are placed in solitary confinement, and that except for rare and exceptional cases, they should not be consigned to solitary confinement.[43] This is consistent with the determination of federal courts in *Madrid v. Gomez* (a class action lawsuit in California involving the supermax SHU at Pelican Bay State Prison), and *Jones 'El v. Berge* (a class action lawsuit in Wisconsin involving the supermax facility at Boscobel) and *Presley v. Epps* (a class action lawsuit in Mississippi involving Unit 32 at Mississippi State Penitentiary).[44]

---

[40]    Hudgins, S. & Cote, G. (1991). The Mental Health of Penitentiary Inmates in Isolation. *Canadian Journal of Criminology, 33*, 177-182. *See also* Human Rights Watch. (2003). Ill-equipped: US prisons and offenders with mental illness. http://www.hrw.org/reports/2003/usa1003/.

[41]    Lovell, D. (2008). Patterns of disturbed behaviour in a supermax population. *Criminal Justice and Behaviour, 35*(8), 985-1004.

[42]    Kupers, T. (1999). *Prison Madness: The Mental Health Crisis Behind Bars and What We Must Do About It.* New York: Jossey-Bass/Wiley.

[43]    Appelbaum, K. (2015). American Psychiatry Should Join the Call to Abolish Solitary Confinement. *Journal of the American Academy of Psychiatry and Law, 43*(4), 406-415; Metzner, J. & Fellner, J. (2010). Solitary confinement and mental illness in U.S. prisons: A challenge for medical ethics. *Journal of the Academy of Psychiatry and Law, 38*, 104-108. http://www.hrw.org/sites/default/files/related_material/Solitary%20Confinement%20and%20Mental%20Illness%20in%20US%20Prisons.pdf.

[44]    *See Madrid v. Gomez*, 889 F. Supp. 1146 (N.D. Cal. 1995); *Jones 'El v. Berge*, 164 F. Supp. 2d 1096 (W.D. Wisc. 2001); *Presley v. Epps*, No. 4:05-cv-148-JAD (N.D. Miss.).

93.     The one outlier piece of research that does not conform to this strong consensus in the field emanates from Colorado. The Colorado Department of Corrections released a report of its research on the psychiatric effects of supermax confinement, concluding that long-term isolation in a supermax unit is no more harmful effects than maximum security imprisonment for the same period of time.[45] Stuart Grassian and I have responded to that research, pointing out that the methodology is very flawed, the researchers did not talk to the prisoners about their mental health issues, and the actual data derived during the study should, if properly interpreted, lead to the opposite conclusion from that propounded by the researchers - i.e., even this study supports the fact that long-term supermax confinement causes much emotional harm and exacerbates mental illness.[46] The Colorado D.O.C. has distanced itself from the study, and publicly prides itself on reducing its solitary confinement population from 7% of the overall prison population when that research was conducted to 1% today.[47]

94.     It is clear that for prisoners prone to serious mental illness, isolation and idleness exacerbate their mental illness and may result in suicide. For that reason, federal courts have ruled that prisoners with serious mental illness must not be subjected to long-term isolation.[48]

95.     Extreme behaviors, including fire-setting and "flooding the range" (causing water to overflow the sink or toilet in a prison cell and creating a flood in the common area of a zone), are observed in institutions providing care for individuals with serious mental illness (hospitals, jails and prisons), all the more so where there is solitary confinement and staff are inattentive or abusive. These behaviors are caused by institutional dynamics and conditions.[49] In general, the more inattentive

---

[45]    O'Keefe, M.L., Klebe, K.J., Stucker, A., Strum, K, & Leggett, W. (2010). One year longitudinal study of the psychological effects of administrative segregation. Colorado Springs, CO: Colorado Department of Corrections. www.ncjrs.gov/pdffiles1/nij/grants/232973.pdf.

[46]    Grassian, S. & Kupers, T. (2011). The Colorado study vs. the reality of supermax confinement. *Correctional Mental Health Report*,*13*; see also Lovell, D. & Toch, H. (2011). Some Observations about the Colorado Segregation Study. *Correctional Mental Health Report, 3-4*(14), 33; Scharff-Smith, P. (2011). The effects of solitary confinement: Commentary on one year longitudinal study of the psychological effects of administrative segregation. *Corrections & Mental Health, 21*, 1-11. http://community.nicic.gov/cfs-file.ashx/__key/CommunityServer.Components.PostAttachments/00.00.05.95.22/Supermax-_2D00_-T-_2D00_-Smith.pdf.

[47]    Raemisch, R. & Wasko, K. (2016). Open the door: Segregation reforms in Colorado. *Corrections.com.* http://www.corrections.com/news/article/42045.

[48]    *See Madrid v. Gomez*, 889 F. Supp. 1146 (N.D. Cal. 1995); *Jones 'El v. Berge*, 164 F. Supp. 2d 1096 (W.D. Wisc. 2001); *Presley v Epps* 2005 & 2007, No. 4:05-cv-148-JAD (N.D. Miss.).

[49]    Goffman E. (1962). *Asylums: Essays on the social situation of mental patients and other inmates*. Chicago: Aldine.

or abusive the custody staff and the harsher the conditions of solitary confinement, the more prevalent prisoners' extreme reactions. These reactions can include non-suicidal self-harm, or "parasuicidal" behavior.[50] In a dysfunctional or abusive correctional isolation unit there will predictably be many incidents of non-suicidal self-harm. Cutting is the most frequent form of non-suicidal self-harm, but prisoners in solitary confinement have also been known to swallow harmful objects, bang their heads on the walls and in other ways cause great damage to themselves. In my clinical experience over forty years, I have very rarely seen an adult male practice self-harm by cutting or other means, except in a prison segregation context where there are especially harsh conditions and/or staff neglect and abuse are commonplace.

96.    The phenomenon of non-suicidal self-harm is quite distinct from consciously suicidal behavior, although, unfortunately, the afflicted individual may nonetheless die, often by accident or because staff fail to respond. Typically, a person who has consciously attempted to commit suicide and failed will continue to feel depressed and self-critical afterward; such people have told me words to the effect of, "Look, I can't even do a good job of killing myself," expressing feelings of failure even at suicide. By contrast, a person engaged in non-suicidal self-harm will have an opposite reaction; he will feel better after an act of self-harm. Such a person will frequently report feeling better and state that the act of cutting himself calmed severe anxiety he had been experiencing.

97.    Unfortunately, too often in prison, when a man in solitary confinement cuts himself, staff observe this relief after the act and conclude that the self-harm was a form of manipulation. This ignores the critical point that the prisoner felt anxiety severe enough to motivate a serious act of self-harm. Such a prisoner must be removed from solitary confinement, because the isolation and idleness are frequently responsible for causing that overwhelming anxiety.

98.    MDOC needs to develop programs to treat the self-harming population. The first step must be to remove such prisoners from solitary confinement.[51] At EMCF,

[49]    Toch, H. & Adams, K. (2002). *Acting out: Maladaptive Behavior in Confinement.* Washington, D.C.: American Psychological Association; *see also* Toch, H. (2014). *Organizational Change Through Individual Empowerment: Applying Social Psychology in Prisons and Policing*. Washington, D.C.: American Psychological Association.

[50]    Jeglic, E. L., Vanderhoff, H. A., & Donovick, P. J. (2005). The function of self-harm behavior in a forensic population. *International Journal of Offender Therapy and Comparative Criminology, 49,* 131-142.

[51]    Marzano, L., Adler, J. & Ciclitira, K. (2015). Responding to repetitive, non-suicidal self-harm in an English male prison: Staff experiences, reactions, and concerns. *Legal and Criminological Psychology, 20*(2), 241–254. The Colorado Department of Corrections has developed a treatment program for prisoners who repetitively commit non-suicidal self-harm in solitary confinement; *see* Raemisch, R. & Wasko, K. (2016). Open the door: Segregation reforms in Colorado. *Corrections.com.* http://www.corrections.com/news/article/42045.

prison staff often view these prisoners as manipulators, deny them necessary treatment, and too quickly put them back in isolation where the anxiety mounts anew and they harm themselves again. In too many cases the process is eventually fatal.

99.    I reviewed Centurion Of Mississippi, LLC (the mental health contractor) policy #3E-09 regarding "Segregated Inmates," and found it generally acceptable by current standards for mental health services, except for the absence of a requirement that when a prisoner is transferred to segregation, a complete mental health assessment must be done to rule out the possibility that the individual's condition precludes transfer to solitary confinement or that the unacceptable behavior that resulted in consignment to segregation may have been driven by the mental illness. Instead, the policy mandates a review of the prisoner's file, and rounds in the segregation units to detect prisoners who are having difficulty. Rounds are an acceptable screening device, but in general, prisoners are resistant to interventions by mental health clinicians at cell-front because officers or prisoners in neighboring cells can overhear the conversation. For this reason, the NCCHC standard and most other standards require an actual thorough mental health evaluation at the time a prisoner is transferred to segregation and then whenever custody, medical or mental health staff (on rounds or when the prisoner is seen in the medical unit) have reason to believe the prisoner's condition is deteriorating. For example, according to the American Correctional Association's (ACA) "Restrictive Housing Performance Based Standards" of August, 2016 (Adult Correctional Institutions, 4th Edition): "Written policy, procedure, and practice provide that a mental health practitioner/provider completes a mental health appraisal and prepares a written report on all inmates placed in restrictive housing within 7 days of placement…" The document continues: "The mental health appraisal form should include at a minimum, but is not limited to:

> *Inquiry into:*
> • *whether the offender has a present suicide ideation*
> • *whether the offender has a history of suicidal behavior*
> • *whether the offender is presently prescribed psychotropic medication*
> • *whether the offender has a current mental health complaint*
> • *whether the offender is being treated for mental health problems*
> • *whether the offender has a history of inpatient and outpatient psychiatric treatment*
> • *whether the offender has a history of treatment for substance abuse*
> *Observation of:*
> • *general appearance and behavior*
> • *evidence of abuse and/or trauma*
> • *current symptoms of psychosis, depression, anxiety, and/or aggression*
> *Disposition of offender:*
> • *no mental health referral*
> • *referral to mental health care service*
> • *referral to appropriate mental health care service for emergency treatment."*

36

I should note that the ACA standards are a bare minimum at best, and that even these very minimal standards are violated at EMCF.

## II.     Standards in the Field and an Evolving Consensus

100.    There are widely accepted standards in the fields of corrections and correctional mental health. Most standards limit the use of solitary confinement and prohibit placement of prisoners with emotional problems in solitary confinement. For example, the American Bar Association, in its "Standards for the Treatment of Prisoners," notes that solitary confinement should only be used for brief periods for reasons related to discipline, security, or crime. The American Bar Association Standard #23-2.8 states:

> Standard 23-2.8 Segregated housing and mental health
>
> (a) No prisoner diagnosed with serious mental illness should be placed in long-term segregated housing.
>
> (b) No prisoner should be placed in segregated housing for more than [1 day] without a mental health screening, conducted in person by a qualified mental health professional, and a prompt comprehensive mental health assessment if clinically indicated. If the assessment indicates the presence of a serious mental illness, or a history of serious mental illness and decompensation in segregated settings, the prisoner should be placed in an environment where appropriate treatment can occur. Any prisoner in segregated housing who develops serious mental illness should be placed in an environment where appropriate treatment can occur.[52]

101.    Again (see Opinion #1), the National Commission on Correctional Health Care includes in its stated positions that: "1. Prolonged (greater than 15 consecutive days) solitary confinement is cruel, inhumane, and degrading treatment, and harmful to an individual's health; 2. Juveniles, mentally ill individuals, and pregnant women should be excluded from solitary confinement of any duration; 3. Correctional health professionals should not condone or participate in cruel, inhumane, or degrading treatment of adults or juveniles in custody; and 4. Prolonged solitary confinement should be eliminated as a means of punishment."[53]

---

[52]     ABA Standards for Criminal Justice on the Treatment of Prisoners, Standard 23-2.6.(a) (2010). http://www.abanet.org/crimjust/policy/midyear2010/102i.pdf.

[53]     Solitary Confinement (Isolation) | National Commission on Correctional Health Care 5/27/16. http://www.ncchc.org/solitary-confinement.

102.   The American Psychiatric Association issued "A Position Statement on Segregation of Prisoners with Mental Illness in 2012."[54]

> Prolonged segregation of adult inmates with serious mental illness, with rare exceptions, should be avoided due to the potential for harm to such inmates. If an inmate with serious mental illness is placed in segregation, out-of-cell structured therapeutic activities (i.e., mental health/psychiatric treatment) in appropriate programming space and adequate unstructured out-of-cell time should be permitted. Correctional mental health authorities should work closely with administrative custody staff to maximize access to clinically indicated programming and recreation for these individuals.

103.   Jeff Metzner, a leader in correctional psychiatry, writing for the National Commission on Correctional Health Care, puts it this way:

> Clinicians generally agree that placement of inmates with serious mental illnesses in settings with extreme isolation is contraindicated because many of these inmates' psychiatric conditions will clinically deteriorate or not improve. In other words, many inmates with serious mental illnesses are harmed when placed in such settings. In addition to potential litigation, this is a main reason that an increasing number of the so-called supermax facilities will not admit inmates with serious mental illnesses. Consistent with the above, the Society of Correctional Physicians (SCP) adopted a position statement in July 2013 that stated the following: "The Society of Correctional Physicians acknowledges that prolonged segregation of inmates with serious mental illness, with rare exceptions, violates basic tenets of mental health treatment. Inmates who are seriously mentally ill should be either excluded from prolonged segregation status (i.e., beyond 4 weeks) or the conditions of their confinement should be modified in a manner that allows for adequate out-of-cell structured therapeutic activities and adequate time in an appropriately designed outdoor exercise area. SCP further recommends that correctional systems provide mental health input into the disciplinary process in order to appropriately shunt some of these inmates into active mental health housing and programming rather than disciplinary segregation when the mental condition is a mitigating factor in the commission of the infraction."[55]

**A.    An Evolving Consensus**

104.   There is growing consensus in the fields of Corrections and Correctional Psychiatry that solitary confinement causes great damage to prisoners, and its use must be reduced substantially. In fact, Special Raporteur of the United Nations,

---

[54]    APA (2012). Position Paper on Segregation of Prisoners with Mental Illness. http://www.dhcs.ca.gov/services/MH/Documents/2013_04_AC_06c_APA_ps2012_PrizSeg.pdf/

[55]    Metzner, J. (2015). Mental Health Considerations for Segregated Prisoners, N,C.C.H.C., available at <http://www.ncchc.org/filebin/Resources/Segregated-Inmates-2015.pdf>

Juan Mendez, has proclaimed that a stint in solitary confinement of over 15 days constitutes a human rights abuse tantamount to torture.[56]

105.    Many professional health and mental health associations and other professional organizations have taken positions against the consignment of prisoners with serious mental illness to solitary confinement, and strongly recommending much reduced solitary confinement for all purposes. The American Psychiatric Association condemns the use of solitary confinement with prisoners suffering from serious mental illness[57]; the American Public Health Association recommends eliminating the use of solitary confinement except in very rare instances because of the great harm done[58]; the American Academy of Child and Adolescent Psychiatry (2012) strongly condemns the use of solitary confinement with juveniles [59]; the National Alliance on Mental Illness (NAMI) strongly opposes the use of solitary confinement with prisoners suffering from serious mental illness[60]; the National Communication Association condemns the use of solitary confinement and all forms of torture[61]; and the American Bar Association strongly advises against solitary confinement for prisoners with serious mental illness and advocates that solitary be a rare last resort in corrections. Dr. Kenneth Appelbaum, a highly respected spokesperson for both the American Psychiatric Association and the American Academy of Psychiatry and Law, writes:

> The arguments for the safety benefits of solitary confinement do not pass muster, the potential for psychological and physiological harm is real, and the misery

---

[56]    Mendez, J. (2011). Interim report prepared by the Special Rapporteur of the Human Rights Council on torture and other cruel, inhuman or degrading treatment or punishment in accordance with General Assembly resolution 65/205. New York: United Nations, August 5. https://documents-dds-ny.un.org/doc/UNDOC/GEN/N11/445/70/PDF/N1144570.pdf.

[57]    APA (2012). Position Statement on Segregation of Prisoners with Mental Illness. http://www.psych.org/File%20Library/Learn/Archives/ps2012 _PrisonerSegregation.pdf.

[58]    American Public Health Association (2013). Solitary Confinement as a Public Health Issue. Policy No. 201310. http://www.apha.org/advocacy/policy/policysearch/default.htm?id=1462>

[59]    American Academy of Child and Adolescent Psychiatry (2012). Solitary Confinement of Juvenile Offenders. http://www.aacap.org/AACAP/Policy_Statements/2012/Solitary_Confinement_of _Juvenile_Offenders.aspx.

[60]    National Alliance on Mental Illness. Public Policy Platform Section 9.8. http://www.nami.org/.

[61]    National Communication Association (2010). Resolution Regarding Extended Solitary Confinement and Torture. http://www.natcom.org/uploadedFiles/About_NCA/Leadership_and_Governance/Public_Policy_ Platform/PDF-PolicyPlatform-Resolution_Regarding_Extended_Solitary_Confinement_and_Torture.pdf.

> that can accompany the experience is well known. The APA
> has led in the effort to restrict solitary confinement for
> inmates with serious mental illness, but it has not taken the
> same stance regarding other inmates. It is time for the APA,
> along with all organizations devoted to mental health, to join
> the chorus opposed to all draconian practices of prolonged
> solitary confinement and for correctional systems to listen.[62]

106.    I have already discussed the consensus in the field that the consignment of
        prisoners with serious mental illness to long-term solitary confinement causes
        great psychiatric damage and must be curtailed. Of course, the issue that must be
        weighed carefully against the emotional harm done by solitary confinement is the
        need for security in the institutions. There is research reflecting that long-term
        solitary confinement does not actually reduce the prevalence of violence in
        correctional settings.[63]

107.    On September 30 and October 1, 2015, a colloquium occurred at the John Jay
        School of Criminal Justice in New York, "Solitary Confinement: Ending the
        Over-Use of Extreme Isolation in Prison and Jail."[64] I was included among
        invited attendees. Also invited and present were fifteen senior correctional
        administrators and commissioners of departments of correction, including
        Marshall Fisher, the Commissioner of the Mississippi Department of Corrections,
        and Bernie Warner, at that time the Commissioner of the Washington Department
        of Corrections (Mr. Warner has since left the Washington D.O.C. to become the
        Senior Vice President for Corrections at MTC). Mr. Warner made a well-received
        presentation, outlining the alternative mental health treatment and rehabilitation
        programs that would be needed to diminish the utilization of solitary confinement
        in a department of corrections, and outlining the successes in the Washington
        D.O.C. in implementing these programs. I had the pleasure of sitting next to
        Commissioner Fisher at the colloquium. The attendees all signed on to a set of
        recommendations, which included the following:

        1. Segregation should be used for the minimum time and in the least
        restrictive conditions necessary to resolve the condition that led to the
        segregation.

---

[62]    Appelbaum, K. (2015). American Psychiatry Should Join the Call to Abolish Solitary
Confinement. *Journal of the American Academy of Psychiatry and the Law, 43*, 406-415.

[63]    Briggs, C., Sundt, J. & Castellano, T. (2003). The effect of supermaximum security
prisons on aggregate levels of institutional violence. *Criminology, 41*, 1341-1376; Kupers, T.
Dronet, T., et al. (2009). Beyond supermax administrative segregation: Mississippi's experience
rethinking prison classification and creating alternative mental health programs. *Criminal Justice
and Behavior, 36*, 1037-1050.

[64]    *Solitary Confinement: Ending the Over-Use of Extreme Isolation in Prison and Jail.* New
York, September 30 - October 1, 2015. http://johnjaypri.org/category/research-and-publications/.

2. Separation is one alternative to segregation or restricted housing. This can be accomplished through moving someone to a different area of a facility, a different facility, or a different prison system.

3. Positive incentives should be incorporated into the management of all incarcerated people, including those in segregation or restricted housing.

4. Even for the most restrictive segregation, the conditions should be humane. These conditions should include, at a minimum: access to natural light; control of light in cells; basic sanitary and safe environmental conditions including adequate space, ventilation and temperature; adequate nutrition; adequate medical and mental health services; and reading materials….

4.2 Apart from the briefest possible initial period, all incarcerated persons in segregation or restricted housing should have some access to out-of-cell time, congregate activity, meaningful social interaction, programming/interventions, phone calls, and visits, recognizing that the extent of these privileges may be more limited than in general population. The most restrictive segregation should be for the shortest amount of time necessary….

7.1 Segregation or restricted housing for disciplinary or management purposes should be used only for the most serious behavioral offenses, such as violence or threats of violence.

7.2 It should not be used for problems such as gang affiliation, status, or political beliefs, or for minor infractions, except for a brief segregation period for investigation or cooling-off purposes.

8. There must to be due process protections in place.

9. The loss of privileges needs to be proportionate to the infraction and must include a pro-social incentive system to restore the privileges….

12. Anyone who is in segregation or restricted housing for more than a brief period of time should be provided with interventions to address their needs and promote their safe transition back to less restrictive settings….

15. Where general population placement cannot be effectively managed without posing an unacceptable risk, vulnerable populations should be assigned to separate living units where their needs can be appropriately met with a goal of maximizing congregate activity, habilitative, rehabilitative, and programmatic opportunities….

17. In extraordinary cases in which a stay of longer than 15 days is essential, any extension must be based on an authorization by medical or mental healthcare professionals in the exercise of their independent professional judgment, with additional review each seven days thereafter, or more often if needed, and in no case shall extreme isolation for significantly vulnerable individuals extend beyond 30 days.

108. During a lunch presentation at the John Jay Colloquium, Mr. Warner explained the "Mandela Rules" and stated unabashedly why he agreed with the Mandela Rules. The Mandela Rules constitute a May, 2015 revision of the United Nations Standard Minimum Rules for the Treatment of Prisoners. The revised rules:

      • Define (prolonged) solitary confinement as the confinement of prisoners for 22 hours or more a day without meaningful human contact (for more than 15 consecutive days), and restrict the use of solitary confinement as a measure of last resort to be used only in exceptional circumstances.

      • Prohibit indefinite or prolonged solitary confinement, the placement of a prisoner in a dark or constantly lit cell, the reduction of a prisoner's diet or drinking water as well as the use of instruments of restraint which are inherently degrading or painful, such as chains or irons.

      • Provide detailed guidance on searches of prisoners and cells as well as on the legitimate use of instruments of restraint in line with the need to ensure security and safety in prison as well as the respect to the inherent human dignity of prisoners.

      • Confirm that health-care professionals should pay particular attention to involuntarily separated prisoners, but exclude their involvement in the actual imposition of disciplinary sanctions.

      • Encourage prison administrations to use, to the extent possible, conflict prevention, mediation or other alternative dispute resolution mechanisms to prevent or resolve conflicts.[65]

109.    It is quite puzzling to me, when the Commissioner of the Mississippi D.O.C. (Mr. Fisher) and the ex-Commissioner of Washington D.O.C. and current Senior Vice President for Corrections at MTC (Mr. Warner), sign on to the recommendations of the John Jay College of Criminal Justice Colloquium on Solitary Confinement, and the Senior Vice President for Corrections at MTC advocates for the Mandela Rules (and there is a growing consensus among American correctional professionals about the value of the Mandela Rules, as attested to by the enthusiasm of the fifteen state and local Commissioners attending the colloquium), why the conditions at EMCF can be so disgraceful and in stark violation of both the consensus recommendations of the John Jay Colloquium on Solitary Confinement and the Mandela Rules.

## III.   Illustrative Prisoner Interviews

110.    I interviewed Prisoner #58 in 2016. This 26-year-old tall, thin, white man with reddish-brown hair and a goatee has been in prison for 10 years and has been on Unit 5 at EMCF for three years. He gets very depressed and irritable in segregation and has attempted to kill himself multiple times while on Unit 5. He was easy-going and relaxed prior to being transferred to Unit 5. He feels staff treat him "like a dog." Staff are not present on the zone, and do not talk to him or other prisoners when they do arrive to pass out food trays. He is diagnosed with Bipolar Disorder but feels he is mostly depressed. In segregation, he paces almost constantly, cleans his cell compulsively, punches the walls, and gets increasingly angry. He fears his anger will get him into more trouble, so he is always working on ways to calm down and stay out of trouble. He feels that this struggle to keep

---

[65]    Available at https://www.unodc.org/documents/justice-and-prison-reform/Brochure_on_the_UN_SMRs.pdf.

from getting enraged makes him out of touch with his feelings altogether. He cannot concentrate and feels his thinking gets tangential in segregation. His mind races and he cannot sleep. He reports slight paranoia, and does not understand why he is paranoid or what he can do to feel less paranoid. His buzzer does not work or triggers no response from staff, which makes him very anxious because he would receive no help in case of a medical emergency. He is restless and agitated all the time in segregation, and cannot calm down enough to watch television. He tells me he is not a violent person but he gets into arguments and then fights with other prisoners, again only since being on Unit 5. Officers are very inattentive and do not provide much protection, so he and many other prisoners feel they need to arm themselves if they are to remain safe. In general population he plays cards, talks to people, and his mental health remains relatively stable, although he suffers from mild depression even in general population. He has made several suicide attempts while in segregation on Unit 5. He laughed when asked about mental health care and stated there is very little; when he asks to see a mental health professional, someone eventually comes to see him spends very little time speaking with him. The unit is usually filthy with discarded food trays and human waste. There are fires on a daily basis and large numbers of prisoners cut themselves but are sent back to their cell after being sutured. Prisoners are often left in their cells in the dark because broken light bulbs are not replaced. According to his EMR, he is diagnosed Bipolar Disorder, recent episode mixed, moderate; stable, polysubstance abuse. He is prescribed Lithium 600 mg (mood stabilizer for Bipolar Disorder) at bedtime, Tegretol 400 mg. (seizure disorder utilized as a mood stabilizer for Bipolar Disorder) at bedtime; and Ibuprofen (non-steroidal anti-inflammatory).

111.    I interviewed Prisoner #59 in 2016. This 36-year-old thin African American man appeared worried, agitated and angry. He had been at EMCF for approximately six months, mostly on Unit 5. He used to be prescribed psychiatric medications, including Tegretol, but refused to take the pills and eventually they stopped prescribing them. Mental health staff do not come to talk or to help. He had visible scars on his arms and reported that he has cut himself on multiple occasions. He also lit fires in his cell on at least two occasions. He has only ever engaged in these behaviors when he is in segregation or solitary confinement. Officers are very delayed responding or don't come at all, and mostly do not attend to prisoners. He feels the conditions in segregation are awful, and he is usually angry and agitated. At the time of our interview, he had been living in a dark cell for two weeks because his light bulb broke and was not replaced. He reports feeling very anxious because his call button elicits no response and he fears he will receive no assistance in an emergency. According to his EMR, he is diagnosed Bipolar Disorder, most recent episode manic. He is prescribed no psychiatric medications but has a past record of prescriptions for Prozac (an antidepressant) and Carbamazepine (a seizure medication utilized as a mood stabilizer for Bipolar Disorder).

112.    Prisoner #5 was a 41-year-old African American man who was housed on Unit 5D when I interviewed him in April, 2014. He says he suffers severe depression.

There has been no light bulb in his cell since he was moved there several months prior. He had not been permitted to leave his cell to shower or go to recreation in two to three weeks, so he was in his cell 24 hours per day in the dark. He told me that he was in the "stepdown" program, in which some prisoners are permitted to go to recreation in the company of a few other prisoners; after six or 12 months on a stepdown unit, prisoners are supposed to be transferred to a general population unit. However, he had been on the stepdown unit for over two years with no progress toward being transferred out, and said this was the case with most of the other prisoners in the stepdown program. Consequently, he felt hopeless about ever getting out of Unit 5, which led to despair and thoughts of suicide. In the EMR, his diagnoses include Major Depressive Disorder, Impulse Control Disorder and Bipolar Disorder, and he is prescribed Zoloft (antidepressant) and two mood-stabilizing medications (Tegretol and Depakote). While this interview occurred in 2014, multiple prisoners I interviewed in 2016 expressed equivalent exasperation about being told they were in a stepdown program and in line to be transferred to general population, but the transfer never occurred. Among prisoner complaints I reviewed, see also Prisoner #70, below, who does not know how he will ever get out of segregation.

113.    I interviewed Prisoner #57 in 2016. This 33-year-old African American man with a goatee and horned rimmed glasses has been in prison since 2002. He has been on Unit 5B for a year, and some form of segregation for seven of the years he has been behind bars. He seeks to be alone, so in a way segregation is an OK arrangement for him. But he is terrified that if he has an emergency nobody will come to help him. He bases that fear on the fact that he has seen many situations where the prisoners in neighboring cells scream "man down" repeatedly and no staff enter the unit to look into the situation. He tells me that the unit is usually filthy with litter from Styrofoam food trays and human waste, but the staff cleaned the floors just prior to my arrival. They usually do not clean the unit for many days at a time. If a prisoner breaks his light bulb he will be in a dark cell for weeks or months because staff will not replace it. Prisoners often break light bulbs because there is no light switch in the cell and the only way to turn the light on or off is to screw the bulb in or out. He cannot sleep because there is noise on the unit all night long. He is always afraid "someone will come in on me," meaning his door will be "popped" (unlocked) and another prisoner will come in and assault him. He sees that happen a lot on the unit, and recently he was stabbed by another prisoner. He knows that that the prisoner who stabbed him has stabbed several others. He told me that officers do not check where a prisoner is housed, and if the prisoner says he is assigned a certain cell the officers will place him in that cell. That is what makes some of the assaults possible, the prisoner who wants to perpetrate an assault merely tells the officers he is assigned a certain cell, the cell of his victim, and the officers place him in that cell without checking to find out which cell he belongs in. There are fires and prisoners cut themselves every day. A fire can be dangerous, either the flames spread to the cells of others or the fumes are toxic to all the cells in the vicinity. He gets very depressed while he is in segregation, and despairs of being released from segregation. Mental health staff make rounds, but really barely talk to prisoners and are of no help.

The clothes are filthy because the laundry exchange is very poorly done and often prisoners are left with no clean clothes for a very long time. He summarizes by saying "they don't give a damn about us," and the result is much aggravated depression and a sense of hopelessness, both are much worse when he is in Unit 5. His EMR contains current diagnoses of R/O Bipolar Disorder; Personality Disorder NOS; PTSD; stab wounds, mental illness and hypertension. His medications include Depacote 500 mg. twice per day; Tegretol 200 mg. twice per day and some medications for medical conditions.

114.    Prisoner #9 illustrates the phenomenon of non-suicidal self-harm. I interviewed him in April 2014. He was a then-25-year-old African American man who had been on a short-term segregation zone on Unit 6 until a few days prior to our interview, when he was transferred to Unit 5A for long-term segregation. The prison mental health staff prescribe him a mood stabilizer for bipolar disorder. He told me that he had never cut himself before coming to EMCF but now does so often; he feels compelled to cut himself and cannot control the urge. Multiple cutting scars on his left arm were visible. He stated that "being behind the [cell] door does things to you." After he cuts himself, he feels some relief from the anxiety and agitation. He stated that he felt dead in the isolation cell, and the cutting provides some respite from this feeling.

115.    Prisoner #61. This African American man with a beard and glasses has been in prison eight years by 2016, at EMCF five years and on Unit 5 for two months. He has terrible sleep problems on Unit 5, has panic attacks and feels like he cannot breathe, and is constantly anxious. These problems only occur when he is on Unit 5 in segregation. He sets fires often because he is so anxious, in large part because staff never respond to the prisoners' needs and are mostly absent from the unit. No one responds to his buzzer. He sets fires in order to make staff respond. He says sometimes they do come, and they put out the fire but do nothing else. Other times they do not even respond and simply allow fires to burn out, leaving him in a charred and smoke-filled cell. He believes these fires are not documented, as he is not removed from his cell and rarely given a rule violation report. He is also frequently subjected to pepper spray by the staff, and is not taken to medical, nor is his cell cleaned or decontaminated. He is angry all the time about the conditions in segregation, the lack of staff response to prisoners' needs and the "gassings." He believes his blood pressure rises when he is in segregation, and he suffers from hypertension. He is moderately depressed, but he is not suicidal. On his EMR, he is diagnosed Bipolar Disorder, most recent episode manic, with psychosis, severe; Antisocial Personality Disorder and Cannabis dependence. His medications include the antipsychotic drugs Thorazine (25 mg.) and Risperdal (2 mg.) at bedtime.

116.    I interviewed Prisoner #69 in 2016. This 32-year-old African American man with a goatee has been in prison for 10 years and has been on long-term segregation on Unit 5B for 3 months. He says he does not see mental health staff and is not on medications. He complained about the food, and said he has lost 40 pounds while on Unit 5. He previously was treated with Haldol injections (an anti-psychotic

medication). He says he, like the other prisoners, has been told if he remains free of Rule Violation Reports ("RVRs" for six months he will be transferred out of Unit 5, but he does not believe it because he sees many other prisoners who have not had RVRs for over 6 months and remain in Unit 5. On mental status exam he has rapid thinking and quite a bit of illogic, he is concrete in his thoughts and he exhibits an obvious thought disorder. He is aware of his serious mental illness, but does not want treatment while he is in the awful conditions of Unit 5. When he is being seen by mental health, they give him involuntary injections of Haldol if he misbehaves, so he simply does not take part in mental health treatment. All of his symptoms, especially agitation, paranoia and confused thinking, are much worse when he is in isolated confinement on Unit 5. On his EMR, he is diagnosed with Bipolar Disorder, most recent episode manic with psychosis. His medications include Methimazole (thyroid medication).

117.   Prisoner #70. This 30-year-old Caucasian man with a beard and blue eyes had been in prison for 5 years, at EMCF for 3 ½ years and in Unit 5 for one year when I interviewed him in 2016. He tells me segregation is "a whole other world," there are fires all the time. The officers do not come around to see the prisoners. Many prisoners cut themselves, he thinks they are driven to do so to get the attention of the totally inattentive officers. He has cut himself several times. He says he sees that when prisoners cut themselves the officers do not do anything, so it's no use. Still, he cut himself very deeply on the right forearm a week ago (he shows us the wound and we take a photo), and all they did was take him to medical to be sutured and then he was put back in his cell. He says he suffers from PTSD (Posttraumatic stress disorder). He has flashbacks and nightmares about his mother, who shot herself several years ago and he witnessed it. When he is in a segregation cell he gets extremely anxious and sees his mother. When he is in general population he feels a need to get out of his cell and get involved with some activity such as exercise. But in segregation there is nowhere to go and nothing to do, so the anxiety keeps rising. He says that besides the PTSD, he suffers from Bipolar Disorder and restless leg syndrome. He takes the Tegretol (seizure medication used as mood stabilizer in Bipolar Disorder) he is prescribed. He tells of an incident recently where he repeatedly and loudly kicked on his cell door. Officers ignored him. Then he set a fire and, after a long delay, they came to his cell. He told them he had not received a food tray and they found one for him. He has scars from many self-inflicted cuts on his arms. He tells me they rarely write RVRs for the fires and the cutting, but sometimes they do. He remembers cutting himself while on Unit 3C because the entire unit was locked down for something he did not do and was not involved in. He cut himself because he was angry. He is very depressed in segregation, does not sleep well and has bad nightmares about his mother. He gets up and paces much of the night. He does much better in general population. He has never had any psychotherapy in prison. He cuts himself often and sometimes receives RVRs for that. He does not believe officers when they tell him if her remains RVR-free for six months he will be transferred out of Unit 5 because he sees many other prisoners remain free of RVRs for longer than that and they are not transferred out. He has received Haldol injections in the past. When I ask him to compare the situation today with

the situation in 2014 when I made my last tour, he avers all the concerns on my list and says things are the same, except he believes fewer involuntary Haldol injections are given. He believes the fires he sets and the cutting are caused by the heightened anxiety he experiences when he is in isolation. He is even more anxious because officers do not respond to fires and cutting in a timely fashion, he worries that in an emergency nobody would come. When he has a manic mood swing, his symptoms of PTSD flare up. Recently he hit his head during an episode of mania and PTSD symptoms. He has received some RVRs for self-mutilation. Sometimes, when he sees other prisoners set fires or cut themselves it makes him want to do the same. He tells me the buzzer does not work and officers do not respond to emergencies, but if the buzzers worked and the officers responded, he would stop setting fires. He sleeps all day and is up all night. When he is up he paces relentlessly to try to ameliorate the anxiety he feels. He has made three very serious suicide attempts. But he has cut on many more occasions, he says he feels more calm after cutting. He receives no visits. He says there have been no changes on the Unit in the year he has been on Unit 5. His EMR contains the diagnoses Bipolar Disorder and Personality Disorder; prior diagnoses of factitious disorder and Depressive Disorder have been removed. He is prescribed Olanzapine 15 mg. per day (anti-psychotic medication), Benztropine 2 mg. per day (anticholinergic medication given for control of side effects of anti-psychotic agents); and Tegretol, 800 mg (anti-psychotic medication) at bedtime.

OPINION 3

THE CONDITIONS IN ISOLATED CONFINEMENT HOUSING AT EMCF ARE SO SHOCKINGLY HARSH
AND INHUMANE AS TO SUBJECT ALL PRISONERS HOUSED THERE TO GREAT PAIN AND SUFFERING
AS WELL AS A SIGNIFICANT RISK OF SERIOUS PSYCHIATRIC ILLNESS, EMOTIONAL BREAKDOWN
AND SUICIDE.

## I.    Conditions at EMCF Unit 5 are Reprehensible

118.    At EMCF, in Unit 5, prisoners' desperate pleas for help are likely to be either met with staff callousness, or perceived by officers as disrespectful or rule-breaking; the officers, in turn, become increasingly insensitive, punitive or even abusive toward the identified troublemakers. But when human beings are subjected to extremes of isolation and idleness, and deprived of every vestige of control over their environment, and in addition are denied social contact and all means to express themselves in a constructive manner; then it is entirely predictable that they (or almost any human being) will resort to increasingly desperate acts to achieve some degree of control of their situation and to restore some modicum of self-respect.

119.    As just one example, prisoners are harshly punished for violating the rule against putting their arm through the food port, even when the purpose of the gesture is to summon urgently needed help. The prisoner may be issued an RVR; furthermore, a group of officers in riot gear likely shoot immobilizing gas into the prisoner's cell, or even directly at his face, and then storm his cell to perform a take-down. Often there are injuries sustained during the take-down. All of the prisoners I spoke with in 2014 and 2016 on the segregation zones tell me that the use of immobilizing gas is quite frequent, often occurring every day or more than once per day; and that they are thrown back into their contaminated cell without the opportunity to decontaminate either their bodies or cells.

120.    In a prison where staff are this neglectful and prisoners so often perform acts of self-harm in order to gain staff attention to needs the prisoners consider urgent, it is abhorrent that staff still fail to respond adequately to the needs the prisoner is expressing in such an inappropriate way. It is not acceptable for the staff to fail to ameliorate the neglect, and merely to penalize the prisoner for taking inappropriate measures to seek needed help.

121.    I will provide case reports from my interviews of the conditions and their effects on prisoners, but it is striking how universal the prisoners' complaints about the conditions and the way they are treated. No prisoner I interviewed failed to aver specific terrible conditions and staff neglect, and precisely the same complaints appear repeatedly in ARP forms I reviewed. For instance, Prisoner █ complains on December 29, 2015 that conditions on Unit 5A, where he had been for 11 weeks by the time of this ARP, are unacceptable, and requests only that conditions be upgraded to the minimum level described in policies:

I have not had any hearing whatsoever concerning my housing (in segregation)… since being housed on Ad Seg, cleaning supplies have not been provided to me… the cell I am housed in has bare wires sticking out of the ceilng but no light fixture, I have constantly told staff about this with no action taken…. Since I have been on housing 5A we have been offered exercise privileges at most two times a week… since I have been on Ad Seg I have been allowed to use the phone one time in 11 weeks despite constant requests to staff… Correctional Officers are only present when an event such as feeding, showers, exercise, etc. is taking place. At any other time officers rarely enter the zone. We go between 2 – 6 hours at a time with no security inspections….[66]

122.    Another example is prisoner ▇ who complains on September 30, 2015 about the conditions on Unit 6D, where he was on segregation. (I was told by staff in May, 2016 that Unit 6 is no longer utilized for segregation, but when I toured EMCF in 2014 I found that conditions on Unit 6 segregation zones were essentially the same as on Unit 5, so I find this man's description relevant to current conditions on Unit 5). Mr. ▇ writes: "complaining of unsanitary and hazardous conditions on HU 6D… once I entered the cell (on 8/4/2015) it was extremely filthy and nasty excrement was all over the floor and bed along with yellowish brownish slime and stains all around the flap, door frame and on the cell walls, the toilet had dark mildew stains all around the inside of the toilet bowl along with feces smeared all around the rim thereof." (He discovers the sewer drain was stopped up, but while that explains the smell of excrement, it does not explain feces on the walls, door and toilet). He continues:

[E]very single time an inmate or inmates floods the zone (cell) that filthy stuff flows into my cell to add on the filth and unpleasant and unsanitized conditions I was already forced to live in…. the inmates are not allowed a squuz-ee to scrape the water out of their cells, nor are they allowed cleaning supplies… trays and food is thrown all over the zone after meals and are left that way sometime from morning until the next day… please feel free to review the zone cameras for further details… On 8/6/2015 I could not take it no more so I started flooding my cell for cleaning supplies, better housing and to talk to the unit managers about the conditions I was forced to live in… Minutes later Capt. Patrick Thomas entered the zone and when I explained the above situation to him he stated, "▇,… so what do you think I care about you being in a sh___y situation, and he told them (officers) to call maintenance and have my water turned off and he told CO Clay to double lock my tray flap so I won't be yelling out of the door…. I also went on a hunger strike from 8/4/2015 until 8/7/2015 without drinking water…." [67]

---

[66]     MTC-CON-00056877.

[67]     MTC-CON-00073125.

123.    Mr. ▮▮ reported these and other ghastly conditions and events on August 11, 2015 in an ARP form. On October 12, 2015, the "Second Step Response Form" to Mr. ▮▮ contains the typed message, "As stated in your First Step Response, the unit is cleaned on a daily basis. It is documented that you have received cleaning supplies to clean your cell. There are cleaning supplies available to offenders on a daily basis. All you need to do is ask. I trust that I have answered your concerns pertaining to your complaint and you consider this matter closed."

124.    Mental health staff are sometimes put in the difficult position of deciding which inappropriate behaviors on the part of prisoners with severe mental illness are related to that mental illness – for example, a hallucination or voice commanding the prisoner to break a rule – versus willful acts deserving of punishment. This is a useless distinction. In previous eras (before the 1990s), a distinction was made between "the Bad and the Mad." The Bad were prisoners with behavior problems deserving of punishment and the Mad were those with a serious mental illness, whose misbehaviors were to be viewed as symptoms of their mental illness. The problem with that dichotomy was that the same individuals could be both mad and bad. Were their bad acts symptoms of their mental illness, or were they simply individuals with mental illness who would act inappropriately? Hans Toch pioneered the contemporary consensus in corrections that prisoners with serious mental illness are often both mad and bad, and the distinction is not actually very important because it is the entirety of the person — the mad and the bad — that need to be taken into account as staff devise a treatment and management plan that integrates the security staff's concerns as well as the treatment concerns of mental health professionals. Toch coined the term "disturbed/disruptive," and provided treatment and management recommendations for mental health staff as well as security staff.[68] In fact, one of Toch's ideas is that the more difficult a prisoner is to treat and manage, the more time staff need to spend creating a collaborative treatment and management plan, a collaboration between mental health and custody staff.[69]

125.    Unfortunately, at EMCF, there is very little evidence of this kind of collaboration.

## II.    A Vicious Cycle of Increasing Abuse and Increasingly Bizarre Responses

126.    The extremity of the neglect of prisoners by staff at EMCF, leading to prisoners' ever more desperate attempts to get needed assistance, comes to a head in a repetitive drama on Unit 5 involving the prisoners who put an arm through the food port of their cell door in order to gain staff attention to their urgent needs. In 2014, prisoners reported that officers require prisoners who have previously engaged in this behavior to put their mattress on the floor next to the cell door and

---

[68]    Toch, H. (1982). The disturbed disruptive inmate: Where does the bus stop? *Journal of Psychiatry and Law, 10*, 37-49.

[69]    Toch, H. & K. Adams. (2002). *Acting out: Maladaptive behavior in confinement.* Washington, D.C.: American Psychological Association.

kneel on the floor at the back of their cell when it is time for the next food tray to be delivered, so the officers can throw the container of food through the food port onto the mattress. If the prisoner refuses to put his mattress on the filthy floor and kneel on the floor behind it the officers refuse to deliver the meal. Some prisoners say that at times they go hungry rather than accept the humiliation of being fed like an animal. Several prisoners I interviewed in May 2016 told me this procedure is still utilized, and they have been subjected to it.

127.    In their desperation for assistance, prisoners resort to ever more extreme cries for help. The prisoner "floods the zone," meaning he stops up his toilet or sink and lets water run over the floor of his cell and out onto the common spaces on the zone. When I toured the segregation zones of Unit 5 in 2014, I observed large puddles of water in several places, the result of prisoners flooding their cells. Prisoners from various locations on the zones reported to me that several prisoners had flooded their cells in the past few days. Some prisoners light fires in an effort to summon help or call for attention. They ignite paper or clothing or any other combustible material in their cell with contraband matches and pass it through a crack at the edge of the solid metal cell door. In 2014, and again in 2016, I saw a number of cells with burnt areas on and around the door. (See 2014 and 2016 Photos, Exhibit H.)[70] Of course, a fire on a segregation zone where prisoners are locked in their cells behind solid metal doors, and the staff are mostly absent, can be quite dangerous, even in a small number of cases deadly. Smoke inhalation is a serious health hazard for inmates with respiratory problems behind locked doors in poorly ventilated cells, and, in severe cases, can cause death.

128.    In other instances, the prisoner resorts to self-harm in a desperate effort to summon attention and assistance. Sometimes the self-harm involves suicidal intent, sometimes it does not. Both kinds of self-harm are urgent problems in a correctional setting. Non-suicidal self-harm, especially cutting of some part of the body, is very commonplace in prison segregation units at EMCF, and in my experience the worse the conditions of confinement and the less the officers attend to prisoners' urgent needs, the more often prisoners cut themselves for non-suicidal reasons. This is certainly the case on the segregation zones of Unit 5 at EMCF. Fatos Kaba et al. report on their research into self-harm in the New York jail system. Only 7.3% of jail admissions to the acute medical unit involved inmates who had been in solitary confinement, but 53.3% of all acts of self-harm and 45% of potentially fatal acts of self-harm occurred within the 7.3% of inmates who had been in solitary confinement.[71]

129.    Often correctional mental health staff, viewing non-suicidal self-harm as manipulative, pay little or no attention to the prisoners' despair, anxiety and needs

---

[70]    Photos 1 and 2 are from 2014; photos 3 and 4 are from 2016.

[71]    Kaba, F., A. Lewis et al. (2014). Solitary Confinement and Risk of Self-Harm Among Jail Inmates. *American Journal of Public Health, 194*(3), 442-447.

that are expressed in the self-harm. That is a deadly mistake. Non-suicidal self-harm can be as dangerous as self-harm with suicidal intent. The degree of despair and depression I observed in 2014 and 2016 in the prisoners on Unit 5 creates a very dangerous situation in terms of potential suicides. Prisoners report they despair of ever being released from their unbearable segregation cell; judging from the long lengths of time prisoners are warehoused on Unit 5 at EMCF, there is an objective reality to their fear of never leaving segregation. Quite a few prisoners I interviewed in 2016 reported they had been told that if they remained free of RVRs for a certain period of time, they would be transferred to general population. But, these prisoners reported, they remained RVR-free for the designated period and were not transferred, or they witnessed other prisoners attaining the landmark and not transferred. This reality creates despair and drives many acts of self-harm. When a prisoner decides out of despair to take his own life, the situation can be dire and much clinical energy and competence need to be expended on providing crisis intervention. There have been suicides in the segregation units at EMCF, and there are very frequent episodes of self-harm, including cutting.

130.    I mentioned that many prisoners try to control the anxiety bred of isolation by cleaning their cell repeatedly, as if the non-productive action will relieve the emotional tension. On the segregation units at EMCF, the prisoners are so poorly provided with cleaning supplies that even this coping strategy is not available to them. Those who can read books and write letters do so, but on the segregation zones I inspected on Unit 5, this is often not possible because there is no light in the cells to read or write by, even if reading and writing materials were available.

## III.    Illustrative Cases

131.    Prisoner #56, who I interviewed in 2016. This 36-year-old man has been in prison since 2003. He is currently on Unit 5D. He complains of insufficient food since being transferred to Unit 5 and has lost significant weight. He is often left in a shower enclosure for hours at a time, when he gets a shower; he often has to wait several days to get a shower. He has only seen the psychiatrist once since coming to EMCF. There are no officers on the unit most of the time; they come in primarily to pass out food trays. Officers do not respond to his buzzer. He reports that the day before my visit, the floor was swept for the first time in quite some time, and the prisoners who are in dark cells were finally given light bulbs. They are not provided sufficient cleaning materials to keep their cells clean. There are fires almost every day. Typically, the fire is not documented; the prisoner is not given an RVR, there is no incident report that he knows of, and the prisoner is simply left in the burnt cell after the fire is extinguished. Someone cuts himself nearly every day. Mental health staff usually do not respond to the cutting. If the cut is deep the prisoner is taken to Medical to have the cut sutured, then put back in his cell with no mental health intervention. Mental health staff make very brief rounds on the unit. The prisoner complains that he is terrified all the time that if he needs something on an emergency basis, staff will not respond. He avers mounting anger, some paranoia, and difficulty concentrating. He has never had a

visit while in segregation. On his EMR he is diagnosed Bipolar Disorder, most recent episode manic, moderate; abnormal liver function tests; and non-specific tuberculin skin test. He is prescribed Tegretol 400 mg. (seizure medication utilized as mood stabilizer in Bipolar Disorder) at bedtime and Ibuprofen (non-steroidal anti-inflammatory).

132.    Prisoner #11. This 25-year-old man was housed in long-term segregation on Unit 5B when I interviewed him in 2014. There has not been any light in his cell for months. He had no psychiatric problems before arriving on Unit 5, but since being in a segregation cell on Unit 5 he has felt agitated. On his EMR, there are many notes by mental health counselors seeing him on rounds in segregation and noting no mental health problem, only that they "continue to monitor." He admits he puts his arm out the food port when it is opened because, he tells me, he needs emergency medical attention for blood in his stool and weight loss, and he is very anxious that he might have cancer or some other serious condition. He has been sprayed with immobilizing gas repeatedly, the last time a few days prior to our meeting, because he put his arm out of the food port. He was left in his cell for a couple of hours without medical attention or decontamination of his body or his cell. A month earlier he was held down by several officers and given a Prolixin injection against his will. He has not been permitted to use the phone to call his family, and this increases his anxiety. He reports that other prisoners can get out of their cells and attack him, so he is always anxious. He feels despair because he is convinced he will not be moved out of Unit 5 until his sentence is finished. This causes him to think often of suicide. He saves up his pills and he has tried overdosing several times. He lit a fire outside of his cell the day before our interview, and said this is the only way he can get staff to come see him when he needs emergency medical attention. In Prisoner #11's EMR, diagnoses include Bipolar Disorder, Depressive Disorder, rule out Malingering, and Impulse-Control Disorder. There are also several medical diagnoses, a bladder condition required an indwelling catheter for some time. He is sometimes prescribed Risperdal (new generation anti-psychotic), sometimes Prolixin (antidepressant), and sometimes he does not take psychotropic medications. He was housed in Medical for Suicide Ideation on October 16, 2013, and then was to be returned to a cell on Unit 5.

133.    I interviewed Prisoner #54 in 2016. This 28-year-old African American man with a beard and tattoos has been on Unit 5 since December, 2013. He believes his diagnosis is Bipolar Disorder and he is prescribed Prozac and Remeron. In 2014 he was being subjected to involuntary and often forced intramuscular injections of Haldol, and he says that is no longer happening. Besides the fact that involuntary injections are much less frequent, he feels everything else about Unit 5 remains the same as it was in 2014, especially the fact that officers are mostly absent from the units aside from passing out food trays, and they do not respond to prisoners' needs, including the need to see medical and mental health staff on an emergency basis. The only other change is that on Unit 5D the prisoners are permitted out of their cells. He believes there is excessive use of force on a regular basis. He suffers from depression, and believes it is much worse when he is on Unit 5. He is

not suicidal. He does fear for his safety because prisoners get loose on Unit 5 and have weapons. That is less of a problem on 5D, he believes that is because the prisoners there do not want to get into trouble because they want to be released to general population. On his EMR (electronic medical record), diagnoses include Bipolar Disorder, most recent episode mixed; Depressive Disorder; R/O malingering; and Impulse Control Disorder. Prescribed medications include Thorazine 25 mg. for sleep.

134.    Prisoner #67. This 28-year-old man had been in prison for 5 years and on Unit 5A for 2 ½ years when I interviewed him in 2016. He was told if he remained free of RVRs for six months he would be transferred to general population, but then he remained free of RVRs for eight months and was not transferred. He then received an RVR, because he was acting out in anger about not being transferred to general population. He is supposed to receive mental health treatment but has been unable to arrange a one-on-one meeting with a clinician. He does take Risperdal and has been for a few months. He reports that all concerns identified in this report exist, including but not limited to inattentive officers, lights going out and bulbs not being replaced, and being locked in the shower for hours. He says that in terms of my entire list of problems, they are the same now as they were in 2014, there have been no changes. He adds that last year the prisoners went eight or nine months without being issued clean clothing. Fires are commonplace. The lack of attention from officers makes him feel very much in danger. He experiences hallucinations and paranoid delusions and his thinking is very distorted, much more so while he is in Unit 5. In his EMR, there are diagnoses of Bipolar Disorder, most recent episode manic with psychosis; Antisocial personality disorder; and history of inhalant abuse. Medications include Risperdal (anti-psychotic) 2 mg. at bedtime, and Lithium Carbonate 300 mg. (mood stabilizer for Bipolar Disorder) at bedtime.

135.    I interviewed Prisoner #71 in 2016. This 24-year-old African American man has been in prison for eight years, at EMCF for five years, and on Unit 5 for 3 ½ years. He says that Unit 5 is the same as it was in 2014 and he avers all the problems on my list. There are fires on the zones, and flooding of the zones, very frequently. The officers do not appear on the zones except to pass out food trays, there is always a filthy mess on the floor (he says they cleaned it up in preparation for our visit), and the buzzers do not work. He is on phone restriction, but thinks other prisoners do get to use the phone sometimes, not nearly as often as they are supposed to have phone access. He is very depressed, much worse so when he is on Unit 5. He tells me the only time the prisoners see the mental health workers is when someone cuts themselves. He was in a cell without lights for a week because the inmate who was previously in the cell took the bulb with him, and officers would not replace it. He has had no contact with his family for the past 8 months. He has lost a lot of weight because there is not enough food. He weighed 173 pounds before coming to Unit 5 and now weighs 150. He is very depressed, much more so when he is in segregation, and he keeps to himself in order to avoid trouble. He realizes that the isolation is very bad for his depression. But the worst exacerbating factor is his hopelessness about ever getting out of Unit 5. He has

not been outside in nature since coming to Unit 5. He goes to recreation as often as he can, but says the officers only permit him to go to recreation at best two times per week. He entered Unit 5 because he needed protection, but since he has been in Unit 5 he has not been permitted to create an exit plan. His EMR contains diagnoses "History Stable," Malingering, Depressive Disorder and Hypertension. His medications include Thorazine 25 mg. at bedtime, Remeron 45 mg. at bedtime, and Depakote, 1,000 mg twice per day (these are medications for Bipolar Disorder and Depression). Prisoner #69 is one of the very few prisoners I interviewed who is diagnosed "Malingering." But the medications he is taking – Thorazine (an anti-psychotic I think is prescribed here for sleep), Depakote in high dosage (a mood stabilizer prescribed for individuals with Bipolar Disorder) and Remeron in high dosage (an antidepressant) – are only prescribed for individuals with Bipolar Disorder and Depression.

136.   I interviewed Prisoner #62 in 2016. This 24-year-old African American man has been in prison since 2008, at EMCF for five years, four of those on Unit 5. At the end of April, he refused to exit his cell when ordered and officers sprayed him with immobilizing gas. He says, "Why should I do that? I'm in a cell by myself, I've been in the cell for some time." They sprayed him repeatedly in a very short time, he believes seven times within 5 minutes. He has been the object of officers' use of force on many occasions. He says a Captain spit in his face recently, and he often feels disrespected by officers. He gets severely depressed and very angry, and it is only on Unit 5 that he feels that way. He set a fire in his cell two months ago, he was mad about the officers never coming by and not responding to his needs, and he was issued an RVR. He has not set other fires. He was told that he needs to be free of RVRs for twelve months and he will be transferred out of Unit 5, but he has done that several times and he is never transferred out. That makes him angry and despairing. Hopelessness about ever getting out of segregation in Unit 5 leads him to misbehave. He is very obviously depressed with sad faces and psychomotor retardation. He goes to the recreation yard three times a week, on average. I had encountered him on the yard earlier that day, in the early afternoon, and he and others on the yard at the time told me that they had been brought to the yard at 8 AM and remained there for over five hours because the officers were simply inattentive. He does not have visitors. His family lives eight hours from EMCF and he would only be permitted a one hour visit through glass, so he dissuades his family from coming to see him. On the yard, he enjoys having the company of other prisoners in caged enclosures nearby, but he does not talk to them. He notices that over time in Unit 5 he has been less and less motivated to talk to others. The food is very inadequate and he has lost a lot of weight while in Unit 5. He spends most of his time in his cell alone, he does not talk to neighbors and the officers certainly do not talk to him. In his EMR he is diagnosed Antisocial Personality Disorder on Axis II with Polysubstance Abuse. He is prescribed Thorazine 25 mg. at night, Depakote 500 mg. twice per day; and Remeron 30 mg. at bedtime. Depakote is a mood stabilizer prescribed for Bipolar Disorder and Remeron is an antidepressant. One wonders why he is prescribed therapeutic dosages of medications for Bipolar Disorder and Major Depressive Disorder when he is not assigned those diagnoses.

OPINION 4

THE CONDITIONS IN THE MEDICAL UNIT AND THE INTAKE UNIT AT EMCF, ESPECIALLY WHEN PRISONERS REMAIN CONFINED THERE FOR MORE THAN A FEW DAYS, ARE AS HARSH AND DAMAGING AS THE CONDITIONS IN UNIT 5.

## I.    The Medical Unit

137.    In May 2016, I toured the Medical and Intake Units and was immediately struck by the relatively large number of prisoners who were housed in these two units for weeks or longer. It seems that the most disturbed or suicidal prisoners are retained in the Medical Unit, and then the Intake Unit is utilized as an overflow area when a bed in the Medical Unit is needed for another patient. The Medical Unit is designed as a crisis unit for mental health services (it is also the site of medical treatment, but here I am only referring to its use for mental health crises). According to prevailing standards of care, the prisoner/patient should be kept in the Medical Unit for a very short time where he can be monitored, kept safe and provided intensive crisis intervention. Then, if his condition does not improve rapidly and he needs further treatment and further attention to his safety, he must be transferred to a more intensive psychiatric treatment setting, i.e. an inpatient psychiatric ward. That is the model that enjoys a very strong consensus in the field of correctional mental health and underpins the standards of the National Commission on Correctional Health Care (NCCHC). But contrary to that model, I observed in the Medical and Intake Units the long-term cell-consignment of acutely disturbed or self-harming individuals, where they have no amenities and do not even have access to recreation. The Medical Unit houses prisoners with acute mental health crises, and there are beds in those cells. Still, a prisoner with an acute psychiatric crisis should only remain in such a cell for a day or a few days while being thoroughly assessed and started on emergency treatment. Then, if he is not stable enough to be returned to his regular location he must be admitted to a more intensive mental health treatment setting.

138.    I know from prior tours of EMCF that there is no higher intensity mental health setting, i.e. there is no inpatient psychiatric ward or hospital, and since EMCF is the designated psychiatric facility for much of the Mississippi Department of Corrections, this means that isolation in a cell in Intake that is not even designed for overnight stays is the routine treatment for prisoners too acutely disturbed or suicidal to return to their regular prison setting, be that in general population or segregation. The cells in Intake are small, perhaps six by ten feet, by my estimate. The cells do not contain beds. Rather, there is a bench along one wall, and the prisoner sleeps on a thin mattress thrown on the floor. There is also a toilet/sink appliance. With the mattress on the floor, there is very little room to move around in the cell. The cells are dark. During my 2016 tour, one cell had a broken overhead light that was not repaired. There is no window to the outside, only a small panel in the cell door to the hall that cannot be opened. Prisoners have no access to recreation, and there is just about nothing for the prisoner to do. This is a form of solitary confinement that is more harmful even than what prevails in Unit

5. It is entirely unacceptable that there is no psychiatric inpatient unit for the treatment of these severely disturbed individuals, and it is totally unacceptable that they are forced to endure such harsh isolative conditions where their condition will predictably deteriorate and they will be denied the treatment they require. The conditions of confinement when an individual remains in Medical or Intake for longer than a few days are entirely unacceptable and violate all standards.

139.    Meanwhile, because mental health services were inadequate, the Medical Unit and Intake Unit served essentially as a warehouse for prisoners who are so acutely disturbed it would not be safe to return them to segregation or general population housing. But the conditions in the Medical Unit and Intake Unit are essentially as bad or worse forms of isolative confinement than one experiences in Unit Five. The prisoners, presumably acutely psychotic or suicidal, are left alone in a cell with almost nothing to do, have no television, are not even permitted to go to recreation, and many, because of mental health crises, are on strict property restrictions and may have very limited access to pen and paper and reading materials.

140.    In my review of ARP forms I came upon prisoner ███'s explanation for why he was being housed in the Medical Unit in September, 2015. He had been on unit 3D, but because there were approximately 10 prisoners on 3D suffering severe mental illness, not taking baths, not taking their medications, and he alleges staff do not do their job and make sure they bathe and take their medications, he found life in the common areas of 3D unbearable and unsafe. He writes that staff fail to keep the prisoners with serious mental illness "… civil enough to be out and in the population without screaming, yelling, cussing at everyone and everything. While they are being punished for crimes they've been convicted of we other inmates, like me, should not have to be punished by their crimes too, yet we've been subjected to group punishment." The relief he requests on the form is simply that the prisoners in question be bathed and that staff get them the help (treatment) they need. Instead, there is a nine day lockdown on his unit, which he designates a group punishment, and the next note is that he is being housed in the Medical Unit, where of course there is further de facto solitary confinement. He writes an ARP response on November 2, 2015 from the Medical Unit stating that he is dissatisfied with staff's response to his September ARP and will proceed to a Step Two appeal: "As the reason I am in Medical is partly due to being housed with a mentally dysfunctional inmate – who has a record of assaulting inmates."[72] Thus this prisoner is twice placed in de facto solitary confinement for extended periods, on lockdown in his general population unit and then in the Medical Unit, instead of having a response from staff about his perfectly appropriate request that they attend to the out-of-control prisoners with serious mental illness on his unit who are making it unsafe for him and other prisoners.

---

[72]    MTC-CON-00074744.

## II.    A Case From the Medical Unit

141.    Prisoner #53. This man had been in Unit 5 from 2012 until a year before our interview, when he attempted suicide by cutting his arms and was transferred to Medical, where he has remained since. He says conditions are worse in Medical than in Unit 5 and segregation. At least in Unit 5, prisoners are allowed time in the recreation yard. He sincerely believes if he was not on Unit 5 he would not be suicidal at all. He never cut himself before being in prison segregation. He first entered prison at age 13. He was at EMCF from 2002 to 2005, then he was at other facilities and returned to EMCF in 2012 and was placed on Unit 5, where he remained until being transferred to medical approximately a year ago. He was told if he remains RVR-free for a year he can be transferred out of Unit 5, and he has reached almost a year free of RVRs, but since he is in the Medical Unit he is not certain of his status *vis a vis* release from Unit 5. In solitary (both in Unit 5 and in the Medical Unit), he has nothing to do, gets very anxious and cuts himself repeatedly. He has severe mood swings. The mood swings, and his anger, increase dramatically when he is in Unit 5 and he believes that is why he cuts himself repeatedly. He feels he is truly suicidal and the purpose of the cutting is to kill himself. He says he feels very unsafe in Unit 5, there are prisoners with weapons who are able to get free of their cells and attack him, and this situation markedly increases his anxiety and panic. He is certain if he is returned to Unit 5 he will kill himself. He sleeps all day and gets up at night, when it is more quiet and he feels safer. He emphasizes that the officers totally ignore the prisoners on Unit 5, do not respond to their needs, and he thinks that is why so many prisoners cut themselves, light fires and flood the zone on Unit 5. In his EMR (electronic medical record) he is diagnosed Bipolar and prescribed mood stabilizing medications.

142.    Prisoner #52 is an "outlier" in that his consignment to the Medical Unit for an entire year is unusual, but the chronic self-harming episodes that cause staff to retain him in the Medical Unit are a well-known phenomenon. He does not cut himself except when he is in solitary confinement, and the compulsion toward self-harming behavior is one of the well-known symptoms of solitary confinement that is reflected in the literature. It appears that the only options available to the mental health staff are bad: they can retain him in the Medical Unit for his own safety or return him to segregation, where he is at extremely high risk of further self-harming behavior. This is not acceptable. Obviously what is needed is a more intensive mental health treatment setting, to begin with admission to a psychiatric hospital, and once treatment is effective enough to control the risk of further self-harm, he could be transferred to a less intensive mental health treatment unit such as a step-down program or residential treatment facility. But returning him to solitary confinement on Unit 5 is absolutely contraindicated.

## III.    The Intake Unit

143.    At the time of my 2016 tour, most of the cells in the Intake Unit were occupied by prisoners who were receiving mental health attention for urgent problems such as

suicide risk, and that means that these prisoners must be retained in cells that are not even designed for overnight stays (see # 134, above). It also means that the "Intake function" of these cells is subverted – i.e., the cells are designated for very short-term placement of incoming prisoners who need to be classified and prepared for transfer to their prison housing, but when the cells serve mostly as an overflow for prisoners in mental health crisis the designated use for the cells is undermined. In fact, the day I toured the facility, most of the prisoners were lying on their mattresses on the floor with the light off in the middle of the day. It is bad enough for a prisoner to be forced to endure this degree of isolation, idleness and discomfort for a day or two, but most of the prisoners filling the Intake Unit the day I visited had been there for a week or even much longer.

## OPINION 5

**TAKEN AS A WHOLE, THE CONDITIONS IN SOLITARY CONFINEMENT AT EMCF ARE THE WORST I HAVE WITNESSED IN MY 40 YEARS AS A FORENSIC PSYCHIATRIST INVESTIGATING JAIL AND PRISON CONDITIONS. THESE CONDITIONS CAN ACCURATELY BE DESCRIBED AS TORTURE ACCORDING TO INTERNATIONAL HUMAN RIGHTS AGREEMENTS AND STANDARDS. THEY CERTAINLY PRESS THE OUTER BOUNDS OF WHAT MOST HUMANS CAN PSYCHOLOGICALLY TOLERATE, AND CAUSE A HUGE AMOUNT OF PSYCHIATRIC ILLNESS AND LASTING DISABILITY.**

144.    At EMCF, mentally ill and emotionally fragile prisoners are held in long-term confinement segregation units and other isolative environments (including in the Medical and Intake Units) where the conditions are abominable. The conditions in these units are so harsh and extreme that they are incompatible with mental health. Prisoners are isolated, abandoned, forced to live in abject filth and darkness, subjected to violence and danger, and denied care for their most basic human needs. Each of these conditions, individually and taken together, inflicts tremendous psychological suffering, exacerbates serious mental illness, increases risk of suicide, and places each prisoner at significant risk of serious harm.

145.    Solitary confinement — even in a clean, well-run facility where staff pay attention to prisoners' needs — is well known to cause very serious psychiatric problems and exacerbate the symptoms of prisoners with preexisting mental illness. But the woefully substandard conditions and staff neglect and abuse at EMCF compound the problems inherent in solitary confinement, making the prisoners' plight that much worse. The combination is psychologically and emotionally unbearable.

146.    I first placed MDOC on notice of these dangers years ago, in 2011 and again in 2014. Since that time, I have seen no evidence that they have taken responsibility for the safety, wellbeing, or mental health of prisoners at EMCF. The predictable result has been ongoing violence, suicide, and the unconscionable suffering of prisoners with mental illness as well as worsening of their mental disorders and disability. Absent remediation on a systemic level, these phenomena will continue unabated.

147.    By at least one widely accepted definition, the conditions in which EMCF prisoners are held in isolation are so severe that they constitute psychological torture.

148.    Dr. Almerindo Ojeda distinguishes between an "extensional definition" of Psychological Torture, whereby a set of practices are delineated that constitute Psychological Torture; and an "intentional definition" of Psychological Torture, where the intentions of the perpetrators must be examined before the practices can

be declared Psychological Torture.[73] Dr. Ojeda proposes that the extensional definition is adequate, and the torturers' intentions do not need to reach specific criteria for Psychological Torture to be in evidence. The practices Dr. Ojeda lists in the extensional definition include isolation, deprivation of food, water, sleep, spatial disorientation through confinement in small places with nonfunctional windows, temporal disorientation due to denial of natural light, sensory deprivation or over-stimulation, induced desperation through indefinite detention or random placement, and so forth.

149.    Just about every one of the practices Dr. Ojeda lists are present in supermaximum security units I have toured, though the entire list is not necessarily in evidence in each facility. For example, supermaximum security units are also called "control units" because of the total control staff have over even the smallest details of the prisoner's life, including how much toilet paper he will be permitted to have. Or, in supermaximum confinement units, many prisoners experience induced desperation; for instance, they fear they will never be released because the severe isolation increases and exacerbates their anger and causes them to act in a way that violates the rules, to which prison staff react by extending their time in isolation as discipline. When there are no meaningful programs and daily activities, and where there are no rewards for appropriate behavior and no incremental steps the prisoner can attain in his effort to be transferred out of segregation. This is the situation at Unit 5 of EMCF - prisoners confide that they are certain they will never get out of segregation alive. A significant proportion of the prisoners on Unit 5 at EMCF told me they feel this way.

150.    The abominable practices I have enumerated at EMCF fulfill the extensional definition of Psychological Torture, and clearly cause and worsen psychological and emotional breakdowns. In my opinion, long term confinement in an isolative confinement unit is torture, even when that unit is well run. But when staff do not respond to prisoners' basic needs, when prisoners are left in darkness for extended periods, when prisoner are permitted to prey upon other prisoners and when all the other abominable conditions I have reported discovering at EMCF obtain, then the word torture is even more appropriate for the state of affairs.

---

[73]    Almerinda Ojeda. (2008). What is Psychological Torture? In *The Trauma of Psychological Torture,* ed. Almerindo Ojeda, 2008, Volume 5 of Trauma and Disaster Psychology, Series Editor Gilbert Reyes, Praeger, 2008.

Respectfully submitted,

Terry A. Kupers, M.D., M.S.P.

# Exhibit A

Exhibit A: Curriculum Vitae

# Terry Allen Kupers, M.D., M.S.P.

Office Address:
2100 Lakeshore Avenue, Suite C, Oakland, California 94610
phone: 510-654-8333

Currently:
Institute Professor, Graduate School of Psychology,  The Wright Institute, 2728
        Durant Avenue, Berkeley, California 94704
Private Practice of Psychiatry, Oakland

Family: Married to Arlene Shmaeff, Education Director at the Museum of
        Children's Art (M.O.C.H.A.) in Oakland; father of three young adult sons

Born:  October 14, 1943, Philadelphia, Pennsylvania

Education:
B.A., With Distinction, Psychology Major, Stanford University, 1964
M.D., U.C.L.A. School of Medicine, 1968
M.S.P. (Masters in Social Psychiatry), U.C.L.A., 1974

Training:
Intern (Mixed Medicine/ Pediatrics/ Surgery), Kings County Hospital/Downstate
        Medical Center, Brooklyn, New York, 1968-1969.
Resident in Psychiatry, U.C.L.A. Neuropsychiatric Institute, Los Angeles, 1969-
        1972
Registrar in Psychiatry, Tavistock Institute, London (Elective Year of U.C.L.A.
        Residency) 1971-1972
Fellow in Social and Community Psychiatry, U.C.L.A. Neuropsychiatric Institute,
        1972-1974

License: California, Physicians & Surgeons, #A23440, 1968-

Certification: American Board of Psychiatry and Neurology (Psychiatry,
        #13387),  1974-

Honors:
Alpha Omega Alpha, U.C.L.A. School of Medicine,1968.
Distinguished Life Fellow, American Psychiatric Association; Fellow, American
        Orthopsychiatric Association.
Listed: Who's Who Among Human Services  Professionals (1995-); Who's Who
        in California (1995-);  Who's Who in The United States  (1997-);  Who's

Who in America (1998-); International Who's Who in Medicine (1995-); Who's Who in Medicine and Healthcare (1997-); The National Registry of Who's Who (2000-); Strathmore's Millenial Edition, Who's Who; American Biographical Institute's International Directory of Distinguished Leadership; Marquis' Who's Who in the World (2004-); Marquis' Who's Who in Science and Engineering, (2006-); Who's Who Among American Teachers & Educators (2007-); The Global Directory of Who's Who (2012-); International Association of Healthcare Professionals' The Leading Physicians (2012-).

Helen Margulies Mehr Award, Division of Public Interest (VII), California Psychological Association, Affiliate of American Psychological Association, March 30, 2001.

Stephen Donaldson Award, Stop Prisoner Rape, 2002.

Exemplary Psychiatrist Award, National Alliance for the Mentally Ill, 2005

William Rossiter Award for "global contributions made to the field of forensic mental health," Annual Meeting, Forensic Mental Health Association of California, March 18,2009, Monterey, California


Clinical Practice:

Los Angeles County, SouthEast Mental Health Center, Staff Psychiatrist, 1972-1974

Martin Luther King, Jr. Hospital, Department of Psychiatry, Los Angeles                                       Staff Psychiatrist and Co-Director, Outpatient Department, 1974-1977.

Contra Costa County, Richmond Community Mental Health Center, Staff Psychiatrist and Co-Director, Partial Hospital, 1977-1981

Private Practice of Psychiatry, Los Angeles and Oakland, 1972 to present


Teaching:

Assistant Professor, Department of Psychiatry and Human Behavior, Charles Drew Postgraduate Medical School, Los Angeles, and Assistant Director, Psychiatry Residency Education, 1974-1977.

Institute Professor, Graduate School of Psychology, The Wright Institute, Berkeley, 1981 to present

Courses Taught at: U.C.L.A. Social Science Extension, California School of Professional Psychology (Los Angeles), Goddard Graduate School (Los Angeles), Antioch-West (Los Angeles), New College Graduate School of Psychology (San Francisco).


Prof'l Organizations:

American Psychiatric Association (Distinguished Life Fellow); Northern California Psychiatric Society; East Bay Psychiatric Association (President, 1998-1999); American Orthopsychiatric Association (Fellow); American Association of Community Psychiatrists; Physicians for Social Responsibility; National Organization for Men Against Sexism; American Academy of Psychiatry and the Law.

Committees and Offices:

Task Force on the Study of Violence, Southern  California Psychiatric Society, 1974-1975

Task Force on Psychosurgery, American Orthopsychiatric Association, 1975-1976

California Department of Health Task Force to  write "Health Standards for Local Detention                                        Facilities," 1976-77.

Prison/ Forensic Committee, Northern California Psychiatric Society,  1976-1981; 1994-

Psychiatry Credentials Committee, Alta Bates Medical Center, Berkeley, 1989-1994 (Chair, Subcommittee to Credential Licensed Clinical Social Workers)

President, East Bay Chapter of Northern California Psychiatric Society, 1998-1999

Co-Chair, Committee on Persons with Mental Illness Behind Bars of the American Association of Community Psychiatrists, 1998-2003

Consultant/Staff Trainer:

Contra Costa County Mental Health Services; Contra Costa County Merrithew Memorial Hospital Nursing Service; Bay Area Community Services, Oakland; Progress Foundation, San Francisco; Operation Concern, San Francisco; Marin County Mental Health Services; Berkeley Psychotherapy Institute; Berkeley Mental Health Clinic; Oregon Department of Mental Health; Kaiser Permanente Departments of Psychiatry in Oakland, San Rafael, Martinez and Walnut Creek; Human Rights Watch, San Francisco Connections collaboration (Jail Psychiatric Services, Court Pre-Trial Diversion, CJCJ  and Progress Foundation); Contra County Sheriff's Department Jail Mental Health Program; Consultant to Protection & Advocacy, Inc., re Review of State Hospital Suicides

Forensic Psychiatry (partial list):

Testimony in Madrigal v. Quilligan, U.S. District  Court, Los Angeles, regarding informed consent  for surgical sterilization, 1977

Testimony in Rutherford v. Pitchess, Los Angeles Superior Court, regarding conditions and mental health services in Los Angeles County Jail, 1977

Testimony in Hudler v. Duffy, San Diego County Superior Court, regarding conditions and mental health services in San Diego County Jail, 1979

Testimony in Branson v. Winter, Santa Clara County Superior Court, regarding conditions and mental health services in Santa Clara County Jail, 1981

Testimony in Youngblood v. Gates, Los Angeles Superior Court, regarding conditions and mental health services in Los Angeles Police Department Jail, 1982

Testimony in Miller v. Howenstein, Marin County Superior Court, regarding conditions and mental health services in Marin County Jail, 1982

Testimony in Fischer v. Geary, Santa Clara County Superior Court, regarding

conditions and mental health services in Santa Clara County Women's Detention Facility, 1982

Testimony in Wilson v. Deukmejian, Marin County Sup Court, regarding conditions and mental health services at San Quentin Prison, 1983

Testimony in Toussaint/Wright/Thompson v. Enomoto, Federal District Court in San Francisco, regarding conditions and double-celling in California State Prison security housing units, 1983

Consultant, United States Department of Justice, Civil Rights Division, regarding conditions and mental health services in Michigan State Prisons, 1983-4

Testimony in Arreguin vs. Gates, Federal District Court, Orange County, regarding "Rubber Rooms" in Orange County Jail, 1988

Testimony in Gates v Deukmejian, in Federal Court in Sacramento, regarding conditions, quality of mental health services and segregation of inmates with HIV positivity or AIDS at California Medical Facility at Vacaville, 1989

Testimony in Coleman v. Wilson, Federal Court in Sacramento, regarding the quality of mental health services in the California Department of Corrections' statewide prison system, 1993

Testimony in Cain v. Michigan Department of Corrections, Michigan Court of Claims, regarding the effects on prisoners of a proposed policy regarding possessions, uniforms and classification, 1998

Testimony in Bazetta v. McGinnis, Federal Court in Detroit, regarding visiting policy and restriction of visits for substance abuse infractions, 2000

Testimony in Everson v. Michigan Department of Corrections, Federal Court in Detroit, regarding cross-gender staffing in prison housing units, 2001

Testimony in Jones 'El v. Litscher, Federal Court in Madison, Wisconsin, regarding confinement of prisoners suffering from severe  mental  illness in supermax, 2002

Testimony in Russell v. Johnson, Federal Court in Oxford, Mississippi, regarding conditions of confinement and treatment prisoners with mental illness on Death Row at Parchman, 2003

Testimony in Austin v. Wilkinson, Federal Court in Cleveland, Ohio, regarding proposed transfer of Death Row into Ohio State Penitentiary (supermax), August, 2005

Testimony in Roderick Johnson v. Richard Watham, Federal Court in Wichita Falls, Texas, regarding staff responsibility in case of prison rape, September, 2005

Testimony in DAI, Inc. v. NYOMH, Federal Court, So. Dist. NY, April 3, 2006,  regarding mental health care in NY Dept. of Correctional Services

Testimony in Neal v. Michigan DOC, State of Michigan, Circuit Court for the County of Washtenaw, January 30, 2008, File No. 96-6986-CZ, regarding custodial misconduct & sexual abuse of women prisoners

Testimony in Hadix v. Caruso, No. 4:92-cv-110, USDistCt, WDistMichiganTestimony, USDistCt, WDistMichigan, Grand Rapids, Michigan, regarding mental health care in prison, April 29, 2008

Hospital Staff:  Alta Bates Medical Center, Berkeley

Journal Editorial Positions:
<u>Free Associations,</u> Editorial Advisory Board
<u>Men and Masculinities,</u> Editorial Advisory Panel
<u>Psychology of Men and Masculinity,</u> Consulting Editor
<u>Juvenile Correctional Mental Health Report,</u> Editorial Board
<u>Correctional Mental Health Report</u>, Contributing Editor

Presentations and Lectures (partial list):
"Expert Testimony on Jail and Prison Conditions."  American  Orthopsychiatric
     Association Annual Meeting, San Francisco, March 30, 1988,  Panel 137:
     "How Expert are the Clinical Experts?
"The Termination of Psychotherapy."  Psychiatry Department Grand Rounds,
     Mills/Peninsula Hospitals, Burlingame, February 24, 1989.
"Big Ideas, and Little Ones."  American Psychiatric Association Annual Meeting,
     San Francisco, April, 1989.
"Men in Psychotherapy."  Psychiatry Department Grand Rounds, Mills/Peninsula
     Hospitals, Burlingame, September 29, 1989.
"Psychodynamic Principles and Residency Training in Psychiatry." The Hilton
     Head Conference, Hilton Head Island, South Carolina, March 15, 1991.
Panelist:  "The Mentally Ill in Jails and Prisons," California Bar Association
     Annual Meeting, Annaheim, 1991.
"The State of the Sexes: One Man's Viewpoint."  The Commonwealth Club of
     California, San Mateo, March 25, 1992.
Keynote Address:  "Feminism and the Family."  17th National Conference on
     Men and Masculinity, Chicago, July 10, 1992.
Panel Chair and Contributor: "Burnout in Public Mental Health Workers." Annual
     Meeting of the American Orthopsychiatric Association, San Francisco,
     May 22, 1993.
Panel Chair and Contributor:  "Socioeconomic Class and Mental Illness." Annual
     Meeting of the American Psychiatric Association, San Francisco, May 26,
     1993.
"Public Mental Health."  National Council of Community Mental Health Centers
     Training Conference, San Francisco, June 12, 1993.
Psychiatry Department Grand Rounds:  "Men's Issues in Psychotherapy."
     California Pacific Medical Center, San Francisco, February 24, 1993.
"The Effect of the Therapist's Gender on Male Clients in Couples and Family
     Therapy."  Lecture at Center for Psychological Studies, Albany, California,
     April 15, 1994.
"Pathological Arrhythmicity and Other Male Foibles." Psychiatry Department
     Grand Rounds, Alta Bates Medical Center, June 7, 1993.
Roger Owens Memorial Lecture.  "Prisons and Mental Illness."  Department
     of          Psychiatry, Alta Bates Medical Center, March 6, 1995.
Keynote Address:  "Understanding Our Audience: How People Identify with

Movements and Organizations."   Annual Conference of the Western Labor Communications Association, San Francisco, April 24, 1998.

"Men in Groups and Other Intimacies."  44th Annual Group Therapy Symposium, University of California at San Francisco, November 6, 1998.

"Men in Prison."  Keynote, 24th Annual Conference on Men and Masculinity, Pasadena, July 10, 1999.

"Trauma and Posttraumatic Stress Disorder in Prisoners" and "Prospects for Mental Health Treatment in Punitive Segregation."  Staff Training Sessions at New York State Department of Mental Health, Corrections Division, at Albany, August 23, 1999, and at Central New York Psychiatric Institution at Utica, August 24.

"The Mental Health Crisis Behind Bars."  Keynote, Missouri Association for Social Welfare Annual Conference, Columbia, Missouri, September 24, 1999.

"The Mental Health Crisis Behind Bars."  Keynote, Annual Conference of the Association of Community Living Agencies in Mental Health of New York State, Bolton Landing, NY, November 4, 1999.

"Racial and Cultural Differences in Perception Regarding the Criminal Justic Population."  Statewide Cultural Competence and Mental Health Summit VII, Oakland, CA, December 1, 1999.

"The Criminalization of the Mentally Ill," 19th Annual Edward V. Sparer Symposium, University of Pennsylvania Law School, Philadelphia, April 7, 2000.

"Mentally Ill Prisoners."  Keynote, California Criminal Justice Consortium Annual Symposium, San Francisco, June 3, 2000.

"Prison Madness/Prison Masculinities," address at the Michigan Prisoner Art Exhibit, Ann Arbor, February 16, 2001.

"The Mental Health Crisis Behind Bars," Keynote Address,  Forensic Mental Health Association of California, Asilomar, March 21, 2001.

"Madness & The Forensic Hospital," grand rounds, Napa State Hospital, 11/30/01.

Commencement Address, The Wright Institute Graduate School of  Psychology, June 2, 2002.

"Mental Illness & Prisons: A Toxic Combination," Keynote Address, Wisconsin Promising Practices Conference,  Milwaukee, 1/16/02.

"The Buck Stops Here: Why & How to Provide Adequate Services to Clients Active in the Criminal Justice System,"  Annual Conference of the California Association of Social Rehabilitation Agencies, Walnut Creek, California, 5/2/02.

Keynote Address, "Mental Illness in Prison," International Association of Forensic Psychotherapists, Dublin, Ireland, May 20, 2005

Invited Testimony (written) at the Vera Institute of Justice, Commission on Safety and Abuse in America's Prisons, Newark, NJ, July 19, 2005

Invited Testimony at the National Prison Rape Elimination Commission hearing in San Francisco, August 19, 2005

Lecture, Prisoners with Serious Mental Illness: Their Plight, Treatment and

Prognosis," American Psychiatric Association Institute on Psychiatric
Services, San Diego, October 7, 2005

Grand Rounds, "The Disturbed/Disruptive Patient in the State Psychiatric
Hospital," Napa State Hospital, June 26, 2007

Lecture, "Our Drug Laws Have Failed, Especially for Dually Diagnosed
Individuals," 19th Annual Conference, California Psychiatric Association,
Huntington Beach, CA, October 6, 2007

Panel: "Mental Health Care and Classification," Prison Litigation Conference,
George Washington University Law School, Washington, D.C., March 28,
2008.

Keynote Address: "Winning at Rehabilitation," Annual Meeting of the Forensic
Mental Health Association of California, Monterey, California, March 18,
2009

Panel: "Construction of Masculinity and Male Sexuality in Prison," UCLA
Women's Law Journal Symposium, Los Angeles, April 10, 2009

Panel: "Solitary Confinement in America's Prisons," Shaking the Foundations
Conference, Stanford Law School, October 17, 2009.

Commencement Address, San Francisco Behavioral Health Court Graduation
Ceremony, October 21, 2009.

Panel: "Negotiating Settlements of Systemic Prison Suits," Training & Advocacy
Support Center, Protection & Advocacy Annual Conference, Los Angeles,
June 8, 2010.

Grand Rounds, "Recidivism or Rehabilitation in Prison?," Alta Bates Summit
Medical Center, November 1, 2010

Keynote Address: "Prison Culture & Mental Illness: a Bad Mix," University of
Maryland Department of Psychiatry Cultural Diversity Day, Baltimore,
Maryland, March 24, 2011.

Grand Rounds, "The Role of Misogyny & Homophobia in Prison Sexual Abuse,"
Alta Bates Summit Medical Center, October 17, 2011

Special Guest, "Offering Hope and Fostering Respect in Jail and Prison," 2011
ZIA Partners UnConvention, Asilomar Conference Center, October 24,
2011.

Invited Lecture, "Suicide Behind Bars: The Forgotten Epidemic," 2011 Institute
on Psychiatric Services, American Psychiatric Association, San Francisco,
October 28, 2011.

Lecture: "How Can We Help Persons with Mental Illness in the Criminal Justice
System?," Solano County Re-entry Council, Fairfield, CA, January 15,
2012.

Lecture: "The Prison System in the U.S.A.: Recent History and Development,
Structure, Special Issues," Conference of the American Bar Association
Rule of Law Initiative, Cross-National Collaboration: Protecting prisoners
in the US and Russia, Moscow, Russia, January 20, 2012.

Continuing Medical Education (CME) Presentation: "Correctional Psychiatry
Overview," The Center for Public Service Psychiatry of Western
Psychiatric Institute and Clinic (co-sponsored by the American Association
of Community Psychiatrists), national videoconference originating in

Pittsburg, PA, February 2, 2012.

Grand Rounds, "Mental Health Implications of the Occupy Movement," Alta Bates Summit Medical Center, October 8, 2012

Invited Speaker: "Solitary Confinement: Medical and Psychiatric Consequences," Session: Multi-Year Solitary Confinement in California and the Prisoner Hunger Strikes of 2011-2012, American Public Health Association Annual Meeting, Moscone Convention Center, San Francisco, October 29, 2012.

Keynote Address:  "Solitary Confinement and Mental Health," Conference of the Midwest Coalition for Human Rights, Northeastern Illinois University, Chicago, November 9, 2012.

Symposium Presentation: "The Experience of Individuals with Mental Illness in the Criminal Justice System," American Psychiatric Association Annual Meeting, Moscone Center, San Francisco, May 20, 2013.

Presentation:  Incarceration and Racial Inequality in the U.S., Roundtable on the Role of Race and Ethnicity Among Persons Who Were Formerly Incarcerated, California Institute for Mental Health, Sacramento, California, February 28, 2014.

Testimony at Nevada Advisory Commission on the Administration of Justice on Isolated Confinement, Las Vegas, Nevada, March 5, 2014.


Books Published:

Public Therapy: The Practice of Psychotherapy in the Public Mental Health Clinic.  New York: Free Press/ MacMillan, 1981.

Ending Therapy: The Meaning of Termination.   New York: New York University Press, 1988.

(Editor):  Using Psychodynamic Principles in Public Mental Health.   New Directions for Mental Health Services, vol. 46.  San Francisco: Jossey-Bass, 1990.

La Conclusione della Terapia: Problemi, metodi, conseguenze.  Rome: Casa Editrice Astrolabio, 1992. (trans. of Ending Therapy.)

Revisioning Men's Lives: Gender, Intimacy and Power.  New York: Guilford Publications, 1993.  (trans. into Chinese, 2000).

Prison Madness: The Mental Health Crisis Behind Bars and What We Must Do About It.  San Francisco: Jossey-Bass/Wiley, 1999.

(Co-Editor): Prison Masculinities.  Philadelphia: Temple University Press, 2001.


Other Publications:

"The Depression of Tuberculin Delayed Hypersensitivity by Live Attenuated Mumps Virus," Journal of Pediatrics, 1970, 76, 716-721.

Editor and Contributor, An Ecological Approach to Resident Education in Psychiatry, the product of an NIMH Grant to the Department of  Psychiatry and Human Behavior, Drew Medical School, 1973.

"Contact Between the Bars  -  A Rationale for Consultation in Prisons," Urban Health, Vol. 5, No. 1, February, 1976.

"Schizophrenia and History,"  Free Associations, No. 5, 1986, 79-89.

"The Dual Potential of Brief Psychotherapy,"  Free Associations, No. 6, 1986, pp.
       80-99.
"Big Ideas, and Little Ones,"  Guest Editorial in Community Mental Health Journal,
       1990, 26:3, 217-220.
"Feminist Men," Tikkun, July/August, 1990.
"Pathological Arrhythmicity in Men," Tikkun, March/April, 1991.
"The Public Therapist's Burnout and Its Effect on the Chronic Mental Patient."
       The Psychiatric Times, 9,2, February, 1992.
"The State of the Sexes: One Man's Viewpoint,"  The Commonwealth, 86,16,
       April, 1992.
"Schoolyard Fights." In Franklin Abbott, Ed., Boyhood.  Freedom, California:
       Crossing Press, 1993; Univeristy of Wisconsin Press, 1998.
"Menfriends."  Tikkun,  March/April, 1993
"Psychotherapy, Neutrality and the Role of Activism."  Community Mental Health
       Journal,1993.
"Review: Treating the Poor by Mathew Dumont."  Community Mental Health
       Journal, 30(3),1994, 309-310.
"The Gender of the Therapist and the Male Client's Capacity to Fill Emotional
       Space."  Voices, 30(3), 1994, 57-62.
"Soft Males and Mama's Boys: A Critique of Bly."  In Michael Kimmel, Ed., The
       Politics of Manhood: Profeminist Men Respond to the Mythopoetic Men's
       Movement (And Mythopoetic Leaders Respond).  Philadelphia: Temple
       University Press, 1995.
"Gender Bias, Countertransference and Couples Therapy."  Journal of Couples
       Therapy, 1995.
"Jail and Prison Rape." TIE-Lines, February, 1995.
"The Politics of Psychiatry: Gender and Sexual Preference in DSM-IV."
       masculinities, 3,2, 1995, reprinted in Mary Roth Walsh, ed., Women, Men
       and Gender,  Yale University Press, 1997.
"What Do Men Want?, review of M. Kimmel's Manhood in America." Readings,
       10, 4, 1995.
Guest Editor, issue on Men's Issues in Treatment,  Psychiatric Annals,2,1, 1996.
"Men at Work and Out of Work," Psychiatric Annals, 2,1, 1996.
"Trauma and its Sequelae in Male Prisoners."  American Journal
       of Orthopsychiatry, 66, 2, 1996, 189-196.
"Consultation to Residential Psychosocial Rehabilitation Agencies."  Community
       Psychiatric Practice Section, Community Mental Health Journal, 3, July,
       1996.
"Shame and Punishment: Review of James Gilligan's Violence: Our Deadly
       Epidemic and its Causes," Readings, Sept., 1996.
"Community Mental Health: A Window of Opportunity for Interracial Therapy,"
       Fort/Da, 2,2,1996.
"Men, Prison, and the American Dream," Tikkun, Jan-Feb., 1997.
"Dependency and Counter-Dependency in Couples," Journal of Couples Therapy,
       7,1, 1997, 39-47.  Published simultaneously in When One  Partner is
       Willing and the Other is Not,  ed. Barbara Jo Brothers, The Haworth Press,

1997, pp. 39-47.

"Shall We Overcome: Review of Jewelle Taylor Gibbs' Race and Justice," Readings, December, 1997.

"The SHU Syndrome and Community Mental Health," The Community Psychiatrist, Summer, 1998.

"Review of Jerome Miller's Search and Destroy," Men and Masculinities, 1, 1, July, 1998.

"Will Building More Prisons Take a Bite Out of Crime?," Insight, Vol. 15, No. 21, June 7, 1999.

"The Mental Health Crisis Behind Bars," Harvard Mental Health Letter, July, 2000.

"Mental Health Police?," Readings, June, 2000.

"The Men's Movement in the U.S.A.," in Nouvelles Approches des Hommes et du Masculine, ed. Daniel Weizer-Lang, Les Presses Universitaires du Mirail, Toulouse, France, 2000.

"Symptoms, Meanings and Social Progress," Voices, 36, 4, 2000.

"Psychotherapy with Men in Prison," in A New Handbook of Counseling & Psychotherapy Approaches for Men,  eds. Gary Brooks and Glenn Good, Jossey-Bass, 2001.

"A Very Wise Decision by the Montana Supreme Court," Correctional Mental Health Report, 5,3, 35-36, Sept./Oct, 2003.

"Review of William Roller's The Dead are Dancing," Psychiatric Services,  54,11,1660-1661, 2003.

"The Future of Correctional Mental Health," Correctional Mental Health Report, 6,1, May/June, 2004.

"Foreword,"  David Jones (ed.): Working with Dangerous People: The Psychotherapy of Violence, Oxon, UK: Radcliffe Medical Press Ltd., 2004.

"Malingering in Correctional Settings," Correctional Mental Health Report, 5, 6, 81-, March/April, 2004.

"Prisons," in Michael Kimmel & Amy Aronson (eds.), Men & Masculinities: A Social, Cultural, and Historical Encyclopedia, Santa Barbara, CA & Oxford, GB, ABC Clio, pp. 630-633, 2004.

"Mental Illness," in Michael Kimmel & Amy Aronson (eds.), Men & Masculinities: A Social, Cultural, and Historical Encyclopedia, Santa Barbara, CA & Oxford, GB, ABC Clio, pp. 537-539, 2004.

"Toxic Masculinity as a Barrier to Mental Health Treatment in Prison," Journal of Clinical Psychology, 61,6,1-2, 2005.

"Posttraumatic Stress Disorder (PTSD) in Prisoners," in Managing Special Populations in Jails and Prisons, ed. Stan  Stojkovic,Kingston, NJ: Civic Research Institute, 2005.

"Schizophrenia, its Treatment and Prison Adjustment," in Managing Special Populations in Jails and Prisons, ed. Stan Stojkovic, Kingston, NJ: Civic Research Institute, 2005.

"The Prison Heat Issue,"  Correctional Mental Health Report, 7,2, July/August, 2005.

"How to Create Madness in Prison," in Humane Prisons, Ed. David Jones, Oxford: Radcliffe Publishing, 2006.

"Conditions on death row,Terrell Unit,Texas," in M. Mulvey-Roberts (Ed.), Writing for their lives: Death Row USA (pp. 69-77). Carbondale: University of Illinois Press, pp. 69-77, 2006.

"Prison madness in Mississippi," in M. Mulvey-Roberts (Ed.), Writing for their lives: Death Row USA, Carbondale: University of Illinois Press, pp. 281-287, 2006.

"Working with Men in Prison,"  In International Encyclopedia of Men and Masculinities, 1 vol., eds. M. Flood, J.K. Gardiner, B. Pease, and K. Pringle. London & New York: Routledge, 2007.

"Post-Incarceration Civil Commitments and Public Mental Health: An Essay," Correctional Mental Health Report, 9,4, 2007.

"Violence in Prisons, Revisited," Hans Toch & Terry Kupers, Journal of Offender Rehabilitation, 45,3/4, 49-54, 2007.

"Posttraumatic Stress Disorder in Prisoners," Correctional Health Care Report, Vol. 9, Nos. 2 & 3, January/February, 2008

"Prison and the Decimation of Pro-Social Life Skills," in The Trauma of Psychological Torture, Editor Almerindo E. Ojeda, Vol 5 of Disaster and Trauma Psychology Series, Series Editor Gilbert Reyes, Westport, Connecticut: Praeger, 2008

"What To Do With the Survivors?: Coping With the Long-Term Effects of Isolated Confinement." Criminal Justice and Behavior, Vol. 35 No. 8, August 2008, pp. 1005-1016

"Beyond Supermax Administrative Segregation: Mississippi's Experience Rethinking Prison Classification and Creating Alternative Mental Health Programs," T.A. Kupers, T. Dronet, M. Winter, et al., Criminal Justice and Behavior, October, 2009.

"Mutual Respect and Effective Prison Management," in Transforming Corrections: Humanistic Approaches to Corrections and Offender Treatment, Editors David Polizzi & Michael Braswell, Durham: Carolina Academic Press, pp. 121-134, 2009.

"Preparing an Expert's Report," Correctional Mental Health Report, 12,1, 2010

"Treating Those Excluded from the SHU," Correctional Mental Health Report, 12,4, 2010.

"The Role of Misogyny and Homophobia in Prison Sexual Abuse," UCLA Women's Law Journal, 18,1, 2010.

Stuart Grassian & Terry Kupers, "The Colorado Study vs. the Reality of Supermax Confinement," Correctional Mental Health Report, Vol. 13, No. 1, May/June, 2011

"Preparing an Expert's Report," in Practical Guide to Correctional Mental Health and the Law, by Fred Cohen (with Terry Kupers,) Kingston, NJ: Civic Research Institute, 2011

"The Role of Psychiatry in Correctional Settings: A Community Mental Health Model," Correctional Mental Health Report, Vol. 13, No. 3, September/October, 2011

"Testimony of Terry Kupers, M.D., at August 23, 2011 Hearing of California Assembly Public Safety Committee Regarding Conditions at Pelican Bay

State Prison Security Housing Units," <u>Correctional Law Reporter</u>, Vol XXIII, No. 4, December/January 2012

"A Community Mental Health Model for Corrections," <u>Correctional Mental Health Report</u>, Vol. 13, No. 5, January/February, 2012

"Programming Cells are Neither the Problem nor the Solution," <u>Correctional Mental Health Report</u>, 2013

"Isolated Confinement: Effective Method for Behavior Change or Punishment for Punishment's Sake?," <u>The Routledge Handbook of International Crime and Justice Studies</u>, Eds. Bruce Arrigo & Heather Bersot, Oxford: Routledge, 2013, pp. 213-232.

"The Psychiatrist's Obligation to Report Patient Abuse: A Dialogue with Fred Cohen," <u>Correctional Mental Health Report</u>, Vol 15, No. 5, Jan/Feb 2014

**Terry A. Kupers, M.D., M.S.P.**
**Depositions and Court Testimony in Past Four Years**


Testimony in Henry Kodimer v. City of Escondido, County of San Diego et al., USDistCt,
SoDistCA, Case No. 07-CV2221, February 11, 2011, San Diego, regarding the quality of
mental health care of a San Diego County jail inmate.

Deposition in Logan v. Burge, USDistCt,NoDistIllinois, Case No. 09 cv 5471,
September 26, 2011, San Francisco by Video to Chicago, regarding the
psychiatric impact of false conviction and incarceration.

Deposition in Nordstrom, Deanne L. vs. Spokane County, US DistCt, EDist
of Washington, Case No. CV-08-374-EFS, November 3, 2011,
involving psychiatric consequences of jail sexual abuse.

Deposition in Darryl Burton v. City of St. Louis, USDistCt, EDMissouri, November
14, 2011, San Francisco by video to Chicago & St. Louis, involving
psychiatric impact of false conviction and incarceration.

Testimony by phone in Bradley Anderson v. Farryl Anderson, 3rdDistCt, Granite
County, Montana, Cause No. DR-12-03, divorce/custody hearing.

Deposition in Gary Engel v. Buchan, Case No. 1:10-CV-32880-North.Dis.Ill.,
March 14, 2013, Oakland, CA, involving psychiatric impact of false
conviction and incarceration.

Testimony in Doe v. Michigan DOC, Case No. CV-14356-RHC-RSW, USDistCt,
EDist Michigan, So. Div., June 4, 2014, regarding incarceration of
juveniles in adult prisons

Deposition in A.B. v. WA State Dept Soc'l & Health Services,
USDistCtWDistWA, No. 14-cv-011 78-MJP, Seattle, January 23, 2015,
regarding Competency Eval. and Restoration Treatment

Testimony in Federal Court, A.B. v. WA State Dept Soc'l & Health Services,
USDistCtWDistWA, No. 14-cv-011 78-MJP, Seattle, March 17, 2015,
regarding Competency Eval. and Restoration Treatment

Deposition in Melgar-Maldonado v. Ahtna Technical Services, Inc., and Lorenzo
Vasquez, Jr.; 2013-DCL-6225-D; 103rd District Court, Cameron County,
Texas; Deposition in San Francisco, May 8, 2015, regarding sexual
assault by officer on transsexual detainee in immigration detention center

Deposition in Ruiz v. Brown, USDistCtNDistCal, Case No.: 4:09-cv-05796-CW,
May 21, 2015, Redwood City, CA, regarding possible harm of conditions
of confinement at PBSP SHU.

Deposition in **Kluppelberg v. Burge**, No. 13 CV 3963 (N.D.Ill.), September 10,
2015, Oakland, CA, regarding effects of 25 years in prison after false
conviction.

Testimony in State v. Dennis Levis, CR2011-008004, Sup Ct., Arizona, Maricopa
County, Phoenix, Arizona, October 25, 2016, regarding mitigation in
Sentencing Phase/Death Penalty.

# Exhibit B

In *The Mentally Ill Offender and the Law*, Editor Fred Cohen, Civic Research Institute, 2010

# Preparing an Expert's Report

## Terry A. Kupers, M.D., M.S.P.

An expert's report has for its purpose informing all sides in civil litigation of the opinions an expert will render if called to testify.[1]  Since the expert will base expert opinions on an investigation, the report should include the investigation's methods and findings.  The Report also begins the job the expert will do educating attorneys and the trier of fact about the expert's understanding of questions at issue in the litigation.  Thus, when I testify as a psychiatric expert about the effects on prisoners of harsh prison conditions such as severe crowding or stints in solitary, I have the job of educating the court about what is known about the psychiatric consequences of crowding or isolated confinement.  The Reports I submit have both a disclosing and an educational purpose.

## How it Begins

The preparation of the report begins with an introductory phone call.  I am asked by counsel for one side or the other if I would be willing to serve as a psychiatric expert in a specific case.  I ask for a brief synopsis of the case and ask what the referral questions for me would be.  In practice, I am often asked to

---

[1] See G. Melton, J. Petrila, N.G. Poythress & C. Slobogin, *Psychological Evaluations for the Courts: A Handbook for Mental Health Professionals and Lawyers*, Third Edition, New York: Guilford Press, 2007, pp. 582-586.

opine about a number of things, but the three most frequent kinds of civil cases that come my way involve the psychiatric effects of prison conditions, the quality of mental health care for prisoners with serious mental illness (SMI), and the possible damage caused by the sexual abuse or rape of a prisoner. I ask to see the complaint, we discuss a list of documents I would need to form an opinion, what investigation I would like to conduct (site visits, examinations, and so forth), and I ask for an explanation of the legal issues in the case.

In criminal matters, when asked to serve as an expert, I ask for the statute controlling the issue, for example a state or federal statute about competency. In civil litigation, the statute might be less specific, for example relief could be sought in federal court for an Eighth Amendment violation or violation of the Americans with Disabilities Act. Case law tends to be the more relevant reference, and the expert should have a firm grounding in case law on point. For example, deliberate indifference is an important consideration in this kind of civil litigation, and the psychiatric expert, while not an attorney, must know something about how the notion of deliberate indifference has played out in case law. Of course, that grounding in legal matters is enlarged each time an expert works with counsel and learns more about the law. I ask the attorney to explain legal aspects of the litigation, and how my opinion about the referral questions might play a role.

I may or may not have signed on as an expert at this point. For example, if it is clearly a case I am interested in and one in which I feel I might have something to contribute, I might agree to serve as expert. In that case, we agree on a fee (this must be a transparent process, and an expert's fee cannot be based on contingency), and move on to the issue of Discovery. If I am uncertain whether or not I will accept the case, I first ask what time commitment is involved and what Discovery is likely. There is an exchange where I list

documents I would ideally want to see in preparation for answering the referral questions, and the attorney explains what is available, what the other side is likely to permit, and what might be sought in Discovery.

## Discovery

Discovery is basically the pre-trial exchange of information, reports and documents between opposing counsel and their experts, so that each has a basis for arriving at opinions and each knows in advance about the case that will be presented at trial or during negotiations by the other.  There is general agreement about what should be turned over to the other side, as dictated by fairness, common sense, legal rules and case law.  There are also disputed areas. Sometimes a state will refuse to turn over certain records to plaintiff's counsel, for example on the grounds of privilege.  Plaintiff's counsel might elect to ask the judge to rule on the issue.  Discovery should not be a fishing expedition - each side needs to be clear about what they need to fairly investigate and present their case, and should not burden the other side with unreasonable requests.  The expert's report and deposition are part of Discovery.  Again, counsel for the two sides should not make the deposition into a fishing expedition.  In my experience, it is attorneys who do not have a very thorough understanding of the legal issues nor a sophisticated legal strategy who turn depositions into wide-ranging attempts to trip up the expert and admit extraneous issues into the legal proceedings.  More adept attorneys stick to the issues in the case and ask pointed questions to determine how the expert is likely to testify.

In the preliminary phone conversation with counsel, we discuss dates. When does Discovery close? Is there a set trial date?   A note of caution here: for the expert, calendars can be tricky, and it is often very difficult to control one's workload.  Even when the trial date seems set, it can subsequently be

postponed.  There is a risk that in accepting an invitation to serve as expert in a trial that should be concluded six months from now, postponements could lead to a year's delay, and then the expert could be faced with reports due in several cases at once or several appearances scheduled in a very short time span.

## The Investigation

Then, if I have signed on, my investigation begins.  Documents are sent to me for review.  When I am asked to opine about the effect of conditions on prisoners' psychiatric health, I need to examine the conditions and I need to talk to a relevant sample of prisoners and staff.  Prison tours are planned and prisoner interviews are scheduled.  When I am asked about the quality of mental health care, I need to see the facilities, talk to mental health and other staff, and talk to prisoners about the care they receive.

Protocols for inspection tours and interviews vary, and they are determined by attorneys for the two sides in consultation with their clients.  But generally when I do an inspection tour there are attorneys for both sides present, and there are representatives of the Department of Corrections and relevant contractors (for example, the contractor for medical and mental health care).  During inspection tours I usually have an opportunity to interview staff briefly about operational issues (I am often told that more substantial conversations must await deposition), and the entire entourage accompanies me.  When a delicate matter is being discussed, for example when I ask a staff physician why a particular prisoner is in a safety cell, I request that the others leave us alone to speak in private.  Then, my interviews with and examinations of prisoners occur in a private, confidential setting.  Sometimes, with the prisoner's permission, the attorney who has retained me will be present, and sometimes I conduct the interview alone.  I try to arrange for the prisoner to be free of restraint as much as possible, and I try to have "contact" visits (in other words,

the prisoner is in a room with me, and not on the other side of a lexan window nor in restraints).  But these arrangements are always made with custody staff's involvement, and safety is a prime consideration.  When I am asked about the psychiatric consequences of sexual abuse I usually meet with the survivors, but I also like to tour the facilities in order to understand as clearly as possible how it would be possible for the alleged abuse to have occurred.

Again, when I serve as plaintiff's expert witness (I make myself available to both sides) and ask to speak in depth to staff, I am sometimes told by defendants that will not be permitted.  An expert for the defense is more likely to be permitted extensive interviews with staff and administrators.  In either case, the expert needs to conduct a significant number of interviews with prisoners, and each interview must be confidential.  Otherwise, how is the expert to assess the relevance and reliability of the plaintiff's claims?  Then, for each prisoner I interview, I want to review the custody file including court documents, and the clinical file including mental health care.  I would like to review operations manuals, audits by accrediting bodies, expert reports and data generated in prior litigation regarding the same facilities, internal reviews by the department of various practices and issues, and so forth.  I also review many depositions. Typically I review quite a few documents - cartons full in a large class action litigation - and I interview a significant number of prisoners and staff.

## The Expert's Report

There are rules and guidelines for expert reports.  For example in federal proceedings there is Rule 26 of the Federal Rules of Civil Procedure, which requires the expert to state his or her qualifications and publications of the previous ten years (I usually append a curriculum vita), the fee for expert services, all opinions he or she will provide, the bases for these opinions, the data that will be relied upon, and a list of all cases in which the expert has

testified in the previous four years.[2]  Rule 26 also serves as a fine guideline for reports in state court.  Frye and Daubert standards must be met, for example the expert must demonstrate that his approach and the literature he relies upon are scientific according to a consensus in his field.

Then there is the writing of the Report.  I stress three things with my students and trainees:

1.  Effectively, our psychiatric/psychological expertise consists of our clinical acumen, as well as our understanding of social psychology and related social sciences, including criminology.  Attorneys and courts don't need legal opinions from us, and custody staff and corrections administrators don't need opinions about security matters.  The judge or jury, the trier of fact, needs to hear our expert opinions so they can make more informed decisions.

2.  Always try to do the investigation you need to do in order to have the bases for your opinions, and then spell out in your report what you did to investigate, what research, documents and findings you relied upon, and what other bases there are for your opinions.

3.  Though the principle players in the legal process can become quite argumentative, aggressive and sometimes impolite; at all times remain professional, report and testify with integrity, and seek the truth of the matter rather than any particular outcome of the case.

I follow the same advice I give students when I am writing a report or testifying.  The other thing I stress with students is that the basis for opinions is actually the most important part of the report.  The expert is not the trier of fact.  The expert's job is to spell out what is known (for example in the clinical and research literature), what can be investigated (a clinical examination, witness reports or a site visit to an institution), and how the expert puts all this

---

[2] available at http://www.law.cornell.edu/rules/frcp/Rule26.htm

together.  In criminal matters, experts are not really supposed to opine about competency or sanity - these are legal categories - rather, the expert brings the trier of fact right up to the point of deciding about competency or sanity, and then ends his or her testimony.  In civil matters, it is not really up to the expert whether there was "deliberate indifference."[3]  But if the expert explains that it is well known that patients who are severely disturbed will predictably suffer psychiatric breakdown or commit suicide if they are consigned for long periods to solitary confinement, then the trier of fact can decide whether correctional administrators acted with deliberate indifference to the mental health needs of the prisoner when they consigned to longterm segregation a prisoner known to suffer from serious mental illness and known to be prone to psychiatric breakdown when in isolation.  Similarly, if the expert determines that fear of retaliation likely prevented women prisoners from reporting custodial sexual misconduct, then the trier of fact can decide whether the correctional staff and administration were negligent in their duty to offer the women a safe place to serve their sentences.  Theoretically, the expert should not be asked for legal opinions.  In practice, the line between clinical judgment and legal opinion is not so clear.  I am often asked during criminal trials whether I believe a criminal defendant was insane, and in civil trials I am asked about deliberate indifference.

**Privilege and Confidentiality**

As clinicians, we are very familiar with ethical questions that can arise, our professional organizations provide ethical standards and guidelines, and the basic principle that guides our actions is to be ethical at every turn.  For example, the expert cannot receive fees based on contingency (that would create a financial interest in the outcome), must

---

[3] See F. Cohen, *The Mentally Disordered Inmate and the Law*, Kingston, NJ: Civic Research Institute, 1998, ¶4.3 - 4.4.

respect confidentiality, needs to acquire appropriate informed consent, and so forth.[4]

Privilege and confidentiality can emerge as thorny issues.  The expert in effect has no attorney work privilege regarding the expert's communications with counsel, since plaintiff's counsel is not the expert's counsel.  I learned this many years ago when, on a break in the middle of a deposition, I spoke in the hall with the attorney who had retained me.  When I returned to the conference room opposing counsel asked what the attorney and I had discussed.  There was no privilege in that context, and I had to disclose the content of our conversation.  But there is privilege and confidentiality regarding access to documents and sensitive clinical material.  Typically issues related to privilege and confidentiality are spelled out in a retention letter when the expert agrees to take the case.  Then there is the rule during Discovery that counsel for the other side (the side that did not hire the expert) has the right to see all communications between expert and counsel or between expert and other parties concerning this litigation.  That is a fair rule, and is applicable to both sides.  But this means the expert must conscientiously maintain a file of all notes, all drafts of the expert report, all emails exchanged with counsel, and so forth, and be willing to turn over these documents to the other side upon request.

The expert's report is presumably written by the expert.  There have been incidents where the attorney wrote the expert's report, and the expert signed it.  Because this occurs, I am often asked in depositions who wrote my report, what was counsel's contribution, and why did I change various things when I wrote a

---

[4] American Academy of Psychiatry & the Law Ethical Guidelines for the Practice of Forensic Psychiatry, 1987/1995, available at www.aapl.org.

later draft or the final report (remember, all drafts are subject to Discovery). These are fair questions. I operate transparently, and with certain guiding principles. For example, I write my own reports, but I write them in response to counsel's referral questions. If counsel reads a draft of my report and comments that he would like to see me discuss one subject more and another less, and if the changes do not compromise my opinions, I am willing to have counsel direct my writing in that fashion. Sometimes counsel will inform me that one of the issues I addressed in my draft report is no longer relevant in the case, and if this does not change my opinions I am willing to delete the irrelevant section. But I am not willing to have counsel tell me what I should disclose or opine. Generally I find that attorneys who seek my expertise are professional and ethical about all of this.

Rarely is it possible for the expert to review all relevant documents, and rarely are the site visits and prisoner examinations ideal. For example, when I serve as plaintiff's expert, some of the documents I would like to review are withheld during Discovery. Sometimes I am unable to visit a particular site or I am unable to make a visit at the ideal time, and sometimes the prisoner or staff member I would like to interview is not available. The expert must disclose the Discovery he or she would like to have available, the efforts made to accomplish that Discovery, and then, when the actual Discovery and investigation fall short of the expert's ideal, the expert must offer an opinion about whether the imperfections have significantly compromised his or her opinions.

The expert can be impeached on account of bias. In my case, opposing counsel are prone to hammer me on two issues at deposition and during cross-examination at trial: either I am accused of holding marginal or even radical ideas which make me an advocate for the prisoners and therefore not a neutral expert; or my proposed remedies are painted as outlying and idealistic. I publish

extensively, and I do have to consider, even while writing something entirely unconnected with my role as a psychiatric expert, whether what I am committing to the page will be read to me at deposition or trial as evidence that I am not neutral. But certainly expert witnesses, like everybody else, have opinions on the issues of the day. I vote for candidates of a certain party, and I advocate for the rights of various disadvantaged populations. Why should my advocacy for the rights of the disadvantaged be viewed as more of a bias than another psychiatrist's disinterest in the plight of those sub-populations? About the accusation that I am an advocate for prisoners, I believe it would be more accurate to say that I advocate for adequate mental health care and constitutional conditions of confinement in our prisons. I hope that all clinicians who are involved in the criminal justice system would share my advocacy in that regard. And if a court permits opposing counsel to ask me what my view is on the death penalty, the attorney who has retained me is very likely to object that the opinion I offer in the instant case has nothing to with my general views on the death penalty. There is another important consideration. Clinicians are trained to put aside their views on a whole list of matters as they examine objectively the clinical situation at hand. It does not matter to me whether my patient voted Democratic or Republican when I am examining him for depression. I am neutral as a clinician, not because I hold no views, but rather because I am trained to put my views aside as I approach the clinical situation with a balanced and objective gaze.   In any case, I have made a decision not to be silenced out of fear I will be impeached for my public pronouncements, and the fact is I have never been impeached as an expert witness.

## Recommendations and Possible Remedies

I usually include recommended remedies in my reports. Depending on the referral questions, the remedies should be specific and comprehensive. If I am

asked about the psychiatric effects of specific prison conditions (crowding, isolated confinement, harsh punishments, etc.), I discuss in the remedies section of my report the kind of injunctive relief that would ameliorate the harsh conditions and the kinds of programs and treatment that could ameliorate some of the harm done to specific prisoners.  Thus, in litigation involving the isolated confinement of prisoners with serious mental illness in supermaximum security units, I recommend excluding prisoners with serious mental illness from isolated confinement, and at the same time the establishment of mental health housing and programming that would provide the prisoners with a modicum of safety and needed treatment.[5]  In litigation about custodial sexual misconduct in women's prisons, I recommend policy changes that would serve to protect the women and enact "zero tolerance," as well as housing and treatment recommendations for women who have been harmed.[6]

It is one thing to appear as an expert witness in court, and quite another to participate in settlement negotiations or consult about possible remedies to alleged problems in a correctional system.  Increasingly, as case law proliferates and attorneys have a better idea what will result from civil litigation, the parties are amenable to what I call a "pre-emptive settlement."  In other words, a complaint is filed, a trial is possible, but the parties agree that the best way to address the constitutional issues raised is to negotiate a settlement agreement

---

[5] See Jones 'El v. Berge, 164 F. Supp. 2d 1096 (W.D. Wis. 2001)., and Russell v. Johnson Civil No. 1:02CV261-D-D; consolidated with Gates v. Cook No. Civil No. 4:71CV6-JAD (N.D. Mississipi, 2003).

[6] The National Prison Rape Elimination Commission has produced useful standards: PRISON RAPE ELIMINATION COMM'N, STANDARDS FOR THE PREVENTION, DETECTION, RESPONSE, AND MONITORING OF SEXUAL ABUSE IN ADULT PRISONS AND JAILS 9 (2009), available at http://www.cybercemetery.unt.edu/archive/nprec/

even before Discovery is completed and the court mandates settlement hearings. If a case goes to trial, the two sides quickly become adversarial, and sometimes the defendants drag their feet implementing ordered remedies - perhaps the state feels the court was overstepping its authority telling them how to run their corrections system, perhaps they are waiting to make the ordered changes until they know the result of their final appeal. But if the parties agree to try and settle the case without proceeding to trial, then the expert for plaintiff becomes more a consultant than an adversary, and has an opportunity to meet with and work with key officials and practitioners in the department of corrections. When I serve as plaintiff's expert in this type of negotiation, I present to the Medical Director or Chief Psychiatrist my rationale for requiring certain remedies to glaring problems, and if we can establish sufficient collegial rapport, the Medical Director and Chief Psychiatrist are more likely to "buy into" the proposed remedy, and it is more likely to be implemented in good faith.[7] This in contrast to the court-ordered remedy, where I am viewed as an intruder and my recommended remedies are viewed more as unwelcome criticisms.

An expert's report is always provisional, and I say so at the end of my reports. New information might become available through discovery or on account of subsequent events. In addition, expert opinions can change. The expert is going to respond at trial to questions on direct examination and cross-examination, and therefore does not quite know in advance what questions will be asked by counsel for the parties. Thus the requirement that an expert disclose in a report the opinions likely to be rendered is a qualified requirement

---

[7] For an example of this kind of collaboration, see T. Kupers, T. Dronet et al, Beyond Supermax Administrative Segregation: Mississippi's Experience Rethinking Prison Classification and Creating Alternative Mental Health Programs," Criminal Justice and Behavior, 36, 1037-1050, October, 2009.

at best.  And the best the expert can and should do is to make a good faith effort to disclose all opinions known at the time of writing the report, and be prepared to offer counsel for the opposing party advance notice when opinions expressed in the report are likely to change.[8]

---

[8] An example of a report by Terry Kupers, M.D., in Rutherford et al v. Baca et al, is found at http://www.aclu.org/prisoners-rights/report-mental-health-issues-los-angeles-county-jail.

# Exhibit C

**Dr. Terry A. Kupers – Documents, Photos & Videos Reviewed**

1. Documents reviewed in connection with 2014 report (see Exhibit I for a complete list)
2. Electronic medical records for 23 prisoners interviewed during 2016 EMCF tour
3. Photographs taken during 2016 tour
4. AG00003450
5. AG00005396
6. AG00005529
7. AG00005550
8. CENT-DOCKERY-ELEC-007328
9. CENT-DOCKERY-ELEC-007328
10. CENT-DOCKERY-ELEC-007358
11. CENT-DOCKERY-ELEC-007358
12. CENT-DOCKERY-ELEC-014955
13. DEF_ESI_0000006
14. DEF_ESI_0000007
15. DEF_ESI_0000008
16. DEF_ESI_0000009
17. DEF_ESI_0000010
18. DEF_ESI_0000017
19. DEF_ESI_0000020
20. DEF_ESI_0000025
21. DEF_ESI_0000106
22. DEF_ESI_0000147
23. DEF_ESI_0000148
24. DEF_ESI_0000192
25. DEF_ESI_0000193
26. DEF_ESI_0000235
27. DEF_ESI_0000236
28. DEF_ESI_0000421
29. DEF_ESI_0000424
30. DEF_ESI_0000426
31. DEF_ESI_0000450
32. DEF_ESI_0000451
33. DEF_ESI_0000454
34. DEF_ESI_0000537
35. DEF_ESI_0000553
36. DEF_ESI_0000554
37. DEF_ESI_0000555
38. DEF_ESI_0000625
39. DEF_ESI_0000636
40. DEF_ESI_0000637
41. DEF_ESI_0000694
42. DEF_ESI_0000715
43. DEF_ESI_0000718
44. DEF_ESI_0000719
45. DEF_ESI_0000720
46. DEF_ESI_0000721
47. DEF_ESI_0000734
48. DEF_ESI_0000735

49. DEF_ESI_0000811
50. DEF_ESI_0000817
51. DEF_ESI_0000823
52. DEF_ESI_0000844
53. DEF_ESI_0000847
54. DEF_ESI_0001702
55. DEF_ESI_0004250
56. DEF_ESI_0004250
57. DEF_ESI_0004254
58. DEF_ESI_0004254
59. DEF_ESI_0004286
60. DEF_ESI_0004286
61. DEF_ESI_0005995
62. DEF_ESI_0005995
63. DEF_ESI_0005996
64. DEF_ESI_0005996
65. DEF_ESI_0006022
66. DEF_ESI_0006022
67. DEF_ESI_0006122
68. DEF_ESI_0006122
69. DEF_ESI_0006514
70. DEF_ESI_0006514
71. DEF_ESI_0006547
72. DEF_ESI_0006547
73. DEF_ESI_0007845
74. DEF_ESI_0007845
75. DEF_ESI_0007846
76. DEF_ESI_0007846
77. DEF_ESI_0007847
78. DEF_ESI_0007847
79. DEF_ESI_0007848
80. DEF_ESI_0007848
81. DEF_ESI_0008500
82. DEF_ESI_0008500
83. DEF_ESI_0008921
84. DEF_ESI_0008921
85. DEF_ESI_0009811
86. DEF_ESI_0009912
87. DEF_ESI_0009960
88. DEF_ESI_0010137
89. DEF_ESI_0010673
90. DEF_ESI_0010695
91. DEF_ESI_0010704
92. DEF_ESI_0010714
93. DEF_ESI_0010723
94. DEF_ESI_0010725
95. DEF_ESI_0010729
96. DEF_ESI_0010933
97. DEF_ESI_0012770
98. DEF_ESI_0012871

99. DEF_ESI_0013408
100.    DEF_ESI_0013549
101.    DEF_ESI_0013823
102.    DEF_ESI_0014483
103.    DEF-026215
104.    DEF-026215
105.    DEF-026649
106.    DEF-026649
107.    DEF-026976
108.    DEF-026976
109.    DEF-027262
110.    DEF-027262
111.    DEF-029483
112.    DEF-029483
113.    DEF-030206
114.    DEF-030574
115.    DEF-030574
116.    DEF-030586
117.    DEF-030586
118.    DEF-031554
119.    DEF-031554
120.    DEF-031817
121.    DEF-031817
122.    DEF-031845
123.    DEF-031877
124.    DEF-031877
125.    DEF-031931
126.    DEF-032043
127.    DEF-032140
128.    DEF-032140
129.    MDOC-CON-00001438
130.    MDOC-CON-00001454
131.    MDOC-CON-00001467
132.    MDOC-CON-00001626
133.    MDOC-CON-00001674
134.    MDOC-CON-00002130
135.    MDOC-CON-00002133
136.    MDOC-CON-00004695
137.    MTC_ESI-0001017
138.    MTC_ESI-0001083
139.    MTC_ESI-0001241
140.    MTC_ESI-0002151
141.    MTC_ESI-0002152
142.    MTC_ESI-0004161
143.    MTC_ESI-0004163
144.    MTC_ESI-0004210
145.    MTC_ESI-0008320
146.    MTC-CON-00000663
147.    MTC-CON-00000673
148.    MTC-CON-00000679

| | |
|---|---|
| 149. | MTC-CON-00001182 |
| 150. | MTC-CON-00002934 |
| 151. | MTC-CON-00002946 |
| 152. | MTC-CON-00003097 |
| 153. | MTC-CON-00003179 |
| 154. | MTC-CON-00003222 |
| 155. | MTC-CON-00003522 |
| 156. | MTC-CON-00003669 |
| 157. | MTC-CON-00003723 |
| 158. | MTC-CON-00003855 |
| 159. | MTC-CON-00003937 |
| 160. | MTC-CON-00003943 |
| 161. | MTC-CON-00003951 |
| 162. | MTC-CON-00003998 |
| 163. | MTC-CON-00004035 |
| 164. | MTC-CON-00004050 |
| 165. | MTC-CON-00004288 |
| 166. | MTC-CON-00004342 |
| 167. | MTC-CON-00004609 |
| 168. | MTC-CON-00004615 |
| 169. | MTC-CON-00004622 |
| 170. | MTC-CON-00004630 |
| 171. | MTC-CON-00004644 |
| 172. | MTC-CON-00004851 |
| 173. | MTC-CON-00004967 |
| 174. | MTC-CON-00005049 |
| 175. | MTC-CON-00005224 |
| 176. | MTC-CON-00005757 |
| 177. | MTC-CON-00005778 |
| 178. | MTC-CON-00005858 |
| 179. | MTC-CON-00005905 |
| 180. | MTC-CON-00006056 |
| 181. | MTC-CON-00006331 |
| 182. | MTC-CON-00006396 |
| 183. | MTC-CON-00006403 |
| 184. | MTC-CON-00006409 |
| 185. | MTC-CON-00006490 |
| 186. | MTC-CON-00006511 |
| 187. | MTC-CON-00006966 |
| 188. | MTC-CON-00007282 |
| 189. | MTC-CON-00007542 |
| 190. | MTC-CON-00020661 |
| 191. | MTC-CON-00020766 |
| 192. | MTC-CON-00021365 |
| 193. | MTC-CON-00021977 |
| 194. | MTC-CON-00022055 |
| 195. | MTC-CON-00022454 |
| 196. | MTC-CON-00023363 |
| 197. | MTC-CON-00023591 |
| 198. | MTC-CON-00026258 |

| | |
|---|---|
| 199. | MTC-CON-00026402 |
| 200. | MTC-CON-00026489 |
| 201. | MTC-CON-00027129 |
| 202. | MTC-CON-00027244 |
| 203. | MTC-CON-00027572 |
| 204. | MTC-CON-00027609 |
| 205. | MTC-CON-00027649 |
| 206. | MTC-CON-00027811 |
| 207. | MTC-CON-00028124 |
| 208. | MTC-CON-00028301 |
| 209. | MTC-CON-00028422 |
| 210. | MTC-CON-00028597 |
| 211. | MTC-CON-00028757 |
| 212. | MTC-CON-00028822 |
| 213. | MTC-CON-00029175 |
| 214. | MTC-CON-00029402 |
| 215. | MTC-CON-00032708 |
| 216. | MTC-CON-00033218 |
| 217. | MTC-CON-00034079 |
| 218. | MTC-CON-00035305 |
| 219. | MTC-CON-00036592 |
| 220. | MTC-CON-00036941 |
| 221. | MTC-CON-00050007 |
| 222. | MTC-CON-00051267 |
| 223. | MTC-CON-00051806 |
| 224. | MTC-CON-00052795 |
| 225. | MTC-CON-00052904 |
| 226. | MTC-CON-00053000 |
| 227. | MTC-CON-00053058 |
| 228. | MTC-CON-00054733 |
| 229. | MTC-CON-00056877 |
| 230. | MTC-CON-00070258 |
| 231. | MTC-CON-00070302 |
| 232. | MTC-CON-00070575 |
| 233. | MTC-CON-00071085 |
| 234. | MTC-CON-00071610 |
| 235. | MTC-CON-00072015 |
| 236. | MTC-CON-00072402 |
| 237. | MTC-CON-00072990 |
| 238. | MTC-CON-00072999 |
| 239. | MTC-CON-00073015 |
| 240. | MTC-CON-00073125 |
| 241. | MTC-CON-00073273 |
| 242. | MTC-CON-00074662 |
| 243. | MTC-CON-00074744 |
| 244. | MTC-CON-00075599 |
| 245. | MTC-CON-00076315 |
| 246. | MTC-CON-00077080 |
| 247. | MTC-CON-00077415 |

# Exhibit D

**Prisoner Name Key**

**Prisoners interviewed by Dr. Kupers in April 2014**



**Prisoners Interviewed briefly by Dr. Kupers during April 2014**



**Prisoners Interviewed by Dr. Kupers in 2016**

Supplemented on March 17, 2017

# Exhibit E

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# OAKLAND DIVISION

TODD ASHKER, et al.,

        Plaintiffs,

  v.

GOVERNOR OF THE STATE OF
CALIFORNIA, et. al.,

        Defendants.

Case No.: 4:09-cv-05796-CW

CLASS ACTION

Judge: Honorable Claudia Wilken

**<u>EXPERT REPORT OF TERRY A. KUPERS, M.D., M.S.P.</u>**

I.    Assignment ............................................................................................... 2

II.   Executive Summary ................................................................................... 2

III.  Qualifications ............................................................................................ 5

IV.   Litigation Experience ................................................................................ 6

V.    Compensation .......................................................................................... 8

VI.   Preparation ............................................................................................... 8

VII.  Research and Literature ........................................................................... 9

VIII. Findings .................................................................................................. 16

      A. The Facility ......................................................................................... 16

      B. Prisoners Who Were in SHU at the Time of My Interviews. ......................... 22

          1.  These prisoners suffered symptoms consistent with those identified in
              the literature ................................................................................ 22

          2.  Description: Prisoners' reports of symptoms identified in the literature .... 26

          3.  More than a decade in SHU results in additional symptoms that go
              beyond those identified in the literature. .................................... 34

          4.  Description: Prisoners' reports of additional symptoms of self-isolation,
              emotional numbing and enlarged despair. ................................... 38

      C. Prisoners Who Were Released from PB SHU .................................... 42

          1.  These interviews reveal a SHU Post-Release Syndrome. ....................... 42

          2.  Description: Reports of former PB SHU prisoners released to other
              prison settings ............................................................................. 46

          3.  Description: Reports of former PB SHU prisoners now in the
              community. ................................................................................... 53

IX.   Opinions ................................................................................................. 62

      A. Harm Caused by SHU Confinement ............................................... 62

      B. Additional Harm Caused by a Decade or More of SHU Confinement .......... 62

      C. Harm That Surfaces After Release from SHU ................................ 63

      D. The Link Between Reported Symptoms and SHU Confinement ................ 64

      E. Representativeness of the Prisoners ............................................... 65

      F. Perceived Fairness ......................................................................... 69

X.    Conclusion ............................................................................................. 71

1

## I.     Assignment

I am a board-certified psychiatrist.  The plaintiffs have retained me to interview named plaintiffs and other prisoners, and to investigate the psychological effects of spending a decade or more in the Security Housing Unit at Pelican Bay State Prison for the purpose of testifying at trial.

## II.     Executive Summary

*Madrid v. Gomez*, 889 F. Supp. 1146 (N.D. Cal. 1995), established, among other things, that keeping prisoners with serious mental illness in the harsh isolative conditions at the Pelican Bay State Prison Security Housing Unit (PB SHU or SHU) would be cruel and unusual punishment.  In that case, a number of experts, I among them, examined prisoners who had been in the Pelican Bay SHU for two or three years. Since the facility had opened in 1989, and the investigations for the *Madrid* litigation occurred in the early 1990s, the experts did not at that time investigate the effects of more prolonged confinement at the SHU.

In this case, I have been asked to help determine the harm, if any, that results from keeping prisoners in isolative confinement at PB SHU for over ten years. To determine this, I interviewed 24 prisoners or ex-prisoners who spent ten or more years at the Pelican Bay SHU. These prisoners fall into three subgroups:

- Prisoners who were still at the PB SHU when I conducted interviews in 2013 and 2014;
- Prisoners who were at the PB SHU for ten years or more but in recent years have been transferred out, mostly back to general population on Step 5 of the "Step Down Program," the modified housing units that permit prisoners to take part in incrementally more productive and congregate activities as they spend more time in the program and demonstrate appropriate behavior;[1]
- Former PB SHU prisoners who have been released to the community.

I interviewed 11 prisoners from the first subgroup, ten of whom are named plaintiffs in the current matter.  These prisoners suffered from very many of the

---

[1] See Regulations concerning Security Threat Groups, effective October 17, 2014, and Title 15, section 3378, regarding the step down program.

EXPERT REPORT OF TERRY A. KUPERS                                    C.A. NO. 4:09-cv-05796-CW

symptoms that are well known in the literature to be caused by isolative confinement. They reported to me a significant number of symptoms that they suffered, including anxiety reaching the level of panic; distorted thinking reaching the level of paranoia; memory and concentration problems; sadness; despair; a growing number of suicidal thoughts; compulsive actions; agitation; mounting anger; the fear that the anger will get out of control and get them into even more trouble; mood swings; and severe problems sleeping. In other words, the prisoners I interviewed while they remained in the SHU consistently reported symptoms that match those reported by prisoners in isolation in a great many settings and are documented in the literature on the psychological effects of isolative confinement.

However, they also suffered additional symptoms that go beyond those symptoms that appear in prisoners who have been in isolation only months or a few years. The prisoners I interviewed, who have remained in isolation for many more years than the average prisoner involved in earlier studies, have developed further symptoms and disabilities. I found that these varied symptoms fit into three general categories: a) symptoms related to a greatly increased urge to isolate; b) a subjective sense of "numbing," closing off all emotions that they report began as an attempt to keep a growing sense of anger at bay; and c) enlarged despair.

Inevitably, a certain number of prisoners are eventually released from their isolative confinement. All of the men I spoke to who had spent ten or more years in the Pelican Bay SHU and were then released, either to another prison setting or to the community, reported that they too experienced the list of symptoms widely reported in the literature about isolative confinement. They too had experienced a growing urge to isolate themselves, mounting despair and a numbing of all feelings during their years in the SHU. They also reported that many of the most serious problems they experience surface only after getting out of the SHU. Among the group of ex-residents of the SHU, there are universally-reported immediate experiences: a sense of being overwhelmed by sensory stimulation, massive anxiety when in crowded places, hyperawareness of every noise or change in lighting, a tendency to seek isolation in contained spaces, and difficulty expressing oneself in close relationships. That immediate reaction subsides somewhat after a period of six months or a year, but then there are residual symptoms.

EXPERT REPORT OF TERRY A. KUPERS                    C.A. NO. 4:09-cv-05796-CW

Almost all of the men I interviewed reported that they continue to avoid crowds, remain suspicious of anyone entering their vicinity, have strong startle reactions, continue to have sleep problems, and have a lot of trouble expressing themselves and their feelings, even to intimates such as a wife or girlfriend.  In fact, I was able to delineate a syndrome that captures the experience of the men who had been released from the PB SHU after ten years, characterized by the following symptoms:

- Disorientation immediately following release.

- Anxiety in unfamiliar places and with unfamiliar people, and the daily life events that had been ordinary prior to SHU confinement become unfamiliar events following release from SHU.

- A tendency to retreat into a circumscribed, small space, often a bedroom or cell.

- A tendency to greatly limit the number of people one interacts with, usually limited to close family members and a few friends.

- Hyperawareness of surroundings, for example a need to sit facing the door to a room or with one's back to a wall.

- Heightened suspicion of everyone who comes close, especially strangers.

- Difficulty expressing feelings.

- Difficulty trusting others, even one's spouse or first degree relative.

- Problems with concentration and memory, beginning in the period of SHU confinement and continuing after release, making it difficult to accomplish tasks and to work.

- A sense of one's personality having changed.  The most often reported form of this change is a change from a relatively outgoing, friendly individual with a sense of humor prior to SHU confinement, to a more serious, guarded, and inward individual following release from the SHU.

- In some, but certainly not all, cases, there is a tendency to resort to alcohol and illicit substances to lessen emotional pain and make feelings of confusion and anxiety more bearable.

I describe this syndrome as a SHU Post-Release Syndrome.

EXPERT REPORT OF TERRY A. KUPERS                    C.A. NO. 4:09-cv-05796-CW

A significant number of these problems are experienced intensely for many months after release from SHU, and then continue indefinitely in somewhat less intense fashion.  This set of symptoms was consistently reported whether the prisoner had been released to the community or simply transferred to a general population or "stepdown" prison setting within the California prison system.  Thus, for example, one former SHU prisoner who had been released to the community reported that he stays in his room a lot of his waking hours, while a prisoner who had been released from SHU to return to general population status in prison reported he stays in his cell most of his waking hours.  Both groups appear to be trying to re-establish the conditions they experienced in the SHU.  It is as if they have become so habituated to life isolated in in a small cell that exposure to any larger, more populated area seems overwhelming and frightening.  Both groups are suspicious of others entering their vicinity, complain of a strong startle reaction, and report great difficulty trusting and sharing feelings with others.

In addition to reporting on the symptoms and damage discovered during my interviews with prisoners who have been in the PB SHU for ten years or more in this report, I describe the facility itself and address the following issues:

- My method for assessing the reliability of prisoners' reports;
- The way to determine whether reported symptoms and problems are in fact linked causally with SHU confinement;
- How representative of the class the prisoners I interviewed are; and
- How the issue of perceived fairness affects prisoners' psychological reactions to SHU confinement.

## III.    Qualifications

I am a board certified psychiatrist, an Institute Professor at the Wright Institute, a Distinguished Life Fellow of the American Psychiatric Association, and an expert on correctional mental health issues. I have testified more than two dozen times in state and federal courts about the psychiatric effects of jail and prison conditions, the quality of correctional management and mental health treatment, and sexual abuse in prison.  I have served as a consultant to the U.S. Department of Justice and Human Rights Watch.  I am author of *Prison Madness: The Mental Health Crisis Behind Bars and*

*What We Must Do About It* (Jossey-Bass/Wiley, 1998), co-editor of *Prison Masculinities* (Temple University Press, 2001), and Contributing Editor of *Correctional Mental Health Report*. I have authored three other books: *Public Therapy: The Practice of Psychotherapy in the Public Mental Health Clinic* (Free Press, 1981); *Ending Therapy: The Meaning of Termination* (NYUP, 1988); and *Revisioning Men's Lives: Gender, Intimacy and Power* (Guilford, 1993). I have authored and co-authored dozens of professional articles and book chapters, including "Beyond Supermax Administrative Segregation: Mississippi's Experience Rethinking Prison Classification and Creating Alternative Mental Health Programs" by T.A. Kupers, T. Dronet, M. Winter, et al., *Criminal Justice and Behavior*, October 2009; and "Isolated Confinement: Effective Method for Behavior Change or Punishment for Punishment's Sake?," *The Routledge Handbook of International Crime and Justice Studies*, Eds. Bruce Arrigo & Heather Bersot, Oxford: Routledge, 2013, pp. 213-232.

I have served as consultant to the departments of mental health in several jails, and to the Ohio Department of Corrections. I was the recipient of the Exemplary Psychiatrist Award presented by the National Alliance on Mental Illness (NAMI) at the 2005 annual meeting of the American Psychiatric Association, and the William Rossiter Award at the 2009 Annual Meeting of the Forensic Mental Health Association of California. My C.V. and a list of forensic cases in which I have served as an expert over the past four years are attached to this report as Exhibit A.

## IV.    Litigation Experience

Litigation in which I have testified at trial on similar matters includes:

- *Rutherford v. Pitchess*, Los Angeles Superior Court, regarding conditions and mental health services in Los Angeles County Jail, 1977;

- *Wilson v. Deukmejian*, Marin County Superior Court, regarding conditions and mental health services at San Quentin Prison, 1983;

- *Toussaint/Wright/Thompson v. Enomoto*, federal district court in San Francisco, regarding conditions and double-celling in California State Prison security housing units, 1983;

- *Gates v. Deukmejian*, federal district court in Sacramento, regarding conditions,

EXPERT REPORT OF TERRY A. KUPERS                                    C.A. NO. 4:09-cv-05796-CW

quality of mental health services and segregation of inmates with HIV positivity or AIDS at California Medical Facility at Vacaville, 1989;

- *Coleman v. Wilson*, federal district court in Sacramento, regarding the quality of mental health services in the California Department of Corrections' statewide prison system, 1993;

- *Bazetta v. McGinnis*, federal district court in Detroit, regarding visiting policy and restriction of visits for substance abuse infractions, 2000;

- *Jones 'El v. Litscher*, federal district court in Madison, Wisconsin, regarding confinement of prisoners suffering from severe mental  illness in supermax isolation, 2002;

- *Russell v. Johnson* and *Presley v. Epps*, federal district court in Oxford, Mississippi, regarding conditions of confinement and treatment of prisoners with mental illness on Death Row inside supermaximum Unit 32 and regarding all prisoners in isolated confinement at Parchman, 2003 and 2006;

- *Austin v. Wilkinson*, federal district court in Cleveland, Ohio, regarding proposed transfer of Death Row into Ohio State Penitentiary (supermax), August, 2005;

- *DAI, Inc. v. NY OMH*, federal district court for the Southern District of New York, April 3, 2006, regarding mental health care in the New York Department of Correctional Services, with special attention to supermax confinement and its effects on vulnerable prisoners;

- *Presley v. Epps*, federal district court in the Northern District of Mississippi, Aberdeen, No. 4:05CV148-JAD, April 4, 2007, regarding conditions and Mental Health Care on Unit 32, Parchman, Mississippi.

- *Hadix v. Caruso*, federal district court in the Western District of Michigan, Grand Rapids, Michigan, regarding correctional mental health care, April 29, 2008.

I also serve as Monitor for the consent decree in *Presley v. Epps*, a federal class action regarding conditions in Supermax Unit 32 at the Mississippi State Penitentiary at Parchman. This case addresses the treatment of prisoners with serious mental illness who are housed in isolated confinement.

EXPERT REPORT OF TERRY A. KUPERS                                    C.A. NO. 4:09-cv-05796-CW

## V.    Compensation

I have been retained by counsel for Plaintiffs, and my rate of compensation is $175 per hour for all work except deposition and trial testimony; for deposition and trial testimony, my rate is $200 per hour.

## VI.    Preparation

In preparation for this report, I conducted the following interviews:

- Prisoners #1-11 for approximately 45 minutes each, during non-contact visits in the Security Housing Unit (SHU) visiting area at Pelican Bay State Prison (PBSP), on April 17 and 18, 2012.  I conducted a second interview with 10 of those 11 prisoners on April 16 and 17, 2013.  I also reviewed medical and custody charts when available in the Medical Facility.  I interviewed Prisoner #7 a third time in general population at CSP-Sacramento on September 28, 2014, for just under two hours, after he had been placed on Step Five of the Step Down Program, and I interviewed Prisoner #9 a third time at SATF on January 14, 2015, where he had been transferred to Step Five of the Step Down Program (general population).

- Prisoner #12 at CSP-Sacramento on March 1, 2013 for approximately two hours.

- Prisoner #13 on the telephone on March 7, 2014 for approximately an hour.

- Prisoner #14 in person ███████████████, on January 20, 2014, for approximately 2½ hours.

- Prisoner #15 ██████████████ on July 23, 2014 for approximately 2½ hours.

- Prisoner #16 on the telephone, ████████████████ on December 24, 2014, for an hour.

- Prisoner #17 and his girlfriend on the telephone, ███████████████ on December 30, 2014, for approximately an hour (combined).

- Prisoners #9 and #s 18-24 at SATF/ Corcoran State Prison on January 14, 2015, for approximately 45 minutes each.[2]

Thus, I have interviewed 23 people who have been in the SHU at PBSP for at least ten years, and one (Prisoner #16) who was at PB SHU for slightly less than ten years. I had the opportunity to interview two of them, Prisoner #7 and Prisoner #9, twice while they were in the SHU and a third time after they had been transferred to maximum security general population facilities.

On April 11, 2014, I participated in a tour of the PBSP facility, including the SHU, the main yard, the Psychiatric Services Unit (PSU), and the SHU Infirmary.

Document review includes clinical and custody files of the eleven prisoners I interviewed who were in SHU at the time I first interviewed them, and one (Prisoner #12) being housed in Administrative Segregation at CSP-Sacramento for medical treatment, plus policies regarding the operation of the PB SHU.[3]

## VII.    Research and Literature

There is a rich literature of robust research on the effects of long-term solitary confinement or isolative confinement in prison.[4][5] Long-term confinement (greater than three months) in an isolated confinement unit such as the supermaximum Security

---

[2] Of the eight prisoners at SATF, the names of seven were obtained from a list counsel received from CDCR in Feb. 2014; the eighth is a named plaintiff (Prisoner #9) who had been transferred to SATF. All have spent at least 10 continuous years at Pelican Bay SHU. In February 2014, defendants sent Plaintiffs' counsel a list of approximately 100 Pelican Bay SHU prisoners who have been placed on Step 5 of the Step Down Program. Of those, 15 had been transferred to SATF. In December 2014, Plaintiffs' counsel wrote to 14 of those prisoners (one was no longer in CDCR custody) about their willingness to be interviewed by me. Seven of those prisoners spent 10 continuous years in SHU and were English-speaking. I interviewed all those prisoners for this report.

[3] Including Regulations concerning Security Threat Groups adopted and effective October 17, 2014, amd Section 3378 of Title 15.

[4] For an overview of supermaximum security and isolated confinement, see LORNA RHODES, TOTAL CONFINEMENT: MADNESS AND REASON IN THE MAXIMUM SECURITY PRISON, (University of California Press, 2004); and SHARON SHALEV, SUPERMAX: CONTROLLING RISK THROUGH SOLITARY CONFINEMENT, (Willan Publishing, 2009).

[5] I employ the terms "solitary confinement" and "isolated confinement" interchangeably. Some correctional officials object to the use of the term solitary confinement because, they claim, individuals in their isolative confinement units have some contact with the officers who pass them their food trays, search them and escort them to appointments. I am not convinced this constitutes adequate human contact, so I continue to employ the two terms synonymously.

9

Housing Unit at Pelican Bay State Prison is well known to cause severe psychiatric morbidity, disability, suffering and mortality.[6]  It has been known for as long as solitary confinement has been practiced that human beings suffer a great deal of pain and mental deterioration when they remain in solitary confinement for a significant length of time.  Thus, in 1890, the U.S. Supreme Court found that in isolation units, "[a] considerable number of prisoners fell, after even a short confinement, into a semi-fatuous condition, from which it was next to impossible to arouse them, and others became violently insane; others still, committed suicide; while those who stood the ordeal better were not generally reformed, and in most cases did not recover sufficient mental activity to be of any subsequent service to the community."[7]

A significant amount of research echoes the Court's findings.  Prof. Hans Toch, a social psychologist and emeritus professor in the School of Criminal Justice at State University of New York at Albany, provided early narrative reports from prisoners at the highest levels of security and Isolation.[8]  Prof. Craig Haney, a social psychologist and Professor of Psychology at the University of California at Santa Cruz, has researched the detrimental effects of long-term isolation.[9]  More than four out of five of the prisoners he evaluated suffered from feelings of anxiety and nervousness, headaches, troubled sleep, and lethargy or chronic tiredness, and over half complained of nightmares, heart palpitations, and fear of impending nervous breakdowns. Equally high numbers reported obsessive ruminations, confused thought processes, an oversensitivity to stimuli, irrational anger, and social withdrawal. Well over half reported violent fantasies, emotional flatness, mood swings, chronic depression, and feelings of overall

---

[6] For reviews of this research, see Peter Scharff Smith, *The Effects of Solitary Confinement on Prison Inmates: A Brief History and Review of the Literature*, CRIME & JUST., 34 441, 488–90 (2006); and Bruce Arrigo & Jennifer Leslie Bullock, *The Psychological Effects of Solitary Confinement on Prisoners in Supermax Units: Reviewing What We Know and Recommending What We Should Change*, INT'L J. OFFENDER THER. COMP. CRIMINOLOGY 52:, 622-640 (2008).
[7] In re Medley, 134 U.S. 160 (1890).
[8] HANS TOCH, MOSAIC OF DESPAIR: HUMAN BREAKDOWN IN PRISON, (American Psychological Association 1975, 1992)
[9] Craig Haney, *Mental Health Issues in Long-Term Solitary and "Supermax" Confinement,* CRIME & DELINQUENCY, 49(2), 124-156 (2003)..

10

deterioration, while nearly half suffered from hallucinations and perceptual distortions, and a quarter experienced suicidal ideation.[10]

Dr. Stuart Grassian, a psychiatrist and researcher, has conducted similar research.[11] He describes a particular psychiatric syndrome resulting from the deprivation of social, perceptual, and occupational stimulation in solitary confinement. This syndrome has basically the features of a delirium. Among the more vulnerable population, it can result in an acute agitated psychosis, and random violence – often directed towards the self, and at times resulting in suicide. He has also demonstrated in numerous cases that the prisoners who end up in solitary confinement are generally not "the worst of the worst"; they include, instead, the sickest, most emotionally labile, impulse-ridden and psychiatrically vulnerable among the prison population. Two-thirds of the prisoners Dr. Grassian initially studied had become hypersensitive to external stimuli (noises, smells, etc.) and about the same number experienced "massive free floating anxiety." About half of the prisoners suffered from perceptual disturbances that for some included hallucinations and perceptual illusions, and another half complained of cognitive difficulties such as confusional states, difficulty concentrating, and memory lapses. About a third also described thought disturbances such as paranoia, aggressive fantasies, and impulse control problems. Three out of the fifteen had cut themselves in suicide attempts while in isolation. In almost all instances the prisoners had not experienced any of these psychiatric reactions prior to their time in isolation. For all prisoners, long-term solitary confinement has the effect, on average, of making post-release adjustment very problematic and worsening recidivism rates.[12]

An alarmingly large proportion of prisoners consigned to supermaximum security isolation in recent decades suffer from serious mental illness. Drs. Sheilagh Hudgins and Gilles Cote, psychologists at the Centre de Recherche Philippe Pinel at Universite de Montreal, performed a research evaluation of penitentiary inmates in a Supermaximum Security Housing Unit and discovered that 29% suffered from severe

---

[10] Ibid.

[11] Stuart Grassian & Nancy Friedman, *Effects of Sensory Deprivation in Psychiatric Seclusion and Solitary Confinement*, INT'L J. OF LAW & PSYCHIATRY, 8(1), 49-65 (1986).

[12] David Lovell, L. Clark Johnson, & Kevin Cain, *Recidivism of Supermax Prisoners in Washington*, CRIME & DELINQ., 52,4, 633-56 (2007).

EXPERT REPORT OF TERRY A. KUPERS                                    C.A. NO. 4:09-cv-05796-CW

mental disorders, notably schizophrenia.[13]  Prof. David Lovell, Professor of Nursing at the University of Washington, has described typical disturbed behavior.[14]  I have reported my own findings from litigation-related investigations.[15]  It is stunningly clear that for prisoners prone to serious mental illness, time served in isolation and idleness exacerbate their mental illness and too often result in suicide.  This is the main reason that federal courts have ruled that prisoners with serious mental illness must not be subjected to long-term isolation.[16]

The ACLU of Texas recently released a report of its research on solitary confinement.  Researchers surveyed 147 prisoners and ex-prisoners who had spent significant time in solitary confinement, and summarized their findings:

> Solitary confinement can cause people's mental health to seriously deteriorate, creating or exacerbating psychiatric symptoms that persist long after their release and impede their ability to reintegrate to society. The medical consensus is that most human beings cannot withstand the prolonged isolation and sensory deprivation that solitary confinement entails, and our survey of people incarcerated in Texas prisons produced predictable results. Ninety-five percent of respondents to our survey had developed some sort of psychiatric symptom as a result of solitary confinement; thirty percent reported having oral or physical outbursts, fifty percent reported suffering from anxiety or panic attacks, and fifteen percent reported hallucinations. Solitary confinement's impact on the human brain is as brutal as a traumatic physical injury; prisoners of war who spent six months in solitary confinement had abnormal brain-wave patterns months after their release.[17]

Prisoners who are released straight out of solitary confinement to the community at the end of their prison sentence (referred to as "maxing out of the SHU") experience significant problems in adjusting to community life. The recidivism and parole violation rates for the group who "max out of the SHU," as well as for those who spent

---

[13] Sheilagh Hodgins & Gilles Cote, *The Mental Health of Penitentiary Inmates in Isolation*, CANADIAN J. OF CRIMINOLOGY, 177-182 (1991).

[14] David Lovell, *Patterns of Disturbed Behavior in a Supermax Population*, CRIM. JUST. & BEHAVIOR, 35,8, 985-1004 (2008).

[15] TERRY KUPERS, PRISON MADNESS: THE MENTAL HEALTH CRISIS BEHIND BARS AND WHAT WE MUST DO ABOUT IT, (Jossey-Bass/Wiley 1999)

[16] *Madrid v. Gomez* , 889 F. Supp. 1146 (N.D. Cal. 1995); *Jones 'El v. Berge*, 164 F. Supp. 2d 1096 (W.D. Wis. 2001); *Presley v. Epps*, 4:05-cv-148 (JAD) (N.D. Miss. 2005 & 2007)

[17] ACLU OF TEXAS, A SOLITARY FAILURE: THE WASTE, COST AND HARM OF SOLITARY CONFINEMENT IN TEXAS (2015).

EXPERT REPORT OF TERRY A. KUPERS                                C.A. NO. 4:09-cv-05796-CW

considerable time in isolation, is extremely dire.[18]  Whether or not prisoners are permitted to "max out of the SHU" (the alternative in several states is to require six months of re-socialization in a general population unit prior to prisoners reaching their release date), the period of isolation and idleness has very negative effects on their chances of successfully reentering society after being released.

The Arizona Chapter of the American Friends Service Committee (AFSC) studied the post-release course of 41 men and 3 women prisoners who had spent long periods in isolative confinement.  Discussing their post-release experience, the AFSC Report states:

> In describing his life on the outside, one participant who avoided old neighborhoods and contacts said that 'life is way harder out here for me than it is in there.'  He is not alone in this nostalgia for prison life and for the isolation of the supermax cell. A female participant, also homeless and barely getting by at the time of the interview, said almost ashamedly, 'The worst thing that I can honestly say about trying to get back into society is I miss my cage more and more everyday. I just can't function out here.' When asked, 'Do you want to [sic] the small cage or the big cage?' she replied, 'The smaller the better. I can control everything in it.' They make repeated efforts to avoid people, for example moving to the edge of the city or living alone in a tunnel. It is strikingly reminiscent of the social withdrawal that Craig Haney describes[19] as endemic to persons held in isolation for long periods, except now they are outside the supermax cell, in the great wide open of supposed freedom, which terrifies them.[20]

The AFSC Report points out that most of the ex-prisoners their researchers interview tended to play down the negative effects of their years in isolative confinement.  Still, they report significant psychological damage, and even more telling is the fact that the interviewer observed in their behaviors and presentation of self more serious psychological disability than the interviewed ex-prisoners spontaneously

---

[18] David Lovell, L. Clark Johnson, & Kevin Cain, *Recidivism of Supermax Prisoners in Washington*, CRIME & DELINQ., 52,4, 633-56 (2007).
[19] Craig Haney, *Mental Health Issues in Long-Term Solitary and 'Supermax' Confinement*, CRIME & DELINQ., 48(1): 124-156 (2003).
[20] AMERICAN FRIENDS SERVICE COMMITTEE OF ARIZONA, LIFETIME LOCKDOWN: HOW ISOLATION CONDITIONS IMPACT PRISONER REENTRY, 33-34 (2012) Available at http://afsc.org/sites/afsc.civicactions.net/files/documents/AFSC-Lifetime-Lockdown-Report_0.pdf

EXPERT REPORT OF TERRY A. KUPERS                    C.A. NO. 4:09-cv-05796-CW

reported.  In other words, the ex-prisoners tended to downplay the damage they had incurred.

It is predictable that prisoners' mental state deteriorates in isolation.  Human beings require at least some adequate or relatively normal social interactions[21] and productive activities to establish and sustain a sense of identity and to maintain a grasp on reality.  In the absence of adequate social interactions, unrealistic ruminations and beliefs cannot be tested in conversation with others, so they build up inside and are transformed into unfocused and irrational thoughts.  Disorganized behaviors emerge.  Internal impulses linked with anger, fear and other strong emotions grow to overwhelming proportions.  Sensory deprivation is not total in supermax units; there is the intermittent slamming of steel doors and there is yelling (one typically has to yell in order to be heard from within one's cell), but this kind of noise does not constitute meaningful human communication.  From my interviews with prisoners and tour of the facility, it is my impression that this is very much true in the SHU at Pelican Bay State Prison.  Prisoners in this kind of segregation do what they can to cope.  Many pace relentlessly or clean their cell repeatedly, as if the non-productive action will relieve the emotional tension.  Those who can read books and write letters do so.

The tendency to suffer psychiatric breakdown and become suicidal is made even worse by sleep deprivation, which is a frequent occurrence among prisoners in isolated confinement.  All prisoners are harmed by chronic sleep problems, and it is very difficult to sleep in the PB SHU.  But when a prisoner suffers from a serious mental illness or is prone to mental illness, the damaging effect is greater.  Loss of sleep intensifies psychiatric symptoms by interfering with the normal diurnal rhythm (the steady alternation of day and night that provides human beings with orientation as to time), and the resulting sleep loss creates fatigue and magnifies cognitive problems, memory deficits, confusion, anxiety, and sluggishness.  It is under these extreme conditions that psychiatric symptoms begin to emerge in previously healthy prisoners.  Toch, Haney, Grassian, Lovell and I, among many others, have described serious symptoms in

---

[21] Of course, prisoners in the SHU can yell from their cell and be heard by other prisoners nearby, they interact with officers delivering their food trays and are accompanied by officers when they go for appointments, and when they go to the yard they pass other prisoners' cells.  But these interactions do not constitute adequate social interactions.

prisoners who are relatively stable from a psychiatric perspective. In their amicus brief in *Wilkinson v. Austin*, leading mental health experts summarize the clinical and research literature about the effects of prolonged isolated confinement and conclude: "No study of the effects of solitary or supermax-like confinement that lasted longer than 60 days failed to find evidence of negative psychological effects" (p. 4).[22] Of course, in less healthy prisoners there is psychosis, mania or compulsive acts of self-abuse or suicide. We know that the social isolation and idleness, as well as the near absolute lack of control over most aspects of daily life, very often lead to serious psychiatric symptoms and breakdown.

It has been known for decades that suicide is approximately twice as prevalent in prison than it is in the community, and recent research confirms that, of all successful suicides that occur in a correctional system, approximately fifty percent involve the 3 to 8 percent of prisoners who are in some form of isolated confinement at any given time.[23] In California, the equivalent statistic is 60%; in other words, 60% of successful suicides occur among the 3% to 6% of the prison population confined in segregation units, including the supermax SHU at PBSP.[24] This is a stunning statistical finding, and constitutes conclusive evidence that long-term consignment to segregation is a major factor in the high suicide rate among prisoners.

A huge volume of very good research on the harm of supermax solitary confinement appears in the reports and testimony of mental health experts investigating supermax facilities in preparation for testimony in class action litigation. When I investigate a correctional system, I interview dozens or even hundreds of prisoners, many in supermax units, and I report in detail to the court the harm done by their long-term solitary confinement or the quality of their mental health treatment. Prof. Haney

---

[22] Amicus Brief to the Supreme Court of the United States. (2005). Brief of professors and practitioners of psychology and psychiatry as amicus curiae in support of respondents. Supreme Court of the United States, No. 04-495.

[23] Daniel P. Mears & Jamie Watson, *Towards a Fair & Balanced Assessment of Supermax Prisons*, JUST. Q., 23,2, 232-270, (2006); Bruce Way, Richard Miraglia, Donald Sawyer, Richard Beer & John Eddy, *Factors Related to Suicide in New York State Prisons,* INT'L J. OF LAW & PSYCHIATRY, 28,3, 207-221 (2005).

[24] Raymond F. Patterson & Kerry Hughes, *Review of Completed Suicides in the California Department of Corrections & Rehabilitation, 1999 to 2004*, PSYCHIATRIC SERVICES, 59, 6, 676-682 (2008)

and Dr. Grassian, among others, do the same.[25] I am very familiar with the testimony provided by mental health and correctional experts in litigation, and I rely in part on that vast literature (the expert reports, testimony and trial transcripts) in arriving at my own opinions and conclusions.

In sum, we know quite a lot from research on prisoners in "long-term" isolated confinement, where "long-term" is typically defined as longer than three months. And there has been a certain amount of research and investigation of very long-term isolated confinement (greater than ten years). I have interviewed and examined dozens of prisoners who had been in isolated confinement for over ten years in numerous states, and prisoners whose solitary confinement has lasted that long are included in the research I have summarized and in the investigations of experts preparing for testimony in litigation.

## VIII.    Findings

### A.  The Facility

On April 11, 2014, I was given a tour of PBSP, in the company of counsel for Plaintiffs and Defendants, and Prof. Craig Haney. I had previously toured the facility while preparing for my testimony in *Coleman v. Brown* in the early 1990s. Here, I present my observations from the 2014 tour. We toured the general population yard, the SHU itself, the Psychiatric Services Unit (PSU), and the medical area.

Pelican Bay State Prison, located near California's coastal border with Oregon, is a Maximum Security correctional facility with a capacity of approximately 3,000 prisoners. Approximately 1,000 or more of them are consigned to the Security Housing Unit (SHU) where most are single-celled and a small minority are double-celled. The SHU is described widely as a "Supermaximum Security Facility."

---

[25] Craig Haney, *Mental Health Issues in Long-Term Solitary & "Supermax" Confinement*, CRIME & DELINQ., 49(2), 124-156. (2003); Stuart Grassian & Nancy Friedman, *Effects of Sensory Deprivation in Psychiatric Seclusion & Solitary Confinement*, INT'L J. OF LAW & PSYCHIATRY, 8(1), 49-65 (1986).

EXPERT REPORT OF TERRY A. KUPERS                                  C.A. NO. 4:09-cv-05796-CW



*A Pod in the PB SHU*[26]

Security is very strict.  Prisoners remain in their cells nearly 24 hours per day. When they leave their pods, they are searched and escorted in handcuffs and/or other restraints.  They are released for up to ninety minutes or less per day to go alone (or with a cell-mate) to their pod's adjacent recreation area, a room-sized space devoid of equipment except for a pull-up bar and a small ball.[27]  The walls are approximately 20 feet high and there is a small space overhead left uncovered (by Lexan) through which the prisoner can see the sky.  Otherwise, the prisoner has no visual connection to the outside world.

---

[26] Photo by CDCR staff during April 11, 2014 tour
[27] It is my understanding that the pull up bar and ball are recent amenities, improvements obtained secondary to prisoner hunger strikes beginning in 2011.

EXPERT REPORT OF TERRY A. KUPERS                    C.A. NO. 4:09-cv-05796-CW



*A Yard at the PB SHU*[28]

The cells are approximately 8' X 10', and have no window.  The front wall of the cell, including the door, is covered by a perforated (honey-comb fashion) metal sheet.

---

[28] Photo by Robert Gumpert available at http://www.taptas.com/pelican-bay-prison/.

EXPERT REPORT OF TERRY A. KUPERS                    C.A. NO. 4:09-cv-05796-CW

The effect is to distort the prisoner's perception as he gazes out of the cell. The only thing he sees most of the time gazing out of the cell is a bare wall on the other side of the walkway, as cells do not face each other.



*Front of a cell with perforated metal sheet, as viewed from inside cell*[29]

Doors are opened and closed by remote control from a control booth at one end of the pod. There are four cells on each of two floors in each pod. Prisoners are cell-fed and are permitted showers where they are locked into a shower stall for a short period. Inside the cells, there is a mattress on a concrete platform, a metal toilet/sink attached to the wall, two concrete blocks for use as a seat or tabletop, and a television if the prisoner is not on restriction and can afford to purchase it. There are no areas designated for congregate activities, and the everyday practice is that prisoners are alone (a small number have cellmates) all the time.

---

[29] Photo from Solitary Watch, available at http://solitarywatch.com/2014/07/07/worst-worst-one-year-later-whats-changed-pelican-bays-hunger-strikers/

EXPERT REPORT OF TERRY A. KUPERS                    C.A. NO. 4:09-cv-05796-CW



*Inside a cell in the SHU at PBSP*[30]

They see mental health staff either at cell-front "rounds" or they are removed from the pod and placed in a "programming cell" or "therapeutic cubicle" to be interviewed by mental health staff. Therapeutic cubicles, called "cages" by the prisoners, are single occupancy booths wherein the prisoner is locked for the duration of a meeting with a counselor, teacher or a hearing officer.

---

[30] Photo by Robert Gumpert available at http://www.taptas.com/pelican-bay-prison/

EXPERT REPORT OF TERRY A. KUPERS                    C.A. NO. 4:09-cv-05796-CW



*A "Programming Cell" or "Therapeutic Cubicle"*

We were shown the "contraband retrieval cells'" or "potty watch."  The men on contraband watch are left in a special room in their shorts.  They are placed in various forms of restraints including waist chains, and they are left there to defecate on a makeshift toilet. The officers check their excrement for contraband.  They remain in the room through three bowel movements.  We were told that during the day the people on watch sit on the floor and at night, a mattress is placed in the room.

There is a Psychiatric Services Unit (PSU) on the prison grounds. It is operated at the Enhanced Outpatient (EOP) level of mental health treatment (an intermediate level between hospital and outpatient).  There are "cages" outside the PSU, with fenced in individual exercise spaces side by side.  Inside the PSU there are treatment rooms where prisoners are locked alone into "programming cells," also called by some "therapeutic cubicles," four or five to a room, and a therapist or teacher can enter the

room, sit in a chair or at a desk, and work with them.  There is also a room with a therapeutic cubicle for one prisoner, presumably for individual meetings with clinicians.

In PBSP's medical facility, there is a nursing station and a number of rooms for examination and housing prisoners suffering from medical illness or psychiatric crises. There are special cells/rooms for the purpose of suicide observation and crisis intervention.  Evidently, prisoners from the SHU can be transferred to this medical unit, for example for suicide observation, and then transferred back to the SHU if they seem stable and are not suffering from serious mental illness.  Presumably, if they are suffering from serious mental illness, they are no longer eligible for SHU housing, and would be transferred to the PSU or another EOP facility.

### B.  Prisoners Who Were in SHU at the Time of My Interviews

#### 1.  These prisoners suffered symptoms consistent with those identified in the literature.

The prisoners who were in the SHU when I interviewed them exhibited all the symptoms and disabilities previously reported widely in the literature. As I will report below, in Section VIII.B.3&4, they evolved additional symptoms of severe isolation and emotional numbing as the years in SHU accumulated.

Early in the course of this litigation, I interviewed eleven prisoners the PB SHU and one in SHU at CSP-Sacramento who had been in the PB SHU for over ten years but then was transferred to CSP-Sacramento for medical treatment.  Some had been at the PB SHU since it opened, and many were already in segregation at another facility for some time prior to their transfer to the PB SHU.  I interviewed ten of them twice, on April 17-18, 2012, and again on April 16-17, 2013.  Subsequently, some of these individuals have been transferred out of the SHU to Step 5 of a "Step Down" program and general population.  While this is an important subsequent development, the interviews I conducted while they were still in the SHU provide a very rich window into the experience of individuals in the SHU and the emotional impact of over ten years of SHU confinement.  Even though some members of the original group are no longer in the SHU, the experiences they recounted to me are representative of the many others who have been in the PB SHU for over ten years and remain there today.

EXPERT REPORT OF TERRY A. KUPERS                    C.A. NO. 4:09-cv-05796-CW

The eleven prisoners I interviewed in the SHU all report a significant number of symptoms long known to result from isolated confinement lasting longer than three months, including irritability, distorted thinking, paranoia, perceptual distortions, mounting anger, fear that they will not be able to control their anger and will get into more trouble, problems concentrating, problems with memory, compulsive and self-destructive behaviors, nightmares, lethargy and chronic tiredness, agitation, wide swings of mood, depression, despair, and emotional numbing.  They report a very significant amount of hyper-alertness with startle responses (e.g. jumping when they hear a door open or a light go on because they are afraid someone will "come in on them").  Most complain of severe chronic insomnia, many of headaches.  They report they often feel infantilized and humiliated by staff. Several cited the implementation of "potty watch" where, in an intrusive search for contraband, prisoners are forced to defecate three times in a makeshift toilet while being watched. Several prisoners cite the existence of this particular form of humiliation even when they have not personally been subjected to it.

These men, at the time of our interviews, were all in SHU because of gang validation.  They reported that the justifications for their validation are very old (i.e. alleged associations that occurred many years before) and then they have been "re-validated," in all cases based on what they report as dubious or false evidence.[31]  When these men approach six years without any disciplinary write-ups (termed "115's," the number of the form where major disciplinary write-ups are documented) and proven gang activity, they are re-validated for reasons they consider unfounded. They consider their validation entirely unfair, and believe they are denied an opportunity to show that they do not belong in the SHU. Further, their every activity is controlled by staff, who are often unfriendly and whom the prisoners consider unfair, in many cases racist. They feel they are denied adequate contact with family members (no phone calls except on rare occasions such as the death of a first degree relative, and visits are problematic because of policies as well as the geographic isolation of the facility), and some believe their mail is being destroyed.  In the SHU they have little or no meaningful activities and

---

[31] In one case, the prisoner was re-validated for a drawing of a picture copied from a book in the PBSP library, and in another case the prisoner was re-validated for saying hello to another prisoner confined in the facility.

EXPERT REPORT OF TERRY A. KUPERS                    C.A. NO. 4:09-cv-05796-CW

essentially no programs. Almost all of them complained about a lack of touching or physical contact other than being searched or transported by officers.

For these and related reasons, they all report a certain amount of anger about their situation. Earlier in their period of incarceration, many of them acted out equivalent anger by talking back to officers or getting into fights. By now, they have learned to keep their anger to themselves. Mounting anger plus dread of losing control of the anger are almost universally reported by prisoners in long-term isolated confinement.

Since all prisoners report they are under constant pressure by staff to "de-brief," they are unable to really trust their neighbors, believing that what they say could be distorted and reported to staff during the "de-briefing" procedure. They are afraid that if they say the wrong thing to someone they will be re-validated or they will suffer some type of retaliation. It is very stunning how universal this concern is among the 24 prisoners and ex-prisoners I interviewed. Quite a few told me that when they complain about poor medical care (or even about the food) they are repeatedly told by officers that they should "de-brief" if they want better medical care (or food).

All but two of the 11 prisoners I interviewed in the SHU participated in the hunger strikes in 2011. The two who did not had health problems that precluded their participation. At the time of my interviews, all of these men maintained the firm belief they would never be released from SHU because they refused, on principle, to "de-brief" and the parole board is very unlikely to approve the parole of a prisoner in SHU. They believe that there is incredible unfairness in the way they are validated and re-validated, and yet they have no opportunity to hear the evidence against them nor to rebut it (i.e. they believe there is no fair or due process). They all believe that the health care is very poor, and most report they are told that if they want better health care they should "de-brief". These men try not to utilize mental health services, and they offer a number of explanations why that is so. Most talk about the stigma in prison towards men who seek mental health services, the dangers of being labeled a "ding" or crazy by other prisoners, and the unwritten rule that a man needs to do his time without showing weakness. Quite a few also tell me that they do not trust the mental health staff to maintain confidentiality and they do not feel that the mental health staff truly cares about them. Further, they object to the fact that they would be seen by mental health staff in a

"therapeutic cubicle" or "programming cell," which they call "a cage," and they find this kind of treatment humiliating.

For the most part, while they have been forced to endure being in a cell nearly 24 hours per day, mostly idle, for ten or more years, this group of men have not fallen victim to serious mental illness,[32] and that is a testament to their emotional strength and stability. However, it is important to note that some prisoners are prone to serious mental illness, many forms of which are clearly exacerbated by isolative confinement. These forms include psychotic disorders, severe depression, mood swings, Bipolar Disorder and suicide.

Suicide is a very important consideration. The eleven men I interviewed are not presently overtly suicidal, even though several told me they would not care if they died, for example from being on hunger strike. But this is not the group who are likely to commit suicide. Yet we know that 60% of completed suicides in the CDCR occur among the 3% to 6% of prisoners who are in isolated confinement.[33] So there is definitely a group of prisoners in the SHU who are at very high risk of suicide, and these men are not in that group. In other words, this group of eleven actually evidences relatively much less suicidal ideation and intention than would be clearly expected in the larger group of prisoners who have been in the SHU at PBSP for over ten years.

Subsequent to my interviews with the eleven men who were in SHU at the time of the interviews, I interviewed one prisoner (#12) who had been transferred to SHU at CSP-Sacramento for medical treatment, eight prisoners (Prisoner #7 at CSP-Sacramento and Prisoners #9, 18-24 at SATF) who had been transferred out of the SHU, either to Step 5 of the Step Down program (general population),[34] and five former prisoners who had been released to the community, either directly from SHU or from general population. Two prisoners (Prisoners #7 and #9) among the 24 total who I

---

[32] Prisoner #12 was transferred to the Psychiatric Services Unit for treatment of major depressive disorder several years ago, and then was determined to be in remission and transferred back to SHU.

[33] Raymond F. Patterson & Kerry Hughes, *Review of Completed Suicides in the California Department of Corrections & Rehabilitation, 1999 to 2004*, PSYCHIATRIC SERVICES, 59, 6, 676-682 (2008).

[34] Several of the individuals I interviewed had been placed in Step 5 and subsequently "graduated" to general population status. For the purpose of this discussion, Step 5 of the Step down program is similar in programming and amenities to general population.

25

interviewed in all settings were seen twice in SHU, and then again after they were transferred from SHU to a general population facility.  It is quite striking how all 24 of the men I interviewed averred having experienced an equivalent list of symptoms and disabilities during their tenure in SHU.  In other words, these symptoms and disabilities are universally reported by prisoners who spend significant time being isolated and idle in the SHU, even if the specific list of reported symptoms varies from one individual to another.

### 2. Description: Prisoners' reports of symptoms identified in the literature.

Not every prisoner I interviewed avers the entire list of common symptoms I have presented above.  Rather, each reports a significant number of them in idiosyncratic fashion.  Thus, Prisoner #7 ███████████████ with a close family, reports many of the symptoms that appear in the literature on the psychological effects of SHU confinement, including severe insomnia.  He is lucky to sleep four or five hours at night. He has heard voices when nobody was talking to him, and believes that this is caused by SHU confinement.  He is ██████████████████████████████ He knows he should exercise, but he feels so listless all the time that he does not have the initiative nor the energy to exercise.  He forces himself to go to the yard (a room-size area, see photo in previous section) for 30 minutes, five times a week, and he walks out there.  He feels a lack of energy to do anything.  He gets headaches.  He thinks that he is frustrated about the unfairness and lack of recourse, and that adds with the effects of the dull colored walls and monotony of SHU to cause him to feel depressed and hopeless.

Prisoner #10 ████████████████████████████ ████████ had been in the PB SHU for 13 years. He does not understand why, when he has been found to be "inactive," he was retained in SHU.  The unfairness of his validation and SHU confinement, along with the lack of any recourse, make him despairing and resentful.  He reports many psychological symptoms, including a high degree of anxiety, mood swings, and frequent bouts of depression.  He has great trouble focusing, for example on something he is trying to read, and finds that his

memory is very poor.  Further, he finds he is overly sensitive to stimulation (a strong startle reaction), has lost the ability to feel things, has wide swings of emotion (he is depressed much of the time, but then feels agitated and "jumpy" at other times), feels blocked in getting things done, feels lonely and feels blue. He avers perceptual distortions, for example seeing things move on the drab walls of his pod, and then he realizes he is imagining something.

Prisoner #10 has a lot of difficulty sleeping. During the nights there are repeated noises of doors being opened and closed, and the noise causes him to waken suddenly. He becomes frightened that someone is going to enter his cell and attack him. He spends his days working out and reading as much as he can (the trouble focusing and memory loss make reading very difficult, and he tends to forget what he read a few pages back).  He does not talk to mental health staff because he believes they do not care about the prisoners, and besides, he tells me, whenever prisoners talk to mental health staff there are officers present and there is no confidentiality.  He looks very sad as he tells me he has not shaken the hand of a human being in 13 years. He worries that he has forgotten the feel of human contact.  Once, on his way to a doctor's appointment, where he was led in shackles by officers, he caught a glimpse of a tree.  That was such a contrast with the monotony of looking at the windowless walls in his pod that he felt excited about the tree. He reacts strongly whenever a door is opened or closed, always afraid "someone is going to come in on me."

Prisoner #5 complains of severe eye problems.  He believes the problem stems from not seeing anything but a blank wall for years. Even to see the wall across the hallway, he has to look through a metal cell door with small holes in it, and this distorts his vision (see photo in previous section).  He gets headaches frequently, and when he does eventually see colors other than the monotonous color of his cell walls, his vision gets distorted. He has a television but watches it very little because he gets headaches when he sees colors.  He really misses having contact with anything natural.  He never sees a tree, nor a bird.  When he finds an insect in his cell, he feels like finally he has company.  He suffers from prostatitis and reports medical care is very poor, but when he asks staff for better care he is told he should "de-brief" and then he would get better care in another facility.  He also complains of severe insomnia, loss of appetite, chronic

EXPERT REPORT OF TERRY A. KUPERS                                C.A. NO. 4:09-cv-05796-CW

tiredness and lack of energy, talking to himself, confused thinking, and losing the ability to feel or know what he is feeling.

Prisoner #9, ███████████████████████████████ had been in SHU for 36 years (with occasional transfers out of SHU, followed by return to SHU) at the time of our interview, arriving at PBSP around when it opened.  He avers intense anxiety, sweating even without exertion, frequent "weird violent dreams," a strong startle reaction especially to the sound of doors opening, perceptual distortions which he attributes to the lack of windows in his cell and the odd experience of looking at the wall across from his cell through the small holes in his metal cell door, a sense of losing the ability to feel things, wide swings in emotion, constantly misplacing things, an inability to concentrate, memory loss, worrying about getting sloppy, and irritability.  He describes irregular sleep with frequent waking whenever he hears the sound of doors opening and closing.  He explains that loud noises make him jump or induce panic attacks because he is afraid someone will come into his cell and attack him.  He is afraid that officers will enter his cell and beat him.  He avers being hyperaware, even paranoid.

He believes his validation is entirely wrong and unfair.  The unfairness makes him very resentful. He claims that far from being connected with a gang, he has served as a mediator and negotiator for peace whenever there has been discord in the general population.  His wrongful consignment to SHU makes him very upset, but he constantly tries to keep his anger suppressed and maintain a positive attitude.  In fact, he presents as cheerful and positive. He does not utilize mental health services.  He believes the mental health staff is very uncaring and there is no confidentiality.  He reports that it is very dangerous to let staff know about one's emotional problems.  Also, the only way a prisoner can talk to mental health staff is to be placed in a "therapeutic cubicle," which "makes you feel like you are an animal in a cage," so he does not utilize mental health services.  He suffers frequent nightmares about violence, something that he never experienced prior to being in SHU. In addition, the fact that medical staff are inattentive and uncaring causes him to be very frightened that were he to suffer a life-threatening emergency, they would fail to respond adequately and he would die.  He concludes, "They want us to die in here."  He becomes easily distracted, cannot concentrate, and loses the initiative and capacity for accomplishing tasks.  Then he stops trying to

accomplish many tasks. He falls into a state of dampened emotions and little energy to do anything. Then he despairs because he believes he will never be released from SHU, therefore he will never be paroled, and he will die in the SHU without having meaningful contact with loved ones.

Prisoner #1 ███████████████████████████████████

has been in a SHU since 1986. He was transferred to the SHU at PBSP when it opened. He complains of inattention from medical staff, and he reports that the physician told him if he wants better care he needs to "de-brief" and go to general population. He suffers from severe insomnia. A part of the sleep problem is the noise that occurs throughout the night. The slamming of doors wakes him, and causes anxiety that his door will open and someone will come into his cell and attack him. He feels that he is being given just enough food and water to stay alive, but he is not actually living. He tells me: "I'm locked in a cell, powerless, I have to rely on these people (staff) for everything, and they treat me as less than human. As soon as you realize that this will never end, and that you are stuck being at the mercy of staff who hate you, then you become more depressed, hopeless and angry."

Prisoner #6 ████████████████████████████████████

████████████████ reports many symptoms that began only since he has been in SHU. He has severe problems with concentration; for example, when he tries to read he forgets what he read a paragraph earlier, so he loses interest in the text and puts the book or newspaper down after reading only a few lines. He used to write things down to compensate for his failing memory, but he has stopped doing that because his eyes are weak (he thinks this is related to his glaucoma) and he cannot see what he is reading. This results in inactivity in his cell, and loss of contact with what is going on in the world. He lays in his bunk quite a lot each day. He also feels he is hyper-aware and has a strong startle reaction, and he experiences visual distortions. He avers wide swings of emotion, anxiety, fantasies of a violent nature, dizziness, low energy and inertia, no interest in any activities, easy crying, blaming himself for things, worrying incessantly, having to do things very slowly to insure correctness, episodes of palpitations, episodes of nausea, and difficulty sleeping. He feels that the officers taunt the prisoners, but he has learned to ignore them. He feels that he closes himself off to

others, stays to himself in his cell while not speaking to others, he feels very lonely and sad, and he is always worried that his resentment will break loose and he will get into trouble.

Prisoner #3 ████████████████████████████████ had been in the SHU at PBSP for 20 years at the time of our interview.  He began a 15-to-life sentence in 1989.  He participated in the hunger strikes in 2011, even though he knew he might die, because he felt hopeless about getting out of SHU and eventually being paroled. He felt that the hunger strike would be a way to change the policies that are currently designed to keep him in SHU until he dies.  He does not believe there is any valid evidence he is associated with any gang.  The pettiness and unfairness of his continuing validation upset him quite a lot.  He reports that as the first few years of a prison sentence go by, you do not see your family, but you can tolerate it because you hope you will eventually be released and go home.  He reported that when many years go by and it does not look like you will ever be paroled, and phone contact is not permitted and visits are extremely difficult and rare because of geography and the awful way staff treat visitors, it really gets you down.  Several members of his family have passed away since he has been in SHU.  He tells me: "Life just slips away."  He suffers from many symptoms that are included in the literature on the effects of isolated confinement, including anxiety, problems sleeping, excessive perspiring, deteriorating eyesight, obsessive ruminations, oversensitivity to stimulation, mounting anger, and despair about ever being released from SHU.  He reports deteriorating memory and progressively more trouble concentrating on anything.  He thinks that thoughts about his son and his family intrude on his concentration, and then he gets sad and cannot continue.

Prisoner #4 ████████████████████████████████ had been in SHU for 27 years at the time of our interview. He was transferred to PB SHU close to the time it opened.  The symptoms he reports include very negative thinking, severe anxiety, frequent rage, hopelessness and lethargy.  He does not initiate conversations, is not motivated to do anything, and feels like he is in a stupor much of the time.  He feels lightheaded when he leaves his cell.  He becomes confused and disoriented; as he put it, "It's like I'm not really here."  He has trouble concentrating on reading a book,

watching television programs and writing a simple letter.  When he is transported by staff he becomes irritated, feels lost and becomes numb.  He has lost all hope of being released from SHU and has lost interest in everything.  He reports: "I wake up every morning consumed with feelings of anger and rage directed at prison staff over my continued isolation, restrictive conditions, and loss of family."  He suffers from severe insomnia.  He repeatedly wakes and cannot go back to sleep because of the loud opening and shutting of doors, officers stamping along the hallway all night long and pointing their flashlights at his face every few hours for "count."  He says he is very depressed most of the time.  He tries to suppress his sadness and not let others see it, but then he becomes "blank," out of touch with all feelings.  He feels tired all the time. He has trouble reading because he cannot concentrate and cannot remember the previous paragraph or page.  As he gets older, health problems multiply, and he is very worried he will not get proper medical care.  He dreads getting to a stage where he cannot take care of himself.  He is not suicidal, but he feels hopeless about his situation. He does not seek mental health treatment because he believes mental health staff members are uncaring and unhelpful, and besides, he believes a history of mental health treatment has an adverse effect on his chances for parole.  Also, he does not believe that contacts with mental health staff are confidential.  They interview prisoners at cell-front within earshot of other prisoners and staff, and if they "pull you out" (take you to an office), everyone on the pod knows about it.

Prisoner #11, ███████████████████████████████ had been in the PB SHU for 15 years at the time of our interview. He believes he will never be granted parole as long as he is in SHU, and that he will never get out of SHU.  This causes him to feel hopeless.  He believes the main reason for his validation is that he said hello to another prisoner he passed in the hall, but feels this is ridiculous and unfair because he always says hello to everyone.  Because he feels the punishments and especially his consignment to SHU are entirely unfair, he cannot trust the authorities or the staff.  But since his life is totally controlled by staff and there is nobody else to ask for help, this creates a quandary for him.  He has had progressively less contact with family members as the years in SHU have gone by.  He suffers many symptoms.  He is anxious much of the time, and has intermittent panic attacks where his heart pounds

and he has trouble breathing.  He cannot sleep and gets only a few hours sleep per night. He is increasingly out of touch with his feelings.  When asked how he feels he responds that he does not feel.  He thinks there is no longer any purpose in life.  He has severe concentration difficulties, for example he has to read paragraphs over and over in order to understand content.  He cannot focus on a topic or a task.  It takes an extraordinarily long time for him to write a letter, as his mind simply wanders.

Prisoner #8 ████████████████████████████ had been in the SHU for 14 years at the time of his interview.  He has not been charged with any violent crimes and has received no gang-related infractions, yet he is validated and repeatedly re-validated as a member ██████████████████  He refuses, on principle, to "de-brief".  He participated in the 2011 hunger strike because he believes that unless something changes, he will die in the SHU.  He participated in the hunger strike in spite of the fact he knew he might die from starvation. Sparse contact with family makes him very sad and lonely.  He reports many symptoms that he is certain only commenced after he came to the PB SHU, including memory problems that have worsened over the years along with an inability to concentrate. The exception is his writing, which he does to stay sane.  He writes about getting older, dying, his sadness about his older brother dying without his having a chance to see him, among other topics.  He believes the long-term effects of SHU consignment include the bags he has under his eyes from chronic and unremitting sleep loss, extreme emotions that range widely through the day, waking up angry every day about the unfairness of it all, deep grief about not raising his son and now having his son go to prison.  He avers talking to himself often and worrying that the SHU will drive him mad.  He says, "I feel like I am here but not here."  He suffers from ongoing severe anxiety.  He is hyperaware of others' presence, cannot tolerate anyone standing behind him, and needs to see the hands of anyone he is in contact with.  He has frequent flashbacks to cell extractions that happened years ago, not at PBSP.  He avers a strong startle reaction.  He believes he is phobic.  To this day, he needs the door to the shower to remain open when he takes a shower.  He becomes hyper-alert when officers approach his cell.  He is anxious most of his waking hours, with only a little relief when he exercises or writes.  He says, "They try to make you crazy, but I struggle to remain sane."  He has

progressively isolated himself over the years in SHU, and meanwhile has found that he is less and less in touch with how he is feeling. He is saddened by the fact it becomes more and more difficult to see himself ever being in the community again.

He feels he almost died during the hunger strike, and tells me that if he died that would be okay with him because living in SHU is not really living at all. He reports being taken off of his heart and blood pressure medications during the hunger strike. He is very close to his family, especially one sister who writes to him and "keeps me going." He was close to his wife at the time he was arrested for the instant offense, but feels his being in the SHU led to their breaking up. They simply could not arrange quality visits and he is not permitted to have phone calls. If he had been in general population, visits and phone calls would have been more realizable and he believes his marriage would have remained intact. He ███████████████████ takes medications for his heart condition as well as for hypertension. He believes that he has had to learn to suppress his feelings in order to survive in SHU, and that were he to express much in the way of feelings in SHU he would be dead. But then the suppressed feelings come back at him during the night and that is why he cannot sleep. Then, the loss of sleep makes all of the emotional pains and symptoms worse. He does not talk to mental health staff because he finds them uncaring and objects to the lack of confidentiality when officers are permitted to overhear sessions or are told of the prisoners' personal problems.

Prisoner #2 ████████████████████████████ ██████████████ entered prison in 1981 and was validated as a member ███████████ ████████████████████ in 1985. He believes that he was validated not because of any involvement with the █████, but because he was an advocate for peace in the troubled general population of the early 1980s. He has a severe back ailment, for which he feels he receives terrible medical care. He does not utilize mental health services because he believes they are not confidential. He avers loss of ability to feel or react emotionally, very low energy, lack of motivation to do anything, intense distrust of the administration and staff, worry that staff are watching him, self-blame for his situation, ongoing nausea and stomach pain, frequent headaches, and numbness and tingling, among other symptoms. When he complains to staff about anything, they tell him if he does not like

EXPERT REPORT OF TERRY A. KUPERS                    C.A. NO. 4:09-cv-05796-CW

it he should "de-brief." He could not stop crying when his sister died a few years ago. He had not been able to see her. He reported that the separation from loved ones that is part of being in prison is magnified by the lack of phone calls in the SHU and the hardship for family members to travel to see him. Even then, no contact visits are permitted and the permitted visits are short. There are no phone calls. He has great difficulty concentrating on any task, and relates that to the loud noises in the SHU, sleep loss on account of the noise, and the general effects of isolation. He feels he has no ability to share what is on his mind with anyone, and this leads to a further sense of isolation and despair. He spends much of his time reading and writing, and feels that his optimism and continuing attempts to express himself in his writing keep him sane. He suffers from many other symptoms known to be related to long-term isolation, including trouble concentrating, memory impairment, anxiety, mounting anger, ongoing fear his anger will get out of control and he will get in trouble, fears of others attacking him and hyperawareness of sounds plus a strong startle response.

### 3. More than a decade in SHU results in additional symptoms that go beyond those identified in the literature.

Over the course of these interviews, it became apparent that these prisoners had symptoms and disabilities that emerged only after prolonged SHU confinement, i.e. symptoms that are mostly unique to prisoners who experience SHU confinement lasting many years, where they remain in a cell nearly twenty-four hours per day and are cell-fed, including those who have spent ten years or more in SHU. While they also aver symptoms and disabilities that are widely reported by prisoners in isolated confinement for three months and are reported in the literature, they aver additional symptoms and disabilities that are, for the most part, unique to prisoners who experience SHU confinement for many years or more than ten years.

Over and above the symptoms I have listed thus far, all eleven men still in SHU when I interviewed them report that over the years they have learned to keep quiet about their feelings and not to talk very much to others – neither staff nor other prisoners. They experience quite a lot of anger after being consigned to isolation; they fear the anger will get them into trouble if expressed; so first, they are silent about their

feelings; then they begin to suppress feelings (beginning with anger, but the suppression spreads to all feelings) to the point where they do not even know what they are feeling; and as a result they feel numb or dead. In addition, they have progressively isolated themselves more and more even within the context of SHU confinement. They give various reasons for not talking about much with their neighbors or even a cellmate. Some say it is the fear that someone will get mad at them and then inform on them in the process of "de-briefing". Others report that living so close together makes tempers flare and they would rather not have enemies. Others say that if they give expression to their anger they will lash out at officers and get into even more trouble. Thus, for various reasons, the universal experience of all eleven men I met with in the SHU is that over many years they experience progressively more emotional numbing and greater isolation. Prof. Haney has described the phenomenon as a form of "social death."[35] Meanwhile, most of the prisoners I interviewed report that their despair grew in intensity over the many years of isolated confinement.

In other words, over and above the list of symptoms from the literature about long-term isolated confinement (anxiety, perceptual distortions, mounting anger, insomnia, compulsive acts, hyper-awareness or strong startle reaction, despair, problems concentrating, memory problems and so forth), there evolves over many years a pattern of increasing self-isolation and emotional numbing as well as enlarged despair, such that the prisoner progressively shuts himself off from other human beings and loses touch with his own feelings. These men have also been living with the very serious symptoms and disabilities that I described in Sections VIII.B.1 & 2. When prisoners live with many of these serious symptoms and disabilities, the symptoms and disabilities become chronic and even more damaging. Then, in addition to the problem that they are suffering from these symptoms and disabilities for many years (here, more than ten), they also suffer from an evolving exaggerated isolation and numbing as well as enlarged despair.

As I will discuss below regarding individuals who have been released from SHU, this pattern is very long-lasting. In many, it is seemingly permanent. In that sense, it is

---

[35] Craig Haney, *Mental Health Issues in Long-Term Solitary & 'Supermax' Confinement*, CRIME & DELINQ., 48(1): 124-156 (2003).

EXPERT REPORT OF TERRY A. KUPERS                                C.A. NO. 4:09-cv-05796-CW

similar to a personality change – that is, a chronic pattern of experience and behavior. Quite a few of the prisoners tell me that they feel their personality has been substantially changed by their years in SHU, and now their personality involves much more isolation-seeking and incapacity to express their emotions.  Of course, each experiences this dual development in his own personal way, and so they each express the themes of emotional numbing and progressively more extreme isolation in idiosyncratic fashion.

Prisoners who have been in SHU for ten years or longer suffer from a number of severe symptoms, including disorientation and numbness that derive from the lack of memorable feelings and social interactions.  Most report that they feel each day is the same, and they lose all sense of time.  Or they simply feel "numb," "dead," or they lack motivation to do anything, even to exercise.  As Prisoner #8 put it, "I am so busy suppressing feelings and isolating myself all day, and so much anger builds up in me from the conditions, that I can't sleep at night because the sound of a door opening or closing wakes me and I get anxious about someone coming in on me and I can't fall back to sleep."  The lack of sleep exacerbates the irritability and anger, so they feel a need to suppress their feelings all the more and to isolate themselves further.

Thus there is a clear pattern in the stories of all eleven of these men about the psychological consequences of spending a decade or longer in the SHU.  That pattern includes, in addition to the many years suffering the symptoms and disabilities I listed in Section VIII.B.1 & 2:  Angry feelings about being in segregation for so long, having little or nothing meaningful to do, being deprived of fair due process and being provided no way to win their release from SHU; and the suppression of the rage, which, along with the harsh isolative conditions, leads to a numbing of all feelings so that over the ensuing years and decades the prisoner becomes less in touch with his feelings and less expressive.  Meanwhile, concerns about evoking hostility in others, boredom with the monotonous conversations that occur in the SHU, concerns that others will use information they receive to lie about them when they "de-brief", or cultural alienation cause the prisoners to progressively isolate themselves, even from cellmates and neighbors, but certainly from staff.  Thus, they are isolated from family and the outside world because visits, phone calls and mail are so limited, and then they isolate themselves from the people physically nearby.  They become increasingly isolated on

36

all levels.  There is a growing feeling that there is no use doing anything, and that nothing will change, so the prisoners shut down to a great extent, become unmotivated to do anything (the memory loss and problems concentrating contribute to this phenomenon), and become listless and lacking in initiative.  Some describe this state as depression, some as numbness, some as deadness.  It is quite evident to this interviewer that the despair they originally experienced early in their tenure in the SHU grows more intense as the years go by.  The prisoners withdraw into themselves, spending endless hours silent and alone, entirely out of touch with how they feel.  They get out of practice expressing themselves.  They experience intense despair, but for them suicide is not an option.  They begin to feel numb, unreal, non-human, or dead.  I have conducted upwards of a thousand interviews with prisoners in a variety of correctional settings, and I have never before found a pattern at this level of specificity described universally by a group of similarly situated individuals.

In the medical and psychiatric literature on the consequences of torture, a comparison is often drawn between the consequences of torture and the consequences of severe trauma (including but not limited to Post-traumatic Stress Disorder).[36]  What I am describing here is a third entity, the consequences of very long-term solitary confinement as obtained in the PB SHU when prisoners remain there for over a decade.  What we find is men who are a shell of their former selves, passionless and isolated.  They are very disabled, but their disability is not readily apparent because, after all, they live in a cell and meals are delivered to them by staff.  All 11 of the men I interviewed at the PB SHU (and all of the additional 13 men I interviewed in other settings) exhibit almost all of the characteristics that are described in the literature about survivors of torture.  For example, Rona Field's list of psychological consequences of torture include, besides suicide and psychiatric breakdown requiring hospitalization (which are not the case for these men), anxiety, fear, depression, irritability, introversion, difficulties in concentration, chronic fatigue, lethargy, restlessness, communication difficulties, especially expressing emotion, memory and concentration loss, loss of sense of identity, insomnia, nightmares, hallucinations, visual disturbances, and

[36] David P. Eisenman, Allen S. Keller & Glen Kim, *Survivors of Torture in a General Medical Setting*, WEST J. MED, 172(5), 301-304 (2000).

EXPERT REPORT OF TERRY A. KUPERS                    C.A. NO. 4:09-cv-05796-CW

headaches.[37]  This is precisely the list of symptoms and experiences the twelve men I interviewed in SHU report.

These symptoms were reported by all 24 prisoners and ex-prisoners I interviewed, whether they were still confined in a SHU, had been transferred to a different prison setting, or had been released to the community. All these prisoners spent at least a decade in the SHU. It is quite stunning how all 24 of the men I interviewed averred having experienced the same tendency to suppress their anger and become numb (or feel "dead") in the process, and the same tendency to isolate themselves even further than the architecture and program of the SHU required.  In other words, emotional numbing and self-isolation are universally reported by prisoners who spend significant time in the SHU.  It is difficult to say precisely when the exaggerated self-isolation and numbing evolved.  There are individual differences. What is very clear is that prisoners who have spent ten years or longer at the PB SHU present a qualitatively different picture of symptoms and disabilities than do individuals who have been in isolated confinement for much shorter periods, and the difference is encapsulated in my description of the exaggerated isolation, numbing and despair, as described above and in Section B4 below.

### 4.  Description: Prisoners' reports of additional symptoms of self-isolation, emotional numbing and enlarged despair.

Prisoner #11, the man who had been in the PB SHU for 15 years when interviewed, gets angry about the awful deprivations and conditions, the unfairness of being in SHU so long when he did not do anything to deserve it, and the lack of recourse to have anything changed.   But as much as the anger mounts, so does his fear he will "go off" again and do something dangerous.  So he suppresses his anger, and that makes him entirely out of touch with all feelings.  He becomes numb and listless much of the time, unmotivated to do anything.  When asked how spending many years in SHU is different than spending a year or two, he says that he has progressively kept to himself more and more.  He has been closing down his emotions and stopped

---

[37] Rona Fields, *The Neurobiological Consequences of Psychological Torture,* in The Trauma of Psychological Torture, 1555, (Almerindo E. Ojeda ed., 2008)

EXPERT REPORT OF TERRY A. KUPERS                                    C.A. NO. 4:09-cv-05796-CW

talking to others, even to his cellmate and prisoners in neighboring cells. He does not talk to anyone about personal things.

Prisoner #9 admits that in order to keep his anger suppressed so he will not get into trouble, he has to isolate himself from others so there will be no opportunity for him to express anger. When he gets angry, which occurs frequently (although he was not an angry person before being in SHU), he does not talk to anyone for several days until his anger cools down. But meanwhile, he feels very isolated and out of touch with all of his feelings. He sees others lash out and get in trouble. Again, his attempts to suppress his feelings lead to his self-isolation, and then he feels even more out of touch with his feelings, alone and lonely. In other words, this is a poignant personal description of what Haney terms "social death."[38] He does not want to deal with his feelings, so he becomes numb. He falls into a state of dampened emotions and little energy to do anything. Meanwhile he isolates himself from others so as not to get into any disputes or lose his temper.

For Prisoner #10, more worrisome than his anxiety, problems concentrating and intense startle reaction, is a total loss of the capacity to feel. He says he does not feel anything, and this makes him "feel dead." Days go by without him feeling anything, "as if I am walking dead." He keeps most of his thoughts to himself and says very little to other prisoners and to staff. He is afraid of sharing what he is feeling and then finding that others attack him because they disagree. He says, "You never want to say what you really feel because others will think there's something wrong with you." On account of such concerns, he ends up saying very little to others, and it frightens him when that leads to his losing touch with his feelings altogether. Increasingly he avoids talking to prisoners on his pod because he does not want anyone he is going to be forced to live closely with to get upset at him. The numbing and isolation have been building over the years he has been in SHU.

Prisoner #5, ██████████████████ tells me "you need to be careful what you say in here. You have to withdraw, I go silent, everyone understands silence in here." He avers working hard to suppress his mounting anger, and then

---

[38] Craig Haney, *Mental Health Issues in Long-Term Solitary & 'Supermax' Confinement*, CRIME & DELINQ., 48(1): 124-156 (2003).

EXPERT REPORT OF TERRY A. KUPERS                                    C.A. NO. 4:09-cv-05796-CW

suppressing other feelings as well, then he loses touch with what he is feeling.  "I don't want to let out what builds up in me, so I shut down completely."

Prisoner #2 tells me he has become increasingly isolated from others as the years in SHU have progressed.  He also feels one has to be careful about speaking to staff and other prisoners because harm can come from saying the wrong thing or telling something to the wrong person.  So he, like others in the SHU, becomes progressively more isolated and has ever fewer opportunities to share thoughts and feelings with others.  As a result, he becomes less aware of how he is feeling and less capable of expressing himself.  He feels extremely cut off from family, partly because phone calls are not permitted, but also he believes staff tamper with his mail, destroying many letters so he never receives them. As the years in SHU have progressed, he has become increasingly out of touch with his feelings, and increasingly isolated, so he feels his growth has been stunted.  Since he will not participate in "de-briefing" (because he is opposed to the informant system and fears retaliation toward his family), he sees no way for himself to ever leave the SHU.  He believes one cannot be paroled out of the SHU.  This causes great despair.  He feels increasingly isolated. With contact restricted so harshly with his family, he has nobody to talk to.  He stops trying even to write letters and becomes overwhelmed by sadness. He has received a 128 (minor disciplinary write-up) for saying "hi" to a prisoner in the next pod as they passed each other.  So, in order to avoid disciplinary trouble, he simply does not talk to other prisoners.  He is not given access to the evidence that results in his validation, and has no opportunity to dispute the charges against him.  He believes that the entire process is unfair, and the unfairness and lack of justice make it much more difficult to tolerate the harsh deprivations.  He has to clamp down on his mounting anger and not show it or he will get in trouble.  Increasingly he keeps all his feelings to himself, and even stops knowing what he is feeling.

Prisoner #1 has been in a SHU since 1986, or 26 years.  He is serving 21 years to life, and has been eligible for parole since 2004.  He was transferred to the SHU at PBSP when it opened. He feels that as time passes, conversations become trivial. Nobody wants to say too much to the others because they are afraid something they say will evoke anger and then they will be stuck on a pod with someone who is mad at

them, or someone will "de-brief" and use information they shared to falsely accuse them of gang affiliation.  Then the trivial conversations suppress one's intellect, and halt personal growth.  Besides, he reports, 99% of one's verbal contact with other prisoners involves disembodied voices (i.e. they cannot see each other from their cells; they can only see the far blank wall).  When they do see one another, for example when one of them is in transit to the "yard" and passes in front of another's cell, he gets very anxious because the experience of face-to-face contact has become so unfamiliar.  This phenomenon worsens over time, and he finds he has given up trying to talk.  He feels he is becoming silent and paralyzed.  He has found himself increasingly out of touch with his feelings and severely isolated from others.

Prisoner #7 reports that the unfairness and absurdity of the entire validation and parole process make him very angry, and very hopeless about ever getting out of SHU. He says, "I struggle to control my emotions, my mother taught me to control my emotions."  But he feels that over-control is bad for his medical condition, for example his blood pressure.  He believes that suppressing anger or keeping it to himself causes a rise in blood pressure.  So he is caught between his need to control his anger toward staff, which could get him in trouble, and his need to give expression to his emotions so he will not worsen the hypertension.  He opts in the SHU to over-control his anger and other emotions to avoid trouble.  He has learned over the years to suppress his anger, but to do so he has had to suppress all feelings to the point where he does not any longer know what he is feeling.  He says that he does not want to let himself succumb to feelings. If he did, he is afraid he would cry relentlessly and roll up into a ball in the corner of his cell.

Prisoner #12, ███████████████████████████████████ has been in prison over half his life, and has spent much more than ten years in the PB SHU. He explained his tendency to isolate: "Not everyone is on your level of understanding, so you don't want to let anyone see you're angry.  It might stir them up, so you withdraw and become silent." He doesn't feel he has totally lost touch with his feelings.  It is just a matter of having to hold back his feelings around volatile people. He prides himself on his skill at not stirring people up.  He is always very cautious around other prisoners, which causes him to isolate himself even more than what's required by the isolative

conditions in SHU.  He absolutely refuses to inform to staff about anybody or anything, as a matter of principle, and this makes him keep his conversations with staff to a minimum.  So progressively, over the years, he has become isolated on all fronts.

### C.  Prisoners Who Were Released from PB SHU.

#### 1.  These interviews reveal a SHU Post-Release Syndrome

Whether they had been released to a general population or stepdown unit within the CDCR or back to the community, all of the prisoners I interviewed who had spent over ten years in the PB SHU and were no longer in the SHU reported they had experienced the same set of symptoms and problems that the 11 prisoners who were in the SHU at the time of our interviews reported to me. (See Section B, above.) They reported the same symptoms that fill the literature about long-term isolated confinement, including intense anxiety, disordered thinking and paranoia, problems concentrating, problems with memory, compulsive acts, despair, suicidal thoughts or actions, severe insomnia, nightmares, and so forth.  Like the 11 prisoners who were in the SHU when I interviewed them, they also reported their prior tendency while in SHU to numb their feelings and isolate themselves even more than SHU confinement required, and their mounting despair.

In addition, however, the group of prisoners who spent a decade in the SHU but are now in a different environment, whether in the prison system or in the community, evidenced further symptoms and problems that emerged only after they were transferred out of the SHU.  Their experience demonstrates that human beings survive in an isolative setting like the PB SHU, where they are alone in a cell nearly 24 hours per day and mostly idle, by shutting down emotionally and isolating themselves in exaggerated fashion, but that when they are released from SHU, the measures they took to survive within the SHU setting become detrimental and disabling in their efforts to become productive participants in the larger community.

I will begin with the report of one ex-prisoner, Prisoner #13, to illustrate the general pattern. Then I will describe the pattern.  Finally, in Sections VIII.C.2 & 3, below, I will provide other prisoners' and ex-prisoners' specific reports of the problems they encountered after leaving the SHU, and in most cases, right up to the present.

In terms of reports about what it was like to be in SHU, Prisoner #13 (a ███████ ████████ man released nine months earlier to the community where he now lives with his wife), reported on his experience while in the SHU:

> I got less social over the years.  It just started happening.  Nobody talks to you.  There's not much to talk about.  I'd ask 'how are you doing.'  I saw myself changing, I didn't really want to talk.  My social skills deteriorated.  Slowly, with my wife's help, I am trying to talk.  But mostly I don't say much.  You stop talking because you've already heard everyone's stories.  I didn't have anything to say.  As the years go by, you are disintegrating.  You don't even know what's happening.  You might say 'good morning,' or you might not.  There's nothing more to say.  I kept saying 'good morning,' but some people stopped talking altogether.  I was also afraid anything I said could be used against me in committee.  They would find a drawing in my cell.  I wasn't gang-related, but I drew images from the Mexican flag.  I was always scared they'd say that's proof I was in a gang…..  In SHU, when I got agitated, angry, I would exercise hard to keep from expressing anger and getting in trouble, so I would exercise to exhaustion.  Gradually I lost touch with all feelings.  You feel dead, you are dead to society, to the mainline.  If you don't keep your mind occupied, you lose it.  You see guys going crazy.  So you clamp down on your feelings, don't talk much, and then you lose touch with what you're feeling.

It is stunning how, without exception, all of the prisoners who were no longer in SHU when I interviewed them echoed the very symptoms from their time in the SHU that the 11 men I interviewed in SHU had reported.  In other words, they report that when they were in the SHU they experienced many of the short term symptoms and disabilities I have previously discussed (Section VII), as well as the self-isolation, despair and numbing symptoms that go beyond those experienced by prisoners who spend less time in the SHU and that appear in the literature (Section VIII.B.3 & 4).  However, in addition, over and above these symptoms and disabilities, Prisoner #13 explained what it is like to be released into the community:

> They left me off in downtown ███████.  I got out with no money and started walking.  I waited for a ride, needed a pay phone to call my wife.  I kept trying to get on my feet, get my mind back to normal.  My mind is still not normal because in the SHU I started thinking I'd never get out, especially when I was denied at six year reviews.  When I [first] went to the street, it was really weird.  I felt all caved in.  I always wanted to be in my room and sit. I did not want to go out of

43

the house.  I would stay in my room 4 or 5 hours.  I had TV and music in my room.  I didn't like going to the store – too many people.  I wasn't used to being with people.  I'm always hyperaware, I won't let anyone touch me.  It's not easy.  It's like coming out of the insane asylum.  Now it's been 9 months, I still spend a lot of time in my room, that's where I'm most comfortable.  I can go to the mini-market, but I can't go to the supermarket.  Sometimes my wife talks me into going to a park or karaoke bar.  When I got out, a lot of people came for interviews.  I drank beer to relax.  It's really difficult to go to new places.

Prisoner #13's report is very similar to the report of all the men I interviewed who had been released from the SHU and were either transferred to another prison setting or released from prison to the community.  Their experiences amount to a syndrome that is characterized by the following symptoms:[39]

- Disorientation immediately following release.

- Anxiety in unfamiliar places and with unfamiliar people, and the daily life events that had been ordinary prior to SHU confinement become unfamiliar events following release from SHU.

- A tendency to retreat into a circumscribed, small space, often a bedroom or cell.

- A tendency to greatly limit the number of people one interacts with, usually limited to close family members and a few friends.

- Hyperawareness of surroundings, for example a need to sit facing the door to a room or with one's back to a wall.

- Heightened suspicion of everyone who comes close, especially strangers.

- Difficulty expressing feelings.

- Difficulty trusting others, even one's spouse or first degree relative.

---

[39] A "syndrome" is "a set of symptoms occurring together; the sum of signs of any morbid state; a symptom complex (see http://medical-dictionary.thefreedictionary.com/syndrome).  My description here of a SHU Post-Release Syndrome is new; I am describing a syndrome that has not been identified in the literature about the effects of isolative confinement because there has been so little attention in the past to the post-release course of individuals confined for significant periods in harsh isolative conditions.  The work of Profs. David Lovell, Craig Haney and the Arizona AFSC (op. cit.) provided some preliminary discussion of a SHU Post-Release Syndrome, but those authors did not use the term "syndrome" in their discussions.

44

- Problems with concentration and memory, beginning in the period of SHU confinement and continuing after release, making it difficult to accomplish tasks and to work.

- A sense of one's personality having changed. The most often reported form of this change is a change from a relatively outgoing, friendly individual with a sense of humor prior to SHU confinement, to a more serious, guarded, and inward individual following release from the SHU.

- In some but certainly not all cases, there is a tendency to resort to alcohol and illicit substances to lessen the pain and make the confusion and anxiety more bearable.

All of these problems are experienced intensely for many months after release from SHU, but then the problems continue in less intense fashion, most often right up to the present, which might be years later. This set of psychologically harmful experiences occurs in both prison and community post-SHU settings. It does not seem to matter whether the prisoner is released to the community or simply transferred to a general population prison within the CDCR.

This syndrome shares many characteristic symptoms and problems with PTSD (Post-traumatic Stress Disorder). Some of the men I interviewed do qualify for a diagnosis of PTSD (indeed, Prisoner #15 receives S.S.I. total disability for PTSD). Others have suffered multiple traumas, but their post-traumatic symptoms are not sufficiently intense and disabling to qualify them for a diagnosis of PTSD. But the diagnosis is, to a certain extent, beside the point. The picture we see in PTSD is a person who has been traumatized and then has strong emotional reactions to the trauma, but works hard at suppressing the resulting feelings and agitation. He or she isolates him- or herself, dreading social interactions, and tends to suppress feelings. Then, unwanted and dysfunctional feelings break through the individual's attempts to suppress all feelings, and erupt in irrational rageful acts or inappropriate outbursts. The reclusive Vietnam veteran who one day comes out of the house where he had been secluding himself and goes on a violent rampage is the tragic exemplar of this pattern. I do not find that the plaintiffs all suffer from PTSD, nor that confinement in SHU in itself constitutes trauma. Rather, I mention the example of the Vietnam veteran with PTSD

as a model of how certain individuals, on account of very stressful experiences, work hard at suppressing their feelings and isolating themselves. Occasionally their suppressed rage or their profound grief breaks loose and they have an emotional episode that is very upsetting to them and those close to them.

I will give examples from interviews I conducted with prisoners who leave SHU after approximately ten years or longer and go to general population (Section VIII.C.2, below), and prisoners who leave SHU and return to the community (Section VIII.C.3, below). All prisoners who have been released from SHU, to either setting, report a syndrome of very disturbing sensory and emotional experiences for months, including a strong startle reaction with loud sounds, feeling overwhelmed by lights and people moving about, feeling paranoid that someone will attack them, feeling hesitant to talk to and trust others, and so forth. A lot of these symptoms wane somewhat (never entirely) and these individuals move into a longer-term syndrome of relative isolation and numbness that they tell me they fear is permanent.

### 2. Description: Reports of former PB SHU prisoners released to other prison settings

Prisoner #13, in his recounting of experiences at California Correctional Institution at Tehachapi (Tehachapi) after being released from SHU to general population, identified themes that emerged in all the other prisoners I interviewed who had been released from SHU to an in-prison stepdown program or general population setting (see Section VIII.C.1, above). In fact, all of the prisoners I interviewed who had been released from SHU but remain in prison aver over half of the component symptoms and problems I have identified as the SHU Post-Release Syndrome. The difference between their reports of the syndrome and reports from prisoners who were released to the community (see Section VIII.C.3, below) is that the elements of the syndrome occur in a prison context. Thus, for example, the prisoner who left SHU but remains in a general population prison setting reports staying in his cell by himself to the extent he is permitted to do so, much like the ex-prisoner who returned home and lives in the community with family reports staying in his room by himself for many hours at a time.

EXPERT REPORT OF TERRY A. KUPERS                    C.A. NO. 4:09-cv-05796-CW

Many symptoms and disabilities I have mentioned that originated during a SHU term are reported by very many of the prisoners I interviewed, including those who had been released from SHU and transferred to general population settings. For example, consider the paranoia that is widely reported by denizens of isolated confinement units including the SHU at PBSP. Prisoner #9, another man I interviewed while he was still confined at PB SHU (see Sections VIII.B.2 & 4, above), was at Substance Abuse Treatment Facility (SATF) adjacent to Corcoran State Prison when I interviewed him again. He had been transferred to SATF from PB SHU on Step 5 of the Step Down Program, but has graduated from the program and is now in General Population at this Maximum Security facility. Despite this change in his status, he remains in the same general population cell. He reports being very slow to mix with other prisoners when he was released from SHU. He tells me that in the SHU, a prisoner is locked into the shower and thus not subject to attack, but in a general population prison multiple prisoners go to the shower at once and the door is unlocked, so there is a certain danger of assault. Prisoner #9 worries that he might be paranoid, thinking whenever he goes to the group shower in general population that he is in danger of attack. He cannot determine if his fear of attack is paranoid, or whether it is a reality-based concern and he does need to be alert to signs of impending attacks in the shower. In my opinion, his fear is a combination of the two: there is a certain danger of attack in a maximum security group shower area, but he also is inclined to "ideas of reference" (a technical term for paranoid thinking), and the ideas of reference were caused by the many years he spent in the SHU.

Prisoner #9 was very anxious about that for some months after arriving at SATF. He continues to look around all the time to be certain he is not about to be assaulted. He feels he obsesses about his safety quite a lot, in ways he never did before his long stint in SHU. In the SHU, he explained, if your cell door opened when it was not supposed to be open, you always had to be ready to defend yourself: it likely meant another prisoner had arranged to have your door "popped" and was about to enter and assault you. He knows this is irrational most of the time, but he is always hyperaware of doors opening and closing at SATF. When a door opens, he has a flash of panic that he is subject to an assault. He gets very anxious whenever another prisoner comes

toward him, and explains that he never felt that in general population prior to going to SHU. He feels he became quite paranoid in the SHU, and his hyperawareness of others in his vicinity seems to him a remnant of that paranoia, though he reports it diminished quite a lot after he was at SATF for several months. He states, "I was like a hermit at Pelican Bay. Here I am adjusting to being with other prisoners, and I come out of my cell a lot." Most of the 24 prisoners I interviewed reported, or seemed on mental status examination to experience, some degree of paranoid ideation that reflected a combination of reality-based concerns and distorted ideas of reference that began during their tenure in the SHU. Prisoner #9 also avers carving out a very small space in the dayroom or yard at SATF when he first arrived at SATF and for several months. Except for the hours he worked in his prison job as a clerk at SATF, he would try to stay in his cell or only be in that particular space with other prisoners he knew. That tendency remains, but is much less intense.

Prisoner #7, ███████████████ man who had been one of the original twelve prisoners I interviewed at the PB SHU, was subsequently transferred to Maximum Security General Population at CSP-Sacramento on ███████████ I interviewed him on September 28, 2014. He told me that he is no longer in SHU, this means that he is permitted out of his cell to go to the yard for 1½ hours per day. He appears depressed and lethargic, and tells me he is exhausted all the time. When he first came to the yard at CSP-Sacramento, he became dizzy, he thinks because he was overwhelmed by stimuli and people all around. He found the noise oppressive, and jumped whenever he heard a noise. He was "jumpy" for 30 days. Since then he has felt a strong startle response but it has not been as extreme. He is nervous all the time. As a result, he greatly circumscribes his activities, such as his travel around the day room and yard, and he relates only to a very few prisoners whom he knows and trusts somewhat. Since his release from SHU, his mind has been racing and he has felt very anxious. He is constantly obsessing about what any sound or sight might mean. He has trouble processing stimulation, so much so that he forced himself to stop trying to make sense of it all. Rather, he stays to himself and to the very small space he has permitted himself to be in, with the very few people he feels safe with. This means that his activities during his free time are very constricted and limited. Visits are somewhat

easier now that he is in a prison near Sacramento (his family is in Southern California, so travel to Pelican Bay State Prison was very problematic), but when his daughter comes to see him he is unable to be in touch with his feelings. He cannot cry with her, he feels very cut off and it is a difficult struggle for him to sustain a conversation. He continues to experience many of the problems that plagued him in SHU, feeling anxious, unable to concentrate, difficulty sleeping, unable to trust others, isolating himself, and so forth.

Again, as with the prisoners I interviewed who had been released from SHU and returned to the community, all nine[40] of the prisoners I interviewed who had been transferred from the PB SHU to general population in a facility within the CDCR averred a large number of the symptoms typically reported in prisoners consigned to long-term isolation (Section VIII.B.1 & 2, above); and all of them reported incrementally more severe isolation, emotional numbing and despair as the years wore on for them in the PB SHU (Section VIII B.3 & 4, above).

Prisoner #19, ██████████████████████████, spent a total of 18 years in the PB SHU. He was released in ████████ to Step 5 of the Step Down Program, and after a year his status changed to general population, even though he remained in the same cell he had been in while on Step 5. He has been in prison since 1981. He told me: "When you first get out you're happy to be free, you enjoy inhaling air that's not in a concrete bunker; but soon all the difficult feelings hit you, the ones you'd been stuffing down while in the SHU." He always believed that his validation was wrong and unfair -- the evidence was hearsay from other prisoners who wanted to get themselves removed from SHU. Staff repeatedly told him that that does not matter; if he wants to get out of SHU he has to "de-brief". He told me: "Growing up I was taught not to inform on other people, so I wasn't going to do that." But the unfairness of his wrongful consignment to SHU weighed on him. He was very resentful all the time, and this made him irritable and made it more difficult for him to tolerate arbitrary, unfair and abusive treatment by officers. He reports that he suffered from hypertension while in the PB SHU, but since he has been at SATF his blood pressure has returned to normal. He continues to feel "very stressed" and is convinced that going to work in his job as a janitor at SATF helps

---

[40] Prisoners #7, #9 and Prisoners #18-24.

EXPERT REPORT OF TERRY A. KUPERS                    C.A. NO. 4:09-cv-05796-CW

relieve the stress.  He reports there was a feeling of unreality when he first arrived at SATF from the PB SHU.  He was very happy to be out of the SHU, but for months after arriving at SATF he tended to isolate himself, choosing to stay in his cell as much as possible or in a familiar place he had staked out for himself in the dayroom.  During his first few months at SATF, he experienced a very strong startle reaction, was very wary of anyone entering his space or vicinity, did not trust anyone, and was unable to share his feelings. He felt out of touch with his feelings to the extent of feeling not really alive. These problems have dwindled to a certain extent in the year and a half he has been at SATF, but are still with him as he tries consciously to remain open to new experiences and grow.

Prisoner #20, ████████████████████ avers a continuing tendency to isolate himself that he first noticed while in the PB SHU, but he feels he brought that problem with him to SATF.  In fact, over a year after arriving at SATF, he is still very anxious in the shower:  "In the SHU, you were locked into the shower alone; here there are a bunch of guys in there and you are vulnerable to attack."  He reports being hyperaware of all the people in the area where he is located, and having a strong startle reaction.  He describes himself as paranoid, he has a very hard time concentrating on almost any task, and he has a very hard time trusting others and letting them know what he is feeling.  He is married, but says that he has trouble sharing his feelings with his wife:  "I'm used to talking in the negative, about dangers lurking or people betraying me; I have to learn to talk about positive stuff.  I have to learn to open up, trust my wife, and share my feelings.  It's very difficult after all those years in SHU."

Prisoner #21, ████████████████████ was transferred to SATF from the PB SHU in ███████████ after 23 years in SHU.  He described his experience in SHU becoming progressively more isolative and numbing his feelings, stating: "you had to, to survive in there."  He explains that it is much better being at SATF, but he continues to isolate himself, and has a lot of trouble trusting others.  He too has a very strong startle reaction.

His paranoia diminished over several months. He thinks having a job and being with other prisoners who had shared his experience in the PB SHU helped him to adjust to being in general population.  He believes he has adjusted well to being in general

population. He did experience for several months when he arrived at SATF, along with quite a lot of startle reaction, paranoia, anxiety (especially when someone approached or touched him, or when he had to leave his familiar small area and move out to another section of the yard or the prison), irritability, angry outbursts that he struggled hard to suppress, problems trusting people, problems sharing his feelings with others, severe sleep problems, social isolation, and emotional numbing. He believes that all of those symptoms diminished quite a bit after several months at SATF, although all of them remain with him in much diminished form. He has a girlfriend, and now that he is in general population they have contact visits. But he feels that he is unable to share a lot of his feelings and inner experience with her – he is certain that is a result of all those years of isolation and emotional numbing while in the PB SHU. He is working very hard on opening up more with her. He thinks that SATF is a relatively small, familiar place, and the real test of his ability to adjust to current conditions and maintain a normal comfort level will come when he leaves prison altogether and re-enters the much larger and more stimulating world of the community. He is nervous about that eventuality. He reports significant hypertension while in SHU, and his blood pressure is much lower now that he is at SATF.

Prisoner #22, ███████████████████████ spent 18 years in the PB SHU, said he felt weird and frightened when they took his handcuffs off and he was surrounded by people (both other prisoners and staff). He remembers a very strong need to stay to himself and avoid other people, which went on for many months. Gradually he started to be more friendly, but over a year after arriving at SATF, he still picks a small area of the dayroom that is his area to "hang out," and he does not go anywhere where there are more than a few people nearby. He feels he learned in SHU to be indifferent to the world and to stop interacting with other people. He avers a strong startle reaction. He is hypervigilant. He plans carefully how to respond if someone enters his area. He pays very intense attention to everything he hears within his earshot, wanting to be ready to defend himself if violence erupts. He feels he remains paranoid about the intentions of others – something he learned in SHU – and he finds it very difficult to trust anyone and let them get close. He tells me, "You normalize yourself to a kind of deadness, it starts to seem normal." Though he is very

EXPERT REPORT OF TERRY A. KUPERS                                    C.A. NO. 4:09-cv-05796-CW

glad to be out of SHU and tries very hard to succeed in his efforts to improve himself, that sense of deadness as normal continues to plague him.

Prisoner #23 ████████████████████████████ was in and out of the PB SHU three times, spending a total of 19 years there. When he first exited the SHU and transferred to SATF, he stayed in his cell or a small space on the yard or dayroom, and only related to a few other prisoners he already knew. He also experiences a strong startle response with hyperawareness of all others nearby. He had a huge amount of trouble trusting anyone and letting anyone get close. He experienced a great amount of anxiety and felt numb a lot of the time. All of these problems waned in degree after several months, but all remain with him. He has a great deal of trouble expressing his feelings to his girlfriend who comes to visit because he learned in SHU to suppress his feelings and share them with nobody.

Prisoner #24, ████████████████████████████ spent a total of 19 years in the PB SHU, tells me he is still not comfortable with people a year and a half after arriving at SATF and being in general population again. He states, "I am only comfortable when I am back in my house [his cell]. I get real nervous in open spaces like the dayroom or the yard, it's like a life sentence of isolation." He avers intense anxiety, severe insomnia, a strong startle reaction, panic attacks when strangers come close, problems with memory and concentration that interfere with reading and task completion, and great difficulty sharing his feelings with anyone. All of these symptoms began for him while he was in the PB SHU, worsened over the years in SHU, were very severe when he first arrived at SATF and for several months, and have waned a little since but remain very problematic. He tells me that when he knows he has to come out of his cell to use the phone or take a shower, he gets very anxious. He is very uncomfortable having people near. He fakes being friendly so he can make friends, but he says he never really lets anyone get close. He tells me, "The inside of my cell is the only place where I feel safe."

It is quite stunning how one hundred percent of the prisoners I interviewed who had been in the PB SHU and are now in general population settings reported many of the components of the SHU Post-Release Syndrome I have described, citing examples relevant to their continuing experience in prison. Again, all of these prisoners reported a

52

long list of the symptoms and problems that I described in Section VIII.B.1.  Very much like the 12 prisoners I interviewed while they remained in SHU, they also describe suppressing their feelings and isolating themselves to survive and stay out of trouble while they existed in a cell and were cell-fed.  And again, like those who returned to the community, the same behaviors that were functional in the SHU became disabling (i.e. their isolation and numbness), and they each evidence many of the problems I listed above as components of the SHU Post-Release Syndrome.  They are severely damaged.  Their quality of life is significantly compromised (e.g. they are not able to work up to their potential, they are relatively incapable of relaxing and enjoying social events and their primary intimacies are very problematic).  The effects of their SHU confinement are relatively long-lasting if not permanent.  One of the men I interviewed at SATF (Prisoner #9) shared his concern that, while he is doing relatively well adjusting to general population conditions at SATF (which is a very sheltered and contained place), he is quite worried that, when he is eventually released from prison, the relatively intense stimulation and unfamiliarity of community surroundings will cause him to have even greater problems adjusting.

### 3.  Description: Reports of former PB SHU prisoners now in the community.

The SHU Post-Release Syndrome plays out in very particular ways when the individual is released from prison at the same time, or some time, after being released from SHU.  The details of how various symptoms are experienced is different for each individual, but the general pattern or syndrome is quite clear in reports from all the individuals I interviewed.  If a prisoner is housed in SHU at the time he is released from prison, he leaves prison straight out of the SHU.  Prisoners call this juxtaposition of release from SHU and release from prison, "maxing out of the SHU."  The prisoners I interviewed who had been released directly from SHU describe a very difficult adjustment in the community.

Prisoner #15, ████████████████████████████████ was released from the PB SHU into general population, and later was released from

prison to return to the community.  He describes what it was like for him to be
transferred from SHU to a general population prison:

> I spent 9 years in [PB SHU], 1992 to 2000.  During that time, I was
> 'validated,' but not 'active.'  Then I got transferred to general
> population at Tehachapi.  It was traumatic.  When I got out of SHU, it
> was like I was brought back to civilization.  I found myself caught up
> in a desperate reconnection with grass on the yard, and I was still
> hearing voices from SHU and the slamming of SHU doors, and I
> could appreciate seeing a bird.  [He cries as he recalls the moment.]
> I didn't know how to act.  I celled with one other guy; I went
> everywhere with him.  I was trying very hard to figure out how to
> function normally.  The SHU environment created a military type
> exterior: you had to be military to survive Pelican Bay SHU.  Then I
> had to work on changing that exterior.  I worked on not being
> paranoid [he reports he was paranoid in SHU, always felt under
> military attack].  I exercised like a soldier.  In SHU, I had exercised
> compulsively to survive the SHU coldness.  I tried to create life
> where it all felt totally dead.  Then, when I got out, I continued the
> exercise to keep my feelings in check.  I did this with no CDCR
> program in place to help us adjust.  Like they said, 'You have to
> recover from that isolation on your own.'  No therapy, no de-briefing.
> I probably could have gotten therapy if I'd asked for it, but I did not
> understand the trauma of SHU and why the need for therapy.  All of
> my reactions were like someone who had been under attack.  I didn't
> trust anyone.  When I was released from [PB SHU] to Tehachapi
> general population, I immediately got involved in securing whatever
> substance I could.  Pruno, pills, marijuana.  I isolated myself at
> Tehachapi, would not go near a crowd.  I even created a space on
> the big yard that approximated the space in a SHU yard.  I didn't do
> any programs, because I was isolating myself.  I didn't know why I
> felt I had to do that.

Eventually Prisoner #15 was released from prison and he now resides in the
community.  He provided me with an account of what happened after he was released
from prison:

> When I got out of prison, I did everything I could to escape into
> euphoria.  I isolated myself, I surrendered myself to drug abuse.  I
> had several relapses.  I was in and out of drug treatment.  Now I've
> been clean and sober for 3 years, seven months.  I've experienced a
> lot of hallucinations and delusions.  The voices and delusions only
> happened after I left SHU.  In SHU I had been hearing [only] echoing
> sounds.  The first time they became voices and paranoia was after I
> left SHU in 2000.  The hallucinations and delusions are always there.
> I still hear the kind of yelling and screaming that I was exposed to in

the SHU. It seems like there is always someone having a mental breakdown. In Tehachapi [he was in and out of SHU at Tehachapi for short periods], I was always hearing screams of mentally ill in the SHU, and the door slamming. That door-closing sound is something that might not have bothered me in SHU, but then when I was in general population and heard a loud noise, I would jump. Then when I was released, I brought that same behavior to the streets. It interferes with every aspect of my life. Still today, if a car backfires, I jump, I'm getting prepared for combat. My heart races. I have flashbacks, always to SHU. I lay in bed now, alone in a room, wanting to urinate, it reminds me of laying in SHU watching TV from bed. I often feel like I am actually back there.

The SHU Post-Release Syndrome did not abate for Prisoner #15 when he left prison. He reports continuing SHU-induced symptoms in the community:

I can't function in a relationship. I can't function in them because I always find a need for compatibility equivalent to having a cellie. A cellie would leave me alone in the isolation I'd become accustomed with. In SHU, I was totally detached from my feelings, I knew of the harsh environment, but refused to be sensitive, refused to cry. But since I've been out here, all of those feelings are released. I cry almost abnormally [he cries as he talks]. I came out of the SHU numb. In general population [where he was for awhile before being released from prison] I didn't allow myself to feel, but after I got out of prison, I slowly reclaimed my feelings. I had several relationships, but I couldn't break down the hard exterior from SHU.

Prisoner #14, ███████████████████████████ with his wife, was released from prison after 19 years, ten of them spent in PB SHU. He reports:

I lost the ability to feel. I started feeling I was callous. Nothing good ever happens in SHU. I tried to hold back the anger so I wouldn't get in trouble. I'm not a disrespectful person, but I was always afraid I would badmouth a cop, so I never let them know anything was bothering me. Holding back anger leads to bottling up other feelings. The problem I have now is not feeling things now. I don't want my girlfriend to see the angry side of me. I'm just trying to do whatever 'normal' is. I try to get along, I'm not critical of other people.

I don't get out a lot. I won't leave the house today. I see people, but I don't go out to dinner with anyone. In SHU I talked to neighbors. And I could hear guys in cells down the pod. I didn't isolate myself, but I saw plenty of other guys who would not talk to anyone, and I saw lots of guys deteriorate over time and go mad or isolate

EXPERT REPORT OF TERRY A. KUPERS                    C.A. NO. 4:09-cv-05796-CW

[themselves].  Part of it is they don't want to get in trouble with other guys.  When you isolate, you lose coherence or sanity.  I did try hard to keep my anger in check, but then that made me stop being in touch with my feelings altogether.  I developed a 'who cares' attitude.

My girlfriend says people are surprised how healthy I seem.  But I'm always feeling inferior inside, I only 'looks normal.'  I have flashbacks.  Something triggers them.  Maybe I feel suddenly boxed in, for example at the mall.  Somehow when I'm there, I get a picture in my head of a prison setting.  My girlfriend says I stare at someone and that's inappropriate.  I'm always hyperaware of my surroundings.  I get on guard if I see black guys around me.  I stay away from crowds and cops.  I try to avoid police.  I'm afraid the police will harass me on account of my record, but they also just remind me of SHU and guards.   SHU makes you feel you're not normal.  It's not normal living in a box.  I feel very bad about myself that I haven't done anything productive for all those years.

Prisoner #16, ███████████████████████████ lives ██████████████ with his family.   He is single and does not work.  He was released from prison in 2004 after serving ten years, 9½ of them in SHU (one at Corcoran and eight at PB SHU).  His sentence followed conviction for drug possession.  After a relatively short time in general population at a lower security prison, he was validated as a gang member, based, according to him, on staff finding drawings in his locker that were gang-related.  He was not charged with nor convicted of any illegal activities that would lead to his consignment to SHU.  He was released from prison straight out of the SHU.  He has four children and is currently single.  He craves being alone, a craving that has been exacerbated by his long stint in solitary.  He admits he tends to isolate himself, and that is very unlike how he was prior to serving those years in SHU.

He believes his personality changed in the SHU: he became more distrustful, even paranoid, and isolates himself.  These tendencies have been present ever since he was released from the SHU.  He remembers isolating himself in the SHU, even beyond the way the prisoners were isolated by the architecture and lack of programs.  He would not even say good morning to prisoners in neighboring cells or prisoners he passed on the way to the yard.  He was afraid his neighbors were hostile and playing psychological games with him.  He now realizes he might have been paranoid about that, but he had no way to assess the actual safety or danger.  He could not see his

neighbors; he could only talk out of his cell door to a faceless voice coming back at him if he and the neighbor yelled loud enough.  He continues:  "So you pull in, you isolate yourself to decrease the danger of a hostile neighbor."  He tells me:  "You're always so angry in the SHU, a lot because they (staff) are always investigating you to prove you're gang-affiliated so they can keep you in the hole, then what you did to control your anger stamps out all your other feelings, you become numb, I felt like I was dead – still do."  He describes being out of touch with his feelings.  He tells me he worked out a lot in SHU, doing calisthenics compulsively, he guesses to handle the nervousness that was always there in the SHU.  He says, "I could do 1,000 push-ups in my cell – it helped bind the anger, and it numbed my feelings."

When Prisoner #16 was first released from the SHU, he was overwhelmed by sounds he heard at home and on the streets.  If he took a walk, he became very nervous.  It was a combination of sounds he was not used to, visual stimuli and traffic. He remains uncomfortable in crowds or even busy spaces like a restaurant.  He knows intellectually that he is not in danger now, but he cannot keep his body from reacting with fear.  I asked how he knows the symptoms he is describing result from time in the SHU, and not simply from being in prison.  He responded:

> If you're in general population, you are relating to other guys, you get
> visits and phone calls, you're social, you're just in prison.  But in
> SHU, you're the opposite of social, you don't get phone calls, you
> can't even look out of a window, so your social world shrinks and
> your visual world shrinks, and then when you get out, look-out!  You
> can't handle all the stimuli and you don't know how to relate to
> people, not even your family.

He continues, "I couldn't work after getting out of the SHU.  The idleness numbed me for work.  I can't focus my mind to get a task done.  Sometimes, with other workers, I get paranoid, I think someone is looking over my shoulder."  He looked for work for quite a while after being released from prison, but was unsuccessful finding a job.  By now, he has so much trouble concentrating that he is not able to carry out work assignments.  This trouble began when he was in the SHU but has continued to the present.  When he hears a loud noise he jumps, having an immediate fear someone is coming to attack him.  He was extremely irritable and quick to anger just after being released.  There is less of that now, but it's still a big problem.  He says his mind never

stops, it is hyperactive, and the rapid-fire thoughts prevent his sleeping.  He never had sleep problems before going to the SHU, not even in prison, but since being in SHU he has had great difficulty sleeping.  He does not believe he hears "voices," meaning hallucinations, but he does aver often thinking someone is hollering at him.  The hollering is vague, and eventually he figures out it is a noise or someone talking loudly, that he incorrectly interprets as a voice hollering at him.

When asked about relationships with women since his 2004 release from prison, Prisoner #16 pauses for quite some time, and then slowly and haltingly reports that he has massive trust problems:

> I can't talk about my feelings – I learned not to express them when I was alone in the SHU – now I mostly don't want to make myself vulnerable – but I am certain that's also from the SHU and all those years not practicing relating to anyone.  There are no phone calls in the SHU, so you can't call someone when you're sad and tell them about it.  Then, after you're out on the streets, and women want to know how you're feeling, you can't tell them.  You forget how to talk to someone about feelings.

Prisoner #16 has been returned to the CDCR several times for parole violations since his release, once for a nine month stint after being found to have "dirty urine." While he has had substance abuse problems in the past, he believes that his post-release drug use has been a weak attempt to numb some of the pain of the SHU and the constricted life he has led since being released.  He is afraid that he lacks sufficient concentration to do what is required at a job, and besides, he is too nervous going for an interview.

I spoke to the sister of Prisoner #16.  She told me that he has lived with his mother and/or his grandmother since being released from prison in 2004.  For many months after his release from prison, he stayed in his room.  He would not go to the refrigerator and get food.  Instead, someone had to bring it to him.  If someone walked unannounced into a room where he was, he would jump and get very agitated.  That reaction has calmed some, but it is still a tendency.   For a few years after being released from prison, he stayed in the house most of the time and refused to go out. She found him to be uncharacteristically quiet and reserved after his release, and for a long time.  He is still not himself.  He avoided all levels of social interaction after leaving

prison, something that is quite different than how he was before going to the SHU.  All of the symptoms she reported to me she thinks Prisoner #16 exhibited very strongly for nine months after his release, but most of them continue into the present in less intense form.

Prisoner #18, ████████████████ tells me: "When you get out, you're happy.  But then you get hit by feelings.  I exercise to keep them down.  Simply inhaling air is a new experience."  He entered prison in 1990 and soon was transferred to the PB SHU, where he remained until 2001.  He entered SHU again in 2006 and remained there until June, 2013, when he was released from SHU to Step 5 of the step down program, but by the time of our meeting he had graduated and was in General Population at SATF.  He recalls many of the oft-reported symptoms while he was in the SHU, including headaches, anxiety, agitation, difficulty concentrating, anger and despair.  He also recalls increasingly isolating himself in SHU, for example never starting any conversations with neighbors.  He also avers emotional numbing that progressed while he was in the SHU both times.  When he transferred to SATF in June, 2013, he felt a sense of unreality.  He transferred with a group of men from the SHU, and he chose to remain with them much of the time and not mingle with other prisoners.  He also remained in a circumscribed space rather than roaming to far reaches of the day room or yard.  Gradually he felt more comfortable in his porter job, but he says "I wouldn't say I am back to normal, I know I need to be more social and I want to be more open and feel more alive than I do now."

Prisoner #17 is more disabled than the others I interviewed.  This ████████ ████████ man graduated from high school and did relatively well in school.  He had

lots of friends.  He was in CDCR custody from 1995 to 2014, and was in PB SHU the entire time.  He was released from prison straight out of SHU.  This was his second prison term.  His first term was six years and he was in general population most of it, and feels he was not damaged by that earlier term.  He was released from this second term on May 23, 2013. ███████████████ He is trying to get SSI Disability for anxiety and panic.  He reports: "I isolated myself in SHU, I went days without talking to anyone.  I could have hollered down the pod, but I just didn't want to communicate.  I tried very hard to suppress the anger, and that deadened all my other feelings.  I couldn't concentrate.  I didn't do much in that cell."  When Prisoner #17 came out of the SHU, he returned home on parole:

> It was a horrible experience, I could not talk to my mother. Since being in SHU, I simply don't know what to say, and that's still going on.  I do stuff I don't understand.  I'm not suicidal.  I didn't see the shrink in prison – too much stigma if you do that – but since being released I've gone to a therapist once a month.  I try to work.  I get odd jobs, and I have trouble concentrating and finishing them. I get all tangled up trying to follow orders.  I think … (indecipherable)… anger about all the stupid orders I had to follow in the SHU.  But right now I can't find work.  I simply can't concentrate.  I can't get tasks completed [because] my mind wanders.  With my wife, she's supportive, but I can't really share what I'm feeling with her, and I know that hurts her.  We've been together about a year.  I don't share my feelings very well.  I don't know what I feel, then she gets upset.  I go out, I can go to a movie or the mall.  I drive.  But I can't get along with people, I just get irritable.  All of these problems started when I was in SHU.  I know I wouldn't have these problems if I'd been in general population.  I would have had social interactions, communications.  But in SHU I forgot how to talk to people.  [Now] I get irritable.  I stay to myself.  I have no real friends, no other family. I think I sound crazy to my mother.  I don't understand what my mother is saying, then I'm silent.[41]  I can't do the things I'd need to do to get a job.  I get too nervous at interviews.

Prisoner #17 tells me that prior to the time he spent in SHU, he had been a very friendly, outgoing person.  During his six-year term in general population he was also outgoing and friendly.  He had no difficulty talking about his feelings and he did not

---

[41] During a brief conversation his mother and I had on the phone, she confirmed that she is not able to talk to her son.  She doesn't know what's wrong, but he just is not present in their conversations.

EXPERT REPORT OF TERRY A. KUPERS                C.A. NO. 4:09-cv-05796-CW

isolate himself.  But that changed dramatically when he was consigned to SHU.  Now, and while he was in SHU, he cannot talk about feelings and does isolate himself quite a lot.  Sleep was very problematic in SHU – prisoners tend to wake many times during the night, and then nap during the days.  He had never had sleep problems before his long stint in SHU.  Since he has been out of prison, he continues to have great difficulty sleeping at night, and then he naps.  He feels depressed and has low energy.  He does not do much.  He is able to do handyman work around the house.  Since being released he has consumed a little bit of drugs and alcohol, but not much.   He never used any substantial amount of substances before.  He is certain that his use of substances is about easing the pain now.  He continues: "Getting out, with the overwhelming stimulation all around, I got very nervous.  Now, I'm not as nervous, but I simply don't know what to say." Prisoner #17 tells me:

> Sometimes I just shut down, I can't talk about my feelings, I can't really talk.  I can't do chores.  I just can't concentrate enough, so I procrastinate.  Then my girlfriend gets upset because I haven't done the chores.  I can't concentrate to finish the task.  I don't trust people, and I don't want to relate to them.  I'm too gullible, that might be why I avoid people.  I can't tell when they are taking advantage of me.  I get really nervous, and that makes concentrating on a task even harder.  I don't watch TV.  I don't even read the newspaper, I'm just not interested in anything.  I don't think I'm mentally ill, but I sure am disabled.

I spoke to the girlfriend of Prisoner #17.  ██████████  She met him after he was released from prison.  She tells me he has been out 1½ years, has a lot of trouble talking to his mom – he does not know what to say.  There is a lot of silence.  With her, there is some of the same problem.  He does not talk about feelings, or does not feel like talking except to say "hi."  Often he isolates himself in the house.  He will not see friends with her.  He is polite, but he will not really talk.  He gets very anxious in social situations and shies away from people.  They do not see friends together, because it is too uncomfortable for him.

All of the prisoners I interviewed reported a long list of the symptoms and problems that I described in Sections VIII.B.1 and VIII.B.2.  Very much like the 11 prisoners I interviewed while they remained in SHU, they also describe suppressing their feelings and isolating themselves to survive and stay out of trouble while they

existed in a cell and were cell-fed (as discussed in Section VIII.B.3 & 4).  But then, when they were released from SHU, the same behaviors that were functional in the SHU become disabling (i.e. their isolation and numbness). They each evidence many of the problems I listed above as components of the SHU Post-Release Syndrome.

## IX.    Opinions

### A.  Harm Caused by SHU Confinement

As described in detail above, all of the 24 prisoners and ex-prisoners I interviewed suffered from very many of the symptoms that are well known in the literature to be caused by isolative confinement.  They consistently reported to me an impressive number of serious symptoms that they suffered while confined in the SHU, including anxiety reaching the level of panic; distorted thinking reaching the level of paranoia; memory and concentration problems that, for example, interfere with the ability to read because one forgets what one read a few pages back; sadness; despair; a growing number of suicidal thoughts; agitation; mounting anger; the fear that the anger will get out of control and get one into even more trouble; and severe problems sleeping.  In other words, all of the prisoners I interviewed told me a list of symptoms and emotional problems that fit exactly the list of symptoms reported in the literature about the damaging effects of long-term isolative confinement.

### B.  Additional Harm Caused by a Decade or More of SHU Confinement

There are additional symptoms that had not been noticed by investigators meeting with prisoners who had been in isolation only months or a few years.  Prisoners who remain in isolation for ten years suffer from the symptoms and disabilities listed in Section IX.A above and reflected in the extant literature about the psychological effects of isolative confinement.  But then, as the years pass by, they develop further symptoms and disabilities.  Of course, part of the further damage is that they suffer from the first set of symptoms and disabilities for the many years they remain in isolative confinement, these problems become more chronic as the years go by, and their pain and suffering is consequently magnified.  In addition, I found that the prisoners' varied personal stories of the additional ways they were uniquely affected by the decade or

62

more of isolation fit into three general categories: symptoms related to a greatly increased urge to isolate; those related to a subjective sense of "numbing," closing off all emotions, beginning usually with attempts to keep the growing anger at bay; and enlarged despair.  Thus individuals who have spent over ten years in the SHU suffer from both longer-lasting and more chronic symptoms than those already described in the literature about isolative confinement.

### C.  Harm That Surfaces After Release from SHU.

Signs of some of the worst harm become evident only after the men are released following ten or more years of SHU confinement.  Whether they are released from SHU to go to another, non-SHU, prison setting, or return to the community, there is an identifiable SHU Post-Release Syndrome that is reported, with some individual variation, by one hundred percent of the men I interviewed.  Most did not report every single component of the syndrome, and the reports of each man were somewhat unique to his personal experience. However, they all complained of a common list of symptoms and disabilities, which I have named the SHU Post-Release Syndrome.  The SHU Post-Release Syndrome is characterized by the following components:

- Disorientation immediately following release.
- Anxiety in unfamiliar places and with unfamiliar people, as daily life events that had been ordinary prior to SHU confinement become unfamiliar events following release from SHU.
- A tendency to retreat into a circumscribed, small space, often a cell (in prison) or a bedroom (in the community).
- A tendency to greatly limit the number of people one interacts with, usually limited to close family members and a few friends.
- Hyperawareness of surroundings, for example a need to sit facing the door to a room or with one's back to a wall.
- Heightened suspicion of everyone who comes close, especially strangers.
- Difficulty expressing feelings.
- Difficulty trusting others, even one's wife or first degree relative.

EXPERT REPORT OF TERRY A. KUPERS                          C.A. NO. 4:09-cv-05796-CW

- Problems with concentration and memory, beginning in the period of SHU confinement and continuing after release, making it difficult to accomplish tasks and to work.

- A sense of having experienced a change of personality. The most often reported form of this change is from a relatively outgoing, friendly individual with a sense of humor prior to SHU confinement, to a more serious, guarded, and inward individual following release from the SHU.

- In some but certainly not all cases, there is a tendency to resort to alcohol and illicit substances to lessen the pain and make the confusion and anxiety more bearable.

All of these problems are experienced intensely for many months after release from SHU, but then the problems continue in less intense fashion, most often right up to the present which might be years later. The prisoners I interviewed after they were released from SHU but remained in prison, as well as the ex-prisoners I interviewed in the community, suffer from a combination of the symptoms that have been included in discussions of isolative confinement in the literature (anxiety, paranoia, insomnia, mounting anger, concentration and memory problems, compulsive acts, despair and so forth), the exaggerated self-isolation and numbing that emerged only after many years in SHU, and the symptoms I have described as the SHU Post-Release Syndrome. In other words, they experience a great many troubling symptoms and as a result the quality of their lives and their functioning are significantly impaired.

### D. The Link Between Reported Symptoms and SHU Confinement.

How are we to know that the damage described in this report is not the result of traumas experienced prior to incarceration or merely to the stressful experience of prison life itself? I have concluded, to a reasonable degree of medical certainty, that there is a clear causal link between the symptoms and problems the men I interviewed reported and their tenure in the PB SHU.

As a psychiatrist, I practice a clinical science designed to fathom the etiology of reported symptoms and events. For example, the first thing a clinician asks when a person reports a symptom such as flashbacks is, "When did you first experience such

things?," and then, "Tell me more, what is the content of the flashbacks?" If the person responds that the flashbacks have been present since his teenage years and the content can be about anything (e.g. childhood, schoolyard fights, or prison events), then we conclude that, while the flashbacks might have been exacerbated by isolated confinement, the flashbacks were not triggered by the person's experience in SHU. On the other hand, if the person says, "I never experienced anything like this before I was in the SHU," and "the flashbacks are always about something that happened in the SHU," then this is evidence that the flashbacks were caused to a great extent by SHU confinement.

Similarly, a detailed psychiatric history is the main instrument we have for determining the origin and roots of various psychiatric symptoms and conditions. The source of the damage can be complicated. Thus Prisoner #15 reported to me that he never experienced flashbacks prior to his nine-year stint in SHU. It is clear that his SHU experience caused him to have flashbacks, even if the content of the flashbacks includes experiences that did not actually occur while he was in the SHU. The equivalent emergence of serious symptoms only after confinement in SHU that Prisoner #15 reported was consistently reported by all the other prisoners I interviewed. In other words, the determination can be complicated, but all of the data needs to be considered to come up with a clinical formulation.

### E.  Representativeness of the Prisoners.

The 25 prisoners I interviewed in all settings are entirely representative of similarly situated prisoners as a class, i.e. the class of prisoners who have been consigned to the PB SHU for ten or more years. I interviewed eleven men in the SHU and a twelfth on SHU status who had been transferred to CSP-Sacramento for medical reasons. Then I interviewed an additional 12 prisoners and ex-prisoners. Clinical research in psychiatry relies upon a number of factors to determine if a sample of affected individuals represents a larger group's shared experience. A sufficient number of representative cases is one consideration. I supervise doctoral research in the Graduate School of Psychology at the Wright Institute, an accredited graduate school granting doctoral degrees. In our dissertation manual, approved for accreditation

EXPERT REPORT OF TERRY A. KUPERS                    C.A. NO. 4:09-cv-05796-CW

purposes by the American Psychological Association, it is recommended that for qualitative research, i.e. research that relies on interviews and narrative reports, a minimum of ten subjects be included to make the study valid and reliable. I have interviewed 24 individuals, some on multiple occasions, so that requirement is satisfied.

Random sampling is one of many techniques for assuring a representative study sample, but it is not always a relevant consideration. In this case, many of the prisoners I interviewed were not selected randomly. For example, the first ten were named plaintiffs in the present litigation. However, the seven SATF prisoners I interviewed were essentially randomly selected, in that I interviewed all English-speaking prisoners from a list provided by the CDCR who had served ten or more years in PB SHU and had been transferred to SATF by CDCR by February 2014.

There are additional ways to assess the degree of commonality and typicality in a larger group. First, there is the degree of shared symptomatology and the consistency of the reported symptoms and disability. Do all of the selected sample exhibit common symptomatology and functional impairment? In other words, how universal are the symptoms and disabilities in the sampled group? In the present case, it is highly significant how consistently the 24 individuals I interviewed report the same experience and resulting symptoms. In their reports, each prisoner recounts somewhat different symptoms,and none experience all of them, but so many of the prisoners report such a long list of these well-known symptoms[42] that it is clear they suffer emotional harm on account of their long-term SHU confinement. The stunning universality of their reported symptoms and problems makes it very likely that all other similarly situated individuals will evidence the same symptoms.

Then there is another list of complaints and symptoms that are reported by every single one of the 24 men I interviewed. These include a growing sense of being out of touch with their feelings to the point of numbness or deadness, a continually worsening sense of isolation accompanied by a tendency to isolate themselves even further, and a sense of despair that enlarges as the years in isolation go by. This group of complaints

---

[42] Anxiety, hopelessness, mounting anger, insomnia, problems with cognition and memory, exaggerated startle reaction, distorted thought processes and so forth (the list of symptoms uncovered by Drs. Toch, Haney, Grassian, myself and others in long-term isolated confinement).

EXPERT REPORT OF TERRY A. KUPERS                              C.A. NO. 4:09-cv-05796-CW

and symptoms, shared by all 24 of the prisoners I interviewed, is distinct from the symptom constellation generally reported in prisoners who are in long-term (more than three months) isolated confinement, and seems clearly to result from very long-term isolated confinement, certainly including confinement in excess of a decade.

While some symptoms traditionally reported in prisoners consigned to isolated confinement (including memory loss, anxiety and paranoia) are reported by a certain proportion of the prisoners in isolated confinement, this last group of experiences and symptoms was reported universally by all the prisoners I interviewed. This is very strong presumptive evidence that this symptom complex is present in very many of the other prisoners who have been in isolated confinement for a very long time, i.e. longer than ten years. In other words, if we find a clear set of symptoms in every single one of the 24 men interviewed, it is almost certain that such symptoms and disabilities are widespread throughout the class.

Of course, ten of the men I interviewed were self-selected in the sense that they agreed to be named plaintiffs in a lawsuit. Obviously they have not committed suicide nor needed the level of mental health care that would mandate their removal from SHU per exclusion criteria established in *Madrid v. Gomez*. They also share a strong resolve not to participate in the "de-briefing" procedure because they consider it a form of "snitching," which they find morally repugnant. In terms of commonality and typicality, we must consider whether there is any reason they should logically be expected to report symptoms the other prisoners do not experience.

Malingering must be considered in this regard. Malingering is the invention or exaggeration of symptoms for secondary gain.[43] In psychiatry, we have methods for determining the authenticity of reported symptoms, and to rule out malingering and other forms of distortion and manipulation. For example, we look for internal consistency in the story reported by a person, we check for contradictions between the subjective history and our objective observations on mental status examination, we make a determination based on our psychiatric acumen whether the reported symptoms are believable and internally consistent, we check related documents and look for

---

[43] DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS, 683, (American Psychiatric Association, 4th Ed., 1994)

EXPERT REPORT OF TERRY A. KUPERS                    C.A. NO. 4:09-cv-05796-CW

consistency versus contradiction with the record, we look for consistency between informants who do not know each other or could not have planned together to provide false answers to our questions, and so forth. I apply this methodology in my interviews and examinations. While some of the first ten men I interviewed do know each other, they are not known by and do not know most of the men I subsequently interviewed. Yet the symptoms and problems reported by the first ten men and all the others are strikingly similar and universal. This fact alone goes a long way toward proving the reliability of these prisoners' and ex-prisoners' reported symptoms and problems.

In fact, the men I interviewed are strongly inclined not to report, or to under-report emotional symptoms. This is because they share a "prison code" that discourages exhibiting weakness and emotional problems. They are very unlikely to use mental health services (many of them tell me that they do not trust that mental health staff will maintain confidentiality, and their reports of symptoms could be harmful to them). And the symptoms and disabilities I am memorializing in this report are not typical of any particular mental disorder. If a prisoner were interested in fooling me into thinking he suffer from a mental disorder in order to gain something, he would not tell me about the kinds of symptoms these men report. Rather he would tell me about symptoms out of a psychiatric textbook such as auditory hallucinations, flashbacks or suicidal inclinations, and he would be seeking some kind of psychiatric services or benefits. Further, because I am putting together the information these men provide and arriving at the conclusion that there is a pattern of numbing, isolation and despair, there is no way they would be able to concoct a false story with the consistency and integrity I discover in their oral reports. Besides, they underplay rather than exaggerate their emotional pain and disability at every turn. Thus there is no evidence of malingering in the reports of these ten men.

Further, because the first ten men are relatively articulate, willing to challenge the conditions of their confinement, and are not seeking mental health treatment, there is every indication that the remainder of the population in the PB SHU would report, on average, relatively more severe symptoms and disability than this group, would aver greater suicidal ideation and planning, and would be driven to greater levels of disability and distress by the same or equivalent symptoms than the original group of ten report. I

interviewed fourteen additional men, and found an impressive and very significant similarity between the symptoms and disabilities they reported and the symptoms and disabilities reported by the ten named plaintiffs who were in the SHU when I interviewed them.  Of course, the men who had been released reported additional problems, which I have characterized as a SHU Post-Release Syndrome.  The men I interviewed while they were in the SHU had not yet experienced or reported many of those symptoms and disabilities.

In arriving at the opinion that the reports of these 24 men are quite representative of the group of prisoners confined in the PB SHU, I also call on all my previous experience investigating conditions in isolation units and interviewing over a thousand prisoners in many states.  I have encountered prisoners in several states who were in isolated confinement for longer than ten years, and found in many cases that they exhibited massively constricted affect, extreme isolative tendencies and significant despair.  As a general tendency, I have discovered that the longer an individual remains in isolated confinement, the more severe the resultant symptoms and disability, especially symptoms related to constriction of affect, severe isolation and despair.[44]  I cannot guarantee that every single prisoner similarly situated in the PB SHU suffers precisely the same emotional pain and psychiatric symptomatology and disability as these 24 men, but I can say with a reasonable degree of medical certainty that, given the severity and consistency of these men's reported suffering and symptomatology, most if not all of the prisoners in the PB SHU for ten years or more suffer from a significant number of the symptoms I have enumerated (in Section VIII.B), a significant degree of emotional numbing, social isolation and despair, resulting in severe pain, suffering and disability.  And most if not all of the individuals who are released from the SHU after ten years suffer from many of the symptom and disabilities I have termed the SHU Post-Release Syndrome.

### F.  Perceived Fairness

Perceived fairness is a very important issue.  While I will not comment directly on

---

[44] See Terry Kupers, *What to Do With the Survivors?: Coping With the Long-Term Effects of Isolated Confinement*, CRIM. JUST. & BEHAVIOR, Vol. 35 No. 8, 1005-1016 (2008).

EXPERT REPORT OF TERRY A. KUPERS                                          C.A. NO. 4:09-cv-05796-CW

the legality or constitutionality of the due process afforded these men, I will mention the psychological consequences of their subjective feeling that they are denied due process and treated unfairly.  A prisoner who commits a crime and is punished feels, to a certain extent, he has "done the crime and will do the time."  But if he is innocent, his resentment about being unfairly punished gnaws at him, and makes the traumas of prison life (the humiliating strip searches, the time in isolation, the lack of phone calls, etc.) much more difficult to bear.  A special measure of resentment wells up inside.  He feels always a bit more angry and irritable about each successive injustice, and he is all the more afraid his anger and resentment will break out and he will do something that will lengthen his sentence or his time in segregation.  His feeling of betrayal by those in authority (the officers, the classification officials, etc.) makes it much more difficult for him to trust staff at the prison, and this both tends to get him into trouble and to deprive him of the help that staff should be providing him during his time behind bars.

All the men I interviewed feel that the validation process was entirely unfair – that they were never given an opportunity to defend themselves, that they were never able to cross-examine those who gave evidence against them, and that the evidence for their six year "re-validations" were entirely "bunk."  These men subjectively (with varying degrees of basis in objective reality) feel that they have been treated unfairly.  They consequently build up a lot of resentment about the unfairness and they are unable to trust the staff upon whom they are entirely dependent in the SHU.  The anger about the unfairness of their validation and SHU confinement serves to exacerbate all the symptoms that anyone confined in isolation would feel.  Secondarily, they isolate themselves and suppress their feelings all the more because of the extra measure of resentment that is swelled by their sense of the unfairness of it all.  Further, the distrust they feel with staff makes it even harder for them to acquire the social skills – including but not limited to the capacity to rely on people in authority to accomplish one's goals – that they will need to succeed either in general population or in the community after their release from prison.  In other words, there are very damaging effects on these prisoners due to their subjective sense that their validation and very long SHU confinement is entirely unfair and that due process is lacking.

EXPERT REPORT OF TERRY A. KUPERS                                C.A. NO. 4:09-cv-05796-CW

## X.    Conclusion

The 24 men I interviewed who had spent ten years or more in their cells for nearly 24 hours per day in the PB SHU are representative of the class and are severely damaged by the experience.  Those who remain in SHU continue to suffer from the major symptoms and disabilities I have described throughout this report, and those who are no longer in SHU find the quality of their lives is significantly compromised.  They are not able to work up to their potential, they are relatively incapable of relaxing and enjoying social events, and their primary intimacies are very difficult because of the psychological damage they incurred while in the SHU.  These negative effects of SHU confinement are relatively long-lasting if not permanent.

I interviewed 24 prisoners or ex-prisoners who spent ten or more years at the Pelican Bay SHU. The 24 prisoners and ex-prisoners I interviewed include 11 prisoners who were still in SHU when I interviewed them, one who was in another SHU  so he could receive medical treatment, seven who had been released from SHU to other prison settings, and five who had returned to the community after being released from SHU. I described (in Section VIII.B.1 & 2) a set of symptoms experienced during their tenure in SHU that I uncovered in all 24 men I interviewed, including anxiety reaching the level of panic; distorted thinking reaching the level of paranoia; memory and concentration problems; sadness; despair; agitation; mounting anger; the fear that the anger will get out of control and get one into even more trouble; and severe problems sleeping.  In other words the prisoners I interviewed while they remained in the SHU consistently reported symptoms that match those reported in the literature by prisoners in isolation in a great many settings.

Then I described (in Section VIII.B.3 & 4) a pattern of additional symptoms that evolve after many years of isolated confinement in SHU, symptoms that fit into three basic categories: an exaggerated urge toward isolation even in the context of isolated confinement; and the numbing of feelings to the point where the individual reports not even knowing what he feels, and several said they feel dead.  In addition, there is the enlarging sense of despair that grows during the years of isolation.

A certain number of prisoners are eventually released from their isolative confinement.  All of the men I spoke to who had been released from SHU, either to

71

another prison setting or to the community, reported that many of the most serious problems they experience surfaced only after they left the SHU.  I was able to identify a syndrome, the SHU Post-Release Syndrome (described in Section VIII.C) that captures the experience of the men who had been released from the PB SHU after ten years. The SHU Post-Release Syndrome is characterized by disorientation; anxiety in unfamiliar places and with unfamiliar people; a tendency to retreat into a circumscribed, small space, often a bedroom or cell; a tendency to greatly limit the number of people one interacts with; hyperawareness of surroundings; heightened suspicion of everyone who comes close; difficulty expressing feelings; difficulty trusting others; problems with concentration and memory; a sense of a changed personality; and a tendency to resort to alcohol and illicit substances to lessen emotional pain.  The set of symptoms that characterize the SHU Post-Release Syndrome was consistently reported, whether the prisoner was transferred from SHU to a general population or "stepdown" prison setting within the California prison system, or returned to the community.  Thus, for example, one former SHU prisoner who has been released to the community reported that he stays in his room a lot of his waking hours, while a prisoner who had been released from SHU to return to general population status in prison stays in his cell most of his waking hours.  Both groups appear to be trying to re-establish the conditions they experienced in the SHU.  It is as if they have become so habituated to life in a small cell that exposure to any larger, more populated area seems overwhelming and frightening.

The extraordinarily painful experiences reported by all 24 prisoners I interviewed are not reflective of any particular diagnosis out of the *Diagnostic and Statistical Manual of Mental Disorders*, yet they make these men miserable and relatively dysfunctional, in and after SHU confinement.  In other words, there are limits to the use of psychiatric diagnoses and standard disability assessments when it comes to the pain and suffering and long-term damage of men who have been in the SHU for a decade or more.  Thus there is very little discussion in the clinical charts I reviewed of the kind of pain and suffering I discovered in the men I interviewed.   Of course, these are men who are not prone to expose psychological pain and vulnerability to a prison mental health clinician they do not even know, and almost all of them tell me they do not want to be diagnosed

nor provided mental health treatment. Again, the kinds of damages they suffer do not fit into any neat diagnostic category.

Many of these men could benefit from mental health treatment, or from other interventions such as relaxation techniques, meditation or psycho-educational classes on coping with the negative effects of prolonged isolation. Treatment cannot take away past suffering, but it might help reduce present and future suffering. But no amount of treatment will eradicate the pain and suffering these men were forced to endure during their years of relative isolation and idleness in the PB SHU.

For example, when I interviewed Prisoner #7, he told me that it is very upsetting to him that when his grown daughter visits him (which occurs more easily now that he is at CSP-Sacramento), he cannot express any emotions or cry with her. Then it pains him deeply that his connection with his daughter necessarily remains superficial. He explains in detail how suppressed he feels most of the time, how he stays to himself and does not exhibit any spontaneity or initiative in his interactions with other prisoners on the yard, does not experience any enjoyment, and how he and his cellmate do not even talk to each other, but both go on about their business as if the other were not present in the cell. In these and comparable ways, he explains that he feels not really alive. Similarly, Prisoner #15, who is in the community, reports:

> I can't function in a relationship. I can't function in them because I always find a need for compatibility equivalent to having a cellie. A cellie would leave me alone in the isolation I'd become accustomed with. In SHU, I was totally detached from my feelings. I knew of the harsh environment, but refused to be sensitive, refused to cry. But since I've been out here all of those feelings are released.... I had several relationships, but I couldn't break down the hard exterior from SHU.

Of course, removing these men from isolative confinement would be a prerequisite for treatment to be effective. But no treatment will take away their immense pain and suffering.

Respectfully submitted,

Terry A. Kupers, M.D., M.S.P.

EXPERT REPORT OF TERRY A. KUPERS                    C.A. NO. 4:09-cv-05796-CW

# CONFIDENTIAL

**Name Key**



EXPERT REPORT OF TERRY A. KUPERS                    C.A. NO. 4:09-cv-05796-CW

# Exhibit F



# Exhibit G





# Exhibit H









# Exhibit I

# Expert Report of Terry A. Kupers, M.D., M.S.P.
## Eastern Mississippi Correctional Facility

Submitted
June 16, 2014

# CONTENTS

Assignment                                                                 3

Summary of Opinions                                                        3

Qualifications                                                             3

Compensation                                                               8

Facts and Data Considered in Forming Opinions                             8

OPINIONS AND BASIS AND REASONS FOR OPINIONS                               10

OPINION 1: The conditions in isolated confinement housing at EMCF are
so shockingly harsh and inhumane as to subject all prisoners housed there
to a significant risk of serious psychiatric symptoms and breakdown, and to subject the
less healthy prisoners to significant risk of very severe and possibly irreversible psychiatric
consequences, including psychosis, mania or compulsive acts of self-abuse or suicide.    10

    I.A. The Known Effects of Long-Term Solitary Confinement                    10
    I.B. MDOC's Awareness of the Damaging Effects of Prolonged Isolated Confinement    14
    I.C. Conditions for Prisoners in Isolated Confinement                          15
    I.D. Abandonment by Staff and Profound Neglect of Prisoners' Basic Needs        20
    I.E. Punishment for Seeking Staff Attention to Urgent Needs                    23
    I.F.  Degrading and Dehumanizing Treatment by Staff                           25
    I.G.  Some Illustrative Cases                                                 26

OPINION 2: Mental health care at EMCF for prisoners with serious mental health needs is
so grossly deficient that it subjects all prisoners with serious mental health needs to
significant risks of psychiatric deterioration, worsening prognoses, permanent psychiatric
damage, and extreme suffering.                                            30

    II.A. Staffing Levels and Competency of Staff                                 30
    II.B. Deficiencies in Levels of Mental Health Care                            32

        *Inpatient care*                                               32

        *Intermediate level of care*                                  33

        *Outpatient Mental Health Treatment*                          36

    II.C. Gravely Deficient Care for Patients in Psychiatric Crisis               37

    II.D. Inadequate Medication Management and Over-Reliance on

        Psychotropic Medications as the Only Available Treatment Modality    41

    II. E.  Unreliable, Inaccurate and Incomplete Mental Health Records            49

    II.F. Effect on Prisoners' Mental Health of Systemic Excessive Force           52

CONCLUSION                                                                54

**Assignment**

Plaintiffs have asked me to evaluate the mental health impact, if any, of the conditions of confinement in the segregation units at East Mississippi Correction Facility (EMCF) on prisoners confined to those units; and to evaluate the adequacy of the system at EMCF for providing treatment for inmates with serious mental health needs.

**Summary of Opinions**

I have formed the following opinions in this case:

The conditions in isolated confinement housing at EMCF are so shockingly harsh and cruel as to subject all prisoners housed there to a significant risk of serious psychiatric symptoms and breakdown, and to subject the less healthy prisoners to significant risk of very severe and possibly irreversible psychiatric consequences, including psychosis, mania or compulsive acts of self-abuse or suicide. Taken as a whole, the conditions in solitary confinement at EMCF are the worst I have witnessed in my 40 years as a forensic psychiatrist investigating jail and prison conditions. These conditions can accurately be described as torture according to international human rights agreements and standards. They press the outer bounds of what most humans can psychologically tolerate.

Mental health care at EMCF for prisoners with serious mental health needs is so grossly deficient that it subjects all prisoners with serious mental health needs to significant risks of psychiatric deterioration, worsening prognoses, permanent psychiatric damage, and extreme suffering. Gross and unacceptable deficiencies in the areas of staffing levels, staff competency, medical records, screening for risk, crisis intervention, inpatient care, intermediate level of care, and outpatient care, and failure to obtain informed consent for treatment with psychotropic medications, among other things, make the mental health care shockingly substandard. The effects of these deficiencies are compounded by the neglect of patients' basic human needs, and by abuse by staff, and for those in the segregation units by the conditions there.

**Qualifications**

**I** am a medical doctor and have been licensed to practice medicine in the State of California

since 1968. I am a Diplomate of the American Board of Psychiatry & Neurology (Psychiatry, 1974, for life).

I am on the staff of the Alta Bates Medical Center in Berkeley.   I am Institute Professor in the Graduate School of Psychology at Wright Institute in Berkeley, and have been on the faculty of the Wright Institute since 1981.

I am Distinguished Life Fellow of the American Psychiatric Association and a member of the American Academy of Psychiatry and the Law and the American Association of Community Psychiatrists. I have served as President of the East Bay Psychiatric Association (local branch of the American Psychiatric Association) and I served for several years as Co-Chair of the Committee on Persons with Mental Illness Behind Bars of the American Association of Community Psychiatrists. I have conducted a private practice of psychiatry since 1974 and I currently maintain a clinical practice in Oakland, California.

I have testified as an expert in over thirty criminal and civil proceedings, in federal and state courts regarding jail and prison conditions, their effects on prisoners, the quality of mental health services, and the problem of sexual assault in correctional settings.

I have extensive experience investigating the conditions of confinement and the treatment of mentally ill prisoners in Mississippi, and in collaborating with the Mississippi Department of Corrections in efforts to ameliorate those conditions. I testified as an expert in two class action cases involving treatment of mentally ill prisoners and the psychiatric effects on prisoners of solitary confinement and other conditions in Mississippi prisons. In *Russell v. Johnson* (2003) I testified about the psychiatric effects of the conditions of confinement on Mississippi's Death Row at Parchman.  In *Presley v. Epps* (2006), I testified about the abuse of mentally ill prisoners in Unit 32, the 1,000 bed supermax unit at Mississippi State Penitentiary.  In both cases, the Court entered remedial decrees.

In *Presley v. Epps*, I assisted MDOC in the implementation of a consent decree that reduced the population in solitary confinement from 1,000 to 150 prisoners and reformed treatment of

prisoners with serious mental illness.  In 2009, in collaboration with officials from Mississippi Department of Corrections (MDOC) and MDOC's private health contractor, Wexford, I published an article about this experience, "Beyond supermax administrative segregation: Mississippi's experience rethinking prison classification and creating alternative mental health programs."[1]

I have had prior experience at EMCF in connection with my work in implementing the decrees in *Presley v. Epps*.  In 2008 I toured EMCF and met with the mental health program director for The GEO Group ("GEO," the private company then running EMCF on contract with MDOC), in an attempt to understand the resources available for prisoners with serious mental illness in Unit 32 at Parchman who, under the terms of the consent decree in *Presley*, were to be transferred to EMCF for treatment.  In January 2011, under the terms of a later decree whereby Unit 32 was to be permanently shuttered and all prisoners with serious mental illness who had been housed there were to be transferred to EMCF absent exceptional circumstances, I investigated the conditions of confinement and mental health treatment at EMCF and consulted with MDOC officials and their mental health contractor, GEO, in collaborative efforts to improve mental health treatment at EMCF.  I again toured EMCF, conducted interviews with staff and prisoners, and met with custody and mental health administrators from MDOC and GEO, including MDOC's Deputy Commissioner Emmitt Sparkman and GEO regional Medical Director for Psychiatry, Dr. Cassandra Newkirk, to make specific recommendations to them.  In October 2011, I reviewed and responded with specific recommendations to a proposal by MDOC/GEO for the creation of a Special Management Unit at EMCF, designed for prisoners on Unit 5.

In addition to the Mississippi cases in which I have testified as an expert, I have testified in the following cases, among others: *Hadix v. Caruso* (2008), regarding mental health care in Michigan prisons; *DAI, Inc. v. NY OMH* (2006), regarding mental health care in the New York Department of Correctional Services; *Austin v. Wilkinson* (2005), regarding the proposed transfer

---

[1] Kupers, T. A., Dronet, T., Winter, M., Austin, J., Kelly, L., Cartier, W., ... & McBride, J. (2009). Beyond supermax administrative segregation: Mississippi's experience rethinking prison classification and creating alternative mental health Programs. *Criminal Justice and Behavior*, *36*(10), 1037-1050.

of Ohio death row prisoners to Ohio State Penitentiary (a supermax facility); *Jones 'El v. Berge* (2001 and 2002), on the effects of isolated confinement on Wisconsin prisoners suffering from serious mental illness; *Everson et al. v. Michigan Department of Corrections* (2001), about prison staffing; *Westchester County in Westchester Co. Correction Officers Benevolent Assoc., v. County of Westchester* (2002, in deposition), about mental health care and prison staffing; *Bazetta v. McGinnis*, 2000, about the effect of visitation and its restriction on Michigan prisoners; *Cain v. Michigan Dept. of Corrections*, 1998, about conditions of confinement and their effect on mental health; *Coleman v. Wilson*, 1993, about conditions of confinement and the quality of mental health treatment for prisoners with mental illness in the California Department of Corrections; *Gates v. Deukmejian*, 1989, regarding the availability and quality of mental health services at the California Medical Facility at Vacaville; *Toussaint/ Wright/Thompson v. Enomoto* (1983), regarding conditions of confinement and effects of double-ceiling in the Security Housing Units of the California Department of Corrections; *Neal v. Michigan DOC* (2008), regarding custodial misconduct and sexual abuse of women prisoners.

I received a B.A. in Psychology from Stanford University with distinction and a Masters in Social Psychiatry degree from UCLA. I received my degree in medicine from UCLA School of Medicine where I was elected to Alpha Omega Alpha Honor Society. I completed an Internship in Medicine/Pediatrics/Surgery at Kings County Hospital/Downstate Medical Center in New York, a Residency in Psychiatry at UCLA NPI (Los Angeles) and Tavistock Institute (London), and a Fellowship in Social and Community Psychiatry at UCLA Neuropsychiatric Institute (NPI). Between 1974 and 1977, I was Assistant Professor in the Department of Psychiatry and Co-Director of the Psychiatry Residency Training Program of the Charles Drew Postgraduate Medical School in Los Angeles, and I was a staff psychiatrist and Co-Director of the Outpatient Clinic at Martin Luther King, Jr. Hospital in Los Angeles. From 1977 to 1981, I was staff psychiatrist and Co-Director of the Partial Hospital Program at the Richmond (California) Community Mental Health Center.

I have published extensively on the subject of mental illness in correctional settings. I have published more than two dozen articles in scholarly journals including "Beyond Supermax Administrative Segregation: Mississippi's Experience Rethinking Prison Classification and

Creating Alternative Mental Health Programs," <u>Criminal Justice and Behavior</u>, 36, 1037-1050 (2009); "What to do with the Survivors?: Coping with the Long-Term Effects of Isolated Confinement," <u>Criminal Justice and Behavior</u>, Vol. 35 No. 8, August (2008), pp. 1005-1016; "Malingering in Correctional Settings," <u>Correctional Mental Health Report</u>, 5, 6, 81-, March/April, (2004); "Violence in Prisons, Revisited," (with Hans Toch), <u>Journal of Offender Rehabilitation</u>, 45,3/4, 49-54, (2007); "Toxic Masculinity as a Barrier to Mental Health Treatment in Prison," <u>Journal of Clinical Psychology</u>, 61,6,1-2, (2005); "The SHIJ Syndrome and Community Mental Health," <u>The Community Psychiatrist</u>, Summer, (1998); "Trauma and Its Sequelae in Male Prisoners," <u>American Journal of Orthopsychiatry</u>, 66,2, (1996), pp. 189-196.

I have published a book on the subject of mental illness in prison, <u>Prison Madness: The Mental Health Crisis Behind Bars and What We Must Do About It</u>, Jossey-Bass/Wiley, (1999), and co-edited another, <u>Prison Masculinities</u>, Temple University Press, (2003). Among book chapters I have written on the subject of mental illness in prison are "Psychotherapy with Men in Prison," in <u>A New Handbook of Counseling & Psychotherapy Approaches for Men</u>, eds. Gary Brooks and Glenn Good, Jossey-Bass/Wiley, (2001), "Posttraumatic Stress Disorder (PTSD) in Prisoners," in <u>Managing Special Populations in Jails and Prisons</u>, ed. Stan Stojkovic, Civic Research Institute, Kingston, NJ, (2005), and "Schizophrenia, its Treatment and Prison Adjustment," in <u>Managing Special Populations in Jails and Prisons</u>, ed. Stan Stojkovic, Civic Research Institute, Kingston, NJ, 2005). I wrote the Foreword for David Jones (Editor), <u>Working with Dangerous People: The Psychotherapy of Violence</u>, Oxon, UK: Radcliffe Medical Press Ltd., (2004); "The Role of Psychiatry in Correctional Settings: A Community Mental Health Model," <u>Correctional Mental Health Report</u>, Vol. 13, No. 3, September/October, (2011); "A Community Mental Health Model for Corrections," <u>Correctional Mental Health Report</u>, Vol. 13, No. 5, January/February, 2012, and "Isolated Confinement: Effective Method for Behavior Change or Punishment for Punishment's Sake?," <u>The Routledge Handbook of International Crime and Justice Studies</u>, Eds. Bruce Arrigo & Heather Bersot, Oxford: Routledge, (2013), pp. 213-232. I am Contributing Editor of <u>Correctional Mental Health Report</u>.

I have served as a consultant regarding prison conditions and the quality of correctional mental health care to the U.S. Department of Justice, Civil Rights Division. I have conducted trainings

for correctional and mental health staff in several departments of corrections.  I serve as consultant to several public mental health agencies.

I testified as an expert to the National Prison Rape Elimination Commission, which was created by Act of Congress to investigate the problem of rape in U.S. prisons and jails and make recommendations for its elimination.

I have lectured and presented on mental illness in prison, at many professional meetings, including a Symposium Presentation, "The Experience of Individuals with Mental Illness in the Criminal Justice System," at the May 20, 2013 Annual Meeting of the American Psychiatric Association in San Francisco.

I received the Exemplary Psychiatrist Award from the National Alliance on Mental Illness (NAMI) at the annual meeting of the American Psychiatric Association in 2005; and the William Rossiter Award for "global contributions made to the field of forensic mental health" from the Forensic Mental Health Association of California in 2009.

I attach to this Report a copy of my current curriculum vitae, which includes a list of all the publications I have authored in the past 10 years and a list of all the cases in which I have testified at trial or deposition during the past four years.

**COMPENSATION**

My rate of compensation in this case is $225/hour for all work except deposition and testimony at trial, for which my rate is $450/hour.

**FACTS AND DATA CONSIDERED IN FORMING OPINIONS**

In forming my opinions in this Report, I considered the information I gathered during the three days I spent at EMCF, April 23 – April 25, 2014, touring the facility, discussing various practices and policies with staff, and interviewing prisoners.  I conducted individual interviews of 23 prisoners in a private meeting room and conducted an additional 27 individual interviews of prisoners on the units while touring.  In addition, I conducted group interviews of more than

25 other prisoners in groups that I assembled by entering general population Units and asking several prisoners, randomly selected, to sit with me and discuss their prison experience and programs. I also met for approximately a half hour with six prisoners, most from Unit 4, in the waiting room of the medical clinic. My tours included visits to Units 5 and 6 on 4/23/14. I spent approximately an hour and a half entering pods, speaking with staff and with prisoners locked in their cells or the showers. I returned to Unit 5 on 4/24/14 and visited the day room on one pod and the control booth. I visited the Crisis Unit in the Medical Department (Observation Cells) and spoke with the prisoners in Observation. I toured Unit 3 C and talked with approximately 20 prisoners individually and in groups in the dayroom. I toured Units 1A, 2A, 2B, 3A, 3B, 4A, and 4C and spoke with prisoners in each location.

I reviewed electronic medical/mental health records (EMR) for over a dozen prisoners that are mentioned in this report, and reviewed the summaries of EMRs prepared and submitted by Dr. Bart Abplanalp. I reviewed a transcript of the Deposition of Captain Matthew Naidow. I reviewed the July 19, 2012 Contract for Medical Services at EMCF between MDOC and Health Assurance, LLC. I reviewed numerous policies of MDOC and Health Assurance, LLC; lists of prisoner grievances; incidents reports; audits; email correspondence of Dr. Carl Reddix; MDOC monitor reports; Reports in this matter by Dr. Bart Abplanalp, Eldon Vale and Dr. Marc Stern; the summary prepared by Madeleine LaMarre of the case of one individual prisoner; and numerous other documents provided in discovery. I reviewed sworn prisoner declarations by prisoners #11, #31, #65 and #66. I reviewed eight videos of use of force episodes, including medical treatment in some cases. I reviewed photographs taken of the facility in April 2014 by environmental health expert Diane Skipworth and by the ACLU and SPLC.

Exhibit B to this Report contains a complete list of the documents I considered in preparing this report.

I have created a numbered Name Key, Exhibit C. I will refer to prisoners throughout this declaration by their number on that Name Key.

I expect to consider additional documents, data and facts as they become available to me and to

modify or supplement my opinions if need be in light of any such new materials.

**OPINIONS AND BASIS AND REASONS FOR OPINIONS**

In forming my opinions, I have relied on my training in general psychiatry, social and community psychiatry and forensic psychiatry; my decades of experience as a clinician, educator, researcher, and consultant in the areas of the delivery of mental health services in prisons and jails, and on the effect on mental health of solitary confinement and other conditions of confinement; my experience as an expert in other cases, including in the Mississippi Department of Corrections and my earlier investigations regarding the treatment of prisoners with serious mental illness at EMCF; my experience as a clinician who has visited correctional facilities and interviewed many administrators, staff and prisoners in numerous states; my familiarity with the literature of psychiatry and the social sciences; my experience as a trainer and consultant in correctional settings; and my extensive clinical practice in my office and in public agencies where I have treated and trained others to treat patients who have been imprisoned; my familiarity with position statements by and guidelines and standards of professional organizations.

**OPINION 1**: **The conditions in isolated confinement housing at EMCF are so shockingly harsh and inhumane as to subject all prisoners housed there to a significant risk of serious psychiatric symptoms and breakdown, and to subject the less healthy prisoners to significant risk of very severe and possibly irreversible psychiatric consequences, including psychosis, mania or compulsive acts of self-abuse or suicide.**

**I.A.    The Known Effects of Long-Term Solitary Confinement**

For the purpose of this Report, I will utilize the following definition of isolated confinement or solitary confinement:

> Segregation from the mainstream prisoner population in attached housing units or free-standing facilities where prisoners are involuntarily confined in their cells for upwards of 22 hours a day or more, given only extremely limited or no opportunities for direct and normal social contact with other persons (i.e., contact that is not mediated by bars, restraints, security glass or screens, and the like), and afforded extremely limited if any access to meaningful programming of any kind.[2]

---

[2] Haney, C. (2009). The social psychology of isolation: Why solitary confinement is psychologically harmful. *Prison Service Journal, 12*.

The locations of isolated confinement at EMCF include approximately 120 prisoners in long-term segregation in Unit 5, approximately 30 prisoners in short-term segregation in Unit 6D, and any or all housing units at EMCF when they are on lock-down status, which occur when prison officials deem that a security problem exists requiring round-the-clock cell confinement of all prisoners, including those in general population.  During lockdowns, prisoners are almost entirely isolated and idle and often are not even permitted to go to the yard for recreation. Lockdowns occur frequently at EMCF and can last weeks or even months at a time.  (Naidow Declaration, p. 20).  I should note that patients in psychiatric observation or the medical unit may also be subjected for extended periods of time to conditions that are the equivalent of isolated confinement.  Thus a significant proportion of the prisoner population at EMCF experiences isolated confinement for extended periods of time.

Long-term confinement (greater than three months) in an isolated confinement unit is well known to cause severe psychiatric morbidity, disability, suffering and mortality.[3]  It has been known for as long as solitary confinement has been practiced that human beings suffer a great deal of pain and mental deterioration when they remain in solitary confinement for a significant length of time.  In 1890, the U.S. Supreme Court found that in isolation units, "[a] considerable number of prisoners fell, after even a short confinement, into a semi-fatuous condition, from which it was next to impossible to arouse them, and others became violently insane; others still, committed suicide; while those who stood the ordeal better were not generally reformed, and in most cases did not recover sufficient mental activity to be of any subsequent service to the community."[4]

---

[3] For reviews of this research, see: Smith, P. S. (2006). The effects of solitary confinement on prison inmates: A brief history and review of the literature. *Crime and justice*, *34*(1), 441-528; and Arrigo, B. A., & Bullock, J. L. (2008). The psychological effects of solitary confinement on prisoners in supermax units: Reviewing what we know and recommending what should change. *International Journal of Offender Therapy and Comparative Criminology*, *52*(6), 622-640.

[4] *In re Medley,* 134 U.S. 160 (1890).

It has been known for decades that suicide is approximately twice as prevalent in prison as in the community.  Long-term consignment to segregation is a major factor in the high suicide rate among prisoners.  Recent research confirms that of all successful suicides that occur in a correctional system, approximately fifty percent involve the 3 to 8 percent of prisoners who are in some form of isolated confinement at any given time.[5]

 In 2005, in an amicus brief to the United States Supreme Court, leading mental health experts summarized the clinical and research literature about the effects of prolonged isolated confinement and concluded: "No study of the effects of solitary or supermax-like confinement that lasted longer than 60 days failed to find evidence of negative psychological effects."[6]

It has been my experience, from prison tours and clinical interviews of prisoners held in long-term near-24-hour cell confinement similar to the segregation pods on Units 5 and 6 at EMCF, that isolated confinement is likely to cause psychiatric symptoms such as severe anxiety, depression and aggression in relatively healthy prisoners, and cause psychotic breakdowns, severe affective disorders and suicide crises in prisoners who have histories of serious mental illness or are prone to mental illness.

There is a rich research literature on the effects of long-term solitary confinement in prison.[7] Hans Toch provided early narrative reports from prisoners at the highest levels of security and

---

[5] Mears, D. P., & Watson, J. (2006). Towards a fair and balanced assessment of supermax prisons. *Justice Quarterly*, *23*(02), 232-270;  Way, B. B., Miraglia, R., Sawyer, D. A., Beer, R., & Eddy, J. (2005). Factors related to suicide in New York state prisons. *International Journal of Law and Psychiatry*, *28*(3), 207-221; Patterson, R., & Hughes, K. (2008). Review of completed suicides in the California Department of Corrections and Rehabilitation, 1999 to 2004. *Psychiatric Services*, *59*(6), 676-682.

[6] *Wilkinson v. Austin*, U.S. Supreme Court, No. 04-495, Brief of Professors and Practitioners of Psychology and Psychiatry as Amicus Curiae in Support of Respondent, 2005.

[7] For an overview of supermaximum security and isolated confinement, see Rhodes, L. (2004). *Total confinement: Madness and reason in the maximum security prison*, Berkeley, CA: University of California Press; and Shalev, S. (2009). *Supermax: Controlling risk through solitary confinement*, Portland, Oregon: Willan Publishing.

Isolation.[8]  Craig Haney has researched the detrimental effects of long-term isolation,[9] including feelings of anxiety and nervousness, headaches, troubled sleep, lethargy or chronic tiredness, nightmares, heart palpitations, obsessive ruminations, confused thinking, irrational anger, chronic depression, and fear of impending nervous breakdowns.  Nearly half suffered from hallucinations and perceptual distortions, and a quarter experienced suicidal ideation. Stuart Grassian has conducted similar research.[10]

Sheilagh Hudgins and Gilles Cote performed a research evaluation of penitentiary inmates in a Super-maximum Security Housing Unit and discovered that 29% suffered from severe mental disorders, notably schizophrenia.[11] David Lovell has described typical disturbed behavior.[12]  I have reported my own findings from litigation-related investigations.[13]

Whatever form of serious mental Illness the prisoner suffers, there is a strong tendency for it to be exacerbated by long-term isolated confinement such as exists at EMCF on Units 5 and 6 and during lockdown on other units.  Prisoners prone to psychotic episodes will predictably have a "breakdown" triggered by the stark isolation and idleness of segregation, and prisoners prone to despair, self-harm and suicide will tend to have crises and harm themselves.  On average, I can generalize to a reasonable degree of medical certainty, the longer prisoners suffering from or

---

[8] Toch, H.  (1975, 1992).  *Mosaic of despair: Human breakdown in prison*, Washington, D.C.: American Psychological Association.

[9] Haney, C. (2003). Mental health issues in long-term solitary and "supermax" confinement. *Crime & Delinquency, 49*(2), 124-156.

[10] Grassian, S., & Friedman, N. (1986). Effects of sensory deprivation in psychiatric seclusion and solitary confinement. *International Journal of Law and Psychiatry, 8*(1), 49-65.

[11] Hudgins, S., & Cote, G.  (1991). The mental health of penitentiary inmates in isolation. *Canadian Journal of Criminology*, 177-182.

[12] Lovell, D.  (2008).  Patterns of disturbed behaviour in a supermax population. *Criminal Justice and Behaviour*, *35(*8), 985-1004.

[13] Kupers, T. (1999). Prison madness: The mental health crisis behind bars and what we must do about it.  New York: Jossey-Bass/Wiley.

prone to serious mental illness are consigned to isolated confinement, the more severe their mental disorders become and the worse their disability and prognosis.

**I.B. MDOC's Awareness of the Damaging Effects of Prolonged Isolated Confinement**

MDOC is well aware of the damaging effects of prolonged isolated confinement on all people, and especially on persons with serious mental illness.  I testified to those effects in 2003 in the Mississippi death row trial, *Russell v. Epps*, and again in 2006 in the Unit 32 supermax case, *Presley v. Epps*. The *Presley* case resulted in a consent decree reducing the solitary confinement population by eighty-five percent and the creation of a mental health step-down unit, and the publication in 2009 of an article jointly authored by me and MDOC leadership and its mental health providers and classification experts recounting the need for and the success of these reforms.[14]

I toured EMCF again in 2011, and met with and made recommendations to MDOC's Deputy Commissioner, and GEO's regional Medical Director for Psychiatry concerning the treatment of prisoners at EMCF.   Specifically, I recommended that no prisoner should be consigned to the segregation units, Unit 5, and Unit 6D indefinitely; all prisoners must be provided a series of incremental phases they can traverse to gain transfer out of segregation; the phases must be very brief, and the rate of movement of prisoners out of Unit 5 would be the measure of success for the program.  I recommended removing prisoners with serious mental illness from long-term segregation on Unit 5.  I also pointed out in no uncertain terms that there were insufficient mental health treatment and rehabilitation programs on Unit 3C, where, I was told, the most intensive mental health treatment programs were located.  I also pointed out that it was entirely unacceptable that the men in that unit are almost totally idle and lack meaningful treatment.  I explained how psychotropic medications are a part of a mental health treatment plan, but not in themselves adequate treatment.  I pointed out problems with the Crisis Intervention component of mental health services, specifically that there was "recycling" whereby prisoners would be

_____

[14]  Kupers, T. A., Dronet, T., Winter, M., Austin, J., Kelly, L., Cartier, W., ... & McBride, J. (2009). Beyond supermax administrative segregation: Mississippi's experience rethinking prison classification and creating alternative mental health programs. *Criminal Justice and Behavior, 36*(10), 1037-1050.

transferred from segregation to Observation, and after a brief tenure there would be transferred back to segregation, where there would be too little follow-up treatment and they would again become acutely suicidal and a high risk of self-harm.

In October 2011, after reviewing a remedial proposal submitted by GEO and MDOC, I responded with recommendations, which were well received. There was consensus among all parties to that discussion that no prisoner should be consigned indefinitely to Unit 5, that incremental rewards and advancement to greater freedom and eventually general population should be built into each phase of the program on Unit 5, and that the phases should be relatively short.  Because of that consensus, I was hopeful that EMCF might become a model facility for the housing and treatment of prisoners with serious mental illness.

It was therefore with great shock that I witnessed the actual conditions at EMCF today for prisoners housed in isolated confinement, and the treatment of those with serious mental illness. The situation at EMCF has deteriorated badly since the last time I visited in 2011.  A large group of prisoners, very many suffering from serious mental illness, are consigned to long-term segregation in Unit 5 for years and seemingly have no exit route. The conditions on Unit 5 are inexcusably horrible.  Meanwhile, there is practically nothing in the entire institution that would qualify as mental health treatment other than an occasional stint in an "Observation" cell for prisoners who evidence acute suicide risk, and the administration of high doses of psychotropic medications, often under duress and without informed consent.

**I.C. Conditions for Prisoners in Isolated Confinement**

Taken as a whole, the conditions in solitary confinement at EMCF are the worst I have witnessed in my 40 years as a forensic psychiatrist investigating jail and prison conditions.  These conditions can accurately be described as torture according to international human rights agreements and standards.  They press the outer bounds of what most humans can psychologically tolerate.

The treatment of prisoners in isolated confinement at EMCF is likely to cause them significant psychiatric damage. They are subjected to profound isolation from human contact and sensory

deprivation, deprived of access to any meaningful activity, and deprived of access to minimally adequate mental health treatment.  Staff are shockingly inattentive to the prisoners basic human needs.  Furthermore, the toll that isolated confinement takes on these prisoners is enormously exacerbated by appallingly cruel features of the segregation pods at EMCF that cause further psychiatric damage.

A large proportion of prisoners consigned to long-term segregation or isolation in recent decades suffer from serious mental illness, and this is certainly true at EMCF.  Security and mental health staff at EMCF are well aware that there are many seriously mentally ill prisoners consigned to the solitary confinement units at EMCF.  (Capt. Naidow Deposition, p. 70).

The many prisoners in segregation on Units 5 and 6 whom I interviewed gave me consistent accounts of the classic symptoms of long-term isolated confinement.  For prisoners who had not suffered significant symptoms of mental illness prior to being housed in isolated confinement, the conditions of their confinement, especially the profound, unremitting isolation and idleness, the dark cells, the filth, and the neglect by staff caused profound depression and anxiety and in many cases repetitive, compulsive acts of self-harm such as cutting.  For those who had pre-existing serious mental illness, the conditions in segregation at EMCF greatly exacerbate their psychiatric disorder and worsen their disability and prognosis.  These prisoners exhibited many of the psychiatric symptoms that are widely understood to be induced by extended time in isolated confinement.

One of the most shocking conditions in the isolated confinement cells in Units 5 and 6D is the deprivation of light. Many, perhaps most, of the prisoners housed there are forced to live in the dark for weeks or months on end.  The solid metal cell doors have a small "window" that does not open and a food port.  A prisoner in the cell is isolated behind the solid door even from people passing by on the tier, more so than he would be if the door was constructed of bars. Then, in most cells I visited on Unit 5 and 6D, and in the cells of prisoners I interviewed, the light bulb, which is supposed to be screwed into a fixture on the ceiling of the cell, is broken or entirely missing. The small horizontal window on the exterior wall of the cell is more than six feet high and does not provide significant light in their cell.  Thus the cells are in near total

darkness 24 hours per day.  During my tour of EMCF, a large majority of the cells in the segregation units were dark in the middle of the day, and most of the inhabitants of the cells were lying on their bunks in darkness.   I have never, in my 40 years touring prisons, seen anything like this.

Captain Matthew Naidow, who works as a captain of security at EMCF, confirms that many cells lack light, but explains that the prisoners break the light bulbs.  (Naidow Deposition, p. 19 & 45)  But many prisoners told me that they have spent weeks or months in total darkness because their light bulb has been missing since they moved into the cell, or it broke because there are no light switches in the cell and they had to screw and unscrew the bulb in order to turn it off or on, and staff either ignore their requests for a replacement or tell them that bulbs are not available.

Depression and paranoid thinking are severely exacerbated by excessive darkness.  The prisoner consigned to a dark cell is left entirely alone to ruminate about self-deprecating or paranoid themes, and there his psychiatric condition is almost certain to deteriorate on account of the stark isolation and idleness.  Living in excessive darkness also results in loss of diurnal rhythm (the steady alternation of day and night that provides human beings with orientation as to time).  Human beings require diurnal changes in lighting to maintain their sanity.  These diurnal changes foster the rhythm of night and day that provides not only a sense of orientation, but also makes possible the physiological processes that we require to function as human beings.  Individuals suffering from mental illness are especially harmed by a lack of diurnal cycles of light and dark.

Another consequence of the loss of diurnal rhythm is sleep deprivation, which greatly exacerbates the tendency to suffer psychiatric breakdown and become suicidal. Loss of sleep creates fatigue and magnifies cognitive problems, memory deficits, confusion, anxiety, and sluggishness.  All of the prisoners I interviewed from the segregation pods on Units 5 and 6 reported great difficulty sleeping at night.

A large proportion of the prisoners in isolated confinement at EMCF suffer from serious mental Illness, and some of these prisoners are prescribed relatively high doses of psychotropic

medications, often by injection and, in some cases, over their objection.  Lack of initiative, passivity and lassitude are very disabling symptoms of Schizophrenia, and all of these symptoms are exacerbated when the patient is administered tranquilizing medications and not provided any kind of congregate activity or meaningful productive pursuits. Drugged and sedated, they spend their days in a dark cell, sleeping much of time, and not able to engage in productive activities of any kind.  This combination of factors is well known to worsen mental illnesses of all kinds.

Some of the prisoners told me they are glad to be drugged so they can sleep all day as a way of escaping the despair produced by their environment.  But the drugging and sleeping all day have very damaging effects on the prisoners' psychiatric condition and their long-term prognosis. Social connections and meaningful productive endeavors are a big part of the treatment for depression, even while psychotropic medications are prescribed.  In the short-run, these heavily-sedated prisoners in isolated confinement may be relatively quiet and docile, but in the long-term, the extended period of sedation results in the withering away of their social skills and ability to engage in meaningful and productive pursuits.  The possibility of their adjusting to life in the general population or the community at the end of their stint in isolated confinement is greatly diminished.

As I toured the segregation pods on Units 5 and 6 I observed portable telephones stored outside the door to the pods.  They seem to be phones that can be wheeled to the cells.  Yet prisoners in segregation universally told me that they are denied phone calls, and those phones are never wheeled onto the pods and are never made available to the prisoners.

Contact with loved ones is one of the most effective measures to support the mental health and eventual rehabilitation of prisoners.  Prisoners who have maintained quality contact with loved ones (parents, partners, children and so forth) throughout a prison term have an impressively lower recidivism rate than those who have lost or been denied contact with family and friends. When a patient in a psychiatric hospital experiences an acute crisis, the staff make every effort to contact the family and involve them in the treatment.  It makes no sense at all that prisoners in segregation at EMCF are denied telephone contact with loved ones.  Cutting them off from family and friends in the community has the effect of worsening their psychiatric condition.

I was disgusted by the shocking level of filth and lack of sanitation I witnessed in the common areas of the segregation pods and in very many cells in the segregation pods of Units 5 and 6. When I walked onto the pod, I saw Styrofoam trays and food waste scattered all around, mixed with large puddles of water and what appeared to be excrement and/or blood.  There was a stench of garbage and excrement. The prisoners I interviewed reported that overflowing toilets are a very common problem, that the unit is infested with rodents and that their cells are filled with rat droppings.

The prisoners I interviewed from the segregation units without exception reported to me that they do not receive basic cleaning materials to keep their cells clean.  Prisoners are issued a small bar of soap each week, by their report not even enough soap to clean their bodies; yet many prisoners report using that tiny bar of soap to clean their unbearably filthy toilets and cells.  Several prisoners report putting an arm through the food port when an officer opens it to deliver a food tray, and refusing to remove it until someone brings some cleaning supplies (or takes them to medical, or to a shower, etc.), even though they realize that this desperate measure of seeking help will most likely result in a disciplinary report and perhaps a violent take-down and gassing.

Evidence of feces smeared on the walls in the segregation pods on Units 5 and 6 reflect extreme neglect of the prisoners by staff.  Compulsive smearing of feces is a commonplace phenomenon in institutions where individuals with mental illness are severely neglected and experience total lack of control over their environment.  In the segregation units at EMCF there is so much severe and inadequately treated mental illness, such gross inattention by staff, and such intolerably filthy and harsh conditions that the smearing of feces becomes a predictable response by mentally ill prisoners to their dreadful plight.

There are serious medical and mental health ramifications when living units are as filthy as the ones I viewed at EMCF, where the staff do not clean the units and the prisoners are given no cleaning supplies and must live in cells filled with rat droppings and where toilets have overflowed and feces has been smeared on the walls.

When I toured EMCF in 2011 with nursing expert Madeleine Lamarre, I noticed that many prisoners appeared to be malnourished, and many prisoners reported to me that they were always hungry and had lost significant weight after spending a few months at EMCF. Ms. Lamarre found that significant weight loss, of up to twenty or thirty pounds, was documented in the medical records of a number of prisoners. During my recent tours, I again noticed that many prisoners appeared malnourished, and several prisoners told me that they were always hungry and had lost significant amounts of weight over several months in segregation.

**I.D. Abandonment by Staff and Profound Neglect of Prisoners' Basic Human Needs in Solitary Confinement**

I do not believe I have ever witnessed in a prison the level of neglect on the part of staff that I witnessed at EMCF. The level of neglect by line staff in the segregation pods on Units 5 and 6 is incredible, abhorrent, and far beneath all standards of correctional care and decency.

The prisoners in segregation unanimously reported that staff rarely come by to check on them, and they are unable to get the staff to pay attention to their basic needs, whether for a light bulb for a dark cell, electricity that shuts down, cleaning supplies, toilet paper, repair of a toilet that is backing up and flooding their cell with excrement, or to see a doctor or mental health clinician for an urgent medical or mental health need. Eldon Vale documents in his report an unconscionable lack of regular 30 minute cell checks by custody officers (see Eldon Vale Report).

Many prisoners report that their emergency call button does not work, or even if it works staff do not respond when they press it. I did a test of the call buttons. I went to the control booth overlooking one of the segregation pods on Unit 5 where an officer is stationed and controls the opening and closing of unit and cell doors, and there are multiple video camera monitors and control technology for the entire Unit. An attorney went to the cells of several prisoners and asked them to press their emergency buttons. Over half of the emergency call buttons did not register in the control booth, and when the call did register, there was no sound so it would only

be detected if the officer in the control booth happened to open the window on her computer screen where the call buttons registered.

Often the officers do not even take the prisoners to yard for their allotted recreation time, or to showers, for weeks on end.  Furthermore, quite a few prisoners report that when officers do take them to the yard or the shower, they sometimes leave them locked in the exercise area of shower cubicles for many hours. During my tour of Unit 5 I talked to three men locked in the tiny shower cubicles, who told me they had been locked in the shower for a couple of hours. Captain Naidow confirmed that prisoners can be left locked in the showers for hours (Naidow Deposition, p. 46).  Madeleine LaMarre and I observed this exact same phenomenon when we visited EMCF in 2011, and reported this issue to MDOC officials.

Over half of the prisoners I interviewed who were housed on Unit 5 or Unit 6D spontaneously and independently told me that not only are the officers absent from the segregation pods most of the time, and not only does no staff come when they scream or bang on their cell door, but also that security is so lax on the pods that it puts them at grave risk.  Many prisoners report, and Captain Naidow confirmed, that inmates can manipulate the locks on their cell doors, and that in addition inmate-on-inmate attacks occur when staff permit certain prisoners in the segregation pods to be out of their cells and unsupervised (Naidow Deposition, pp. 37-40).

Prisoners also told me that staff are so inattentive that when they escort a prisoner back to his cell after showers or yard, the prisoner can simply stop in front of a cell that is not his and the officer will unlock that cell door and let him enter, without checking if it is his cell and whether there is another prisoner in that cell.  After the officer leaves, the prisoner who has gained entry to another's cell can assault or obtain willing or coerced sex from the inmate who lives there.

Prisoners #3, #8, #9, #10, and #11 independently told me about staff leaving prisoners free on the Pod where they can harm other prisoners.  Prisoner #26 reports that while he was being escorted in handcuffs by an officer from his cell in segregation on Unit 5 to the showers, he was forced to walk very close to the cells along the way, and that another prisoner reached through the food port and stabbed him multiple times. Quite a few prisoners told me that they are forced to take

sedating psychotropic medications and then, in a "doped up" state, they are more vulnerable to attack and less able to defend themselves.  This fact, added to the lack of security in their segregation cells, makes them quite anxious about their safety.

Captain Naidow testifies that some officers are corrupt, some are involved with the gangs or with individual prisoners in illegal smuggling of contraband and drugs and in extortion, prisoners can defeat the locks on their cell doors in segregation and get loose on the segregation pods to harm other prisoners, and some corrupt officers do let certain prisoners out and collude with their assaults on other prisoners (Naidow Deposition, p. 37-40, 89, 92-93).  He does not believe sexual assaults happen often, but they do happen. Eldon Vale documents in his Report that senior officials in the MDOC are aware of the security problems reported by the prisoners and confirmed by Captain Naidow.  Eldon Vale also notes that the contraband report for August, 2013 reflects that 62 weapons were found by staff, 20 of them in Units 5 and 6.

Thus the prisoners' perceptions are frighteningly accurate: EMCF is a very dangerous place. This fact weighs very heavily on prisoners with serious mental illness, for example they need to think seriously about how their tranquilizing medications will slow them down and make them more vulnerable to attack, and this concern plays into many prisoners' reluctance to cooperate with the administration of their psychotropic medications.  Prisoner #12 explained to me that "the shots slow me down, then I get threatened by other prisoners, and that's why I don't want to get the shots."  Prisoner #23 told of being attacked by another prisoner who threw scalding water on him, scarring him on the left arm, "It happened the same day as the shot, you're sleepy, you can't respond when someone attacks you."

The prisoners' reports of custodial staff's indifference to the most basic prison security were also corroborated by the extraordinary amount of contraband openly strewn about the Unit.  When I toured Unit 5, I saw many improvised strings or ropes – "fishing lines" - that are used by prisoners to communicate from cell to cell.  And many of the windows on cell doors were completely covered, which is also against the rules as a security risk.  Staff on the pod at the time I visited seemed entirely unconcerned about the fishing lines and the covered windows, as if they are a frequent occurrence and staff do not remedy the situation.

There is much objective basis for the prisoners' fear and their panic that nobody will heed their cries for help and they will die of a stabbing, or a heart attack. Dr. Marc Stern concluded his report on medical care at EMCF that he found ample evidence that inmates at EMCF do not have timely access to urgent care.[15] Dr. Stern discusses a Patient #23 (for the purpose of my report, he is Prisoner #68). This 43 year old African American man died in the custody of EMCF. He suffered from very severe heart disease with hypertension and anemia, as well as Schizophrenia. He spent several months in Observation in the Medical Department before being sent back to a segregation cell on Unit 5 for a month, and then died there on December 18, 2013. (Stern Report, Prisoner #23) Dr. Stern describes the repeated and systematic neglect of this man's legitimate and emergency medical complaints by both custody staff and medical staff.

This tragic case evidences abominable and inexcusable neglect by staff, both custody and medical. Prisoners universally complain of precisely this kind of neglect and failure to heed prisoners' cries for help, and that neglect then leads many prisoners in segregation cells to commit bizarre, illegal and ineffectual actions they believe to be the only way to get the urgent attention they need. Prisoner #68 (my numbering system) reportedly set fire to his cell the day prior to his death and in the medical record a nurse (L.P.N.) wrote "the patient set fire to his cell to get medical attention." In fact, when someone like Prisoner #68 dies unattended, the prisoners in surrounding cells become very frightened, fearing the same neglect would happen to them if they had a heart attack or other emergency medical crisis, or if they were attacked by another prisoner.

### I.E.  Punishment for Seeking Staff Attention to Urgent Needs

The prisoners' desperate pleas for help are likely to be either met with staff callousness or even abuse. The staff views these inmates as troublemakers, and responds to them in an increasingly insensitive, punitive or even abusive manner. But when human beings are subjected to extremes of isolation and idleness, and deprived of every vestige of control over their environment, and in addition are denied social contact and all means to express themselves in a constructive manner; then it is entirely predictable that they (or almost any human being) will resort to increasingly

---

[15] Dr. Marc Stern Report, Patient 23

desperate acts to achieve some degree of control of their situation and to restore some modicum of self-respect.

Prisoners are harshly punished for violating the rule against putting their arm through the food port, even when the purpose of the gesture is to summon urgently needed help. The prisoner may be issued a Rule Violation Report (RVR); furthermore, a group of officers in riot gear likely shoot immobilizing gas into the prisoner's cell, or even directly at his face, and then storm his cell to perform a take-down. Often there are injuries sustained during the take-down. All of the prisoners I spoke with on the segregation pods tell me that the use of immobilizing gas is quite frequent and that they be put back in their cells without the opportunity to decontaminate either their bodies or cells. Eldon Vail's analysis of videotapes corroborates the prisoner accounts. Prisoners resort to other extreme behaviors to try to summon help for emergency needs. The prisoner "floods the range," meaning he stops up his toilet or sink and lets water run over the floor of his cell and out onto the common spaces on the pod, or they light fires in an effort to summon help or call for attention. I saw a number of cells with burnt areas on and around the door. Prisoner #23 set a fire in his cell on 12/28/13 and had to be removed from that cell and monitored for breathing problems. In the EMR for that date it is noted "he had set fire in his cell because he felt his life was in danger and that was the only way he could get any help." Or the prisoner resorts to self-harm in an effort to summon urgently needed attention and assistance.

In a prison where staff are this neglectful and prisoners so often perform bizarre acts of self-harm in order to gain staff attention to needs the prisoners consider urgent, it is inappropriate for staff to issue Rule Violation Reports for the inappropriate behavior without actually responding to the needs the prisoner is expressing in an inappropriate way. In other words, it is not acceptable for the staff to fail to ameliorate the neglect, and then merely penalize the prisoner for taking measures to seek needed help.

For example, an RVR was issued to Prisoner #67 by a mental health staff member on April 26, 2013, for "Faking an illness or injury by reporting he was going to cut himself due to security-related issues" (RVR No. 01288802). In the electronic medical record for Prisoner #67 there are several entries on April 25 and 26, 2013, reflecting that the prisoner is very upset about being on lockdown on Unit 1 (essentially he is in isolation during lockdown, and he complains he is

experiencing symptoms of isolation), is very fearful that someone is going to die when the lockdown ends, is clearly nervous and agitated, is seen by staff tying a ligature around his neck, asks several times to talk to mental health, and then is seen on rounds by the mental health counselor who wrote the RVR.  At the time of their encounter, the prisoner was scraping a razor blade against the wall "to sharpen it" (quote from MHC's note on the EMR).

The mental health counselor ignores the prisoner's anxious, agitated state and very real concerns (i.e., when the lockdown ends, somebody is going to die, which upsets this prisoner quite a lot) and opts to issue a Rule Violation Report (RVR) instead of offering to talk to the prisoner about his anxiety and concerns.  At EMCF, where staff are appallingly neglectful of prisoners' urgent needs including the need to talk to a mental health staff member about a perceived deadly situation, the issuing of such an RVR is merely another reflection of staff callousness.

**I.F. Degrading and Dehumanizing Treatment by Staff**

The extremity of the neglect of prisoners by staff at EMCF comes to a head in a repetitive drama on Unit 5 involving the prisoners who put an arm through the food port of their cell door in order to gain staff attention to their urgent needs.[16]

Officers require prisoners who have previously broken the rules by "bucking the tray flap" (refusing an order to remove an arm from the tray slot) to kneel on the floor at the back of their cell and to put their mattress on the floor next to the cell door when it is time for the food tray to be delivered, so the officers can throw the container of food through the food port onto the mattress.  If the prisoner refuses to put his mattress on the filthy floor and kneel on the floor behind it the officers refuse to deliver the meal.  Some prisoners say that at times they go hungry rather than accept the humiliation of being fed like an animal.

Prisoners # 11, 31, 65 and 66 submitted declarations describing this dreadful procedure.  Prisoner #65, confined in segregation on Unit 5B, declares:  "When the food tray is thrown into my cell, the food that is on the tray spills out onto the floor.  If I refuse to go to the back of my cell, I cannot eat because the officer will refuse to give me my food tray.  I have gone without eating

---

[16] See Declarations of Prisoners #11, #31, #65 and #66.

approximately 4 or 5 times in a two week period because I would not go to the back of my cell and have my food thrown onto the floor…. I refuse to go to the back of my cell because having my food thrown at me makes me feel like an animal..” The electronic medical record of Prisoner #65 contains this entry for April 29, 2014: "Chief Complaint: Referred to this provider with report that the offender has cut himself - presents with superficial cut to right forearm. Reports reasons for cutting himself – 'got mad....they messing with our trays..want us to go to the back of the cell and get on our knees...we ain't no dogs...'"

**I.G.  Some Illustrative Cases**

The following examples are typical of the descriptions that prisoners gave me of their existence in the segregation units at EMCF.

Prisoner #2, a 29 year old African American man, has been in long-term segregation on Unit 5 for a year. He reports ongoing hallucinations and on the mental status examination I conducted he is quite obviously suffering from a psychotic process. He is prescribed powerful anti-psychotic medication but is not undergoing any kind of congregate activity, talking therapy or rehabilitation, and spends all of his time, 24 hours per day, idle in a dark cell with no light and a solid metal door increasing his isolation. This harsh environment will further damage his mental condition, his disability and his prognosis. In the Electronic Medical Record (EMR) his diagnosis is Schizophrenia, he is prescribed Haldol Decanoate 150 mg. by injection every 28 days. There are notes indicating medication compliance had been an issue and the patient does better when continuity is maintained with 28-day injections. Interspersed between notes about his psychotic symptoms, non-compliance with medications, and assaultiveness, are notes by mental health counselors stating he is not having problems and mental status examination is normal. The alternation between notes reflecting psychiatric crises by the psychiatric nurse practitioner, and notes by mental health counselors stating the prisoner is doing fine, is a problem in many of the EMRs we reviewed.

Prisoner # 7 is a young African American man who has been on Unit 6D (Short-term punitive segregation) only for a few days, though he had been there previously. On mental status exam there is apparent depressed affect and slowness (psychomotor retardation), signs of depression.

He was sentenced to a period in segregation for refusing housing with "gang bangers."  He says he did not have a hearing, and does not know how long he will remain in segregation. He has become increasingly depressed even after a few days on his current segregation pod.  Not knowing when he will be released from segregation and not being able to do anything to hurry his release make him more depressed.  There was no light in his cell when he moved in, and when he pointed that out the officer said they do not have any replacement bulbs.  He remembers becoming much more depressed after being moved into the segregation unit.  He would think seriously of cutting himself.  "It's a dark cell.  What do you do?  You sit there' (he laughs)."

Prisoner 7 also tells me that there are never any officers around the pod, and the buzzer in his cell does not work, so there would be no way for staff to know if he were in a medical crisis.  He adds, "You can yell, but they don't hear you."  He tells me mental health staff mostly do not talk to prisoners during rounds.  He estimates a mental health counselor enters the pod and leaves within 5 minutes, meanwhile not really talking to anyone.

Prisoner 7 tells me he has a G.E.D. and would like to write letters to his family, but he can't write from 'the hole.'  "The guards here don't care about you, they do a lot of gassings (spraying of prisoners with pepper spray or another immobilizing gas)." He tells me that just about every day there's a fire on the pod.  "The CO's just put out the fires and leave all the burnt stuff there." He tells me the voices he hears get louder and more persistent when he is in segregation, especially when it is dark in his cell all day, he gets much more anxious and depressed, and he thinks constantly of cutting himself, which happens only when he is in segregation.  He shows me a large, ugly scar on his arm from cutting himself while in segregation. In segregation he almost compulsively slashes his arm, he says, to try to get sent to the medical department.  He has also attempted suicide by hanging in the past. He avers hearing voices, talking to spirits, and on at least two occasions being imminently suicidal "because of the situation in this prison."  He admits he should be in prison, but "I don't deserve the torture going on in this prison."

Prisoner #10, an African American man who is housed in segregation on 5B.  He complains that his cell is dark 24 hours per day and it has been like that for months, the officers never respond to requests for supplies or assistance, prisoners with mental illness throw feces on the pod,

officers leave prisoners in situations that are very dangerous, the toilet overflows when the prisoner upstairs flushes his toilet and it backs up into Prisoner #10's toilet, which overflows and then there are no supplies to clean up the mess, and many prisoners are sprayed with immobilizing gas and then the officers do not decontaminate their cells.  Prisoner 10 states, "I feel trapped in a box and I can't take it anymore," "I try to stay calm but I'm not very successful at it,"  "I can't sleep, I have a lot of trouble falling asleep and I wake up very early in the morning," "I get mad and don't want to talk to anyone, then I talk in my cell to my dead grandmother," "I pace constantly in my cell,"  "there's no light in my cell so I can't read," "I keep getting angry, I can't control it, and I'm afraid I'll go off on someone and get into more trouble," "when I get mad my thoughts become cloudy,"  "I get paranoid."  Prisoner #10 had been in segregation at another prison within the Mississippi DOC, the Southern Mississippi Correctional Institution (SMCI), a prison where physically abusive treatment of prisoners in segregation was prevalent in the period when he was there.  But he tells me that Unit 5 at EMCF is much worse even than SMCI.

Prisoner #8 is an African American man who was recently released from segregation on Unit 6. He cut himself a month prior to my visit, on March 18, 2014.  When I asked why, he told me he gets desperate to talk to someone who can help him, "but staff don't come to see me, so I have to cut myself to get them to notice I need help - but even in Observation, they don't talk to you." Prisoner #8 has a long history of multiple serious suicide attempts beginning when he was 10. He says he does not want to take psychiatric medications.  He cuts himself in order to get someone to talk to him.  He says the tendency to cut himself is worse when there is no light in the cell which is most of the time, the cutting is driven by anxiety and not a wish to die, and he has cut himself multiple times while in segregation at EMCF. He tells me that after he cut himself the staff put him in an Observation Cell in the Infirmary.  He was naked in Observation and says that no staff came to talk to him and uncover his history.  He tells me he was forced to accept injections of Haldol, even though he did not want them.  He was not offered a form to document treatment refusal.  On Prisoner #8's electronic medical record, he is noted to be manipulative and attempting self-harm as a way of gaining something from staff.  He has been diagnosed with serious mental illnesses and he is prescribed several psychotropic medications, including antidepressants and Haldol Decanoate by injection.

Prisoner #5 is a 41-year-old African American man who was housed on Unit 5, D Pod when I encountered him.  He says he suffers severe depression.  There is no light bulb in his cell.  It was missing when he moved into the cell and officers keep telling him no new supply of bulbs has arrived in the months he has been in the cell.  He had not been permitted to leave his cell to shower or go to recreation in two to three weeks, so he was in his cell 24 hours per day in the dark.  He told me that he was in what is supposed to be a stepdown program, in which some prisoners are permitted to go to recreation in the company of a few other prisoners; after 6 or 12 months on a stepdown unit, prisoners are supposed to be transferred to a general population unit. However, he had been in the "stepdown" unit for over 2 years with no progress toward being transferred out, and he told me that was the case with most of the other prisoners in the stepdown program.  Consequently, he feels hopeless about ever getting out of Unit 5, and that has led to despair and thoughts of suicide.

Prisoner #11 is a 25 year old African American man housed in long-term segregation on Unit 5B. There has not been any light in his cell for months. Since being in a segregation cell on Unit 5 he has felt agitated. He admits he puts his arm out the food port when it is opened because, he tells me, he needs emergency medical attention for blood in his stool and weight loss, and he is very anxious that he might have cancer or some other serious condition.  He has been sprayed with immobilizing gas repeatedly, the last time a few days prior to our meeting.  He was sprayed because he put his arm out of the food port and then he was left in his cell for a couple of hours without medical attention or decontamination of his body or his cell.  He tells me that he puts his arm through the food port repeatedly because it is the only way he can think of to get the officers to take him for medical attention, but when he does so he has been beaten by several officers.  A month earlier he was held down by several officers and given an injection against his will.  He says, "I know I'm doing time, but this is extreme punishment."   He has not been permitted to use the phone to call his family, and this increases his anxiety.  He reports that other prisoners can get out of their cells and attack him, so he is always anxious. He feels despair, is convinced he will not be moved out of Unit 5 until his sentence is finished, and this causes him to think often of suicide.  He saves up his pills and he has tried overdosing several times.  He lit a fire outside of his cell the day before our interview, and said this is the only way he can get staff to

come see him when he needs emergency medical attention.  "If I get beat up, it's worth it, I need to see a doctor."

**OPINION 2: Mental health care at EMCF for prisoners with serious mental health needs is so grossly deficient that it subjects all prisoners with serious mental health needs to significant risks of psychiatric deterioration, worsening prognoses, permanent psychiatric damage, and extreme suffering.**

The Mississippi Department of Corrections uses EMCF as a primary mental health facility for housing prisoners with serious mental illness[17] Despite the fact that MDOC houses over a thousand prisoners suffering from serious mental illness at EMCF, it has failed to provide a functioning system for the delivery of basic mental health care for these prisoners' serious mental health needs.  The grossly sub-standard mental health care provided by MDOC and its contractor, Health Assurance LLC, subjects all these prisoners to extremely severe risks of serious injury.

What follows is a discussion of the extreme and unacceptable deficiencies in essentially every aspect of the mental health care system at EMCF.

**II.A. Staffing Levels and Competency of Staff**

The staffing levels at EMCF are grossly inadequate.  There are two ways for an investigator or auditor to assess staffing levels.  One is to use a standard formula for staff-to-prisoner ratios:  For

---

[17] A spokesperson for MDOC was recently quoted in the Jackson Clarion-Ledger saying that the Mississippi Department of Corrections has 3,637 mentally ill inmates, with the largest number of those — 1,193 — at East Mississippi Correctional Facility.[17]  The 2010 termination of the Decree in the *Presley v. Epps* litigation regarding Unit 32 at Mississippi State Penitentiary provides that MDOC "will no longer house any persons with serious mental illness at Unit 32 and they will transfer all persons with serious mental illness to East Mississippi Correctional Facility or, in the rare and extraordinary case where a seriously mentally ill prisoner cannot safely be housed at EMCF, then another appropriate facility."  In the 2010 Annual Report of MDOC, EMCF is designated a "Special Needs Facility." Available at
http://www.mdoc.state.ms.us/Annual%20Report%20PDF/AnnualReport2010/12%20-%20Institutions.pdf

example, there is the American Psychiatric Association's recommendation that a correctional psychiatrist should have responsibility for no more than 150 patients on psychotropic medications. The other way to assess the adequacy of staffing levels is to evaluate the quality of mental health care: where care is seriously deficient in important areas, these deficiencies are likely to reflect insufficiency in terms of staffing levels.

By either measure, the staffing levels at EMCF are grossly inadequate.  There are 844 patients at EMCF on psychiatric medication, and only one psychiatrist working only two days per week, plus one psychiatric nurse practitioner working full time.  This would constitute a serious staffing shortfall even if we doubled the American Psychiatric Association's recommendation that a psychiatrist should have no more than 150 patients on the medication caseload.

What is more, there are massive shortfalls in services that provide strong evidence of under-staffing.  Few mental health treatment options are available other than medications and psychiatric observation.  Even in Unit 3C, which is supposed to be the place where the most intensive mental health services are provided, there is little meaningful mental health treatment.

From my review of the medical records and my interviews with prisoners, it appears to me that Nurse Dunn, the psychiatric nurse practitioner, is a caring and conscientious clinician, who is simply overwhelmed with too many patients to treat, and too little time to spend with each. The quality of her notes is far superior to that of other mental health staff.  For example, she wrote on the chart of Prisoner #8 (see # 75): "Although thought processes organized and coherent, he presents with severe poor insight/ poor judgment/ poor impulsivity, with severe impulse control issues, which places the offender at a severe danger to himself. Therefore he is being placed on a Level 1 Suicide Watch with 1:1 observation."  Here as elsewhere, she writes coherent notes that contrast with the superficial and seemingly 'cut-and-paste' notes about "no problem" that are written repeatedly by mental health counselors as if they either did not see the prisoner (mostly this occurs with prisoners behind solid cell doors in segregation) or they did not take the care to actually examine the prisoner.  But even these more rigorous notes usually do not include adequate suicide risk assessments, treatment plans, or ongoing follow-up.

Having carefully considered the patient summaries prepared by Plaintiffs' mental health expert Dr. Bart Ablanalp, the chief psychologist for the Washington Department of Corrections, I conclude that competency of staff it EMCF is extremely inadequate. I agree with Dr. Abplanalp's conclusion that the overwhelming majority of clinical encounters documented in the records "were essentially meaningless and of virtually no diagnostic or therapeutic value whatsoever." Further, I question the ethical fiber and integrity of several of the mental health counselors at EMCF after reading their notes stating "no problem" where there is overt psychosis. I was unable to find any evidence of meaningful supervision, peer review or quality assurance. Staffing at every level needs to be massively upgraded in qualifications, training and supervision, and security staff needs to be upgraded in terms of qualifications and training to manage prisoners with mental illness (Captain Naidow expresses a similar opinion on that latter point).

**II.B. Deficiencies in Levels of Mental Health Care**

People with mental illness must receive treatment at a level of intensity that meets their individual needs. The basic levels of care for any mental health system are inpatient care, intermediate care, and outpatient care.

Inpatient care is the equivalent of what is provided by a psychiatric hospital in the community: that is, care for people so psychiatrically impaired that they cannot function on their own, and require the highest level of care available. Intermediate level of care is for higher-functioning patients who are able to be in a less restrictive environment but who still need greater supervision and care than they could receive in a general population housing unit. Outpatient mental health care t provides care for patients who can function well on their own but who require periodic or regular treatment that can be provided in a general population setting.

***Inpatient care:*** There is no inpatient level of care at EMCF and I could find no indication that psychiatric patients are ever transferred to psychiatric facilities outside of EMCF. If a prisoner cuts himself badly enough, or has major medical complications from an overdose of medications, he is sent to a nearby hospital for medical attention. But in the several charts I reviewed where that has occurred, there is never any psychiatric attention at the outside hospital, and the prisoner is referred back to EMCF for mental health assessment and treatment – which does not occur.

Unit 3 is the place at EMCF where the most intensive mental services are offered, and supposedly the place where the most seriously mentally ill patients are housed.[18]  But it does not qualify as inpatient care.  Apart from medication -- sometimes by forced injections of heavy sedating drugs, with insufficient informed consent -- the mental health services provided in Unit 3 are almost nonexistent.  I toured Unit 3  repeatedly, at different times of the day on two separate days, and found the men to be entirely idle, roaming the day room of the unit or opting to remain in their cells, often in the dark, even when they are permitted to be in the day room.

I interviewed quite a few men in Unit 3, and they gave consistent accounts of life on the Unit. Practically no group or individual therapy is available.  There is a case manager who comes to the unit (she was present the days of my tours), but I am told by the prisoners that she does not come to see them on a regular basis, and their meetings with her are very brief, usually occurring in the day room of Unit 3 and lasting a minute or a few minutes.  There are a few groups – including substance abuse groups, anger management, religious meetings, educational classes – but the prisoners tell me that except for religious meetings and classes, they rarely occur; there might be a group on the unit once a month or once every two months.  There are no milieu meetings.  With an occasional exception, the patients do not receive any individual psychotherapy.  There are almost few or no programmatic activities such as vocational rehabilitation, group therapy, psycho-education, or just about any form of psychiatric rehabilitation.  And there do not seem to be any vocational rehabilitation programs for any of the prisoners at EMCF.  An adequate inpatient unit must be able to provide *intensive* treatment, including multiple modalities and several hours per day of structured programming and treatment. Psychiatric observation, as practiced at EMCF, does not constitute an inpatient level of care.

***Intermediate level of care:***  The Intermediate Level of Care is a crucial component in any correctional mental health program.  The generic term for this type of treatment program is "step-down mental health unit."  Whatever they are called, the clinical staffing and the programming in these units are not as rich as in inpatient psychiatric hospitals, but are far richer

---

[18] Capt. Naidow Deposition, p. 68:  "Question.  The -- is there -- are there special areas of the prison where prisoners with serious mental illness are housed?  Answer.  Yes.  Q.   And where are those areas?   A.   The most highly severe cases are housed on our Housing Unit 3."

than in outpatient clinics.  For example, an inpatient unit has nursing staff 24 hours per day, whereas an Intermediate Care Unit might have nursing staff present only during the daytime shift. In the community, equally intensive treatment programs are called halfway houses, day treatment centers or psychiatric rehabilitation programs.

An intermediate level of care is an essential component of an adequate mental health care system in a prison because the safety and encouragement provided in the step-down treatment program helps prisoners remain infraction-free, avoid victimization and avoid punitive or long-term segregation.  When prisoners with serious mental illness are placed in an intermediate level of mental health care, they are much less likely than otherwise to be victimized or to run afoul of the disciplinary system, and therefore they are much less likely to be consigned to long-term administrative segregation.

An illustrative example of the critical importance of this level of care is provided by the *Presley v. Epps* litigation, in which I participated as a psychiatric expert, then as a court-approved monitor, and later wrote about the experience there with the use of Intermediate Treatment.[19] *Presley* involved conditions of confinement and their destructive effects on prisoners with serious mental illness in the approximately 1,000 bed Unit 32, supermaximum security facility in the Mississippi State Penitentiary at Parchman.  The remedy included removal of prisoners with serious mental illness from administrative segregation, and their transfer either to a psychiatric hospital at another facility (EMCF was the first choice) or to a step-down mental health treatment program then being established at Unit 32.  The result was a marked decrease of violence as well as a stunning decrease in the number of disciplinary infractions (RVRs or rule violation reports) given to prisoners suffering from serious mental illness.[20]

---

[19] T. A. Kupers. (2010). Treating those excluded from the SHU," *Correctional Mental Health Report, 12* ,4, 2010.
**[20]** Kupers, T. A., Dronet, T., Winter, M., Austin, J., Kelly, L., Cartier, W., ... & McBride, J. (2009). Beyond supermax administrative segregation: Mississippi's experience rethinking prison classification and creating alternative mental health programs. *Criminal Justice and Behavior, 36*(10), 1037-1050.

The intermediate level of mental health care is almost entirely lacking at EMCF.   EMCF refers to Unit 2A as a "therapeutic community" and offers more programming than in other parts of the facility but still falls short of an adequate intermediate level of care.  Also, Unit 2A houses only minimum- and medium-security prisoners who are near their time of release from prison.  There are 66 spots in the twelve month program,[21] which is limited to prisoners at minimum and medium security levels.  The prisoners on that unit tell me that they are happy to be in this Unit: because there are fewer violent "take-downs" and some groups.  But the prisoners also tell me that prisoners with Serious Mental Illness are not admitted to Unit 2A.  In other words, the treatment program that seems the richest in programming at EMCF is not available to the many prisoners at EMCF who are higher than Medium security and who suffer with serious mental illness.  Thus, most prisoners I interviewed who are housed on Units 5 and 6D are excluded from Unit 2A.  Other than Unit 2A there are no mental health treatment programs at EMCF that qualify as "Intermediate Mental Health Treatment."

Furthermore, it appears that the Therapeutic Community on Unit 2A at EMCF excludes prisoners who break the rules or harm themselves.  Thus, Prisoner #1, who I interviewed twice during my tour while he was in an Observation Cell in the Medical Department because of life-threatening suicidal behavior (he cut his abdomen very badly), had previously been in Unit 2A's therapeutic community, and then was expelled from that program.  A "Final/Behavior Contract" dated 1/24/13 documents that he had been in the Therapeutic Community, but because he "continued to cut on himself" he was expelled.  The contract stipulates that inmates in the therapeutic community will not cut themselves, will not be absent from class without an excuse from the medical or substance abuse staff, will not participate in sports, and will not talk about harming himself.  In other words, the inmate has to be emotionally stable already in order to remain in the therapeutic community.  So it is not a treatment program for prisoners with serious mental illness. Prisoner #1 has on at least two occasions cut his abdomen badly enough to expose his intestines, he repeatedly and compulsively cuts himself badly, and he is a constant risk of killing himself. Obviously he needs more intensive mental health treatment than EMCF is capable of providing.

---

[21] see 2010 MDOC annual report, available at <http://www.mdoc.state.ms.us/Annual%20Report%20PDF/AnnualReport2010/12%20-%20Institutions.pdf>

***Outpatient Mental Health Treatment:*** Patients in Outpatient Mental Health Treatment can be housed in any prison setting and receive mental health care.  Outpatient mental health care is provided on all of the Units at EMCF, but it is entirely inadequate.

In general population units at EMCF (I will discuss mental health care in segregation next) outpatient care is provided, but it consists of medication alone plus Observation at times of suicidal and other crises. Nursing staff bring a cart with oral medications to the door of each Unit and distribute pills.  There is a case manager, but the case manager does not spend more than a few minutes talking to each prisoner, and the prisoners tell me they might not see her for long periods of time.  Case management, even when delivered consistently and with adequate time to talk, is not sufficient mental health treatment in itself and does not substitute for the other treatment modalities.

This kind of outpatient mental health treatment is very deficient.  There need to be multiple modalities of mental health treatment, including individual and group psychotherapy and a variety of psychiatric rehabilitation programs, which are all lacking at EMCF except in Unit 2A. It is not the case that every patient requires every modality of treatment.  But the modalities of treatment must be available so that the patients who require individual or group psychotherapy, for example, can be provided those services.  At EMCF, as I have described, there are almost no treatment modalities except medications, short-term Observation, and very thin "case management."  This is entirely substandard and unacceptable mental health treatment.

Outpatient mental health treatment in the segregation pods at EMCF is even more deficient. There is a growing national consensus that prisoners with serious mental illness should not be housed in long-term segregation. Their mental illness becomes worse, as does their disability and their prognosis. Yet at EMCF, judging by the large number of prisoners suffering from acute and very disabling mental illness on the segregation pods, segregation seems the very place to which many prisoners with serious mental illness are relegated.

For prisoners in segregation at EMCF there are far too few confidential clinical encounters. There are mental health "rounds" on the segregation pods at EMCF, but these are sadly

inadequate.  Prisoners tell me that the mental health counselor conducting the rounds never talks to them or only talks to them for a minute through their solid cell door, and spends only five minutes going through an entire pod. These brief cell-front interviews become the prisoners' only contact with mental health staff absent a crisis where the prisoner is taken to an observation cell in the Medical Area.  Cell-front interviews are entirely unacceptable except as a method for mental health clinicians to attempt to identify those who need to be taken to an office for a confidential clinical encounter.

**II.C. Gravely Deficient Care for Patients in Psychiatric Crisis**

Every mental health care system must have (1) a program for intervening with and stabilizing patients in acute psychiatric crisis, and (2) an active program to prevent suicide.  Meaningful crisis intervention and suicide prevention programs do not exist at EMCF.

Crisis Intervention as well as Suicide Prevention and Treatment must include a number of components. One formulation, provided by the National Commission on Correctional Health Care,[22] enumerates the following elements:  Training of mental health and custody staff on recognition and intervention regarding prisoners at risk, identification (i.e., screening at admission to the prison or the segregation unit as well as ongoing suicide risk assessment as clinically appropriate), referral (to the appropriate mental health practitioners and programs), evaluation (comprehensive mental health examination including past suicidal and self-harm crises and incidents as well as current stressors), housing (for example, transfer to an Observation cell, or after a period of Observation, to a location where the patient will be safe and appropriately monitored), monitoring (this means not only intensive observation during the immediate crisis, but also ongoing monitoring at incrementally less frequent intervals as the prisoner demonstrates diminishing risk of self-harm), communication (between custody and mental health staff and also between the various mental health and medical providers), intervention (including but not limited to observation and monitoring, for example meaningful talking psychotherapy must occur if the staff are to get to the issues driving the prisoner to despair and contemplate or attempt suicide), notification (of family members, and so forth), reporting (in the electronic medical record according to widely accepted standards in the medical

and mental health fields), review (peer review, quality assurance, etc., with the assumption that where programmatic deficiencies or lapses in staff interventions are discovered they will be corrected), and critical incident debriefing (which are essential if flaws in the mental health program are to be addressed). It does not appear that any of these elements are in place at EMCF. I found little or no evidence in the medical records that Dr. Abplanalp and I reviewed of a functioning crisis intervention or suicide prevention program at EMCF. I agree with Dr. Abplanalp that EMCF is a system is a system that breeds crises because it lacks a system to provide adequate care, and yet it is completely incapable of responding to the crises it creates.

At EMCF, the mental health staff rely too much on "self-harm contracts." These are written statements that the prisoner agrees not to harm himself. When a self-harm contract is used instead of talking to the prisoner about his despair and reasons for self-harm, they are almost always useless. As an aide to talking, i.e. when staff ask the prisoner to sign the contract in the context of talking to him and covering the important issues related to his self-harm, the contract can constitute a symbolic act where the prisoner takes a step toward healthy behavior and commitment to the treatment. But the "self-harm contracts" I discovered on the EMRs seem to be signed in the absence of any real face-to-face intervention or treatment, and where that is the case they are next to useless or worse, provide staff a false sense that the prisoner will not harm himself.

Continuity of care is absolutely essential in crisis intervention in prisons. Often prisoners complain to an officer that they are suicidal, the officer refers them to the mental health staff, and they are transferred to an "Observation Cell," often in the Infirmary. But after a few days they tell staff they are no longer feeling suicidal. They are then transferred back to prison housing, perhaps to a segregation cell where they were confined prior to the suicide crisis. When suicides actually happen in prison, it is quite likely this will be the period when they occur.

Thus, a prisoner must not be sent back to his prior housing after his stay in Observation without a detailed treatment plan that includes recommendations on housing (for example, if the prisoner has been known to attempt self-harm in segregation in the past, it could be very dangerous to transfer him back to a segregation cell), the frequency of monitoring, the kind of ongoing mental

health treatment he will receive (this might include medications, and must include some talking psychotherapy so the mental health staff can assess ongoing suicide risk and the prisoner can be helped to become more functional).

Unfortunately, at EMCF, following a crisis patients are often transferred from Observation Unit back to population – sometimes back to a segregation cell—without treatment plan or follow-up. This results in patients cycling back and forth from Observation to population, over and over and over.   Thus, it is not unusual to see patients housed in the Observation Unit for weeks and months at a time, when the purpose of such a unit should be short-term stabilization.

I briefly interviewed several of the patients on Suicide Observation and Psychiatric Observation in the course of my tour and interviews, and I spoke to quite a few prisoners who had been in suicide observation or psychiatric observation in the past.  They universally tell me that staff do not spend much time at all talking to the patients in Observation cells.  The prisoners inform me that mental health staff and nursing come by each day to check on them, but nobody really asks them about their past suicidal behaviors or what might be causing the current despair.  Nobody other than N.P. Dunn provides more than perfunctory care, or actually spends more than a few minutes talking to the patients.  Rather, a prisoner is identified as a suicide risk or noted to be decompensating, and he is sent to Observation in the Infirmary.  There are windows on the front of the Observation cells and he is observed by staff each day he is there.  But essentially the Crisis Intervention service is deficient in most if not all of the NCCHC-required components I listed above.

These frequent and sometimes long-term stays in the Observation Unit are psychiatrically damaging.   Typically, patients on suicide precautions have their clothes removed and they are provided only a suicide-proof gown and blanket; usually there are no other amenities or possessions in the Observation cell, and the patient does not get out of the cell for recreation.  He is even more isolated and idle and uncomfortable in the Observation cell than he would be in a segregation cell.  These deprivations may be necessary for safety while a patient is being stabilized, but they become problematic when imposed for extended periods of time.

Some prisoners tell me that they eventually say they are no longer suicidal, simply because they are so uncomfortable in the Observation cell and nobody talks to them anyway. They are then sent back to the unit they came from – sometimes to a segregation pod on Unit 5 or Unit 6. There is little or no follow-up except that they may be prescribed psychotropic medications.

The case of Prisoner #29 illustrates the lack of inpatient care as well as the dangers of using the Crisis Unit, that is, the Observation cells in the medical unit or Infirmary, for the treatment of prisoners who clearly need to be admitted to a psychiatric inpatient hospital ward. I encountered Prisoner #29 in the medical unit, where he was locked into an Observation Cell. This 37year old African American man appeared disheveled. On mental status examination he evidenced severe thought disorder with rambling sentences, tangential references and disturbed orientation and judgment, a clinical picture consistent with Schizophrenia or Schizoaffective Disorder. He had been on observation in the medical unit continuously for at least three months, during which time he has spent 24 hours per day in the observation cell with no recreation or other out-of-cell or congregate activities. His medical record contained the diagnosis Schizophrenia. He has been prescribed Haldol Decanoate by monthly injection off and on since August, 2011. There is little documentation in his chart about his symptoms or functional impairment. A Psychiatric Note by Nurse Dunn on 1/17/14 reflects "increased psychotic agitation on the unit." He is given the anti-psychotic medication, Haldol, by injection. The psychiatrist writes (4/1/14 & 4/23/14) that Prisoner #29 has been in the Crisis Intervention Unit since January and remains acutely decompensated (psychotic).

There are no adequate treatment plans in Prisoner #29's medical record, and, with a few exceptions, there is little mention of the signs and symptoms that are the focus of specific treatments. For example, it is noted that there are side effects from medications, but the side effects are not listed. Medications are changed with no explanation in the chart of any reason. In other words, treatment plans are either entirely lacking or are deficient.

Prisoner #29 has been suffering a psychotic episode with regressed behavior, thought disorder, hallucinations and delusions almost continuously for three months, and he has been retained in an Observation cell that entire time. Obviously this man belongs in a psychiatric hospital where

he can receive adequate mental health treatment.  A Crisis Intervention/Suicide Observation bed in a medical unit/infirmary such as the one at EMCF must have a time-limit, for example 24 hours or even 48 hours, and then at the end of that time-limit, the patient must be declared ready for return to a housing unit or a lower intensity mental health program, or if he continues to require intensive mental health treatment he must be admitted to a psychiatric inpatient unit. That is the way Crisis Intervention Units are designed to operate.

Not surprisingly, Prisoner #29 continues to exhibit signs and symptoms of acute psychosis in spite of the very high dosages of psychotropic medications prescribed for him.  A patient this regressed and disabled needs to have mental health clinicians spend a significant time talking to him, and he needs a structured therapeutic environment consisting of therapy groups and various supervised activities if he is to regain a sense of orientation and appropriate goal-directed behavior, and if he is to regain the capacity to relate appropriately to others.  But the Observation cell where he is confined is simply another kind of isolation cell.  He is alone in that cell 24 hours of every day, he does not even get out for recreation.  He has practically no possessions or amenities, and no provisions for meaningful activities.  He frequently smears feces all over the cell.  Staff do not talk to him except for brief visits when he is asked how he is feeling.

Thus, the conditions of isolated confinement in the Observation cell are exacerbating this patient's psychosis, and he is not being provided the kinds of treatment and programs that are needed and only available in a psychiatric hospital, that is, in-patient level of care.  The combined effect of the isolation and idleness in an Observation Cell and the shortfalls of treatment are that his psychotic condition is becoming more persistent and disabling, and his prognosis is becoming much worse.

## II.D. Inadequate Medication Management and Over-Reliance on Psychotropic Medications as the Only Available Treatment Modality

Over-reliance on psychotropic medications, as the only available treatment modality, is commonplace at EMCF.  It appears that the most frequently prescribed psychiatric medications

are the older generation anti-psychotic agent, Haldol, and Tegretol, a seizure medication
prescribed in psychiatric practice as an alternative to Lithium for mood stabilization.

 Haldol has very dangerous side effects, including Extrapyramidal Syndrome (EPS), Tardive
Dyskinesia (TD), and, when given by injection and the accumulated dose is relatively high,
neuroleptic malignant syndrome. Extrapyramidal Syndrome (EPS) is an acute neurological side
effect of anti-psychotic medications involving muscle spasms, excess salivation and tremor.  It
can be very frightening and dangerous.  It usually disappears when the medication causing it is
discontinued, and there are medications, including Cogentin, Benadryl and Artane, that can be
given orally to reverse this side effect.  Tardive Dyskinesia involves a different set of
neurological side effects of Haldol, which take a longer time to appear but usually involve
permanent brain damage and do not cease when the medication is discontinued.  Other serious
side effects include changes in the eyes, heart arrhythmias, other cardiovascular effects including
hypotension or dangerously low blood pressure, obesity and diabetes, liver damage and
neuroleptic malignant syndrome.

Neuroleptic malignant syndrome is an often fatal side effect of Haldol, which can include high
fever, severe muscle rigidity and death.  It is a rare side effect except when Haldol is given by
injection at high dosage – but injections of relatively high dosages are at issue at EMCF,
especially when emergency involuntary injections are added to the standing order for monthly
long-acting Haldol.

On some of the electronic medical records I reviewed the dosage of Haldol Decanoate by
injection is 100 mg. or 150 mg. every 28 days, which is a relatively high dosage.  Then, the same
patient might receive several additional injections of 5 mg. of Haldol, and the long-acting and
subsequently injected Haldol combine in a relatively high accumulated dosage, which makes
neuroleptic malignant syndrome and other side effects much more likely.

I encountered quite a few prisoners who told me how the Haldol "shots" slow them down so they
do not feel like doing anything, make them feel "like a zombie," drool or make their jaw muscles
cramp (E.P.S.) or cause a tremor (T.D.), and that in their slowed down state they are very
vulnerable to assault by other prisoners

Why are so many patients prescribed Haldol while so few are prescribed other anti-psychotic agents such as the new generation atypical anti-psychotic medications?  This makes no sense, clinically speaking.  A psychiatrist must have a wide choice of psychotropic agents in order to create an individualized treatment plan for each patient, "one size" does not "fit all."

When psychotropic medications are given in the absence of a mental health treatment program, they tend to have the effect of merely tranquilizing the patients, and then long-term prognoses worsen.  This was a big problem in the state hospitals, the so-called "snakepits" of the 1940s and 1950s. Many patients were turned into chronic patients or "zombies" in the state hospitals through the administration of high doses of anti-psychotic medications.  It was the public's outrage about the warehousing and drugging of mental patients in the asylums that brought on the de-institutionalization movement and the down-sizing of state mental hospitals since the 1960s.

Patients on psychotropic medications must have periodic monitoring and follow-up.  The frequency of this monitoring and follow-up must be based on the patient's individual needs.  A fixed follow-up interval of ninety days might be adequate for some patients, but extremely inadequate for others.  From the records that Dr. Abplanalp and I reviewed, it appears that there is no individualized determination of the intervals for follow-up.

For example, the antipsychotic medication Clozaril requires close monitoring of white blood cell counts, sometimes on a weekly basis or even more frequently.  The reason is that Clozaril, often the strongest and most effective anti-psychotic medication for individuals suffering from severe and unremitting psychosis, is also very dangerous.  Two of the potentially lethal side effects of this medication are agranulocytosis and suicide.  Agranulocytosis is the rapid reduction of white cell count in the blood, a condition that can lead to rapid death from infection.  The patient prescribed Clozaril must be monitored closely, laboratory tests including frequent white cell counts must be done and quickly reviewed so that if agranulocytosis occurs, the medication can be halted immediately and precautions can be set up to decrease the risk of death from immune failure.

Dr. Abplanalp reviewed the chart of a patient on Clozaril at EMCF. This patient's medication management was dangerously inadequate. According to the medical record, Prisoner #64, a man in his early twenties with a diagnosis of Paranoid Schizophrenia, had been very psychotic and difficult to manage until he was started on Clozaril in 2009 or 2010. His psychiatric condition improved markedly. But then his white cell count dropped beneath the normal range beginning in October, 2012, indicating a possible evolution of agranulocytosis. When a patient's white cell count begins to fall he must be monitored very closely because the medical team do not yet know whether the slightly lower white cell is the beginning of a plummeting white cell count, which would be a medical emergency and possibly fatal.

But the psychiatrist failed to follow up on these abnormal results for months, even though they caught the attention of the primary care physician at the prison. And six more months passed before the psychiatrist documented a clinically adequate "risk/benefit" analysis, that is, the risk is agranulocytosis (or a continuing and rapid fall in the white cell count) and the benefit is that Clozaril is the only medication that has proved capable of controlling this patient's severe psychotic condition.

The psychiatrist eventually opted to continue the Clozaril at a slightly lower dose and supplement the anti-psychotic effect with another psychotropic agent. This is an acceptable clinical practice. The problem is that there are delays of many weeks or months between the lab tests that reflect a falling white blood cell count and the psychiatrist's attention to and response to the lab tests. Again, I have to conclude from the medical record that the psychiatrist is present at the facility too infrequently or has too many patients to be able to respond in timely manner to the lab tests that indicate a serious and urgent risk. This kind of time delay in responding to blood tests is quite frequent at EMCF (as is discussed in the reports of the other experts) and this makes the prescription of a medication like Clozaril very dangerous.

Another major deficiency in medication management at EMCF is the failure to consistently obtain patients' informed consent for treatment with psychotropic medications.

Informed consent is a fundamental ethical consideration in the practice of medicine, including psychiatry.  Patients have a right to accept or reject any recommended treatment, and that right cannot be meaningfully exercised unless the decision is informed:  that is, the physician must explain to the patient the material facts about the nature, consequences, and risks of the proposed treatment, examination or procedure; the alternatives to it; and the prognosis if the proposed treatment is not undertaken.  This fundamental principle of the requirement of informed consent applies in prisons just as it does in the community.

The National Commission on Correctional Health Care (NCCHC) articulates the requirement of informed consent as follows:  "Informed consent is the agreement by a patient to a treatment, examination, or procedure after the patient receives the material facts about the nature, consequences, and risks of the proposed treatment, examination or procedure; the alternatives to it; and the prognosis of the proposed treatment is not undertaken."[23]   Further, If at any point the patient indicates refusal, the medication must not be forced: the right to refuse treatment "is inherent in the notion of informed consent…."[24]

MDOC's own policy recognizes the right to refuse treatment.[25]  MDOC Policy #25-04-A, "Offender Right to Refuse Medical Treatment," spells out the prisoner's right to refuse treatment, including psychotropic medication: "An offender can refuse medical evaluation or treatment being offered by medical staff.   Refusal must be in writing using the Release of Responsibility form."

At EMCF, the requirement of obtaining informed consent to treatment is frequently ignored.  I was told by very many prisoners taking psychotropic medications that they were never given an explanation of the medications they would receive, they were not permitted to decline the treatment, nobody ever showed them a "Release of Responsibility form" or they would have signed it, and they were never given a hearing to determine if emergency involuntary

---

[23] National Commission on Correctional Health Care, Standards for Mental Health Services in Correctional Facilities.  Correctional Mental Health Care: Standards & Guidelines for Delivering Services, 0262008, M-I-104.
[24] Ibid, M-I-03, p. 146.
[25] MDOC Policy #25-04-A.

medications would be permitted.  Instead, they nearly unanimously reported, they witness frequent "take-downs" by the "goon squad" and it is only their fear that the same violent action will be taken against them if they refuse that leads them to comply with medication administration by mouth or by injection.

In some very limited circumstances, it may be clinically appropriate to administer mediation in the absence of consent.  The NCCHC standard for Emergency Psychotropic Medication calls for a "protocol for emergency situations when an inmate is dangerous to self or others due to a medical or mental illness and when forced psychotropic medication may be used to prevent harm, based on a provider's order.  NCCHC Standards for Mental Health Services in Correctional Facilities (2008) (essential standard MH-I-02). The standard "supports the principle that psychotropic medication may not be used simply to control behavior or as a disciplinary measure. *Id.*  The NCCHC standard requires that the provider document in the inmate's record the inmate's condition, the threat posed, the reason for forcing medication, other treatment modalities attempted, if any, and treatment goals for less restrictive treatment a alternatives as soon as possible.  *Id.*

The required documentation regarding consent and forced medication in the EMRs I reviewed is far from adequate.  I saw a few notes about emergency medications, and sporadic mentions that the prisoner is a danger to himself or others.  I did not find any reference to consideration of less restrictive alternative interventions (and I know from my tour and interviews that practically no significant alternative treatment modalities exist at EMCF).  Occasionally progress notes in the EMR document the acuteness of the prisoner's danger to self - for example, he has cut himself - but more often there is insufficient documentation in the chart for the reviewer to figure out the reason for the involuntary injection, and even if it is in fact involuntary.  Frequently there is a "p.r.n." or "as needed" order in the EMR The prisoners I interviewed all told me that very little talking and reasoning occur; rather if they refuse to take their medication or become agitated, they are required to have an injection, and if they refuse they are "taken down" by a team of officers.

For example, there is the case of Prisoner #21.  This 36 year old African American man was in two mental hospitals before coming to prison.  His medical record contains a diagnosis of Paranoid Schizophrenia with suicide ideation, and he is prescribed Haldol Decanoate by injection every 28 days.  He evidences an intense, flat stare.  He tells me he has received "… the shots, half the guys on 3C get shots."  He has received a Haldol injection once a month, and another "shot" if he gets agitated.  He does aver hallucinations, and when he sees the psychiatrist they talk about that.  Their visits last about 6 to 10 minutes.  He sees other prisoners being taken down by the "goon squad" and that frightens him, so when they would come and tell him it is his turn to get a shot he cooperated.  But he did not want the shots and told staff he is very willing to take pills.  He says he was not given an opportunity to refuse the shots.  He has never been presented with a form to refuse medications.  There has never been any kind of hearing to determine he needs involuntary medications.  He has been in punitive segregation twice in Unit 6 at EMCF, and tells me that if you refuse a shot of medications there they will do a cell extraction where a bunch of officers charge into your cell and hold you down while they give you an injection against your will.  He tells me there is no real mental health assessment done on prisoners entering Unit 3C, and mostly nobody from mental health staff to talk to.

More than a few prisoners complain about involuntary medications, and especially about the many "take-downs" that are done where several officers grab the prisoner, force him to the floor and hold him while a nurse pulls his pants down and gives him an injection in his gluteal muscle.  Viewing video footage of "take-downs," I have to agree with the prisoners that it may entail an extremely brutal use of force and, besides the physical pain and risk of serious physical injury, it is humiliating for the prisoner.

For example, I watched a video of Prisoner # 23 taken on 5/5/13.  There was no evidence in the video or chart that he posed the sort of danger that would have justified involuntary medication.  However, the medication was nonetheless administered over his objection.

It might seem that if the patient cuts himself, involuntary medications would be appropriate under the emergency exception to the requirement of consent.  But again, the emergency provision requires consideration of less restrictive alternatives. Mental health staff should take

the time to talk to the patient, trying to understand the reason for the patient's self-harm, and negotiating a response other than an involuntary injection. For example, the patient might be convinced to take pills orally, or even to halt the unacceptable or self-destructive behavior. That kind of intervention – attempting to find a less-restrictive alternative - is what is required by the standard of care in the community.

There are cases, and they are relatively rare, where non-emergency medication-over-objection is clinically indicated. However, in such cases, due process is required, including an "Involuntary Medication Hearing" and determination, with the prisoner notified in writing 24 hours prior to the hearing. After that, there must be a due process hearing and determination.[26]

I believe that the use of involuntary medication is not uncommon at EMCF. I reach this conclusion based on the absence of adequate informed consent, the lack of alternative treatments to exhaust, the coercion implicit in frequent "take-downs" in view of other patients, and the incredibly poor documentation in the EMRs about the reason for the injection or the treatment plan the injection is a part of, and the reports of the prisoners.

An example is Prisoner #20, a 23 year old man housed on Unit 3C who tells me he has been in prison for 7 years. He tells me "I get shots, they slow me down and they don't help me." He tells me he does not see a psychiatrist for a year at a time and, indeed, his chart shows that he went for months without seeing a psychiatric provider in 2011. He thinks he is allergic to Haldol, and the medical staff have switched him to Prolixin, but he gets the kind of "shots" that last a month. He has never been presented with a form to refuse medications, though he would like to refuse the medications and he says he tells that to staff. There has never been any kind of hearing to determine he needs involuntary medications.

In Prisoner 20's medical record he is diagnosed Schizophrenia, Disorganized Type and mild Mental Retardation. He is currently prescribed Prolixin/Fluphenazine Decanoate, 25 mg, by injection every 14 days. A 10/1/13 note in his EMR reflects his concern he is allergic to Haldol,

---

[26] *Washington v. Harper*, 494 U.S. 210 (1990) addresses non-emergency involuntary medication in prison.

and becomes "locked up like the exorcist" (a poignant description of a likely case of EPS or extrapyramidal syndrome, a side effect of Haldol). NP Dunn switched his prescription to Prolixin (Fluphenazine). He is administered anti-psychotic long-acting medications by injection, yet there is no documentation of informed consent or refusal to take the medication. The patient received a Haldol Lactae shot for agitation but it is not clear from the record whether it was voluntary or involuntary. There are notations of visits with the psychiatrist on 2/2/13, psychiatric NP on 10/1/13, and the psychiatrist on 1/11/14.

## II. E.  Unreliable, Inaccurate and Incomplete Mental Health Records Reflecting Substandard Assessment and Treatment

Accurate, complete and reliable records are the essential foundation for adequate mental health treatment (and indeed for all medical treatment). Screening instruments and all assessments must be carefully documented in the clinical chart. Contacts with prisoners, laboratory reports, diagnoses, medication prescribing, changes in status and so forth must be carefully and accurately recorded according to the accepted standard of care in the community. In addition to the psychiatric history, observed signs and reported symptoms, diagnoses and other pertinent information, there must be a treatment plan on the chart covering every point in time. Shifts in the treatment must be documented as changed treatment plans, and explanations of the changes must be included in the electronic medical record (EMR).

There are very dangerous problems with documentation in the records at EMCF. There are large gaps or absent documentation in Medication Administration Records (MARs). These are forms on which nursing staff document the delivery of medications per orders from the physician or nurse practitioner. The many gaps in the MARs and missing or incomplete notes are consistent with reports from Ms. Madeleine LaMarre about irregularities in the delivery of prescribed medications (see Ms. LaMarre's Report). This kind of inconsistency and error is very dangerous when it comes to psychotropic medications, which must be given in a consistent and continuous manner or there will be great harm to the mental state and safety of the patients.

In addition to gross omissions and gaps in the electronic medical records, Dr. Abplanalp and I found a systemic pattern of utterly unreliable and suspect notes by mental health counselors.

This kind of widespread unprofessional practice and unreliable medical record-keeping at EMCF violates basic professional standards of care and contributes to all of the other utterly unacceptable deficiencies in the provision of mental health care at EMCF.

To illustrate the pattern of unreliable clinical notes:  There are a number of notes on Prisoner #29's electronic medical record indicating no mental health problem during times when he was obviously acutely psychotic.  Thus, on 2/3/14 there is a note by one provider, "patient too disorganized to participate and has ongoing, nonstop psychotic symptoms."  By that time he was in a crisis intervention cell in the Infirmary and noted by another mental health clinician to be "too disorganized to take part in the interview."  Still, notes by Mental Health Counselor Roger Davis on 2/17/14 and 2/21/14 indicate "no problem reported or observed."  This is incredible, given that on the same day that MHC Davis documented "no problem reported or observed, Prisoner #29 was in an Observation Cell and was noted by another provider to be acutely psychotic ("loose and disorganized thoughts with symptoms of mania - standing on bed at interview - rambling and disorganized conversations…").

Many notes in the EMRs by Mental Health Counselors are entirely useless and misleading.  One wonders whether Mr. Davis saw the same patient Ms. Dunn is describing as floridly psychotic and/or manic, or whether he simply left a boilerplate note (where even the typos match the typos in notes he writes about other patients) without even seeing Prisoner #29.  In fact, on 4/6/14, Mr. Davis writes:  "He is asleep on his mat, no body movement, or response.  No… hallucinations, …or any threats to harm self observed.  IM (inmate) is able to weigh the risks and consequences of his behaviors. No mental health issues."

This is ludicrous. How can a clinician assess the presence of hallucinations, suicidal thoughts and the patient's ability to weigh risks and consequences when the patient is asleep during the examination?  If this kind of egregiously false charting occurred with only this one patient, I would conclude this counselor's unacceptable behavior is an issue his supervisor and the mental health staff need to address in the course of their supervision and peer review process.  But he is not the only counselor to write this kind of note, and this kind of falsity in the medical records is not a rare occurrence.  In fact, there seems to be a system-wide pattern of this kind of false

documentation, which is quite dangerous – it camouflages the patients' real and possibly urgent mental health problems.

Very many of the entries by mental health counselors are entirely unreliable.   Prisoner #56 is a 54 year old African American man on Unit 3C.  He is diagnosed in the chart Undifferentiated Schizophrenia and prescribed Depakote 1,000 mg twice daily plus an intramuscular injection of Haldol Decanoate, 200 mg per month.  He has delusions involving "pythons and a 72-year-old man living inside (him);" he claims he can hear his ancestors talking and he has been observed talking to himself. He "believes he is a 'mud cat' and a combination of other things."  He denies special powers.  On 2/14/13, Sergeant Hardy requested that Prisoner #56 be seen by mental health due to his exhibiting "bizarre behaviors."  The prisoner was noted to be exhibiting delusional beliefs including both that a python and a "72-year-old man" were living inside of him.

The following day, on 2/15/13, Mental Health Counselor Ms. Lockett conducted rounds and stated that Prisoner #56's mental status was within normal limits.  No concerns were noted and there was no indication of any psychotic or delusional processes. It seems readily apparent from this note that MHC Lockett did not see nor interact with Prisoner #56 at all, unless his delusional and psychotic behavior resolved completely within 24 hours – which is clinically very unlikely.

This kind of alternation between notes reflecting psychotic ideas and behaviors and notes indicating no mental health problem continues throughout the chart of Prisoner #56.  Thus, for example, in a note reflecting a 03/18/13 Quarterly Treatment Team Review, MHC Lakeisha Prude reported that Prisoner #56 states that he "hears his ancestors daily and believes he is a mud cat" and "can be seen talking to self."  That same day there is a note by Marshall Powe: "Inmate is medication compliant, and has no auditory visual or tactile hallucinations. He reports hearing his mother's voice daily. Inmate has eccentric behavior, he describes himself as a 'silver back gorilla.'" On 03/19/13, 03/30/13 and 04/01/13, "Mental Health Rounds" evidenced "no problems."  But then a nursing note 04/03/13 indicates Prisoner #56 came to medical for an "as needed" injection of Haldol.  If, during rounds for several weeks, there was no problem, why was an "as needed" injection given?  There is no explanation to be found in the record.

Part of the ethical and professional duty of psychiatrists as well as other mental health professionals is to carefully review the patient's medical records, identify any irregularities, and bring them to the attention of the proper person to address them.  It appears from the medical records that this most basic kind of review and follow-up is simply not occurring at EMCF in the treatment of prisoners with mental illness.

When there are almost simultaneous notes in the medical record, one saying that the prisoner is fine with no complaints, the other describing a serious psychiatric crisis replete with hallucinations or very high suicide risk, this anomalous pattern is a sign of fraudulent record-keeping.  It is the duty of supervising mental health professionals to notice this kind of irregularity and remedy it.

**II.F. Effect on Prisoners' Mental Health of Systemic Excessive Force**

The general principle that underlies the standard of care in the community as well as correctional health care standards, is that the use of force must be a last resort, and it should only happen very rarely when all other, less restrictive options have been attempted and failed.  The first option, always, is to talk, perhaps to negotiate, compromise, whatever it takes to avoid violence.

Eldon Vale comments in his Report about a pattern of use of excessive force at EMCF: "While many of the use of force events occur in units 5 and 6 at the prison, there are many in the other units as well. There is a pattern of dangerous and abusive practices that run through many of these events putting the prisoner population at significant risk of serious harm."  Mr. Vale proceeds to analyze several videos of use of force incidents, pointing out the failure of staff to put energy into de-escalating situations so use of force would not be necessary, the failure of staff to provide de-contamination when immobilizing gas is employed, and so forth.  He concludes this section of his report:  "It is clear from the information made available to me that the incompetence of the custody staff at EMCF is profound, deeply troubling and places the inmates, as well as themselves, at risk of serious and significant injury."

It is very obvious from my review of videos involving use of force and from Eldon Val's very carefully conducted investigation into the use of force at EMCF that there is very little in the way of talk and negotiation that precedes the multiple uses of force portrayed in the videos we reviewed.

The video I reviewed of Prisoner #4, incident date 3/7/13, provides a vivid example of this pattern. The video shows Prisoner #4 being handcuffed, then he is told he will be stripped, and he starts to resist. But the officers do strip him. Then they try to move him to another location, he is thrown to the floor by several officers, one pushing his face into the floor. Prisoner #4 repeatedly insists he is not resisting, saying they are hurting him and he is not resisting. In a little while the prisoner starts to cry, and says on the video: "That man just punched me in the face, too." His lip is bleeding. They stand him up and move him. Prisoner #4 says to a specific officer: "I see you trying to slam my head." Prisoner #4 is upset and about not getting regular showers, being stripped, and that an officer ordered him to be taken down when he wasn't doing anything wrong." He proceeds to threaten the officers. Eventually he is examined by a nurse, and then talks to a mental health counselor, to whom he says "It's just wrong that an officer punched me in the face with my hands behind my back and everyone saw it and didn't do anything." Prisoner #4 confirms he took his medications and says he was just angry, he has been telling people that he has been handled too roughly, choked and threatened with a gun by the officers, and he is afraid they are trying to kill him. The prisoner is crying and talking about how he tried to do better when he moved cells and the mental health counselor gets up and leaves while he is speaking.

Added to the shocking absence of talking, and trying to reason with prisoners on the part of staff at EMCF prior to initiating the use of force, is the dreadful callousness on the part of staff, the insensitivity that is immediately apparent to the visitor or viewer of these videos. Officers, on average, talk very little to the prisoners. The officers on the segregation pods do not even enter the pods much of the time to check on the prisoners' safety. And in the general population units, the officers spend very little time talking to prisoners. Mental health staff usually spend a very short time, minutes, talking to the prisoners, even in the crisis intervention or Observation cells. There is a remarkable callousness that permeates the staff at EMCF, both custody and mental health staff.

The keyword is trauma. Prisoners generally, as a class, have been multiply traumatized throughout their lives. We know that from a large amount of literature about prisoners and traumas that occurred prior to

their incarceration.  Prisoners with serious mental illness are more susceptible to trauma than the average prisoner in two ways: Prisoners with serious mental illness are disproportionately victimized by fellow prisoners and disproportionately selected for disciplinary action and punishment by Correctional Officers; and trauma in prison, including "take-downs" by officers and involuntary injections, tend to trigger or exacerbate acute breakdowns or self-harm crises in this population.  For these and other reasons, prisoners with serious mental illness are very vulnerable to trauma, and the traumas that occur in the prison environment become "re-traumatizations" and cause significant psychiatric damage.

**CONCLUSION**

MDOC has created a totality of conditions in the segregation units at EMCF so harsh and extreme that they are incompatible with mental health.   Prisoners are isolated, abandoned, forced to live in abject filth and darkness, subjected to violence and danger, and denied care for their most basic human needs.  Each of these conditions, individually and taken together, inflicts tremendous psychological suffering and places each prisoner at significant risk of serious harm.

There is no functioning mental health care system at EMCF.  The availability and quality of care fall far short of what is minimally required to meet the needs of the population.  As a result, on a systemic basis and regardless of diagnosis, acuity or history, MDOC denies patients the care necessary to meet their mental health needs.  Mental health care at EMCF is inexcusably indifferent, reckless, and provided in a manner that places all patients at risk.

I first placed MDOC on notice of these dangers more than three years ago.  Since that time, I have seen no evidence that they have taken responsibility for the safety, wellbeing, or mental health of prisoners at EMCF.  The predictable result has been ongoing violence, suicide, and the unconscionable suffering of prisoners with mental illness.  Absent remediation on a systemic level, these phenomena will continue unabated.

Respectfully Submitted,

Terry A. Kupers, M.D., M.S.P.

June 16, 2014

Exhibit A: Curriculum Vitae

# Terry Allen Kupers, M.D., M.S.P.

Office Address:
2100 Lakeshore Avenue, Suite C, Oakland, California 94610
phone: 510-654-8333

Currently:
Institute Professor, Graduate School of Psychology,  The Wright Institute, 2728
        Durant Avenue, Berkeley, California 94704
Private Practice of Psychiatry, Oakland

Family: Married to Arlene Shmaeff, Education Director at the Museum of
        Children's Art (M.O.C.H.A.) in Oakland; father of three young adult sons

Born:  October 14, 1943, Philadelphia, Pennsylvania

Education:
B.A., With Distinction, Psychology Major, Stanford University, 1964
M.D., U.C.L.A. School of Medicine, 1968
M.S.P. (Masters in Social Psychiatry), U.C.L.A., 1974

Training:
Intern (Mixed Medicine/ Pediatrics/ Surgery), Kings County Hospital/Downstate
        Medical Center, Brooklyn, New York, 1968-1969.
Resident in Psychiatry, U.C.L.A. Neuropsychiatric Institute, Los Angeles, 1969-
        1972
Registrar in Psychiatry, Tavistock Institute, London (Elective Year of U.C.L.A.
        Residency) 1971-1972
Fellow in Social and Community Psychiatry, U.C.L.A. Neuropsychiatric Institute,
        1972-1974

License: California, Physicians & Surgeons, #A23440, 1968-

Certification: American Board of Psychiatry and Neurology (Psychiatry,
        #13387),  1974-

Honors:
Alpha Omega Alpha, U.C.L.A. School of Medicine,1968.
Distinguished Life Fellow, American Psychiatric Association; Fellow, American
        Orthopsychiatric Association.
Listed: Who's Who Among Human Services  Professionals (1995-); Who's Who
        in California (1995-);  Who's Who in The United States  (1997-);  Who's

Who in America (1998-); International Who's Who in Medicine (1995-); Who's Who in Medicine and Healthcare (1997-); The National Registry of Who's Who (2000-); Strathmore's Millenial Edition, Who's Who; American Biographical Institute's International Directory of Distinguished Leadership; Marquis' Who's Who in the World (2004-); Marquis' Who's Who in Science and Engineering, (2006-); Who's Who Among American Teachers & Educators (2007-); The Global Directory of Who's Who (2012-); International Association of Healthcare Professionals' The Leading Physicians (2012-).

Helen Margulies Mehr Award, Division of Public Interest (VII), California Psychological Association, Affiliate of American Psychological Association, March 30, 2001.

Stephen Donaldson Award, Stop Prisoner Rape, 2002.

Exemplary Psychiatrist Award, National Alliance for the Mentally Ill, 2005

William Rossiter Award for "global contributions made to the field of forensic mental health," Annual Meeting, Forensic Mental Health Association of California, March 18,2009, Monterey, California

Clinical Practice:

Los Angeles County, SouthEast Mental Health Center, Staff Psychiatrist, 1972-1974

Martin Luther King, Jr. Hospital, Department of Psychiatry, Los Angeles                                    Staff Psychiatrist and Co-Director, Outpatient Department, 1974-1977.

Contra Costa County, Richmond Community Mental Health Center, Staff Psychiatrist and Co-Director, Partial Hospital, 1977-1981

Private Practice of Psychiatry, Los Angeles and Oakland, 1972 to present

Teaching:

Assistant Professor, Department of Psychiatry and Human Behavior, Charles Drew Postgraduate Medical School, Los Angeles, and Assistant Director, Psychiatry Residency Education, 1974-1977.

Institute Professor, Graduate School of Psychology, The Wright Institute, Berkeley, 1981 to present

Courses Taught at: U.C.L.A. Social Science Extension, California School of Professional Psychology (Los Angeles), Goddard Graduate School (Los Angeles), Antioch-West (Los Angeles), New College Graduate School of Psychology (San Francisco).

Prof'l Organizations:

American Psychiatric Association (Distinguished Life Fellow); Northern California Psychiatric Society; East Bay Psychiatric Association (President, 1998-1999); American Orthopsychiatric Association (Fellow); American Association of Community Psychiatrists; Physicians for Social Responsibility; National Organization for Men Against Sexism; American Academy of Psychiatry and the Law.

Committees and Offices:

Task Force on the Study of Violence, Southern  California Psychiatric Society, 1974-1975

Task Force on Psychosurgery, American Orthopsychiatric Association, 1975-1976

California Department of Health Task Force to  write "Health Standards for Local Detention                                Facilities," 1976-77.

Prison/ Forensic Committee, Northern California Psychiatric Society,  1976-1981; 1994-

Psychiatry Credentials Committee, Alta Bates Medical Center, Berkeley, 1989-1994 (Chair, Subcommittee to Credential Licensed Clinical Social Workers)

President, East Bay Chapter of Northern California Psychiatric Society, 1998-1999

Co-Chair, Committee on Persons with Mental Illness Behind Bars of the American Association of Community Psychiatrists, 1998-2003

Consultant/Staff Trainer:

Contra Costa County Mental Health Services; Contra Costa County Merrithew Memorial Hospital Nursing Service; Bay Area Community Services, Oakland; Progress Foundation, San Francisco; Operation Concern, San Francisco; Marin County Mental Health Services; Berkeley Psychotherapy Institute; Berkeley Mental Health Clinic; Oregon Department of Mental Health; Kaiser Permanente Departments of Psychiatry in Oakland, San Rafael, Martinez and Walnut Creek; Human Rights Watch, San Francisco Connections collaboration (Jail Psychiatric Services, Court Pre-Trial Diversion, CJCJ  and Progress Foundation); Contra County Sheriff's Department Jail Mental Health Program; Consultant to Protection & Advocacy, Inc., re Review of State Hospital Suicides

Forensic Psychiatry (partial list):

Testimony in Madrigal v. Quilligan, U.S. District  Court, Los Angeles, regarding informed consent  for surgical sterilization, 1977

Testimony in Rutherford v. Pitchess, Los Angeles Superior Court, regarding conditions and mental health services in Los Angeles County Jail, 1977

Testimony in Hudler v. Duffy, San Diego County Superior Court, regarding conditions and mental health services in San Diego County Jail, 1979

Testimony in Branson v. Winter, Santa Clara County Superior Court, regarding conditions and mental health services in Santa Clara County Jail, 1981

Testimony in Youngblood v. Gates, Los Angeles Superior Court, regarding conditions and mental health services in Los Angeles Police Department Jail, 1982

Testimony in Miller v. Howenstein, Marin County Superior Court, regarding conditions and mental health services in Marin County Jail, 1982

Testimony in Fischer v. Geary, Santa Clara County Superior Court, regarding

conditions and mental health services in Santa Clara County Women's Detention Facility, 1982

Testimony in Wilson v. Deukmejian, Marin County Sup Court, regarding conditions and mental health services at San Quentin Prison, 1983

Testimony in Toussaint/Wright/Thompson v. Enomoto, Federal District Court in San Francisco, regarding conditions and double-celling in California State Prison security housing units, 1983

Consultant, United States Department of Justice, Civil Rights Division, regarding conditions and mental health services in Michigan State Prisons, 1983-4

Testimony in Arreguin vs. Gates, Federal District Court, Orange County, regarding "Rubber Rooms" in Orange County Jail, 1988

Testimony in Gates v Deukmejian, in Federal Court in Sacramento, regarding conditions, quality of mental health services and segregation of inmates with HIV positivity or AIDS at California Medical Facility at Vacaville, 1989

Testimony in Coleman v. Wilson, Federal Court in Sacramento, regarding the quality of mental health services in the California Department of Corrections' statewide prison system, 1993

Testimony in Cain v. Michigan Department of Corrections, Michigan Court of Claims, regarding the effects on prisoners of a proposed policy regarding possessions, uniforms and classification, 1998

Testimony in Bazetta v. McGinnis, Federal Court in Detroit, regarding visiting policy and restriction of visits for substance abuse infractions, 2000

Testimony in Everson v. Michigan Department of Corrections, Federal Court in Detroit, regarding cross-gender staffing in prison housing units, 2001

Testimony in Jones 'El v. Litscher, Federal Court in Madison, Wisconsin, regarding confinement of prisoners suffering from severe mental illness in supermax, 2002

Testimony in Russell v. Johnson, Federal Court in Oxford, Mississippi, regarding conditions of confinement and treatment prisoners with mental illness on Death Row at Parchman, 2003

Testimony in Austin v. Wilkinson, Federal Court in Cleveland, Ohio, regarding proposed transfer of Death Row into Ohio State Penitentiary (supermax), August, 2005

Testimony in Roderick Johnson v. Richard Watham, Federal Court in Wichita Falls, Texas, regarding staff responsibility in case of prison rape, September, 2005

Testimony in DAI, Inc. v. NYOMH, Federal Court, So. Dist. NY, April 3, 2006, regarding mental health care in NY Dept. of Correctional Services

Testimony in Neal v. Michigan DOC, State of Michigan, Circuit Court for the County of Washtenaw, January 30, 2008, File No. 96-6986-CZ, regarding custodial misconduct & sexual abuse of women prisoners

Testimony in Hadix v. Caruso, No. 4:92-cv-110, USDistCt, WDistMichiganTestimony, USDistCt, WDistMichigan, Grand Rapids, Michigan, regarding mental health care in prison, April 29, 2008

Hospital Staff:  Alta Bates Medical Center, Berkeley

Journal Editorial Positions:
<u>Free Associations,</u> Editorial Advisory Board
<u>Men and Masculinities,</u> Editorial Advisory Panel
<u>Psychology of Men and Masculinity,</u> Consulting Editor
<u>Juvenile Correctional Mental Health Report,</u> Editorial Board
<u>Correctional Mental Health Report</u>, Contributing Editor

Presentations and Lectures (partial list):
"Expert Testimony on Jail and Prison Conditions."  American  Orthopsychiatric
        Association Annual Meeting, San Francisco, March 30, 1988,  Panel 137:
        "How Expert are the Clinical Experts?
"The Termination of Psychotherapy."  Psychiatry Department Grand Rounds,
        Mills/Peninsula Hospitals, Burlingame, February 24, 1989.
"Big Ideas, and Little Ones."  American Psychiatric Association Annual Meeting,
        San Francisco, April, 1989.
"Men in Psychotherapy."  Psychiatry Department Grand Rounds, Mills/Peninsula
        Hospitals, Burlingame, September 29, 1989.
"Psychodynamic Principles and Residency Training in Psychiatry." The Hilton
        Head Conference, Hilton Head Island, South Carolina, March 15, 1991.
Panelist:  "The Mentally Ill in Jails and Prisons," California Bar Association
        Annual Meeting, Annaheim, 1991.
"The State of the Sexes: One Man's Viewpoint."  The Commonwealth Club of
        California, San Mateo, March 25, 1992.
Keynote Address:  "Feminism and the Family."  17th National Conference on
        Men and Masculinity, Chicago, July 10, 1992.
Panel Chair and Contributor: "Burnout in Public Mental Health Workers." Annual
        Meeting of the American Orthopsychiatric Association, San Francisco,
        May 22, 1993.
Panel Chair and Contributor:  "Socioeconomic Class and Mental Illness." Annual
        Meeting of the American Psychiatric Association, San Francisco, May 26,
        1993.
"Public Mental Health."  National Council of Community Mental Health Centers
        Training Conference, San Francisco, June 12, 1993.
Psychiatry Department Grand Rounds:  "Men's Issues in Psychotherapy."
        California Pacific Medical Center, San Francisco, February 24, 1993.
"The Effect of the Therapist's Gender on Male Clients in Couples and Family
        Therapy."  Lecture at Center for Psychological Studies, Albany, California,
        April 15, 1994.
"Pathological Arrhythmicity and Other Male Foibles." Psychiatry Department
        Grand Rounds, Alta Bates Medical Center, June 7, 1993.
Roger Owens Memorial Lecture.  "Prisons and Mental Illness."  Department
        of          Psychiatry, Alta Bates Medical Center, March 6, 1995.
Keynote Address:  "Understanding Our Audience: How People Identify with

Movements and Organizations."   Annual Conference of the Western Labor Communications Association, San Francisco, April 24, 1998.

"Men in Groups and Other Intimacies."  44th Annual Group Therapy Symposium, University of California at San Francisco, November 6, 1998.

"Men in Prison."  Keynote, 24th Annual Conference on Men and Masculinity, Pasadena, July 10, 1999.

"Trauma and Posttraumatic Stress Disorder in Prisoners" and "Prospects for Mental Health Treatment in Punitive Segregation."  Staff Training Sessions at New York State Department of Mental Health, Corrections Division, at Albany, August 23, 1999, and at Central New York Psychiatric Institution at Utica, August 24.

"The Mental Health Crisis Behind Bars."  Keynote, Missouri Association for Social Welfare Annual Conference, Columbia, Missouri, September 24, 1999.

"The Mental Health Crisis Behind Bars."  Keynote, Annual Conference of the Association of Community Living Agencies in Mental Health of New York State, Bolton Landing, NY, November 4, 1999.

"Racial and Cultural Differences in Perception Regarding the Criminal Justic Population."  Statewide Cultural Competence and Mental Health Summit VII, Oakland, CA, December 1, 1999.

"The Criminalization of the Mentally Ill," 19th Annual Edward V. Sparer Symposium, University of Pennsylvania Law School, Philadelphia, April 7, 2000.

"Mentally Ill Prisoners."  Keynote, California Criminal Justice Consortium Annual Symposium, San Francisco, June 3, 2000.

"Prison Madness/Prison Masculinities," address at the Michigan Prisoner Art Exhibit, Ann Arbor, February 16, 2001.

"The Mental Health Crisis Behind Bars," Keynote Address,  Forensic Mental Health Association of California, Asilomar, March 21, 2001.

"Madness & The Forensic Hospital," grand rounds, Napa State Hospital, 11/30/01.

Commencement Address, The Wright Institute Graduate School of  Psychology, June 2, 2002.

"Mental Illness & Prisons: A Toxic Combination," Keynote Address, Wisconsin Promising Practices Conference,  Milwaukee, 1/16/02.

"The Buck Stops Here: Why & How to Provide Adequate Services to Clients Active in the Criminal Justice System,"  Annual Conference of the California Association of Social Rehabilitation Agencies, Walnut Creek, California, 5/2/02.

Keynote Address, "Mental Illness in Prison," International Association of Forensic Psychotherapists, Dublin, Ireland, May 20, 2005

Invited Testimony (written) at the Vera Institute of Justice, Commission on Safety and Abuse in America's Prisons, Newark, NJ, July 19, 2005

Invited Testimony at the National Prison Rape Elimination Commission hearing in San Francisco, August 19, 2005

Lecture, Prisoners with Serious Mental Illness: Their Plight, Treatment and

Prognosis," American Psychiatric Association Institute on Psychiatric Services, San Diego, October 7, 2005

Grand Rounds, "The Disturbed/Disruptive Patient in the State Psychiatric Hospital," Napa State Hospital, June 26, 2007

Lecture, "Our Drug Laws Have Failed, Especially for Dually Diagnosed Individuals," 19th Annual Conference, California Psychiatric Association, Huntington Beach, CA, October 6, 2007

Panel: "Mental Health Care and Classification," Prison Litigation Conference, George Washington University Law School, Washington, D.C., March 28, 2008.

Keynote Address: "Winning at Rehabilitation," Annual Meeting of the Forensic Mental Health Association of California, Monterey, California, March 18, 2009

Panel: "Construction of Masculinity and Male Sexuality in Prison," UCLA Women's Law Journal Symposium, Los Angeles, April 10, 2009

Panel:  "Solitary Confinement in America's Prisons," Shaking the Foundations Conference, Stanford Law School, October 17, 2009.

Commencement Address, San Francisco Behavioral Health Court Graduation Ceremony, October 21, 2009.

Panel:  "Negotiating Settlements of Systemic Prison Suits," Training & Advocacy Support Center, Protection & Advocacy Annual Conference, Los Angeles, June 8, 2010.

Grand Rounds, "Recidivism or Rehabilitation in Prison?," Alta Bates Summit Medical Center, November 1, 2010

Keynote Address: "Prison Culture & Mental Illness: a Bad Mix," University of Maryland Department of Psychiatry Cultural Diversity Day, Baltimore, Maryland, March 24, 2011.

Grand Rounds, "The Role of Misogyny & Homophobia in Prison Sexual Abuse," Alta Bates Summit Medical Center, October 17, 2011

Special Guest, "Offering Hope and Fostering Respect in Jail and Prison," 2011 ZIA Partners UnConvention, Asilomar Conference Center, October 24, 2011.

Invited Lecture, "Suicide Behind Bars: The Forgotten Epidemic," 2011 Institute on Psychiatric Services, American Psychiatric Association, San Francisco, October 28, 2011.

Lecture: "How Can We Help Persons with Mental Illness in the Criminal Justice System?," Solano County Re-entry Council, Fairfield, CA, January 15, 2012.

Lecture:  "The Prison System in the U.S.A.: Recent History and Development, Structure, Special Issues," Conference of the American Bar Association Rule of Law Initiative, Cross-National Collaboration: Protecting prisoners in the US and Russia, Moscow, Russia, January 20, 2012.

Continuing Medical Education (CME) Presentation: "Correctional Psychiatry Overview," The Center for Public Service Psychiatry of Western Psychiatric Institute and Clinic (co-sponsored by the American Association of Community Psychiatrists), national videoconference originating in

Pittsburg, PA, February 2, 2012.

Grand Rounds, "Mental Health Implications of the Occupy Movement," Alta Bates Summit Medical Center, October 8, 2012

Invited Speaker: "Solitary Confinement: Medical and Psychiatric Consequences," Session: Multi-Year Solitary Confinement in California and the Prisoner Hunger Strikes of 2011-2012, American Public Health Association Annual Meeting, Moscone Convention Center, San Francisco, October 29, 2012.

Keynote Address:  "Solitary Confinement and Mental Health," Conference of the Midwest Coalition for Human Rights, Northeastern Illinois University, Chicago, November 9, 2012.

Symposium Presentation: "The Experience of Individuals with Mental Illness in the Criminal Justice System," American Psychiatric Association Annual Meeting, Moscone Center, San Francisco, May 20, 2013.

Presentation:  Incarceration and Racial Inequality in the U.S., Roundtable on the Role of Race and Ethnicity Among Persons Who Were Formerly Incarcerated, California Institute for Mental Health, Sacramento, California, February 28, 2014.

Testimony at Nevada Advisory Commission on the Administration of Justice on Isolated Confinement, Las Vegas, Nevada, March 5, 2014.


Books Published:

Public Therapy: The Practice of Psychotherapy in the Public Mental Health Clinic.  New York: Free Press/ MacMillan, 1981.

Ending Therapy: The Meaning of Termination.   New York: New York University Press, 1988.

(Editor):  Using Psychodynamic Principles in Public Mental Health.    New Directions for Mental Health Services, vol. 46.  San Francisco: Jossey-Bass, 1990.

La Conclusione della Terapia: Problemi, metodi, conseguenze.  Rome: Casa Editrice Astrolabio, 1992. (trans. of Ending Therapy.)

Revisioning Men's Lives: Gender, Intimacy and Power.  New York: Guilford Publications, 1993.  (trans. into Chinese, 2000).

Prison Madness: The Mental Health Crisis Behind Bars and What We Must Do About It.  San Francisco: Jossey-Bass/Wiley, 1999.

(Co-Editor): Prison Masculinities.  Philadelphia: Temple University Press, 2001.


Other Publications:

"The Depression of Tuberculin Delayed Hypersensitivity by Live Attenuated Mumps Virus," Journal of Pediatrics, 1970, 76, 716-721.

Editor and Contributor, An Ecological Approach to Resident Education in Psychiatry, the product of an NIMH Grant to the Department of  Psychiatry and Human Behavior, Drew Medical School, 1973.

"Contact Between the Bars  -  A Rationale for Consultation in Prisons," Urban Health, Vol. 5, No. 1, February, 1976.

"Schizophrenia and History,"  Free Associations, No. 5, 1986, 79-89.

"The Dual Potential of Brief Psychotherapy,"  Free Associations, No. 6, 1986, pp. 80-99.

"Big Ideas, and Little Ones,"  Guest Editorial in Community Mental Health Journal, 1990, 26:3, 217-220.

"Feminist Men," Tikkun, July/August, 1990.

"Pathological Arrhythmicity in Men," Tikkun, March/April, 1991.

"The Public Therapist's Burnout and Its Effect on the Chronic Mental Patient." The Psychiatric Times, 9,2, February, 1992.

"The State of the Sexes: One Man's Viewpoint,"  The Commonwealth, 86,16, April, 1992.

"Schoolyard Fights." In Franklin Abbott, Ed., Boyhood.  Freedom, California: Crossing Press, 1993; Univeristy of Wisconsin Press, 1998.

"Menfriends."  Tikkun,  March/April, 1993

"Psychotherapy, Neutrality and the Role of Activism."  Community Mental Health Journal,1993.

"Review: Treating the Poor by Mathew Dumont."  Community Mental Health Journal, 30(3),1994, 309-310.

"The Gender of the Therapist and the Male Client's Capacity to Fill Emotional Space."  Voices, 30(3), 1994, 57-62.

"Soft Males and Mama's Boys: A Critique of Bly."  In Michael Kimmel, Ed., The Politics of Manhood: Profeminist Men Respond to the Mythopoetic Men's Movement (And Mythopoetic Leaders Respond).  Philadelphia: Temple University Press, 1995.

"Gender Bias, Countertransference and Couples Therapy."  Journal of Couples Therapy, 1995.

"Jail and Prison Rape." TIE-Lines, February, 1995.

"The Politics of Psychiatry: Gender and Sexual Preference in DSM-IV." masculinities, 3,2, 1995, reprinted in Mary Roth Walsh, ed., Women, Men and Gender,  Yale University Press, 1997.

"What Do Men Want?, review of M. Kimmel's Manhood in America." Readings, 10, 4, 1995.

Guest Editor, issue on Men's Issues in Treatment,  Psychiatric Annals,2,1, 1996.

"Men at Work and Out of Work," Psychiatric Annals, 2,1, 1996.

"Trauma and its Sequelae in Male Prisoners."  American Journal of Orthopsychiatry, 66, 2, 1996, 189-196.

"Consultation to Residential Psychosocial Rehabilitation Agencies."  Community Psychiatric Practice Section, Community Mental Health Journal, 3, July, 1996.

"Shame and Punishment: Review of James Gilligan's Violence: Our Deadly Epidemic and its Causes," Readings, Sept., 1996.

"Community Mental Health: A Window of Opportunity for Interracial Therapy," Fort/Da, 2,2,1996.

"Men, Prison, and the American Dream," Tikkun, Jan-Feb., 1997.

"Dependency and Counter-Dependency in Couples," Journal of Couples Therapy, 7,1, 1997, 39-47.  Published simultaneously in When One  Partner is Willing and the Other is Not,  ed. Barbara Jo Brothers, The Haworth Press,

1997, pp. 39-47.

"Shall We Overcome: Review of Jewelle Taylor Gibbs' Race and Justice," Readings, December, 1997.

"The SHU Syndrome and Community Mental Health," The Community Psychiatrist, Summer, 1998.

"Review of Jerome Miller's Search and Destroy," Men and Masculinities, 1, 1, July, 1998.

"Will Building More Prisons Take a Bite Out of Crime?," Insight, Vol. 15, No. 21, June 7, 1999.

"The Mental Health Crisis Behind Bars," Harvard Mental Health Letter, July, 2000.

"Mental Health Police?," Readings, June, 2000.

"The Men's Movement in the U.S.A.," in Nouvelles Approches des Hommes et du Masculine, ed. Daniel Weizer-Lang, Les Presses Universitaires du Mirail, Toulouse, France, 2000.

"Symptoms, Meanings and Social Progress," Voices, 36, 4, 2000.

"Psychotherapy with Men in Prison," in A New Handbook of Counseling & Psychotherapy Approaches for Men,  eds. Gary Brooks and Glenn Good, Jossey-Bass, 2001.

"A Very Wise Decision by the Montana Supreme Court," Correctional Mental Health Report, 5,3, 35-36, Sept./Oct, 2003.

"Review of William Roller's The Dead are Dancing," Psychiatric Services,  54,11,1660-1661, 2003.

"The Future of Correctional Mental Health," Correctional Mental Health Report, 6,1, May/June, 2004.

"Foreword,"  David Jones (ed.): Working with Dangerous People: The Psychotherapy of Violence, Oxon, UK: Radcliffe Medical Press Ltd., 2004.

"Malingering in Correctional Settings," Correctional Mental Health Report, 5, 6, 81-, March/April, 2004.

"Prisons," in Michael Kimmel & Amy Aronson (eds.), Men & Masculinities: A Social, Cultural, and Historical Encyclopedia, Santa Barbara, CA & Oxford, GB, ABC Clio, pp. 630-633, 2004.

"Mental Illness," in Michael Kimmel & Amy Aronson (eds.), Men & Masculinities: A Social, Cultural, and Historical Encyclopedia, Santa Barbara, CA & Oxford, GB, ABC Clio, pp. 537-539, 2004.

"Toxic Masculinity as a Barrier to Mental Health Treatment in Prison," Journal of Clinical Psychology, 61,6,1-2, 2005.

"Posttraumatic Stress Disorder (PTSD) in Prisoners," in Managing Special Populations in Jails and Prisons, ed. Stan  Stojkovic,Kingston, NJ: Civic Research Institute, 2005.

"Schizophrenia, its Treatment and Prison Adjustment," in Managing Special Populations in Jails and Prisons, ed. Stan Stojkovic, Kingston, NJ: Civic Research Institute, 2005.

"The Prison Heat Issue,"  Correctional Mental Health Report, 7,2, July/August, 2005.

"How to Create Madness in Prison," in Humane Prisons, Ed. David Jones, Oxford: Radcliffe Publishing, 2006.

"Conditions on death row,Terrell Unit,Texas," in M. Mulvey-Roberts (Ed.), Writing for their lives: Death Row USA (pp. 69-77). Carbondale: University of Illinois Press, pp. 69-77, 2006.

"Prison madness in Mississippi," in M. Mulvey-Roberts (Ed.), Writing for their lives: Death Row USA, Carbondale: University of Illinois Press, pp. 281-287, 2006.

"Working with Men in Prison,"  In International Encyclopedia of Men and Masculinities, 1 vol., eds. M. Flood, J.K. Gardiner, B. Pease, and K. Pringle. London & New York: Routledge, 2007.

"Post-Incarceration Civil Commitments and Public Mental Health: An Essay," Correctional Mental Health Report, 9,4, 2007.

"Violence in Prisons, Revisited," Hans Toch & Terry Kupers, Journal of Offender Rehabilitation, 45,3/4, 49-54, 2007.

"Posttraumatic Stress Disorder in Prisoners," Correctional Health Care Report, Vol. 9, Nos. 2 & 3, January/February, 2008

"Prison and the Decimation of Pro-Social Life Skills," in The Trauma of Psychological Torture, Editor Almerindo E. Ojeda, Vol 5 of Disaster and Trauma Psychology Series, Series Editor Gilbert Reyes, Westport, Connecticut: Praeger, 2008

"What To Do With the Survivors?: Coping With the Long-Term Effects of Isolated Confinement." Criminal Justice and Behavior, Vol. 35 No. 8, August 2008, pp. 1005-1016

"Beyond Supermax Administrative Segregation: Mississippi's Experience Rethinking Prison Classification and Creating Alternative Mental Health Programs," T.A. Kupers, T. Dronet, M. Winter, et al., Criminal Justice and Behavior, October, 2009.

"Mutual Respect and Effective Prison Management," in Transforming Corrections: Humanistic Approaches to Corrections and Offender Treatment, Editors David Polizzi & Michael Braswell, Durham: Carolina Academic Press, pp. 121-134, 2009.

"Preparing an Expert's Report," Correctional Mental Health Report, 12,1, 2010

"Treating Those Excluded from the SHU," Correctional Mental Health Report, 12,4, 2010.

"The Role of Misogyny and Homophobia in Prison Sexual Abuse," UCLA Women's Law Journal, 18,1, 2010.

Stuart Grassian & Terry Kupers, "The Colorado Study vs. the Reality of Supermax Confinement," Correctional Mental Health Report, Vol. 13, No. 1, May/June, 2011

"Preparing an Expert's Report," in Practical Guide to Correctional Mental Health and the Law, by Fred Cohen (with Terry Kupers,) Kingston, NJ: Civic Research Institute, 2011

"The Role of Psychiatry in Correctional Settings: A Community Mental Health Model," Correctional Mental Health Report, Vol. 13, No. 3, September/October, 2011

"Testimony of Terry Kupers, M.D., at August 23, 2011 Hearing of California Assembly Public Safety Committee Regarding Conditions at Pelican Bay

State Prison Security Housing Units," <u>Correctional Law Reporter</u>, Vol XXIII,
No. 4, December/January 2012

"A Community Mental Health Model for Corrections," <u>Correctional Mental Health
Report</u>, Vol. 13, No. 5, January/February, 2012

"Programming Cells are Neither the Problem nor the Solution," <u>Correctional Mental
Health Report</u>, 2013

"Isolated Confinement: Effective Method for Behavior Change or Punishment for
Punishment's Sake?," <u>The Routledge Handbook of International Crime
and Justice Studies</u>, Eds. Bruce Arrigo &
Heather Bersot, Oxford: Routledge, 2013, pp. 213-232.

"The Psychiatrist's Obligation to Report Patient Abuse: A Dialogue with Fred
Cohen," <u>Correctional Mental Health Report</u>, Vol 15, No. 5, Jan/Feb 2014

**Terry A. Kupers, M.D., M.S.P.**
**Depositions and Court Testimony in Past Four Years**


Testimony in Henry Kodimer v. City of Escondido, County of San Diego et al., USDistCt,
    SoDistCA, Case No. 07-CV2221, February 11, 2011, San Diego, regarding the quality of
    mental health care of a San Diego County jail inmate.
Deposition in Logan v. Burge, USDistCt,NoDistIllinois, Case No. 09 cv 5471,
    September 26, 2011, San Francisco by Video to Chicago, regarding the
    psychiatric impact of false conviction and incarceration.
Deposition in Nordstrom, Deanne L. vs. Spokane County, US DistCt, EDist
    of Washington, Case No. CV-08-374-EFS, November 3, 2011,
    involving psychiatric consequences of jail sexual abuse.
Deposition in Darryl Burton v. City of St. Louis, USDistCt, EDMissouri, November
    14, 2011, San Francisco by video to Chicago & St. Louis, involving
    psychiatric impact of false conviction and incarceration.
Testimony by phone in Bradley Anderson v. Farryl Anderson, 3rdDistCt, Granite
    County, Montana, Cause No. DR-12-03, divorce/custody hearing.
Deposition in Gary Engel v. Buchan, Case No. 1:10-CV-32880-North.Dis.Ill.,
    March 14, 2013, Oakland, CA, involving psychiatric impact of false
    conviction and incarceration.
Testimony in Doe v. Michigan DOC, Case No. CV-14356-RHC-RSW, USDistCt,
    EDist Michigan, So. Div., June 4, 2014, regarding incarceration of
    juveniles in adult prisons
Deposition in A.B. v. WA State Dept Soc'l & Health Services,
    USDistCtWDistWA, No. 14-cv-011 78-MJP, Seattle, January 23, 2015,
    regarding Competency Eval. and Restoration Treatment
Testimony in Federal Court, A.B. v. WA State Dept Soc'l & Health Services,
    USDistCtWDistWA, No. 14-cv-011 78-MJP, Seattle, March 17, 2015,
    regarding Competency Eval. and Restoration Treatment
Deposition in Melgar-Maldonado v. Ahtna Technical Services, Inc., and Lorenzo
    Vasquez, Jr.; 2013-DCL-6225-D; 103rd District Court, Cameron County,
    Texas; Deposition in San Francisco, May 8, 2015, regarding sexual
    assault by officer on transsexual detainee in immigration detention center
Deposition in Ruiz v. Brown, USDistCtNDistCal, Case No.: 4:09-cv-05796-CW,
    May 21, 2015, Redwood City, CA, regarding possible harm of conditions
    of confinement at PBSP SHU.
Deposition in **Kluppelberg v. Burge**, No. 13 CV 3963 (N.D.Ill.), September 10,
    2015, Oakland, CA, regarding effects of 25 years in prison after false
    conviction.
Testimony in State v. Dennis Levis, CR2011-008004, Sup Ct., Arizona, Maricopa
    County, Phoenix, Arizona, October 25, 2016, regarding mitigation in
    Sentencing Phase/Death Penalty.

Exhibit B   Dr. Terry A. Kupers
Documents, Photos & Videos Reviewed

1.  Class Action Complaint

2.  Policies of MDOC and Health Assurance, L.L.C.

3.  Transcript of the Deposition of Capt. Naidow.

4.  July 19, 2012 Contract for Medical Services at EMCF between MDOC and
    Health Assurance, LLC.

5.  Email correspondence of Dr. Carl Reddix

6.  MDOC monitor reports

7.  Report in this matter by Eldon Vale

8.  Report in this matter by Madeleine LaMarrre.

9.  Report in this matter by Dr. Marc Stern

10. Sworn declarations by prisoners #11, #31, #65 and #66.
    photographs taken of the facility in April 2014 by environmental health
    expert Diane Skipworth and by the ACLU and SPLC.

11. Report of Dr. Bart Aplanalp containing summaries of the 20 EMRs he reviewed.

12. EMCF "Programming Chart" handed to me by staff during tour.

13. HHALLC Mortality/Death Review re Felipe Cook, #77958

14. HALLC Staffing List

15. EMCF List of Prisoners

16. HALLC Medical Audit/Comprehensive Quality Improvement Meeting,
    4th Quarter, 2013.

17. EMCF Medical Infirmary Admission Log up to April 15, 2014.

18. HALLC Mental Health Caseloads

19. EMCF Roster of Prisoners on Psych Meds

20. Videos of Joseph Penden (1/16/13), Harold Jackson (2/9/13), Kenneth Watson
    (2/20/13), John Kennedy (3/7/13), Kenneth Watson (3/12/13), Louis Eason (6/8/13),
    Jenario Reed (6/19/13), D. Lee (9/23/12), Rico Lyons (1/24/13; 5/5/13; 11/21/13;
    12/24/13; 2/18/14; 3/11/14), Edward Williams (8/29/13).

21. EMCF List of prisoner medical/psych grievances.  The list is grouped by housing
    unit and pod.  More than a couple were for "not getting meds."

22. EMCF List of prisoner medical/psych grievances.

23.  2011 ACA Audit.

24. EMCF Significant Incident Summary for ACA audit (only Jan. 2011-April 2011 is complete).

25. Significant Incident Summary from Jan 2011-August 2011.

26. Significant Incident Summary from Jan. 2011-Oct. 2011.

27. Monthly Report Revision- Signed by Warden Horton on 2/7/12.

28. EMCF Monthly Report with data for July 2011-Jan 2012

**Exhibit C: Prisoner Name Key**

**Prisoners interviewed by Dr. Kupers**



**Prisoners Interviewed briefly by Dr. Kupers during Tour**





**Additional Prisoners Dr. Kupers did not interview, but EMR Chart was reviewed by Dr. Kupers or Dr. Abplanalp, or the prisoner is mentioned in this Report**

