# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### NORTHERN DIVISION

**JERMAINE DOCKERY, ET AL.**                                    **PLAINTIFFS**

**VS.**                                              **No. 3:13-cv-326-WHB-JCG**

**PELICIA HALL, ET AL.**                                         **DEFENDANTS**

### DEFENDANT'S BRIEF IN SUPPORT OF MOTION FOR DECERTIFICATION

At Plaintiffs' urging, the Court certified this prisoner suit as a class action and created a general class and three subclasses.  Through the class and subclasses, Plaintiffs attack virtually every aspect of their confinement at the East Mississippi Correctional Facility ("EMCF").  Such a generalized approach to class action is improper under both the Prison Litigation Reform Act of 1995 and the Supreme Court's decision in *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011).  This Court, under its continuing obligation to reassess its prior certification decision, should decertify this case in full or at least in part.  In its current form, a trial of this case would be unmanageable and inconsistent with Federal Rule of Civil Procedure 23.

A central problem with allowing this case to proceed in its current form is cohesion. After certification was granted in September 2015, further discovery made clear that individualized determinations permeate this case. Plaintiffs' seven different "claims" implicate different prisoners, different harm, different conduct, different actors, different legal inquiries, and different remedies.  Even if Plaintiffs could identify sufficient common questions of law or fact under Rule 23(a), they still must satisfy Rule 23(b)(2)'s requirement of showing that Defendant Mississippi Department of Corrections[1] ("MDOC") "acted or refused to act on grounds that apply generally to the class[es], so that final injunctive relief or corresponding declaratory relief

---

[1] The named defendants are Pelicia Hall, Gloria Perry, Jerry Williams, and Richard McCarty in their official capacities, but persons sued in their official capacity "assume the identity of the government [entity] that employs them."  *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 109 (1989).  Thus, the real party-in-interest is MDOC.

is appropriate respecting the class[es] as a whole." Plaintiffs simply cannot meet their obligation under Rule 23(a) or Rule 23(b).

Class treatment only makes sense when there is representative proof that will be provided at trial to support each claim. Proof is not "representative," however, unless the members of a class or subclass are similarly situated. When, as here, there are distinct claims, liability theories, and factual circumstances, the case should not be tried as a class. Prisoners at EMCF certainly may bring individualized claims if their specific circumstances warrant it, but this case, in its current posture, should be decertified in whole or at least in part.

## I. RELEVANT BACKGROUND

A. <u>EMCF</u>

The East Mississippi Correctional Facility Authority ("the Authority") has contracted with the State of Mississippi, through MDOC, for the operation and management of EMCF.[2] Pursuant to its agreement with the Authority, Management & Training Corporation ("MTC"), a private entity, manages EMCF and provides safety and security for the facility.[3] Since July 2015, the medical care provided to prisoners at EMCF is provided by Centurion of Mississippi LLC ("Centurion"), an entity which also contracts with the MDOC.[4]

The design capacity of EMCF is 1,561, but, per contract, the prisoner capacity at EMCF is set at 1,350.[5] Consistent with MDOC's classification system, prisoners at EMCF are classified into one of three levels: low/minimum, medium, high/close.[6] Minimum custody prisoners require the least security and supervision and are afforded a more relaxed atmosphere and extensive

---

[2] *See* Residential Services Agreement Between MDOC and East Mississippi Correctional Facility Authority 1, attached as **Exhibit** "**A**".

[3] *See* Management and Operations Agreement 1, 4, attached as **Exhibit** "**B**".

[4] *See* 30(b)(6) Dep. of Mississippi Department of Corrections (Gloria Perry) 6-8, attached as **Exhibit** "**C**".

[5] *See* Exhibit A, specifically the Second Amendment to the Management and Operations Agreement Between MDOC and EMCF Authority (DEF-257598 through DEF-257600).

[6] *See* MDOC Standard Operating Procedure 22-01-01, attached as **Exhibit** "**D**".

PD.21996077.1

privileges.[7] Medium custody prisoners are those who have "displayed a desire to be considered responsible and present[] a moderate risk."[8] Close custody is assigned to those prisoners who present the highest risk and have one or more of the following risk factors: risk of escape, periodic demonstration as a threat to staff or prisoners, and recent or serious disciplinary record.[9]

Currently, there are six air-conditioned housing units, each of which consists of four "pods," A, B, C, or D, in which prisoners live.[10] Each pod consists of two levels of cells, a shower area containing three showerheads on both the lower and upper levels, a dayroom, and access to an outdoor recreation yard.[11] One of the units, Unit 5, is used to provide housing for prisoners assigned to the segregation unit.[12] The remaining five units house general population and special needs prisoners.[13] In addition to these six housing units, a seventh air-conditioned housing unit exists which essentially serves as a work cadre and houses minimum and medium custody prisoners assigned to specific work details.[14] There also are a number of key support service areas, including a kitchen, intake unit (containing six beds), medical unit (containing 10 beds), laundry area, gym, indoor and outdoor recreation areas, two libraries, program space, educational classrooms, visitation, warehouse, maintenance, and administrative space.[15]

Within the units, there are two pods designed specifically to help prisoners rehabilitate and improve themselves while incarcerated. The first is the Therapeutic Treatment Community that is located in Unit 2-A and is designed primarily for substance abuse treatment programming

---

[7] *See id*. at 9-10.

[8] *Id*. at 9.

[9] *Id*. at 8.

[10] *See* Facility Layout, *infra* page 13. *See also*, Decl. of Warden Frank Shaw, attached as **Exhibit** "**E**".

[11] *See* Dep. of Diane Skipworth 76-78, attached as **Exhibit** "**F**".

[12] *See* Dep. of Norris Hogans 186, attached as **Exhibit** "**G**". The segregation unit at EMCF is Unit 5 and it is where prisoners are housed single-cell for 23 hours per day due to those prisoners having committed rule violations or otherwise lost the privilege of living with the general population. When being moved within the facility, prisoners housed in the segregation unit must be escorted by two staff members and be in hand and leg restraints. *Id*. at 25, 31, 129.

[13] *See* Facility Layout, infra page 13.

[14] Dep. of Michael Sullivan 9-11, attached as **Exhibit** "**H**".

[15] *See* Facility Layout, infra page 13.

for offenders accepted into the program.[16] In the Therapeutic Treatment Community, offenders learn to work and live together to develop a positive lifestyle, and the program structure includes self-governing by prisoners, which is marked by enthusiastic participation in the programs offered.[17] During calendar year 2016, thirty offenders graduated the 9 to 12 month program, seven of whom were court-ordered to participate in the program as an alternative to traditional sentencing.[18] In 2015, there were 23 graduates, eight of which were court-ordered.[19]

The second, Pod 4-B, houses offenders participating in the Pathway to Change Program, which is a residential-evidence-based program designed to restructure the way in which offenders approach their day-to-day lives.[20] Offenders assigned to the program must be engaged in the learning process of changing their behavior and developing cognitive skills to enable them, while incarcerated, to live a more productive life and, once released, to stay out of prison.[21]

In every housing unit with the exception of pods 5-A, 5-B, and 5-C, offenders have open access to both showers and recreation during dayroom hours.[22] Offenders assigned to the general population housing units normally are allowed out of their cells from 5 to approximately 15 hours per day depending upon their custody level.[23] Dayroom access normally is provided five days per week until 11:00 p.m. and two days per week until 1:00 a.m.[24] This represents over 90% of the offender population. Offenders assigned to pods 5-A, 5-B, and 5-C are predominantly close custody offenders who pose a safety and security risk to either themselves or others and, as a result, must be segregated from the general population prisoners and restrained at all times

---

[16] Dep. of Van Kendrick 7-8, attached as **Exhibit "I"**.
[17] *Id*. at 8-12.
[18] *See* Excerpt of Expert Report of Tom Roth and Ken McGinnis 9, attached as **Exhibit "J"**.
[19] *Id*.
[20] Dep. of Anthony Bean 7-13, attached as **Exhibit "K"**.
[21] *See id*.
[22] *See* Dep. Simone Jones 292-93, attached as **Exhibit "L"**; *see also* Hogans Dep. 186.
[23] *See* EMCF Twenty Four (24) Hour Building Schedule, attached as **Exhibit "M"**.
[24] *See id*.

when not locked behind a cell door.[25] These offenders receive their meals in their cells and are scheduled to have recreation five days per week and showers three days per week.[26]

## B.   Plaintiffs' Lawsuit

On May 30, 2013, Plaintiffs, a group of prisoners housed at EMCF, filed a Complaint for injunctive relief, advancing seven Eighth Amendment claims.[27] Plaintiffs also sought certification of a prison-wide class of all prisoners housed at EMCF[28] and three subclasses: the Isolation Subclass,[29] the Mental Health Subclass,[30] and the Units 5 and 6 Subclass.[31] With respect to the EMCF Class, Plaintiffs advance Eighth Amendment claims for inadequate medical care,[32] excessive force,[33] failure to protect prisoners from harm,[34] and inadequate nutrition and food safety.[35] With respect to the Mental Health Subclass, Plaintiffs advance an Eighth Amendment claim for inadequate mental health care.[36] With respect to the Isolation Subclass, Plaintiffs claim that members are at a substantial risk of serious harm from being housed in conditions amounting to solitary confinement.[37] With respect to the Units 5 and 6 Subclass,

---

[25] *See* Hogans Dep. 30-31, 249.

