**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

**JERMAINE DOCKERY, et al.**                                                    **PLAINTIFFS**

**VS.**                                                           **No. 3:13-cv-326-WHB-JCG**

**MARSHALL L. FISHER, et al.**                                          **DEFENDANTS**

**DEFENDANT'S BRIEF IN SUPPORT
OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

Through this prison conditions class action, Plaintiffs attack virtually every aspect of their confinement at the East Mississippi Correctional Facility ("EMCF") in Meridian, Mississippi. They bring claims related to safety and security and inadequate mental healthcare, attempting to paint a picture of horrid conditions that simply do not match the reality of their incarceration. If the Court does not grant the Mississippi Department of Corrections' ("MDOC")[1] contemporaneously filed motion for decertification, partial summary judgment should be granted on Plaintiffs' claims related to safety and security.  Allowing this case to proceed to trial in its current posture would be both unmanageable and inconsistent with governing constitutional standards.

The Supreme Court has long been skeptical of cases, like this one, where prisoners employ a scattershot strategy. *See Wilson v. Seiter*, 501 U.S. 294 (1991) (explaining that "[n]othing as amorphous as 'overall conditions' can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists").  Indeed, Eighth Amendment claims may not be based on the totality of the circumstances unless "they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need[.]"

---

[1] The named defendants are Pelicia Hall, Gloria Perry, Jerry Williams, and Richard McCarty in their official capacities, but persons sued in their official capacity "assume the identity of the government [entity] that employs them." *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 109 (1989). Thus, the real party-in-interest is MDOC.

*See Gates v. Cook*, 376 F.3d 323, 333 (5th Cir. 2004). MDOC is entitled to partial summary judgment under Rule 56 on Plaintiffs' safety and security claims.

## BACKGROUND

Among the population of prisoners housed at EMCF are those with special needs.[2] Management & Training Corporation ("MTC"), a private entity, manages EMCF and provides safety and security for the facility.[3] The medical care provided to prisoners at EMCF is provided by Centurion of Mississippi LLC ("Centurion"), an entity which also contracts with the MDOC.[4]

On May 30, 2013, Plaintiffs, a group of prisoners housed at EMCF,[5] filed a Complaint for injunctive relief seeking class certification and advancing claims under the Eighth Amendment.[6] Specifically, Plaintiffs sought certification of the "EMCF Class"[7] and three subclasses: the Isolation Subclass,[8] the Mental Health Subclass,[9] and the Units 5 and 6 Subclass.[10] On behalf of these classes, Plaintiffs advance seven Eighth Amendment claims related to the conditions of confinement at EMCF. On September 29, 2015, the Court certified the EMCF Class and each of the three subclasses.[11]

The Court's [257] Opinion and Order outlined Plaintiffs' seven different constitutional claims: (1) an inadequate medical care claim in regards to the EMCF Class, (2) an inadequate

---

[2] *See* Dep. of Pelicia Hall 63-64, attached as **Exhibit** "**A**".

[3] *See* Management and Operations Agreement 1, 4, attached as **Exhibit** "**B**" (filed under seal).

[4] *See* 30(b)(6) Dep. of Mississippi Department of Corrections (Gloria Perry) 6-8, attached as **Exhibit** "**C**".

[5] The Plaintiffs are Jermaine Dockery, John Barrett, Michael Combs, Jeffrey Covington, Taveres Flaggs, Phillip Fredenburg, Derrick Hayes, Derrick Lane, Alvin Luckett, Henry Moore, Joseph Osborne, Eddie Pugh, and James Vann (hereinafter "Plaintiffs").

[6] *See* [1] Compl. 69-80. For a more in-depth discussion of Plaintiffs' Complaint, please see section I.B. of Defendant's Brief in Support of Motion for Decertification.

[7] *See id*. at 69-71. The EMCF Class is a prison-wide class of all prisoners housed at EMCF. *Id*.

[8] *See id*. at 71-73. The Isolation Subclass consists of "of all persons who are currently, or will be, subjected to Defendants' policies and practices of confining prisoners in conditions amounting to solitary confinement at the [EMCF]." [257] Op. and Order 30.

[9] *See* [1] Compl. 73-75. The Mental Health Subclass consists "of all persons who are currently, or will be, subjected to Defendants' mental health care policies and practices at the [EMCF]." [257] Op. and Order 30.

[10] *See* [1] Compl. 75-77. The Units 5 and 6 Subclass consists "of all persons who are currently, or will be, housed in Units 5 and 6 at [EMCF]." [257] Op. and Order 30.

