**IN THE UNITED STATES DISTRICT COURT FOR THE**
**SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

JERMAINE DOCKERY, *et al.*,

        Plaintiffs,

v.                                       Civil Action No. 3:13-cv-326-WHB-JCG

PELICIA HALL, *et. al*.,

        Defendants.

---

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR**
**PARTIAL SUMMARY JUDGMENT [Dkt. No. 531]**

---

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................. iv

EXHIBIT LIST ........................................................................... viii

INTRODUCTION ......................................................................... 1

FACTUAL BACKGROUND ............................................................. 1

SUMMARY JUDGMENT STANDARD ................................................ 5

LEGAL STANDARD .................................................................... 6

ARGUMENT ............................................................................. 8

    A.    Defendant Is Not Entitled to Summary Judgment on Plaintiffs'
        Excessive Use of Force Claim (Claim 4) ................................... 9

        1.    *A Pattern of Excessive Force at EMCF Poses a Substantial Risk
            of Harm* ....................................................................... 10

        2.    *Defendant Is Deliberately Indifferent to the Risks Created by an
            Excessive Use of Force* .................................................... 19

    B.    Defendant Is Not Entitled to Summary Judgment on Plaintiffs'
        Protection from Harm Claim (Claim 5) ................................... 23

        1.    *Defendant's Failure to Protect Plaintiffs Subjects Them to a
            Substantial Risk of Harm* ................................................. 23

            a)    *EMCF Is an Understaffed Facility, Which Results in
                Unsupervised Pods and Delayed Responses to
                Emergencies* ....................................................... 25

            b)    *Even Basic, Minimally-Necessary Correctional Practices,
                Including Properly Conducting Inmate Counts, Are Not
                Followed at EMCF* ................................................. 29

            c)    *Gangs Exercise Significant Control Over Staff at EMCF,
                Threatening the Security of Other Prisoners and
                Contributing to the Prevalence of Contraband* .......... 32

            d)    *Unsecure Cell Doors Enable Prisoners to Exit Their Cells
                Easily Without Supervision or Warning* ..................... 34

            e)    *The Widespread Prevalence of Weapons Reinforces an
                Environment in Which All Persons at EMCF Are
                Susceptible to Violence* ........................................ 36

     **2.**    *Defendant Is Deliberately Indifferent to the Risks Created by a Failure to Protect Plaintiffs From Harm* .................................................. 37

**C.**    **Defendant Is Not Entitled to Summary Judgment on Plaintiff's Inadequate Nutrition Claim (Claim 7)** ................................................. 40

     **1.**    *An Inadequate Diet, Compounded by Unsanitary Kitchen Conditions and Unsupervised Meal Distribution, Subjects Plaintiffs to a Substantial Risk of Harm* ................................... 41

     **2.**    *Defendant Is Deliberately Indifferent to the Risks Created by Inadequate Nutrition* ................................................................ 47

**D.**    **Defendant Is Not Entitled to Summary Judgment on Plaintiffs' Environmental Conditions Claims (Claims 3 and 6)** ....................................... 51

     **1.**    *Disturbing and Dangerous Environmental Conditions Expose Plaintiffs to a Substantial Risk of Harm* .................................. 52

          *a)*    *The Failure to Maintain a Clean Living Environment Endangers Health and Well-Being* ............................... 52

          *b)*    *The Failure to Maintain a Safe Living Environment Endangers Health and Well-Being* ............................... 57

     **2.**    *Defendant Is Deliberately Indifferent to the Risks Created by Unsanitary and Unsafe Environmental Conditions* .............................. 66

**CONCLUSION** ....................................................................................................... 69

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Beck v. Lynaugh,*
  842 F.2d 759 (5th Cir. 1988) ...............................................................64

*Bell v. Wolfish,*
  441 U.S. 520 (1979)...........................................................................61

*Blyden v. Mancusi,*
  186 F.3d 252 (2d Cir. 1999)..................................................................7

*Bolding v. Holshouser,*
  575 F.2d 461 (4th Cir. 1978) ...............................................................44

*Boulies v. Ricketts,*
  518 F. Supp. 687 (D. Colo. 1981) ........................................................61

*Brown v. Bolin,*
  500 F. App'x 309 (5th Cir. 2012) .........................................................48

*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986)..............................................................................5

*Christopher v. Buss,*
  384 F.3d 879 (7th Cir. 2004) ...............................................................64

*Cunningham v. Jones,*
  667 F.2d 565 (6th Cir. 1982) (per curiam).............................................42

*Curry v. Scott,*
  249 F.3d 493 (6th Cir. 2001) ..........................................................7, 12

*Depriest v. Epps,*
  No. 3:10-cv-00663-CWR-FKB (March 26, 2012) (Reeves, J. presiding)...............................61

*Depriest v. Walnut Grove Corr. Auth.,*
  Civil Action No. 3:10-cv-663-CWR-FKB, 2015 WL 3975020 (S.D. Miss.
  June 11, 2015) (Reeves, J. presiding) .......................................24, 36, 38

*DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.,*
  489 U.S. 189 (1989)........................................................................6, 40

*DeSpain v. Uphoff,*
  264 F.3d 965 (10th Cir. 2001) .............................................................56

*Deville v. Mercantel,*
  567 F.3d 156 (5th Cir. 2009) .......................................................................5

*E.A.A.F. v. Gonzales*
  600 F. App'x 205 (5th Cir. 2015) ...............................................................20

*Estelle v. Gamble,*
  429 U.S. 97 (1976).....................................................................................64

*Farmer v. Brennan,*
  511 U.S. 825 (1994)........................................................................... *passim*

*Gates v. Cook,*
  376 F.3d 323 (5th Cir. 2004) ............................................................ *passim*

*Graves v. Arpaio,*
  623 F.3d 1043 (9th Cir. 2010) (per curiam)..........................................40, 41

*Green v. Ferrell,*
  801 F.2d 765 (5th Cir. 1986) ...............................................................40, 42

*Hanks v. Rogers,*
  853 F.3d 738 (5th Cir. 2017) ......................................................................5

*Harper v. Showers,*
  174 F.3d 716 (5th Cir. 1999) .....................................................................52

*Helling v. McKinney,*
  509 U.S. 25 (1993)......................................................................6, 23, 60

*Horton v. Cockrell,*
  70 F.3d 397 (5th Cir. 1995) .......................................................................23

*Hudson v. Palmer,*
  468 U.S. 517 (1984).....................................................................................6

*Hudson v. McMillian,*
  503 U.S. 1 (1992).................................................................................7, 23

*Huff v. Pundt,*
  No. 2:11-cv-148, 2012 WL 2994839 (S.D. Tex. June 29, 2012).............................53

*Lakin v. Barnhart,*
  No. 1:11-cv-00332-JAW, 2013 WL 5407213 (D. Me. Sept. 25, 2013) ...........................17, 18

*LaMarca v. Turner,*
  662 F. Supp. 647 (S.D. Fla. 1987) ...............................................................61

*Legate v. Livingston*,
   822 F.3d 207 (5th Cir. 2016) ..........................................................................64

*Madrid v. Gomez*,
   889 F. Supp. 1146 (N.D. Cal. 1995) ..................................................9, 17, 19

*Marsh v. Butler Cnty., Ala.*,
   268 F.3d 1014 (11th Cir. 2001) (*en banc*), *abrogated on other grounds by Bell
   Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ...................................................25

*McClure v. Tex. Dep't of Criminal Justice Corr. Dep't*,
   459 F. App'x 348 (5th Cir. 2012) ....................................................................44

*McCord v. Maggio*,
   927 F.2d 844 (5th Cir. 1991) ....................................................................55, 64

*Nigro v. Carrasquillo*,
   NO. 15-60919-CIV-COHN/SELTZER, 2015 WL 9244606 (S.D. Fla. Dec. 17,
   2015) ..................................................................................................................9

*Palmer v. Johnson*,
   193 F.3d 346 (5th Cir. 1999) ...........................................................................65

*Peterson v. Peshoff*,
   216 F.3d 1079 (5th Cir. 2000) (unpublished table decision) (per curiam) ............11

*Reeves v. Sanderson Plumbing Prods., Inc.*,
   530 U.S. 133 (2000)............................................................................................5

*Robinson v. Louisiana*,
   363 F. App'x 307 (5th Cir. 2010) (per curiam) .................................................63

*Ruiz v. Johnson*,
   37 F. Supp. 2d 855 (S.D. Tex. 1999), *rev'd on other grounds sub nom. Ruiz v.
   United States*, 243 F.3d 941 (5th Cir. 2001)......................................................9

*Russ v. Int'l Paper Co.*,
   943 F.2d 589 (5th Cir. 1991) ..............................................................................5

*Shrader v. White*,
   761 F.2d 975 (4th Cir. 1985) ...........................................................................18

*Slaken v. Porter*,
   737 F.2d 368 (4th Cir. 1984) ..............................................................................9

*Smith v. Brenoettsy*,
   158 F.3d 908 (5th Cir. 1998) ..............................................................................7

*Smith v. Sullivan,*
    553 F.2d 373 (5th Cir. 1977) ...............................................................40

*Sostre v. McGinnis,*
    442 F.2d 178 (2d Cir. 1971)................................................................42

*Stewart v. Stalder,*
    Civil Action No. 05-0416-P, 2007 WL 184892 (W.D. La. Jan. 19, 2007)............................12

*Thomas v. Bryant,*
    614 F.3d 1288 (11th Cir. 2010) ..........................................................12

*Tillery v. Owens,*
    907 F.2d 418 (3d Cir. 1990)................................................................55

*Treats v. Morgan,*
    308 F.3d 868 (8th Cir. 2002) ..............................................................15

*Valdes v. Crosby,*
    450 F.3d 1231 (11th Cir. 2006) ...........................................................7

*Wilson v. Seiter,*
    501 U.S. 294 (1991).........................................................................7

*Walker v. Schult,*
    717 F.3d 119 (2d Cir. 2013)................................................................53

*Washburn v. Harvey,*
    504 F.3d 505 (5th Cir. 2007) ..............................................................51

**Rules and Statutes**

Fed. R. Civ. P. 56...................................................................................5

**EXHIBIT LIST**

| Exhibit Number | Exhibit Description |
|---|---|
| | **Expert Reports** |
| 1 | Vail 2014 Expert Report |
| 2 | Vail 2016 Expert Report |
| 3 | Vail Rebuttal Expert Report |
| 4 | Skipworth 2014 Expert Report |
| 5 | Skipworth 2016 Expert Report |
| 6 | Skipworth Rebuttal Expert Report |
| 7 | Kupers 2014 Expert Report |
| 8 | Kupers 2016 Expert Report |
| 9 | LaMarre 2016 Expert Report |
| 10 | McGinnis-Roth Expert Report |
| | **Deposition Transcripts** |
| 11 | MDOC 30(b)(6) Witness Deposition Transcript [excerpts] |
| 12 | MTC 30(b)(6) Witness Deposition Transcript [excerpts] |
| 13 | Trinity Services Group 30(b)(6) Witness Deposition Transcript [excerpts] |
| 14 | Tom Roth Expert Witness Deposition Transcript [excerpts] |
| 15 | Diane Skipworth Expert Witness Deposition Transcript [excerpts] |
| 16 | Steven Stonehouse Expert Witness Deposition Transcript [excerpts] |
| 17 | Dr. Rolando Abangan Deposition Transcript [excerpts] |
| 18 | Marylin Braxton Deposition Transcript [excerpts] |
| 19 | Marjorie Brown Deposition Transcript [excerpts] |
| 20 | Hillman Clemons Deposition Transcript |
| 21 | Capt. Christopher Dykes Deposition Transcript [excerpts] |
| 22 | Tyeasa Evans Deposition Transcript [excerpts] |
| 23 | Warden Norris Hogans Deposition Transcript [excerpts] |
| 24 | Saul Mata Deposition Transcript [excerpts] |
| 25 | Dr. Kim Nagel Deposition Transcript [excerpts] |
| 26 | Warden Frank Shaw Deposition Transcript [excerpts] |
| 27 | Vernell Thomas Deposition Transcript [excerpts] |
| 28 | Kimberly Townsend Deposition Transcript [excerpts] |
| | **Prisoner Declarations** |
| 29 | Declaration of Jimmy Brewer |
| 30 | Declaration of Dexter Campbell |

| 31 | Declaration of Alfonzo Griffin |
|----|--------------------------------|
| 32 | Declaration of David Grogan |
| 33 | Declaration of Johnny Holton |
| 34 | Declaration of Charlie Jones |
| 35 | Declaration of Bobby Mitchell |
| | **Other Exhibits** |
| 36 | A Barbaric Massive Move |
| 37 | Abston Inmate Request |
| 38 | ACA Accreditation Report |
| 39 | Allen 2016 ARP |
| 40 | Allen 2017 ARP |
| 41 | April 2012 News Report |
| 42 | April 2015 Monitor Email to STG Investigator |
| 43 | December 2014 Contract Monitor Note |
| 44 | December 2016 On-Site Contract Monitoring Worksheet |
| 45 | EMCF MS Department of Health Inspection Summary |
| 46 | February 13, 2017 Lighting Work Orders |
| 47 | February 2017 Work Orders |
| 48 | IL Department of Health Health Beat |
| 49 | July 2015 First Shift Rosters |
| 50 | July 2015 Monitor Email to MDOC-MTC |
| 51 | June 2012 OSHA Press Release |
| 52 | June 2016 Brown Email to Dykes |
| 53 | June 2016 Use of Force Report |
| 54 | March 2016 Department Head Meeting Minutes |
| 55 | March 2017 Ceiling Work Order |
| 56 | March 2017 EMCF Inspection Report |
| 57 | March 2017 Work Order |
| 58 | May 2011 Corrective Action Letter |
| 59 | May 2016 Use of Force Report |
| 60 | MDOC Monthly Report July 2015 to June 2016 |
| 61 | MDOC Monthly Report July 2016 to Jan 2017 |
| 62 | Monitor Monthly Report (Offender Counts) |
| 63 | Monitor Monthly Report (Physical Plant) |
| 64 | Monitor Monthly Report (Staff Training) |
| 65 | Monitor Monthly Report (Use of Force) |
| 66 | MTC Chemical Agents Presentation |
| 67 | November 2015 Department Head Meeting Minutes |

| 68 | November 2016 First Shift Rosters |
| 69 | November 2016 Second Shift Rosters |
| 70 | November 2016 Third Shift Rosters |
| 71 | October 2015 Monitor Email to MDOC-MTC |
| 72 | October 3, 2016 Plumbing Work Orders |
| 73 | October 4, 2016 Plumbing Work Order |
| 74 | Officer Discipline Report |
| 75 | Plumbing Work Orders |
| 76 | Prisoner Records |
| 77 | Report of Investigation |
| 78 | Tapley ARP |
| 79 | Tornes Incident Report |
| 80 | Understanding Food Facility Inspection Grades |
| 81 | Walnut Grove Settlement Order |
| 82 | Weekly Contract Monitor Reports (Food) |
| 83 | Weekly Contract Monitor Reports (Security) |
| 84 | Wilson ARP |
| 85 | Use of Force and Extraordinary Occurrence Reports |
| 86 | Plaintiffs' Experts' Declarations |

## INTRODUCTION

Defendant, which includes various officials of the Mississippi Department of Corrections, seeks partial summary judgment against Plaintiff-class members' claims for excessive force, protection from harm, and inadequate nutrition, and against Plaintiff-subclass members' claims related to unsanitary and unsafe environmental conditions. Defendant argues that there is an "absence of evidence" to support Plaintiffs' claims. Simply put, not so. The record is replete with evidence showing that Plaintiffs are housed in a prison where unnecessary and excessive applications of force are a routine occurrence; that Plaintiffs are housed in a prison where the locks on their cell doors do not work, guards do not actually supervise prisoners, gangs have significant control, and weapons are widely available; that Plaintiffs are housed in a prison where the food is not nutritionally adequate and prisoners have no guarantee of actually receiving a tray during any given meal; and that Plaintiffs are housed in units that are in serious disrepair, with dark cells and showers, constant indoor fires, and a maintenance program that is slow to respond, even when human waste is seeping into a prisoner's cell. The record is also replete with evidence showing that Defendant knows, and just does not care, about the horrific conditions under which Plaintiffs must live. Under the weight of this evidentiary record, Plaintiffs respectfully request the denial of Defendant's motion for partial summary judgment.

## FACTUAL BACKGROUND

The East Mississippi Correctional Facility ("EMCF") is the facility designated by Defendant Mississippi Department of Corrections ("MDOC")[1] for its most seriously mentally ill

---

[1] The named defendants in this matter are MDOC Commissioner Pelicia Hall, MDOC Chief Medical Officer Gloria Perry, and MDOC Deputy Commissioner for Institutions Jerry Williams. All named defendants are sued in their official capacity and collectively are hereinafter referred to as "MDOC" or "Defendant."

and psychiatrically disabled prisoners. Since 2012, EMCF has been privately operated by the Management & Training Corporation ("MTC"), pursuant to a contract between MTC and the EMCF Authority, which contracts on MDOC's behalf. MTC is responsible for the day-to-day operation of EMCF, including security, staffing, and maintenance of the prison. MTC has subcontracted food services, including preparation of meals, to another company, Trinity Services Group, Inc. ("Trinity"). And MDOC has delegated responsibility for provision of medical and mental healthcare services for prisoners at EMCF to another contractor, Centurion of Mississippi, LLC ("Centurion").

Despite Defendant's delegation of day-to-day operations at EMCF to its contractors, Defendant continues to maintain a daily presence at the facility. Pursuant to state statute, Defendant employs a Contract Monitor who serves as its "eyes and ears" at EMCF. *See* Exh. 11 ("MDOC Dep.") at 31:3–31:14, 142:2–9. The Monitor has extensive on-site contact (including full-time presence at the facility), hears from prisoners and staff, prepares a weekly report of concerns about prison operations, and evaluates MTC's compliance with the contract each month using 40 different evaluative criteria, including use of force, environmental health and safety, facility security and control, count procedures, food service, and medical care. *See* Exh. 27 ("Thomas Dep.") at 14:6–14:17; 44:25–48:17; 266:20–272:4. Defendant retains the power to sanction MTC in the event of material breaches of the contract, *see* MDOC Dep. 26:8–27:10, which can include findings of non-compliance on the Monitor's monthly reports, *see id.* at 76:14–77:10.

Plaintiffs, a certified class of over 1,100 prisoners currently housed at EMCF, allege that Defendant has deliberately ignored or failed to remediate the life-threatening conditions that persist at EMCF. Plaintiffs have pleaded seven claims related to the conditions of their

confinement, alleging that the policies and practices at EMCF subject them to a substantial risk of

harm and injury from:

1. Inadequate medical care, including dental care, optical care, and other health-related services;
2. Inadequate mental health care;
3. Being housed in conditions that amount to solitary confinement, including risks of harm from inadequate physical exercise, filthy and unsafe environmental conditions, inadequate nutrition, inadequate mental health treatment, and conditions of extreme social isolation and sensory deprivation;
4. The infliction of excessive force;
5. The failure to protect prisoners from violence, including failing to provide basic elements of a safe prison environment, and enabling violent attacks on prisoners;
6. Dangerous environmental conditions in Housing Units 5 and 6, including vermin, exposure to smoke and other toxic substances, filthy cells and fixtures, broken plumbing, inoperable lighting, constant illumination, and inadequate ventilation; and
7. Inadequate nourishment to maintain health, and the service of food in an unsanitary and unsafe manner.

While Claims 1, 4, 5, and 7 are brought on behalf of all class members, Claim 2 is brought on

behalf of subclass members constituting the Mental Health Subclass, Claim 3 is brought on

behalf of subclass members constituting the Isolation Subclass, and Claim 6 is brought on behalf

of subclass members constituting the Units 5 and 6 Subclass.

