**THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

JERMAINE DOCKERY, *et al.*,

        Plaintiffs,

v.

PELICIA HALL, *et. al.*,

        Defendant.

Civil Action No. 3:13cv326-WHB-JCG

**PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANT'S**
**MOTION FOR DECERTIFICATION**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................ 1

LEGAL STANDARD......................................................................................... 5

ARGUMENT ..................................................................................................... 6

A.    Defendant Misstates the Standard Applicable to Plaintiffs' Claims Under Rule
      23(a)(2). ................................................................................................... 8

      1.    Defendant Misunderstands the Eighth Amendment Standard Governing
            Plaintiffs' Claims and Misapplies Recent Case Law ............................... 9

      2.    Defendant Ignores the Substantial Evidence Supporting Class Certification....... 17

            a.    Defendant Cites No New Facts Supporting Decertification — Instead,
                  Defendant's Evidence Supports Continued Certification ........................ 17

            b.    Plaintiffs Have Amassed Significant Proof that Certification Remains
                  Appropriate .......................................................................... 17

                  i.    EMCF's Failure to Protect Prisoners from Violence Persists....... 22

                  ii.   The Medical Care at EMCF Remains Systemically
                        Inadequate. ................................................................ 34

                  iii.  Mental Health Care at EMCF Continues to Endanger All
                        Prisoners with Serious Mental Health Needs................................ 41

                  iv.   Inadequate Nutrition and Food Safety Practices at EMCF
                        Continue to Create a Risk of Harm................................. 47

                  v.    Prisoners at EMCF Continue to Be Subjected to Conditions
                        Amounting to Solitary Confinement................................ 49

                  vi.   Prisoners Housed on Unit 5 and 6 Continue to Be Subjected to
                        Dangerous Environmental Conditions ........................... 52

B.    Defendant Misstates the Standard Applicable to Plaintiffs' Claims Under Rule
      23(b)(2). ................................................................................................ 56

CONCLUSION................................................................................................ 63

i

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                    **Page(s)**

*In re Apple iPod iTunes Antitrust Litig.*,
  No. 05-CV-0037 YGR, 2014 WL 6783763 (N.D. Cal. Nov. 25, 2014) ...................................8

*Baldridge v. SBC Commc'ns, Inc.*,
  404 F.3d 930 (5th Cir. 2005) .................................................................................7

*Braggs v. Dunn*,
  317 F.R.D. 634 (M.D. Ala. 2016) ................................................................. *passim*

*Brown v. Plata*,
  563 U.S. 493 (2011)........................................................................12, 57, 59

*Cole v. Livingston*,
  No. 4:14-CV-1698, 2016 WL 3258345 (S.D. Tex. June 14, 2016)........................................49

*Day v. Celadon Trucking Servs., Inc.*,
  827 F.3d 817 (8th Cir. 2016) ..........................................................................7, 18

*Depriest, et al. v. Walnut Grove Correctional Authority, et al.*,
  No. 3:10-cv-663-CWR-FKB, Order (S.D. Miss. June 11, 2015) ...........................................16

*Doe v. Hommrich*,
  No. 3-16-0799, 2017 WL 660681 (M.D. Tenn. Feb. 17, 2017) ..............................................9

*M.A. ex rel. E.S. v. Newark Public Schools*,
  No. 01-3389, 2009 WL 4799291 (D. N.J. Dec. 7, 2009)........................................................58

*Ebert v. General Mills*,
  823 F.3d 472 (8th Cir. 2016) ..........................................................................58, 59

*Farmer v. Brennan*,
  511 U.S. 825 (1994)...................................................................................... *passim*

*In re: First American Home Buyers Protection Class Action Litigation*,
  313 F.R.D. 578 (S.D. Cal. 2016) ......................................................................57, 58

*Forbush v. J.C. Penney Co., Inc.*,
  994 F.2d 1101 (5th Cir. 1993) ...........................................................................57

*Gates v. Cook*,
  376 F.3d 323 (5th Cir. 2004) ..........................................................................1, 13

*Graham v. Parker*,
  No. 16-CV-01954, 2017 WL 1737871 (M.D. Tenn. May 4, 2017)...........................................8

*Hernandez v. County of Monterey*, 305 F.R.D. 132 (N.D. Cal. 2015)……………  ....................60

*Holmes v. Godinez*,
    311 F.R.D. 177 (N.D. Ill. 2015).................................................................9, 13, 16

*Jewett v. Calif. Forensic Med. Grp., Inc.*,
    No. 2:13-CV-0882 MCE AC P, 2017 WL 980446 (E.D. Cal. Mar. 13, 2017) ........................8

*Johnson v. American Credit Co.*,
    581 F.2d 526 (5th Cir. 1978) .................................................................57

*Jones v. Gusman*,
    296 F.R.D. 416 (E.D. La. 2013)................................................................13, 57, 59

*Lakin v. Barnhart*,
    758 F.3d 66 (1st Cir. 2014) .................................................................13

*Lippert v. Baldwin*,
    No. 10 C 4603, 2017 WL 1545672 (N.D. Ill. Apr. 28, 2017).................................8, 10, 52, 53

*Lyon v. U.S. Immigration & Customs Enforcement*,
    300 F.R.D. 628 (N.D. Cal. 2014), *modified*, 2015 WL 4538047 (N.D. Cal.
    July 27, 2015).................................................................9

*M.D. v. Perry*,
    294 F.R.D. 7 (S.D. Tex. 2013).................................................................13, 54

*Maldonado v. Ochsner Clinic Found.*,
    493 F.3d 521 (5th Cir. 2007) .................................................................53

*Marlo v. United Parcel Serv., Inc.*,
    251 F.R.D. 476 (C.D. Cal. 2008) .................................................................7

*Marlo v. United Parcel Serv., Inc.*,
    639 F.3d 942 (9th Cir. 2011) .................................................................7

*Mazzei v. Money Store*,
    829 F.3d 260 (2d Cir. 2016).................................................................7

*McGee v. Pallito*,
    No. 1:04-CV-00335-JGM, 2015 WL 5177770 (D. Vt. Sept. 4, 2015) .................................9, 16

*McNamara v. Felderhof*,
    410 F.3d 277 (5th Cir. 2005) .................................................................7

*Menocal v. GEO Grp., Inc.*,
    No. 14-CV-02887-JLK, 2017 WL 880882 (D. Colo. Feb. 27, 2017)........................................9

*Parsons v. Ryan,*
    754 F.3d 657 (9th Cir. 2014) ...............................................................51, 52, 53, 57

*In re Pharmacy Benefit Managers Antitrust Litigation,*
    No. CV 03-4730, 2017 WL 275398 (E.D. Pa. Jan. 18, 2017) ...............................58

*Phillips v. Sheriff of Cook County,*
    828 F.3d 541 (7th Cir. 2016) .................................................................49, 50, 51, 52

*In re Processed Egg Prod. Antitrust Litig.,*
    No. 08-MD-2002, 2017 WL 3494221 (E.D. Pa. Aug. 14, 2017) ...........................18

*In re Rodriguez,*
    695 F.3d 360 (5th Cir. 2012) ...............................................................................9, 53

*Scott v. Clarke,* 61 F. Supp. 3d 569 (W.D. Va. 2014).................................................20

*Smentek v. Sheriff of Cook Cty.,*
    No. 09 C 529, 2014 WL 7330792 (N.D. Ill. Dec. 22, 2014) ........................8, 49, 50

*In re St. Jude Medical, Inc.,*
    425 F.3d 1116 (8th Cir. 2005) .................................................................................58

*M.D. ex rel. Stukenberg v. Perry,*
    675 F.3d 832 (5th Cir. 2012) ...................................................................................59

*Unknown Parties v. Johnson,*
    163 F. Supp. 3d 630 (D. Ariz. 2016) ................................................................ *passim*

*V.W. v. Conway,*
    236 F. Supp. 3d 554 (N.D.N.Y. 2017) .......................................................................9

*Wal-Mart Stores, Inc. v. Dukes,*
    564 U.S. 338 (2011).......................................................................................... *passim*

*West v. Atkins,*
    487 U.S. 42 (U.S. 1988)..............................................................................................2

*Williams v. Conway,*
    312 F.R.D. 248 (N.D.N.Y. 2016) ...............................................................................9

*Yates v. Collier,*
    __ F.3d ___, No. 16-20505, 2017 WL 3574968 (5th Cir. Aug. 18, 2017) ...................... *passim*

## Other Authorities

Federal Rule of Civil Procedure 23 ....................................................................... *passim*

Prison Litigation Reform Act Section, 18 U.S.C. § 3626.......................................59, 60

NEWBERG ON CLASS ACTIONS (5th ed. 2013) ..........................................................7, 9, 14, 18, 54

## I.   INTRODUCTION

On September 29, 2015, the Court certified a class and three subclasses of prisoners confined at the East Mississippi Correctional Facility ("EMCF"), a special needs facility designated by the Mississippi Department of Corrections ("MDOC") to house prisoners who suffer from serious mental illness. *See* ECF No. 257. Defendant, which includes various officials of MDOC, now seeks decertification of those classes. *See* ECF No. 530. Defendant cites no new law or facts meriting decertification. Nor could it. The law governing prison condition class actions has remained materially unchanged since the Court's order granting certification, and merits discovery has produced substantial additional evidence that the policies and practices at EMCF that Plaintiffs identified in their original class certification briefing continue to place all class members at a "substantial risk of serious harm," in violation of their Eighth Amendment rights. *See* ECF No. 240; *see also Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *Gates v. Cook*, 376 F.3d 323, 332 (5th Cir. 2004). At bottom, Defendant's motion to decertify is nothing more than a thinly-veiled effort to relitigate the Court's original certification order. For that reason, and the reasons set forth in this brief, Defendant's motion for decertification should be denied.

## II.   PROCEDURAL BACKGROUND

Plaintiffs, prisoners confined at EMCF, filed this action on May 30, 2013. *See* ECF No. 1. Plaintiffs' complaint alleged that policies and practices at EMCF subject prisoners to conditions so harsh and inhumane as to deprive them of basic human needs, including reasonable protection from violence, *id.* at 78–79 (Claims Four and Five), access to care for serious medical and mental health needs, *id.* at 77–78 (Claims One and Two), reasonably safe and clean environmental conditions, *id.* at 79–80 (Claim Six), adequate nutrition, *id.* at 80 (Claim Seven), and freedom from conditions amounting to solitary confinement, *id.* at 78 (Claim Three).

Plaintiffs further alleged that Defendant is aware of the substantial risk of serious harm these policies and practices pose to prisoners at EMCF and that Defendant has failed to act reasonably to address that risk. *Id.* at 77–80. As a result, Defendant has and continues to violate the right of EMCF prisoners, under the Eighth Amendment, to be free from cruel and unusual punishment.[1] *Id.* at 81.

Because these systemic violations would be best assessed and remedied on a class-wide basis, Plaintiffs sought certification of a class including all current and future prisoners at EMCF, with respect to Plaintiffs' protection from violence, medical care, and nutrition claims (the "EMCF Class"). *Id.* at 69–71. In addition, Plaintiffs sought certification of three subclasses: (1) all prisoners at EMCF subject to Defendant's mental health care policies and practices (the "Mental Health Subclass"), *id.* at 73–75; (2) all prisoners at EMCF housed in Units 5 and 6, with respect to Plaintiffs' conditions claim (the "Units 5 and 6 Subclass"), *id.* at 75–77; and (3) all prisoners at EMCF subjected to Defendant's policies and practices of confining prisoners in conditions amounting to solitary confinement (the "Isolation Subclass"), *id.* at 71–73. Plaintiffs did not seek any individual damages. Instead, Plaintiffs sought only injunctive relief to address these systemic violations. *Id.* at 80–82.

---

[1] Prisoners at EMCF are in the exclusive custody of MDOC, which is solely responsible for their care. As has been the case since class certification, MDOC contracts with private, for-profit vendors to provide services at EMCF: Management and Training Corporation ("MTC") manages institutional operations at EMCF, *see* ECF No. 541; Trinity Services Group, Inc. ("Trinity") subcontracts with MTC to provide food services, *see* Exhibit 1, "MTC 30(b)(6) Deposition" (hereinafter "MTC Dep.") 43:25–44:5; and Centurion of Mississippi, LLC ("Centurion") provides medical and mental health care, *see* Exhibit 2, "Deposition of Dr. Gloria Perry" (hereinafter "Perry Dep.") 65:5–66:8. Centurion's contract to provide medical and mental health care services at EMCF began in July 2015, subsequent to class certification briefing in this case, but prior to the Court's certification order. *See* Perry Dep. 53:5–7. However, while MTC and Centurion operate EMCF, MDOC bears ultimate responsibility for deprivations of prisoners' constitutional rights. *See, e.g.*, *West v. Atkins*, 487 U.S. 42, 56 (U.S. 1988).

After the complaint was filed, the parties engaged in extensive discovery. Pre-certification discovery lasted over one year, and encompassed the production of thousands of documents, six expert reports on behalf of Plaintiffs, eight expert reports on behalf of Defendant, and six depositions, among other items. *See* ECF Nos. 48, 49 (Plaintiffs' initial discovery requests, filed Sept. 16, 2013); July 15, 2014 ECF Entry (noting "extensive discovery produced"); ECF No. 179 (Plaintiffs' motion to certify, filed Sept. 25, 2014). To produce their reports, the six experts engaged by Plaintiffs spent multiple days at EMCF to tour the facility, review records, and interview prisoners. *See* ECF Nos. 179-4, 179-5, 179-6, 181-9, 181-14, 181-24. Defendant's experts collected similar information to prepare their reports. *See* ECF Nos. 217-2, 217-8, 217-10, 217-11, 217-17, 217-23, 218-14, 218-15. Following discovery, the parties filed extensive briefs addressing Plaintiffs' motion for class certification. The briefing spanned 289 pages and was supported by thousands of pages of exhibits, including expert reports, prisoner declarations, and other evidence. *See* ECF Nos. 179–183, 217–221, 240.

On September 29, 2015, the Court granted Plaintiffs' motion for class certification. ECF No. 257. In reaching its decision, the Court conducted a "rigorous analysis" to determine whether the putative classes proposed by Plaintiffs satisfied the requirements for certification under Federal Rule of Civil Procedure 23. *See* ECF No. 257 at 16–41. With respect to each of these requirements — numerosity, commonality, typicality, and adequacy of representation under Rule 23(a), and whether the requested remedies would provide classwide relief under Rule 23(b)(2) — the Court made findings of fact supporting its decision. *See id*. at 34–41. Specifically, the Court found that the "number of potential class members" and the fact that "joinder would not be practical" satisfied numerosity. *Id.* at 34. Because Plaintiffs had "identified a common policy or practice on the part of the prison officials" and there were "common

3

questions of law or fact that will resolve all of their claims," the Court ruled that commonality was satisfied. *Id.* at 38. Because all of the class members' claims arose "from the same policy or practice" and were "based on the same legal theory," the Court found that typicality was satisfied. *Id.* at 39. Because "Plaintiffs' counsel [had] shown themselves to be both zealous and competent" and there was "no evidence that the proposed representatives [were] unwilling or unable to participate in the litigation and seek to protect the interests of class members," the Court found that adequacy of representation was satisfied. *Id.* at 39–40. Finally, because the class members "all allege[d]" claims based on the conditions of their confinement, Plaintiffs did "not seek" money damages, and "specific injunctive relief could be ordered" without "requir[ing] that the Court adjudicate the individual class members' needs or circumstances," the Court found certification under Rule 23(b)(2) to be appropriate. *Id.* at 40–41.

Having found that "the Rule 23(a) and Rule 23(b)(2) prerequisites [were] satisfied with respect to the EMCF Class as well as the identified subclasses," the Court certified the following classes:

1.  EMCF Class: All persons who are currently, or will be, confined at the East Mississippi Correctional Facility.

2.  Isolation Subclass: All persons who are currently, or will be, subjected to Defendants' policies and practices of confining prisoners in conditions amounting to solitary confinement at the East Mississippi Correctional Facility.

3.  Mental Health Subclass: All persons who are currently, or will be, subjected to Defendants' mental health care policies and practices at the East Mississippi Correctional Facility.

4.  The Units 5 and 6 Subclass: All persons who are currently, or will be, housed in Units 5 and 6 at the East Mississippi Correctional Facility.

*Id.* at 41, 43. On August 2, 2017, Defendant filed a motion to decertify the EMCF Class and Subclasses, asking that the Court "reconsider" its certification order on the ground that "a

4

generalized approach to class action is improper" and that "a trial of this case would be unmanageable and inconsistent with [Rule 23]." ECF No. 530 at 1, 8. Plaintiffs now respond.

## III.   LEGAL STANDARD

Class certification is appropriate under Federal Rule of Civil Procedure 23 when a party has satisfied the four threshold requirements set forth in Rule 23(a) as well as one of the relevant subsections set forth in Rule 23(b). Rule 23(a) permits certification when:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Rule 23(b)(2), is the relevant subsection here, permits certification when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Pursuant to Rule 23(c)(1)(C), "[a]n order that grants or denies class certification may be altered or amended before final judgment." However, while a court is "free to reconsider its class certification ruling as often as necessary before judgment," *McNamara v. Felderhof*, 410 F.3d 277, 280 (5th Cir. 2005), "decertification and modification should theoretically only take place after some change, unforeseen at the time of the class certification, that makes alteration of the initial certification decision necessary," NEWBERG ON CLASS ACTIONS § 7:34 (5th ed. 2013).

