**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

JERMAINE DOCKERY, et al.                                                    **PLAINTIFFS**

VS.                                         **CIVIL ACTION NO. 3:13-cv-00326-WHB-JCG**

MARSHALL L. FISHER, et al.                                            **DEFENDANTS**

**DEFENDANT'S REPLY BRIEF IN SUPPORT
OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

Defendant has filed both a decertification motion and a partial summary judgment motion. These motions serve different purposes. The decertification motion, on the one hand, shows why there is a lack of classwide proof that would allow Plaintiffs' general class and three subclasses to proceed to trial. The partial summary judgment motion, on the other hand, shows why certain claims are not viable as a matter of law, even if they could be pursued on a classwide basis. If any of Plaintiffs' safety and security claims remain triable as a class after this Court considers Defendant's decertification motion, this Court should grant summary judgment on them.

Before rebutting Plaintiffs' oppositional brief, Defendant again reiterates the scattershot nature of Plaintiffs' case. Plaintiffs have brought seven different "claims," but within those claims are countless different "legal theories." While Plaintiffs dispute that they have employed an unfocused, scattershot approach to this litigation,[1] this case is precisely the type of "overall conditions" case that *Wilson v. Seiter*, 501 U.S. 294, 304-05 (1991) warned against. Because "a federal court is not the proper forum for challenging or changing every aspect of the harsh realities of confinement unless the conditions cannot be tolerated under the Constitution[,]" *see,*

---

[1] *See* [549] Resp. Opp'n Mot. Partial Summ. J. 8.

*e.g., Griffin v. Smith*, 493 F. Supp. 129, 131 (W.D. N.Y.), all claims related to safety and security – claims three, four, five, six, and seven – should be dismissed if this case is not decertified.

## REBUTTAL ARGUMENTS

**I.      Plaintiffs' "evidence" is no evidence at all.**

This prison conditions class action requests systemic relief.  Because it is not a single plaintiff case, proof of individual Eighth Amendment violations is not enough.  Systemic relief must be supported by proof of a systemic Eighth Amendment violation.  *See Lewis v. Casey*, 518 U.S. 343, 349 (1996) (explaining that "the success of respondents' systemic challenge was dependent on their ability to show widespread actual injury, and [the district court's] failure to identify anything more than isolated instances of actual injury renders its finding of a systemic . . . violation invalid.").  This Court must review the evidentiary record through this lens.

Even in regards to the individual incidents offered in the oppositional brief, however, Plaintiffs' evidence largely is misleading.  At many points, Plaintiffs either take evidence out of context, omit materially relevant facts, or rely on inadmissible evidence that is nothing more than rank speculation.  At other times, Plaintiffs flat out do not tell the truth about the evidence they rely upon.  Defendant previously has pointed out the admonishment given to Plaintiffs' counsel in a recent Florida case for misrepresenting the evidentiary record.  *See Hughes v. Judd*, 108 F. Supp. 3d 1167, 1173 (M.D. Fla. 2015) (explaining that the conditions of the prison in that case were "not consistent with the plaintiffs' dark, grim, and condemning portrayal" and that Plaintiffs "pluck[ed] words from the defining context in a pertinent authority and transport[ed] the words to a more expansive, more pliable, and more favorable setting, free of the defining context").  Throughout this reply, Defendant will highlight the more egregious misrepresentations made by Plaintiffs in this case.

An additional point of note is Plaintiffs reliance on outdated evidence from 2014.  Often in the oppositional brief, Plaintiffs cite to the expert reports commissioned in 2014 when Plaintiffs requested certification as well as to other evidence that is more than two years old. This Court, under the Prison Litigation Reform Act, only has authority to consider evidence related to any Eighth Amendment violation that may be "current and ongoing."  *See, e.g.*, *Kress v. CCA of Tennessee, LLC*, No. 1:08-cv-431-LJM-DML, 2011 WL 3154804, *2 (S.D. Ind. July 26, 2011) (explaining that, under 18 U.S.C. § 3626, "injunctive relief be instituted only as 'necessary to correct a current and ongoing violation'"); *see also Cason v. Seckinger*, 231 F.3d 777, 783-84 (11th Cir. 2000) (explaining that "current and ongoing" does not encompass "potential, or even likely, future violation[s]").[2]  Plaintiffs therefore may not rely upon past evidence unless they also can show that the conditions at EMCF currently are the same.

## II.     Summary judgment is proper on Plaintiffs' excessive force claim (Claim 4).

Defendant's opening brief highlighted Plaintiffs' excessive force theory as one of the more obvious theories that is inappropriate for class treatment because of the "individualized" nature of such claims.[3]  Plaintiffs respond by calling the contention "misleading," but the cases they cite are inapposite.[4]  *Ruiz v. Johnson*, 37 F. Supp. 2d 855 (S.D. Tex. 1999) and *Madrid v. Gomez*, 889 F. Supp. 1146 (N.D. Cal. 1995) are two pre-*Wal-Mart* cases that other courts have noted are "relatively isolated" decisions.  *See, e.g.*, *Scarver v. Litscher*, 371 F. Supp. 2d 986, 1005 (W.D. Wis. 2005).  *Nigro*, conversely, is a post-*Wal-Mart* decision, and there is the Tenth Circuit's decision in *Shook v. Bd. of County Commissioners*, 543 F.3d 597, 602-03 (10th Cir. 2008), which holds that excessive force claims are not appropriate for class treatment "because

---

[2] For the seminal Fifth Circuit authority on the PLRA's "current and ongoing" requirement, albeit in the consent decree termination context, see *Castillo v. Cameron Cnty., Tex.*, 238 F.3d 339, 353 (5th Cir. 2001).

[3] *See* [532] Mem. Supp. Mot. Partial Summ. J. 11 (quoting *Nigro v. Carrasquillo*, No. 15-60919-CIV-COHN/SELTZER, 2015 WL 9244606, at *2 n.1 (S.D. Fla. Dec. 17, 2015)).

[4] [549] Resp. Opp'n Mot. Partial Summ. J. 9 n.9.

the propriety of using such methods depend[s] on the circumstances in which they [are] used, and those circumstances necessarily var[y] among class members." Tellingly, the cases Plaintiffs rely on most heavily in their oppositional brief involve individual plaintiffs and not classes.[5]

Underscoring the individualized inquiry that applies in use-of-force circumstances is the substantive standard. Unlike with other Eighth Amendment claims that focus on substantial risk of serious harm and deliberate indifference, "[i]n evaluating excessive force claims under the Eighth Amendment, the 'core judicial inquiry' is 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" *See Cowart v. Erwin*, 837 F.3d 444, 452 (5th Cir. 2016) (quoting *Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992)). This standard of course requires courts to consider the subjective intent of the prison official utilizing the force, and that "is determined by reference to the well-known *Hudson* factors—'the extent of injury suffered, the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response.'" *Id*. at 452-53. In short, before it could be determined that every class member is subject to a "substantial risk" of being exposed to excessive force, this Court would have to evaluate every use-of-force example cited by Plaintiffs to determine whether it constitutes competent evidence under the *Hudson* factors.

Plaintiffs argue that the *Hudson* test is irrelevant in the class context,[6] but such an argument cannot be the law. This Court cannot possibly determine whether Plaintiffs have provided <u>any</u> evidence of unconstitutional uses of force, much less provided evidence rising to the needed level of pervasiveness, without first evaluating whether the cited examples satisfy the

---

[5] *See* [549] Resp. Opp'n Mot. Partial Summ. J. 9-22.
[6] *See id*. at 7 n.6.

substantive requirement for Eighth Amendment excessive force.  Stated differently, a court does not get to the issue of supervisory liability without first evaluating whether a particular incident constitutes a violation of law.  The primary case Plaintiffs rely on, *Blyden v. Mancusi*, 186 F.3d 252, 265 (2d Cir. 1999), makes this very point: "Of course, for a supervisor to be liable under Section 1983, there must have been an underlying constitutional deprivation."[7]

Nonetheless, even if Plaintiffs' theory were cognizable as a class, it could not satisfy the governing Eighth Amendment standard in any event.  Plaintiffs' anecdotal examples do not rise to the level of a "substantial" risk of serious harm nor can Plaintiffs overcome the high threshold of deliberate indifference.  Plaintiffs' very cases acknowledge that "the use of force is not only a justified, but also a necessary, tool in the quest to maintain an institution's order, or a guard or inmate's safety."  *Ruiz*, 37 F. Supp. 2d at 929 (cited in [549] Resp. Opp'n Mot. Partial Summ. J. 9).

It is curious that Plaintiffs attack Defendant's use of force policies on pages 10 and 11 of their oppositional brief, especially when their expert witness testified that Defendant's policies were not being challenged.[8]  That testimony was expected, given that Defendant has detailed use of force policies and procedures ranging from those governing the use of security equipment, restraints, firearms, and chemical agents such as oleoresin capiscam ("OC") to the use and application of force in various circumstances.[9]  The Fifth Circuit has made clear that a policy is not constitutionally inadequate simply because it does not address every particularized situation.  *See, e.g., Roberts v. City of Shreveport*, 397 F.3d 287, 293 (5th Cir. 2005).  Plaintiffs' complaint

---

[7] Plaintiffs cite the Fifth Circuit's decision in *Smith v. Brenoettsy*, 158 F.3d 908 (5th Cir. 1998) in support of their argument that this Court should disregard *Hudson*, but *Smith* does not hold that *Hudson* is inapplicable. *See* [549] Resp. Opp'n Mot. Partial Summ. J. 7 n.6.

[8] Dep. of Eldon Vail 34:19-36:15, attached as **Exhibit "A"**.

