# East Mississippi Correctional Facility (EMCF) Report

Submitted November 16, 2018

Submitted by
Madeleine L. LaMarre MN, FNP-BC

# Contents

Qualifications .................................................................................................................... 3

Facts and Data Considered ................................................................................................ 4

Overview ............................................................................................................................ 6

Executive Summary ........................................................................................................... 7

Findings ............................................................................................................................ 11

   1.   Routine Access to Care ............................................................................... 11

   2.   Medication Administration Process and Medication Administration Records ............... 17

   3.   Infirmary Care ............................................................................................ 21

   4.   Urgent Care and Hospitalizations .............................................................. 26

   5.   Chronic Disease Management .................................................................... 30

   6.   Specialty Services ...................................................................................... 36

   7.   Clinic Space, Equipment and Supplies ....................................................... 39

   8.   Intrasystem Transfer Screening ................................................................. 40

   9.   Access to Dental Care ................................................................................ 42

   10.   Health Records .......................................................................................... 44

   11.   Policies and Procedures ............................................................................. 45

   12.   Continuous Quality Improvement and MDOC Oversight ............................ 47

   13.   Recommendations ..................................................................................... 50

Appendix A – Patient ID Numbers ................................................................................... 53

Appendix B – EMCF Record Reviews ............................................................................... 54

## Qualifications

I, Madeleine LaMarre, MN, FNP-BC, have been retained by Plaintiffs' counsel as a correctional and nurse practitioner expert to review health care services at the East Mississippi Correctional Facility. Compensation for my work is being billed at $250 per hour and ½ my hourly rate for travel time. In the following paragraphs, I have summarized my background and experience in correctional health care as a prelude to this report. During trial in this action on March 27, 2018, the Court qualified me as an expert in the field of correctional medical care.

I am an independent consultant in correctional health care with more than 30 years of experience in corrections. My general qualifications as an expert are set forth in my Curriculum Vitae, attached hereto as Exhibit 1. I hold current licensure as a family nurse practitioner in the state of Georgia and am nationally certified by the American Nurse Credentialing Center (ANCC). I am a member of the American Nurses Association, the American Association of Nurse Practitioners, and the Academy of Correctional Health Care Professionals. I am familiar with standards of health care in correctional facilities. Beginning in 1982, I worked as both clinician and administrator of a Georgia Department of Corrections (GDC) facility providing clinical care to inmates. I later became the GDC Nursing Director providing expert clinical assistance in the planning, implementation and evaluation of nursing services. In 1995, I became the GDC Clinical Services Manager, and my responsibilities included development of health care policy, chronic disease guidelines and oversight of a clinical auditing program to monitor and improve the quality of health care in GDC institutions. In that role, I provided technical assistance and consultation to nurses and clinicians to achieve patient care goals. I am or have been a correctional medical expert in the states of California, Delaware and Ohio, monitoring state compliance with settlement agreements. I have been an independent monitor at the Dallas (TX), Cook (IL) and Passaic (NJ) County Jails. I am currently a consultant to Miami-Dade County Jail. I have served as a consultant to the Centers for Disease Control and Prevention (CDC) regarding the management of hepatitis C in correctional facilities and HIV testing implementation for correctional settings. I have authored and coauthored several publications, including serving as associate editor of Clinical Practice in Correctional Medicine, Second Edition, a textbook on correctional medicine. In this text, I authored a chapter on the nursing role and practice in correctional health care settings.

**Facts and Data Considered**

In addition to my site visit at EMCF and my interviews with inmates, I reviewed the following documents for this report.

1. Class Action Complaint. Jermaine Dockery et al. v. Christopher Epps et al. Civil Action No: 3:13CV326TSL-JMR. United States District Court. Southern District of Mississippi, Jackson Division. May 30, 2013.
2. East Mississippi Correctional Facility Report. Madeleine L. LaMarre MN, FNP-BC. February 25, 2011. Presley v. Epps, No. 4/05-c-00148-DAS (ND. Miss. Nov 8, 2011). DOC. No. 151-8.
3. East Mississippi Correctional Facility Report. Madeleine L. LaMarre MN, FNP-BC. June 16, 2014. Jermaine Dockery, et al. vs. Christopher Epps, et al. No. 3:13 cv-00326-TSL-JCG.
4. East Mississippi Correctional Facility Report. Madeleine L. LaMarre MN, FNP-BC. December 29, 2016. Jermaine Dockery et al. vs. Christopher Epps, et al., No. 3:13 cv-00326-TSL-JCG.
5. Centurion MDOC Health Services Contract, effective July 1, 2015 (CENT-DOCKERY-ELEC-034785)
6. Centurion of Mississippi LLC, EMCF Health Care Policies and Procedures, Revised September 21, 2016 (CENT-POSTTRIAL-000001-000458)
7. Mississippi Nursing Practice Law. Effective Date: July 1, 2010.
8. National Commission on Correctional Health Care (NCCHC) Standards for Health Care Services in Prisons 2018
9. Dr. Patrick Arnold MD Trial Transcript
10. Dr. Gloria Perry MD Trial Transcript
11. EMCF Staffing Documents (CENT-POSTTRIAL-001819, CENT-POSTTRIAL-001805, CENT-POSTTRIAL-001883-001887)
12. EMCF Medical Sick Call Log (CENT-POSTTRIAL-001165-001804)
13. EMCF Chronic Disease Log (CENT-POSTTRIAL-001807)
14. EMCF Emergency Room and Hospital Admission Log (CENT-POSTTRIAL-001808)
15. EMCF Consult Log (CENT-POSTTRIAL-001806)
16. EMCF Medical Housing Logs (CENT-POSTTRIAL-000992-001164)
17. EMCF Acute Care Units Admission and Discharge Logs (CENT-POSTTRIAL-000991)
18. EMCF CQI Reports (CENT-POSTTRIAL-001809-001818)
19. EMCF Medical Records[1] (DEF-POSTTRIAL-000001-006356, DEF-026694-033681, and records reviewed on site)
20. EMCF Medication Administration Records (CENT-POSTTRIAL-001911-003357)

[1] Following the EMCF site visit I requested copies of records I reviewed and additional records identified during the site visit. The records provided to me did not include documents that were scanned into the record as attachments. Therefore, in some cases I was unable to supplement my report and/or confirm findings.

21. EMCF Nursing Protocols (reviewed on site)
22. EMCF Disease Management Guidelines (CENT-POSTTRIAL-001888-001910)
23. EMCF Mortality & Morbidity Review Documents (CENT-POSTTRIAL-000968-000989)

## Overview

On October 23-26, 2018 I visited the East Mississippi Correctional Facility (EMCF) in Meridian, Mississippi. EMCF is a prison that is part of the Mississippi Department of Corrections (MDOC) system and privately operated by Management Training Corporation (MTC). The facility has a capacity of 1,500 inmates, and houses a population of nearly 1,300 inmates as of October 2018.[2] Centurion of Mississippi, Inc. provides health care services. EMCF has a specialized mission of providing psychiatric services and individualized and group counseling.

The purpose of my 2018 visit was to assess whether EMCF inmates receive adequate health care for their serious medical and mental health conditions. Specifically, I was tasked with assessing whether and how the provision of health care at EMCF has changed since my December 29, 2016 report.

I was accompanied by Alesha Judkins and Benjamin Salk of the Southern Poverty Law Center (SPLC) and Jennifer Wedekind of the National Prison Project of the ACLU.

I performed the following activities in preparation for and during the site visit:

- Reviewed the class action complaint alleging inadequate medical and mental health care at EMCF
- Toured EMCF inmate housing units, main and satellite medical clinics
- Spoke with health care and custody staff
- Interviewed inmates
- Observed medication administration by nursing personnel
- Reviewed patient health records
- Reviewed the MDOC/Centurion Health Services Contract
- Reviewed Centurion Health Care Policies and Procedures, effective September 21, 2016
- Reviewed other medically related documents

I selected health records from various tracking logs provided by defendants in discovery, including nurse and physician sick call, chronic disease, emergency room visits and hospital admissions logs. I reviewed over 100 separate health encounters in 23 health records (as well as more than 60 instances in which patients were not transported for health encounters due to decisions made by custody staff). These encounters represented various health care systems, including intrasystem transfers, nurse sick call, physician encounters, chronic disease management, infirmary care, specialty services, urgent and post-hospitalization care, and laboratory and diagnostic test reports. In addition, I reviewed numerous medication administration records. I reviewed each record for the timeliness, appropriateness and quality

---

[2] Mississippi Department of Corrections website. November 15, 2018.

of care, and assessed whether health care systems functioned in an integrated manner.

I thank Frank Shaw, Warden, Anthony McCort, Health Services Administrator, and Centurion staff for their assistance in conducting this review.

# Executive Summary

The Mississippi Department of Corrections (MDOC) has chosen to concentrate a large population of seriously mentally ill inmates, many of whom also have serious medical illnesses, at EMCF. Providing adequate health care for this high-acuity medically and mentally ill population requires that EMCF have an adequate structure for providing health care services, including site specific health care policies and procedures; adequate numbers and types of staff; staff training; and a functional quality improvement program designed to identify problems and implement strategies to correct them. In addition, an adequate health care delivery system requires that the components of a health care system function in an integrated manner.

This is my fourth report regarding health care services at EMCF. I submitted my first report in 2011, when GEO provided health care services. My second report was submitted in 2014, when Health Assurance, LLC provided health care services. My third report was submitted in December 2016. In my three previous reports, I identified systemic issues with the health care system at EMCF that resulted in failure to provide timely and appropriate health care to inmates with serious medical needs. Those systemic issues resulted in actual harm to individual patients, and created a substantial risk of serious harm to all EMCF patients. I have reviewed and relied on these prior reports and underlying documents when preparing this report, which were admitted at trial as Plaintiffs' Exhibit 1498.

This review showed that despite MDOC officials being aware of the systemic issues identified in my reports, and although there have been some minor improvements in certain aspects of the health care system at EMCF, many of the systemic issues identified in my three previous reports still exist, and in fact some have significantly worsened. The most striking finding is the profound lack of access to medical care caused by Centurion's failure to adhere to its policies and procedures, repeated failure of MTC correctional officers to escort patients to medical appointments, and repeated statewide and EMCF lockdowns that result in wholesale cancellation of medical appointments. Ultimately these are ongoing failures by MDOC to ensure that the inmates held in its custody are provided adequate medical care. These systemic problems can be generally grouped into the following categories.

_Routine Access to Care._
Lack of timely access to medical care extends to all aspects of health care including routine appointments to see a nurse or medical provider, laboratory tests, chronic disease management, dental care and even urgent care. It also results in ordered medical care not being implemented such as wound care and blood pressure monitoring.

Inmates in segregation are not monitored according to policy and some cells do not have functional call buttons to notify officers in the event of an emergency.

*Medication Administration*

EMCF patients do not receive ordered medications for their serious medical and psychiatric conditions. Upon transfer into EMCF, patients do not receive continuity of medications for days or weeks. Medication Administration Records (MARs) show systemic failures of nurses to administer medications, medications not being available, and medication errors.

During facility lockdowns, nurses do not timely administer medications, sometimes administering morning medications after lunch and evening medications after midnight. Diabetic patients routinely refuse insulin, even when their blood sugars are high, because they cannot depend on receiving their meal in time to prevent hypoglycemia.[3] This places diabetic patients in the position of either refusing care and having poorly controlled diabetes, or accepting care and risking hypoglycemia which may result in harm, and even death.

*Infirmary Care*

Lack of access to care extends to patients in the infirmary. Infirmary patients are not within sight or hearing of health care staff as required by National Commission on Correctional Health Care (NCCHC) Standards. Infirmary rooms do not have a call system for patients to notify health care staff of their serious medical needs.  Moreover, Centurion has changed the Infirmary Care policy to reflect that EMCF no longer provides infirmary level care; and instead provides only Sheltered Housing which requires less monitoring. However, record review shows that patients needing infirmary care are indeed admitted to the infirmary and do not receive adequate monitoring and treatment. These concerns were illustrated by a patient who had surgery on his leg and used a crutch to bang against his cell door to try to gain the attention of nurses regarding his severe post-operative pain.

*Urgent Care and Hospitalization*

I found that even when correctional staff are notified that an inmate needs urgent medical attention, too frequently they do not timely escort the patient for medical evaluation. The day before my arrival at EMCF, an inmate in administrative segregation requested medical attention for feeling feverish and repeated vomiting. Correctional staff would not escort him to medical due to a statewide lockdown, so the inmate set fires in his cell in an attempt to bring attention to his medical concerns. A mental health (MH) professional intervened and notified a nurse who told her to have the inmate submit a sick call request. The MH professional went up the custody chain of command to arrange transport. When a nurse finally saw the patient, his vital signs were abnormal, with a fever of 101.2°F, blood pressure of 178/78 mm Hg and a pulse of

---

[3] If a diabetic patient receives insulin without also receiving a snack or a meal within 15-30 minutes this can cause the patient's blood sugar levels to fall too low, resulting in hypoglycemia. Hypoglycemia can result in brain damage and death.

112/minute. Despite the patient's abnormal vital signs, the nurse did not contact a medical provider and he was sent back to segregation. This illustrative case is alarming; it shows that even when inmates demonstrate obvious signs of illness, their access to a medical professional who can diagnose and treat their medical conditions is obstructed.

*Chronic Disease Management*

When medical providers see chronic disease patients, they frequently fail to perform adequate medical evaluations. Providers do not conduct adequate assessments by inquiring about symptoms of their chronic diseases (*e.g.*, hypertension and diabetes) and performing pertinent physical examinations. Labs are not coordinated to be obtained prior to clinic visits and providers fail to document lab results and timely address abnormal findings. Providers document chronic disease encounters using an electronic medical record (EMR) template in which virtually all documented physical examinations are exactly the same from visit to visit, even documenting examinations that may not have been performed (*e.g.*, hernia exams). In some records, there is no documentation that the provider ever spoke to the patient much less obtained a history. These findings reflect two systemic issues, the lack of adequate medical evaluations and the unreliability of medical record documentation. These and similar instances of improper and inadequate chronic disease management expose patients suffering from chronic diseases to a serious risk of harm.

Moreover, my review showed that medical providers also do not adequately evaluate patients that do not have known chronic diseases but have signs and symptoms of serious medical conditions including patients with significant weight loss and inability to urinate.

*Specialty Services*

When patients are sent to specialists, the consult tracking log shows that some reports are not received. Dr. Arnold and other medical providers do not consistently address specialist recommendations increasing the risk of harm to patients. Consult logs show that specialty services appointments are cancelled because of custody transportation issues.

*Infirmary Care*

For example, one patient with a leg abscess requiring surgery was hospitalized two more times because nurses did not perform wound care and providers did not routinely monitor the patient to that nurses implemented medical orders and his condition was improving.

Other systemic issues are unchanged from my 2016 report. These include:

- Lack of standardization of clinic space, equipment, and supplies sufficient to provide adequate care.
- Failure to properly screen patients for serious medical, dental and mental health conditions upon transfer to EMCF, and to provide continuity of care.
- Lack of timely medical staff review and follow-up of abnormal laboratory reports.
- Lack of timely access to dental care.
- Lack of complete and accurate health records.

- Failure to adapt Centurion's health care policies and procedures to provide site-specific operational detail to staff necessary to implement the policies at EMCF.
- Lack of an adequate quality improvement program.
- MDOC's failure to provide a robust contract monitoring oversight program to ensure that health care vendors provide adequate health care for patients with serious medical conditions that meets community standards and complies with policies and procedures as well as contract requirements.

I address each of these issues in the body of my report. I also include throughout my report basic recommendations for addressing the deficiencies I have identified. These recommendations are intended to be a starting place for improving the system of care at EMCF and are not intended to be an exhaustive list of necessary reforms.

In sum, each of these conditions that I previously identified at EMCF, most recently in 2016, continues to exist in 2018. Despite being on notice of these conditions since at least my first report in 2011, MDOC officials have failed to take steps to remedy the situation; in some cases, the conditions are worse than they were previously. In combination, these conditions create a health care system that is dangerously deficient and provides inadequate medical care to patients at EMCF. Because any inmate at EMCF may fall ill, become injured, require medication, or find himself in need of routine care at any time, these systemic deficiencies expose the whole EMCF population to a substantial risk of serious harm.

Finally, it is apparent that MDOC has not demonstrated the will or capacity to correct the systemic health care issues at EMCF. For this reason, I recommend the appointment of a qualified health care professional as a monitor for the court, to develop measurable standards for adequate delivery of care in these deficient areas and to ensure compliance with those standards.

## Findings

## 1.    Routine Access to Care

As a general matter, access to care involves patients being timely evaluated by a health care professional licensed to diagnose and treat their medical, dental and/or mental health conditions. To review access to care at EMCF, I toured housing units, main and satellite medical clinics; reviewed health records; and interviewed custody, health care staff, and inmates.

**Findings:**

My review showed that EMCF patients do not have timely access to care for their serious medical and dental conditions. Since December 2016, access to care at EMCF has significantly worsened resulting in actual and on-going risk of harm to EMCF patients.

At EMCF, when inmates want treatment for a medical, mental health or dental condition, they are required to submit a sick call request (SCR) form to receive initial access to care. This system is to permit health care staff to review the request and to determine the type of service needed as well as the urgency of the request (*e.g.*, routine, urgent or STAT).

Centurion policy states that inmates should submit the SCRs into secure boxes accessed only by health care staff. Health care staff are to collect and triage the forms twice each day, 7 days per week. A registered nurse is to assess the patient in a face to face encounter within 24 hours of receipt. The policy also states that "The sick call system is conducted in a manner to protect the confidentiality of the patient request" and "only health care staff have access to written sick call requests describing specific health issues."

However, as noted in previous reports, EMCF inmates do not have the ability to confidentially submit their sick call requests. Sick call boxes are not located in the housing units and inmates reported that they gave their SCRs to the correctional officers who are supposed to place the requests in the sick call boxes located outside inmate housing units. This practice is unchanged from my prior visits to EMCF, most recently in 2016. Likely owing in part to this system where inmates cannot directly submit their SCRs, my review shows that medical staff often do not receive SCRs for days after an inmate writes his request.

My review of 39 applicable SCRs showed that 22 (56%) were received within 1 day of the date written on the form. However, 17 (44%) were received 2 to 9 days after the inmate wrote the request. This is an unacceptable delay in processing SCRs, which are the primary route for a patient to raise a health concern, and exposes all inmates to a risk that severe medical conditions may go unreviewed by medical staff and untreated for a long period of time.

During my site visit in 2018, Warden Shaw stated that he does not allow sick call boxes inside

the housing units because inmates might tamper with them, but inmates cannot readily access the sick call boxes outside the housing units, especially during lockdowns. Thus, EMCF continues to disregard and apparently has no intention to comply with its own policy to provide inmates the ability to confidentially submit their health requests to health care staff. Confidentiality is important not only to ensure patient privacy for its own sake, but also to encourage inmates to get help with private and potentially embarrassing medical conditions that they may not want security staff or other inmates to know about. The lack of confidentiality therefore creates a risk of harm because it discourages inmates from seeking care for medical conditions, some of which may cause serious complications or even death if not treated, and which require more expensive, complex medical treatment when they are not timely diagnosed. This is a simple issue to remedy: EMCF should put locked sick call boxes inside the dayrooms on housing units where inmates can submit their own SCRs confidentially. The issue of tampering should be adequately addressed by a combination of the use of appropriate equipment and staff supervision.

Even once the SCRs are actually received by medical staff, nurses did not timely see patients to assess their health requests. In 20 (51%) of 39 applicable cases, nurses saw the patient the following day in accordance with policy. In 19 (49%) of 39 cases nurse saw the patient from 2 to 14 days after receipt of the health requests.  Of serious concern is that for 12 (31%) of 39 health requests, lack of custody escorts or facility lockdowns caused repeated delays in access to care, resulting in harm.

The following cases are illustrative of problems with routine access to care:

**Patient #11**

- On May 10, 2018 a 25-year-old patient submitted a SCR complaining of itching and a rash. The next day, the SCR was received and triaged; however, on May 11 and May 12 a nurse documented that custody did not transport the patient to medical for an appointment. On May 13, 2018 a registered nurse saw the patient and referred him to a nurse practitioner. That same day, the patient submitted another SCR stating that he needed medical attention for a burn on the left side of his face as soon as possible. Remarkably it was not until seven days later, on May 20, 2018, that the request was deemed "received" by medical staff.

- Meanwhile, on May 19, 20, and 21, 2018, custody did not transport the patient for medical appointments due to facility lockdown.

- On May 21, 2018, the patient submitted a SCR stating that he was having severe back pain. On May 23, 2018 – two days later – it was received and triaged. In between, on May 22, 2018 mental health staff saw the patient and noted that a week prior he received a burn to his face from another inmate throwing hot oil.

- On May 23, 2018, a medical provider saw the patient, who (according to medical

records) reported that another inmate threw hot oil on his face one month prior (contrary to the mental health staff's notation that it had been a week prior). The provider described a 5 cm area of erythema crusted with yellow secretions at the patient's left temple, and ordered Bactrim and wound care for 14 days.

- Despite the order for daily wound care, custody did not escort the patient to medical on May 24 or 25. On May 26, 2018 the patient submitted a SCR complaining that his face was draining and he had nothing to put on the open wound, writing, "I am supposed to get wound care once a day and I haven't received it at all." The SCR was not received and triaged until four days later, on May 30, 2018; a nurse did not see the patient that day. Meanwhile, on May 29 and 30, 2018 the patient was again not seen due to facility lockdown.

**Assessment:** This patient did not receive timely access to care following submission of SCR and following an assault from another inmate resulting in a severe burn. The wound became infected and he did not receive ordered wound care. The patient did not receive timely care following submission of two SCRs for back pain. Facility lockdowns were a significant factor in delay in access to care. These delays in access to care appear likely to have exacerbated the patient's condition, and certainly extended his suffering from an injury that should have been properly treated immediately.

**Patient #14**

- On April 20, 2018 this 30-year-old patient submitted a SCR requesting to see the nurse practitioner because he was underweight. That same day, the SCR was received and triaged. However, on April 20, 21, 23, 25, and 26, 2018, the patient's record shows that he was not seen by medical due to facility lockdown.

- On April 27, 2018, the patient again submitted a SCR requesting to see the doctor or nurse to start Ensure because he could not maintain his weight. He also complained of headaches. The form was received and triaged the same day. Again, however, on April 27 and April 30, 2018, the patient was not seen due to facility lockdown. On May 1, 2018 an RN saw the patient, who weighed 145 pounds. The nurse referred the patient to a nurse practitioner. On May 4, 2018 custody did not escort the patient to medical for provider sick call.

- On May 9, 2018 the provider finally saw the patient, whose weight had dropped to 140 pounds – having lost 5 pounds in just over one week. His BMI was 19.1 and his "[r]ibs print through skin." The NP did not perform any medical evaluation of the patient for weight loss.

**Assessment:** This patient did not receive timely access to care for weight loss. Again, facility lockdowns were a major factor in delaying access to care, as the patient was unable to see medical staff for more than ten days after initially asking for medical attention. This illustrates

the ways that a lack of adequate security staffing negatively impacts the provision of adequate medical care at EMCF. When he was finally seen, the provider did not medically evaluate the patient's weight loss which may be a sign of a serious medical condition such as cancer, thyroid disease or inadequate nutrition.

**Patient #17**

- On April 19, 2018 this patient 37-year-old patient submitted a SCR stating that he had been "kicked down there," and that he was "swollen and in a lot of pain." On April 22, 2018 it was received and triaged, but on April 22, 23, 24, 25, and April 26, 2018 custody did not transport the patient to medical due to facility lockdown.

- On April 27, 2018, the RN finally saw the patient for sick call and took his vitals, but did not examine the patient. The patient had ibuprofen, and the nurse instructed the patient to RTC (return to clinic) if no better in five to seven days.

- On May 10, 2018 the patient submitted a SCR stating that he was still having sharp pain between his legs and swelling, and it was hard for him to urinate. On May 11, 2018 the SCR was received and triaged, and an RN saw the patient. He reported continued groin pain and blood in his urine. The RN noted the patient had a history of previous injury to the groin and was taking Flomax. The RN did not examine the patient's groin, and planned to follow up with a nurse practitioner.

- On May 12, 2018 the patient submitted another SCR stating that he was having a problem urinating and needed to see a nurse. It was not marked received until May 21, 2018. Meanwhile, on May 20, 2018 a NP saw the patient who reported that he had suffered right groin pain for two weeks after being kicked in the groin in April during a fight. He described his pain as an out 8 of 10 in severity and suffered from burning during urination. The NP still did not examine the patient's groin or genitalia, but diagnosed the patient with dysuria (i.e., painful urination) and right groin pain and ordered urinalysis.

- On May 23, 2018 a RN saw the patient who reported being unable to void. The RN referred the patient to the physician. He did not perform a rectal examination to determine if the prostate was enlarged, but ordered a straight catheterization for urinalysis for C&S (culture and sensitivity) and ordered two antibiotics, Cipro and Zithromax.

- On May 25, 2018 custody did not escort the patient to medical due to facility lockdown. On May 27, 2018 a NP saw the patient who was taking his antibiotics but not Flomax due to dizziness. The NP planned to collaborate with Dr. Arnold regarding putting him on another medication. No further information is available in the note.

- On June 3, 2018 the NP saw the patient, who reported not receiving his prostate medications for three nights. He was still having problems urinating, and reported a white-yellowish discharge. His scrotum was edematous and slightly erythematous, and the pubis area was painful to touch. No discharge was noted. The NP ordered that the patient should continue Cipro and would request an RN to culture the patient's penile discharge on June 4, 2018. The NP did not schedule follow-up. On June 8, 2018 urinalysis results were obtained and showed trace blood.

- On July 20, 2018 the patient reported that he had not been able to urinate since July 19, 2018. An RN noted that the patient had been catheterized the day before and produced 200 cc urine. The NP saw the patient and did not perform a prostate exam to assess for prostate enlargement contributing to urinary tract obstruction symptoms.

- On July 23, 2018 the physician documented that the patient had bladder outlet obstruction and required an out catheterization. He ordered catheter supplies for the patient. The physician did not medically evaluate the patient for the causes of urinary tract symptoms.

- On July 24, 2018 the patient submitted an SCR complaining of having problems putting the catheter in his bladder. On July 25, 2018 it was received and triaged. On July 25, 2018 the RN saw the patient and referred him to a NP.

**Assessment:** This patient did not receive timely access to care following a groin injury and has not been medically evaluated for his inability to urinate. Facility lockdowns repeatedly delayed access to care. This patient should have been immediately referred to a urologist for diagnosis and treatment. While it is appropriate to catheterize a patient who is unable to urinate, the patient should have been referred to a urologist for diagnosis and treatment. Long-term self-catheterization introduces a risk of infection that could spread to the bladder and kidneys and cause harm to the patient.

**Patient #5**

- On Tuesday, April 17, 2018 at 4:17 pm this 54-year-old patient presented urgently with wheezing and difficulty breathing. Dr. Arnold sent him to the emergency department where he was diagnosed with exacerbation of his chronic obstructive pulmonary disease (COPD) and recommended an antibiotic. On April 18, 2018 at 01:37 am the patient was discharged back to EMCF. Dr. Arnold did not see the patient upon his return and did not order the antibiotic for almost 18 hours, until 5 pm that evening.

- On April 23, 24, and 25, 2018 custody did not escort the patient to a lab appointment due to facility lockdown. The phlebotomist noted that labs would be rescheduled when the lockdown was lifted.

- On April 30, 2018 the patient submitted a SCR form complaining of foot pain from nerve damage. It was received on May 1, 2018 but that day, the patient was not seen due to facility lockdown. On May 2, 2018 a RN saw the patient. The plan was to follow-up with an NP.

- On May 1, 2018 a chest x-ray was performed and showed COPD and a density overlying left lower anterior fifth rib that could be an old rib fracture. The results suggested a non-contrast chest CT to exclude pulmonary nodule. On May 2, 2018 Arnold signed the report but did not see the patient to discuss the findings and recommendations with him.

- On May 6 and 8, 2018 an NP noted that the patient refused an appointment per officer report. On May 9, 2018 an NP noted that the patient was not transported to medical and the appointment was rescheduled for May 16, 2018.

**Assessment:** Dr. Arnold did not timely order antibiotics or see the patient following release from the hospital for exacerbation of COPD symptoms. The patient was not timely seen for medical appointments due to facility lockdowns delaying access to medical care and treatment. This is a particular concern for this patient who was recently sent to the hospital for exacerbation of his chronic obstructive pulmonary disease.

## 2.     Medication Administration Process and Medication Administration Records

Another access to care issue concerns timely, safe, and reliable access by a patient to his correct medication. I evaluated pharmacy and medication services by reviewing applicable policies and medical records, including MARs, and by observing nurses administer medications in general population and segregation housing units.

**Findings:**

Based upon this review, I have determined that nurses do not adhere to accepted standards of nursing practice with respect to medication administration resulting in actual and ongoing risk of medication errors. I also found systemic issues related to lack of custody escorts and ongoing facility lockdowns resulting in patients with serious medical and mental health needs not receiving medications timely, if at all.

**Medication Policies and Procedures**

Centurion medication policies address the need to adhere to the five rights of medication administration: the right patient, the right medication, the right time, the right amount (dose) and the right form (route). However, Centurion procedures do not ensure adherence to the five rights nor accepted standards of nursing practice with respect to medication administration. For example, the policy does not require nurses to document medications at the time they are given, and instead are permissive of nurses documenting medication administration hours afterwards. This increases the risk that nurses will make documentation errors, including failing to document at all. In fact, many medication administration records (MARs) show systemic failures of nurses to document administration of medications. MARs that are inaccurate, incomplete, or unreliable create more than a mere paperwork problem – they make it impossible for providers to know whether or not patients have received ordered medical care and affect clinical decision making. It is important for a provider to know whether or not the patient's poorly controlled disease is due to not receiving medication, or receiving medication that is not effective, warranting a change in the treatment plan. However, it makes no sense to change the patient's medication regimen if the patient is not receiving treatment already ordered. This systemic failure to ensure patients with serious medical and mental health conditions receive medications exposes all inmates at EMCF who take medications, or who may take medications at some point in the future, to a substantial risk of harm. Centurion's policies and procedures should be revised to require that nurses document medication administration at the time the medication is provided to patients to ensure that records are accurate.

