# Expert Report of Eldon Vail

*Dockery et al. v. Hall et al.*, No. 3:13-cv-00326-WHB-JCG

Submitted November 16, 2018

# Table of Contents

I.   ASSIGNMENT ........................................................................................................... 1

II.  QUALIFICATIONS ................................................................................................... 1

III. COMPENSATION ..................................................................................................... 1

IV.  FOUNDATION FOR EXPERT OPINION ............................................................... 1

V.   SUMMARY OF OPINIONS ...................................................................................... 2

VI.  OPINIONS ................................................................................................................. 5

OPINION 1: EMCF's Current Mandatory Staffing Plan is Inadequate Because Under It, EMCF Does Not Have Enough Mandatory Posts to Safely and Adequately Supervise Prisoners ......................................................................................................................... 5

    A.  The EMCF Staffing Plan Confirms that the Facility does not have Enough Mandatory Posts to Supervise Prisoners ............................................................ 8

    B.  The 2018 Shift Rosters Show Almost No Change in Mandatory Staffing from the 2016 Rosters. ................................................................................................... 8

    C.  The Facility's Increase in the Overall Number of Officers Employed at EMCF is not Enough to Solve the Problem of Not Having Enough Mandatory Posts at EMCF ............................................................................................................... 10

    D.  Substantially similar MDOC facilities—the Walnut Grove Correctional Facility—Adopted a Staffing Plan Similar to my recommended staffing for EMCF (and did so on the recommendation of Defendant's expert, Tom Roth) ............................. 11

OPINION 2: EMCF's Consistent Failure to Fill its Mandatory Posts Causes Persistent Understaffing and Places All Prisoners at Substantial Risk of Harm ................................. 12

    A.  The Potential Excuses Offered by MDOC and MTC Staff for Why Mandatory Posts Might not be Filled on the Shift Rosters do not Withstand Scrutiny ........... 14

OPINION 3: All EMCF Prisoners Remain at a Substantial Risk of Harm because Correctional Officers Routinely Fail to Adequately Fulfill their Primary Job Duties and Are Not Consistently in Or Viewing The Pods ........................................................................ 15

OPINION 4: The Dangers that Result from Not Adequately Staffing EMCF—and Which I Described Extensively in My Prior Reports and Trial Testimony—Persist at EMCF .......... 17

    A.  Understaffing, and the Failure of Officers to Actually Directly Supervise Prisoners, Continues to Result in Basic Rules that are Critical to Safety and Security at EMCF going Unenforced .................................................................... 18

    B.  Understaffing also Contributes to the Persistent Problem of Counts Not Being Conducted Properly at EMCF ......................................................................... 20

    C.  Inadequate Staffing Affects Prisoners' Access to Medical Services .................... 21

    D.  Insufficient Staffing Also Has Serious Negative Effects on the Provision of Basic Services to Prisoners in Segregation at EMCF ...................................................... 21

E.  Understaffing is Also a Contributing Factor to EMCF Remaining a Prison that is Awash in Contraband, Including Weapons ........................................................... 22

F.  There Also Continues to be a High Rate of Assaults at EMCF ............................ 24

G.  Recent Examples of Assaults at EMCF (Like Those Presented in My Previous Reports and at Trial) Demonstrate the Ongoing Harms That Can Result From Understaffing ................................................................................................................ 25

VII. CONCLUSION AND RECOMMENDATIONS ................................................................. 28

Recommendation 1: EMCF should be directed to conduct a comprehensive staffing analysis performed by independent outside experts ............................................................................ 28

Recommendation 2: Consistent with the floor officer staffing recommendation I described above, EMCF must immediately revise its polices and post orders such that they are able to provide direct supervision to prisoners in the housing units (1 floor officer per pod in General Population units, and 2 floor officers per pod in Close Custody/Segregation units) ...................................................................................................................................... 29

Recommendation 3: The Court should appoint an independent monitor to oversee changes at EMCF, including an immediate increase of floor officer staffing, as well as the longer-term shift towards direct supervision based on the completion of a comprehensive staffing analysis ...................................................................................................................................... 31

## I.   ASSIGNMENT

1.   Plaintiffs' counsel retained me to evaluate and offer my opinion regarding the safety and security of prisoners confined at the East Mississippi Correctional Facility (EMCF), in Meridian, Mississippi.  On August 24, 2018, the Court directed Plaintiffs to "proffer supplemental expert reports detailing the effects, if any, of the changes made at EMCF to date" in the areas of physical health care, mental health care, and, as discussed in this report, prison staffing.[1]

2.   This supplemental report is offered pursuant to the Court's August 24, 2018 Order. In it, I evaluate current security staffing at EMCF, and the impacts of such staffing levels on the safety and security of prisoners housed at the prison. I also offer recommendations on how to remedy the problems with the persistent understaffing that I have identified at EMCF.

## II.   QUALIFICATIONS

3.   I am a former correctional administrator with nearly 35 years of experience working in and administering adult institutions, including four years as Secretary of the Washington State Department of Corrections. Through my work as a corrections practitioner and as an expert/consultant, I am closely familiar with the needs of prisons, like EMCF, which house large populations of mentally ill prisoners.[2]

4.   On March 5, 2018, based on my extensive experience in the field, the Court recognized me as an expert in safety and security conditions in a correctional facility, including "the field of prison management of facilities that handle mentally ill or high percentages of mentally ill inmates."[3]

5.   A true and correct copy of my current resume, which has been updated since I provided testimony to the Court in March 2018, is attached as Exhibit 1 to this supplemental report.

## III.   COMPENSATION

6.   My billing rate for work on this case remains $150 per hour.

## IV.   FOUNDATION FOR EXPERT OPINION

7.   My evaluation of current staffing at EMCF is built upon my close review of the prison's safety and security practices and conditions since 2014. This is a facility where a majority of the prisoner population has been diagnosed as suffering from mental illness, a population I am familiar with from my work as a corrections practitioner and as an expert/consultant.

---

[1] Dkt. No. 767, Opinion and Order, August 24, 2018, at 11
[2] EMCF is the Mississippi Department of Corrections' designated facility for prisoners who have been diagnosed with a mental illness. Approximately 80% of the population has a mental health diagnosis.
[3] Trial Tr. Vol. 2, at 108:15–109:21 (March 5, 2018)

8.  In June 2014, I authored my first report regarding the safety and security of prisoners in EMCF. That report was based on a 4-day inspection of the facility that took place between March 31 and April 3, 2014, as well as a review of documents and videos relevant to that time. My primary conclusion in that report was the, "East Mississippi Correctional Facility is an extraordinarily dangerous prison. All prisoners are subjected on a daily basis to significant risk of serious injury."[4]

9.  In December 2016, I authored my second report. That report was based on another inspection of the facility that took place on June 22 and 23, 2016, as well as a review of documents and videos relevant to that time. My primary conclusion in that report was, "EMCF is and remains a very dangerous prison. Inmates housed there are at significant risk of serious harm."[5]

10. For this supplemental expert report, in forming my opinions I considered documents provided by the parties from January – September 2018, including a sample of daily shift rosters, Extraordinary Occurrence Reports (EOR's), Weekly and Monthly Reports from the Mississippi Department of Corrections Monitor, several volumes of trial testimony from March and April of 2018, as well as a variety of other documents. The documents I reviewed were of the same or similar type to those that I had reviewed and relied upon in preparing my prior expert reports, as well as to the testimony and evidence presented at trial. Attached as Exhibit 2 to this report is the list of documents and other materials I considered in preparing this report.

11. In addition to the documents reviewed, I visited EMCF from October 16–18, 2018. During my three-day visit, I inspected all of the living units and had private interviews with 20 prisoners who were housed throughout the facility. I also spoke with other inmates at their cell fronts and in the dayrooms. Other than brief (and generally non-substantive) conversations with the Warden, as was the case on previous inspection visits, I was again not permitted to talk to other EMCF staff.

## V.    SUMMARY OF OPINIONS

12. In my 2016 report, and at trial in 2018, I testified that many (though certainly not all) of the safety and security concerns I identified were a symptom of the severe understaffing of the facility. I noted that mandatory posts frequently go unfilled at EMCF, and that even if all mandatory posts were consistently filled, the number of officers being assigned to actually supervise prisoners simply is not enough to adequately manage the safety and security risks to prisoners (and officers) at EMCF. In that this facility's mission is to house mentally ill inmates, correctional staffing levels are critical to supervise this difficult and vulnerable population.

13. For the purpose of this supplemental report, per the Court's instructions, I have focused my

---

[4] PTX-1507, *Dockery v. Fisher,* Expert Report of Eldon Vail (June 16, 2014) attached as Exhibit 3 [hereinafter "Vail Report (2014)"], ¶ 19
[5] PTX-1507, *Dockery v. Fisher,* Expert Report of Eldon Vail (December 29, 2016) [hereinafter "Vail Report (2016)"], ¶ 22

2

analysis on the adequacy of security staffing at EMCF, primarily housing unit supervision.[6] My assessment of appropriate staffing levels includes consideration of the number of correctional officers who are responsible for supervising prisoners, their deployment and placement throughout the facility, and whether they fulfill their minimum job responsibilities to ensure the safety and wellbeing of prisoners at EMCF.

14.    Ultimately, based on my recent reevaluation of security staffing at EMCF, including a site tour, a review of records from January–September 2018, and interviews with prisoners, it is my opinion that with rare exception, the deficiencies in safety and security conditions at EMCF that I identified in my 2016 report and trial testimony are ongoing. Indeed, since my last report in 2016, the culture of EMCF has become calcified in its failure to provide actual supervision to the prisoner population in the housing units, and it is "normal" for correctional officers at EMCF to not keep their eyes on the prisoners.

15.    As such, the resultant risk of harm—and sometimes, actual harm—to prisoners will continue until EMCF deploys sufficient correctional officers in the pods, and commits to consistently and constantly viewing what is going on in those pods, in order to detect, prevent, and/or intervene in events before they become more serious. Simply put, in 2018, due to the lack of adequate security staffing throughout the prison, EMCF remains an extraordinarily dangerous prison, and continues to place all prisoners at substantial risk of harm.

**OPINION 1: EMCF's Current Mandatory Staffing Plan is Inadequate Because Under It, EMCF Does Not Have Enough Mandatory Posts to Safely and Adequately Supervise Prisoners**

16.    The number of total correctional staff for any correctional facility is important. But those staff must be deployed in a manner that maximizes the direct supervision of the inmate population. When deployed properly, which is measured by having a sufficient number of mandatory posts and evaluating where staff are physically located to carry out their responsibility to supervise prisoners, correctional officers can sometimes detect, prevent, and intervene in incidents and potential incidents, which reduces the risk of harm for the prisoners, as well as the staff themselves.

17.    In my prior reports, and in my trial testimony, I found that there are not enough mandatory correctional officers posts to adequately and directly supervise prisoners. My opinion was based, in part, on an analysis of how and where officers are deployed in the facility—*i.e.*,

---

[6] Although not directly related to staffing, and therefore, not otherwise addressed in my report, I feel a professional obligation to briefly comment on use of force practices that continue in violation of MDOC policy and sound corrections practice. Even though I only reviewed four videos for this report (related to prisoners who I met with), two of them are cause for concern. (*See* EMCF-PUOF-18-0081-EMCF-18-0337 – SEC-PostTrial-018064-Video and EMCF-PUOF-18-EMCF-18-0427 – SEC-PostTrial-018223-Video). Defendants continue to engage in use of force practices that ignore and misunderstand the role and value of de-escalation attempts by mental health staff in a planned use of force situation. If the Court were to appoint a monitor this is another area where assistance could be provided to EMCF that would improve the safety for both the prisoners and the staff.

how many officers are actually assigned to posts directly supervising prisoners in the housing units on any given shift.

18.   Unfortunately, since my previous review of EMCF, there has been no meaningful change to the actual number of mandatory posts staffed at the prison. EMCF continues to have too few mandatory posts to supervise the housing units, and those staff who are assigned to those units fail to consistently provide supervision of them.

**OPINION 2: EMCF's Consistent Failure to Fill its Mandatory Posts Causes Persistent Understaffing and Places All Prisoners at Substantial Risk of Harm**

19.   During trial, significant evidence was presented demonstrating that even with respect to the mandatory posts that it does have, EMCF consistently failed to actually assign officers to fill those posts. Based on my recent review of shift rosters from 2018, that problem persists at EMCF.

20.   I found that while the evidence appears to show that EMCF now employs more correctional officers as compared to when I last evaluated the prison, as I document later in this report, a review of the facility's shift rosters shows no evidence that those officers are being deployed in a manner that increases the number of mandatory posts, meaningfully improves the direct supervision of prisoners, or even ensures that all existing mandatory posts are filled on every shift. As a result of this deficiency, the prisoners at EMCF are still not being properly supervised, which results in a significant and ongoing risk of harm.

**OPINION 3: All EMCF Prisoners Remain at a Substantial Risk of Harm because Correctional Officers Routinely Fail to Adequately Fulfill their Primary Job Duties And Are Not Consistently In Or Viewing The Pods**

21.   For the officers who are deployed to mandatory posts, there is remarkably consistent evidence that those officers are far too frequently not actually in the pods where the inmates live. On many occasions, the floor officers are not even viewing or monitoring what is going on inside the pods through the windows from outside the pods. This lack of consistent, eyes-on supervision adds to the problem of insufficient staffing, and again presents a significant and ongoing risk of harm to prisoners (and staff) at EMCF.

**OPINION 4: The Dangers that Result From Not Adequately Staffing EMCF—and Which I Described Extensively In My Prior Reports and Trial Testimony—Persist at EMCF**

22.   In my 2016 report, and in my trial testimony, I described several examples of the consequences of having inadequate numbers correctional staff for the housing units, which create serious risks of harm to prisoners at EMCF. These include breakdowns in the following of basic rules in the housing units and an erosion of the staff's authority, failures to conduct proper counts, prisoners feeling unsafe and resorting to self-help tactics like making and stocking extreme amounts of weapons, and sometimes, actualization of the risk in the form of actual assaults or other bodily harm. Similar events continued to occur at EMCF during the period of January–September 2018, and until the number of mandatory

posts staffed at EMCF is adequately increased, the serious risk of such events occurring into the future will remain.

## VI.   OPINIONS

23.   The United States Department of Justice National Institute of Corrections provides training and a training manual to guide corrections officials in determining appropriate staffing for correction institutions.[7] In the training manual, it defines a "mandatory post" as:

> A post/job that is critical to maintaining safety or security or to accomplishing mandated activities/operations of a facility. Designation of the priority the post carries in staffing the facility on a given shift.[8]

24.   Typical of every correctional facility I have operated or inspected, EMCF also uses this phrase and concept, "mandatory post," in its daily operation. Indeed, echoing the National Institute of Corrections' definition, at trial, MDOC Deputy Commissioner Williams testified that "mandatory posts should never go unfilled."[9]  Warden Hogans said the same at trial when he agreed that he would expect that all mandatory positions be filled.[10] This testimony demonstrates that MDOC and MTC understand the importance of mandatory post staffing to the safe operation of the prison.

25.   Unfortunately, at EMCF, there continue to be several critical problems with the staffing of mandatory posts such that prisoners are put at a serious risk of harm:

   a.   First, there simply are not enough mandatory posts to adequately and safely supervise prisoners;
   b.   Second, even with respect to those mandatory posts that EMCF does have, there is not a consistent practice of ensuring that those posts are actually being staffed;
   c.   Third, even when technically on post, correctional officers at EMCF do not consistently spend meaningful time in the living units.