[26] *See* Dep. of Michael Rice 93-94, attached as **Exhibit "N"**.

[27] *See generally* [1] Compl. The Plaintiffs are Jermaine Dockery, John Barrett, Michael Combs, Jeffrey Covington, Taveres Flaggs, Phillip Fredenburg, Derrick Hayes, Derrick Lane, Alvin Luckett, Henry Moore, Joseph Osborne, Eddie Pugh, and James Vann (hereinafter "Plaintiffs").

[28] *See id.* at 69-71.  This class is known as the "EMCF Class." *Id.*

[29] *See id.* at 71-73. The Isolation Subclass consists of "of all persons who are currently, or will be, subjected to Defendants' policies and practices of confining prisoners in conditions amounting to solitary confinement at the [EMCF]." [257] Op. and Order 30.

[30] *See* [1] Compl. 73-75. The Mental Health Subclass consists "of all persons who are currently, or will be, subjected to Defendants' mental health care policies and practices at the [EMCF]." [257] Op. and Order 30.

[31] *See* [1] Compl. 75-77. The Units 5 and 6 Subclass consists "of all persons who are currently, or will be, housed in Units 5 and 6 at [EMCF]." [257] Op. and Order 30.

[32] *See* [1] Compl. 77 (First Claim for Relief).

[33] *See id.* at 78 (Fourth Claim for Relief).

[34] *See id.* at 79 (Fifth Claim for Relief).

[35] *See id.* at 80 (Seventh Claim for Relief).

[36] *See id.* at 77 (Second Claim for Relief).

[37] *See id.* at 78 (Third Claim for Relief).

PD.21996077.1

Plaintiffs claim that prisoners are at a substantial risk of serious harm and injury from dangerous environmental conditions.[38]

C.    The Class Certification Order

On September 29, 2015, this Court certified the EMCF Class as well as three subclasses. "The 'EMCF Class' . . . is defined as a 'class of all persons who are currently, or will be, confined at the [EMCF].'"[39] The "Isolation Subclass" consists "of all persons who are currently, or will be, subjected to Defendants' policies and practices of confining prisoners in conditions amounting to solitary confinement at the [EMCF]."[40] The "Mental Health Subclass" consists of "all persons who are currently, or will be, subjected to Defendants' mental health care policies and practices at the [EMCF]."[41] The Mental Health Subclass is effectively another facility wide class, as over 90% of the inmates at EMCF are on the mental health caseload and receive some form of mental health care.[42]  The "Units 5 and 6 Subclass" consists of "all persons who are currently, or will be, housed in Units 5 and 6 at the [EMCF]."[43]

Importantly, Housing Unit 6 has changed significantly since the Complaint was filed on May 30, 2013. At that time, Unit 6 was a segregation unit, similar to Unit 5. However, as of May 2016, housing Unit 6 has been converted to a general population housing unit that consists of four pods housing offenders of varying custody levels. Offenders assigned to Unit 6 are eligible for both structured and informal access to program activities and limited work assignments.[44]

---

[38] *See id*. at 79-80 (Sixth Claim for Relief).
[39] [257] Op. and Order 30.
[40] *Id*.
[41] *Id*.
[42] Dep. of Dr. Kim Nagel 38, attached as **Exhibit** "**O**".
[43] [257] Op. and Order 30.
[44] Hogans Dep. 303-307.

PD.21996077.1

D.      The Parties Have Conducted Substantial Post-Certification Discovery

Since the Court's September 29, 2015 Order, substantial additional discovery has taken place. Plaintiffs have served 36 requests for production, 22 interrogatories, and 42 requests for admission, which has yielded production of approximately 350,000 documents. Defendant has served 11 requests for production and 24 interrogatories. Defendant also has served a questionnaire containing 14 questions seeking information regarding the issues in this case and has received responses to this questionnaire from 53 prisoners living at EMCF. Plaintiffs have required Defendant and its contractors to collect, review, and produce nearly 44,000 electronic documents.[45] The parties also engaged in extensive discovery of experts, resulting in production of 10 expert reports and 5 expert depositions. Plaintiffs have deposed 20 fact witnesses and three corporate entities while Defendant has deposed 17 prisoners.

## ARGUMENT AND AUTHORITIES

Class certification is a preliminary proposition because district courts are required to reassess class rulings as a case develops. *See Richardson v. Byrd*, 709 F.2d 1016, 1019 (5th Cir. 1983).  Indeed, "[t]he district judge must define, redefine, subclass, and decertify as appropriate in response to the progression of the case from assertion to facts." *Id*.  The textual source for decertification is Rule 23(c)(1)(C), which provides that "[a]n order that grants or denies class certification may be altered or amended before final judgment."

Reevaluating certification is consistent with constitutional notions of due process. *See Unger v. Amedisys Inc.*, 401 F.3d 316, 320-21 (5th Cir. 2005).  Because class actions are "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only[,]" courts have a continuing obligation to "rigorous[ly] analy[ze]" Rule 23's

---

[45] The term "documents" is not synonymous with "pages" as pages are thought of on paper.  One electronic document could have 1 page or any number of pages, and thus the actual pages reviewed and produced are much greater than the more than 44,000 electronic documents produced.

requirements. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348-51 (2011) (quotation marks and citations omitted). When, as here, discovery has concluded, it is imperative that courts reassess certification prior to making the defendant endure the burdens of a class action trial. *See, e.g, Owens v. S. hens, Inc.*, 2008 WL 723923, *3 n.3 (S.D. Miss. 2008) (allowing class discovery but explaining that the court could "'decertify' the class following discovery when the court ha[d] more information to achieve a factual determination").

This Court should reconsider its September 2015 certification decision and decertify the EMCF class as well as the three subclasses. Since the Order certifying the classes, merits discovery has revealed significant changes at EMCF and the Court now has the benefit of additional legal authority applying *Wal-Mart* specifically within the context of prison litigation. Decertification tracks certification, in that the same Rule 23 requirements must be met. *See, e.g., Brooks v. GAF Materials Corp.*, 301 F.R.D. 229, 230 (D.S.C. 2014) ("The standard is the same for class decertification as it is with class certification: a district court must be satisfied that the requirements of Fed. R. Civ. P. 23(a) and (b) are met[.]"). Plaintiffs shoulder the burden of proof to maintain certification in the face of new evidence obtained in the merits stage of litigation. *See, e.g., Mazzei v. Money Store*, 829 F.3d 260, 270 (2d Cir. 2016).

### I.     Plaintiffs cannot satisfy Rule 23(a).

Rule 23(a) contains four prerequisites: numerosity, typicality, commonality, and adequacy of representation. At issue in this case is commonality, which requires Plaintiffs to "affirmatively demonstrate," with "significant proof," that their claims depend upon a "common contention" that will resolve an issue that is "central to the validity" of their claims in "one stroke." *Wal-Mart Stores, Inc.*, 564 U.S. at 349-56. Because Plaintiffs cannot meet their commonality burden, decertification is warranted.