[11] *See* [257] Opinion and Order. For a more detailed discussion of the Court's Order certifying the class and subclasses, please see section I.C. of Defendant's Brief in Support of Motion for Decertification.

mental health care claim in regards to Mental Health Subclass, (3) a protection from harm and mental health treatment claim in regards to the Isolation Subclass, (4) an excessive force claim in regards to the EMCF Class, (5) a protection from harm claim in regards to the EMCF Class, (6) an environmental conditions claim in regards to the Units 5 and 6 Subclass, and (7) a food service claim in regards to the EMCF Class.[12]

Since Plaintiffs filed the Complaint, many of the circumstances inside and outside of EMCF have changed. Housing Unit 6 provides an example of the significant changes since the [1] Complaint was filed. At the time the [1] Complaint was filed, Unit 6 was a segregation unit, similar to Unit 5.[13] However, since May 2016, housing Unit 6 has been converted to a general population housing unit that consists of four pods housing offenders of varying custody levels.[14]

In addition, EMCF has garnered recognition from three independent, respected national associations during the pendency of this lawsuit. First, the American Corrections Association ("ACA") audited EMCF in March 2015, reviewing virtually all aspects of the correctional environment at EMCF, including security, environmental conditions, sanitation, fire safety, food service, recreation, and various offender programs.[15] The audit team reviewed 56 mandatory standards and 426 non-mandatory standards and found EMCF in compliance with 100% of these standards, resulting in EMCF's accreditation by the ACA.[16]

Second, EMCF was audited in May 2015 by auditors trained through the Bureau of Justice Assistance of the United States Department of Justice to determine the level of

---

[12] *See* [257] Opinion and Order 7-9.
[13] *See* Dep. of Norris Hogans ("Hogans Dep.") 303-307, attached as **Exhibit "D"**.
[14] *See id.*
[15] *See* ACA Accreditation Report, (DEF-024595 through DEF-024605), attached as **Exhibit "E"**.
[16] *See id.* at DEF-024615.

compliance with the standards of the Prison Rape Elimination Act ("PREA") Commission.[17] The PREA standards are intended to ensure that facilities such as EMCF operate in a safe and secure manner and provide protection from harm of the prisoners housed in the facility.[18] The audit's final report found that the facility "Meets Standards," complies in all material ways with the standard for the relevant review period, and the auditor reported that EMCF "is well managed and the staff well trained in their assignments . . . ."[19]

Lastly, EMCF was audited by the Correctional Educational Association ("CEA") in June 2015, a review predicated on standards measuring the effectiveness and completeness of the education programs offered to the prisoners of EMCF.[20] The CEA certified EMCF's education programs effective July 1, 2015.[21]

Against this backdrop, Plaintiffs do not challenge the policies controlling operations at EMCF; instead, they claim practices at EMCF represent *de facto* policies and practices which cause constitutional problems for Plaintiffs.[22] As will be shown below, many of the problems of which Plaintiffs complain do not create the requisite substantial risk of serious harm for prisoners housed at EMCF. And, even if the Court were to find that these problems actually rose to such a constitutionally significant level, the record makes plain that the management and staff at EMCF have and continue to take reasonable steps to address those problems.[23] Consequently, Defendant should be granted summary judgment on claims (3) through (7), if this case is not decertified.

---

[17] *See* PREA Audit: Auditor's Summary Report Adult Prisons & Jails, attached as **Exhibit "F"** ("PREA Audit"). Passed by Congress in 2003, the PREA established national standards for the detection, prevention, reduction, and punishment of prison rape.

[18] *See generally* PREA Prison and Jail Standards United States Department of Justice Final Rule, available at https://www.prearesourcecenter.org/sites/default/files/content/prisonsandjailsfinalstandards_0.pdf.

[19] PREA Audit 5.

[20] *See* July 1, 2015, Auditor Report for Standards Commission, attached as **Exhibit "G"**.

[21] *See id.*

[22] Dep. of Eldon Vail 34-36 ("Vail Dep."), attached as **Exhibit "H"**.

[23] *See, e.g., id.* at 159, 166-67; *see also* Dep. of Diane Skipworth 39, 81-82, attached as **Exhibit "I"**.

## SUMMARY JUDGMENT STANDARD

Summary judgment motions are appropriate vehicles for attacking both claims and issues. *See, e.g., GuideOne Elite Ins. Co. v. Mount Caramel Ministries*, 2017 WL 344278, *6-7 (5th Cir. 2017) (affirming summary judgment on a specific issue); *Ainsworth v. Moffett Engineering, Ltd.*, 595 Fed. App'x 326, 328-29 (5th Cir. 2014) (affirming summary judgment on a specific claim). Rule 56 provides that summary judgment shall be granted when there are no genuine issues of material fact.  A fact is material if it is essential under the applicable theory of recovery, and, without it, the nonmovant is unable to prevail.  *See Celotex v. Catrett*, 477 U.S. 317 (1986). The movant's burden is merely to point out the absence of evidence supporting the nonmovant's case.  *See Stults v. Conoco, Inc.*, 76 F.3d 651, 656 (5th Cir. 1996).