    In support of their claims, Plaintiffs have designated six experts: Eldon Vail (safety and

security), Diane Skipworth (nutrition and environmental health and safety), Terry Kupers

(isolation), Bruce Gage (mental health care), Marc Stern (medical care) and Madeleine LaMarre

(medical and mental health care). As particularly relevant here,[2] Plaintiffs' experts concluded:

- EMCF is an "extraordinarily dangerous" place where prisoners are at a significant risk of serious harm, from inadequate staffing, an "extreme" number of available weapons, and widespread violence, *see* Exh. 2 ("Vail 2016 Rpt.") ¶¶ 20–29;

---

[2] Because Defendant does not seek summary judgment on Plaintiffs' medical or mental health claims, issues any findings related to those claims are not addressed in this brief.

- "[O]verall environmental conditions at EMCF hinder proper sanitation practices and good personal hygiene while promoting unsafe, dangerous, and potentially life-threatening conditions," Exh. 5 ("Skipworth 2016 Rpt.") at 15;

- The harm of solitary confinement is exacerbated at EMCF by "aggravating conditions such as neglect by staff, non-functioning lights, inadequate medical and mental health treatment, the ever-present risk of assault, or a lack of cleaning supplies," *see* Exh. 7 ("Kupers 2016 Rpt.") at 1.

In response to Plaintiffs' expert designations, Defendant designated three experts: two correctional experts, Kenneth McGinnis and Tom Roth, who authored a joint report,[3] and a locksmith, Steven Stonehouse. *See* Dkt. No. 384. Defendant elected not to designate an expert on the topics of medical care, mental health care, environmental health and safety, or nutrition, and they chose to depose only two of Plaintiffs' six experts.

Beyond expert discovery, Plaintiffs have requested and reviewed numerous documents from Defendant[4] and taken 20 fact depositions of MDOC, MTC, and Trinity employees. Three witnesses, MDOC Deputy Commissioner, Jerry Williams; MTC Vice President for Region VI, Marjorie Brown; and Trinity District Manager, David Thumma, each testified as 30(b)(6) designee-witnesses on behalf of their respective organizations.[5] In addition, in response to questionnaires drafted and propounded by Defendant, 53 absent Plaintiff-class members provided detailed responses regarding their interactions with excessive uses of force, rampant violence,

---

[3] The joint report of Messrs. McGinnis and Roth is the subject of Plaintiffs' previously-filed *Daubert* motion, which argues that the report should be stricken because the authors assess EMCF under irrelevant standards, the jointly-authored report obscures an evidentiary and analytic evaluation, and the authors relied upon unverified and inaccurate data. *See* Dkt. No. 534.

[4] Defendant's sorely deficient and dilatory document production is the subject of Plaintiffs' pending motion for sanctions against Defendant. *See* Dkt. No. 537. In short, Defendant failed to produce over 10,000 pages of highly relevant documentary evidence, as well as 150 discs containing videos and photos of incidents at EMCF, until more than 15 days *after* the close of discovery. *See* Dkt. No. 538. To the extent that Plaintiffs have thus far been able to review this tardy production, the documents and video strongly suggest that there the conditions described in this brief have not abated in the 2017 calendar year.

[5] Throughout this memorandum, citations to the deposition testimony of MDOC, MTC, and Trinity's 30(b)(6) witnesses are styled as "MDOC Dep.," "MTC Dep.," and "Trinity Dep.," respectively.

inadequately nutritious or satiating meals, and decrepit environmental conditions at EMCF. The questionnaires detail the undignified, inhumane, and dangerous conditions to which prisoners are subject. Additionally, 17 Plaintiff-class members sat for depositions noticed by Defendant. Inexplicably, Defendant's Motion for Partial Summary Judgment, which broadly argues that there is an absence of evidence to support Plaintiff's claims, ignores this prisoner testimony, and more broadly, the bulk of the factual record in this case. *See* Dkt. No. 532 ("MSJ").

## SUMMARY JUDGMENT STANDARD

A party moving for summary judgment must identify each claim on which summary judgment is sought. Fed. R. Civ. P. 56(a). The movant bears the initial burden of demonstrating the basis for its motion and "that there are no factual issues warranting trial." *Russ v. Int'l Paper Co.*, 943 F.2d 589, 592 (5th Cir. 1991) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). If that initial burden is met, the non-movant must then "go beyond the pleadings" and identify "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324; *see also* Fed. R. Civ. P. 56(c). The movant "is entitled to summary judgment only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." *Deville v. Mercantel*, 567 F.3d 156, 163 (5th Cir. 2009) (internal quotation marks omitted). In evaluating the parties' positions, the Court must construe all facts and reasonable inferences in the light most favorable to the non-movant. *See Hanks v. Rogers*, 853 F.3d 738, 743-44 (5th Cir. 2017). The Court, however, "may not make credibility determinations or weigh the evidence," *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000), which remain the province of the factfinder at trial.

## LEGAL STANDARD

"[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Helling v. McKinney*, 509 U.S. 25, 31 (1993). Prison conditions need not be comfortable, and they may be "restrictive and even harsh," but they must also be humane. *Farmer v. Brennan*, 511 U.S. 825, 832–34 (1994) (citations omitted). Prison officials must therefore provide prisoners under their care with "adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" *Id.* at 832 (citing *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984)); *see also Helling*, 509 U.S. at 33 ("[W]hen the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—*e.g.*, food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment." (quoting *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 198–99 (1989))).

Whether a prison official violates a prisoner's Eighth Amendment rights is governed by the two-component test articulated in *Farmer v. Brennan*. The first component of the *Farmer* test, an "objective" component, requires a showing that the official's actions or omissions resulted in a "sufficiently serious" deprivation such that the prisoner is denied "the minimal civilized measure of life's necessities." 511 U.S. at 834. Importantly, under *Farmer*, the relevant inquiry is not whether the prisoner can demonstrate that he faced an actual deprivation—*i.e.*, that he has already been harmed by the prison official's actions—but rather, that he faces a "substantial *risk* of harm." *See id.* at 842 (emphasis added); *see also Helling*, 509 U.S. at 32 ("It would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them."); *Gates v. Cook*, 376 F.3d 323, 333 (5th Cir.

2004) ("It is also important to note that the inmate need not show that death or serious illness has occurred.") Further, "[c]onditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise." *Gates*, 376 F.3d at 333 (citing *Wilson v. Seiter*, 501 U.S. 294, 304 (1991)).

The second component of the *Farmer* test, a "subjective" component, seeks to inquire into the prison official's state of mind, and asks whether the official displayed "'deliberate indifference' to inmate health or safety."[6] 511 U.S. at 834 (quoting *Wilson*, 501 U.S. at 302–03). "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Id.* at 842 (noting, by way of example, that the factfinder may rely upon "evidence showing that a substantial risk of inmate attacks was 'longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk'"). Additionally, "a factfinder may conclude that a

---

[6] While *Farmer* plainly addressed claims related to nutrition, environmental conditions, and protection from harm, it did not directly comment on the standard to be applied in excessive force cases. An earlier case, *Hudson v. McMillian*, held that in the context of a prisoner's claim against the specific officer that used force against him, the core judicial inquiry was "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." 503 U.S. 1, 7 (1992). But later courts have clarified that *Hudson v. McMillian*'s standard for individual officer liability does not apply where prisoners seek redress against prison officials whose failure to supervise and train officers resulted in excessive uses of force. Rather, in such cases, the normal *Farmer* test governs. *See Smith v. Brenoettsy*, 158 F.3d 908, 912 (5th Cir. 1998) (applying the *Farmer* test in the context of a supervisory liability claim); *see also Valdes v. Crosby*, 450 F.3d 1231, 1236 (11th Cir. 2006) (affirming that supervisors may be held liable for the excessive force of their subordinates on a theory of supervisory liability); *Curry v. Scott*, 249 F.3d 493, 506 n.5 (6th Cir. 2001) ("Prison officials are held liable for *exposing* prisoners to excessive force at the hands of prison employees under the same 'deliberate indifference' standard that *Farmer v. Brennan* employs for prison officials who *fail to protect* inmates from violence by others."); *Blyden v. Mancusi*, 186 F.3d 252, 265 (2d Cir. 1999) ("Just as prison officials may be liable for their deliberate indifference to protecting inmates from violence at the hands of fellow inmates, they may also be liable for their deliberate indifference to violence by subordinates" (citing *Farmer*, 511 U.S. at 832–33)).

prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.* Prison officials found to have actual knowledge of a substantial risk to prisoner health or safety might escape liability, but only if they are found by the factfinder to have "responded reasonably to the risk." *Id.* at 844.

## **ARGUMENT**

Defendant accuses Plaintiffs of employing a "scattershot strategy" of alleging harms based on "overall conditions" at EMCF, rather than deprivations of identifiable human needs. *See* MSJ at 1, 6. Defendant is mistaken. To make perfectly clear, Plaintiffs allege that Defendant's callous and contemptable operation of EMCF deprives prisoners of their basic humanity, including through deprivation of the following identifiable human needs: adequate medical care (Claim 1); adequate mental health care (Claim 2); non-isolated confinement (Claim 3); protection from the excessive use of force (Claim 4); protection from the risk of assault and other bodily harms (Claim 5); sanitary and safe environmental conditions (Claim 6); and adequate nutrition (Claim 7).[7]

The record evidence, supplemented by the findings of Plaintiffs' experts, as well as the testimony of numerous employees of MDOC, MTC, and Trinity, supports Plaintiffs' allegations, and demonstrates that Defendant is not entitled to partial summary judgment on any of Plaintiffs' claims. The conditions under which Plaintiffs are housed pose a substantial risk of harm to their health and safety, and are patently obvious to even a casual observer at the facility. Despite its longstanding awareness of the risks of harm posed by Plaintiffs' complained-of conditions,[8]

---

[7] Defendant seeks partial summary judgment on Claims 3, 4, 5, 6, and 7. While Defendant's memorandum discusses Claims 3 and 7 together, and then Claim 6 separately, Plaintiff addresses Claims 3 and 6—the environmental conditions claims—together, and Claim 7—the nutrition claim—separately for ease of organization and explanation.

[8] Defendant vaguely notes that conditions inside EMCF have changed since Plaintiffs originally filed their Complaint in 2013. *See* MSJ at 3. While Housing Unit 6 may no longer be a segregated housing unit, the

Defendant remains deliberately indifferent to those risks. Moreover, the "reasonable measures" Defendant purports to have taken in response to the known risks are anything but. The measures merely pay lip service to Plaintiffs' harms, and fail to actually address the very serious problems underlying Plaintiffs' Complaint. On such a record, summary judgment is neither warranted nor appropriate, and should be denied.

### A. Defendant Is Not Entitled to Summary Judgment on Plaintiffs' Excessive Use of Force Claim (Claim 4)

EMCF is not a prison environment where, in isolated and aberrant events, well-trained and supervised correctional staff sometimes cross a line and use more force than necessary as part of their good faith effort to restore order. Rather, the record is replete with evidence that at EMCF, force is routinely applied in a manner that is unnecessary and excessive, particularly when considering the special needs status of a significant proportion of EMCF's prisoner population. Indeed, the record reveals that at EMCF, staffing and supervisory functions are so deficient that force is systematically applied in a manner that not only offends the minimum constitutional standard, but also Defendant's own prescribed policies for the use of force (which are, themselves, inadequate in certain respects).[9] *See Slaken v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984) ("Even

---

conditions that originally gave rise to the Housing Units 5 & 6 Subclass remain present. *See infra* pp. 51–69. Indeed, EMCF remains the same decrepit and degrading prison that it was more than four years ago, and continues to subject Plaintiffs to substantial risks of harm to their health and safety. Defendant offers no evidence to suggest that that fact has or will change, absent Court intervention.

[9] Defendant curiously cites to *Nigro v. Carrasquillo* for the proposition that "Plaintiffs' claim is a non-starter . . . because 'excessive force claims under Section 1983 require a great deal of individualized inquiry inappropriate for resolution on a class-wide basis.'" MSJ at 11. *Nigro* was a Fourth Amendment case, and the court there was asked to address whether a specific police tactic was *per se* unconstitutional. CASE NO. 15-60919-CIV-COHN/SELTZER, 2015 WL 9244606, at *2 (S.D. Fla. Dec. 17, 2015). The case is wholly inapposite to evaluating Plaintiffs' claims here. Unlike *Nigro*, in the Eighth Amendment prison conditions context, numerous other courts have heard—and issued injunctions on the basis of—class-wide excessive force claims. *See, e.g.*, *Madrid v. Gomez*, 889 F. Supp. 1146, 1255 (N.D. Cal. 1995); *Ruiz v. Johnson*, 37 F. Supp. 2d 855, 929, 939–40 (S.D. Tex. 1999), *rev'd on other grounds sub nom. Ruiz v. United States*, 243 F.3d 941 (5th Cir. 2001), *adhered to on remand*, 154 F. Supp. 2d 975 (S.D. Tex. 2001). Defendant's argument that class-wide relief is not available, is, quite simply, misleading.

when a prisoner's conduct warrants some form of response, evolving norms of decency require prison officials to use techniques and procedures that are both humane and restrained."). Moreover, given Defendant's deficient policies and practices, the risk that force will be applied excessively is substantial.

     *1.*     **_A Pattern of Excessive Force at EMCF Poses a Substantial Risk of Harm_**

In prison environments, including at EMCF, uses of force are categorized as either "spontaneous" or "planned." As Plaintiffs' expert, Mr. Vail, explained:

> A spontaneous use of force (SUOF) is appropriate when the inmate presents an immediate or imminent risk of harm, for example when an inmate is assaulting someone and will not respond to verbal orders to cease his actions. A planned use of force (PUOF) is appropriate when there no immediate risk of harm, for example when an inmate is refusing orders to submit to handcuffs and come out of his cell. In this example the inmate is confined to a cell and presents no immediate or imminent risk of harm. This gives the officers the advantage of time and circumstance and allows the opportunity for staff to attempt to create a dialogue with the inmate and de-escalate the situation so that use of force might be avoided. This is especially true for inmates who are mentally ill.

Vail 2016 Rpt. ¶ 134; *see also* Exh. 1 ("Vail 2014 Rpt.") ¶ 99 ("The decision to utilize the planned use of force approach as opposed to spontaneous use of force is one of the most critical factors in keeping both prisoners and staff safe. A planned use of force takes advantage of both the physical security of the prison and time, which provides an opportunity to work to try and avoid force altogether.").

But while MDOC's use of force policy describes planned uses of force as a "preferred tactic," it does not provide "any clear instruction in how a planned use of force should proceed." *See* Vail 2014 Rpt. at ¶ 87. Moreover, as Mr. Vail noted, the policy fails to fully define spontaneous uses of force, providing only that it is "[a] use of force employed as an immediate response to a specific act." *Id.* at ¶ 98. The lack of further a further definition clarifying that the "specific act"

must be serious or imminent—*i.e.* that there is "a level of threat present to justify the immediate use of force"—leaves room for officers "to use force anytime an inmate refuses or fails to follow an order, no matter how trivial." *See id.* Unfortunately, notwithstanding Mr. Vail's criticism, to Plaintiffs' knowledge, substantially the same use of force policy remains in place at EMCF today. Indeed, the policy on which Mr. Vail commented in 2014 is the same policy on which Defendant's experts relied to form their opinions about use of force at EMCF. *See* Exh. 10 ("McGinnis-Roth Rpt.") at 24.

As a consequence of this insufficient policy, as well as a broader culture that endorses force at EMCF,[10] the record evidence shows that spontaneous uses of force are routinely utilized in situations that should be treated as planned, and "[e]ven when it is called a 'planned use of force,' EMCF fails to meet the requirements for a planned use of force." Vail 2014 Rpt. ¶ 99; *see also id.* ¶ 89 (noting that based on reviewing videos of "planned" use of force incidents, "it does not appear that [staff's] efforts at verbal intervention were meaningful"); Vail 2016 Rpt. ¶¶ 134 (noting that there is opportunity to de-escalate during a planned use of force). Put differently, prisoners at EMCF are subjected to excessive applications of force—including spraying by chemical agents— that would be avoided if staff had a clear understanding of, and cultural adherence to, sound use of force practice. *See Peterson v. Peshoff*, 216 F.3d 1079 (5th Cir. 2000) (unpublished table

---

[10] That culture includes supervisors who view use of force videos as a source of entertainment. As former MTC employee, Marilyn Braxton testified, on one occasion, a shift captain, Captain Dykes, showed her a use of force video in which a prisoner had been shot in the face. *See* Exh. 18 ("Braxton Dep.") at 135:2– 21. Ms. Braxton said that Captain Dykes showed her the video "for entertainment," and that he was "laughing" while watching it. *Id.* On another occasion, Captain Dykes showed Ms. Braxton a video of a Lieutenant Cooney applying force on a prisoner. *See id.* at 185:13–18. He introduced the video to her by saying, "Let me show you Lieutenant Cooney in action." *Id.* Plaintiffs understand that Lieutenant Cooney has since been placed on administrative leave for using excessive force against a prisoner in another incident, and that Captain Dykes has been promoted to the rank of Major, and now serves as the Chief of Security for EMCF (which includes the responsibility of reviewing all use of force incidents for possible violations, *see* Exh. 19 ("Brown Dep.") at 98:3–14).

decision) (per curiam) (holding that plaintiff, who alleged that defendants "spray[ed] him with mace without provocation while he was confined in his cell," stated a claim for relief under the Eighth Amendment); *Curry*, 249 F.3d at 506 (holding that plaintiffs' alleged harm, being beaten without cause by a prison guard, is "sufficiently serious" to satisfy the objective component of the *Farmer* test). Such adherence is particularly critical here given the mental health status of most of EMCF's prisoner population. *See Thomas v. Bryant*, 614 F.3d 1288, 1312 (11th Cir. 2010) (finding that the Florida DOC's policy of spraying people with mental illness with chemical agents while they are secured in cells, not presenting a threat of immediate harm to others, and unable to understand and comply with officers' orders due to mental illness, violates the Eighth Amendment's objective harm requirement); *Stewart v. Stalder*, Civil Action No. 05-0416-P, 2007 WL 184892, at *4 (W.D. La. Jan. 19, 2007) (holding that the plaintiff could state an Eighth Amendment violation if he could prove officials used mace to compel him to follow an order when they had knowledge that his mental health prevented him from complying).

During his 2014 review of the prison, which included a close examination of approximately 382 use of force reports and/or videos, Mr. Vail summarized the evidence in the record and was highly critical of use of force policy and practice at EMCF, both in the segregation and general population units. *See* Vail 2014 Rpt. ¶¶ 80–135. In his 2014 Report, Mr. Vail described numerous specific use of force incidents demonstrating a pattern of excessive and improper applications of force, and non-compliance with EMCF use of force policy. A few are reproduced here, though each example in the report is worth examining:

- In a[n] example from [2014], the door to the prisoner's cell is surrounded by fully suited up CERT team members when the mental health counselor approaches the door to talk. The counselor asks the inmate if he has any mental health issues and then turns to the camera and reports that he does not. The entire exchange takes about five seconds, and the use of force then proceeds.

- In [a] use of force video from January 2014, the prisoner is sprayed through his tray slot with no warning. Officers then attempt to force the tray slot closed while the inmate's fingers are in the hinge area between the tray and the cell door. As they do so, the inmate screams in pain. They do it a second time and the inmate screams in pain again, and staff spray him again. It is hard to see this event as anything other than physical torture.