Contrary to Defendant's assertions, ECF No. 530 at 8, Plaintiffs do not bear the burden of proof on Defendant's motion for decertification. While the Fifth Circuit has not definitively ruled on the issue, it has suggested that the burden properly lies with the party seeking decertification. *See Baldridge v. SBC Commc'ns, Inc.*, 404 F.3d 930, 932 (5th Cir. 2005) ("Although the defendants may be correct in noting that the burden of persuasion shifts from plaintiffs (to show the merits of certification) to defendant (to show the merits of decertification), the difference is

5

irrelevant."). Moreover, as the Eighth Circuit recently held in a thorough ruling placing the burden of proof on defendants, holding otherwise would (1) run afoul of the general principle that "the proponent of a motion bears the initial burden of showing that the motion should be granted," (2) violate the "law of the case" doctrine, and (3) "skew" incentives such that defendants may be tempted to challenge a certification ruling without any legal or factual support for their motion. *See Day v. Celadon Trucking Servs., Inc.*, 827 F.3d 817, 831–32 (8th Cir. 2016); *see also* NEWBERG ON CLASS ACTIONS § 7:39 (noting that "there is some logic in requiring a moving defendant to shoulder at least some initial burden before the plaintiff need defend the certification").[2] For these reasons, the burden of proof on the instant motion appropriately lies with Defendant and, as explained below, that burden has not been met.

## IV.   ARGUMENT

In moving for decertification, Defendant recycles the same failed arguments made in its original opposition to class certification. Specifically, Defendant contends that Plaintiffs have not met Rule 23(a)(2)'s commonality requirement, due to differences between individual prisoners' circumstances; and that under Rule 23(b)(2), injunctive relief would not be appropriate for the EMCF Class and Subclasses as a whole, due to an alleged lack of "cohesion." ECF No. 530 at 10, 21. Having failed to convince the Court with these arguments two years ago, Defendant also again attacks the propriety of prison conditions class actions generally, proclaiming that "the days of aggregating individualized grievances and asking the Court to take over prison

---

[2] While the Second and Ninth Circuits have indicated without analysis that the burden of proof on a decertification motion remains with plaintiffs, both cases are procedurally distinct from this case: in *Mazzei*, the court considered a decertification motion post-trial, once all evidence had been considered, and in *Marlo*, the court *sua sponte* raised the issue of decertification pre-trial and not on the defendant's motion. *See Mazzei v. Money Store*, 829 F.3d 260, 270 (2d Cir. 2016); *Marlo v. United Parcel Serv., Inc.*, 639 F.3d 942 (9th Cir. 2011); *Marlo v. United Parcel Serv., Inc.*, 251 F.R.D. 476, 479 (C.D. Cal. 2008).

operations have ended." *Id.* at 29. Defendant's arguments fail now for the same reasons they did in 2015.[3]

Despite Defendant's recycled arguments, there is no question that class actions remain a viable vehicle for challenging unconstitutional prison conditions. In addition to the half-century of case law Plaintiffs cited in their original class certification briefing, *see generally* ECF. Nos. 183, 240, more than a dozen classes challenging conditions of confinement have been certified or withstood a decertification motion since class certification briefing ended in this case.[4] Further, in addition to the extensive evidence in Plaintiffs' original briefing of policies and practices giving rise to an unconstitutional risk of harm for all prisoners at EMCF, *see id.*, merits

---

[3] Indeed, the Court need not even assess Defendant's recycled arguments, which have already been considered and dismissed. *See, e.g.*, *Smentek v. Sheriff of Cook Cty.*, No. 09 C 529, 2014 WL 7330792, at *9 (N.D. Ill. Dec. 22, 2014), *aff'd sub nom. Phillips v. Sheriff of Cook Cty.*, 828 F.3d 541 (7th Cir. 2016) ("Many of the points made by defendants . . . were rejected in the court's original certification opinions and the court will not revisit them here."); *In re Apple iPod iTunes Antitrust Litig.*, No. 05-CV-0037 YGR, 2014 WL 6783763, at *6 (N.D. Cal. Nov. 25, 2014) ("Apple presented many of these arguments while opposing earlier certification motions. . . . [T]he Court declines to revisit this previously resolved issue so soon before trial especially where no intervening events have led to changed circumstances.").

[4] *See Yates v. Collier*, __ F.3d ___, No. 16-20505, 2017 WL 3574968 (5th Cir. Aug. 18, 2017) (affirming class of prisoners challenging excessive heat); *Graham v. Parker*, No. 16-CV-01954, 2017 WL 1737871 (M.D. Tenn. May 4, 2017) (class of prisoners with Hepatitis C challenging state prison systems' treatment practices); *Lippert v. Baldwin*, No. 10 C 4603, 2017 WL 1545672 (N.D. Ill. Apr. 28, 2017) (class of prisoners challenging medical and dental practices at Illinois's twenty-five state prisons); *Jewett v. Calif. Forensic Med. Grp., Inc.*, No. 2:13-CV-0882 MCE AC P, 2017 WL 980446 (E.D. Cal. Mar. 13, 2017), *report and recommendation adopted*, 2017 WL 1356054 (E.D. Cal. Apr. 5, 2017) (class of disabled prisoners challenging accommodations); *V.W. v. Conway*, 236 F. Supp. 3d 554 (N.D.N.Y. 2017) (class of juvenile prisoners challenging solitary confinement and education practices); *Doe v. Hommrich*, No. 3-16-0799, 2017 WL 660681 (M.D. Tenn. Feb. 17, 2017) (class of juvenile prisoners challenging isolation practices); *Menocal v. GEO Grp., Inc.*, No. 14-CV-02887-JLK, 2017 WL 880882 (D. Colo. Feb. 27, 2017) (class of detainees alleging forced labor violations); *Braggs v. Dunn*, 317 F.R.D. 634 (M.D. Ala. 2016) (class of prisoners challenging mental health care practices in nearly all state prisons); *Williams v. Conway*, 312 F.R.D. 248 (N.D.N.Y. 2016) (class of deaf and hearing-impaired prisoners); *Unknown Parties v. Johnson*, 163 F. Supp. 3d 630 (D. Ariz. 2016) (class of 60,000 immigration detainees, in eight facilities, challenging multiple conditions of confinement); *Holmes v. Godinez*, 311 F.R.D. 177 (N.D. Ill. 2015) (class of deaf and hearing-impaired prisoners challenging statewide accommodations); *McGee v. Pallito*, No. 1:04-CV-00335-JGM, 2015 WL 5177770 (D. Vt. Sept. 4, 2015) (class of prisoners challenging lighting practices in cells); *Lyon v. U.S. Immigration & Customs Enforcement*, 300 F.R.D. 628 (N.D. Cal. 2014), *modified*, 2015 WL 4538047 (N.D. Cal. July 27, 2015) (expanding class of immigration detainees).

discovery has produced ample evidence demonstrating that these same policies and practices *continue* to put all class members at risk — nearly two years after class certification in this case. Because Defendant cites no new law or facts justifying decertification, Defendant's motion for decertification must fail.[5]

### A.   *Defendant Misstates the Standard Applicable to Plaintiffs' Claims Under Rule 23(a)(2).*

For class certification to be proper, Rule 23(a)(2) requires there to be "questions of law or fact common to the class." Contrary to Defendant's representation, this does not mean that Defendant's policies and practices must affect all class members in exactly the same manner as to all claims. Rather it means, there must be at least one common question for which a "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011); *see also Yates v. Collier*, __ F.3d ___, No. 16-20505, 2017 WL 3574968, at *7 n.6 (5th Cir. Aug. 18, 2017) (reaffirming that, under Rule 23(a)(2), "demonstrat[ing] at least one common question of law or fact" is sufficient to establish commonality). What matters here, then, is "the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." *Wal-Mart*, 564 U.S. at 350. Such common answers exist here, and Defendant's failure to recognize this is rooted in their misunderstanding of the governing Eighth Amendment standard.

---

[5] Defendant does not challenge the EMCF Class and Subclasses' continued satisfaction of Rule 23(a)'s requirements regarding numerosity, typicality, and adequacy of representation, or the ascertainability of those classes. ECF No. 530 at 8 ("At issue in this case is commonality . . . ."). Plaintiffs satisfy these requirements for the same reasons outlined the Court's certification order. *See* ECF No. 257 at 30–44.

1.     **Defendant Misunderstands the Eighth Amendment Standard Governing Plaintiffs' Claims and Misapplies Recent Case Law**

Because a "prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment," *Farmer*, 511 U.S. at 828, it is firmly established that, in a class action challenging prison conditions under the Eighth Amendment, "the commonality requirement can be satisfied by proof of the existence of systemic policies and practices that allegedly expose inmates to a substantial risk of harm," *Lippert*, 2017 WL 1545672, at *4. In its certification order, the Court found Plaintiffs satisfied Rule 23(a)(2) because:

> To prevail on the merits of their class action claims, Plaintiffs will have to prove a causal connection exists between the alleged systematic failure on the part of prison officials to act in the face of actual or constructive knowledge regarding the conditions existing at EMCF, and the unconstitutional risk of harm about which they complain. Thus, the Court finds that all of Plaintiffs' claims will have, at their core, common issues regarding (1) the physical conditions under which prisoners at EMCF are being housed and the type and quality of health and mental health care they are receiving or to which they have access, and (2) whether those conditions and health care have either subjected prisoners to an unconstitutionally unreasonable risk of harm or, conversely, were sufficient to provide humane conditions of confinement. If it is shown, for example, that the physical conditions and health care as provided are sufficient to maintain humane conditions of confinement, all of Plaintiffs' claims will resolved at once.

ECF No. 257 at 37–38. Defendant cites no new law or facts warranting a reversal of this finding.[6] Instead, Defendant yet again asserts that class members have been allegedly harmed in differing ways, thereby barring continued certification. *Compare* ECF. No. 221 at 31 (arguing, without success, in brief opposing class certification that differences between inmates should

---

[6] To the extent Defendant implies that the Court's commonality analysis was only for "initial" or conditional certification purposes, ECF No. 530 at 9, that understanding would conflict with the 2003 amendments to Rule 23, which prohibited "conditional" class certifications. *See* Fed. R. Civ. P. 23, Committee Notes on Rules (2003). It would also conflict with the explicit text of the Court's order, in which the Court noted its "rigorous analysis" of all of the requirements under Rule 23. *See* ECF No. 257 at 16.

defeat certification); ECF No. 530 at 10–20 (arguing, in brief supporting decertification, that differences between prisoners should defeat certification). But as this Court previously ruled, this argument misconstrues the *Farmer* risk of harm standard.

Indeed, the Fifth Circuit reaffirmed the Court's 2015 understanding of class actions under *Farmer* just two weeks ago. In that case, *Yates v. Collier*, ___ F.3d ___, No. 16-20505, 2017 WL 3574968 (5th Cir. Aug. 18, 2017), the defendants appealed the certification of a class of prisoners challenging excessive temperatures in the prison, on the ground that, while all class members were exposed to the same temperatures, the question of risk of harm could not be decided "in one stroke," as individual prisoners would be impacted by those temperatures in varying ways. *Id.* at *5. The court rejected this argument out of hand, reciting the district court's finding that, while "no two individuals have the exact same risk . . . [that] obvious fact does not destroy commonality because the evidence calls into serious question the adequacy of [the defendants'] mitigation measures — as applied in practice — *in reducing the heat risk for all the inmates . . . .*" *Id.* (alterations and quotation marks omitted). Because "the district court found, based on the expert testimony, that [the defendants'] heat-mitigation measures . . . were ineffective to reduce the risk of serious harm to a constitutionally permissible level for *any* inmate, including the healthy inmates," there was a "common question," satisfying Rule 23(a)(2). *Id.* at *5–6.

Here, as in *Yates*, Plaintiffs have identified policies and practices that place all class members at a substantial risk of serious harm, and this is sufficient for class certification — regardless of variations in the degree of risk or ultimate harm experienced by each individual. For example, while prisoners at EMCF may face a somewhat greater or lesser risk of assault in specific housing units, such differences are immaterial given that *all* prisoners face an

unconstitutional risk of assault throughout the prison due to Defendant's policies and practices, such as understaffing and lax security practices, and those overarching policies and practices are enough glue to bind the class together. *See* ECF No. 530 at 14–15 (documenting assaults in every housing unit and in communal areas where any prisoner could be present, such as hallways, recreation areas, and the kitchen, laundry room, and medical unit); *Braggs v. Dunn*, 317 F.R.D. 634, 661 (M.D. Ala. 2016) (finding "idiosyncratic" differences between facilities did not defeat commonality where evidence supported that class members were transferred between — and were therefore present in — different facilities); Similarly, while prisoners at EMCF may have different medical needs, they are *all* subject to the unconstitutional risk that they will be denied adequate medical care due to Defendant's policies and practices, such as delayed access to care and erratic medication administration. *See, e.g.*, *Brown v. Plata*, 563 U.S. 493, 532 (2011) ("Prisoners who are not sick or mentally ill do not yet have a claim that they have been subjected to care that violates the Eighth Amendment, but in no sense are they remote bystanders in California's medical care system. They are that system's next potential victims.").

To rebut the propriety of class certification, Defendant misapplies an out-of-circuit case to support the proposition that Plaintiffs must meet an even higher evidentiary burden — by showing "'pervasive' conduct that demonstrates a 'substantial risk of serious harm'" — to prevail on their Eighth Amendment claims. ECF No. 530 at 10 (quoting *Lakin v. Barnhart*, 758 F.3d 66, 71 (1st Cir. 2014)). Defendant also asserts that Plaintiffs cannot cite "distinct instances of harm, over an extended period of time" to meet this standard. *Id.* Defendant is mistaken. As an initial matter, this argument misreads *Lakin*.[7] And, even if it were a correct reading, governing

---

[7] In *Lakin*, the First Circuit *declined* to adopt a "pervasiveness" standard, which would have applied only to protection from harm claims, because the plaintiffs' claim — premised on assaults in a prison typically occurring at a rate of "one or two annually" — would have been insufficient to show a substantial risk of (continued…)

Fifth Circuit precedent offers no support for it. *See Gates v. Cook*, 376 F.3d 323, 339 (5th Cir. 2004) (Plaintiffs "[do] not need to show that death or serious illness has yet occurred to obtain relief. [They] must show that the conditions pose a substantial risk of harm to which MDOC officials have shown a deliberate indifference."); *Jones v. Gusman*, 296 F.R.D. 416, 465–66 (E.D. La. 2013) ("[T]he Fifth Circuit . . . [has] expressly disagreed with the proposition that a policy must injure each class member to provide the foundation for class wide relief."); and *M.D. v. Perry*, 294 F.R.D. 7 (S.D. Tex. 2013) ("Plaintiffs allege that these policies lead to an unreasonable risk of harm. As explained above, that risk alone is the legal injury."). Moreover, in the Fifth Circuit, it is wholly permissible to extrapolate from specific instances of harm to find widespread practices and thereby substantiate a systemic risk of harm. *See Jones*, 296 F.R.D. at 430 ("Specific examples of dysfunction at [the prison] are representative of systemic deficiencies."); *see also Unknown Parties v. Johnson*, 163 F. Supp. 3d 630, 639 (D. Ariz. 2016) ("A policy, practice, or custom may be inferred from widespread practices or evidence of repeated constitutional violations for which the errant officials are not reprimanded."); *Holmes v. Godinez*, 311 F.R.D. 177, 219 (N.D. Ill. 2015) ("As for claims not directly derived from [the defendant's] written policies, Plaintiffs present expert testimony and anecdotal evidence to support their allegations.") Indeed, as the Court noted in its certification order, "affidavits, deposition testimony, and expert reports" documenting numerous such distinct instances of harm helped "substantiate" Plaintiffs' claims that Defendant's policies and practices subjected class members to a substantial risk of serious harm. *See* ECF No. 257 at 35. Because Plaintiffs have identified significant proof that Defendant's policies and practices in fact subject class members

---

significant harm under any standard. *Lakin*, 758 F.3d at 71. Defendant's effort to apply *Lakin* to this case, where their own (understated) figures show one to five assaults occurring *per month* in *each* of EMCF's seven housing units, is absurd. *See* ECF No. 530 at 14–15.

to such a risk — regardless of prisoners' individual circumstances — certification remains appropriate under a correct reading of *Farmer* and *Wal-Mart*. *See* ECF No. 257 at 37–38.

Finally, Defendant relies on a misreading of *Phillips v. Sheriff of Cook County*, 828 F.3d 541 (7th Cir. 2016), to contend that the law governing prison condition class actions has changed since the Court's certification order.[8] *See* ECF No. 530 at 11–12, 16, 20. In fact, *Phillips* supports continued certification here. In *Phillips*, detainees of the Cook County Jail ("CCJ") challenged the adequacy of dental care at that facility. *Id.* at 543. The district court initially concluded that the plaintiffs presented one common question — "whether the alleged inadequacy of dental staff deprived class members of timely relief from dental pain" — and thus certified a class of all prisoners required to wait more than one week for treatment after complaining of dental pain. *Smentek v. Sheriff of Cook Cty.*, No. 09 Civ. 529, 2014 WL 7330792, at *8 (N.D. Ill. Dec. 22, 2014), *aff'd sub nom. Phillips*, 828 F.3d 541. Following discovery, the defendants moved for decertification, which the court granted after a bench trial, in which the defendants established that the understaffing responsible for the challenged delays in dental care had been eliminated. As the court noted, over the course of the litigation, CCJ went from having only one dentist at the time the lawsuit was filed, to having seven dentists, two dental hygienists, and seven dental assistants at the time of trial. Even the plaintiffs' expert deemed this new staffing ratio "optimal." *Id.* at *4. Because "the question that was common to all plaintiffs — whether the

---

[8] Defendant also cites in passing *Cole v. Livingston*, No. 4:14-CV-1698, 2016 WL 3258345 (S.D. Tex. June 14, 2016), the class certification opinion affirmed by the Fifth Circuit in *Yates*, apparently for the proposition that a class action challenging conditions of confinement must be "narrowly drawn to challenge [a] single issue." ECF No. 530 at 20. Defendant's assertion, not supported by *Cole*, is also belied by *Phillips*, which states "[h]ad the district court imposed a cap on the number of common questions, as the detainees suggest, its decision could not be justified by the teaching of *Wal–Mart*." *Phillips*, 828 F.3d at 553.

alleged inadequacy of dental staff deprived class members of timely relief of dental pain —

[wa]s no longer present," the court decertified the class. *Id.* at *8.