[9] *See, e.g.*, MDOC Policy Nos. 16-11, 16-13, 16-15, 16-23, *and* MDOC Procedure Nos. 16-11-01, 16-12-01, 16-13-01, 16-13-02, 16-15.-01, and 16-23-01, attached as **Composite Exhibit "B"**.

that Defendant has not accepted their expert's "criticism," shows that this litigation is an inappropriate quest to second-guess the judgment of Defendant.[10]   *See Bell v. Wolfish*, 468 U.S. 520, 546-47 (1979).   Nowhere in Plaintiffs' oppositional brief do they articulate what they believe Defendant's policy must say to satisfy the Constitution.

Unable to point to a constitutional deficiency in the written policy, Plaintiffs point to anecdotal examples of alleged excessive force incidents.   For this strategy to be effective, however, Plaintiffs would have to show a "pervasive" number of excessive forces as well as a specific cause that could be remedied through injunctive relief.   *See* Fed. R. Civ. P. 23(b)(2).

A central problem with Plaintiffs' position is their conflation of the phrases "use of force" and "excessive force."   It is beyond debate that uses of force are absolutely required at EMCF, as it houses dangerous criminals that have been convicted of despicable crimes.   *See Weeks v. Warden*, No. 15-C-5234, 2017 WL 3404965, *5 (N.D. Ill. Aug. 7, 2017) ("[P]risons are inherently dangerous places: 'Inmates get there by violent acts, and many prisoners have a propensity to commit more.'").   Again, for there to be a "substantial risk" that inmates will be subjected to unconstitutional uses of force in the future, this Court must look to each incident cited as evidence by Plaintiffs, on the incident's own facts, to determine whether the incident is sufficiently serious, such that Plaintiff has cited to enough incidents that equate to a "pervasive" amount of incidents attributable to the same cause.   "Excessive force" is a legal term of art, and neither expert nor lay witnesses can make the determination of whether the incidents cited by Plaintiffs were unconstitutionally excessive.   *See, e.g. Braggs v. Dunn*, 317 F.R.D. 634, 649-50 (M.D. Ala. 2016) (explaining that expert witness could not make the determination of whether there was a "substantial risk of serious harm").   That task is within the province of this Court only, and, under *Hudson*'s "maliciously and sadistically" standard, there must be an even higher

---

[10] *See* [549] Resp. Opp'n Mot. Partial Summ. J. 11.

showing than the already "extremely high standard" that applies to deliberate indifference claims. *See Watson v. Samuels*, 2017 WL 3896360, *9 (N.D. Tex. Aug. 3, 2017).

Plaintiffs have made no attempt to show how the anecdotal examples they rely upon satisfy the *Hudson* standard, such that they could be counted towards whether there is a pervasive use of excessive force at EMCF.  The reason is simple: nearly all of the incidents cited by Plaintiffs involve attempts by EMCF officials to "maintain or restore discipline[,]" which takes the conduct outside of the Eighth Amendment's purview.  *See Hudson*, 503 U.S. at 6-7. What follows is the necessary context for various examples cited by Plaintiffs in their oppositional brief:

- Incident No. EMCF-14-0054 (AG023850) – Plaintiffs' claim that this January 18, 2014, planned use of force against a prisoner who repeatedly refused to allow staff to close his tray slot amounted to a "sneak attack" in their view.[11] A plain reading of the incident description reveals this was a planned use of force carried out to gain compliance and maintain discipline after the prisoner was afforded multiple warnings and a mental health evaluation.[12] The video accompanying this incident report, which is being submitted conventionally, confirms these facts.[13]

- Incident No. EMCF-14-0125 (AG023893) – The video related to this incident, which is being submitted by Defendant to the Court conventionally, quickly reveals the egregious nature with which Plaintiffs' expert Eldon Vail has mischaracterized this incident. Plaintiffs opine that mental health staff involved in this March 17, 2014 incident did not speak with the prisoner long enough in their view, claiming that "[t]he entire exchange takes about five seconds, and the use of force proceeds."[14] In reality, the use of force video shows that officers attempted verbal intervention, which the prisoner refused while putting a cloth around his mouth and nose in an ostensible effort to defeat the effects of a chemical agent. The mental health counselor nevertheless approaches the prisoner's cell and spends approximately <u>four minutes and fifteen seconds</u> talking with and evaluating the prisoner. The mental health counselor concludes the prisoner's issues were behavioral rather than related to mental health, and states that chemical agent can be used. The officers then give three additional orders which were all refused, and they administer chemical agent for the first time approximately five minutes and fifteen seconds after the camera began

---

[11] *See id.* at 12 (citing Vail 2014 Report ¶ 97).

[12] *See* MDOC Extraordinary Occurrence Report, EMCF-14-0054 (AG023850), with incident video being filed conventionally, attached as **Exhibit "C"**.

[13] *See id.*

[14] *See* [549] Resp. Opp'n Mot. Partial Summ. J. 13 (citing Vail 2014 Report ¶ 95).

PD.22305633.1

recording. Plaintiffs' mischaracterization of this incident is troubling indeed, and it absolutely fails to acknowledge the time and patience afforded the prisoner by the officers and mental health counselor as they attempted to restore and maintain discipline.[15]

- Incident No. EMCF-14-0010 (AG023828) – Plaintiffs quote their expert's observations of this report, which make it seem like officers simply approached an orderly prisoner's tray slot and used force.[16] However, the incident video, which is being submitted conventionally, makes clear this was not the case: the prisoner was refusing to allow officers to close his tray slot. A mental health counselor attempted to convince the prisoner to cooperate.[17] When the prisoner continued to refuse, the counselor announced to the camera this was the second time that morning mental health had intervened because the prisoner would not remove his arm from the tray slot. (*See* Incident Video at 3:40.) Officers spend approximately 19 minutes attempting with get the prisoner to put his arms back in his cell before being successful.

- Incident No. EMCF-15-0026 (DEF-027668 to DEF-027677) – Included in Plaintiffs' Exhibit 85,[18] this incident involved the use of force on January 22, 2015 after a prisoner engaged in an attempt to throw an unknown liquid substance on a corrections officer as the officer walked by the prisoner's cell. The incident report states the officer used force "[t]o prevent the offender from assaulting" the officer.[19]

- Incident No. EMCF-15-0158 (DEF-028654 to DEF-028667) – Included in Plaintiffs' Exhibit 85,[20] this May 16, 2016 incident involved the use of force against an inmate who refused to obey corrections officers' commands to allow them to close his cell door tray slot, threatened to stab staff, and then reached for an object in his cell. At that point, the officers believed their safety was at risk and administered a one second burst of chemical agent to protect themselves.[21]

- Incident No. EMCF-15-0360 (DEF-030549 to DEF-030557) – Included in Plaintiffs' Exhibit 85,[22] this October 29, 2015 incident was a planned use of force executed after a prisoner refused repeated verbal commands to gather his belongings so that he

---

[15] *See* MDOC Extraordinary Occurrence Report, EMCF-14-0125 (AG023893), with accompanying video filed conventionally, attached as **Exhibit** "**D**".

[16] *See* [549] Resp. Opp'n Mot. Partial Summ. J. 13 (citing Vail 2014 Report ¶ 105).

[17] *See* MDOC Extraordinary Occurrence Report, EMCF-14-0010 (AG023828), with accompanying video filed conventionally, attached as **Exhibit** "**E**".

[18] [549] Resp. Opp'n Mot. Partial Summ. J. 13 (citing Exhibit 85 at DEF-027668 to DEF-027677). This is the same January 22, 2015 incident highlighted by Plaintiffs at page 14 of their oppositional brief. *See id*. at 14 (citing [549-2] Vail 2016 Report at ¶ 143, which, in turn, cites DEF-027668 to DEF-027677).

[19] *See* [549-85] at DEF-027671.

[20] Similar to the preceding incident, this incident is described on page 14 of Plaintiffs' oppositional brief, in addition to being identified on page 13 of their oppositional brief. *Compare* [549] Resp. Opp'n Mot. Partial Summ. J. 13 (citing Exhibit 85 and specifying DEF-028654 to DEF-028667), *with id*. at 14 (citing [549-2] Vail 2016 Report ¶ 139).

[21] *See* [549-85] at DEF-028656, DEF-028665, and DEF-028666.

[22] [549] Resp. Opp'n Mot. Partial Summ. J. 13 (citing Exhibit 85 at DEF-030549 to DEF-030557).

could be moved back to general population from the segregation unit. When it was apparent the prisoner would not comply, the officers obtained approval to execute a planned use of force, mental health staff arrived and determined the prisoner's conduct was behavioral rather than due to a mental health problem. After the prisoner refused an additional three commands and warnings to pack his belongings, an officer administered chemical agent to gain compliance.[23]

- Incident No. EMCF-15-0352 (DEF-030522 to DEF-030535) – A planned use of force carried out to gain compliance of an prisoner who refused repeated warnings to submit to restraints so that he could be secured and escorted from an outdoor recreation area to his cell in the segregation unit.[24] Mental health staff talked with the prisoner and determined the prisoner's conduct was not due to mental distress but rather behavioral, and, after the prisoner ignored three additional orders to submit to hand restraints, chemical agent was administered to gain the prisoner's compliance.[25]

In the alternative, even assuming that Plaintiffs could show a pervasive amount of individual incidents of excessive force that would lend credence to the contention that all class members are at a substantial risk of serious harm in the future, Plaintiffs cannot show that Defendant is deliberately indifferent to the issue of excessive force.  Defendant's opening brief recounted the various measures that are taken to protect inmates from excessive force, including pre-service and in-service use of force training, discussing issues related to use of force in pre-shift briefings, taking seriously allegations of staff misconduct in the form of alleged excessive force, investigating such allegations, and disciplining staff found to have used excessive force.[26]

Most notable in the oppositional brief is Plaintiffs' repeated claim that Defendant's efforts are inadequate because, in Plaintiffs' view, they have not been successful.[27] Despite

---

[23] *See* [549-85] at DEF-030556.