**Medication Preparation**

Throughout the site visit, there was a statewide facility lockdown and inmates were not permitted out of their cells to receive medications, except diabetics receiving insulin. During

this time, nurses prepared medications in the medical unit to administer to patients in the housing units' cell to cell. I observed that nurses reviewed medication administration records (MARs) to determine what medications the patient was due and then wrote the patient's name, ID number and housing location on the outside of a coin envelope and placed the medication into the envelope. One nurse documented administration of the medication at the time of preparation. These practices are not compliant with Centurion policy that states:

> *The container/envelope must specify: the patient's first and last name, identification number and the entire prescription order for each medication in the envelope. (Example: Haldol 5 mg PO BID). Documentation of medication administration on the MARs will not be completed at time of preparation but immediately after actual administration.*

Medications should be administered from pharmacy dispensed containers that include legally required information to ensure that patients receive the correct medications and comply with applicable regulatory and legal requirements. However, to expect nurses to adhere to the policy of recopying the entire prescription for each medication onto the envelope is not only physically impossible (i.e., the envelope is too small); it would take nurses all day long to prepare envelopes for over 1,000 inmates who receive medications.

This problem could be remedied by having nurses take medication carts with the MARs to housing units to administer medications, administering cell to cell during lockdowns if necessary. Another option that other prisons and large institutional facilities have implemented is an automated medication dispensing system in which machines dispense properly labeled single dose containers, which eliminates the need for nurses to label envelopes and only requires the nurse to compare the medication package against the MAR. EMCF should immediately take such steps to reduce medication errors and facilitate timely administration of medications.

**Medication Administration Schedules**

General medication administration at EMCF is scheduled for 9 am and 9 pm. However, during lockdowns it takes nurses several hours to prepare medications delaying administration until 11 am or after. Inmates reported not receiving evening medications until midnight and even 1:00 or 2:00 am. One inmate reported that he asks someone to wake him up when nurses come late at night to administer medications. However, it is an unreasonable barrier to care that inmates have to stay awake until 2 am to receive their medications or request other inmates to wake them up. Thus, EMCF does not ensure that patients timely receive medications.

Insulin is scheduled to be given at 4:30 am and 3:30 pm or later, depending on the housing unit and meal times. I observed nurses administering insulin to diabetic patients. Nurses checked patient blood sugars and if the blood sugar was high, nurses were to administer regular insulin according to a sliding scale to bring the patient's blood sugar under control. However, many patients refused regular insulin even though their blood sugars were high. Nurses reported that

inmates refused the insulin because EMCF does not timely serve meals and patients become hypoglycemic.[4] This puts patients in the position of either having poorly controlled diabetes due to insufficient insulin, or risking harm, including death, from hypoglycemia.

For example, on October 21, 2018 nurses responded to a housing unit for a patient who felt hypoglycemic.[5] At 10:21 am his blood sugar was low – 59, where normal is 80-120. The patient stated that he had received his insulin but had not received his breakfast tray due to the facility lockdown. The nurse informed security that diabetic patients must be fed first so they do not develop hypoglycemia. EMCF should take steps to ensure insulin and meals are provided in a timely manner.

Medication orders for each patient should be documented in the electronic medical record. However, as noted in previous reports, providers do not enter medication orders for sliding scale insulin into the medical record. Therefore, there is no way to know whether the nurse administers the correct dose of sliding scale insulin to the patient. This is a medical-legal issue that should be immediately remedied.

**Medication Administration Process**

I observed a nurse administer medications in general population and segregation units. The nurse brought coin envelopes containing patient medications. The nurse did not bring a medication cart with access to hand sanitizer or medication administration records with her to document medication administration. The lack of hand sanitizer exposes patients to potential infection and illness. The failure to bring medication administration records is not compliant with standards of nursing practice and increases the risk of documentation errors. This introduces a serious risk that the MARs are inaccurate and cannot be relied upon to determine whether inmates have received their prescribed medications.

In Unit 3, the nurse administered medication by going cell to cell, calling out the patient's name, checking the patient's ID. The officer did not open up the food port for each cell so the nurse could hand the patient his medication. Instead, the nurse slid the medication envelope under the cell door onto the dirty floor, which is unsanitary. The nurse was not able to observe the patient picking up the coin envelope medication and ingesting the medication. The nurse did not perform oral cavity checks, required by policy and also best practice to ensure both that inmates are taking their medications as required and that there are no medications freely available in the housing units, possibly being provided to inmates without a prescription for those medications. Both possibilities expose inmates to a substantial risk of harm. The process varied somewhat from cell to cell.

---

[4] As noted earlier in this report, if a diabetic patient receives insulin without also receiving a snack or a meal within 15-30 minutes this can cause the patient's blood sugar levels to fall too low, resulting in hypoglycemia. Hypoglycemia can result in brain damage and death.

[5] Patient #6.

In Unit 5A, the process was similar, however several cells (*e.g.*, 103 and 104) had grates over the window such that the patient's face was obscured preventing the nurse from comparing the patient's face with the photo ID. In several cells, inmates covered the window with a towel preventing the nurse and correctional officers from observing the inmate. In each case, the nurse put the medication envelop on the cell floor to be picked up by the inmate. This process, again, prevented the nurse from verifying that the correct patient was receiving the medications and that the patient actually took the medications, exposing the prison population to the risks described above. To alleviate this risk, nurses at EMCF should be required by policy and in practice both to positively identify (by face) the patient receiving the medication and, working with custody, to perform oral cavity checks to ensure the patient actually took the medication.[6]

**Medication Administration Records**

I reviewed multiple MARs that showed systemic issues reflecting a broken medication process. These include:

- Lack of continuity of medications for newly arrived patients;
- Delayed administration of newly ordered medications;
- Mental health and chronic disease medications not being available for multiple days:
- Nurses repeatedly failing to document the status of medication administration;
- Medication nonadherence not timely addressed by nurses or medical providers;
- Medication discontinuity from provider failure to timely order medications following hospitalization or specialty services;
- Nurses incorrectly transcribing new medication orders onto an existing medication order by defacing the MAR and changing the dates of the previous order;
- Nurses administering medications after the medication order has expired

Taken together, the medication administration and recordkeeping systems at ECMF do not ensure that patients receive timely administration of ordered medications for their serious medical conditions, medication continuity is not provided for treatment of their serious medical conditions, and the medication records are unreliable. These errors rise to a systemic level and create a substantial risk of serious harm to any patient who takes medications at EMCF.

---

[6] In some systems, officers perform oral cavity checks using a penlight after the nurse administers medication to ensure ingestion.

## 3.    Infirmary Care

Another important issue at EMCF is inmates' treatment for acute, non-emergency medical conditions. To evaluate this area, I toured the medical housing area where patients with acute medical and mental health conditions are placed, reviewed medical housing unit logs, and reviewed medical records.

**Findings:**

My review showed that patients placed in the medical housing area do not receive timely and appropriate care for their serious medical conditions, resulting in preventable hospitalizations and suffering. Because any inmate at EMCF has the potential to suffer from an acute injury or condition requiring medical care, the inadequacies of infirmary care subject the whole population at EMCF to a substantial risk of harm.

The EMCF infirmary has 10 beds. Since my last site visit in 2016, infirmary room windows have been replaced, improving visibility into the cells. However, there are no nurses stationed in this area and still no functional call system for patients to contact health care staff for a routine or urgent complaint. Thus, infirmary patients are not within sight or hearing of health care staff as required by NCCHC standards. This should be remedied by the installation of a functional call system.

Despite my prior findings, MDOC leadership appears to be shockingly neglectful of this problem. Dr. Gloria Perry, MDOC's chief medical officer, testified at trial that she believed patients held in the medical unit had access to individual call buttons they could carry with them to summon assistance, which is incorrect. As noted in my last report, one infirmary room (521) still has a bed with a rail, more than two years later. This poses a serious risk to suicidal patients, who may use the rail as a tie-off point for attempted hangings. This should be removed and any cell in which any suicidal patient may be housed should be free of any similar risks.

Review of medical housing unit logs from December 2017 to September 2018 show that the majority of patient admissions to the unit are for psychiatric reasons. Lengths of stay (LOS) vary from 24 hours to over 4 months. Patients are admitted for medical reasons including to maintain NPO (nothing by mouth) status prior to procedures or surgery; following discharge from the hospital, and for other medical reasons such as weight loss and wound care.

At the last site visit in 2016, Centurion's Infirmary Care policy was consistent with NCCHC standards for patients requiring infirmary level care and included the following elements:

- Infirmary care, when provided, is appropriate to meet the serious needs of patients.
- The policy defines the scope of medical, psychiatric and nursing care provided in the infirmary setting.

- Patients are always within sight or hearing of a qualified healthcare professional.
- Admission and discharge from the infirmary can occur only on the order of a physician or other health care staff where permitted by virtue of his/her credentials and scope of practice.
- The frequency of physician and nursing rounds in the infirmary is specified based on clinical acuity and the categories of care provided.
- A complete inpatient health record is kept for each patient and includes:
  - Admitting order that includes the admitting diagnosis, medication, diet, activity restrictions, diagnostic tests required, and frequency of vital sign monitoring and other follow-up.
  - Complete documentation of care given.
  - The medication administration record.
  - A discharge plan and discharge notes.
- Patients with an illness or diagnosis requiring skilled care for daily monitoring, medication administration, specific therapies or assistance with activities of daily living above the level of typical outpatient or home care are admitted or transferred to an infirmary setting.
- Sheltered housing provides a protective environment that does not require 24-hour nursing care. Sheltered housing is equivalent to home care for those not confined to an institutional setting.

Since my 2016 report, Centurion subsequently changed the Infirmary Care policy to state that EMCF provides only sheltered housing, and not infirmary level care. This might be appropriate if EMCF never had patients requiring infirmary level care, but this is not the case.

As described in the updated policy, the scope of sheltered housing care is no different from the scope of infirmary-level care as defined in the previous policy (*e.g.*, patients needing intravenous fluids, etc.). The only elements in the policy that have changed are the requirements of health care staff related to admission, monitoring and discharge from the Infirmary. According to the new policy, registered nurses may admit, monitor and release of patients from the sheltered housing for an unspecified period of time without any physician or nurse practitioner involvement.

*In other words, Centurion's policy change does nothing except reduce the level of oversight by more experienced and qualified medical professionals, allowing patients to be in medical housing for indefinite periods of time without routine monitoring by a physician or nurse practitioner.* The policy changes increase the likelihood of inadequate care, exposing all patient who are housed in the medical unit or may be housed there in the future (i.e., the whole prison population) to a substantial risk of harm. In my review, I identified many cases where this risk manifested in actual failures of infirmary care.

Infirmary level care patients often are patients with special health needs for which the Patients

with Special Health Needs policy applies.[7] This policy requires an individualized treatment plan for each patient and applies to patients requiring assistance with activities of daily living and those with recent hospitalizations or emergency room care. The changes in the Infirmary Care policy are inconsistent with the Special Health Needs policy to document an individualized treatment plan.

Though the Infirmary Care policy creates a serious risk by allowing patients to go without assessments by physicians or nurse practitioners, an analysis of medical records reveals seriously inadequate care even where a provider does see patients. Among other things this is caused by a systemic failure to ensure that the doctor's orders are being carried out and patients receive necessary follow-up, which is exemplified by the following case.

**Patient #11**

- On June 5, 2018, a 25-year-old man reported that his right leg was swollen and painful. On June 5 and 6, 2018, a nurse practitioner ("NP") saw the patient, who reported that his leg turned purple and he thought he had a blood clot. The NP consulted Dr. Arnold, who ordered a Doppler ultrasound and to start the patient on coumadin (a blood thinner). However, there is no Doppler report in the record and it's unclear whether it was performed. The NP did not order coumadin at that time, which is appropriate since there was no diagnosis of a blood clot in the patient's leg.

- On June 8, 2018, the patient submitted a SCR stating (again) that he thought he had a blood clot. His right leg was purple and very hot, and he was having trouble walking. The next day, an NP saw the patient but did not palpate the patient's leg for tenderness, induration or measure the size of his calf, nor did the NP address the previous order for doppler ultrasound (which, it appears, was never performed). The NP ordered an antibiotic and did not schedule a return visit.

- On June 12, 2018 – a week after the patient initially reported his right leg pain and swelling – Dr. Arnold saw the patient and sent him to the hospital, where he was diagnosed with a large abscess. The patient underwent surgical debridement leaving a 4.5 cm x 4.0 cm cavity on his right lower leg.

- On June 15, 2018, the patient was discharged from the hospital with orders for antibiotics and daily wound care. A nurse practitioner ordered daily wound care but did not document complete admission orders addressing diet, activity, frequency of vital signs, and clinical criteria for notifying the provider (*e.g.*, fever, recurrent signs of wound infection, etc.). Admission orders constitute the treatment plan to be implemented and the means to monitor the patient to determine whether his condition is improving. By failing to document complete admission orders the providers exposed the patient to a

---

[7] Centurion Policies and Procedures. Patients with Special Health Care Needs. G-02.

serious risk that his condition would worsen without anyone noticing or referring the patient to a provider.

- Between June 15 and 18, 2018, nurses did not document any patient assessments, including vital signs, pain severity, and descriptions of the patient's wound. Providers did not make routine rounds on the patient (*e.g.* daily, every other day, etc.) to determine whether the treatment plan was being implemented and the patient's condition improving. On June 20, 2018 a nurse practitioner described the patients' wounds as being yellowish with no drainage.

- On Saturday, June 23, 2018, a nurse practitioner noted the patient's leg wound had a moderate amount of blood, pus and foul odor. The patient reported pain 10 of 10 in severity. The patient was transported to the hospital where the surgeon noted necrotic tissue within the wound. The patient underwent a second surgical debridement. On June 25, 2018, the surgeon sent a letter to EMCF stating that the patient reported that for the first week staff did not pack his wound. It appears that the surgeon was sufficiently concerned by this report of inadequate wound treatment to raise the concern in writing so that it would not happen again.

- On June 27, 2018, back at EMCF, a nurse practitioner saw the patient following hospital discharge and ordered antibiotics. There was no order for admission to the infirmary with accompanying orders for vital signs, etc., which should be a standard practice in this situation to ensure the patient's condition was being properly monitored.

- On June 28, 2018, now more than three weeks after the patient's initial report, Dr. Arnold ordered wound care, and an RN documented that the patient still was complaining of pain 10 of 10 in severity. The patient was given an injection of Toradol and Tramadol was ordered for his severe pain.

- From June 29 until July 2, 2018, nurses did not document any wound care. On June 30, 2018 an NP saw the patient, who – still – complained of pain 10 of 10 in severity. He reported that his last dose of Toradol was the prior day and that his crutches were taken away from him because he used them to beat on the infirmary door to get something for pain. On July 2, 2018, the patient was the subject of an interdisciplinary meeting because the charge nurse discovered he was putting toilet paper in his wound because, the patient reported, the wound was draining and required packing – the same concern that the surgeon had raised in the letter he sent to EMCF a week before, on June 25. The physician wrote an order to perform wound care twice daily.

- On July 3, 2018 an RN documented that the patient's wound had purulent drainage and foul odor but did not report this to Dr. Arnold or a nurse practitioner. However, from July 4 to 7, 2018, nurses did not document any wound care or any description of the patient's wound.

- On July 12, 2018, Dr. Arnold saw the patient and documented that the wound had good granulation with no purulent drainage, but when he applied pressure that chunks of paper came out. This description of the wound is inconsistent with those before and after this date. Tramadol 50 mg was ordered twice daily with wound care, but the first dose was not given until July 15, 2018, and was not given on July 18, 19, or 20.

- On July 13 and 14, 2018, nurses again documented no wound care nor any description of the wound. On July 17, 2018, a nurse expressed pus from the wound; a provider saw the patient but did not order any additional treatment. On July 18 and 19, 2018, a nurse again documented purulent drainage from the wound. On July 23, 2018, Dr. Arnold sent the patient back to the hospital where he underwent debridement of his wound for third time.

- It appears that complications from this condition persisted for several months. On October 15, 2018 a NP saw the patient who reported recurrent cellulitis on his right leg. The NP stated Bactrim, bacitracin and wound care. However, the patient was a "no show" for wound care on October 17, 2018 and was not brought by custody on October 20 due to a statewide lockdown. The patient was transferred to another facility on or about October 25, 2018.

**Assessment:** This case demonstrates multiple problems, beginning with delayed diagnosis of his leg abscess. Following release from the hospital he was placed in the infirmary with no treatment plan other than wound care. While in the infirmary he was neglected. Nurses did not perform wound care and vital signs as ordered but neither the physician nor nurse practitioners noted or addressed that medical orders were not implemented and that the patient's condition was worsening. The patient reported severe pain but was not adequately treated for his pain. Even when the physician ordered Tramadol twice daily with wound care nurses did not administer the medication for 3 days thereafter. There are no call buttons in the infirmary for the patient to notify staff of his medical needs and the patient resorted to using his crutch to bang on the infirmary cell door. The failure to provide this patient adequate care is shocking and resulted in his being hospitalized three times for surgical debridement. Clearly this patient required infirmary level care with close medical and nursing monitoring and treatment. Although it is impossible to say with certainty what the outcome of the patient's condition would be had he received proper care, it is very likely that medical staff's inattention and neglect caused an extraordinarily painful wound to linger for weeks, perhaps months, and required multiple surgeries that could have been avoided. It is a good example, in which bad medical care costs more than good medical care. Finally, the patient missed medically necessary care because of a statewide lockdown, illustrating an issue common to many patients where decisions made by security staff result in patients being unable to receive necessary medical attention – a state of affairs that clearly creates a risk of harm to the whole population.

## 4.      Urgent Care and Hospitalizations

Adequate care for patients with urgent complaints and hospitalizations requires that patients with urgent conditions have timely access to a medical provider who can diagnose and treat their conditions. If the patient requires transport to a hospital, the transport vehicle should be adequately equipped and supplied to treat the patient (*e.g.* oxygen, intravenous fluids) should the patient's condition deteriorate during transport to the hospital. Following hospitalization, the facility should ensure that hospitalization records and discharge recommendations are timely reviewed and implemented. If the facility physician does not order hospital discharge recommendations, the physician should document the clinical rationale for the departure and monitor the patient to ensure that the patient's condition has improved.

To review access to urgent care, I selected records from the Centurion emergency room (ER) and hospital admissions logs, and reviewed each record for the timeliness and appropriateness of emergency response, the timely review of hospital reports and the timely follow-up with hospitalized patients. For patients with exacerbations of their chronic diseases, I reviewed the record to determine whether providers timely monitored and treated patients in accordance with their disease control.

**Findings:**

My review showed that EMCF patients did not receive timely and appropriate care for their urgent medical conditions, resulting in preventable hospitalizations. Facility lockdowns were a factor in delayed access to care.

My review also showed that registered nurses typically saw patients upon return from the emergency department or hospital, but that provider follow-up did not timely take place. In some cases, this resulted in readmission of patients to the hospital. January 2018 Offsite/Hospital CQI studies show that an emergency report was available in only 75% of records and that a return from hospital nursing or provider assessment occurred in only 75% of records. The failure to timely receive emergency department and hospital reports creates a risk that recommended medical care for urgent medical conditions will not be timely addressed and implemented.

The following cases are examples of these issues:

**Patient #1**

- On October 23, 2018 I interviewed a 24-year-old man with a history of asthma who was housed in administrative segregation (5A). A statewide lock down had been in effect since Friday October 19, 2018. He reported that on October 22, 2018 he was acutely ill with fever, nausea and vomiting and requested medical attention. He stated that officers would not take him to medical so he set fire to his cell.

- Review of his medical record showed that on October 22, 2018 at 3:17 pm the MH nurse practitioner saw him at his cell. The NP observed evidence of a fire outside his cell. Security put out the initial fire and he set another fire. She noted that he was agitated and reported that he was sick with a cold and has been throwing up all day, unable to keep any food down. He also complained of chest pain and feeling hot. He said he needed to go to medical. She documented:

  *"It is clear that he is setting fires to get the attention of staff that he needs to go to medical. This provider discussed with the security staff, include Captain Jones, CO Lawson and CO Stribling. Captain Jones is the captain of the long-term segregation unit and CO Lawson was assigned to the pod today, unit 5A. CO Stribling is working on 5; however, on a different pod. She was present during the discussion of him setting the fire.*

  *Primary concerns, he has asthma and if he has a cold combined with asthma, his setting the fire will only complicate the matter. Will continue to push for him to be escorted to medical for assessment. The facility is on lock down, however, he presents with an emergency. RN James was contacted earlier per this provider, prior to him setting the fire with reports he complained of vomiting, stating he has a cold. She stated he would need to submit a sick call. At this point security and medical have been notified, will leave to them to arrange the final disposition of the patient regarding being escorted to medical."*

- On October 22, 2018 at 9:25 pm a registered nurse saw the patient for complaints of a productive cough, feeling hot and vomiting. The patient's vitals were abnormal, with a temperature of 101.2°F, blood pressure of 178/78 mm Hg, and pulse of 112/minute. His breathing was clear but slightly diminished. The nurse ordered Tylenol and Guaifenesin but did not schedule the patient for medical follow-up. The patient was sent back to administrative segregation.

**Assessment:** Both the failure of officers to escort the patient to medical and the registered nurse to timely see the patient is truly shocking and demonstrates indifference to the patient's serious medical needs. The record supports that the patient was acutely ill and despite his pleas for help, officers would not escort the patient to medical for evaluation. In his desperation he set fires. The MH nurse practitioner attempted to intervene, contacting a nurse who did not see the patient and negotiating with custody to escort the patient to the medical unit for evaluation. The nurse's failure to timely see the patient falls below the standard of care for a registered nurse. When a nurse did see the patient, he had a fever and his blood pressure and pulse were elevated. Despite these abnormal vital signs, the nurse did not contact a medical provider who could diagnose and treat the patient's condition.

**Patient #11**

- On May 13, 2018 this 25-year-old man submitted a SCR stating that he needed medical attention for a burn on the left side of his face as soon as possible. Seven days later, on May 20, 2018 the request was received and triaged. A nurse did not see the patient.

- From May 19, 2018 to May 22, 2018 custody did not transport the patient for medical appointments due to facility lockdown.

- On May 22, 2018 mental health saw the patient and noted that a week ago he had a burn to his face from another inmate throwing hot oil.

- On May 23, 2018 a medical provider saw the patient who reported that another inmate threw hot oil on his face one month ago (sic). The provider described a 5 cm area of erythema crusted with yellow secretions at his left temple. The provider ordered Bactrim and wound care x 14 days.

- On May 24 and May 25, 2018 custody did not escort the patient to medical due to facility lockdown.

- On May 26, 2018 the patient submitted a SCR complaining that his face was draining and he has nothing to put on an open wound. "I am supposed to get wound are once a day and I haven't received it at all." On May 30, 2018 the form was received and triaged. A nurse did not see the patient.

- On May 29, 2018 and May 31, 2018 custody did not escort the patient to medical due to facility lockdown.

**Assessment:** On or about May 13, 2018 the patient suffered a severe facial burn after another inmate threw hot oil on him, but custody did not take him to medical following the assault. His May 13, 2018 medical services request was not timely received, and when it was finally triaged the nurse did not have the patient immediately brought to medical for evaluation of his burn. The patient did not receive ordered medical care because custody failed to escort the patient to medical. Burns are extremely painful and subject to infection, and once again, the failure of custody to bring the patient to medical following a severe burn is truly shocking.

In some cases, nurses do not notify providers of patients with signs and symptoms of serious medical conditions. The following case is an example.

**Patient #5**

- This 54-year-old patient has chronic obstructive pulmonary disease. On March 25, 2018,

the patient submitted a SCR form complaining of a headache, sore throat and coughing. On March 26, 2018, a nurse received and triaged the form, and an RN assessed the patient. His weight was 156 lbs, his temperature was 100.3°F, his blood pressure was 108/80 mm Hg, his pulse was 104/minute and his respirations were 20/minute. Oxygen Saturation was 96%. The nurse noted the patient had headache, nasal congestion, sore throat, and painful cough productive of yellow sputum. The patient's throat was red and lungs exhibited scattered wheezes. However, the nurse did not note the patient's history of asthma/COPD. The patient was given a cold pack and cough drops and told to follow-up as needed and in 5-7 days if he had no improvement. The nurse did not consult a medical provider.

- On March 27, 2018, at 5:53 pm a nurse practitioner documented that a nurse informed her the patient had been diagnosed with pneumonia and currently has a fever of 104.4°F. Dr. Arnold went to the housing unit and ordered the patient sent to the emergency department.  At 6:00 pm it was documented that the patient had chest pain, shortness of breath, and a temperature of 105° F. His blood pressure was 123/79 mm Hg, his pulse was 130/minute, and his oxygen saturation was 80%, which increased to 94% when given oxygen as ordered by the NP. The patient was sitting in a wheelchair and appeared weak with difficulty breathing; his respirations were labored, breathing was coarse, and he had an irregular heart rate.

- The patient was sent out at 7:15 pm via ambulance for evaluation and treatment of pneumonia.  Dr. Arnold did not document an examination of the patient.

**Assessment:** The nurse should have notified the provider of the patient's abnormal vital signs and symptoms of COPD exacerbation on March 26, 2018.

## 5.    Chronic Disease Management

Incarcerated populations have a high prevalence of chronic diseases such as diabetes, hypertension, asthma, chronic obstructive pulmonary disease, seizure disorders, and HIV and hepatitis C infection. Routine monitoring and treatment are necessary to prevent the complications of these chronic conditions. The frequency of patient monitoring is determined by the patient's degree of disease control. For example, patients with poorly-controlled hypertension should be monitored more frequently than patients with well-controlled hypertension in order to assess patient's response to the treatment regimen and adjust their medication accordingly. Therefore, it is important that health care staff enroll eligible patients into the chronic disease program upon arrival so they can be timely monitored and treated.

At each visit, providers should perform a disease-pertinent review of systems (ROS) and physical examination for each chronic disease. Provider should reference labs that support assessments of disease control and treatment plan. Follow-up intervals should be based upon the patient's disease control.

I evaluated the management of patients with chronic diseases at EMCF by reviewing applicable policies and procedures, chronic disease tracking logs and 38 chronic disease encounters in 23 patient records.

**Findings:**

My review showed that EMCF patients do not receive timely and appropriate care for their chronic diseases. Consequently, some patients experienced poor disease control, resulting in risk of harm from complications and preventable hospitalizations.

Centurion maintains a chronic disease tracking log that includes the patient's name, types of chronic diseases, disease control, date of the most recent appointment and the target date for the next appointment. At the time of my 2018 site visit there were 670 patients enrolled into the chronic disease program, or approximately 50% of the population.

Dr. Arnold and nurse practitioners treat chronic disease patients. Record review showed that providers did not consistently perform disease pertinent review of systems (ROS), particularly for hypertension and diabetes. For example, for hypertension patients, providers did not consistently ask about chest pain, shortness of breath, palpitations or ankle swelling to assess for end-organ damage from hypertension. When patients do report symptoms, providers do not explore the onset, frequency and severity of symptoms or inquire about them at follow-up visits. Likewise, providers did not perform a diabetes ROS by asking about increased thirst, urination and weight loss, or episodes of hypoglycemia, which are symptoms of poorly controlled diabetes. Providers usually asked about asthma symptoms using the electronic medical record (EMR) template.

Providers documented physical examinations using the EMR template. With some exceptions, the majority of provider examinations were not pertinent to the patient's disease and were unchanged from encounter to encounter. For example, for hypertension patients, providers did not document heart sounds; for diabetic patients providers did not document foot exams. Providers also documented examinations that likely did not take place such as documenting that the patient had no hernia at every encounter. This reflects two major problems: providers do not perform examinations that are appropriate for each patient's conditions; and the EMR records are unreliable because they document examinations that likely did not take place. I interviewed a patient who reported that Dr. Arnold does not stand up to examine him, but slides his chair over to the exam table to perform examinations. This approach to physical examinations limits their utility and increases the risk that the provider may miss crucial information.

Further, providers did not order labs to be drawn in advance of the chronic disease visit to have clinically pertinent information available (*e.g.* hemoglobin A1C for diabetics) and did not reference labs in the note. Providers documented "I have reviewed labs with the patient" even when there were no recent labs performed, again illustrating a lack of diligence in ensuring the EMRs are complete and accurate. Neither did providers consistently perform peak expiratory flow rates (PEFRs) for patients with asthma and chronic obstructive pulmonary disease which is an objective measure of disease control. Providers did not timely follow-up abnormal labs even when labs showed the patients disease was poorly controlled. MARs show systemic problems with administration of chronic disease medications.

In summary, due to the lack of timely access to treatment due to custody failure to escort patients to medical appointment and facility lockdowns; inadequate provider evaluations, lack of timely provider follow-up and adjustment medication regimens for patients with poorly controlled chronic diseases, and failure to receive ordered medications, EMCF chronic disease patients are at risk of harm from their poorly controlled chronic diseases, including heart attacks, strokes, loss of vision, and death.

The following cases are exemplary of these problems:

**Patient #8**

- A 38-year-old patient's medical history included HIV infection, hypertension, hypothyroidism, asthma and major depression.

- On March 12, 2018 labs showed the patient's hypothyroidism was poorly controlled, with a thyroid stimulating hormone level of 90, where the goal level was 0.17 to 4.5. Providers did not address this extremely abnormal lab.

- On August 13, 2018 Dr. Arnold saw the patient. He performed an asthma ROS but did not inquire about cardiovascular (*e.g.* chest pain, shortness of breath), thyroid (*e.g.* weight loss or gain, cold intolerance, etc.) or HIV symptoms (fever, nausea, diarrhea,

etc.) to assess each of the patient's diseases. He did not examine the patient's thyroid. He did not measure PEFR's or reference the patient's abnormal TSH. He assessed the patient's hypothyroidism as being in good control despite the highly abnormal lab.