The result is that problems and incidents are not detected or prevented early on, a typical duty and skill set of competent correctional officers. In addition, when incidents do occur detection is delayed, sometimes resulting in additional harm to the prisoners at EMCF.

**OPINION 1: EMCF's Current Mandatory Staffing Plan is Inadequate Because Under It, EMCF Does Not Have Enough Mandatory Posts to Safely and Adequately Supervise Prisoners**

26.   In my prior reports and during my trial testimony, I was very critical of the level of

---

[7] Prison Staffing Analysis, A Training Manual with Staffing Considerations for Special Populations, U.S. Department of Justice, National Institute of Corrections, Camille Graham Camp, December 2008
[8] *Id.* at 135
[9] Trial Tr. Vol. 13, at 102:7 (March 13, 2018)
[10] Trial Tr. Vol. 6, at 24:23–25 (March 7, 2018)

mandatory correctional staffing of EMCF, especially for the housing units.[11] In those reports and testimony, I focused primarily on mandatory correctional floor officer staffing because those are the officers who are primarily responsible for the direct supervision of prisoners in the housing units, and in my view, increasing staffing of floor officers is the most critical staffing need at EMCF.

27.   With respect to floor officer staffing, at the time of my prior reports and testimony, there were about two floor officers assigned to each of Housing Units 1–4, and about 4 floor officers assigned to Housing Units 5–6 during the first and second shifts (which span from 7 a.m. to 11 p.m., and cover most of the primary waking hours of prisoners at EMCF, including when they are out of their cells, moving in the dayrooms, working, participating in programs, or accessing services such as medical and mental health care).[12]

28.   Based on those staffing patterns, it was my view that EMCF simply did not have enough mandatory posts, particularly within the prisoner housing units, to directly and appropriately supervise prisoners. Discussing mandatory staffing of correctional officers, in my December 2016 report, I wrote:

> With respect to the general population units, Units 1–4, each living unit consists of four pods, separate and apart from each other, that require officers and inmates to get through a locked door to enter or exit the pod, there should be four floor officers assigned to each of these units to ensure some level of supervision of the inmates. Put differently, staffing levels should be such that there is at least one officer in each pod, and one in the picket.[13]
>
> In a close custody setting, [at the time, Units 1D, 3C, 5, and 6] even with staffing by experienced and well-trained correctional officers, working alone endangers staff and inmates alike, as officers sometimes need immediate backup in working with close custody inmates. In my opinion there should be two officers assigned to work inside each close custody pod.[14]

29.   In 2018, EMCF continues to employ essentially the same staffing pattern as it did in 2016. This is confirmed through two different sources: (1) the contractual Staffing Plan that is currently in place at EMCF (and has been unchanged since 2012), and (2) shift rosters from 2018. Based on my review of these records, my opinion about minimal and mandatory required positions for the living units at EMCF has not changed. EMCF needs more

---

[11] *See, e.g.*, Trial Tr. Vol. 3, at 5:15–8:11, 22:19–23:7, 26:9–23 (March 6, 2018); Vail Report (2016), ¶¶ 81–107
[12] *See* PTX-2429 and PTX-2431; *see also* Vail Report (2016), ¶¶ 86–90. The third shift, from 11 p.m. to 7 a.m., requires fewer staff because at night, for the most part, prisoners are locked in their cells.
[13] Vail Report (2016), ¶ 84
[14] *Id.* ¶ 100

mandatory posts per shift.[15]

30.    The current staffing crisis at EMCF is caused by the inadequate number of mandatory posts and officers' failure to provide direct supervision. To address the understaffing, MDOC should be required to increase the number of mandatory posts per shift and require officers to be in the pods at all times. There should be one floor officer per pod where minimum and medium custody prisoners are housed and two floor officers per pod where close custody prisoners are housed. In summary, and as explained in further detail below, EMCF should increase the overall number of mandatory floor officer positions as follows:

| Current Mandatory Staffing (Per Contractual Staffing Plan) | | | Recommended Mandatory Staffing | | |
|---|---|---|---|---|---|
| Unit | First Shift – Floor Officers | Second Shift – Floor Officers | Unit | First Shift – Floor Officers | Second Shift – Floor Officers |
| 1 | 2 | 2 | 1 | 4 | 4 |
| 2 | 2 | 2 | 2 | 4 | 4 |
| 3 | 2 | 2 | 3 | 5 | 5 |
| 4 | 2 | 2 | 4 | 4 | 4 |
| 5 | 3 | 3 | 5 | 8 | 8 |
| 6 | 3 | 3 | 6 | 5 | 5 |

31.    If EMCF does not increase the overall number of mandatory posts staffed in the facility (particularly in the housing units), it will continue to put prisoners in danger of the same, serious risks of harm that I described in my 2016 report and trial testimony.[16]

---

[15] Even though EMCF now houses fewer close custody prisoners than when I wrote my 2016 Report, the current Staffing Plan remains inadequate, notwithstanding that change. First, there are still close custody prisoners housed at EMCF, including on Units 3, 5, and 6. Second, in my opinion, the number of mandatory posts at EMCF is inadequate in both the Close Custody/Segregation units and the General Population units. Reducing the close custody population at EMCF therefore does not change my analysis of the inadequacy of mandatory staffing at EMCF.

[16] *See, e.g.*, Vail Report (2016), ¶¶ 71–73, 92–97, 101–107; Trial Tr. Vol. 3, at 22:12–39:9 (March 6, 2018)

### A. The EMCF Staffing Plan Confirms that the Facility does not have Enough Mandatory Posts to Supervise Prisoners

32. The EMCF Staffing Plan—which I understand to be the minimum security staffing that MTC is required to provide at EMCF under its contract with MDOC—has not been changed since 2012.[17] Under that Staffing Plan, the following staffing is required in terms of mandatory floor officer staffing during the day and afternoon shifts for each of the Housing Units at EMCF[18]:

|                | First Shift | Second Shift |
|----------------|-------------|--------------|
| Housing Unit 1 | 2           | 2            |
| Housing Unit 2 | 2           | 2            |
| Housing Unit 3 | 2           | 2            |
| Housing Unit 4 | 2           | 2            |
| Housing Unit 5 | 3           | 3            |
| Housing Unit 6 | 3           | 3            |

33. The Staffing Plan demonstrates that contractually, MTC is only required to staff two officers on each of the General Population Housing Units 1–4 (as compared to my recommended four officers in each of Units 1, 2, and 4, and five officers in Unit 3 due to the close custody pod). In General Population Unit 6, MTC is only required to staff three floor officers (as compared to my recommendation of five officers). And per the Staffing Plan, in Close Custody/Segregation Unit 5, MTC is only required to staff three floor officers (as compared to my recommendation of eight floor officers). While the 2018 staffing rosters described below assign somewhat more mandatory floor officer staffing in Unit 5 than is required by the Staffing Plan, both the shift rosters and Staffing Plan still severely under-account for how many mandatory floor officer positions are necessary in Unit 5.

### B. The 2018 Shift Rosters Show Almost No Change in Mandatory Staffing from the 2016 Rosters.

34. Mandatory positions on the EMCF shift rosters are indicated by an * and/or darker shading.[19] The number of mandatory posts per shift is essentially unchanged since 2016, and is therefore inadequate to meet EMCF's minimum staffing needs.

---

[17] EMCF Staffing Plan, SEC-PostTrial-007600. In response to the post-trial request for the current staffing plan, MDOC re-produced the 2012 Staffing Plan as the operative plan.

[18] There are obviously other mandatory officer positions at EMCF such as those that supervise the perimeter, the kitchen, medical and control booths, as well as correctional supervisors. Although some of them can and do enter and respond to issues in the living units, they cannot be counted on to be there at all times to help supervise the units. The supervisors have other administrative responsibilities and non-housing unit officers have other duties to attend to. My analysis is therefore focused on housing unit correctional staff.

[19] Trial Tr. Vol. 7, at 13:22–24 (March 8, 2018)

35.   In the General Population Units 1–4, the rosters show that EMCF continues to only staff two mandatory floor officers per housing unit.[20] But as I described in my 2016 report, because there are four pods per housing unit, this staffing pattern means it is virtually impossible for an officer to be supervising prisoners in each pod at all times. Instead, staffing in EMCF's General Population Units 1–4 must increase to four mandatory floor officers per housing unit in order to provide minimally adequate supervision to prisoners.[21] The only exception is 3C, which is close custody. Consistent with my 2016 report,[22] close custody pods should have two floor officers on the first (day) and second (evening) shifts in order to provide minimally adequate supervision per shift.

36.   In General Population Unit 6, the rosters show that EMCF utilizes only three mandatory floor officers.[23] This is not sufficient for supervision of close custody inmates. Each of Units 6A–6C needs one floor officer per pod on the First and Second shifts, and because Unit 6D is close custody, it should have two mandatory floor officers in the pod in order to provide minimally adequate supervision to prisoners.

37.   In the Close Custody/Segregation Unit 5, the rosters show that EMCF continues to utilize only five mandatory floor officer positions.[24] But unlike in the General Population units, the Close Custody/Segregation unit is much more labor intensive for correctional staff. For example, in addition to regular round and count duties, floor officers in segregation must also administer showers and recreation to prisoners, transport them to medical and other parts of the facility as necessary, and tend to the other needs of the prisoners, who are entirely reliant on correctional officers to address their basic needs.[25] Prisoners in

---

[20] See e.g. EMCF First Shift Rosters, SEC-PostTrial-000017 (Jan. 4, 2018), SEC-PostTrial-000057 (Feb. 23, 2018), SEC-PostTrial-000508; see also e.g. EMCF Second Shift Rosters, SEC-PostTrial-000692 (Mar. 13, 2018), SEC-PostTrial-000879 (May 22, 2018)

[21] Vail Report (2016), ¶¶ 84, 90–91

[22] Vail Report (2016), ¶¶ 99–100

[23] See e.g. EMCF First Shift Rosters, SEC-PostTrial-000062 Feb. 24, 2018), SEC-PostTrial-000137 (March 15, 2018), SEC-PostTrial-000528 (Aug. 17, 2018); see also e.g. EMCF Second Shift Rosters, SEC-PostTrial-000546 (Jan. 2, 2018), SEC-PostTrial-000730 (March 19, 2018), SEC-PostTrial-001123 (July 3, 2018)

[24] See, e.g., EMCF First Shift Rosters, SEC-PostTrial-000022 (Jan. 5, 2018), 000042 (Feb. 20, 2018), 0000162 (March 20, 2018), 000241 (April 18, 2018), 000329 (June 7, 2018), see also e.g. EMCF Second Shift Rosters, SEC-PostTrial-000583 (Feb. 19, 2018), 001039 (June 20, 2018), 001142 (July 6, 2018)

[25] Theoretically, each of the cells in the Segregation Unit should have a call button that allows the prisoner in the cell to contact the picket officer. While some of the cells in the Segregation Unit do have a call button, based on my inspection, those buttons are not always functional. In fact, during the last four years, I have never talked to a prisoner at EMCF that believes the call buttons in their cell even work at all.  Moreover, even to the extent that they do function, they are not helpful—as they exist at EMCF—to ensuring that the prisoner that presses the button will get help. During my inspection, the Warden escorted me to the picket in Unit 5. The picket officer seemed unfamiliar with the function of the call buttons, but with some prompting, was able to show me that a small green light flashed on the single monitor in the picket when the prisoner pushed the button in his cell. However, unless the picket officer's screen was displaying the specific pod (out of four in Unit 5) in which the prisoner was housed, they would not see the green light flashing. Moreover, there is no audible alert or intercom with the prisoner in the cell, meaning that it would be impossible to determine the nature of the prisoner's problem without an officer going to go check on the prisoner. As a result, in my view, the call buttons on Unit 5 are not a meaningful

segregation must also be placed in restraints and escorted by two officers any time they are moved out of their cell.[26] As such, given the extra labor necessary, as well as the generally increased danger to staff operating in close custody units, it is my view that these units must be staffed with at least eight mandatory floor officers (*i.e.*, two officers per pod) to provide minimally adequate supervision, and services, to prisoners.

38.  Notably, with respect to floor officer staffing in the Close Custody/Segregation Unit 5, during trial, the Unit Manager for the unit, Tony Donald, testified he also believes that seven or eight officers are required for the operation of Unit 5, the segregation unit he supervises.[27] Unfortunately, however, notwithstanding even Unit Manager Donald's recommendation, neither as a matter of the contractual staffing of EMCF, nor just in practice based on the shift rosters, EMCF does not regularly staff eight floor officers on Unit 5.

### C. The Facility's Increase in the Overall Number of Officers Employed at EMCF is not Enough to Solve the Problem of Not Having Enough Mandatory Posts at EMCF

39.  During his April 2018 trial testimony, Warden Shaw testified that the overall number of correctional officers employed at EMCF had increased since I wrote my 2016 report. He said that there were approximately 177 correctional officer positions at the facility.[28] That fact may be correct, and appears generally consistent with documentation that was provided by the facility during my recent re-inspection of the prison.[29] It is also somewhat tangential to the pertinent analysis of minimum-necessary staffing at EMCF.

40.  What Warden Shaw described is the total number of correctional officers *employed* at EMCF. That number is important to understanding, for example, whether there is theoretically enough staff to provide coverage when an assigned officer calls in sick, has to attend a training, or for some other reason, cannot actually staff their assigned post.[30] By contrast, my concerns relate to how those officers employed at EMCF are actually being *deployed* throughout the facility. That is, whether there are enough mandatory posts to provide minimally adequate supervision to the prisoners. As I've described above, there are not. Rather, at EMCF, while the total number of officers *employed* may have increased, the number that are mandatorily *deployed* during each shift has essentially not changed (*i.e.*,

---

tool in helping to alert officers to the needs of or potential harm to prisoners in the segregation unit. Instead, unless officers are present in the unit checking on the prisoners, the only realistic chance a prisoner has of getting an officer's attention is by either catching the officer when they walk by the prisoner's cell, or engaging in a self-destructive act like setting a fire.

[26]  Trial Tr. Vol. 8, at 11:16–20 (March 8, 2018)
[27]  Trial Tr. Vol. 14, at 25:13–19 (March 14, 2018)
[28]  Trial Tr. Vol. 32, at 72:8 (April 2, 2018)
[29]  EMCF 2018 Staffing Report, SEC-PostTrial-007824
[30]  What is curious about the detail in the rosters is that on the 2nd shift (evenings) half of the time (51 shifts) there are ten or more officers on overtime. One would think that if so many additional correctional officers were hired, they would be available to cover vacancies instead of relying on overtime. Apparently, that is not how they are being utilized.

there has been no increase in the number of mandatory posts at EMCF). That is a problem, and one that cannot be addressed simply by hiring more correctional officers, which is what the facility appears to have done. Notably, while the facility has increased the number of staff *employed*, it continues to have difficulty staffing each of the mandatory posts that do exist on each shift. as discussed in more detail in Opinion 2.

41.   Moreover, it is important to note here that as Warden Shaw testified, the increase in total correctional officers employed at EMCF was not mandated by the contract. Therefore, that number could be decreased at any time, consistent with MTC's minimum contractual obligation to MDOC at EMCF.[31]

### D. Substantially similar MDOC facilities—the Walnut Grove Correctional Facility—Adopted a Staffing Plan Similar to my recommended staffing for EMCF (and did so on the recommendation of Defendant's expert, Tom Roth)

42.   The Walnut Grove Correctional Facility ("Walnut Grove") was another MDOC prison that privately-operated by MTC. In 2012, the prison was placed under a Consent Decree, and both myself and Defendant's corrections expert, Mr. Roth, were tasked with helping evaluate the prison in the years following. Based on my own visits to and study of the prison, and a report that Mr. Roth submitted to the court in March 2015, the physical plant layout of Walnut Grove was very similar to EMCF. Walnut Grove can therefore serve as a useful comparison in trying to evaluate minimum necessary mandatory staffing at EMCF. Of course, in 2015, Walnut Grove also had fewer prisoners housed at the facility than does EMCF today (957 at Walnut Grove[32] compared to between about 1200–1300 at EMCF[33]), and, unlike EMCF, Walnut Grove was not tasked with the additional correctional burden of being specially-designated to house the especially vulnerable population of special needs prisoners. Therefore, if anything, EMCF would need *more* mandatory officer positions than Walnut Grove to account for its larger and more vulnerable prison population.