This Court's September 2015 order did not separately analyze commonality for the EMCF class and the three subclasses.  *See* Doc. No. 257 at 34-38.  Instead, it accepted—at least for initial certification purposes—Plaintiffs' arguments that the class could pursue broadly drawn "common issues," such as "physical conditions," "health care," and "mental health care":

> "[t]he Court finds that all of Plaintiffs' claims will have, at their core, common issues regarding (1) the physical conditions under which prisoners at EMCF are being housed and the type and quality of health and mental health care they are receiving or to which they have access, and (2) whether those conditions and health care have either subjected prisoners to an unconstitutionally unreasonable risk of harm or, conversely, were sufficient to provide humane conditions of confinement."

*Id*. at 37.

Such reasoning is insufficient under current law to retain certification.  Pre-*Wal-Mart*, courts analyzed commonality in general terms.  *See, e.g., Lovely H. v. Eggleston*, 235 F.R.D. 248, 260 (S.D. N.Y. 2006) (explaining that "[t]he Second Circuit ha[d] approved district court findings of commonality at 'high levels of abstraction[ ]'").  Post-*Wal-Mart*, however, a particularized articulation is required.  *See, e.g., M.D. ex rel. v. Stukenberg*, 675 F.3d 832, 842 (5th Cir. 2012) (explaining that merely stating there are "'common questions of law, based upon [p]laintiffs' claims of constitutional violations, . . . lacks the specificity required"); *see also Corwin v. Lawyers Title Ins. Co.*, 276 F.R.D. 484, 489 (E.D. Mich. 2011) ("[G]eneralized or abstract commonality will not suffice.").  MDOC's decertification request requires that Plaintiffs do more than couch the question in terms of whether Defendant's conduct could endanger the prisoners.  *See Wal–Mart Stores, Inc.*, 564 U.S. at 350-51 (explaining that a "rigorous analysis" is required).

The reason particularized scrutiny is required is because "[a]ny competently crafted class complaint literally raises common 'questions.'"  *Id*. at 349.  In other words, without a specific

showing, the commonality requirement has no teeth. Rule 23(a) requires Plaintiffs to demonstrate that their claims "depend upon a common contention . . . of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id*. at 350.

Significantly, Plaintiffs do not contend that written policies at EMCF have led to unconstitutional harm. Their expert witness, Eldon Vail, readily concedes that he does not take issue with the written policies governing EMCF operations.[46] Rather, Plaintiffs' theory is that there are *de facto* policies and practices that supposedly result in constitutional deprivations. Plaintiffs' strategy, however, is fatally flawed.

Namely, Plaintiffs have a relatedness problem. Underlying the deficiency is the substantive evidentiary standard. *See Wal-Mart*, 564 U.S. at 351 (explaining the commonality inquiry "entail[s] some overlap with the merits of the plaintiff's underlying claim"). To ultimately prevail under the Eighth Amendment, Plaintiffs must show "pervasive" conduct that demonstrates a "substantial risk of serious harm." *See Lakin v. Barnhart*, 758 F.3d 66, 71 (1st Cir. 2014) (analyzing pervasiveness). Citing distinct instances of harm, over an extended period of time, does not satisfy the pervasiveness requirement and likewise cannot serve as the "glue" required by *Wal-Mart* to bridge the gap between all class members. *See* 564 U.S. at 352.

Discovery has produced many distinctions between the prisoners, the conduct at issue, the relevant decision-makers, the legal inquiries required, and the remedies sought. All of these distinctions mean that the class members are not similarly situated and thus that there is no "representative proof" that could be used to prove Plaintiffs' claims. *See Tyson Foods, Inc. v. Bouaphakeo*, 136 S.Ct. 1036, 1045-46 (2016).

---

[46] Dep. of Eldon Vail 34-36, attached as **Exhibit "P"**.

Take the EMCF class for example.  Claims four and five concern allegations of physical harm, but Plaintiffs' evidence in support of those claims is geared primarily towards housing unit three and housing unit five's segregation population.[47]  There is no comparable evidence associated with the other five housing units, which shows that the prisoners' factual theories are unrelated.  Only if prisoners in housing unit five were similarly situated to prisoners in each of the other housing units would the general EMCF class be supportable.  They are not.

The Seventh Circuit's recent decision of *Phillips v. Sheriff of Cook County*, 828 F.3d 541 (7th Cir. 2016) is particularly instructive here, as it undertakes a careful analysis of how the Supreme Court's *Wal-Mart* decision must be applied in prisoner conditions-of-confinement cases.  Like here, the prisoner-plaintiffs in *Phillips* advanced claims involving untimely and inadequate medical treatment as well as deliberate indifference based on "systemic deficiencies at the prison[.]"  *Id*. at 554-58.  The Seventh Circuit affirmed the district court's decertification of the class action.  *Id*.

As the *Phillips* Court explained, to maintain certification the "prospective class must articulate at least one common question that will actually advance *all of the class members' claims*."  828 F.3d at 550 (emphasis added).  In the absence of such a universal common question, the plaintiffs' have asserted only "claims of isolated instances of indifference to a particular inmate's medical needs"—which claims cannot be tried as a class.  *Id.* at 554. And the

---

[47] *See* Responses to Interrogatory No. 2 by **Alvin Luckett** (stating "[t]he use of physical force and chemical agents were an everyday occurrence on Housing Unit 5 when I lived there" and recounting five instances), **Eddie Pugh** (noting that he when he worked on Unit 5 as a barber, he "saw many prisoners get sprayed with mace" and recalling at least seven instances of allegedly excessive use of force on Unit 5), and **Derrick Lane** (Most of the use of force incidents happens [sic] on Housing Unit 5 where most of the lockdowns are. . . . [O]n Housing Unit 5, people were sprayed every other day."), attached as **Composite Exhibit "Q"**; *see also* Vail Dep. 27-30 (acknowledging he did not address EMCF's Therapeutic Treatment Community in Unit 2-A, the pre-release program in Unit 2-C, the Pathway to Change program in Unit 4-B, or Unit 7, and that these areas have few if any assaults); 82-84 (acknowledging that the locking mechanisms were installed correctly, are mechanically sound, and are maintained properly and that any defeating of door locks which he identified in his report are exclusively located in Unit 5); 180 (noting he did not know if there were many use of force incidents in Units 7, 2-A, 2-C, or 4-B and stating he "would be surprised" if there were).

commonality determination in an Eighth Amendment conditions-of-confinement class action "requires a precise understanding of the nature of the plaintiffs' claims." *Id.* at 552.

*Phillips*' reasoning is forceful. With respect to medical care, the court explained that the plaintiffs' allegations of inadequate and untimely medical treatment could "only be answered by looking at the unique facts of each detainee's case." *Id.* at 556. The "contextual nature" of the legal analysis, said the court, prevented class treatment. *Id.* With respect to deliberate indifference arising out of "systemic deficiencies," the court similarly explained that the facts of each prisoner's circumstance were too context specific. *Id.* at 556-58. The court explained that the prisoners, in reality, had brought "a series of individual claims of deliberate indifference." *Id.* at 558.

So it is in this case as well. EMCF essentially is comprised of various mini-prisons, each of which houses different types of prisoners who have different experiences because of their custody levels and health issues. An illustration showing the differences across the facility underscores the point:[48]

---

[48] In the illustration, each unit is identified in blue typeface with the unit number circled, each pod within each unit is identified in red typeface, the prisoner capacity of each pod is indicated in purple typeface, and the areas shaded in green are recreation areas available to prisoners in the particular pods.