Once the movant meets his or her burden, the nonmovant must go beyond the pleadings and "identify specific evidence in the record, and articulate the 'precise manner' in which that evidence support[s] [his] claim."  *See Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994). Allegations without substance will not defeat summary judgment.  *See Celotex*, 477 U.S. at 321. If the nonmovant fails to meet his or her burden, then summary judgment must be granted.  *See Stults*, 76 F.3d at 656-57 (citing *Tubacex, Inc. v. M/V Risan*, 45 F. 3d 951, 954 (5th Cir. 1995)). "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment[.]"  *See Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006) (internal quotation marks omitted).

## ARGUMENT AND AUTHORITIES

Plaintiffs challenge their conditions of confinement at EMCF.  Their lawsuit is brought pursuant to 42 U.S.C. § 1983, and they allege numerous violations of their Eighth Amendment rights. To succeed under the Eighth Amendment, Plaintiffs must satisfy two requirements:

demonstration of a substantial risk of serious harm and deliberate indifference. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

"Substantial risk of serious harm" is an objective inquiry that requires satisfaction of two components: (1) harm and (2) risk. With respect to "harm," courts must consider whether the alleged harm is "sufficiently serious[.]" *Hudson v. McMillian*, 503 U.S. 1, 21 (1992). "This circuit has worded the test as requiring extreme deprivation of any 'minimal civilized measure of life's necessities.'" *Gates*, 376 F.3d at 332 (quoted case omitted)). With respect to "risk," courts must consider whether there is a "substantial" risk that the alleged harm is likely to occur. *Id*. Courts equate "substantial risk" with "pervasive conduct" that results in a "real and proximate threat[,]" as opposed to "isolated incidents[.]" *See Lakin v. Barnhart*, 2013 WL 5407213, *7-8 (D. Maine 2013) (collecting cases).

"Deliberate indifference" likewise requires satisfaction of two components: (1) the defendant's awareness "of facts from which the inference could be drawn that a substantial risk of serious harm exists" and (2) the defendant actually "draw[ing] the inference." *See Williams v. Hampton*, 797 F.3d 276, 281 (5th Cir. 2015) (en banc). These components cannot be met if the defendant "responds reasonably" to substantial risks to inmate health or safety, "even if the harm ultimately [i]s not averted." *See Farmer*, 511 U.S. at 844-45 ("Whether one puts it in terms of duty or deliberate indifference, prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause.").

Before analyzing the safety and security claims, it is important to again highlight the scattershot-nature of Plaintiffs' lawsuit. With so many different claims, premised on so many different factual circumstances, it is difficult to anticipate every liability theory Plaintiffs' may be

pursuing.  MDOC, in addressing Plaintiffs' claims, adheres to its obligation to merely point out the absence of evidence supporting Plaintiffs' case.  *See Stults*, 76 F.3d at 656.

## A.      *Claims Three and Seven*

This safety and security claim of the Isolation Subclass Plaintiffs ("Claim Three") includes allegations that they are subject to unsafe environmental conditions and that they do not receive adequate nutrition. The safety and security claim of the EMCF Class Plaintiffs ("Claim Seven") similarly alleges that they receive inadequate nutrition and that their food is served in an unsanitary manner. These allegations, however, are not supported by evidence demonstrating a substantial risk of serious harm or deliberate indifference.

With respect to their environmental conditions theory, Plaintiffs focus on lighting, air ventilation, cleanliness of showers, and pest control.  None of this, however, amounts to a substantial risk of serious harm.  Plaintiffs have failed to demonstrate anything more than isolated incidents of uncomfortableness, with no class-wide injuries.  *See Desroche v. Strain*, 507 F.Supp.2d 571, 581 (E.D. La. 2007) (collecting cases holding that "a short term sanitation restriction or problem, although admittedly unpleasant, does not amount to a constitutional violation").  "[T]he Constitution does not mandate prisons with comfortable surroundings or commodious conditions."  *See Talib v. Gilley*, 138 F.3d 211, 215 (5th Cir. 1998) (cited case omitted).