- In another use of force incident, the video shows custody officers taking advantage of the inmate's conversation with a person who appears to be from mental health. The camera shows the inmate with his face fully exposed in the tray slot expressing his frustration with the treatment he has received in segregation, saying that he has been "treated like a dog." Without warning, an officer appears at the side of the cell and sprays the inmate directly in his face. Such a "sneak attack" completely destroys any trust the inmate might have in speaking with mental health staff and will likely make the prisoner much harder to manage in the future.

*Id.* at ¶¶ 95, 97, 105; *see also* Exh. 85 at DEF-027668 to -77, -28654 to -67, -30549 to -57. Mr.

Vail noted that these incidents—and others like them—made clear to him that "the incompetence

of the custody staff at EMCF, and the lack of sufficient supervisory review, is profoundly and

deeply troubling," and that "as a result of Defendant's policies and procedures, prisoners at EMCF

are subjected to unnecessary, dangerous, and excessive force by officers and are at substantial risk

of serious harm, including death." *See id.* at ¶¶ 134–35.

Reviewing the prison's use of force policy and practice again two years later, Mr. Vail

affirmed his concerns with use of force at EMCF based on the evidence in the record:

In my first report in this case, I criticized EMCF for failing to follow the good correctional practice of allowing mental health staff to engage in attempts to de-escalate potential PUOF situations so that violence could be avoided. . . . From my review of EORs and use of force videos, I remain critical of EMCF. I do not see that they have made progress in this area—slowing situations down so they can be turned into PUOF instead of SUOF, or in providing meaningful mental health interventions when incidents are being managed as PUOFs.

Vail 2016 Rpt. ¶ 136. Unlike Defendant's experts, whose analysis largely hinged on accepting as

true the hearsay explanations of prison administrators, *see* McGinnis-Roth Rpt. at 25–28, Mr. Vail

reached his conclusions, as he did in 2014, after closely examining a significant volume of use of

13

force reports and videos. Again, in his 2016 Report, Mr. Vail described examples of improper and unnecessary uses of force at EMCF that are exemplary of the pattern of excessive force at the prison. *See id.* at ¶¶ 137–54. A few of those examples are reproduced here:

- On January 22, 2015 a Captain was walking by a cell door in segregation when an inmate threw an unknown liquid substance on him through the food tray slot. There is no indication that the Captain was in any immediate danger and, in my opinion, no immediate response was required. Rather than back away from the cell and create an organized response, the Captain immediately sprayed the inmate with a chemical agent. Once again, mental health staff was called to the scene but not until after the inmate was already sprayed.

- On May 16, 2015, during feeding time, an inmate had his arm through the food tray slot and refused to remove it and verbally threatened staff. Even though there was no immediate danger to the officer given the inmate was secure behind a locked cell door, the inmate was still immediately sprayed with a chemical agent. In this case there is no mention of involving mental health staff to de-escalate the situation either before or after the spray was used. This too should have been executed as a PUOF.

- In another report from October 20, 2015, an inmate was refusing to be restrained to come out of the recreation cage and be returned to his cell. It was treated as a PUOF situation. Again mental health was called for and the report says: "[Mental Health Counselor] Anderson spoke briefly with [the inmate] and stated on camera that the offender was not under no type of mental distress and his refusal towards staff was only behavioral." The use of the word "briefly" emphasizes that the involvement of mental health staff is only cursory and not meaningfully purposed to attempt to de-escalate the situation so that force might be avoided.

*Id.* at ¶¶ 139, 143, 150. The examples Mr. Vail provided in his 2016 analysis are remarkably similar to those from several years earlier, demonstrating a lack of improvement on, or even attention paid to, the underlying problem by prison officials. Officers at EMCF continued to lack understanding of when spontaneous force is appropriate, and in planned situations, failed to grasp the importance of mental health intervention. *See id.* at ¶¶ 145, 154. Thus, again, Mr. Vail's 2016 review of MDOC's use of force practices revealed a prison where force is unnecessarily applied in situations where the application could have been avoided given the prisoner posed no threat to officer or

prisoner safety. *Accord Treats v. Morgan*, 308 F.3d 868,873 (8th Cir. 2002) ("A basis for an Eighth Amendment claim exists when, as alleged here, an officer uses pepper spray without warning on an inmate who may have questioned his actions but who otherwise poses no threat.").

Other evidence in the record also shows a practice of excessive use of force. Prisoners at EMCF have described being involved in or witnessing use of force incidents where force was administered unnecessarily and excessively. For example, Prisoner Saul Mata testified that in late 2016, he witnessed an excessive use of force in which a prisoner who could not tell "right from wrong" because he is a "psych patient[]" got sprayed with a significant amount of mace by an officer because he was "kicking the door." *See* Exh. 24 ("Mata Dep.") at 24:16–25:20. Prisoner David Grogan noted that he had witnesses staff deploy chemical agents on prisoners "while they are locked behind their doors" about 50 times, but that mental health counselors are only called prior to the incident about half of the time. *See* Exh. 32 ("Grogan Decl.") ¶ 15 (describing that sometimes officers do not call for mental health counsellors at all, and other times, they do call but then either do not wait for the counsellor to arrive or are told that the counsellor will not come to the scene). And prisoner Alfonzo Griffin described seeing officers "mace prisoners often inside of their cells . . . without getting a camera and without calling for mental health," or simply for not closing their tray flaps. *See* Exh. 31 ("Griffin Decl.") ¶ 33–35.

Further evidence in the record supporting a pattern of problematic use of force incidents at EMCF comes from former and current prison staff. Ms. Braxton, who worked at EMCF between 2013–2017, testified during her deposition that she personally witnessed prison staff engage in at least 50 excessive uses of force against prisoners. *See* Braxton Dep. 131:19–132:7. And since September 2014, the MDOC Contract Monitor has regularly found the facility to be in non-compliance with most evaluative criteria related to the "Use of Physical Force and Restraints":

| Criteria Assessed | Months Finding Non-Compliance | |
|---|---|---|
| Policy governing immediate/calculated use of force consistent with MDOC [policy]. | **2015:** | September, October, November, December; |
| | **2016:** | January, February, March |
| All use of force incidents documented and reviewed. | **2014:** | September, October, November, December; |
| | **2015:** | January, February, March, April, May, June, August, September, October, November, December; |
| | **2016:** | January, February, March, April, May, June, July, August, September, October, December |
| Use of Force consistent with law and MDOC [policy], incident report prepared and MDOC notified asap by phone/fax, contract monitor notified. | **2014:** | September; |
| | **2015:** | September, October, November, December; |
| | **2016:** | January, February, March, May, June, July, August, September, October, December |
| Incident reports, other than critical, furnished w/in 1 week. | **2015:** | September, October, November, December; |
| | **2016:** | January, February, March, April, May, June, July, August, September, October, December |
| Video tapes of incidents preserved/catalogued as per MDOC [policy]. | **2015:** | September, October, November, December; |
| | **2016:** | January, February, March, May, June, July, August, September, October, December |
| Offender is seen by medical immediately after incident. | **2014:** | September, October, November, December; |
| | **2015:** | January, February, March, April, June, July, August, September, October, November, December; |
| | **2016:** | January, February, March, May, June, July |
| Facility subscribes to prescribed confrontation avoidance procedures. | **2014:** | October, November, December; |
| | **2015:** | January, February, March, April, May, June, July, August, September, October, November, December; |
| | **2016:** | January, February, March |
| Medical staff consulted prior to calculated use of force situations. | **2015:** | September, October, November, December; |
| | **2016:** | January, March, May, June, August, September, October, December |

The Contract Monitor's findings echo those of Mr. Vail, particularly in noting that during significant portions of the two-year period ending in 2016, the facility routinely failed to apply force in a manner "consistent with law and MDOC [policy]," did not "subscribe[] to prescribed confrontation avoidance procedures," and did not "consult [medical staff] prior to calculated use

of force situations." *See, e.g.*, Exh. 44 at lns. 140–150.[11] Moreover, because the facility failed to

"document[] and review[]" all use of force procedures during that time period, and failed to always

"preserve[]/catalogue[]" video tapes of incidents, *see id.*, it is impossible to know just how many

more use of force incidents failed to either adhere to MDOC policy, or worse, were excessive in

nature. *Accord Madrid*, 889 F. Supp. at 1180 ("Indeed, given the code of silence, the lack of

specificity in many incident reports, and the fact that some number of incidents go unreported by

staff and inmates, it is surely impossible to determine conclusively the number of times that

excessive force has been used against inmates at Pelican Bay."). MDOC itself confirmed that one

of the basic purposes of these documentation requirements is for "accountability." *See* MDOC

Dep. 171:15–172:12. More broadly, when asked about the Contract Monitor's findings, MDOC

was clear that non-compliance in the use of force-related evaluative criteria "jeopardizes safety of

staff and offenders." *See id.* at 170:6–174:23, 175:17–176:7. Such clarity notwithstanding, non-

compliance with appropriate use of force procedure persists at EMCF, and places all prisoners at

risk of having force excessively used against them.

     Defendant argues that the factual record notwithstanding, Plaintiffs cannot satisfy the

objective component of *Farmer* with respect to their use of force claim because the evidence does

not disclose "pervasive conduct resulting an imminent threat." *See* MSJ at 12 (citing *Lakin v.*

*Barnhart*, No. 1:11-cv-00332-JAW, 2013 WL 5407213, at *7–8 (D. Me. Sept. 25, 2013)). But that

is not the test. *Farmer*, and indeed the *Lakin* case on which Defendant relies, requires a showing

of substantial *risk*, not conduct. *See Farmer*, 511 U.S. at 843 (describing the relevant question as

"whether prison officials, acting with deliberate indifference, exposed a prisoner to a sufficiently

---

[11] A compilation of the relevant pages from the monthly reports between September 2014 and December
2016 provides the underlying information from which the above chart was created. *See* Exh. 65.

substantial risk of serious damage to his future health"); *Lakin*, 2013 WL 5407213, at *6 (equating *Farmer*'s "substantial risk" test with a determination whether risk is "pervasive"). In *Lakin*, a protection from harm case, the district court found such risk lacking because there had only been a few prisoner attacks involving padlocks over a several year period. 2013 WL 5407213, at *7–8 ( "[A] pervasive *risk* of harm may not ordinarily be shown by pointing to . . . isolated incidents, but it may be established by much less than proof of a reign of violence and terror" (emphasis added) (quoting *Shrader v. White*, 761 F.2d 975, 978 (4th Cir. 1985))).[12] Here, by contrast, the record evidence, which includes a pattern of excessive applications of force, demonstrates that as a result of Defendant's use of force policies and practices, Plaintiffs' exposure to the risk of excessive force is not aberrant or isolated, but objectively intolerable, *i.e.*, substantial.

Nevertheless, Defendant's own statistics further demonstrate the pervasiveness of uses of force at the prison. In 2016 alone, there was a monthly average of 20.3 documented use of force incidents, including 9.5 incidents per month involving the use of chemical agents. *See* McGinnis-Roth Rpt. at 25 (showing a substantial increase in use of force at EMCF between 2015 and 2016). While Plaintiffs by no means suggest that each use of force incident was not justified, the risk presented by them—due to a lack of consistent accountability and oversight, inadequate training, untimely and inadequate review of use of force incidents, insufficiently defined policy, and a lack of understanding of when and how to apply appropriate levels of force—is ever-present. *See supra*

---

[12] Notably absent from Defendant's brief is the fact that on appeal, the First Circuit explicitly *declined* to rule on whether "pervasiveness" provides the appropriate definition for determining whether a risk is "substantial" under *Farmer*. *See Lakin*, 758 F.3d 66, 71 (1st Cir. 2014) ("This Circuit has not yet had occasion to attempt precision in explaining when the risk of violence among inmates is sufficiently "substantial" to satisfy the first prong of *Farmer*, and we need not close in on it now."). Rather, the First Circuit affirmed the district court on the basis that the risk alleged was not substantial, no matter how the term is defined. *Id.*

p. 10–17 (describing Mr. Vail and the Monitor's findings with respect to use of force at EMCF). Moreover, the record evidence shows a clear pattern of use of force incidents over a several-year period that, as Mr. Vail described, could have been avoided had EMCF staff adhered to minimally necessary use of force avoidance techniques.[13] *See id.*; *see also Madrid*, 889 F. Supp. at 1180 ("[T]he size of an institution does not mandate that plaintiffs prove some particular number of incidents to demonstrate the presence of a pattern of excessive force."). That pattern includes prisoners' numerous disclosures of other incidents where they were subjected to excessive force that might have been avoided but for EMCF staff's failure to adhere to minimally necessary use of force avoidance techniques. It includes the MDOC Contract Monitor's reports, which found, over a several-year period, that EMCF is routinely and consistently non-compliant in its adherence to critically important use of force policies and practices. And, it includes MDOC's own testimony, which admits that failure to adhere to use of force policies and practices evaluated by the Monitor "jeopardizes safety of staff and offenders." For Defendant to suggest then that the risk of harm from excessive uses of force is not "pervasive" or "imminent" at EMCF is wholly inconsistent with the factual record.

### 2. *Defendant Is Deliberately Indifferent to the Risks Created by an Excessive Use of Force*

Just as the factual record discloses a pattern of EMCF correctional staff engaging in the excessive use of force against prisoners, it also reveals that this pattern of abuse has been well-

---

[13] It is also worth noting that at EMCF, uses of force are sometimes preceded by prisoners trying to "register frustration and complaints" with prison staff, including by placing their hands through the food tray slot. *See* Vail 2016 Rpt. ¶ 136; *see also* McGinnis-Roth Rpt. at 25–26 (describing an increase in uses of force to address the issue of prisoners placing their hands through their food tray slot). As described below, however, those frustrations are exacerbated by EMCF's non-functional grievance system. *See infra* note 34; *see also* Vail 2014 Rpt. ¶¶ 69–79. With prisoners unable to have their legitimate concerns heard by staff, they may act out, starting the cycle towards what might otherwise be an avoidable use of force. *See* Vail 2014 Rpt. ¶¶ 72, 79, 81.

known to, and remains unremedied by, Defendant, which is all that is required under *Farmer*. 511 U.S. 842–43 (noting that evidence of a substantial risk that is "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past . . . could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk," as can demonstration that the risk is "obvious"). Most notably, the Contract Monitor's routine findings or non-compliance with respect to use of force are provided to at least MDOC's Director of Regional and Private Prisons and to the Warden of EMCF. *See* MDOC Dep. 58:22–25. And, these repeated findings of non-compliance were repeatedly made despite the fact that at EMCF, *each* use of force is supposed to be reviewed by the facility's Chief of Security, meaning that Defendant should be able to see and correct the deficiencies in EMCF staff's applications of force that the Contract Monitor and Mr. Vail identified.[14] *See* Brown Dep. 97:23–98:14; *but see generally supra* p. 16 (noting that for 26 of the 28 months between September 2014 and December 2016, the Contract Monitor found the facility non-compliant with the requirement that "[a]ll use of force incidents [are] documented and reviewed.").

Of course, Defendant's motion for partial summary judgment does not contest that Defendant *knows* of the substantial risk of harm posed by the excessive use of force at EMCF. Rather, Defendant argues only that it has "responded more than 'reasonably' to use-of-force concerns." *See* MSJ at 12 (citing *E.A.A.F. v. Gonzales*, 600 F. App'x 205, 214 (5th Cir. 2015)). The evidence Defendant cites in support of its argument, however, does not demonstrate that it took reasonable steps to abate the substantial risk of harm posed by the excessive use of force at EMCF, and certainly does not demonstrate the lack of any material dispute on that point.

---

[14] The Contract Monitor's non-compliance findings were made even after Plaintiffs' expert, Mr. Vail, clearly identified for MDOC the significant deficiencies in many of the same use of force policies and practices the Contract Monitor found to be deficient. *See generally* Vail 2014 Rpt.

First, Defendant references staff training, pre-shift briefings, use of force investigations, and discipline as evidence of its reasonable response. *See* MSJ at 12–13. But there are genuine disputes about the reasonableness of these programs, which should be left to the trier of fact. As Mr. Vail and the Contract Monitor have both found, the training program is inadequate. Staff at EMCF have "insufficient training and experience to manage a population of mentally ill or close custody inmates." *See* Vail 2016 Rpt. ¶ 24; *see also* Exh. 64 at ln. 15 (showing that in 10 out of 12 months of 2015, and in April 2016, the Contract Monitor found EMCF non-compliant with the requirement that "[t]he facility conducts appropriate orientation, initial training, and annual training for all staff, contractors, and volunteers").[15] Indeed, the inadequacy of the training and pre-shift briefing program is made obvious by the fact that it so consistently yields non-compliance findings on nearly every measured metric related to use of force.[16] *See supra* p. 16. Even MDOC itself acknowledges that the Contract Monitor's findings on use of force, which persisted for months, means that appropriate corrective action is not being taken. *See* MDOC Dep. 176:20–25.

Moreover, the evidence shows that staff fail to appropriately document use of force incidents or to preserve and catalogue videos of such incidents. Accordingly, it is impossible for the facility to actually conduct complete investigations of each questionable uses of force, or discipline the involved officers. *See* MDOC Dep. 171:15–172:18 (agreeing that "[i]f reports aren't

---

[15] This exhibit is a compilation of the relevant pages from the monthly Contract Monitor reports. An example of a monthly Contract Monitor report in full, from December 2016, can be found at Exh. 44.

[16] With respect to pre-shift briefings specifically, Defendant's only cited evidence does not actually state that pre-shift briefings consistently cover—at any level of depth—appropriate use of force procedure and practice. Rather, it only discloses that *if* the staff involved in one specific incident received additional *training and instruction on self-defense tactics*, they would have received it during a 15-minute pre-shift briefing. *See* MSJ at 12 (citing Shaw Dep. 113). Defendant also provides no evidence regarding the contents of use of force training provided to staff, leaving no measurable mechanism by which to determine its adequacy (except by reference to the fact that the Monitor's non-compliance findings strongly suggest that it is not adequate).

being prepared and incidents aren't being videotaped, MDOC can't properly evaluate whether use of force incidents are consistent with policy and the law"). And, even where questionable conduct is found, there is no guarantee that the offending staff will actually be disciplined. *See infra* p. 31 (describing deficiencies in the facility's staff discipline program).

Finally, Defendant's citation to its use of force statistics for the proposition that "officers and staff at EMCF are making an effort to reduce the need for force at EMCF, and where that force is required, applying it in a planned manner as opposed to spontaneously reacting to a situation," is disingenuous at best. MSJ at 13. First, between 2015 and 2016, use of force at EMCF nearly *doubled*, suggesting that any effort EMCF staff exerted towards reducing the use of force was, to put it mildly, unsuccessful. *See* McGinnis-Roth Rpt. at 25. Second, while planned uses of force did increase slightly in 2016 as compared to in 2015, the problems in EMCF's use of force practice arise in *both* spontaneous and planned situations. *See* Vail 2016 Rpt. ¶¶ 132–154; *see also* Exh. 3 ("Vail Rebuttal") ¶ 37 (noting that Defendant's statistics "present[] a false and rosy picture" of use of force at EMCF and that more than 72% of all uses of force are still spontaneous). Moreover, there is nothing in the record to suggest that, to the extent staff performance on use of force at EMCF is improving (though the evidence cited above strongly disputes such a claim), dangerous and non-compliant habits will not persist or worsen after this litigation ends. Indeed, even *with* Court and public scrutiny, the conditions at EMCF have hardly changed.

\* \* \*

As described above, the evidence in the record makes abundantly clear that at a minimum, there are genuine issues of material fact as to both the use of force at EMCF and Defendant's response to it. Summary judgment therefore must be denied.