Reviewing for abuse of discretion, the Seventh Circuit affirmed, finding that the plaintiffs

"had not presented even one question that could 'resolve an issue that is central to the validity of

each one of the claims in one stroke.'" *Phillips*, 828 F.3d at 553 (quoting *Wal–Mart*, 564 U.S. at

350). Specifically, the plaintiffs — not challenging the district court's conclusion as to staffing

— asserted that common questions remained as to the timeliness of care, based on the testimony

of eight inmates (out of 9,500 at the jail). *Id.* at 555. The court rejected that such timeliness

questions could be resolved in "one stroke," given the nature of such claims (turning on whether

individual care was unduly delayed) and the individualized evidence presented to the court (the

testimony of the eight inmates).[9] *Id.* at 556. By contrast, the court acknowledged that, "[i]f

plaintiffs can present classwide evidence that a prison is engaging in a policy or practice which

rises to the level of a systemic indifference, then we can identify conduct common to members of

the class which advances the litigation." *Id.* at 557. As an example of such a claim, the court

explained: "a class action probably could be brought where plaintiffs presented some evidence

that a prison had a policy that regularly and systemically impeded timely examinations . . . [or]

where evidence suggested that a prison had such a consistent pattern of egregious delays in

medical treatment that a trier of fact might infer a systemic unconstitutional practice." *Id.*

---

[9] Notably, the plaintiffs offered no expert testimony that dental care delays were a "systemic" concern. In fact, the plaintiffs' expert "did not offer any opinion about the adequacy of the dental care policies at CCJ, the staffing levels, or the quality of care." *Smentek*, 2014 WL 7330792, at *4. By contrast, the defendants' expert toured CCJ's dental clinics, "observed the flow of patients and reviewed the daily appointment logs," and reviewed CCJ's policies "on oral and non-emergency care," to determine that "the facilities, staffing levels, and equipment he observed [we]re sufficient to meet the dental health needs of the detainee population" and that the requests for care he reviewed "were timely addressed." *Id.* at *5.

Plaintiffs present claims of such "systemic unconstitutional practice[s]" here. Moreover, while the defendants in *Phillips* effected sweeping changes to their policies and practices, including increasing dental staffing by 1600% to a level that even the plaintiffs' expert deemed "optimal," Defendant here has cited no similarly sweeping changes at EMCF that could eliminate even a single common question, much less every common question underlying Plaintiffs' seven claims. To the contrary, in their original certification briefing and below, Plaintiffs have presented substantial evidence that the systemic unconstitutional policies and practices identified in Plaintiffs' original certification briefing continue to place all class members at a substantial risk of serious harm. *See* ECF Nos. 183, 240. This evidence — of policies and practices resulting in systemic risk — is precisely the type cited by *Phillips* as supporting class certification.

*Phillips* itself supports this proposition. *Phillips* cites *Parsons v. Ryan*, 754 F.3d 657 (9th Cir. 2014), as an example of a properly certified class action. *See Phillips*, 828 F.3d at 552–57. In *Parsons*, the Ninth Circuit reviewed the certification of a class including more than 30,000 prisoners, in an action alleging that systemically deficient policies and practices regarding medical care, mental health care, and solitary confinement at ten Arizona prisons had subjected class members to a substantial risk of serious harm. *Parsons*, 754 F.3d at 662. Noting that such class actions are "firmly established in our constitutional law," the Ninth Circuit affirmed on the ground that the district court had identified ten policies or practices to which all class members were exposed, and which raised common questions that could be addressed with common answers (specifically, "whether the specified statewide policies and practices to which they are all subjected by [the defendants] expose them to a substantial risk of harm"). *Parsons*, 754 F.3d at 678.

Case law subsequent to *Phillips* also supports this proposition. In *Lippert v.* Baldwin, No. 10 C 4603, 2017 WL 1545672 (N.D. Ill. Apr. 28, 2017), the court certified a class of prisoners challenging medical and dental practices at all of Illinois's twenty-five state prisons, on the ground that the plaintiffs had "identified nine . . . policies and practices that allegedly put them at substantial risk of serious harm in violation of the Eighth Amendment" and that "[t]he question common to all plaintiffs, then, is whether each of defendants' policies and practices do in fact put inmates with serious medical conditions at risk." *Id.* at *4. In so ruling, the court specifically distinguished *Phillips*, noting that while the claims in *Phillips* "were best characterized as claims of isolated instances of indifference to a particular inmate's medical needs," the claims in *Lippert* were supported by a well-researched expert report, which concluded that the state had "been unable to meet minimal constitutional standards with regards to the adequacy of its health care program for the population it serves." *Id.* at *5.

Plaintiffs' claims are analogous to those in *Parsons* and *Lippert*. As in *Parsons* and *Lippert*, Plaintiffs have identified numerous policies and practices that impact all members of the EMCF Class or the relevant Subclass, with respect to protection from violence, medical and mental health care, nutrition and food safety, isolation practices, and conditions in Units 5 and 6. As also in *Parsons* and *Lippert*, Plaintiffs have cited significant proof, both in this brief and in the original class certification briefing, that class members are exposed to these policies and practices. And, as in *Parsons* and *Lippert*, these policies and practices raise common questions that may be addressed with common answers — that is, whether these policies and practices have exposed the class members to a substantial risk of serious harm and whether Defendant has been deliberately indifferent to that risk. Therefore, far from preventing continued certification,

*Phillips* — and the contrasts drawn with it in *Parsons* and *Lippert* — support continued certification in this case.

### 2. Defendant Ignores the Substantial Evidence Supporting Class Certification

#### a. *Defendant Cites No New Facts Supporting Decertification*

Defendant asserts that "further discovery [has] made clear that individualized determinations permeate this case," thereby requiring decertification. ECF No. 530 at 1. Defendant is mistaken. As an initial matter, despite noting that "substantial additional discovery" has taken place, *id.* at 7, Defendant cites only a sliver of the available evidence to assert that EMCF consists of "various mini-prisons" that are not amenable to class treatment. *Id.* at 12. Indeed, in support of its motion, Defendant references only a map of EMCF; general descriptions of housing units and programming; a chart documenting assaults occurring throughout EMCF; a few citations from its deposition of Plaintiffs' safety and security expert; and summaries of select class members' responses to Defendant's discovery questionnaires, interrogatories, and depositions. *Id.* at 2–5, 13–20. Even in the absence of additional evidence supporting continued certification, these few record citations are insufficient to support a reversal of the Court's certification order, given the significant amount of evidence the Court considered prior to ordering certification in this case. *See* NEWBERG ON CLASS ACTIONS § 7:39 (noting that, "if the initial certification decision was made after certification-related discovery and on that record, the defendant's burden in seeking decertification, logically, ought to be somewhat more onerous").

Moreover, some of the information — such as the map of EMCF and housing unit descriptions — was already provided to the Court in Defendant's opposition to class certification, and thus does not support a contrary holding now. *Compare* ECF No. 221 at 8–13; *with* ECF No. 530 at 3–4, 13. Further, to the extent Defendant asserts that there have been superficial changes to programming and housing units, Defendant provides no support for the

assertion that these changes have actually *eliminated* the unconstitutional risk of serious harm to which all class members are subjected. For example, Defendant notes that Unit 6 has "changed significantly" since class certification, insofar as it is no longer a segregation unit. *See* ECF No. 530 at 6. But Defendant provides no reason that that change is relevant to class certification. Plaintiffs' claim with respect to Unit 6 concerns the dangerous environmental conditions prisoners housed there face; Defendant cites no evidence that conditions in the unit have improved. *See* ECF No. 240 at 48–58. Nor does Defendant provide any basis to find that the threats of violence, poor medical care, and inadequate nutrition are not as endemic in Unit 6 as elsewhere in the prison.[10]

More importantly, much of Defendant's evidence is flawed or misleading. For example, the assault charts — which cannot be relied upon for the reasons set forth in Plaintiffs' *Daubert* motion[11] — understate the rate of assaults at EMCF. Based on a review of Defendant's internal documents, Plaintiffs have identified a number of assaults that occurred in 2016 and that were known to Defendant, but were apparently not included in these charts.[12] And, by Defendant's own admission, these charts include only "reported assaults"; however, numerous assaults go

---

[10] To the extent Defendant seeks modification of the Isolation Subclass on the basis of this information, their effort is misplaced. The Court's definition of the Isolation Subclass is not geographically based within the prison, and instead reaches all prisoners who are or will be "subjected to Defendants' policies and practices of confining prisoners in conditions amounting to solitary confinement." ECF No. 257 at 43. Thus, the change in housing status of prisoners in Unit 6 is immaterial to the definition of this Subclass.

[11] As explained in Plaintiffs' motion, Defendant's experts do not know and the record does not reveal who compiled the data these charts are based on, how that data was compiled, or whether the compilation was accurate. *See* ECF No. 535 at 15–18.

[12] Plaintiffs understand that the charts included in Defendants' brief are summaries of the assault data Plaintiffs contend is inaccurate in their *Daubert* motion. *See* ECF Nos. 534, 534-5. Based on a review of incident reports and other documents, Plaintiffs have identified assaults that do not appear to be included in this more detailed list of assaults from 2016. *See* ECF Nos. 534-6, 535 at 15–18.

undetected by EMCF staff.[13] Additionally, that class members responded to Defendant's questionnaires, interrogatories, and deposition questions with information regarding their individual experiences is not surprising — Defendant intended for these questions to elicit any information possible regarding distinctions among class members; the responses Defendant selectively chose to cite in its brief are, presumably, the best evidence for decertification Defendant could muster.[14]

Further, to the extent Defendant's selected evidence is accurate, the minor variations among housing units and class members identified therein are immaterial to the commonality analysis, which, as discussed above, looks to evidence of whether all class members are subjected to a substantial risk of serious harm, regardless of variations in each class member's

---

[13] Numerous assaults occur without officers' knowledge, due in large part to their failure to adequately monitor prisoners. *See* ECF No. 549-30, "Declaration of Dexter Campbell" (hereinafter "Campbell Decl.") ¶¶ 6; ECF No. 549-34, "Declaration of Charlie Jones" (hereinafter "Jones Decl.") ¶ 18. Moreover, gang members often force prisoners who have been assaulted to remain in their cells until their injuries have healed, in order to avoid staff detection. *See* Campbell Decl. ¶¶ 6, 21 (describing a "48 Hour Rule" that prevents prisoners from seeking medical attention after an assault); Jones Decl. ¶ 39 (explaining that offenders deliver medication and meals to injured prisoners who cannot leave their cell due to a recent assault). And, as has been recently recognized in this District, poorly controlled prisons — like EMCF — may have "significant underreporting of assaults and other crimes that occur at the prison." *See Depriest, et al. v. Walnut Grove Correctional Authority, et al.*, No. 3:10-cv-663-CWR-FKB, Order at 170 (S.D. Miss. June 11, 2015).

[14] Defendant asserts that "[c]laims four [excessive force] and five [protection from harm] concern allegations of physical harm, but Plaintiffs' evidence in support of those claims is geared primarily towards housing unit three and housing unit five's segregation population." ECF No. 530 at 11 n.47. To support this assertion, Defendant cites three interrogatory responses by named Plaintiffs supporting that uses of force occur routinely in Unit 5. *Id.* This is evidence that violence is endemic on Unit 5, not that it does not occur elsewhere. Defendant also characterizes the deposition testimony of Plaintiffs' expert on safety and security regarding Units 2-A, 2-C, 4-B, and 7 as somehow supporting that class members are not exposed to an unconstitutional risk of violence in those zones. Not so. As Defendant's assault charts support, assaults are endemic in the prison, with thirteen assaults *at minimum* occurring in these four zones in 2016 alone, despite housing only 16% of the prison's population. ECF No. 530 at 14–15. Further, as Plaintiffs recount at length below, there is significant proof that Defendant's policies and practices expose all prisoners at EMCF to an unconstitutional risk of violence throughout the prison.

level of risk.[15] Indeed, Defendant's evidence *supports* the conclusion that all class members are exposed to such risk. For example, even if Defendant's assault charts were accurate — and they are not — they paint a picture of a chaotic, violent prison. By Defendant's own admission, there were, *at least*, 169 assaults at EMCF in 2016, resulting in 71 serious injuries, with no fewer than 12 assaults in any given unit and 17 assaults in communal areas that all prisoners may be required to traverse. *See* ECF No. 530 at 14–15. That Defendant believes these assault rates are favorable evidence is indicative of the sheer disregard for prisoner safety and well-being that it has displayed throughout this litigation and that subjects every prisoner at EMCF to a substantial risk of serious harm.

Defendant's summaries of class members' accounts of their experiences with medical and mental health care are similarly harmful to its cause. For example, Defendant contends that prisoners' complaints regarding medication administration defeat class certification because their complaints "varied," including reports that medication administration occurred at different, odd hours or was withheld for different reasons. *Id.* at 19–20. Defendant ignores Plaintiffs' assertion that medication administration practices at EMCF subject prisoners to a substantial risk of

---

[15] *See*; *see also Braggs*, 317 F.R.D. at 655–56 ("This case law supports a finding of commonality here, because being subjected to a substantial risk of serious harm is an actionable constitutional injury, even when a prisoner's physical or mental condition has not yet been detrimentally impacted." (collecting cases)); *Johnson*, 163 F. Supp. 3d at 638 (stating that, for certification to be proper, the "[p]laintiffs need not demonstrate that all class members have been or will be subjected to identical harms"); *Holmes*, 311 F.R.D. at 220 ("Despite factual variations in putative class members' situations, Plaintiffs' allegations regarding IDOC's system-wide failures are the 'glue' that ties their claims together."); *McGee*, 2015 WL 5177770, at *7 ("The fact that class members experience injuries varying in type and kind, however, is no bar to class treatment here, as even after *Wal–Mart*, Rule 23(b)(2) suits remain appropriate mechanisms for obtaining injunctive relief in cases where a centralized policy is alleged to impact a large class of plaintiffs, even when the magnitude (and existence) of the impact may vary by class member."); *Scott v. Clarke*, 61 F. Supp. 3d 569, 585–86 (W.D. Va. 2014) ("The key factual issues at the heart of Plaintiffs' claims of constitutionally deficient medical care do not turn on an individual plaintiff's particular personal health concerns, but rather on [the defendant's] alleged systemic failure to provide a level of medical care to all of its residents that complies with constitutional norms.").

serious harm *because they occur so randomly as to prevent prisoners consistent access to their prescribed medications*, an allegation bolstered by Defendant's brief. *See* ECF No. 240 at 28, n.18 Similarly, while Defendant highlights differences between select class members' medical conditions, it fails to grapple with the fact that *every* class member it references voiced complaints about the adequacy of medical care at the prison. *See* ECF No. 530 at 16–18. Similarly, Defendant proffers select excerpts of class members' statements regarding mental health care at EMCF, which also support continued class certification, as each bolsters the finding that access to mental health professionals is random, brief, and lacking confidentiality. *Id.* at 16–19. In short, Defendant's evidence alone supports that continued class certification is proper.[16]

### b. *Plaintiffs Have Amassed Significant Proof that Certification Remains Appropriate*

In addition to the evidence cited by Defendant, Plaintiffs have amassed significant evidence during merits discovery reaffirming that the policies and practices Plaintiffs identified in their original class certification briefing continue to subject prisoners to a substantial risk of serious harm, and that Defendant has knowledge of that risk but has failed to act to remedy it. Because Plaintiffs' claims thus continue to raise common questions of law and fact, and because

---

[16] Of note, Defendant asserts no specific factual argument challenging continued class certification as to the EMCF Class with regard to nutrition and food safety issues, or as to the Isolation Subclass and the Units 5 and 6 Subclass. Defendant's failure to assert any specific legal or evidentiary argument as to these classes should not only be fatal to its motion as to these classes, but also exemplifies the need for Defendant to bear the burden of proof on their motion for decertification, because "if a defendant can require a court to revisit certification decisions without any showing whatsoever . . . 'its incentives will be skewed.'" *Day*, 827 F.3d at 832 (quoting Newberg on Class Actions § 7:39)); *see also In re Processed Egg Prod. Antitrust Litig.*, No. 08-MD-2002, 2017 WL 3494221, at *3 (E.D. Pa. Aug. 14, 2017) ("[D]ecertification must be justified by actual, compelling developments in the litigation. Generally, class decertification is prompted by a change in factual circumstances or developments in applicable substantive or procedural law.") (collecting cases).

those common questions can still be answered in "one stroke," certification of the EMCF Class and Subclasses remains appropriate under Rule 23(a)(2).

> ### i.   *EMCF's Failure to Protect Prisoners from Violence Persists*
>
> #### 1.   *EMCF Still Fails to Protect Prisoners from Prisoner-on-Prisoner Violence*

In 2014, Plaintiffs identified the following policies and practices concerning Defendant's failure to reasonably protect members of the EMCF Class from prisoner-on-prisoner violence:

> "[S]ystemic staff shortages and failure to hire and train qualified security staff increased the risk of violence"; "widespread security staff corruption at EMCF contributes to systemic violence"; and "structural defects in cell-door locking mechanisms . . . contribute to the risk of serious harm from inmate on inmate violence."