[24] *See* Incident Report No. 15-0352 (Oct. 20, 2015), attached as **Exhibit "F"**.

[25] *See id.* at DEF-030530.

[26] *See* [532] Mem. Supp. Mot. Partial Summ. J. 12-13; *see also* Dep. of Christopher Dykes 274:15-277:16, 279:19-280:13 (describing the steps taken to review uses of force once they occur and demonstrating that staff do not merely use of force and move on, but a review of each use of force even is conducted at various levels), 277:17-279:18 (discussing the reporting of uses of force and the requirement that each staff member involved must complete documentation regarding the use of force), attached as **Exhibit "G"**.

[27] *See* [549] Resp. Opp'n Mot. Partial Summ. J. 19-20 (claiming that there is a "pattern of abuse [that] remains unremedied"), *and* 22 (claiming that Defendant's efforts are, "to put it mildly, unsuccessful").

Plaintiffs' claim that *Farmer* requires Defendant's efforts to be successful,[28] that simply is not the law. "Reasonableness," not ultimate successes, is the focal point of the deliberate indifference inquiry. *See Cotton v. Taylor*, 176 F.3d 479 (5th Cir. 1999) (reversing deliberate indifference finding, where the district court listed alternatives the facility could have taken and criticized the facility's "inability to resolve the problem").

Plaintiffs similarly misconstrue the law by arguing that "there are genuine disputes about the reasonableness of" Defendant's efforts.[29]   Whether or not a Defendant has responded "reasonably" for purposes of deliberate indifference is a question of law, not a question of fact. *See Johnson v. Johnson*, 385 F.3d 503, 526 (5th Cir. 2004).  There is no dispute here about what measures Defendant has taken; Plaintiffs' position is that Defendant's efforts just are not good enough.   Case law makes clear that Defendant has reasonably responded to concerns of excessive force.   *See, e.g., Hare v. City of Corinth*, 135 F.3d 320, 328-29 (5th Cir. 1998) (finding no deliberate indifference where, although protective measures taken were unsuccessful, they were "within the parameters of objective reasonableness").

### III.   Summary judgment is proper on Plaintiffs' protection from harm claim (Claim 5).

The thrust of claim five is Plaintiffs' contention that they are subjected to an unconstitutional risk of inmate-on-inmate violence.  They do not, however, point to a single cause for the alleged potential harm.  Instead, they focus on at least four different causes, including complaints about staffing, gangs, cell door locks, and contraband.  The expansive nature of Plaintiffs' claim again shows that it is precisely the type of "amorphous" claim that is not viable under the Eighth Amendment.  *See Wilson*, 501 U.S. at 304; *see also Hughes*, 108 F. Supp. 3d at 1194 (rejecting the plaintiffs' "constellation of conditions of confinement" theory).

---

[28] *See id*. at 20.
[29] *See id*. at 21.

This Court need not reach the alleged causes because Plaintiffs cannot satisfy their threshold obligation of showing that the alleged harm, i.e. inmate-on-inmate assaults, is pervasive.  As explained elsewhere, except for obvious cases like exposed wiring, a plaintiff must show a pervasive amount of serious harm in the past for a court to be able to determine that a future risk is "substantial."[30]  Plaintiffs cannot satisfy that standard here.

The oppositional brief wholly distorts the assault statistics in the record.  In accordance with Association of State Correctional Administrators ("ASCA") Standards, assaults at EMCF are broken down between those that involve "serious injuries" and those that do not.[31]  It is misleading for Plaintiffs to claim that, "[i]n 2016, on average, there was an assault inside the prison almost every other day."[32]  Per the ASCA Standards, a serious injury requires urgent and immediate medical treatment that is more extensive than first aid and that restricts the offender's normal activity.[33]  However, a minor assault can be anything that does not require urgent and immediate medical treatment, does not restrict the inmate's usual activity and is not more extensive than simply being screened by medical personnel and/or provided first aid.[34]  The Eighth Amendment standard is concerned only with substantial risks of "serious harm."  *See, e.g., Landry v. Barnhart*, 2013 WL 5407220, *8 (D. Maine 2013) (explaining that "courts look directly at the number of . . . assaults in the prison to decide whether the risk of harm is substantial").

Viewed in this proper context, it is clear that sufficiently serious assaults are not pervasive at EMCF.  For the year 2016, there were only 17 total serious assaults in Unit 1, 10 in

---

[30] *See supra* page 6; *see also* [532] Mem. Supp. Mot. Partial Summ. J. 12.
[31] *See* Excerpt of Expert Report of Ken McGinnis and Tom Roth at 68, attached as **Exhibit "H"** ("McGinnis and Roth Excerpt").
[32] *See* [549] Resp. Opp'n Mot. Partial Summ. J. 24.
[33] *See* McGinnis and Roth Excerpt.
[34] *See id.*

Unit 2, 11 in Unit 3, 6 in Unit 4, 11 in Unit 5, 10 in Unit 6, and 1 in Unit 7.  These numbers, over the course of a year's time, do not amount to a "substantial risk of serious harm."  *See, e.g., Shrader v. White*, 761 F.2d 975, 980 (4th Cir. 1985) (no substantial risk of serious harm, where there were seven inmate murders, 54 stabbings, and 24 other serious inmate-on-inmate assaults at a Virginia State Prison).

No one relishes the thought of even one serious injury at EMCF, but Plaintiffs refuse to focus on the governing Eighth Amendment standard.  As one court put it, "the fact is that maximum security prisons house violent offenders, and confrontations between inmates are, to some extent, inevitable[.]" *See, e.g., Jones v. Goord*, 435 F. Supp. 2d 221, 238 (S.D. N.Y. 2006).

Consideration of the cases where a substantial risk of serious harm has been found is instructive.  Plaintiffs take issue with the standard being so high as to amount to a "reign of terror,"[35] but that is how other courts have described the standard.  *See Jones v. Diamond*, 636 F.2d 1364, 1373 (5th Cir. 1981) ("Confinement in a prison where terror reigns is cruel and unusual punishment."); *Baker v. Williams*, 2017 WL 1929677, *3 (M.D. Fla. 2017) ("Although inmate-on-inmate violence may create a "substantial risk of serious harm," Plaintiff has not provided any factual allegations to suggest that "violence and terror reign" at the jail."); *Bush v. Smith*, 2007 WL 4224929, *4 (S.D. Ga. 2007 ) ("It is well settled that "confinement in a prison where violence and terror reign" presents a substantial risk of serious harm to a prisoner."); *see also Walsh v. Brewer*, 733 F.2d 473, 476 (7th Cir. 1984) (collecting cases).  EMCF is not a place, simply put, where officials have lost control.  *See, e.g., Harrison v. Culliver*, 746 F.3d 1288, 1299-1300 (11th Cir. 2014) ("Although assaults did occur throughout [the prison,] the evidence of inmate-on-inmate assault involving weapons does not indicate that inmates were

---

[35] *See* [549] Resp. Opp'n Mot. Partial Summ. J. 23.

'exposed to something even approaching the constant threat of violence'" required under the Eighth Amendment.).

Given that there is not a "substantial risk" that Plaintiffs are in danger of a constant threat of immediate violence, the alleged "causes" advanced by Plaintiffs are inconsequential. Nonetheless, Plaintiffs certainly cannot show that Defendant was deliberately indifferent to each issue they rely upon. Defendant has responded more than reasonably to each concern advanced by Plaintiffs. *See Hare*, 135 F.3d at 328-29.

With respect to staffing, Plaintiffs ignore the measures Defendant has in place to adequately staff EMCF and to train staff. Among them are the following:

- Consistent and frequent efforts to hire staff;[36]

- Having additional staff on duty to fill any gaps in unit staffing which may arise due to absences of staff assigned to a particular unit;[37]

- Having staff work overtime when necessary so that the facility can be adequately staffed during a given shift;[38]

- Conducting a comprehensive pre-service training program for newly hired staff, which includes training in the areas of use of force, de-escalation, reporting, and counting procedures;[39]

- Requiring annually 40 hours in-service training for all security staff in those same areas;[40]

- Conducting pre-shift briefings to remind staff of issues on which they should focus and to keep staff abreast of what is going on the facility at a given time;[41]

---

[36] *See* Dykes Dep. 37:10-38:20; 55:4-56:9.
[37] *See Id.* 41:24-42:15 (discussing overstaffing so that there is extra staff); 79:11-80:29 (acknowledging the fact the facility tries to overstaff shifts); 84:11-19, 104:9-106:18.
[38] Dep. of Michael Rice 175:3-177:18, attached as **Exhibit "I"**; *see also* Dykes Dep. 40:17-41:25.
[39] Rice Dep. 185:17-189:13, 192:3-21; *see also* Dep. of David Thumma 33:1-37:25 (discussing the training program for food service staff), attached as **Exhibit "J"**.
[40] Rice Dep. 203:16-204:6.
[41] Dykes Dep. 40:16-41:7; *see also* Dep. of Frank Shaw ("Shaw Dep.") 113:16-25, as found in [531-16] Excerpts from the Deposition of Frank Shaw.