- I interviewed the patient who reported that he had recently lost 15-20 pounds. He reported he discussed it with Dr. Arnold, who did not perform any medical evaluation but just told him to "eat more from the canteen."  Records show the patient lost 15 pounds between mid-August and late October 2018.

- Review of the patient's July to September 2018 medication administration records shows multiple occasions in which nurses did not document administering the patient his HIV, hypertension and thyroid medications. He reported that he refused medications for a period of time due to concerns about confidentiality of his HIV infection.

**Assessment:** This patient has not received timely and appropriate follow-up for his poorly controlled hypothyroidism. Dr. Arnold has not medically evaluated the patient's weight loss. The patient is prescribed levothyroxine 300 mcg for his hypothyroidism which is a high dose. If the patient was previously non-compliant but now taking his levothyroxine, his weight loss may be due to receiving too high a dose of levothyroxine. However, labs must be performed to evaluate his disease control. I referred this case to the Health Services Administrator for follow-up.

**Patient #6**

- A 52-year-old patient's medical history includes diabetes, hypertension, asthma and latent TB infection. He was prescribed nitrostat for a history of chest pain.

- In July 2017 the patient's chronic disease appointments were rescheduled 4 times due to lack of custody escorts.

- In August 2017 finger stick blood sugars showed the patient's diabetes was not well controlled (FSBS=200's and 300's).

- On August 26, 2017, a nurse practitioner saw the patient who reported not receiving chronic disease medications because he did not have an ID badge. His blood pressure was elevated, at 155/97 mm Hg. The NP performed no cardiovascular or diabetes ROS. The NP did not reference fingerstick blood sugars showing the patient's diabetes was poorly controlled and made no adjustment to the patient's diabetes medications. The NP ordered labs and planned to see the patient in 3 months. This follow-up visit did not occur.

- On September 17, 2017 labs showed the patient's diabetes was poorly controlled, with hemoglobin A1C levels of 10.8%, where the goal is 7% or less. Neither the physician or

nurse practitioner saw the patient for follow-up of his diabetes.

- On March 8, 2018, labs showed the patient's diabetes was improved (HbA1C=8.6%) but not at the goal of 7% or less. Neither the physician or nurse practitioner saw the patient for follow-up of his diabetes.

- On March 18, 2018 Dr. Arnold saw the patient and performed a CV ROS noting the patient complained of chest pain, SOB (shortness of breath), DOE (dyspnea on exertion) and orthopnea (shortness of breath when lying down). His blood pressure was 145/77 mm Hg. Dr. Arnold referenced the patient's HbA1C at above 10% and increased the patient's insulin. He attributed the patient's symptoms to chronic bronchitis but did not order an EKG or chest x-ray to rule out cardiac causes.

- On April 5, 2018 an NP saw the patient for follow-up. His blood pressure was 149/88 mm Hg. The NP did not perform a cardiovascular or diabetes ROS. The patient had asthma symptoms but the NP did not measure PEFRs. The NP did not reference labs showing the patient's diabetes was not at goal. The NP did not address the patient's poorly controlled hypertension and made no adjustments to his diabetes or hypertension medication regimen.

- On April 11, 2018 ophthalmology saw the patient and diagnosed him with retinal vein occlusion and recommended better blood sugar and blood pressure control; and carotid ultrasound to evaluate for cardiovascular disease. He was advised to return in 4 months. Dr. Arnold did not address this report.

- On July 10, 2018 Dr. Arnold saw the patient. No CV or diabetes ROS. He specifically did not ask about previous symptoms of chest pain, SOB, DOE and orthopnea. The patient reported not having a short-acting inhaler and having nighttime asthma symptoms. BP=112/80 mm Hg. Dr. Arnold did not reference the patient's fingerstick blood sugars but assessed his diabetes in fair control and made no changes to his diabetes regimen.

- On July 12, 2018 an EKG was abnormal suggesting early repolarization, pericarditis or injury. Dr. Arnold signed that he reviewed the EKG but made no comment.

- On July 13, 2018 labs showed the patient's diabetes control worsened (HbA1C was 8.8%, goal at or below 7%). Neither the physician or nurse practitioner addressed this abnormal lab.

- On September 26, 2018 Dr. Arnold saw the patient again. The patient reported chest pain and shortness of breath. He did not explore the patient's chest pain. No diabetes ROS. The patient had lost 20 pounds in 2 months but Dr. Arnold did not discern whether this was intentional or unintentional weight loss. His blood pressure was 128/90 mm Hg. No peak expiratory flow rate was measured, but his condition was nonetheless

documented "consistent with asthma". He documented the patient did not have a hernia. He increased the patient's insulin and planned to see the patient in 3 months.

- On October 15, 2018 Dr. Arnold saw the patient. His blood pressure was 154/92 mm Hg. No CV or diabetes ROS. Diabetes assessed as being in poor control and he increased his insulin but did not address the patient's poorly controlled hypertension.

- On October 25, 26, and 30, 2018 custody did not escort the patient for lab appointments due to facility lockdown.

**Assessment:** Providers have not conducted adequate evaluations with review of systems and labs; and not timely adjusted treatment for poorly controlled diseases. Of concern is that Dr. Arnold has not evaluated the patient's complaints of chest pain and shortness of breath or addressed his abnormal EKG reported in July. The patient is overdue for diabetes labs but custody has not escorted the patient to medical due to facility lockdowns. Dr. Arnold did not address ophthalmology recommendations for carotid ultrasound. Due to the patient's poorly controlled diabetes and hypertension and lack of follow-up of ophthalmology recommendations, the patient is at risk of heart attack, stroke and death. This patient has not had timely and appropriate treatment for his serious medical needs.

**Patient #7**

- This 44-year-old patient with HIV and hepatitis B and C infection transferred to EMCF on February 9, 2018. At CMCF the patient tested positive for hepatitis C antibody but was not tested for a detectable HCV viral load to determine whether the patient was chronically infected and to be evaluated for treatment.

- On February 9, 2018 an EMCF RN performed an intrasystem transfer screen but did not note the patient had HIV or hepatitis B and C. The patient's HIV and mental health medications were not ordered until February 12/18 and not administered to the patient until February 22/18.

- An EMCF provider did not see the patient in 30 days according to policy. On March 14/18 an HIV provider saw the patient via telemedicine. The provider planned to stop an antibiotic (Bactrim) but did not discontinue the order it in the EMR, and the pharmacy continued it on his MAR.

- On May 14, 2018 Dr. Arnold saw the patient for HIV, hepatitis B and C infection. Dr. Arnold did not perform a GI ROS and further evaluate the patient's hepatitis B and C infection. The patient had a detectable HIV viral RNA (120/copies) but Dr. Arnold misinterpreted the test as undetectable.

- On June 13, 2018 the HIV provider saw the patient but did not perform an HIV or hepatitis

ROS.

- On August 17, 2018 a nurse practitioner saw the patient but did not perform a hepatitis ROS and did not review labs. The NP ordered labs and planned to see the patient in 6 months.

- On September 4, 2018 the HIV provider saw the patient and noted he had HBV and HCV coinfection. He changed the patient's HIV medication to a different formulation and planned to see the patient in 3 months.

**Assessment:** This HIV patient did not receive continuity of medication upon arrival and was not seen within 30 days of arrival according to Centurion policy. The patient has three infectious diseases that are being separately managed by an HIV telemedicine provider and EMCF providers. HIV infection may accelerate the progression of HBC and HCV disease and should be taken into consideration with respect to treatment decisions, as there is overlap in medications used to treat HIV and HBV infection. Providers have not medically evaluated the patient to determine if he has chronic hepatitis C infection and evaluate him for treatment. The patient has not had adequate treatment for his known chronic hepatitis B infection which may result in cirrhosis and liver failure.

**Patient #2**

- This 35-year-old patient has a history of severe hypertension, hyperlipidemia and bipolar disorder.  The patient had a strong family history of hypertension. His father had two strokes and his mother has kidney disease due to hypertension. He was housed in administrative segregation.

- This patient has multiple hypertensive emergencies requiring emergency department visits. The patient reported that he took medications "when the nurses give them to him". Nurses documented high blood pressures noting that "the patient had not received his blood pressure medications today (May 26, 2018)."

- Dr. Arnold ordered that one medication (Coreg) should be discontinued when another medication arrived from the pharmacy but nurses committed a medication error by continuing to give both medications resulting in medication side effects (headaches) and the patient refused his medications. The patient did not receive blood pressure monitoring as ordered, in part due to facility lockdowns, but even after the patient was placed in Sheltered Housing.

**Assessment:** This patient had malignant hypertension which places him at risk of heart attack and stroke but was not adequately monitored and treated for his severe hypertension. Cardiology recommendations were not fully implemented to rule out an adrenal gland tumor which is a treatable condition.

## 6.      Specialty Services

Specialty services are provided to patients that require specialized medical care beyond what is provided by a primary care provider (*e.g.*, a physician or nurse practitioner). Services include those such as cardiology, ophthalmology and orthopedics. Many patients requiring specialty services tend to be of higher medical acuity and are at risk of harm if access to specialty care is delayed, or providers do not timely address and implement specialist recommendations.

**Findings:**

My review of specialty services was limited to review of the consultation log and specialty services found in records of patients with chronic diseases. In reviewing specialty services, I determined whether the service occurred timely following the determination that the service was needed. I also determined whether a consultant report was received following performance of the service and whether a physician timely reviewed the report and met with the patient to discuss the findings and recommendations. I also assessed whether the physician developed a treatment plan and monitored the patient to determine if, following implementation of the treatment plan, the desired clinical outcome was achieved.

The consultation log showed a significant number of reports were not received, which is both a clinical and medical records issue. Review of records showed lack of follow-up of consultation recommendations which may be due in part, to the lack of timely reports. I also found that providers do not consistently meet with the patient to discuss consultant findings and recommendations and do not monitor the patient to ensure that ordered recommendations are timely implemented. The failure to do so, has resulted in actual and ongoing risk of harm.

Reports and other documentation from specialty consults, and other offsite visits or care provided by non-EMCF staff should be timely obtained by EMCF staff, reviewed with clinically appropriate action taken, and filed in the EMR.

The following are examples of the above issues:

**Patient #6**

- This 52-year-old patient has diabetes, hypertension and retinal artery embolism.

- On April 3, 2018 the ophthalmologist saw the patient and diagnosed him with embolism and thrombosis of unspecified retinal artery and ordered an echocardiogram and carotid ultrasound to assess for cardiovascular disease. On April 3, 2018 Dr. Arnold reviewed this report but did not meet with the patient and did not order the tests.

**Assessment:** Dr. Arnold did not address ophthalmology recommendations for echocardiogram and carotid ultrasound that may reveal a cause of the patient's retinal artery embolism and

may put the patient at risk for other emboli that may cause a stroke.

**Patient #10**

- This 51-year-old patient has hypertension, latent TB and hepatitis C infection and schizophrenia. Glaucoma was not listed on his Problem List.

- On April 23, 2018 ophthalmology saw the patient and diagnosed him with right eye retinal vein occlusion with macular edema and left eye retinal vein occlusion, stable. The patient had a history of glaucoma for 1 year. Ophthalmology noted the patient was prescribed Timolol eye drops twice daily for his glaucoma. The ophthalmologist administered injections to the patient's right eye. Neither Dr. Arnold nor a nurse practitioner signed the ophthalmologist's report indicating that they were aware of the ophthalmologists' findings and recommendations

- On May 1, 2018 and June 26, 2018, Dr. Arnold saw the patient for chronic disease management and did not note that he had glaucoma and should have been prescribed Timolol eye drops.

- On June 6, 2018 ophthalmology saw the patient and performed eye injections. An EMCF provider did not sign the report.

- On June 26, 2018 a NP saw the patient for chronic disease management but did not address the recent ophthalmology findings and recommendations.

- On July 12, 2018 ophthalmology saw the patient again and recommended continuing Timolol eye drops. The physician saw the patient but did not note ophthalmology recommendations for Timolol and did not order the medication.

- On September 19, 2018 Dr. Arnold saw the patient for chronic disease management but did not note that the patient had glaucoma and did not order Timolol eye drops.

**Assessment:** This patient has severe eye disease requiring ongoing ophthalmology treatment. However, Dr. Arnold and the nurse practitioner are unaware that the patient has glaucoma and have not documented it on the Problem List. On three separate occasions, neither Dr. Arnold nor the nurse practitioner addressed ophthalmology recommendations to continue Timolol which increases the patient's risk of worsening glaucoma and vision loss. I discussed this case to the health services administrator for follow-up.

**Patient #9**

- On July 10, 2017 urology saw this 51-year-old patient for an increased prostate specific antigen (PSA) test of 5.25. Urology recommended repeat PSA and follow-up in one year.

- Dr. Arnold saw the patient on April 9, May 24, May 18, and September 4, 2018 but never addressed the urology recommendation.

**Assessment:** The patient has not been timely evaluated for his elevated PSA, which is an indicator of possible prostate cancer. If the patient has undiagnosed and untreated prostate cancer, he is at risk of harm, including death. I referred this case to the Health Services Administrator.

**Patient #2**

- This 35-year-old patient has a history of severe hypertension, hyperlipidemia and bipolar disorder. The patient had a strong family history of hypertension. His father had two strokes and his mother has kidney disease due to hypertension.

- The patient had multiple hypertensive emergencies requiring emergency department visits with extremely high blood pressures such as 240/130 mm Hg. The patient was in administrative segregation and reported to hospital physicians that he took his medications "when the nurses brought it to him" (suggesting that the medications were not always provided). Dr. Arnold referred the patient to the cardiologist. On July 26, 2018 cardiology saw the patient and ordered a Lexiscan cardiolite stress test, echocardiogram, and renal ultrasound. Cardiology also recommended labs to rule out an adrenal gland tumor (pheochromocytoma).

- On July 30, 2018 Dr. Arnold ordered recommended diagnostic tests that were performed. However, lab tests ordered to rule out an adrenal gland tumor were not performed.

**Assessment:** The physician did not monitor the patient to ensure that all recommended tests were timely performed. This occurred despite the fact that these tests were specifically recommended by a cardiologist in order to determine whether the patient was suffering from a serious but treatable condition such as an adrenal gland tumor.

## 7.   Clinic Space, Equipment and Supplies

Providing adequate health care requires an infrastructure to deliver care. This involves having adequate numbers of medically equipped and supplied examination rooms, as well as medical beds (*e.g.* infirmary) to provide care for acutely ill medical and mental health patients. To assess this area, I toured the main medical and satellite clinics, infirmary, and dental.

**Findings:**

**Infirmary**
There are 10 beds in the infirmary. EMCF opened an acute treatment unit, which is a step-down from the infirmary. The windows of infirmary cells have been replaced providing better visibility into the rooms. There are still no call buttons enabling patients to notify health care staff of their routine or urgent health needs. In room 521, the bed has a rail from which a suicidal inmate could hang himself, creating an ongoing risk of harm to patients.

**Acute Treatment Unit (ACU)**
Since the last report, EMCF has opened up an Acute Treatment Unit for patients needing stabilization due to severe, emotional and behavioral crisis but who are not actively engaging in self-injurious behavior. The ACU provides flexibility in use of infirmary beds and potentially frees up bed space for medical patients.

**Clinic Examination Rooms**
As noted in previous reports, examination rooms in the main clinic are not standardized with respect to medical equipment and supplies. One exam room did not have an oto-ophthalmoscope or ear speculums. The sphygmomanometer on the wall was in disrepair. In Cabinet handles are broken and supplies are disorganized. In a second room, the physician maintained a personal prescription and cell phone in a drawer that was not secured.  A nurse in a satellite clinic reported that there were no peak flow meters to assess patients with acute or chronic respiratory conditions.

**Dental Clinic**
Dental chairs have been refurbished but the headrest of one chair was torn, preventing effective disinfection. No improvements have been made to the dental lab where the x-ray developer and file cabinets are rusted and cabinetry falling apart. As noted in the last report, dental instruments, including sharp instruments are unsecured. As of October 23, 2018, the sharps log showed that dental staff had not counted sharps since October 10. 2018. This presents a risk that inmates would gain access to sharps that could be used as weapons against staff or other inmates.

In summary, several deficiencies in clinic space, equipment and supplies described at this site visit have been described in previous reports and yet persist. This reflects a failure of MDOC and Centurion oversight and should be remedied.

## 8.      Intrasystem Transfer Screening

At EMCF, patient access to health care begins following transfer from another correctional institution. Nurses conducting transfer screening are to identify an inmate's health care needs and facilitate continuity of care. This includes noting the patient's medical, dental and mental health conditions, current medications, pending or recently completed specialty services, and need for enrollment into the chronic disease program.

**Findings:**

At the previous site visit, review of this area showed that nurses did not perform the medical screening process in the medical clinic with access to the medical record so the nurse could review the patients' medical history and current medications. This resulted in lack of continuity of care.

My findings are essentially unchanged from the last visit. Record review shows that when patients transfer into EMCF, nurses frequently fail to document a patient's chronic diseases and patients do not receive continuity of their chronic disease and mental medications. Chronic disease patients frequently are not seen within 30 days as required by Centurion policy.  This creates a substantial risk that chronic disease patients will fall through the cracks and may go without necessary treatment, which may cause the exacerbation of serious chronic conditions.

The following cases are examples:

**Patient #3**

- A 30-year-old patient with HIV infection transferred to EMCF on July 26, 2018. At 4:37 pm a nurse medically screened the patient who denied medical or mental health complaints. The nurse noted his diagnosis of HIV infection and planned to arrange continuity of his medications. However, the patient did not receive his HIV medications until July 30, 2018 and did not receive his mental health medication until July 31, 2018. Lapses in HIV treatment may lead to viral resistance medications rendering HIV medications ineffective against HIV and harming the patient.

**Patient #7**

- A 44-year-old patient with HIV, hepatitis B and C infection transferred to EMCF on February 9, 2018. On February 9, 2018 at 8:00 am an RN screened the patient. The nurse did not document his diagnoses of HIV and HCV infection. The patient stated he has glaucoma of the left eye. The nurse did not document the patient's medications or need for enrollment into the chronic disease clinic. The patient's HIV and mental health medications were not ordered on the day of arrival. On February 11, 2018 the patient's HIV medications were ordered and on February 14, 2018 the patient's mental health

medications were ordered. February 2018 MARs showed the patient did not receive HIV medications until February 22, 2018. Once again, lapses in HIV treatment may harm the patient.

The fact that these patients had such lapses in continuity of care for their serious medical conditions created a substantial risk that they would suffer serious harm from their lack of treatment. These lapses should not occur, and are evidence of a systemic deficiency in the provision of care for transferred inmates, subjecting anyone in that position to a substantial risk of serious harm.

## 9.    Access to Dental Care

To assess access to dental care, I inspected the dental clinic, interviewed the dental staff, and reviewed logs.

The first step in access to dental care is for nurses to initially assess patients' dental complaints during sick call encounters to determine the urgency of referral for dental treatment. For patients with severe pain and/or infection, the nurse should contact a dentist or medical provider to determine the need for immediate evaluation and treatment, or to receive orders for antibiotics and pain medication pending a dental appointment.

**Findings:**

Dental staff reported that three different dentists come to EMCF from 8:00 am to 4:30 pm Wednesday to Friday. Another dentist works Monday to Saturday, primarily in the evenings. A description of the dental clinic is noted earlier in this report.

Review of health records show that nurses do not timely see patients with dental pain and facility lockdowns are a contributing factor.

**Patient #11**

- On October 12, 2018 the patient submitted a SCR complaining of dental pain. On October 15, 2018 it was received. On October 15, 2018 a nurse saw the patient and treated his with Tylenol. Referred to dental in less than 7 days. On October 24, 2018 custody did not escort the patient to dental due to the statewide lockdown. Dental rescheduled the patient for November 7, 2018.

**Assessment:** This patient did not receive timely access to dental care in part due to facility lockdown.

**Patient #1**

- On July 26, 2018 he submitted a SCR form complaining of dental pain from his wisdom teeth cutting his gums. On July 27, 2018 it was received by medical. On July 31, 2018 a RN saw the patient who also requested to see mental health. The nurse did not describe the patient's oral cavity and teeth other than to note "no swelling" and the plan was to follow-up with dental to "pull wisdom tooth." On September 27, 2018, two months after his initial report of dental pain, dental saw the patient who noted gum swelling. No x-rays were taken. The dentist treated him with Amoxicillin and Ibuprofen and planned to refer him to an oral surgeon.

**Assessment:** This patient did not receive timely access to care for his dental pain.

**Patient #20**

- This 26-year-old man transferred to EMCF on January 22, 2018. His medical history was unremarkable. He was taking no medications. On May 15, 2018 he submitted a SCR complaining of a severe toothache and inability to sleep. On May 16, 2018 the form was received and triaged, but that day he was not seen due to a facility lockdown. On May 17, 2018 a RN saw the patient and noted that he had left sided dental pain for 2-3 weeks.

- On May 26, 27, 29, and 31, 2018 the patient was not escorted to medical for appointments due to facility lockdown.

- On June 13, 2018 dental saw the patient and noted that tooth #13 required extraction. The patient wanted to save the tooth but was informed the facility does not do root canals. There was no documentation that any x-rays were taken. The dentist premedicated the patient with antibiotics and planned to follow-up.

**Assessment:** The patient was not provided access to dental care.

## 10.    Health Records

The health record is a medical-legal document that records health care staff assessments and treatment provided to individual patients. The purpose is not only to document care provided to the patient, but also to facilitate communication among health care providers to ensure that care is coordinated, efficient and safe. It is important that the record is accurate and complete to prevent medical errors and harm to the patient. For example, it is important that following hospitalization, health records staff obtain a complete hospital report, as it may contain recommendations for follow-up tests, such as CT scans to rule out cancer, or cardiac stress tests to rule heart disease.

I evaluated the adequacy of health records by reviewing patient records to determine if documents were timely reviewed by a health care provider, accurately labeled and scanned into the record, and whether the health record was complete, including documentation of specialty services and hospital reports.

**Findings:**

My review showed that MDOC's electronic medical record templates used to document chronic disease encounters contributes to inaccurate recordkeeping. I also found that consultation reports are not timely received, resulting in delays or failure to review consultant findings and implement recommendations.

MDOC has implemented an electronic medical record program (EMR), Centricity, throughout its correctional system, including at EMCF. Under the system, medical staff are to document all clinical encounters either in the EMR or on paper that is scanned into the EMR in a timely manner, so that the information is readily available to all staff caring for a patient. Timely scanning of health documents into the correct location decreases the risk of medical errors in future treatment.

However, the EMR's design and EMCF's staff's use of the EMR have resulted in dangerously deficient medical recordkeeping. For example, certain components in the EMR do not facilitate the provision of adequate care. Some provider notes (*e.g.*, chronic disease) are prepopulated with information that is not current and, therefore, may lead to inappropriate treatment during subsequent encounters In addition, the EMR template instructions for patients with poorly controlled hypertension are to admit patients to the infirmary or perform daily blood pressure monitoring until the patient's blood pressure is less than 160/100 mm Hg; however, record review shows that medical providers do not follow the EMR template treatment plans. Thus, EMR templates are outdated and/or not followed, and patient health is put at risk.

I found that some MARs are not scanned into the record. This renders the record incomplete and does not permit medical providers to know whether or not patients receive medications for their serious medical and mental health needs.

## 11.    Policies and Procedures

Policies and procedures are one component of an adequate health care system. They provide expectations and guidance to staff to meet the requirements of the health care program. Inadequate policies and procedures often result in lack of consistent and timely care, and increase risks of harm to patients.

To assess this area, I reviewed Centurion's current policies and procedures, which are based on National Commission of Correctional Health Care (NCCHC) Standards for Health Services in Prisons and American Correctional Association (ACA) Standards, and which were last reviewed on May 15, 2018.

My findings are essentially unchanged from my 2016 report. Centurion's current policies and procedures are not site specific, and provide inadequate operational guidance to health care staff to implement the policy. The policies are not compliant with some NCCHC standards (*e.g.* infirmary policy) nor are some policies compliant with standards of nursing practice (*e.g.* medication administration).

**Findings:**

Centurion's Healthcare policies and procedures include a table of contents and a signature page showing that the policy manual effective date was September 21, 2016 and health care leadership reviewed the manual on May 15, 2018.

The policies are not site specific with respect to EMCF local operating procedures and thus do not provide adequate operational guidance to health care staff.[8] For example, the policies lack operational details as to how certain health care operations are to take place, such as medication administration schedules.

There are also inconsistencies with policies and actual practice. For example, as noted earlier in this report, the policy for Non-Emergency Health Requests care states that the system is to be conducted in a manner to protect the confidentiality of the patient request. Typically, this is accomplished by inmates being able to submit their SCRs into a locked box accessed only by health care staff. However, as noted above and in previous reports, inmates universally reported that in order to access health care, they must give their SCRs to correctional officers who placed the requests in the sick call box, located outside the housing units. Even assuming that this process was followed in all instances, EMCF patient requests are at a minimum not handled confidentially, potentially inhibiting inmates' request for care. The policy should describe how inmates will be able to confidentially submit their medical services request forms, specifically in light of the conditions at EMCF.

---

[8] Centurion policy and procedures included Walnut Grove and EMCF policies which were exactly the same, and not site specific.

And, in some cases, EMCF is not compliant with its own policies and procedures. Nurses do not administer medications in accordance with the Medication Administration policy which states that in segregation nurses will administer medications to patients through the food port. However, officers do not open food ports and nurses slide medication envelopes under the cell door onto the floor. This is obviously unsanitary. Another example is that clinic examination rooms (*e.g.*, physician's examination room) are not standardized with medical equipment and supplies required by policy. This shortcoming inhibits the performance of adequate medical evaluations to timely diagnose and treat patient medical conditions, increasing the risk of harm to patients.

Also, as noted earlier in this report, the Infirmary Care policy has been changed to state that EMCF provides only Sheltered Housing with minimal monitoring. However, as described in the policy, the scope of sheltered housing care is no different from the scope of infirmary-level care as defined in the previous policy (*e.g.*, patients needing intravenous fluids, etc.). The only elements in the policy that have changed are the requirements of health care staff related to admission, monitoring and discharge from the Infirmary. According to the new policy, registered nurses may admit, monitor and release of patients from the sheltered housing for an unspecified period of time without any physician or nurse practitioner involvement. In other words, Centurion's policy change does nothing except reduce the level of oversight by more experienced and qualified medical professionals, allowing patients to be in medical housing for indefinite period of time go entire stints in the medical unit without routine monitoring seeing by a physician or nurse practitioner. This is not consistent with NCCHC standards with respect to providing infirmary level care. The policy changes increase the likelihood of inadequate care, exposing all patient inmates who are housed in the medical unit or may be housed there in the future (i.e., the whole prison population) to a substantial risk of harm.

EMCF leadership should revise the policies and procedures to ensure that they include sufficient operational directives that conform to Centurion policies and procedures and the MDOC/Centurion Health Services Contract.

## 12.    Continuous Quality Improvement and MDOC Oversight

The purpose of a continuous quality improvement (CQI) program is, among other things, to  improve the timeliness and quality of health care. A CQI program identifies health care aspects  to be monitored, establishes performance thresholds, implements and monitors corrective  actions, and monitors the effectiveness of the corrective action plan. To implement an effective  CQI program, health care leadership should establish a quality improvement committee with  representatives from major program areas (*e.g.*, medical, nursing, pharmacy, custody, etc.).  The committee should meet as frequently as necessary to monitor and correct problems.  Monitoring should include review of sentinel events, such as unexpected hospitalizations and mortalities, to determine if the event was preventable. To assess whether EMCF's CQI program  met these and other criteria, I reviewed EMCF policies and procedures and Centurion CQI studies  from 2018.  My  findings showed EMCF's CQI program to remain inadequate.

**Findings:**

The EMCF CQI Program (A-06) policy is generally consistent with NCCHC and ACA standards. However, EMCF's implementation of its CQI program is lacking. There are two general categorical problems with the CQI. First, many of the measures used in the CQI program are irrelevant or poorly designed to capture actual problems. Therefore, compliance with CQI measures is not necessarily indicative that EMCF's health care system provides timely and appropriate care to patients with serious medical, dental and mental health conditions. Second, even by these flawed measures, CQIs routinely identify systemic problems that are not adequately addressed. There is no evidence that CQI studies identify root causes of systemic issues and develop effective strategies to correct them

As just one example, when addressing timely responses to sick call requests, the CQI asks whether the sick call was triaged within one day of receipt. However, as described above, sick calls are often not deemed "received" by medical staff for several days after they are submitted by patients. This CQI measure fails to capture the issues related to inmates' inability to timely and confidentially submit sick call requests described in this and previous reports. Even so, using this flawed measure that systemically underestimates the delays in sick call responses, the CQI illustrates an ongoing problem with timely sick call triage. In January 2018, for instance, triage occurred within one day of receipt of a sick call request only 84% of the time; in June 2018, this only occurred 65% of the time.

Other CQI measures also reflected issues that I describe elsewhere in this report, yet demonstrate no improvement. For instance, for diabetes patients, the CQI observes that where finger stick blood glucose (FSBG) is ordered, it is documented in the EMR far too infrequently: only 68% of the time in January 2018, for example. Similarly, the CQI demonstrates grave problems with inmates housed in segregation: there are failures to document rounds in segregation by medical staff 3 times per week as per policy; a failure to see inmates within 24

hours for documented health complaints; and a failure in MARs to illustrate that there were no lapses in medication administration.

More generally the CQI illustrate serious issues with MARs. The CQIs report that the initials of the nurse administering medication are almost never legible on MARs; signatures are almost never legible; doses are frequently not documented appropriately; and missed doses are not documented appropriately. Notably, the measures changed in mid-2018 and the facility stopped monitoring many of these measures. For instance, the CQI measures removed the question, "Are all doses documented appropriately?" despite the extremely poor performance on that measure in the first months of the year.