43.   According to Mr. Roth's 2015 Report, in 2015, Walnut Grove had *more* mandatory correctional officer positions than does EMCF today. In fact, at Walnut Grove—consistent with what I have recommended as minimally-necessary for EMCF—the units housing general population prisoners were staffed with four floor officers per shift, in addition to other supervisory staff, utility officers, and a picket officer.[34]

44.   Reviewing the newly established staff level for Walnut Grove, Mr. Roth said in his expert report at the time:

> In reviewing the revised shift schedule, appropriate post coverage is provided to meet the existing workload. For example, during the

---

[31] Trial Tr. Vol. 32, at 72:24–25, 73:6–8 (April 2, 2018)

[32] *DePriest v. Walnut Grove Correctional Authority et al*, Case No. 3:10-cv-00663, Dkt. No. 129-1, Expert Report of Tom Roth (March 3, 2015), at 6.

[33] MDOC Statistical Report, July-August 2018, at SEC-PostTrial-020022

[34] *DePriest v. Walnut Grove Correctional Authority et al*, Case No. 3:10-cv-00663, Dkt. No. 129-1, Expert Report of Tom Roth (March 3, 2015), at 35

first and second shifts (6:00 am – 10:00 pm) seven days per week a
correctional officer is assigned to each housing zone. . . . The
revised staffing schedule reflects the appropriate number and type
of security post for each shift provided two housing units remain
closed and the population capacity remains at or below 962.[35]

45. I concur with the broad principle that Mr. Roth offers here (except for the segregation unit
at WGCF) and believe floor officer coverage for the non-close custody general population
pods at EMCF should be staffed to the same level—one floor officer per pod on the day
and evening shifts. That's the only way to significantly reduce the risk of harm faced by
prisoners at EMCF—by having officers supervising what is actually going on in the living
units so that they can detect, prevent, and intervene in incidents and potential incidents.

**OPINION 2: EMCF's Consistent Failure to Fill its Mandatory Posts Causes Persistent
Understaffing and Places All Prisoners at Substantial Risk of Harm**

46. During the trial, MDOC Deputy Commissioner Williams testified, "mandatory posts
should never go unfilled."[36] But during that same trial, significant evidence was introduced
showing that at EMCF, even with respect to the mandatory posts that do exist, mandatory
posts were consistently not filled on each shift.[37] Based on my review of EMCF shift
rosters from January–September 2018, I find that the EMCF's dangerous practice of not
consistently staffing mandatory posts persists.[38]

47. Prior to his current position, Major Dykes was a Captain—and thus the shift commander—
who was responsible for completing the shift rosters during each shift he supervised. Today
he is the Chief of Security. In his trial testimony he says:

> Q.  Okay. And so if there's not a name there, there's no – nobody
> in the post. Right?
>
> A.  Yes sir, a good chance of that. What we do with that, sir, is if
> we have staffing positions we cannot fill, then we do things like we
> attempt to hire overtime. We also have a mandatory overtime list
> of staff that – from previous shifts that are notified they may be
> needed for other shifts. We attempt to get them to.
>
> Sometimes we do have staff that refuse. And when staff refuse, at
> that time we do take up possible – well, we do take disciplinary

---

[35] *Id.* at 35–36
[36] Trial Tr. Vol. 13, at 102:7 (March 13, 2018)
[37] *See, e.g.*, Trial Tr. Vol. 7, at 19:25–24:12 (March 7, 2018); *see also* PTX-2429, January–September
2016 Shift Rosters; PTX-2431, November 2016 Shift Rosters
[38] I have reviewed a large sample of rosters dating from January through September 2018—one week
from January, one week from February, the entire month of March, one week from April, one week from
May, the entire month June, one week in July and one week from August. This is 104 days' worth of
rosters, one for each shift for the three shifts each day, totaling approximately 312 separate rosters.

action for that refusal because all of our staff are warned when the first come to work there that they may have to work overtime, sir, because we do take manning those posts very seriously.

Q.  Sure. But with respect to the rosters themselves or the post if left blank, it reflects that the post is not filled. Right?

A.  Yes, sir.[39]

Thus, according to EMCF's Chief of Security, if no officer's name is listed next to the mandatory post on a shift roster, that indicates that no officer occupied that post during the shift.

48.  The evidence from 2015 and 2016 shift rosters presented at trial showed that vacancies of mandatory posts happened with regularity at EMCF.[40] Two years later, in 2018, the shift rosters show that EMCF continues to fail to consistently staff each of the mandatory posts, the minimum posts required to safely operate the facility.

49.  In reviewing the EMCF shift rosters from 2018, I looked for when mandatory positions were not filled (*i.e.*, the places where no name was listed next to a mandatory position on the roster). Calculating shift by shift, the days when one or more mandatory positions were not filled results in the following:

|  | # Shift Rosters Reviewed (Jan – Aug 2018) | # Shifts on Which All Mandatory Posts Filled | % Shifts with All Mandatory Posts Filled |
|---|---|---|---|
| First Shift | 104 | 78 | 75% |
| Second Shift | 104 | 73 | 70% |
| Third Shift | 104 | 52 | 50% |
| Total | 312 | 203 | 65% |

50.  Taking a look at the two months where I do have complete rosters, in March 2018, all mandatory posts were only filled 66 out of 93 times (or 71%).[41] In June of 2018, all mandatory posts were filled 66 out of 90 times (or 73.3%).[42]

51.  Although the data shows some improvement in the number of shifts where mandatory posts

---

[39] Trial Tr. Vol. 7, at 15:8–25 (March 8, 2018); *see also* Trial Tr. Vol. 7, at 20:19–21:4 (March 8, 2018)
[40] *See* PTX-2803, Calendar of Unfilled Mandatory Posts, November 2016; *see also* PTX-2431, November 2016 Shift Rosters; PTX-2429, January-September 2016 Shift Rosters; PTX-2431, November 2016 Shift Rosters
[41] March 2018 Shift Rosters, SEC-PostTrial-000067–SEC-PostTrial-000224; SEC-PostTrial-000620–SEC-PostTrial-000809; SEC-PostTrial-001270–SEC-PostTrial-001437; SEC-PostTrial-020154–SEC-PostTrial-020246
[42] June 2018 Shift Rosters, SEC-PostTrial-000298–SEC-PostTrial-000460; SEC-PostTrial-000917–SEC-PostTrial-001110; SEC-PostTrial-001522–SEC-PostTrial-001677; SEC-PostTrial-020086–SEC-PostTrial-020153

are filled, the high percentage of shifts where mandatory posts remain vacant is alarming and indicative of a facility that is regularly operating below a safe staffing level. EMCF's continued inability to regularly or routinely fill mandatory posts on each shift—despite the fact that this is a well-known problem that has persisted since at least 2015—is deeply problematic, exacerbates the deficiency of understaffing at the prison generally, and is a major contributor to the risk of harm at EMCF.

### A. The Potential Excuses Offered by MDOC and MTC Staff for Why Mandatory Posts Might not be Filled on the Shift Rosters do not Withstand Scrutiny

52.    During the March 2018 trial, MDOC Deputy Commissioner Williams testified that with respect to the shift rosters, it is possible that officers on non-mandatory posts can be reassigned to perform the functions of the mandatory posts.[43] While that may theoretically be true, there is nothing in the record to document that this practice of reassigning officers to occupy mandatory posts is occurring at EMCF (not to mention that to the extent it is occurring, it is not being reflected on the shift rosters as it should be, pursuant to both good correctional practice and Chief of Security Dykes' own description of how shift rosters at EMCF are completed).

53.    During the course of the trial, and contrary Chief of Security Dykes' testimony, Warden Shaw suggested that the EMCF shift rosters are not always reliable in that they may not get accurately completed each shift.[44] If this is correct, it defines a different problem. If the rosters are not generally accurate, there is no way to measure how many correctional staff are ever on a specific shift and how they are deployed throughout the facility.

54.    In its training manual for staffing analysis, the U.S. Department of Justice, National Institute of Corrections includes this definition of a "roster" in its glossary:

> **Daily Roster.** A document that reflects daily assignments of uniformed staff to each post for each shift that has been approved for the facility, according to the master roster. The daily roster accounts for and shows the status of all uniformed staff, including all staff absent and the reason for their absence; delineates the assignment of relief staff; and reflects the temporary detachment of uniformed staff.[45]

55.    The National Institute of Corrections also describes the importance of rosters and the need for them to be accurate:

> A daily roster shall be completed for each shift in accordance with the master roster. All post assignments on the daily roster shall be recorded and any deviations from the master roster during the shift

---

[43] Trial Tr. Vol. 13, at 101:1–3 (March 13, 2018)
[44] Trial Tr. Vol. 21, at 97:22–98:8 (March 20, 2018)
[45] Prison Staffing Analysis, A Training Manual with Staffing Considerations for Special Populations, U.S. Department of Justice, National Institute of Corrections, Camille Graham Camp, December 2008, at 134

shall be noted. The daily roster shall be prepared and maintained at
the direction of the shift commander.[46]

56. I agree with the National Institute of Corrections' description of the importance of shift
rosters. I was the Superintendent of three different correctional facilities, and earlier in my
career, part of my duties included the responsibility of roster manager for a small
institution. I would never have accepted the practice that Warden Shaw described occurs at
EMCF, of rosters potentially being incompletely or inaccurately completed. Rosters are an
important official document for any prison, (in fact in Washington we used them to drive
payroll). It stretches the bounds of credibility to believe more than a third of the time, the
rosters at EMCF are not accurate. In my experience as an expert and correctional
consultant, I have never encountered another jurisdiction that does not expect and represent
their shift rosters as being accurate.

57. Further, given that the facility has not produced or indicated any other document exists that
provides the information as to the number and post of security staff on a given day and shift,
this is the only documentation that can be used to analyze staffing patterns and determine
appropriate staffing based on number of staff present and how they are deployed.[47] In
addition, the shift roster has a place to indicate staff that were called in or were on leave as
well as denotes the number of staff who were required to work overtime on a given shift.

58. If the Warden were correct in his testimony, then there would literally be no way to
ascertain whether or not mandatory positions are actually being filled in his prison. As an
experienced correctional administrator, I cannot imagine being unable to rely on a shift
roster to accurately account for who was on a particular post on a given shift. It would
make it impossible to know if an officer was even assigned to a critical mandatory post, or
to assign accountability (and train officers) when incidents did happen on the shift. Simply
put, it is entirely implausible that EMCF is so deficiently operated from an administrative
standpoint that it can't even perform the most basic task of properly completing shift
rosters.[48] The more reasonable explanation then is the one offered by EMCF's Chief of
Security: where the shift roster does not reflect an officer assigned to the mandatory post,
that means that no officer was, in fact, assigned to that post.

**OPINION 3: All EMCF Prisoners Remain at a Substantial Risk of Harm because
Correctional Officers Routinely Fail to Adequately Fulfill their Primary Job Duties and
Are Not Consistently in Or Viewing The Pods**

59. Despite having too few mandatory posts to properly supervise the housing units, and a
persistent problem of actually staffing those mandatory posts that do exist, based on my
reviews of the records and my own observations, there is an additional problem with

---

[46]*Id.* at 5

[47] At trial, Major Dykes confirmed that at EMCF, the way to determine how a given shift was staffed is to
examine the shift roster for that shift. *See* Trial Tr. Vol. 7, at 14:12–14 (March 8, 2018)

[48] Not to mention, if EMCF supervisors cannot be trusted to accurately complete shift rosters—a basic
prison management task—it is hard to imagine they can be trusted to perform the more complex functions
necessary to actually supervise officers (and prisoners) inside the prison.

staffing at EMCF: the officers assigned to the housing units are rarely actually in those units and fail to perform their primary job functions, resulting in a substantial risk of harm.

60.    In my opinion, the lack of sufficient staffing makes understandable the officer's reluctance to remain in the pods in the living units. As I said in 2016:

> To be clear, two officers to supervise four pods of inmates in the general population units at EMCF is the level of staffing that MTC defines, and MDOC authorizes as "mandatory staffing." But at this staffing level, at best, an officer could be in the pod only half the time, assuming the officer is diligent about splitting his/her time between two different pods. This staffing pattern is unsafe for the inmates as, too frequently, no officer is available to detect conflict and resolve issues before they escalate. When there are not enough officers assigned to staff at least one to each of the pods where the inmates reside, compliance with basic rules is not achieved and the inmates are left to fend for themselves and do what they must to ensure their own safety.[49]

61.    The reports from the MDOC Contract Monitor in 2018 include the following exemplar comments, which document her observation that the problem of officers not actually being in and directly observing the living units persists:

- 12:00 on 12/21/17 during lunch feeding inmate workers were observed at the beginning with no staff present…[50]
- At 2:45 as Ms. Thomas and I entered the main slider to 5&6 all staff from those housing unit were sitting in main vestibule on benches rather than being in area assigned due to us entering and offenders were out. Finally, staff did enter the area.[51] (1/18)
- All staff sitting in the entrance foyer to 5&6[52] (1/18)
- 6D Food trays on pod no Staff observed on the pod.[53] (4/18)
- There were 6 officers in 6A sitting at a table no one was watching the other 3 pods.[54] (6/18)

62.    The documentation from the MDOC Contract Monitor is consistent with my own observations during my recent inspection of the facility. There appears to be no effort to make sure the officers are actually in the pods. I saw officers sitting in the bottom picket

---

[49] Vail Report (2016), ¶ 91
[50] December 2017-January 2018 Weekly Monitor Report, at SEC-PostTrial-007825. The weekly report is undated but contains findings from the latter part of December of 2017 and early January 2018
[51] *Id.* at SEC-PostTrial-007827
[52] January 8-January 12, 2018 Weekly Monitor Report, at SEC-PostTrial-007838. The weekly report is undated but contains findings from the week identified.
[53] April 15-21, 2018 Weekly Monitor Report at SEC-PostTrial-007877
[54] June 4–8, 2018 Weekly Monitor Report at SEC-PostTrial-007889

and not paying attention to what is going on in the pods, resulting in pods having no supervision whatsoever. Others were not even in the general vicinity of the living units where they could see into the pods. In my experience prisoners watch to see and take advantage of times when there are lapses in supervision by correctional officers in order to pursue what they don't want the officers to see. Correctional professionals routinely work to minimize the frequency when this is possible. This is not the practice at EMCF.

63. During my inspection I made the observation that there were sometimes no officers in any of the pods. For example, on October 16, I observed there were no officers in any of the pods of the Unit I was visiting. On October 17, in the hallway that connects Units 5 and 6, there were six officers, but none in the pods when we entered Unit 6. On October 18, there were four officers in 6C, but none in any of the other pods.