PD.21996077.1



| **Unit 1** |
| --- |
| • Medium custody prisoners |
| • Many prisoners living on 1-C and 1-D work in kitchen or laundry services |
| **Unit 2** |
| • 2-A is the Therapeutic Treatment Community |
| • 2-B and 2-D house minimum / medium custody prisoners primarily involved in EMCF's education programs and work assignments in the pods, barber, kitchen, and laundry services |
| • 2-C houses prisoners with less than 24 months to serve and who are involved in EMCF's pre-release program, which seeks to prepare them to successfully function in society after release |
| **Unit 3** |
| • Prisoners with mental health diagnoses and who are being monitored by mental health team |
| • 3-A, 3-B, and 3-D house minimum or medium custody prisoners allowed to participate in general program activities and to obtain limited work assignments such as pod orderlies |
| • 3-C houses medium or close custody prisoners |
| **Unit 4** |
| • 4-A, 4-C, and 4-D house minimum and medium custody prisoners |
| • Prisoners participate in both program activities and work assignments |
| • 4-B is the Pathway to Change program |
| **Unit 5** |
| • Prisoners are housed single cell in Unit 5 |
| • 5-A is the long term segregation orientation unit |
| • 5-B houses the long term segregation and administrative segregation |
| • 5-C houses prisoners in administrative segregation |
| • 5-D is the Level 3 Progression unit (the High Risk Incentive Program), which houses prisoners progressing from segregation status to eventual release to the general population |
| • Prisoners in 5-D are out of their cells programming and recreating at during the day depending on their level within High Risk Incentive Program, and there is open access to showers and day room recreation programs when they are out of their cells |
| **Unit 6** |
| • As of May 2016, each pod in Unit 6 houses general population prisoners only, with 6-D only housing closed custody prisoners pending their transfer from EMCF per the Second Amendment to the to the Management and Operations Agreement |
| • Prisoners assigned to Unit 6 are eligible for structured and informal access to program activities and limited work assignments |
| **Unit 7** |
| • Unit 7 is a 29 bed, self-contained housing unit functioning similar to an honor dorm |
| • All prisoners in Unit 7 are assigned to work assignments throughout EMCF and participate in various program activities |

Further buttressing the point are the assault ratios over a two-year period, which paint a clear picture of the individualized nature of prisoners' experience at EMCF depending on where

PD.21996077.1

they are housed.  The following chart shows that the majority of the assaults were concentrated in specific parts of EMCF, not facility-wide:[49]

| UNIT - 1 | Assault Incidents | | No Injury or Minor | | Serious Injuries | |
|---|---|---|---|---|---|---|
| | 2015 | 2016 | 2015 | 2016 | 2015 | 2016 |
| 1A (40) | 6 | 6 | 2 | 2 | 4 | 4 |
| 1B (40) | 3 | 7 | 2 | 3 | 1 | 4 |
| 1C (62) | 6 | 8 | 3 | 2 | 3 | 6 |
| 1D (60) | 1 | 2 | 0 | 0 | 1 | 2 |
| 1 - HALLWAY | 2 | 3 | 1 | 2 | 1 | 1 |
| Monthly Ave | 1.5 | 2.1 | 0.6 | 0.75 | 0.83 | 1.41 |
| Per 100* | 8.82 | 12.74 | 3.92 | 4.41 | 4.9 | 8.33 |

* based on 202 beds

| Unit - 2 | Assault Incidents | | No Injury or Minor | | Serious Injuries | |
|---|---|---|---|---|---|---|
| | 2015 | 2016 | 2015 | 2016 | 2015 | 2016 |
| 2A (60) | 4 | 2 | 3 | 1 | 1 | 1 |
| 2B (66) | 4 | 2 | 3 | 1 | 1 | 1 |
| 2C (66) | 5 | 6 | 3 | 2 | 2 | 4 |
| 2D (60) | 7 | 5 | 2 | 1 | 5 | 4 |
| 2 - HALLWAY | 4 | 0 | 0 | 0 | 4 | 0 |
| Monthly Ave | 2 | 1.25 | 0.9 | 0.41 | 1.08 | 0.83 |
| Per 100* | 9.36 | 5.85 | 4.29 | 1.98 | 5.07 | 3.9 |

*based on 252 beds

| UNIT - 3 | Assault Incidents | | No Injury or Minor | | Serious Injuries | |
|---|---|---|---|---|---|---|
| | 2015 | 2016 | 2015 | 2016 | 2015 | 2016 |
| 3 - Unknown | 1 | 3 | 1 | 2 | 0 | 1 |
| 3A (60) | 13 | 9 | 8 | 7 | 5 | 2 |
| 3B (66) | 12 | 6 | 9 | 6 | 3 | 0 |
| 3C (66) | 24 | 29 | 8 | 23 | 16 | 6 |
| 3D (60) | 5 | 9 | 2 | 8 | 3 | 1 |
| 3 - HALLWAY | 1 | 3 | 0 | 2 | 1 | 1 |
| Monthly Ave | 4.6 | 4.9 | 2.3 | 4 | 2.3 | 0.83 |
| Per 100* | 21.84 | 23.01 | 10.92 | 18.72 | 10.92 | 3.9 |

*based on 252 beds

---

   [49] The chart presents a summary of incident report data for the period from January 1, 2015, thru December 31, 2016, and was developed to permit further analysis of the level of incidents of assaults at EMCF and the seriousness of those assaults as defined by the Association of State Correctional Administrators (ASCA) standards.
   Prepared by Defendant's experts Ken McGinnis and Tom Roth, the chart separates reported assaults by individual housing unit pods and records assaults separately for 2015 and 2016. The second column of the chart separates the assaults by those with no injuries and those with minor injuries as defined by the ASCA standards while the third column summarizes assaults with serious injuries by pod.  The monthly average per housing unit and the number of assaults by housing unit per 100 prisoners is also provided. This calculation permits accurate comparison of the data between the individual housing pods.  The per 100 calculation is a result of the following: (Housing Unit 5 example: 100 divided by housing unit count of 124 = .80 X Number of Assaults = rate per 100).

PD.21996077.1

| | Assault Incidents | | No Injury or Minor | | Serious Injuries | |
|---|---|---|---|---|---|---|
| **UNIT - 4** | **2015** | **2016** | **2015** | **2016** | **2015** | **2016** |
| 4A (60) | 11 | 5 | 5 | 3 | 6 | 2 |
| 4B (66) | 0 | 1 | 0 | 0 | 0 | 1 |
| 4C (66) | 1 | 5 | 0 | 2 | 1 | 3 |
| 4D (60) | 3 | 1 | 2 | 1 | 1 | 0 |
| 4 - HALLWAY | 2 | 0 | 2 | 0 | 0 | 0 |
| Monthly Ave | 1.41 | 1 | 0.75 | 0.05 | 0.66 | 0.5 |
| Per 100* | 6.63 | 4.68 | 3.51 | 2.34 | 3.12 | 2.34 |

*based on 252 beds

| | Assault Incidents | | No Injury or Minor | | Serious Injuries | |
|---|---|---|---|---|---|---|
| **UNIT - 5** | **2015** | **2016** | **2015** | **2016** | **2015** | **2016** |
| 5A (30) | 4 | 5 | 3 | 4 | 1 | 1 |
| 5B (32) | 9 | 12 | 5 | 6 | 4 | 6 |
| 5C (32) | 2 | 10 | 0 | 7 | 2 | 3 |
| 5D (30) | 2 | 1 | 1 | 0 | 1 | 1 |
| 5 - HALL/REC | 1 | 1 | 1 | 1 | 0 | 0 |
| Monthly Ave | 1.5 | 2.41 | 0.83 | 1.5 | 0.66 | 0.91 |
| Per 100* | 14.4 | 23.2 | 8 | 14.4 | 6.4 | 8.8 |

*based on 124 beds

| | Assault Incidents | | No Injury or Minor | | Serious Injuries | |
|---|---|---|---|---|---|---|
| **UNIT - 6** | **2015** | **2016** | **2015** | **2016** | **2015** | **2016** |
| 6A (30) | 2 | 1 | 1 | 1 | 1 | 0 |
| 6B (32) | 1 | 4 | 1 | 2 | 0 | 2 |
| 6C (32) | 4 | 6 | 2 | 1 | 2 | 5 |
| 6D (30) | 3 | 3 | 2 | 0 | 1 | 3 |
| Monthly Ave | 0.83 | 1.16 | 0.5 | 0.33 | 0.33 | 0.83 |
| Per 100* | 8 | 11.2 | 4.8 | 3.2 | 3.2 | 8 |

* based on 124 beds

| | Assault Incidents | | No Injury or Minor | | Serious Injuries | |
|---|---|---|---|---|---|---|
| **UNIT - 7** | **2015** | **2016** | **2015** | **2016** | **2015** | **2016** |
| UNIT 7 | 1 | 4 | 1 | 3 | 0 | 1 |
| GREEN | 0 | 2 | 0 | 0 | 0 | 2 |
| HOSPITAL | 0 | 1 | 0 | 1 | 0 | 0 |
| KITCHEN | 1 | 1 | 0 | 0 | 1 | 1 |
| MEDICAL | 8 | 6 | 3 | 4 | 5 | 2 |
| LAUNDRY | 1 | 0 | 1 | 0 | 0 | 0 |
| Monthly Ave | 0.91 | 1.16 | 0.41 | 0.66 | 0.5 | 0.5 |
| Per 100 | NA | NA | NA | NA | NA | NA |

In addition, the individualized nature of Plaintiffs' complaints related to medical and mental healthcare is borne out by the inmate-specific evidence obtained during merits discovery.