Inadequate lighting does not rise to the level of a substantial risk of serious harm unless "the minimal civilized measure of life's necessities" is being denied. *Wilson*, 501 U.S. at 298. Plaintiffs' environmental expert admitted at her deposition that she was unaware of any injury that had ever resulted at EMCF from inadequate lighting.[24] *See  Morissette v. Peters*, 45 F.3d 1119, 1123 (7th Cir. 1995) (observing that even shocks from exposed wiring were an easily

---

[24] Skipworth Dep. 14-15, 18, 80.

avoided, "unpleasant inconvenience" rather than a substantial risk). Plaintiffs' environmental expert determined that six occupied cells out of a total of 248 cells in Units 5 and 6 did not have lights but she did not know why or how long the lights had been missing.[25] Nothing more than speculation has been offered in support of Plaintiffs' theory that the lighting in Units 5 and 6 violates constitutional norms. *See Thorson v. Epps*, 701 F.3d 444, 449 (5th Cir. 2012) (explaining that "mere speculation cannot rise to the level of an objectively intolerable risk").

The same conclusion results from Plaintiffs' allegations about air ventilation.  Plaintiffs claim that prisoners block vents to control air flow and that there is often a strong odor of smoke throughout EMCF, but their environmental expert admitted at her deposition that she was unaware of any injury that had ever resulted from these complaints.[26] At most, Plaintiffs complain of "uncomfortable" conditions that are inactionable.  *See Woods v. Edwards*, 51 F.3d 577, 581 (5th Cir. 1995) (rejecting claim regarding prison temperatures, where plaintiff "failed to present medical evidence of any significance" to support allegation that heat negatively impacted his health).

Similarly, Plaintiffs allegations of unclean showers do not rise to the level of cruel and unusual punishment. Plaintiffs point to "apparent mold growths" in the prison showers, but the Fifth Circuit has rejected Eighth Amendment claims in far worse circumstances. In *Davis v. Scott*, for example, a plaintiff did not suffer an extreme deprivation of any minimally civilized measure of life's necessities where a cell was described as "filthy," with "blood on the walls and excretion on the floors[.]" 157 F.3d 1003, 1004 (5th Cir. 1998). It is entirely speculative for Plaintiffs' environmental expert to claim that the mold "may produce upper respiratory tract symptoms" and "an increased risk of infection[.]"  *See Thorson*, 701 F.3d at 449.  Plaintiffs'

---

[25] *Id*. at 22, 27.
[26] *Id*. at 30-31, 35, 80.

environmental expert is unqualified to render such a medical opinion and, as in *Davis*, there is no evidence of any injuries attributable to Plaintiffs' complaints about cleanliness.[27] *Compare* this case with *Davis*, 157 F.3d at 106. Plaintiffs' environmental expert admitted that she was not aware of any inmate in the last five years at EMCF who had suffered any significant illness because of unclean showers or any environmental problem.[28]

Plaintiffs' pest control allegations likewise are without merit. Though Plaintiffs mostly focus on kitchen observations by their environmental expert during a site inspection, it is well settled that "[t]he occasional presence of a rodent is insufficient to establish the objective component of an Eighth Amendment claim[.]" *See, e.g., Tucker v. Rose*, 955 F.Supp. 810, 816 (N.D. Oh. 1997). Plaintiffs utilize the word "infestation" in an attempt to prop up their claim, but there simply is no evidence approaching what other courts have required to demonstrate a sufficiently serious risk of harm. *See, e.g., Antonelli v. Sheahan*, 81 F.3d 1422, 1431 (7th Cir. 1996) (acknowledging "sixteen months of infestation and significant physical harm" as sufficient to state an Eighth Amendment claim). It is undisputed that the Mississippi Department of Health, an independent body, has consistently provided satisfactory ratings to EMCF.[29] In fact, Plaintiffs' own environmental expert admitted at her deposition that she was unaware of any injury in the last five years at EMCF that resulted from the presence of pests.[30]

It is entirely speculative for Plaintiffs' environmental expert to claim that any of these environmental issues could pose a substantial risk of serious harm to prisoners. *See Thorson*, 701 F.3d at 449. Plaintiffs' environmental expert is unqualified to render such a medical opinion

---

[27] *Id*. at 78-80.
[28] *Id*. at 38-39, 80.
[29] *See id.* at 71-72; *see also* Food Service Information, Mississippi Department of Health Facility: EMCF, covering the period of time from July 23, 2012, through October 19, 2016, attached as **Exhibit "J"**.
[30] Skipworth Dep. 39-40.

and, as in *Davis*, there is no evidence of any injuries attributable to these issues. *Compare*, this case *with Davis*, 157 F.3d at 106.