**B.** **Defendant Is Not Entitled to Summary Judgment on Plaintiffs' Protection from Harm Claim (Claim 5)**

Plaintiffs' protection from harm claim is unquestionably governed by the two-component test articulated by the Court in *Farmer*. *See supra* pp. 6–8. But Defendant misstates the test here. Defendant submits that "[f]or the violence allegations to be actionable, Plaintiffs must show that the threat is so imminent that 'terror reigns.'" *See* MSJ at 14. That is simply not the case. *See Horton v. Cockrell*, 70 F.3d 397, 401 (5th Cir. 1995) ("There is no concise definition of what types of prison conditions pose a 'substantial risk of serious harm' under the Eighth Amendment."). Rather, the Fifth Circuit has instructed courts to apply the objective component of *Farmer* "'contextually,' making sure to be responsive to 'contemporary standards of decency.'" *Id.* (quoting *Hudson v. McMillian*, 503 U.S. at 8). Included as part of such inquiry is the question "whether society considers the risk . . . to be so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk," and the acknowledgment that "[p]rison authorities must protect not only against current threats, but also must guard against 'sufficiently imminent dangers' that are likely to cause harm in the 'next week or month or year.'" *Id.* (quoting *Helling*, 509 U.S. at 33, 36); *see supra* pp. 7–8. Nonetheless, the objective facts below certainly describe a terrifying prison, where prisoners face the risk of violent assault daily. They also show that such risk is directly tied to Defendant's deliberate indifference to the dangerous conditions at EMCF. The evidence in the record thus more than satisfies Plaintiffs' burden to show triable disputes of material facts as to the substantial risk of serious harm in the prison, and Defendant's indifference to such risk.

**1.** **Defendant's Failure to Protect Plaintiffs Subjects Them to a Substantial Risk of Harm**

The assault statistics compiled by Defendant's experts reveal some stark realities about the

number of assaults at EMCF. In 2016, on average, there was an assault inside the prison almost every other day. *See* McGinnis-Roth Rpt. at 71–72. Approximately every 5 days, the assault was classified "serious," meaning that it required "urgent and immediate medical treatment and restrict[ed] the Offender's normal activity." *See id.* at 68–69, 71–72. At least one assault occurs per month in each housing pod at EMCF, but assaults also regularly occur in the hallways in between the housing units. *Id.* at 69–72. These statistics are largely unchanged from the prior year, *id.*, and as described in Plaintiffs' *Daubert* motion, undercount the actual number of assaults at the facility as a result of Defendant's unsound counting methodology. *See* Dkt. No. 535. The statistics also necessarily cannot include those assaults that go unreported by prisoners, a practice that is not at all uncommon in prison environments, including EMCF. *See Depriest v. Walnut Grove Corr. Auth.,* Civil Action No. 3:10-cv-663-CWR-FKB, 2015 WL 3975020, at *13 (S.D. Miss. June 11, 2015) (Reeves, J. presiding) ("When gangs run amok and control a facility, as they do here, it certainly can lead to riots, but it also can lead to significant underreporting of assaults and other crimes that occur at the prison."); *see also* Exh. 30 ("Campbell Decl.") ¶ 21 (describing a "48 hour rule that if you have been injured or have injured someone in a gang related violation, you cannot seek medical treatment for 48 hours . . . to keep officer presence off the zone"); Exh. 34 ("Jones Decl.") ¶ 39 (stating that injured prisoners are required by gang members to stay in their cells after an assault).

The high number of assaults at EMCF only tells part of the story. Even where they are not actually assaulted, prisoners at EMCF daily face a "substantial risk" of bodily harm, including death, at the hands of other prisoners. These risks—and the actualization of them—are directly attributable to Defendant's deliberate indifference to dangerous and pervasive conditions at the prison, including chronic understaffing and failure to follow minimally necessary safety

procedures, significant gang control, defective locking mechanisms on cell doors throughout EMCF, and the widespread availability of weapons. *See* Vail 2016 Report at ¶¶ 22–25 (concluding that EMCF remains a "very dangerous prison" where "authorities are not in control," where staff are "too few" and have "insufficient training and experience" to control the prison population, where "the prevalence of contraband . . . is alarming," and where "[v]iolence, often driven by the power and influence of gangs, is widespread"). While each of these conditions, viewed alone, could establish an objective basis on which to find a "substantial risk of harm" from conditions inside the prison, in combination, they leave no doubt that the result of their mutually reinforcing effect is to seriously endanger prisoners' lives and safety. *See Marsh v. Butler Cnty., Ala.*, 268 F.3d 1014, 1028 (11th Cir. 2001) (*en banc*) ("[C]onditions in a jail facility that allow prisoners ready access to weapons, fail to provide an ability to lock down inmates, and fail to allow for surveillance of inmates pose a substantial risk of serious harm to inmates."), *abrogated on other grounds by Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).

### a)   *EMCF Is an Understaffed Facility, Which Results in Unsupervised Pods and Delayed Responses to Emergencies*

At EMCF, three daily shifts of officers are employed to supervise prisoners. The first shift runs between 7 am - 3 pm, the second shift between 3 pm - 11 pm, and the third shift between 11 pm - 7 am. During each shift, certain posts, which require full-time coverage, are deemed "mandatory," meaning that under MTC's contract with MDOC, they must be staffed. *See* MDOC Dep. 110:20–111:4. As several MTC and MDOC employees explained, failure to staff mandatory posts makes the prison less safe and harms the safety and security of prisoners. *See, e.g.*, Exh. 21 ("Dykes Dep.") at 133:20–134:15; MDOC Dep. 115:25–116:5, 118:1–5. It also delays or prevents prisoners from accessing basic services like medical care. *See* Campbell Decl. ¶ 10 (noting that he was not able to go to a medical appointment because there were not enough officers available to

25

take him).

Despite this awareness of the dangers posed by understaffing, mandatory posts are consistently not staffed at EMCF. In November 2016, for example, on 23 out of 30 first shifts of the month, at least one mandatory post was not staffed.[17] *See* Exh. 68 (compendium of first shift rosters for November 2016). Similarly, during 15 out of 30 second shifts of November 2016, at least one mandatory post was not staffed. *See* Exh. 69 (compendium of second shift rosters for November 2016). And, during 14 out of 30 third shifts of November 2016, at least one mandatory post was not staffed. *See* Exh. 70 (compendium of third shift rosters for November 2016). Egregiously, in November 2016, there were 25 shifts (out of 90) during which at least 3 mandatory posts were not staffed by an officer. The month was not an outlier. For example, the first shift rosters for July 2015 similarly show the prison's consistent failure to staff mandatory posts. *See* Exh. 49 (showing that during 25 out of 31 first shifts in June 2015, the facility failed to staff at least one mandatory post).

Of course, even when the facility does assign officers to each mandatory post, there is no guarantee that those officers will remain in their position during their shift. Rather, the evidence shows that EMCF security staff routinely fail to stay on the posts to which they are assigned. *See, e.g.*, Exh. 50 (Monitor's July 2015 email noting that "[s]taff assigned to the units are not remaining on their pod; leaving the pod unsupervised"); Exh. 43 (Monitor's December 2014 note explaining that for at least the last four months, there was an on-going problem with "[s]ecurity checks not being conducted," and "[p]ods not being monitored by staff"); Exh. 83 at DEF-212959 (Monitor's July 24–31, 2016 report to MTC that she has "observed staff sitting in the entrance to the unit,

---

[17] On the EMCF daily shift rosters, mandatory posts are designated by the highlighting of their corresponding cells, and with an asterisk (except for the Shift Commander and Assistant Shift Commander posts, which are mandatory but not designated by asterisks). *See* Dykes Dep. 70:6–14.

looking to be doing nothing"), DEF-212961 (Monitor's August 1–7, 2016 report to MTC that there were "no security staff inside of kitchen (mostly sitting/standing in the hall)"), DEF-212963 (Monitor's August 8–13, 2016 report to MTC that on Units 5 and 6, "staff are not located where they can monitor pods/offenders (sitting in main entrance)"), DEF-212970 (Monitor's October 3–8, 2016 report describing a security officer asleep in the security tower), DEF-212975 (Monitor's October 22–29, 2016 report to MTC that on Units 5 and 6, she witnessed "staff sitting in entrance and offices" rather than conducting security checks), DEF-212977 (Monitor's October 31–November 6, 2016 report to MTC noting that on Housing Unit 7, there was "no security present; this happens too often and is a breach of security"); *see also* Vail 2016 Rpt. ¶¶ 108–113 (describing reasons for and impact of staff failing to stay on their assigned posts). As a result, in 23 out of the 27 months between September 2014 and December 2016 for which reports are available,[18] the Contract Monitor found the facility to be in non-compliance with the requirement that "[s]ecurity officer posts [are] located in or immediately adjacent to offender living areas to permit officers to see or hear and respond promptly to emergency situations." *See* Exh. 63 at ln. 42 (summarizing the Contract Monitor's non-compliance findings between September 2014 and December 2016).[19]

While such understaffing would be "irresponsible" in any prison environment, it is "particularly dangerous" at EMCF given the mental health status of many of its prisoners. *See* Vail 2016 Rpt. ¶¶ 93–98 (detailing several examples of how the dangers of understaffing actualize at EMCF). For instance, in his Report, Mr. Vail describes "a video from July 20, 2015 [which] shows an inmate being stabbed and chased around the unit for over a minute. It takes an officer almost two minutes from the time the stabbing began to enter the unit." *See id.* ¶ 94. Mr. Vail concludes

---

[18] No monthly report was prepared in November 2016. *See* Thomas Dep. 267:14–268:3.

[19] This exhibit is a compilation of the relevant pages from the monthly Contract Monitor reports. An example of a monthly Contract Monitor report in full, from December 2016, can be found at Exh. 44.

that "[h]ad an officer been in the unit when the assault began, it is highly likely that the incident would have gone on as long as it did and may not have even happened." *Id.*; *see also id.* ¶ 109 (describing an incident in which an inmate lit a fire, but there was "no staff response to the unit until 10 minutes after the incident"); *id.* ¶ 121 (describing video of a delayed security and medical staff response to a prisoner who set a fire in his cell, leading to a period of about one hour during which prisoner was unconscious from the smoke); Exh. 85 at DEF_ESI_0005994, DEF-028099 to -108, MDOC-CON-00001202 to -04. Confirming Mr. Vail and the Contract Monitor's findings, prisoners have also noted the persistent lack of staff supervision in the units, and the dangers posed by it. *See, e.g.*, Exh. 20 ("Clemons Dep.") at 51:20–52:58, 52:19–53:2 (describing not being able to get the picket officer's attention to get medical help, and seeing security officers asleep on their posts); Jones Decl. ¶ 5 (noting that staff do not conduct regular security checks, and that "this is dangerous . . . because if [prisoners] have a safety concern or a medical emergency, we have to wait until the next time an officer comes to the zone to get help").

Defendant asserts that the prison is not understaffed because, during 2016, "there were, on average, 156 correctional officers assigned to EMCF." *See* MSJ at 14. But that statistic, especially without any meaningful context around when, where, how, or to which posts these officers were assigned, sorely misses the point.[20] The daily shift rosters quite clearly demonstrate that no matter

---

[20] Even under its preferred staffing model, Defendant *still* fails to actually staff the posts it deems mandatory. Leaving that aside, it is worth further noting that the statistic is meaningless, because, among the other reasons described in text, it includes no discussion whether this baseline is sufficient. While Defendant's experts state that MTC's contract requires a minimum of 136 officers assigned to the facility, the underlying assumption is that the facility will be supervised under an "indirect supervision" model, meaning that correctional officers "are not required to be inside each living area on a 24/7 basis." *See* McGinnis-Roth Rpt. at 22. As Mr. Vail has explained at length, however, such a model is not appropriate at EMCF. *See* Vail Rebuttal ¶¶ 60–64 (explaining that "this staffing configuration explains one of the primary reasons why there is a high level of violence" at EMCF). Plaintiffs therefore do not have a "mere disagreement about trivial differences in staffing ratios," *see* MSJ at 14, but a disagreement about whether Defendant actually staffs EMCF in a manner that will promote prisoner safety.

how many correctional officers are assigned to EMCF, Defendant fails to ensure that those officers are then assigned to the designated mandatory posts. Failure to staff these "vital" posts is, as facility staff and MDOC itself acknowledges, dangerous. *See* Dykes Dep. 133:20–134:15; MDOC Dep. 115:25–116:5, 118:1–5; *see also* Vail 2016 Rpt. ¶ 82 ("The lack of appropriate numbers of staff makes it very difficult to supervise and control any inmate population. The result is that the rules for inmate conduct are not enforced which erodes the authority of the institution. Moreover, an understaffed prison is an unsafe one, for both inmates and officers."). Further, even where they are actually assigned to mandatory posts, the facility fails to ensure that correctional officers actually remain on the post for the duration of their shifts. Thus, no matter how many correctional officers are "assigned" to the facility, the fact is that Defendant fails to adequately supervise them such that they actually perform the minimum functions of their job.

### b) *Even Basic, Minimally-Necessary Correctional Practices, Including Properly Conducting Inmate Counts, Are Not Followed at EMCF*

Compounding the understaffing problem at EMCF is the facility's consistent failure to engage in minimally necessary prison supervision practices. For example, one of the fundamental duties of a prison is to count prisoners to ensure that they are still housed inside the facility, to ensure that they are where they are supposed to be, and to ensure that they are alive and breathing. *See* Dykes Dep. 375:2–376:2; Vail 2016 Rpt. ¶ 36. Counts are vital to the safe operation of the facility. *See* Dykes Dep. 375:5–7. Unfortunately, they are also consistently improperly conducted at EMCF. In fact, in 26 of the 27 months between September 2014 and December 2016 for which reports are available, the Contract Monitor found that EMCF staff failed to "conduct formal count at least once per 8 hour shift/ 3x per day," in compliance with facility policy. Exh. 62 at ln. 107 (summarizing the Contract Monitor's non-compliance findings in the category of "Offender

Counts").[21] Similarly, in each of the 27 months, staff were not in compliance with the requirement that "face to photo count [be] conducted as necessary." *Id.* at ln. 109. And, in each of the 27 months, the Contract Monitor also found EMCF in non-compliance with the requirement that "[e]ach offender [is] positively identified during count." *Id.* at ln. 110. In comments, the Monitor frequently reported that "counts are conducted improperly," and that "staff do not take items down that are hanging[,] therefore they cannot see in the cell to verify offenders."[22] *Id.* at lns. 107–110.

Beyond the Contract Monitor's findings, the evidence in the record shows that there are serious deficiencies in EMCF's count procedures including that, at times, EMCF facility staff cede the responsibility of conducting counts to prisoners themselves. Prisoners proactively raised the concern to Mr. Vail during his June 2016 tour of EMCF, telling him that "since officers do not routinely stay in the units and supervise the inmates, . . . many officers do not feel comfortable actually being in the units and therefore rely on the inmates to keep the peace." *See* Vail 2016 Rpt. ¶ 42. Other prisoners have made similar observations. *See, e.g.*, Exh. 35 ("Mitchell Decl.") ¶ 12; Campbell Decl. ¶¶ 8–9; Jones Decl. ¶¶ 7–8).

The problem of not accurately conducting counts is not just an academic one, but one that creates the types of substantial risks to prisoners' health and safety with which *Farmer* and its progeny are concerned. For example, in April 2016, a prisoner named Thomas Hall committed

---

[21] This exhibit is a compilation of the relevant pages from the monthly Contract Monitor reports. An example of a monthly Contract Monitor report in full, from December 2016, can be found at Exh. 44.

[22] When officers see coverings on cell doors that obstruct their view into the cell, it is important that they take the items down "[t]o account for the offenders." MDOC Dep. 81:3–82:3 (agreeing that if staff do not take items down that are hanging, it is not possible to conduct a proper count); *see also* Vail 2016 Rpt. at ¶ 50 (noting that if officers do not "regularly and routinely look[] into the cells, they may not detect prisoners who have been assaulted or . . . are engaged in acts of self-harm"). That the Monitor continually finds correctional staff to not follow such procedure—or to require prisoners to adhere to the rule—"sends a message to the inmates that rules do not matter and that they are left to fend for themselves since the officers cannot control the basic expectations for inmates in the living units." *Id.* at ¶ 50–52.

suicide while being housed in the EMCF medical department for psychiatric observation. *See* Exh. 77 (describing that prior to committing suicide, Mr. Hall had spent the entire day pleading with various EMCF staff to allow him to raise his concerns about his living environment with the Warden, an opportunity he was never given). During the investigation of Mr. Hall's suicide, it was revealed that two officers assigned to the unit, Tanja Malone and Querida Williams, "did not conduct a proper count" shortly before Mr. Hall's death. *See id.* While the officers were put on administrative leave pending investigation, *see id.*, the investigation apparently did not find that any actual discipline of the officers was warranted, despite the fact that Officer Williams had a noted history of not properly conducting counts, *see* Dkt. No. 531-18, MSJ Exh. R (showing that neither Officer Tanja Malone nor Querida Williams were disciplined by MDOC or MTC for their admitted failure to conduct a proper count); Exh. 74 (showing Officer Williams was previously cited for failing to conduct a proper certified count).

Death is, of course, not always a consequence of improperly performed counts and a failure to supervise vulnerable inmates.[23] But, it is a present risk, as is the risk that because staff fail to perform their basic supervision tasks, inmates are able to take control of facility operations including "control[ling] cell assignments." Vail 2016 Rpt. ¶ 45; *see also, e.g.*, Exh. 44 at ln. 248 (describing that "[o]ffender decides where he wants to sleep/be housed"). Further, the likelihood of prisoners breaching their cells—*i.e.* making unauthorized movement out of the cell—is

---

[23] In another egregious, though fortunately not fatal, example, in December 2016, a prisoner reported to an officer that he had been assaulted *five* days prior. *See* Exh. 79. His wounds were clearly still visible to the officer to whom he made the report. *Id.* The prisoner told the officer that he had been forced by other prisoners to "hide in his cell" until he had recovered. *Id.* Of course, that his injuries weren't discovered by EMCF staff before they were self-reported suggests (1) that no officer was present on the unit to actually stop the fight while it was in progress, and (2) that for the five days after the fight, no officer saw the injured prisoner, even during counts. *See also* Vail 2016 Rpt. ¶¶ 196–197 (describing another harrowing assault at EMCF after which the prisoner did not receive access to medical treatment for several days; the prisoner's declaration is attached as Exhibit 5 to Mr. Vail's Report).

increased. *See* Vail 2016 Rpt. ¶ 46.

> ### *c)* ***Gangs Exercise Significant Control Over Staff at EMCF, Threatening the Security of Other Prisoners and Contributing to the Prevalence of Contraband***

The dangers posed by the failure at EMCF to adequately staff the prison, to conduct proper supervision including in the form of counts, or to ensure that inmates remain secure behind their cell doors, *see infra* pp. 34–36, are further reinforced by the significant gang presence at and control of the facility. Of the over 1,100 prisoners housed at the facility, about half are members of a Security Threat Group ("STG"), or gang. *See* Exh. 61 at lns. 420, 430 (MDOC Monthly Report showing gang presence at EMCF between July 2016 – January 2017). And while Defendant claims that because it employs an STG investigator, there is no evidence in the record of inappropriate gang control, *see* MSJ at 16, the record discloses serious reason to doubt the impact of the investigator, who quite apparently has minimal effect in actually curbing the influence of gang leaders inside the facility.

Gang influence has been a constant source of concern and complaint from the MDOC Contract Monitor. In April 2015, the Monitor sent an email to an MDOC STG investigator, identifying 13 prisoners about whom she had concerns because "they seem to be running things" at EMCF. *See* Exh. 42. In July 2015, she sent another email, including to the Warden and Deputy Commissioner of MDOC, identifying problems including that "gang members [are] working in the segregation units and I am being told they can run the units," and that "[g]ang members sell drugs to offenders and staff is aware, but does nothing." *See* Exh. 50. Then, in October 2015, the Monitor sent another email detailing concerns about ten prisoners who "have been calling the shots/running the offenders/staff here with the ability to move almost anywhere they want to go." *See* Exh. 71. But, demonstrating the facility and MDOC's complete abdication of responsibility to

actually address known problems, two years later, three of inmates identified by the Monitor as having "control" continued to be housed in the prison. *See* Exh. 76 (records demonstrating prisoner location). Incredulously, one remains housed on the *exact same* unit the Monitor said he had control over in October 2015. *See id.* at 1 (showing the prisoner still resides on Unit 2 at EMCF); *see also* Thomas Dep. 248:15–250:6 (same).