ECF No. 240 at 17. Two years after the Court's certification order, each of these policies and practices remains in place. As a result, Plaintiffs' safety and security expert, Eldon Vail,[17] concluded in his report that EMCF "is and remains a very dangerous prison" where "authorities are not in control," staff are "too few" and have "insufficient training and experience," the prevalence of contraband . . . is alarming," and "[v]iolence, often driven by the power and influence of gangs, is widespread," subjecting every member of the EMCF Class to a "significant

---

[17]   Mr. Vail has nearly thirty-five years' experience as a corrections administrator. He served as the Deputy Secretary and then as Secretary of the Washington State Department of Corrections ("WSDC"). Earlier he held various line and supervisory level positions at a number of WSDC prisons including the position of Superintendent. *See* ECF No. 549- 2, "2016 Expert Report of Eldon Vail" (hereinafter "Vail 2016 Expert Rpt.") ¶¶ 2–4. His experience as a prisons and corrections administrator included responsibility for mentally ill prisoners and their custody, housing and treatment. *Id.* ¶¶ 7–11. He has served as an expert witness and correctional consultant for cases and issues in multiple jurisdictions, including as a consultant for the U.S. Department of Justice. *Id.* ¶¶ 12–13. To prepare his report, Mr. Vail toured EMCF, privately interviewed sixteen inmates and spoke with several others at their cell doors, and reviewed hundreds of videos, photographs, and internal documents regarding uses of force and other security incidents at the prison. *Id.* ¶¶ 16–18.

risk of serious harm." *See* ECF No. 549-2, "2016 Expert Report of Eldon Vail" (hereinafter "Vail 2016 Expert Rpt.") ¶¶ 24–25, 131.

"[S]ystemic staff shortages and failure to hire and train qualified security staff" continue. ECF No. 240 at 17. With regard to staff shortages, required staffing levels at EMCF remain inadequate to "supervise and control" the prisoner population. *See* Vail 2016 Expert Rpt. ¶¶ 81–107 (finding that the "mandatory staffing" levels at EMCF are "unsafe for the inmates"). In addition, EMCF is consistently unable to adhere to even its inadequate staffing model; officers are often not assigned — or are not even available — to staff each of EMCF's so-called "mandatory" posts. *See* ECF Nos. 549-68, 549-69, 549-70. (November 2016 shift rosters showing that, during the majority of shifts, Defendant failed to staff all "mandatory" security posts). This failure stems from EMCF's continued inability to hire and retain competent staff due to low wages, high staff turnover, and slack disciplinary practices, all of which fuel staffing shortages and chronic absenteeism. *See* Exhibit 3, "Deposition of Marjorie Brown" (hereinafter "Brown Dep.") 162:15–163:23 (testimony from MTC's regional vice-president that low wages are a known cause of high staff turnover at the prison); Exhibit 4, "Deposition of  Norris Hogans" (hereinafter "Hogans Dep.") 14:7–21 (testimony from EMCF's deputy warden that staff turnover was a "challenge" and estimating that EMCF loses five or more officers every month); Exhibit 5, "Excerpt of MTC Staff Discipline Report" (hereinafter "MTC Discipline Rpt.") at 102–106. (documenting chronic, undisciplined staff absenteeism). As a result, EMCF relies heavily on overtime, and those staff members who do report to work are frequently mandated to work double shifts. *See* MTC Discipline Rpt. at 102 (citing disciplinary action against officer who refused to work required overtime); Exhibit 6, "EMCF Monthly Report, July 2016 to June

2017" (hereinafter "EMCF Monthly Rpt.") at 3, line 130(a) (showing that officers log several thousand hours of overtime each month).

The impact of Defendant's failure to hire and train staff capable of or willing to protect prisoners from violence is evident in the lax security practices at EMCF. For example, staff habitually abandon housing units they are assigned to, leaving prisoners entirely unsupervised. *See, e.g.*, Vail 2016 Expert Report, ¶¶ 108–113; *see also* ECF No. 549-63, "Monitor Monthly Report (Physical Plant) (MDOC's Contract Monitor's monthly reports from September 2014 to December 2016 showing that, in the overwhelming majority of months the contract monitor found non-compliance with the requirement that "[s]ecurity officer posts [are] located in or immediately adjacent to offender living areas to permit officers to see or hear and respond promptly to emergency situations"); Exhibit 7, "2016 MDOC Contract Monitor Weekly Reports" (hereinafter "2016 Monitor Weekly Rpts.") at 44, 54–55, 61, and 67 (regularly identifying security staff's failure to remain at their assigned posts and monitor prisoners); Exhibit 8, "Expert Report of Dr. Bruce Gage, 2016" (hereinafter "Gage Expert Rpt.") at 18 (citing personal observation, videos, and prisoner interviews to conclude that officers are not present on the housing zones). Even when security staff are at their posts, they routinely fail to perform basic security functions, such as conducting proper prisoner counts — a "fundamental" factor in protecting both the prisoners and public safety. *See* Vail 2016 Expert Rpt. ¶ 36; Exhibit 9, "MDOC 30(b)(6) Deposition of Jerry Williams" (hereinafter "MDOC J. Williams Dep.") 78:24–79:13 (testimony by MDOC's Deputy Commissioner of Institutions that "accounting for all offenders . . . [is] a public safety concern as well as [a concern for] staff and the inmates"); *see* ECF No. 549-62 at lines 106-110 (monthly reports showing that, in nearly every month between

September 2014 and December 2016, the MDOC contract monitor found non-compliance with basic count procedures and noted that "counts are conducted improperly").

Staff also engage in dangerous practices that literally allow prisoners to run EMCF, placing all prisoners at a substantial risk of serious harm. *See* Vail 2016 Expert Rpt. ¶¶ 36–47 (noting that improper counts, prisoner control of cell assignments, and other lax security practices send a "message" that "authority in the institution is based on the power of the inmate population and not the authority of prison officials"). These practices include permitting prisoners to assist with counts[18]; not verifying the identity or well-being of prisoners during counts[19]; and ceding the most basic responsibility to gang members, who in addition to conducting counts, are often allowed to serve meals and even make housing assignments.[20]

"[W]idespread security staff corruption at EMCF" also still "contributes to systemic violence." ECF No. 240 at 17. Officers commonly collude with gang members.[21] Staff also fraternize with prisoners, including communicating with prisoners via cell phone, sexual relationships, and other inappropriate conduct.[22] This instills fear in other prisoners that officers

---

[18] For examples of instances in which prisoners were permitted to assist with counts, see Campbell Decl., ¶¶ 8–9; Charlie Jones Decl. ¶¶ 7–8.

[19] For examples of instances in which staff failed to verify the identity or well-being of prisoners, see ECF No. 549-32 "Decl. of David Grogan" (hereinafter "Grogan Decl.") ¶¶ 4–5); Exhibit 10 "Decl. of Cordarious Nelson" (hereinafter "Nelson Decl." ¶¶ 5–11; ECF No. 549-33, "Decl. of Johnny Holton" (hereinafter "Holton Decl.") ¶ 6.

[20] For examples of instances in which staff ceded basic responsibilities to prisoners, see *e.g.*, Jones Decl. ¶¶ 9, 24 (prisoner witnessed organization members controlling cell assignments every time a new prisoner moved onto 1D and as a pod orderly saw gang members distributing trays on every zone on Housing Unit 1);Campbell Decl. ¶¶ 26–27 (prisoners witnesses at least one instance a month where a prisoner is forced to share a cell with more than one prisoner because gang affiliated prisoners are controlling housing assignments); *see also* Vail 2016 Expert Report ¶¶ 47, 71–73.

[21] For examples of instances in which staff colluded with gang members, see Exhibit 11, Decl. of Terry Beasley (hereinafter "Beasley Decl.") ¶¶ 10–11; Jones Decl. ¶¶ 9, 15; ECF No. 549-31, Decl. of Alfonzo Griffin (hereinafter "Griffin Decl.") ¶¶ 21–23.

[22] For examples of instances in which staff fraternized with prisoners, see *See e.g.*, Exhibit 12, "March 7, 2016 Investigation Report" (multiple officers met with, and were threatened by, a prisoner in the control tower of a housing unit and text messages between prisoners and officers were found on an officer's (continued…)

would only these favored individuals and not them.[23] And officers, including supervisory staff, introduce contraband into the facility. EMCF staff's resulting inability to stem — or complicity in — the flood of contraband within EMCF places all prisoners at risk.[24] For example, the abundance of weapons at EMCF is well-documented, yet remains unchecked.[25] As a result, prisoners are at constant risk of being assaulted with shanks and other contraband: Defendant's own brief admits that a "serious" assault occurs at EMCF approximately every five days, with such assaults occurring throughout the prison. *See* ECF No. 530 at 14–15, *see also* Vail 2016 Expert Rpt. ¶ 117 (noting that widespread availability and use of weapons "creates a climate where inmates do not feel safe in the prison they are confined in, and where the officers do not feel safe in the prison they are meant to administer"). Compounding to the risk posed by

---

cellphone); Exhibit. 13, "Feb. 25, 2016 Memorandum Regarding Officer Sherrod" (officer was seen on video exiting a prisoner's cell where the door had been closed and the window blocked by a blanket); Exhibit 14, "June 16, 2015 Report of Investigation" (officer did not report being assaulted by a prisoner, which was a pattern of the officer's continued and documented leniency towards members of one particular gang).

[23] *See* Campbell Decl. ¶¶ 16-17 (prisoners have sexual relationships with officers, and prisoner is concerned that he were to get into a conflict with an officer, she would have another prisoner assault him in retaliation); Holton Decl. ¶¶ 16–19 (prisoner saw another prisoner go into the picket with an officer, and this was concerning because the prisoner knew that the guard was not watching for the safety of everyone on the zone).

[24] In February 2017, a prisoner posted a Facebook video from a contraband cell phone of another prisoner submitting to a beating in exchange for contraband narcotics. That prisoners were able to (1) film a video, (2) on a contraband cellphone, (3) of a prisoner being beaten, (4) while declaring he was being beaten in exchange for drugs, is itself a testament to the deficient level of security provided at EMCF. *See, e.g.*, Mississippi News Now, *Prison video shows contraband still a problem* February 28, 2017. The video prompted a shakedown that "turned up cell phones, shanks, drugs and other contraband," including "wooden bats, a radio transmitter and bags of crystal methamphetamine." *See* Exhibit 15 "ASSOCIATED PRESS, *More contraband found at Meridian prison* (Mar. 6, 2017)).

[25] For examples of weapons found at EMCF, see Exhibit 16, "EMCF Monthly Report, July 2016 to June 2017" at 5, line 290 (documenting weapons recovered across the prison); Vail 2016 Expert Rpt. ¶ 115 (documenting 742 weapons discovered at EMCF between July 2014 and January 2016, over 39 weapons per month); Campbell Decl. ¶ 20) (attesting that a recent shakedown revealed 32 knives on Unit 4C, nearly one per each of the zone's 33 cells).

weapons, other contraband, such as illegal drugs, tobacco, and cell phones are also rife throughout EMCF.[26]

EMCF further fails to protect prisoners from violence in other rudimentary ways, including the continued presence of "structural defects in cell-door locking mechanisms." ECF No. 240 at 17. Put plainly, a fundamental measure in maintaining prison security is through the use of reliable locking mechanisms. Well before the initiation of this action, MDOC had been on notice of the ease with which locks on cell doors at EMCF could be disabled and the failure of officers to properly secure doors. *See* Exhibit 20 , "OSHA Citation and Notification of Penalty to GEO Group" at 7. Nevertheless, prisoners are still able to tamper with locks  Units 1, 2, 3, 4, 5, and 6, and can jam locks with items as readily accessible as toothpaste caps, milk cartons, and paper. *See* Exhibit 21, "Deposition of Christopher Dykes" (hereinafter "Dykes Dep.") 176:18– 177:7; 179:15–25); Exhibit 22, "Deposition of Frank Shaw" (hereinafter "Shaw Dep.") 236:7– 237:8; Gage Expert Rpt. at 9. Indeed, Defendant's own expert witness regarding prison locks, Steven Stonehouse, testified that six out of ten cell doors he examined had been rigged such that they could not be locked properly. *See* Exhibit 23, "Deposition of Steven Stonehouse" 80:18- 81:4, 83:9-84:9. Mr. Stonehouse  also testified that the only way to prevent this problem— without replacing the current locks—w as for staff to be diligent in removing impediments from

---

[26] For examples of such contraband found at EMCF, see Exhibit 17, "October 19, 2016, Incident Report, EMCF-16-0654" (documenting  assorted contraband found on Housing Unit 1C, including assorted pills, door key, 4 cell phones, a knife, and 5.29 grams of methamphetamine); Exhibit 18, "March 22, 2017 Incident Report, EMCF-17-241" (targeted search of Housing Unit 6D revealing major contraband: 17 inch homemade knife, 2 Smith and Wesson handcuff keys; assorted drugs multiple cell phones, batteries and chargers);  Exhibit 19, "May 5, 2017, Incident Report, EMCF-17-0351" (Unit search of 4C recovered contraband including 3 drills, 14 sharpened metal weapons, and a tattoo gun).

the locks, a step they had failed to take even knowing Mr. Stonehouse would be touring the facility. *See id.* at 87:17-88:14, 91:23-92:3.

Exacerbating this issue, in some instances, staff inexplicably discourage prisoners from securing their cell doors or rely on prisoners to open their own doors by manipulating locks, because the staff cannot open the doors themselves. *See e.g.,* Jones Decl., ¶ 35 (stating that a lieutenant asked him to let himself out of his cell because the lieutenant did not have a key) Even more astounding, prisoners are able to manipulate locks so that staff cannot enter cells without the use of tools. *See* Dykes Dep. 231:5–233:23; *see e.g.*, Exhibit 24, "June 1, 2016, Incident Report, EMCF-16-330" (prisoner barricaded door, preventing officers from opening it until he unjammed the door ten minutes later). The failure by Defendant to maintain control over cell door locks at EMCF has had devastating consequences.[27] *See* Vail 2016 Expert Rpt. ¶ 60 (recounting incident in which prisoner escaped from cell to attack another prisoner so severely that the victim was hospitalized); Hogans Dep. 31:25–40:15 (testimony from EMCF's deputy warden regarding riots on Units 1A and 1D that occurred after prisoners released themselves from their cells, while EMCF was on lockdown, requiring off-site medical treatment for three prisoners).

In short, Defendant's policies and practices enable ongoing, rampant prisoner-on-prisoner violence at EMCF: beatings[28], stabbings[29], sexual assaults[30], and remain a daily fact of life for all

---

[27] *See* Exhibit 25, "August 4, 2016, Incident Report, EMCF-16-0485/SUOF-16-0140" (Prisoner on 5C manipulated door and exited unit to the recreation cage); Exhibit 26, "June 19, 2016 Incident Debriefing Form, EMCF-PUOF-16-0694-EMCF-16-0367" (prisoner housed in medical was able to access his own cell door and then also access the cell doors of three other prisoners); *see also* Vail 2016 Expert Rpt. ¶¶ 56, 57, 61, 62.

[28] For examples of such fights and beatings, see Exhibit 27, "May 8, 2017, Incident Report, EMCF-17-0353" (fight involving five prisoners on Unit 4A); Exhibit 28, January 7, 2017, Incident Report, EMCF-17-0019" (physical altercation between two prisoners on Unit 3A); Exhibit 29, "October 28, 2016, Incident Report, EMCF-16-0685" (Prisoner on Unit 5B manipulated his hand restraints and assaulted (continued…)

prisoners. Yet Defendant has responded to these episodes of violence, years of expert reports, and findings of non-compliance by its own contract monitor with apathy: policies and practices regarding violence at EMCF have remained the same since class certification, with Defendant failing to take even basic steps to improve security. As found by Mr. Vail, "EMCF authorities are not in control of the institution," Vail2016 Expert Rpt. ¶ 24, and in the past two years, Defendant has taken no steps to regain that control or to protect members of the EMCF Class.

### 2. *EMCF Still Fails to Protect Prisoners from Staff's Excessive Use of Force.*

Also, in 2014, Plaintiffs identified the following policies and practices concerning Defendant's failure to reasonably protect members of the EMCF Class from staff's excessive uses of force:

> "[S]taff engage in abusive use of pepper spray"; "security staff are not trained to respond to inmates who resist staff direction"; "MDOC's Use of Force Policy does not properly explain how staff should conduct a planned use of force"; "MDOC's Use of Force Policy does not contain sufficient guidance on what circumstances justify spontaneous uses of force"; and "EMCF lacks a functioning grievance system."

another prisoner who was locked in a cell, through the tray port); Exhibit 30, "May 5, 2016, Incident Report, EMCF-16-0267" (prisoner-on prisoner assault on Unit 7); Exhibit 31, "April 15, 2016, Incident Report, EMCF-16-0218" (three prisoner's entered a cell on Unit 6A and assaulted another prisoner)

[29] For examples of stabbings, see Exhibit 32 "March 4, 2015, Incident Report, EMCF-15-0063" (prisoner stabbed on Unit 5C resulting in multiple lacerations and a stab wound to the abdomen necessitating emergency transport to the hospital); Exhibit. 33 "September 29, 2016, Incident Report, EMCF-SUOF-16-0183-EMCF-16-0609" (two prisoners stabbed in a classroom, with one prisoner requiring treatment at a local intensive care unit); Exhibit. 34 "November 18, 2016, Incident Report, EMCF 16-735" (prisoner stabbed in the arm on Unit 6D); *see also* Exhibit. 35 ASSOCIATED PRESS, *Inmate Stabbed Multiple Times at East Mississippi Prison* (May 12, 2017); Exhibit. 36 (ASSOCIATED PRESS, *Inmate accused of stabbing 3 workers at Mississippi prison* (Apr. 12, 2017); Exhibit. 37, WTOK, *Inmate stabbed at East Mississippi Correctional Facility* (Mar. 28, 2017); Exhibit 38 THE MERIDIAN STAR, *Stabbing at Lost Gap* (February 14, 2017).