- Consistently disciplining staff (up to and including termination) for failing to comply with EMCF policies and procedures;[42] and

- Pursuing arrests of staff who are caught violating the law.[43]

When, as here, a prison is in compliance with correctional norms, it cannot be said that the prison has acted unreasonably for purposes of the deliberate indifference inquiry. *See, e.g., Street v. Corrections Corporation of America*, 102 F.3d 810, 817 (6th Cir. 1996) (no deliberate indifference where "staffing levels were maintained consistent with the requirements of the Tennessee Corrections Institute and the American Corrections Association").

With respect to gangs, Plaintiffs give Defendant no credit for EMCF's Investigator, STG Lieutenant, and gang classification system. These measures include:

- Maintaining records on suspected and validated gang members;[44]

- Monitoring the location of validated gang members;[45]

- Training staff to remain cognizant of the possibility of unvalidated gang members within the prisoner population at EMCF;[46]

Plaintiffs also fail to acknowledge that many of the gang members that Plaintiffs claim "run the facility" have been transferred out of EMCF.[47] It is well settled that "completely eradicating gangs and their inherent violence" in prisons "is an unrealistic aim." *See Lewis v. Richards*, 107

---

[42] Rice Dep. 228:1-231:2; Dykes Dep. 81:6-83:10, 86:14-21; *see also* [531-18] Employee Discipline / Term July 1, 2015, through May 1, 2017 Chart and Supplement covering May 1, 2017-July 13, 2017

[43] *See* [531-18] Employee Discipline / Term July 1, 2015, through May 1, 2017 Chart and Supplement covering May 1, 2017-July 13, 2017 (noting employees Hentrell Purnell and Ashley Granger were arrested after investigations by Defendant).

[44] *See* Dep. of Frank Shaw 252:17-253:19, attached as **Exhibit** "**K**"; Dykes Dep. 352:21-356:1; *see also* MDOC Policy No. 16-19, Security Threat Group Management, attached as **Exhibit** "**L**". *See also* MDOC Security Threat Group Validation Form, *and* MDOC Security Threat Group Participation Form, attached as **Composite Exhibit** "**M**".

[45] *See, e.g.*, Shaw Dep. 256:18-258:23.

[46] *See* Dykes Dep. 352:21-356:1.

[47] *Compare* the list of nine (9) prisoners set out in [549-71] *with* the List of Current Locations as obtained through the MDOC's public website, attached as **Exhibit** "**N**".

F.3d 549, 557 (7th Cir. 1997).  Defendant need only respond reasonably to the issue of gangs, and it indisputably has done so.  *See Hare*, 135 F.3d at 328-29.

With respect to cell door locks, Plaintiffs fail to show anything mechanically wrong with the sliding doors in Units 5 and 6 or proffer a different type of cell door that they believe Defendant should utilize.[48]  The reason is simple: it is the prisoners who sometimes compromise the doors by placing items in the locking mechanisms. Defendant has not ignored this issue, as it has put in place the following protocol and training to address this prisoner misconduct:

- Training staff on what to look for when securing prisoners' cell doors at EMCF to ensure that cell doors are secure once a prisoner is placed behind the door;[49] and

- Replacing the picket tower control boards for all seven housing units at EMCF, which will allow staff throughout the facility to better determine whether cell doors which appear to be secure are indeed correctly locked and secured.[50]

At the end of the day, "[t]here is no sweeping constitutional rule that every cell in every prison must be locked as soon as the sun sets."  *See Bennett v. Washington*, 2015 WL 731227, *10 (E.D. Penn. 2015) (quoting *Walton v. Dawson*, 752 F.3d 1109, 1120 (8th Cir. 2014)).

With respect to weapons, Plaintiffs are silent on the measures taken by Defendant to prevent weapons, including the following:

- Housing a K-9 Unit at EMCF, which includes a K-9 animal trained to detect weapons and other contraband, a step which Plaintiffs' expert Eldon Vail acknowledged was reasonable;[51]

- Installing mesh netting around the facility to prevent outsiders from throwing contraband, including weapons, onto facility grounds, which Vail

---

[48] In fact, their expert Vail only testified about cell door locks in Units 5-A, 5-B, and 5-C, without raising any issues regarding the locks in the remaining units of EMCF. *See* Vail Dep. 89:21-90:12.

[49] Dykes Dep. 178:6-179:25.

[50] Decl. of Warden Frank Shaw ¶ 3 ("Shaw Decl."), attached as **Exhibit "O"**.

[51] Vail Dep. 167:14-24.

PD.22305633.1

acknowledged was a reasonable effort to stop contraband from being introduced;[52]

- Installing a full body scanner at the facility entrance to detect and prevent the introduction of contraband, including weapons, through the entrance to EMCF, another step which Vail agreed was a reasonable effort to stem the introduction of contraband;[53]

- Consistently and frequently performing wide-spread searches throughout the EMCF general population units to discover contraband, including weapons;[54]

- Performing targeted cell searches when intelligence indicates that weapons are present in a particular cell or cells;[55]

- Replacing particular type of light fixtures which prisoners in the past have used to create weapons,[56] another step which Vail agreed was a reasonable effort to reduce the amount of contraband at EMCF;[57] and

- Reducing the amount of close-custody prisoners housed at EMCF.[58]

The very fact that Plaintiffs acknowledge that Defendant is recovering weapons shows that Defendant is responding reasonably, and Plaintiffs' expert admitted the reasonableness of several of Defendant's efforts at his deposition.  Plaintiffs wholly miss the point that "the stark reality of prison life is that virtually anything can be employed as a weapon, *e.g.*, a pencil can become a dagger; an electric cord a garrote, a lock inside a sock a bludgeon; human excretion a poison, Pool cues, brooms, and chairs have all been used as weapons at one time or another."  *See, e.g., Francisco v. Hebert*, 2007 WL 1805772, *6 (W.D. La. 2006).  Courts, to be sure, "have been unwilling to establish constitutional liability solely on the basis of the existence of weapons

---

[52] *Id*. at 167:1-12.

[53] *Id*. at 166:12-25.

[54] *See generally* 2016 K-9 Report *and* 2017 K-9 Report, attached as **Exhibit "P"** (depicting the K-9 unit search operations and results for 2016 and 2017).

[55] *See, e.g.*, Dykes Dep. 306:1-23; *see generally* Contraband Reports through June 2017, attached as **Exhibit "Q"** (depicting the results of both targeted cell searches and pod- or unit-wide shakedowns); *see also* Rice Dep. 366:2-4.

[56] Shaw Decl. ¶ 4.

[57] Vail Dep. 159:1-15.

[58] *See* Second Amendment to the Management and Operations Agreement Between MDOC and East Mississippi Correctional Facility Authority, attached as **Exhibit "R"**; *see also* Shaw Decl. ¶ 2.

16

within an institution." *Id*. The Fifth Circuit has permitted Eighth Amendment claims only when "there is no established procedure for discovering and confiscating weapons, nor is the possession of weapons reported or punished. *See Gates v. Collier*, 501 F.2d 1291, 1308-09 (5th Cir. 1974).

In summary, Defendant re-emphasizes that "[i]t is an unfortunate fact that [ ] assaults are not uncommon in our prisons." *See, e.g., Bradford v. Buchanan*, 1990 WL 140988, *4 (N.D. Il. 1990). That is especially so at a maximum security facility like EMCF. But there is not an unconstitutional substantial risk of serious harm, and Plaintiffs' certainty cannot meet the "extremely high" standard of deliberate indifference. *See Domino v. Tex. Dep't of Crim. Justice*, 239 F.3d 752, 756 (5th Cir. 2001).

### IV. Summary judgment is proper on Plaintiffs' environmental conditions claims (Claims 3 and 6).

Defendant's opening brief addresses Plaintiffs' claims related to environmental conditions and nutrition together.[59] In response, Plaintiffs separate the environmental and nutrition claims and combine the environmental conditions theory included in claims three and six.[60] Defendant follows that same approach here simply to avoid confusion.

As an initial matter, Plaintiffs contention on page 51 that Defendant has "implicitly conce[ded]" certain aspects of the claims must be rejected. This assertion brings into focus what was anticipated in Defendant's opening brief: it was impossible to envision every factual and legal theory Plaintiffs intended to advance because of their scattershot strategy.[61] Defendant made clear that it was moving for summary judgment on all aspects of Plaintiffs' claims related

---

[59] *See* [532] Mem. Supp. Mot. Partial Summ. J. 7-11.
[60] *See* [549] Resp. Opp'n Mot. Partial Summ. J. 51-69.
[61] *See* [532] Mem. Supp. Mot. Partial Summ. J. 6-7.

to safety and security,[62] and Plaintiffs' subtle attempt to reduce Defendant's argument is unwarranted.  *See Stults v. Conoco*, 76 F.3d 651, 656 (5th Cir. 1996) (explaining the movant's burden of merely pointing to an absence of facts).