The charts below identify only some of the problematic, systemic deficiencies reflected in CQI studies. The CQI studies are of limited value because, as described above, many of the measures they capture are not targeted to identify the most serious and systemic problems with health care delivery at EMCF. Moreover, even when CQI studies illustrate ongoing problems, issues similar to those I have identified in my previous reports and continued to observe in 2018, MDOC and Centurion have failed to address and correct the problems.

| CQI Data Concerning Medication Administration Records | | | | |
|---|---|---|---|---|
| Month | Are initials legible? | Are signatures legible? | Are all doses documented appropriately? | If there are missed doses is the back of the MAR documented appropriately? |
| January | 4% | 4% | 16% | 0% |
| February* (Identified as "January," in the file but appears to be February data) | 0% | 0% | 4% | 0% |
| March | 0% | 0% | 28% | 4% |
| April | 20% | 20% | -- | 13% |
| May | - | - | - | - |
| June | - | - | - | - |
| July | 100% | 100% | - | 100% |
| August | - | - | - | - |

| CQI Data Concerning Segregation | | | | |
|---|---|---|---|---|
| Month | Medical services completed and documented segregation rounds at least 3 x per week (MDOC) | Inmates reporting healthcare issue were seen within 24 hours of documented complaint | Inmates receiving medication MAR shows that there was no lapse in medication at the time of placement in segregation and continued during housing | If in segregation, mental health services completed and documented rounds at least weekly |
| January | 15% | 50% | 44% | 33% |
| February* | 22% | 100% | 29% | "na" |
| March | 8% | 83% | 89% | 40% |
| April | - | - | 63% | 45% |
| May | - | - | - | - |
| June | - | - | - | - |
| July | - | 75% | 32% | 35% |
| August | - | - | - | - |

Thus, based upon the available information, I conclude that the Centurion CQI process is inadequate and does not timely correct either health care processes or the quality of health care. This allows systemic issues with health care delivery and quality to continue and increases the risk of harm to patients with serious medical conditions. Moreover, MDOC has failed to effectively remedy the risk to patients that Centurion's management of health care has caused.

Where the CQI measures have clearly demonstrated shortcomings in the healthcare system, putting Centurion and MDOC on notice of specific deficiencies that should be addressed through corrective action and monitoring, Centurion and MDOC have failed to take steps to address those deficiencies. This leaves patients at EMCF at a continuing risk of serious harm. These findings indicate the absence of effective health care leadership, particularly of the Medical Director who testified that he did not regularly attend CQI meetings.

**Mortality Review:**

I reviewed Mortality and Morbidity (M&M) Review Committee Findings for deaths in 2018 performed by the Centurion Regional Medical Director. In general, the M&M reviews were cursory, provided no meaningful clinical information regarding the patient's care prior to death. The reviews made no attempt to identify individual or systemic issues that may have contributed to the patient's death may place other inmates at risk of harm. This is an ineffective process.

# 13.    Recommendations

MDOC's continued failures to provide adequate health care at EMCF for all of the reasons identified in this report create a substantial risk of harm to the population of inmates at EMCF. To ensure these failures are corrected, I recommend the appointment of a qualified health care professional as a monitor, to develop measurable standards for adequate delivery of care in these deficient areas and to ensure compliance with those standards. In addition, as noted elsewhere in this report, several concrete and readily identifiable actions could be taken to improve discrete conditions. Implementation of these recommendations may require revising policies and procedures and providing updated training to relevant staff members. These identifiable actions include but are not limited to these illustrative examples:

**Access to Care**

- MDOC must ensure that EMCF has sufficient correctional officer staffing to escort patients to their medical appointments.

- MDOC must ensure that facility lockdowns do not result in wholesale cancellation of medical appointments but that patients with serious medical needs are provided timely access to care.

- MDOC should install lockable sick call boxes in all housing units and provide adequate correctional officer supervision to ensure that the boxes are maintained.

- Inmates must be provided sick call forms upon request and the ability to confidentially submit their sick call requests in sick call boxes or directly to a nurse on a daily basis.

- Correctional staff must contact health care staff when inmates present with urgent complaints and escort patients to the medical clinic.

- MDOC should install functional call buttons in the infirmary and restricted housing units.

- MDOC and Centurion should ensure that segregation rounds are performed according to policy.

**Medication Administration**

- MDOC and Centurion must ensure that there is adequate nurse and correctional officer staffing to timely administer medications.

- Nurses must adhere to the five rights of medication administration and refrain from the wholesale redispensing of dangerous drugs.

- Custody should permit nurses to bring medication carts to all housing units with medication administration records.

- In segregation and lockdowns correctional officers should open the food port to permit nurses to administer medications to patients.

- Officers and nurses should collaboratively perform oral cavity checks to ensure medication ingestion.

- Nurses should document medications onto the MAR at the time they are administered.

- Health care leadership should investigate and address reasons for medications not being available for administration.

- Centurion policies should be revised to meet standards of nursing practice and provide operational guidance for performing medication administration.

**Chronic Disease Management**

- Newly arriving chronic disease patients should be seen within 30 days in accordance with policy.

- Providers should order labs to be available in advance of the next scheduled chronic disease clinic.

- Providers should perform and document medical evaluations that include disease-pertinent review of systems and physical examinations; review of labs and a patient specific treatment plan.

- Providers should objectively assess medication adherence by review of medication administration records and address causes of patients not receiving medications.

- Providers should monitor patients in accordance with their disease control.

**Infirmary Care**

- MDOC/Centurion should revise its Infirmary Care policy to be consistent with NCCHC standards. The scope of services should specify the frequency of provider and nursing rounds for infirmary patients.

- Remove all physical objects that present a suicide risk.

**Clinic Space and Sanitation**

- Standardize clinic examination rooms and institute and inspection system to ensure that broken equipment is replaced and rooms are organized and sanitary.

- Staff should not place personal medications and cell phones in unsecured clinic drawers.

- All sharps should be secured behind two locked doors/cabinets and counted each shift. Discrepancies should be immediately reported to health care and custody chains of command.

**Hospitalizations and Specialty Services**

- Health care leadership should ensure timely receipt and review of emergency department, hospital and specialty services reports.

- Providers should timely address and implement hospital and specialty services recommendations. If the provider does not concur with a recommendation, the provider should document the clinical rationale and alternate treatment plan.

**Health Records**

- MDOC/Centurion should revise the electronic medical record (EMR) template to facilitate documentation of disease pertinent ROS, physical examinations and lab results.

**Dental Care**

- Perform CQI studies to identify root causes of delays in access to dental care, including delays related to custody transport, nurse triage and access to a dentist.

**Continuous Quality Improvement**

- The CQI program should be modified to target and study and identify root causes of systemic issues that result in harm to patients, such as have been identified in my reports. Health care and custody leadership should collaborate to develop and implement strategies to correct root causes.

Again, these recommendations are not intended to be comprehensive but a starting point to correct systemic issues.

Respectfully Submitted,

_____              November 16, 2018
Madeleine LaMarre FNP-BC              Date

The opinions in this report, set forth in the Executive Summary and Findings sections of the report, are based on evidence and documentation currently available to me. I reserve the right to modify or expand these opinions if additional information becomes available.

**Appendix A – Patient ID Numbers**

| Patient Number | Name | Inmate ID |
|---|---|---|
| Patient #1 | | |
| Patient #2 | | |
| Patient #3 | | |
| Patient #4 | | |
| Patient #5 | | |
| Patient #6 | | |
| Patient #7 | | |
| Patient #8 | | |
| Patient #9 | | |
| Patient #10 | | |
| Patient #11 | | |
| Patient #12 | | |
| Patient #13 | | |
| Patient #14 | | |
| Patient #15 | | |
| Patient #16 | | |
| Patient #17 | | |
| Patient #18 | | |
| Patient #19 | | |
| Patient #20 | | |
| Patient #21 | | |
| Patient #22 | | |
| Patient #23 | | |

**Appendix B – EMCF Record Reviews**

**Patient #1**
This 24-year-old man transferred to EMCF on 7/22/18. His medical history included asthma. His medications are Xopenex and Olanzapine. The patient is housed in administrative segregation (5A).

**Chronic Disease**
On 1/11/18 a different NP saw the patient for chronic disease management. Weight=138 lbs. The patient reported using his inhaler twice a week. CTA (clear to auscultation). Documented examining the abdomen and lymphatic system. No PEFR.  The NP documented that the patient would be seen for follow-up in 6 months (due 7/11/18) due to "no asthma attack in over one year and uses inhaler infrequently currently". However, the patient reported using his inhaler twice weekly.

**Sick Call**
On 2/3/18 the patient submitted a SCR complaining of his hand hurting and swelling, and having bad headaches. On 2/5/18 the form was received and triaged. On 2/5/18 a RN saw the patient. Temp=100°F. BP=117/79 mm Hg, pulse=108/minute.

**Sick Call**
On 7/26/18 he submitted a SCR form complaining of dental pain from his wisdom teeth cutting his gums. On 7/27/18 it was received by medical. On 7/31/18 a RN saw the patient who also requested to see mental health. Weight=148 lbs. Temp=99.4 BP=133/91 mm Hg, pulse=100/minute and respirations=18/minute. The nurse did not describe the patient's oral cavity and teeth other than to note "no swelling" and the plan was to follow-up with dental to "pull wisdom tooth". On 9/27/18 dental saw the patient who noted gum swelling. No x-rays were taken. The dentist treated him with Amoxicillin and Ibuprofen and planned to refer him to an oral surgeon.

On 8/6/18 custody did not transport the patient to medical for an appointment.

On 8/7/18 custody did not transport the patient to medical for an appointment.

**Chronic Disease**
On 8/14/18 at 09:58 the physician saw the patient for chronic disease management. His current problems were noted, including asthma, psychotic and bipolar disorder. BP=104/80 mm Hg. The physician documented an abdominal exam including no hernia. No peak expiratory flow rate (PEFR) Lungs were clear. Assessed him to have mild asthma. Template protocol said to follow-up in 3-4 months. Ordered Xopenex and planned to see the patient in 6 months due to "no asthma attack in over one year and uses inhaler infrequently currently".

**Labs**
On 8/14/18 his LDL was 70 and hemoglobin A1C=5.1%

**Urgent Care**

I interviewed this patient on 5A. He stated that he was acutely ill the day before with fever, nausea and vomiting. He complained that officers would not take him to medical so he set a fire to his cell.

On 10/22/18 at 7:05 pm the MH nurse practitioner at his cell saw the patient who was agitated. He reported that he was sick with a cold and has been throwing up all day, unable to keep any food down. He reported trying to get a sick call. He set multiple fires to try to obtain medical care for not feeling well, including chest pain and body feeling hot. The NP observed evidence of a fire outside his cell. Security put out the initial fire and he set another fire. He continued to report that he needed to go to medical.

> *"It is clear that he is setting fires to get the attention of staff that he needs to go to medical. This provider discussed with the security staff to include Captain Jones, CO Lawson and CO Stribling. Captain Jones is the captain of the long-term segregation unit and CO Lawson was assigned to the pod today, unit 5A. CO Stribling is working on 5; however, on a different pod. She was present during the discussion of him setting the fire.*
>
> *Primary concerns, he has asthma and if he has a cold combined with asthma, his setting the fire will only complicate the matter. Will continue to push for him to be escorted to medical for assessment. The facility is on lockdown; however, he presents with an emergency. RN James was contacted earlier per this provider, prior to him setting the fire with reports he complained of vomiting, stating he has a cold. She stated he would need to submit a sick call. At this point security and medical have been notified, will leave to them to arrange the final disposition of the patient regarding being escorted to medical."*

**Urgent Care**

On 10/22/18 at 8:50 pm a registered nurse saw the patient for complaints of coughing, feeling hot and vomiting. Temp=101.2°F, BP=178/78 mm Hg, pulse=112 and respirations=98%. weight=150 lbs. States he was hurting and coughing all day and felt really hot. States he vomiting three times before 3 pm of undigested food and water. Lungs: No wheezing. No rales or rhonchi noted. Sounds clear but slightly diminished. Alert and oriented and able to verbalize needs. Has productive cough. Orders written per nursing protocol. The nurse ordered Tylenol and Guaifenesin. The nurse did not contact a medical provider.

**Medications**
August 2018 MAR showed he received Xopenex on 8/17/18. He was prescribed Olanzapine and Zyprexa.

September 2018 MARs showed that he did not receive Amoxicillin ordered by the dentist. He did not receive an inhaler during the month. No documentation regarding the status of Zyprexa administration for 9/3, 9/11, 9/12, 9/18, 9/24, and 9/25/18.

**Assessment:** This record shows serious issues including access to routine, urgent and dental care. Multiple medical appointments were not kept due to lack of custody escorts and lockdowns.

This patient was housed in administrative segregation and the record shows repeated facility lockdowns. It is alarming that the patient was acutely ill with fever, nausea and vomiting and was denied access to evaluation and treatment for his condition. His desperation was evident as he set multiple fires to his cell. A mental health professional intervened by contacting a registered nurse who denied him access, and the patient was still not seen for another six hours. When a RN saw the patient, he had a fever of 101.2°F extremely high blood pressure but the nurse did not contact a medical provider. Medical providers did not perform adequate medical evaluations of the patient's asthma, failing to document adequate review of systems and measuring PEFR's at each visit. A nurse did not timely see the patient for a routine health request and a dentist did not see the patient for approximately two months after he submitted his complaint. September 2018 Medication records show that nurses did not document administration status on 8 of 30 days.

**Patient #2**
This 35-year-old man transferred to EMCF on 10/13/15. On 10/3/18 he transferred from EMCF to CMCF. His medical history included severe hypertension, hyperlipidemia and bipolar disorder. His medications are lisinopril, norvasc, labetalol, triamterene-hydrochlorothiazide, zocor, aspirin, Prozac, and olanzapine and zantac. The patient was housed in 5A.

**Segregation**
March 2018 Segregation checks were not consistently performed.

**Chronic Disease Visit**
On 4/5/18 a NP (EC) saw the patient for chronic disease management. Weight=260 lbs. BP=186/92 mm Hg. Pulse=81 mm Hg. The NP documented that the patient reported not taking his medication regularly. "I have reviewed labs with the patient". The NP did not perform a cardiovascular review of systems such as chest pain, shortness of breath, palpitations, lower extremity edema. There is no examination of the heart for rhythm and murmurs. CTA (clear to auscultation). The patient had bilateral lower extremity 2+ pitting edema. The NP assessed the patient in poor hypertension control. Template orders were to:

"Admit to the infirmary or daily BP monitoring until blood pressure is less than 160/100 mm Hg. Then monthly until consistently below 140/90 mm Hg, then every 3 months."

Hyperlipidemia was assessed to be in fair control (LDL=130-159). The NP ordered medications and weekly blood pressure checks and to document in the record. Follow-up in one month.

On 4/5/18 weekly blood pressure checks were ordered. An April 2018 MAR showed that nurses did not document weekly blood pressures.

4/6/18          BP=158/90 mm Hg
4/12/18         BP=Not Measured
4/14/18         BP=157/111 mm Hg. No action documented.
4/20/18         BP=Not measured
4/27/18         BP=Not measured

**Chronic Disease**
On 5/7/18 the physician saw the patient for chronic disease management. The physician noted the patient complained of chest pain and shortness of breath infrequently but not associated with not receiving medication. The provider did not investigate the patient's chest pain and SOB or inquire about headaches, lower extremity swelling. Weight=257 lbs. BP=190/127 mm Hg. CTA. No documentation of heart sounds or murmurs. No examination of his extremities for peripheral edema. The provider assessed the patient's hypertension as has being in poor control. Template orders were to:

> *Admit to the infirmary or daily BP monitoring until blood pressure is less than 160/100 mm Hg. Then monthly until consistently below 140/90 mm Hg, then every 3 months.*

The physician assessed the patient's hyperlipidemia to be in fair control. The provider plan was to follow-up in 2 weeks due to poor control. No documentation of any discussion with the patient including whether the patient was receiving his medications. The physician did not admit the patient to the infirmary/sheltered housing.

On 5/9/18 an order was written to check the patient's blood pressure daily for two weeks and record in the record. The May 2018 MAR or nurses' notes shows the following:

On 5/10/18      BP=Not Measured
On 5/11/18      BP=Not Measured
On 5/12/18      BP=120/90 mm Hg
On 5/13/18      BP=Not Measured
On 5/14/18      BP=Illegible on MAR
On 5/15/18      BP=Illegible on MAR
On 5/16/18      BP=Not Measured

On 5/17/18     BP=189/115 mm Hg          No documentation the nurse notified a provider
On 5/18/18     BP=196/124 mm Hg          LPN notified provider for clonidine.
On 5/19/18     BP=Lockdown
On 5/20/18     BP=191/138 mm Hg
On 5/21/18     BP= 178/140 mm Hg
On 5/22/18     BP= Not Measured
On 5/23/18     BP148/95 mm Hg
On 5/24/18     Stop

On 5/17/18 at 7:55 pm a nurse documented that the patient requested a blood pressure check at 1242. BP=189/135 mm Hg. Nurse documented that the patient's blood pressure medications were given and he was told to remain for a recheck. The patient did not want to stay and was told to come back then, so the nurse could recheck his blood pressure. Nurse again attempted to gain compliance. There was no documentation that the nurse notified a provider of the patient's blood pressure. A provider did not see the patient.

**Urgent Care**
On 5/18/18 the patient's blood pressure was 196/124 mm Hg. A nurse contacted a nurse practitioner who ordered for clonidine 0.2 mg x one dose and 0.1 mg after one hour if BP=>160/100 mm Hg. At 7:46 pm the patient's blood pressure=184/120 mm Hg. Recheck was 136/80 mm Hg.

**Urgent Care**
On Tuesday, 5/21/18 at 1:53 pm a nurse documented the patient's blood pressure was 178/140 mm Hg and would be referred back to Dr. Arnold today. At 1:53 pm Dr. Arnold wrote "Patient will see FNP Cole for evaluation".

At 1:56 pm a nurse practitioner saw the patient (EC). BP=240/124 mm Hg. The NP performed a CV ROS noting the patient denied headaches, diplopia, vertigo, chest pain or shortness of breath. The patient reported that he takes his medications when they bring it. CV: S1, S2 regular no murmur. The NP diagnosed the patient with hypertensive emergency and ordered hydralazine 25 mg three times daily and ordered transport to the ED. Follow-up with a medical provider at the first available appointment. The NP did not document consultation with the physician.

On 5/21/18 at 3:06 pm the patient was transported via ambulance to the Rush ED. At 3:22 pm a nurse documented administration of clonidine 0.2 mg given prior to departure.

On 5/21/18 at 3:45 pm a Rush physician saw the patient for hypertensive crisis.

*Per EMS their first BP reading was 148/98 mm Hg and the second reading was 134/78 mm Hg. Patient explained that his medication has been changed multiple times but that his blood pressure is not checked regularly. States has*

*intermittent blurry vision and headaches but is not experiencing these at present. Feels fine. Denies fever, nausea, chest pain or abdominal pain, constipation, diarrhea or shortness of breath. Presenting problem started two hours ago. History comes from the patient. Some of the history is supplied by the ambulance crew. Unclear if patient is compliant with his regimen. CV: Regular rate and rhythm, no murmur. At 16:03 BP=150/103. Hydralazine was added to his regimen; the patient was given discharge instructions educating him on the complications of hypertension with recommendation for provider follow-up as soon as possible.*

**Off Site Return Visit**

On 5/21/18 the patient returned to EMCF. Dr. Arnold saw the patient saw the patient. BP=142/108 mm Hg. The patient reported that he was not given any medications at the emergency department (ED). There was no documentation of any discussion with the patient. The plan was to have the patient follow-up with the nurse practitioner (EC) in 3 days. Dr. Arnold did not order blood pressure monitoring.

**Labs**

On 5/21/18 labs showed LDL=98, Cr=1.06 GFR=105 AA.   On 5/24/18 a provider signed the report.

On 5/23/18 BP=148/70 mm Hg.

On Thursday, 5/24/18 at 7:30 pm the patient's blood pressure was very high BP=175/115 mm Hg, pulse=65/minute. Scheduled hydralazine given as ordered. At 8:30 pm repeat BP=170/110 mm Hg. The RN notified Dr. Arnold who did not order any treatment but to have the patient seen on Friday. The patient was not admitted to the infirmary for monitoring and the follow-up visit did not take place.

On 5/26/18 at 2:40 pm BP=166/99 mm Hg and a nurse noted "patient has not had BP meds yet. BP meds given while in medical." The nurse did not recheck the patient's blood pressure.

**Chronic Disease**

On 6/7/18 Dr. Arnold saw the patient for chronic care. BP=160/103 mm Hg, pulse=56/minute. The physician noted in the GERD review of systems that "the patient has been elevating the head of his bed". No CV ROS. No questions about headache, chest pain, SOB, lower extremity swelling. Under cardiovascular auscultation is noted as "normal" but does not document what vascular system was examined (i.e. heart, aortic or carotid arteries, etc.). The physician ordered hydralazine 50 mg twice daily, weekly blood pressure checks and planned to see the patient in one month. Hyperlipidemia in good control. The provider documented the patient was not compliant with medications but did not document any discussion with the patient.

**Sick Call**

On 6/13/18 (sic) the patient submitted a SCR form stating that he had toenail fungus with resulting pain when he put his shoes on. On 6/12/18 (sic) the form was received. On 6/15/18 the RN saw the patient and provided tolnaftate. VS normal.

**Urgent Care**

On Tuesday, 6/19/18 at 2:30 pm a RN documented that custody escorted the patient to medical due to the patient's blood pressure being very high. BP=210/120 mm Hg manually and BP=173/122 mm Hg with Dinemap. The nurse notified Dr. Arnold who ordered Hydralazine 50 holding cell. At 4:30 pm the patient's BP=192/130 mm Hg and manual=240/130 mm hg. The RN performed a neurological ROS: no headache, slurred speech, no blurred vision, numbness tingling and weakness. Dr. Arnold ordered the patient sent to the ED without seeing the patient. The patient departed via ambulance at 4:34 pm.

On 6/19/18 at 5:48 pm a hospital provider documented the following in all caps:

> *Patient here for hypertension. Incarcerated. States he takes his blood pressure medications when the nurse gives them to him. symptomatic. States they just took his BP and saw that it is high. Denies headache, chest pain, shortness of breath, dizziness, blurry/double vision, nausea or vomiting. Denies fever. States that he has swelling in his hands and feet at times but none right now. Family history of father with 2 strokes due to hypertension and mother has kidney disease due to hypertension. Exam showed no JVD, normal breath sounds, regular rate and rhythm no murmur, peripheral pulses are strong and equal. BP not controlled.*

On 6/19/18 at 9:35 pm the patient returned from offsite. A RN documented that the patient reported that at the hospital he was given blood pressure medications through an IV (metoprolol) and a (nitroglycerin) patch on his chest. EKG and Chest x-ray were performed. Troponins=0.48, (normal=000.-0.56). Urine drug screen was negative for opiates, cocaine, amphetamines. Discharge orders were to follow-up with a provider the next day. The nurse checked the patient's blood pressure and gave him his evening medications.

BP=171/116 mm Hg,
BP=188/110 mm Hg
BP=142/104 mm Hg.

On 6/19/18 at 11:09 pm the nurse documented that Dr. Arnold had assessed the patient at 4:34 pm BP=192/130 mm Hg, pulse=105/minute, Temp-99.5 and oxygen saturation=98*%. However, there is no note by Dr. Arnold.* Dr. Arnold entered an order for Hydralazine 50 mg now at 2:57 pm.

On 6/20/18 Dr. Arnold ordered hydrochlorothiazide 25 mg daily and hydralazine 100 mg twice daily and blood pressure check for 14 days.

On 6/27/18 BP=145/101 mm Hg.

**Chronic Disease**
On 7/3/18 Dr. Arnold saw the patient for chronic disease management. BP=180/140 mm Hg. *The patient reported not receiving his medications.* The physician did not perform a cardiovascular or neurological review of systems. He documented the exact same physical examination including that he performed a hernia exam. The EMR template orders were to place the patient in the infirmary for monitoring. The provider ordered triamterene-HCTZ (Maxide) and to discontinue hydrochlorothiazide when maxide arrives. The provider admitted the patient to sheltered housing and planned to see the patient in one week. The provider did not order blood pressure monitoring.

I do not find blood pressure monitoring while the patient was in sheltered housing.

On 7/9/18 the physician saw the patient for chronic disease follow-up. BP=160/120 mm Hg. No ROS of any kind. The physician did not document any discussion with the patient. Physical exam appears to be the template with all findings normal. Assessment was poor blood pressure control on 6 different medications. Continue in sheltered housing for twice daily blood pressure checks. The provider ordered Coreg 25 mg one two times per day and may discontinue when labetalol arrives. Cardiology consult. Follow-up in one week.

**Medication Error**
Although the physician ordered Coreg to be discontinued when labetalol arrived, the order for Coreg was not discontinued and the patient continued to receive Coreg and Labetalol.

On 7/9/18 BP=145/93 mm hg and 157/109 mm Hg.

On 7/10/18 at 07:28 BP=143/103 mm Hg.

On 7/10/18 at 12:13 BP=183/132 mm Hg. No provider notification. No BP Recheck

On 7/11/18 BP=164/110 mm hg. No provider notification. No BP recheck.

On 7/12/18 No blood pressure documented.

On 7/13/18 BP=145/95 mm Hg.

On 7/14/18 BP=139/91 mm hg and 148/79 mm Hg.

On 7/15/18 at 7:02 am BP=164/100 mg Hg. At 7:38 pm BP=180/120 mm Hg. Nurse gave clonidine 0.2 mg.  No repeat blood pressure.

On 7/16/18 at 08:33 am BP=149/92 mm Hg.

On 7/16/18 Dr. Arnold documented a chronic disease note. There is no documentation of any discussion with the patient. He documented a normal heart exam with no heart sounds. BP=170/140 mm Hg. Diagnosis was malignant hypertension. Change medications from hydralazine to clonidine 0.3 mg twice daily. Blood pressure monitoring. Pending cardiology consult. Follow-up one week.

On 7/17/18 BP=160/98 mm Hg left arm and BP=164/90 mm Hg Right arm. A nurse documented that the patient did not complain of headaches or dizziness. Compliant with medications.

On 7/19/18 at 6:30 am BP= BP=150/100 mm Hg.

On 7/19/18 at 8:53 mm Hg. Dr. Arnold documented that the patient's diastolic pressures had improved to 98-105 mm Hg. BP=130/100 mm Hg. He released the patient from sheltered housing and ordered blood pressure monitoring. Follow-up one week.

On 7/23/18 custody did not transport the patient to medical for a nurse sick call appointment.

On 7/23/18 Dr. Arnold saw the patient for follow-up noting that he was taking six medications and denied chest pain and shortness of breath. BP=150/110 mm hg. He ordered labs and admitted the patient to sheltered housing. Blood pressures twice daily. He did not document vital signs criteria for notifying the physician.

On 7/24/18 at 7 am BP=170/115 mm Hg. The nurse did not notify a provider.

On 7/25/18 No blood pressure documented.

On 7/26/18 at 10:27 am BP=150/80 mm Hg.

**Specialty Services**
On 7/26/18 cardiology saw the patient.

> *Patient reported episodes of mid sternum chest pain and left arm numbness and dizziness. Patient denies SOB, palpitation and syncopal episodes. Patient reports bilateral swelling. Patient reports family history of mother with hypertension and stroke in father. Patient reports taking all medications as prescribed. The exam showed edema of lower extremity. EKG showed possible anterior myocardial infarction with Q wave in V3-V4. The provider ordered Lexiscan cardiolite stress test.*

Cardiology ordered to hold clonidine, labs (*e.g.*, aldosterone and urine metanephrines) and diagnostic test (transthoracic echocardiogram and renal ultrasound).

On 7/26/18 the patient returned from the off-site and told a nurse the cardiologist said there was something wrong with him. The nurse documented that an officer reported that the patient had an abnormal EKG. No paperwork returned.

On 7/27/18 the patient was discharged from the infirmary to 5A. A medical provider did not see the patient following his return from cardiology.

On 7/27/18 at 11:55 am orders were faxed from Cardiovascular services of Central MS to the facility with recommendations for Lexiscan stress test and labs (aldosterone and urine metanephrines).

On 7/27/18 the patient was not transported to medical for an appointment.

On 7/28/18 the patient was not transported to medical for an appointment.

On 7/29/18 the patient was not transported to medical for an appointment.

On 7/30/18 the patient was not transported to medical for an appointment.

On 7/30/18 Arnold saw the patient for follow-up noting that he was awaiting (cardiology) paperwork. BP=150/108 mm Hg.

On 7/31/18 the patient was not transported to medical for an appointment.

On 8/14/18 the patient was scheduled to be NPO (nothing by mouth) for a stress test on 8/15/18. However, the Lexiscan did not take place as scheduled.

On 8/17/18 the patient had a stress test revealing no major reversible ischemia but "cannot rule out minimal ischemia in the basal inferolateral wall." Renal ultrasound and echocardiogram were unremarkable.

On 8/17/18 a NP saw the patient upon return. The patient reported not taking some of his medications because they make his head hurt, dizzy and blurred vision. August MARs show the patient was receiving two beta blockers. Carvedilol and Labetalol which likely contributed to his headaches. BP=240/140 mm Hg. The NP ordered clonidine. No results from urine metanephrines. BP checks x 3 days. No plan for follow-up.

On 8/19/18 BP=210/140 mm Hg. The patient was not taking all his medications because of how it made him feel. The nurse gave the patient medications from stock. Recheck BP=124/81 mm Hg. Did not notify the physician.

On 8/23/18 custody did not transport the patient to medical for a chronic care visit.

On 8/29/18 the patient was not transported to medical for chronic care visit.