64. My observations are also consistent with the reports I received from prisoners during my interviews. Five inmates told me that officers come into the pods only to perform a function, like a count. Two prisoners told me that officers "work to stay out of the zones." One of them told me that officers hang out in the lower picket (where there is no clear view into all of the pods). Two others told me that officers don't stay on the pod and prisoners have to pound on the pod windows to get staff attention when emergencies occur. Several others told me that the officers don't come around for hours at a time, and that it is much worse on the evening shift than on the day shift. Several prisoners described serious incidents that occurred in the pods when officers were not present, and several said they do not feel safe at EMCF.

65. There is remarkable consistency to the inmate's reports about officers failing to regularly and routinely be in the pods supervising the inmates. I interviewed 20 prisoners privately, who were housed on all of the living units and they described their experiences of staff practices on their current housing unit as well as other housing units where they had lived during 2018. These descriptions from the prisoner population are, in my opinion, credible in that I have also documented there are simply too few officers to put one in each pod or even to keep a view of what is going on in the pods.

### OPINION 4: The Dangers that Result from Not Adequately Staffing EMCF—and Which I Described Extensively in My Prior Reports and Trial Testimony—Persist at EMCF

66. In my 2016 report, and during my trial testimony, I described several examples of the consequences of inadequate correctional staff for the housing units that create serious risks of harm to prisoners at EMCF.[55] These include breakdowns in following of basic rules in the housing units and an erosion of the staff's authority, failures to conduct proper counts, prisoners feeling unsafe and resorting to self-help tactics like making and stocking extreme amounts of weapons, and sometimes, actualization of the risk in the form of actual assaults or other bodily harm.[56] As described below, similar events continued to occur at EMCF

---

[55] *See, e.g.*, Vail Report (2016), ¶¶ 30–52, 72–80, 94–97, 104–106, 108–31

[56] Clearly, understaffing is not the *only* source for the existence of these risks and risk factors within EMCF—there are also other contributing factors. But, it is my opinion that addressing the staffing needs

during the period of January–September 2018, and until the number of mandatory posts staffed at EMCF is adequately increased, the serious risk of such events occurring into the future will remain.

### A. Understaffing, and the Failure of Officers to Actually Directly Supervise Prisoners, Continues to Result in Basic Rules that are Critical to Safety and Security at EMCF going Unenforced

67. Not having sufficient staff to put one in each pod explains, in part, the continuing struggle at EMCF to keep prisoners from blocking view into their cells by covering the window in their cell doors. If officers are not directly supervising prisoners, small disciplines, which are important to running a living unit, like removing coverings, are often not enforced.

68. As I wrote about this issue in my 2016 Report:

> It is critical for officers to be able to quickly and routinely identify what is going on with inmates in their cells. When a rule this fundamental is not regularly enforced, it sends the message to the inmates that rules do not matter and that they are left to fend for themselves since the officers cannot control the basic expectations for inmates in the living units. Again, I emphasize that this issue is critical because, if officers aren't regularly and routinely looking into the cells, they may not detect inmates who have been assaulted or inmates who are engaged in acts of self-harm.[57]

69. In my December 2016 report I illustrate what can happen when officers are not regularly checking on inmates in their cells,[58] and in my 2018 trial testimony, I further elaborated that being unable to regularly and routinely view into the cells is a serious security concern because if the officer cannot see into the cell during a count or security check, there is no way to know for certain if the prisoner is safe or is actually in the right cell.[59] It also contributes to a breakdown in the staff's authority to actually control the living unit.[60]

70. During my October 2018 inspection I received similar reports from inmates I interviewed about the problem not being remedied, and the consequences of it.

---

of the housing units in the prison would be a major step in the direction of actually alleviating the significant risks of harm that face prisoners at EMCF each day.

[57] Vail Report (2016), ¶ 50
[58] *Id.* ¶ 196
[59] Trial Tr. Vol. 4, at 17:21–18:6 (March 6, 2018)
[60] Trial Tr. Vol. 4, at 18:13–19:4 (March 6, 2018)

71. Throughout her 2018 Weekly Reports, the MDOC monitor also documented this recurring problem:

- Offenders continue to be allowed to cover up cell windows in housing unit 5 & 6.[61] (12/17)
- Cell 214 window covered, 213 clothesline and window covered[62] (1/18)
- Cell 107 door covered[63] (1/18)
- Cell 104 cell door blocked with sheet.[64] (1/18)
- Cell 216 blanket cover cell door[65] (1/18)
- Cell 207 window covered[66] (1/18)
- Windows and doors covered [on Housing Units 1 and 2][67] (3/18)
- Unit six has doors and windows covered[68] (4/18)
- 4C bottom/top tier sheets hanging windows covered[69] (7/18)
- 5C 502 door covered[70] (8/18)
- Unit 5 sheet/hanging doors covered[71] (8/18)
- Unit 6 doors covered[72] (8/18)

This is but a small sample of the many times the MDOC monitor documents this concern.[73]

72. Unsurprisingly, given that EMCF has not actually addressed the problem of prisoners covering their cell windows, the risk from not doing so remains present. For example, similar to the incident I described in my 2016 Report,[74] one of the prisoners I interviewed described an assault that occurred against him on Unit 1A in September 2018 when he was beaten with a food tray and stabbed multiple times. He says that he was "held hostage" in his own cell from about 9:30 pm until about Noon the next day. During this time, the prisoners assaulting him covered the window to his cell and no one ever asked that the

---

[61] December 2017-January 2018 Weekly Monitor Report, at SEC-PostTrial-007827. The weekly report is undated but contains findings from the latter part of December of 2017 and early January 2018
[62] January 8–January 12, 2018 Weekly Monitor Report, at SEC-PostTrial-007829. The weekly report is undated but contains findings from the week identified.
[63] *Id.* at SEC-PostTrial-007832
[64] *Id.*at SEC-PostTrial-007833
[65] *Id.*
[66] *Id.*
[67] February 25–March 3, 2018 Weekly Monitor Report at SEC-PostTrial-007868
[68] April 15–21, 2018 Weekly Monitor Report at SEC-PostTrial-007877
[69] July 2–6, 2018 Weekly Monitor Report at SEC-PostTrial-007896
[70] August 13–18, 2018 Weekly Monitor Report, at SEC-PostTrial-007906
[71] August 6–10, 2018 Weekly Monitor Report, at SEC-PostTrial-007914
[72] *Id.*
[73] *See also, e.g.*, March 2018 Monthly Monitor Report at SEC-PostTrial-019920 (noting that prisoners "are being allowed to cover [cell] windows with paper")
[74] *See* Vail Report (2016), ¶ 96

window be uncovered. During count officers came by and asked how many were in the cell, but did not verify the response or check to see if the right inmate(s) was in the cell. While there was no EOR provided for this event, the list of prisoners requiring off-site medical treatment confirms that this prisoner was taken off-site for treatment for a head laceration and nasal fracture on September 17, 2018 at 11:00 a.m..[75]

73. Based on my recent review of the record, including the Contract Monitor's reports, as well as my own observations at EMCF, my opinion about the seriousness of the problem of cell door windows being covered has not changed—the problem is a persistent, and dangerous one.

### B. Understaffing also Contributes to the Persistent Problem of Counts Not Being Conducted Properly at EMCF

74. In my 2016 Report, and in my 2018 trial testimony, I described the problem of counts not being conducted properly at EMCF.[76] The problem of failing to keep the cell window uncovered contributes to the difficulty in performing a good count, remembering that one of the functions of a count is to make sure all the inmates are accounted for in the prison but also to check on their welfare to see if that are okay and in the right cell.

75. The MDOC Monitor continues to report this as a problem in her monthly reports. For the monthly reports I received from January–August 2018, every month the monitor rates EMCF as non-complaint with the audit items that say, "Face to photo count conducted as necessary" and "Each offender positively identified during count."[77] EMCF has been in non-compliance with these provisions for years. As was presented at trial, EMCF was found in non-compliance with these provisions in every single one of the 32 months between September 2014–June 2017 for which the Monthly Contract Monitor Reports were available.[78]

76. In the Monitor's more recent reports, she continues to document the extent of the problem beyond just indicating "Non-Compliance." For example, in January and February 2018 she adds the comment, "staff do not take items down that are hanging therefore they cannot see in the cell to verify offenders."[79] In March 2018 she adds the comment, "some staff has (sic) roster but not checking each cell as they go by doors."[80] In July she adds a very revealing comment, "have observed staff not looking into cells but offenders holding up 2

---

[75] 2018 Emergency Room and Hospitalization Log, CENT-POSTRIAL-001808

[76] *See e.g.*, Vail Report (2016), ¶¶ 36–47; Trial Tr. Vol. 4, at 9:7–31:2 (March 6, 2018)

[77] 2018 Monthly Monitor Reports, at SEC-PostTrial-019882 (January), SEC-PostTrial-019808 (February), SEC-PostTrial-019914 (March), SEC-PostTrial-019930 (April), SEC-PostTrial-019946 (May), SEC-PostTrial-019962 (June), SEC-PostTrial-019978 (July), SEC-PostTrial-019994 (August)

[78] *See* PTX-2799, Contract Monitor Non-Compliance Findings: Offender Counts, September 2014–June 2017

[79] January 2018 Monthly Monitor Report, at SEC-PostTrial-019882; February 2018 Monthly Monitor Report, at SEC-PostTrial-019898

[80] March 2018 Monthly Monitor Report, at SEC-PostTrial-019914

fingers,"[81] a clear example of officers relying on inmates about how many are in a cell during count time.

77.   Notwithstanding, even during my inspection in October 2018, when I would expect the facility to be alert to this long-expressed concern and take steps to reduce its occurrence, one or more cells in nearly every pod I entered had the view into the cell blocked. I sometimes documented this in my notes:

- 1D, one cell had the view blocked
- 1B, 5 cells
- 3B, 6 cells
- 3C, 1 cell
- 3D, 2 cells
- 4B, 1 cell
- 5A, 3 cells
- 5D, 6 cells
- 6A, 1 cell
- 6C, 1 cell
- 6D, 1 cell

78.   If you can't see into a cell and are simply taking the prisoner's word for how many people are in the cell during a count, the total number of prisoner may add up but the opportunity to check on the prisoner's welfare is missed.

### C.   Inadequate Staffing Affects Prisoners' Access to Medical Services

79.   Security staff are required to ensure the facility operates properly—including escorting prisoners to receive medical services. Similar to problems that were identified in 2016 the lack of security staff continues to interfere with prisoners' ability to access other services. Based on a review of the 2018 Sick Call Log, there are numerous documented instances in January through September 2018 where a prisoner could not be taken to sick call due to an issue with custody escorts. The Sick Call Log shows that both general population and prisoners in segregation were unable to access medical services due to security staffing issues.[82]

### D.   Insufficient Staffing Also Has Serious Negative Effects on the Provision of Basic Services to Prisoners in Segregation at EMCF

80.   MDOC policy requires that prisoners in segregation receive showers three times a week and exercise outside of the cell five days a week.[83] In my first two reports in this case I

---

[81] July 2018 Monthly Monitor Report, at SEC-PostTrial-019978
[82] *See e.g.* 2018 Sick Call Log at CENT-POSTTRIAL-001184, CENT-POSTTRIAL-001194, CENT-POSTTRIAL-001315, CENT-POSTTRIAL-001623, CENT-POSTTRIAL-001625, CENT-POSTTRIAL-001636, CENT-POSTTRIAL-001755, CENT-POSTTRIAL-001788
[83] PTX-2078, MDOC SOP 19-01-01, Offender Segregation

criticized EMCF for failing to meet these requirements.[84] For this report I did not receive documents for my review that would illustrate their current practice in as much depth as I was able for my earlier report. However, I did inspect EMCF segregation units when I was at the facility where the relevant records are attached to the front of each cell. I did not find any record that showed a prisoner had gotten more than two days of recreation per week, actually worse than my review in my December 2016 report where I documented that 16% of the time prisoners were getting the required five days. The records on the cell doors did show that prisoners were getting the required three showers, an improvement from the 41% of the time I described for showers in my December 2016 report.

81. These numbers—twice a week for exercise and three times a week for showers—were also what the prisoners who were either in segregation or had recently been in segregation reported to me during my private interviews. While the improvement in showers to meet the policy requirement is noted, the lack of exercise five days a week is a violation of policy, as well as national and international correctional standards.[85] In addition to the prisoner interviews, the segregation sheets hanging on each pod during my inspection tour corroborated the shower and recreation schedule that was reported by prisoners.

82. In my opinion, the opportunity for exercise is being denied due to insufficient mandatory posts assigned to the segregation pods. As I discussed above, the Segregation Unit is labor intensive because it requires two officers to escort any prisoner out of his cell—even to the shower. Thus, until those pods are staffed appropriately, this violation is likely to continue and places prisoners in segregation at continued risk of harm.

### E. Understaffing is Also a Contributing Factor to EMCF Remaining a Prison that is Awash in Contraband, Including Weapons

83. In my 2016 Report, I described the numbers of weapons present within EMCF as "extreme."[86] I wrote "[t]here were 742 weapons discovered at EMCF in the 19-month period, July 2014–January 2016. Taken as a simple average, that means that over 39 weapons were discovered in EMCF per month over a nineteen-month period."[87] By the time of trial, in March 2018, evidence was presented that from January 2016–June 2017 the facility continued to recover weapons each month—an average of 35 weapons per month.[88]

84. Based on my recent review of conditions at EMCF, the discovery of weapons continues to occur at EMCF at alarming rates. From January–August 2018 there were 438 weapons

---

[84] *See* Vail Report (2016), ¶¶ 159–160
[85] American Correctional Association Standard 4-4270; United Nations Standard Minimum Rules for the Treatment of Prisoners (the Nelson Mandela Rules), 2015, Rule 23
[86] Vail Report (2016), ¶ 114
[87] *Id.* ¶ 116
[88] PTX-2805, MDOC Statistical Report Summary, September 2014–December 2016; PTX-2190 MDOC Monthly Statistical Report July 2016–June 2017; JTX-43 MDOC Monthly Statistical Report July 2015–June2016

discovered, or 54.8 each month at EMCF.[89] That is a 71% increase, cause for serious concern and a level of weapons I have never seen in any other correctional facility.

85.  Moreover, as a review of facility Extraordinary Occurrence Reports shows, these weapons continue to be found throughout the facility.[90]

86.  In part these weapons discoveries can be attributed to an increased level of cell searches by EMCF. From July 2014–January 2016 there were an average of 595 random cell searches and 287 targeted cell searches each month.[91] From January–August 2018 those searches were increased to an average of 1,104 random cell searches and about 649 targeted cell searches each month.[92] It is commendable that EMCF is doing more searches and discovering weapons.

87.  But cell searches alone cannot solve the problem of weapons inside a prison facility, because it is the underlying and unsafe conditions at the prison that give rise to so many prisoners feeling the need to arm themselves with a weapon. In my experience as a practitioner and an expert, the extreme level of weapons reflects a prison population that does not believe that the staff can keep them safe. When there is not enough staff to consistently supervise the inmates when they are in the housing units, a fact well known by the prisoner population at EMCF, prisoners arm themselves.

88.  One Extraordinary Occurrence Report offers some insight into why prisoners may fear that staff will not protect them.[93] On April 16, 2018, a prisoner was stabbed. He did not identify the attackers because he feared for his safety. The EOR does not indicate that staff undertook any efforts to review the camera footage to identify the prisoners who assaulted him and instead told him he had to return the housing unit. The EOR states he was placed in segregation pending investigation, but the documents attached to the EOR show that in fact, staff wrote up the prisoner for refusing housing when they tried to place him back in the same housing unit where he had just been assaulted. It was only after he refused housing, and received a written rule violation, that was he moved to segregation.