*See Phillips*, 828 F.3d at 546-48. Plaintiffs' counsel identified 46 inmates as possessing information relevant to the claims in this class action, and each inmate completed questionnaires detailing their experiences at EMCF. Like the inmate testimony in *Phillips*, the questionnaires reveal that the inmates' claims vary greatly across the class and are driven by individual health conditions and treatment needs. For example, the questionnaires show:[50]

- **Prisoner B.A.** suffers from bipolar disorder, weight-control issues, high cholesterol, and stomach problems. B.A., who says he always seeks care when needed, described six incidents in which he sought medical care between May 2013 and April 2016. According to Allen, he was seen by a provider each time, and (in his view) received adequate treatment on all but one occasion. His lone complaint relates to leg cramps and "spider veins" in his legs and feet, a condition that he believes was not properly diagnosed by the prison doctor. B.A. did not describe any mental health concerns.

- **Prisoner C.B.** suffers from a seizure disorder, hypertension, asthma, paranoid schizophrenia, and bipolar disorder. C.B. admits that he sometimes fails to seek care when needed, but he described four instances in which he did seek medical care between 2013 and 2016. In C.B.'s view, he received inadequate care every time, ranging from ineffectual treatment of a rash to a perceived indifference by medical staff to concerns over lack of counseling to address his anger and suicidal tendencies.

- **Prisoner D.B.** suffers from hypertension, depression, paranoia, anti-social disorder, and asthma. D.B. related four times in which he sought medical care between 2010 and 2014 for issues including dental hygiene, breathing problems, a rash, and a Q-tip stuck in his ear. He claims to have received inadequate care on three of those four occasions because, for example, the nurse who removed the Q-tip was "not gentle" and the doctor who x-rayed his chest did not refer him to a hospital for further testing.

- **Prisoner D.C.** suffers from chronic pain throughout his body, acid reflux, seizures, asthma, post-traumatic stress disorder, bipolar disorder, and paranoid schizophrenia. D.C. has sought regular care for four conditions—plantar fasciitis, a hernia, chronic pain, and seizures—and he is seen routinely by a healthcare provider and receives regular treatment for all of his conditions. Still, D.C. claims that his care is inadequate in several respects unique to him:

---

[50] *See* the Excerpt of Questionnaire Responses Submitted by B.A., C.B., D.B., D.C., J.K., J.K.(2), C.U., and M.V, attached as **Composite Exhibit "CC"**. For identification of the prisoners whose initials are used in this Memorandum, see **Exhibit "DD"**.

it is delayed, his access to a specialist and certain medications (that he feels he should be prescribed) is limited, and he had to use a hernia belt three months longer than he was originally led to believe.

- **Prisoner J.K.** suffers from bipolar disorder, seizures, asthma, hypertension, hyperthyroidism, and undefined "stomach issues." J.K. admits that he has not sought care for his chronic stomach problems because he says sick call requests are a "hassle" and he believes they will be thrown away. J.K. did recall four occasions on which he sought medical care between 2013 and 2016—including treatment for cold and flu symptoms, a rash, weight loss, and a spider bite. In each case, he was seen and treated by a doctor or nurse, but he believes his treatment was inadequate on three occasions because he is not seen frequently enough by mental health staff, suffered an allergic reaction to a shot administered to treat his spider bite, and was not hospitalized quickly enough when he experienced stomach pains, chest pains, and a high fever.

- **Prisoner J.K.(2)** suffers from hypertension, diabetes, bipolar disorder, and paranoid schizophrenia. J.K.(2) always seeks care when needed, and he recounted four instances in which he sought medical care between 2015 and 2016—when he needed glasses, requested dentures, suffered from pneumonia, and accidentally cut himself while trying to remove a callous from his toe. In each case he was treated by a healthcare professional, but J.K.(2) complains that his care has been inadequate due to delays in receiving his glasses and dentures, delays in receiving toe surgery, and an incident in which a dentist broke one of his teeth while extracting other teeth.

- **Prisoner C.U.** suffers from arthritis, asthma, bipolar disorder, and paranoid schizophrenia. C.U. has sought care for six conditions between 2011 and 2016, including tooth removal, tooth cleaning, and dentures, watery eyes and blurry vision, arthritis pain, and groin pain. He received treatment for all but the tooth cleaning request, and he receives ongoing chronic care treatment for his arthritis. He claims that his care was inadequate in every instance because his dentures were not provided quickly enough, his request for glasses was ignored for a year, he wants additional medication for his arthritis pain, he prefers name-brand over generic inhalers for his asthma, and his snack bag and glucose tablets (which were once provided for hypoglycemia) have been discontinued.

- **Prisoner M.V.** has Hepatitis C, asthma, back issues, and suffers from paranoid schizophrenia. M.V. admits that he has failed to seek care even when needed, but described five occasions in which he did seek care between 2010 and 2016 for the following: Hepatitis C treatment, vision problems, a teeth cleaning, orthopedic shoes to address the height differential in his legs, and medical care after an altercation with another inmate. He was treated for

17

four of those five complaints (the only exception being his request for a teeth cleaning), but claims that treatment was inadequate in every instance: his glasses prescription took too long to be filled, his orthopedic shoes were not provided quickly enough, and he had to walk to the medical unit for treatment following his altercation (rather than be transported on a gurney).

As these individualized medical conditions, treatments, and complaints make clear, there is no common thread tying the claims together. There is no prison policy or prevailing practice that, if changed, would allow **J.K.(2)** to receive glasses in a timely manner, **J.K.** to be prescribed a spider-bite medication that does not trigger an allergic reaction, **D.C.** to rely on a hernia belt for less time, **D.B.** to experience a gentler Q-tip removal procedure, **C.B.** to receive the individualized mental health counseling he prefers, **B.A.** to be cured of his leg cramps, **C.U.** to be prescribed a different pain medication for his arthritis, and **M.V.** to be carried to the medical unit after an altercation.

The inmates' interrogatory responses are to the same effect. For example, **J.B.** complains that he has been denied caps on his teeth and that the medical records for other inmates are mixed in with his medical records.[51] **M.C.** contends a total lack of one-on-one counseling with a psychiatrist has "made my mental health problems" and increased his generalized anxiety.[52]

Likewise, inmates' reports about their access to mental health care expressed during depositions were specific to individuals and their particular circumstances. **A.A.** testified that while on housing Unit 6 he sees a mental health professional every thirty days in a private setting.[53] **A.R.**, on Unit 7, sees a mental health counselor about once a month who visits him outside the door to his cell for less than five minutes.[54] **T.B.**, on Unit 1C, sees Nurse Dunn about

---

[51] J.B.'s Second Supplemental Responses to Defendant's Second Set of Interrogatories, Nos. 19 & 20, at pp. 38-41, attached as **Exhibit "R"**.

[52] M.C.'s Second Supplemental Responses to Defendant's Second Set of Interrogatories, No. 10, at p 33-35, attached as **Exhibit "S"**.

[53] Dep. of A.A. 16, attached as **Exhibit "T"**.