With respect to nutrition, Plaintiffs' theory falls flat as well.  It is undisputed that prisoners receive three meals per day,[31] even though the Fifth Circuit has suggested that only two meals per day would be constitutionally sufficient. *See Green v. Ferrell*, 801 F.2d 765, 770-71 (5th Cir. 1986).  Plaintiffs' expert conceded at her deposition that she was unaware of any instance where a prisoner who was not on a restricted diet received less than 2,900 calories per day,[32] and courts have deemed less caloric amounts to be constitutionally sufficient.  *See, e.g., Cunningham v. Jones*, 667 F.2d 565, 566 (6th Cir. 1982) (finding meal of 2,000 to 2,500 calories to be sufficient); *Sostre v. McGinnis*, 442 F.2d 178, 186, 193-94 (2d Cir. 1971) (finding diet of 2,800 calories per day constitutionally adequate) (overruled on other grounds).  There can be no doubt that the "inmates receive reasonably adequate food[,] as required by the Eighth Amendment. *See Eason v. Thaler*, 73 F.3d 1322, 1327 (5th Cir. 1996).

The ACA's March 2015 audit of EMCF further underscores the fact that Plaintiffs' allegations regarding environmental and nutritional conditions do not rise to the level of a substantial risk of serious harm. As part of its facility-wide review, the ACA reviewed environmental conditions, sanitation, and food service.[33]  It was determined that EMCF was 100% in compliance with both the mandatory and non-mandatory standards of the reviewing body.[34] Of course, based on the audit, EMCF was granted accreditation.[35]

Nonetheless, even if Plaintiffs could demonstrate a substantial risk of serious harm, they certainly cannot demonstrate deliberate indifference. EMCF is extremely attentive to

---

[31] Dep. of David Thumma 181, 184, attached as **Exhibit** "**K**".
[32] Skipworth Dep. 42.
[33] *See* ACA Accreditation Report at DEF-024598-024599.
[34] *See id.* at Compliance Tally (DEF-024615-024632).
[35] *See id.* at ACA Correspondence to MTC dated Aug. 17, 2015 (DEF-024565).

environmental conditions and nutritional needs, as illustrated by the weekly provision of pest control throughout the kitchen and consistent provision of pest control in the living areas,[36] continued maintenance of the lighting, showers, and cells,[37] use of a dietician-approved and reviewed meal plan,[38] limiting the number of times that meals provided for in that plan are substituted with other meals,[39] and regularly cleaning and inspecting the kitchen area.[40]

In no less than 55 different decisions, the Fifth Circuit has acknowledged that "[d]eliberate indifference is 'an extremely high standard to meet.'"  *See, e.g., Domino v. Tex. Dep't of Criminal Justice*, 239 F.3d 752, 755 (5th Cir. 2001).  This simply is not a case where EMCF has turned a "blind eye" to the Plaintiffs' needs.  *See Whitley v. Hanna*, 726 F.3d 631, 652 n.3 (5th Cir. 2013) (Elrod, J., concurring) (explaining that deliberate indifference occurs when the defendant is guilty of "turning a blind eye").

## B.    *Claim Four*

This safety and security claim of the EMCF Plaintiffs is based on the allegation that they are subjected to excessive force.  This allegation is not supported by evidence demonstrating a substantial risk of serious harm or deliberate indifference.

Plaintiffs' claim is a non-starter under the substantial risk of serious harm requirement because "[e]xcessive force claims under Section 1983 require a great deal of individualized inquiry inappropriate for resolution on a class-wide basis."  *See Nigro v. Carrasquillo*, 2015 WL

---

[36] *See* Independent Contractor Agreement for Pest Control with attached Summary of Invoices for Pest Control Services covering Jan. 1, 2015 through June 29, 2017, attached as **Composite Exhibit** "**L**". The actual invoices for pest control have been produced to Plaintiffs and can be made available at the Court's convenience.

[37] *See* Maintenance Log, Jan. 2017 - June 2017, attached as **Exhibit** "**M**". The voluminous nature of this maintenance log, which only covers January 1, 2017, through June 30, 2017, yet spans 179 pages, is representative of the considerable number of maintenance jobs completed by EMCF maintenance staff during the time period of January 1, 2015, through December 31, 2016. The maintenance logs covering that period, of course, are even more voluminous, have previously been produced to Plaintiffs, and can be made available upon request, if necessary.

[38] *See* Skipworth Dep. 41; *see also* Statements of Nutritional Adequacy, attached as **Exhibit** "**N**".

[39] *See* Composite of Meal Substitution Logs covering all meal substitutions from September 28, 2016, to present, attached as **Exhibit** "**O**".