In November 2015, a similar concern was raised by a different staff member at a scheduled meeting for EMCF's Department Heads, including the Warden and Deputy Warden. At that meeting, it was disclosed that "a staff member said that EMCF is out of control and that the inmates are running the facility." *See* Exh. 67. The minutes do not reflect that any follow up was taken to address the staff member's concerns. And Ms. Braxton also testified that she believed gangs are used at EMCF to control other prisoners. *See* Braxton Dep. 107:25–108:14.

The dangers of this situation are well-understood by MDOC itself. Explaining why it is not acceptable to keep a prisoner housed on a unit he is said to have control over, MDOC testified that doing so would be a "security threat" because "he's controlling the population. He can control other inmates, manipulate them to carry out assaults. You know, pretty much just being what we call a hog in the prison system, taking from other inmates. He should be moved." MDOC Dep. 140:15–141:6. Mr. Vail similarly described the impact of such gang prevalence and control, including over making cell assignments, Vail 2016 Rpt. ¶ 45; causing the assault of other prisoners, *id.* at 101–02; and deciding whether or not prisoners receive a meal tray, *see id.* ¶¶ 71–72; *see also infra* pp. 46–47 (describing unsupervised prisoner involvement in the feeding process). Prisoners also describe their fears of being assaulted, extorted, or suffering other harms at the behest of gangs inside EMCF. *See, e.g.*, Clemons Dep. 48:8–24 (describing how it is "scary" to be in an environment with gang members because "you just never know when someone is going to run in

your room with a knife, and being in a room with the person with the knife"); Mata Dep. 30:12–32:3 (testifying that around late 2016, his life was threatened by six different organization members with knives; as a result, Mata, a prisoner who works on the maintenance crew no longer works in Units One, Five, or Six). As one prisoner put it, "[g]ang members have more control and power at EMCF than the staff does." Campbell Dec. ¶ 24; *see also id.* ¶¶ 24–30 (describing the influence of gangs at EMCF, including that officers ask them "to help enforce the rules").

<b><i>d)   Unsecure Cell Doors Enable Prisoners to Exit Their Cells Easily Without Supervision or Warning</i></b>

Further contributing to the remarkably dangerous security environment at EMCF is the fact that throughout the prison, prisoners can tamper with the cell doors such that they are rendered unsecure. *See* Vail 2016 Rpt. ¶¶ 53–70 (describing the magnitude of problems with the locking mechanism on cell doors at EMCF). Put differently, with as little effort as inserting a toothpaste cap into the door locking mechanism, prisoners can ensure that their cell door does not actually lock when closed by security staff. *See* Dykes Dep. 179:8–11. As one inmate succinctly explained, the result is a situation where "cell doors are rigged all the time, and a prisoner could come out of his cell and attack me." Grogan Decl. ¶ 50; *see also* Dykes Dep. 177:24–178:3 (explaining that the purposes of securely locking cell doors is to "prevent the offenders from being able to come out any time they get ready").

Predictably, assaults do occur as a direct result of prisoners not being securely locked inside their cells. The record is replete with examples of such harm, as is Mr. Vail's 2016 Report. *See* Vail 2016 Rpt. ¶¶ 56–65. As just one example:

> On January 15, 2015, an inmate was taken out of his segregation cell in restraints to be taken to medical for his monthly shot. Another inmate "breeched his cell door . . . and attacked" the inmate in restraints with a homemade weapon "causing multiple injuries." The victim "sustained 3 lacerations to his abdomen area, 2 lacerations to his right arm, 3 lacerations to his facial area, 1 laceration to left side

34

> of his neck, and [] 1 deep laceration between the 3rd and 4th finger on his left hand."
> He was transported by ambulance to the hospital.

*Id.* at ¶ 60; Exh. 85 at DEF-027588 to -603; *see also, e.g.*, Exh. 53 (June 2016 use of force report

describing that after a prisoner "was able to manipulate his cell door and exit his cell," that prisoner

attempted to assault another prisoner, before finally being subdued by a use of force); Exh. 59

(May 2016 report detailing that a prisoner "breached his door" and assaulted another prisoner;

based on the prisoner's account, "the officers did not check the door all day long").

Notwithstanding the volume of evidence describing a pervasive problem of cell doors

being easily rendered unsecure at EMCF, Defendant argues that "[t]here is no meaningful, relevant

evidence that there is a problem with the cell door locks" at EMCF. MSJ at 14. Among other

sources in the record, Defendant's own maintenance records and crew, as well as its expert witness,

disagree. *See* Dkt. No. 531-13, MSJ Exh. M (showing that in a six month period, there were nearly

150 instances in which there was a "cell door showing unsecure [from] control tower"); Mata Dep.

47:24–48:18 (testifying that in his duties as a maintenance worker, he has to fix about five cell

doors per day); Exh. 16 ("Stonehouse Dep.") at 83:9–20 (noting that in six out of the 10 doors he

observed, the cell door was jammed such that it could not securely close). So does the staff of

Defendant's contractor, MTC. *See* Brown Dep. 154:4–11 (describing that the "challenge" with

some of the cell doors at EMCF is that "they are jammed by inmates, and unless the officers check

them on a regular basis, they won't lock and secure as they should"); Exh. 52 (June 2016 email

exchange in which after receiving a use of force report in which a prisoner was able to manipulate

his cell door, leave his cell, and assault another prisoner, MTC's Regional Vice President asked,

"How are we going to prevent this from *continuing* to occur?" (emphasis added)).

Defendant also argues that their expert locksmith, Mr. Stonehouse, found that the "locks

were designed properly and function properly." *See* MSJ at 14. But that is beside the point, because

> [R]egardless whether the cell door locks at EMCF were installed as designed, the evidence in the record shows the locks are easily defeated by the inmates. They are therefore not adequate to keep inmates (or staff) safe, and especially not in a prison where staff only indirectly supervise the inmates, and where the presence of contraband weapons is prevalent.

Vail Rebuttal ¶ 7; *see also* Exh. 23 ("Hogans Dep.") at 234:17–237:16 (describing a recent incident where prisoners were able to manipulate their cell doors and exit their cells while the unit was on a security lockdown). Judge Reeves made this very same point just two years ago, when placing another MDOC facility (also operated by MTC) under a Consent Decree because of the exact same problem of malfunctioning cell doors: "It is impossible for Defendant to provide protection from harm in a facility where inmates are aware that they can freely escape their cells." *Depriest*, 2015 WL 3795020, at *14.

> ### e) *The Widespread Prevalence of Weapons Reinforces an Environment in Which All Persons at EMCF Are Susceptible to Violence*

Finally, each of the above problems is amplified by the widespread prevalence of contraband weapons inside EMCF. Defendant's own statistics show that in 2016, staff recovered, on average, more than 33 weapons per month inside the facility. *See* Exhs. 60–61 at ln. 2370; *see also* Vail 2016 Rpt. ¶ 116 (noting that between July 2014 and January 2016, an average of over 39 weapons were discovered in EMCF per month, and describing such numbers as "startling and alarming"); Mata Dep. at 43:3–21 (noting that in his role as a maintenance worker, he comes across three or four knives a day); Campbell Decl. ¶ 20 (noting that during a recent shakedown, 32 knives were recovered on a zone with 33 cells). As Mr. Vail explained, "correctional staff never discovers all of the contraband in an institution. Thus, the prevalence of weapons in the prison is probably much higher." Vail 2016 Rpt. ¶ 116. As Defendant's assault statistics show, these weapons are used with startling regularity inside the prison. *See supra* pp. 23–25. "This creates a climate where

inmates do not feel safe in the prison they are confined in, and where the officers do not feel safe in the prison they are meant to administer." Vail 2016 Rpt. ¶ 117 (describing the risk of becoming a victim to the use of a weapon as "ever present").

### 2. *Defendant Is Deliberately Indifferent to the Risks Created by a Failure to Protect Plaintiffs From Harm*

The magnitude and obviousness of dangers facing prisoners inside EMCF makes clear Defendant's knowledge of, and disregard towards, them. Moreover, Defendant receives explicit notice of the security issues each month. The Monitor's monthly reports, which routinely describe the facility's non-compliance with basic measures of prison security, including count procedures, housing assignments, and conducting rounds, are provided to officials at MTC and MDOC. *See* MDOC Dep. at 59:22–25. The Monitor also sent numerous emails and other correspondence detailing her concerns. *See, e.g.*, *supra* pp. 32–33 (detailing a series of emails in which the Monitor specifically identified gang members with "control" over the facility; at least three of the prisoners still remain at the facility, despite the Monitor's concerns); *see also infra* p. 50 (describing a series of weekly reports sent by the Contract Monitor admonishing staff to ensure that prisoners are not handing out food trays unsupervised). In the email sent in July 2015, and described above, in addition to outlining her concerns with gang control at EMCF, the Monitor also identified numerous other problems at the facility, including that: "[s]taff assigned to the units are not remaining on their posts;" "offenders are allowed to violate policy . . . staff see what I see and say or do nothing unless I say something first;" "security checks are not being conducted;" and "classified offenders [are] being allowed to hold long conversations with offenders on long term and the seg units unsupervised." *See* Exh. 50. After identifying the numerous issues at the facility, the Monitor ends her email with a telling note to the Warden: "You advised [that] you, Mrs. Jones, and I would meet today about some of these issues, but you and I both know it's not going to

37

happen. . . . I have been talking on these issues for weeks. These issues are all over EMCF but the seg units are the worst." *Id.* That the issues have continued, well past July 2015, bespeaks the lack of attention being paid to genuine security concerns at EMCF. *See, e.g.*, Exh. 54 at 4 (EMCF Department Head meeting minutes from March 10, 2016 in which the Monitor again states that she is "just making suggestions. Offenders can't be a gang member and work on Unit 6 [segregation]"). Notably, the above evidence is all contained in Defendant's *own* records.

Similarly, and further demonstrating Defendant's deliberate indifference to the interacting nature of the security problems at EMCF, the deficiencies in EMCF's cell doors are well-known, including to maintenance staff and MTC corporate executives with oversight over the prison.[24] *See supra* pp. 34–36. As Ms. Brown, MTC's executive with direct oversight over EMCF noted, "unless the officers check [cell doors] on a regular basis, they won't lock and secure as they should." *See* Brown Dep. 154:4–11. Relying on officers to check doors is a non-permanent, and potentially dangerous, solution to the problem. *See Depriest*, 2015 WL 3795020, at *14 ("Instructing guards to check doors each time they open and close is only a short-term and impracticable solution that does not rectify the problem. It also places too much responsibility, in an area where mistakes can be fatal, on human error."). But given that it is the facility's solution of choice,[25] it is particularly indefensible that Defendant relies on an indirect supervision model where officers are not required to be in the housing units, and at the same time, does not ensure adequate staffing at the prison,

---

[24] The problems with the cell doors at EMCF are so longstanding, and so dangerous, that in 2012—a year before this litigation even commenced—ECMF was cited for a willful violation by the Occupational Health and Safety Administration's ("OSHA") regulations for failing to protect staff by, among other things, not fixing the locks on the prison's cell doors. *See* Exh. 51 (June 12, 2012 OSHA press release). While OSHA's citation related to staff safety, quite clearly, the malfunctioning cell doors pose the same—if not a greater—threat to prisoner safety.

[25] It is worth noting here that MDOC testified that it does not know whether a different door type could be used to reduce the ability of prisoners to jam cell doors at EMCF, nor has it done the research to find out if such a solution is available. *See* MDOC Dep. 45:2–19.

does not ensure that officers remain on the posts to which they are assigned, and does not ensure that officers actually and adequately perform security functions like counts (which would give them an opportunity to check each cell door multiple times per day). *See supra* pp. 25–36.

Defendant's only argument is that it has implemented "countless measures" to protect prisoners. *See* MSJ at 15. The record is to the contrary. For example, most of the measures the facility has implemented since the start of this litigation to curb the influx of contraband into the facility actually do little to impact the number of weapons inside the facility. Indeed, while a full body scanner and mesh netting *might* help reduce the amount of drugs or cell phones entering the facility, as Defendant's expert testified, weapons can be homegrown inside the facility. *See* Exh. 14 ("Roth Dep.") at 320:9–12. Similarly, shakedowns and other searches for contraband by a K-9 Unit, might result in more contraband being found, but do nothing to alleviate the myriad other problems contributing to violence at the facility, including non-functioning locks on cell doors, the prevalent influence of gangs, understaffing, or the failure of staff to engage in minimally necessary security functions. *See supra* pp. 25–36 (describing EMCF's long-standing deficiencies in these areas).

The same is true for the supposed disciplinary action taken by EMCF against non-performing staff for which Defendant seeks credit. *See* MSJ at 15. *But see supra* p. 31 (describing that the facility did not discipline staff members whose admitted failure to conduct a proper count contributed to the death of a prisoner). Similarly, whether or not the facility employs an STG investigator, the Contract Monitor's multiple emails and other correspondences pleading—without effect—that gang members not be permitted to work in segregation units, or that those who "control" the facility be removed from it, demonstrate a non-serious effort towards resolving these concerns.

\*      \*      \*

Taken together, the facts in the record demonstrate that each day, Plaintiffs face a substantial risk of serious harm—including death—living in an extremely dangerous prison environment that is marked by understaffing and staff abdication of even minimal security functions, significant gang control, malfunctioning cell door locking mechanisms, and prevalently available weapons. Defendant is aware of, and remains deliberately indifferent to, such risks, To the extent Defendant disagrees with the weight of this substantial record of evidence, those disputes of fact must be reserved for trial.

### C.      Defendant Is Not Entitled to Summary Judgment on Plaintiff's Inadequate Nutrition Claim (Claim 7)

It is undisputed that food is a basic human need, and that the Eighth Amendment requires prison officials to ensure that "inmates receive adequate food." *See Farmer*, 511 U.S. at 832; *DeShaney*, 489 U.S. at 200. Adequacy in this context relates not only to the absolute quantity or caloric amount of food provided, but also to its nutritional value. *See Green v. Ferrell*, 801 F.2d 765, 770-71 (5th Cir. 1986) ("The [E]ighth [A]mendment requires that jails provide inmates with 'well-balanced meal[s], containing sufficient nutritional value to preserve health.'" (quoting *Smith v. Sullivan*, 553 F.2d 373, 380 (5th Cir. 1977))); *see also Graves v. Arpaio,* 623 F.3d 1043, 1050-51 (9th Cir. 2010) (per curiam) (noting that the Eighth Amendment requires jails and prisons to provide prisoners with "adequate nutrition").[26] Therefore, even where a prison purports to serve a 2,900 calorie diet, and three meals per day—as does EMCF[27]—it will still not meet constitutional

---

[26] *See also, e.g.*, Skipworth 2016 Rpt. at 5 (widely accepted diet standards include minimum "calorie, vitamin, mineral, fat, protein, and carbohydrate content with respect to age, gender, and health status of the prisoners").

[27] Defendant asserts that "[i]t is undisputed that prisoners receive three meals per day," citing only testimony suggesting that three meals are prepared and/or paid for daily. MSJ at 10 (citing Trinity Dep. 181, 184) .

requirements if the food served is not nutritionally adequate. *See Graves*, 623 F.3d at 1050 (declining to overturn the district court's finding that defendant's expert testimony regarding the calorie count of diets should not be credited because the menus were "exceedingly vague, it was clear that the dietician did not actually know what prisoners were fed, and substantial testimony . . . established that [plaintiffs] are often given food that is overripe, moldy, and generally inedible"). Unfortunately, at EMCF, that is just the case—prisoners are subjected to meals made with food of degraded and insufficient quality, and that are prepared in an unsanitary environment. Further, at EMCF, no matter what the content or quality of the meal tray, there is no guarantee that prisoners will actually receive that tray. Defendant is well-aware of, and deliberately indifferent to these significant problems related to food service at EMCF.

1.     ***An Inadequate Diet, Compounded by Unsanitary Kitchen Conditions and Unsupervised Meal Distribution, Subjects Plaintiffs to a Substantial Risk of Harm***

Food services at EMCF are contracted to the Trinity Services Group. However, the sole requirement in Trinity's contract related to the content of the meals it provides is that prisoners must be provided 2900 calories per day (except for certain medical diets in which calories are restricted). *See* Exh. 13 ("Trinity Dep.") at 17:8–18:14. The contract does not contain any other nutrient requirements. *Id.* As such, "as long as Trinity delivers in the regular diet 2,900 calories, it has fulfilled all of its obligations that it undertook with regard to food quality and quantity at EMCF." *Id.*; *see also id.* at 58:2–18 (testifying that Trinity does not know whether there is any limit on the number of calories in a daily diet plan that can be supplied through simple sugar); Exh. 33 ("Holton Decl.") ¶ 27 ("Over three quarters of the food I receive is a starch."). The minimum

---

The record, including Defendant's own documents, demonstrate that the number of meals prepared is not indicative of the number of meals prisoners receive. *See infra* pp. 46–47 (describing that prisoners may not receive meals because meals are withheld by staff or other prisoners).

requirements for food provision under Trinity's contract are, as a result, not in accord with the minimum requirements for food provision under the Constitution, which requires that meals be nutritionally adequate." *See Green*, 801 F.2d at 770–71.[28]

This lack of alignment between Trinity's contract and the constitutional standard has a meaningful impact on the food prisoners at EMCF actually receive. During her on-site inspections of EMCF in 2014 and 2016, Plaintiff's nutrition expert, Ms. Skipworth, documented significant substitutions in the food served that appeared to reduce the nutritional value of the meal, such that even if the printed menu at EMCF purports to serve a 2,900 calorie diet, the food actually served does not meet that threshold. This "[f]ailure to adhere to a dietitian-approved menu places prisoners at risk of under-nutrition and weight loss."[29] Skipworth 2016 Rpt. at 13. For example,

---

[28] Defendant asserts that caloric amounts lower than 2,900 daily calories have been found constitutionally sufficient. MSJ at 10. Neither case cited by Defendant is analogous to the instant case, and Defendant's attempt to analogize demonstrates a profound misunderstanding of Plaintiffs' claims. *See Cunningham v. Jones*, 667 F.2d 565, 566 (6th Cir. 1982) (per curiam) (affirming finding that 2,000–2,500 daily calories "was sufficient to maintain normal health for the *15 days involved*" (emphasis added)); *Sostre v. McGinnis*, 442 F.2d 178, 186, 193–94 (2d Cir. 1971) (considering *denial of dessert* to the plaintiff in segregation when his diet still consisted of 2,800–3,300 daily calories as a factor against finding of unconstitutionality). Here, Plaintiffs allege a systemic deprivation of basic nutritional meals to the entire EMCF Class, a problem that has persisted at EMCF for years. Calorie count alone is only a part of Plaintiffs' claim, and without context, a meaningless measure given that it does not describe the nutritional adequacy of the provided food. Further, the isolated case law Defendant presented notwithstanding, the record evidence demonstrates that, for a reference male with a height of 5'10" and weight of 154 pounds, 2,900 calories is sufficient only if he is sedentary or of a low activity level, or if he is in his late 30's or older. *See* Skipworth 2016 Rpt. at 12; Skipworth 2014 Rpt. at 13. Most of EMCF's prisoner population does not fall into those categories.