[30] For examples of such assaults, see Exhibit 39, "August 2, 2016, Incident Report, EMCF-16-0484" (prisoner physically and sexually assaulted by cell mate on Unit 3C); Exhibit. 40 "November. 15, 2015 Incident Report, EMCF 15-0383) (prisoner was forced to perform oral sexual acts by his cellmate on Unit 6A) Exhibit. 41, "Aug. 4, 2016 ARP" (prisoner was forced to strip and submit to an anal cavity search by four other prisoners on 2B).

ECF No. 240 at 17–18. Use of force policies and practices are "a critical component of determining whether or not a prison is being operated safely and humanely." ECF No. 549-3 Rebuttal Expert Report of Eldon Vail, 2017 (hereinafter "Vail Rebuttal Rpt.") ¶ 40. Yet, Defendant has failed to eliminate or improve any of these policies and practices in the two years since class certification, such that all members of the EMCF Class continue to be subjected to an unconstitutional risk of harm. *See* Vail 2016 Expert Rpt. ¶ 136 (noting that he "remain[s] critical of EMCF" in this area).

In 2014, Mr. Vail explained the risks posed by MDOC's use of force policy. *See* ECF Nos. 240 at 18, ECF No. 549-1,  2014 Expert Report of Eldon Vail (hereinafter "Vail 2014 Expert Rpt.") ¶¶ 87, 98 (concluding that MDOC's use of force policy fails to "explain how staff should conduct a planned use of force" or provide "sufficient guidance on what circumstances justify spontaneous uses of force."). Yet, to Plaintiffs' knowledge, substantially the same policy remains in place today. Moreover, EMCF staff fail to comply with even this threadbare policy: from 2015 through June 2017, MDOC's own contract monitor found routine non-compliance at EMCF with most meaningful measurements concerning use of force:

| Criterion Assessed | Months Finding Non-Compliance | |
|---|---|---|
| Policy governing immediate/calculated use of force consistent with MDOC [policy]. | **2015:** September, October, November, December **2016:** January, February, March | |
| All use of force incidents documented and reviewed. | **2015:** January, February, March, April, May, June, August, September, October, November, December **2016:** January, February, March, April, May, June, July, August, September, October, December | |

| Use of Force consistent with law and MDOC [policy], incident report prepared and MDOC notified asap by phone/fax, contract monitor notified. | **2015:** September, October, November, December;<br>**2016:** January, February, March, May, June, July, August, September, October, December |
|---|---|
| Incident reports, other than critical, furnished w/in 1 week. | **2015:** September, October, November, December;<br>**2016:** January, February, March, April, May, June, July, August, September, October, December |
| Video tapes of incidents preserved/catalogued as per MDOC [policy]. | **2015:** September, October, November, December;<br>**2016:** January, February, March, May, June, July, August, September, October, December |
| Offender is seen by medical immediately after incident. | **2015:** January, February, March, April, June, July, August, September, October, November, December<br>**2016:** January, February, March, May, June, July |
| Facility subscribes to prescribed confrontation avoidance procedures. | **2015:** January, February, March, April, May, June, July, August, September, October, November, December<br>**2016:** January, February, March |
| Medical staff consulted prior to calculated use of force situations. | **2015:** September, October, November, December;<br>**2016:** January, March, May, June, August, September, October, December |

*See* ECF No. 549-65, Monitor's Monthly Reports (Use of Force); Vail 2016 Expert Rpt. ¶¶ 132–

33. As evidenced by the contract monitor's findings, security staff are also still "not trained to

respond to inmates who resist staff direction." *See* ECF No. 240 at 18. Indeed, in her report, the

contract monitor also routinely included the notation that staff "[n]eed training in how to

conduct" confrontation avoidance. Vail 2016 Expert Rpt. ¶ 132 (quoting MDOC-CON-

00005687)  Reviewing these findings, Mr. Vail concluded that "[a]ll of these items are important

to make sure force is not used unnecessarily or excessively and that inmates receive medical care after a use of force event," *id.* ¶ 133, and that based on these items, it is evident that EMCF staff are "poorly trained" in the proper use of force and "engage in unnecessary uses of force," *id.* ¶ 132.

Given EMCF's flawed use of force policy and training, it is not surprising that instances of excessive use of force are common throughout the prison.[31] In drafting his most recent report, Mr. Vail reviewed hundreds of videos, photographs, and  incident reports documenting use of force at EMCF. *See* Vail 2016 Expert Rpt. ¶ 16. Among Mr. Vail's findings, staff still "engage in abusive use of pepper spray," *see* ECF No. 240 at 17–18, including spraying prisoners when they are locked in their cells and do not pose a threat, s*ee* Vail 2016 Expert Rpt. ¶¶ 137, 139, 141. Staff also opt to use force without first determining whether force could have been avoided, and frequently fail to involve mental health professionals in an effort to avoid or reduce the amount of force used. *Id.* ¶¶ 148, 150, 153. Furthermore, EMCF staff and class members have reported witnessing staff use excessive force or having been subjected to such force themselves.[32]

---

[31] *See, e.g.* Exhibit 42,  "June 9, 2017 Incident Report, SUOF-17-0154/EMCF-17-0429 (describing June 2017 use of force incident on Housing Unit 4C, against prisoner who was wrestled to the floor of his cell by several officers, while wearing only a towel ); Beasley Decl. ¶¶ 17, 18 (describing October 2016 use of force incident, when Lt. Cooney and two officers dragged a prisoner down the hallway leading to Housing Units 5 and 6, and August 2017 use of force incident by Captain Jones  and a lieutenant against two prisoners who reside in cell 109 on Housing Unit 1C); Exhibit 43, June 2, 2017, Incident Report, SUOF-17-0146/EMCF-17-0413(describing July 2017 use of force incident on Housing Unit 5C, against prisoner who was attempting to tie rope around his neck).

[32] Campbell Decl. ¶ 36); ECF No. 549-35 "Decl. of Bobby Mitchell" (hereinafter "Mitchell Decl.") ¶ 25– 29, 31; Beasley Decl. ¶ 16–18; Braxton Dep. 131:19–25-132:1–7 (testimony of EMCF's former legal assistance clerk, who worked at EMCF through January 13, 2017 and who visited every area of the facility, that she witnessed nearly 50 excessive use of force incidents EMCF, in which officers continued to use force after the prisoner had complied); Exhibit 44, Braxton Dep. 8:13–14; Vail 2016 Expert Rpt. ¶¶ 134–154.

Compounding these issues, EMCF continues to "lack[] a functioning grievance system." ECF No. 240 at 18. In his 2014 report, Mr. Vail explained:

> Critical to the operation of any prison is an internal grievance system. When legitimate complaints and concerns are raised — and legitimate issues exist in every prison — there must be a way for those issues to be brought forward and addressed. If the prisoners do not believe the grievance system is effective, they will not believe the authority of the prison administration is legitimate, and they will find other ways to express their frustration, often by acting out.

> ECF No. 549-1 ¶ 72.

Such "acting out" — including prisoners seeking assistance by placing their hands through their food tray slots, *id.* ¶ 80 — can, and at EMCF, does result in the use of force. *See* ECF No. 534-1, Expert Report of Tom Roth and Kenneth McGinnis at 27 (citing the warden's statement that force, specifically the use of chemical agents, results when prisoners refuse to remove their arms from their food tray slots). Such uses of force ignore the underlying problem of prisoners simply seeking to have their legitimate concerns heard by prison officials. Vail 2016 Expert Rpt. ¶¶ 75–76. Prisoners often "act out" because risking a confrontation and potential use of force incident with staff is the only way to redress valid grievances.[33] MDOC's own statistics show that in 2016, out of 2,100 grievances filed by prisoners, less than 750 were actually resolved with any response at all, leaving 1,350 prisoner grievances left unheard. ECF Nos. 549-60, 549-61 (lines 2410-30); Vail 2016 Expert Rpt. ¶¶ 132–133, 145, 154.

*     *     *

Sadly, the threat of violence is not limited to any one housing unit or cured by any prison programming. While EMCF is divided into multiple housing units and houses prisoners of varying custody levels, violent episodes occur throughout the prison, and prisoners frequently

move around the prison due to work assignments and changing housing assignments. *See, e.g.,* Griffin Decl., ¶ 3) (stating he has lived on Housing Units 1A, 1B, 1C, 2C, 2D, 3A, 3C, 4C, 5A, 5B, 5C, 5D, 6A, 6B, 6C, 6D); Beasley Decl. ¶¶ 1–3 (attesting he has been housed on Housing Units 1B, 1C, 1D, and 6B); Simply put, no prisoner at EMCF is safe. And despite having two years since class certification to remedy the rampant violence at EMCF, prisoners face the same systemic risk of harm. Thus, certification of the EMCF Class as to Plaintiffs' protection from violence claims, Claims Four and Five, remains proper.

### ii.    The Medical Care at EMCF Remains Systemically Inadequate.

Additionally, in 2014, Plaintiffs identified the following policies and practices concerning Defendant's failure to provide members of the EMCF Class with adequate access to medical care:

> "Defendants deny prisoners timely access to medical care"; "the health care system at EMCF fails to provide the class with necessary medical care by qualified clinicians"; "a systemic failure to carry out orders for care subjects the entire class to risk of serious injury"; "the structurally deficient policies and procedures and medical record system subject the EMCF class to risk of serious harm"; and "the lack of meaningful oversight of the medication delivery system at EMCF subjects the class to serious risk of injury."

ECF No. 240 at 27–28. Despite contracting with a new vendor, Centurion, to provide medical services at EMCF shortly before the Court ordered certification, EMCF's medical care system continues to subject all members of the EMCF Class to an unconstitutional risk of harm. Indeed, as Dr. Marc Stern[34], one of Plaintiffs' medical experts, concluded in his unrebutted 2016 report,

---

[34] Dr. Stern is a board certified internist specializing in correctional health care. He has held leadership positions in both privatized and state-run prison health care systems, including most recently as the Assistant Secretary of Health Care for the Washington State Department of Corrections. He has investigated, evaluated, and monitored the adequacy of health care delivery systems in correctional institutions on behalf of federal courts, the U.S. Department of Homeland Security, the U.S. Department of Justice, and other parties. *See* Exhibit 45, "Expert Report of Dr. Marc Stern, 2016" (hereinafter "Stern Expert Rpt.") at 2.

"[t]he findings of my current report are essentially the same as the findings of my [2014 report]."
Exhibit 45, "Expert Report of Dr. Marc Stern, 2016" (hereinafter "Stern Expert Rpt.") at 2. Dr.
Stern continued:

> Despite the passage of two years, despite MDOC having access to my 2014 report
> — as well as a companion report produced by Ms. LaMarre[35] — both of which
> provided a detailed road map of the conditions at EMCF that were broken and
> required repair, and despite MDOC's engagement of a different vendor of health
> services at EMCF, I conclude, sadly, that little has changed at EMCF. Medical
> conditions created and/or allowed to exist by MDOC are still systematically
> inadequate. Medical conditions are just as dangerous as they were two years ago
> and continue to put inmates at a risk of serious harm and even death.

*Id.*[36]

Defendant continues to "deny prisoners timely access to medical care," including timely
access to urgent, episodic, chronic, dental, and infirmary care. *See* ECF No. 240 at 27; Stern
Expert Rpt. at 5–17; ECF No.549-9, "Expert Report of Madeleine LaMarre, 2016" (hereinafter
"LaMarre Expert Rpt.") at 12–25. With regard to access to urgent care, prisoners continue to
have difficulty accessing care when officers are not present in a housing unit, due to call buttons
in cells that are either broken or ignored. *See* Stern Expert Rpt. at 5–6; Griffin Decl. ¶ 29. Jones
Decl., ¶ 5; Exhibit 46, Decl. of Kenneth Clemons, ¶ 8. As a result, prisoners are left to kick and
scream, set fires, or wait for staff to make their infrequent rounds in order to obtain medical care,

---

[35] Plaintiffs' second medical expert, Madeleine LaMarre, is a licensed family nurse practitioner with more
than 30 years of experience in correctional health care, including as Nursing Director and Clinical
Services Manager for the Georgia Department of Corrections. She has served as a federal court-appointed
monitor and as a consultant to the Centers for Disease Control and Prevention regarding managing
hepatitis C and HIV testing in correctional settings. ECF No. 549-9, (Expert Report of Madeleine
LaMarre, 2016 (hereinafter "LaMarre Expert Report") at 3, Ex. 1.

[36] Ms. LaMarre also concluded in her unrebutted 2016 report that "systemic issues remain at EMCF that
result in patients not receiving timely and appropriate care for their serious medical conditions. These
issues are of such magnitude to have either caused harm . . . or created an ongoing risk of serious harm."
LaMarre Expert Rpt. at 6. To reach these conclusions, Dr. Stern and Ms. LaMarre toured EMCF and
collectively interviewed and reviewed the medical records of more than 80 patients. *See* Stern Expert Rpt.
at 3; LaMarre Expert Rpt. at 5.

regardless of the urgency of their condition. *See* Stern Expert Rpt. at 5–6. Even when staff are aware of a prisoner's serious condition, medical personnel fail to respond appropriately, including delaying or denying treatment.[37] *Id.*; LaMarre Expert Rpt. at 23–25.

Access to episodic, or non-urgent, care is similarly lacking. While prisoners are required to request non-urgent care by submitting forms called sick call requests, these forms are frequently unavailable on the housing units, and even when prisoners are able to submit them, they may receive no response or care may be unacceptably delayed, frequently because staff are unavailable to escort them to the medical unit.  Stern Expert Rpt. at 6–8. As a result of these practices, prisoners with fractured bones, severe rectal pain, and dental pain have been forced to wait days or even weeks for care. *Id.* And, as with urgent care, when care is provided, it is often inadequate.[38] LaMarre Expert Rpt. at 12–17.

Access to chronic care is also wanting: not all prisoners with chronic diseases are enrolled in the chronic disease program and therefore receive no or limited treatment for their chronic conditions; nurses, and not the physician, treat these "medically complicated" patients; evaluations are often inadequate; medications are interrupted; and, frequently, patients miss appointments due to lack of a security escort or because the patient "refused," likely without informed consent. *Id.* at 17–23; Stern Expert Rpt. at 6–9. Patients with conditions like diabetes, asthma, heart disease, and hepatitis can ill afford such erratic treatment, which may result in

---

[37] For examples of patients impacted by deficient access to urgent care, see Stern Expert Rpt., Patients 3, 7, 8, 15, 17, 18, 26, 27, 36, 37) and LaMarre Expert Rpt., Patients 2, 5.

[38] For examples of patients impacted by deficient access to episodic care, see Stern Expert Rpt., Patients 5, 6, 11, 13, 26, 28, 31, 33, 34, 38, 39, 41, 43) and LaMarre Expert Rpt.,  Patients 2, 3, 4, 5, 7, 8.

"increased risk for complications and harm from their poorly controlled chronic diseases."[39] 2016 LaMarre Rpt. at 23.

Care in the infirmary — which houses EMCF's most acutely ill patients — is also deficient. There are simply too few beds to serve EMCF's population, resulting in patients in need of intensive care being housed for days or weeks, in medical holding cells, without toilets and running water, or intake cells, which are separate from the medical unit and lack sleeping bunks.[40] *See* MDOC Monitor 2016 Weekly Rpts. at 26, 54; Stern Expert Rpt. at 9–10; LaMarre Expert Rpt. at 12–17. Even when patients are given a bed, Dr. Stern found that the monitoring and care these patients received was so infrequent and perfunctory that their relocation to the infirmary was "better [] described as warehousing."[41] Stern Expert Rpt. at 10; *see* LaMarre Expert Rpt.at 12–17.

As was true in 2014, the medical care system at EMCF still "fails to provide the [EMCF] class with necessary medical care by qualified clinicians." *See* ECF No. 240 at 27–28. Medical staff continue to work outside their licensure, training, and ability. For example, licensed practical nurses — who receive approximately 18 months of post-high school training — continue to provide emergency care, post-assault evaluations, and screening for admission to isolation cells, practices well beyond their competencies.[42] Stern Expert Rpt. at 10–11; *see*

---

[39] For examples of patients impacted by deficient access to chronic care, see Stern Expert Rpt., Patients 2, 3, 4, 9, 16, 25, 38, 41) and LaMarre Expert Rpt., Patients 2, 3, 4, 6, 7, 8, 13, 18.

[40] Even MDOC's Chief Medical Officer testified that housing prisoners, who would otherwise be housed in the infirmary, where they cannot be directly monitored by medical staff is not an appropriate or safe practice. *See* Perry Dep. 184:9–185:8.

[41] For examples of patients impacted by deficient care in the infirmary or in the intake unit, see Stern Expert Rpt., Patients 15, 27; LaMarre Expert Rpt., Patients 2, 3, 6, 19, 21.

[42] For examples of patients impacted by deficient care by LPNs, see Stern Expert Rpt., Patients 6, 16, 26, 27, 28, 34, 38, 45, 46, 47, 48, 49)

Exhibit 47, Deposition of Kimberly Townsend (hereinafter "Townsend Dep.") 37:15–21, 136:18–137:10 (EMCF licensed practical nurse testifying that she conducts "body sheets" after assaults and use of force incidents in addition to assessing prisoners prior to placement in segregation); Exhibit 48, Deposition of Penny Brookshire (hereinafter "Brookshire Dep.") 39:18–40:8, 70:18–25, 83:19–85:23 (stating that as a licensed practical nurse she conducts examinations after fights and use of force incidents as well as pre-segregation screenings). Even when medical staff acted within their competencies, both Dr. Stern and Ms. LaMarre identified dozens of improper instances of care, endangering patients' lives and well-being.[43] *See, e.g.*, Stern Expert Rpt. at 12–17.