Plaintiffs cannot satisfy their burden of proof with inflammatory descriptions, such as saying the conditions at EMCF are "disgusting and degrading[.]"[63]  Instead, there must be actual evidence of a substantial risk of serious harm due to environmental conditions at EMCF.  *See Mayberry v. Donahoe*, 2012 WL 3976738, *4 (M.D. Ala. 2012) ("Strong adjectives cannot substitute for weak evidence[.]").  This applies with equal force to Plaintiffs' reliance on Dr. Kupers' adjective-laden description of Unit 5, void of any reference to specific observations, locations, or descriptive context.[64]

Similarly, Plaintiffs cannot satisfy their burden with speculation and hearsay.  *See Vance v. N. Panola Sch. Dist.*, 189 F.3d 470 (5th Cir. 1999) ("[T]his court does not allow the admission of pure hearsay or speculation as evidence to avoid summary judgment.").  For example, Plaintiffs repeatedly make the generalized contention that prisoners set fires to gain the staff's attention related to the prisoners' unmet needs, but Plaintiffs contentions are predicated on hearsay and speculative assertions.[65]

The environmental conditions at EMCF simply do not deprive Plaintiffs of "the minimal civilized measure of life's necessities."  *See Farmer*, 511 U.S. at 833.  Plaintiffs' resort to testimony offered by the MDOC's former contract monitor assigned to EMCF, Tyeasa Evans, to

---

[62] *See id.* at 1, 6.
[63] [549] Resp. Opp'n Mot. Partial Summ. J. 52.
[64] *See id.* at 53 (citing "Kupers 2016 Rpt. ¶ 144").
[65] *See id.* at 62 (citing "Skipworth 2014 Rpt. at 17," which references hearsay "report[s]" from unidentified "[i]mates" regarding the reasons why other prisoners set fires and "Vail 2014 Rpt. ¶ 80[,]" which simply states, without citation to any evidence, that "some [prisoners] start fires" to gain staff's attention); 64 (citing Braxton Dep. 159:15-19, which contains Braxton's testimony of hearsay statements allegedly made by unidentified prisoners regarding why they set fires, and [549-35] Mitchell Decl. ¶ 44, which amounts to pure speculation regarding why inmates set fires).

support their argument related to "the condition of the cells at EMCF."  Evans, however, made clear that she has no personal knowledge of any of the conditions of EMCF after September 2014—when she began monitoring another facility—and that, when she noted a line-item as "noncompliant," she had to make such a notation even where she noticed only a single, specific area of the facility as noncompliant.[66]  Critically, Evans testified this did not mean the entire facility was noncompliant with the particular line-item.[67]  Plaintiffs point to Skipworth's 2014 Report to argue that "the conditions of the cells at EMCF" are unconstitutional,[68] but Skipworth makes no such observations in her 2016 Report, and the page of that report Plaintiffs cite only relates to observations allegedly made by Skipworth in Units 1, 2, and 3.[69]  In fact, Plaintiffs reliance on Skipworth's 2014 Report to support their argument regarding the cleanliness and sanitation of the conditions at EMCF today does nothing to avoid summary judgment because Plaintiffs have not and cannot demonstrate that Skipworth observed the same conditions in 2016 as she observed in 2014.[70]  *See Kress*, 2011 WL 3154804 at *2 (explaining that, under 18 U.S.C. § 3626, "injunctive relief be instituted only as 'necessary to correct a current and ongoing violation'").

Plaintiffs' misrepresentation of various evidence plainly indicates the desperation with which they attempt to avoid summary judgment.  First, Plaintiffs argue that "serious plumbing issues can take a significant amount of time to be resolved[,]" yet a review of the 11 work orders contained in Exhibit 75 reveals that 2 relate to the same, single issue and 8 list the "cause for

---

[66] Dep. of Tyeasa Evans 234:22-235:4, 233:13-234:21, attached as **Exhibit** "**S**".

[67] *Id*. at 233:13-234:21.

[68] [549] Resp. Opp'n Mot. Partial Summ. J. 53 (quoting "Skipworth 2014 Rpt. at 9").

[69] *See id.* at 53 (citing "Skipworth 2016 Rpt. at 15"); *see also* Dep. of Diane Skipworth 77:23-80:7, attached as **Exhibit** "**Z**".

[70] *Compare* Skipworth's 2014 Report 9 *with* Skipworth's 2016 Report 14-15. *See also* Skipworth Dep. 77:23-80:7.

repair" as "misuse/neglect."[71] Plaintiffs cannot profit from their own voluntary destructive behavior by complaining EMCF staff cannot keep pace with their destruction.[72] *See Legate v. Livingston*, 822 F.3d 207, 210 (5th Cir. 2016) ("[A] prisoner cannot establish a[n Eighth Amendment] violation where he willingly participates in the conduct giving rise to his injury."). Second, citing their Exhibit 72, Plaintiffs contend that "plumbing issues are exceedingly common at EMCF[,]" but a review of the work orders contained in Exhibit 72 undercuts Plaintiffs' conclusory argument related to allegedly unconstitutional delays in completing maintenance projects and underscores the reality that many maintenance issues are caused voluntarily by the prisoners themselves.[73] Lastly, Plaintiffs place great emphasis on "[a] work order at EMCF submitted on October 4, 2016[,]"[74] and for which they incorrectly suggest there is no record of when it was completed.[75] Although it is the only such work order they cite, Plaintiffs contend the work order "is not an outlier[,]" and "highlights the reprehensible and uncivilized nature of staff response to maintenance issues at EMCF."[76] However, the work order makes clear this maintenance issue was caused by "misuse/neglect" and even details that maintenance staff had to not only snake the line and clear the drain, but also were forced to "t[ake] trash out of [the] line."[77]   Contrary to Plaintiffs' suggestions related to the date of completion, the work order was reported to maintenance staff on October 4, 2016, and completed

---

[71] *See* [549-75] Plumbing Work Orders. Moreover, the two work orders which relate to the same, single toilet leak (Work Order Nos. 1600027612 and 1600027615) were reported on Friday, November 11, 2016, and fixed the following Monday, November 14, 2016. *See id.*

[72] Decl. Michael Sessions ¶ 2, attached as **Exhibit** "**T**".

[73] *See* [549-72] October 3, 2016 Plumbing Work Orders (containing 10 work orders of which 7 were completed the same day they were entered and of which 4 listed the "cause of repair" as being "misuse/neglect").

[74] This work order is identified as Exhibit 73 to Plaintiffs' Response Brief, and the work order number is WO-1600024550. *See* [549-73] October 4, 2016 Plumbing Work Order.

[75] [549] Resp. Opp'n Mot. Partial Summ. J. 55.

[76] *Id*. at 55-56.

[77] [549-73] October 4, 2016 Plumbing Work Order.

PD.22305633.1

by maintenance staff the next day, October 5, 2016.[78] Plaintiffs' claim—made without citation to record evidence—that the work order was "only submitted when stench on [the] pod was already "horrible[,]" is predicated on nothing more than unbridled speculation and is not the stuff on which denials of summary judgment motions can be based. *See Celotex v. Catrett*, 477 U.S. 317, 321 (1986) (noting that allegations without substance will not defeat summary judgment).

Plaintiffs' argument related to "exposure to chemicals and bodily fluids" is equally insufficient to prevent summary judgment on Claims 3 and 6.[79] Plaintiffs predicate their argument related to bodily fluids upon a single incident involving the clean-up of blood more than three years ago.[80] As a threshold matter which is also dispositive of this issue on summary judgment, this single incident occurring more than three years ago certainly does not establish pervasiveness. Worse, Plaintiffs' brief misrepresents the facts surrounding the incident by suggesting that EMCF staff failed to provide the prisoner-workers tasked with cleaning up the spill with sufficient personal protective equipment ("PPE"). While a prisoner-worker initially sent to clean up the blood did not arrive with sufficient PPE, a second prisoner-worker "showed up shortly later . . . wearing rubber rain-type boots and then the prisoners were provided with some gloves and some other PPE equipment to utilize."[81] Lastly, Plaintiffs' argument related to exposure to "chemical agents" is predicated entirely on speculation and void of any evidence that oleoresin capsicum spray ("OC spray") presents a substantial risk of serious harm.[82]

---

[78] *See* Excerpt from Maintenance Log Summary (indicating work order WO-1600024550 was completed on October 5, 2016), attached as **Exhibit** "**U**".

[79] *See* [549] Resp. Opp'n Mot. Partial Summ. J. 64-66.

[80] *See id.* at 65-66.

[81] Skipworth Dep. 94:5-95:20. *Compare* [549] Resp. Opp'n Mot. Partial Summ. J. 65 (stating only that a second prisoner-worker arrived wearing rubber boots" and making no mention of the PPE both prisoner-workers were provided).

[82] *See* [549] Resp. Opp'n Mot. Partial Summ. J. 66 (claiming that "most . . . exposures" to OC spray "have undoubtedly affected prisoners who were not the direct target" without any meaningful evidence of the severity of the speculative "affect" or its frequency).

Plaintiffs further complain of "filthy" conditions, including plumbing and pest control problems, lighting and fire safety issues, and exposure to chemicals and bodily fluids, but their rhetoric does not match the undisputed record evidence.[83]   Plaintiffs,  to put it bluntly, are blatantly mischaracterizing the facts.

What follows is the testimony of Plaintiffs' own expert, Diane Skipworth, in regards to the areas on which Plaintiffs focus:

- Skipworth offers no opinion regarding plumbing in her 2016 Report or during her deposition on April 12, 2017.

- Neither Skipworth's 2016 Report nor her April 2017 deposition makes any mention of her observing rodent droppings at EMCF during her 2016 inspection.

- Skipworth testified that she observed "drain flies" in a sum total of four (4) distinct floor drain locations during her 2016 inspection: cell 3C-104, Unit 5-B showers (lower level), Unit 6-B showers (lower level), and the dishwashing area of the kitchen.  Skipworth did not observe drain flies anywhere else in the entire facility and was not aware of drain flies causing any illness to any prisoner housed at EMCF in the last five (5) years.[84]

- With respect to the alleged "infestation of roaches in the kitchen,"[85] Skipworth testified that while roaches near the dishwasher area were a concern because roaches are known to carry bacteria including Salmonella, she was unaware of any inmates at EMCF getting sick from Salmonella in the last five (5) years.[86]

---

[83] *See id*. at 51.

[84] Skipworth Dep. 38:7-39:2.