On 9/4/18 the physician saw the patient for follow-up. BP=172/100 mm Hg. The patient reported dizziness, palpitations and leg swelling. The provider did not perform any additional CV ROS (*e.g.*, chest pain, shortness of breath, etc.). No pertinent CV exam (*e.g.*, heart sounds, extremities). Poor hypertension control. Patient admits to not taking labetalol. Follow-up 4 weeks.  No follow-up on urine metanephrines.

**Provider Visit**
On 9/24/18 Arnold saw the patient for follow-up BP=120/78 mm Hg. Pulse 64/minute. No CV ROS. Has episodic swelling in his legs but none currently by report. No lower extremity edema today. Good control. Follow-up in 3 months.

On 9/27/18 mental health saw the patient who was having ongoing thoughts regarding paranoia.

On 10/2/18 he transferred to CMCF. At the time of arrival his BP=194/109 mm Hg. The nurse noted that he had not received any blood pressure medications.

**Medication Administration Records**
March 2018 MARs show that nurses did not document administration of Coreg and Norvasc on 3/13, 3/20 and 3/21, did not document administration of lisinopril and aspirin on 3/13 and 3/15 and did not document administration of zocor and zantac on 3/9 and 3/10.

April 2018 MARs show that the patient was prescribed lisinopril, carvedilol, valsartan, aspirin, zocor and olanzapine. The MARs show that Norvasc was not available on 4/1, 4/2, 4/3, 4/6, 4/7, 4/8, and 4/9/2018.

May 2018 MARs showed that on 5/7/18 a provider ordered hydralazine 25 mg three times daily but the patient did not receive it until 5/10/18. A nurse documented that the patient was administered Valsartan daily. On 5/6/18 the MARs do not show documentation status of the evening doses for olanzapine, simvastatin, carvedilol, and ranitidine.

June 2018 MARs show a nurse documented that the patient received hydralazine, amlodipine and carvedilol for most of the month. There was an order to check the patient's blood pressure daily x 14 days and document results, but between 6/20 and 6/30/18 only one blood pressure was recorded. One may have been refused and the rest were not documented.

July MARs show a nurse documented that the patient was administered amlodipine, carvedilol, hydralazine and hydrochlorothiazide and olanzapine for most days of the month. A nurse crossed out a 5/8/18 order for carvedilol 25 mg twice daily and overwrote an order for 7/9/18 and to discontinue on 7/16/18. The same nurse wrote stop carvedilol when labetalol arrives. A nurse also wrote on the hydrochlorothiazide order to discontinue when triamterene arrives. There is no administration status for any medications on 6/13 except for the evening dose of hydralazine. For Olanzapine there is no documentation status for 6/2 and 6/4/18.

August 2018 MARs show that a nurse documented that the patient received amlodipine, clonidine, labetalol, carvedilol and lisinopril. The patient was not supposed to be receiving both carvedilol and labetalol at the same time.

September 2018 MARs show the patient was receiving carvedilol and labetalol, as well as amlodipine, lisinopril and maxide. There is no documentation of administration status for simvastatin on 9/12, 9/23, 9/24 and 9/25/18. On 9/7/18 Maxide was not available.

**Segregation**
April 2018 Segregation Rounds show that staff performed visual and verbal checks on 13 out of 30 days. In May 2018 Segregation rounds sheet shows that no visual or verbal checks were made in the evening on 5/12, 14, 17, 18, 19, 20, 23, 24, 26, 28 and 29.

**Assessment:** This patient did not receive timely and appropriate care for repeated hypertensive emergencies. There were multiple instances in which the patient was not transported to the clinic for medical appointments and ordered blood pressure monitoring was not performed. The patient reported that he was compliant "when the nurses brought him medications" However, medication records show that nurses did not administer medications to the patient and antihypertensive medications were sometimes not available. The failure to consistently provide ordered medical care contributed to the patient's poorly controlled hypertension, multiple trips to the emergency department, and possible myocardial infarction. Medication administration records also show medication errors including failure to discontinue carvedilol when labetalol was received. After this medication error the patient reported that he could not tolerate some of his medications duet to headaches, likely a side effect of taking two beta-blocker medications.

At chronic disease visits, providers did not obtain cardiovascular review of systems (*e.g.*, chest pain and shortness of breath, etc.) and pertinent physical examinations. Providers use EMR physical examination templates that do not describe heart sounds or examination for peripheral edema, and every examination is exactly the same. However, when seen by cardiology the patient did report episodes of dizziness, chest pain and left arm numbness and had lower extremity edema. Cardiology recommended diagnostic procedures and labs to rule out secondary hypertension (*e.g.* pheochromocytoma), however it does not appear that the labs were performed. The patient was admitted to sheltered housing for blood pressure monitoring from 7/3 to 7/19/18 however nurses did not consistently perform blood pressure monitoring and report critical blood pressure values to a medical provider.

**Patient #3**
This 30-year-old man transferred to EMCF on 7/26/18. His medical history included HIV infection and major depressive disorder. His medications are Descovy, Prezista and Norvir.

Prior to transfer, at CMCF on 5/4/18 the patient's CD4 count was 411 cells and viral load was undetectable. On 5/18/18 HIV telemedicine saw the patient whose disease was well controlled and recommended CMP (chemical metabolic profile) and HIV viral load in 10 weeks and follow-up in 3 months.

**Intrasystem Transfer**
On 7/26/18 at 4:37 pm a nurse screened the patient as a new arrival. The patient denied medical or mental health complaints. VS normal. Weight=147 lbs. The nurse noted his diagnosis of HIV infection and planned to arrange continuity of his HIV medication. An LPN enrolled the patient into the chronic disease program.

**Medication Continuity**
On 7/30/18 the patient received HIV medication and on 7/31/18 the patient received Celexa. The patient did not receive continuity of his HIV and mental health medications.

**Chronic Disease Visit**
On 8/8/18 HIV telemedicine saw the patient noting that he missed about 6 days of medication due to transfer. The provider reviewed his labs and noted he was to be released in 4 months. No documented physical examination. The plan was to continue medications and perform HIV viral load in 20 weeks. Return to clinic in 6 months.

**Medication**s
July 2018 MARs show the patient did not receive his HIV medications for 4 days after arrival.

August 2018 MARs show that nurses documented that that the patient received his HIV medications. September 2018 MARs show the patient received his HIV medications except on 8/14/18 in which a nurse did not document administration status for the medication. On 9/10 and 9/11 the nurse did not document administration status for Celexa.

**Labs**
HCV antibody test is non-reactive. On 7/27/18 labs show the patient's HIV viral load was undetectable.

**Segregation**
On 10/10/18 an LPN performed pre-lockdown assessment. The patient reported he was forced into oral sex on another inmate. The LPN notified mental health and security, but not a medical provider. No further assessment performed.

**Assessment:** This patient's HIV disease is well controlled. However, the patient did not receive timeliness of HIV medications. He has been at EMCF for 3 months but an EMCF provider has not seen the patient. The patient reported being sexually assaulted but was not seen by a medical provider. MARs show that nurses did not document each dose of medication.

**Patient #4**

This 54-year-old patient's medical history included hypertension, seizure disorder, latent TB infection, anorexia, weight loss, bipolar disorder and antisocial personality. His medications are norvasc, hydrochlorothiazide, Depakote, Risperdal and Benadryl.

On 1/x/2017   weight=155 lbs.
On 3/14/17   weight=170 lbs.
On 8/17/17   weight=152 lbs.
On 1/3/18   weight=150 lbs.
On 5/8/18   weight=159 lbs.
On 8/15/18   weight=160 lbs.

**Chronic Disease Visit**

On 5/8/18 Dr. Arnold saw the patient for chronic disease management noting the patient's past medical history included hypertension, seizure disorder, decreased appetite and weight loss. Weight=159 lbs. BP=114/76 mm Hg. The patient reported one seizure in 3 months lasting 15-20 minutes. No CV ROS. Patient complained of leg cramps sometimes at night. No examination of the heart. The provider assessed the patient's seizure disorder and hyperlipidemia as being in good control and did not assess the patient's hypertension. The patient is not diagnosed with hyperlipidemia. The provider did not assess the patient's decreased appetite and weight loss. The plan was to see the patient in 3 months. The provider reordered Depakote but not his blood pressure medications.

**Chronic Disease Visit**

On 8/15/18 Dr. Arnold saw the patient for follow-up. Seizure ROS was performed. No CV ROS for hypertension and hyperlipidemia. Current Medical Condition: chest pain when anxious. No other description. Same physical examination template. BP=98/62 mm Hg. Although the patient was hypotensive, the provider noted the patient's hypertension control was improved and planned to see the patient in 3 months.

**Medications**

April 2018 MARs show that nurses documented administration of amlodipine, hydrochlorothiazide, Depakote, and risperidone.

**Labs**

On 7/11/18 LDL=90.

**Sick Call**

On 8/22/18 the patient submitted a SCR form requesting medication for foot fungus. On 8/23/18 it was received. On 8/23/18 the patient was not transported to medical. On 8/24/18 a RN saw the patient.

**Assessment:** The physician did not perform a review of systems for each chronic disease and did not take a history of the patient's chest pain other than to say it occurred when he was

anxious. No description of the location, quality, intensity, radiation or alleviating factors. Documentation of physical examinations is done using a template and lack pertinent physical findings related to the patient's chronic disease (*e.g.*, heart sounds for patients with hypertension). The patient was not transported to medical for his scheduled sick call appointment.

**Patient #5**
This 54-year-old man transferred to EMCF in 2013. His medical history included asthma/COPD, GERD, hyperlipidemia, chest pain, migraines, history of small bowel obstruction and bipolar disorder. His medications are alvesco, atrovent, Xopenex, zocor and ibuprofen.

**Medications**
March 2018 MARs show that nurses did not document administration of simvastatin for 3/1, 3/3, 3/8, 3/16, 3/17, 3/19 and 3/31/18.

April 2018 showed blank spaces for simvastatin (4/1, 4/7, 4/14, 4/19, and 4/27). For Cipro and Zithromax ordered on 3/28/18 the patient did not receive any doses of Cipro and Zithromax due to patient no show and refusal that was shown as being completed on 4/9/18.

On 4/18/18 the physician ordered Zithromax for 5 days. On 4/20/18 the patient received a dose but then the medication was noted not to be available on 4/21 and 4/22 and then received for 7 days (4/23 to 4/28 and 4/30/18) when it was ordered only for 5 days.

May 2018 MARs show the patient did not receive his Alvesco inhaler due to no show or refusal on 11 days and nurses did not document administration status for 19 days. Nurses documented that the patient missed simvastatin doses due to No show.

June 2018 MARs showed that nurses did not document administration status for 5 days for simvastatin and multiple no shows.

July 2018 MARs showed nurses did not document administration status for 4 days for simvastatin and multiple no shows.

August 2018 MARs showed nurses did not document administration status for multiple days for simvastatin, Tums, and Alvesco. Atrovent is ordered every 8 hours for wheezing instead of daily.

September 2018 MARs show that Simvastatin was incorrectly scheduled to be administered at 0900 when the order was to be given at night. Many MAR blanks for Alvesco which is not noted as a KOP.

**Labs**
On 1/19/18 the patient's LDL=53. On 1/20/18 a NP signed the report.

**Labs**
On 4/30/18 labs were performed and were essentially normal. On 5/1/18 Dr. Arnold reviewed the report.

**Sick Call/Urgent**
On 3/25/18 the patient submitted a SCR form complaining of a headache, sore throat and coughing. On 3/26/18 a nurse received and triaged the form. On 3/26/18 a RN assessed the patient. Weight=156 lbs. Temp=100.3°F, BP=108/80 mm Hg pulse=104/minute and respirations=20/minute. Oxygen Saturation=96%. The nurse noted the patient had headache, nasal congestion, sore throat, and painful cough productive of yellow sputum. The patient's throat was red and (lungs) with scattered wheezes. The nurse did not note the patient's history of asthma/COPD. The plan was a cold pack, cough drop and follow-up as needed. Follow-up in 5-7 days if no improvement. The nurse did not consult a medical provider.

On 3/27/18 at 6:00 pm the patient had chest pain, SOB and temp of 105° F. BP=123/79 mm Hg, pulse=130/minute oxygen saturation=80% and increased to 94% on oxygen.

On 3/27/18 at 5:53 pm a nurse practitioner documented that a nurse informed her the patient had been diagnosed with pneumonia and currently has a fever of 104.4° F. Dr. Arnold is on the unit and ordered the patient sent to the emergency department. The patient was sitting in a wheelchair and appeared weak with difficulty breathing. Respirations were labored, coarse bilateral (sic) and irregular heart rate. The NP ordered oxygen and the patient was sent out.

The patient was sent out at 7:15 pm via ambulance for evaluation and treatment of pneumonia. Dr. Arnold did not document an examination of the patient.

On 3/28/18 at 00:50 a RN saw the patient for return from off-site noting that he was diagnosed with a urinary tract infection and influenza. Discharge medications were Levaquin 500 mg daily x 7 days.

Dr. Arnold signed the order for Levaquin the next morning at 7:57 am. However, he discontinued the Levaquin and changed the medication order to Cipro 500 mg one twice daily and Zithromax 250 mg 2 first day then one daily x 4 days. Dr. Arnold did not document the clinical rationale for the change in discharge medications. The note indicated to begin Cipro 500 mg twice daily from stock until meds arrive.

**Medications**
March 2018 MARs show that nurses did not discontinue the order for Levaquin but the patient did not receive it because it was not available for 2 days and then was a no show for one day, MARs also show the patient did not receive Cipro or Zithromax on the day that Dr. Arnold ordered the medication to be obtained from stock. March and April MARs show the patient did not receive any antibiotics from 3/28 to 4/9/18. Refusals were documented on 3/30 and 3/31/18.

**Medical Records**
The hospital report is not in the record, only the prescription and patient educations.

**Hospitalization Follow-up**
Dr. Arnold did not see the patient upon return from the hospital.

**Chronic Disease Management**
On 4/17/18 at 4:17 pm Dr. Arnold saw the patient for follow-up. Weight=155 lbs. Temp=98.2 BP=102/78 mm Hg, Pulse=Not measured. Respirations=28/minute. Oxygen saturation=98%. PEFR=150, 150, and 150.  The provider took a history of the patient's asthma noting that he had 4 asthma attacks in the past month and used 2 inhaler cannisters. History of inhaled and systemic steroids. Spirometry results are consistent with COPD. Daily nocturnal awakenings. No evidence of hypertension. Exam: Wheezes. The provider noted the patient was tachycardic but no pulse was included in his note. The providers assessment was severe asthma and worsening. He ordered labs, CXR, ordered solumedrol 250 mg IM, Atrovent 17 MCG/ACT HFA two puffs every 8 hours for wheezing and SOB. Transfer to the ED for COPD exacerbation. At 5:21 pm the patient was transported to the ED via ambulance.

**Urgent Care**
At Rush Foundation Hospital the patient was diagnosed and treated for acute bronchitis and COPD exacerbation. Zithromax was prescribed for 5 days. Discharge orders included provider follow-up in 2-3 days.

On 4/18/18 at 01:37 am the patient returned to EMCF and a RN assessed the patient. Afebrile. BP=130/84 mm Pulse=122/minute, respirations=22 and oxygen saturation=98%. Dr. Arnold signed the note at 05:51. Eleven hours later, at 5:04 pm Dr. Arnold ordered Zithromax. *Dr. Arnold did not see the patient upon return.*

On 4/23/18 a lab appointment did not take place due to facility lockdown.

On 4/24/18 a lab appointment did not take place due to facility lockdown.

On 4/25/18 the patient was scheduled for a lab appointment but did not take place due to a Statewide Lockdown. Lab will be rescheduled when lifted.

**Sick Call**
On 4/30/18 the patient submitted a SCR form complaining of foot pain from nerve damage. It was received on 5/1/18. On 5/1/18 the patient was not seen due to facility lockdown. On 5/2/18 a RN saw the patient. Weight=150 lbs. BP=140/82 mm Hg. Pule=66/minute. The nurse noted the patient was missing a toe on his left foot but did not say which toe. Took Neurontin at CMCF. Under objective the nurse wrote: Weight loss. The plan was follow-up with NP.

On 5/1/18 a chest x-ray was performed and showed COPD and a density overlying left lower anterior fifth rib that could be an old rib fracture. Suggest a non-contrast chest TC to exclude pulmonary nodule. On 5/2/18 Arnold signed the report but did not see the patient.

On 5/6/18 a NP noted that the patient refused an appointment per officer report.

On 5/8/18 a NP noted that the patient refused an appointment per officer report.

On 5/9/18 a NP noted that the patient was not transported to medical. It was rescheduled for 5/16/18.

**Medical Provider Sick Call Follow-up**
On 5/15/18 a NP saw the patient for 18 to 20-pound weight loss, migraine headache and left foot pain related to traumatic amputation of 3rd toe. The NP did not assess the patient's weight loss other than to note that he reports eating 3 meals a day and denies food allergies. The NP did not assess the patient's headache with respect to onset, location, frequency, intensity and presence of auras. The NP did not have an assessment or plan for his weight loss, and ordered diabetic shoes and Excedrin headache.

**Chronic Disease Management**
On 5/17/18 Arnold saw the patient for chronic disease follow-up. He did not reference the patient's two hospitalizations in March and April for acute bronchitis and COPD exacerbation. He did not assess the frequency of symptoms only that the patient said his breathing is better and he had less wheezing. He did not assess the patient's reported weight loss. No PEFR's. Right lung wheezes, left CTA. No documentation of heart sounds. He assessed the patient's COPDS as being in fair control and planned to see him in 2 months.

**Diagnostic Test**
On 5/17/18 a chest CT showed no pulmonary nodule. The report was received the same day but a provider did not date and sign the report.

**Sick Call**
On 5/24/18 the patient submitted a SCR form complaining of 15-20-pound weight loss. I need to see the doctor about getting an enhanced food tray. ASAP. It was received on 5/30/18. On 5/301/8 a RN saw the patient. Weight=147 lbs. Under subjective the nurse noted that the patient wanted to know why he was losing weight. "Recent chest CT done and he reports they told him he had cancer at that time". No other ROS. No examination. The nurse wrote on the form that the patient's weight was in normal range and planned to refer him to the NP.

On 6/6/18 there is an unsigned refusal of NP sick call.

On 6/7/18 the patient signed a refusal of chronic care but there are no listed risks of refusal.

**Chronic Disease**

On 6/11/18 a NP (EC) saw the patient for chronic disease management. Weight=132 lbs. The patient had not been tested for TB since 6/23/2009. Hypertension was listed as a diagnosis but Dr. Arnold previously documented there was no evidence of hypertension. The NP documented that the patient was seen for evaluation of asthma (not COPD) and reported good control with inhalers. + pulmonary ROS. The patient reported losing too much weight despite dietary compliance and stated he had some of his intestine removed and was supposed to be getting Vitamin B12 injections. Lungs: CTA. The NP assessed the patient's hypertension as being in good control even though the patient did not have evidence of hypertension. Hyperlipidemia assessed as being in good control although labs are not referenced. The NP did not assess the patient's weight loss and planned to see the patient in 6 months.

**Sick Call**

On 8/15/18 the patient submitted a SCR form complaining of severe headache and being out of Excedrin for 3 weeks. It was received and triaged on 8/16/18. On 8/20/18 a RN saw the patient. Weight=146 pounds.

On 8/21/18 the patient's weight was noted as being 157 lbs. which is discrepant from recent weights.

On 9/12/18 the patient's weight was noted as being 158 lbs. which is discrepant from recent weights.

**Assessment:** This record shows repeated issues with access to care. The patient was not brought to medical appointments primarily due to facility lockdowns. Nurses did not timely evaluate the patient following submission of sick call requests. In March 2018 the nurse did not refer the patient to a provider for a fever and productive cough and several days later he was sent to the hospital to rule out pneumonia. Medication records show medication errors and lack of documentation that nurses administered medications to the patient.

At chronic disease visits, providers did not perform disease pertinent review of systems and consistently measure peak expiratory flow rates at each visit. Measured weights are highly discrepant, raising questions about the accuracy of scales and whether the patient was weighed with or without shackles. Nevertheless, medical providers have not adequately evaluated the patient's complaint of weight loss. Lack of evaluation for weight loss. Lack of timely access to care. Lack of adequate chronic disease medications.

Dr. Arnold was on-site and ordered the patient sent to the hospital but did not document a clinical evaluation and did not see the patient following his return from the hospital. This patient was not provided timely and appropriate care for his serious medical conditions.

**Patient #6**

This 52-year-old man transferred to EMCF on 2/10/14. His medical history included diabetes, hypertension, latent TB infection, adjustment disorder, mild asthma. His medications are

Novolin 70/30 and regular insulin, lisinopril, aspirin, Zocor, nitrostat, Albuterol, Alvesco, Tegretol and Omeprazole.

**Chronic Disease Management**
In June 2017 the patient was receiving Humulin 70/30 and regular insulin for treatment of diabetes, hydrochlorothiazide 25 mg and amlodipine 2.5 for BP and nitroglycerin for chest pain.

In August 2017 the patient was rescheduled for chronic disease management 4 times for lack of escorts.

August 2017 MARs show the patient's morning blood sugars were frequently in the 200's and afternoon blood sugars in the high 200's and 300's. The MARs also showed that nurses did not document administration status for 10 days for amlodipine, hydrochlorothiazide and tegretol.

**Chronic Disease Management**
On 8/26/17 a NP (PH) saw the patient for chronic disease management. Weight=238 lbs. BP=155/97 mm Hg. Patient states he is not getting his chronic disease medications because he does have his name badge but reports getting insulin. The NP performed no CV or diabetes ROS, including asking the patient about chest pain for which he was prescribed nitrostat. + pulmonary ROS. I have reviewed labs with the patient but the NP did not specify which labs. The NP assessed the patient's hypertension in fair control, hyperlipidemia in good control, and diabetes in fair control but it is unclear what this assessment is based upon. The NP updated the patient's medications hydrochlorothiazide, norvasc and nitrostat for chest pain. No adjustment to diabetes or hypertension regimen. The NP ordered a hemoglobin A1C and planned to see the patient in 3 months.

**Lab**
On 9/12/17 labs showed the patient's diabetes was poorly controlled (HbA1C=10.8%).

**Chronic Disease Management**
On 3/6/18 Dr. Arnold saw the patient for chronic disease follow-up. Weight=245 lbs. BP=145/77 mm Hg. The physician documented that the patient had chest pain, SOB, DOE and orthopnea. The provider did not describe the onset, location, quality, radiation or duration of his chest pain. Also has asthma with SOB and cough productive of yellow phlegm. No PEFRs. All physical findings were noted as completely normal. Hypertension control was fair with recent diastolic readings above 90. He planned weekly blood pressure monitoring and chronic disease visit in 3 months. No change in medication regimen. Hyperlipidemia control was worsening and in fair control. Did not reference labs. Dr. Arnold noted the patient's diabetes was in poor control with a hemoglobin A1C over 10 in October 2017. He ordered Novolin 70/30 65 units in the morning and evening. Lisinopril-Hydrochlorothiazide 20-12.5 daily, Zocor 20 at bedtime and Alvesco one inhalation twice daily and Xopenex. Dr. Arnold did not address the patient's chest pain, SOB, DOE and orthopnea. He did not order an EKG or chest x-ray.

**Labs**
On 3/8/18 labs showed the patient's LDL=96 and diabetes control was improved but not at goal (HbA1C=8.6%). AST=44.

**Specialty Service-Ophthalmology**
On 4/3/18 the ophthalmologist saw the patient and diagnosed him with embolism and thrombosis of unspecified artery and ordered an echocardiogram and carotid ultrasound. On 4/3/18 Dr. Arnold reviewed this report and noted the recommendations but did not document an order for the recommended tests and they were not performed.

**Chronic Disease Management**
On 4/5/18 NP (EC) saw the patient for follow-up. Weight=253 lbs. BP=149/88 mm Hg. No CV or diabetes ROS. Patient had one asthma attack in the past month and used one short acting inhaler. Later in the note the NP noted the patient reported night time awakening and to use the inhaler once a week. No PEFRs. Did not reference recent diabetes and lipid labs. The NP assessed the patient's diabetes and asthma in fair control, but did not address the patient's poorly controlled hypertension. No change in treatment regimen and planned to follow-up in 3 months.

**Specialty Service-Ophthalmology**
On 4/11/18 an ophthalmologist saw the patient who reported floaters in both eyes. The ophthalmologist noted that he had left eye tributary retinal vein occlusion, type II diabetes, intraocular lens and keratoconus. He recommended better blood sugar control, consider blood pressure work-up, carotid ultrasound and follow-up in 4 months or sooner as needed.

**Specialty Services Follow-up**
On 4/11/18 a nurse practitioner saw the patient and noted the patient reported that the eye doctor told him he had a blockage in his left eye and that his blood pressure needs to be monitored. The patient reported he takes his blood pressure medications if they bring his medications to the kitchen. BP=160/96 mm Hg. The NP ordered blood pressure monitoring three times a week but made not adjustment to the patient's hypertension medication regimen and did not order follow-up. There is no documentation that the ophthalmologist's recommendations were ordered.

**Chronic Disease Management**
On 7/10/18 Dr. Arnold saw the patient. Weight=254. BP=112/80 mm Hg. Oxygen saturation=95%. No PEFRs. No CV or diabetes ROS. The patient reported not having a short acting inhaler the previous month and was having nocturnal symptoms once a week. The provider assessed the patient has having moderate asthma due to using 1 to 1.5 cannisters per month, but the patient didn't have access to a short acting inhaler the previous month. The provider documented Type II diabetes now requiring insulin, but the patient had not been on any oral agent for over a year. Diabetes was assessed to be in fair control. Provider counseled patient about diet but made no adjustments to his diabetic regimen including adding an oral agent. Hypertension and hyperlipidemia in good control. Patient reported difficulty swallowing

and has to drink water to make his food go down. The physician planned a trial of tums and possible endoscopy. He ordered labs and planned to see the patient in 3 months.

**Abnormal EKG**
On 7/12/18 an EKG showed NSR and ST elevation, consider early repolarization, pericarditis or injury. Abnormal EKG. On 7/12/18 a provider illegibly signed the report.

**Lab**
On 7/13/18 labs showed the patient's diabetes control was not at goal (HbA1C=8.8%).

**Chronic Disease Management**
On 9/26/18 Dr. Arnold saw the patient. Weight=236 mm Hg. BP=128/90 mm Hg. No PEFRs. No CV or DM ROS. The patient continued to have difficulty swallowing and Tums did not help. The provider did not note the patient had 20-pound weight loss since 7/10/18. He assessed that his hypertension was not at goal and diabetes control was worsening and in fair control. He increased the patient's Novolin 70/30 from 65 to 70 units and planned to see him in 3 months.

**Chronic Disease Management**
On 10/15/18 Dr. Arnold saw the patient for follow-up. Weight=247 lbs. BP=154/92 mm Hg. No CV or diabetes ROS. Diabetes in poor control. He increased his Novolin 70/30 from 70 to 75 units in the morning and 70 units in the evening. The provider did not address the patient's poorly controlled hypertension.

**Specialty Services-Gastroenterology**
On 10/17/18 GI saw the patient for dysphagia, GERD and illegible. GI recommended PPI, EGD and colonoscopy.

On 10/21/18 nurses responded to a housing unit for a patient who felt hypoglycemic. At 10:21 am His blood sugar was low (59, normal=<80-120). The patient stated that he had received his insulin but had not received his breakfast tray due to the facility lockdown. The nurse informed security that diabetic patients must be fed first so they do not develop hypoglycemia. Repeat BS=68.

On 10/25, 10/26 and 10/30/18 custody did not escort the patient to medical due to facility lockdown.

**Assessment:** Medical provider did not perform disease pertinent evaluations by obtaining review of systems, consistently performing peak expiratory flow rates for asthma. There was lack of timely follow-up for the patient's poorly controlled diabetes in October 2017. N 10/15/18, Dr. Arnold did not address the patient's poorly controlled hypertension, assess whether he was receiving and taking his medications, or modify the patient's treatment plan. Following the ophthalmology consult, Dr. Arnold did not meet with the patient to discuss the findings and did not address ophthalmology recommendations for carotid ultrasound following diagnosis of retinal artery embolism. Measured weights show the patient lost 20 lbs. in 2

months but providers did not assess whether this was intentional or unintentional weight loss. This patient was not provided timely and appropriate care for his serious medical conditions.

**Patient #7**

This 44-year-old man transferred to EMCF on 2/9/18. His medical history included HIV and chronic hepatitis B and C infection, and depression. His medications are Descovy, Prezista, Norvir, Paxil and Buspirone.

The patient has been diagnosed with hepatitis C infection, however there is no HCV viral load test showing whether the patient has a detectable viral load demonstrating chronic infection.

Prior to transfer to EMCF, on 11/30/17 Intake labs showed the patient had HIV and hepatitis B and C infection. Liver function tests were normal.

On 12/21/17 HIV telemedicine saw the patient who was diagnosed in 2001. The patient had been taking Truvada, Prezista, Norvir and Bactrim. No HIV or hepatitis ROS. Previous CD4=213 and HIV viral load=23. HIV Genotype showed NNRTI resistance. The provider discussed a new regimen but the patient wished to continue the current one. CD4 and VL today, VL in 10 weeks. The provider did not address his hepatitis B and C infection.

On 12/21/17 labs drawn the same day show his CD4=337.

**Intrasystem Transfer**

On 2/9/18 at 0800 a RN screened the patient. Vital signs were normal except the patient had a temperature of 99.8° F. Weight=188 lbs. Patient stated he has glaucoma of the left eye. No notation of HIV and HCV infection. Medications not identified or need for enrollment into the chronic disease clinic.

On 2/9/18 mental health saw the patient.

**Continuity of Medications**

On 2/11/18 at 20:12 an LPN entered the patient's HIV medications into the EMR. On 2/12/18 at 0635 the physician signed the order. On 2/14/18 the patient's mental health medications were ordered.

**Chronic Disease Management**

An EMCF provider did not see the patient within 30 days of arrival.