89.  Until EMCF appropriately increases the number of mandatory posts to ensure constant supervision of prisoners (and then actually staffs those mandatory posts consistently), it is likely that EMCF will remain awash in weapons, placing prisoners (and staff) at a

---

[89] MDOC Statistical Report, January–June 2018 at SEC-PostTrial-020040; MDOC Statistical Report, July–August 2018 at SEC-PostTrial-020010

[90] *See, e.g.*, 2018 Extraordinary Occurrence Reports, EMCF-18-0087 (sharpened metal objects found on Unit 6); EMCF-18-0270 (weapons found on Unit 2); EMCF-18-0470 (sharpened instrument found on prisoner in Medical)

[91] JTX-42, MDOC Monthly Statistical Report, at DEF-024386; JTX-43, MDOC Statistical Report July 2015–June 2016 at DEF-215933

[92] MDOC Statistical Report, January–June 2018 at SEC-PostTrial-020049 (This average was calculated omitting the data from June 2018 which reflects 9,362 targeted searches because it appears to be an error as it was nearly nine times the number of targeted searches conducted in the next highest month); MDOC Statistical Report, July–August 2018 at SEC-PostTrial-020021

[93] April 16, 2018 Extraordinary Occurrence Report, EMCF-18-0285

substantial risk of harm. Indeed, I have been describing exactly this problem—of extreme numbers of weapons inside the facility—since 2014.[94] Since that time, while the number of cell searches has increased, the numbers of weapons being found has not decreased (something that you would expect to see if prisoners were actually feeling safer). At the same time, what has not meaningfully changed since 2014 is the consistent understaffing of EMCF.

90.    The presence of so many weapons in a single prison creates great risk that they may be used. Given that so many are being discovered at EMCF, it is a clear indication that many prisoners do not feel safe and are ready to defend themselves if the situation arises.

### F.  There Also Continues to be a High Rate of Assaults at EMCF

91.    Sometimes, in addition to a clear risk of harm being created by understaffing at EMCF, actual harm can and does occur. While fortunately, the rate of assaults appears to have decreased some since 2016, because of the factors described above, including the ever-presence of weapons inside the facility, the *risk* of such harm remains pervasive. Put differently, at EMCF, whether the actual assault rate goes up or down, the risk of assault remains constant—and high—for all of the reasons described above.

92.    According to the MDOC Monthly Reports, the rate of assaults at EMCF appears to have gone down from the rates in 2015 and 2016. The Defendant's experts documented in their report the total number of assaults for 2015 was 154, or 12.8 per month. For 2016 the number of assaults went up for a total of 169 or 14.1 each month.[95] My own calculations from the MDOC Monthly Reports indicate that for January–August 2018 (numbers for September were not provided) the total number of assaults for this 8-month period was 60, or 7.5 assaults per month.[96]

93.    While on its face this reduction in the number of assaults is a good thing, it is important to emphasize that that certainly does not mean that the risk of harm (*i.e.* the risk of being assaulted) at EMCF is reduced. The many factors I have described above, including an insufficient number and understaffing of mandatory posts, lack of direct supervision over prisoners, and extreme numbers of weapons inside the prison, all indicate that the risk of assault to a prisoner inside EMCF remains significant (even if, thankfully, the number of assaults that have actually occurred in 2018 is lower than in previous years).

94.    Moreover, on closer examination I am not sure that EMCF is accurately reporting the data on assaults in 2018. For example, on their monthly report for January 2018, EMCF reports that zero assaults occurred (with respect to the total number of assaults recorded with or without a weapon).[97] However, a review of the EORs for January 2018 indicates that there

---

[94] *See* Vail Report (2014), ¶¶ 21, 62
[95]  *Dockery v. Hall*, Expert Report of Ken McGinnis and Tom Roth (February 24, 2017), at 72
[96] MDOC Statistical Report January–June 2018, at SEC-PostTrial-020040; MDOC Statistical Report, July–August 2018, at SEC-PostTrial-020009–10.
[97] *Id.*

24

were at least nine assaults that month.[98] For the month of February 2018, EMCF reports that only one assault occurred (against staff, without a weapon, and that there were no other assaults with or without a weapon).[99] But a review of the EORs for February 2018 reveals there were at least six assaults that month.[100] And for the month of April 2018, EMCF reports there were no assaults with a weapon,[101] but the EORs indicate there were at least two assaults with a weapon that month.[102]

95. If these additional assaults were indeed reported on the monthly report, as they should have been, that would add another sixteen assaults that occurred from January–August 2018 for a total of 76, or a monthly average of 9.5 assaults per month. That is, of course, still a reduction from the assault levels in 2015 (12.8) and 2016 (14.1), but one that is less significant, and which calls to question the level of underreporting in EMCF's assaults data (even leaving aside the fact that inside a prison facility, not all assaults will be detected).[103] If there are more assaults that were not properly reported on the monthly report, the total could be even higher.

96. Overall, while the number of actual assaults at EMCF in 2018 is down from previous year, given the sources of risk that I have already discussed—including insufficient and understaffing of mandatory posts and extreme numbers of weapons—there is nothing preventing that number from increasing again in coming months and years. The risk of assault at EMCF remains significant and ever present.

### G. Recent Examples of Assaults at EMCF (Like Those Presented in My Previous Reports and at Trial) Demonstrate the Ongoing Harms That Can Result From Understaffing

97. In my previous report and trial testimony, I described at length examples of assaults and other harms befalling prisoners as a result of inadequate staffing at EMCF.[104] Those harms are ongoing at EMCF.

98. On March 5, 2018, an officer entered Housing Unit 4A and discovered that a prisoner had been stabbed.[105] The assault was then verified by looking at camera footage. That means the assault occurred in full view of the camera, and not in a cell, but it was not detected by

---

[98] *See* January 2018 Extraordinary Occurrence Reports, EMCF-18-0008-1 (Jan. 3, 2018); EMCF-18-0016 (Jan. 9, 2018); EMCF-18-0017 (Jan. 10, 2018); EMCF-18-0035 (Jan. 18, 2018); EMCF-18-0039 (Jan. 19, 2018); EMCF-18-0044 (Jan 22, 2018); EMCF-18-0053 (Jan. 25, 2018); EMCF-18-0057 (Jan. 28, 2018); EMCF-18-0064 (Jan. 29, 2018)

[99] MDOC Statistical Report January–June 2018, at SEC-PostTrial-020040

[100] *See* February 2018 Extraordinary Occurrence Reports, EMCF-18-0070 (Feb. 2, 2018); EMCF-18-0082 (Feb. 6, 2018); EMCF-18-0089 (Feb. 7, 2018); EMCF-18-0094 (Feb. 8, 2018); EMCF-18-0125 (Feb. 15, 2018); EMCF-18-0141 (Feb. 22, 2018)

[101] MDOC Statistical Report January–June 2018, at SEC-PostTrial-020040

[102] *See* April 2018 Extraordinary Occurrence Reports, EMCF-18-0284 (April 16, 2018); EMCF-18-0285 (April 16, 2018)

[103] *See* Trial Tr. Vol. 3, 15:23–16:8 (March 6, 2018)

[104] *See, e.g.*, Vail Report (2016), ¶¶ 94–97, 101, 109; Trial Tr. Vol. 3, at 22:12–39:9 (March 6, 2018)

[105] March 5, 2018 Extraordinary Occurrence Report, EMCF-18-0168

the officer in the picket, by officers assigned to supervise that housing unit, or by the officers in central control where the camera footage can be viewed. On that day there were only 2 floor officers assigned to supervise the 4 pods in Unit 4, and clearly, no officer was in or actually supervising Unit 4A when the assault occurred.[106]

99.   On September 1, 2018 a prisoner was stabbed multiple times in Unit 1A. I interviewed that prisoner during my recent inspection of EMCF. He described the event as taking place for several minutes before it was discovered. He was accused of owing money to one of the prison gangs. After a verbal confrontation he was assaulted by more than one prisoner and fought them on the upper tier of the Unit. The prisoner said he grabbed the fence that faces the dayroom and held on for about 5 minutes, but the assault was not detected during that period of time. The prisoner was then forced into a cell where several prisoners stabbed and beat him. He then fought his way out of the cell and back on to the tier and then he returned to his own cell. Recognizing he was having trouble breathing he made his way out of the cell and to the bottom floor dayroom of the unit and went to the window to get the attention of correctional staff. As the incident report describes, officers only then entered the unit and discovered that the prisoner was severely injured. He was taken on a stretcher to the medical unit where it was documented that he had been stabbed 6 times. He was then transported to an outside hospital for treatment.[107] This event clearly went on for some time and was not detected by the officers assigned to supervise the floor of unit 1, by the picket officer or by the officers in central control where the cameras are displayed. Had there been 1 officer assigned to each pod it is highly likely that this assault could have been detected much earlier or could have been prevented.

100.  On April 16, 2018, two officers were escorting a restrained inmate from the shower back to his cell on Unit 5A when another inmate breached his cell door and stabbed the restrained inmate with a makeshift knife.[108] The incident demonstrates that the problem of cell door locks not functioning properly at EMCF, which I described in my 2016 Report and at trial, continues to persist at the facility.[109] It also shows that despite that known problem, officers are unable to spend the necessary time ensuring that each cell door is properly secured. That they cannot or do not do so is no surprise given that the task is a labor intensive one that would be difficult to perform given the understaffing of floor officer positions throughout the facility, and the volume of other tasks these officers have to perform each shift.[110]

---

[106] March 5, 2018 First Shift Roster, SEC-PostTrial-000091–000018

[107]  September 1, 2018 Extraordinary Occurrence Report, EMCF-18-0570

[108] April 16, 2018 Extraordinary Occurrence Report, EMCF-18-0284

[109] Vail Report (2016), ¶¶ 56–65; Trial Tr. Vol. 3, at 6:21–7:2 (March 6, 2018); Trial Tr. Vol. 4, at 31:15–32:1 (March 6, 2018).

[110] While the incident described in the EOR happened on Unit 5, which utilizes slider doors, the ability for prisoners to make locks become unsecured exists throughout the facility. Indeed, multiple inmates shared with me during my recent inspection that the security of the cell doors remains an on-going threat to their safety. One prisoner, in a general population unit that utilizes a swing door, went so far as to demonstrate for me how quickly and easily prisoners can breach security by manipulating their cell door locks: the prisoner pulled a small piece of metal out of his pocket, placed it into the door jam, and opened his secured cell door.

101. On September 13, 2018 medical staff entered Unit 4A for a pill call, accompanied by correctional staff. A prisoner "ran to the unit door bleeding profusely from his head area." One of the officers reported that the prisoner was bloody and "screaming to get him off the pod." When asked, he identified the primary aggressor. After being taken to medical the prisoner was asked if anyone else was involved and he said there was but did not know the names. EMCF then viewed the video record and identified the other prisoners involved. The medical record shows the prisoner suffered multiple lacerations requiring over 20 staples for his wounds.[111] I interviewed this prisoner during my recent inspection of EMCF. He indicated that during this assault there were 3 officers in the bottom picket but none actually in the pod where he was assaulted. He told me the fight started in the cell but then moved into the dayroom and it attracted a group of other prisoners watching what was going on. The officers assigned to supervise the unit did not notice the assault until medical staff entered the unit for an unrelated pill call, nor did the picket officer or the officers in central control observe what was going on. Without officers regularly assigned to be in the unit, it is no surprise that assaults go undetected until after a serious incident occurs. This prisoner, like many others, told me he did not believe he is safe at EMCF.

102. These events illustrate the limitations of relying on the picket officers or the officers in central control (where the cameras can be viewed) to provide the necessary constant supervision over prisoners. During my most recent inspection of EMCF I had the opportunity to enter the pickets in some of the housing units, including the Unit 1 picket. From that picket you cannot see into each pod (there are a few blind spots, primarily of the doors leading out of the pod and by the stairwells on the pods) without getting up from the desk and approaching the window for each individual pod. This cannot be a constant occurrence, as the picket officer needs to stay near the desk to open multiple doors that they control from the desk and maintain their written log. According to Warden Shaw and my own observation, there is no video display in the pickets, except for one screen in Unit 5 (which I also inspected), which means that the picket officer can only rely on their own visual observation to detect and prevent assaults (a task, which the above examples confirm, is an impossible one without additional floor officer supervision in the living units themselves).

103. The cameras for the housing units are displayed in central control where there are two officers assigned on the day and evening shifts. Central control is the hub of the facility and the duties of those posts can make those officers very busy. I also had the opportunity to inspect central control with the Warden. Cameras displayed in central control include one for each pod of each housing unit, one for each recreation area attached to the housing units, cameras that show the hallways of the prison, a camera for the front gate and at least four perimeter cameras. These cameras are fixed unless an officer in control detects some action, and although the camera's fixed position views most of the pod, there are significant blind spots on each pod that the camera cannot observe from its fixed position. While the observation provided by the officers in the pickets and in central control are important, there is no way they can regularly, routinely or consistently monitor what is going on in the housing units. Floor officers must be in those units to properly supervise the

---

[111] September 13, 2018 Extraordinary Occurrence Report, EMCF-18-0588

prisoner population.

## VII. CONCLUSION AND RECOMMENDATIONS

104. Based on my nearly four-year study of EMCF, I am convinced the prisoners housed at EMCF face a substantial risk of harm on a daily basis. It has been, and remains, a very dangerous prison. While some improvements have been made over the last four years—including, in addition to what I have already mentioned in this report, that the facility appears cleaner and seems to offer more (though still not enough) structured programming to prisoners—the improvements that have been made do not address the core safety and security problems at the prison. Staffing remains woefully deficient, weapons remain pervasive, and the culture of the staff permits them to not provide constant supervision over the prisoners. Until these problems are addressed, the risk of harm to prisoners at EMCF will remain substantial.

105. I fear for the future of the facility unless systemic and fundamental changes occur. The most critical need is to increase the staffing and change the way that the prisoners are supervised. Below, I offer some modest recommendations of necessary steps that must be taken in this regard. While more will certainly need to be done to improve the overall safety and security picture at EMCF, adoption of these three recommendations would result in EMCF taking a massive step forward in the direction of reducing the risk of harm to the prisoners it houses.

### Recommendation 1: EMCF should be directed to conduct a comprehensive staffing analysis performed by independent outside experts

106. Insufficient correctional officer staffing is at the root of many of the problems at EMCF. The staffing levels for EMCF were established in 2012 and, according to MDOC itself, it is not known what those levels were based on.[112] There is no evidence that a staffing analysis was ever conducted to determine the staffing levels for EMCF, and it is equally clear that MDOC has not made any recent attempt to do so.[113] It is my strong recommendation that the Court direct that such an analysis occur. Staffing analysis experts who are not beholden to the Defendants or the Plaintiffs should be selected to perform such an analysis.

107. As I referenced earlier in this report, the United State Department of Justice, National Institute of Corrections provides training in staffing analysis and has published a related manual. Utilizing experts who have been trained by NIC to conduct a staffing analysis by authorities from outside the jurisdictions is a common practice in prison systems throughout the country and should be employed by MDOC for EMCF. Ultimately MDOC is responsible for the safety and security of prisoners at EMCF and it is within their authority and responsibility to direct such an analysis occur. However, there is nothing in the record that indicates they have done so or plan to do so.

108. Performing a staffing analysis is a complex undertaking. It involves an on-site inspection,

---

[112] Trial Tr. Vol. 13, at 116:11–119:19 (March 13, 2018)

[113] *Id.*

28

access to the facility written materials and records as well as interviews with line staff and administrators. A summary from the NIC manual further describes the areas that must be considered to determine the appropriate staffing levels for an individual facility.