[54] Dep. of A.R. 30-31, attached as **Exhibit "U"**.

every 90 days for blood work, and sees her in her office about every month.[55]  He also meets with mental health professionals in their office as needed.[56]  **J.H.**, housed on Unit 4B, says he should be seeing Nurse Brown once a month, but at the time of his deposition he had not seen her in two months.[57]  **B.M.** reports that on Unit 2 he met with Dr. Nagel in his office for an adequate amount of time but complains that he had not seen Dr. Nagel since he was placed in Unit 5.[58]  In segregation, Nurse Dunn rounds a couple times a week and inmates can flag her down and she meets with them cell side.[59]  She is escorted with a security officer who stands with her during these visits.[60]  Mr. Pickering also comes by segregation about once a week, but when Barry Melton was on housing Unit 2 he never saw a mental health counselor, he just went to medical for any help he needed.[61]

These inmates' complaints about medication administration are also varying.  According to **T.B.**, his evening medication on Unit 1C is distributed at 11 or 12 p.m.  He is sometimes too sleepy to wake up to get his morning dose, when it arrives at 8 a.m., so he will get it in medical with his insulin shot in the afternoon.[62]  **A.A.** states that while he was living on Units 5 & 6 his medication did not come on time, but he has no complaints about medication distribution in Unit 2.[63]  **J.H.** says that some nurses do not stay long enough on Unit 4B to hand out all the medications.[64]  **B.M.** feels medication has been withheld from him, while in segregation, for weeks at a time out of retaliation.[65]

---

[55] Dep. of T.B., 39-40, attached as **Exhibit "V"**.
[56] *Id*. at 43-44.
[57] Dep. of J.H. 20, attached as **Exhibit "W"**.
[58] Dep. of B.M. 27-28, attached as **Exhibit "X"**.
[59] *Id*. at 29.
[60] *Id*. at 31.
[61] *Id*. at 34-35.
[62] T.B. Dep. 26-27, 28-29.
[63] A.A. Dep. 16, 28.
[64] J.H. Dep. 11-12.
[65] B.M. Dep. 18.

PD.21996077.1

Though there may be some trends across the 53 responders, the inmate questionnaires and deposition testimony reveal nothing common to *all members* of the EMCF Class. For example, many inmates reported issues with medication administration, though the issues varied within that group. But Plaintiffs have not focused on even these few trends, much less a common policy or practice at EMCF that affects the entire EMCF Class. Instead, Plaintiffs have assembled "claims of isolated instances of indifference to a particular inmate's medical needs," *Phillips*, 828 F.3d at 550, and such individualized instances of inadequate treatment—while not to be ignored if presented in individual cases—cannot be tried on a classwide basis.

In sum, this Court's "rigorous analysis" should result in a holding that Plaintiffs have not satisfied commonality under Rule 23(a). The prior certification order relied heavily on the district court decision of *M.D. v. Perry*, 294 F.R.D. 7 (S.D. Tex. 2013), which involved Texas's foster care system, but more recent cases clarify *Wal-Mart*'s impact on the analysis in prisoner cases. *See, e.g.*, *Phillips*, 828 F.3d at 550; *Cole v. Livingston*, 2016 WL 3258345 (S.D. Tex. 2016) (finding that prison wide class which was narrowly drawn to challenge single issue of excessive temperatures in summer months could be certified under *Wal-Mart*) . The EMCF class, as well as the three subclasses, should be decertified for lack of commonality.

## II.    Plaintiffs cannot satisfy Rule 23(b).

Even if Plaintiffs could satisfy their burden of demonstrating commonality, that is not enough to prevent decertification. Plaintiffs also must satisfy Rule 23(b)(2), which requires a demonstration that members of the class "have been harmed in essentially the same way" and that "the injunctive relief sought [is] specific." *See Maldonado v. Ochsner Clinic Foundation*, 493 F.3d 521, 524 (5th Cir. 2007). Again, Plaintiffs shoulder the burden of proof, and they cannot satisfy their burden. *See Mazzei*, 829 F.3d at 270.

A plaintiff must satisfy both Rule 23(a) and Rule 23(b) because the rules focus on different interests.  Rule 23(a), on the one hand, requires commonality to ensure that there are factual and legal nexuses between the claims of all class members.  *See, e.g., Cal. Rural Legal Assistance, Inc. v. Legal Servs. Corp.*, 917 F.2d 1171, 1175 (9th Cir. 1990).  Rule 23(b)(2), on the other hand, requires cohesion to ensure that "the case will not devolve into consideration of myriad individual issues."  *See* Newberg on Class Actions § 4:34.  Courts often assume without deciding that commonality exists because cohesion is the easier ground for decision. *See, e.g., Ebert v. Gen. Mills, Inc.*, 823 F.3d 472, 478 n.3 (8th Cir. 2016).

Plaintiffs' litigation strategy prevents them from being able to demonstrate cohesion. Rather than focus this case on one, or even a few, discrete issues, Plaintiffs have taken a scattershot approach.  Seven different claims have been brought, containing a multitude of issues such as the adequacy of medical care provided at EMCF, the adequacy of mental health care provided at EMCF, the sufficiency of physical exercise afforded to prisoners housed in solitary confinement, the sufficiency of environmental conditions in various parts of EMCF, the adequacy of nutrition provided to prisoners at EMCF, the level of force used at EMCF in response to particular incidents or situations, the degree to which prisoners at EMCF are protected from violence, the adequacy of lighting, ventilation, and pest control at EMCF, and the adequacy of nutrition and food safety provided at EMCF.[66]  All of these different liability theories conflict with a central tenant of cohesion: "ensuring that the litigation remains manageable."  *See, e.g., In re Pharmacy Benefit Managers Antitrust Litig.*, 2017 WL 275398, *28 (E.D. Pa. 2017).

The EMCF class again serves as a useful example of Plaintiffs' kitchen-sink strategy. Plaintiffs aim four different claims at this general class, ranging from complaints related to

---

[66] *See* [1] Compl. 77-80.

medical care, dental care, eye care, excessive force, prisoner-on-prisoner violence, malnourishment, and unsafe food preparation. Different legal inquiries apply to these different issues, and different methods of proof would be necessary at trial.

Put simply, it is dispositive under Rule 23(b) that all members of the EMCF class have not had similar experiences. The dark portrayal in Plaintiffs' May 2013 complaint cannot be squared with the testimony obtained from prisoners in housing units two and four during the merits discovery phase in 2017. One prisoner, Van Kendrick, has lived on Unit 2-A since September 1, 2015 and testified that he has not witnessed any uses of excessive force in 2-A, he has felt safe at all times on Unit 2-A, prisoners on Unit 2-A do not tamper with their cell door locks, and, with respect to contraband, he is not aware of any issue with contraband on Unit 2-A because the prisoners on that unit will expose the existence of contraband during the unit's community meetings held each Tuesday.[67] Saul Mata testified that, in the 1.5 years that he has lived on Unit 4-D, EMCF staff has not used force on him that he believes was excessive, he has not witnessed staff use force in 4-D that he believed was excessive, he has not been assaulted by another prisoner living in 4-D, and he has felt safe at all times on 4-D.[68] Anthony Bean testified that, in nearly three years living in 4-B, he has not witnessed excessive use of force against prisoners in 4-B, he has not been involved in or witnessed an prisoner-on-prisoner assault in 4-B, he has not been concerned for his personal safety on 4-B, and prisoners on 4-B do not tamper with their cell door locks.[69] In fact, Bean's testimony illustrates the complete lack of cohesion of the EMCF Class:

> Q.    Now, is the Pathway to Change Program open to persons who are classified as closed custody?
> A.    No. . . .

---

[67] Kendrick Dep. 28, 29.
[68] Dep. of Saul Mata 9-10, 20, attached as **Exhibit "Y"**.
[69] Bean Dep. 18, 22.

Q.      Have you lived around people who were classified closed custody?
A.      Yes.
Q.      Do you feel safe then?
A.      No. . . .
Q.      You currently live in 4-Bravo; correct?
A.      Correct.
Q.      You know about those general conditions there; correct?
A.      Correct.
Q.      And is it your understanding that the entire prison is the same as 4-Bravo?
        . . .
A.      No. . . .[70]

When, as here, the circumstances of class members are not congruent, there is a lack of cohesion among the class. *See, e.g., In re: First American Home Buyers Protection Corporation Class Action Litigation*, 313 F.R.D. 578, 609 (S.D. Cal. 2016) (explaining that the plaintiffs' different "stories highlight the lack of cohesion among potential class members, as they were exposed to disparate" circumstances). The just-referenced examples, as well as the multitude of examples related to both safety and security and medical issues as detailed in Defendant's analysis of the commonality requirement show that there is not cohesiveness among the members of the EMCF Class.