[40] Dep. of Warden Frank Shaw 330, attached as **Exhibit** "**P**"; *see also* Trinity Services Group Monthly Inspection Reports dated September 5, 2016, through March 28, 2017, attached as **Exhibit** "**Q**".

9244606, *2 n.1 (S.D. Fla. 2015) (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)).  Indeed, Plaintiffs' claim is self-defeating, as they provide a laundry list of practices that they believe *could* contribute to excessive uses of force.[41]  Such speculative opinions do not violate the Eighth Amendment. *See Williams v. Wood*, 223 Fed. App'x 670, 671 (9th Cir. 2007) (explaining that "generalized fears of harm" do not constitute a substantial risk of serious harm).  The evidentiary requirement is a demonstration of "pervasive" conduct resulting in an "imminent" threat.  *See Lakin*, 2013 WL 5407213 at *7-8.  At most, Plaintiffs have proffered what they believe are "best practices" for EMCF.  *See Baze v. Reeves*, 553 U.S. 35, 51 (2008) (warning that federal courts are charged with interpreting the Constitution, not determining what "best practices" are for prisons).

Nonetheless, even if Plaintiffs could demonstrate a substantial risk of serious harm, they certainly cannot demonstrate deliberate indifference.  EMCF has not turned a "blind eye" to the issue of excessive force.  *See Whitley*, 726 F.3d at 652.  Quite differently, EMCF has responded far more than "reasonably" to use-of-force concerns.  *See E.A.A.F. v. Gonzalez*, 600 Fed. App'x 205, 214 (5th Cir. 2015) (explaining that defendants were "not deliberately indifferent because they responded reasonably to the risk").  The undisputed evidence shows that EMCF provides use of force training to staff both pre-service and in-service,[42] and use of force is a topic that is discussed during the pre-shift briefings which occur before each of the three shifts at EMCF.[43] Further, allegations of staff misconduct, including but not limited to misconduct related to use of force, are investigated.[44] Where excessive use of force is alleged, the staff involved are placed on

---

[41] *See, e.g.*, Vail Dep. 177-178, 191-192.
[42] *See* Shaw Dep. 149.
[43] *See id*. at 113.
[44] *Id*. at 176-180.

administrative leave pending the investigation,[45] and where the investigation reveals excessive force was used, staff are disciplined up to and including termination.[46]

Additionally, there are two types of force used at EMCF: spontaneous and planned.[47] Critically, planned uses of force involve attempts by corrections officer and mental health staff to verbally intervene and deescalate a situation so as to avoid the need to use force.[48] A review of EMCF use of force statistics from 2015 and 2016 reveals an increase in planned uses of force coupled with a reduction in the number of spontaneous uses of force between 2015 and 2016.[49] This reveals that officers and staff at EMCF are making an effort to reduce the need for using force, and where that force is required, applying force in a planned manner as opposed to spontaneously reacting to a situation.

## C.    *Claim Five*

This safety and security claim of the EMCF Plaintiffs is based on allegations that prisoners harm themselves and are subjected to inmate-on-inmate violence.  Plaintiffs primarily point to supposed staffing problems and problems with cell door locks as culprits. This claim is not supported by evidence demonstrating a substantial risk of serious harm or deliberate indifference.

As an initial matter, it is significant that many of Plaintiffs' allegations relate to voluntary conduct.  For example, Plaintiffs insist that prisoners are subjected to a serious risk of harm because they stick paper in their lights and cover up their windows.  The voluntarily nature of these acts implicates the rule "that a prisoner cannot establish a[n Eighth Amendment] violation

---

[45] *Id*. at 137-138.
[46] *Id*. at 170; *see also* "Employee Discipline / Term July 1, 2015, through May 1, 2017 Chart and Supplement covered May 1, 2017-July 13, 2017," submitted in response to Plaintiffs' Fifth Set of Interrogatories, attached as **Exhibit** "**R**".
[47] *See id*. at 161, 165; *see also* Dep. of Tyeasa Evans, attached as **Exhibit** "**S**", *and* Dep. of Kenneth McGinnis 20-21, attached as **Exhibit** "**T**".
[48] McGinnis Dep. 98-99.
[49] *Id*. at 155-157.

where he willingly participates in the conduct giving rise to his injury." *See Legate v. Livingston*, 822 F.3d 207, 210 (5th Cir. 2016). Many of Plaintiffs' allegations simply are incompatible with this rule.