[29] Defendant's reliance on the "use of a dietician-approved and reviewed meal plan" as evidence that they are "extremely attentive" to the nutrition issues at EMCF is yet another example of the vast difference between policy and practice at EMCF. *See* MSJ at 10–11. There is substantial evidence that the problem of prisoners being subjected to nutritionally deficient, inedible, and potentially harmful food persists in spite of the approved meal plans. *See infra* pp. 43–44. Defendant also asserts that meal substitutions are limited, but its own evidence demonstrates a failure to plan for the approved menu, even twice within the same month. *See* Dkt. No. 531-15, MSJ Exh. O (substituting in September 2016 turkey for eggs and bologna for sausage when the kitchen did not have eggs or bologna). Tellingly, since 2012, only one dietician, Ms. Skipworth, has actually inspected the meals served at EMCF (rather than merely the menus approved to be served). Trinity Dep. 99:18-23.

Ms. Skipworth noted that whereas the menu provided for three ounces of sliced turkey, the actual tray prisoners received was substituted with barely visible shreds of turkey. *See* Exh. 4 ("Skipworth 2014 Rpt.") at 81.[30] During her 2016 inspection, Ms. Skipworth documented similar deviations from the planned menu. *See* Skipworth 2016 Rpt. at 43–44.

Confirming Ms. Skipworth's findings, a prisoner who worked in the EMCF kitchen from 2012 to November 2016 reported that there was frequently not enough food to serve to prisoners. *See* Exh. 29 ("Brewer Decl.") ¶¶ 5–6, 22–36. He also described being instructed by the kitchen supervisor to add water to the food being prepared in order to alleviate his concerns about the insufficient amount of available food. *See id.* Similarly, Ms. Braxton reported that on an occasion when she worked in the kitchen, she was unable to tell the mashed potatoes from the gravy because both were liquid. Braxton Dep. 141:18–143:5.[31]

The lived experience of prisoners at EMCF further supports these findings. For example, prisoners report that the food they receive on their trays is "not edible," and that it sometimes consists of raw, undercooked, or spoiled meat. *See, e.g.*, Brewer Decl. ¶¶ 8–10 (attributing a rise in the number of sick prisoners on his unit to rancid meat served by the kitchen); Campbell Decl. ¶ 42 ("Approximately five times a week, I receive meat on my tray that is raw. . . . When the meat is raw, I do not eat it because I worry that I will get sick.") Prisoners also do not receive enough food to eat. *See, e.g.*, Jones Decl. ¶ 31 ("[E]very day I saw prisoners try to eat the remaining scraps

---

[30] *See* Skipworth 2014 Rpt. at 82 (substituting corn chips for carrots and cookies for gelatin, a source of protein); *id*. at 83 (substituting lunch menu for a regular dinner meal); *id*. at 85 (the planned meal contained turkey stir fry, white rice, peas, cornbread, margarine, gelatin, and fruit drink; the served meal contained cold cuts, sliced bread, coleslaw, cake, and condiments).

[31] Ms. Braxton also testified that prisoners had to eat the meal with their hands because they were not given spoons, and that on the same day, the meat served to prisoners was "frozen bologna." Braxton Dep. 143:6–144:4. Ms. Braxton also testified that chicken parts served to prisoners are "scrapings of . . . the bone marrow" that look "[l]ike gray ground meat." *Id.* at 147:7–20.

off of the discarded food trays. While collecting dirty trays as part of my job as an orderly, prisoners would also ask me for any remaining food left on the dirty trays."); Campbell Decl. ¶¶ 40–41 ("The sizes of the servings are posted on the menu so I can tell when we are not getting the appropriate amount. . . . I have seen prisoners eating out of the garbage."). As a result of these deficiencies, prisoners have exhibited detrimental, and sometimes significant, weight loss. *See* Braxton Dep. 163:15–164:12 (describing her observation of a prisoner's extreme weight loss from around 260 pounds to 135 over her tenure at EMCF because of a lack of food); Brewer Decl. ¶ 39 ("I am 6 feet, 3 inches tall, and weighed approximately 185 pounds when I arrived at EMCF. Now, I only weigh approximately 150 pounds."); Exh. 9 ("LaMarre 2016 Rpt.") at 80–82, 84, 86–88 (reviewing prisoner medical records documenting weight loss from 14 to 30 pounds); Exh. 28 ("Townsend Dep.") at 145:7–14 (EMCF nurse testifying that she has witnessed "a prisoner experience rapid weight loss"). In fact, Ms. Braxton testified that prisoners talked to her "constantly" about having lost too much weight. *See* Braxton Dep. 163:15–17. These experiences of weight loss are, of course, not surprising given Ms. Skipworth's finding that 2,900 calories likely only "meets the minimum nutrition standards for older, sedentary, and low active prisoners." *See supra* note 28.

Beyond the objectively deficient content of the food actually served at EMCF (as opposed to the food listed on the menu), meals at EMCF are prepared in an unsanitary environment that creates a substantial health risk. *See McClure v. Tex. Dep't of Criminal Justice Corr. Dep't*, 459 F. App'x 348, 351 (5th Cir. 2012) (suggesting that evidence of "unsanitary treatment of serving trays" disgusting enough to amount to cruel and unusual punishment could be "competent summary judgment evidence"); *Bolding v. Holshouser*, 575 F.2d 461, 465 (4th Cir. 1978) (holding that plaintiffs alleging the that prison officials "failed to provide sanitary food service facilities"

stated a cognizable claim). Roaches and other insects are observed in the EMCF kitchen. *See* Skipworth 2016 Rpt. at 11 ("The automatic dishwasher in the kitchen was infested with cockroaches, as numerous nymphs and adults were observed emerging out of the machine on June 1, 2016. . . . [R]oaches are typically nocturnal and their activity during the busy, well-lit day shift likely indicates a heavy infestation."); Brewer Decl. ¶ 20 ("When I worked in the kitchen, I saw roaches every day in the kitchen."); Braxton Dep. 145:4–25; Exh. 26 ("Shaw Dep.") at 330:21– 23. Rodents are also observed in the kitchen. *See* Braxton Dep. 146:15–21; *see also* Brewer Decl. ¶ 19 (observing mouse droppings and chewed-through bags of dry goods in the kitchen). And the meal trays prisoners receive are also dirty and unsanitary. *See* Braxton Dep. 144:5–19 (describing observing maggots in noodles on a prisoner's meal tray).

While Defendant seeks to contest the unsanitary conditions in EMCF's kitchen by arguing that the Mississippi State Department of Health has not found any "critical" violations during its occasional inspections of the food preparation areas, the argument does not align with reality. EMCF received a "C" grade in June 2013, a "critical" violation.[32] *See* Exh. 45 (EMCF Mississippi Department of Health Inspection Summary). Since then, six of the last eight State Department of Health inspections of EMCF, including the most recent one in March 2017, have resulted in a "B" grade. *See id*.; *see also* Exh. 56 (showing that in March 2017, the EMCF kitchen was cited for violations with respect to "Food Separated And Protected," "Food Contact Surface Cleaned Sanitized," and "Proper Hot Holding Temperatures"). This means that "critical" violations were found by the inspectors, but that EMCF was able to correct the identified violations prior to the

---

[32] Under the Department of Health's grading system, a "critical violation" is one "that can lead to food-borne illness outbreaks" or one "generally of a more serious nature in food service." Exh. 15 ("Skipworth Dep.") at 102:11–24; *see also* Exh. 80. A facility receives a "C" grade when critical violations are found, but some or all are not corrected during the inspection. *See* Exh. 80.

end of most inspections. *See* Exh. 80 (describing that if critical violations are found, but they can be corrected prior to the end of the inspection under the supervision of the inspector, the facility receives a "B" grade). It does not mean that the EMCF kitchen's ratings are "satisfactory." *Contra* MSJ at 9. Nor does it mean that staff cannot easily revert to their unsanitary practices as soon as the inspectors leave.[33] The repeated "B" grade findings would suggest that they do. *See, e.g.*, Brewer Decl. ¶¶ 15–16 ("I came into the kitchen a few days in a row to find trash in the bins I typically use as food preparation bins.").

Finally, even setting aside the content of the meal trays at EMCF or the manner in which they are prepared, given lax security conditions at the facility, there is no guarantee that prisoners actually receive the meals that are prepared for them. In fact, the MDOC Contract Monitor has repeatedly pointed out that the correctional officers have improperly delegated to prisoners the function of distributing meals without supervision. *See, e.g.*, Exh. 82 at DEF-212942 (Monitor's report to MTC observing meal being delivered with no officers onsite); *see also* Exh. 6 ("Skipworth Rebuttal") at 10–11 (citing Monitor's reports that describe the failure of correctional staff to ensure that prisoners were not in control of food delivery to other prisoners); Exh. 82; Vail 2016 Rpt. ¶ 72 (citing findings by Monitor); Exh. 43. Prisoners also report the same deficiency in food distribution at EMCF. *See* Vail 2016 Rpt. ¶¶ 71–72 (noting prisoners' reports that at EMCF, meals "depended on which inmate was handing out food," and could be impacted by whether the gang member in the unit was "righteous" or whether other prisoners were requiring food to be withheld as punishment for unpaid debts or other wrongs).

---

[33] The same point also speaks to Defendant's citation to Trinity's obviously non-objective inspections of its own kitchen facilities. *See* MSJ at 11 & n. 40. Even if the facility was clean at the specific time on the specific day of the month that Trinity inspected it, that is not to say that the facility is not otherwise operated in an unsanitary manner (as record evidence demonstrates).

This practice—of allowing prisoners to distribute food without supervision, coupled with significant gang control over the facility—poses a "threat to inmate security," *see* MDOC Dep. 146:17–147:4, and can, and does, result in prisoners missing meals because of stolen food trays. *See supra* pp. 46–47 (describing the substantial dangers posed by prisoners distributing food trays unsupervised); Vail 2016 Rpt. ¶¶ 71–73; Braxton Dep. 147:22–148:11 (testifying that prisoners have reported to her that they do not receive their meal trays); Campbell Decl. ¶ 26 ("The officers do not stay on the zone to monitor that everyone collects their tray."); Grogan Decl. ¶¶ 41–42 (describing unsupervised meal distribution and an incident where an officer did not serve a prisoner for at least two days because of threats by another prisoner). Prison officials have also withheld food from prisoners as a form of punishment. *See* Braxton Dep. 148:12–22 (describing instruction from a superior officer to a subordinate to deny food to prisoners who did not "want to move").

> **2.** **_Defendant Is Deliberately Indifferent to the Risks Created by Inadequate Nutrition_**

Defendant has long had knowledge, from various sources, about the deficiencies in the meals offered at EMCF and failed to act in response. The deficiencies are "obvious" to any correctional officer willing to look. *See Farmer*, 511 U.S. at 842. In fact, when asked how the living conditions at EMCF could be improved, Ms. Braxton answered regarding the food: "[i]f [staff] looked at the food themselves, taste[d] the food, they will see that all of the complaints are not just [prisoners] complaining. If they would look at the food and see, okay, this is not enough food for a grown person to eat and be full to the next meal." Braxton Dep. 165:17–166:10. But EMCF staff, including medical staff, pay little attention to the diets prisoners receive. *See, e.g.*, Exh. 17 ("Abangan Dep.") at 311:7–16 (former EMCF medical doctor testifying that he did not know the correct daily caloric value of meals "because [he] didn't check it," even after prisoners

told him the food was inedible). Rather, staff are, at best, willfully ignorant of the dietary requirements and content of the actual meals provided at EMCF. *See Brown v. Bolin*, 500 F. App'x 309, 322 (5th Cir. 2012) (defendant "should not be permitted to turn a blind eye . . . or to insulate himself by instituting a policy of indifference" (internal quotation marks and brackets omitted)). Others take specific steps to perpetuate the harm. *See* Brewer Decl. ¶ 33 (describing that kitchen supervisors have instructed "the serving line staff to serve less food in order to make the food last longer").

Complaints about the food at EMCF have also been raised directly to prison staff and authorities for years. For example, in a May 2011 letter in response to concerns raised by an MDOC compliance officer upon inspection of EMCF, the then-Warden detailed corrective action plans, including a plan to monitor the food serving line; the compliance officer had found that portions were not adequate. *See* Exh. 58. Ms. Skipworth similarly made Defendant aware in 2014, and again in 2016, that the meals served at EMCF are nutritionally suitable only for sedentary or "low active" prisoners and older (age 50+) prisoners. *See* Skipworth 2014 Rpt. at 13; Skipworth 2016 Rpt. at 12. Even so, as of March 2017, MTC had not made *any* nutrition-related changes in response to the instant lawsuit, *see* Brown Dep. 256:22–257:6, and Trinity testified that no dietician has actually inspected the meals being served at EMCF (as opposed to just approving the written menu cycles) since 2012, *see* Trinity Dep. 99:19–23. Prisoners themselves also regularly complain to EMCF staff, both in person and in writing, about the food they receive. *See, e.g.*, Townsend Dep. 144:23–145:6 (testifying that she hears complaints from prisoners about both the quality and quantity of food provided). But these complaints fail to register with prison

authorities.[34] Unfortunately, situations in which the response to prisoner complaints is significantly delayed or nonexistent are common and indicative of the many failings at EMCF to provide prisoners with adequate food. *See, e.g.*, Exh. 78 (prisoner ARP pleading for staff to "give me and everyone enough food to last from one meal to the next"); Exh. 36 (alleging that prisoners in the segregation-psychiatric unit are served "[v]ery small portions of food," or "suicidal" meals); Holton Decl. ¶¶ 26-27 (detailing deficiencies in his meals and no difference between his meal and the other prisoners' despite the fact that "[t]he nurse practitioner told [him that he is] supposed to be on the cardiac diet" because he has suffered two heart attacks).

Defendant is also well-aware of, and fails to remedy, the obviously unsanitary conditions under which food is prepared.[35] *See supra* pp. 44–46 (describing consistent findings of "critical violations" in EMCF's kitchen, as well as obvious signs of pest and rodent infestations). While Defendant argues that its pest control contract evidences reasonable measures to mitigate unsanitary conditions, *see* MSJ at 11, there is, again, reason to doubt the reasonableness of those measures (not to mention no evidence regarding what treatments are actually applied).[36] Further,

---

[34] For example, in October 2016, prisoner Bobby Allen submitted a grievance through the Administrative Remedy Program ("ARP") concerning the facility's failure to provide him with an enhanced meal tray despite being under doctor's orders to receive one. *See* Exh. 39 at 1 (Allen 2016 ARP). Over a month later, the kitchen supervisor responded to Mr. Allen's diet concern, stating that his "team will make sure that you will receive your tray." *Id.* That did not happen, and in January 2017, Mr. Allen again had to request an enhanced diet. *See* Exh. 40 at 8 (Allen 2017 ARP). This time, after waiting nearly four months for a response, Mr. Allen was told that there was no diet order for him to receive an enhanced tray. *Id.* at 9. Mr. Allen's situation is also descriptive of EMCF's broken grievance process. *See* Mata Dep. 38:5–14 (describing ARP system as "a joke" because weeks pass between each step of the process "[a]nd nine out [of] ten" ARPs are denied).

[35] *See, e.g.*, Brewer Decl. ¶¶ 15-16 (stating that he told kitchen supervisors that food preparation bins were being used as trash bins by other kitchen workers, but they failed to address the problem).

[36] For example, Defendant's pest control documents indicate that the kitchen and food preparation area were treated on June 1, 2016, the very day Ms. Skipworth observed roaches emerging out of the dishwasher. *See* Dkt. No. 531-12 at 16; Skipworth 2016 Rpt. at 11; *see also* Braxton Dep. 145:4–25 ("I told [the kitchen supervisor] they had roaches in there. And she said they sprayed."). Even if Defendant is to argue that Ms. Skipworth observed the kitchen before the pest control treatment that day, then either the infestation arose

Ms. Skipworth noted that the filth of the kitchen area provided harborage for pests. Even regular pest control, then, is effectively meaningless when a primary cause of infestations, filth, is left unaddressed. *See* Skipworth Rebuttal at 8 ("[T]o be successful, pest control must also be coupled with cleaning and elimination of harborage and breeding sites.").

Finally, Defendant has similarly turned a blind eye towards ensuring that the meals that are prepared for prisoners are actually received by them. Throughout 2016, for example, the Contract Monitor reported that prisoners were passing out lunch trays unsupervised. *See, e.g.*, Exh. 82. The response to the October 3–8, 2016 report was that the Contract Monitor and the MTC Compliance Coordinator met with the unit manager to discuss proper meal service procedure. *See id.* at DEF-212969. The meeting was clearly not fruitful as the same problem was again reported two months later in the December 17–24, 2016 report. *See id.* at DEF-212985. Remarkably, despite its own Contract Monitor's findings and the documented responses, MDOC testified that it is "not aware" of the problem of prisoners distributing food trays unsupervised. *See* MDOC Dep. 145:14–146:16. Especially given MDOC's clear understanding of the dangers posed by such a practice, *see supra* pp. 46–47, MDOC's failure to study and stop the problem, is particularly unreasonable.

*   *   *

Again, the record evidence discloses that Plaintiffs are routinely served inadequately nutritious meals (to the extent those meals are received at all), which are prepared in a wholly unsanitary kitchen environment. The risks posed by such conditions are obvious, and yet, ignored by Defendant.

---

in one week (since the previous treatment on May 25, 2016), or the contracted-for pest control is insufficient to maintain a clean and sanitary environment.

**D.** **Defendant Is Not Entitled to Summary Judgment on Plaintiffs'**
**Environmental Conditions Claims (Claims 3 and 6)**

There is no dispute that the *Farmer* standard applies to Plaintiffs' environmental conditions claims, which are brought on behalf of the Isolation Subclass (Claim 3), and the Units 5 & 6 Subclass (Claim 6), respectively. *See Gates*, 376 F.3d at 337–38, 340–43 (affirming, under *Farmer*, injunctions related environmental conditions including maintaining clean cells, remedying prisoners' exposure to human waste due to malfunctioning toilets, and upgrading cell lighting). However, Defendant does not challenge every aspect of these claims. With respect to Claim 3, Defendant only challenges the aspects of the claim addressing the risks of harm from filthy and unsafe environmental conditions (including lighting, ventilation, cleanliness of showers, and pest control) and from inadequate nutrition.[37] MSJ at 7. Similarly, with respect to Claim 6, Defendant only challenges the aspects of the claim addressing the risk of serious harm and injury from dangerous environmental conditions (including exposure to smoke, filthy cells, vermin, plumbing problems, lighting issues, and inadequate ventilation). *Id.* at 16. Because Defendant has limited the grounds on which it seeks summary judgment as to Claims 3 and 6, Plaintiffs likewise limit their opposition to address only those raised grounds. Plaintiffs do not here address those aspects of Claims 3 and 6 that are unchallenged by Defendant, including risks of harm from inadequate physical exercise, inadequate mental health treatment, conditions of extreme social isolation and sensory deprivation, and exposure to toxic substances besides smoke. Those unchallenged portions of Plaintiffs' claims necessarily must survive summary judgment based on Defendant's implicit concession that they are ripe for trial. *See, e.g.*, *Washburn v. Harvey*, 504

---

[37] The risks associated with inadequate nutrition are addressed above with respect to Claim 7, as the problems with nutrition affect both the Isolation Subclass and the EMCF Class as a whole. *See supra* pp. 40–50. The arguments contained there are explicitly and fully incorporated herein.

F.3d 505, 509–10 (5th Cir. 2007) (declining to consider grounds not raised by moving party on summary judgment).