And, there is still "a systemic failure [at EMCF] to carry out orders for care." *See* ECF No. 240 at 28. Medical staff fail to follow-up on and execute medical orders and tests in a timely manner, resulting in weeks', months', or years' long waits for care.[44] *See* Stern Expert Rpt. at 17–19; LaMarre Expert Rpt. at 25–27. The "medical record system" continues to be poorly designed and difficult to use, as in 2014, and medical records themselves continue to betray inaccuracies, omissions, and likely falsifications. Stern Expert Rept. at 21(opining that, "at times EMCF nurses (and/or other EMCF clinical staff responsible for record-keeping) document 'patient refused' or 'no show' even when they know that that is not the correct explanation for the missed dose"); *see also* LaMarre Expert Rpt. at 39–49.

---

[43] For examples of patients impacted by deficient care by RNs, NPs, and the physician, see Ex. Stern Expert Rpt.,, Patients 17, 19, 20, 22, 23, 24, 26, 28, 30, 31, 33, 34, 38, 42, 43).

[44] For examples of patients impacted by delays in carrying out medical orders, see Stern Expert Rpt., Patients 1, 3, 7, 8, 9, 16, 20, 21, 25, 34, 38, 41, 42, 43. Dr. Stern also noted that the case of Patient 43, whose three-year lapse in care is summarized in Dr. Stern's report, was "emblematic of MDOC's utter paralysis to be able to repair the serious problems it faces in health care delivery at EMCF." *Id.* at 28.

Finally, a "lack of meaningful oversight of the medication delivery system at EMCF" continues to subject prisoners to a serious risk of harm. *See* ECF No. 240 at 28. Defendant continues to deny prisoners access to their prescribed medications, by virtue of the prison's inconsistent medication administration, poor record keeping, and repeated inability to timely stock medications. *See* LaMarre Expert Rpt. at 41–44; Stern Expert Rpt. at 17–18. Based on her review of medical records and observation of medication administration on multiple housing units, Ms. LaMarre found EMCF's current medication administration process to be "dangerous" and concluded that it "does not ensure [that] . . . the right patient receives the right medication, at the right dose, by the right route, at the right time." LaMarre Expert Rpt. at 41–44. For example, when asked to describe their practices regarding medication administration, Nurses Kimberly Townsend and Penny Brookshire gave dramatically different testimony. *Compare, e.g.*, Townsend Dep. at 66:16–67:1; 70:21–73:4 (stating that she brings missed medications to prisoners the following day, but does not ensure that each prisoner takes his medication); *with* Brookshire Dep. at 103:6–13; 97:22–98:20) (noting that she does not bring missed medication to prisoners because "[i]f they miss it, they miss it," but that an officer with her does ensure that prisoners take their medications).

Ms. LaMarre also identified a litany of other concerns with medication administration at EMCF, including medication discontinuity due to the failure to renew, refill, and order medications; failure to administer newly ordered medications; nurses independently withholding medications or administering them after they expired; and nurses' falsification of medication

administration records. *See* LaMarre Expert Rpt. at 43–44. Testimony from class members echo

medication administration deficiencies identified by Ms. LaMarre.[45]

Other deficiencies in EMCF's medical care system — including a lack of adequate clinic

space, equipment, and supplies; inadequate transfer screenings; and inadequate oversight by

MDOC — also abound. *See* Stern Expert Rpt. at 24–25; LaMarre Expert Rpt. at 9–12, 45–47.

Yet, despite being advised of these failed policies and practices repeatedly by Plaintiffs' experts,

and in Centurion's self-reporting[46], Defendant has remained indifferent to the resulting risk of

harm faced by all prisoners at EMCF. As Dr. Stern concluded in his unrebutted report:

> The health care system at EMCF is simply incapable of meeting the serious
> medical needs of the inmate population, and it thereby puts the entire inmate
> population at EMCF at constant substantial risk of serious injury. . . . The
> dysfunction in the medical care delivery system at EMCF permeates every
> essential aspect of the system; health care operations are broken at every level,
> and there is massive evidence that the health care system, as it interacts with
> custody, fundamentally fails to address the systematic health care needs of the
> prisoner population. Furthermore, it is apparent that this extreme level of
> dysfunction within EMCF can exist only if the statewide oversight system is also
> broken. There is a paucity of oversight of health care at EMCF by MDOC. . . . It

---

[45] For examples of prisoner complaints regarding medication administration at EMCF, see Exhibit 49,
"Deposition of Alex Armstrong" (hereinafter "Armstrong Dep.") 32:12–34:8 (testifying that nurses tell
prisoners that medication does not arrive until after midnight because the nurses are short-staffed);
Exhibit 50, "Deposition of Terry Beasley" (hereinafter "Beasley Dep.") 29:19–33:10 (discussing that he
regularly misses his evening medication because medication distribution happens so late he is already
asleep); Exhibit 51, "Deposition of Allen Rogers" (hereinafter "Rogers Dep.") 12:15–13:10. (stating that
sometimes he does not receive his medication because it was not reordered) Exhibit 52, "Deposition of
Barry Melton" (hereinafter "Melton Dep.") 18:2–19:10 (testifying that he sometimes goes "weeks at a
time" without receiving his prescribed medications)

[46] Centurion reports on its performance to MDOC. *See* Stern Expert Rpt. at 24–25. While Dr. Stern
deemed these reports to be inadequate measures of Centurion's performance — as the "measures [in the
CQI] are all limited to the timing of health care delivery [n]ot a single measure addresses the clinical
appropriateness of the care delivered" — even these inadequate measures show a healthcare system in
disarray. *Id.* at 25; LaMarre Expert Rpt. at 45–46. In her deposition, Dr. Gloria Perry, MDOC Chief
Medical Officer, addressed segregation and sick calls, indicating that"if['[s not a good situation" at
EMCF. Perry Dep. 226:13–228:9. She also testified that, on the basis of the deficiencies identified in Dr.
Stern's and Ms. LaMarre's expert reports, she ordered Centurion to produce a corrective action plan to
her. Perry Dep. 159:4–21; 246:12–23. Despite having requested the corrective action plan 2 months
earlier, Dr. Perry testified that she had still not received the requested action plan. *Id.* 159:10–15.

is clear to me that MDOC (at least with regard to EMCF) is unable to detect and repair problems, that is, to learn from experience. . . . Based on contrasting the findings in my first report with those of this second report more than two years later, it is clear EMCF is incapable of self-repair.

Stern Expert Rpt. at 27. Thus, certification of the EMCF Class as to Plaintiffs' medical care claim, Claim One, remains proper.

### iii.    Mental Health Care at EMCF Continues to Endanger All Prisoners with Serious Mental Health Needs

In 2014, Plaintiffs identified the following policies and practices concerning Defendant's failure to provide members of the Mental Health Subclass with adequate access to mental health care:

"[F]ailure to ensure access for prisoners to appropriate levels of care"; "failure to provide adequate numbers of qualified mental health staff"; "failure to provide adequate supervision of mental health staff"; "inadequate training for security staff interactions with prisoners with mental illness"; "inadequate management of psychotropic medications"; "failure to maintain accurate mental health records"; and "lack of meaningful clinical encounters."

ECF No. 240 at 36. These practices and policies have continued since the Court certified the Mental Health Subclass, such that, in the opinion of Plaintiffs' mental health expert, Dr. Bruce Gage[47], "the mental health care system at EMCF both places mentally ill inmates at an unreasonable risk of harm and has resulted in actual harm." Gage Expert Rpt. at 6.

---

[47] Dr. Bruce Gage is a board certified psychiatrist and the Chief of Psychiatry for the Washington State Department of Corrections, a role he has served in for nearly a decade. See Exhibit 8, Expert Report of Dr. Bruce Gage (hereinafter "Gage Expert Rpt.") at 4. Dr. Gage's experience in corrections dates to 1993, when he worked with the Washington State Department of Corrections to develop a residential treatment unit, modify the transfer processes for mentally ill prisoners, and consult on individual, complex mental health cases. Id. Over the course of his career, he has provided correctional monitoring services and evaluation, and correctional mental health consultation, in multiple jurisdictions, including the Orleans Parish Prison in Louisiana, the Escambia County Jail in Florida, and the Los Angeles County Jails and the Riverside County Jails in California. Id. at 4–5. To prepare his report, Dr. Gage toured EMCF, reviewed internal documents regarding mental health care at EMCF and videos regarding use of force and self-harming behavior, and interviewed or reviewed the medical records of fifty-eight prisoners. Id. at 1, App'x. 1

Defendant's "failure to ensure access for prisoners to appropriate levels of care" continues. *See* ECF No. 240 at 36. This failure to provide adequate access to care turns on both access and adequacy. *Id.* at 6. For example, there is "clear consensus among the inmate population that responses to requests" for mental health care at the prison "were highly variable," with responses occurring the same day, days or weeks later, or not at all. *Id.* at 36. Custody staff do not reliably convey requests for treatment to mental health care staff, and custody staff "often" cancel mental health care appointments. *Id.* at 37.

Moreover, follow up often occurs on an "as needed" basis, improperly placing the "burden of seeking the follow-up on the patient." *Id.* at 38. With regard to the adequacy of care, there is no access to licensed care — the EMCF facilities "are not licensed and staff is unable to secure psychiatric care in an off-site licensed facility, . . . a serious shortcoming . . . no different from failing to hospitalize a medical patient needing hospital level services." *Id.* at 39. There is "virtually no evidence of courses of individual therapy . . . because the service is not provided" and group therapy is evidently only available for a "minority of patients . . . for a small portion of the patients' time." *Id.* at 40. Indeed, Dr. Gage ultimately concluded that, because "access to many important services is virtually absent, there is little to say about the delivery, appropriateness, or quality of services" and that "[u]pon medical record review, [he] found not a single patient who had an appropriately targeted treatment plan." *Id.* at 56.

Prisoners agree with Dr. Gage's assessment. In the depositions concerning mental health care conducted by Defendant, prisoners identified deficiencies with the care they had received at EMCF.[48] This failure to provide adequate access to care imposes substantial risk on prisoners

---

[48] *See* Exhibit 53, "Deposition of Merlin Hill" (hereinafter "Hill Dep.") 51:25- 52:19 (testifying that during the seven days prior to the deposition, he did not receive his mental health medication for four of those days); Melton Dep. 42:14–44:3; 45:16–46:23 (prisoner describes the mental health response to (continued…)

with mental illness. Access to appropriate levels of care is crucial for such prisoners, given that untreated or poorly treated mental illness "is associated with higher rates of suicide and self-harm, danger to others and actual assaults, and worsening of the condition of the mentally ill, including reducing the likelihood of response to treatment in the future." *Id.* at Ex. 6. Indeed, owning to "profound deficits in suicide prevention" at EMCF, "there has been an abundance of preventable injury and at least one preventable death." *Id.*

EMCF also still "fail[s] to provide adequate numbers of qualified mental health staff" and to "adequate[ly] supervis[e]" staff. *See* ECF No. 240 at 36. As an initial matter, EMCF's staffing plan provides inadequate guidance as to minimally necessary staff based on the clinical needs of the prisoner population. *See* Gage Expert Rpt. at 35; Exhibit 55, "Deposition of Dr. Kim Nagel" (hereinafter "Nagel Dep.") 188:13–191:25 (EMCF psychiatrist testifying that very limited psychological testing is done due to limited staffing) . Instead, EMCF's staffing plan is nothing more than a "roster of positions," many of which — on Dr. Gage's review — appear to be vacant. *See* Gage Expert Rpt. at 35. This "highly problematic" shortcoming has a predictable result: EMCF mental health care "staffing is substantially below what would be necessary to afford basic, constitutionally adequate care." *Id.* at 35–36. Moreover, staff are inadequately supervised. As Dr. Gage noted in his report, "[n]ot only must the numbers of staff be adequate but the discipline . . . , training and performance of these staff must be sufficient as well." *Id.* at 36. Nevertheless, in his review of mental health care at EMCF, Dr. Gage "saw abundant evidence of very substandard care." *Id.* Moreover, based on the data provided to Dr. Gage,

---

requests as inconsistent because responses to his written requests are not consistently answered); Exhibit 54, "Deposition of Jason Holloway" (hereinafter "Holloway Dep.") 6:5-6:14 (prisoner requested mental health treatment after being raped, but was never given access to counseling);  Armstrong Dep. 39:16-40:18 (prisoner feels like he has to act out to receive mental health care because staff is not responsive to the formal process for requesting care).

EMCF's "[q]uality improvement functions" — or self-reporting systems — "are profoundly sub-standard," *id.* at 48, making it impossible to track "population-based clinical outcome measures." This "bespeaks a 'head in the sand' attitude on the part of leadership," thus placing patients at risk of harm. *Id.* at 51.

Defendant's "inadequate training for security staff" regarding interactions with mentally ill prisoners also persists. *See* ECF No. 240 at 36; *see also* Exhibit 56 , "Deposition of Shawanda Wallace" (hereinafter "Wallace Dep.") 127:8–10 (testimony of EMCF security officer that she does not know when to involve mental health staff in an interaction with a prisoner); Dykes Dep. 114:5–23 (testimony by supervising officer that staff who work on Unit 3, housing acutely mentally ill inmates, do not receive any additional use of force or specialty training regarding mentally ill prisoners). This failure to train may be evidenced in the security staff's frequent failure to alert mental health care staff to prisoners' treatment needs, as noted above. *See, e.g.*, Armstrong Dep. Ex. 47:9–48:25; Campbell Decl. ¶ 13; Gage Expert Rpt. at 36–37. As a result, prisoners often feel compelled to "act out" in order to receive help, by engaging in self-harm, assaulting others, or setting fires. Holloway Dep. 32:21–33:20 (same); Gage Expert Rpt. at 36 (quoting prisoner stating that, "If you tell the officers about being suicidal they don't do anything. They only do something if you do something."). Often, prisoners are disciplined for this behavior instead of being provided treatment, a "strictly punitive approach [that] is entirely unreasonable and in many cases amounts to punishing an inmate for being ill." *Id.* at 37. Indeed, as noted by Dr. Gage, "[i]nmates *almost uniformly* reported a frighteningly high degree of interpersonal violence among the inmates, excessive use of force by staff (especially, liberal use of [mace] sometimes without giving them an opportunity for decontamination)." *Id.* at 20 (emphasis added).

EMCF's management of its primary method of mental health care — psychotropic medications — also continues to be "inadequate." *See* ECF No. 240 at 36. As noted by Dr. Gage, "[t]he limited formulary deprives patients of ameliorative treatment, and the excessive use of haloperidol and many other older antipsychotics in common use at EMCF places patients at risk of excessive adverse outcomes." Gage Expert Rpt. at 62. EMCF's monitoring of patients on medication is also "spotty," lacking consistent testing for drug levels, screenings for metabolic syndromes that are "a routine part" of such care, and monitoring for "other common adverse reactions." *Id.* at 62–63. In addition, prisoners are "common[ly]" put on medications for side effects "regardless of an identified need" and, even when medication use is monitored and tests reveal abnormalities, "these abnormalities were virtually never addressed in the medical record." *Id.* at 63. This, of course, all assumes prisoners are actually receiving their medications — which is frequently not the case, based on prisoners' testimony.[49]

Deficiencies also persist with regard to maintenance of "accurate mental health records" and a "lack of meaningful clinical encounters." *See* ECF No. 240 at 36. As discussed above, EMCF's medical recordkeeping system — which includes mental health care reporting — is poorly designed and difficult to use. *See* Stern Expert Rpt. at 19–21; *see also* Gage Expert Rpt. at 64–65. Clinical encounters are often also deficient, occurring at prisoners' cells, with other prisoners and security staff present, requiring a waiver of confidentiality for just a "brief" moment of a mental health care practitioner's attention. *See* Exhibit 58, "Deposition of Charles

---

[49] For examples of prisoners testifying that they have not received their mental health medications, see Armstrong Dep. 31:24–32:11, 33:6–34:8 (testifying that nurses tell prisoners that medication does not arrive until after midnight); Beasley Dep. 29:19–33:13 (discussing that he regularly misses his evening medication because medication distribution happens so late he is already asleep); Rogers Dep. 12:15–13:10 (stating that sometimes he does not receive his medication because it is not reordered); Melton Dep. 18:2–19:10 (testifying that he sometimes goes "weeks at a time" without receiving his prescribed medications).

Pickering" (hereinafter "Pickering Dep.") 336:17–337:7 (testimony by mental health staff member that security staff is sometimes unavailable to escort mental health staff on the unit and therefore the mental health staff were forced to "catch" prisoners in the hallway or outside medical to speak with them); Gage Expert Rpt. at 48. As a result, prisoners are denied privacy in their mental health care encounters, a "vitally important" factor in mental health treatment, because "[i]n order to address their problems, patients must discuss issues they would never reveal to custody [staff] or peers." Gage Expert Rpt. at 48; Pickering Dep. 314:17–316:13 (testifying that it is difficult to find private space to meet with clients and that group sessions are cancelled one to two times per month because the classroom is unavailable); Nagel Dep. 175:5–22; 182:10–13 (facility psychiatrist testifying that, during lockdowns, he is required to do meetings with patients at their cells because security staff will not let patients out of their cell for care.)

Finally, as Dr. Gage explains in his report, MDOC cannot plead ignorance to the risk posed by these continued policies and practices:

> Given that this facility is designated by the MDOC for providing services to the mentally ill, the State must be acutely aware that the population needs treatment. Further, their own data show many of the incidents and trips to the hospital as a result of self-injury and violence perpetrated by the mentally ill. Walking on the units, the smell of smoke from all the fires set by inmates is pervasive and it is clear that staff have become so accustomed to this behavior and do not consider it out of the ordinary in much the same way the staff accede to the violence in the facility. Further, it is well-known that mental illness is associated with suicide, self-harm, and danger to others, especially when the mentally ill are in a decompensated (acutely ill or untreated) state. Failure to adequately manage and treat this population is thus well-known to be associated with harmful outcomes. In short, the State could not be unaware of the risks posed by this population and to this population.

Gage Expert Rpt. at 7. Because significant proof exists that policies and practices with respect to mental health care at EMCF place all mentally ill prisoners at risk, and that Defendant is

knowingly indifferent to that risk, continued certification of the Mental Health Subclass as to Plaintiffs' mental health care claim, Claim Two, is appropriate.