[85] [549] Resp. Opp'n Mot. Partial Summ. J. 56.

[86] Skipworth Dep. 39:17-40:5.  Insofar as Plaintiffs also rely upon the declaration of Bobby Mitchell, a witness of extraordinarily questionable credibility who has in the past harbored in his cell feces and urine in milk cartons so that he can throw his waste on staff, the single, vague sentence contained in his declaration represents the observation of a single inmate in a single pod and cell, and this cannot be viewed as establishing pervasiveness. *See* [549-35] Mitchell Decl. ¶ 39; *see also* Mitchell – RVRs consisting of RVR Nos. 01707844 (throwing feces and urine on staff throw his tray slot), 01708353 (throwing unknown substance on staff throw his tray slot), 01703276 (throwing unknown liquid on staff throw his tray slot), attached as **Exhibit** "**V**". To the extent Plaintiffs rely on the inmate request form submitted by inmate Anthony Abston, this request describes conditions allegedly observed by Mr. Abston over four years ago, does not parallel any evidence related to mold obtained by Skipworth during her 2016 inspection, and simply does not establish pervasiveness with respect to pests or "filthy living conditions." *See* [549-37] Abston Inmate Request; *see also* Skipworth Dep. 31:1-4, 79:5-13.

- Skipworth testified that it would be reasonable for MDOC to have EMCF's housing units undergo pest control service provided monthly and as needed, which is precisely the pest control provided at EMCF.[87]

- With respect to lighting in the showers of Units 5 and 6, Skipworth did not know of any inmates in the last five (5) years who have been injured by being assaulted in the showers or by slipping and falling in the showers, and she did not know of any inmates who had avoided the showers because they did not feel safe due to the lighting.[88]

- With respect to the lighting in the cells of Units 5 and 6, Skipworth testified that she found a total of eight (8) cells out of the 248 cells in Units 5 and 6 which did not have a working light, two of those cells were not occupied by a prisoner, she did not know why or how long those lightbulbs in Units 5 and 6 were missing, and she did not know of the lightbulbs had been replaced or how often they had been replaced.[89]

- With respect to wicks observed by Skipworth, she testified that other than the wicks she observed in eight (8) cells within Units 5 and 6, she did not observe any other wicks (these eight cells out of the 248 cells within Units 5 and 6 represent a mere 3.2% of the cells in Units 5 and 6), and she does not know of any inmates who incurred health problems because of smoke from wicks in the last five years at EMCF.[90]

- With respect to scorched cell doors, Skipworth did not observe any other scorched cell doors in Units 5 and 6 other than the six (6) she mentioned in her report (which amounts to 2.4% of the cell doors in Units 5 and 6), and she did not see scorched doors in any other pods besides Units 5-A and 5-C.[91]

- With respect to ventilation grilles blocked by prisoners, Skipworth testified she observed blocked vent grilles in only nine (9) cells within Units 5 and 6 (which represents, out of the 248 total cells in Units 5 and 6, 3.6 % of the cells in Units 5 and 6), she acknowledged that some prisoners block the vent grilles because of personal comfort because they like the temperature to be warmer or cooler, and she does not know of any examples in the last five years of blocked vent grilles causing mechanical problems, fires, or mold accumulation.[92]

---

[87] *Compare* Skipworth Dep. 39:3-16, *with* [531-12] Summary of Invoices for Pest Control Services covering January 1, 2015 through June 29, 2017 (indicating the housing units are treated at least once per month but commonly more than once per month).
[88] Skipworth Dep. 14:7-15:7.
[89] *Id*. at 19:8-24:2; 27:16-28:8.
[90] *Id*. at 33:24-36:1.
[91] *Id*. at 36:4-12, 36:21-25.
[92] *Id*. at 28:9-29:9, 30:5-10, 30:18-31:4.

PD.22305633.1

The evidence here simply does not meet the high standard applicable under the Eighth Amendment.  Even if Plaintiffs could show "harsh conditions" at EMCF, that is not enough. Harsh conditions, the Supreme Court has said, "are part of the penalty that criminal offenders pay for the offenses against society."  *See Rhodes*, 452 U.S. at 345; *see also Farmer*, 511 U.S. at 837 ("The Eighth Amendment does not outlaw cruel and unusual 'conditions;' it outlaws cruel and unusual 'punishments.'").  Plaintiffs anecdotal, often misrepresented, examples do not demonstrate a substantial risk of serious harm.

Nonetheless, even if Plaintiffs could satisfy the taxing substantial risk of serious harm standard, there is no deliberate indifference on Defendant's part.  Citing various work orders, Plaintiffs argue delays in resolving maintenance requests evidence deliberate indifference, but Plaintiffs' conclusory, unsupported allegations of delay are divorced from context and meaningless. Viewing their cherry-picked maintenance requests in a vacuum, Plaintiffs do not consider that some maintenance issues are more time sensitive than others, that maintenance staff thus must prioritize the requests, or that materials must be on hand to complete repairs and replacements.[93]

For example, Plaintiffs cite a maintenance request related to missing ceiling tile, bemoan the fact it took 11 eleven days to replace the missing tile, and cite a notation in the request which states that "birds [were] coming in."[94] Plaintiffs' conclusory assumption is refuted by the fact that when maintenance staff investigated the work order, they discovered that while there was ceiling tile missing, ceiling tiles were no longer actively falling, there was no hole in the exterior metal roofing, and that birds were coming in through the pod's door to the recreation yard, which was being left open, rather than the missing ceiling tile, which provided no access to the

---

[93] Sessions Decl. ¶ 1.
[94] [549] Resp. Opp'n Mot. Partial Summ. J. 67 (citing [549-55], which is work order number WO-1700007123, dated March 27, 2017, and completed April 7, 2017).

outside.[95] Maintenance prioritized other, more time-sensitive requests ahead of this request, and they completed it nine (9) working days after receiving it.[96] In another example, Plaintiffs attempt to paint a terrible picture of a window not being replaced in Unit 5, when Plaintiffs fail to consider that maintenance staff could have determined the window need not be replaced. This is precisely what happened in this example when maintenance staff investigated the window, determined there was nothing structurally wrong with the window, and that the problem was that the prisoner had smeared feces all over the window and it simply needed to be cleaned.[97] These and other speculative, unsupported assumptions made by Plaintiffs related to maintenance work orders are not cognizable summary judgment evidence and, worse for Plaintiffs, are easily refuted.[98]

In reality, the record is full of far more than reasonable responses in each area identified by Plaintiffs:

- MTC has contracted with a pest control company, which provides weekly, monthly, and as-needed treatments to various areas of EMCF.[99] According to Plaintiffs' expert, Diane Skipworth, this is a reasonable step.[100]

- A full-time sanitation officer has been added to the EMCF staff, and the focus of this officer's responsibilities is sanitation at EMCF.[101] According to Skipworth, this is a reasonable step taken by Defendant.[102]

- A full-time fire safety lieutenant on the EMCF staff to maintain the fire safety systems in the facility and to ensure that there are chemicals necessary to clean the facility but that those chemicals are kept out of the hands of prisoners who would

---

[95] Sessions Decl. ¶ 3.

[96] Id.

[97] Id. at ¶ 8.

[98] See id. at ¶¶ 4-7.

[99] See [531-12] Independent Contractor Agreement for Pest Control with attached Summary of Invoices for Pest Control Services covering January 1, 2015 through June 29, 2017.

[100] Skipworth Dep. 39:9-16.

[101] See Jan. 10, 2017, 1st Shift Roster at DEF-214949 (identifying Fire/Safety Lieutenant as "J. Wilson" and Facility Sanitation Officer as "J. Keaton"), attached as **Exhibit** "**W**".

[102] Skipworth Dep. 81:23-82:2.

harm themselves or others with those chemicals. [103] According to Skipworth, this is a reasonable step taken by Defendant.[104]

- Regularly performed fire alarm tests and fire sprinkler system tests.[105]

- The volume of maintenance being performed at the facility by the maintenance staff, especially in light of the fact that a significant number of the maintenance issues are caused repeatedly by the prisoners themselves.[106]

- The facility's use of the shower crew, which consists of a group of prisoner-workers who focus on keeping the showers throughout EMCF clean.[107]

In opposing summary judgment as to Claims 3 and 6, Plaintiffs either ignore or disparage these efforts claiming they are not successful.[108] Insofar as Plaintiffs contend that the fires set at EMCF are set because of the allegedly "broken grievance system[,]" this contention is nothing more than argument of counsel, is not cited to any record evidence, and is a thinly veiled attempt to cast prisoners' voluntary misconduct back onto EMCF staff.[109] To the extent Plaintiffs bemoan the purported delays in resolving maintenance requests, Plaintiffs take absolutely no account of the context of a given maintenance request and the materials and work that may be required to correctly resolve the request.[110] More importantly, Plaintiffs implicitly acknowledge they cannot argue that Defendant ignores maintenance issues and the record paints a vivid picture of the extensive maintenance efforts Defendant consistently undertakes at EMCF. At bottom, Plaintiffs have not met their burden of creating a question of fact on deliberate indifference, and consequently, even if the Court finds a substantial risk of serious harm

---

[103] *See* Jan. 10, 2017, 1st Shift Roster at DEF-214949 (identifying Fire/Safety Lieutenant as "J. Wilson" and Facility Sanitation Officer as "J. Keaton").

[104] Skipworth Dep. 81:23-82:2.

[105] *See* EMCF Quarterly Fire Alarm Test Log, February 2016 through June 2017, *and* EMCF Sprinkler Control Monthly-Quarterly Inspection, February 2016 through June 2017, attached as **Composite Exhibit** "**X**".