**Specialty Services**

On 3/14/18 the HIV Telemedicine provider saw the patient for follow-up noting that he had HBV and HCV coinfection. Restarted therapy about a month after transfer to EMCF. VL=120 two weeks prior and CD4=400. The plan was to continue current regimen and discontinue Bactrim, however the HIV provider did not discontinue Bactrim in the EMR. Recheck labs in a few months. The provider did not address the patient's HCV and HBV coinfection. RTC in 3 months.

On 3/29/18 HIV viral load=129 copies.

**Chronic Disease Management**
On 5/10/18 Dr. Arnold saw the patient for the first chronic disease management visit noting his HIV and hepatitis B and C infections. Dr. Arnold did not perform a GI ROS. Exam is the same as in every record. Last HIV labs on 3/3/18 showed VL=120/copies and CD3=300. The provider assessed the patient's viral load as being undetectable which was incorrect and noted the patient was compliant with his medications. Dr. Arnold did not medically evaluate the patient's HBV and HCV infection.

**Labs**
On 6/1/18 the patient's CD4=303 and HIV viral load=21/copies. HBV viral load was detectable. No HCV viral load.

**Specialty Services-HIV Telemedicine**
On 6/13/18 the HIV Telemedicine provider saw the patient for follow-up noting that he had HBV and HCV coinfection. No HIV or HCV ROS. Good medication compliance. Continue current regimen. Recheck VL (viral load) 10 weeks. The provider did not address the patient's HCV and HBV coinfection. RTC in 3 months.

**Chronic Disease Management**
On 8/17/18 a NP (PH) saw the patient for chronic care. No hepatitis or HIV ROS. No review of labs. Plan is CBC with differential and CMP. Follow-up in 6 months.

**Specialty Services-HIV Telemedicine**
On 9/4/18 the HIV Telemedicine provider saw the patient for follow-up noting that he had HBV and HCV coinfection. No HIV or HCV ROS. Good medication compliance. Change Truvada to Descovy and maintain other components. Recheck VL in 11 weeks. The provider did not address the patient's HCV and HBV coinfection. RTC in 3 months.

**Medications**
February 2018 MARs show that the patient's HIV medications were ordered on 2/11/18 and were not provided to him until 2/22/18. A nurse dd not document administration status on 2/26/18. Bactrim was previously ordered on 12/21/18 and was not provided until 2/22/18. The patient received Buspar on 2/12/18 and Paxil on 2/16/18. There was no start and stop date for Paxil.

March 2018 MARs show the patient received HIV medications. The patient had been switched from Descovy to Truvada. The patient received Bactrim until 3/14/18 when it was discontinued.

April 2018 MARs show the patient did not receive HIV medications in the morning due to refusal or no show. Bactrim was shown as being an active order when the HIV provider

intended to discontinue it. Although there was an active order, nurses did not administer the medication to the patient.

May 2018 MARs show the patient received HIV medications with some no shows and refusals. Bactrim was still an active order although the HIV provider intended to discontinue it and nurses were not administering the medication. Numerous no shows for Paxil.

June 2018 MARs show that the nurse did not document administration status for HIV medications on 6/14, 6/22 and 6/27/18.

July 2018 MARs show that nurses documented the patient was administered HIV medications with some no shows and refusals. Bactrim still appeared as an active order although the HIV provider intended to discontinue it and nurses were not administering the medication since mid-March 2018. Numerous no shows for Paxil.

Another July 2018 MAR has an order dated 7/27/18 stating "Take antivirals" and lists Truvada, Prezista and Norvir on a single line. It is signed by T. McCort HSA and initialed as being given on 7/28 and 7/29/18. It is unclear what this means, and whether the patient was given his medications to keep on person (KOP) or something else.

August 2018 MARs show a medication order for HIV medications as a single entry instead of listing each medication individually. Another August 2018 MAR notes an order dated 7/27/18 that states "Take Antivirals" with a nurse documenting administration of doses. It is unclear what this means.

**Assessment:** The intake nurse did not acknowledge the patient's chronic diseases and the patient was not provided continuity of HIV and mental health medications. This suggests that the nurse was performing the intake assessment without access to the medical record. Dr. Arnold did not see the patient for 3 months after his arrival to assess his chronic diseases. He incorrectly assessed the patient as having an undetectable viral load when the patient's viral load was detectable reflecting interruptions in HIV medication. He did not perform an HIV or GI review of systems. The patient has not been evaluated for treatment of chronic hepatitis B infection and not evaluated to determine whether he has chronic hepatitis C infection (i.e. a detectable viral load) and evaluated for treatment. Medication records show a number of concerns including: lack of continuity of HIV medications; provider failure to discontinue medication in physician orders; nurse's failure to contact a provider to discontinue the medication order; incorrect transcription of HIV medications; and nurse failure to document medication administration. The patient has not been provided adequate care for his chronic hepatitis B infection and not evaluated for his hepatitis C infection.

### Patient #8
This 38-year-old man transferred to EMCF on 12/15/16. His medical history included HIV infection, hypertension, hypothyroidism s/p radioactive iodine to treat hyperthyroidism, asthma and major depression. His medications are Triumeq, hydrochlorothiazide and Xopenex.

I interviewed an HIV patient who was brought to the clinic for medication noncompliance counseling. This was done because the patient was refusing HIV medications because he believed his confidentiality was being violated. When he received his medications, the nurse did not ask other inmates to stand back from the cart. He was concerned that other inmates knew he was taking HIV medications. In one instance, a nurse gave his medication to another inmate to deliver to him because he was in the bathroom. He reported that he was now being brought to the clinic to receive his chronic disease medications but that sometimes he was not being called to the clinic. He reported that nurses began asking inmates to present ID badges at medication pass only in the past 2-3 months.

The patient reported that the health program at EMCF "a mess". On the day was brought to the clinic he reported that when Dr. Arnold saw him, he said: What is (name) doing here? I don't know what you are up here for." The health administrator arranged for a nurse practitioner to see the patient. The patient reported that he dreads seeing the doctor who doesn't ask him any questions and examines him by rolling his chair over to the exam table and not standing up out of the chair. He told the doctor he had lost 15-20 pounds in 3 weeks and the doctor told him to eat more from the canteen.

On 7/27/18 he weighed 171 lbs. and on 10/25/18 his weight was 150 lbs.

**Intrasystem Transfer**
On 12/15/16 a RN completed a transfer screening. VS normal. No documentation of chronic diseases. Medications were synthroid, buspirone and Zoloft. No documented referral to the chronic disease program. On 12/15/16 signed by the physician. December 2016 MARs show the patient did not receive any chronic disease medications, including Atripla. No start and stop date for the Atripla order. Others ordered on 12/15/16.

**Labs**
On 3/12/18 labs showed the patient's hypothyroidism was poorly controlled (TSH=90.33), normal=0.1784 to 4.5). On 3/14/18 the lab was signed by a NP (PH).

**Chronic Disease Management**
On 4/9/18 Dr. Arnold saw the patient for chronic disease management. Weight=167 lbs. BP=124/97 mm Hg. The provider noted the patient had HIV infection, asthma and hyperthyroidism. No CV or endocrine ROS. PEFR=343. The patient was currently taking HIV medications. "I have reviewed appropriate labs with the patient". The physician documented the patient did not have a hernia. Asthma control=Improved. Hypertension control=Fair. Hyperlipidemia control=Good. Hypothyroidism with elevated TSH last month but now has been on medication for one month. Now compliant but too soon to get TSH. HIV disease control good, viral load undetectable one month ago.  The physician planned to see the patient in 3 months.

**Specialty Services-HIV Telemedicine**
On 4/11/18 the HIV provider saw the patient who reported not receiving medications for unclear reasons. (March 2018 MARs show that nurses documented the patient as a No Show for most doses and no administration status for 5 doses). No other complaints. VL=88 copies in February 2018. Recheck VL one month after starting therapy. Virologic control=none. Clinical control=good. RTC in 3 months.

**Medications**
May 2018 MARs show multiple no shows for HIV medications but not the same number of no shows for blood pressure and thyroid medications.

No June 2018 MAR in the record.

**Specialty Services-HIV Telemedicine**
On 7/18/18 the patient did not come to an HIV telemedicine clinic visit and had been noncompliant with treatment. The provider recommended to counsel the patient on the importance of HIV treatment and to schedule him ASAP for the next appointment.

**Specialty Services-HIV Telemedicine**
On 8/8/18 HIV telemedicine saw the patient noting he was diagnosed in 2012 and currently taking Triumeq. The provider noted the patient missed appointments in the past and has been non-compliant to treatment because coming to the clinic exposes him to others and makes them aware of his diagnosis. Nurses have been able to convince him to take his medications for 1.5 months. He denies side effects. CD4=813 and viral load=6150 copies. Virologic control fair and clinical control good. The provider counseled the patient about compliance and told him that with compliance and viral suppression they can see him every 6 months. RTC in one month.

**Chronic Disease Management**
On 8/13/18 Dr. Arnold saw the patient for chronic disease management. Noted the patient's history of HIV, hypertension, hypothyroidism and asthma. Weight=166 lbs. BP=96/62, pulse=88/minute, respirations=16. Afebrile. O2Sat=98%. Dr. Arnold performed an asthma history and ROS but obtained no CV or endocrine history or ROS. No PEFRs, "spirometry results consistent with asthma". No reference to labs including TSH. The PE documented that the patient had no hernia. Despite no recent TSH the physician documented that the patient's hypothyroidism was in good control. The physician documented that the patient's hypertension was in good control and did not comment on the patient's HIV infection.

Note has a template Plan that is not patient specific.

**Chronic Disease Management**
On 10/25/18 NP saw the patient for chronic disease follow-up. Weight=150 lbs. BP=130/80 mm Hg. The patient reports that he has been missing doses of HIV medications because they don't call him for pill call and sometimes, he doesn't feel like getting up. However, he stated that

today he is going to take his medications as prescribed. He reports nasal congestion and coughing some nights. He reports that he will go home in 4 months. The examination states that the patient does not have a hernia. "I have reviewed labs with the patient". Continue Triumeq. The NP did not address the patient's hypothyroidism.

**Medications**
July 2018 MAR shows that nurses did not document administration status for 8 doses of Triumeq, hydrochlorothiazide and levothyroxine. There were 9 refusals (Patient on 4A).

August 2018 MAR show that nurses documented administration status for most doses. On 8/2/18 the order for Bactrim was discontinued but nurses continued to administer it until 8/4/18.

**Medications**
There is a September 2018 MAR with an order dated 7/24/18 that states come to medical at 1300 for wound care patient for medication. There are multiple blanks spaces on the MAR. An August MAR for wound care shows the patient came all but 3 days. The record does not reflect the patient had a wound and the MAR may have been a surrogate for coming for medication administration.

**Assessment:** This patient has had timely follow-up for his HIV infection and the telemedicine provider has addressed the patient's concerns about confidentiality as it relates to medication adherence. Likewise, medical staff have attempted to address his confidentiality concerns by bringing him to the medical clinic to receive his HIV medications.

However, at chronic disease visits, providers did not conduct disease pertinent review of systems and physical examinations (*e.g.* examination of his thyroid gland). Providers use physical examination templates that are virtually unchanged and document examinations that likely did not take place (*e.g.* hernia). The physician and NP have not timely addressed the patient's poorly controlled hypothyroidism by obtaining TSH levels and adjusting his medication. Neither have providers addressed his documented weight loss. The patient is prescribed a relatively high dose of levothyroxine (300 mcg), and it's possible that with improved medication adherence that the patients weight loss may be due to too much levothyroxine, however his TSH has not been checked since March 2018.

It is concerning that the patient reported an encounter with the physician that, if true, reflects a negative and unprofessional attitude toward patients.

MARs show that nurses do not document administration of each medication dose and have continued to administer medications after the provider discontinued them. This patient has not had timely and appropriate care for his hypothyroidism and documented weight loss.

**Patient #9**
This 51-year-old man transferred to EMCF in 2010. His medical history included hypertension, increased PSA and schizophrenia. His medications are hydrochlorothiazide, norvasc, hydralazine, and haloperidol.

On 7/10/17 urology saw the patient for an increased PSA (5.25). The patient reported bladder outlet obstruction and he had a history of right testicular injury with atrophy. Urology recommended repeating the PSA today with follow-up in one year. He did not have a repeat PSA and has not returned to the urologist.

On 7/13/18 his valproic acid was undetectable.

**Chronic Disease Management**
On 2/18/18 a NP (PH) saw the patient for chronic disease management. The patient inappropriately touched the NP and was dismissed from the clinic.

**Chronic Disease Management**
On 4/9/18 Dr. Arnold saw the patient for chronic disease management. Weight=148 lbs. BP=139/96 mm Hg. There is no clinical information in the note, no assessment of the patient's hypertension and no plan.

On 4/27/18 the patient's blood pressure was 156/98 mm Hg.

**Chronic Disease Management**
On 5/24/18 Dr. Arnold saw the patient for follow-up of hypertension and hyperlipidemia. BP=116/84 mm Hg. No CV ROS. Did not reference labs. PE the same. Did not examine extremities. Hypertension and hyperlipidemia assessed as being in good control. Follow-up 3 months.

On 6/22/18 the patient's blood pressure=148/99 mm Hg.

On 8/23/18 the patient was not transported to medical for a scheduled appointment.

On 8/29/18 the patient was not transported to medical for a chronic disease appointment.

**Medications**
August 2018 MARs show the patient was a no show for multiple doses. Nurses did not documentation administration of medications on 8/22, 8/23 and 8/30/18.

**Chronic Disease Management**
On 9/4/18 Dr. Arnold saw the patient for follow-up. BP=108/68 mm Hg. The provider noted the patient was delusional and it was difficult to obtain a ROS. PE the same with hernia.

Hypertension and hyperlipidemia in good control. The provider reordered Norvasc and hydrochlorothiazide. Follow-up in 3 months.

On 9/6/18 mental health saw the patient who was placed in ad-seg for assaulting security staff. He was refusing all medications, including Haldol and Depakote. The MH NP addressed the patient's noncompliance and planned to discuss with the psychiatrist and Dr. Arnold.

On 9/12/18 at 1:45 pm a nurse documented that the MH NP admitted the patient to the infirmary for psychiatric observation. The nurse did not measure vital signs.

On 9/12/18 the MH NP wrote an extensive note documenting that the patient's behavior and refusal of medications was due to severe psychosis. History of improved hypertension mediation compliance when taking antipsychotics. Planned to closely monitor BP due to continued refusal. Involuntary medication may be needed.

A medical provider did not see the patient.

On 9/13/18 at 08:06 patient refused blood pressure checks and medication.
On 9/14/18 at 7:30 am patient refused blood pressure checks and medication.
On 9/15/18 at 9:43 am patient refused blood pressure checks and medication.
On 9/15/18 at 5:08 pm patient refused blood pressure checks and medication.
On 9/16/18 patient refused blood pressure checks and medication.
On 9/17/18 patient the patient refused blood pressure medication.
On 9/18/18 patient refused blood pressure checks and medication.

On 9/18/18 the psychiatrist saw the patient noting that he was refusing medications but was not yet a danger to self.

On 9/19/18 the psychiatrist saw the patient noting that he was refusing medications but was not yet a danger to self.

On 9/20/18 patient refused blood pressure checks and medication.

On 9/20/18 the NP documented continued delusions.

**Medications**
September 2018 MARs show the patient refused or was a no show for 17 days.

The doctor documented that the patient was delusional during this time. No action taken.

On 9/21/18 BP=160/86 mm Hg. Took all of his medications without problems.
On 9/22/18 BP=158/88 mm Hg. Took all of his medications without problems.
On 9/23/18 patient refused blood pressure checks and medication.
On 9/25/18 patient refused blood pressure checks and medication.

On 9/25/18 the patient was discharged from the infirmary.

**Assessment:** Mental health staff appropriately admitted the patient to the infirmary to monitor him and encourage him to take his medical and mental health medications. There is no documentation that a medical provider attempted to evaluate and counsel the patient. The patient has a history of an elevated PSA and bladder outlet obstruction symptoms. Over a year ago, a urologist recommended repeat PSA and return in one year. Medical providers did not address this recommendation and the patient has been lost to follow-up. This is a concern due to a possibility of prostate cancer. The patient has not had timely follow-up for his increased PSA.

### Patient #10
This 51-year-old patient's medical history included hypertension, hepatitis C infection, latent TB infection, and schizophrenia. His medications are norvasc, hydralazine, propranolol, lithium fluphenazine, and Benadryl.

### Chronic Disease Management
On 3/27/18 the physician saw the patient for chronic disease management. The provider noted the patient complained of chest pain and dizziness which he attributed to elevated blood pressure relieved by ibuprofen. The provider also noted the patient had dizziness when rising from bed or sitting down. GI ROS=denies hematochezia, constipation, fatigue, myalgias and arthritis. BP=141/93 mm Hg. PE is exactly the same except to note under mass/organomegaly: None, but skin (sic) from weight loss. Hypertension in fair control today but has been poor over the last 3 months. Hyperlipidemia in fair control. Hepatitis in poor control. The physician planned to obtain qualification for treatment and ordered labs and liver ultrasound for increased ALT. The patient had detectable HCV RNA and was genotype 1a.

### Specialty Services-Ophthalmology
On 4/23/18 ophthalmology saw the patient and diagnosed him with retinal vein occlusion right eye with macular edema and left eye retinal vein occlusion, stable. History of glaucoma x 1 year. Ophthalmology noted the patient was prescribed Timolol twice daily. IOP (intraocular pressure) =14/16. The patient received injections to OD (right eye). An EMCF provider did not date and sign the ophthalmologist's report.

### Diagnostic Test
On 4/24/18 liver ultrasound was normal.

### Chronic Disease Management
On 5/1/18 the physician saw the patient for chronic disease management noting that he has cirrhosis by clinical parameters and liver ultrasound was normal. He is awaiting GI for further evaluation and treatment. He did not note the patient had glaucoma and was being followed by ophthalmology. The physician did not note the patient was to be prescribed Timolol. Weight=150 lbs. BP=130/90 mm Hg. Follow-up in 1 month.

**Labs**
On 5/24/18 labs show the patient is anemic (Hgb/Hct=11.7/33.7%). FOBT negative x 3. Creatinine=2.2

**Chronic Disease Management**
On 5/29/18 the physician saw the patient for chronic disease management. He did not note glaucoma as one of his chronic diseases and that he was being followed by ophthalmology. Weight=146 lbs. BP=142/96 mm Hg. The provider performed no CV or GI ROS. Noted that ultrasound was normal for liver and kidneys. 5/4/18 labs show creatinine had increased to 2.22 compared to 1.17 before. The PE examination uses the template and was unchanged. The physician did not assess the patient's hypertension or glaucoma control and found HCV under fair control. He ordered labs and follow-up in 1 month.

**Specialty Services-Ophthalmology**
On 6/6/18 ophthalmology saw the patient for follow-up. IOP=15/16. Patient states compliance with drops. The ophthalmologist performed Avastin injection. An EMCF provider did not sign the report.

**Chronic Disease Management**
On 6/26/18 the NP (PH) saw the patient for chronic disease management. Weight=145 lbs. BP=147/100 mm Hg. The NP performed no CV or GI ROS. Patient had not received medications that morning. The physical examination was the EMR template that documented no hernia. I have reviewed labs with the patient. The NP noted that the patient's hepatitis C was in fair control due to ALT 2x normal for greater than 6 months and abnormal APRI. Continue plan of care. The NP noted that hypertension was under good control. Follow-up in 3 months. Ordered labs in 3 months.

**Lab**
On 6/27/18 lithium level was subtherapeutic (0.5, 0.6-1.2).

**Specialty Service-Ophthalmology**
On 7/12/18 ophthalmology saw the patient for follow-up. The patient complained of flashes OS (left eye) and floaters OU (both eyes). HTN controlled by meds. IOP=15/16. Timolol twice daily OU. S/P Avastin #2 Last injection 6/6/18. Continue Timolol every morning OU. Control BP. The provider performed another injection.  The report is unsigned by a provider.

On 7/12/18 the physician saw the patient for off-site return. The physician did not note that ophthalmology recommended timolol for glaucoma.

**Chronic Disease Management**
On 9/19/18 the physician saw the patient for chronic disease management. Weight=146 lbs. BP=130/86 mm Hg. The provider performed no CV or GI ROS other than to note the patient had

nausea. Physical examination is documented using the same EMR template with normal findings. The physician did not reference any labs in the note. HTN and HCV under good control. Labs and follow-up in 3 months. The physician did not address his previous plan to refer the patient to GI for treatment.

**Labs**
On 9/24/28 labs showed creatinine=1.4 and GFR=58. AST/Alt=87/175. Other hepatic function tests are normal.

As of 10/26/18 the patient is not prescribed timolol for treatment of his glaucoma.

**Assessment:** The physician did not explore the patient's symptoms of chest pain (*e.g.*, quality, location, intensity, radiation and aggravating and alleviating factors) and dizziness other than to describe the onset. The physician has diagnosed the patient as likely having cirrhosis and is pending evaluation for hepatitis C treatment since May 2018, however 5 months have elapsed and GI has not evaluated the patient for treatment. The physician appears to be unaware that the patient has glaucoma and has not prescribed Timolol as recommended by the ophthalmologist. The physician has not evaluated the patient's anemia. The patient was not provided timely and appropriate care for his glaucoma and hepatitis C infection.


**Patient #11**
This 25-year-old man transferred to EMCF on 2/25/18. His medical history included hepatitis C infection, alcohol and amphetamine abuse and major depression. His medications are prazosin, Bactrim Zyprexa and paroxetine.

Prior to transfer to CMCF on 1/22/18 CMCF provider saw the patient for chronic disease management of hepatitis C infection. The patient's liver enzymes were significantly elevated (AST/ALT=167/435, normal=AST=0-40 and 0-60). Fib score=0.73 continue with current RX. Good control. Follow-up in 6 months.

**Intrasystem Transfer**
On 2/11/18 a RN screened the patient. No notation of chronic or mental health diseases. VS stable. Weight=160 lbs. Arrangements made for medication administration.

**Mental Health**
On 2/28/18 mental health saw the patient who reported that a CMCF NP saw him on 1/22/18 and that he was paranoid and anxious. The NP discontinued Risperdal and recommended Haldol. The patient stated he did not want to take any medications. The NP counseled the patient.

Benadryl was ordered on 2/27/18 but there is no MAR in the record for February and March 2018.

**Mental Health**
On 3/22/18 MH saw the patient for follow-up.

**Sick Call**
On 5/10/18 the patient submitted a SCR complaining of itching skin and a rash. He would like to have blood drawn and be tested. On 5/11/18 the form was received and triaged. On 5/11 and 5/12/18 custody did not transport the patient to medical. On 5/13/18 a RN saw the patient and noted he had red blotching areas to chest and arm and treated the patient with HC (hydrocortisone cream) and referred the patient to a provider.

**Sick Call**
On 5/13/18 the patient submitted a SCR stating that he needed medical attention for a burn on the left side of his face as soon as possible. He also requested blood tests. On 5/20/18 the request was received.

On 5/18/18 custody did not transport the patient for a medical appointment due to facility lockdown.

On 5/19/18 custody did not transport the patient for a medical appointment due to facility lockdown.

On 5/20/18 custody did not transport the patient for a medical appointment due to facility lockdown.

On 5/21/18 custody did not transport the patient for a medical appointment due to facility lockdown.
On 5/22/18 mental health saw the patient and noted that a week ago he had a burn from another inmate throwing hot oil on his face.

On 5/22/18 a nurse saw the patient and noted the patient was burned with hot oil a week ago and had a 3 cm partial thickness burn.

On 5/23/28 a provider saw him for an assault that took place one month prior (sic). Another inmate had thrown hot oil on his face. The patient had 5 cm wound to left temple with erythema and thick yellow secretion around the wound. The provider ordered Bactrim and wound care x 14 days.

On 5/26/18 the patient submitted a SCR complaining that his face was draining and he has nothing to put on an open wound. "I am supposed to get wound are once a day and I haven't received it at all." On 5/30/18 the form was received and triaged. On 6/5/18 a RN saw the patient noting that his right calf was larger than his left. No heat no loss of ROM, redness noted several small red spots. BP=156/87 mm Hg. Temp 98.4. Follow-up with NP.

On 5/31/18 custody did not transport the patient for a medical appointment due to facility lock down.

On 6/5/18 the patient submitted a SCR requesting blood work. On 6/6/18 the form was received and triaged. On 6/7/18 a RN saw the patient noting that he had +1 pitting edema to his right leg. BP=142/86 mm Hg. Afebrile.

On 6/5/18 a NP saw the patient who reported that his right leg has been swelling for two days and was painful. Noted 5 cm wound to left temple and "right leg with small scattered red sores and mid swelling to right leg". The NP's plan was Bactrim and to collaborate with Dr. Arnold regarding obtaining Doppler to rule out DVT in his right leg. Clean left temple x 14 days. The NP did document scheduling a follow-up visit but counseled the patient to put in a sick call request.

**Provider Follow-up**
On Wednesday, 6/6/18 a NP saw the patient who reported that his head hurt and his leg turned purple last night and had been like this for 2 days. He thinks he has a blood clot. The patient reported pain with ambulation. VS normal.  The NP ordered Cleocin and bacitracin and consulted Dr. Arnold who recommended putting the patient on coumadin and order a doppler. Dr. Arnold did not see the patient.

**Diagnostic Test**
It is unclear from the record, but the patient may have been sent out for a doppler ultrasound the same day. There is no report in the record.

**Provider Follow-up**
On 6/9/18 a NP saw the patient who reported that his right lower leg was swollen and had a sore on it. He reported that he could not feel his toes. He was not getting wound care to temple. Right lower leg swollen with scab wound on shin. The NP did not palpate the calf for heat, tenderness or induration and did not measure the size of his calf. The NP's plan was Cleocin, Bacitracin and wound care. Follow up will be scheduled

**Sick Call**
On 6/8/18 the patient submitted a SCR stating that he was worried about having a serious blood clot on his right leg because it went from red to purples and was very hot. He was having trouble walking. The patient was in 5B. On 6/12/18 the form was received and triaged. On 6/12/18 a RN sent the patient to medical.

**Provider Visit**
On 6/12/18 at 1202 Dr. Arnold wrote that the patient was seen 2 times previously by two other NP's for swelling of the right leg. He was sent to the ER (emergency department) last week to rule out DVT but no report had returned. He is on coumadin 1 mg day. Continues to have pain and swelling. He is not coming for wound care for treatments. He is on Bactrim and Cleocin. Swelling of left lower leg with areas of induration and drainage. Tender to touch. The physician

ordered Rocephin 2 grams IM daily for 3 days, Add Bactrim and daily wound care, C&S (culture and sensitivity) and RTC to see FNP in 3 days. Toradol 60 mg IM every 12 hours for 5 days.

On 6/12/18 at 11:30 am the patient was given Bactrim 2 tablets stat and IM Toradol per Arnold's orders. On 6/12/18 wound culture showed enterococcus faecium susceptible to penicillin.

**Hospitalization**

On 6/12/18 at 3:42 pm the patient was admitted to the hospital for right lower extremity abscess. Labs showed he had leukocytosis (increased white blood cell count indicating systemic infection). He underwent surgery with debridement of non-viable tissue leaving a cavity 4.5 x 4.0 cm. He was treated with Bactrim and Clindamycin.

On 6/15/18 he was discharged back to the facility with wound care instructions and prescription for Cipro 500 mg x 7 days (antibiotic) and Tramadol (pain medication). At 5:57 pm a NP saw the patient noting wound care instructions to pack the wound care to allow it to heal secondarily from the inside out. Follow-up with Denison (the surgeon) in 2 weeks on 6/27/18. The NP noted that Tramadol and cipro 500 x 7 days. The NP did not write an order for admission to the infirmary with orders to include the frequency of vital signs,

On 6/15/18 nurses did not document an admission assessment of the patient.

On 6/16/18 the NP ordered daily wound care wash normally with soap and water repack with saline moistened gauze.

On 6/16/18 nurses did not document a patient assessment.

On 6/17/18 nurses did not document a patient assessment.

On 6/18/18 nurses did not document a patient assessment.

On 6/19/18 at 4:23 pm a nurse documented that the patient remained in sheltered housing for medical observation related to this left wound leg. Receives daily care that includes packing of the wound. The nurse did not document vital signs, description of the wound or wound care provided.

On 6/20/18 at 5:35 am a nurse wrote a brief note about a wound on the patient's left lower leg. The nurse did not describe the patient's wound.

On 6/20/18 a NP documented that the patient reported that his wound is looking better but still hurts. The NP described the patient's right leg with a 4 cm red-yellowish wound to the right medial leg and a 1.5 cm yellowish wound on lateral left leg. No active drainage. The plan was to continue wound care until the surgeon saw the patient for follow-up.

On 6/20/18 at 9:19 am a nurse administered Toradol to the patient. The nurse did not perform a pain assessment.

On 6/21/18 neither a nurse nor provider documented an assessment of the patient.

On 6/22/18 a provider did not assess the patient.

On Friday, 6/22/18 at 7:00 pm, a nurse wrote the patient was receiving wound care to his left leg, no documentation regarding the patient's right lower leg wound.

**Hospitalization**
On Saturday 6/23/18 at 12:37 pm a nurse documented that NP Bennett saw the patient to evaluate wounds to patient's right mid and lower leg. The nurse noted that the wound had foul odor and bloody pus. Patient complained of pain 10 of 10 in severity. Patient also noted with new spot on the same leg. The nurse documented that NP Bennett in collaboration with Arnold gave a verbal order to send the patient to the ED for evaluation and treatment. Patient had previously had surgery to right leg at Anderson ER and was to follow-up with doctor and treated him before. VS=131/95 mm Hg, pulse=104/minute, respirations=16/minute and Temp=99.8. Shift supervisor was notified of impending transport. The nurse documented that a report was given to the Anderson ER nurse and that the patient was transported by van.

The NP documented that there was an approximate 3 cm wound to right lateral leg and 5 cm wound to the right medial leg with moderate amount of blood, pus drainage and foul odor. Send to hospital.