> At the facility level the analyst has to become familiar with the role the facility plays in the agency. This requires a review of the facility's mission statement, organizational chart, the number and types of inmates housed there, the configuration of the facility's physical plant and grounds, the layout of the housing unit, its policies and procedures, the facility's unique operation and activities and programs, its budget, its staffing issues, its current staffing plan and its current shift relief factor. Any recent facility-specific changes or facility-specific court orders are likely to affect the staffing as well. The analyst's role requires considerable reviewing of documents in addition to discussion of the facility's current circumstances.

109.  I have consistently opined about the need for a staffing analysis at EMCF, but I have only focused on the need to increase the number of officers in housing units. Indeed, in the context of this litigation, my ability to do more was not possible given that full and unrestricted access to the facility (and the ability to interview its staff) was not permitted. As a result, I limited my own recommendation of increasing correctional officer staffing in the housing units to the immediately obvious—and critical to resolve—problem that EMCF simply does not have enough floor officers to adequately supervise prisoners.

110.  A staffing analysis will need to take a much more comprehensive look at all correctional staff at the facility, including officers not assigned to the living units and correctional supervisors. They will also take a look at the "relief factor" that drives overall staffing at EMCF. The relief factor takes into account how many staff it takes to fill a particular post. For example, it usually takes between 5 to 5.4 people to staff a single 24-hour a day, 7-day a week post. If that factor is off, it can result in significant differences in the overall facility staffing level. The relief factor takes into account things like regular days off, annual leave, sick leave, military leave, and training needs in determining the precise number.[114]

111.  Once a qualified consultant is identified, it is likely that the analysis could be completed in a matter of weeks or at most a couple of months,

**Recommendation 2: Consistent with the floor officer staffing recommendation I described above, EMCF must immediately revise its polices and post orders such that they are able to provide direct supervision to prisoners in the housing units (1 floor officer per pod in General Population units, and 2 floor officers per pod in Close Custody/Segregation units)**

112.  My second recommendation is that EMCF immediately revise their policies and post orders

---

[114] The relief factor at EMCF for a 24-four hour a day, 7 day a week post is calculated as 4.71, well below what I have seen in other jurisdictions. But until there is a close study of the actual records of EMCF by a qualified staffing analysis expert, we can't know for certain.

so that officers are required to position themselves to actually keep their eyes on what is going on in the living units. There needs to be one officer assigned to each pod in the general population units and two assigned to each pod housing segregation or close custody inmates. It is critical that changes take place as soon as possible. In the interim before a staffing analysis is completed, EMCF should put more officers in the living units, as I have recommended in my report, and expect those officers to stay in the units and supervise the prisoners.

113. As I said in my 2016 report and during trial testimony,[115] I strongly recommend that correctional officers at EMCF be deployed in a direct supervision model—a change that would not require any extensive or expensive changes to the physical plant of the facility to accomplish. Direct supervision requires that the officers remain in the pods where they inmates are housed. Their consistent presence and enforcement of normative rules and being available to meet the needs of individual inmates is a long-standing corrections practice proven to be effective in lowering levels of violence in correctional institutions.

114. In an extensive review of the effectiveness of the direct supervision model Dr. Richard Wener offers the following summary:

> The direct supervision system of correctional management and design was first used in adult detention facilities in 1974. Since then, it has been adopted by hundreds of prisons and jails an accepted as best practice by professional associations and accrediting organizations in corrections. Research assessing its success has taken the form of detailed case studies, comparisons among different facilities, and comparisons within the same facility or system over time. Overall, reports have been consistent in finding that direct supervision has led to reduced assaults and other serious incidents, and lower costs.[116]

.

115. MTC is capable of making the transition to an expectation that officers stay on their assigned posts to provide direct supervision to prisoners. MTC used to operate the Walnut Grove Correctional Facility. I became involved in *DePriest v. Walnut Grove Correctional Authority, et al.*, which resulted in a Consent Decree regarding Walnut Grove, in the fall of 2013. In my first report for that case, I was critical of the practice of not expecting correctional officers to be in the units where the inmates live.[117] After two riots occurred at the facility resulting in serious injuries to over a dozen inmates in 2014, by the fall of 2015, MTC had accepted this advice and instructed their officers to stay on their posts in the

---

[115] Vail Report (2016), ¶ 103; Trial Tr. Vol. 3, at 70:6–71:8 (March 6, 2018); Trial Tr. Vol. 5, at 34:9–14 (March 7, 2018)

[116] Effectiveness of the Direct Supervision of Correctional Design and Management: A Review of the Literature, Dr. Richard Wener, NYU, Criminal Justice and Behavior, Volume 33, No 3, June 2006

[117] *DePriest. et al v. Walnut Grove Correctional Authority et al*, Case No. 3:10-cv-0663, Dkt. No. 100 Expert Report of Eldon Vail (March 14, 2014), at 7

living units (in addition to increasing overall mandatory staffing for the facility).[118] MTC continues to resist this recommendation at EMCF. Until that changes, EMCF will remain a very dangerous prison with an ongoing risk of harm to the prisoners who are housed at that facility.

**Recommendation 3: The Court should appoint an independent monitor to oversee changes at EMCF, including an immediate increase of floor officer staffing, as well as the longer-term shift towards direct supervision based on the completion of a comprehensive staffing analysis**

116.  MDOC has not demonstrated the capacity to forcefully support the findings of their own monitor and demand change at EMCF. And I am not confident that MDOC or MTC have the capacity to implement the recommendations I am making in this report. First, I am not confident MDOC allow an unbiased staffing analysis to take place and to see that the result of the analysis is implemented successfully. Second, I am even less confident that they possess the capacity to properly train and then oversee what it means to implement a direct supervision model in their housing units, most of which are full of prisoners who suffer from some level of mental illness. It is a much different skill set to actually supervise an inmate population, especially one with high levels of mentally ill persons, without proper monitoring and training, than what is their current practice. Direct supervision for prison housing units is not a new concept in corrections; it has been around for decades. If you are not experienced with it, it can sound scary and dangerous. But the research and experience of corrections professionals has shown it is actually safer. For it to be implemented successfully, it would require a court-appointed monitor from outside MTC or MDOC who is familiar with the practice. That court-appointed monitor could also assist EMCF with the multitude of basic custody problems that I have raised in this report, and the others I have written, that seem imbedded in the current operation of this troubled facility. Without outside monitoring, I fear the facility will continue going on as it has for the last several years, placing prisoners at significant risk of serious harm.

---

[118] In June 2015, the Court entered an Order that the Consent Decree would remain in effect because of ongoing violations related to safety and security. *See DePriest v. Walnut Grove Correctional Authority et al.*, Case No, 3:10-cv-663, Dkt No. 170 (June 11, 2015)

Respectfully Submitted:

_____
Eldon Vail

Exhibit 1

**ELDON VAIL**
1516 8th Ave SE
Olympia, WA. 98501
360-349-3033
Nodleliav@comcast.net

## WORK HISTORY

Nearly 35 years working in and administering adult and juvenile institutions, and probation and parole programs, starting at the entry level and rising to Department Secretary. Served as Superintendent of 3 adult institutions, maximum to minimum security, male and female. Served as Secretary for the Washington State Department of Corrections (WADOC) from 2007 until 2011.

- Secretary                         WADOC                              2007-2011
- Deputy Secretary                  WADOC                              1999-2006
- Assistant Deputy Secretary        WADOC                              1997-1999
- Assistant Director for Prisons    WADOC                              1994-1997
- Superintendent                    McNeil Island Corrections Center   1992-1994
- Superintendent                    WA. Corrections Center for Women   1989-1992
- Correctional Program Manager      WA. Corrections Center             1988
- Superintendent                    Cedar Creek Corrections Center     1987
- Correctional Program Manager      Cedar Creek Corrections Center     1984-1987
- Juvenile Parole Officer           Division of Juvenile Rehabilitation 1984
- Correctional Unit Supervisor      Cedar Creek Corrections Center     1979-1983
- Juvenile Institution Counselor    Division of Juvenile Rehabilitation 1974-1979

## SKILLS AND ABILITIES

- Ability to analyze complex situations, synthesize the information and find practical solutions that are acceptable to all parties.

- A history of work experience that demonstrates how a balance of strong security and robust inmate programs best improves institution and community safety.

- Leadership of a prison system with very little class action litigation based on practical knowledge that constitutional conditions are best achieved through negotiation with all parties and not through litigation.

- Extensive experience as a witness, both in deposition and at trial.

- Experience working with multiple Governors, legislators from both political parties, criminal justice partners and constituent groups in the legislative and policymaking process.

- Skilled labor negotiator for over a decade. Served as chief negotiator with the Teamsters and the Washington Public Employees Association for Collective Bargaining Agreements. Chaired Labor Management meetings with Washington Federation of State Employees.

## HIGHLIGHTS OF CAREER ACCOMPLISHMENTS

- Reduced violence in adult prisons in Washington by over 30% during my tenure as Secretary and Deputy Secretary even though the prison population became much more violent and high risk during this same time period.

- Long term collaboration with the University of Washington focusing on improving treatment for the mentally ill in prison and the management of prisoners in and through solitary confinement.

- Implemented and administered an extensive array of evidence based and promising programs:

  o Education, drug and alcohol, sex offender and cognitive treatment programs.

  o Implemented sentencing alternatives via legislation and policy, reducing the prison populations of non-violent, low risk offenders, including the Drug Offender Sentencing Alternative and, as the Secretary, the Parenting Sentencing Alternative.   http://www.doc.wa.gov/corrections/justice/sentencing/parenting-alternative.htm

  o Pioneered extensive family based programs resulting in reductions in use of force incidents and infractions, as well as improved reentry outcomes for program participants.

  o Established Intensive Treatment Unit for mentally ill inmates with behavioral problems.

  o Established step down programs for long-term segregation inmates resulting in significant reduction in program graduate returns to segregation.

- Initiated the Sustainable Prisons Project
  http://blogs.evergreen.edu/sustainableprisons/

- Improved efficiency in the agency by administrative consolidation, closing 3 high cost institutions and eliminating over 1,200 positions. Housed inmates safely at lowest possible custody levels, also resulting in reduced operating costs.

- Increased partnerships with non-profits, law enforcement and community members in support of agency goals and improved community safety.

- Resolved potential class action lawsuit regarding religious rights of Native Americans.

2

http://seattletimes.nwsource.com/html/opinion/2015464624_guest30galanda.html

- Successful settlement of the Jane Doe class action law suit, a PREA case regarding female offenders in the state's prisons for women.

- Led the nation's corrections directors to support fundamental change in the Interstate Compact as a result of the shooting of 4 police officers in Lakewood, WA.

- Dramatically improved media relations for the department by being aggressively open with journalists, challenging them to learn the difficult work performed by corrections professionals on a daily basis.

## EDUCATION AND OTHER BACKGROUND INFORMATION

- Bachelor of Arts - The Evergreen State College, Washington – 1973

- Post graduate work in Public Administration - The Evergreen State College, Washington - 1980 and 1981

- National Institute of Corrections and Washington State Criminal Justice Training Commission - various corrections and leadership training courses

- Member of the American Correctional Association

- Associate member, Association of State Correctional Administrators (ASCA)

- Guest Speaker, Trainer and Author for the National Institute of Corrections (NIC)

- Instructor for Correctional Leadership Development for the National Institute of Corrections

- Author of *Going Beyond Administrative Efficiency—The Budget Crisis in the State of Washington*, published in Topics of Community Corrections by NIC, 2003

- Consultant for *Correctional Leadership Competencies for the 21st Century*, an NIC publication

- Consultant for Correctional Health Care Executive Curriculum Development, an NIC training program, 2012

- Commissioner, Washington State Criminal Justice Training Commission 2002-2006, 2008-2011

- Member, Washington State Sentencing Guidelines Commission 2007-2011

3

- Advisory Panel Member, *Correctional Technology—A User's Guide*

- Co-chair with King County Prosecutor Dan Satterberg, *Examining the Tool Box: A Review of Supervision of Dangerous Mentally Ill Offenders*
  http://www.kingcounty.gov/depts/prosecutor/news-media-center/reports.aspx

- Guest lecturer on solitary confinement, University of Montana Law School in 2012

- On retainer for Pioneer Human Services from July 2012 - July 2013

- On retainer for BRK Management Services from September 2012 – April 2013

- Guest Editorial, Seattle Times, February 22, 2014
  http://www.seattletimes.com/opinion/guest-opinions-should-washington-state-abolish-the-death-penalty/

## CURRENT ACTIVITIES

- Serve on the Board of Advisors for Huy, a non-profit supporting Native American Prisoners

- Serve on the Board of Directors for HEAL for Reentry, a non-profit supporting Native Americans' transition to the community from prison

- Retained as an expert witness or correctional consultant in the following:

    o ***Mitchell v. Cate***
       No. 08-CV-1196 JAM EFB
       United States District Court, Eastern District of California,
       Declarations, March 4, 2013, May 15, 2013 and June 7, 2013
       Deposed, July 9, 2013
       Case settled, October 2014

    o ***Parsons, et al v. Ryan***
       No. CV 12-06010 PHX-NVW
       United States District Court of Arizona
       Declarations and reports, November 8, 2013,
       January 31, 2014, February 24, 2014, September 4, 2014
       Deposed, February 28, 2014 and September 17, 2014
       Case settled, October 2014

    o ***Ananachescu v. County of Clark***
       No. 3:13-cv-05222-BHS
       United States District Court, Western District of Tacoma
       Case settled, February 2014

o ***Gifford v. State of Oregon***
> No. 6:11-CV-06417-TC
> United States District Court, For the District of Oregon,
> Eugene Division,
> Expert report, March 29, 2013
> Case settled, May 2013

o ***Coleman, et al v. Brown, et al***
> No. 2:90-cv-0520 LKK JMP P
> United State District Court, Eastern District of California,
> Declarations, March 14, 2013, May 29, 2013, August 23, 2013 and
> February 11, 2014
> Deposed, March 19, 2013 and June 27, 2013
> Testified, October 1, 2, 17 and 18, 2013

o ***Peoples v. Fischer***
> No. 1:11-cv-02694-SAS
> United States District Court, Southern District of New York
> Interim settlement agreement reached February 19, 2014
> Case settled, March 2016
> Continuing assignment monitoring for the Plaintiffs'

o ***Dockery v. Hall***
> No. 3:13-cv-326 TSL JMR
> United States District Court for the Southern District of
> Mississippi, Jackson Division
> Reports, June 16, 2014, December 29, 2016 and
> March 23, 2017
> Deposed, April 7, 2017
> Testified March 5-7, 2018

o ***C.B., et al v. Walnut Grove Correctional Authority, et al***
> No. 3:10-cv-663 DPS-FKB,
> United States District Court for the Southern District of
> Mississippi, Jackson Division
> Memo to ACLU and Southern Poverty Law Center,
> March 14, 2014, filed with the court
> Reports, August 4, 2014 and February 10, 2015
> Testified, April 1, 2 and 27, 2015

o ***Graves v. Arpaio***
> No. CV-77-00479-PHX-NVW,
> United States District Court of Arizona
> Declarations, December 15, 2013, April 1, 2016,
> December 22, 2017, February 9, 2018 and October 22, 2018
> Testified, March 5, 2014

- ***Wright v. Annucci, et al***
  No. 13-CV-0564 (MAD)(ATB)
  United States District Court, Northern District of New York
  Reports, April 19, 2014 and December 12, 2014
  Testified, February 13, 2017

- ***Corbett v. Branker***
  No. 5:13 CT-3201-BO
  United States District Court, Eastern District of North Carolina,
  Western District
  Special Master appointment November 18, 2013
  Expert Report, January 14, 2014
  Testified, March 21, 2014