Most prison class actions involve narrow issues. Take, for example, the seminal case of *Bell v. Wolfish*, 441 U.S. 520, 558 (1979), where a class of prisoners challenged the prison's strip search policy, or *Cole v. Livingston*, 2016 WL 3258345 (S.D. Tex. 2016), where a prison-wide class challenged their exposure to excessive heat in summer months. In this case, by contrast, Plaintiffs challenge no less than 9 different "practices," which supposedly amount to a violation of the Eighth Amendment. MDOC does not mean to suggest that a class action must always involve a single issue, but, when it involves many different issues, it is more susceptible to

---

[70] *Id*. at 31-32.

failing under the cohesion requirement.[71]  *See, e.g., M.A. ex rel. E.S. v. Newark Public Schs.*, 2009 WL 4799291, *15 (D. N.J. 2009) (holding that individualized circumstances and remedies prevented class cohesion).

Imagine what a trial might look like if this case were to proceed as currently construed. Plaintiffs have identified more than 50 fact and expert witnesses, and the record contains nearly 300,000 pages worth of documents.  There is a general EMCF class and three subclasses, all of which are subject to different factual circumstances and legal inquiries.  It is ill advised to proceed as a class when, as here, "significant individual issues [will] arise consistently."  *See In re St. Jude Medical, Inc.*, 425 F.3d 1116, 1121 (8th Cir. 2005).

Courts have found cohesion lacking under even less individualized circumstances.  In *St. Jude Medical Center*, for example, cohesion was found lacking in a medical monitoring class that involved a prosthetic heart valve.  *Id*. at 1117.  The court explained that the patients "may or may not require additional monitoring, and whether he or she does is an individualized inquiry depending on that patient's medical history, the condition of the patient's heart valves at the time of implantation, the patient's risk factors for heart valve complications, the patient's general health, the patient's personal choice, and other factors."  *Id*. at 1122.  In another example, the *Ebert* case, the court found a lack of cohesion in a residential class, where home owners alleged they had been subjected to adverse health risks and diminished property values because of a chemical disposal.  823 F.3d at 475-77.  The court explained that there would be property-by-property assessments based on the extent of contamination and inquiries over when each class

---

[71] Rule 23(b)(3), by comparison, contains both a predominance requirement and a superiority requirement. Predominance requires that common issues in the case predominate over uncommon issues, and superiority requires that class treatment be superior to other available methods of adjudication.  Courts expressly have held that "the cohesiveness requirement of Rule 23(b)(2) is more stringent than the predominance and superiority requirements for maintaining a class action under Rule 23(b)(3)."  *See, e.g, Ebert*, 823 F.3d at 480.

member acquired their property.  *Id*. at 480-81.  Both of these cases highlight the type of particularized inquires that will be called for in this case.

A corollary to cohesion, i.e. the showing that all class members "have been harmed in essentially the same way," is the requirement of being able to craft "specific" injunctive relief. *See Maldonado*, 493 F.3d at 524 (5th Cir. 2007).  Class treatment under Rule 23(b)(2) is proper "only when a single injunction or declaratory judgment would provide relief to each member of the class."  *See Wal-Mart Stores, Inc.*, 564 U.S. at 360.  The rule "does not authorize class certification when each individual class member would be entitled to a different injunction or declaratory judgment against the defendant."  *Id*.

Plaintiffs' desired relief shows precisely why a single, specific injunction could not be entered on a classwide basis.  Their sweeping requests and suggested forms of relief cover distinct and unrelated categories that simply are not susceptible to classwide application. Among the divergent requests and suggestions which could be applicable to the EMCF Class are the following:

1. Installation of locking mechanisms that the prisoners cannot defeat;[72]
2. Require more staffing;[73]
3. Require officers to work immediately in the pods and living units;[74]
4. Address "documentation in general," including (a) requiring more formal documentation between the MDOC contract monitor and MTC staff such that the monitor's findings be "further formalize[d]" in a document that differs from the one currently being used and the facility's responses tracked on a historical basis and (b) improving documentation related to use of force at the facility;[75]
5. Upgrade how use of force reviews are conducted and require additional reporting from mental health staff;[76]
6. "[L]ogging problems . . . need to be corrected[;]"[77]

---

[72] Vail Dep. 90-91. Eldon Vail, Plaintiffs' proposed expert regarding safety and security issues at EMCF.
[73] *Id*. at 156-57.
[74] *Id*. at 169-70.
[75] *Id*. at 228-30.
[76] *Id*. at 229-30.
[77] *Id*. at 177-78, 230.

7. Increase mental health staff's review of uses of force, develop a better understanding of their role in attempting to talk a prisoner out of a particular situation, and develop a better curriculum for mental health staff;[78]

8. Improve prisoner checks in 5-A, 5-B, and 5-C at least every 40 minutes and improve the effort to get prisoners out for showers and recreation;[79]

9. Expand training, particularly on-the-job training, related to both hours required and structure, and review curriculum;[80]

10. Review the grievance system, addressing grievances not receiving a response and the fact few grievances are resolved in prisoners' favor;[81]

11. Examine and address various "physical plant issues" if not already addressed;[82]

12. Increase analysis of the source of contraband including how it is introduced, how it is created within the facility, and how visitors or staff may contribute to introducing contraband into the facility;[83]

13. Change how staff responds to issues by reducing the number of spontaneous uses of force and creating a "more robust program to attempt to avoid" use of force;[84]

14. Sufficiently illuminate washrooms and showers to facilitate proper cleaning and disinfection necessary to inhibit microorganism growth;[85]

15. Clean air ventilation systems vent coverings as often as necessary to eliminate blockages and to maintain proper airflow and exchange;[86]

16. EMCF staff must adhere to fire protection and safety practices;[87]

17. Conduct frequent drain cleanings to prevent blockage and drain flies;[88]

18. Maintain kitchen and floor in good repair to facilitate the cleanliness necessary to reduce/eliminate microbial and mold growth and prevent food borne illness;[89]

19. Maintain sufficient, operable lighting in the kitchen;[90]

20. Improve prisoners' access to urgent medical care by requiring custody officers be more responsive to prisoner requests for medical attention;[91]

21. Make sick call requests ("SCRs") forms more available, decrease response time to SCRs, reduce cancellations of visits for custody-related reasons, and provide sufficient, reliable documentation of visits cancelled due to "inmate refusal";[92]

22. Reduce cancellations of chronic care appointments for custody-related reasons and improve documentation of visits cancelled due to "inmate refusal";[93]

23. Improve infirmary's monitoring of and provision of care to acutely ill prisoners;[94]

---

[78] *Id*. at 191-92.
[79] *Id*. at 205-06.
[80] *Id*. at 230-31.
[81] *Id*. at 231-32.
[82] *Id*. at 232, 236-37.
[83] *Id*. at 169-70, 246.
[84] *Id*. at 246-47.
[85] *See* Excerpts from the Report of Diane Skipworth 7, attached as **Exhibit "Z"**.
[86] *See id*. at 9.
[87] *See id*. at 11.
[88] *See id*. at 11.
[89] *See id*. at 13-14.
[90] *See id*. at 14.
[91] *See* Excerpts from the Report of Dr. Marc Stern 5-6, attached as **Exhibit "AA"**.
[92] *See id*. at 6-7.
[93] *See id*. at 8-9

24. Increase amount of available bed space in infirmary by not using the infirmary to treat/monitor patients with acute mental health needs;[95]

25. Retain a sufficient number of appropriately licensed medical professionals, which will alleviate providers exceeding the limits of their licensure/training;[96]

26. Reduce instances of medical staff at EMCF—including the facility physician, nurse practitioners, RNs, and LPNs—departing from expected clinical practices;[97]

27. Reduce instances in which nurses do not follow up on physician's medical orders and improve documentation of the reasons prisoners miss their medication;[98]

28. Improve medical record-keeping at EMCF by replacing the EMR system used by MDOC, improving accuracy and completeness of data entry by healthcare staff, correcting documentation of medical records, and reducing the use of "no show" or "patient refusal" as a reason for failure to provide medications;[99]