EMCF's staff does not pose a substantial risk of serious harm. During 2016, there were, on average, 156 correctional officers assigned to EMCF. These correctional officers undergo the extensive training described below in reference to the deliberate indifference inquiry. Other courts have rejected "attempt[s] to reduce a constitutional condemnation of deadly neglect and brutal malfeasance to a mere disagreement about trivial differences in staffing ratios[.]" *See Hughes v. Judd*, 2015 WL 1737871, *22 (M.D. Fla. 2015).

Plaintiffs complaints about the cell door locks similarly are unfounded. There is no meaningful, relevant evidence that there is a problem with the cell door locks. In fact, EMCF's lock expert details that the locks were designed properly and function properly.[50] Plaintiffs' expert, Eldon Vail, did not disagree.[51] Plaintiffs cannot establish a "substantial risk of serious harm" by merely pointing to anecdotal instances where prisoners have placed items in the locks to allow them to be opened.

For the violence allegations to be actionable, Plaintiffs must show that the threat is so imminent that "terror reigns[.]" *See, e.g., Jones v. Diamond*, 636 F.2d 1364, 1373 (5th Cir. 1981) (overruled on other grounds); *see also Walsh v. Brewer*, 733 F.2d 473, 476 (7th Cir. 1984) (citing cases). EMCF simply is not a place where acts of violence are so pervasive that the Eighth Amendment has been violated.[52] Plaintiffs' position ignores that a certain amount of

---

[50] Dep. of Stephen Stonehouse 58-59, attached as **Exhibit** "**U**"; *see also* Vail Dep. 82.

[51] *Id.*

[52] This fact is borne out clearly by comparing the chart of assaults occurring at EMCF in 2015 and 2016 to the total average prisoner population in 2015 (1139.167) and 2016 (1141.25) and the fact that EMCF houses prisoners falling within all three custody levels as described in Defendant's Motion to Decertify. *See* Mot. Decertify 3 (discussing each of the three custody levels of prisoners housed at EMCF: minimum, medium, and close), 14-15 (Chart of Assaults in 2015 and 2016); *see also* Profile of EMCF Inmate Population, attached as **Exhibit** "**V**". For

violence unfortunately is a "horrific reality" in nearly every prison system.  *See Lucien v. Peters*, 107 F.3d 873 (7th Cir. 1997).

Nonetheless, even if Plaintiffs could demonstrate a substantial risk of serious harm, they certainly cannot demonstrate deliberate indifference. EMCF has implemented countless measures to protect prisoners, beginning with taking an aggressive approach to detecting and removing contraband, a campaign which includes identifying the various sources of contraband and working to eliminate those sources. Namely, EMCF has installed and is operating a full body scanner at the front of the facility to search visitors and staff as they enter the facility and a separate parcel scanner to search and detect the attempted introduction of contraband through packages, a fact which Plaintiffs' expert Eldon Vail acknowledges is a reasonable effort to reduce introduction of contraband.[53] EMCF has installed mesh netting around the entire perimeter of the facility to prevent people from throwing contraband over the fence, and this is another effort that Vail finds reasonable to stop contraband from being introduced.[54] EMCF also has housed at the facility a K-9 Unit consisting of two trained German shepherds, which are trained to assist in searching for contraband. This is yet another step Vail agrees is a reasonable effort to detect and keep contraband out of the facility.[55]

In addition to taking disciplinary action against staff involved in excessive uses of force, both those who commit the excessive use of force and those who stand by idly and fail to report it,[56] EMCF provides its staff with training on the use of force both pre-service and in-service.[57]

---

example, 24 assaults took place in Unit 2 during 2015 for an average of 2 per month but in 2016 only 15 assaults occurred, which is 1.25 assaults per month; in Unit 4, 17 assaults took place in 2015 averaging out to 1.41 assaults per month while only 12 assaults occurred in 2016, an average of a single assault per month; and in Unit 6, 10 assaults occurred in 2015 for an average of less than one assault per month while 14 assaults occurred in 2016, averaging out to only 1.16 assaults per month.   These statistics simply do not reflect a "reign of terror" at EMCF.
[53] Vail Dep. 166.
[54] *Id*. at 167.
[55] *Id*. at 167.
[56] *See* Exhibit R.

EMCF has in place on premises a full time Security Threat Group Intelligence Coordinator and PREA Compliance Manager, responsible for identifying and monitoring gang members and gang-related activity within EMCF as well as potential PREA issues within the facility.[58] EMCF also has a full time Investigator, whose responsibilities include investigating inmate-on-inmate and inmate-on-staff assaults, investigating potentially excessive uses of force by staff, and reporting to the warden regarding these incidents.[59] EMCF thus has responded far more than "reasonably" to concerns over prison violence. *See E.A.A.F.*, 600 Fed. App'x 205 at 214.