As to those parts of Claims 3 and 6 that Defendant does address in its motion, the evidence undeniably demonstrates that prisoners at EMCF are housed in disgusting and degrading conditions, including unclean and unsanitary housing units (lacking adequate plumbing and pest control) that are also unsafe (due to deficient lighting, inadequate ventilation, and exposure to bodily fluids and other harmful agents). These conditions, and the interaction of them, support Plaintiffs' Eighth Amendment claims. They hide, as Plaintiffs' expert Ms. Skipworth found, in plain sight, and are described at length in documents, prisoners' accounts, and the reports and testimony of MDOC and MTC employees. They are further corroborated by the photo exhibits to Ms. Skipworth's reports, which serve as visual evidence of fundamental shortcomings that both threaten the health and safety of prisoners and are completely obvious to anyone at the facility. *See* Skipworth 2016 Rpt. at 17–44; Skipworth 2014 Rpt. at 19–85.

### 1.   *Disturbing and Dangerous Environmental Conditions Expose Plaintiffs to a Substantial Risk of Harm*

#### a)   *The Failure to Maintain a Clean Living Environment Endangers Health and Well-Being*

The failure to take reasonable steps to ensure that prisoners are not forced to live in cells and use showers that are grossly unsanitary, that fail to protect from a high risk of disease, and that are consistent with human dignity has frequently been the subject of court concern. *See Gates*, 376 F.3d at 333–34; *Harper v. Showers*, 174 F.3d 716, 720 (5th Cir. 1999) (holding that allegations of conditions of confinement depriving a prisoner of sleep, cleanliness, and peace of mind could

violate the Eighth Amendment).[38] The conditions of confinement in these cases parallel in multiple respects the conditions to which the Isolation and Unit 5 and 6 Subclasses are subjected by reason of their confinement at EMCF.

> Ms. Skipworth unequivocally condemned the conditions of the cells at EMCF, noting that:
>
> Based on the levels of soil, dust, dirt, mold, and overall conditions during the tours, adequate cleaning and disinfection practices are not being followed throughout the housing units . . . . [T]he sporadic frequency with which I saw cleaning supplies and solutions indicates they are not widely available for use in the housing areas. Furthermore, inmates reported that they do not have access to cleaning supplies and chemicals in their cells, and when they are provided, the quantity of supplies is often inadequate[.] These allegations appear to be substantiated based on the quantity of cleaning supplies and filthy environmental conditions observed in the housing units.
>
> ***
>
> [I]t is apparent that basic cleaning procedures are not being performed on a regular basis. Accumulations of filth were noted on the walls and floors in all housing units.

Skipworth 2014 Rpt. at 9; *see also* Skipworth 2016 Rpt. at 15; Exh. 22 ("Evans Dep.") at 196:20–197:6, 200:7–11 (discussing non-compliance with obligation to keep EMCF a clean and well-maintained facility); Kupers 2016 Rpt. ¶ 144 (finding that "prisoners held in long-term confinement segregation units and other isolative environments" are "forced to live in abject filth"); Mitchell Decl. ¶¶ 39, 42–43 (describing the filth of the Unit 5 showers, which have bugs and mildew, and the Unit 5 dayroom). Apparent mold growths that have adverse respiratory effects can increase the risk of infection in immuno-suppressed persons. Skipworth 2016 Rpt. at 15, 42;

---

[38] *See also, e.g., Walker v. Schult,* 717 F.3d 119, 127 (2d Cir. 2013) ("[W]e have long recognized that unsanitary conditions in a prison cell can, in egregious circumstances, rise to the level of cruel and unusual punishment. . . . Indeed, unsanitary conditions lasting for mere days may constitute an Eighth Amendment violation." (citing cases)); *Huff v. Pundt*, No. 2:11-cv-148, 2012 WL 2994839, at *8-11 (S.D. Tex. June 29, 2012) (recommending denial of summary judgment to defendants in prisoner *pro se* damages case in which prisoner presented evidence of lack of light in shower, shock hazard from live wires of a broken light fixture, and possibility of eye infection resulting from shower conditions).

*see also* Skipworth 2014 Rpt. at 9, 63–64.[39] Such conditions, combined with the various failures to maintain working plumbing and adequate pest control create a substantial risk of harm to Plaintiffs' health and well-being.[40]

### (1) *Persistent Plumbing Problems Are Resolved Slowly, Resulting in Extended Periods of Exposure to Bodily Waste*

A review of the work orders from the facility demonstrates that plumbing issues are exceedingly common at EMCF. *See, e.g.*, Exh. 72 (showing that on October 3, 2016 alone, there were 10 plumbing-related work orders on Units 5 and 6, signifying a lack of or deficiency in plumbing in 4% of the units' cells).[41] The plumbing problems cover a wide range of mechanical and maintenance failures and place prisoners at risk of adverse health effects. *See, e.g.*, Grogan Decl. ¶ 18 ("One of [three] showers [on the top tier of Housing Unit 5A] has been broken for approximately three or four weeks."). Defendant's maintenance records corroborate that serious plumbing issues can take a significant amount of time to be resolved. *See, e.g.*, Exh. 72 at DEF-

---

[39] Defendant alleges that Ms. Skipworth, Plaintiffs' environmental health and safety expert, is unqualified to opine on the risk to prisoners from mold growths and other risks caused by environmental issues. MSJ at 8–10. To the extent that Defendant believes Ms. Skipworth is unqualified, it should have moved to exclude her opinions using a *Daubert* challenge. Defendant chose not to do so, and for good reason: Ms. Skipworth is a registered and licensed dietitian, a registered professional sanitarian, a certified correctional health professional, and a certified laundry and linen manager, with extensive experience in correctional food service and environmental health. *See* Skipworth 2016 Rpt. at 3, Attachment A. She is well-qualified to offer opinions regarding the health risks associated with the myriad environmental problems at EMCF.

[40] *See infra* pp. 58–61 for discussion of Defendant's long-standing knowledge of broken lighting fixtures that posed multiple obvious safety and security risks at EMCF. This knowledge interacts with and is amplified by the lack of regular staffing, inability to have maintenance requests fulfilled, and the lack of any reasonable means to maintain cell sanitation.

[41] The work orders are likely not representative of the prevalence of maintenance issues at EMCF, as only certain staff members are able to submit them, and even then, only at their discretion. *See, e.g.*, Grogan Decl. ¶ 24 ("When the officers come around, and I express a concern about maintenance or any other issue, they do not write it down, so I have no way to know if they remember or actually report the issue. I cannot verify if and when a work order is submitted. I have to rely on the correctional officers to relay the issue to a superior officer or maintenance because I am locked in my cell all the time.").

288488–89 (work orders showing two adjacent showers were not working and took 8 days to be repaired); *see generally* Exh. 75 (compendium of selected work orders from 2016 and 2017 showing significant and recurring plumbing problems at EMCF that the facility is often slow to address).

In *Gates*, the Fifth Circuit found that "[f]requent exposure to the waste of other persons can certainly present health hazards that constitute a serious risk of substantial harm." 376 F.3d at 340–41; *see also McCord v. Maggio*, 927 F.2d 844, 848 (5th Cir. 1991) (finding that it is "unquestionably a health hazard" to sleep on a bare mattress in "filthy water contaminated with human waste"); *Tillery v. Owens*, 907 F.2d 418, 425 (3d Cir. 1990) (noting danger in showers from a combination of sanitation and plumbing failures). A work order at EMCF submitted on October 4, 2016 reads:

> Toilet inside the cell is overflowing. They have been having bowel movements and still flushing the toilet and it continues to overflow all outside the cell and down into the other cells. It smells horribly on the pod.

Exh. 73. The work order does not indicate when a repair was completed. *See id.* As the many other work orders and prisoner statements cited herein describe, however, the event is not an outlier. *See, e.g.*, Clemons Dep. 46:24–48:7 (stating that he "can't count the number of times I've been trapped inside of a cell and the toilet didn't work," and that during a recent lockdown, he got hemorrhoids after staff would not address the non-working toilet in his cell for 11 days); Grogan Decl. ¶¶ 22–23 (describing toilet malfunctions, including one in his cell for three days, and failures of staff to take maintenance action). It highlights the reprehensible and uncivilized nature of staff response to maintenance issues at EMCF: maintenance issues often go unnoticed and unaddressed

until they reach extreme levels.[42] *See infra* p. 55 (work order only submitted when stench on pod was already "horrible"); *accord infra* pp. 25–29 (describing the significant problems at EMCF with staff leaving pods unsupervised). That such serious violations of health standards, not to mention human dignity, are allowed to persist for so long before being addressed is impossible to explain except by affirming that EMCF does not function in a minimally tolerable manner, is a prison fundamentally incapable of providing minimally necessary protections of basic health and sanitation necessities, and is truly indifferent to the concept of prisoners' basic human dignity. *See Gates v. Cook*, 376 F.3d at 341 ("[E]xposure to human waste, like few other conditions of confinement, evokes both the health concerns emphasized in *Farmer* and the more general standards of dignity embodied in the Eighth Amendment." (quoting *DeSpain v. Uphoff*, 264 F.3d 965, 974 (10th Cir. 2001))).

### (2)    *Filthy Living Conditions Promote Pest Infestations*

The pest control problems observed in the kitchen are representative of the problems faced by the Isolation and Unit 5 and 6 Subclasses, if not the entire prison. *See supra* pp. 44–45. In 2014, Ms. Skipworth concluded that "[t]he observation of rodent droppings and reported sighting of mice confirm the presence of rodents in the facility, placing inmates and staff in danger of contracting the diseases they carry." Skipworth 2014 Rpt. at 12; *see also id.* at 54–57 (photographs of mouse droppings and rodent harborage locations). In 2016, Ms. Skipworth observed drain flies in the Unit 5B lower showers and an infestation of roaches in the kitchen. *See* Skipworth 2016 Rpt. at 11. Prisoners also report that Unit 5 is infested with roaches, spiders, rodents, and other pests. *See,*

---

[42] This event also reflects the profound understaffing at EMCF, resulting in a lack of any mechanism for prisoners to contact staff for emergency needs, including, for example, a toilet overflowing with human waste.

*e.g.*, Mitchell Decl. ¶ 39 ("There are many bugs on Housing Unit 5, and my cell is currently full of flying black bugs that look like fleas."); Exh. 37 at AG017134 ("What do I have to do about this moldy, black, bug infested cell?").[43] These reports bespeak a lack of adequate pest control at EMCF, despite Defendant's representation that such services are provided at the facility by a different contractor. *See* Dkt. No. 531-12, ("MSJ Exh. L") (EMCF pest control contract).

As noted above in Plaintiffs' arguments regarding nutrition and kitchen sanitation at EMCF, the pest control provided in the kitchen is ineffective, *see supra* note 36, and such a problem appears to pervade the housing units as well. Beyond that, these reports reinforce a more deep-seated underlying problem: the failure to maintain a clean and sanitary environment, which permits infestations of bugs, rodents, and other vermin throughout EMCF. *See* Skipworth 2016 Rpt. at 11, 13 (noting, for example, that doors to the outside were propped open and an insect-control device was non-operational); Skipworth Rebuttal at 8 (the existence of a pest control contract "does not substantiate the claim that EMCF has elevated the importance of sanitation" when "[a] contract with a licensed pest control company is a basic necessity of maintaining any correctional facility"). Given that these insects are health hazards that can cause contamination and carry disease, the failure to provide adequate pest control (as opposed the *minimally-required* pest control that Defendant's pest control contract suggests it provides), or more broadly, a clean living environment, poses a substantial risk to prisoners' health. *See* Skipworth 2016 Rpt. at 12.

b)      <u>***The Failure to Maintain a Safe Living Environment Endangers Health and Well-Being***</u>

In addition to the above risks to Plaintiffs' health, the conditions at EMCF also expose

---

[43] About two weeks after the request form was submitted, the Contract Monitor notified Mr. Abston that his concerns had been forwarded to Deputy Warden Rice. *See* Exh. 37 at AG017116. It is unclear how much longer after that it took for the prisoner's concern to actually be resolved.

Plaintiffs to numerous safety hazards. Defendant's failure to ensure reliably working lights or cell control panels (which were allowed to remain non-functional for years before Defendants attempted to address this fundamental safety issue), apply proper fire safety protocols and maintain ventilation, and respond to environmental hazards such as spilled chemicals and bodily fluids, creates a substantial risk of harm to Plaintiffs' health and safety.

### (1)   *The Absence of Adequate Lighting Undermines Safety and Exacerbates Mental Health Issues*

Cell lighting is a critical problem at EMCF and deprives prisoners of a necessary condition of confinement. *See Gates*, 376 F.3d at 341–42 (approving injunctive relief requiring the provision of 20 foot-candles of light within prison cells). The absence of necessary lighting renders the showers unsafe by substantially increasing the risks of accidental injury and prisoner assault. The severely deficient lighting also exacerbates anxiety resulting from knowledge of the lack of fundamental safety in the cells, and is itself a source of serious mental distress for members of the class. *See* Kupers 2016 Rpt. ¶¶ 54–58, 111–12, 138 (detailing effects and prisoner accounts of living in a cell without light); Exh. 25 ("Nagel Dep.") at 53:18–54:2 (Centurion psychiatrist recognizing that non-functioning lights create a stressful environment, anxiety, and a lack of security). Failure to maintain the lighting in safe operating condition also undermines prisoner and staff safety by creating multiple fire and electric shock hazards, as discussed more fully below, *see infra* p. 63.

Lighting is particularly critical at EMCF because it is the only facility within the MDOC system that is specifically designated to house prisoners with serious mental health needs. *See* Kupers 2016 Rpt. ¶ 81 (noting that every prisoner he interviewed on Unit 5 had a current diagnosis of serious mental illness); *see also* Vail Rebuttal ¶ 63 (noting that 87% of prisoners at EMCF have a diagnosis of an Axis I psychological disorder and are on psychotropic medication). For prisoners

with mental illness, like most of those on Unit 5, as well as those potentially subject to isolation throughout EMCF, the absence of lighting is a serious stressor. *See* Grogan Decl. ¶¶ 19–20 ("During [the month I did not have a light bulb in my cell], not having a light made me anxious. I am diagnosed with depression and bipolar disorder. When I have to sit in the dark all day, I feel sad and lonely."); *see also* Kupers 2016 Rpt. ¶¶ 70, 81 (explaining that many of the prisoners in Unit 5 are forced to live continually in the dark because of broken lights in their cells combined with solid doors containing a small window). Moreover, excessive darkness severely exacerbates depression and paranoid thinking and alters the ability to remain oriented to time. *See* Kupers 2016 Rpt. ¶ 56; Mitchell Decl. ¶ 36 ("Living without a light affects my mood. I am agitated and sad, and I feel like I am living underground."). Persons who suffer from mental illness are particularly affected by the lack of diurnal cycles of dark and light, which also causes sleep deprivation, memory deficits, and anxiety. *See* Kupers 2016 Rpt. ¶ 56.

Based on scientific lighting level analyses, Ms. Skipworth concluded that Defendant fails to provide the level of lighting necessary for ordinary human activities such as reading, or to avoid safety hazards while showering.[44] *See* Skipworth 2014 Rpt. at 7–8; Skipworth 2016 Rpt. at 6-9; Kupers 2016 Rpt. ¶ 54, 112 (describing cells without lights to be in near total darkness 24 hours a

---

[44] Defendant argues that Ms. Skipworth could only speculate as to why six occupied cells out of a total of 248 cells in Units 5 and 6 did not have lights and for how long the lights had been missing. *See* MSJ at 8. Such an argument distracts from the actual health and safety risks that exist when prisoners are forced to live in dark cells; such risks clearly do not depend on the reason the lights are missing. Moreover, Ms. Skipworth could not even have observed all 248 cells, in part because of Defendant's refusal to adhere to the minimally necessary security practice of requiring prisoners to remove coverings, like paper, from their windows. *See infra* note 22 (describing the security problem posed by window coverings). That at least six occupied cells did not have lights during Ms. Skipworth's visit, coupled with evidence that maintenance requests are often slow to be resolved, indicates that at any given time, multiple prisoners are living in near-total darkness. *See* Kupers 2016 Rpt. ¶ 76 ("[I]t was still the case that except for the provision of light bulbs in advance of my tour, [prisoners] often found themselves in a dark cell and had to wait weeks for staff to replace a broken or missing bulb"); Exh. 46 (seven work orders from Units 5 and 6 on February 13, 2017 for broken light fixtures).

day); Mitchell Decl. ¶¶ 32–37 (describing being moved into four different cells without light fixtures within a one-year period). Ms. Skipworth observed missing light bulbs and light fixtures in Unit 5, and reported that a maintenance staff member had resolved not to "give out any[]more light bulbs" without a Rule Violation Report from the unit manager because replacing bulbs was "a major budget issue." Skipworth 2016 Rpt. at 8–9; Exh. 84 at MTC-CON-00003860. She also found that the showers fail to provide sufficient light to meet generally applicable standards, and are so dark that she could not see a prisoner in a shower stall and could not photograph the interior of the showers when the door to the dayroom was closed. *See* Skipworth 2016 Rpt. at 6–7 (finding that only two of the 12 showers she measured in Unit 5 met minimally acceptable standards for lighting)*; see also id.* at 17–22 (photo exhibits of dim showers); Skipworth 2014 Rpt. at 7–8 (finding only two of 31 light readings in Units 5 and 6, at the time both units housing prisoners under restrictions amounting to isolation, met minimal shower lighting requirements). In 2016, the majority of the showers Ms. Skipworth tested in Unit 5 did not even meet one-tenth of the lighting standard, meaning that the interior was essentially dark. *See* Skipworth 2016 Rpt. at 6.

By contrast, Defendant simply asserts that lighting issues are "isolated," with "steady maintenance" and that Ms. Skipworth did not know of any injuries resulting from inadequate lighting.[45] *See* MSJ at 7, 17. It presents no actual evidence based on scientific testing of lighting

---

[45] Throughout its motion for partial summary judgment, Defendant argues that Plaintiffs are not entitled to relief because Ms. Skipworth did not point to specific, actual injury befalling prisoners as a result of decrepit conditions and nutritional deficiencies at EMCF. *See, e.g.*, MSJ at 7, 8, 9. The argument entirely misunderstands the applicable legal standard, which requires Plaintiffs to show a "substantial *risk* of harm," not actual injury. *See Gates*, 376 F.3d at 333 (holding, in an environmental conditions case for injunctive relief that "[i]t would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them" (quoting *Helling*, 509 U.S. at 32)). Nonetheless, the record evidence does demonstrate that Plaintiffs have suffered actual, and serious injuries as a result of environmental conditions and inadequate nutrition at EMCF, including, the inability to breathe due to smoke, feelings of depression, and weight loss. *See infra* 62–63; *supra* pp. 44, 58–59.

levels within the cells at EMCF, and its contention that the ACA found the lighting levels acceptable is not backed by any actual test measurements.[46] The contention is further contradicted by its own records, *see supra* p. 60, and simple visual examination of the cells and showers in the facility, *see, e.g.*, Skipworth 2016 Rpt. at 17 (almost completely black photograph of the Unit 5B lower shower); Mitchell Decl. ¶ 37 ("I believe [not having lights] is a regular occurrence because I have seen prisoners sitting in the dark when I walk by their cells.").

Accordingly, the mutually enforcing actions of the darkened cells and showers, combined with the severe vulnerabilities of the seriously mentally ill prisoners at EMCF, produce a substantial risk of serious harm and violate the Eighth Amendment.