### iv.   Inadequate Nutrition and Food Safety Practices at EMCF Continue to Create a Risk of Harm.

n 2014, Plaintiffs identified the following policies and practices concerning Defendant's failure to provide members of the EMCF Class with adequate nutrition and to adopt adequate food safety practices:

> [P]ervasive deficiencies in the safety and sanitation of food preparation at EMCF subject prisoners at EMCF to a substantial risk of serious harm, [and] . . . the food that EMCF provides is insufficient to meet prisoners' nutritional needs.

ECF No. 240 at 45. These policies and practices persist, subjecting all members of the EMCF Class to a substantial risk of serious harm. Indeed, as Plaintiffs' environmental and nutrition expert, Ms. Diane Skipworth[50], concluded in her 2016 report, "the presence of insects, condition of the dishwasher, and lack of kitchen floor repairs and maintenance is placing prisoners at risk of food-borne illness" and "meals served at EMCF do not correspond with the posted menus . . . plac[ing] prisoners at risk of undernutrition and weight loss." ECF No. 549-5, "Expert Report of Diane Skipworth, 2016" (hereinafter "Skipworth Expert Rpt.") at 11, 13.

---

[50] Ms. Skipworth is employed by the Dallas County Sheriff's Department as Director of Detention Support Services. See ECF No. 549-5, "2016 Expert Report of Diane Skipworth" (hereinafter "Skipworth Expert Rpt.") at Att. B at 1. In that capacity, she oversees the Support Services Division, with a yearly budget of $10 million, 57 employees, and 200 inmate workers. *Id.* She participates in regulatory inspections of jails to ensure compliance with relevant law and regulations. *Id.* She has also performed inspections of immigration detention facilities and correctional facilities on behalf of the U.S. Department of Justice and the U.S. Department of Homeland Security. *Id.* Att. B at 1–2. Ms. Skipworth is a registered professional sanitarian and licensed and registered dietician, and has also obtained certification in laundry and line management and as food protection management instructor. *Id.* Att. B at 2–3. To prepare her report, Ms. Skipworth conducted environmental inspections at EMCF, relying on tools such as a light meter, temperature meter, and probe thermometer. *Id.* at 3–4.

There continue to be "pervasive deficiencies" in the food safety practices at EMCF. *See* ECF No. 240 at 45. EMCF's kitchen is unsanitary and contaminated by pests. *See, e.g.*, Skipworth Expert Rpt. at 11–14; *see also* ECF No. 549-29, Declaration of Jimmy Brewer (hereinafter "Brewer Decl.") ¶¶ 17–20; Jones Decl. ¶ 28; Braxton Dep. 144:9–146:5. Surfaces and appliances that come into contact with food are frequently not cleaned and sanitized before use, *see* Brewer Decl. ¶¶ 15–16, and the food itself is served spoiled, unwashed, improperly thawed, or is otherwise poorly prepared. *See* Skipworth Expert Rpt. at 13); Braxton Dep. Braxton 141:18–144:4; 147:7–20 (testimony of former EMCF staff member that, when she assisted in the kitchen, bologna was still frozen when it was served and chicken served to prisoners was "scrapings of . . . the bone marrow" that looked like "gray ground meat"); *see also* Brewer Decl. ¶¶ 8–14 (detailing examples of spoiled meat, inadequate portions, and unwashed and rotten produce); Campbell Decl. ¶ 42 (describing undercooked vegetables and cold or raw food).

Even when food is properly prepared, it still "is insufficient to meet prisoners' nutritional needs." *See* ECF No. 240 at 45; Skipworth Expert Rpt. at 12–13. While EMCF theoretically serves meals following a dietician-approved menu, substitutions are routine. *Id.* at 43–44. In addition, meals are watered down at the direction of supervisors, such that prisoners' trays neither reflect the approved menu nor its supposed nutritional content. *See* Brewer Decl. ¶¶ 26–30; Braxton Dep. 142:14–143:12 (testimony of former EMCF staff member that she was unable to distinguish between mashed potatoes and gravy served to prisoners because both were liquid). As a result, many prisoners rely on the canteen to supplement meals, but prisoners in segregation and those otherwise unable to make canteen purchases are left with insufficient, EMCF-issued meals. Campbell Decl. ¶¶ 40–41 ("If you don't supplement the food trays with canteen purchases you will starve."); *see* ECF No. 549-35, "Declaration of Bobby Mitchell," (hereinafter "Mitchell

48

Decl.") ¶¶ 46–47; Ex. Grogan Decl. ¶ 32. Due to the insufficient nutrition provided at EMCF —

not to mention gang control over much of the meal distribution process — prisoners are forced to

scavenge from discarded trays and even the garbage for food. *See e.g.*, Holton Decl. ¶ 28;

Campbell Decl. ¶ 41; Vail 2016 Expert Rpt. ¶¶ 71–73. Unsurprisingly, prisoners have

experienced severe weight loss as a result of these practices. Exhibit 44,  Braxton Dep. at

163:15–164:12 (describing a prisoner who had lost approximately 125 pounds); Brewer Decl. ¶

39 (noting loss of thirty-five pounds);  Exhibit 59, Bobby Allen Decl. (hereinafter "Allen Decl.")

¶ 7 (noting that he is six feet two inches tall and weighs 136 pounds).

The common risk posed by these policies and practices to every — affecting every

prisoner at EMCF and unremedied by Defendant over the past two years — supports continued

certification of the EMCF Class with respect to Plaintiffs' nutrition and food safety claim, Claim

Seven.

### v.       *Prisoners at EMCF Continue to Be Subjected to Conditions Amounting to Solitary Confinement*

In 2014, Plaintiffs identified the following policies and practices concerning Defendant's

imposition of conditions amounting to solitary confinement on members of the Isolation

Subclass:

> "[T]he lack of regular access to outdoor exercise and showers"; "the lack of
> functioning emergency call buttons"; "a systemic failure to perform thirty minute
> security checks on prisoners in isolation"; and "unremitting isolation and idleness
> for prisoners confined there.

ECF No. 240 at 58–59. In the two years since class certification, MDOC has failed to remedy

these policies and practices that place all EMCF prisoners housed in isolation at an

unconstitutional risk of harm. As Plaintiffs' isolation and mental health expert, Dr. Terry

Kupers[51], concluded: "I was very surprised and disappointed to find, after I wrote a report documenting the dreadful deficiencies and abuses at EMCF in 2014, that when I returned in May 2016, very little had changed in terms of the conditions on Unit 5" — the isolation unit — resulting in damage to prisoners' mental health and exposing them to severe, potentially life-threatening risks to their physical safety and wellbeing. *See* ECF No.-8, " 2016 Expert Report of Dr. Terry Kupers" (hereinafter "Kupers 2016 Expert Rpt.") ¶¶ 69, 126–30. Moreover, Dr. Kupers concluded that conditions in the medical and intake units, which also house prisoners in isolation, "are as harsh and damaging as the conditions in Unit 5." *Id.* at 56.

Prisoners housed in isolation continue to lack "regular access to outdoor exercise and showers." *See* ECF No. 240 at 58. As Dr. Kupers noted, prisoners in the medical and intake units, who are housed there for "unacceptably long stints," lack access to the recreation yard entirely, Kupers Expert Rpt. at 2, and prisoners in Unit 5 report that they are brought to the recreation yard "much less often than they are entitled to be there," and when they are brought there, are left to languish for hours "vulnerable to weather conditions," *id.* ¶ 74. Prisoners similarly report waiting weeks for showers and then being left in showers for hours on end. *See id.* ¶¶ 112, 131, 134.

---

[51] Dr. Terry Kupers is a medical doctor and a Diplomate of the American Board of Psychiatry & Neurology. ECF 549-8, "2016 Expert Report of Dr. Terry Kupers" (hereinafter "Kupers Expert Rpt.") at ¶ 1. He has testified as an expert in over thirty criminal and civil proceedings regarding jail and prison conditions, and on the quality of mental health services, and the effect of solitary confinement. *Id.* ¶ 12. He has extensive experience monitoring the treatment of mentally ill prisoners in Mississippi. *Id.* ¶ 13. He has published extensively on the subject of mental illness in correctional settings, including, in collaboration with MDOC's Deputy Commissioner, the article *Beyond Supermax Administrative Segregation: Mississippi's Experience Rethinking Prison Classification and Creating Alternative Mental Health Programs*. *Id.* ¶ 14. To prepare his report, Dr. Kupers toured EMCF, reviewed prisoners' medical records and other internal documents, and interviewed twenty-three prisoners. *Id.* ¶¶ 27–31.

Defendant has also failed to remedy either "the lack of functioning emergency call buttons" or the "systemic failure to perform thirty minute security checks on prisoners in isolation." *See* ECF No. 240 at 58–59. As Dr. Kupers wrote, "*[e]very* prisoner I interviewed reported that the call button or 'buzzer' in his cell either does not work or the officers ignore it when it is set off by a prisoner in need." Kupers Expert Rpt. ¶ 77 (emphasis added). Moreover, prisoners "*universally*" told Dr. Kupers that "officers never respond to their pressing the call button" and "*universally*" reported that "officers are almost never present on the pods." *Id.* ¶¶ 77–78 (emphasis added); *see* Grogan Decl. ¶ 7; Mitchell Decl. ¶¶ 13–16; Griffin Decl. ¶¶ 6–10; 29–30. As a result of these and other failings, Dr. Kupers concluded that "[t]here is much objective basis for the prisoners' fear, even their panic, that nobody will heed their cries for help and they will die of a stabbing, or a heart attack." Kupers Expert Rpt. ¶ 79.

Finally, prisoners in isolation continue to be subjected to "unremitting isolation and idleness," during which they are confined in cells for weeks at a time with little or no opportunity for constructive programming or positive interaction *See* ECF No. 240 at 59. As Dr. Kupers wrote, prisoners housed in the medical and intake units, who are "presumably acutely psychotic or suicidal, are left alone in a cell with almost nothing to do, have no television, are not even permitted to go to recreation, and many, because of mental health crises, . . . may have very limited access to pen and paper and reading materials." Kupers Expert Rpt. ¶ 139. And prisoners in Unit 5, who are also subjected to "unremitting isolation and idleness, the dark cells, the filth, and the neglect by staff" gave "consistent accounts" to Dr. Kupers "of the classic symptoms of long-term isolated confinement," such as "profound depression and anxiety and in many cases repetitive, disordered thinking including paranoid delusions, and compulsive acts of self-harm such as cutting." *Id.* ¶ 81. Further, Dr. Kupers concluded, "*[w]ithout exception*, these prisoners

51

exhibit many of the psychiatric symptoms that are widely understood to be induced by extended time in isolated confinement, and meanwhile their serious mental illness has worsened." *Id.* (emphasis added). Indeed, "even in relatively healthy prisoners," this mental deterioration is widespread — a "predictable" consequence of the harsh conditions imposed on all members of the Isolation Subclass. *Id.* ¶¶ 37, 40.

Based on these findings, Dr. Kupers concluded in 2016, as he concluded in 2014, that "the conditions in solitary confinement at EMCF are the worst I have witnessed in my 40 years as a forensic psychiatrist investigating jail and prison conditions." *Id.* at 60. Defendant has been aware of Dr. Kupers' findings for three years and done nothing to alleviate the unconstitutional risk its policies and practices pose to all prisoners housed in isolation at EMCF. Thus, certification of the Isolation Subclass as to Plaintiffs' isolation claim, Claim Three, remains proper.

### vi.    *Prisoners Housed on Unit 5 and 6 Continue to Be Subjected to Dangerous Environmental Conditions*

In 2014, Plaintiffs identified the following policies and practices concerning Defendant's exposure of members of the Unit 5 and 6 Subclass to dangerous environmental conditions:

> "Defendants' failure to make adequate cleaning supplies available to members of the class"; "the provision of substandard lighting that fails to meet health and safety standards"; "the failure to maintain a ventilation system"; "the failure to follow fire protection and safety practices"; "the failure to maintain effective pest control"; and "the failure to meet minimum sanitation standards."

ECF No. 240 at 49. The policies and practices underlying the dangerous environmental conditions  described in 2014 remain virtually unchanged. As a result, all members of the Unit 5 and 6 Subclass continue to live in filthy, inhumane, and dangerous conditions that subject them to an unconstitutional risk of harm. Indeed, as noted above, Dr. Kupers wrote in his unrebutted

2016 report that from 2014 to his return to the facility in May 2016, "very little had changed in terms of the conditions on Unit 5." Kupers Expert Rpt. ¶ 69.

Defendant still "fail[s] to make adequate cleaning supplies available to members of the class." *See* ECF No. 240 at 49. Prisoners "*universally*" reported to Dr. Kupers that "the staff still fail to . . . provide the prisoners with supplies for cleaning their cells," Kupers Expert Rpt. ¶ 75 (emphasis added), leaving prisoners at the mercy of other prisoners or reliant on bathing and cleaning their cell with the same bar of soap, , *see* Grogan Decl. ¶¶ 25–26; Mitchell Decl. ¶¶ 38–39; Jones Decl. ¶¶ 41–43; Beasley Decl. ¶ 19. In addition, class members report that they are not permitted to use brooms or mops, and are therefore confined to dirty cells that staff do not clean and that they themselves are rarely able to clean. Mitchell Decl. ¶¶ 38–39.

"[S]ubstandard lighting" also continues to be a problem. *See* ECF No. 240 at 49. Ms. Skipworth reported in 2016 that "[f]indings of inadequate light levels were observed throughout the shower areas in the housing units," including Units 5 and 6. Skipworth Expert Rpt. at 6–9, 17–20. Prisoners linger in the dark, sometimes for weeks, in their cells. *E.g.*, Grogan Decl., ¶ 19); Mitchell Decl., ¶¶ 32–37. Dr. Kupers also found many dark cells during his tour in 2016, and prisoners informed him that they frequently "had to wait weeks for staff to replace a broken or missing bulb." Kupers Expert Rpt., ¶ 76. Further, even where there is some light, it often falls below acceptable standards, a pattern Ms. Skipworth identified inside and outside almost every shower in Units 5 and 6. Skipworth Expert Rpt. at 6–7. Adequate illumination is critical to both prisoners' physical safety and psychological health, yet Defendant persists in allowing prisoners in Units 5 and 6 to languish in near darkness. *Id.* at 6–7; *see* Kupers Expert Rpt. at 1 (noting the "human damage" of "non-functioning lights"); Mitchell Decl., ¶¶ 32–37 (describing how living in the dark makes him "depressed" and "sad").

The continued "failure to maintain a ventilation system" and "failure to follow fire prevention and safety practices" also creates a dangerous and unhealthy environment for subclass members. *See* ECF No. 240 at 49. Fires occur on Unit 5 "multiple times a week," Hogans Dep. 278:9–22; *see, e.g.*, Grogan Decl., ¶¶ 27–30; Mitchell Decl., ¶¶ 44–45; Pickering Dep. 177:25–178:9 (fires occur "two to three times a day"); Wallace Dep. 131:20–132:8 (testimony of EMCF security officer that she hears reports of fires every day or other day), and are often set because staff ignore prisoners' needs, *see* Mitchell Decl., ¶ 44. Staff also fail to respond to fires appropriately, "simply allow[ing] the fires to burn out," and to ensure that vents are clear of obstructions, "restrict[ing] the proper airflow" in Unit 5 and 6. Kupers Expert Rpt. ¶¶ 88–90, 111, 115, 117; Skipworth Expert Rpt. at 9–10. Further, Ms. Skipworth observed flammable materials in direct contact with "an unprotected bulb creat[ing] a potential fire hazard" in cell son Housing Units 5 and 6. Skipworth Expert Rpt. at 11. As a result, fires and poor fire prevention practices subject all prisoners in Units 5 and 6 to the risk of aggravated pulmonary conditions, burns, and even death. *E.g.*, Mitchell Decl., ¶¶ 44–45; Braxton Dep. 44:18–45:11 (testimony by former EMCF staff member that she was forced to bring an inhaler and wear a mask when visiting Unit 5); Stern Expert Rpt. at 25–26. The October 2015 Regular Fire Inspection revealed violations in housing units 5 and 6 as we; as well as other common areas of EMCF. *See also* ECF No. 549-6, "Rebuttal Expert Report of Diane Skipworth, 2017" (hereinafter "Skipworth Rebuttal Expert Rpt.") at 9.

EMCF's continued "failure to maintain effective pest control" is also evident. *See* ECF No. 240 at 49. In 2016, Ms. Skipworth observed flies in the Unit 5 showers, and prisoners reported that their cells and showers are infested with bugs. *See* Skipworth Expert Rpt. at 11; *see e.g.*, Mitchell Decl. ¶¶ 39, 42; Skipworth Rebuttal Expert Rpt. at 8. Finally, EMCF's "failure to

meet minimum sanitation standards" also persists. *See* ECF No. 240 at 49. Plumbing issues take days, if not weeks, to be resolved, exposing prisoners to human waste and forcing them to live in flooded cells. *See, e.g.*, Grogan Decl., ¶¶ 21–24; Mitchell Decl., ¶¶ 39–42; Clemons Decl. ¶¶ 6– 7. Showers are not regularly cleaned and dayrooms are littered with trash from daily meals. Mitchell Decl., ¶¶ 42–43; *see also* Skipworth Expert Rpt. at 14–15. Tellingly, Unit 5 appears to be adequately cleaned only before Plaintiffs' experts or MTC and MDOC supervisors visit. Kupers Expert Rpt. ¶ 75 (noting that the pods on Unit 5 were cleaner than his 2014 visit, but prisoners reported that the pod was thoroughly cleaned the day before his visit); *see also* Grogan Decl., ¶ 26 ("The only time the staff ensures the zone is cleaned thoroughly is when there are visitors coming to the facility, such as visitors from MTC or MDOC.").