[106] *See* [531-13] Maintenance Log, Jan. 2017 - June 2017.

[107] Dep. of Ricky Thurman 23:24-24:20, attached as **Exhibit** "**Y**".

[108] *See* [549] Resp. Opp'n Mot. Partial Summ. J. 66-68.

[109] *See id.* at 68.

[110] *See, e.g.*, Sessions Decl. ¶¶ 1-6.

PD.22305633.1

presented by the environmental conditions at EMCF, Defendant is entitled to summary judgment on claims 3 and 6 because it has not acted with deliberate indifference towards any such risk.

### V.      Summary judgment is proper on Plaintiffs' nutrition claim (Claims 7).

Plaintiffs' nutrition claim continues down the same road as their environmental conditions claim – all froth and no substance.  The evidence does not support the contention that "prisoners are subjected to meals made with food of degraded and insufficient quality" or that food is "prepared in an unsanitary environment."[111]   The evidence also does not support the contention that prisoners do not receive their food trays.[112]  Plaintiffs can show neither a substantial risk of serious harm nor deliberate indifference related to their nutrition claim.

To be sure, even if Plaintiffs' allegations are taken as true, they do not amount to cruel and unusual punishment in violation of the Eighth Amendment.  Significantly, however, the actual evidence is not how Plaintiffs attempt to characterize it, and Defendant addresses Plaintiffs' purported "evidence" in turn.

Trinity Services Group prepares meals for distribution at EMCF.[113]  Plaintiffs take issue with "substitutions" that Trinity has made from its planned menu.  Among those substitutions are such minor variations as: substituting slice bread for a hamburger bun or substituting pinto beans for black eyed peas.[114]  Skipworth, however, testified that she did not see any significant difference between the substitutions.[115]

To support their argument, Plaintiffs cite their nutrition expert, Skipworth, who they claim "documented significant substitutions in the food served that appeared to reduce the

---

[111] *See* [549] Resp. Opp'n Mot. Partial Summ. J. 41.
[112] *Id*.
[113] Thumma Dep. 13:12-19, 18:9-19:2.
[114] Skipworth Dep. 47:12-25, 48:1-18.
[115] *Id*.

nutritional value of the meal," and "documented similar deviations from the planned menu."[116] These are misrepresentations of Skipworth's deposition testimony regarding her 2016 report.  In fact, Skipworth testified that she did not know of any times in 2015 or 2016 when inmates who were not on a special diet did not receive 2,900 calories per day in meals.[117]  Courts have deemed less caloric amounts to be constitutionally sufficient.  *See*, *e.g.*, *Cunningham v. Jones*, 667 F.2d 565, 566 (6th Cir. 1982) (finding meal of 2,000 to 2,500 calories to be sufficient); *Sostrev McGinnis*, 442 F.2d 178, 186, 193-194 (2nd Cir. 1971) (finding diet of 2,800 calories per day constitutionally adequate) (overruled on other grounds).

While touring EMCF, Skipworth reviewed two different meal trays.  In the first, she agreed that the substitutions made resulted in no significant difference.[118]  She further testified that she did not have enough information to determine if there were any fewer calories in that particular tray.[119]  In the second tray, she agreed that there was no significant difference in the substitutions made except where corn was substituted for carrots.[120]  She admitted that corn actually has more calories than carrots.[121]  She did testify that the menu called for a salad but all three compartments of the second serving tray already were filled and she was not aware if a salad was actually served in a different container on the particular day.[122]  These two trays were the only two mentioned in her 2016 report or her deposition.

Equally unavailing for Plaintiffs is their insinuation that meal substitutions are routine based on two meal substitutions in September 2016.[123]  This information is taken from Defendant's Menu Substitution Log, which does show the two substitutions to which Plaintiffs

---

[116] [549] Resp. Opp'n Mot. Partial Summ. J. 43.
[117] Skipworth Dep. 42:15-19.
[118] *Id*. at 46:19-48:18.
[119] *Id*. at 48:20-49:1.
[120] *Id*. at 49:2-17.
[121] *Id*. at 49:20-50:4.
[122] *Id*. at 51:2-23.
[123] [549] Resp. Opp'n Mot. Partial Summ. J. 42, n.29.

refer but only one more during the more than nine-month period of time between September 2016 through July 2017.[124]

As mentioned above, Skipworth testified that 2,900 calories meets the requirements for all but young, active adults but agreed young adults in prison are not likely as active as young adults in the free world.[125]  Plaintiffs attempt to support their contention that prisoners do not get enough food by giving examples of five prisoners who allegedly have lost weight due to inadequate nutrition.[126]  In doing so, Plaintiffs grossly misrepresent both the facts and circumstances regarding the six inmates.

Plaintiffs cite the deposition of former employee Marilyn Braxton who testified that she observed a prisoner's weight loss from 260 pounds to 135 pounds while she was at EMCF "because of a lack of food."[127]  The inmate to whom Braxton refers is Austin McKennsey. According to prison records, however, Austin transferred to EMCF on January 5, 2011 and weighed 150 pounds.[128]  On August 10, 2017, McKennsey weighed 162 pounds.[129]  Plaintiffs next claim that inmate Jimmy Brewer weighed 185 pounds when he arrived at EMCF but now weighs on 150 pounds.[130]  According to Brewer's medical records, Brewer arrived at EMCF on January 12, 2011 and weighed 156 pounds.[131]  He now weighs 152 pounds.[132]

---

[124] *See* Composite of Menu Substitution Logs, attached as **Exhibit "DD"**.

[125] Skipworth Dep. 43:15-44:9.

[126] *See* [549] Resp. Opp'n Mot. Partial Summ. J. 44.

[127] [549] Resp. Opp'n Mot. Partial Summ. J. 44

[128] *See* [564-5] Decl. of Marie Grady *and* [564-6] Composite of Redacted Medical Records for Prisoners Austin McKennsey, Bobby Ray Allen, and Jimmy Brewer.

[129] *Id*.

[130] [549] Resp. Opp'n Mot. Partial Summ. J. 44.

[131] 564-5] Decl. of Marie Grady *and* [564-6] Composite of Redacted Medical Records for Prisoners Austin McKennsey, Bobby Ray Allen, and Jimmy Brewer.

[132] *Id*. In their response to Defendant's Motion for Decertification, Plaintiffs also cite the Declaration of Bobby Allen, another prisoner housed at EMCF, "noting that he is 6'2" and wighs 136 pounds." [551] Resp. Opp'n Mot. Decertification 49. Although they do not appear to rely on Allen's claim in this brief, Defendant addresses it out of an abundance of caution. Allen was transferred to EMCF on April 29, 2010, at which time he weighed 145 pounds. *See id*. On September 7, 2017, Allen weighed 140 pounds.  *Id*.

Plaintiffs cite the 2016 expert report of Madeline LaMarre for the proposition that prisoners have lost 14 to 30 pounds due to lack of nutrition.[133]   In reality, LaMarre's report refers to three inmates, all of whom have substantial medical problems.   She offers no opinion regarding the level of nutrition for these inmates.[134]   Patient No. 9 has a medical history that includes AIDS, and seizure and bipolar disorder, and this inmate also complained about dental problems and mouth irritation.[135]   Patient No. 10 has a medical history that includes HIV infection, hepatitis and major depression. In addition, Patient 10 had a history of cancer and dental problems.[136]  Patient No. 11 has a medical history that includes bipolar disorder, schizophrenia, and possible HIV infection, and this patient reported that he had lost 30 pounds in one year but, critically, the report was made just two days after he arrived at EMCF.[137]   Obviously, the serious medical problems of these inmates could result in weight loss.  However, LaMarre did not indicate that any such weight loss was the result of lack of nutrition at EMCF.[138]  *See* Exhibit 4.  Thus, there is no admissible evidence demonstrating that inmates at EMCF who are not on a restricted diet are not being fed three meals per day comprised of 2,900 calories.

Plaintiffs allege that inmates receive "spoiled" food, but the evidence upon which they rely is suspect at best.  Namely, Skipworth admitted at her deposition that she could not identify anyone who has become sick as a result of spoiled food.[139]  *See Shrader v. White*, 761 F.2d 975, 986 (4th Cir. 1985) (finding food service conditions adequate where there was "no evidence of outbreaks of food poisoning, diarrhea, or other diseases which are indicative of unhealthy conditions in the preparation or handling of food"); *Grubbs v. Bradley*, 552 F. Supp. 1052, 1123

---

[133] [549] Resp. Opp'n Mot. Partial Summ. J. 44.
[134] *See* [549-9] LaMarre 2016 Expert Report.
[135] *Id*. at 78-79.
[136] *Id*. at 82-83.
[137] *Id*. at 86-87.
[138] *See generally* [549-9] LaMarre 2016 Expert Report.
[139] Skipworth Dep. 40:2-5 (acknowledging she has no knowledge of any inmate in last five years who got sick from Salmonella bacteria).

(M.D. Tenn. 1982) (explaining that the Eighth Amendment only requires conditions that are "sanitary enough so that inmates are not exposed to an unreasonable risk of disease"); *Collins v. Haga*, 373 F. Supp. 923, 926 (W.D. Va. 1974) (finding conditions to be adequate, in part, because "there is no indication that any inmate has become ill by reason of the conditions").