On 6/23/28 the surgeon noted old necrotic debris within the wound. The patient underwent surgery to debride necrotic tissue away from the surrounding skin. Temp=99.8°F and BP=162/106 mm Hg.

On 6/24/18 at 3:19 am a RN documented that the patient has been sleeping quietly at this time. Respirations even, nonlabored skin w/d color WNL. Remains under medical observation for wound leg at leg wit dressing d/I Cont. B&B. Receives tray with meals.

On 6/24/18 at 03:35 am the same RN documented that the previous note was from 6/23/18. Currently in Anderson hospital. This raises questions about falsification of the medical record.

On 6/25/18 the surgeon sent a letter stating that the patient reported for the first week that the facility did not pack the wounds. Plan to follow-up on 7/17/18

On 6/27/17 A NP saw the patient for return from offsite. Ordered Levaquin and Bactrim and wound care. There is no order to admit the patient to the infirmary with accompanying orders such as frequency of vital signs, etc. An LPN did not sign this order off until 7/6/18.

On 6/28/18 Dr. Arnold wrote orders for daily wound care. There is no documentation that he saw the patient.

On 6/28/18 at 10:00 am a RN noted the patient was in sheltered housing complained of pain 10 of 10 in severity. The patient's leg dressing was intact. There was no description of the patient's right lower leg wound. Given Toradol. Tramadol ordered.

On 6/29/18 at 1:45 pm the patient was given an injection of Toradol

On 6/29/18 nurses did not document wound care.

On 6/30/18 at 12:27 pm a NP saw the patient who complained of right leg pain 10 of 10 in severity. They took his crutches because he was beating on the door because he wanted something for pain. Did not examine wound. He reported that the last dose of Toradol was given yesterday evening during wound care. The NP did not address the patient's pain.

On 7/1/18 the patient was given an injection of Toradol.

On 7/2/18 the physician did not see the patient but ordered ketorolac IM for pain.

On 7/2/18 the patient was the subject of an interdisiplinary meeting because the charge nurse discovered the patient had put toilet paper in his wound. Patient stated that the wound kept draining and he thought that is why it was necessary to pack his own wound. Dr. Arnold wrote an order to conduct wound care twice daily.

There was no documentation of wound care until 7/3/18.

On 7/3/18 the charge nurse (KH) documented that the patient's wound had Serous purulent drainage and foul odor.

No wound care documented from 7/4 to 7/7/18.

**Chronic Disease Management**
On 7/9/18 the physician saw the patient for chronic disease follow-up. No GI ROS. PE exactly the same. Hepatitis C in fair control with consistently elevated ALT. Same. Fair control. No plan for work-up. Follow-up in 3 months. The physician did not address that the patient was in the infirmary or examine his leg. There is no documentation that the patient even spoke to the patient.

**Lab**
On 7/9/18 labs showed HCV RNA =8130, genotype 3a. AST/ALT=21/25.

On 7/9/19 a nurse did not document wound care.

**Lab**
On 7/11/18 LDL=69.

On 7/12/18 Arnold saw the patient noting that he has good granulation and no purulent drainage but when applied pressure that chunks of paper come out. Counseled the patient. Wound care twice daily. No documented plans for follow-up.

On 7/12/18 a provider ordered Tramadol 50 mg twice daily with wound care. First dose not given on 7/15/18 and not given on 7/18, 7/19, and 7/20/18.

On 7/13 and 7/14 there is no documentation that nurses performed wound care.

On 7/15/18 a nurse gave the patient Tramadol.

On 7/15/18, and 7/16/18, wound care was performed.

On 7/17/18 provider saw the patient because the nurse expressed pus from the wound.

On 7/18 and 7/19 wound care was performed and purulent drainage was noted.

On 7/23/18 Dr. Arnold saw him and sent him back to the hospital where he underwent surgical debridement for the third time. The plan was to follow-up in 1 to 2 weeks.

**Chronic Disease Management**
On 9/25/18 the physician saw the patient for follow-up. ROS= fatigue pruritis. I have reviewed labs with the patient. LFT's stable per July 2018 labs. Follow-up in 3 months.

**Lab**
On 9/6/18 ALT=57

**Mental Health**
On 9/19/18 at 1943 Dr. Bonner admitted the patient to the infirmary.

**Mental Health**
On 10/2/18 a MHP documented that on 10/1/18 the patient declared he was suicidal. The unit was on lockdown and the patient started a fire. Cert team came and put out the fire. HU3C. The patient stated that he wanted to go to medical and stay. The MHP documented that "…It wasn't until lockdown that the patient was crying suicidal". Client taken to 5B.

On 10/2/18 at 3:25 pm an LPN performed a pre-lockdown assessment and injury screen. BP=148/93 mm Hg, pulse=101/minute, respirations=18/minute and Temp=101°.2 F. The LPN did not notify a provider of the patient's fever. On 10/3/18 at 11:20 am Dr. Arnold signed this note.

**Sick Call**
On 10/7/18 the patient submitted a SCR stating that he had staff on his right leg again and need medical attention. (patient on 3A) It hurts when I walk. On 10/12/18 it was received and triaged. On 10/12/18 the patient was not transported to medical due to facility lockdown.

**Sick Call-Dental**
On 10/12/18 the patient submitted a SCR complaining of dental pain and needing a tooth pulled. On 10/13/18 the form was received and triaged. On 10/15/18 a RN saw the patient and referred the patient to dental in 7 days. On 10/24/18 custody did not escort the patient to dental due to the statewide lockdown. Dental rescheduled the patient for 11/7/18. Dental has not seen the patient.

On 10/13/18 the patient was not transported to medical due to lockdown.

**Nurse Encounter**
On 10/14/18 a RN saw the patient. The nurse did not describe the wound other than to note "blister" The RN referred the patient to a provider. On 10/16/18 a provider saw the patient and prescribed Bactrim and to perform wound care in the clinic x 2 weeks.

On 10/17/18 the patient refused Bactrim and Prozac. The patient was listed as a no show for wound care.

On 10/18/18 a nurse performed wound care but did not describe the wound.
On 10/19/18 a nurse performed wound care but did not describe the wound.
On 10/20/18 the patient was not brought to medical due to lockdown.
On 10/21/18 a nurse performed wound care and described the wound.
On 10/23/18 a nurse performed wound care but did not describe the wound.
On 10/24/18 a nurse performed wound care but did not describe the wound.

On 10/24/18 not brought to dental due to lockdown.

**Assessment:** This patient's medical care is shocking and exacerbated by lack of access to care from ongoing facility lockdowns. First, the patient suffered a facial burn from an assault with hot oil by another inmate and was not provided medical care for this burn until at least a week if not longer, and not until the burn became infected. Second, providers did not timely diagnose the patient with a lower leg abscess, believing that the patient had a deep vein thrombosis, but did not timely follow-up the patient for this potentially serious condition. The physician planned to start the patient on Coumadin prior to a diagnosis of DVT, however it does not appear that the order was ever written. Following, diagnosis of the patient's leg abscess, the patient was not formally admitted to the infirmary with orders addressing activity, diet, and vital signs. Nurses did not perform an admission assessment documenting a plan of care, and did not perform daily wound care. When wound care was performed, nurses did not describe the patient's wound. The lack of adequate wound care resulted in the patient being re-hospitalized twice for recurrent infection and surgical debridement. Nurses also did not assess the patient's

pain, and did not administer pain medications according to physician orders. Infirmary rooms do not have call buttons and the patient resorted to using his crutches to bang on his cell door to try to get nurses attention regarding his pain. As a result, his crutches were taken away. Sick call forms are not timely received and triaged following submission and nurses do not timely see patients, often due to facility lockdowns. Dental has not seen the patient following submission of a sick call request on 10/12/18.

Dr. Arnold documented a chronic disease note while the patient was in the infirmary, but did not perform a GI review of systems or document a plan to further evaluate the patient for treatment of his hepatitis C infection. Dr. Arnold did not acknowledge that the patient was in the infirmary with a leg infection. There is no documentation that the provider even spoke to the patient.

**Patient #12**
This 38-year-old man transferred to EMCF on 3/21/17. His medical history included hypertension, seizure, asthma, eczema and bipolar disorder. His medications are hydrochlorothiazide, Norvasc and Xopenex.

**Intrasystem Transfer**
On 3/21/17 at 8:28 am a RN completed a transfer screening. BP=129/91 mm Hg. Weight=199 lbs. The nurse did not note the patient's chronic diseases or current medications. The nurse documented enrollment into the cardiovascular chronic disease clinic needing to be scheduled by 3/28/17. This note was signed on 3/23/17.

**Medication Administration Records**
According to March 2017 the patient's chronic disease medications were ordered on 3/21/17 and received on 3/24/17. Blank spaces on 3/26 and 3/31/17.

On 3/21/17 a provider ordered Tegretol. It was received on 3/24/17.

**Chronic Disease Program Enrollment**
On 4/4/17 a LPN enrolled the patient into the chronic disease program.

**Sick Call**
On 4/12/17 the patient submitted a SCR form complaining of foot pain. It was received on 4/15/17. On 4/25/17 the patient refused a visit.

**Chronic Disease Management**
On 4/29/17 a NP (BS) saw the patient for chronic disease management noting that he had hypertension, asthma and seizure disorder. The NP took a history of the patient's chronic diseases including whether he had aura's with onset of seizures. Last seizure 6 months prior. Uncertain of age of onset. Did not take Tegretol due to side effects. Asthma ROS negative. No PEFRs. Weight=207 lbs. BP=115/74 mm Hg. The NP documented the patient's physical

examination using the template. Follow-up pulmonary 3 months and seizure and hypertension in 6 months.

**Chronic Disease Management**
On 1/8/18 a NP (PH) saw the patient for follow-up. Weight=188 lbs. BP=138/97 mm Hg. The patient reported occasional swelling of his hands and feet. No asthma attacks in past month. PEFRs=250, 300 and 280. PE template the same. No hernia. No examination of hands and feet for swelling. Asthma in fair control. Follow-up in 3 months. The NP did not address the patient's poorly controlled hypertension. No assessment of medication adherence.

**Sick Call**
On 4/5/18 the patient submitted a SCR form stating that he needed a refill for Tylenol and his inhaler. On 4/9/18 the form was received. On 4/9/18 a nurse wrote that the issue was resolved. However, April 2018 MARs do not show the patient received an inhaler.

**Chronic Disease Management**
On 4/16/18 Dr. Arnold saw the patient for follow-up. Weight=195 lbs. Temp=100.2 F. BP=115/74 mm Hg. Reports occasional swelling of hands and feet. No assessment of medication adherence. No CV ROS. No asthma attacks in past month. No PEFRs. PE template the same. No hernia. No examination of hands and feet for swelling. Hypertension in good control. Seizure disorder in good control off Tegretol for 2 weeks. The provider ordered Dilantin for seizure disorder. Asthma control unchanged (noted as fair the last visit). Follow-up in 3 months. The physician did not address that the patient had a fever. The requested follow-up visit has not taken place.

On 4/25/18 the phlebotomist documented that the patient could not be seen due to facility lockdown.

On 5/20/18 a RN documented the patient could not be seen because of a facility lockdown.

**Sick Call**
On 5/18/18 the patient submitted a SCR form stating that he needed a refill of his inhaler. On 5/20/18 the form was received. On 5/21/18 a nurse wrote that the refill was ordered.

**Sick Call**
On 5/27/18 the patient submitted a SCR form stating that was having difficulty breathing at night without an inhaler. "I have done several medication refills". On 5/30/18 the form was received. On 5/31/18 a nurse documented that the patient could not be seen because of a facility lockdown. On 6/1/18 a RN saw patient who noted that he received his inhaler. MARs show that he received his inhaler on 5/28/18.

**Assessment:** The patient did not receive continuity of chronic disease and mental health medications upon arrival. A provider did not timely see the patient following arrival for chronic disease management and the provider did not perform cardiovascular review of systems or

peak expiratory flow rates to assess his hypertension and asthma, respectively. The physician documents physical examinations using a template that do not vary and include an examination for hernia which is unlikely to have taken place and follow-up has not taken place at the requested interval. April MARs and May sick call requests show that the patient did not timely receive his inhaler. Facility lockdowns have interfered with access to care. Overall the patient has not received timely and appropriate care for his sick call requests and chronic diseases.

**Patient #13**

This 61-year-old man transferred to EMCF on 12/21/16. His medical history included depression and anxiety. His medications are mirtazapine, buspirone, ibuprofen and zantac.

On 5/12/17 a RN saw the patient for bright red blood in his stool with a hard BM. Weight=187 lbs. Temp=99.9°F.

**Sick Call**

On 3/6/18 the patient submitted a SCR form complaining of persistent pain following his hernia repair. On 3/6/18 the form was received and triaged. On 3/6/18 a nurse assessed the patient who reported that he had continued pain following surgery. VS normal except pulse=112/minute. Surgical scars healing well. On Indocin. Refer to NP.

**Provider Visit**

On 3/7/18 the NP (PH) saw the patient noting the patient said he had not received any pain medication since his surgery. The patient complained of pain 7 or 8 of 10 in severity. Four days since his last bowel movement. No redness or swelling at hernia incision. Abdomen is firm and distended with hypoactive BS (bowel sounds). The NP ordered Tylenol and Lactulose. PRN follow-up.

**Sick Call**

On 3/11/18 the patient submitted a SCR form stating that his testicles and hernia were hurting badly. On 3/12/18 the form was received and triaged. On 3/12/18 a nurse assessed the patient who reported that he had continued pain to testicles after hernia repair. Tylenol not helping. Temp=99.1 Weight=160 lbs. BP=110/81, pulse=112, respirations=18/minute.  The nurse did not examine his testicles or incision. Refer to NP.

**Provider Visit**

On 3/12/18 a NP saw the patient and examined his hernia incision but not his testicles. Tylenol. RTC prn.

**Sick Call**

On 3/18/18 the patient submitted a SCR form stating that hips still hurt badly. On 3/20/18 the form was received and triaged. On 3/20/18 a nurse assessed the patient who reported that he had continued hip Tylenol not helping. Reports post-op pain not improved. Temp=99.2°F. The

nurse did not document an examination of his incision. Refer to NP. This appointment did not take place.

**Sick Call**

On 3/24/18 the patient submitted a SCR form stating that his hernia was hurting badly. On 3/26/18 the form was received and triaged. On 3/26/18 a nurse assessed the patient who reported that he had continued pain to testicles after hernia repair. Tylenol not helping. Weight=163 lbs., Temp=99.6°F, BP=121/83 mm Hg, pulse=110/minute, resp=18/minute. The nurse did not document an examination of his incision. The nurse noted that he was scheduled but not seen last week. Refer to NP.

**Provider Visit**

On 3/27/18 the NP (PH) saw the patient but did not examine his hernia incision. Ordered Tylenol and as needed follow-up.

**Sick Call**

On 3/26/18 the patient submitted a SCR form complaining of pain. On 4/1/18 the form was received and triaged. On 4/1/18 a nurse saw the patent and noted he complained of neck and back problems and GSW to left face in 1980. wrote that the refill was ordered. Tylenol not helping. No exam. Planned to refer to the provider.

**Sick Call**

On 4/2/18 the patient submitted a SCR form stating that he needed to clean his toe nails and his left side hurt bad. On 4/3/18 the form was received. On 4/3/18 a nurse saw the patient. On 4/4/18 a NP saw the patient for hip pain.

On 4/11/18 weight-=160 lbs. Pulse=120/minute. Temp=100.1°F.

On 5/15/18 weight-=150 lbs. Pulse=120/minute. Temp=98.2° F.

**Sick Call**

On 10/18/18 the patient submitted a SCR complaining of his right side being swollen and painful. On 10/19/18 the form was received and triaged. On 10/19/18 a RN saw the patient who reported a tearing pain with constipation. Swelling noted to right side of abdomen. Weight=150 lbs. Temp=99.8°F, BP=111/63 mm Hg, pulse=97/minute. The patient complained of a hard BM. The nurse provided Colace and referred the patient to the NP.

On 10/22/18 custody did not escort the patient to medical due to a facility lockdown.

On 10/23/18 the NP saw the patient. Weight=145 lbs. Temp=99°F, Pulse=108/minute. The NP assessed the patient but did not note or address the patient's 15-pound weight loss since April 2018. The NP documented a normal abdominal exam. The NP treated the patient for constipation.

**Assessment:** I interviewed this patient who reported that his weight has dropped from 224 lbs. to 145 lbs. over an unspecified period of time. He complains of night sweats and a swelling in his right abdomen. He has documented 40-pound weight loss, intermittent low-grade fevers, abdominal pain, and constipation since May 2017. He has discussed his weight loss with Dr. Arnold and requested dietary supplements but he reports that Dr. Arnold told him his weight "wasn't low enough". Custody did not escort the patient for a medical appointment following complaints of abdominal/flank pain and fever due to facility lockdown. This patient has not received timely and appropriate care for his weight loss and abdominal symptoms. I discussed this patient with the Health Services Administrator and advised that he needed medical evaluation as soon as possible.

**Patient #14**
This 30-year-old man transferred to EMCF on 8/2/17. His medical history included neck and back pain. His medications are Depakote.

On 3/29/17 the patient weighed 154 lbs.

| | |
|---|---|
| 1/6/18 | weight=144 lbs. |
| 1/25/18 | weight=134 lbs. |
| 3/16/18 | weight=138 lbs. |
| 4/6/18 | weight=155 lbs. |
| 10/19/18 | weight=141 lbs. |

**Sick Call**
On 4/20/18 the patient submitted a SCR requesting to see the NP about ensure because he was underweight. On 4/20/18 the form was received and triaged.

On 4/20/18 the patient was not seen for nurse sick call due to facility lockdown.

On 4/21/18 the patient was not seen for nurse sick call due to facility lockdown.

On 4/23/18 the patient was not seen for nurse sick call due to facility lockdown.

On 4/24/18 mental health saw the patient cell side.

On 4/25/18 the patient was not seen for nurse sick call due to facility lockdown.

On 4/26/18 the patient was not seen for nurse sick call due to facility lockdown.

**Sick Call**
On 4/27/18 the patient submitted a SCR requesting to see the doctor or nurse to start ensure because he could not maintain his weight. He also complained of headaches. On 4/27/18 the form was received and triaged. On 4/27/18 a RN noted it was a duplicate.

On 4/27/18 the patient was not seen for nurse sick call due to facility lockdown.

On 4/30/18 the patient was not seen for nurse sick call due to facility lockdown.

On 5/1/18 a RN saw the patient. Weight=145. VS normal. Requests enhanced diet. Refer to NP.

On 5/4/18 custody did not escort the patient for provider sick call.

On 5/9/18 the provider saw the patient. Weight=140 lbs. BMI=19.1. "Ribs print through skin" The NP did not perform any medical evaluation of the patient for weight loss.

**Assessment:** This patient has not received timely and appropriate medical evaluation of his weight loss. Measured weights are significantly vary in relatively short periods of time raising questions about accuracy of scales and whether patients are weighed with shackles and waist chains rendering inaccurate weights. The NP documented that the patient's ribs were visible through his skin but did not perform a medical evaluation for weight loss. Facility lockdowns and failure to escort the patient for medical appointments resulted in lack of timely access to medical care.

### Patient #15
This 69-year-old man transferred to EMCF on 12/21/16. His medical history included hypertension, hyperlipidemia, hypothyroidism, hepatitis C infection, GERD, BPH with LUTS, and depression. His medications are lovastatin, aspirin, levothyroxine, Tamsulosin, Effexor, and omeprazole.

### Sick Call
On 5/22/18 this patient submitted a SCR stating that he had a knot on his chest that hurt and was getting bigger. On 5/23/18 it was received and triaged. On 5/23/18 a RN referred him to a NP. The patient reported that his left breast was swollen for one week and he hoped he did not have breast cancer. The NP noted a 5 cm hard red lesion below the left breast nipple with a small pustule. BP=157/95 mm Hg. Afebrile. Diagnosis was left breast abscess. The NP ordered Rocephin, Cleocin, decadron and ibuprofen. "Follow-up will be scheduled. Complete SC (Sick Call) request if increased problems occur prior to follow-up.

On 5/23/18 the patient received Rocephin and Toradol.

On 5/25/18 the patient received Clindamycin and Ibuprofen. The patient was not seen for follow-up.

**Assessment:** This patient had a large infection on his chest for which a nurse practitioner prescribed intramuscular antibiotics. However, the NP did not order a follow-up appointment to evaluate whether the patient's conditioned had improved. The patient is diagnosed with hypertension, however is not currently prescribed antihypertensive medication. The NP did not

address the patient's poorly controlled hypertension. The patient has not received timely follow-up for an infection and his poorly controlled hypertension.

**Patient #16**
This 58-year-old man transferred to EMCF on 5/19/17. His medical history included hyperlipidemia and depression. His medications are zocor, aspirin, Mobic and mirtazapine.

**Sick Call**
On 5/21/18 patient submitted a SCR stating that he was having severe back pain. On 5/23/18 it was received and triaged. On 5/23/18 the patient was scheduled for nurse sick call but not seen due to facility lockdown.

On 5/24/18 the patient was scheduled for nurse sick call but not seen due to facility lockdown.

On 5/25/18 the patient was scheduled for nurse sick call but not seen due to facility lockdown.

On 5/29/18 the patient was scheduled for nurse sick call but not seen due to facility lockdown.

On 5/31/18 the patient was scheduled for nurse sick call but not seen due to facility lockdown.

**Sick Call**
On 5/31/18 this patient submitted a SCR stating that he put in a sick call request over a week ago on Monday. He complained of severe pain in his lower back all the way to his calf muscle. On 5/31/18 it was received and triaged. A RN documented on the form that he also had painful bumps on his arm. On 6/4/18 a RN wrote duplicate on the form.

On 6/5/18 a nurse saw the patient for the 5/21/18 sick call request for back pain. The nurse treated the patient symptomatically.

**Assessment:** The patient did not have timely access to care for his health requests due to facility lockdowns.

**Patient #17**
This 37-year-old man transferred to EMCF on 4/18/18. His medical history included obesity, and right flank pain. His medications are ibuprofen and Colace.

**Intrasystem Transfer**
On 4/18/18 a nurse performed transfer screening. No medical or mental health history noted or medications. The patient was admitted directly to sheltered housing for psychiatric observation. Medications were Flomax and ibuprofen.

On 4/18/18 at 10:17 pm a nurse wrote a brief assessment with vital signs.

On 4/19/18 at 08:51 am a nurse wrote a brief assessment with vital signs.

On 4/19/18 the MH NP saw the patient and discharged him from observation.

**Sick Call**
On 4/19/18 this patient submitted a SCR stating that he was "kicked down there and I am swollen and in a lot of pain. On 4/22/18 it was received and triaged. On 4/22/18 the patient was not seen for nurse sick call due to facility lockdown.

On 4/23/18 the patient was not seen for nurse sick call due to facility lockdown.

On 4/24/18 the patient was not seen for nurse sick call due to facility lockdown.

On 4/25/18 the patient was not seen for nurse sick call due to facility lockdown.

On 4/26/18 the patient was not seen for nurse sick call due to facility lockdown.

On 4/27/18 the RN saw the patient for sick call. Temp=99.1 BP=129/98 mm Hg, pulse=93/minute. The nurse did not examine the patient. The patient had ibuprofen so the nurse instructed the patient to RTC if no better in 5-7 days.

**Sick Call**
On 5/10/18 the patient submitted a SCR stating that he was still having sharp pain between his legs and swelling and it was hard for him to urinate. On 5/11/18 it was received and triaged. On 5/11/18 a RN saw the patient who reported continued groin pain and blood in his urine. The RN noted the patient had a history of previous injury to the groin and was taking Flomax. VS normal. The RN did not examine the patient's groin. The plan was to follow-up with the NP.

**Sick Call**
On 5/12/18 this patient submitted a SCR stating that he was having a problem urinating and need to see a nurse. On 5/21/18 it was received and triaged. On 5/23/18 a nurse sent the patient to medical.

**Provider Visit**
On 5/20/18 a NP saw the patient who reported that he had right groin pain for 2 weeks after being kicked in the groin in April during a fight. Pain 8 of 10 in severity. Complains of pain and burning upon urination. Denies blood in his urine.   The NP did not examine the patient's groin or genitalia. Diagnosed the patient with dysuria and right groin pain and ordered urinalysis.

On 5/23/18 a RN saw the patient who reported being unable to void. The RN referred the patient to the physician. The physician noted the patient was circumcised without phimosis. He did not perform a rectal examination. He ordered a straight catheterization for urinalysis for C&S and ordered Cipro and Zithromax.

On 5/25/18 the patient was scheduled for nurse sick call but not seen due to facility lockdown.

**Provider Visit**

On 5/27/18 a NP saw the patient who was taking his antibiotics but not Flomax due to dizziness. The NP planned to collaborate with Dr. Arnold regarding putting him on another medication. No further information in the note.

**Provider Visit**

On 6/3/18 the NP saw the patient who reported not receiving his prostate medications for 3 nights. Still having problems urinating and has to strain with white-yellowish discharge. Scrotum edematous and slightly (sic) erythema. Pubis area painful to touch. No discharge noted. Continue Cipro. Will request RN to culture penile discharge on 6/4/18. Follow-up as needed. The NP did not schedule follow-up.

**Lab**

On 6/8/18 urinalysis showed RBC's and trace blood, few WBC's and negative for nitrites and leukocyte esterase.

On 7/20/18 the patient reported that he had not been able to urinate since 7/19/18. A registered nurse noted that the patient had been catheterized the day before and produced 200 cc urine. The NP saw the patient and did not perform a prostate exam to assess for prostate enlargement contributing to urinary tract obstruction symptoms.

**Provider Visit**

On 7/23/18 the physician documented that the patient had bladder outlet obstruction and requires in an out catheterization. He ordered catheter supplies for the patient. The physician did not medically evaluate the patient for the causes of urinary tract symptoms.

**Sick Call**

On 7/24/18 the patient submitted an SCR complaining of having problems putting the catheter in his bladder. On 7/25/18 it was received and triaged. On 7/25/18 the RN saw the patient and referred him to a NP.

**Sick Call**

On 8/19/18 the patient submitted a SCR complaining of hurting around his kidneys. On the form was received and triaged. On a RN saw the patient.

On 8/30/18 the patient had a positive H. pylori test.

**Assessment:** This patient has not received timely and appropriate care for his bladder outlet obstruction symptoms. He has not been referred to a urologist for a diagnosis and in August 2018 complained of flank pain which may represent infection or hydronephrosis.

**Patient #18**

This 21-year-old man transferred to EMCF on 11/30/17. His medical history included asthma and hyperlipidemia. His medications are Xopenex.

**Intrasystem Transfer**

On 11/30/17 at 2207 a RN screened the patient. No notation of chronic diseases or medications. No referral to the chronic disease program. Weight=129 lbs. BP=99/64 mm Hg.

**Sick Call**

On 1/11/18 a dentist noted that the patient had returned to the clinic for extraction. X-ray taken. #30=non-restorable. Plan was extraction.

**Sick Call**

On 5/25/18 the patient submitted a SCR stating that a tooth needs to be pulled. On 5/25/18 the form was received and triaged. On 6/1/18 a RN saw the patient noting that he had lower left molar pain for 2-3 weeks. No swelling or redness today. Follow-up with dental.

On 6/6/18 dental saw the patient for a sick call and an oral surgery consent was completed but no examination was documented. The patient was not seen again.

**Assessment:** This patient did not have timely access to care for his dental pain.

**Patient #19**

This 39-year-old man transferred to EMCF on 12/5/2011. His medical history included hypertension, latent TB infection, GERD, renal calculus and schizophrenia. His medications are lisinopril, Coreg, fluphenazine, Benadryl and tums.

**Sick Call-Dental**

On 5/23/18 the patient submitted a SCR complaining of his right top wisdom tooth hurting and needs to come out. On 5/24/18 the form was received and triaged.

On 5/24/18 the patient was not seen for nurse sick call due to facility lockdown.

On 5/25/18 the patient was not seen for nurse sick call due to facility lockdown.

On 5/29/18 the patient was not seen for nurse sick call due to facility lockdown.

On 5/30/18 a RN saw the patient.

On 6/27/18 dental saw the patient and requested the dentist stop after 2 carpules of lidocaine. There was no documentation of the tooth involved, x-ray results or procedure to be performed.

**Assessment:** The patient did not receive timely access to care for his dental pain due to facility lockdowns.

**Patient #20**

This 26-year-old man transferred to EMCF on 1/22/18. His medical history was unremarkable. He was taking no medications.

**Sick Call**

On 5/15/18 the patient submitted a SCR complaining of a severe toothache and inability to sleep. On 5/16/18 the form was received and triaged. On 5/16/18 the patient was not seen due to a facility lockdown. On 5/17/18 a RN saw the patient and noted that he had left sided dental pain for 2-3 weeks.

On 5/26/18 the patient was not escorted to medical for an appointment due to facility lockdown.

On 5/27/18 the patient was not escorted to medical for an appointment due to facility lockdown.

On 5/29/18 the patient was not escorted to medical for an appointment due to facility lockdown.

On 5/31/18 the patient was not escorted to medical for an appointment due to facility lockdown.

On 6/13/18 dental saw the patient and noted that tooth #13 required extraction. The patient wanted to save the tooth. We don't do root canals. No documentation that x-rays were taken. The dentist premedicated the patient with antibiotics and planned to follow-up.

On 7/15/18 dental saw the patient for follow-up. X-rays show decayed pulp. Need RC. Will discuss with Dr. Kelly. Started patient on analgesic and antibiotic.

On 8/29/18 patient refused dental treatment.

**Assessment:** The patient was not provided initial access to care for dental pain due to facility lockdowns.

**Patient #21**

This 42-year-old man transferred to EMCF on 11/4/14. His medical history included diabetes, hypertension, hyperlipidemia and bipolar disorder. His medications are metformin, lisinopril, Norvasc, zocor and Risperdal.

**Sick Call**

On 6/12/18 (sic) the patient submitted a SCR complaining of a tooth that broke off and needed to be pulled. On 7/12/18 the form was received and triaged. On 7/12/18 a RN saw the patient

and noted tooth avulsion and referred the patient to dental in 7 days. No documentation that analgesics were provided.