- ***Fontano v. Godinez***
  No. 3:12-cv-3042
  United States District Court, Central District of Illinois,
  Springfield Division
  Report, August 16, 2014
  Testified June 29, 2016
  Case settled June 30, 2016

- ***Atencio v. Arpaio***
  No. CV12-02376-PHX-PGR
  United States District Court of Arizona
  Reports, February 14, 2014 and May 12, 2014
  Deposed, July 30, 2014
  Case settled, March 2018

- ***Larry Heggem v. Snohomish County***
  No. CV-01333-RSM
  United States District Court,
  Western District of Washington at Seattle
  Report, May 29, 2014
  Deposed, June 27, 2014

- ***Disability Rights, Montana, Inc. v. Richard Opper***
  No. CV-14-25-BU-SHE
  United State District Court for the District of Montana,
  Butte Division

- ***Doe v. Michigan Department of Corrections***
  No. 5:13-cv-14356-RHC-RSW
  United States District Court, Eastern District of Michigan,
  Southern Division
  Declaration, September 12, 2018

o ***Padilla v. Beard, et al***
  Case 2:14-at-00575
  United States District Court, Eastern District of California,
  Sacramento Division
  Declaration, February 26, 2016
  Deposed June 3, 2016
  Testified April 19, 2017
  Case settled, April 24, 2017

o ***Braggs, et al v. Dunn, et al***
  No. 2:14-cv-00601-WKW-TFM
  United States District Court, Middle District of Alabama
  Declarations, September 3, 2014, April 29, 2015,
  June 3, 2015
  Expert Report, July 5, 2016
  Declarations, February 9, 2017 and October 19, 2017
  Expert Report, July 1, 2018
  Deposed August 21, 2016
  Testified, December 22, 2016, January 4, February 21, December
  5, 2017, February 13, 2018 and October 23, 2018

o ***Sassman v. Brown***
  No. 2:14-cv-01679-MCE-KJN,
  United States District Court, Eastern District of California,
  Sacramento Division
  Declaration, August 27, 2014, Report, December 5, 2014
  Deposed, December 15, 2014

o ***Robertson v. Struffert, et al***
  Case 4:12-cv-04698-JSW
  United States District Court, Northern District of California
  Declaration, March 16, 2015
  Deposed May 4, 2015
  Case settled, October 2015

o ***Commonwealth of Virginia v. Reginald Cornelius Latson***
  Case No: GC14008381—00
  General District Court of the County of Stafford
  Report, January 12, 2015
  Pardon granted

o ***Flores v. United States of America***
  Civil Action No 14-3166
  United States District Court, Eastern District of New York
  Report, August 14, 2015

7

- o ***Latson v. Clarke***
  No. 1:16-cv-00447-GBL-MSN
  United States District Court, Eastern District of Virginia
  Reports, November 16, 2016 and January 6, 2017
  Deposed, December 13, 2016
  Case settled, May 2, 2017

- o ***Latson v. Clarke***
  Civil No. 1:16-cv-00039
  United States District Court, Western District of Virginia,
  Abingdon Division
  Report, September 29, 2017
  Deposed, December 28, 2017

- o ***Star v. Livingston***
  Case No: 4:14-cv-03037
  United States District Court, Southern District of Texas,
  Houston Division
  Reports, March 3, 2015 and October 12, 2016
  Case settled, March 2018

- o ***Doe v. Kelly***
  Case 4:15-cv-00250-DCB
  United States District Court for the District of Arizona
  Reports, December 4, 2015, March 10, 2016,
  September 23, 2017 and November 20, 2017
  Testified, November 14, 2016

- o ***Redmond v. Crowther***
  Civil No. 2:13-cv-00393-PMW
  United States District Court, Central Division,
  State of Utah
  Report, April 28, 2015
  Deposed, July 28, 2015

- o ***Cole v. Livingston***
  Civil Action No. 4:14-cv-1698
  United States District Court, Southern District of Texas,
  Houston Division
  Reports, August 5, 2015 and April 28, 2017
  Deposed, December 2, 2015
  Testified, June 20, 2017
  Case settled, March 2018

- ***Fant v. The City of Ferguson***
  Case No. 415-cv-00253 E.D. MO
  United States District Court, Eastern District of Missouri
  Report, January 8, 2016

- ***State of Arizona, Appellee, v. Pete J. Van Winkle, Appellant***
  No. CR–09–0322–AP
  Testified, March 28, 2016

- ***Rasho v. Godinez***
  Civil Action No. 07-CV-1298
  United States District Court, Central Division of Illinois,
  Peoria Division
  Case settled, December 2015

- ***Morgal v. Williams***
  No. CV 12-280-TUC-CKJ
  United States District Court for the District of Arizona
  Report, February 1, 2016
  Deposed, February 25, 2016

- ***Sacramento County Sheriff***
  Retained by Sacramento County Sheriff to evaluate housing units
  in the Sacramento County jails, including maximum custody,
  segregation and protective custody
  Report, June 27, 2016

- ***Community Legal Aid Society, Inc. v. Robert M. Coupe***
  Case No. 1:15-cv-00688
  United States District Court for the District of Delaware
  Report, March 31, 2016
  Case settled, August 2016

- ***C-Pod Inmates of Middlesex County Adult Correction Center, et al. v. Middlesex County***
  Civil Action No. 15-7920 (PGS)
  United States District Court for the District of New Jersey
  Report, July 29, 2016

- ***Williams v. Snohomish County***
  Case No. 15-2-22078-1 SEA
  Superior Court for the State of Washington, King County

- ***P.D. v. Middlesex County***
  Case No. MID-L-3811-14
  Superior Court of New Jersey
  Report, July 29, 2016

9

- *Gould v. State of Oregon, et al*
  - Case No. 2:15-cv-01152-SU
  - United States District Court for the District of Oregon
  - Case settled, October 2016

- *Johnson v. Mason County*
  - NO. 3:14-cv-05832-RBL
  - United States District Court, Western District of Washington at Tacoma
  - Declaration, April 5, 2016
  - Deposed, October 26, 2016
  - Case settled, March 2017

- *United States Department of Justice*
  - Retained by DOJ to join a team investigating conditions for LGBT inmates including sexual harassment, sexual abuse and sexual assaults by inmates and staff in the Georgia Department of Corrections
  - Report, October 2016

- *Daniel Evans v. Management and Training Corporation, et al*
  - NO. 3:15-cv-770-DPJ-FKB
  - United States District Court, Southern District of Mississippi, Northern Division
  - Report, October 17, 2016
  - Case settled, January 2017

- *Webb v. Collier*
  - Civil Action NO. 6:13cv711
  - United States District Court, Eastern District of Texas, Tyler Division
  - Report, March 13, 2017
  - Deposed, May 5, 2017
  - Case settled, March 2018

- *Holbron v. Espinda*
  - Civil No. 16-1-0692-04 RAN
  - Circuit Court of the First Circuit, State of Hawai'i
  - Reports, February 1, 2017 and November 20, 2017
  - Testified, December 20, 2017

- *Carruthers v. Israel*
  - Case No. 76-6086-civ-Middlebrooks
  - United States District Court, Southern District of Florida

10

o   ***Dahl v. Mason County***
      Case 3:16-cv-05719
      United States District Court, Western District of Washington at Tacoma
      Report, August 21, 2017, Declaration, December 4, 2017
      Case settled, August 2018

o   ***Adams, James, Hudson v. Livingston***
      Civil Action No. 4:14-cv-03326
      United States District Court, Southern Division of Texas
      Houston Division
      Report, June 15, 2017
      Case settled, March 2018

o   ***Ashker v. Governor of the State of California, et al***
      Case No. 4:09 CV 05796 CW
      United States District Court, Northern District of California, Oakland Division
      Declaration, December 6, 2017

o   ***Togonidze v. Livingston***
      Civil Action No. 3:13-cv-229
      United States District Court, Southern District of Texas, Galveston Division
      Report, October 3, 2017
      Case settled, March 2018

o   ***Martone v. Livingston***
      Civil Action No 4:13-CV-3369
      United States District Court, Southern Division of Texas, Houston Division
      Case settled, March 2018

o   ***Cody v. City of St. Louis***
      Case 4:17-cv-02707-AGF
      United States District Court, Eastern District of Missouri, Eastern Division
      Affidavit, August 30, 2018

o   ***Davis v. Baldwin***
      Case No. 3:16-cv-600
      United States District Court, Southern Division of Illinois

o   ***Sabata v. Nebraska Department of Correctional Services***
Case No. 4:17-CV-3107
United States District Court for the State of Nebraska
Report, August 24, 2018

Exhibit 2

**Exhibit 2: Documents Considered in Forming Expert Opinions**

**Shift Rosters [SEC-PostTrial-000001 – SEC-PostTrial-00748; SEC-PostTrial-020051 – SEC-PostTrial-020251]**

1. January 1-7, 2018
2. February 18-24, 2018
3. March 1-31, 2018
4. April 15-21, 2018
5. May 20-26, 2018
6. June 1-30, 2018
7. July 1-7, 2018
8. August 12-18, 2018

**Trial Testimony**

1. Volume 2 (March 5, 2018)
2. Volume 3 (March 6, 2018)
3. Volume 4 (March 6, 2018)
4. Volume 5 (March 7, 2018)
5. Volume 6 (March 7, 2018)
6. Volume 7 (March 8, 2018)
7. Volume 8 (March 8, 2018)
8. Volume 12 (March 13, 2018)
9. Volume 13 (March 13, 2018)
10. Volume 14 (March 14, 2018)
11. Volume 15 (March 14, 2018)
12. Volume 17 (March 15, 2018)
13. Volume 18 (March 16, 2018)
14. Volume 21 (March 20, 2018)
15. Volume 22 (March 20, 2018)
16. Volume 25 (March 22, 2018)
17. Volume 26 (March 22, 2018)
18. Volume 31 (April 2, 2018)
19. Volume 32 (April 2, 2018)
20. Volume 33 (April 3, 2018)
21. Volume 36 (April 5, 2018)
22. Volume 37 (April 5, 2018)
23. Volume 38 (mislabeled as Volume 40) (April 9, 2018)

**Extraordinary Occurrence Reports and Use of Force Reports**

1. EMCF-18-0001
2. EMCF-18-0002
3. EMCF-18-0006
4. EMCF-18-0007
5. EMCF-18-0008
6. EMCF-18-0008-1
7. EMCF-18-0009
8. EMCF-18-0009-1
9. EMCF-18-0010
10. EMCF-18-0011
11. EMCF-18-0012
12. EMCF-18-0013
13. EMCF-18-0015
14. EMCF-18-0016
15. EMCF-18-0017
16. EMCF-18-0018
17. EMCF-18-0019
18. EMCF-18-0020
19. EMCF-18-0021
20. EMCF-18-0024
21. EMCF-18-0026
22. EMCF-18-0027
23. EMCF-18-0028
24. EMCF-18-0032
25. EMCF-18-0033
26. EMCF-18-0034
27. EMCF-18-0035
28. EMCF-18-0036
29. EMCF-18-0038
30. EMCF-18-0039
31. EMCF-18-0040
32. EMCF-18-0041
33. EMCF-18-0042
34. EMCF-18-0043
35. EMCF-18-0044
36. EMCF-18-0045
37. EMCF-18-0046
38. EMCF-18-0047
39. EMCF-18-0048
40. EMCF-18-0049
41. EMCF-18-0050
42. EMCF-18-0051
43. EMCF-18-0052
44. EMCF-18-0053
45. EMCF-18-0054

46. EMCF-18-0055
47. EMCF-18-0057
48. EMCF-18-0058
49. EMCF-18-0059
50. EMCF-18-0064
51. EMCF-18-0065
52. EMCF-18-0066
53. EMCF-18-0067
54. EMCF-18-0068
55. EMCF-18-0069
56. EMCF-18-0070
57. EMCF-18-0071
58. EMCF-18-0072
59. EMCF-18-0073
60. EMCF-18-0074
61. EMCF-18-0077
62. EMCF-18-0077-1
63. EMCF-18-0078
64. EMCF-18-0079
65. EMCF-18-0080
66. EMCF-18-0081
67. EMCF-18-0082
68. EMCF-18-0083
69. EMCF-18-0084
70. EMCF-18-0084-1
71. EMCF-18-0085
72. EMCF-18-0086
73. EMCF-18-0087
74. EMCF-18-0089
75. EMCF-18-0090
76. EMCF-18-0092
77. EMCF-18-0093
78. EMCF-18-0094
79. EMCF-18-0096
80. EMCF-18-0099
81. EMCF-18-0101
82. EMCF-18-0102
83. EMCF-18-0105
84. EMCF-18-0106
85. EMCF-18-0107
86. EMCF-18-0108
87. EMCF-18-0108-1
88. EMCF-18-0109
89. EMCF-18-0110
90. EMCF-18-0111
91. EMCF-18-0112

92. EMCF-18-0113
93. EMCF-18-0114
94. EMCF-18-0115
95. EMCF-18-0115-1
96. EMCF-18-0118
97. EMCF-18-0120
98. EMCF-18-0121
99. EMCF-18-0122
100.     EMCF-18-0123
101.     EMCF-18-0124
102.     EMCF-18-0125
103.     EMCF-18-0126
104.     EMCF-18-0127
105.     EMCF-18-0128
106.     EMCF-18-0129
107.     EMCF-18-0132
108.     EMCF-18-0134
109.     EMCF-18-0135
110.     EMCF-18-0136
111.     EMCF-18-0137
112.     EMCF-18-0139
113.     EMCF-18-0141
114.     EMCF-18-0142
115.     EMCF-18-0142-1
116.     EMCF-18-0148
117.     EMCF-18-0162
118.     EMCF-18-0163
119.     EMCF-18-0165
120.     EMCF-18-0167
121.     EMCF-18-0168
122.     EMCF-18-0169
123.     EMCF-18-0170
124.     EMCF-18-0171
125.     EMCF-18-0172
126.     EMCF-18-0173
127.     EMCF-18-0174
128.     EMCF-18-0176
129.     EMCF-18-0177
130.     EMCF-18-0178
131.     EMCF-18-0181
132.     EMCF-18-0182
133.     EMCF-18-0184
134.     EMCF-18-0185
135.     EMCF-18-0188
136.     EMCF-18-0189
137.     EMCF-18-0191

| 138. | EMCF-18-0192 |
| 139. | EMCF-18-0193 |
| 140. | EMCF-18-0196 |
| 141. | EMCF-18-0197 |
| 142. | EMCF-18-0198 |
| 143. | EMCF-18-0200 |
| 144. | EMCF-18-0203 |
| 145. | EMCF-18-0209 |
| 146. | EMCF-18-0211 |
| 147. | EMCF-18-0214 |
| 148. | EMCF-18-0217 |
| 149. | EMCF-18-0218 |
| 150. | EMCF-18-0219 |
| 151. | EMCF-18-0220 |
| 152. | EMCF-18-0222 |
| 153. | EMCF-18-0230 |
| 154. | EMCF-18-0231 |
| 155. | EMCF-18-0232 |
| 156. | EMCF-18-0233 |
| 157. | EMCF-18-0234 |
| 158. | EMCF-18-0235 |
| 159. | EMCF-18-0236 |
| 160. | EMCF-18-0238 |
| 161. | EMCF-18-0238-1 |
| 162. | EMCF-18-0239 |
| 163. | EMCF-18-0240 |
| 164. | EMCF-18-0242 |
| 165. | EMCF-18-0243 |
| 166. | EMCF-18-0247 |
| 167. | EMCF-18-0248 |
| 168. | EMCF-18-0251 |
| 169. | EMCF-18-0252 |
| 170. | EMCF-18-0253 |
| 171. | EMCF-18-0254 |
| 172. | EMCF-18-0255 |
| 173. | EMCF-18-0256 |
| 174. | EMCF-18-0258 |
| 175. | EMCF-18-0260 |
| 176. | EMCF-18-0261 |
| 177. | EMCF-18-0261-1 |
| 178. | EMCF-18-0262 |
| 179. | EMCF-18-0263 |
| 180. | EMCF-18-0267 |
| 181. | EMCF-18-0268 |
| 182. | EMCF-18-0269 |
| 183. | EMCF-18-0270 |