29. Medical professionals must obtain and properly document informed refusal of treatment where failure to provide treatment is due to "inmate refusal";[100]

30. Eliminate the ways in which the sick call referral (SCR) system jeopardizes patient confidentiality through custody officers' involvement, cease performing sensitive procedures in view of other prisoners, and remove or safeguard medical information included in post-incident reports viewed by custody staff;[101]

31. Improve the availability of important medical equipment such as (1) a peak expiratory flow (PEF) meter to measure an asthmatic's breathing strength and (2) a monofilament to test for nerve damage in diabetics;[102]

32. MDOC must verify the results of Centurion's annual peer reviews or respond to any problems identified in the reviews and put in place adequate measures for determining whether Centurion is complying with its contract with MDOC and relevant standards of care;[103]

33. Make living conditions throughout EMCF sanitary, humane, and safe, and secure sharp instruments and chemicals stored in the medical unit;[104]

34. Improve custody practices at EMCF;[105]

35. Properly equip and supply exam rooms and the dental room in the medical unit;[106]

36. Screen newly arriving prisoners privately in the medical clinic within 12 hours of arrival, as opposed to the intake unit or gym, and by a nurse who has access to the prisoner's medical records;[107]

37. Nurses should not order antibiotics or x-rays without consulting a physician;[108]

---

[94] *See id.* at 9-10.
[95] *See id.* at 9-10.
[96] *See id.* at 11-17.
[97] *See id.* at 11-17.
[98] *See id.* at 17-19.
[99] *See id.* at 19-21.
[100] *See id.* at 22-23
[101] *See id.* at 23-24.
[102] *See id.* at 24.
[103] *See id.* at 24-25
[104] *See  id.* at 25-26.
[105] *See id.* at 26-27.
[106] *See* Excerpts from the Report of Madeleine LaMarre 9-11, attached as **Exhibit "BB"**.
[107] *See id.* at 11-12.

38. Physician-referral by nurses must be made when vital signs indicate they should be and must document the urgency of the condition;[109]

39. EMCF medical staff should be required to ensure all prisoners with chronic diseases are enrolled in EMCF's chronic disease program, nurses handling SCRs should consistently refer prisoners with poorly controlled chronic diseased to other medical providers when necessary, and physicians should manage prisoners with chronic diseases;[110]

40. Medical staff must timely follow-up on prisoners returning from a hospital;[111]

41. Prisoner transports to the hospital should be by a vehicle "adequately equipped and supplied to treat the patient";[112]

42. EMCF medical staff should be trained to provide a "reliable system" for ensuring that specialty services (cardiology, ophthalmology, and orthopedics) are provided to prisoners with a chronic disease, and physicians at EMCF must reliably receive "consultant reports," discuss them with the patient, and reliably implement consultant recommendations; [113]

43. Keep infirmary rooms clean and sanitary and install a call system;[114]

44. Only house prisoners in the infirmary per formal admitting orders;[115]

45. Medical provider should make daily rounds in the infirmary and adequately document clinical evaluations when making rounds;[116]

46. Nurses must assess urgency of SCRs for dental pain or refer prisoners to a medical provider for infection or pain management pending dental treatment;[117]

47. EMCF should provide sufficient dental staff;[118]

48. Train nursing staff to make the process for administering medication consistent from nurse to nurse;[119]

49. Train nurses to conform to the standard of care for administering medication;[120]

50. Train nurses to properly document medication administration;[121]

51. Create a procedure for ensuring that prisoners who are not in their unit when medication is administered timely receive their medication;

52. Document reasons anytime medication is delayed, discontinued, or withheld;[122]

---

[108] See id. at 12-16.
[109] See id. at 12-16.
[110] See id. at 17-22.
[111] See id. at 23-25.
[112] See id. at 23-25.
[113] See id. at 25-27.
[114] See id. at 27-37.
[115] See id. at 27-37.
[116] See id. at 27-37.
[117] See id. at 27-37.
[118] See id. at 37-39
[119] See id. at 41-44.
[120] See id. at 41-44.
[121] See id. at 41-44.
[122] See id. at 41-44.

53. Update Centurion's policies to include a table of contents, an approval page bearing the signature of the facility HSA, Medical Director, and Director of Nurses, and to provide "operational details" for sick call and medication administration;[123]

54. Comply with policies for ensuring a confidential SCR process and adequately supplying exam rooms;[124]

55. Centurion's Continuous Quality Improvement process must be properly documented and indicate timely efforts to correct issues identified;[125] and

56. MDOC's contract monitoring program must be administered in a way that leads to MDOC addressing reported deficiencies.[126]

These voluminous and wide-ranging requests demonstrate that Plaintiffs' claims are not capable of a classwide injunction. In addition, the Prison Litigation Reform Act ("PLRA") mandates that prospective relief be "narrowly drawn, extend[] no further than necessary to correct the violation of the Federal right, and [] the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(a)(1)(A). Thus, under the PLRA, the days of aggregating individualized grievances and asking the Court to take over prison operations have ended. *See Cole*, 2016 WL 3258345 at *10 (considering PLRA's narrow-tailoring mandate in conjunction with Rule 23(b)'s injunctive relief requirements). Class remedies in the form of prospective relief must be specific and narrow, and the laundry list of relief sought by Plaintiffs simply does not fit these requirements.

Ultimately, decertification is warranted under Rule 23(b). Plaintiffs can satisfy neither the cohesion test nor the requirement that a single, specific injunction apply to all members of the class. Either deficiency requires this Court to reconsider its prior certification order, but together the two are decisive.

---

[123] *See id.* at 44-45.
[124] *See id.* at 44-45.
[125] *See id.* at 45-46.
[126] *See id.* at 45-46.

## CONCLUSION

Plaintiffs could have limited this litigation to legal issues that actually may be debatable. They instead have filed a "best practices" lawsuit, in which they attempt to second-guess every single aspect of prison management. *See Baze v. Reeves*, 553 U.S. 35, 51 (2008) (warning that federal courts are charged with interpreting the Constitution, not determining what "best practices" are for prisons). Because such a litigation strategy is self-defeating under Rule 23, the EMCF class as well as the three subclasses should be decertified.

Dated: August 2, 2017.

Respectfully submitted,

BY:   JIM HOOD, ATTORNEY GENERAL
       STATE OF MISSISSIPPI

BY:   *s/ Krissy Nobile*
       Harold E. Pizzetta, III, Bar No. 99867
       Krissy Nobile, Bar No. 103577
       Office of the Attorney General
       Post Office Box 220
       Jackson, Mississippi 39205
       Telephone: (601) 359-3860
       Facsimile: (601) 359-2003
       hpizz@ago.state.ms.us
       knobi@ago.state.ms.us

BY:   *s/ Gary E. Friedman*
       Gary E. Friedman, Bar No. 5532
       G. Todd Butler, Bar No. 102907
       H. David Clark, III, Bar No. 104165
       Nicholas F. Morisani, Bar No. 104970
       Phelps Dunbar, LLP
       4270 I-55 North
       Jackson, Mississippi 39211-6391
       Telephone: 601-352-2300
       Facsimile: 601-360-9777
       Gary.Friedman@phelps.com
       Todd.Butler@phelps.com
       clarkt@phelps.com
       Nick.Morisani@phelps.com

PD.21996077.1

BY:   *s/ Michael J. Bentley*
       Michael J. Bentley, Bar No. 102631
       Megan B. Conner, Bar No. 102030
       Molly M. Walker, Bar No. 100689
       Bradley Arant Boult Cummings, LLP
       Post Office Box 1789
       Jackson, Mississippi 39215-1789
       Phone:  (601) 948-8000
       Fax:     (601) 948-3000
       mbentley@babc.com
       mconner@babc.com
       mmwalker@babc.com

**ATTORNEYS FOR THE DEFENDANT**

**<u>CERTIFICATE OF SERVICE</u>**

I, *Gary E. Friedman*, certify that the foregoing document has been filed with the Clerk of Court using the Court's ECF system, which provides service of the foregoing to all counsel of record who have entered an appearance in this case as of the date below.

Dated: August 2, 2017.

       */s/ Gary E. Friedman*
       Gary E. Friedman