## D.     Claim Six

This safety and security claim brought by the Units 5 and 6 Subclass Plaintiffs is based on the allegation that they are subjected to dangerous environmental conditions. This allegation is not supported by evidence demonstrating a substantial risk of serious harm or deliberate indifference.

Like with claim three of the Isolation Subclass, Plaintiffs advance a host of items they categorize as environmental conditions, such as exposure to smoke, filthy cells, vermin, plumbing problems, lighting issues, and inadequate ventilation. To the extent that any of the conditions involve Plaintiffs' intentional conduct, however, they are foreclosed by the rule "that a prisoner cannot establish a[n Eighth Amendment] violation where he willingly participates in the conduct giving rise to his injury." *See Legate*, 822 F.3d at 210. Plus, the majority of Plaintiffs complaints fall within the refrain that "the Constitution does not mandate prisons with comfortable surroundings or commodious conditions." *See Talib*, 138 F.3d at 215.

Nonetheless, even if Plaintiffs could demonstrate they were denied "the minimal civilized measure of life's necessities[,]" they cannot satisfy the deliberate indifference requirement. *See*

---

[57] Shaw Dep. 149.
[58] *Id*. at 253-255; Hogans Dep. 113-114; *see also* PREA Audit.
[59] *See* Shaw Dep. 176-180.

*Wilson*, 501 U.S. at 29.   EMCF has taken more than sufficient action to both alleviate environmental concerns and to respond to problems, including consistent pest control throughout the living areas,[60] steady maintenance of the lighting, showers, and cells,[61] and regular cleaning and inspection of the kitchen area.[62] In addition, EMCF has assigned a fire/safety lieutenant to monitor fire safety issues at the facility and a sanitation officer to maintain sanitation at the facility. Plaintiffs' proposed expert Diane Skipworth acknowledges this is a reasonable effort.[63]

## CONCLUSION

Defendant has moved for summary judgment on grounds that there is an absence of facts supporting Plaintiffs' claims Three through Seven.  That is, Plaintiffs cannot demonstrate that the various conditions of which they complain rise to the level of a substantial risk of serious harm, which is the Eighth Amendment standard.   Even if Plaintiffs could meet the constitutional threshold in this regard, they cannot demonstrate that Defendant has taken reasonable efforts to respond to those alleged risks. Consequently, Defendant respectfully requests summary judgment as to Counts Three through Seven of Plaintiffs' Complaint.

Dated: August 2, 2017.

Respectfully submitted,

BY:   JIM HOOD, ATTORNEY GENERAL
STATE OF MISSISSIPPI

BY:   *s/ Krissy Nobile*
Harold E. Pizzetta, III, Bar No. 99867
Krissy Nobile, Bar No. 103577
Office of the Attorney General
Post Office Box 220
Jackson, Mississippi 39205
Telephone: (601) 359-3860

---

[60] *See generally* Exhibit L.
[61] *See generally* Exhibit M.
[62] *See generally* Exhibit Q.
[63] Skipworth Dep. 81-82.

PD.21578163.2

Facsimile: (601) 359-2003
hpizz@ago.state.ms.us
knobi@ago.state.ms.us

BY: *s/ Gary E. Friedman*
Gary E. Friedman, Bar No. 5532
G. Todd Butler, Bar No. 102907
H. David Clark, III, Bar No. 104165
Nicholas F. Morisani, Bar No. 104970
Phelps Dunbar, LLP
4270 I-55 North
Jackson, Mississippi 39211-6391
Telephone: 601-352-2300
Facsimile: 601-360-9777
Gary.Friedman@phelps.com
Todd.Butler@phelps.com
clarkt@phelps.com
Nick.Morisani@phelps.com

BY: *s/ Michael J. Bentley*
Michael J. Bentley, Bar No. 102631
Megan B. Conner, Bar No. 102030
Molly M. Walker, Bar No. 100689
Bradley Arant Boult Cummings, LLP
Post Office Box 1789
Jackson, Mississippi 39215-1789
Phone: (601) 948-8000
Fax: (601) 948-3000
mbentley@babc.com
mconner@babc.com
mmwalker@babc.com

**ATTORNEYS FOR THE DEFENDANT**

## CERTIFICATE OF SERVICE

I, *Gary E. Friedman*, certify that the foregoing document has been filed with the Clerk of Court using the Court's ECF system, which provides service of the foregoing to all counsel of record who have entered an appearance in this case as of the date below.

Dated: August 2, 2017.

*/s/ Gary E. Friedman*
Gary E. Friedman