### (2) *Constant Fires and Blocked Vents Create Smoke-Filled Zones*

Fires are a constant presence on every housing unit at EMCF, and particularly housing units to which isolated prisoners are assigned. Particularly in the segregated housing units, it has

---

[46] Defendants attempt to support their position as to Claims 3, 6, and 7 by pointing to the accreditation of EMCF by the American Correctional Association ("ACA") and satisfactory audits by other organizations. MSJ 3–4, 10. This Circuit has found it "absurd to suggest that the federal courts should subvert their judgment as to alleged Eighth Amendment violations to the ACA whenever it has relevant standards." *Gates*, 376 F.3d at 337; *see also Bell v. Wolfish*, 441 U.S. 520, 543 n.27 (1979) ("[W]hile the recommendations of . . . groups [including the ACA] may be instructive in certain cases, they simply do not establish the constitutional minima; rather, they establish goals recommended by the organization in question."). Accreditation is based largely on a review of a prison's policies, not its practices. *See, e.g.*, Exh. 38 ("ACA Accreditation Report") at DEF-024596 (describing individual treatment and program plans without analysis of how and whether plans are actually implemented), DEF-024597 (finding that staff are aware of chemical agent policy and other security procedures, but not probing into whether those policies and procedures are actually followed in practice). Moreover, "accredited prisons have [nonetheless] been found unconstitutional by courts." *LaMarca v. Turner*, 662 F. Supp. 647, 655 (S.D. Fla. 1987); *cf. Boulies v. Ricketts*, 518 F. Supp. 687, 689 (D. Colo. 1981) (denying summary judgment when an accredited prison's law library failed to meet the relevant ACA standard and "any known acceptable standard"). In this district, for example, the ACA-accredited Walnut Grove Youth Correctional Facility was found to have "allowed a cesspool of unconstitutional and inhuman acts and conditions to germinate, the sum of which places the offenders at substantial ongoing risk." Exh. 81, Order Approving Settlement, *Depriest v. Epps*, No. 3:10-cv-00663-CWR-FKB (March 26, 2012) (Reeves, J. presiding); *see also* Exh. 41 (noting that "the prison had recently received a perfect score by outside auditors from the American Correctional Association").

become the common practice of prisoners—who lack an otherwise reliable way to contact staff about concerns and have them addressed—to set fires as the one way to bring urgent issues to the attention of staff. *See, e.g.*, Skipworth 2014 Rpt. at 17 ("Inmates reported that prisoners frequently set fires, as it is the only way to attract the attention of the officers."); Vail 2014 Rpt. ¶ 80 (describing methods, including starting fires, by which prisoners register their frustrations and complaints).

The pervasiveness of fire-setting at EMCF is demonstrated by the multiple photographs and references to evidence of fire-setting noted in Ms. Skipworth's 2014 and 2016 reports. *See* Skipworth 2016 Rpt. at 24–30 (showing wicks, fire hazards, and scorched cell doors); Skipworth 2014 Rpt. at 41–51 (showing evidence of past significant fires on cell blocks and fire safety hazards). It is also demonstrated by the extreme numbers of prisoners suffering from fire-related injuries each year. *See* Exhs. 60–61 at ln. 310 (showing that in 2016, there were over 1,250 fire-related injuries among prisoners and staff). Such fires threaten respiratory and other harms to prisoners, including anxiety and mental stress from being confined in a cell while fires fill the air with soot and make breathing difficult. *See, e.g.*, Kupers 2016 Rpt. ¶ 88 (describing asthmatic prisoner who frequently experiences shortness of breath from fires and immobilizing gas sprayed by officers and who suffers severe anxiety in segregation).

The risk posed by fires is further exacerbated because the air vents in the facility are commonly blocked. *See* Skipworth 2016 Rpt. at 9 (finding that miscellaneous objects and heavy accumulations of dust blocked ventilation system grilles, which consequently pose a risk of fire and can cause mechanical problems and promote mold growth). This means that after a fire is set, the smoke from that fire will linger in the unit, forcing prisoners to breathe smoke-filled air for prolonged periods of time. This is particularly true because fires on Units 5 and 6 are common,

and often responded to slowly, if at all, and prisoners are not evacuated from the unit after the fires are put out. *See* Braxton Dep. 39:13–41:25, 42:12–44:21; *see also* Kupers 2016 Rpt. ¶¶ 88-90, 111, 113, 115, 117 (prisoner accounts of staff failure to respond to fires and other emergencies on Unit 5); Grogan Decl. ¶¶ 27–29 (describing frequency of fires and delays in extinguishing them because of faulty equipment). For Ms. Braxton, ventilation on (at least) Unit 5 was so poor that she almost had an asthma attack while visiting the unit, and thereafter would not go to the unit without a mask. *Id.* at 44:18–45:20; *see also* Grogan Decl. ¶ 30 ("When a fire is set, I have difficulty breathing. There is a lot of smoke on the zone."); Mitchell Decl. ¶ 45 ("I have asthma, and it is difficult to breathe during fires [on Units 5A and 5B]. . . . The feeling of being unable to breathe is frightening.").

Plaintiffs do not contest that the fires at EMCF are set by prisoners. *See* Skipworth 2014 Rpt. at 17 (explaining use of broken light socket as a way to light cell fires). But the effects of a fire are not only visited upon the individual prisoner who sets it. *See, e.g.*, Kupers Rpt. ¶ 90 ("He has had neighbors on both sides who repeatedly set fires, which often causes him to inhale smoke.") Other prisoners, by virtue of their confinement, cannot escape the secondhand smoke and are thus involuntarily subjected to the harm. *See Robinson v. Louisiana*, 363 F. App'x 307, 308 (5th Cir. 2010) (per curiam) (finding a genuine issue of material fact based on prisoner affidavits "showing consistent exposure to smoke in prison" and "evidence of negative health effects" and reversing summary judgment as to a defendant who was deliberately indifferent to the health violation). It is outrageous for Defendant to suggest that because certain conditions are exacerbated by some prisoners, no prisoner can obtain relief, when Defendant has created or

allowed such deplorable conditions in the first place.[47] *See* MSJ at 16 (arguing that "to the extent any of the conditions involve Plaintiffs' intentional conduct . . . they are foreclosed"). Given that the reason most prisoners give for setting fires is because they need attention and cannot get it through any other means, Defendant's failure to address prisoners' needs such that they are compelled to set fires must not preclude Plaintiffs from the relief sought. *See* Braxton Dep. 159:15–19; Mitchell Decl. ¶ 44 ("Prisoners on Housing Units 5A and 5B set fires for many different reasons: some need medical attention, some need to see a case manager, and some are trying to get the attention of an officer. Setting a fire may be the only way a prisoner can get the attention of an officer because they rarely come to the zone.").

### (3)    *Exposure to Chemicals and Bodily Fluids Leaves Prisoners Vulnerable to Injury and Disease*

Prisoners at EMCF are also exposed to great risk of illness or disease because chemical and bodily fluid spills are left uncleaned for extended periods and those prisoners assigned to clean

---

[47] The case Defendant cites for the proposition that "a prisoner cannot establish a[n Eighth Amendment violation] where he willingly participates in the conduct giving rise to his injury" is inapposite. MSJ at 16 (quoting *Legate v. Livingston*, 822 F.3d 207, 210 (5th Cir. 2016)). Plaintiffs who set fires in their cells are not being injured because they voluntarily chose to pass around a peace pipe, *see Legate*, 822 F.3d at 209–11, or voluntarily chose to join in a softball game, *see Christopher v. Buss*, 384 F.3d 879, 882 (7th Cir. 2004). Rather, the act of setting a fire is a direct consequence of Defendant's staff refusing to respond to even urgent calls for help in the absence of a fire. *See, e.g.*, Grogan Dec. ¶ 12 (describing having to light a fire in order to get staff to take him to the medical unit). For prisoners with urgent needs, the "choice" that EMCF offers is between letting these needs go unmet, or engaging in a dangerous act like setting a fire that forces the staff to respond. That is not the kind of truly voluntary, uncoerced choice involved in *Legate*.

Moreover, even if setting a fire is a voluntary act, Defendant has a constitutional obligation to protect prisoners from suffering unnecessary harms stemming from their failure to respond appropriately. *See Estelle v. Gamble*, 429 U.S. 97 (1976) (requiring prison to provide medical care to prisoner injured during voluntary work detail); *see also McCord*, 927 F.2d at 847 ("[T]he possibility that inmate vandalism of plumbing fixtures was at times responsible for sewage backup, . . . while perhaps material, is certainly not dispositive on the basis of this record to the question of whether [plaintiff] personally was cruelly and unusually punished."); *Beck v. Lynaugh*, 842 F.2d 759, 761 (5th Cir. 1988) (windows broken by prisoners did not preclude a finding that plaintiffs' claims related to exposure to the elements in the winter were non-frivolous).

up the spills are not provided appropriate protective gear or training. *See* Skipworth 2014 Rpt. at 33–37 (photographs and descriptions of blood and bloody waste found in a grossly contaminated cell and separately in a shower, and noting the risk entailed by such findings). Exposing prisoners to contact with such substances absent proper protective measures creates a serious risk of harm that violates the Eighth Amendment. *See Palmer v. Johnson*, 193 F.3d 346, 352 (5th Cir. 1999) (finding that seventeen-hour outdoor confinement resulting in exposure to prisoners' bodily waste constituted an unconstitutional "deprivation of basic elements of hygiene"). The dangerous failures revealed in this record with regard to the exposure of prisoners to hazardous bodily fluids and chemical agents creates a substantial risk of potentially life-threatening harm.

For example, in 2014, after Ms. Skipworth discovered that the floor and interior of the door in cell 6C-114 were covered with blood, the staff sent a prisoner-worker who was dressed only in his prison-issued clothing, aside from disposal plastic gloves. Skipworth 2014 Rpt. at 34–37. Recognizing the need to protect against the serious hazards of spilled human blood, Ms. Skipworth requested that the prisoner be issued protective clothing before attempting to clean this major blood spill; he was given trash bags to cover his shoes after that request. *Id.* A second prisoner-worker arrived wearing rubber boots. *Id.* Ms. Skipworth noted that "[t]he clean-up of this major blood spill did not appear to follow an appropriate, standardized plan for cleaning this biohazard, particularly in light of the extensive nature of the spill." *Id.* at 35; *see also id.* at 33-34, 36-37 (discussing this blood spill and another probable one found during the inspection); *id.* at 38 (noting that a cleaning cart on a different pod of Housing Unit 6 at nearly the same time was not equipped with a cleaning agent that would be effective against-disease-causing agents). Ms. Skipworth's findings notwithstanding, MTC testified that prisoners who clean up biohazard spills are given only latex gloves and rubber boots, and *maybe* sometimes a mask, to prevent contact with

biohazard material. *See* Exh. 12 ("MTC Dep.") at 243:20–247:8.

While the risk of prisoners exposed to bodily fluids is particularly severe, many more prisoners at EMCF have been exposed to chemical agents. *See* McGinnis-Roth Rpt. at 25–27 (describing the pervasiveness of uses of force involving chemical agents). Indeed, most of these exposures have undoubtedly affected prisoners who were not the direct target of the use of such agents by staff. *See, e.g.*, Exh. 66 at MTC077225 (MTC presentation stating, "[w]hen chemical agents are used, all personnel in the area are subject to the agent's effects"); Vail 2014 Rpt. ¶ 84 (observing on video officers coughing from the use of a chemical agent on a prisoner); Mata Dep. 27:1–16 ("[Y]ou can't breathe [on Units 5 and 6 because there is] so much mace down there.").

### 2. *Defendant Is Deliberately Indifferent to the Risks Created by Unsanitary and Unsafe Environmental Conditions*

Defendant's deliberate indifference to the appalling environmental conditions at EMCF is easily established by the obviousness of such conditions to any individual, including prison staff, who walks around the facility. Representative photographs of actual conditions in the prison were appended to Ms. Skipworth's reports. *See, e.g.*, Skipworth 2016 Rpt. at 24–30 (showing images of pervasive evidence of fire damage within the housing units at EMCF); Skipworth 2014 Rpt. at 34–51 (showing images of days-old blood stains, fire damage, and a live fire).[48] The statements and testimony of prisoners, employees, and experts who have each spent considerable time at EMCF, corroborate and contextualize the images in the photographs. Taken together with Defendant's own records, which reveal delays in addressing urgent maintenance problems, the evidence is overwhelming that Defendant is aware of the disgusting and degraded conditions at EMCF.

---

[48] Notably, Ms. Skipworth was accompanied on her tours by Warden Frank Shaw and other staff in 2016, and by Warden Jerry Buscher, Deputy Warden Ray Rice, and Assistant Warden N. Hogans in 2014, who presumably witnessed the same conditions and deficiencies as reported by Ms. Skipworth. Skipworth 2016 Rpt. at 4; Skipworth 2014 Rpt. at 4.

The example of lighting is particularly instructive. During her first inspection of EMCF in 2014, Ms. Skipworth found a remarkable number of inoperable light fixtures in both general population and cells used for disciplinary and other forms of isolated confinement. The absence of working lights in all of these housing areas posed substantial risks in a facility housing almost entirely prisoners with serious mental health diagnoses, *see supra* pp. 58–61. Evidence in the record even shows that staff aware of the problem deliberately ignored it. *See* Skipworth 2016 Rpt. at 8 (maintenance staff refusing to give out replacement light bulbs for housing units). Although Defendant was well-aware of the lighting deficiencies, pointed out repeatedly by Plaintiffs' experts, the problems persist to this day. *See, e.g.*, Skipworth 2016 Rpt. at 5–9, 17–23; Skipworth 2014 Rpt. at 6–8, 20–29; Kupers 2016 Rpt. at ¶ 76; Exh. 7 ("Kupers 2014 Rpt.") at 16–18.

Defendant argues that it "has taken more than sufficient action to both alleviate environmental concerns and to respond to problems." *See* MSJ at 16–17; *see also* MSJ at 10–11 (arguing that "EMCF is extremely attentive to environmental conditions and nutritional needs"). The record evidence simply does not support Defendant's claim. Defendant's own maintenance records disclose a maintenance program that is often slow to address actual and serious needs. For example, Defendant's maintenance records for March 2017 contain the remarkable information that it took eleven days to fix a ceiling tile and during that period, "birds [were] coming in." Exh. 55;[49] *see also* Exh. 47 (maintenance records completed in February 2017 showing wait times of 19–57 days for resolution of serious maintenance issues); Exh. 57 (work order stating "supervisor said not to replace" a window in cell 5B-110); *supra* p. 55 (describing a toilet that had been

---

[49] This report regarding the lack of an acceptable response to a maintenance emergency suggests a serious structural deficiency in both the response to preventive maintenance and in the facility itself. Bird feces constitute a significant health threat. *See, e.g.*, Exh. 48 (describing the risks of contracting histoplasmosis in the areas drained by the Mississippi and Ohio rivers).

overflowing so long that the smell from it had pervaded the housing unit). Tellingly, the maintenance log submitted by Defendant omits the key metric of how long it actually took prison staff to address the myriad maintenance issues that were made known to them in the six-month period. *See* Dkt. No. 531-13, MSJ Exh. M.

Similarly, Defendant's reports also show an inattention to solving the underlying problems that create environmental concerns at EMCF. For example, despite the extreme numbers of fires and fire-related injuries at EMCF, *see supra* p. 62, Defendant refuses to actually address why the fires are set in the first instance—a broken grievance system. In fact, Defendant's annual statistics show that in 2016, out of over 2,100 grievances filed by prisoners, fewer than 750 were actually resolved, either formally or informally. *See* Exhs. 60–61 at lns. 2410–30. That means that around 65% of prisoner grievances were left unresolved by EMCF. *See* Vail 2016 Rpt. ¶¶ 74–76 (describing the consequences of a broken grievance system); *see also* Vail 2014 Rpt. ¶¶ 72–79 (same). The failure to hear those grievances results in the constant lighting of fires in the facility, and harm to the health of not only the individual setting the fire, but also those prisoners housed on the same unit who are forced to suffer its effects. The same failure to address the root causes of a problem applies to pest control. While Defendant promotes the fact that it has retained a contractor to provide pest control services at the facility, *see* MSJ at 11, 17, pests continue to be a substantial problem. Defendant fails to address the reasons why, which include, most obviously, an indifference to trash and debris littering the facility.. Ultimately, Defendant's reasonable measures are anything but reasonable given that they demonstrate little actual effort to tackle the very serious problems related to environmental conditions at EMCF. [50]

---

[50] Defendant, however, is clearly more than *capable* of such effort. *See* Braxton Dep. 160:4–20 (describing how the facility was painted and cleaned such that it was "spotless" ahead of a visit from MTC's Regional Vice President); Kupers 2016 Rpt. ¶ 75 ("[T]he day before my tour the pods were thoroughly cleaned [and

\*      \*      \*

The record evidence demonstrates that Defendant is, and has been, deliberately indifferent to the substantial risks imposed on Plaintiffs by the degrading and degraded environmental conditions at EMCF. At the least, it discloses genuine disputes regarding the fact of these conditions, and Defendant's response to them. Such disputes cannot be resolved by a summary proceeding on a paper record, but rather, must be judged by the factfinder at trial.

## CONCLUSION

Ultimately with respect to each of the claims on which Defendant seeks summary judgment, the evidence overwhelmingly demonstrates that conditions at EMCF put Plaintiffs at substantial risks of harm, and that Defendant is both aware of and deliberately indifferent to those risks. To the extent there is any disagreement about the weight of that record, or the facts contained therein, they must be resolved at a full trial on the merits of Plaintiffs' claims. Defendant's Motion for Partial Summary Judgment should be denied.

Dated: September 1, 2017

Respectfully submitted,

_s/ Ravi Doshi_____

Ravi Doshi (admitted _pro hac vice_)
Anna Q. Han (admitted _pro hac vice_)
Covington & Burling LLP
850 Tenth Street, NW
Washington, DC 20001
Phone: 202-662-6000

---

prisoners] had never seen the staff clean the floors any other time"); Brewer Decl. ¶ 21 ("[W]hen [there is advance notice of a visit by MDOC], everyone cleans and polishes everything in the kitchen for three or four days so that it looks like things are being done correctly. This is the only time the kitchen is really clean . . . the overhead vents are cleaned out, the walls are washed, and somebody scrubs the outside of the pots. . . . When there are no visitors, [none of this is done]."); Grogan Decl. ¶ 26 ("The only time the staff ensures the zone is cleaned thoroughly is when there are visitors coming to the facility, such as visitors from MTC or MDOC.").

Mark P. Gimbel (admitted *pro hac vice*)
Erin Monju (admitted *pro hac vice*)
Benjamin R. Salk (admitted *pro hac vice*)
Covington & Burling LLP
620 Eighth Avenue
New York, NY 10018
Phone: 212-841-1000

Gretchen Hoff Varner (admitted *pro hac vice*)
Covington & Burling LLP
One Front Street
San Francisco, CA 94111
Phone: 415-591-6000

Jody E. Owens, II, MS Bar # 102333
Elissa Johnson, MS Bar #103852
Chelsea Caveny, MS Bar # 105300
Sarah D. Bidinger, MS Bar # 105015
Southern Poverty Law Center
111 E. Capitol Street, Suite 280
Jackson, MS 39201
Phone: 601-948-8882; Fax: 601-948-8885

Gabriel B. Eber (admitted *pro hac vice*)
Eric G. Balaban (admitted *pro hac vice*)
Carl Takei (admitted *pro hac vice*)
National Prison Project of ACLU
915 15th Street, NW, 7th Floor
Washington, DC 20005
Phone: 202-393-4930; Fax: 202-393-4931

Elizabeth Alexander *(admitted pro hac vice)*
Law Offices of Elizabeth Alexander
1416 Holly Street NW
Washington, DC 20012
Phone: 202-291-3774

*Attorneys for Plaintiffs*

70

**CERTIFICATE OF SERVICE**

I, Ravi Doshi, hereby certify that a true and correct copy of the foregoing document was filed electronically. Notice of this filing will be sent by electronic mail to all parties by the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF System.

SO CERTIFIED, this 1st day of September, 2017.


Respectfully submitted,

*s/ Ravi Doshi* _____
Ravi Doshi