That these dangerous conditions remain constant in Units 5 and 6 two years after certification in this case is emblematic of Defendant's continued unconcern for the substantial risk of serious harm faced by prisoners. Thus, certification of the Units 5 and 6 Subclass with respect to Plaintiffs' conditions and sanitation claim, Claim Six, remains appropriate.

*       *       *

As detailed above, Plaintiffs have identified significant proof that the same policies and practices that supported class certification in 2015 persist today, and that these same policies and practices continue to place all members of the EMCF Class and Subclasses at an unconstitutional risk of harm. Plaintiffs have also cited significant proof that, despite years of notice, Defendant remains deliberately indifferent to that risk. Based on this evidence, Plaintiffs have identified common questions with common answers that "will resolve [] issue[s] that [are] central to the validity of each one of the claims in one stroke": Do the policies and practices identified by Plaintiffs place prisoners at an unconstitutional risk of harm and is Defendant deliberately

indifferent to that risk?[52] Thus, continued certification of the EMCF Class and Subclasses is proper under Rule 23(a)(2).

### B. Defendant Misstates the Standard Applicable to Plaintiffs' Claims Under Rule 23(b)(2).

Under Rule 23(b)(2), a class action shall be maintained if Rule 23(a) is satisfied and "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted — the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Wal-Mart*, 564 U.S. at 360–61 (citation and quotation marks omitted). Thus, "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class. It does not authorize class certification when each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant." *Id.*

In the Fifth Circuit, "[i]t is well-established that '[i]nstead of requiring common issues, [Rule] 23(b)(2) requires common behavior by the defendant toward the class.'" *Yates*, 2017 WL 3574968 at *8 (quoting *In re Rodriguez*, 695 F.3d at 365). As such, courts in the Fifth Circuit have found Rule 23(b)(2) to be satisfied where three requirements are met: "(1) 'class members must have been harmed in essentially the same way'; (2) 'injunctive relief must predominate over monetary damage claims'; and (3) 'the injunctive relief sought must be specific.'" *Id.* (quoting *Maldonado v. Ochsner Clinic Found.*, 493 F.3d 521, 524 (5th Cir. 2007)). Further, "if a plaintiff has satisfied the requirements of Rule 23(a), then the conditions of Rule 23(b)(2) will

---

[52] Plaintiffs have also identified more particularized common questions, all of which may be answered in "one stroke." *See* ECF No. 183 at 70–72.

tend to follow," as "[i]n establishing commonality the plaintiff will have identified a common practice or policy that is the source of the class members' harm" and "if she prevails on the merits, a single injunction barring or modifying that course of that behavior will, in the ordinary course of things, provide relief to the members of the class." *Perry*, 294 F.R.D. at 30.

Under this standard, the Court found Plaintiffs satisfied Rule 23(b)(2) because:

> Plaintiffs all allege that their Eighth Amendment rights have been violated based on the conditions under which they are housed at EMCF, and based on the medical and mental health treatment they have received (or failed to receive) at that facility. Thus, any injunction ordered by the Court would provide relief to each member of the class. Second, injunctive relief clearly predominates over monetary damages claims in this case because Plaintiffs do not seek any monetary judgments on their claims. Third, the Court finds that specific injunctive relief could be ordered in this case to, *inter alia*, clean and repair the plumbing and other housing problems at EMCF, ensure that there is adequate staff and training of staff, and policies are implemented to govern the access to, as well as types of medical and mental health care being provided to, inmates at EMCF. As the types of injunctive relief requested by Plaintiffs would not require that the Court adjudicate the individual class members' needs or circumstances, the Court finds the injunctive relief requested by Plaintiffs satisfies Rule 23(b)(2).

ECF No. 257 at 40–41. Defendant asserts no legal or factual basis for disturbing this ruling.[53] Instead, as with its argument concerning Rule 23(a)(2), Defendant twists applicable law and facts to assert an argument with no basis in precedent or the record developed in this case. Defendant primarily contends — again and incorrectly — that the classes here lack "cohesion" due to the existence of differences between individual class members and the fact that Plaintiffs assert seven claims. ECF No. 530 at 21–29. Defendant, however, misconstrues the requirements for a cohesive class.

---

[53] Defendant also asserts the burden of proof rests with Plaintiffs for the Rule 23(b)(2) inquiry. ECF No. 530 at 20. That assertion is incorrect for the reasons stated above.

While not a formal requirement of Rule 23(b)(2), cohesion ensures efficient adjudication where "class members' claims are so inherently intertwined that injunctive relief as to any would be injunctive relief as to all." NEWBERG ON CLASS ACTIONS § 4:34. Classes challenging prison conditions are prototypical of those certified under Rule 23(b)(2), because, "if a prisoner in a prison conditions lawsuit secures a ruling that a prison policy violates the Constitution, the court-ordered injunctive relief will necessarily apply to all other prisoners." *Id.*; *see, e.g.*, ECF No. 240 at 2 and n.2 (collecting cases); *Braggs*, 317 F.R.D. at 667 (noting, in certifying a class of prisoners under Rule 23(b)(2), that "some courts have gone so far as to say that the rule's requirements are almost automatically satisfied in actions primarily seeking injunctive relief"). The EMCF Class and Subclasses thus offer, quite literally, textbook examples of cohesion.

Defendant's objections are misplaced under this standard. Defendant asserts, without support, all members of the EMCF class have not had "similar experiences." *See* ECF No. 530 at 22. Defendant again misapprehends the Eighth Amendment standard that applies in this case. For certification to be proper under Rule 23(b)(2), class members must have been "harmed in essentially the same way." *Yates*, 2017 WL 3574968 at *8. Under *Farmer*, class members here have been "harmed in essentially the same way" by virtue of their exposure to a "substantial risk of serious harm" that Defendant has knowingly failed to alleviate.

The Fifth Circuit's recent holding in *Yates* is instructive. While the Defendant in *Yates* asserted that individual differences between class members prevented certification of a class of prisoners challenging the prison's temperature control policies and practices, the Fifth Circuit concluded that such differences were immaterial where *all* class members were subject to the same policies and practices by the defendants and thus subject to the same substantial risk:

> [T]here is no serious question that defendants have engaged in common behavior that "appl[ies] generally to the class[es]." Fed. R. Civ. P. 23(b)(2).

> All inmates, regardless of age or health, are subject to the *same* policy on climate control (*i.e.*, their housing units are not air-conditioned), all have the *same* heat-mitigation measures available to them (whether or not those measures are effective), and all are (allegedly) harmed in essentially the *same* way — *i.e.*, by exposure to a substantial risk of serious harm because of exposure to excessive heat. Thus, the same action/inaction by defendants is the source of any injury for the entire General Class and the subclasses.

*Yates*, 2017 WL 3574968 at *9. Because class members here are similarly subjected to the *same* policies and practices resulting in the *same* substantial risk of serious harm, Rule 23(b)(2) is satisfied.[54]

Moreover, the few cases Defendant cites to suggest a lack of cohesion are inapposite, given the distinct standard used to determine systemic risk of harm in the prison context. Defendant first cites to *In re: First American Home Buyers Protection Class Action Litigation*, 313 F.R.D. 578 (S.D. Cal. 2016), to suggest that "expos[ure] to disparate circumstances" defeats cohesion. ECF No. 530 at 23. This citation, however, concerns the cohesion of a proposed class of individual homeowners alleging fraud by different agents, where there was "no evidence of common representations or omissions having been made to putative class members." *Home Buyers*, 313 F.R.D. at 605. Defendant also cites to the unpublished case of *M.A. ex rel. E.S. v. Newark Public Schools,* No. 01-3389, 2009 WL 4799291 (D. N.J. Dec. 7, 2009), to suggest that class actions raising multiple causes of action lack cohesion. ECF No. 530 at 24. In *M.A.*,

---

[54] A district court in Alabama recently made a similar point in certifying a class of prisoners challenging the adequacy of mental health treatment in the state prison system:

> For some reason, defendants repeatedly misconstrue the claims in the case as demands for individual treatment of various kinds, and then proceed to argue that the individualized claims plaintiffs are not raising cannot be brought in the form of a class action. . . . . Fundamentally, defendants err in forgetting that the language of Rule 23(b)(2) focuses on the nature of defendants' acts and omissions and the suitability of class-wide relief, and does not require that the class-wide relief benefit each class member in precisely the same way.

*Braggs*, 317 F.R.D. at 667–68.

however, the plaintiffs sought individualized relief in the form of compensatory education for qualifying students, and not just class-wide injunctive relief. *M.A.*, 2009 WL 4799291, at *12, *15. Likewise, Defendant's reliance on *In re Pharmacy Benefit Managers Antitrust Litigation*, No. CV 03-4730, 2017 WL 275398, at *26 (E.D. Pa. Jan. 18, 2017), which addressed anti-trust claims where there was "no evidence" of anti-competitive injury; *In re St. Jude Medical, Inc.*, 425 F.3d 1116, 1122 (8th Cir. 2005), which addressed patients' "highly individualized" responses to prosthetic heart valves; and *Ebert v. General Mills*, 823 F.3d 472, 481 (8th Cir. 2016), which addressed "myriad considerations on the issues of liability and damages" in the context of property remediation, is also misplaced. ECF No. 530 at 21, 24.

Even if there were legal support for Defendant's objection in the context of prison condition class actions — and they point to none — Defendant's few factual assertions would not require decertification. Defendant cites deposition excerpts of three prisoners to suggest the absence of "similar experiences" among class members. ECF No. 530 at 22–23. These excerpts, however, ignore the overwhelming and countervailing evidence of system-wide deficiencies, as established above, and exclude testimony regarding the risk of harm faced by these prisoners.[55] Defendant also ignores that all prisoners face risk of harm within the facility, as they can be easily transferred between units, or may be present in other units or locations for work or other purposes. *Cf. Braggs*, 317 F.R.D. at 661 (ignoring "idiosyncratic" differences between facilities where prisoners were transferred "frequently" between them). As noted above, Defendant's

---

[55] For example, prisoner Saul Mata testified that he witnessed troubling uses of force in a common area and a unit where he works, he has been threatened in his unit, and he has concerns with the cell door locks in his unit — all material omitted from Defendant's brief. *See* Exhibit, 60 "Deposition of Saul Mata" (hereinafter "Mata Dep.") 12:17–23, 17:23–18:11, 23:3–25:20.

assault chart alone shows that class members are at risk of being assaulted throughout EMCF, in communal areas such as hallways and recreation areas. ECF No. 530 at 14–15.

Defendant also states without support that "[m]ost prison class actions involve narrow issues," and on that basis assert that Plaintiffs' challenge to multiple conditions at EMCF cannot support certification under Rule 23(b)(2). ECF No. 530 at 23–25. Defendant is wrong. Large prisoner classes confronting multiple conditions of confinement are routinely certified under Rule 23(b)(2). *See, e.g.*, *Plata*, 563 U.S. 493 (medical and mental health care in a statewide class action involving an 80,000-person class); *Parsons*, 754 F.3d 657 (medical, dental, and mental health care, and solitary confinement, in a statewide class action involving a 33,000-person class); *Johnson*, 2016 WL 267009 (basic necessities, food, water, medical care, and enforcement of health and safety standards in an immigration detention class action involving a 60,000-person class); *Hernandez*, 305 F.R.D. 132 (protection from harm, medical and mental health care, and assistance to inmates with disabilities in prison in a class action with 1,000 inmates); *Jones*, 296 F.R.D. 416 (safety and security, medical and mental health care, environmental conditions, fire safety, and Spanish-language services across seven facilities). Simply put, the breadth of Defendant's constitutional violations does not protect Defendant from suit.[56]

That Defendant's cohesion argument fails is only underscored by the list of potential injunctive relief compiled in their brief. ECF No. 530 at 25–29. Defendant's list of potential relief, drawn from expert witness depositions and reports, is similar in nature to the list of

---

[56] To the extent Defendant asserts that a trial of this case would be "unmanageable," ECF No. 530 at 1, that argument is foreclosed by *Forbush v. J.C. Penney Co., Inc.*, 994 F.2d 1101, 1105 (5th Cir. 1993) ("[Q]uestions of manageability and judicial economy are . . . irrelevant to 23(b)(2) class actions."); *Johnson v. American Credit Co.*, 581 F.2d 526, 531 n. 9 (5th Cir. 1978) ("The defendants argue that the class is unmanageable because it is too large and too diversified. This argument would be relevant only if [plaintiff] had sought class certification under Rule 23(b)(3)."). Plaintiffs also note that the hundreds of claims that may be brought individually against Defendant instead of a class action would result in the very waste of time and resources Rule 23 was intended to avoid.

proposed class-wide injunctive relief provided by Plaintiffs and considered by the Court in its
original grant of class certification. *See* ECF No. 240 at 75–77. Defendant argues that such
"sweeping requests and suggested forms of relief" are "not susceptible to classwide application."
ECF No. 530 at 25. But Defendant fails to identify a single reason why Plaintiffs' proposed relief
— or Defendant's own list of potential relief — would not apply generally to the EMCF Class or
Subclasses.[57] "Installation of locking mechanisms," "[r]equire more staffing," and "[r]equire
officers to work immediately in the pods and living units," *id.*, are the precise types of relief that
would be applicable to all prisoners at EMCF. *See, e.g.*, *Jones*, 296 F.R.D. at 465–66 (noting that
a class of prisoners challenging, *inter alia*, failing locks and staffing levels "present[ed] a
paradigmatic case for Rule 23(b)(2) relief"). As such, continued certification under Rule 23(b)(2)
is proper.

Of course, the general applicability of the proposed relief is not Defendant's true concern.
Instead, Defendant's chief grievance is with the breadth of the proposed relief. However, in light
of Defendant's wide-ranging misconduct, it does not follow that the harm here is not "capable of
a classwide injunction." *See* ECF No. 530 at 29. Although this potential list of relief may be
lengthy, the proposed remedies are tailored to the constitutional violations at the facility. *See*
*Plata*, 563 U.S. at 531 (stating that, in prison condition cases, the "scope of the remedy must be
proportional to the scope of the violation"). More to the point, Defendant draws their assertion
that relief must be "narrowly drawn" from Section 3626(a)(1)(A) of the Prison Litigation Reform
Act ("PLRA"). While Defendant's argument ignores *Plata* — in which the Supreme Court

---

[57] This is not to suggest that Defendant could argue that items on its list would not be applicable to all
members of the EMCF Class or Subclasses in an effort to obtain decertification. Under *M.D. ex rel.*
*Stukenberg v. Perry*, 675 F.3d 832 (5th Cir. 2012), Plaintiffs need only "make an effort to give content to
what it would mean to provide" relief, not to establish that no potential relief would reflect individualized
inquiries. *Id.* at 848 (citation and quotation marks omitted). In their original certification briefing,
Plaintiffs more than satisfied this requirement. *See* ECF No. 240 at 75–77.

affirmed a class-wide remedy that required the potential release of 46,000 prisoners, a far more dramatic remedy than is sought here — their argument is also premature. As the Fifth Circuit affirmed in *Yates*, Section 3626(a)(1)(A) of the PLRA "does not alter the requirements for certifying a class action under Rule 23(b)(2)." *Yates*, 2017 WL 3574968 at *12. Instead, Section 3626(a)(1)(A) of the PLRA is relevant only when a court is fashioning relief. *See id.* For that reason, and those discussed above, the EMCF Class and Subclasses continue to satisfy Rule 23(b)(2).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court deny Defendant's motion for decertification, and permit Plaintiffs — who have sought relief from the inhumane and dangerous condition at EMCF since 2013 — to proceed to trial as a class.

Dated: September 1, 2017                    Respectfully submitted,

                                            /s/Elissa Johnson
                                            Elissa Johnson, MSB #103852

Ravi Doshi
Anna Q. Han
Covington & Burling LLP
One City Center, 850 Tenth Street,
NW
Washington, DC 20001-4956
Phone: 202-662-5620
rdoshi@cov.com
ahan@cov.com
(admitted *pro hac vice*)

Mark P. Gimbel
Gretchen Hoff Varner
Xinping Zhu
Erin K. Monju
Benjamin R. Salk
Covington & Burling LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
Phone: 212-841-1000
Fax: 212-841-1010
mgimbel@cov.com
ghoffvarner@cov.com
xzhu@cov.com
emonju@cov.com
bsalk@cov.com
(admitted *pro hac vice*)

Jody E. Owens, II, MS Bar # 102333
Chelsea Caveny, MS Bar #105300
Sarah D. Bidinger, MS Bar #105015
William Bardwell, MS Bar #102910
Southern Poverty Law Center
111 E. Capitol Street, Suite 280
Jackson, MS39201
Phone: 601-948-8882
Fax: 601-948-8885
elissa.johnson@splcenter.org
jody.owens@splcenter.org
chelsea.caveny@splcenter.org
sarah.bidinger@splcenter.org
will.bardwell@splcenter.org

Elizabeth Alexander
Law Offices of Elizabeth Alexander
1416 Holly St., NW
Washington, DC 20012
Phone: 202-291-3774
elizabethalexander@lawofficesofelizabethalexander.com
(admitted *pro hac vice*)

Gabriel B. Eber
Eric G. Balaban
Carl Takei
Margaret Winter
National Prison Project of ACLU
915 15th Street, NW, 7th Floor
Washington, DC 20005
Phone: 202-393-4930
Fax: 202-393-4931
geber@aclu.org
ebalaban@aclu.org
ctakei@aclu.org
(admitted *pro hac vice*)

## <u>CERTIFICATE OF SERVICE</u>

I, Elissa Johnson, hereby certify that a true and correct copy of the foregoing document was filed electronically. Notice of this filing will be sent by electronic mail to all parties by the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF System.

SO CERTIFIED, this 1st day of September, 2017.

/s/Elissa Johnson

Elissa Johnson, MS Bar #103852