Plaintiffs' only attempt to show a causal connection between "spoiled" food and disease is the [] Declaration of Jimmy Brewer, "attributing a rise in the number of sick prisoners in his unit to rancid meat served by the kitchen."[140]   Brewer claims that two or three days after the "rancid" meat was served, there was a "spike" in the number of inmates who got sick.  He heard a nurse say that a stomach virus was going around "but the timing made [him] think it was connected to the bad meat."[141]   Brewer's wholesale, inadmissible speculation amounts to a medical opinion Brewer is not qualified to render.[142]   *See Ruiz v. Whirlpool, Inc.*, 12 F.3d 510, 514 (5th Cir. 1994) (an expert's opinion "that the relays for the evaporator blower fan motor could have been a source of the fire" was not sufficient to defeat summary judgment).

Similar problems follow Plaintiffs' claim that the conditions in which the food is prepared are unsafe.  Skipworth claimed that she saw various food code violations in the kitchen during her tour in June 2016.[143]   These included roaches and flies in the kitchen, a broken gauge on the automatic dishwasher, floor tiles that were broken and missing in the dishwashing area, and general cleanliness issues.[144]   Skipworth was questioned about each of these in her deposition.

---

[140] [549] Resp. Opp'n Mot. Partial Summ. J. 43.

[141] [549-29] Brewer Decl. ¶ 10.

[142] Plaintiffs rely on several prisoner declarations that lodge various complaints about food safety and nutrition.  Aside from such testimony being inherently untrustworthy, *see Alberti*, 600 F. Supp. at 450, the declarations, like that of Brewer, are riddled with inadmissible speculation and hearsay that do not rise to the level of depriving the inmates of "the minimal civilized measure of life's necessities" in any event.  *See Farmer*, 511 U.S. at 833.

[143] [549-5] Skipworth 2016 Report at 13.

[144] Skipworth Dep. 53:22-59:16.

Skipworth stated that she saw roaches in the kitchen which "suggests a heavy infestation." [145] There is no indication, however, that Skipworth actually saw the infestation. More importantly, on October 19, 2016, the Mississippi Department of Health inspected the EMCF kitchen but did not indicate any insects were present under the heading "insects, rodents and animals not present."[146]  As Skipworth pointed out in her deposition, this finding means that insects, rodents and other animals were not present in the EMCF kitchen on the day of the inspection.[147]

Looking next to Skipworth's statement that the low temperature final rinse gauge on the automatic dishwasher did not work and appeared to be broken,[148] Skipworth's deposition again speaks volumes. Namely, Skipworth admitted in her deposition that the broken low-temperature final rinse gauge does not mean the dishwasher was not working.[149]  She further did not know if EMCF kitchen staff was doing anything to make sure the temperature was correct in the dishwasher.[150]

Skipworth next took issue with the fact that "[l]arge areas of floor tiles were observed to be broken and missing in the dishwashing area and the cooking area."[151]  Her concern was that the missing tiles could cause the splashing of dirty water from the hole in the floor on to clean equipment, but Skipworth admitted she did not see that actually happen while she was there.[152]

In concluding her 2016 Report as it relates to food services and nutrition, Skipworth makes a general criticism of the kitchen's cleanliness and condition,[153] but, like the rest of her

---

[145] [549-5] Skipworth 2016 Report at 13.
[146] Miss. Dept. of Health Inspection Details, Oct. 19, 2016 Inspection, attached as **Exhibit "AA"**.
[147] Skipworth Dep. 71:9-20.
[148] [549-5] Skipworth 2016 Report at 13.
[149] Skipworth Dep. 53:22-54:4.
[150] *Id*. at 54:9-12.
[151] Skipworth 2016 Report at 13.
[152] Skipworth Dep. 58:14-16.
[153] Skipworth 2016 Report 14.

opinions related to food services and nutrition, her statement does not comport with reality. Namely, Skipworth acknowledged that the Mississippi Department of Health gave the EMCF kitchen a score of "A" during its October 19, 2016 audit and that this is the highest score the Department of Health awards.[154]   She had no reason to dispute that all of the Health Department scores except one in 2013 were for A's and B's with "A" being the highest and "B" being number two.[155] Skipworth also had no reason to disagree with following conclusion reached by the Health Department: "Food in good condition safe and unadulterated."[156]

Pertinent to the analysis of whether a substantial risk of serious harm is created by EMCF's food services and nutrition operations, Skipworth could not name any inmate who had become ill in the past five years because of any of the issues she alleges exist.[157]  Plaintiffs' only attempt to rebut this lack of a causal connection is their reference to the speculative statement offered by Jimmy Brewer in paragraph 10 of his [549-29] Declaration, which as discussed above, is inadmissible.

Even assuming the issues Plaintiffs discuss rise to the level of constitutional violations, Defendant has not been deliberately indifferent to those issues.  Skipworth testified that she is aware that EMCF has a pest control contract with an outside vendor.[158]  She admitted that a

---

[154] Skipworth Dep. 67:9-68:3; *see also* Exhibit "AA".

[155] Skipworth Dep. 68:4-12; *see also* [531-10] Food Service Information, Mississippi Department of Health Facility: EMCF, covering the period of time from July 23, 2012, through October 19, 2016.

[156]  Skipworth Dep. 71:22-72:11. Plaintiffs' attempt to downplay the Health Department inspections that resulted in a "B" grade by emphasizing that this meant "critical" violations were found but were corrected prior to the end of the inspection. [549] Resp. Opp'n Mot. Partial Summ. J. 45-46.  The "B" rating is the second highest and it is not unusual for food preparation facilities to receive such a rating. *See* Skipworth Dep. 68:4-25.  For example, Char Restaurant in Jackson, Mississippi, which recently was described as the most expensive in Mississippi, has had several "A" and "B" ratings since 2009 and has even received one "C" rating. *See* Food Service Information, Mississippi Department of Health Facility: Char Restaurant, covering the period of time from Oct. 26, 2009, through September 7, 2016, attached as **Exhibit "BB"**; *see also The Daily Meal, The Most Expensive Restaurant in Every State  Slideshow*,  https://www.thedailymeal.com/eat/most-expensive-restaurant-every-state-slideshow/slide-25  (last visited Sept. 28, 2017).

[157] Skipworth Dep. 40:2-5, 57:11-14, 57:21-58:1, 59:24-60:2.

[158] *Id*. at 39:3-5.

weekly pest control service in the kitchen would be a reasonable effort to keep pests out.[159] According to the contract and invoices from the pest control company, the kitchen is treated for pests at least once per week.[160]

Plaintiffs cite to the deposition testimony of Marilyn Braxton to support their contention that the kitchen at EMCF is not clean and that the food was not nutritional.[161]  However, Braxton testified that Orlando Glass took over as supervisor of the EMCF kitchen sometime in 2016 although she could not remember the exact time.[162]  She admitted that since Glass took over, inmates have told her that the food taste better.[163]  She further testified that the issues with cleanliness in the kitchen also have improved since Glass took over.[164]  These facts make plain that even if Plaintiffs' could establish a substantial risk of serious harm, there is no evidence that Defendant has been deliberately indifferent to that risk.

## CONCLUSION

For the foregoing reasons, Defendant respectfully requests this Court grant its Motion for Partial Summary Judgment and enter judgment as a matter of law in Defendant's favor as to claims three, four, five, six, and seven of Plaintiffs' [1] Complaint.

Dated: September 29, 2017.

<div style="margin-left: 40%">

Respectfully submitted,

BY:    JIM HOOD, ATTORNEY GENERAL
           STATE OF MISSISSIPPI

BY:    *s/ Krissy Nobile*
           Harold E. Pizzetta, III, Bar No. 99867

</div>

---

[159] *Id*. at 39:3-16.
[160] See [531-12] Independent Contractor Agreement for Pest Control with attached Summary of Invoices for Pest Control Services covering January 1, 2015 through June 29, 2017.
[161] *See* [549] Resp. Opp'n Mot. Partial Summ. J. 43-46.  Braxton admitted she only helped in the kitchen one time and that is when she saw the issues.  Dep. of Marilyn Braxton 145:4-20, attached as **Exhibit** "**CC**".
[162] Braxton Dep. 169:12-171:23.
[163] *Id*.
[164] *Id*. at 170:5-13.

PD.22305633.1

Krissy Nobile, Bar No. 103577
Office of the Attorney General
Post Office Box 220
Jackson, Mississippi 39205
Telephone: (601) 359-3860
Facsimile: (601) 359-2003
hpizz@ago.state.ms.us
knobi@ago.state.ms.us

BY:    *s/ Gary E. Friedman*
Gary E. Friedman, Bar No. 5532
G. Todd Butler, Bar No. 102907
H. David Clark, III, Bar No. 104165
Nicholas F. Morisani, Bar No. 104970
Phelps Dunbar, LLP
4270 I-55 North
Jackson, Mississippi 39211-6391
Telephone: 601-352-2300
Facsimile: 601-360-9777
Gary.Friedman@phelps.com
Todd.Butler@phelps.com
clarkt@phelps.com
Nick.Morisani@phelps.com

BY:    *s/ Michael J. Bentley*
Michael J. Bentley, Bar No. 102631
Megan B. Conner, Bar No. 102030
Molly M. Walker, Bar No. 100689
Bradley Arant Boult Cummings, LLP
Post Office Box 1789
Jackson, Mississippi 39215-1789
Phone:  (601) 948-8000
Fax:      (601) 948-3000
mbentley@babc.com
mconner@babc.com
mmwalker@babc.com

**ATTORNEYS FOR THE DEFENDANT**

## CERTIFICATE OF SERVICE

I, *Gary E. Friedman*, certify that the foregoing document has been filed with the Clerk of Court using the Court's ECF system, which provides service of the foregoing to all counsel of record who have entered an appearance in this case as of the date below.

Dated: September 29, 2017.

*/s/ Gary E. Friedman*
Gary E. Friedman

36