On 7/23/18 at 10:35 dental saw the patient who had a broken front tooth. #9 was decayed and fractured to the gum line. PA=abscess. Started on antibiotics. Return for extraction.

On 8/15/18 dental saw the patient and extracted #9.

**Assessment:** The patient had timely access to a nurse following submission of a health request for dental pain. There is no documentation the nurse provided analgesics pending dental care. The patient was followed up by dental staff who provided definitive treatment.


**Patient #22**
This 32-year-old man transferred to EMCF on 10/25/17. His medical history included bipolar. His medications are olanzapine.

**Sick Call**
There is no sick call request in the record. On 6/6/18 a RN saw the patient for dental pain. Broken right lower molar. The RN and treated the patient with Tylenol and referred the patient to dental in 7 days.

**Dental Visit**
On 6/8/18 dental saw the patient for a lower right toothache. #31 grossly decayed. PA=nonrestorable. Antibiotics and analgesics. Return for extraction.

On 7/6/18 dental extracted #31.

**Assessment:** There is no sick call request in the record to assess the timeliness of nursing response, but the patient was timely seen by dental following nurse assessment. Dental staff followed up the patient to provide definitive care.

**Patient #23**
This 45-year-old man transferred to EMCF on 5/17/18. His medical history included hypertension and hyperlipidemia. His medications are lisinopril, Coreg, aspirin, omeprazole, and aspirin.

**Intrasystem Transfer**
On 5/17/18 a nurse screened the patient. BP=128/95 mm Hg. Weight=278. Pulse=94/minute. Has diagnosis of CAD, hyperlipidemia, and hypertension. No documentation of medications. Referred for enrollment into the chronic disease program.

**Medications**
There is no May 2018 MAR showing that the patient received chronic disease medication.

June 2018 MARs show that medications were ordered prior to transfer on 3/17/18. The MAR shows that nurses documented administration status for most days of the month for metoprolol, lisinopril and aspirin. Nurses did not document administration status of medications on 6/4 and 6/13/18. There were blanks spaces for Simvastatin on 6/1, 6/7, 6/21, and 6/23/18.

**Chronic Disease Management**
On 7/13/18 Dr. Arnold saw the patient for chronic disease management. BP=120/90 mm Hg. No CV ROS. +GI ROS. PE the same. No hernia. Doesn't reference labs. GERD and HTN=good control. Follow-up in 3 months.

As of 10/26/18 the provider has not seen the patient again.

**Assessment:** MARs do not show the patient received continuity of medications upon arrival. The physician did not perform a cardiovascular review of systems. The physical examination is documented using an EMR template

# **Exhibit 1**

**Madeleine LaMarre, MN, FNP-BC**
**1143 Citadel Drive NE**
**Atlanta, Georgia 30324**
**(404) 694-0655**
mlamarre55@gmail.com

**EDUCATION**

Master of Nursing. Emory University, Atlanta, Georgia. March 1982.
Bachelor of Science in Nursing. Russell Sage College, Troy, New York. May 1977.

**EXPERIENCE**

**Correctional Health Care Consultant**                    **May 2003 - Present**
**Madeleine LaMarre PC**
Provides technical assistance to correctional agencies regarding correctional health care delivery systems. Assists agencies with the development of health care policies, protocols, training, and clinical auditing processes to ensure compliance with generally accepted professional standards. Serves as an independent correctional expert monitoring compliance with settlement agreements and/or remedial plans in state and county correctional agencies (see Appointments).  Also serves in a consulting role to assist health care providers in achieving patient/client goals with emphasis on patients with acute, chronic, and infectious diseases.

**Family Nurse Practitioner**                    **January 2005 to April 2007**
**Medical College of Georgia**
Provided clinical care to women with HIV infection at Georgia Department of Corrections facilities. Works in collaboration with an infectious disease trained physician to provide HIV consultation services regarding HIV infected patients to physicians, nurse practitioners, nurses and other health care providers.

**Statewide Clinical Services Manager**                    **January 1995 - December 2004**
**Georgia Department of Corrections**
Assessed, monitored, and evaluated the quality of health services within state correctional facilities. Assisted in the development of health care policy, clinical guidelines and standards for the agency. Conducted site visits to correctional facilities to provide consultation and technical assistance to health care providers in meeting clinical, professional standards, and state law. Served in a consulting role to assist health care providers in achieving patient/client goals with emphasis on patients with acute, chronic, and infectious diseases. Monitored the performance of contract vendors by conducting health care evaluations at correctional facilities. Collaborated with agencies to obtain grant monies and resources to advance the goals and objectives of health service delivery. Coordinated responses to communicable disease outbreaks with the Georgia Department of Human Resources (DHR) and Centers for Disease Control and Prevention (CDC). Represented the Department of Corrections at interagency task forces and planning councils.

**Nursing Director/Nurse Practitioner**                    **November 1984-December 1994**
**Georgia Department of Corrections**
Provided expert clinical assistance in the planning, implementation and evaluation of nursing services within the state correctional system. Coordinated the development of statewide policies and procedures for nursing services. Evaluated nursing practice at the approximately 65 state institutions, transitional and detention centers. Provided technical assistance in meeting professional standards, state, and federal laws. Provided primary care services to offender/clients at correctional institutions, exercising skills of assessment, diagnosis, and plans of care in collaboration with the health care team. Directly supervised two professional nursing staff and an epidemiologist to implement nursing and public health programs. Coordinated the development of statewide policies and procedures related to the diagnosis and management of offenders with HIV infection, tuberculosis, and chronic illnesses. Provided training regarding clinical and administrative topics. Represented the agency through participation in various interagency task forces and planning councils.

**Family Nurse Practitioner**                    **March 1982 - October 1984**
**Atlanta Advancement Center**
**Georgia Department of Corrections**
Administrator of the health clinic and primary health care provider to the adult male population at the transitional center. Exercised skills of patient assessment, diagnosis, and implementation of therapeutic measures in collaboration with a physician consultant and other appropriate health care personnel. Coordinated health care referrals and consultations for all residents. Supervised clinical experiences for nurse practitioner students from local universities. Collaborated closely with the superintendent of the transitional center to ensure organized, systematic operation of the clinic while maintaining quality standards of health care.

**Family Medicine, Philip Cohen, M.D., Marietta Georgia**
Collaborated with Philip Cohen M.D. in a private practice sitting in the management of acute and chronic illness in adults and children. Actively encouraged individual responsibility for personal health, and strategies to promote health and prevent illness among clients.

**Lawrenceville Regional Youth Development Center, Lawrenceville Georgia**
Clinician/administrator of health clinic for a 300-bed capacity adolescent detention facility. Provided physical examination services and evaluation of acute illness in collaboration with the physician consultant. Provided phone consultation for the center. Referred to local agencies when appropriate.

**Staff Nurse, Level II**                    **October 1978-September 1980**
**Emory University Hospital**
Developed expertise in the pre- and post-operative care of adults requiring cardiovascular surgery. Provided teaching and counseling prior to discharge to the home setting. Oriented new staff to the cardiovascular unit. Frequently acted as charge nurse of the unit.

## EXPERT WITNESS

I have testified as a health care expert in court or by deposition, or provided an opinion in the following cases:

Reed v. Cook County et al. Court No: 03 L 010075, September 2006 (Deposition). Plaintiff expert.

Don Foster and Vincent Williams v. Midwest Security Housing LLC, et al. October 2006 (Deposition). Plaintiff expert.

Jeffery Presley, et al. v. Christopher Epps, et al. United States District Court for the Northern District of Mississippi, Greenville Division. No.4-05CV148-M-D. Supplemental Consent Decree for Medical Care. April 16, 2007. Plaintiff Expert.

Flynn v. Doyle. United States District Court for the Eastern District of Wisconsin, No. 06-CV-537-RTR. April 2008 (Deposition). Plaintiff expert.

Emily Rice v. Denver Health Medical Center. 2008.  Defendant expert.

Heino v. Outagamie County. 2009. Plaintiff expert.

Kimberly Brown et al. v. CCA et al. USDC Western District Court for the Western District of Tennessee. 2011. Defendant expert.

Michael Campbell v. Boyd County et al., USDC Eastern District of Kentucky. Case No. 10-00062-HRW. January 2012. (Deposition) Plaintiff Expert.

Joyce Christie, Individually, and On Behalf of the Estate and Next of Kin of Nicholas T. Christie, Deceased vs. Lee County Sheriff's Office, et al. United States District Court, Middle District of Florida. Case No. 2:10-CV-420-FTM-36-DNF. March 2012 (Deposition). Plaintiff Expert.

Louis Henderson et al. v. Kim Thomas et al. United States District Court for the Middle District of Alabama, Northern Division. Civil Action No.: 2:11-CV—00224. 2011 (Deposition and Trial). Plaintiff Expert.

Gregory Johnson et al. v. City of Philadelphia and Prison Health Services, Inc. United States District Court, Eastern District of Pennsylvania .Case No. 09-6097. July 2012 (Videotaped testimony for trial). Plaintiff Expert.

Ray E. Hamilton v. Pike County Kentucky et al. Case No. 02:11-cv-0009-ARY. 2012. Plaintiff Expert.

Cindy Jimenez et al. v. Hopkins County, Kentucky, Joe Blue, Southern Health Partners, Inc., et al. United States District Court for the Western District of Kentucky. Owensboro Division. Civil Action No. 4:11cv-33 M. November 2012 (Deposition). Plaintiff Expert.

Jermaine Dockery et al. v. Christopher Epps et al. United States District Court for the Southern District of Mississippi. Jackson Division. Civil Action No. 3:13cv326-TSL-JMR. 2013. Plaintiff Expert.

C.B., et al. v. Walnut Grove Correctional Authority et al. Consent Decree. The United States District Court for the Southern District of Mississippi Jackson Division. Civil Action No. 3:10 cv663. March 26, 2012. Plaintiff Expert (Trial).

Estate of Rachel M. Hammers et al., vs. Douglas County Board of Commissioners et al.  No.2:14-CV-02188-JTM-KMH. February 2015. Plaintiff Expert. February 2015 (Deposition and Trial).

Diana Rice, Administratrix of the Estate of Ronald Gaunce, Deceased, and Next of Friend of Mr. Gaunce Minor Child, S.C.G. v. Montgomery County, Kentucky et al. United States District Court, Eastern District of Kentucky At Lexington. Civil Action No: 5:14-CV-181-KKC. February 2015. (Deposition) Plaintiff Expert.

Mark Burden v. Grant County Fiscal Court, Grant County, Kentucky, et al. United States District Court, Eastern District of Kentucky, Northern Vision at Covington. Case No. 2:14-CV—54-WOB-JGW. March 2015. Plaintiff Expert.

Michael Faziani v. Sierra Board of County Commissioners, Roxanna Cardenas, Christopher Rees, Curtis Cherry, Leonard Stufflebean, Joshua Corley, and Virgil Eaton.   In the United States District Court For the District of New Mexico. Case No. CIV 14-00592 MV/CG.  June 2015. Plaintiff Expert.

Charlotte Diana Winkler, Administratrix of the Estate of Brandon Clint Hacker, Deceased vs. Madison County, Kentucky, Doug Thomas, Advanced Correctional Health Care, Inc., Nadir Al-Shami MD, et al. United States District Court. Eastern District of Kentucky. Central Division Lexington. Civil Action No. 5:15-CV-45-KKC. November 2015. (Deposition) Plaintiff Expert.

Lewis et al. v. Cain et al. United States District Court. Middle District of Louisiana. Civil Action No. 15-318-BAJ-RLB.  December 2016. (Deposition). Plaintiff Expert.

Teresa Berry, Administrator of the Estate of Rhianna Filichia vs. Delaware County Sheriff's Office, et al. United States District Court Southern District of Ohio. Case No: 2:16-cv-0296. December 2016. (Deposition). Plaintiff Expert

Adam Baker, Personal Representative to the Estate of Douglas Edmisten v. Michael Dodds, et al. First Judicial District Court. County of Santa Fe. State of New Mexico. No. D-101-CV-2017-01908. August 2017. (Opinion). Plaintiff Expert.

Austin Christian Griffith v. Franklin County, Kentucky et al. United States District Court, Eastern District of Kentucky, Central Division at Frankfort. Case No. 3:16-cv-00077-GFVT. October 2017. (Opinion) Plaintiff Expert.

## CORRECTIONAL HEALTH CARE EXPERT

I have been qualified in State and Federal Courts as a medical/nursing/correctional health care expert, assisting in the monitoring of remedial plans or settlement agreements in the following cases:

*Plata v. Brown*, USDC/Northern District of California, Case No. C-01-1351, TEH, re: Prisoner medical

care in the California Department of Corrections and Rehabilitation (CDCR).

*Farrell v. Cate*, Superior Court of California, Case No. RG03079344, re: Medical care in the Division of Juvenile Justice, CDCR.

*Fussell v. Wilkinson*, USDC/Southern District of Ohio, Western Division, Case No. C-1-03-704.

United States Department of Justice and the State of Delaware Memorandum of Agreement to Monitor 4 Delaware Correctional Facilities.

United States Department of Justice versus Dallas County Jail. Memorandum of Agreement. Civil No. 307CV 1559-N.

United States Department of Justice versus Cook County Jail. Memorandum of Agreement. Civil No. 10 C 2946.

Colon et al. v Passaic County et al. Memoranda of Agreement. Case No. 2:08-cv-04439.


**CONSULTATION SERVICES**

Provided consultation services regarding correctional health care delivery to the following agencies:

- Miami-Dade Corrections Department (MDCR) June 2018
- US Territory of the Virgin Islands-August 2007
- Department of Homeland Security-January 2007 to present
- DeKalb County Jail. Atlanta, Georgia. January-April 2002.
- Fulton County Jail. Atlanta, Georgia. April-May 2000.
- Minnesota Department of Corrections. January 2000.
- Vermont Department of Corrections. January 1997.
- District of Columbia Detention Facility. June 1996.


**PROFESSIONAL MEMBERSHIPS**

- American Association of Nurse Practitioners #1757617 Expires 6/24/2019
- Academy of Correctional Health Professionals Expires #007318 2/28/2019
- American Nurses Association #32325980  Expires 6/30/2019
- Georgia Nurses Association  #RN053008 Expires 6/30/2019

## CERTIFICATIONS

Family Nurse Practitioner. American Nurses Credentialing Center. January 1, 2018-December 31, 2022. #0035518

Registered Nurse/Nurse Practitioner. State of Georgia. # RN053008. 1/31/2020.

Certified Nurse Practitioner. State of New Mexico. CNP-#02639. 6/30/2018.  Inactive.

Registered Nurse. State of New Mexico #80842.  6/30/2018. Multistate Compact. Inactive.

Registered Nurse. State of New York. #298832. 10/21/1977. Inactive.

National Provider Identifier No. 1851372452.


## PROFESSIONAL ACTIVITIES

**Appointments**:

Editorial Advisory Board. Correctional Health Care Report. Civic Research Institute. January 2014 to present.

Advisory Board Member for Plata v. Brown. Appointed by Judge Thelton Henderson May 2010-2012

Affiliate Faculty. Nell Hodgson Woodruff School of Nursing. Emory University. May 2002-2007 and September 2009 to August 2012.

National Prison Rape Elimination Commission. Medical and Mental Health Standards Committee Member. 2007-2009.

Federal Court Appointed Expert for Plata v. Schwarzenegger. United States District Court-Northern District of California. June 2002-Present.

Publication Advisory Board. Correctional Health Care: Guidelines for the Management of an Adequate Delivery System. National Commission on Correctional Health Care. 2001- 2002.

Reviewer for the American Journal of Public Health-2001.

NIDA-Emory Men's Prison Initiative Advisory Committee-1999.

Distinguished Faculty in Correctional HIV Medical Services. Bristol-Myers Squibb. 1998-present.

Advisory Board Member-Center for Crime, Communities, and Culture. Open Society Institute. 1996-2000.

Human Investigations Committee, Emory University School of Medicine. 1997-2000.

Clinical Associate Faculty. Nell Hodgson Woodruff School of Nursing, Emory University, Atlanta, GA. 1984-1991.

Chairperson. Institutional Review Board. AIDS Research Consortium of Atlanta. October 1991-September 1994.

Editorial Advisory Board. Correctional Health Care Management. July 1993-94.

Georgia Statewide HIV Prevention Community Planning Council 1994-95.

**Publications:**

Jafa, K, McElroy P, Fitzpatrick, L. Borkowf CB, MacGowan R. et al (2009) HIV Transmission in a State Prison System 1988-2005. *PLoS ONE* 4 (5): e5416. doi:10.137/journal.pone.0005416

Centers for Disease Control and Prevention. HIV Testing Implementation Guidance for Correctional Settings. Co-Author. January 2009.

LaMarre, M. Point-Counterpoint: What are the Implications of the Study Conducted in the Georgia Department of Corrections For HIV Prevention in Prisons? Infectious Diseases in Corrections Report. May 2006. Vol. 9, Issue 5.

CDC. "HIV Transmission among Male Inmates in a State Prison System-Georgia 1992-2005.*" Centers for Disease Control and Prevention. Morbidity and Mortality Weekly Report,* April 21, 2006, Vol. 55, No 15. Reported by Taussig, J., Shouse, L., LaMarre, M., et al.

Puisis, Michael. Associate Editor, Madeleine LaMarre. *Clinical Practice in Correctional Medicine.* Second Edition. Mosby. 2006

LaMarre, Madeleine. "Nursing Role and Practice in Correctional Facilities" in *Clinical Practice in Correctional Medicine*. Second Edition. Puisis, M. Mosby, 2006.

Khan, A., Simard, E., Bower, W., Wurtzel, H., Khristova, M., Wagner, K., Arnold, K., Nainan, O., LaMarre, M., Bell, B. "Ongoing Transmission of Hepatitis B Virus Infection among Inmates at a State Correctional Facility." *American Journal of Public Health,* Vol. 95, No 10*.* October 2005.

DeRavello, L., Brantley, M., LaMarre, M. Qayad, M., Aubert, H. and Beck-Saug, C. "Sexually Transmitted Infections and Other Health Conditions of Women Entering Prison in Georgia 1998-1999." *Sexually Transmitted Diseases*. Vol. 32, April 2005. pg. 247-251.

Arnold, K., LaMarre, M., Taussig, J. et al. "Transmission of Hepatitis B Virus in Correctional Facilities-Georgia, January 1999-June 2002.*" Centers for Disease Control and Prevention. Morbidity and Mortality Weekly Report,* August 6, 2004, Vol. 53, No 30.

Wootton, S., Arnold, K., Hill, H., McAllister, S., Ray, M., MS, Kellum, M., BS, LaMarre, M., Lane, M., Chaitram, J., Lance-Parker, S., DVM, Kuehnert, M. "Interventions to Reduce the Incidence of Methicillin

Resistant Staphylococcus Aureas (MRSA) in a Georgia Correctional Facility." *Infection Control and Hospital Epidemiology*, Vol. 25, No. 5. May 2004.

Tobin-D'Angelo, M., LaMarre, M., Lane, M.E. "MRSA Outbreak in a State Prison: Implications for Prevention and Control." Oral Presentation. 131st American Public Health Association Meeting. November 15-19, 2003.

W. Bower, A. Khan, E. Simard, M. Khristova2, H. Wurtzel, K. Arnold, M. LaMarre, O. Nainan, B. Bell. "Molecular Epidemiology of Hepatitis B Virus Transmission in a United States Correctional Facility." ISDA Abstract.

Barrett, KL. Braithwaite, R., Krane, KM, LaMarre, M. Creagh, T., Moore, W. "Women's Transition to Health and Healing: HIV Correctional Health Care/Education/Transition (CET) Team." Poster and Oral Presentation. ACA Conference, San Antonio, Texas, August 12-17, 2000.

Barrett, KL. Braithwaite, R., Krane, K., M. LaMarre, M. Creagh, T., Moore, W. "Women's Transition to Health and Healing: HIV Correctional Health Care/Education/Transition (CET) Team." The XIII International AIDS Conference, Durban, South Africa. July 9-14, 2000.

Bock, N., Reeves, M., and LaMarre, M. "Tuberculosis Case Detection in a State Prison System." *Public Health Reports.* July/August 1998. Vol. 113.

Uhl, Gary, Schwartz, I., Emshoff, J., Swift, R., LaMarre, M. & Lavinghouze, R., (1996). "Medical Chart Audit: A Tool to Assess Critical Care," Provided to Inmates with HIV/AIDS. Poster presented at the meeting of the American Evaluation Association, Atlanta, GA.

Nursing Protocols. Georgia Department of Corrections. October 1996. Co-author.

Hipkens, J., LaMarre M., Paris, J., Shansky, R. "How To: a Manual of Essential Elements for a CQI-driven Correctional Health Care Program." Georgia Department of Corrections. March 1996. Co-author.

Health Education and HIV Risk Reduction Program for Inmates at Correctional Institutions. Co-author. Revised January 1992.

LaMarre, M. "AIDS Inmates: A Dilemma for Management." *Corrections Today,* June 1988 50 (3) pp. 98, 100, 103, 127.


**Presentations:**

"Out of Sight: Out of Mind: Introduction to Correctional Health". Nell Hodgson Woodruff School of Nursing. Graduate Nursing Program. Atlanta, Georgia. July 18, 2012.

"Out of Sight: Out of Mind: Introduction to Correctional Health". Nell Hodgson Woodruff School of Nursing. Graduate Nursing Program. Atlanta, Georgia. July 21, 2010.

"Out of Sight: Out of Mind: Introduction to Correctional Health". Nell Hodgson Woodruff School of Nursing. Graduate Nursing Program. Atlanta, Georgia. July 1, 2009.

"Out of Sight: Out of Mind: Introduction to Correctional Health". Nell Hodgson Woodruff School of Nursing. Graduate Nursing Program. Atlanta, Georgia. July 16, 2008.

"Out of Sight: Out of Mind: Introduction to Correctional Health". Nell Hodgson Woodruff School of Nursing. Graduate Nursing Program. Atlanta, Georgia. August 3, 2006.

"Health Care Provider Role in the Prevention and Response to Prison Rape". American University. Washington DC. July 11, 2006.

"The Role of Health Care Providers in Prevention and Treatment of Prison Rape." Association of State Correctional Administrators Directors Training Program. Charleston, South Carolina. November 20, 2004.

"The Public Health Implications of Prison Rape: National Videoconference regarding the Prison Elimination Rape (PREA) Act." National Institute of Corrections. July 21, 2004.

"Incarcerated Women and Infectious Diseases. International Conference on Women and Infectious Diseases: From Science to Action." Centers for Disease Control and Prevention. February 28, 2004.

"Update on the Prevention and Management of Hepatitis A, B and C: New Recommendations from the Centers for Disease Control and Prevention (CDC)". American Correctional Association Conference. Nashville, TN. August 9-11, 2003.

"Prevention and Control of MRSA Infections in Correctional Facilities." Infection Control Conference. Georgia Department of Corrections. Forsyth GA. May 13, 2003.

"Improving the Health of Incarcerated Women Transitioning into the Community." Georgia Department of Human Resources, Division of Public Health. Forsyth, Georgia. May 12, 2003.

"Improving the Health of Incarcerated Women through Collaboration with Public Health." Centers for Disease Control and Prevention. Advancing the Health of Women: Prevention, Practice and Policy Conference. Atlanta, Georgia. October 7, 2002.

"Vulnerable Populations: Prisons and Aftercare." Georgia Chapter of Nurses in AIDS Care Conference, Atlanta, GA. October 12, 2001.

"Improving Collaboration between Corrections and Public Health." National Hepatitis Coordinators Conference. Centers for Disease Control and Prevention, Richmond, Virginia. July 29-August 2, 2001.

"Improving the Collaboration between Corrections and Public Health." Georgia Department of Human Resources (DHR) TB Nurses Coordinator Meeting. Stone Mountain, GA. July 19, 2001.

"The Legal Basis for Health Care in Correctional Settings." CDC Consultants Meeting: Recommendations for Prevention and Control of Viral Hepatitis among Incarcerated Persons. Mach 5-7, 2001.

An Introduction to Correctional Health Care. "Why the Public Health Must Go To Jail" Series. Centers for Disease Control, Atlanta, GA. January 12, 2000.

"An Introduction to Correctional Health Care." National Hepatitis Coordinators Conference. Centers for Disease Control. Tucson, AZ. May 24-27, 1999.

"Are People Behind Bars Part of the Community?" Panel Presentation. Fourth Annual Georgia Nurses Tuberculosis Conference. December 1-2, 1998.

"Profiling Special Needs Patients in the Correctional Setting: A Case Study of Process." Panel Presentation. 22nd National Conference on Correctional Health Care. Long Beach, California November 2-4, 1998.

"Clinical Update on Medical Management of HIV Disease-Initial Patient Workup and Treatment Plan." SPNS/HIV Training Series, Forsyth, GA., November 22, 1996.

"TB Control in Institutional Settings: Prisons, Hospitals and Long-Term Care Facilities." First Georgia Nurses' Tuberculosis Conference, Atlanta, GA. December 5, 1995.

"Chronic Care Clinics in Correctional Settings." GDC Health Services Clinical and Administrative Conference, Dillard, GA. November 30, 1995.

"Perspectives on Health Assessment and Classification Criteria." Co-presenter. 19th National Conference on Correctional Health Care, Washington D.C. November 14, 1995.

"Correctional Health Care: Improving Systems of Delivery." American Public Health Association, San Diego, CA. October 30, 1995.

"Primary Oral Management of the Patient with HIV Disease." Satellite Teleconference Series on HIV Care in Correctional Settings. National AIDS Education and Training Centers Program, Columbus, OH. April 26, 1995.

"Caring for Populations in Alternative Settings--The Incarcerated Client." Georgia State University School of Nursing, Atlanta, GA. March 9, 1995.

"Risk Assessment for HIV Infection and HIV Antibody Testing and Counseling: Implications for Corrections." Pennsylvania AIDS Training Network, Edinboro, PA. August 29, 1994.

"The Urethral Connection: Male Genitourinary Assessment." Georgia Nurses Association, Atlanta, GA. June 4, 1994.

"Management of HIV Infection." North Carolina AIDS Training Network, Durham, N.C. May 5, 1994.

"Psychosocial Issues for the Inmate." Pennsylvania AIDS Education and Training Center. Cresson Correctional Institution, PA. October 8, 1993.

"Management of HIV Infection." Metro Correctional Institution, Atlanta, GA. August 12, 1993.

"Tuberculosis." Metro Correctional Institution, Atlanta, GA. August 10, 1993.

"Psychosocial Issues for the Inmate." Pennsylvania AIDS Education and Training Center. Mercer State Regional Correctional Facility, Mercer, PA. June 24, 1993.

"Tuberculosis/HIV Update. Meeting Standards: County Health Care Staff." Georgia Public Safety Training Center, Forsyth, GA. April 15, 1993.

"Correctional Institutions: Linking the HIV Positive Client with Community Resources." The 1993 Middle Georgia Conference on HIV/AIDS, Fort Valley, GA. March 31, 1993.

## CONTINUING EDUCATION ACTIVITIES (2005-2018)

Update from the International AIDS Conference 2018.  IAS-USA. 8/21/18.

Antiretroviral Treatment and Prevention of HIV Infection. IAS-USA. August 7, 2018.

2nd National Congress on the Prevention of Diabetes and Its Complications. Emory University School of Medicine. November 17-19, 2017.

Caring for People With Hepatitis C Virus Infection Who Inject Drugs. International Antiviral Society-USA. Atlanta, GA. November 9, 2017.

Nurse Practitioner Certification Exam Review & Advanced Practice Update. Family, Adult-Gerontology and Adult Program. Fitzgerald Health Education Associates. Tucson, AZ. January 8-10, 2016.

Improving the Management of HIV Disease:   An Advanced CME Course in HIV Pathogenesis, Antiretrovirals, and Other Selected Issues in HIV Disease Management. International Antiviral Society-USA. Atlanta, GA. March 10, 2015.

An Intensive Workshop on Evolving Strategies in Viral Hepatitis Management.  International Antiviral Society-USA. Atlanta, GA. March 9, 2015.

The 17th Annual Update and Review of Internal Medicine 2013. University of New Mexico School of Medicine. Santa Fe, New Mexico. October 20-25, 2013.

The 16th Annual Update and Review of Internal Medicine 2012. University of New Mexico School of Medicine. Santa Fe, New Mexico. October 21-26, 2012.

National Nurse Practitioner Symposium. Annenberg Center for Health Sciences. Copper Mountain, Colorado. July 11-15, 2012.

20th Annual Improving the Management of HIV Disease Advanced CME Course. Washington DC. June 19, 2012.

Diabetes in Depth. Pri-Med. Atlanta, Georgia. December 9, 2009.

34th National Primary Care Nurse Practitioner Symposium. Copper Mountain Colorado. July 15-19, 2009.

Legal Aspects of Nursing Documentation. PESI, LLC. Atlanta Georgia. June 16, 2008.

32nd National Primary Care Nurse Practitioner Symposium. Keystone Colorado. July 12-15, 2007.

The Pain Management Dilemma: From Persistent Pain to Palliative Care. At the 32th National Primary Care Nurse Practitioner Symposium. Keystone Colorado. July 13, 2007

Community-Acquired Pneumonia: Treatment Strategies in the Age of Resistant Pathogens. At the 32th National Primary Care Nurse Practitioner Symposium. Keystone Colorado. July 12, 2007.

National Conference on Correctional Health Care. October 28-November 1, 2006.

30th National Primary Care Nurse Practitioner Symposium. Keystone Colorado. July 20-24, 2005.

Dietary Supplements 2005: What's Hot, What's Not. At the 30th National Primary Care Nurse Practitioner Symposium. Keystone Colorado. July 21, 2005.

New Dynamics in Health Care: Hormone Therapy and Menopause Care. At the 30th National Primary Care Nurse Practitioner Symposium. Keystone Colorado. July 20, 2005.