| 184. | EMCF-18-0273 |
| 185. | EMCF-18-0274 |
| 186. | EMCF-18-0278 |
| 187. | EMCF-18-0278-1 |
| 188. | EMCF-18-0280 |
| 189. | EMCF-18-0280-1 |
| 190. | EMCF-18-0282 |
| 191. | EMCF-18-0283 |
| 192. | EMCF-18-0284 |
| 193. | EMCF-18-0285 |
| 194. | EMCF-18-0287 |
| 195. | EMCF-18-0289 |
| 196. | EMCF-18-0290 |
| 197. | EMCF-18-0291 |
| 198. | EMCF-18-0292 |
| 199. | EMCF-18-0295 |
| 200. | EMCF-18-0296 |
| 201. | EMCF-18-0297 |
| 202. | EMCF-18-0298 |
| 203. | EMCF-18-0301 |
| 204. | EMCF-18-0303 |
| 205. | EMCF-18-0304 |
| 206. | EMCF-18-0305 |
| 207. | EMCF-18-0308 |
| 208. | EMCF-18-0309 |
| 209. | EMCF-18-0310 |
| 210. | EMCF-18-0311 |
| 211. | EMCF-18-0312 |
| 212. | EMCF-18-0314 |
| 213. | EMCF-18-0315 |
| 214. | EMCF-18-0316 |
| 215. | EMCF-18-0317 |
| 216. | EMCF-18-0318 |
| 217. | EMCF-18-0322 |
| 218. | EMCF-18-0323 |
| 219. | EMCF-18-0324 |
| 220. | EMCF-18-0325 |
| 221. | EMCF-18-0326 |
| 222. | EMCF-18-0327 |
| 223. | EMCF-18-0330 |
| 224. | EMCF-18-0331 |
| 225. | EMCF-18-0333 |
| 226. | EMCF-18-0335 |
| 227. | EMCF-18-0338 |
| 228. | EMCF-18-0341 |
| 229. | EMCF-18-0341-1 |

| | |
|---|---|
| 230. | EMCF-18-0342 |
| 231. | EMCF-18-0342-1 |
| 232. | EMCF-18-0345 |
| 233. | EMCF-18-0352 |
| 234. | EMCF-18-0361 |
| 235. | EMCF-18-0362 |
| 236. | EMCF-18-0364 |
| 237. | EMCF-18-0365 |
| 238. | EMCF-18-0366 |
| 239. | EMCF-18-0367 |
| 240. | EMCF-18-0368 |
| 241. | EMCF-18-0371 |
| 242. | EMCF-18-0373 |
| 243. | EMCF-18-0374 |
| 244. | EMCF-18-0375 |
| 245. | EMCF-18-0379 |
| 246. | EMCF-18-0383 |
| 247. | EMCF-18-0383-1 |
| 248. | EMCF-18-0385 |
| 249. | EMCF-18-0386 |
| 250. | EMCF-18-0387 |
| 251. | EMCF-18-0388 |
| 252. | EMCF-18-0389 |
| 253. | EMCF-18-0390 |
| 254. | EMCF-18-0391 |
| 255. | EMCF-18-0392 |
| 256. | EMCF-18-0393 |
| 257. | EMCF-18-0394 |
| 258. | EMCF-18-0397 |
| 259. | EMCF-18-0398 |
| 260. | EMCF-18-0402 |
| 261. | EMCF-18-0403 |
| 262. | EMCF-18-0408 |
| 263. | EMCF-18-0409 |
| 264. | EMCF-18-0410 |
| 265. | EMCF-18-0411 |
| 266. | EMCF-18-0414 |
| 267. | EMCF-18-0415 |
| 268. | EMCF-18-0416 |
| 269. | EMCF-18-0416-1 |
| 270. | EMCF-18-0417 |
| 271. | EMCF-18-0421 |
| 272. | EMCF-18-0422 |
| 273. | EMCF-18-0424 |
| 274. | EMCF-18-0425 |
| 275. | EMCF-18-0426 |

276.     EMCF-18-0429
277.     EMCF-18-0430
278.     EMCF-18-0431
279.     EMCF-18-0432
280.     EMCF-18-0433
281.     EMCF-18-0434
282.     EMCF-18-0435
283.     EMCF-18-0436
284.     EMCF-18-0437
285.     EMCF-18-0438
286.     EMCF-18-0439
287.     EMCF-18-0440
288.     EMCF-18-0441
289.     EMCF-18-0442
290.     EMCF-18-0443
291.     EMCF-18-0444
292.     EMCF-18-0445
293.     EMCF-18-0446
294.     EMCF-18-0448
295.     EMCF-18-0449
296.     EMCF-18-0450
297.     EMCF-18-0451
298.     EMCF-18-0452
299.     EMCF-18-0453
300.     EMCF-18-0455
301.     EMCF-18-0459
302.     EMCF-18-0460
303.     EMCF-18-0463
304.     EMCF-18-0465
305.     EMCF-18-0466
306.     EMCF-18-0467
307.     EMCF-18-0468
308.     EMCF-18-0470
309.     EMCF-18-0471
310.     EMCF-18-0472
311.     EMCF-18-0474
312.     EMCF-18-0475
313.     EMCF-18-0476
314.     EMCF-18-0477
315.     EMCF-18-0478
316.     EMCF-18-0480
317.     EMCF-18-0481
318.     EMCF-18-0482
319.     EMCF-18-0487
320.     EMCF-18-0488
321.     EMCF-18-0489

| | |
|---|---|
| 322. | EMCF-18-0490 |
| 323. | EMCF-18-0493 |
| 324. | EMCF-18-0495 |
| 325. | EMCF-18-0496 |
| 326. | EMCF-18-0497 |
| 327. | EMCF-18-0498 |
| 328. | EMCF-18-0500 |
| 329. | EMCF-18-0503 |
| 330. | EMCF-18-0504 |
| 331. | EMCF-18-0505 |
| 332. | EMCF-18-0506 |
| 333. | EMCF-18-0508 |
| 334. | EMCF-18-0509 |
| 335. | EMCF-18-0511 |
| 336. | EMCF-18-0512 |
| 337. | EMCF-18-0513 |
| 338. | EMCF-18-0515 |
| 339. | EMCF-18-0516 |
| 340. | EMCF-18-0517 |
| 341. | EMCF-18-0518 |
| 342. | EMCF-18-0519 |
| 343. | EMCF-18-0520 |
| 344. | EMCF-18-0521 |
| 345. | EMCF-18-0522 |
| 346. | EMCF-18-0523 |
| 347. | EMCF-18-0524 |
| 348. | EMCF-18-0525 |
| 349. | EMCF-18-0526 |
| 350. | EMCF-18-0528 |
| 351. | EMCF-18-0529 |
| 352. | EMCF-18-0530 |
| 353. | EMCF-18-0531 |
| 354. | EMCF-18-0533 |
| 355. | EMCF-18-0534 |
| 356. | EMCF-18-0535 |
| 357. | EMCF-18-0538 |
| 358. | EMCF-18-0539 |
| 359. | EMCF-18-0540 |
| 360. | EMCF-18-0542 |
| 361. | EMCF-18-0543 |
| 362. | EMCF-18-0545 |
| 363. | EMCF-18-0546 |
| 364. | EMCF-18-0548 |
| 365. | EMCF-18-0549 |
| 366. | EMCF-18-0550 and accompanying video |
| 367. | EMCF-18-0551 |

| | |
|---|---|
| 368. | EMCF-18-0552 |
| 369. | EMCF-18-0553 |
| 370. | EMCF-18-0554 |
| 371. | EMCF-18-0555 |
| 372. | EMCF-18-0557 |
| 373. | EMCF-18-0558 |
| 374. | EMCF-18-0562 |
| 375. | EMCF-18-0563 |
| 376. | EMCF-18-0569 |
| 377. | EMCF-18-0570 |
| 378. | EMCF-18-0571 |
| 379. | EMCF-18-0572 |
| 380. | EMCF-18-0573 |
| 381. | EMCF-18-0574 |
| 382. | EMCF-18-0577 |
| 383. | EMCF-18-0579 |
| 384. | EMCF-18-0581 |
| 385. | EMCF-18-0583 |
| 386. | EMCF-18-0585 |
| 387. | EMCF-18-0586 |
| 388. | EMCF-18-0588 |
| 389. | EMCF-PUOF-18-0018-EMCF-18-0076 |
| 390. | EMCF-PUOF-18-0107-EMCF-18-0427 and accompanying video |
| 391. | EMCF-SUOF-18-0141-EMCF-18-0568 and accompanying video |
| 392. | EMCF-PUOF-18-0081-EMCF-18-0337 and accompanying video |

## Custodial Records for Prisoners who I Interviewed

1. George Butler, 68320
2. Alex Hunter, 128611
3. Willis Robertson, 154306
4. Ira Williams, 189839
5. Paul Hoskins, R7068
6. Kenneth Jones, 168144
7. Cameron Green, 204087
8. Adrian Montgomery, 207456
9. Ricky Frierson, 55436
10. Joseph Pressley, 139435
11. Kewan Hosey, 183982
12. Mario Johnson, 110740
13. Austin Braddock, 177538
14. Ricky Thomas, 198449
15. Gregory Shelton, 138632

16. Broderick Powell, T3791
17. Damien McWhorter, 77111
18. Daniel Thomas, 172620
19. James Kendrick, K9729
20. Jeffrey Clark, 15411

## MDOC Contract Monitor Monthly Reports [SEC-PostTrial-019878 – SEC-PostTrial-020005]

1. January 2018 Contract Monitor Worksheet
2. February 2018 Contract Monitor Worksheet
3. March 2018 Contract Monitor Worksheet
4. April 2018 Contract Monitor Worksheet
5. May 2018 Contract Monitor Worksheet
6. June 2018 Contract Monitor Worksheet
7. July 2018 Contract Monitor Worksheet
8. August 2018 Contract Monitor Worksheet

## MDOC Contract Monitor Weekly Reports [SEC-PostTrial-007825 – SEC-PostTrial-007915]

1. December 2017–January 2018 Weekly Report
2. January 08-12, 2018 EMCF weekly
3. January 22-26, 2018 EMCF Weekly Report
4. January 29- February 02, 2018 EMCF Weekly Report
5. February 05-09, 2018 EMCF Weekly Report
6. February 12-16, 2018 EMCF Weekly Report
7. February 18-24, 2018 EMCF Weekly Report
8. February 25-March 3, 2018 EMCF Weekly Report
9. March 5-9, 2018 EMCF Weekly Report
10. March 19-24, 2018 EMCF Weekly Report
11. March 26-27, 2018 EMCF Weekly Report
12. April 15-21, 2018 EMCF Weekly Report
13. May 1-6, 2018 EMCF Weekly Report
14. May 7-11, 2018 EMCF Weekly Report
15. June 4-8, 2018 EMCF Weekly Report
16. June 11-17, 2018 EMCF Weekly Report
17. July 2-6, 2018 EMCF Weekly Report
18. July 9-13, 2018 EMCF Weekly Report
19. August 13-18, 2018 EMCF Weekly Report
20. August 27-September 1, 2018 EMCF Weekly Report
21. August 6-10, 2018 EMCF Weekly Report

**Logbooks [SEC-PostTrial-007916 – SEC-PostTrial-017520]**

1. ***Housing Unit 1***
   a. January 2018 (Files 001, 002, and 006)
   b. March-April 2018 (003)
   c. April 2018 (007)
   d. May-June 2018 (008)
   e. June-July 2018 (009)
   f. August 2018 (010)
   g. September-October 2018 (011)
2. ***Housing Unit 3***
   a. March 2018 (004)
   b. March-April 2018 (005)
   c. April 2018 (012, 013)
   d. May 2018 (014)
   e. June 2018 (015)
   f. July-August 2018 (016)
   g. August 2018 (017, 018)
   h. September 2018 (019)
3. ***Housing Unit 5***
   a. February 2018 (021)
   b. February-March 2018 (022)
   c. March 2018 (023)
   d. March-April 2018 (024)
   e. April 2018 (025)
   f. May 2018 (027)
   g. May-June 2018 (028)
   h. June 2018 (029)
   i. June-July 2018 (030)
   j. July 2018 (031)
   k. July-August 2018 (032)
   l. August 2018 (033)
   m. August-September 2018 (034)
   n. September 2018 (035)
   o. September-October 2018 (036, 037)
4. ***Housing Unit 6***
   a. December 2017-January 2018 (038)
   b. January 2018 (039)
   c. January-February 2018 (020, 040)
   d. February 2018 (041)
   e. February-March 2018 (042)

    f.  March 2018 (043)
    g.  April-May 2018 (044)
    h.  May-June 2018 (045)
    i.  June 2018 (046)
    j.  July 2018 (047)
    k.  August 2018 (048)
    l.  August-September 2018 (049)

## Other Documents[1]

1. Timothy Taylor Death Record (SEC-PostTrial-007732)
2. Anthony Bolton Death Record (SEC-PostTrial-007743)
3. Oscar Glasper Death Record (SEC-PostTrial-007755)
4. James Gibson Death Record (SEC-PostTrial-007762)
5. Eddie Saucier Death Record (SEC-PostTrial-007774)
6. Zachary Amos Death Record (SEC-PostTrial-007781)
7. MDOC Statistical Report, January 2018-June 2018 (SEC-PostTrial-020037)
8. MDOC Statistical Report, July 2018-August 2018 (SEC-PostTrial-020006)
9. EMCF Staffing Plan, dated May 31, 2012 (SEC-PostTrial-007600)
10. EMCF Security Staff List (SEC-PostTrial-017580)
11. EMCF Bed Roster, October 16, 2018
12. 2018 Staffing Report (SEC-PostTrial-007824)
13. EMCF Employee Discipline Report (SEC-PostTrial-017521)
14. 2018 Sick Call Log (CENT-POSTTRIAL-001165)
15. 2018 Hospitalization Log (CENT-POSTTRIAL-001808)
16. Prison Staffing Analysis, A Training Manual with Staffing Considerations for Special Populations, U.S. Department of Justice, National Institute of Corrections, Camille Graham Camp, December 2008
17. *DePriest et al. v. Walnut Grove Correctional Authority et al.*, Case No. 10-cv-00663, Expert Report of Tom Roth (March 3, 2015), Dkt. No. 129-1.
18. MDOC SOP 19-01-01, Offender Segregation
19. ACA Standard 4-4270
20. United Nations Standard Minimum Rules for the Treatment of Prisoners ("the Nelson Mandela Rules"), 2015, Rule 23
21. Effectiveness of the Direct Supervision of Correctional Design and Management: A Review of the Literature, Dr. Richard Wener, NYU, Criminal Justice and Behavior, Volume 33, No 3, June 2006
22. *DePriest et al v. Walnut Grove Correctional Authority et al.*, Expert Report of Eldon Vail (March 14, 2014), Dkt No. 100.

---

[1] Documents are identified by the beginning Bates number.