# EXHIBIT B

**Bruce C. Gage, M.D.**

**General and Forensic Psychiatry**

SUPPLEMENTARY EVALUATION OF MENTAL HEALTH SERVICES

**East Mississippi Correctional Facility**

Report Submitted November 30, 2018

# Introduction

This evaluation was completed by the undersigned at the request of Plaintiffs' counsel in connection with a law suit involving the East Mississippi Correctional Facility (EMCF), a Mississippi Department of Corrections (MDOC) institution.  My task was specifically to supplement my previous evaluation of mental health services at EMCF.

The opinions rendered in this report are those of the undersigned alone and are rendered within a reasonable medical probability and certainty. My opinions are based on my background, education, training, clinical practice and other professional experience; my review of the materials; and my knowledge of the relevant medical and scientific literature.  I reserve the right to add to or otherwise modify my opinions should additional data be made available to me.

Resource documents include, but are not limited to, National Commission on Correctional Health Care standards and the American Psychiatric Association's Correctional Guidelines.  These resource documents are not used as a measure of the standard of care for this report but to guide inquiry into relevant topic areas to assess the array of services needed in a correctional mental health system.  These standards and guidelines are designed to help systems identify the functions, services, and policies necessary to deliver adequate care.  The standard here is a Constitutional one focused on a substantial risk of serious harm.

I do not use the American Correctional Association standards as a guide; they are insufficiently comprehensive with regard to mental health delivery.  Their emphasis is much more on correctional standards for custody rather than correctional health care.

In terms of methodology, it is important to make two comments.  First, the data provided by MDOC continues to be very limited in terms of aggregate and summary data. So I again utilized medical records reviews, patient interviews, direct observation, and review of the documents that were provided, such as incident reports and policies, as the foundation for my opinions.

Second, just as for my initial report, the medical record reviews and detailed patient interviews I conducted were intentionally not random.  It is essential that the most seriously ill patients are taken

care of as they represent the greatest risk; thus I emphasized interview and review of patients with serious mental illness and repeated self-harm.

My qualifications are set forth fully in my curriculum vitae, which is attached to this report as Appendix 3. My qualifications are also set forth in my 2016 report. I am being compensated at the rate of $350 per hour for my services.

Below is a listing of data used in addition to that previously cited in my reports.  On the following page is a table of contents organized by general topic areas and sub-topics.  Clinical summaries of medical records are provided in Appendix 2.  Appendix 1 is a patient key matching names and MDOC numbers with the de-identified data in the body of the report and the clinical summaries.

**Database**

1. Visits to the infirmary, HU-1, HU-2, HU-3, HU-5, and ACU (camp support) in October 2018
2. Individual and group interviews of inmates and patients at EMCF in October 2018, as well as discussions with custodial and health care staff
3. Death reviews
4. ACU admission log from 2/14/18 to 9/19/18
5. Medical housing log from January 2018 to September 2018
6. Sick call request log from January 2018 to September 2018
7. MTC staffing plan for EMCF dated 5/31/12
8. Centurion Policies and Procedures Manual, Clinical Guidelines, Prescribing Guidelines, Chronic Disease Management and Formularies; effective date 9/21/16, reviewed 5/15/18
9. Centurion staffing spreadsheet, undated but including staffing data for 9/18
10. Centurion audits of health services at EMCF from January 2017 to August 2018
11. December 2017 MDOC Clinical Contract Compliance Review Report
12. MDOC contract monitor reports from December 2017 to September 2018, including MTC responses to findings
13. MDOC monthly staffing reports from January 2018 to September 2018
14. Mental health log from 10/15/18
15. Centurion staffing matrix from September 2018
16. Extraordinary Occurrence Reports covering months in 2017-2018
17. Medical records, reviewed and summarized in Appendix 2
18. Use of Force reports covering months in 2017-2018
19. Use of Force videos covering months in 2017-2018
20. Custodial Records for inmates listed in Appendix 1
21. Rule Violation Reports covering months in 2017-2018
22. Administrative Remedy Program reports covering months in 2017-2018
23. Provider Schedules for January 2018, March 2018, August 2018, and September 2018
24. Mental Health Provider Schedules (undated)
25. Housing Logbook for Unit 5 covering months in 2017-2018
26. Housing Logbook for Unit 1 covering months in 2017-2018
27. Housing Logbook for Unit 6 covering months in 2017-2018
28. Housing Logbook for Unit 3 covering months in 2017-2018
29. Housing Logbook for ACU covering months in 2017-2018

30. Segregation Logs and Records covering months in 2017-2018
31. Deposition Transcripts of EMCF and Centurion Staff
32. DOCKERY V. HALL - VOL. 32 (4.2.2018)
33. DOCKERY V. HALL - VOL. 34 (4.3.2018)
34. DOCKERY V. HALL - VOL. 37 (4.5.2018)
35. DOCKERY V. HALL - VOL. 6 (3.7.2018)
36. DOCKERY V. HALL - VOL. 7 (3.8.2018)
37. DOCKERY V. HALL - VOL. 13 (3.13.2018)
38. DOCKERY V. HALL - VOL. 14 (3.14.2018)
39. DOCKERY V. HALL - VOL. 15 (3.14.2018)
40. DOCKERY V. HALL - VOL. 21 (3.20.2018)
41. DOCKERY V. HALL - VOL. 22 (3.20.2018)
42. DOCKERY V. HALL - VOL. 23 (3.21.2018)
43. DOCKERY V. HALL - VOL. 24 (3.21.2018)
44. DOCKERY V. HALL - VOL. 31 (4.2.2018)
45. DOCKERY V. HALL - VOL. 34 (4.3.2018)
46. Inpatient Days Log covering months in 2017-2018
47. MDOC Monthly Report covering months in 2017-2018
48. Weekly Contract Monitor Report and Worksheet covering months in 2017-2018
49. Monthly Contract Monitor Worksheet covering months in 2017-2018
50. Mental Health Caseload covering months in 2017-2018
51. Centurion Staff List 2017-2018
52. Chronic Care Log covering months in 2017-2018
53. Classroom Schedule covering months in 2017-2018
54. Contract Monitor Report covering months in 2017-2018
55. Facility Schedule covering months in 2017-2018
56. HU2A Therapeutic Community Schedule covering months in 2017-2018
57. HU5 Schedule covering months in 2017-2018
58. MTC Programs and Class List covering months in 2017
59. Sick Call Log covering months in 2017-2018
60. Programs Listing covering months in 2017-2018
61. Staffing Report covering months in 2018
62. MDOC Monthly Reports covering months in 2018
63. SEC-PostTrial-007825-SEC-PostTrial-007915
64. Contract Monitor Reports covering months in 2018
65. CQI Reports covering months in 2018
66. Acute Care Unit - Admission and Discharge Log covering months in 2018
67. Medical Housing Logs covering months in 2018
68. Medical Sick Call Request Log covering months in 2018
69. McGinnis-Roth Report dated 02/24/2017
70. EMCF Policy and Procedures
71. Staffing Matrix covering months in 2017-2018
72. Staffing Plan
73. Acute Care Unit – Short-Term Treatment covering months in 2017-2018
74. Mortality and Morbidity Review Committee Findings
75. Acute Unit Schedule covering months in 2017-2018
76. CENT-POSTTRIAL-001805_Confidential Business Information.xlsx
77. CENT-POSTTRIAL-001809_Highly Confidential.xlsx

78. CENT-POSTTRIAL-001810_Highly Confidential.xlsx
79. CENT-POSTTRIAL-001811_Highly Confidential.xlsx
80. MTC Programs and Class Lists Nurse, MH, Dental Sick Call
81. Programs Listing
82. Centurion Staff List covering months in 2017-2018
83. Centurion Mississippi Vacancy Report covering months in 2018
84. EMCF Staffing Summary Report
85. Centurion Mississippi Staffing Report
86. Mental Health Treatment Plan MASTER
87. December 2017 MDOC Clinical Contract Compliance Review Report
88. PTX-2877 - Acute Unit Schedule – Revised
89. PTX-2878 - Social Skills and Planning for a Better Life
90. Overview of Mental Illness Powerpoint
91. EMCF Group Schedules
92. Mental Health Provider Schedules
93. Nursing Schedules EMCF January-September 2018
94. Provider Schedule covering months in 2018
95. All documents otherwise cited in body of report

# Contents

Executive Summary.................................................................................................... 6

Intake Process .......................................................................................................... 8

Assessment and Treatment Planning ......................................................................... 10

    Assessment & Level of Care ................................................................................... 11

    Treatment Planning .............................................................................................. 13

Crisis Response ....................................................................................................... 15

    Clinical Response.................................................................................................. 15

    Assessment of Responsibility ................................................................................ 17

Suicide Prevention ................................................................................................... 17

    Suicide Risk Assessment....................................................................................... 17

    Suicide Monitoring................................................................................................ 18

    Suicide and Self-Harm Risk Reduction ................................................................... 19

Admission and Discharge to Mental Health Settings..................................................... 20

Treatment in Residential Mental Health Settings ......................................................... 21

    Residential Mental Health Units ............................................................................. 21

    Acute Care Unit (ACU) ......................................................................................... 23

    Infirmary............................................................................................................ 27

Medication Management ........................................................................................... 29

    Psychotropic Prescribing....................................................................................... 29

    Medication Administration ..................................................................................... 32

Group and Individual Therapy ................................................................................... 32

Restrictive Housing and Isolation of the Seriously Mentally Ill ...................................... 33

Hospital-Level Care ................................................................................................. 35

Quality Management ................................................................................................ 36

    MDOC Audits...................................................................................................... 36

    2017 Centurion Audits ......................................................................................... 37

    2018 Centurion Audits ......................................................................................... 38

    Death Reviews.................................................................................................... 42

Mental Health Staffing ............................................................................................. 44

    Case Loads......................................................................................................... 45

Recommendations ................................................................................................... 46

## Executive Summary

Since my initial report and review of materials in preparation for my testimony earlier this year, there have been minimal changes in the mental health services provided at EMCF.  In my opinion, the major sources of harm and potential harm to the mentally ill remain.

There were no significant changes to policy so my previous comments with regard to policies from my 2016 Report and 2018 testimony stand.  I have not repeated those comments here, as they are already part of the record.  I will note that in June 2017, a policy regarding the mental health treatment of adolescents at EMCF was added. I did not see any records of adolescents, so it is not possible to comment on adherence to this policy. It is a limited policy, but reasonable as far as it goes.

The primary deficiencies are as follows:

1. An inadequate intake process that fails to promptly and reliably detect patients with mental health concerns.
2. Inadequate assessment and treatment planning.  This is a serious and thoroughgoing problem.  Without our adequate assessment, proper treatment cannot be determined.  Without an individualized treatment plan based on such an assessment, proper treatment cannot be rendered.
3. Inadequate treatment in response to mental health crises.  Crisis responses are limited or absent.  Crisis plans are absent or not followed.  Follow-up after a crisis is lacking.
4. Excessive use of isolation in lieu of adequate treatment.  Mentally ill patients are housed in restrictive housing and the infirmary, sometimes for extended periods of time, under conditions of isolation.  Rounds in these settings have been more reliable over recent months, but patient treatment still consists only of medications with no structured treatment.
5. There is a lack of essential treatment services, primarily group and individual therapy.  The development of the Acute Care Unit (ACU) is too small to have a significant impact on this problem.  Further, many of the more seriously ill patients at EMCF are not being treated on the ACU, undermining its potential benefit.  This leaves the large majority of seriously mentally ill patients who are in the so-called "residential" mental health units and other living units still without adequate treatment services.
6. Substandard and dangerous medication practices have also continued and appear to have worsened since my previous evaluations.  This includes lack of a process for long-term involuntary antipsychotic administration, inappropriate use of emergency and routine antipsychotics, lack of use of critical emergency medications such as benzodiazepines, starting medications at excessively high doses, and poor medication monitoring.
7. Dangerously substandard suicide prevention practices persist.  There are no adequate suicide assessments or associated plans for reducing risk.  Means restrictions remains a serious problem.  Monitoring practices of patients on watch in the infirmary remain grossly inadequate.  Suicide-proofing has not been substantially improved; a new light fixture that is being installed in high risk areas is not suicide resistant.
8. Mental health staff still does not have sufficient input over patient placement into treatment settings, resulting in many seriously mentally ill being housed in inappropriate and restrictive settings

9.  Mental health staff continue to be rarely involved in de-escalation of planned uses of force.  In many instances when they are involved, they do not actually engage in de-escalation, often opining that the problem is not related to mental illness and leaving the scene.

10. There is no access to hospital-level care for the most seriously ill.

11. Quality management, including clinical supervision, remains inadequate.

12. Staffing is inadequate to serve the needs of the population and many of the staff do not demonstrate the level of skill needed to serve the seriously mentally ill.

13. Living units, including the primary residential mental health units, remain chaotic, dangerous, and patently non-therapeutic.  Mental health staff spend very little time on the units and patients are almost always without any structured activities or direct supervision.

## Intake Process

The EMCF intake process has not changed in any significant way. EMCF does not operate as a general intake facility for the Mississippi prison system. However, when inmates are transferred to EMCF, they are screened by medical and mental health staff. Centurion policy E-03 specifies in a policy statement that "Qualified healthcare (including mental health) anprofessionals [sic] review each transferred patient's health record or summary within 12 hours of arrival to ensure continuity of care." The associated procedures include the following:

1. All intrasystem transfer inmates will receive a medical, dental, and mental health screening performed by health trained or qualified healthcare personnel upon arrival at the facility. All findings will be recorded in the screening form in the Electronic Health Record approved by the MDOC medical records committee.
2. Healthcare staff are responsible for completing reviews of a patient's health record when a patient is transferred within the system. Mental health staff are responsible for completing reviews of a patient's mental health record/history.
3. The health record of any patient received from the reception centers or other state facilities will be reviewed upon the patient's arrival. Record review will include at a minimum the following:
   a. current mental health needs
4. The following dispositions and notifications are considered:
   a. emergency mental health contact for:
      - patients released from suicide precautions within past 30 days
      - patient expresses thoughts plans to harm self or signs of psychosis, depression, anxiety, aggression.
   c. Mental Health-Routine Referral: Mental health staff receive written notification if patient currently on mental health caseload, currently on psychotropic medications, history of suicide attempts more than 30 days ago, or expressed mental health complaints.

This policy is not being adhered to.  Every medical record that had an intake showed deficiencies.

Not all patients transferred to EMCF were screened by mental health at intake (e.g., Patient 23, Patient 24), presumably because they were level of care A, but in neither of those cases was there evidence that the medical record was reviewed by mental health within 12 hours as required by policy.

The intake nursing screening for these and other patients is extremely limited and not adequate to determine current mental health needs.  It amounts to one broad question about whether the patient has medical, dental, or mental health complaints and whether there is any current suicidality.  In the case of one patient (Patient 23), not even this was done; there was no report on mental health complaints, any history of suicide attempts, or current suicidality.  These nursing notes almost never specify whether a referral was made. There was no evidence of mental health staff receiving written notification of patients currently on the mental health caseload, currently on psychotropic medications, with a history of suicide attempts more than 30 days ago, or with expressed mental health complaints.

In other cases (Patient 2, Patient 25), the nursing screening reported mental health diagnoses but for the one question on "current medical, mental health or dental complaint (including suicidal ideations)"

the note simply said "yes." There was no discussion of whether this was "yes" to medical, mental health, dental, or suicidal ideation whether they had recently been on suicide watch.

In other cases (Patient 4, Patient 5), the nursing intake reported that he had no mental health complaints or suicidal ideation (i.e., the question regarding "Current medical, mental health or dental complaint (including suicidal ideations)" was answered simply "no". There were no reports on whether they had a history of suicidal ideation or recent suicide watch. One (Patient 5) had a history of recent self-harm and even had bandages on, which were not noted by the nurse, in fact the element "signs of abuse/trauma" was marked "no."

Routine mental health screening remains cursory as well. Screening MHPs do not triage cases for more detailed assessment. They are to make a determination about whether or not an inmate needs referral to a psychiatric prescriber, though this is not always indicated in the associated note. The intake forms have a very abbreviated mental status examination and the associated narrative is limited in scope and would not constitute an assessment. On occasion, intake MHPs also complete an additional form entitled LOC [Level of Care] & High Risk Screening. It was not clear when this form was to be done, as there were patients that were high risk on whom it was not done (e.g., Patient 2) and others who demonstrated no significant risk on whom it was done (e.g., Patient 4). The form includes limited additional self-report information. No level of risk is produced by this report, so it is unclear what purpose it serves.

For one of the cases noted above (Patient 25), the MHP screening was done the day after admission to EMCF, despite the fact that he had been removed from suicide watch just a few days before. The mental status examination was completely within normal limits. Yet the note reported that the patient complained of mood swings and racing thoughts and "denies any psychosis" (note that patients cannot deny psychosis, only the presence of certain symptoms and can certainly not deny delusions, though the same finding on other patients is commonly found in EMCF mental health notes). He reportedly denied any suicidal ideation. The plan was to monitor him. There was no mention of his medications or recently being on suicide watch.

For another of the cases noted above (Patient 2), there was an MHP intake assessment the day of admission. The diagnosis at that time was changed to bipolar disorder. The note says he had a "mood disturbance" but the mental status examination shows no evidence of mood disorder (it was completely within normal limits) or history consistent with bipolar disorder. The note said he both did and did not have hallucinations. It stated that he had suicidal ideation but there was no suicide risk assessment and no mention of the patient having recently cut himself or having been on suicide watch just a week before. Thankfully, he was seen by a PNP who did report on the above important history and did a basic screening examination, though the PNP did not do a suicide risk assessment.

In another case (Patient 4), the mental health intake was filled with erroneous information. It reported no history of psychiatric hospitalization (which was not true) and that he was on no psychotropic medications. The mental health intake noted no symptoms, no complaints, and no psychotropic medications, yet he was level of care C (the record suggests that he had been D). He reportedly denied a history of suicide attempts though the subsequent record reported otherwise. There is also a LOC & High-Risk Screening form that was all self-report (i.e., no chart review required) that is basically a limited mental status examination with four very general questions about mood symptoms (all reported as negative), six questions about suicide (which he reportedly all denied, again inaccurately reported no

history of suicide attempts), and four general questions about psychotic symptoms (all reported as negative).  He denied a history of drug use or treatment and denied being on psychotropic medications in the last six months.  Note that almost all of this history was incorrect, including that he had a past diagnosis of schizophrenia, had previously been on psychotropic medication, had a history of past substance abuse, had active mood symptoms, and had a history of suicide attempts. Note that even the prefilled section on prior problems on the MHP note had diagnoses of alcohol abuse, history of psychotic disorder, major depressive disorder, and possible bipolar disorder. This is simply sloppy work.

There was one MHP intake that was reasonable (Patient 5), but it was not done by a regular EMCF staff. This intake included a brief mental status examination but everything was not just simply noted as being normal. There is some relevant history, including recent self-harm behavior and other behavioral issues. It also indicated a plan for a referral to psychiatry and the need to do treatment planning. However, it was not a complete assessment and did not indicate the need for such an assessment.

Despite the fact that virtually all of the patients coming to EMCF have been screened and usually treated prior to coming to the facility, the intake screen is entirely based on self-report, other than the automated information that is included in routine notes. As a result, intake screenings often contain incorrect information when inmates do not accurately report their history. There is no reason that this should be the case when record review would provide correct information. Examples include patients who were said to have no history of psychiatric hospitalization (e.g., Patient 4), no history of suicide attempts (e.g., Patient 4).  One patient (Patient 2) who had recently cut himself so severely a little over a week prior to transfer that he was described as having "blood all over his clothes" after cutting himself with a "3 to 4 inches long piece of knife," was noted to have suicidal ideation on intake but the history of this recent event was not mentioned nor was a suicide risk assessment done. No LOC [Level of Care] & High Risk Screening was done. Fortunately, he was seen later that day by a PNP who did a somewhat more thorough assessment and changed him from level of care C to D, though still did no formal suicide assessment.  Other critical information is often lacking from MHP intake assessments such as recent suicide watches (e.g., Patient 25).

Failure to conduct adequate screenings clearly places patients at risk of harm. Transfers and other changes of setting are stressful and therefore risky. Careful screening is essential. Further, given that EMCF is the primary mental health facility for MDOC, there should be a presumption that the patients are likely mentally ill and may pose a risk of harm to self or others and may suffer from psychiatric symptoms.  When only nurses do screening, the screening is so limited that it cannot even be said to be a mental health screening. Nursing and MHP screens are unreliable, often containing erroneous information or lacking critical information, and thus are of little value. The only time an adequate screening is done is when the patient happens to be referred to a psychiatric prescriber. But psychiatric prescribers do not routinely screen patients at intake and initial contacts may be days or weeks later. In short, the intake screening process creates an unreasonable risk of failing to detect serious and even imminent risk of harm.

## Assessment and Treatment Planning

Prior to commenting on assessment and treatment planning in particular, it is important to make the point that documentation by mental health staff in the medical records demonstrates numerous mistakes and inconsistencies. As noted repeatedly in the medical records review, MHP mental status

examinations were almost always completely normal, even for patients who are in the infirmary due to a psychiatric crisis or who had concurrent documentation of serious mental health symptoms. It was clear that many of these were boilerplate mental status examinations. Many MHP notes were identical across time. Important errors of fact such as whether a patient was taking medications, history of suicide attempts, and past psychiatric hospitalization were in evidence. If there was any content, MHP notes primarily commented on current events. There is no evidence of any attempt to understand why a patient was behaving the way they were let alone what to do about it other than the ubiquitous plan to "monitor" the patient, which is clearly not treatment. MHP documentation was repetitive, inaccurate, and unreliable.

Psychiatric prescriber documentation tended to be more rigorous and accurate, but still lacked the kind of detail necessary to constitute an adequate assessment. Psychiatric prescribers reliably addressed psychopharmacologic treatment needs (though see the section "Medication Management" for some problems in this domain), but they did not address psychotherapeutic or behavior management needs. In short, nobody addressed safe psychotherapeutic (group or individual) or behavior management needs.

## Assessment & Level of Care

As at the time of my initial report, I saw no evidence of any adequate assessments.  There were occasional notes by psychiatric prescribers that had elements of an adequate assessment, but none included all of the necessary components. Social and developmental history was almost always absent, and when addressed to some degree, it was inadequate. History of medication response was also very limited or absent. There was never even a good history of psychiatric treatment; what history there was primarily consisted of where they had been treated and/or what they had been treated with, not a history of treatment response or participation. Accordingly, I saw no evidence of any medical records from community treatment or a summary of such records. This is an essential part of good assessment. Not surprisingly, I saw no reference to or evidence of releases of information to obtain such records.

The psychiatrist reported that he had not ordered special studies such as neuroimaging and electrophysiologic studies and was uncertain how to obtain such studies. I saw no evidence of any such studies ordered for the evaluation of psychiatric patients. Special studies are sometimes essential for a complete psychiatric assessment.

Similarly, I saw no psychological testing. There were numerous cases where psychological testing might have clarified the clinical picture (e.g., Patient 2, Patient 3, Patient 5, Patient 12, Patient 16, Patient 23, Patient 28, Patient 29).

Failure to conduct proper assessment has many associated risks. As with any healthcare condition, proper treatment requires proper assessment and diagnosis. While longitudinal monitoring of some cases makes it clear what the patient's condition is (which was the case in some of the cases I reviewed), sometimes it is unreasonable to wait that long (especially when there are unresponsive psychotic symptoms or risk of harm to self or others). Overdiagnosis of bipolar disorder was exceedingly common. When a patient is diagnosed with a condition that is not present, and treated with medications, they're put at risk of the complications of treatment with those medications. Failure to detect psychosis or sufficiently treat it puts patients at risk of worsening symptoms and poorer future response to treatment (as noted in my previous report). Failure to assess the underlying reasons for recurrent self-

injury also poses a serious risk. Even if self-injury is used for instrumental purposes, it still represents a substantial risk of suicide and morbidity. The repeated notations of self-harming patients being "behavioral" or "manipulative" is not an appropriate clinical stance. When patients are at risk, it is incumbent upon clinicians to determine the nature of the risk and address it appropriately. While no patients received an adequate assessment, there were numerous examples of patients who were not properly assessed and whose mental health condition remained unclear and thus they were put at unreasonable risk of receiving inappropriate treatment and/or mistreatment (e.g., Patient 2, Patient 3, Patient 5, Patient 7, Patient 12, Patient 16, Patient 20, Patient 23, Patient 25, Patient 28, Patient 29).

Each patient is assigned a level of care (LOC) based on their acuity. LOC A is the lowest acuity (essentially having no mental health needs) and LOC E is the highest. The psychiatrist reported that there are 300 to 400 LOC A (an increase) but that the majority of inmates at EMCF were LOC C with about 30 LOC D and rare LOC E (more of whom were housed at the Central Mississippi Correctional Facility (CMCF) for unclear reasons, given that EMCF is the designated mental health facility for the system). Surprisingly, there was evidence in the medical record of patients with LOC D who were not housed in a residential mental health unit, the Acute Care Unit (ACU), or the infirmary.  Some were on HU-1 (e.g., Patient 3) and, more concerning, some were housed in restrictive housing (see Restrictive Housing and Isolation of the Seriously Mentally Ill below). The psychiatrist also noted that approximately 70 to 75% of EMCF's population is on the mental health caseload (consistent with the number of LOC A reported).

I conducted counts of patients on the Mental Health Caseload log from 10/15/18, consisting of 877 entries.  The results of my findings were similar to those described by the psychiatrist and with records finding that a number of mentally ill were in restrictive housing.  The breakdown of levels of care was as follows (A is the lowest, those with no mental health needs and thus not included in the log, and E is the highest, the most seriously ill):

- B – 25 (3%)
- C – 816 (93%)
- D – 36 (4%)
- E – 0

Those on HU-3, the ACU, or in the infirmary totaled 245 and served the following percentages of each level of care:

- 8/25 = 32% of level B patients
- 209/816 = 26% of level C patients
- 28/36 = 78% of level D patients

There were also a number in restrictive housing:

- 0/26 = 0% of level B patients
- 84/816 = 10% of level C patients
- 5/36 = 14% of level D patients

The remainder were in general population units:

- 17/25 = 68% of level B patients
- 522/816 = 64% of level C patients

- 3/36 = 8% of level D patients

Thus, almost a quarter of the sickest patients (level of care D) at EMCF are not housed in a mental health setting and 14% of them are in the isolative setting of restrictive housing where they get essentially no treatment.  And 10% of those designated level C, having substantial symptoms are in restrictive housing.  (84 + 5)/877 = 10% of those on the mental health caseload are in restrictive housing.  (9 + 224 + 28)/877 = 30% are in residential units.

I also reviewed diagnostic distributions of those on the mental health caseload.  To simplify the findings, I collapsed diagnoses into psychotic disorders (including schizophrenia, schizoaffective disorder, and other psychoses), bipolar disorder, depressive disorders, personality disorders (as a primary diagnosis), substance abuse disorders (as a primary diagnosis), intellectual/developmental/neurocognitive disorders (including intellectual disabilities and dementias), and other.  There were a few patients with no diagnosis.  The breakdown was as follows:

- Psychotic disorders – 125/877 = 14%
- Bipolar disorders – 460/877 = 52%
- Depression – 195/877 = 22%
- Personality disorders – 58/877 = 7%
- Substance abuse disorders – 20/877 = 2%
- Intellectual/developmental/neurocognitive disorders – 2/877 = 0%
- Other = 66/877 = 8%

This diagnostic distribution is not consistent with the literature on the prevalence of mental illness in correctional settings.  The percentage of bipolar disorder is very high and the percentage of intellectual/developmental/neurocognitive disorders is low.  I also counted the number of patients noted to have any personality disorder (which was also included as a separate column on the caseload log) and found that 58/877 = 7% had a personality disorder diagnosed.  This is extraordinarily low as studies show over 50% with personality disorders.

These skewed diagnostic findings also demonstrate that poor assessments are being conducted at EMCF.

## Treatment Planning

There were fewer treatment plans in the medical records that I reviewed for this report than at the time of my previous report. The treatment plans that I did find were no longer on treatment planning forms but were mostly included as additions to psychiatric prescriber notes associated with treatment team meetings or were freestanding MHP treatment plans. They were not being done every 90 days for those on the residential treatment units; many patients did not have one at all.  Most of them were from the ACU. The only patient that may have received treatment plans according to policy was Patient 4. Patients at EMCF with no treatment plans whatsoever included:  Patient 5, Patient 7, Patient 9, Patient 15, Patient 16, Patient 17, Patient 24, Patient 26.

While the treatment plans were not quite as repetitive and boilerplate as those I saw during my previous assessment, they remained very generic and nonspecific; none were adequate. It is important to observe that in order to have an adequate treatment plan, there has to be an adequate assessment. A diagnosis alone does not provide an adequate foundation for treatment of a mentally ill person.

Treatment must begin by developing a treatment alliance with the patient and then developing a shared view of what will be worked on. For those patients who are refusing treatment, the treatment plan needs to focus on steps necessary to engage the patient in treatment. This usually requires the exploration of goals that are of interest to the patient. Once patient goals are identified, barriers to the attainment of those goals can be explored. Once identified, steps can be developed in order to address those barriers. Once long-term goals are established and the immediate barriers to attaining those goals are identified, short-term goals that begin to address those barriers can be created. Once these short-term goals are identified and agreed upon, appropriate interventions can be developed to achieve those short-term goals. Short-term goals can be seen as steps towards the achievement of the patient's long-term goals. A simple example of this that comes up over and over in the medical records is psychotic patients' refusal of medication. There are well-established methods for working with this population of medication refusers.  There was no evidence of any attempt to employ these methods, only vague statements such as encouraging patients to take their medications, which is rarely effective for patients who deny they have a mental illness and do not see that they are having difficulties achieving their long-term goals or who may not have established any long-term goals. There was no evidence that EMCF clinicians have developed such treatment plans.

Treatment plans primarily consisted of instructing patients to take their medications and attend group and individual therapy. This admonishment to attend group and individual therapy makes no sense when such treatment is essentially not even offered, especially to the most ill.

I attended a treatment planning conference in a psychiatrist's office in the infirmary area. It was an unreasonably small space in which to conduct treatment planning meetings with the treatment team. There was an MHP and a custody representative in the conference and they did interview the patients who were the subject of the treatment plans. Both were ACU patients. Though the MHP and custody representative reviewed the patients' treatment participation, there was no discussion of what the patient was working on, what the goals of treatment were, or what specific interventions were to be made other than attending group therapy sessions and taking medications. There was no discussion of what sorts of group therapy sessions would be indicated for the particular patient and there was no discussion of individual therapy interventions or goals or even whether it was needed. During the meeting, one of the patients asked for an injection of an antipsychotic and complained of having thoughts of suicide because of "[his] past."  There was no discussion of what to do about this issue or even what he was referring to regarding his past. There was virtually no participation by the custody representative who soon left.  However, it is important to say that the two clinicians were professional and respectful with the patients.

Consistent with the foregoing, the December 2017 MDOC Clinical Contract Compliance Review Report found that 40% of EMCF patients did not have a treatment plan. 50% of EMCF patients did not have treatment plans indicating the level of functioning of the patient.  32% of EMCF patients did not have treatment plans signed by the psychiatric provider and that completion of treatment plans and reviews of those plans "need significant improvement at EMCF" (Cent-Dockery-Elec-0355562).

The same report showed that as of December 2017, 0% of EMCF patients had progress notes in their medical records that reflect goals of the treatment plans, or progress towards those goals (Cent-Dockery-Elec-0355563).  I also saw no evidence of charting on treatment plan goals.

I also reviewed the Mental Health Caseload Log from 10/15/18 for the presence of a treatment plan. 546/877 = 62% had a treatment plan.  The log included dates of the current plan.  Some dates were as far back as 2016.  Review of the dates of the first 148 entries showed that only 53/148 = 36% had been done in 2018.

## Crisis Response

### Clinical Response

I reviewed 134 use of force incident reports and associated videos from incidents involving uses of force on mental health caseload prisoners through 2017, including planned use of force incidents.  They show a consistent pattern of substandard and dangerous practices where mental health staff fails to meaningfully engage patients in an effort to de-escalate planned uses of force.  These include instances where staff determines that behavior a patient is exhibiting is "behavioral" with no documented de-escalation efforts, where staff does not even see the patient, and yet determines the patient's behavior is "behavioral" based entirely on a phone call describing the patient's behavior.  *See, e.g.,* PTX-2691.  Records and videos reviewed from 2018 show the same problems.

There was no meaningful intervention for patients in crisis (including expressions of suicidal ideation or actual instances of self-harm) outside of normal working hours except for occasional early evening and weekend PNP responses.  These patients were simply sent to the infirmary and later seen by a psychiatric prescriber. This is not surprising given that there are no mental health staff assigned routinely from late evening to early morning and on many weekend days. Such patients were sometimes seen the following day, usually by a psychiatric prescriber rather than an MHP.  The Centurion contract requires that there be "Crisis assistance through an established on-call system" but I saw no evidence of such a system for crises when no MHP was on site.  Psychiatric prescribers are on call but were not always contacted by nursing staff when patients committed self-harm.

Other than periodic rounds, crisis response constituted the majority of MHP medical records entries, as opposed to structured treatment interventions, which should be the majority.  Structured treatment contemplates courses of treatment delivered according to a treatment plan or in accordance with a manualized treatment that addresses the content, frequency, and duration of a specific treatment.  A typical example are groups, such as Anger Management, that have a specific number of sessions of a particular duration, each with a specified content.  When there is no structured treatment and the only sure way to secure contact with staff is to be in crisis, crisis is reinforced. This is clearly the dynamic at EMCF. Lack of sufficient structured treatment contributes to the inmate population deteriorating to the point of being in crisis or manufacturing a crisis, which may include dangerous self-harm behavior, in order to secure this contact with staff.

There are some cases where an MHP was called to respond to a crisis and provided some basic counseling (e.g., Patient 5).  But in many cases, the MHP would simply refer the patient to a PNP (e.g., Patient 2, Patient 12, Patient 18, Patient 20, Patient 29) or there was no evidence of an actual crisis intervention (e.g., Patient 2, Patient 5, Patient 12, Patient 29).  MHPs must be able to provide essential crisis services rather than relying on placement in the infirmary or referral to a PNP.

In many cases, patients were brought to the medical area after self-harm and either seen by a nurse, after hours, or a PNP.  When seen by a nurse, the response was often a telephone order for an

emergency intramuscular injection of an antipsychotic medication in response to a nurse call to a psychiatric prescriber (e.g., Patient 2, Patient 29), sometimes with no reasonable foundation (See Medication Management below), or most commonly, there would be a psychiatric prescriber contact the next day or within a few days.

There were also many cases of crises, such as self-harm, for which there was no mental health response (e.g., Patient 2 [multiple times], Patient 5 [multiple times], Patient 20, Patient 27 [multiple times], Patient 29); There is of course no crisis response in such cases and there is no way to know the magnitude of this problem.

The December 2017 MDOC Clinical Contract Compliance Review Report noted that a sick call slip that contained emergent concerns had been placed in a  MHP's mailbox instead of handled immediately by the nursing or mental health staff (Cent-Doclery-Elec-0355561), further raising concerns about the adequacy of identification and referring mental health crises to appropriate staff.

Mental health staff are involved in some planned uses of force, sometimes assisting in de-escalating patients. However, associated charting often did not reflect any de-escalation but instead  reported on the events and included a determination that the problem behavior was not due to mental illness (see below), whereupon the patient was subject to custody use of force. In most instances, the MHP crisis intervention was absent or the quality poor and the value added almost nil.  Their function consisted primarily in reporting on events, making a judgement about responsibility, and referring the patients to a psychiatric prescriber.

Another thoroughgoing deficiency was care of patients in the immediate aftermath of crisis. Most patients in serious crisis were transferred to the infirmary. While there, MHP notes consisted of meaningless rounds virtually all the time.  Psychiatric prescribers saw patients in the infirmary, however their focus was assessment of the need for continued placement in the infirmary or associated observation status and psychopharmacologic interventions. But at least the patients were receiving some contact.

More problematic, there was never a formal plan to follow-up with patients after a crisis, after discharge from the infirmary, or after discharge from the ACU.  In most instances, it was weeks before such patients were seen again by mental health staff and that was often because another crisis had arisen.

I saw only two crisis plans (Patient 18, Patient 20).  The first (Patient 18) was not really a crisis plan but a set of goals, instructions for a basic suicide risk assessment, and some general direction regarding working with chronic delusions (which have no place in a crisis plan).  The other (Patient 20) was marginally adequate but was not followed.

Relatedly, I saw no behavior management plans. Despite frequent charting about behavioral problems and crisis calls that were purportedly "behavioral," rather than due to mental illness, I saw no behavior management plans.  Crisis plans and behavior management plans are important tools that allow mental health and custody staff to develop a shared approach to a patient to diminish the use of crisis in order to get needs met or secure contact with a mental health or other staff member.

The December 2017 MDOC Clinical Contract Compliance Review Report acknowledged that mental health crisis services should include at a minimum: a structured assessment of patient's current risk of self-harm, violence, and psychiatric decompensation; a formal suicide risk assessment when clinically

indicated; an individualized crisis treatment plan developed within one business day for patients placed on suicide watch or psychiatric observation; daily behavioral health interventions for patients on suicide watch and per crisis treatment plan for patients on psychiatric observation; and an assessment of need for a higher level of care if suicide watch or psychiatric observation status continues for more than 72 hours (Cent-Dockery-Elec-035572). This is still not being done at EMCF.

As noted in the December 2017 MDOC Clinical Contract Compliance Review Report, there is also no provision for clinical restraint (Cent-Dockery-Elec-035575), and I saw no evidence of any orders for clinical restraint despite provision for clinical restraint in Centurion policies. Use of clinical restraint is sometimes necessary to assure patients can be safely restrained with the appropriate type of clinical restraint when they present an imminent risk of harm to self or others by reason of mental illness. This is not happening at EMCF.

## Assessment of Responsibility

Medical records and use of force data include instances where problem behavior, such as refusing to close tray slots, was determined not to be due to mental illness but "behavioral" (e.g., Patient 2 [multiple times]). In one case from 4/26/18 (Patient 2), the Use of Force Report states that the MHP reportedly made "a determination … that the offenders [sic] actions were behavioral not mental." The notes do not reveal any analysis of his mental status that would warrant such a conclusion nor was there an evaluation of any contraindication of a use of force, even though the patient complained of being sick. Review of the associated videos shows that the MHP visited the cell front for only about 30 seconds, not enough to make any meaningful evaluation of any contraindications, let alone evaluate responsibility or engage in any de-escalation.

The appropriate role for mental health in planned uses of force is to attempt to defuse the situation. There is no role in determining a patient's intentions or the contribution of mental illness to behavioral problems during a crisis response. Mental health may have a role in recommending whether a use of force during a crisis is contraindicated for a particular patient.

I saw no evidence in the medical records of mental health providing input regarding sanctions ensuing from a rule violation report. This is another appropriate role for mental health. Working with hearings officers to help craft a sanction for behavior that is related to mental illness may include recommendations for what kinds of sanctions or program assignments would be likely to reduce such behavior.

# Suicide Prevention

Self-harm behavior continues at an alarming rate at EMCF. While there have been no deaths attributed to suicide, there have been numerous self-harm incidents requiring emergency room care. There has been no discernible change in the suicide prevention program at EMCF.

## Suicide Risk Assessment

Formal suicide risk assessment is rarely in evidence in the medical records, despite there being abundant evidence of risk of and actual self-injury. A form entitled Suicide Potential Screening exists for conducting suicide assessments, though it was clearly designed for screening at the time of an arrest. It

includes items relevant to a suicide risk assessment, however in and of itself, it is not an adequate assessment.  The problem is that there is no single form or test that is sufficient for conducting a suicide risk assessment as there are myriad factors that may be germane to a particular case.  It is necessary for clinicians to have sufficient grasp of the field so they can use general information, such as that obtained from a structured or semi-structured form or interview, to guide a more focused inquiry.  There were no examples of such an approach to suicide risk assessment in any of the medical records I reviewed.

Despite having this form available, which is a reasonable starting point for an assessment (though needs to be modified for the setting in which it is being used), I only saw two cases where it was completed (Patient 2, Patient 29), and in one case (Patient 29) it was done by a nurse, who was unlikely to have the proper training to conduct such an assessment.  The other was done after a patient was released from the infirmary after self-harm, rather than being used to determine whether the patient was safe to be released from suicide monitoring.  Neither of these was a complete assessment or resulted in a formal opinion regarding risk or a particular course of action.

Even when there is reason to be believe that self-harm behavior is being used instrumentally, it is important to be aware that this behavior is associated with an increased risk of suicide as well as unintended death.  Even under duress or the stressful circumstances of restrictive housing, most people do not resort to self-injury; it is an abnormal response that is indicative of some form of psychopathology.  Thus, it is not clinically acceptable to pass off self-harm as "manipulative" or "behavioral" and use this as a justification for not conducting a proper assessment or providing appropriate clinical care based on such an assessment.  In such cases, a proper assessment may indicate that the patient does not require close suicide monitoring, but to simply release the patient from monitoring without any structured follow-up or intervention (treatment or behavior management plan), as commonly happened, will simply result in repeated cycles of self-harm, as was repeatedly demonstrated.

There were instances where information regarding suicide history was incorrect (e.g., Patient 2, Patient 14).  There were many cases needing but never receiving a sound suicide risk assessment (Patient 2, Patient 5, Patient 12, Patient 14, Patient 16, Patient 29, Patient 30).

## Suicide Monitoring

When I was in the infirmary during my October 2018 site visit, the officer monitoring the cameras was doing cell-to-cell infirmary rounds every 30 minutes and entering this in a single log book.  The officer stated that there were no 15-minute checks, only the alternative of a 1:1 cell-front observation.  It is critical to have 15-minute checks available as well as one-to-one observation; it is an important intermediate step between a 1:1 and 30-minute checks. 15-minute checks are an industry standard (e.g., NCCHC).

Medical records do not contain logbooks of checks or one-to-one observations. These logs should be a part of the medical record in that they are an essential element of the care of the patients on watch status. Further, suicide monitoring and psychiatric observation are statuses ordered by clinicians and so not having the associated logs in the medical records leaves an incomplete medical record and an inability to determine whether provider's order was in fact followed.

Some patients were placed on suicide watch even when there was no evidence of suicidality (e.g., Patient 16, Patient 19). It appeared to be an effort to limit the availability of property, possibly to prevent harm to others.  Why this could not be done by psychiatric observation status was not clear.

Those on suicide watch were sometimes found to have proscribed items such as clothing or property (e.g., Patient 19).  Patients on various degrees of observation in the infirmary were able to get items to harm themselves, including a 33-inch piece of rebar (Patient 2).  These failures to provide adequate means restriction continue to be a serious source of risk.

See the Infirmary section below for conditions in this area.

Almost all MHP notes on patients in the infirmary are completely cursory. In many cases, there is a completely normal mental status examination in the record for patients who are asleep or do not respond. There was no evidence of any treatment. These contacts were without any value in almost all instances. Further, they did not meet requirements for daily contact, even if combined with PNP notes.

Nursing notes in the infirmary were done most days, as required, however there were notable exceptions where patients went several or many days without nursing notes (e.g., Patient 2, Patient 19, Patient 27, Patient 28).  In these cases, considering that these patients were also not being seen daily by a mental health professional, these patients would go several days without any clinical contact. Given that we know that such contacts are important for detection of imminent suicide risk, this omission places patients at unreasonable risk.

## Suicide and Self-Harm Risk Reduction

As mentioned in the section on crisis response, I saw no evidence of any meaningful crisis plans. Worse, I saw no evidence of any treatment plans that were specific enough to properly address patients' self-harm behavior. As with treatment planning generally, the fundamental problem is there are no adequate assessments upon which to base a patient-specific treatment plan that might reasonably be expected to address the problems underlying self-harm behavior.

I saw no evidence of any individual or group therapy directed at reduction of self-harm behavior. Other than medications, which are of little value to most patients with recurrent self-harm behavior, there was no attempt to reduce these behaviors. The underlying causes of self-harm behavior were not even mentioned as a target of treatment in the records I reviewed.  Occasionally, there was a goal to reduce self-harm but no step-wise plan to achieve that goal.

Another aspect of risk reduction is creating suicide resistant settings. In addition to the problems noted in the Infirmary section below, it is important to note that the other two housing units where the highest risk patients are placed (HU-3 and HU-5) are not suicide resistant settings. The old light fixtures provide a ready anchor point for hanging remain throughout the units.  While in some cells new light fixtures are being used to replace older broken fixtures, these new fixtures have very good anchor points on them as well. This is entirely unreasonable for such settings. There are good alternatives available. While it is not possible to create an entirely suicide proof setting, every effort should be made when upgrading physical plants in high risk settings to minimize anchor points and other sources of self-harm risk. Exposed lightbulbs in many cells represent another unreasonable form of risk. These are not academic considerations as patients frequently attempt hanging and do cut themselves on these units.

In the December 2017 MDOC Clinical Contract Compliance Review Report, MDOC auditors found that "the mattresses being provided to patients on suicide watch at EMCF do not appear to be safety mattresses." (Cent-Dockery-Elec-035574). I saw no evidence that this problem has been rectified.

## Admission and Discharge to Mental Health Settings

Medical records continued to demonstrate that custody staff determine placement, even to residential mental health units.

While it appeared that mental health staff had some say in ACU placement, the actual decision-making process was not clear and records only stated that placement required the approval of several staff members (e.g., Patient 2). The document "East Mississippi Correctional Facility Acute Care Unit (ACU): Short-Term Treatment (typically up to 14 days)" provides the following:

> If the site Mental Health Clinical Director approves the referral, the referral will be reviewed in the morning "Huddle" meeting with the HSA, Case Manager, Director of Nursing and the psychiatric provider for approval. If all parties approve the referral, the patient will be admitted to the ACU for evaluation and treatment. The signed referral will be scanned into the medical record.

I saw no evidence of such a record of the decision for placement in the ACU in any of the medical records. Thus, how the admission decisions were made was opaque.

I have previously noted my concerns about the ACU admission criteria being so restrictive that it would preclude the admission of the most seriously mentally ill. I interviewed all seven of those currently housed on the ACU. It was abundantly clear from my group interview of all seven patients that none of them were acutely ill. Only two presented evidence of a possible serious mental illness, and they were quite stable. Four of the seven clearly stated that they were in the ACU to get respite from the conditions on their housing units, both HU-3 and HU-1. Since one of my major indictments of the system had been its inability to properly care for the most seriously ill, and the ACU was being offered as a solution to this problem, I also reviewed medical records of those placed in the ACU and found clear evidence that those recently admitted to the ACU were much more stable than many patients who were housed in restrictive housing, HU-3, and the infirmary. While it would be expected that imminently dangerous patients would be housed in the infirmary, some were housed there for months. If the ACU is incapable of managing those so seriously ill that the only alternative is placement in the restrictive infirmary setting, then it is not meeting the need to manage the sickest mentally ill.

The medical records demonstrated that patients with acute psychosis who did very poorly in restrictive housing were nonetheless placed there (e.g., Patient 19, Patient 18). There was no evidence in the medical record of mental health staff endeavoring to prevent such placement. In fact, a psychiatrist wrote that a very psychotic patient (Patient 19) who did not want to return to HU-5 "really has no choice given his long-term [segregation] status -- despite his denial that he should have his status." The psychiatrist even noted, regarding the necessity of returning to HU-5, that "it is unclear how he will react to this." There was even discussion of use of force to return him to HU-5.

Consistent with the preceding, the December 2017 MDOC Clinical Contract Compliance Review Report admits there are no policies addressing, among others, the following areas of operation in Unit 3, and states they must be developed: formal admission and discharge criteria, a clinical referral and approval

process, and a formal discharge process (Cent-Dockery-Elec-035578). It also states that patient movement into and off Unit 3 is "typically determined by security staff often without input from the mental health providers," (Cent-Dockery-Elec-035575) and that patients with a LOC-D designation should be housed in Unit 3, but that LOC-D EMCF patients are actually housed in other units at EMCF. This clearly includes restrictive housing.

As noted in the Assessment and Treatment Planning sections, almost 25% of level of care D patients (there were no level of care E patients) are not housed in residential mental health units and 14% are in restrictive housing.

The case of one very debilitated patient (Patient 27) with both mental illness and cognitive limitations is particularly instructive in this regard. After being discontinued from suicide observation and released from the infirmary, he was to return to restrictive housing "to serve his time for pushing an officer a few days ago." There was no consideration of whether restrictive housing was contraindicated for him or any documented mental health input to the associated RVR sanction process. The PNP was reportedly told by custody that the patient "would have to serve his time on the ad-segregation."

## Treatment in Residential Mental Health Settings

The December 2017 MDOC Clinical Contract Compliance Review Report identified many of the same deficiencies in treatment that I found noting, "MDOC mental health leadership reported significant concerns about the services provided by Centurion. In particular, challenges at EMCF were discussed including the need to fill critical vacancies as well as provide more intensive clinical services for patients with serious mental illness." Cent-Dockery-Elec-035553. These problems continue at EMCF.

### Residential Mental Health Units

Per the December 2017 MDOC Clinical Contract Compliance Review Report, EMCF Unit 3 houses the largest percentage of patients in the state with serious mental illness and houses approximately 225 patients (Cent-Dockery-Elec-035575). It consists of four pods, each with a capacity of about 60. HU-3C is designated as the single close custody residential mental health unit. However, there are some patients on this unit that are not close custody. Why these lower custody patients are placed there was not clear. The other units are lower custody.

The psychiatrist described the population on HU-A/B as medium custody with HU-3A primarily housing those with intellectual disabilities and borderline intellectual functioning, including some close custody patients. HU-3B was primarily populated with patients having serious mental illness. HU-3D primarily houses an older population and was "a quieter setting."

I visited HU-3A, HU-3C, and HU-3D, and briefly interviewed many patients on these units, identifying a number for more in-depth interviews. HU-3C had many overtly psychotic patients milling about the dayroom. There were obvious fishing lines in many cells. Several cells were in substantial disarray and malodorous, as were a number of the patients. On HU-3A, patients told me that a peer had thrown a chair and broken the television the previous evening (it was obviously seriously damaged); I later interviewed this patient, who was clearly mentally ill.

Medical records, use of force reviews, and extraordinary occurrence reports demonstrate that there is a good deal of violence on HU-3 pods. Many patients reported regularly witnessing violence as they had reported during my first visit.

Patients on these units reported that evening medications came anywhere from 8pm to midnight, consistent with other reports.  They noted that medications came more reliably than previously, but that they still sometimes did not get their medications.  Several noted that it might take up to a month for expired medications to be re-ordered.  Patients on HU-3C noted that several patients virtually never come out of their cells.  Virtually all of the patients reported that an MHP would meet with them once a month, in an office, the dayroom, or at cell front.

The MHP assigned to HU-3C is also responsible for the ACU.  This is an unreasonable caseload for one person.  Per the psychiatrist, the MHP is only able to run one group per week on HU-3C.  Record review demonstrates that almost no patients are receiving any group therapy on any HU-3 pods.

Similarly, there is a single MHP that is assigned to HU-3A and HU-3B who conducts one group per week on each of these units.  This MHP is also responsible for the individual interventions for all the patients on these pods.

Activities therapists conduct a single group per week on each HU-3 pod (A-D).

Groups are reportedly held in a classroom and there are offices available for MHPs to meet with patients.

These units are far from therapeutic.  They lack structure both in terms of the daily running of the unit and in terms of the treatment provided. Patients mill about in the dayroom unsupervised.  There are frequent incidents including altercations, stabbings, property destruction, and self-harm. Contraband was visible during my walk through and use of spice is commonly mentioned in the records and death reviews and contraband was found on cell searches, including serious weapons (e.g., Patient 31). There are very few structured programs or treatment activities. Other than periodic meetings with psychiatric prescribers, almost no patients are receiving any meaningfully individual services. Psychiatric prescribers provide psychotropic medications but do not do individual therapy. It was only on rare occasions that an MHP note would include anything regarding any therapeutic interventions, and this usually only constituted a brief reference to reinforcing or educating someone about relaxation or very basic coping skills.

There was no evidence of any patients receiving any psychotherapy. The vast majority of MHP contacts are rounds in the housing units, almost always with security present, rather than individual treatment session in an office. In short, most patients receive nothing other than medications and occasional brief contacts with an MHP and live in a chaotic, unstructured, counter-therapeutic setting.

The December 2017 MDOC Clinical Contract Compliance Review Report admits there are no policies addressing the following areas of operation in Unit 3, and which still must be developed: (1) formal admission and discharge criteria (2) a clinical referral and approval process (3) appropriate staffing levels to meet established treatment requirements (4) schedules of treatment activities (5) regularly scheduled triage meetings to discuss each patient (6) a formal discharge process (7) staff training on all policies (Cent-Dockery-Elec-035578).

The same report assessed, among other things, compliance with relevant mental health policies for eight EMCF patients housed in Unit 3.  They found the following for 2017: (1) none of the patients had received an orientation to the unit, (2), none had an admission order to the unit from a provider, (3) none had an admission assessment confirming the need for placement in the unit, (4) 67% of the

patients did not have treatment plans identifying specific frequencies of interventions, (5) None had discharge criteria clearly indicated in their treatment plans, (6) none had individual counselling provided every 30 days by a qualified MHP, (7) none of the clinical contacts for EMCF patients were documented as occurring out-of-cell, (8) 37% of the clinical contacts failed to identify the interventions provided to the patient, (9) 33% of the clinical interventions listed were inconsistent with the patient's treatment plan, (10) 75% of progress notes failed to identify the patient's progress towards goals in the treatment plan, and (11) 75% of patients were not participating in group therapy. (Cent-Dockery-Elec-035576-035577)

The report also notes that appointments with Unit 3 patients occur in offices, classrooms, hallways, or at tables within the common area of the unit and admits that finding appropriate places to meet with Unit 3 patients in private can be challenging as clinical space is shared with MTC program staff. (Cent-Dockery-Elec-035577). In order to get a sense of how unit rounds were being conducted by mental health staff assigned to HU-3, I reviewed HU-3 logs for 9/2/18 to 9/8/18 and 9/23/18 to 9/29/18.  For the mental health staff visits that have an entry time and exit time, I found that visits to the residential mental health housing unit pods (HU-3A through HU-3D) were usually brief.  For one MHP, the times on the unit (in minutes) were: 20, 14, 11, 14, 3, 4, and 3.  Another MHP visited for:  18 minutes and 7 minutes.  Clearly, MHPs do not spend any substantial amount of time on the units.  Given such brief visits (none longer than 20 minutes) it is no surprise that typical MHP notes were exceedingly cursory. Note that medical records reviews also demonstrated that many MHP notes indicate that they are rounds, often with security present, so these are doubtless rounds conducted on the units.  While it is reasonable for security to be present for rounds, when these are the only monthly contacts, which was often the case, patients do not have the opportunity for confidential communication with MHPs, which is not consistent with standards.

## Acute Care Unit (ACU)

The ACU is a 14-bed unit (there are 15 cells), which is also referred to as "camp support." It opened in February 2018.  The concept of the ACU is sound and addresses an element of the residential treatment unit services needed at EMCF: residential treatment for the acutely ill.  However, it is only 14 beds which are not adequate to serve the acute needs of the seriously mentally ill at EMCF.  There are also problems with the current operation of the program that continue to place EMCF patients at risk.

There are significant systemic problems with EMCF mental health care provided to the most acutely ill patients that the ACU cannot and will not address.  EMCF houses over 1,000 inmates on the mental health caseload.  A substantial minority of this population require treatment in a long-term residential mental health unit.  The 200+ patients typically housed at EMCF's mental health unit, Unit 3, require enhanced services, which they do not receive in Unit 3.  The ACU does not address this problem.  Nor could it, given its small size.  Many of the patients in Unit 3 meet the admission criteria for the ACU. They require the enhanced services as described for the ACU in the program description, but those services are limited to ACU patients.

The ACU also does not provide a hospital-level of care and has exclusion criteria that would exclude patients who require a hospital-level of care (such as those who are danger-to-self or danger-to-others). Though EMCF's own policies require the hospitalization of patients whose treatment needs exceed what EMCF can and does provide, Defendants do not comply with these policies, and the most acutely ill EMCF patients thus remain at the prison.  The ACU does not address this ongoing problem.

According to the ACU Program Description,[1] patients must meet the following criteria to be accepted into the ACU:  (1) Presenting with acute psychotic and/or mood symptoms resulting from the presence of a serious mental illness; (2) In need of stabilization due to severe mental, emotional, or behavioral crisis; (3) Non-responsive or not adequately responsive to treatment approaches used thus far; and (4) Having difficulty functioning due to decompensation of a serious mental illness that requires increased monitoring and more intensive intervention.

In addition, patients meeting the following criteria may be admitted into the ACU: (1) Noncompliant with medication and in need of observation, medication regulation or adjustment(s); (2) In need of an extended mental health evaluation and/or observation leading to stabilization; (3) Demonstrating abrupt behavioral change secondary to a suspected underlying symptoms(s) of mental illness; or (4) Transitioning from a higher level of mental health services (suicide watch or psychiatric observation status).

The following criteria exclude a patient from admission to the Acute Care Unit: (1) Actively engaging in self-injurious behaviors and/or expressing suicidal ideation with a plan to attempt suicide imminently; (2) Posing an overt threat of danger to self or others, or (3) In need of suicide precautions or constant monitoring/observation.

While many of the admission criteria to the ACU are reasonable and identify patients with legitimate needs, there are numerous patients meeting these criteria who are housed at EMCF.  The exclusion criteria are problematic in that they would exclude high-needs patients who are a danger to self or others.  It is reasonable to exclude those who pose a risk of imminent danger to self or others (who should be placed on watch for up to 72 hours and then hospitalized if still an imminent risk).  However, the term "overt threat" is overbroad and would include many who are always at elevated risk to self and others and thus represent an enduring threat.  The language "actively engaging in self-injurious behaviors" is overbroad; a more appropriate term would be "currently."  Clearly, those currently engaging in self-harm must be stopped, which is not a proper function of such a unit.  "Actively engaging" would generally be read to include those who are engaging in frequent self-harm but who are not currently harming themselves.  Last, there is no reason that patients on some degree of suicide precautions could not be managed on the acute unit, though probably not those requiring 1:1 monitoring or substantial means restriction.

EMCF psychiatric nurse practitioner Evelyn Dunn endorsed the overbroad exclusion criteria in her 2018 testimony.  She noted that patients had to be stabilized in the infirmary before being placed on the ACU. Trial tr., vol. 34, 93:10-15 (Dunn).  An acute unit should serve the function of stabilization; the infirmary should serve only the imminently dangerous.

There were some patients with serious mental illness admitted to this unit, but when unstable they were generally returned to the infirmary (about half of releases). Others were discharged to restrictive housing (3/45), the residential mental health unit (12/45), other general population units (4/45), or released/transferred (2/45).

Most of the acutely ill are treated either on HU-3 or in the infirmary. I saw numerous examples of far more ill patients in those units than on the ACU. In fact, the patients on the ACU at the time of my October 2018 visit were actually quite stable.

---

[1] PTX-2869 (Cent-Dockery-Elec-035594).

The discharge criteria states that patients meeting the following will be deemed discharge ready and a plan for discharge will be established by the treatment team: (1) Exhibiting an increase in overall functioning as evidenced by improved activities of daily living, (2) increased medication compliance, (3) improved communication, (4) increased ability to advocate for his needs, (5) increased engagement in treatment opportunities, (6) Exhibiting a decrease in symptoms presented at admission, (7) Sufficiently stable for placement on the step down unit, (8) Patient can be treated in a less restrictive environment, and (9) Patient has not required placement on suicide watch in the past 72 hours.  Other than those who were discharged for behavioral problems, it was not clear from the medical records why patients were discharged except occasional reports of increased participation in treatment activities.  Record review repeatedly demonstrated that unstable patients were discharged from the ACU, as does the fact that half the patients discharged from the ACU went to the infirmary, sometimes for extended periods.  In short, the ACU does little to augment the treatment of the most seriously mentally ill.

The overbroad exclusion criteria have resulted in the continued long-term placement of the acutely ill in restrictive settings including the infirmary and segregation (e.g., Patient 2, Patient 18, Patient 19, Patient 27, Patient 29), all patients who were discharged from the ACU while still acutely ill and/or at risk of harm to self or others.  These patients continued to receive dangerously substandard care.  They are exposed to isolation conditions that predictably exacerbate their serious illnesses and remained at a substantial risk of serious harm.  That harm manifests itself in continued or increased symptoms, an increased risk of self-harm and harm to others, and unnecessary suffering due to their untreated and undertreated illnesses.  The harm to this most acute population is magnified due to Defendants' ongoing failure to implement their own policies and hospitalize those patients in need of hospital-level care.

The ACU is also quite underutilized.  The psychiatrist reported that the census on the unit is typically 8 to 9, consistent with the census when I visited. While it was intended to be a short stay unit, initially intended for up to two weeks, length of stay is highly variable, from days to months. Analysis of the ACU admission/discharge log shows that the average length of stay has been 21.5 days. The range has been from 0 to 117 days.  The psychiatrist noted that many patients are on the ACU because there is difficulty finding an alternative placement that works for the patient. Medical records entries confirm this report (e.g., Patient 12, Patient 25, Patient 28). In this regard, the psychiatrist noted that HU-3C is "off and on lockdown."  As noted above, this is the only close custody residential treatment unit and houses many seriously mentally ill patients.  Instructively, a 7/3/18 PNP note for one patient (Patient 12) indicated that he was to remain in the ACU until achieving medium custody because it "allows for more availability of housing on Unit 3." That is, something other than HU-3C; this is not a good reason to house somebody on a unit that is designated to be treating the acutely ill, but at the same time, speaks to the non-therapeutic environment on HU-3C.

I conducted a group Interview of all the patients currently on the ACU.  Four of the seven patients reported that they were on the ACU because they needed to get away from the chaos and violence of HU-3.  They reported that it was a much calmer environment. They also appreciated that there were groups almost daily, sometimes two, and that the MHP was always willing to talk with them. However, none of them were receiving regular individual sessions, but had individual meetings only upon request.

In addition, medical record reviews demonstrated that many patients with less serious illnesses were placed in the ACU or remained long after stabilized.  Early Record reviews[2] of early admissions demonstrated that five of the first seven (5/7) patients admitted to the ACU were admitted from the

---

[2] PTX-2870 through PTX-2876 (DEF-346473 through DEF-346898).

infirmary (patients FG, CB, JD, CD, DW).  All but one had largely stabilized by the time they were admitted to the ACU and the one who was still acutely ill (FG) had been in the infirmary for months and was improved substantially by the time he was transferred to the ACU.  The other two were admitted from HU-3 (patient PF) and HU-5 (patient RA).  Recent cases show the same pattern with a number of less ill patients being placed in the ACU (e.g., Patient 12, Patient 16, Patient 23, Patient 25, Patient 28) while other with severe illness were not treated in the ACU (e.g., Patient 3, Patient 6, Patient 8, Patient 17).

There was no individual psychotherapy on the ACU.  Mental health professionals (MHPs) generally met with patients weekly but did not provide psychotherapy.

The original EMCF ACU schedule[3] shows 12 groups weekly; 10 hours of appropriate group programming weekly per patient is sufficient to provide essential treatment for the seriously mentally ill needing mental health residential services whether in an acute unit or a longer term unit (though the needs will be different).  The 10 hours of structured out-of-cell therapy is a consensus standard that is employed in residential mental health programs across the country, including in the California and Washington state prison systems.  Early record reviews showed an average of 7 groups weekly.  Patients averaged only 4.25 groups per week.  At the time of my October 2018 visit, I was told by the EMCF psychiatrist that an MHP runs one group each day during the workweek.  Activities therapists do three groups per week.  Records reviews were consistent with this report.  This is not consistent with the original plan for staffing the ACU with one MHP and two activities/recreation therapists.

Most of the groups were activity oriented (coloring, playing games, exercise) which is an appropriate subset of rehabilitative groups for the most ill but cannot represent the vast majority of therapy as was the case on the ACU.  Only two groups appeared to be structured and manualized, Social Skills and Planning for a Better Life.[4]  The former was appropriate for an acute unit, but the latter was not; it focused on release planning, work, and skill acquisition, which are not the needs of an acutely ill population, though might have been appropriate for many of the patients actually treated in the ACU because they were less ill.  There were no psychoeducational groups at all, a key treatment modality/target for this population.  There were occasional nurse notes that mentioned medication education, but it was not clear what this consisted of and there was no evidence it was structured or manualized.

I observed a group on the ACU. It was a group on self-esteem attended by 8 patients. In addition to the fact that therapeutic interventions specifically targeting self-esteem have been shown to be ineffective, what was more concerning was that the group was run in a day room setting with no privacy and custody sitting in the group, the MHP did not set a proper frame for the group (no group norms), and the MHP did the vast majority of the talking, which is not what should happen in a therapy group, though most patients said something. That said, it was clear the MHP clearly wanted to help the patients.  The MHP did review previous homework and reviewed written materials on self-esteem.

I reviewed a Weekly Activity and Rounds Log form that is supposed to be used for all ACU patients.  Use of such forms in acute and long-term residential treatment units at prisons and jail around the country is a common means of documenting patient's behavior and adherence to treatment.  The content of the form produced is adequate.  However, only one patient (PF) had a Weekly Activity and Rounds Log in the record and it was incomplete; the form was also designed such that it is not clear whether absent

---

[3] PTX-2877 (Cent-Dockery-Elec-035606)
[4] PTX-2878 (Cent-Dockery-Elec-035609through Cent-Dockery-Elec-035614**).

entries represent failed data entry or patient non-participation.  It appears that they later quit using this form as it did not appear in more recent medical records.

In my experience reviewing and working in correctional mental health systems around the country, prison systems with adequate mental health services typically have between 0.5 and 1.5% of the population in acute and intensive (hospital or near hospital level) beds; having well-functioning residential treatment units allows lower numbers of acute and intensive beds.  For an MDOC total population of 19,000, this would be between 95 and 285 beds for patients needing acute and intensive beds in MDOC.  EMCF is designated to hold the most seriously mentally ill in the state system, and most of the SMI are at EMCF.  Therefore, it should contain all or the vast majority of these beds.  There are no intensive beds at EMCF, only the 14 acute beds.

In summary, the concept of the ACU is sound though too small in scale to have a substantial impact on the needs of the SMI at EMCF.  The ACU is also not providing the frequency of quality of services it was designed to provide.  Further, the specified groups are not adequate to serve the needs of the population.  It is likely providing some small benefit to services but it by no means addresses the deficiencies identified at EMCF.

## Infirmary

The mentally ill who require some degree of suicide watch or psychiatric observation are placed in the infirmary.  Conditions in the infirmary are unchanged. It still operates and appears to be more like a restrictive housing unit than an infirmary.  Cells are austere, lighting is poor, and the unit smells of smoke or burnt materials. Several cells continued to show fire damage to the windows.

An officer sits in the central station monitoring the video feed. The video is supposed to provide for views into the cells. There were two cells that were occupied which you could not see into at all: 514 and 517.  Reportedly, cells 512, 513, 514, and 516 are used for suicide watch. The same are used for one-to-ones, except 516 only occasionally. I was unable to enter most of the cells as they were occupied. It was clear that cell 516 had available anchor points that could be used for hanging. I was able to enter a cell 517. The light fixtures were breakable and could be made into sharps and there were clear anchor points.  The fixtures seem to be the same as those in occupied cells and unchanged from my first visit.

There was a logbook of checks that was kept at the station by the officer monitoring the videos. An officer also does a walk through every 30 minutes, but times showed these walk throughs were occasionally more than 30 minutes apart. The officer said there was no provision for 15-minute checks. The officer also logs coming and going of staff on to the unit, impairing ability to effectively monitor the video feed.

Log sheets posted by patient cells had entries approximately every 30 minutes. Most showed that meals were given. Showers are supposed to be offered Monday, Wednesday, and Friday. Some of these logs were blank, some indicated no shower was offered, some indicated the patient refused, and some indicated that the patient accepted.

Cell cleaning is noted on log sheets posted by the cells as well. Cells are supposed to be cleaned on Monday, Wednesday, and Friday. The checklist all say that cleaning was not scheduled, sometimes even for weeks. Not all the sheets were complete.  Log sheets also indicate patient activity, including showering, meals, and patient activity.

While I was visiting, there was one patient on a one-to-one suicide watch. I spoke with the officer who reported coding the patient's behaviors every 15 minutes. I reviewed the code sheet and there were no codes for anything other than the patient lying quietly.

One seriously mentally ill patient occupied cell 521. He had been admitted to the infirmary on 10/13/18, but there were no log sheets until 10/16/18.

The central station where custody staff monitor the video feed also serves as a nursing station, violating patient confidentiality.  Medication carts are also prepared in this station.

The psychiatrist noted that there were usually 5 to 6 patients in the infirmary for mental health reasons by the end of the workweek but that after the weekend the infirmary would fill up again. Patients knew that they could simply state they were suicidal, and they would be taken to the infirmary until they could be evaluated by a psychiatric prescriber on a weekday. Record review demonstrated that this was in fact the case. See the above section on Crisis Response for a review of MHP interventions to crises.

The psychiatrist noted 1:1 observation was available but that they tried to limit these watches to 24 to 48 hours.

Sometimes there are no beds available for patients who have been placed on watch in the housing units, including both restrictive housing and residential mental health units (e.g., Patient 19, Patient 29); in such cases, there was no evidence that they were placed on any increased level of checks or on 1:1, though often had their property restricted.  In one case (Patient 29), the patient was placed back in restrictive housing with "boxers only."  This patient had a history of multiple self- injuries and had the day before engaged in a hanging attempt. While the assessment was that this patient was doing this for "manipulative" reasons, the fact that clothing needed to be restricted to this degree for safety indicated that this patient was clearly at risk of self-injury. To place such a patient in restrictive housing with only boxers for clothing is completely clinically unreasonable and abusive. In another instance (Patient 19), the patient was placed on the ACU where he assaulted a peer. Had he remained in the infirmary on observation status, this would not have happened.

The psychiatrist reported engaging in daily rounds in the infirmary. While there was no documentation of such rounds in the medical record, patients in the infirmary were seen regularly, though not daily, by a psychiatric prescriber.

MHP infirmary rounds were not conducted consistently and were not done daily in most cases; in one case (Patient 27), the patient was never seen during a week-long stay in the infirmary. These notes were extremely cursory and virtually never included any therapeutic interaction. In many instances, the patient was asleep or nonresponsive. In most cases these rounds amounted to looking to see that the patient was alive, a function that was already supposed to be served by custody rounds. In the vast majority of cases, there was a normal mental status examination included along with these MHP rounds, even for patients who had well documented grossly abnormal mental status examinations. These notes were unreliable and virtually worthless.

Nursing entries were in the chart the large majority of days, but stray missing days were common (daily charting is required).  There were several cases, especially those patients placed for extended periods of time in the infirmary, where there was repeated failure to chart daily on these patients (e.g., Patient 2,

Patient 12, Patient 14, Patient 18, Patient 19, Patient 27, Patient 28).  In many instances, the nursing notes, though brief, contain far more useful information than the MHP notes.

None of the records reviewed by MDOC auditors for the December 2017 MDOC Clinical Contract Compliance Review Report showed  evidence that a higher level of care was considered for EMCF patients after they spent more than 72 hours on suicide watch (Cent-Dockery-Elec-035573) and found that EMCF patients were held in an acute setting "for extended periods of time" (Cent-Dockery-Elec-035574). Patients were held on watch status (suicide watch or psychiatric observation) on average for 22 days (Cent-Dockery-Elec-035573). The MDOC auditors "were concerned with the fact that [EMCF] patients who require crisis interventions for lengthy periods may need to be considered for a more appropriate treatment location or more intensive treatment interventions" and state that "[i]f crises are lasting two weeks and beyond without stabilization, staff should be referring the patient to a more suitable treatment location or demonstrating attempts at intensive treatment interventions beyond 'observation.'" (Cent-Dockery-Elec-035574).  This remains a problem at EMCF, notwithstanding the opening of the ACU.

Review of the infirmary logbook demonstrates a wide range of lengths of stay. Length of stay was not tracked until August 2018. At the end of the records in September 2018, there were several patients with stays longer than three months.  The longest stay I saw was 152 days.  These are unreasonably long stays in such a highly restrictive setting with no treatment other than medications. If these patients could not be stabilized quickly in the infirmary and could not be treated in the ACU or residential mental health units, they should have been hospitalized.

## Medication Management

### Psychotropic Prescribing

There is still no procedure in place at EMCF providing due process to administer long-term involuntary antipsychotic medications consistent with *Harper v. Washington*.  So-called "*Harper* hearings" are industry standard and policies and processes for these hearings have been developed and implemented in prison and jail systems across the country over the past 25 years.  However, the medical records demonstrated several patients who were receiving long-term involuntary antipsychotic treatment (e.g., Patient 3, Patient 18, Patient 19, Patient 27) without receiving *Harper* hearings.

MDOC identified this as a problem last December, despite the fact that its own policies provided for administrative reviews of requests for non-emergency involuntary medications (Cent-Dockery-Elec-035575).

The psychiatrist reported that there was no difficulty obtaining labs. There are periodic chart entries that blood draws for labs were canceled, but usually done later, owing to facility lockdowns or lack of security escorts.

On numerous occasions, medications were frequently started above recommended starting doses, sometimes 2-3 times above (e.g., Patient 2, Patient 3, Patient 4, Patient 12, Patient 16, Patient 18, Patient 19, Patient 20, Patient 25, Patient 27, Patient 28, Patient 30).

Medication monitoring was variable.  An Abnormal Involuntary Movement Scale (AIMS) was done on every patient taking antipsychotics for the medical records I reviewed (and Centurion data also showed

good results – see Quality Management below).  However, I found numerous problems with laboratory monitoring.  Baseline labs are rarely obtained.  Labs are frequently ordered after beginning a medication, but usually 2-4 weeks after starting medications.  This is too long as it is during that time period that risk of adverse events is highest.  It is reasonable to order them within 3 days if it is critical to start medications immediately, but this is not happening.  Another problem was that lab results were often not addressed in progress notes, even when abnormal (but they should always be noted, even if normal).  There were also several instances where patients refused labs and this was never addressed (e.g., Patient 7, Patient 8, Patient 27).  Centurion data shows that lab monitoring was usually done according to protocol (see Quality Management below).  Review of Policy D-02b Psychotropic Medication (which speaks only to Walnut Grove Correctional Facility; presumably it applies to EMCF as well since it is the only policy on psychotropic prescribing submitted) states that "laboratory tests … are made prior to initiating psychotropic medication.  When clinically appropriate, the initiation of psychotropic medication is delayed until after the results of … laboratory tests are available and have been reviewed by the psychiatrist or nurse practitioner.  Psychiatric staff document their review of the … laboratory rest results in the health record."  Policy D-02b specifies that "When atypical antipsychotic medications are prescribed, the psychiatrist or nurse practitioner ensures that the patient's weight, girth and metabolic functioning are assessed and documented to provide a baseline."  I saw no examples of weight or girth measurements documented in patient progress notes; weights were sometimes in the record but generally were not current at the time of starting a medication and there were no girth measurements in the record that I could find.  Metabolic studies were virtually never done prior to starting medications.  I also saw no examples of baseline electrocardiograms.

Policy D-02b also speaks to monitoring metabolic and endocrine function "according to the Centurion Laboratory Guidelines for Psychotropic Medications."  I was not provided a copy of this. Given that in virtually every instance, baseline labs were not obtained, it is difficult to know how the Centurion quality management data could find such a high degree of compliance. Further, there are well-established guidelines for laboratory monitoring published in the literature. Regardless of what Centurion publishes as its own guidelines, standard of care is driven by what is published in the mainstream literature. Examples of poor laboratory monitoring were numerous (Patient 7, Patient 23, Patient 2, Patient 4, Patient 5, Patient 8, Patient 12, Patient 14, Patient 16, Patient 18, Patient 20, Patient 19, Patient 27, Patient 28, Patient 30).

Several patients were treated with antipsychotics with no justification (e.g., Patient 5, Patient 20, Patient 30).

Many patients received emergency injections of an antipsychotic, virtually always haloperidol, even though this is no longer preferred medication for emergency antipsychotic treatment. There were several patients who received antipsychotic injections without sufficient clinical justification (e.g., Patient 2, Patient 3, Patient 4, Patient 14, Patient 16, Patient 20, Patient 27, Patient 29).  Oddly, one of those same patients should have received an emergency antipsychotic injection at a different time, but the psychiatrist noted it was not justifiable (Patient 3).  One patient also received repeated injections of haloperidol without justification (Patient 14) and though he sometimes requested it, it is still inappropriate to have given it as an injection; it should have been given orally if needed.  Another patient received about 30 such injections (Patient 19); while they were mostly warranted each time, the standing dose should have been adjusted as there is no evidence of the efficacy of as needed antipsychotics other than in emergency situations.  Further, this patient was on the same medication for

months with no response and there was no discussion of alternative medications; this was extremely poor practice.

Acknowledging problems with use of emergency medications, the December 2017 MDOC Clinical Contract Compliance Review Report states that emergency medications are not a long-term solution to the needs of seriously mentally ill patients who are in need of psychotropic medications for their own safety and well-being (Cent-Dockery-Elec-035576).

Consistent with my current findings, in the December 2017 MDOC Clinical Contract Compliance Review Report, Defendants' auditors reviewed the records of five EMCF patients who had received emergency medications. For one patient, there was no documented order for emergency medication. For two patients, documentation did not provide clear clinical support for the use of the medication. There was also one instance where emergency medication was continued for more than 72 hours. The report states that the use of emergency medicines for more than 72 hours is not consistent with standards (Cent-Dockery-Elec.-035577).

I saw no examples of any patients receiving emergency injections of benzodiazepines, despite the fact that this is the standard of care in many situations of treating acutely agitated patients. Policy D-02b appropriately provides for the use of benzodiazepines in emergency situations. It also provides for use in other cases with the approval of the Chief Psychiatrist; I saw no patients treated with any benzodiazepines. While it is reasonable to be cautious about using such medications in a correctional setting, to not use them at all is not clinically justifiable.

One patient (Patient 16) was also given an inappropriate injection of Benadryl. The patient complained of side effects ("locking up"), but the PNP noted no evidence of dystonia or other side effects and nonetheless gave an injection. Note that there was not one case where a physical examination for side effects other than an AIMS, was documented in the medical records. The assessment of dystonia, rigidity, and tremor, all potential antipsychotic side effects, all require a physical examination.

Another patient (Patient 30) had Depakote discontinued after reporting having reportedly taken an overdose of others' Depakote. However, the PNP did not verify whether he had overdosed by checking a Depakote level, did not consider whether the medication was indicated, and did not consider alternatives to assure that the patient did not have access to Depakote. While the PNP noted that another reason for discontinuing the medication was non-adherence, the MAR showed adherence. Besides, if the patient was being truthful about getting the Depakote from a peer, stopping this medication would not reduce the risk. This appeared to be a non-clinical response.

Similar to the findings of my initial report, the December 2017 MDOC Clinical Contract Compliance Review Report found that 94% of EMCF patients prescribed psychotropic medications do not have signed informed consent forms in their medical records (Cent-Dockery-Elec-035565). This has much improved since that time; almost all patients had consent forms for each psychotropic medication prescribed.

According to a December 2017 MDOC Clinical Contract Compliance Review Report, patients at six state prisons including EMCF were generally being seen by psychiatric providers every 90 days at their cell front, rather than in a confidential clinical space (Cent-Dockery-Elec-035571). Where patients were seen

was often not recorded in provider progress notes, but there were some notations of contacts being at cell front.  Except under unusual circumstances, patient encounters should never be at cell front.

In my opinion, the psychotropic prescribing practices have deteriorated since my previous review. While the new psychiatrist spoke of rectifying some of the problems, the records are replete with problems including:  poor prescribing (especially excessive initial dosing), inappropriate use of emergency injections of antipsychotics, poor laboratory monitoring, failure to conduct appropriate physical examinations, and lack of a *Harper* procedure for long-term involuntary antipsychotics.

## Medication Administration

Most patients reported that medications were rarely coming after midnight over the last few months. However, they still frequently come after 10 PM according to the medical records which include a number of notes where patients asked to be placed on morning medications either because the medications are coming so late that they are having difficulty getting up in the morning or because they are already asleep when medications come and are thus not getting their medications. The psychiatrist confirmed that medications were sometimes coming late but rarely after midnight. Morning medications were described as coming more timely than nighttime medications, rarely after 10 AM.

A patient (Patient 12) submitted an administrative review program complaint in January 2018 regarding medications coming at two in the morning. The staff response was, "We continue to recruit and hire for the positions at EMCF." Another complaint submitted in June 2018 (Patient 32) stating that there was no pill pass at all.  The response was, "Thank you for this information, we are working on getting right staff in the facility."

MARs were almost never complete. As noted in a number of medical record reviews, patients who had undetectable or very low levels of medications found in their blood frequently showed that the patient was taking medications for those entries that were completed, even for a patient who was known to be flushing medications down the toilet (Patient 18). The reliability of the MAR is highly suspect. Also note that while I was in the infirmary, I witnessed two nurses completing an MAR in the nursing station prior to administering medications to patients in the infirmary rather than at the time of medication administration.  This is not proper procedure and obviously predisposes to error.

Note that it was also not uncommon to see entries in the MAR showing that medications were out of stock. This rarely went on for more than two or three days but nonetheless is a serious problem as it is recurrent. It may lead to discontinuation syndromes (similar to withdrawal) or even deterioration of the psychiatric condition. The psychiatrist noted that when medications were ordered, they were usually filled the next day.

There were also numerous times when emergency injections of antipsychotics were administered but there were no nursing notes reporting on the patient's response (e.g. Patient 18); this is not within the standard of care.  One patient was given an injection of long-acting haloperidol decanoate when the order was for a short-acting injection of haloperidol (Patient 19).

## Group and Individual Therapy

if anything, the provision of therapy has declined from my previous review, except for the few patients admitted to the ACU.

According to a December 2017 MDOC Clinical Contract Compliance Review Report, "for many patients in correctional settings group treatment can be a very effective modality." At EMCF, groups were "being offered by activity therapists to patients at EMCF, but no groups were being offered at the site by MHPs" and only 10% of EMCF patients reviewed had evidence of any group therapy in their records. EMCF "staff primarily attributed the limited group programming to mental health staffing shortages, lack of space, lack of time, and lack of expressed patient interest" (Cent-Dockery-Elec-0355564).

While I did see evidence of groups being run by MHPs, both at the time of my initial report and in in my current review of medical records, most patients did not receive any group therapy. Other than in the ACU, I saw almost no evidence of any patients receiving group therapy. As noted above in the section Residential Mental Health Units, there is only provision for one group per week conducted by an MHP and one group per week by in activities therapist on these units. As there are up to 60 patients on one unit, it is impossible for the vast majority of patients to receive any of these groups at any given time (maximum group size is typically 15). Given that the vast majority of seriously mentally ill are on HU-3, this is a serious deficiency.

I saw no evidence of any individual therapy. There were stray instances where an MHP note indicated the discussion of coping strategies such as relaxation, but never any concerted effort to teach and reinforce such strategies, let alone any formal psychotherapy.

There were many patients, especially patients with serious and recurrent self-injury, who needed basic individual psychotherapy or, if willing, appropriate group therapy. None of these patients received any such treatment nor were they helped through strategies such as behavior management plans. Other than medications, which are of minimal help with most patients who exhibit this behavior, these patients were completely neglected.

## Restrictive Housing and Isolation of the Seriously Mentally Ill

I saw more evidence of the seriously mentally ill being placed in restrictive housing and remaining in isolation in the infirmary during this assessment than previously. Restrictive housing of the mentally ill can lead to exacerbation of mental illness, largely owing to the isolation and lack of appropriate stimulation, and limit access to treatment that can ameliorate mental illness. This puts patients at risk of long-term worsening of their condition and decreases the likelihood of responding to treatment. It is also well-known that placement in restrictive housing is associated with suicide and self-harm, for which the mentally ill are already at elevated risk.

As noted in the opening of the section Assessment and Treatment Planning, 10% of those on the mental health caseload are in restrictive housing and 14% of the most ill are in restrictive housing.

Per the December 2017 MDOC Clinical Contract Compliance Review Report, there are 103 segregation beds at EMCF. 99% of the inmates in segregation are on the mental health caseload. MDOC admits the percentage of mental health caseload inmates housed in segregation is higher statewide than in other correctional departments throughout the country (Cent-Dockery-Elec-035568).

HU-5 smelled strongly of smoke and burned materials. HU-5C is primarily administrative segregation, HU-5A and HU-5B are for long-term maximum custody, and HU-5D is for step down from restrictive housing.

On HU-5C, I saw several cells with windows covered in smoke and fire damage on other windows. There is obvious fishing gear (strings and cloth used by inmates to exchange materials between cells) in several cells. Custody staff simply walked by and did not do anything about this. I spoke briefly with many of the men on this unit and identified several for more in-depth interviews later.

On HU-5B, one cell had an overflowing sink. The inmate in the cell noted that it was hot water and that he had nothing to clean it up with. There had been a broken pipe inside the pipe chase that had not yet been fixed, but he remained inside the cell. I again interviewed a number of the men on this unit and identified several for more in-depth interview.

When I was visiting HU-5, the door to HU-5A was broken and I was unable to enter.

An MHP is assigned to restrictive housing. There is occasional weekend and evening coverage, but weekend coverage is not consistently provided for.  None of the mentally ill EMCF inmates housed in segregation whose records were reviewed for a December 2017 MDOC Clinical Contract Compliance Review Report had evidence of participation in group therapy in their medical records (Cent-ockery-Elec-035569). I saw no evidence of patients receiving any group therapy while in restrictive housing. The same December 2017 report also found that MHPs were not consistently providing 30-day individual contacts with EMCF patients in segregation, as required by their LOC designations (Cent-Dockery-Elec-035571).

MHPs are more reliably conducting weekly rounds in restrictive housing, though the rounds remain cursory and often do not include information in the observations section.  Nursing rounds in segregation were very poor until the last few months when they were being done more reliably.

I reviewed HU-5 logs to determine how long MHPs spent conducting rounds in restrictive housing, which are required weekly.  For MHP visits that have both entry and exit times, I found the following for 9/2/18 to 9/8/18 and 9/23/18 to 9/29/18 in the 4 restrictive housing pods, HU-5A through HU-5D (in minutes):  5, 14, 3, 12, 2, 7, 12, 5, 7.  It is not clear how many patients were seen during each visit, but it is clear that MHPs spend little time in restrictive housing.  Thus, it is not surprising that MHP medical record notes of patient contacts in restrictive reflect cursory contacts.

Kites for medical or mental health care are given to officers, rather than to healthcare professionals. There is no provision for confidential requests for healthcare.

A number of seriously mentally ill patients were placed in restrictive housing in HU-5 (e.g., Patient 3, Patient 4, Patient 7, Patient 9, Patient 18, Patient 27, Patient 29), some even while acutely ill (e.g., Patient 3, Patient 18, Patient 27, Patient 29).  There was never any discussion about contraindications to restrictive housing.  In one case, a psychiatrist wrote of a very psychotic patient (Patient 18) who did not want to return to HU-5 stating he "really has no choice given his long-term [segregation] status -- despite his denial that he should have his status." The psychiatrist even noted, regarding the necessity of returning to HU-5, that "it is unclear how he will react to this."  There was even discussion of use of force to return him to HU-5.  A similar series of events, including a use of force, occurred for another seriously mentally ill patient who did not want to be moved from the infirmary to restrictive housing (Patient 27).  One very mentally ill man (Patient 3) refused to leave the infirmary despite being sprayed with OC three times.  He remained in the infirmary, where he received emergency injections of

haloperidol, and a few days later was transferred to restrictive housing, again the subject of a use of force with OC. He remained psychotic and refused medications in restrictive housing.

Two seriously mentally ill patients (Patient 27, Patient 29) were even placed in restrictive housing on what amounts to suicide precautions, "stripped" of clothing because they were required to return to restrictive housing and every time they were, they harmed themselves; both had psychotic disturbances. There was no discussion of whether restrictive housing was contraindicated. This is unconscionable. Another (Patient 2) was on 15-minute observation after having set a fire and yet was able to cut himself seriously enough to require treatment in an emergency room.

While placement in restrictive housing is isolating and HU-5 is a patently non-therapeutic environment, the infirmary is, in some ways worse. Patients in the infirmary are just as isolated or more so. They have no activities and do not even get out of their cells for yard. Some patients stay there for many months (e.g., Patient 18, Patient 19). This is extremely counter-therapeutic.

I reviewed numerous RVRs involving seriously mentally ill patients (Patient 2, Patient 3, Patient 33, Patient 17, Patient 34, Patient 35, Patient 29) and saw no evidence of mental health participation in the RVR process. In one case, a clearly chronically mentally ill patient (Patient 3), in denial of his mental illness refused placement in HU-3, stating he was not "retarded" or "crazy," and was found guilty of an RVR. In another instance, a clearly psychotic patient (Patient 17) was infracted for writing on the wall of his cell; he lost his privileges for 30 days. Another patient (Patient 35) was found to have over 100 pills in his cell; there was no report of this in the medical record, the note soon thereafter indicated that he was indicated that he was taking his medications. On another occasion, a psychotic patient (Patient 29), who was trying to hang himself was found guilty of an RVR for reportedly taking a swing at staff who were trying to cut off the noose.

I also reviewed segregation records of 18 mentally ill inmates, several of them with severe symptoms (e.g., Patient 3, Patient 18, Patient 29). Only one (Patient 29) had any mention of mental health involvement. In that case, the mental health staff conveyed that he should not return to his living unit because he owed a debt; there was no mention of his serious mental illness.

It is a well-accepted practice throughout corrections for mental health staff to be involved in the disciplinary process to help ensure that patients are not punished for behavior that is the product of mental illness, that any disciplinary sanction is not clinically contraindicated, and that a timely clinical contact follows disciplinary offenses so the underlying behavior can be assessed and treated. These safeguards are not in place at EMCF.

## Hospital-Level Care

EMCF still has no access to hospital-level care.

Two patients I reviewed clearly required hospital-level care (Patient 18, Patient 19). Others (e.g., Patient 17 and Patient 3) likely did as well, but the poor documentation and assessments throughout the records I reviewed make it difficult to say with certainty. Both Patient 18 and Patient 19 were in the infirmary for months without being stabilized. Both received numerous emergency injections but remained grossly psychotic and unstable. Both spent time in restrictive housing because they were too out of control to be on residential mental health units, demonstrating that EMCF lacks an appropriate setting for the most seriously ill.

## Quality Management

Per the contract, there is to be "a program of Continuous Quality Improvement (CQI) Program and Professional Peer Review at each Facility and Satellite Facility, which will include, but not be limited to, audits and medical record review." Peer review may take many forms but typically involves review of clinical work by peers in the same field; for my original report I received only one incomplete peer-review of a psychiatrist, and I have seen no further peer reviews. The contract also specifies that inmate deaths are also to be reviewed. The contract provides that "quality management support services shall be system-wide and shall be in place within six (6) months following commencement of services under this agreement." The contract specifies that these services must be documented. I did not receive any such documentation other than some limited death reviews (see below).

The contract also calls for medical staff to meet "monthly with MDOC representative(s) and staff to discuss issues relevant medical care in the system." Documentation of this meeting is specifically required. I did not receive any such documentation in the CQI data provided.

### MDOC Audits

MDOC contract monitor monthly site visits did not address clinical services. They focused on facility conditions and policy adherence by custody staff. Every month there were numerous facility problems and policy violations noted. Among the policy violations noted included: failure to properly monitor food distribution, failure to assure that windows remained uncovered, failure to lock security doors (including pod doors), failure to halt obvious inmate misconduct, failure to complete proper paperwork upon segregation of inmates, failure to maintain a post, failure to maintain inmate property restrictions, failure to detect and remove contraband (including obvious contraband), failure to assure inmates had their state issue, failure to assure property accompanied inmates upon transfer, failure to update inmate photos, failure to properly store chemicals, failure to complete facility logs, failure to properly screen staff upon entry to the facility, failure to properly complete and review use of force packets, failure to properly conduct counts, failure to properly monitor living unit pods, failure to assure that prisoners are wearing proper uniforms. Note that many of these problems continued month after month. Many of these problems directly put the mentally ill at risk. Covered windows and other forms of failed monitoring prevent proper monitoring of patients' condition (including self-harm). Security failures, the presence of contraband, and failure to halt misconduct create an unduly stressful correctional environment, to which the mentally ill are especially sensitive. The ubiquitous presence of drugs such as "spice" is also very problematic for the mentally ill as they are more sensitive to its psychotogenic properties.

The only robust audit of mental health services was in December 2017. During the week of December 11, 2017, the Mississippi Department of Corrections conducted a yearly clinical contract compliance review at EMCF and five other facilities of "mental health services delivered under the contract between Centurion and the MDOC and to identify areas that may need improvement or support." To complete the compliance review, "input was obtained from facility Wardens . . . Centurion Health Service Administrators; Site Mental Health Directors; and Centurion mental health and psychiatric staff." A total of 182 medical records were audited representing 5.6% of the 3,250 inmates receiving mental health services at the time of the review." The review included documentation audits, process audits and on-

site review of treatment space (Cent-Dockery-Elec-035550).  Many of the results of this audit were cited in the above sections.

Centurion's health care contract with MDOC requires that patients on medications be seen by an MHP every 30 days.  Auditors noted that Centurion's health care contract with MDOC requires that patients with a level of care C designation be seen by an MHP every 45 days.  Auditors noted that "the expectation of the Centurion Regional Office is that patients are to be seen at least every 30 days."  As of December 2017, 70% of EMCF patients with a level of care C designation were not seen by an MHP every 45 days and none were seen every 30 days (Cent-Dockery-Elec-0355563). Accordingly, "significant improvements are required in conducting 30-day clinical contacts with patients at EMCF" (Cent-Dockery-Elec-033567).

Centurion's health care contract with MDOC requires that patients with a level of care D designation be seen by an MHP every 30 days and level of care E every 7 days.  As of December 2017, there was no data reported on this population (Cent-Dockery-Elec-0355563).

According to the December 2017 MDOC Clinical Contract Compliance Review Report, at five of the six MDOC correctional facilities audited patients on the mental health caseload were seen by a psychiatric provider every 90 days.  The one facility that failed to ensure the mental health caseload prisoners were seen every 90 days by a provider was EMCF (Cent-Dockery-Elec-035566) and there was a backlog of 236 EMCF patients for the psychiatrist as of December 11, 2017 and 33% of EMCF patients were not seen by the psychiatric provider at the interval required per the Centurion contract (Cent-Dockery-Elec-035565). The contract requires that patients initially prescribed psychotropic medication be seen every month for three months and then every 90 days.  Routine referrals are supposed to be seen within 14 days.

## 2017 Centurion Audits

Defendants conducted monthly quality improvement studies through 2017.  Each study measured the same health services processes, referred to as indicators in their QI studies.  For mental health, these were the following: (1)  If an EMCF inmate is currently on mental health caseload, there is documentation that mental health staff was notified of placement; (2) non-intake MHP referrals to a psychiatric provider were seen by a provider within 14 days; (3) mental health services completed and documented rounds are conducted at least weekly for mental health caseload patients in segregation; (4) EMCF patients on psychotropic medications are seen every 90 days by a psychiatric provider; and (5) mental health caseload patients are seen in group or an office visit monthly by an MHP.  *See, e.g.,* Cent-Dockery-Elec-035581_020, 035 (Jan. 2017 CQI report).

Defendants established a minimum 90% compliance threshold for each indicator.  *See, e.g.,* Cent-Dockery-Elec-03581_037 (Jan. 2017 CQI report).

A facility CQI committee reviews all QI data monthly and must complete an Improvement Plan for deficient indicators, "listing strategies for improvement, the responsible party, date of next review, and means of measuring improvement." Cent-Dockery-Elec-035581_037 (Jan 2017 CQI report).

The results of these audits are as follows:  If an inmate is currently on the mental health caseload, there is documentation that mental health staff was notified of placement.  Defendants fell below the 90% threshold for every reporting month in 2017.  The studies show the following results for 2017: January: 95% non-compliance; February: 90% non-compliance; March: 40% non-compliance; April: 43% non-

compliance; May: 86% non-compliance; June: 76% non-compliance; July: 82% non-compliance; August and September 2017: no results; October: 32% non-compliance; November: 100% non-compliance; December: 33% non-compliance. *See* Ptx 2818

Defendants' Improvement Plans for this indicator show the following: the February, March, and May Improvement Plans are identical. There are no Improvement Plans for October, November, and December 2017. The January, April, June, and July Improvement Plans fail to list the means to measure improvement. *See Ptx 2818.*

For the indicator, "if in segregation, mental health services completed and documented rounds at least weekly," Defendants measured two elements: "mental health services completed," and "documented rounds at least weekly." The methodology section of the CQI reports does not instruct staff on how to score records where only one of two indicators is met. Also, the CQI reports do not define what "mental health services" are to be measured by this indicator, and there are no instructions to staff in the methodology section of the reports instructing staff what they are to assess as to "mental health services." *See, e.g.,* Cent-Dockery-Elec-035581_032 (Jan. 2017 CQI Report)

The indicator for weekly mental health rounds in segregation is inconsistent with EMCF Policy, which requires three mental health rounds per week in segregation. *Compare* PTX-2058; Cent-Dockery-Elec-000914 (Policy E-09)

As to this indicator, the 2017 monthly reports show that Defendants fell below the 90% threshold for two of the seven months measured. For three months, there was no CQI data, the reports stating "n/a" or not applicable for this indicator. In November 2017, Defendants were 80% non-compliant. No Improvement Plan was listed. In December 2017, they were 100% non-compliant. Again, there was no Improvement Plan listed. *See Ptx 2818.*

Defendants conducted monthly CQI studies in 2017 to measure the following: mental health caseload patients are seen by an MHP in group or an office visit every month. *See* Ptx. 2818. The CQI indicator is inconsistent with EMCF policy, which requires that an MHP monitor all patients suffering serious mental illness every 30 days. PTX 2058, Cent-Dockery-Elec-000972. The CQI studies show that Defendants failed to reach the 90% compliance threshold every month in 2017. The monthly results are as follows: 46% non-compliance in January-April 2017; 32% non-compliance in May 2017; 26% non-compliance in June and July 2017; no results for August or September; 58% non-compliance in October 2017; 57% non-compliance in November 2017; and 54% non-compliance in December 2017. *See* Ptx. 2818*.*

## 2018 Centurion Audits

I received 10 Excel spreadsheets of Centurion quality management data for 2018 (Cent-Posttrial-001809 to Cent-Posttrial-001818). There are eight spreadsheets for January through August 2018. One spreadsheet has a date of 2/8/18 for "dates of contract compliance review." The final spreadsheet appears to show summary data for January through August 2018. No methodology was provided, so interpretation is difficult in some cases. Some measures are transparent and can be interpreted.

The most important thing to note about these audits is that they look only at medical records documentation. They do not address the quality of care or even the content of medical records documentation for mental health patients. They also look at a very narrow range of mental health

documentation. The only elements reviewed were (note that item one was for CMCF only and is not included):

2. Non-intake MHP referrals to psychiatry seen within two weeks
3. Weekly MHP segregation rounds
4. Patients on psychotropic medications seen by a psychiatric prescriber at least every 90 days
5. patients on mental health caseload seen in group or office visit monthly

The Excel spreadsheets tallying the results of these audits specify that "items 4 & 5 will be given compliance rating based on [mental health] sick call & [mental health] caseload log information." As there was no methodology included, it is not clear exactly what this means. If Item 4 is based only on whether there was a sick call for a patient, or based on the log of appointments for mental health staff, this is inadequate, as it is possible that patients may not be seen when there is a sick call; for instance, if there is a lock down or other reason for cancellation. For Item 5, if use of the caseload log is limited to determination of the pool of patients that need to be seen, this is a reasonable methodology provided the caseload log is an accurate measure of those needing services. As there are large numbers for these two items, it appears that this was drawn from an electronic source, likely the electronic health record, but that is not specified.

While these are important benchmarks to track and represent a good starting point, they do not represent an adequate quality management program. Each of them has substantial limitations. For instance, referrals to psychiatry may need to be seen immediately in some cases, not just every 90 days. And the contract requires that those started on psychotropics be seen monthly for three months and then every 90 days; this is a reasonable provision but is not being tracked by Centurion. Urgent and emergent referrals are also not tracked.

Weekly segregation rounds are a solid benchmark but it is important to determine whether the rounds are providing any value beyond just assuring that the person is alive and the cell is clean, which should be a custody function anyway.

While all patients on psychotropic medications should certainly be seen at least every 90 days, the frequency of clinically necessary visits can vary from daily to every 90 days. Assuring that patients who are started on medications or have medication changes are seen more promptly is another important benchmark that is not tracked.

Assuring that patients on the mental health caseload are seen in a group or office visit monthly is virtually worthless. While there may be some patients who require only monthly case management services, as the sole benchmark for MHP treatment, this is entirely inadequate.

Some reports included tracking of medication monitoring, though the requirements for the monitoring were not included so it is difficult to interpret these results. Some reports also include monitoring of those on suicide watch and the presence of treatment plans. Note that for treatment planning, the requirements vary with the level of care. Those with level of care B must have an annual treatment plan, C every six months, D every three months, and E monthly. These are reasonable standards given the acuity definitions. The data are not broken down by level of care. Given that those with higher acuity need more frequent plans, it would be especially concerning if the problems lie mostly with this at-risk population; this should be specifically evaluated.

Most elements of mental health services at EMCF were not measured. There is no tracking of clinician caseloads, diagnostic distribution, levels of care, residential mental health placement, psychotropic medication prescribing, crisis response, mental health grievances, use of force on mental health patients, placement of mental health patients in segregation, completion of groups, provision of individual therapy, involuntary medication, or even suicide and self-harm.  It is not necessarily to track all of these on an ongoing, monthly basis.  Some do require this level of tracking and others should at least be annually assessed. Without knowing important things like the distribution of diagnoses and levels of care in the EMCF population, it is not possible to know what the needs of the patients are. Tracking of response to crises, patient requests for services, residential mental health placement, and suicide and self-harm are standard benchmarks for correctional quality management mental health care.

The spreadsheets for January show the following:

- 19/20 (95%) of non-intake MHP referrals were seen by a psychiatrist within 14 days
- 1/3 (33%) of patients had segregation rounds documented at least weekly (note: records were not selected on the basis of whether patients were in segregation, so this sample is exceedingly small)
- 908/998 (91%) of inmates on psychotropic medications were seen at least every 90 days
- 630/1029 (61%) of patients on the mental health caseload log were seen in a group or office visit at least monthly

The spreadsheets for February show the following:

- 9/12 (75%) of non-intake MHP referrals were seen by a psychiatrist within 14 days
- 0/0 (NA) of patients had segregation rounds documented at least weekly (note: records were not selected on the basis of whether patients were in segregation, so this sample is exceedingly small)
- 937/956 (98%) of inmates on psychotropic medications were seen at least every 90 days
- 699/991 (71%) of patients on the mental health caseload log were seen in a group or office visit at least monthly

The spreadsheets for March show the following:

- 21/24 (88%) of non-intake MHP referrals were seen by a psychiatrist within 14 days
- 10/25 (40%) of patients had segregation rounds documented at least weekly
- 912/923 (99%) of inmates on psychotropic medications were seen at least every 90 days
- 946/952 (99%) of patients on the mental health caseload log were seen in a group or office visit at least monthly

The reports from April were much more difficult to interpret.

Spreadsheets for April show the following:

- 18/18 (100%) of non-intake MHP referrals were seen by a psychiatrist within 14 days
- 2/10 (10%) had timely treatment plans
- 20/20 (100%) had psychotropic monitoring labs per protocols
- 9/9(100%) had AIMS testing per protocols

- 14/19 (74%) of those on suicide or psychiatric observation were seen daily
- 0/10 (0%) of those on suicide watch had documentation of their status every 15 minutes
- 0/19 (0%) of those on suicide or psychiatric observation had crisis intervention plans
- 0/6 (0%) of those on suicide or psychiatric observation had a treatment plan revised or reviewed within 72 hours

Spreadsheets for May show the following (no raw data was included for several measures, only percentages, so it is unclear how meaningful these results are):

- 100% of non-intake MHP referrals were seen by a psychiatrist within 14 days
- 838/930 (90%) of those on psychotropic medications were seen at least every 90 days
- 899/957 of patients on the mental health caseload log were seen in a group or office visit at least monthly
- There are two measures that do not have any clear definition or source.  In a table titled, "Evaluation," the figures were 70% for "mental health" and 18% for "suicide or psych obs"

Spreadsheets for June had limited mental health data and show the following:

- 850/861 (99%) of those on psychotropic medications were seen at least every 90 days
- 919/943 (97%) of non-intake MHP referrals were seen by a psychiatrist within 14 days

Spreadsheets for July show the following (no raw data was included for several measures, only percentages, so it is unclear how meaningful these results are):

- 810/817 (99%) of those on psychotropic medications were seen at least every 90 days
- 872/920 (95%) of non-intake MHP referrals were seen by a psychiatrist within 14 days
- 0/0 (NA) of non-intake MHP referrals were seen by a psychiatrist within 14 days (none of the 20 records reviewed included a referral)
- 0/20 (0%) had timely treatment plans
- 7/7 (100%) had psychotropic monitoring labs per protocols
- 11/12 (92%) had AIMS testing per protocols
- 19/19 (100%) of those on suicide or psychiatric observation were seen daily
- 0/19 (0%) of those on suicide watch had documentation of their status at least every 15 minutes
- 3/19 (16%) of those on suicide or psychiatric observation had crisis intervention plans
- 0/19 (0%) of those on suicide or psychiatric observation had a treatment plan revised or reviewed within 72 hours
- 17/20 (85%) of those in segregation had weekly mental health rounds documented
- 0/20 (0%) of those in segregation more than 30 days had a current mental health assessment
- 0/20 (0%) of those in segregation more than 90 days had a current mental health assessment
- 17/20 (85%) of those in segregation had daily nursing rounds

Spreadsheets for August had limited mental health data and show the following:

- 790/798 (99%) of those on psychotropic medications were seen at least every 90 days
- 991/1112 (98%) of non-intake MHP referrals were seen by a psychiatrist within 14 days

Some of these results must be interpreted in the context of other findings. For instance, a different measure, reported only in February 2018, found that only 67% of those seen at intake by EMCF had proper referrals for medical, dental, or mental health.  Thus, the fact that those referred were reliably seen within 14 days by a psychiatrist when referred excludes cases that were not properly referred, giving a skewed sense of the effectiveness of psychiatric referral to and follow-up from intake.

These results generally corroborate the medical records reviews I conducted and summarized in preceding sections. As I observed in the medical records, the audits found that MARs were often incomplete (a small minority until July 2018 when it increased to 80%) and that nursing rounds in segregation were often not conducted.

Patients on psychotropic medications are being seen regularly by psychiatric prescribers and psychiatric prescribers are responding promptly to referrals from MHPs (with some exceptions, e.g., Patient 20). I found more problems with medication monitoring than indicated above; this is likely because the associated protocols are permissive and do not require important components of medication monitoring such as obtaining baseline laboratory examinations and follow-up of abnormal results.  AIMS testing was being done regularly as shown by their results and consistent with my review.

15-minute checks for suicide watch are not being done at all reliably. Assessments and clinician visits with those on suicide and psychiatric observation are spotty but these patients are being seen, though the only clinicians providing any meaningful contact are the psychiatric prescribers who do not see the patients daily.  There were numerous instances where patients went several days without being seen.

Recently, segregation rounds are being done most of the time by both nursing and mental health. Mental health improved earlier this year but nursing improved only the last months, so it is unclear if this will be sustained. Mental health staff are not doing periodic assessments (30 and 90 day) of those in long-term segregation as required by policy.

MHPs are more reliably having contact with patients every 30 days.  However, as documented above, these contacts are of almost no clinical value and amount to brief contacts (likely seconds to minutes) rather than any type of treatment.

Treatment planning is virtually nonexistent. Crisis plans are not being done; I found only two in the medical records and they were not implemented.  Treatment plans remain generic.  My review of Centurion data showed that only 62% of caseload patients had treatment plans and most are outdated.

## Death Reviews

In the following, I do not comment on the adequacy of the custody or medical responses as those are in the purview of other experts.  A number of these is mention "spice" (a synthetic cannabinoid) use as a cause of death, but there was only one case where any support for actual use was in the death review. Further, there was no discussion about how "spice" use may have contributed to death.  Lastly, and most importantly, if it were actually true that "spice" use was contributory to so many deaths, there clearly should be a corrective action plan to address the problem of spice use.  As noted above, the mentally ill are particularly susceptible to the psychotogenic effects of "spice," which puts them at risk of other untoward outcomes such as suicide and failure to seek proper medical attention. They are also at high risk of use.  Given the medical, mental health, and custodial aspects of this problem, all have a role in the corrective action.

It is also highly concerning that in one case there was a very high level of a psychotropic medication in the deceased's post-mortem blood sample and this was not even discussed.

None of these death reviews were adequate.

Death Review 1

The post-mortem olanzapine level was 6-15 times therapeutic.  This was not discussed.  The review mentioned spice as possible cause of death, but there is no discussion of what evidence there was for spice use (there were no synthetic cannabinoids noted on the toxicology report), how he got it, or how it contributed to his death.

This case called for further review of the above.  Based on the current findings, corrective action with respect to spice use and availability on the units and elevated olanzapine level were indicated.

Death Review 2

The review mentioned spice as possible cause of death, but there is no discussion of what evidence there was for spice use (there were no synthetic cannabinoids noted on the toxicology report), how he got it, or how it contributed to his death.

This case called for further review of the above.  Based on the current findings, corrective action with respect to spice use and availability on the units was indicated.

Death Review 3

The review mentioned spice as possible cause of death, but there is no discussion of what evidence there was for spice use (there were no synthetic cannabinoids noted on the toxicology report), how he got it, or how it contributed to his choking death.

This case called for further review of the above.  Based on the current findings, corrective action with respect to spice use and availability on the units was indicated.

Death Review 4

The review mentioned spice as possible cause of death, but there is no discussion of what evidence there was for spice use (there were no synthetic cannabinoids noted on the toxicology report), how he got it, or how it contributed to his drowning death.  Of note, there were no toxicology results so whether other drugs may have contributed to death is unknown; it is not clear why there were no such results, which should have been addressed in the review.

This case called for further review of the above.  Based on the current findings, corrective action with respect to spice use and availability on the units was indicated.

Death Review 5

The review mentioned spice as possible cause of death, but there is no discussion of how he got spice or how it contributed to his choking death.

This case called for further review of the above.  Based on the current findings, corrective action with respect to spice use and availability on the units was indicated.

## Mental Health Staffing

Mental health staffing at EMCF is insufficient to provide adequate services, which has been recognized by MDOC.  During the December 2017 MDOC Clinical Contract Compliance Review Report, Warden Shaw "added that additional mental health staff may be needed in order to accomplish the mental health mission at EMCF." (Cent-Dockery-035552). The report admits that not every Unit 3 patient is able to attend groups due to understaffing (Cent-Dockery-Elec-035577).  Even more broadly, also in reference to HU-3 (the EMCF residential mental health unit), the MDOC auditors noted that "[s]taffing was not sufficient to ensure that all patients have access to intensive services including individual and group therapy due to vacancies and the number of MHPs allocated to the facility" (Cent-Dockery-Elec-035575).

The December 2017 MDOC Clinical Contract Compliance Review Report states, "[g]iven the plan to open a new Acute Mental Health Unit and to increase programming in Unit 3 at EMCF, staffing levels require further review as there is an expected increase in the number of LOC D's and LOC E's at this facility" (Cent-Dockery-Elec-035556) and includes a recommendation that "[o]ngoing analysis of the mental health staffing at EMCF is needed as part of the planning for the expansion of inpatient/residential mental health services at that site" (Cent-Dockery-Elec-035557).  Presumably, these were referring to the ACU.  There was no evidence of any additional staffing being provided or such analysis being conducted.

There is no director of mental health at EMCF.  A Centurion central office psychologist is filling in in this capacity and supervises all the Centurion MHPs.

The psychiatrist, who had only started at EMCF a few months before, reported that in addition to his full-time position, there were 3.5 to 3.75 PNP positions. He reported that all were assigned geographically to different units with the psychiatrist covering the ACU an infirmary as well as another unit. However, record review demonstrated that patients were frequently seen by several different psychiatric prescribers. This lack of continuity undermines quality of care; this is worsened by the fact that psychiatric prescriber notes virtually never indicate a plan for potential future changes so that there is no consistent direction to psychotropic prescribing in those cases where different prescribers treat the same patient.

Review of the staffing rosters is similar to this report, though the PNP staffing was reported to be 3.25 positions.  Monthly provider schedules from August and September 2018 are consistent with the staffing rosters. The schedules show some evening and weekend coverage by the PNPs, but it is hit or miss. Recently, about half of weekend days and a little more than half of evenings have a PNP on duty.

There are six mental health professional positions and the staffing from September 2018 shows 6.4 filled. The MHPs work day shift on weekdays. There are also two activity therapists and both positions are filled; their schedule was not reported. The mental health provider schedules show that each of the MHPs are assigned to units, as reported by the psychiatrist. There is one assigned to each of the following units: HU-1, HU-2, HU-4, HU-5, and HU-6.  There are two assigned to HU-3, again consistent with the report psychiatrist. The ACU is not noted on the schedule but the MHP covering HU-3C he reportedly also covers the ACU.  That leaves the other HU-3 MHP three pods to cover.

The psychiatrist also told me that an additional staff member was needed in order to properly run the ACU. The MHP assigned to HU-3C is also responsible for the ACU.  This is a completely unreasonable

caseload for one person.  There is absolutely no way that a single MHP can provide adequate services to all of the patients on HU-3C, who are the most acute other than those in the infirmary, and on the ACU where the most intensive services are supposed to be offered.

Similarly, there is only one MHP assigned to serve both HU-3A and HU-3B. This is an even more unreasonable caseload.

There is one secretary for all mental health staff.

MTC staff provides some case managers who do some groups but do not conduct treatment groups. There was no evidence of those patients in HU-3 receiving such services in the medical records I reviewed. The psychiatrist was uncertain if they provided any services on HU-3.

Centurion quality management data on employee training shows that those employees reviewed only had required training about 50% of the time (e.g., June 2018).

## Case Loads

Per the December 2017 MDOC Clinical Contract Compliance Review Report, the average daily population at EMCF in 2017 was 1234, a 6.4% increase over the 2016 ADP of 1160.  In 2017, 1099 inmates, or 89% of the total population were on the mental health caseload, a 4% increase over 2016 statistics.  In 2017, 96% of the inmates on the mental health caseload were prescribed psychotropic medications (Cent-Dokery-Elec-035559).

The December 2017 MDOC Clinical Contract Compliance Review Report found that the average caseload for mental health professionals (MHPs) at EMCF was 177:1. Cent-Dockery-Elec-035556.  This caseload average does not include "the required interventions based on the identified LOC codes."

The same report showed that as of December 2017, 40 inmates held at EMCF were designated either LOC-D or LOC-E, the designations used for the most seriously mentally ill inmates in MDOC custody. "According to policy, those with LOC-D and LOC-E codes should be housed at EMCF whenever possible. Reviewers were informed by on-site staff that due to a psychiatrist vacancy at EMCF, MDOC leadership directed that these patients were to be rerouted to MSP" (Cent-Dockery-Elec-0355560).  Presumably, this is no longer necessary with the psychiatrist position now filled.

Review of the 10-15-18 Mental Health Caseload Log reveals the following.  For the two MHPs primarily serving HU-3, Giles and Cameron, their caseloads on HU-3 are 112 and 104 respectively.  Another 14 patients were assigned to other MHPs but this may be an error in the data related to MHP coverage or patient transfers.  Giles also serves the ACU and another 7 patients were assigned to him there. Cameron had one assigned as well, perhaps also an error in the data.  While this number is somewhat lower than the average MHP caseload, these are the units designated to house the seriously mentally ill. These are unreasonably high caseloads.  Just an hour monthly meeting with each patient would take over half the available time.  There is simply no way for an MHP with these caseloads to provide individual and group therapy, crisis response, intake, assessment, treatment team planning, and case management services to this number of patients.  For such settings, caseloads should be on the order of 1:30.

Psychiatric coverage for HU-3 is also unreasonable.  The one EMCF psychiatrist has 189 patients on HU-3 (PNPs are reported to have another 9, also perhaps a data error) and another 8 on the ACU.  This does

not include responsibilities for the infirmary (where the psychiatrist frequently sees patients), administration, or clinical oversight.  While this is a reasonable outpatient caseload (even up to 300 would be reasonable), it is not a reasonable residential mental health unit caseload where many patients require near or beyond hospital-level services.  About 1:100 is a reasonable caseload.

## Recommendations

The general recommendations of improvements to bring EMCF mental health services to the point where they do not present a risk of serious harm to the patients it serves map onto the areas of deficiency laid out in the Executive Summary and addressed in the body of this supplemental report, my previous report, and in testimony.  The following list is not meant to be exhaustive, but rather points out high priority areas that must be addressed via effective policies implemented by adequate staff whose performance is subject to a comprehensive quality improvement system:

1. There must be an adequate intake process.  While EMCF does not conduct intakes for patients new to MDOC, it is the identified site for treating the seriously mentally ill.  As such, there should be a presumption that patients coming into EMCF may present emergent or urgent mental health needs.  While it is reasonable for nurses to conduct screenings of those few patients coming into EMCF without a current identified mental health problem (i.e., level of care A), the nurse screening must be more robust than the current extremely limited intake.  It must be sufficient to detect potential routine needs in the level of care A population but, more importantly, must be able to detect potential urgent or emergent needs as mental health staff may not be able to see patients when they enter the facility.  Mental health staff should see all patients identified as having emergent needs within four hours and urgent needs within one working day.  Mental health staff should also screen all patients level of care B and above.  This screening should include a record review in order to determine if a thorough assessment has been done.  It must also be sufficient to detect any significant change in patients' clinical status and detect any urgent or emergency problems the nurse screening may have missed.  The intake screening process must also include ready access to psychiatric prescribers in case emergent medications are needed.  Routine referral to psychiatry should be seen within two weeks.

2. All patients receiving mental health services need a thorough assessment that consists of, at a minimum, a chief complaint, history of present illness (including current problems and treatment), pertinent medical history, psychiatric history (including hospitalizations, treatment received, and response to treatment), substance abuse history, social and family history (including a developmental and trauma history), laboratory studies, results of any specialized testing, a mental status examination, a diagnosis, and a case formulation (discussion of the patient's problems and their impact).  Treatment plans need to be based on the assessment and consist of a list of problems with associated long-term goals, short-term goals with objective targets of treatment (essentially, the immediate steps towards the long-term goals), specific interventions for achieving each short-term goal (including the assigned staff member and frequency of intervention), and a medication plan.  For patients in specialized units, such as the ACU, discharge criteria should also be included.

3. There must be meaningful and available crisis response.  Prior to any planned use of force on a mentally ill inmate, mental health staff must make a reasonable attempt at de-escalation.  There

must be more availability of after-hours crisis response, which could include referral to off-site services.  There must also be crisis plans for patients in serious crisis or having repeated crises, to include prompt and regular follow-up to assure resolution of the crisis.

4.  Limit the placement of seriously mentally ill in restrictive settings.  For those few patients who need more restrictive settings and do not qualify for hospital-level services, services (including group and/or individual therapy) must be delivered in sufficient dosages to those in restrictive settings.  Other systems around the country have developed treatment units run jointly by custodial and mental health staff that have proven to be effective in treating those patients who are too ill to be placed in segregation, but whose behavior poses a security risk.  Development of such a unit at EMCF should be a priority.

5.  There must be a substantial increase in the availability of group and individual therapy.  It is well-established that medications alone are insufficient to treat the seriously mentally ill.  These treatments should emphasize structured treatment, including psychosocial rehabilitation for the seriously mentally ill (primarily groups), group and individual treatment of mood disorders, and trauma-informed group and individual treatment of patients with recurrent self-harm.  Treatments should be evidence-based and developed based on an assessment of the needs of the overall EMCF population.

6.  Establish stricter monitoring and/or standards for psychiatric prescribing are needed, including medication dosing, medication monitoring, and appropriate prescription of antipsychotics.  There must also be a due process procedure developed for long-term involuntary antipsychotics.

7.  Improve the suicide prevention program.  There must be provision for random 15-minute checks as well as 1:1 monitoring.  The infirmary cells used for watch must be fully suicide resistant; vision into cells must be assured.  HU-3 and HU-5 must be made more suicide resistant.  Means restriction must be assured; at the same time, only those means needed to be limited based on a suicide risk assessment should be used for a particular patient.  Adequate suicide risk assessments must be conducted and treatment and crisis plans based on these assessments.

8.  Develop mechanisms for mental health to collaborate with custody on placement.  Absent unusual circumstances, no mentally ill patient should be removed from a mental health unit without mental health authorization and no inmate should be placed in a mental health unit without an assessment of need by mental health staff.  This may necessitate the development of mental health services in more restrictive settings; if so, these settings should provide for 10 hours of structured treatment and programming and 10 hours of unstructured out of cell time weekly.

9.  Mental health staff must be meaningfully involved in de-escalation efforts before planned uses of force with the seriously mentally ill. Mental health staff must cease opining at the time of crisis that a behavior is not the result of mental illness and instead must render opinions regarding whether restrictive housing or a particular form of use of force is contraindicated.

10. There must be access to hospital-level care for the seriously mentally ill, at least for those meeting civil commitment criteria.

11. Quality management must be much more robust.  It must address:  characterization of the population and its clinical needs, access to care, caseloads, patient encounters (treatment dosage), psychotropic medication prescribing practices, involuntary medications, use of force on the mentally ill, suicide and self-harm, length of stay, timeliness of response to referrals and

patient requests for services, completion and adequacy of essential functions (e.g., intake, assessment, treatment planning, crisis response and follow-up), and clinical oversight that is more than just peer review.

12. There must be a staffing plan that is based on a careful analysis of the needs of the patient population.

13. Residential mental health units must be developed into more therapeutic settings with more structured activities and greater staff presence on the units.

14. Mental health staff should be involved in the disciplinary process to help ensure that patients are not punished for behavior that is the product of mental illness, that any disciplinary sanction is not clinically contraindicated, and that a timely clinical contact follows disciplinary offenses so the underlying behavior can be assessed and treated.

Respectfully submitted,

Bruce C. Gage, M.D.

# APPENDIX   1

# APPENDIX 1

**MEDICAL RECORD REVIEWS**

The following reviews include follow-ups of patients I previously reviewed as well as new patients. For those not at EMCF, I conducted brief reviews. While I provide commentary in the body of these reviews, at the end of each review I briefly summarize the findings; these are placed in italics to make them easy to identify.

**Patient 1**

This was a case I previously reviewed and asked for subsequent records to follow the clinical course in progress.

Records are complete from 7/31/18 to 9/18/18.  There are older scanned documents from 2017, but there are no associated progress notes so it is not possible to fully summarize his care during this period.

He had a 7/31/18 medical intake at CMCF.  The 8/2/18 mental health intake noted his mental health history, including being at EMCF and having a diagnosis of ADHD.  Past medications included Adderall, Depakote, and Zyprexa.  The LPN screening was otherwise negative and he was directed to general population with a routine psychiatric referral.  He was seen by a psychiatrist the following day.  He denied symptoms and no evidence of mental illness was noted in the body of the text, though the note also reported psychosis and bipolar disorder.  No medications were started and he was made level of care A.  He remained level of care A at end of records.

Labs:  Lipids, CBC, TSH, CMP within normal limits 9/14/18.

*This patient clearly did much better at CMCF than he had while at EMCF, based on my previous review of his record.*

**Patient 2**

Records are from 1/3/18 to 9/23/18.

As the record opens, he was at SMCI.  He had a diagnosis of schizophrenia and medical diagnoses related to self-harm, including foreign body ingestion.  He was also noted to have "hostile, threatening behavior towards staff" as a problem.  His only psychotropic medication was Remeron, an antidepressant.

He cut himself repeatedly, sometimes severely.  He was last released from suicide watch on 2/5/18.  While there was no note of this from SMCI, the intake EMCF PNP note reported that he cut himself 2/12/18 and 2/13/18.

He was transferred to EMCF on 2/13/18.  The nursing intake note simply responds "yes" to the question "current medical, mental health or dental complaint (including suicidal ideations)."  There was no report of his recent self-harm or suicide precautions.

He had an MHP intake assessment that day.  The diagnosis at that time was changed to bipolar disorder. The note says he had a "mood disturbance" but the mental status examination shows no evidence of

mood disorder or history consistent with bipolar disorder.  The note said he both did and did not have hallucinations.  It stated that he had suicidal ideation but there was no suicide risk assessment and no mention of having been on suicide watch within the last 30 days.  He was still on Remeron and also on Benadryl.

A psychiatric nurse practitioner (PNP) note from that same day included a diagnosis of schizophrenia and said he was not suicidal and denied hallucinations.  It reported on his recent cutting.  He was noted to be "on long-term segregation."  There were no findings consistent with schizophrenia.  Despite this, he was started on Zyprexa 10 mg (an antipsychotic started above the recommended starting dose) and Depakote 1500 mg (a mood stabilizer started above the recommended starting dose) and continued on Benadryl.  There was no mention of Remeron.  He was ordered labs for 3 weeks later.  An AIMS was scored as 0.  He was made level of care D and was to go to segregation.  Despite being level of care D, there was no mental health assessment of whether placement in restrictive housing was contraindicated.

The following day he was placed on suicide watch in the infirmary after expressing suicidal ideation and complaining of command hallucinations to harm himself.

There were no further notes until a nursing note 2/16/18.  He was also seen that day by the  PNP and changed to observation status.

He was not seen again by mental health until a PNP note from 2/18/18.  He was then seen 2/19/18, and 2/20/18.  He was released from observation because he was no longer suicidal.  He was returned to restrictive housing.

There was no nursing note from the infirmary until a 2/20/18 infirmary discharge note.

He was next seen by a PNP 2/22/18 and had refused his meds because they were "put under the door" instead of through the tray slot.  He agreed to take them and was taken to the clinic.

On 2/24/18 per an RN note, he was given an injection of haloperidol (an antipsychotic) and Benadryl after being "distrupted on unit [sic]" and putting a string around his neck.  A PNP had been called and gave the order.  No psychotic or other symptoms were documented that would be an indication for an involuntary antipsychotic.  The PNP also asked that he be placed in the infirmary on watch but was told there were no beds.  The PNP then asked for an alternative location for observation but the captain said there were not enough staff to conduct a watch.  The PNP then instructed the RN to "tell security to monitor inmate on unit."  As he was in restrictive housing, it is unclear what this meant beyond remaining on the unit.  There were no documented checks by either custodial or health care staff in his record.  Later that day, he cut himself, though not seriously.

On 2/26/18, a PNP note appears to indicate a "mood disorder questionnaire" was done or placed in the record.  The results were never discussed in the record.

On 2/27/18, he was given another injection of haloperidol and Benadryl after threatening to open an old wound.  The RN note again documents a PNP order but no symptoms indicating an antipsychotic was warranted.  An MHP note that same day noted that he was agitated and irritable but had appropriate affect and no psychotic symptoms.

A PNP saw him the following day and found only irritability but no other symptoms of mental illness. The PNP noted he had been given haloperidol for "danger to self," which is not an indication for an antipsychotic. They discussed placement in the acute care unit (ACU), but the PNP noted that would "require the approval of several staff members," though does not specify who. He has also continued to refuse medications because being given under the door rather than through the tray flap, which the PNP discussed with the health services administrator, who reportedly was going to address the need to give them through the tray flap.

He was transferred to the ACU on 3/6/18. The RN note reported on multiple scars on several places on his body from self-harm and that he reported auditory hallucinations to harm himself and officers and that he saw "spirits," but it did not bother him. There is a nursing care plan with goals related to changing communication with the intent to give queues "…as to proper ways to communicate that he is upset or needs something" and coping, though no actual intervention other than a "quiet environment" is noted.

On 3/7/18, an activity therapy assessment was reported in the record. There was no discussion of the results or associated needs.

A mental health treatment plan from that day is devoid of individualized interventions and merely says he will be in groups. It notes medication adherence as a problem, but there is nothing to address this in the plan.

He attended the following groups on the ACU:

- Round Table Discussion 3/8/18 with objectives "to discuss what subject they need to work on; what do we live life for or who; social support; employment; independence, go to college to learn new trade, manage and make money."
- Played Uno 3/8/18. He reportedly cooperated with other patients.
- Planning for a Better Life module 1 on 3/8/18.
- Social Skills 3/8/18 – played board games with a staff and another patient. Exhibited no deficits in social skills.
- Social Skills 3/12/18 – played bingo.
- Daily Activities 3/14/18 – played bingo.
- Daily Activities 3/16/18 – played games.
- Planning for a Better Life module 3 on 3/16/18.
- Planning for a Better Life module 3 on 3/19/18. [note: same goals as 3/16/18.]

On 3/8/18, a PNP changed Zyprexa to risperidone due to increased appetite on Zyprexa, a common side effect. No symptoms of mental illness were noted. The patient also wanted a job, but other inmate workers were doing jobs on the unit.

A 3/8/18 MHP note reported that it was "unclear to me why he has been placed on this unit." The goal was "to offer needed intervention to allow him to sustain placement on the acute care unit." The MHP conducted a Suicide Potential Screening that was entirely negative, including stating that he had no prior suicide attempts (though it specifically asked that wrists be checked and he had a history of cutting his wrists) and no family history of suicide attempts, though these had been previously reported in the record. The mental status examination was completely within normal limits.

On 3/12/18, he threatened to hang himself and reported that he felt he had been lied to regarding the ACU, but the reason was not documented. The unit nurse saw him; he denied suicidal ideation and the plan was for custody to "watch inmate closely."

A PNP saw him the next day and reported he was not suicidal but upset about the noise in his cell. There was no mention of being lied to. An elevated valproic acid level was not discussed in the record and he remained on the same dose.

During MHP rounds 3/13/18, the patient complained of having to come out in handcuffs and having little out of cell time. His cell was "immaculate." He again asked for work and was told he might get work if he continued to do well.

That same day in a treatment team meeting (documented by a PNP), he voiced the same concerns and was told that he could come out of his cell without restraints on the ACU. No needs or patient-specific interventions were mentioned.

On 3/15/18, the treatment team met with him again because he was agitated due to the ACU being locked down after an altercation between two patients. He complained of group punishment and being punished without having done anything wrong. He was told it was not punishment but did not understand, though he agreed to stay on the ACU. The note reported on increased insight and judgement but there were no specifics.

On 3/19/18, he cut himself after a broom and mop he had been keeping in his cell were taken away. The RN who treated the wound also noted that he had a bottle with urine and blood and spit out a razor blade. He talked about having had "a rough childhood." This is the first of any sort of historical discussion that might bear on his repeated self-harm.

A PNP note that same day speaks to his being disruptive and harming himself and that he "remained disruptive to the unit. … His ongoing disruptive behavior is negatively impacting programming and the therapeutic milieu that is being provided. … These behaviors no longer meet admission criteria for the ACU." He was ordered to the infirmary on suicide observation. However, he was not moved by custody. On 3/20/18, he was to be moved but resisted and threatened to harm himself and throw blood on staff; he was placed in a restraint chair. The discharge summary speaks to him needing a more structured environment, which makes no sense as the ACU is the only unit with any degree of structure in EMCF. Perhaps what was meant is more restriction, which is what happened.

He was moved to the infirmary. While in the infirmary he was able to secure 33-inch long piece of rebar and used it to put a hole through the wall between his cell and a neighboring peer's cell. The associated Extraordinary Occurrence Report mentioned nothing about how he was able to get this piece of rebar while in the infirmary on observation.

He was then taken to the ACU for temporary placement. A nurse called the on-call mental health professional to advise them of the events that transpired. There is no indication of direct mental health staff involvement.

On 3/21/18, he kicked a peer who was reportedly shaking his penis at him. A PNP note that day indicated that this occurred in medical and that a neighbor was masturbating. The patient also reportedly made a hole through the wall from his cell to the next cell but it was not known how. He was

placed in segregation where he destroyed his bed.  He was given an involuntary injection of haloperidol despite having "shut down" when confronted with his behavioral problems.  There was no evidence of mania or psychosis.  He was placed in restraints by custody.  He calmed and was released later that day. Restraint may have been indicated, but there was no evidence of an indication for haloperidol. Risperidone was discontinued.  An AIMS was noted as 0; it is unclear how an AIMS could have been completed under such circumstances.

He escalated 3/23/18 and was again placed in restraints after reportedly tearing a sink off a wall.  The patient said he had done that the previous day.  He was told he would receive involuntary injections for such behavior, though again no psychosis or mania or other indications for antipsychotics were noted. He was also restarted on Zyprexa.

On 4/17/18, Depakote was discontinued, reportedly due to non-adherence.

At the patient's request, not in response to assessment, a PNP restarted him on Depakote 4/24/18, this time at 2500 mg, way above recommended, with no consideration of having had an above normal serum level on a lower dose.  Labs were ordered for a month hence.  The Zyprexa was also discontinued at his request.  He cut himself soon thereafter, per a PNP, this was reportedly because he was not given coffee by custody after it was promised.

He developed nausea and vomiting 4/26/18.  He was given Phenergan for nausea, but no consideration of the impact of Depakote was considered.  A serum level was not obtained until 7/17/18, at which point he had been non-adherent for some time as demonstrated by an undetectable serum level (the MAR shows him as largely adherent and are clearly inaccurate).  All medications were discontinued soon thereafter.

On 4/26/18, he was also subject to a planned use of force when he was hanging his arm out the tray slot on HU-5B.  An MHP came and the use of force documentation reported that the MHP determined "that the offender's actions were behavioral not mental." The associated MHP note reported that he was upset about not having gotten his anti-viral medication.  It went on to say that "his concerns would be forwarded to the [director of nursing]. Use of force was used due to client refusing to close his tray slot and he was brought to medical for assessment."  There was no discussion of how mental illness was determined not to play a role in his behavior. There was also no discussion of efforts made to de-escalate the patient. He was sprayed with OC and taken to the medical department. He was reportedly "combative after making threatening comments towards [the captain]" and was taken to the floor, sustaining "minor injuries to his facial area" which the medical record showed were a laceration near his left eye and to cuts on his bottom lip where his teeth cut through. He was returned to restrictive housing.  Review of the associated videos shows that the MHP visited the cell front for only about 30 seconds, not enough to make any meaningful evaluation, let alone engage in de-escalation.  The patient complained of feeling sick, consistent with the above reports of nausea.

That same day, an MHP mentions developing a behavior management plan.  One was never developed.

On 4/30/18, he was again the subject of a spontaneous use of force. Per the associated EOR, he refused to close his tray slot and also pulled a custody staff member's arm into his cell through the tray slot. Per the associated EOR, he was sprayed with OC and taken to medical for wound care and decontamination, though there is no documentation of this in the medical record.

This pattern of periodic self-harm, sometimes serious lacerations, and behavioral disruption continues until the end of the record with no evidence of any meaningful intervention, only reaction.  If anything, his behavior worsens.

On 5/15/18, he was the subject of a spontaneous use of force after he cut himself. He was bleeding from his face and arms and the use of force report indicated that he had a "cup of blood threatening to dash it on security staff."  He was taken to medical and placed in a restraint chair. The associated PNP note indicated that custody staff was asking for "approval to continue the restraint chair for another 4 hours; however, the Centurion staff does not have policy/authorization to utilize restraints. Will give Haldol lactate/Benadryl and monitor response to the medications. The goal is that the medications will calm his agitation. Of great concerns [sic], he is at high risk of harm to self/others due to his reports [sic] of recent use of spice."

He was the subject of a planned use of force on 5/21/18, again after refusing to close his tray slot.  An MHP came to see him and per the use of force documentation (there was no MHP note), contacted the medical provider for advice; he was restrained and sent to medical for evaluation. There, he was placed in a restraint chair, reportedly at the recommendation of a medical provider.  The PNP note from that date indicated that the patient was asking to be placed in the restraint chair. It is not clear from the medical record what actually happened.  The associated video only documents his placement in the restraint chair, at which time he was calm and cooperative so there was no reason to restrain him.

There is a PUOF video for 5/26/2018, EMCF-PUOF-18-0076-EMCF-18-0307. There is a date discrepancy between the video and the accompanying written EOR. The EOR is dated 4/26/2018. On video V. 0044, mental health staff speaks with him at 00:29. Mental health staff walks away at 00:46. On video V. 0018, a possible mental health staff member speaks with him.

After a self-inflicted 6 cm laceration, he was sent to the emergency room on 5/29/18.

He again refused to close his tray slot on 6/17/18. He was again sprayed with OC, restrained, and decontaminated in the medical department. No MHP was involved in this planned use of force.

On 6/18/18, he reportedly tore a sink and toilet from the wall in restrictive housing. He was removed from his cell and placed in restraint chair in the intake area.  No MHP was involved in this Sunday evening planned use of force; none were on grounds.  The associated video (EMCF-PUOF-18-0105-EMCF-18-0419) shows him cuffing up and cooperating with medical care, yet he is then placed in a restraint chair, with which he is also cooperative.

He was the subject of another planned use of force on 7/30/18. He would again not close his tray slot. Prior to the MHP arriving, he began to cut himself with a razor blade. The MHP reportedly spoke with the patient and determined that the behavior was "behavioral not mental." He was sprayed with OC and later placed in a restraint chair.  The associated MHP note indicated that he had "cut his arm just enough to bleed and stated he would flip blood on anybody that tried to get him. He stated that he wanted to move to another facility. He was tired of being tortured by officers. He threatened the officers that he would kill them." The MHP offered that he was not suicidal "even though he cut himself." How this was determined is not clear. The plan was: "this issue was negative behavior toward the officers. Client was homicidal [sic], not suicidal."  Review of the associated videos (EMCF-PUOF-18-0120-EMCF-18-0499-SEC-PostTrial-018301-Video) shows that the MHP visited the cell front for only

about 30 seconds, not enough to make any meaningful evaluation, let alone engage in de-escalation. After the use of OC, he does receive some counseling while waiting in medical and pending restraint chair placement.

On 8/3/18, he was the subject of a spontaneous use of force for reportedly trying to destroy his cell door.  The video begins after the use of OC and shows fire damage to the door, burned items outside the cell, and smoke in the cell.  After removal from the cell, the patient is retching, hyperventilating, and falls to the floor several times. Back in the restrictive housing unit, outside of his cell, he repeatedly shouts, "Kill me" and he bangs his head on the wall once while restrained by officers. He was reportedly placed back in the cell on 15-minute observation. Yet later that day, he was once again sent to the emergency room after discovery of self-inflicted lacerations to his abdomen and left arm.

On 8/25/18, he was able to take a custody staff members OC canister. While he threatened staff, they left the unit and he then went around and appeared to spray  other inmates. There is a video for 8/29/18, EMCF-PUOF-18-0134-EMCF-18-0559, MAH02074.mp4; no mental health staff are identified in the video. A second video for the same PUOF, MAH02077.mp4, at 00:40 a lieutenant states that a verbal intervention was attempted once, and that mental health staff was notified and they say his acts are "behavioral not mental."  There is no MH present.

On 8/30/18, he set a fire outside his restrictive housing unit door and was then kicking the door. He had also cut himself. He was the subject of a spontaneous use of force, again being sprayed with OC and taken to medical. He refused decontamination and medical treatment. He was also involuntarily administered an injection of haloperidol and Benadryl. The associated PNP note indicated that the behavior was not the result of mental illness but "behavioral."  There was no evidence of psychosis or mood disturbance that would warrant use of emergent antipsychotic. It was justified in the basis of his behavioral dyscontrol. It is inconsistent to call his behavioral problems intentional and yet treat him with an antipsychotic. Use of involuntary antipsychotics for behavioral control is not justified. The note also reported that he was to "continue on security property restriction with boxers and mattress. Security reminded that he has other property in his possession at this time, clothing, bedding, and other personal property. Will leave this part security to address and follow through, to ensure that he is on property restriction." The associated video demonstrates only the aftermath and shows him receiving an involuntary injection.

There is a Spontaneous Use of Force report for the same day. He refused to come to the tray portal for hand restraints so that he could receive wound care and a medical shot for his mental capacity. He began kicking the cell door and trying to rip the toilet off the wall. A chemical agent was administered. He was taken to the green mile medical department when he received "a shot for his mental capacity." He refused wound care. He was taken to the eye wash station for decontamination. He received an RVR. There is no indication of mental health staff involvement to de-escalate the patient prior to receiving the injection.

There is an associated video for 8/30/18, EMCF-SUOF-18-0136-EMCF-18-0561.pdf. No mental health professional is identified. The video shows him in medical being restrained by several individuals and being given two shots, one in each arm.  He was then taken to decontamination and then back to his cell.

He received multiple RVRs without adequate mental health staff involvement: Robert Anderson #153440 RVR 2018-04-30.pdf; Robert Anderson #153440 RVR 2018-06-04.pdf; Robert Anderson #153440 RVR 2018-06-07.pdf; Robert Anderson #153440 RVR 2018-07-07.pdf; Robert Anderson #153440 RVR 2018-01-27.pdf; Robert Anderson #153440 RVR 2018-03-20.pdf; Robert Anderson #153440 RVR 2018-03-21.pdf; Robert Anderson #153440 RVR 2018-03-30.pdf.

Later that night, he was still in restraints, reportedly refusing to give them up to custody staff. He was again the subject of a planned use of force. A nurse was reportedly contacted and reportedly stated that the behavior was not a mental illness. It was not clear whether there was any in person evaluation. There is no indication of mental health staff involvement.  It is inappropriate for a nurse to make such a behavioral judgement.

Nursing rounds in segregation and mental health and nursing rounds in the infirmary were not done consistently.  Labs were not followed up.  Most MARs are incomplete.  Consent for some medications is present, but not all.

Medication prescribing was poor and he was frequently given injections of antipsychotics without clinical justification periodically through the record, including 8/30/18, 9/12/18, and 9/19/18.

He also had serious medical problems and was periodically non-compliant with medication; this was never addressed other than being "encouraged" to take medications.

Labs: CMP 1/12/18 with low sodium and high potassium; CMP and CBC normal 1/24/18; CBC unremarkable 3/1/18; lipids, CBC, and CMP unremarkable 3/12/18 but valproic acid level was elevated at 115.6; valproic acid level 7/17/18 undetected; CBC and CMP unremarkable 8/22/18; CBC unremarkable 9/11/18.

*No adequate mental health or psychiatric assessment is in the records.  Given his poor course, careful assessment and psychological testing were indicated.  No behavior management plan was ever developed and he received no treatment other than medications and monitoring.  MHP notes spoke to completing anger management modules (though only through a workbook rather than actual treatment) while in restrictive housing and meeting twice per week, but charting does not reflect this being done. He bounced back and forth between the infirmary and restrictive housing and was placed in the restraint chair and subject to use of force, including physical and OC, on multiple occasions.  Mental health responded to his repeated crises, almost certainly reinforcing his problem behavior.  Some notes refer to his behavior as "manipulative" (e.g., 9/14/18), seeming not to understand the severity and risk of his condition and behavior.  The impact on his mental health condition of placement in restrictive housing was never addressed, despite repeated and sometimes serious self-injury while in that setting. Accordingly, mental health staff never considered whether such placement was contraindicated.*

**Patient 3**

I saw this patient when I was at EMCF in October 2018.  He appeared grossly mentally ill but would not speak with me initially until I told him I was a doctor rather than a lawyer.  He spoke about something electronic being placed in his body and doing something to his "behind and penis" and other bizarre

ideas.  He complained that staff did not talk to him and he was unable to get into any groups or other programs.

Records are from 1/3/18 to 10/15/18.

The record opens on 1/3/18 with the nursing note where the patient complained of being sexually assaulted. He was noted to have "very disorganized thoughts, unable to give specifics about sexual assault; denies any inappropriate touching by other offenders or security staff; kept repeating that there was a 'sex offender kit' inside his body and he wanted us to remove it; kept insisting that 'we' were the ones that placed it there; is requesting help in getting 'it' removed." Of note, he was not on any psychotropic medications at that time but was diagnosed with bipolar disorder.  The nurse made a routine referral to mental health; this should have been an urgent referral.

He was seen by a PNP on 1/5/18. He expressed the same delusional ideas and also indicated that he felt that he was anally penetrated. The PNP noted that these delusions have been in place since January 2015 and that he had had emergency medications in the past due to being assaultive to staff and peers, including attempted stabbings. He had not been on medications since July 2017. Mental status examination showed him to be thought disordered as well.  Though he agreed to take medications, he was given an emergency injection of haloperidol. He was also started on an injection of haloperidol decanoate 150 mg that day (above the recommended starting dose) and then every 28 days.

He was seen again by nursing on 1/10/18 after a sick call request regarding the same delusional idea. He had not been seen by any mental health staff since the PNP visit.

He was not seen again by mental health until a PNP visit on 1/25/18. His diagnosis had been changed to delusional disorder, this was inappropriate given the bizarre nature of his delusions. He remained delusional at that time and now stated that he did not want to take medications. Despite being level of care D and being overtly psychotic he was on HU-1 and had been on administrative segregation prior to that.  The medications were discontinued and it was noted that he "does not meet criteria for involuntary medications at this time." An AIMS that day was scored as zero.

He had a visit with an MHP on 2/5/18 and was noted to be quite delusional and unremarkable. MHP tried to talk to him about medications but he was not interested. There was no plan as to how to work with him to secure his cooperation with medication taking.

There was a brief MHP note from cell front rounds on 2/12/18. Mental status examination was completely normal.

A PNP saw him again on 2/20/18 and he continued to be psychotic but refusing medications.

He had another MHP visit on 2/21/18 continued to refuse medications.

Labs on 3/28/18 showed a normal CBC, normal TSH, and normal CMP.

He continued to make repeated sick call requests to have the sex offender kit removed from his body. He continued to talk about being sexually molested. He had occasional contacts with mental health, often after referral from a sick call request. The MHP would refer the patient on to a PNP and he would refuse medications.

He finally became so agitated and disruptive on the unit that he was admitted to the infirmary on 4/6/18. He was yelling, disorganized, and delusional. He continued to accuse staff of putting the sex offender kit inside him. He was given an emergency injection of haloperidol and Benadryl. He was also given an injection of the long acting haloperidol decanoate 150 mg; there was no evidence that he had a Harper hearing as is required to administer the long acting haloperidol decanoate . He was placed on psychiatric observation.

On 4/12/18, he was returned to HU-1B, still quite psychotic but not as agitated. It was not clear why he was not transferred to the ACU or HU-3. An AIMS was scored as zero.

He was next seen by a PNP on 4/23/18. He continued to be thought disordered and was also pressured and unkempt. His mood was labile. The plan was to continue the haloperidol decanoate, though there was no evidence of informed consent in the record. He refused the injection on 5/5/18. Despite this, when seen by a PNP on 5/9/18 and haloperidol was continued; again there was no evidence of a Harper hearing. He was level of care D yet remained on HU-1.

An MHP note from 5/24/18 indicated that he had "made progression reporting that he is not having any mental health issues." This makes no sense in a patient who has long-standing denial of obvious psychosis.

On 7/3/18, he was the subject of a pre-lockdown nursing assessment. He was seen by a PNP on 7/5/18 on the restrictive housing unit. He had reportedly been agitated and disruptive on the housing unit. However, why this resulted in placement in restrictive housing was unclear as the report did not indicate what he had done or whether there was an RVR. Despite being in restrictive housing almost certainly due to his mental illness, he was not considered for involuntary medications and his medications were discontinued.

An MHP note from 7/10/18 continued to report his psychotic thinking. The plan was to "learn and use skills to help improve ability to deal psychotic episodes effectively. Take medications as prescribed and report if medication is not effective in helping alleviate symptoms. Complete sick call request as needed." This is completely worthless given that this patient was denying any mental illness and refusing to take medications. A completely different approach was indicated.

On 7/12/18, a PNP note indicated that he was agitated and talking about being a killer. He began to threaten overtly to kill others. He was quite agitated. The PNP noted that he was" in need of admission to the sheltered housing unit in medical; however, no beds." Despite his condition, no emergency medications were ordered. He remained in restrictive housing.

There was a similar evaluation by a PNP on 7/14/18. No medications were ordered.

A psychiatrist saw him on 7/16/18 and noted that he was hostile and agitated. His delusions remained unchanged. The psychiatrist noted that, "if he acts out in a violent manner than we would be able to give him an injection, but at this point that is not an option." However, there were many other instances where no such violent act preceded emergency involuntary medications and policy does not require an overt act. There does not have to be actual violent act in order to give emergency medications only a risk of imminent violence. He had well documented history of violence towards others and was acutely agitated and behaviorally disrupted to such an extent that he was requiring placement in restrictive housing.

He was placed back in the infirmary by a PNP on psychiatric observation on 7/26/18. That same day there was a note that indicated he was being placed on suicide watch though had not expressed any suicidal ideation. However, later charting suggests he was on psychiatric observation status.

He remained agitated and threatening. He was disruptive and spilled urine under his door. Despite this, a 7/30/18 psychiatry note indicated that he "has not acted out here in medical and at this time there is no way to medicate him against his will." He was to be released from medical "to be placed on a unit per security choosing. Since he has a [mental health] issue, unit 3 would be best." However, the patient refused to leave and remained in the infirmary the following day, still grossly psychotic and agitated. Custody staff had used OC on him three times and he still refused to leave the infirmary. As he was too agitated for verbal de-escalation, he was finally given an emergency injection of haloperidol 10 mg and Benadryl 50 mg.

An 8/1/18 psychiatry note indicated that once he was stabilized, he would likely be moved to restrictive housing. He was released the following day but again refused to leave. He was given another emergency injection of haloperidol and Benadryl. He was also started on haloperidol decanoate 100 mg; while he reportedly accepted the injection, there was no informed consent in the record and he subsequently refused. Given his previous and subsequent refusals, it would be surprising that he had given consent.

An 8/6/18 psychiatric note indicated that he was to be released again and that if he refused to go to HU-3, he would be taken to restrictive housing where he had been. An MHP note later that day indicated that he refused to leave and that this was a security issue; the note did not document any attempt at de-escalation. OC was used once again, and he was taken to restrictive housing. The patient submitted an administrative remedy program complaint on 8/29/18 asking to have the associated RVR dismissed because, by his report, he refused housing on HU-3B because he was "not retarded" and did not take medication. It was not overturned. There is no evidence of mental health staff participation.

He was seen by an MHP on 8/15/18 continued to express his delusional ideation. On 8/27/18 he had a 90-day segregation assessment by an MHP. This amounted only to a limited mental status examination. What was to be done with this was completely unclear.

A PNP saw him on 9/4/18. He remained psychotic and was refusing medications. The same was true at a 9/11/18 PNP meeting.

A 9/24/18 MHP note indicated that he had a completely normal mental status examination and that the client reported that he was "not experiencing any of the following: mood and thought disturbance, suicidal or homicidal ideation, nor is he experiencing visual or auditory hallucinations." This of course makes no sense given his history. The plan was to monitor him.

A psychiatrist saw him on 10/1/18. He was still psychotic and refusing medications. He had been transferred to HU-3A and reportedly was getting along adequately on the unit.

An MHP note from 10/3/18 indicated that he had a completely normal mental status examination though he reportedly only said that he was okay and would not elaborate any further.

On 10/15/18 in association with a psychiatric note, there was a treatment plan entered into the record. For problem number one, delusional disorder, the goal was "reduction of delusional thoughts and

aggression related to it." The objectives were that the patient would "voice a reduction in delusional thought processes related to his somatic delusions. He will also be calm and cooperative and not hostile or agitated."  The interventions are merely "regular visits with MHP and MH provider."  For problem number two, hostility/aggression, the objective was for the patient to "remain calm and interact in a normal calm manner with all staff and other inmates."  The interventions are merely "regular visits with MHP and MH provider."  This is not a treatment plan.  There are specific therapeutic techniques for treating delusional disorder that should have been incorporated into the treatment plan. Some discussion of how to work with him to motivate his willingness to take medications was also indicated, such as the techniques of Motivational Interviewing.

The record ends here.

Review of segregation rounds shows that he was not seen weekly by mental health and not seen daily by nursing staff. While the mental health segregation rounds better towards the end of the year, nursing segregation rounds are completely missing for his long stint in restrictive housing in July and August.

MARs are incomplete.  They generally show poor adherence with his hypertensive medications.

*This patient never received an appropriate assessment to determine whether his disorder was truly a delusional disorder or a schizophrenia spectrum disorder; psychological testing could have helped clarify this. As noted in the previous paragraph, no treatment was ever undertaken to address his adherence or his delusional thinking, let alone the sexual assault. He was merely isolated when behaviorally out of control or allowed to manage on his own; MHPs did not document attempts at de-escalation and there was no documented consideration of whether restrictive housing was contraindicated. Involuntary emergency medications were unduly delayed, likely resulting in his repeated exposure to use of force. If he was dangerous enough to place in a restrictive setting on psychiatric observation, certainly warranted consideration of involuntary medication at least through a Harper proceeding if not emergently. Failure to adequately treat this man put both himself and others at risk of harm.*

*His competency to consent to or refuse treatment was never evaluated. This is especially concerning since he frequently refused his antihypertensives.*


**Patient 4**

When I met this man during my October 2018, he was in restrictive housing.

Records are from 1/22/18 to 9/24/18.

He was admitted to EMCF on 1/22/18. It appeared that he had come from CMCF.  The nursing intake reported that he had no mental health complaints or suicidal ideation (i.e., the question regarding "Current medical, mental health or dental complaint (including suicidal ideations)" was answered simply "no").  There was no report on whether he had a history of suicidal ideation or recent suicide watch.

The first mental health note in the record was a cursory intake note. The mental status examination was completely within normal limits.  It reported no history of psychiatric hospitalization (which was not true) and that he was on no psychotropic medications.  The mental health intake noted no symptoms, no complaints, and no psychotropic medications, yet he was level of care C (the record suggests that he

had been D).  He reportedly denied a history of suicide attempts though the subsequent record reported
otherwise.  There was also a LOC & High-Risk Screening form that was all self-report (i.e., no chart
review required) that is basically a limited mental status examination with four very general questions
about mood symptoms (all reported as negative), six questions about suicide (which he reportedly all
denied, again inaccurately reported no history of suicide attempts), and four general questions about
psychotic symptoms (all reported as negative).  He denied a history of drug use or treatment and denied
being on psychotropic medications in the last six months.  Note that almost all of this history was
incorrect, including that he had a past diagnosis of schizophrenia, had previously been on psychotropic
medication, had a history of past substance abuse, had active mood symptoms, and had a history of
suicide attempts. Note that even the prefilled section on prior problems on the MHP note had diagnoses
of alcohol abuse, history of psychotic disorder, major depressive disorder, and possible bipolar disorder.

There was a global consent for treatment that same day, including for injected medications.

The next mental health note is a treatment team meeting 1/24/18.  At that time, he was said to be sad
and having crying spells.  The discharge plan is "reduction in active symptoms."  This could apply to any
patient and is therefore meaningless.  The objective for this is to be able to "verbalize an understanding
of the causes for, symptoms of and treatment of sad, depressed mood within 90 days."  This is not a
helpful objective as it has nothing to do with improvement or symptom reduction.  The interventions
are to "provide the client with the rationale for treatment involving medication and psychosocial
treatment to recognize, manage and reduce biological and psychological vulnerabilities that could
precipitate relapse."  In addition to being entirely generic and not an implementable intervention, the
patient was described as having symptoms, so relapse is not the proper target.  A second problem of
poor concentration was also noted.  The objective was to "maintain a pattern of regular rhythm to daily
activities within 90 days."  Why this is the objective is entirely unclear.  The intervention is to "educate
the client on the importance of attending all mental health appointments and attending pill call to
maintain medication compliance and a reduction in symptoms."  This is again entirely generic and a
meaningless individual intervention.

Unaccountably, the author of the treatment plan, in a separate note, writes that the patient "did not
voice any mental health concerns/complaints at this time and did not display any [signs or symptoms] of
agitation or distress."  The plan in this note was to "monitor."

A PNP note the same day gave much more detail and describes active mood symptoms and a history of
possible psychosis.  The diagnosis was a mixed bipolar disorder.  He was started on Depakote 1000 mg (a
mood stabilizer – it was started above the recommended starting dose).  No baseline labs were in the
record but were ordered for two weeks later; they should have been obtained more promptly.

He had not been seen again by 2/9/18 when he refused labs.  The MAR shows that he started receiving
Depakote 1/26/18 and of the 5 doses shown (one was missing), he refused them all.

He was seen by a different PNP on 2/11/18.  He reported not getting the Depakote and the MAR for
Depakote is blank for 2/1/18-2/8/18.  Limited mood symptoms were noted and no psychosis.  The PNP
noted possible intellectual limitations.  A lab refusal was not addressed.

He was seen by yet a different PNP on 2/28/18.  An MHP had referred him for "inappropriate, bizarre
behavior" yet there was no note from the MHP.  He was reportedly taking others' food trays and

"intruding in their cells." He had been in an altercation earlier that day. He had been moved from the mental health housing unit (HU-3) to a GP unit recently; he was noted to have hit a peer with a cane on HU-3. This PNP also noted intellectual limitations. He was still not getting the Depakote; the MAR, though incomplete, showed he had been offered it most days 2/9/18-2/27/18 and he did not show to pill call to take it multiple times. For unknown reasons, he was given an injection of haloperidol. Though described as agitated, paranoid and illogical, he was clearly participating in the interview and there was no evidence of imminent danger to others documented. He was also started on olanzapine and placed on psychiatric observation in the infirmary. No baseline labs were ordered.

There was a brief and unhelpful MHP note the following day.

He was released from the infirmary the following day after yet another PNP saw him. This PNP noted that he had been on multiple units in the short time since his arrival at EMCF. He stated he was not taking medications and was unaware of being on any. This PNP found evidence of psychosis, including responding to internal stimuli (hallucinations) and thought disorder. He was referred to the ACU, but with a short-term goal of returning to HU-3. Medications were not changed but labs were to be obtained in three weeks. An AIMS was scored as 0.

The next note is a nursing admission to the ACU 3/6/18. He was anxious and guarded. He had a swollen eye and abrasions and said he was and then was not assaulted. As with other ACU admissions, the nursing goals are communication and coping.

A PNP saw him that day. He had not taken any medications. Oral medications were stopped, and he was placed on long acting haloperidol injections starting that day. There was no evidence of consent. He was also ordered a short-acting injection of haloperidol though there was no evidence of imminent danger to others and no consent.

There was an Activity Therapy Assessment 3/7/18; he reportedly agreed to participate in groups, but his needs were not discussed.

He initially declined groups and was seen at cell front and "given lessons in his cell."

Groups will on the ACU included:

- Refused group 3/7/18, 3/8/18, 3/9/18, 3/14/18, 3/15/18, 3/16/18 (though watched others play games), 3/19/18, 3/22/18, 3/26/18
- Social skills 3/12/18 – played bingo
- Planning for a New Life, module 4 3/20/18
- Planning for a New Life, module 5 3/21/18
- Activities Group 3/28/18 – games and other activities

On 3/8/18, he was given the injection of short acting haloperidol and the long-acting as well (he had not received it the day before, as ordered). There was still no evidence of imminent danger to others that would warrant a short-acting injection of haloperidol; in fact, he was noted to have "no … disruptive behaviors on the zone." Psychotic symptoms were more clearly documented. He was also started on Depakote 1000 mg (above the recommended starting dose) with no baseline labs. There were no clear mood symptoms documented at this time. However, the MAR showed he had continued to be offered Depakote.

A 3/13/18 PNP note regarding a treatment team meeting reports some reduction in symptoms and increased relatedness. However, he was still symptomatic.

On 3/21/18, there was another PNP note from a treatment team meeting. He reported taking medications but a valproic level was undetected, so he was not taking Depakote. The MAR showed he was taking about half of it, so some level should have been detected if this were accurate. He was continued on the same medications; no intervention for non-adherence was discussed or included in the treatment plan. He remained symptomatic but still somewhat more participatory in groups.

Labs from 3/22/18 showed a valproic acid level below detectable, normal CMP, and normal CBC.

On 3/29/18, there was another PNP note from a treatment team meeting. An AIMS that day was scored 0. The undetectable valproic acid level was noted; he was unsure he was getting it. He was said to be participating more; review of the groups above shows some limited increased participation. He was discharged from the ACU to HU-3. He remained on haloperidol decanoate, Depakote, and Benadryl.

The only individual contacts with an MHP during his time on the ACU were cell front rounds.

On 4/4/18, he had a contact with an MHP and reported he was not taking any medications and wanted "back on meds." The plan was to monitor; there was no intervention or evidence of treatment. The MAR was incomplete but showed him taking Benadryl and Depakote 4/1/18 and 4/4/18. The MAR for the rest of the month is partially complete and shows him not taking medications about half the time. The May MAR was missing about 1/3 of entries but what remained continued to show adherence about half the time.

There were no notes until a nursing note 4/20/18 when he received an injection of haloperidol decanoate.

The next note in the record is an MHP contact 5/24/18. No problems were identified; the patient reported taking his medications. The MAR was clearly not reviewed.

A 6/7/18 MHP note has exactly the same text as the 5/24/18 note.

However, a 6/10/18 PNP note stated that he was "not getting his meds" but was taking is Depakote. He was delusional, anxious, and felt his life was in danger. The plan was to get labs and continue his medications unchanged. The June MAR is incomplete about 1/3 of the time; he was reported to have taken most of the doses when recorded.

On 7/2/18, a valproic acid level was far sub-therapeutic at 11.5. The MAR was clearly not an accurate representation of his medication taking, especially as it showed complete adherence the last week of June.

The following day, there is another MHP note with exactly the same text as the previous two, including that "he stated that he was compliant with his meds and they were working." That same day, the PNP saw him again and noted the low valproic acid level but the plan was simply to continue current medications. There was no discussion of his obvious poor adherence.

He was seen by a psychiatrist 7/20/18 who found it difficult to get a clear sense of his degree of illness. The psychiatrist elected to lower the Depakote to 500 mg with a plan to follow-up in a month.

He was next seen by mental health for an MHP visit 8/3/18 with an officer present.  No problems were noted.

The psychiatrist saw him 8/7/18 and noted anxiety and sleep/wake reversal but no significant mood symptoms or psychosis.  There were no medication changes.

The next mental health contact was a 9/4/18 brief MHP contact with an officer present.  No problems were identified.  He reported not being "a people person" but it was not clear whether this meant that he had continued to isolate himself.  The August MAR, again incomplete, showed nonadherence most days it was complete.

There was a generic treatment plan from 9/6/18:

**"Discharge Plan:** Reduction in active symptoms that related to anxiety and nervousness around people
**Patient Strengths:** Able to make his needs known, reads, sleeps and works out to stay busy
**Patient Weaknesses:** very nervous around people
**Problem #1:** Sad/crying, very nervous spells
Goal: Increase positive/stable mood
Measurable Objectives: Verbalize an understanding of the causes for, symptoms of and treatment of sad, nervous mood within 90 days.
Interventions: medication, counseling, groups or classes
**Problem #2:** Poor concentration
Goal: Increase concentration
Measurable Objectives: Maintain a pattern of regular rhythm to daily activities [sic] within 90 days.
Interventions: Educate the Client on the importance of attending all Mental Health appointments and attending pill call to maintain medication compliance [sic] and a reduction in symptoms.
**Patient Responsibilities:** Attend Mental Health appointments as scheduled and notify of any changes in mood
and be med compliant.
**Participating in Treatment Team:**
Patient, Psychiatric provider, MHP
**Discharge Criteria:** Client will be free of symptoms of disorder with mixed emotions so that his LOC can change fom [sic] D to B or A."

He received a haloperidol decanoate injection on 9/24/18.

There are no subsequent notes, so it is unclear when or why he was placed in restrictive housing where he was at the time of my visit just a few weeks later.

*The EMCF intake was poor that did not meet standards and missed the fact that this man had a serious mental illness. He also never had an adequate assessment. This patient appeared to receive adequate psychopharmacologic treatment recommendations except for starting medications above recommended dosages and not getting baseline laboratories, but it is difficult to be certain as there was never an adequate assessment.  The treatment plans were generic and indicated no plan for individualized or any directed interventions.  Other than a few rudimentary activities groups on the ACU, he received no other treatment than medications, with which he was not adherent, yet this was never addressed. His behavioral problems were also never addressed either in a treatment plan or with a behavior management plan.  He remained isolative and documentation does not reveal whether he was availing himself of any activities or programs.  All indications are that he remained, at best, marginally functional.*

**Patient 5**

I interviewed this middle-aged male patient during my October 2018 site visit. He had been in MDOC for about 20 years, much of it at EMCF but recently only since August 2018. He reported being in long term restrictive housing since July 2017. He complained that he and others sometimes were left in their cells after cutting themselves. He reported cutting himself multiple times. He also reported that second and third shifts often do not do security checks in restrictive housing. He also complained that sometimes medications are not brought to restrictive housing; he stated that he was on lithium and olanzapine. He reported that one mental health staff member would occasionally talk with him out of his cell, which he found helpful as there were many things that he stated he could not talk about when health staff came only to cell front. He spoke about a good deal of early life trauma and was at times near tears talking about his mother's death. He stated that at times he did have suicidal ideation, though some of his self-injury was not related to suicidal ideation. He felt that he was in need of psychotherapy that he was not getting to address some of these issues.

The medical record is from 1/1/18 to 10/23/18.

As the record opens, he was at SMCI. His psychotropic medications at that time were lithium 300 mg twice daily and olanzapine 10 mg nightly, though the reasons he was on these medications were not documented in the available records. His diagnosis was intermittent explosive disorder. He was level of care C.

While at SMCI, he was seen periodically by both MHPs and psychiatric prescribers. He was noted at times to be depressed and/or agitated and to have poor mood regulation, but no psychosis or overt depression or mania, though there were reports of repeated masturbation consistent with possible hypersexuality. At times he expressed suicidal ideation, cut himself several times, and made nooses; as a result he was frequently placed on watch or observation in the infirmary. He was described at times as being manipulative. He often complained of difficulty with peers on living units and wanting to transfer in addition to difficulty managing his own emotional states. He was also placed in restrictive housing; though the reasons for these placements were generally not in the medical record, on one occasion he had been throwing excrement, though claimed others threw at him as well. He spoke about struggling with the isolation of being in restrictive housing and using self injury to get contact, often with mental health. Owing to his repeated self-injury, mental health staff began to discuss transfer to EMCF in May 2018. Other than occasional mention of coping skills and "cognitive tools to manage his stress," he received no treatment other than medications. MHP contacts consisted primarily and brief assessments and monitoring. He received no group treatment. He was released from psychiatric observation for the final time at SMCI on 7/25/18. A psychiatric note from that day reported that he was released from observation "because he was masturbating." Soon thereafter, he assaulted a captain and when seen by the psychiatrist, attempted to assault the psychiatrist. There was no discussion of whether this might have been driven by mental illness. There was a normal CBC on 7/24/18 and an undetectable lithium level on 8/1/18, but there was no CMP, lipid profile, or an AIMS since the records began. The undetectable lithium level was never addressed. He was made level of care E on 8/7/18 by the psychiatrist who noted that this was done "for him to transfer to EMCF." The diagnosis remained intermittent explosive disorder.

He arrived at EMCF on 8/17/18. An intake nursing note from that day indicated that he had no "medical, mental health, or dental complaints (including suicidal ideations)." He was seen by an MHP

that day. The mental status examination was completely within normal limits. He was described as "cooperative yet preoccupied with classification status." He still had bandages from previous self-harm, the most recent reportedly three days previously. The MHP noted that he had "behaviors leading to numerous RVRs, boundary concerns, and [history] of inappropriate sexual behaviors." The patient reportedly denied suicidal and homicidal ideation.

The plan was referral to a psychiatric provider. A PNP saw him that day and wrote that the transfer was "an emergency type transfer with reports that the Deputy Commissioner intervened with request to this [sic] transfer to EMCF." The PNP noted current medications and that the most recent lithium level was undetected. The PNP noted that his suicidality was "per record review and from interview today, all due to personality type/behavioral type issues -vs- severe mental illness. This is also determined after his reports/discussions at interview of, [sic] ongoing issues with masturbation and poor institutional conduct. Also similar from [sic] this provider's previous [history] with [this patient]. The transfer request had initially been denied due to he [sic] simply did not meet any indications for a transfer to EMCF. His primary issues were behavioral." The patient described himself as having problems with anger behavioral dyscontrol. He attributed his self-harm primarily to anger. The PNP noted that he had a brother with severe mental illness. The patient reportedly denied early life trauma, though the note goes on to say that "he was whipped a lot; however, acknowledges he was bad; however, denies abuse. [History] of placement at Columbia Training School." The PNP initially reported there were no psychotic symptoms or signs. Review of mood disorder symptoms was minimal, though he complained of poor sleep and reported problems with masturbation and did so in front of staff, especially female, stating that he "did not care about a RVR"; appetite was normal. He reported daily use of spice at SMCI. He made vague complaints about auditory hallucinations. He was changed from olanzapine to ziprasidone 40 mg nightly, reportedly because he was having difficulty breathing on olanzapine (highly unlikely). However, it was clear that the PNP doubted that the patient actually had psychotic auditory hallucinations so the there was no indication for ziprasidone. The patient reportedly agreed to take lithium, though there is no discussion of why he had not been adherent. The PNP ordered appropriate monitoring labs though did not do an AIMS. He was to be placed in restrictive housing.

A PNP saw him again 8/21/18 with classification and an MHP. The PNP reiterated that there was no evidence of serious mental illness and that behavioral problems were thought to be due to personality disorder. However, he was to be continued on lithium and ziprasidone. He was changed to the level of care C. There was no plan to address his behavioral problems with any form of treatment or behavior management plan other than psychotropic medications. An AIMS was scored as zero. He remained in restrictive housing.

He was seen by an MHP on 8/29/18, reportedly at the patient's request. He was described as hostile, belligerent, loud, angry, illogical and to have blunted affect. He was expressing suicidal ideation. The MHP noted that "The client used very aggressive speech and being agiatted [sic] when the MHP requested security to stand her. The MHP infornmed [sic] the client that he needed to use a respectful tone or she would leave, she also reminded him that she had certain protocol to follow on her job and having a security officer present was one of them. The client calm [sic] down and proceeded to discuss his issues." He had complaints about not being given a proper diet and stated he would cut himself "even more after revealing blood on his hand and arm area." The MHP left when security left, reporting that she "would have to leave the zone after discovering security was no longer present after requesting that one of them assist me."

He was seen that same day by a PNP and continued to complain about getting food that he was allergic to.  The PNP described his cutting as being "for secondary gains, his food tray issues." There was no discussion of this being maladaptive behavior or of any approach to managing it or rendering treatment designed to reduce the behavior.

He was seen by an MHP 8/31/18 after requesting to be seen.  His mood was described as labile and his thought circumstantial. He was reportedly "adjusting well despite some concerns with security and his meals being incorrect." He also complained of side effects because of not being on Benadryl. The plan was to "begin treatment planning based on self-reported goals." There was to be a follow-up appointment in a week.

A 9/4/18 MHP note reported that he was "crying at this time because he is frustrated wants to make a phone call to his aunt." The MHP "taught client relaxation techniques and stress the client continue using previous [sic] taught distraction skills to help maintain positive mood."  An ensuing PNP note indicated that he was referred "by the MHP staff with reports he has cut himself." The was no MHP note did not include this information. He was reportedly refusing to close his tray flaps. He complained of phones not working and needing soap and that the security staff were not doing anything to address these issues despite saying they would. He was loud, irritable, talkative, exhibited racing thoughts or flight of ideas, and was distractible. His insight and judgment are poor. Despite behavioral problems being attributed to personality disorder, the PNP noted the patient was "likely noncompliant [with medications] as evident [sic] by his presentations [sic] at interview today and it previous interviews." Despite indicating that some of his problem behavior was due to medication nonadherence, the PNP went on to say that "His presentation today is just that, behavioral – vs - severe mental illness." Medications were continued with no changes.

There was a brief MHP contact on 9/6/18 when the patient asked to see the MHP and inquired about needed wound care. . He was seen later that day by a PNP along with "the case manager."  He continued to complain of staff not following through on what they said they were going to do. He was irritable, loud, and hyperactive. The PNP continued to emphasize that personality disorder was driving this behavior.

He cut himself superficially on 9/8/18 but was not seen by mental health.

A 9/10/18 medical note indicated that he was to be placed on a restricted medical diet related to food intolerance.

He was next seen by mental health for an MHP visit on 9/17/18. They "processed feelings and discussed the[patient's] current security status, struggles with moods as a result of status, and cognitive distortions with impact his [sic] overall well-being."

9/18/18 laboratory results included a normal lipid profile, hemoglobin A1C, CBC, TSH, and CMP. The lithium level remained undetectable.  MARs for August and September are incomplete, but completed entries show that he was adherent with medications.  Given that the lithium level was undetectable, these MAR entries cannot be accurate, especially those in September just before the lithium level was drawn.

He was seen by a PNP on 9/20/18 following a security staff referral. He was reportedly agitated "due to issues with his tray." He had been brought an incorrect tray and it was replaced by custody staff, but he

continued to be upset. There was no mention of the low lithium level or other lab results. Medications were continued unchanged.

He was seen by an MHP on 9/25/18 segregation rounds. The patient wanted to speak with a different MHP, the one who had spoken about having weekly contacts on 8/31/18.

He was seen again by a PNP at the patient's request on 9/26/18. The PNP noted that the patient was concerned about hypothyroidism related to lithium. The PNP noted that if he were nonadherent to medications they would be discontinued, obviously not yet aware of the reported lithium level.  The PNP noted that the patient "would benefit from anger management and behavior modification type plans." No such plans were ever put in place.

There was another brief MHP segregation rounds note on 10/2/18. The patient complained about the phone not working and "tried to rationalize with him that the phone was messed up and the guards were not out to get him. Client still was irate and MHP told him that he would check on the phone for him in follow-up on him [sic]."  There was no documentation that this was done.

On 10/8/18, he cut himself again. He was seen the following day by a PNP at the request of security. The patient was concerned about his RVR status. The PNP continued to emphasize that there was no evidence of major mental illness but continued him on with him and ziprasidone, still with no comment on the undetectable lithium level.

He was again the subject of brief segregation rounds by an MHP on 10/10/18. The patient complained of not being able to go to the yard. Patient was told how to request to talk to mental health. He cut himself again later that day.

As of 10/23/18, he was not seen again by any mental health staff.

*This patient never had an adequate assessment.  While it is possible that his behavior might be attributable to a personality disorder, in the absence of an adequate assessment it is not possible to rule out other causes of impulse dyscontrol and mood instability. Psychological testing was indicated to clarify the clinical picture as uncertainty remained about the presence of a mood disorder. A trial of a mood stabilizer such as lithium would be reasonable even if impulsivity and mood instability were due to personality disorder in some cases. However, his nonadherence to lithium was never addressed so it is unclear whether this medication might have benefited him. There was also no clear indication for being on an antipsychotic. This patient would have benefited from a behavior management plan as well as therapy targeted to address his recurrent behavioral problems, which treatment would have been better guided with an adequate assessment. There was no follow through on the 8/31/18 MHP plan to meet with him weekly, undermining MHP credibility and the treatment alliance.*

*While in segregation, he was seen most but not all weeks by an MHP. I saw no 30 or 90-day assessments. He was not seen daily by nursing staff while in segregation.  Whether restrictive housing was contraindicated for mental health reasons was unclear, again owing to the lack of an adequate assessment that would allow better characterization of how much, if any, of his problem behavior, was related to a serious mental illness.*

**Patient 6**

I interviewed this man during my first visit and conducted a thorough chart review. He was overtly mentally ill. I also interviewed him during my October 2018 visit. While he remained obviously mentally ill, he was not as disorganized and ill-kempt as the first time we met, though still had poor self-care and was obviously mentally ill, for instance telling me he was Tupac Shakur (as documented in previous medical records) and offering other grandiose ideas.

The current records extend from 1/4/18 to 9/19/18.  The record opens with a 1/4/18 note from a nursing staff indicating that he had not been taking Dilantin, a seizure medication, as ordered.

An MHP note from 1/10/18 indicated that he had a completely normal mental status examination and reported taking his psychotropic medications. This is a brief contact with security present. The plan was to monitor him.

He was next seen by mental health for a PNP visit on 2/21/18. The note indicated that he was leaving in two weeks which turned out not to occur. Mental status examination was completely within normal limits. The plan was to continue his current medication, haloperidol decanoate 150 mg IM every 14 days.  An AIMS was scored as zero.

He was given an injection of haloperidol decanoate on 2/25/18.

On 2/28/18, there was another brief MHP note with security present. Again, the mental status examination was completely within normal limits. The note indicated that his request to transfer to Rankin had been submitted.

He received another haloperidol to decanoate injection on 3/13/18 and continue to receive them every two weeks until July.

There was another brief MHP note on 3/28/18. No mention of transfer was made. The plan was to monitor him.

There was another brief mental health note on 4/12/18 with security present. No problems are identified. There was a similar note from 4/19/18.

A brief 4/22/18 PNP note reported that he was stable.  It noted that he was to be released from prison 4/19/19.

During a 5/1/18 MHP note, the patient wanted to "know how everything is going toward his release." However, the MHP made no comment about his release other than that he had signed prerelease papers.

There was another cursory MHP note from 6/20/18 provided no useful information other than that the patient said "he was doing okay." Security was again present during the contact. The plan was to monitor.

A 7/10/18 physician note indicated that he was "inappropriate."  He had had one seizure in the last three months. His adherence was not mentioned and had not been addressed in the record.

A7/16/18 lab report showed a normal CBC and an undetectable Dilantin level.

The next mental health contact was another brief MHP visit with security present on 7/18/18. No problems were identified. His lack of adherence to Dilantin was not addressed. That same day he was

seen by a psychiatrist who reported that he had refused his haloperidol injection that day. The psychiatrist noted no evidence of mental illness but there was no chart review just a current mental status examination and patient self-report that attributed his problems to substance use. The plan was to discontinue his medications. His nonadherence to Dilantin was not noted or addressed.

The psychiatrist saw him again on 8/2/18. The patient stated that he felt hyper and complained of sleep problems. The psychiatrist noted no evidence of mania or psychosis and declined to give him any medications. The plan was to follow-up in 60 days, despite the fact that he would still be expected to have a substantial blood level of haloperidol at the time that he was seen.

An MHP saw him on 8/15/18 with security present. He remained on HU-3. Despite the fact that he was on no medications, the MHP reported that "he was compliant with his meds and they were working." There was a similar note on 9/19/18.

The record ends here.

*This mentally ill man with limited functional ability continues to receive little to no support. He needed treatment to improve his activities of daily living, self-management skills, and social skills. It is highly concerning that his medication was stopped without a thorough chart review and assessment, especially given his history of severe psychosis and disorganization as well as being both victimized and violent towards others. It is fortunate that he had not as yet seriously decompensated at the time that I saw him, though he continued to have obvious symptoms.*


**Patient 7**

I interviewed this patient during my October 2018 site visit. He spoke about there being a mouse or rat in his cell and conditions being "dirty, nasty." He had been in MDOC for two years. He made staring eye contact, had obvious negative symptoms of schizophrenia, exhibited lags and latency in his speech and was generally slow, and spoke about auditory hallucinations of a derogatory nature and commanding him to kill himself. He stated that he was in restrictive housing because he had "hit a guy with a lock – he was stealing canteen from me." He had been on HU-3B. He reported taking lithium and olanzapine and commented that he was not getting the correct medications since he had come to restrictive housing. He noted that he had been in some mental health groups while on HU-3B and had occasional meetings with an MHP, complained that this is mostly about substance abuse which he stated had not been a problem for him, except that he sold them. He reported a past history of suicide attempts, including trying to shoot himself, overdose, and hanging.

The medical record is from 1/2/18 to 10/18/18.

The record opens with him at EMCF HU-3C and carrying a diagnosis of bipolar disorder and head trauma. He was prescribed lithium and olanzapine. A PNP saw him on 1/2/18. The PNP noted that a lithium level from two months previously had been undetectable. He was noted to have paranoid delusions and poor insight and judgment, but no other abnormalities on mental status. He did not want to return to the housing unit owing to fighting on the unit. He was returned to HU-3C and there were no medication changes. A lithium level was ordered for the following week.

A 1/8/18 lithium level was undetectable.

An MHP note from 1/10/18 as well reported on his suicidal ideation but stated that he denied auditory hallucinations. Despite talking about suicidal ideation, the MHP wrote that he "did not appear to be in distress and/or agitated." He was seen with security present. The plan was to refer him to the PNP and monitor him.

He was seen by a different PNP that same day and complained of suicidal ideation and command hallucinations to kill himself. He stated he was having a difficult time preventing himself from harming himself. He stated he had not taking his medications for a week and noted that medications were coming late and he was "asleep at medication passes ... So I miss my medications." The PNP gave him a dose of olanzapine 30 mg and with him 600 mg at the time of the visit and also increased the daily dose of olanzapine to 30 mg. Because he reportedly "adamantly denies any plans, thoughts, or intents [sic] of suicide," he was allowed to return to the housing unit. There was no proper suicide risk assessment, especially given his report of command hallucinations, his history of suicide attempts, and the fact that he had not been receiving medications. He was to have labs in the lithium level rechecked in a month.

He was not seen again until a PNP visit on 1/30/18. He reported that the auditory hallucinations had stopped since restarting medications.

The patient refused labs on 2/9/18.

The patient was next seen by mental health for a 2/28/18 MHP contact with security present. The mental status examination was completely within normal limits. The patient reportedly stated that he was adherent with medications. His recent refusal of labs was not noted.

There were brief MHP notes on 3/8/18 and 4/10/18 that reported he had a completely normal mental status examination.

A PNP saw him on 4/18/18 at which time he complained suicidal thoughts but denied any suicide attempt. He stated he would "hang himself if he had to return to [housing unit] 3C and requested to go to 3B or 6A. He was upset that the other [patients] had taking [sic] his trays, and canteens [sic] because he was in debt to them." He reported that he had attempted to hang himself four nights previously, but there was no notation of this in the record. He was paranoid and complained of visual and auditory hallucinations. The PNP took the patient to speak to a Lieutenant. The PNP noted concern about having the patient return to HU-3C given the "risk involved of patient harming himself." The PNP requested that he be moved to a different unit that night and he was moved to HU-3B. There were no changes to medications. Appropriate monitoring labs were ordered; none were yet in the available medical records.

Labs were put off for a week due to a facility lockdown. He then refused labs on 4/30/18.

He was seen at cell front by an MHP on 4/27/18. The mental status examination was completely within normal limits. The plan was to monitor him.

The next visit was with a PNP on 5/9/18. The PNP noted that he had not gotten labs but did not realize that he had refused labs. The patient reported doing much better in the mental status examination was unremarkable.

There was another brief cell front MHP contact on 5/23/18 with another completely normal mental status examination.

He was next seen by an MHP on 6/22/18 and was described as "incoherent with several loose ideals [sic] or thoughts." He also appeared paranoid. The plan was only to monitor him despite evidence of decompensation.

A brief MHP note from 7/27/18 reported him again to have a completely normal mental status examination.

He was seen by a psychiatrist on 8/2/18 and initially reported that he was "doing okay on his meds. He feels they helped him, but then he states he wants off." The psychiatrist noted no positive symptoms but noted negative symptoms of schizophrenia. He was disheveled as well. Medications were unchanged. There was no comment on laboratory examinations.

Another brief MHP note from 8/21/18 recorded a completely normal mental status examination with a plan to monitor him.

At some point in the ensuing days he was placed in restrictive housing. There were no healthcare notes other than mental health segregation rounds placed in the chart on 8/29/18. There are cursory entries for mental health segregation rounds on 8/29/18 only. There are no nursing segregation rounds entries.

There was an EOR for him dated August 29, 2018. The EOR states that the patient and another inmate assaulted a third inmate. It further states that the inmates were separated and taken to the EMCF Medical Department. There should have been a note of this encounter.

There was another brief MHP note from 9/5/18 that did not report on the reason for him being in restrictive housing and again reported a normal mental status examination and plan to monitor him. There was an identical MHP note from 9/20/18. The patient remained in restrictive housing.

There was another brief MHP note on 10/1/18.

On 10/17/18, he complained that he was bitten by a rat but there were no findings on physical examination. There is no follow-up of this unusual, possibly psychotic, complaint.

The record ends here.

Many of the MARs are incomplete (i.e., there are not entries specifying whether a medication was given or not for some dates and times). Completed entries record frequent no-shows for medications periodic medications being out of stock.

*This patient never had an adequate assessment. The possible contribution of head trauma to his presentation was never considered, which would likely have resulted in identification of different treatment needs and interventions. In this regard it should be noted that lithium is relatively contraindicated in patients with head injury. The lack of characterization of his head injury and severity put this patient unreasonable risk both because of use of medications that may have been unsafe for him and because different treatment may have been necessary. There is no evidence of a treatment plan in the record; he clearly needed one. He received nothing other than psychotropic medications for his mental illness with which he was regularly nonadherent. His nonadherence was never addressed. He refused laboratories and this was never followed up. Appropriate monitoring laboratories are missing in the medical record and he was on medications require laboratory monitoring to assure safe administration. He was not the subject of segregation rounds as required by policy and the reason for his*

*being in segregation was never documented in the medical record despite having come from a residential mental health unit. This man received virtually no attention except occasional psychiatric prescriber visits and brief MHP contacts. This is an example of very poor treatment. In addition to being at risk due to failure of proper monitoring, it is likely that his symptomatology was what was retaining him in restrictive housing, worsening his significant mental health symptoms and resistance to treatment.  There was no consideration of whether restrictive housing was contraindicated for him, which was likely given his serious symptoms, history of head injury, and history of self-injurious behavior.*

**Patient 8**

I saw this patient briefly on my first visit to EMCF. He was overtly psychotic, talking about being a judge and lawyer. He had been restrained by other inmates when trying to leave the unit to try to talk to the warden, who was in the group with me during the facility. He refused to talk to me during my most recent visit but was obviously agitated in the dayroom.

The current records are from 1/2/18 to 9/21/18.

The record opens 1/2/18 with an AIMS there was scored as zero. He was level of care C and housed on HU-3C.  His mental health diagnosis was Bipolar Disorder.  The accompanying PNP note indicated that he was "over talkative and tangential." He was also reported to be delusional, believing that he had been kidnapped from California. He believed that his kidnappers were involved in Congress or the Senate. He was overtly paranoid and rambling. His medication at that time was olanzapine 30 mg. The plan was to increase the olanzapine by 10 mg, above recommended doses but at the maximum shown in the literature to be effective. However, the dose remained at 30 mg.

He was next seen 1/10/18 by an MHP. The cursory note indicated that he "did not have any mental health concerns at this time." He reportedly denied hallucinations. Despite the preceding and has extensive history of mental illness, the mental status examination was completely within normal limits.

On 1/12/18, he submitted a sick call request and complained of side effects and wanting something other than Benadryl.  The nurse referred him for a allow follow-up within seven days.

He was seen 1/21/18 by a PNP. The brief note indicated that he was complaining of "leg cramps and requested something for side effects." There was no examination. He was started on Cogentin 2 mg nightly.

On 1/28/18, he was ordered Ensure, a dietary supplement, for weight loss.  He also suffered from hepatitis. He was later noted to have loose and broken teeth and swollen gums.

He was again seen by a PNP on 2/6/18. Continued to express delusional ideas.  No changes were made to his medications.

On 2/28/18, his BMI was low at 15.2. He was 5'10" and weighed 145 pounds. He remained on Ensure.

That same day there was a cursory MHP note with security present during the visit. The mental status examination was completely within normal limits.

He again complained of cramping and was seen by a PNP on 3/6/18. He spoke of Angels talking to him. The Cogentin was increased to 2 mg twice daily to try to address reported side effects, however there was still no physical examination to assess his side effects.

He was seen by an MHP on 3/8/18 and asked to no longer be seen by psychiatry. The mental status examination was again completely within normal limits. The MHP told the patient that being discontinued from psychiatric follow-up was up to the psychiatrist. The plan was to "complete [sick call requests] as needed."

There was another cursory MHP note from 3/23/18. Security was present during the contact. Mental status examination was completely within normal limits. The patient stated he was adherent to his medications. The plan was to monitor him.

A PNP saw him again on 4/2/18. He complained of leg and stomach cramping. He expressed multiple delusions and auditory hallucinations and was mostly thought disordered. The PNP questioned his medication adherence, but there is no evidence that this was checked. The plan was simply to continue his medications.

There was another cursory MHP note on 4/4/18 that noted him to have no psychiatric symptoms. The plan was to monitor him.

On 4/11/18, he told the nurse that he had awoken to his cellmate trying to kiss him. They had an altercation. He was reportedly not injured. That same day he saw a PNP and complained of feeling "edgy." They discussed mood stabilizers which he did not want to take. He continued to have psychotic symptoms. No medication changes were made.

He gained weight on the dietary supplement.

There was another cursory MHP note from 5/4/18. Security was again present during the contact. No evidence of mental illness was indicated. The plan was to monitor him.

During a brief MHP contact on 5/21/18 with security present, the patient asked to see a PNP because his meds were reportedly not working. The note is truncated but appears to say something about giving him "a shockwave." The plan was to monitor him.

He was seen the following day by a PNP and complained of racing thoughts and needing help with anger. The note says that no delusions were elicited but he continued to be paranoid and report auditory hallucinations. He agreed to start lithium. He was started on lithium at 600 mg nightly. The PNP ordered a CBC, CMP, hemoglobin A1c, lipid profile, TSH, and lithium level. He refused the labs on 6/11/18 and 6/22/18.

He was seen again by a PNP on 6/19/18. The lab refusal was noted. No mental health symptoms were noted. The plan was to reschedule labs for July.

There was another cursory MHP note the following day with security present. His lab refusal was not noted.

On 7/3/18 there was an MHP note that reported on the patient being quite delusional, talking about going to the White House to see the president and vice president. The patient stated that he was adherent to his medications.

He again refused labs on 7/11/18. That day there was a cursory MHP note with security present that indicated that he had no symptoms. Lab refusal was not noted.

The next contact was another cursory note from 8/9/18. Again, security accompanied the MHP. Mental status examination was completely within normal limits.

During a 9/3/18 medical appointment, he was clearly psychotic.

It appears his olanzapine expired in early September.

A 9/6/18 MHP visit with security, he complained of his medications being "messed up" and only getting "downers" that made him want to sleep. The mental status examination was completely normal. The plan was to refer to psychiatry and monitor. No mention was made of the medication expiring.

On 9/10/18, there was a treatment team meeting. Bipolar disorder was identified as well as delusions. The goal was to reduce manic symptoms and delusions. The objectives were for him to "verbalize that mood is more stable and a reduction in delusional thought processes over the next 60-90 days." The generic interventions were: "Medications, Individual sessions monthly, and groups held on his unit." His responsibilities were essentially to take meds and go to treatment. This is not a meaningful treatment plan. No mention was made of the medication expiring.

The next contact was a 9/12/18 psychiatric visit. He was grossly psychotic. He reported that is daily activities were "building ships, calculating all his money" and other more ordinary activities. He also had a mild tremor, attributed to lithium. The psychiatrist noted a history of assaults, including on officers. The plan was to restart olanzapine 10 mg. No upward titration was planned.

He again refused labs 9/13/18.

The last note is 9/19/18 MHP note where the patient complains of leg cramping and asks for Cogentin.

*This seriously ill man received nothing other than medications and brief MHP rounds. Despite treatment plan statements regarding individual and group therapy, he received none. His repeated refusal of laboratories was never addressed, yet he was continued on medications that require laboratory monitoring. It is highly unlikely that he was competent to consent to medications or to refuse laboratory evaluation. A surrogate decision-maker is almost certainly required for this patient. Note that it is almost certain that this patient suffered from a schizophrenic spectrum disorder as he exhibited chronic delusions even when not exhibiting mood symptoms; an adequate assessment was needed to clarify the diagnosis. He needed extensive psychosocial rehabilitation that he never received. Given his history of assaultive behavior, failure to properly treat him also put others at risk.*

**Patient 9**

I met this patient briefly in the restrictive housing unit during my October 2018 visit. When I spoke with him, he showed evidence of the negative symptoms of schizophrenia, including flat affect and paucity of content.

Medical records are from 1/9/18 to 10/23/18.

The first mental health contact was a 1/19/18 treatment team meeting. The associated PNP note began by reporting that the patient had been "getting agitated waiting in hallway." He was guarded and suspicious. There is some question of whether he might be under the influence of drugs at that time. The plan was to continue him on olanzapine 15 mg nightly and to get monitoring labs. An AIMS was scored as zero. There was no treatment plan.

Lab results from 2/1/18 showed lipid abnormalities consistent with metabolic syndrome. An olanzapine level was in the low normal range. A CMP was within normal limits.

There were cursory MHP notes, during which security was usually present, from 3/1/18, 3/30/18, 4/26/18, 5/17/18, 7/10/18, 8/9/18, 9/4/18, and 9/12/18 that have completely normal mental status examinations. None show any evidence of treatment being provided.

The patient was seen by a psychiatrist on 4/29/18. The very brief note had a completely normal mental status examination.  No changes were made to his treatment. There was no mention of the lipid abnormalities or of metabolic syndrome in general.

There was another very brief psychiatric note on 6/22/18. Treatment was continued and there was still no mention of the abnormal lab results.

He was seen by a PNP on 9/6/18 at the request of security staff. Inmates on HU-6 reportedly "do not want him on the unit. Basically, security staff with [sic] a mental health assessment to assist with further allowing for the most appropriate placement for him." There was no discussion of why other inmates did not want him on the unit. The PNP reported that custody staff was planning to place him on HU-3. He was described as cooperative, though guarded and suspicious with paranoid delusions and blunted affect. The content of the delusions was not specified.  His treatment was continued. There is no mention of the elevated lipids. An AIMS was scored as zero.

On 9/28/18 he was seen by an MHP after staff reported "that he was hitting the floor with his shoe as if he saw bug [sic].  [Patient] presents with angry affect. He is somewhat guarded and suspicious, not being familiar with provider. Housing has changed for him several times over recent months. He was moved from 2B where it believed [sic] that he was having problems due to not being affiliated. He was then sent to housing unit 6, or other offenders stated that they didn't want him on the zone.  NP Dunn was then consulted and 3B was chosen as the most appropriate housing."  The patient stated that he was "suppose [sic] to have been home…last year."  He was rambling and required redirection. He had written on his clothing and arms "random letters and symbols. Officer reports that he started writing everywhere the day he came to the zone. He has a piece of fabric that he is ripping up and tying knots." He stated that he was not hearing voices and reported adherence to medications. The PNP suspected that he was not adherent to medications. He could not explain why he was hitting the floor with his shoe. He was also described as disheveled and having paranoid delusions. The plan was to continue the olanzapine 15 mg. There was no follow-up plan. Despite symptoms suggestive of delirium, this was never considered.

He was seen by a psychiatrist on 10/4/18. The patient was frustrated with not having an address to which he could be released. He reportedly denied any mental health complaints though reported being paranoid in the past. He exhibited some strange behavior such as repeatedly covering his head with his

T-shirt and making poor eye contact. No changes were made to his medications. The previously detected elevated lipids still were not addressed.

On 10/11/18 he was seen by a PNP after being moved to restrictive housing.  There was no indication that mental health was consulted about whether this was contraindicated. He was destroying the phone on HU-3 but the patient denied this. The patient reportedly denied any mental health symptoms. The PNP noted no mental health cause for his behavior. However, there is no explanation for his behavior either, which seemed unusual given the proximity of his release.

There was another PNP visit on 10/16/18, he was "seen while in the office to sign his release paperwork." He was to be released the following week to structured living setting in Jackson. He was noted to have negative symptoms of schizophrenia, social dysfunction, and to exhibit "odd mannerisms/presentation at interview, which are indicative of his [diagnosis], schizophrenia." The patient also reported not being on any medications despite having an active prescription for olanzapine. He was noted to be "a poor historian with poor insight. He simply presents with [symptoms] that suggest an extensive [history] of mental illness that is not associated with behavioral issues. He recently reported behavioral issues that occurred on unit 3 were likely related to his mental illness."  It was not clear what this meant. The PNP noted that would be difficult to get the patient to follow up with outpatient care due to his denial of mental illness. Oddly, despite the fact that he was about to release, there was a generic treatment plan associated with the PNP note. As with many other such treatment plans, it had generic interventions that were of course not going to be done because he was releasing. This makes it abundantly clear that these treatment plans are boilerplate.

*This is another seriously mentally ill man that received nothing other than psychotropic medications. Abnormal laboratory results consistent with metabolic syndrome were never discussed or followed up, putting him at risk of the adverse health consequences of metabolic syndrome. Despite indications of deterioration, nothing was done to address this, and he landed in restrictive housing just prior to his release yet despite being obviously and seriously ill, there was no consideration of the likely harm of such restrictions or the impact of his mental illness on his behavior. It appears that he in fact released from restrictive housing. There was no release plan other than a statement about structured housing, which he clearly needed. To release a chronically mentally ill man from isolation directly into the community places him at risk both because of the shock of such a huge change and because there would be no chance to assess his stability in interactions with others.  Further, he was in need of discharge medications, prompt mental health follow-up, and assistance with benefits and insurance, none of which were addressed.*


**Patient 10**

This is a patient I previously reviewed.

Records are from 7/11/18 to 9/21/18.  He was diagnosed with Bipolar Disorder, Antisocial Personality Disorder, and poly-substance dependence.

MARs are in the record for June and July (both showing incomplete entries).

Labs: unremarkable complete blood count 7/20/18 and a complete metabolic panel was normal 7/23/18.

On 7/11/18, there is a note that he was placed on suicide watch at the time of intake to Delta Correctional Facility though a suicide assessment was negative. It appears he was transferred to MSP shortly thereafter. A global consent that even includes injectable medications is dated 7/11/18 at the time of admission.

On 7/20/18 he sustained a jaw fracture in an altercation as well as other injuries. There was also another global consent that day. He was in another fight 7/25/18 and described by a nurse, as "euphoric" and, consistent with the long-standing diagnosis, "Suspect that [inmate] is bipolar."

On 7/26/18, he was given an IM injection of Haldol and Benadryl. Standing orders for Tegretol and Benadryl were also started. He was noted to be manic and uncontrollable.

On 7/30/18, he cut himself while in segregation at Delta. No foreign body in abdomen 7/30/18.

He was at MSP in August, in segregation for some time. He remained level of care C.

He was assaulted again 9/20/18 at Delta.

*This man's continuing serious behavioral problems were never addressed and continued on after leaving EMCF and being at Delta.*


**Patient 11**

This is a seriously mentally ill man diagnosed with bipolar disorder and having a clear history of psychosis whom I saw on my first visit and did a thorough chart review on.

Current records are from 1/4/18 to 9/11/18.

As the record opens, he was level of care C and placed on HU-4 at EMCF. His medications were Depakote 1000 mg and olanzapine 10 mg.

He was not seen by mental health until 3/2/18. There was a brief note indicating that he "has made progression in reporting that he is not having any mental health issues." The mental status examination was unremarkable. There was a similar note from 3/12/18.

On 3/20/18 he complained to a PNP that the medications were not "giving the high that I want." The PNP said that that was not the purpose of medications but staff did not explore this further. He then spoke about a wish to be transferred and family. He made personal inquiries of the PNP. He spoke about his CO having an inmate boyfriend and that somehow the CO was using this as a threat and went on to talk about how he was in for murder and should thus not be threatened. He talked about how he felt his mother was killed for insurance money. He was difficult to redirect. None of these issues were explored as to whether they might be symptoms of reemerging psychosis or mood disorder. He stated that he needed "more time than this visit to talk about everything going on with me." The PNP noted that the labs reflected medication adherence though these are not in the record. An AIMS that day was scored as zero.

He was next seen 4/10/18 by an MHP. The brief note indicated that his mental status examination was normal. Reported taking his medications. There were similar notes on 5/30/18 and 6/4/18.

He was seen by a PNP on 6/26/18. He reported using spice and wanting to quit "when I get out so I can find a good woman and be a good husband." He spoke about murdering his sister and her fiancé. He stated that he wanted to swear at the PNP and that somebody needed to put the PNP in her place. The note suggests some hypersexuality and the patient reported mood swings. He was noted to be talkative and some grandiosity. The plan was to continue current medications. An AIMS was scored as zero. There was another brief MHP note on 7/3/18 that had a mental status exam that was completely within normal limits.

A lab report from 7/11/18 shows a normal CBC, normal CMP, and a therapeutic valproic acid level of 83.1.

There was another brief MHP note from 8/2/18 that showed no abnormalities in his mental status examination. There was a very similar note from 8/28/18.

The final note was a PNP note from 9/11/18. He continued to require frequent redirection and made advances on the PNP. He stated that he had continued to smoke spice. Other than his flirtatious behavior, no mental status examination abnormalities were noted.

The MARs are largely complete and show no medication refusal.

*This patient's record demonstrates a positive response to medications. He received adequate psychopharmacologic intervention with appropriate monitoring except for not having any lipids done while on olanzapine. While he received no other treatment, he remained reasonably stable. He clearly would have benefited from treatment to improve his insight and to address his substance abuse. However, it was concerning to see some growing evidence of problem behavior toward the end of the record that was never addressed.*


**Patient 12**

I interviewed this middle-aged man during my October 2018 site visit; he was housed on the ACU. He reported that HU-3C was "chaotic" and "violent" and that custody only came on the unit for count or to break up fights. He stated that the ACU was the "only haven." He reported that on the ACU, nurses and mental health did almost daily rounds. He reported that groups occurred regularly, except when they were lockdowns. He was hoping to have one-to-one psychotherapy to address PTSD symptoms. He complained that once patients do well, they are moved and have to start over with a new mental health staff. He reported that medications were coming more reliably over recent months but that historically medications came in at 2 AM if at all. He had been at EMCF for 18 years and had a life sentence as a habitual offender. He reported a history of suicide attempts, including swallowing razor blades and hanging. He reported making nooses "while asleep." He could not recall all of his medications. He reported a history of early life trauma and that his father and brother committed suicide.

The medical record was from 1/8/18 to 10/23/18.

The first mental health note was a brief 1/10/18 MHP note with security present. The mental status examination was completely within normal limits. The plan was to monitor him.

He was seen that same day by a PNP. He reported having refused a haloperidol decanoate injection the previous month. He was noted to have anxious affect, to be euphoric, and to complain of auditory hallucinations "from guys dying in the military." There were no delusions or thought disorder noted. Despite being anxious he was described as call. They discussed other antipsychotics but his medication regimen was unchanged: Depakote 1500 mg nightly, haloperidol decanoate 150 mg IM monthly, Benadryl 50 mg in the morning and 100 mg at night. His diagnosis was bipolar disorder.

He saw a PNP again on 2/6/18. The patient wanted to leave EMCF. He stated he had been refusing haloperidol since December 2017. He reported hearing "screams of dying soldiers." He also reportedly stated he had visual hallucinations of soldiers he served with dying. There is no evidence of mood disorder, thought disorder or delusions. He had no negative symptoms. The haloperidol was discontinued and he was to be started on olanzapine 15 mg nightly (above the recommended starting dose). There were no baseline labs ordered but a valproic acid level was ordered. Despite his symptoms clearly being more consistent with PTSD, he continued to be treated as if he had bipolar disorder and continue to carry this diagnosis.

On 2/13/18, labs ordered by a medical provider showed a normal CBC. The CMP showed slightly low sodium and chloride in a mildly elevated liver function test. A valproic acid level was in the therapeutic range at 82.4.

A 2/21/18 note indicated that he was on HU-3.  He attended the following groups while on HU-3:

- social skills: 2/21/18, 3/7/18, 3/21/18,
- the patient refused groups on the following dates: 3/14/18,

He had brief MHP contacts (most with security present) on 2/28/18 and 3/23/18.

He was seen by a PNP on 3/6/18.

A PNP saw the patient on 3/25/18 after he was referred by the MHP because of requesting to "be alone and on lockdown. He reported [complaints of] having a 'meltdown and his unit is stressful, three fights on my unit'."  The patient reported that he had swallowed razor blades three weeks previously but had passed them. He continued to report PTSD symptoms. He denied suicidal and homicidal ideation. He reported paranoid ideation.  While the note indicated that he had paranoid delusions, the content was not reported. The plan was to increase Zyprexa and Depakote and refer to the ACU.  No follow-up labs were ordered.

He was admitted to the infirmary on 3/29/18 and seen by a PNP. He had told custody staff that he "felt like he was going to either hurt someone or hurt himself." He continued to report seeing dead bodies and having auditory hallucinations. He was cooperative but irritable and anxious. There was no suicide risk assessment. He was placed on suicide observation in the infirmary in a suicide shroud with a suicide blanket and finger foods. He is not allowed to have personal property but was allowed to have a mattress and shower shoes. An AIMS was scored as zero. There was still no lipid profile in the record.

There was no infirmary admission nursing note.

While in the infirmary, he was seen by an MHP in brief rounds on 3/30/18 and 4/3/18.

There were no nursing notes on the following dates:  3/30/18, 4/1/18

A PNP saw him on 3/30/18. He was marginally cooperative but denied any problems. He was retained on suicide observation.

A 4/2/18 PNP note indicated that he was doing somewhat better. He asked for clothes back. Suicide observation was discontinued and he was placed on psych observation.

On 4/3/18 he was placed on the ACU still on psych observation but with regular clothing, bedding, and personal property. Other than his speech being mildly pressured, the mental status examination was completely within normal limits. It is unclear why he was placed on the ACU.

On 4/4/18, there was an ACU nursing plan with generic goals regarding age-specific communication and coping. That same day there was an Activity Therapy Assessment that noted him to be interested in virtually everything but did not identify any problems or how activity therapy would address any particular issues.

He regularly attended groups while on the ACU. These included activities groups, depression, medications (actually a 1:1 nursing staff).  Groups were sometimes canceled, even for several days, due to lockdowns.

He was next seen by a PNP on 4/12/18.  He reported feeling depressed and being somewhat isolative, not wanting to be around others. He reported that he liked "the quietness and being able to get away, not able to do that on the units, I like this. He reports he has been having thoughts to cut his throat at times due to his moods, depressed; however, he denies thoughts, plans, or intents [sic] at interview." He also reported that he had shot himself under the chin and required reconstructive surgery. He spoke about his childhood abuse. For unclear reasons, lithium was added to his regimen. Appropriate labs were ordered including a lipid profile. However, baseline lithium labs were not ordered prior to starting it. There was no urgency to start lithium, as it takes weeks or longer to show efficacy, so there was time to first obtain the labs.

On 4/18/18, a PNP note reported a completely normal mental status examination. He was having some mild lithium tremor.  He had not been a behavior management problem on the unit.

A 4/25/18 PNP note indicated some symptoms of depression. He complained of poorly described "crazy thoughts" and having auditory hallucinations.

On 5/2/18 he was placed on suicide observation in the infirmary after reporting "flashbacks" and hearing voices that were "wanting me to die." He was thinking of hanging himself. The patient felt that the medications were not helping him.  Paranoid delusions were again reported, though there was no content these in the note.

While in the infirmary he was seen in brief MHP rounds (the mental status examination was always within normal limits, however, the associated note often demonstrated that he was either asleep, did not respond, or only made eye contact) on the following dates: 5/3/18, 5/4/18, 5/10/18, 5/11/18, 5/15/18.

He was seen by a PNP on the following dates: 5/7/18, 5/10/18, 5/15/18, 5/16/18, 5/17/18.

There were no nursing notes on the following dates: 5/3/18, 5/4/18, 5/6/18, 5/7/18, 5/13/18.

On 5/10/18 lab report showed mild and probably insignificant lipid abnormalities, normal CBC, a normal hemoglobin A1C, a therapeutic lithium level of 0.7, a substantially elevated TSH at 13.54, a high normal valproic acid level of 96.6, and a CMP showing larger elevations in liver function tests. The PNP referred the elevated TSH to medical. Liver function test abnormalities and the possible association with Depakote was not addressed. It is important to note that the patient carried a diagnosis of hepatitis; use of Depakote and hepatitis is relatively contraindicated. These lab results were never addressed by a psychiatric prescriber.

On 5/16/18, a PNP increased his Depakote to 2500 mg, despite the fact that his most recent level was near the upper end of the therapeutic range. There is no evidence that he was having serious manic symptoms that would require such an increase.  The patient also expressed a wish to be sent to the ACU or if not there, a housing unit other than HU-3C due to excessive drug use on that unit.  HU-6 was specifically noted as an option.

On 5/17/18, a medical provider opined that the elevated TSH was due to lithium. This would be very difficult to ascribe to lithium, given that there was such a substantial elevation after only being on lithium for one month. But this certainly points out the necessity of obtaining baseline laboratories prior to starting a medication. This would've clarified whether or not the TSH elevation was in fact due to lithium. The medical provider started him on levothyroxine 50 μg daily. There is no evidence of any collaboration between mental health and medical to determine whether in fact continued lithium was even necessary.  The following day a TSH was still elevated at 11.55.

The patient was returned to the ACU on 5/17/18.

During this period in the ACU, he continued to attend groups, though they did not start until 5/25/18 due to an extended facility lockdown. These groups included: activities groups, anger management, personal hygiene (though there were no indications that he had any problems with hygiene - this was simply the group being run at the time), roundtable discussion, depression, hoping and coping, coping with incarceration, dealing with feelings, substance abuse and mental illness, accepting mental illness, adjustment to incarceration, and self-esteem.  The patient refused groups occasionally but largely participated. Some of the groups were just single sessions.

He was seen for brief MHP contacts on the following dates: 5/25/18 (given anger management worksheets as group could not be held due to the facility lockdown), 6/22/18, 7/9/18, 7/17/18, 7/25/18, 7/31/18, 8/3/18, 8/9/18, 8/14/18.

He was seen by a psychiatric prescriber on the following dates (usually in conjunction with the treatment team meeting): 5/23/18, 5/30/18, 6/6/18, 6/13/18, 6/20/18, 6/26/18, 7/3/18, 7/10/18, 7/17/18, 7/24/18, 7/31/18, 8/7/18, 8/14/18, 8/21/18, 8/28/18, 9/4/18, 9/11/18, 9/18/18, 9/25/18, 10/4/18, 10/9/18, 10/16/18, and 10/23/18.

The 5/30/18 PNP note indicated that he was at baseline. However, he was to remain in the ACU.

Despite the increase in Depakote, a 6/7/18 valproic acid level came back lower at 84.3.  This was not discussed in any psychiatric prescriber notes.

The 6/26/18 PNP note continues to report on PTSD symptoms including nightmares and other PTSD symptoms. The PNP finally address the symptoms by adding presence and to try to address nightmares. However, PTSD was not added as a diagnosis at that time.

The 7/3/18 PNP note indicated that he was to remain in the ACU until achieving medium custody because it "allows for more availability of housing on unit3." This is not a good reason to house somebody on a unit that is designated to be treating the acutely ill.

The 7/17/18 MHP note reported that the patient woke up with a "braided rope hanging from the light fixture" in a noose. The patient reported that he did not remember doing this. There was no attempt to evaluate what had actually happened or to conduct a suicide risk assessment. There was no discussion of or collaboration with custody regarding how he was obtaining the materials. There was no plan to manage this potentially risky behavior. The mental status examination was completely within normal limits.

The 7/31/18 psychiatric note indicated that the patient requested 1:1 therapy to address issues that were coming up in groups. The psychiatrist appropriately planned to ask the MHP to provide this therapy. Such therapy was never done. Subsequent MHP notes merely report on events and on occasion that relaxation techniques were employed. While relaxation techniques may be a small element of treatment for PTSD or mood disorder, it is not a complete treatment and does not address the fundamental problems. Cognitive behavior therapy or other evidence-based treatments were indicated.

The 8/3/18 MHP note stated that the patient again woke up, this time reportedly with the "rope around his neck." He again stated he did not know how it happened. This contact occurred with security present. There was no attempt to evaluate what it actually happened or whether there was any suicide risk.

Despite previous notes reporting on the substantial amount and doses of medications that this patient was on, on 8/7/18, a psychiatrist started yet another medication. Sertraline was started for PTSD symptoms. Though the associated note does not directly ascribe the behavior of creating nooses to PTSD, the note seems to imply this. This would be highly atypical for flashback type behavior. This is not something that ordinarily occurs only during nighttime. Flashbacks are generally set off by environmental reminders and consist of reenactment of elements of the previous trauma.

An 8/20/18 TSH was reduced but still slightly elevated at 5.6.

A psychiatrist added PTSD to his diagnoses on 8/21/18. Mental status examination from that date was completely within normal limits. Despite this, he was to continue in the ACU.

On 8/22/18, there was a treatment plan put in the record by an MHP. The goal was to return him to general population within the next 30 to 60 days. PTSD goals were reduction in flashbacks, re-experiencing, and nightmares. However, there was no clear documentation that he was having all these symptoms except for the complaint of nightmares. The interventions were generic: medications, ACU programming, and individual counseling. There are very specific forms of group and individual therapy for addressing PTSD that were not mentioned. The second problem was bipolar disorder with the goals of reducing depression and episodes of mania, generic goals for bipolar disorder. The interventions were exactly the same as for PTSD: medication, ACU programming, and individual counseling. In short, this is another generic treatment plan.

Labs from 9/6/18 include a normal CBC, CMP was slightly further elevated liver function tests and continued low sodium and chloride. These abnormal labs were never addressed, including their potential relationship to psychotropic medications.

On 9/25/18, a psychiatrist adds yet another medication, despite the fact that the mental status examination was completely within normal limits and the only complaint the patient had was that he was having some difficulty sleeping and was still occasionally reporting finding ropes on his floor in the morning (there was no evidence that this was actually verified or if it was verified with the source of material was). The patient reported reduction in flashbacks as well. Despite this, mirtazapine 30 mg was added. While this was reportedly added to help for sleep, at this dose, mirtazapine is not as sedating as at lower doses. Further this is twice the recommended starting dose.

The 10/4/18 psychiatric note stated that patient was "ok, but still has nightmares some. He does feel Zoloft has helped a lot. They're less intense and shorter in duration. Mood is ok in the day. He started Remeron recently but has not seen a tremendous help him sleep yet. He is not worse than last week, but not a lot better he continues to participate in benefit from groups and counseling." It is unclear what the psychiatrist was referring to with regard to counseling as the patient had not been having 1:1 sessions. The mental status examination was completely within normal limits. Zoloft was increased to 150 mg. By this time, he was on very high doses of multiple medications with unclear indications for many of them. The same generic treatment plan was appended to this note as well.

On 10/9/18, he was changed to level of care C. The mental status examination by the psychiatrist was completely normal except for anxiety. He was described as shaking during the interview but then exhibiting no such behavior after he left the room. He also did not have any shaking when he was in groups and had no difficulty with art projects.

Labs from 10/15/18 show a normal CBC and CMP that has normal electrolytes this time but slightly higher liver function tests. The valproic acid level remained high normal at 97.2. The liver function test abnormalities were never addressed.

The final mental health note by a psychiatrist on 10/23/18 indicated that he was still occasionally creating ropes and finding them in his cell.

*This patient continued to claim that he made ropes/nooses during sleep and did not recall making them. I did not see evidence that this behavior was ever verified or that how he was finding materials to make them was ever addressed. No explanation was ever sought or found for this unusual behavior. He ended up on multiple medications at substantial doses, yet his mental status examinations were almost always normal. Further there was never any assessment of whether he truly had bipolar disorder. Most of his complaints were more consistent with PTSD. Nonetheless, a thorough evaluation for PTSD was never done. Given this man's unusual behavior and atypical complaints, careful evaluation, likely with psychological testing, was clearly indicated. Medications were started at above recommended doses and laboratory monitoring was poor. He never received any individual counseling, though this was noted repeatedly as being indicated. He was put at risk in many ways including likely being on unnecessary medications, not having proper laboratory monitoring of the medications that he was prescribed, failure to address potential self-harm, and lack of appropriate psychotherapeutic treatment. This man was not nearly as ill as many of the patients I saw on HU-3 or HU-5.*

**Patient 13**

I reviewed this patient's record previously through May 2017. There was no proper assessment in his record. It was not possible to determine if this patient had needs outside of medication management due to this. Medication management was reasonable. He received no individual or group therapy and only rare contacts with mental health.

The patient was discharged 2/12/18. The discharge note indicates he was on Depakote 1500 mg, olanzapine 10 mg, and propranolol mg 10 BID but does not say whether he was given a supply, only that he needed follow-up; there is no evidence in the record that he received any medications at release. These medications are the same as shown on an MHP note from 1/31/18 during which security was present. No mention was made of upcoming release or release medications; the plan was to monitor.

*There was no evidence of proper release planning for this patient.*


**Patient 14**

The records are from 1/2/18 to 9/7/18.

The record opens with the patient in the infirmary on a 1:1 suicide watch after having seriously cut his arm. He later pulled out the stitches. He was on haloperidol decanoate 150 mg every 14 days, Depakote 1500 mg, Li 900 mg, and Cogentin for side effects. He remained in the infirmary initially for another 6 weeks. During that time, he was mostly on a 1:1 watch, first as a suicide watch, then under psychiatric observation. He exhibited some signs of psychosis and struggled a good deal with anxiety. However, he did not harm himself again and was not a danger to others. Despite this, he received repeated intramuscular injections of haloperidol and Benadryl. In no instance was the documentation consistent with needing an emergency injection. Further, he had been taking oral medications. Thought he sometimes asked for an injection, this was an inappropriate and dangerous use of injections of haloperidol. There is no pharmacological justification for such as-needed use of antipsychotics for reasons other than emergency treatment of acute symptoms with imminent dangerousness. Adjustment of the standing medication dose is the proper approach to use of antipsychotics.

While in the infirmary, he was seen most, but not all, days by nursing staff. He was seen most days by a mental health staff, but not all and not even all weekdays. Further, almost all contacts with mental health staff, other than PNPs, was cursory. There were numerous instances where he was asleep or the note indicated that he had merely made eye contact, yet even these notes included a mental status examination, which was always normal. First, it is not possible to conduct a mental status examination on a sleeping patient. Second, the PNP regularly noted significant symptoms so it is highly unlikely that the patient's mental status was normal.

The PNP meetings were primarily directed at medication management, placement, and assessment of the need for continued observation, which was appropriate. He received virtually no psychotherapeutic encounters except one MHP note that mentioned working with skills and also noted some discussion about planning for future treatment, though this was not spelled out.

He was in the infirmary until being admitted to the ACU. While that was not the original plan, a PNP expressed concern about his ability to be able to manage the environment of HU-3. Because of this concern, he remained in the infirmary rather than going to HU-3 to await admission to the ACU. The PNP clearly considered the environment on HU-3 to be detrimental to the psychological well-being of this mentally ill patient.

During this period he had a lithium level that was 1.0 and the valproic acid level 60.9, both in the therapeutic range. He also had an AIMS was scored as zero. No other monitoring labs were in the record.

The MAR from January 2018 is incomplete but where complete generally shows that he was adherent though there were times when medication was out of stock.

The patient was admitted to the ACU on 2/14/18. The nursing plan identified "coping" as a problem and "anxiety related to present condition." The goals were for the patient: to "express thoughts and feelings," have a "relaxed facial expression," exhibit "no combative/overt behavior," "acknowledges decreased [sic] in anxiety," and "displays coping skills." The interventions were: "explain test/procedures, quiet environment, observe [every] hour(s) for anxiety [for 12 hours], assess orientation/mood/affect [every] hour(s) [412 hours close where bracket." Additional needs were identified as "groups on coping skills, and medication compliance."

The treatment plan from that date is very cursory. It did note that he "often experiences periods of time in which he has an increase in paranoia and police about his life being in danger." The only indication of a plan of any sort was "individual therapy focused on trauma and mood stabilization skills. He never received any individual therapy.

The following day, an MHP gave him a short story to read in his cell. The PNP note that same day indicated that he remained on psychiatric observation status. The PNP informed him "that the unit is still in the works and plans are to start the scheduled activities soon, to include rec." The patient was requesting a shave but PNP was informed that due to staffing shortage the barbershop had been closed for the last two days. He also complained that he hadn't gotten his lithium the previous night. The patient asked to call his mother. The mental status exam was notable for mild symptoms of distractibility and racing thoughts. No psychotic symptoms were noted. No medication changes were made.

On 2/16/18, the patient complained that being on the ACU was just like being in the infirmary, that is he was essentially confined to his cell. However, when speaking with a nurse he did say that it was quieter. He also reported that he again did not receive his lithium.

On 2/19/18, he had an activities therapy assessment. This assessment reported on his interests and attitudes but there is nothing in the assessment or any notes indicating what his needs were and how activities would be used to address his needs.

On the ACU he attended the following groups:

- social skills 2/20/18, 2/21/18 (30 minutes), 2/22/18 (30 minutes), 2/23/18 (23 minutes), 2/26/18 (40 minutes), 2/28/18 (29 minutes), 3/1/18, 3/5/18, 3/6/18 (the final session)
- social skills (unclear if this was a new group) – bingo

- activities group 2/22/18 – activity was coloring, 2/26/18 – board and card games, 3/5/18 – board games, 3/8/18 – board games, 3/16/18 – bingo (limited participation)
- Roundtable discussion 3/7/18
- planning for a better life 3/19/18, 3/20/18, 3/21/18, 3/22/18
- depression 3/28/18, 4/9/18
- psych medications (a nurse run intervention) 4/7/18
- he refused groups on the following dates: 2/23/18, 2/28/18, 3/9/18, 3/16/18, 3/19/18, 3/21/18, 3/23/18, 3/26/18, 3/28/18, 3/30/18, 4/2/18, 4/5/18

A psychiatrist saw him on 2/20/18. The mental status examination was completely within normal limits. The psychiatrist noted no mental health problems and that he was stable on medications.

The February 2018 MAR shows that he was adherent with medications almost all the time. However, lithium was out of stock for several days.

The psychiatrist saw him again on 3/3/18. He complained of depression but no other problems were noted in the plan was to move him to HU-3, which did not occur at that time.

An MHP saw him briefly in rounds on 3/1/18. That same day he saw a PNP and continued to complain of being locked in his cell. Mental status examination was in within normal limits. The plan was to discuss release from the ACU. The following day he told the PNP that he was not sure he was ready leave the unit. He also requested a change from haloperidol decanoate to olanzapine. He also complained of restless leg syndrome. The PNP noted that Benadryl is not helping with this. If the patient truly had restless leg syndrome Benadryl would not help as it is not an appropriate medication nor is the Cogentin that the PNP also discussed. The PNP started him on trihexyphenidyl, which also does not help restless leg syndrome. The patient was changed to olanzapine. No baseline labs were obtained.

On 3/6/18, the PNP saw him again. He complained that he was not getting olanzapine. He had had a visit from his parents. The mental status examination was again within normal limits. He was changed to level of care  D.

A PNP saw him again on 3/8/18 and other than mild anxiety and paranoia he had no problems and the mental status examination was unremarkable. He had an individual session with an MHP that same day, but these sessions were not continued. He spoke about having used spice prior to being placed in the infirmary and becoming convinced that someone was trying to murder his family. He spoke about continued concerns about there being a "hit" on his family. The suicide screening was completely negative including incorrect information about no past suicide attempts and no family history of suicide attempts.

He was seen briefly in MHP rounds on 3/13/18. He was also seen by the treatment team that day and reported feeling depressed. He reported wanting to stay on the ACU due to fearing for his safety in general population. He spoke about fearing being stabbed and alternatively of having thoughts to cut his own throat. The staff told him that there were fewer gang issues on HU-3.  He felt that protective custody would be worse. Monitoring labs were ordered by a PNP. There was no risk assessment and no plan to address these concerning thoughts.

A lab report from 3/14/18 shows substantially elevated lipids. The CBC was within normal limits. He also had an elevated TSH(indicating thyroid dysfunction likely related to lithium). A CMP was within normal

limits. The lithium level was low at 0.5 as was the valproic acid level of 35.2. As his dose had not been changed this clearly indicated that he had only been partially adherent.

The ACU was on lockdown 3/15/18.

During brief MHP rounds on 3/20/18, the patient reported that he had not slept well.

A PNP saw him on 3/21/18. There was no report of the abnormal labs. Mental status examination was normal and all medications were continued.

A PNP saw him again on 3/29/18.  His increasing failure to attend groups was noted. He complained about his meds being brought out one or two in the morning and this interfering with his sleep schedule. He also stated that they were out of Depakote for "a couple of days." The low lithium and valproic acid levels were noted but the elevated lipids and TSH were not. The PNP increased the olanzapine, highly problematic in a patient with elevated lipids. The patient reportedly signed a medication consent this day, but there is no evidence that the patient was informed of the elevated lipids and the risk of being on olanzapine. The Depakote was also increased but there was no discussion of adherence issues and the fact that he had had a previous therapeutic level of Depakote on the same dose.

The MAR for March 2018 shows that he was completely adherent with psychotropic medications. This cannot be accurate given the lab results above.

The PNP saw him again on 4/2/18.  He requested an increase in lithium and this was done. Again, there is no discussion of problems of adherence and the fact that he had had a previous therapeutic level. Despite the fact that he was continuing to miss groups and had these low levels, he was noted to be doing well.

Another PNP note from 4/4/18 reported on his problems with sleep. They also discussed the plan to move him to HU-4B, a faith-based program.  An AIMS was scored as zero.

He was discharged from the ACU on 4/10/18 and transferred to HU-4B.

The next mental health note was a PNP note from 4/13/18. He complained of difficulty waking up to attend programs on his new unit. The PNP decreased is lithium, Depakote, and olanzapine to previous dosages. He had some increased activity and flight of ideas, but this was not commented on with regard to his complaints of being drowsy.

Another PNP saw him on 4/16/18, and he reported decreased need for sleep but no other symptoms were noted. The medications were continued.

The April 2018 MAR is very difficult to read. It is also partially incomplete. It appears to show that he was largely adherent with psychotropic medications.

The next visit was from a PNP on 5/8/18. He complained of being paranoid and was again worried about being harmed. The PNP noted that Artane was helping with "[restless leg syndrome]" which is highly unlikely and if it was helpful it was much more likely side effects of medications rather than restless leg syndrome.

There were brief mental health rounds by an MHP on 5/17/18 at cell front due to a facility lockdown. No problems were noted.

The next note was on 6/11/18 by a PNP during a treatment team. He continued to complain of his legs "jumping around all night." He now stated that Artane was not helping. The PNP started Sinemet without doing a clear diagnostic evaluation for restless leg syndrome. He was continued on the other medications though the times of administration were changed.  An AIMS was scored as zero.

On 7/5/18 he saw the PNP again and reported that he was still having problems with leg movements but not as severe. He was pleased to have his medications in the morning so that he did not have to be "sitting up all night waiting on meds." The mental status examination was within normal limits.

An MHP note from 7/10/18 indicated that he was reporting auditory, visual and tactile hallucinations and was having racing thoughts and mood swings. He reported he was taking his medications.

On 7/24/18 he was changed to level of care C.

On 7/27/18 he participated in a group on setting goals.

On 8/17/18 he participated in a group on expression/open discussion.

On 8/23/18 and 9/7/18 he participated in group called Life Purpose.

The MARs from May through August 2018 are difficult to read and partially incomplete. They appear to show that he was largely adherent to his psychotropic medications.

*Medication management for this patient was poor. He received inappropriate and numerous doses of intramuscular injections of haloperidol without adequate justification when he was already taking oral medications. Abnormal laboratory results including substantially elevated lipids were never addressed and the patient was continued on a medication well known to cause elevated lipids and with long-term health risks. He had dosages adjusted when there were low levels despite having had normal levels on the same dosage previously. The MARs are often incomplete and unlikely to reflect his actual medication taking behavior. Other than a smattering of groups while on the ACU, he received no meaningful treatment. The promise of individual therapy in his treatment plan was not followed through.  This man had serious psychosocial rehabilitation needs that were never addressed.*


**Patient 15**

I interviewed this patient during my first visit to EMCF and reviewed the record in detail.  He has a history of psychotic illness and somatic preoccupation.  He was treated with long-term antipsychotics and mood stabilizers.

The current records are from 1/5/18 to 9/19/18.

The record opens with a PNP visit on 1/5/18; he was level of care C and on HU-3. At that time his psychotropic medications consisted of olanzapine 20 mg at bedtime and diphenhydramine 100 mg at bedtime.  His speech was pressured, he exhibited flight of ideas or racing thoughts, and his mood was labile. He had religious delusions and was paranoid but had no hallucinations. He was having trouble getting along with his cellmate but there were no details about this; the note does not indicate whether he was having thoughts of harming the cellmate. The medications were continued. The diagnosis was bipolar disorder.

On 1/12/18 he refused lab work.

The PNP saw him on 1/24/18 and addressed lab refusal. The patient reported getting along better with his cellmate. He continued to have psychotic symptoms.

On 1/29/18, and MHP saw him along with security. The mental status examination was completely normal. The patient asked about receiving his Benadryl and MHP indicated intent to check with nursing.

There was another MHP rounds with security on 2/16/18 that has no meaningful content. The mental status examination was again normal. The next mental health note was a similar MHP note from 3/15/18. It was a similar MHP note on 3/26/18, though it did report that he was taking his medications.

On 3/27/18 he placed a sick call request and told the nurse that he wanted to be off psychotropic medication so he could leave EMCF. And MHP saw him the following day and essentially reiterated the request and directed him to a psychiatric prescriber. The mental status examination was completely within normal limits.

A PNP saw him on 4/2/18 and he reiterated his request for transfer. Mental status examination was completely within normal limits and he was noted to be adherent to his medications. The PNP noted that he signed consent for his medications. The PNP referred him to his case manager and unit director regarding transfer. The PNP did not mention that being level of care C was a barrier to transfer. An AIMS was scored as zero.

He continued to place sick call requests for transfer.

On 4/27/18 there was another brief MHP note. The patient continued to request transfer. The mental status examination was completely normal. Reported being adherent with his medications.

There was another brief MHP note on 5/23/18 showed no mental status abnormalities in the plan was to monitor.

He had a brief MHP contact on 6/20/18. The MHP noted that his thought process "was incoherent with several loose ideals [sic] or thoughts." He was also agitated. The plan was to monitor him.

A PNP saw him on 6/24/18. He was noted to be "hyper." No other symptoms were noted. The plan was to continue meds and reorder labs.

On 7/12/18 lab results showed a slightly elevated cholesterol, and unremarkable CBC, and normal CMP.

There is a brief MHP note from 7/17/18 that showed no abnormalities. He continued to request transfer. There was a similar MHP note on 8/10/18. He remained on HU-3. Another MHP note from 8/21/18 reported that he wanted off medications but no longer want to transfer. The plan was to monitor him.

He was next seen by a psychiatrist on 9/5/18. He told the psychiatrist he did wish to be transferred to be closer to home. He told the psychiatrist he had a diagnosis of schizophrenia rather than bipolar disorder. The psychiatrist noted negative symptoms consistent with schizophrenia and no clear history of mood disorder by patient report. He noted that the patient was "pretty stable on his meds at this time" and decreased the olanzapine to 10 mg. There was no mention of the slight elevation of cholesterol.

There was another brief MHP note on 9/12/18. He again requested to come off medications. The mental status examination was completely within normal limits. The plan was to monitor him.

He continued to make numerous sick call requests and made multiple medical complaints with limited foundation.

MARs are incomplete, but the entries show that he was generally adherent to his psychotropic medications, largely because they were given at night. He frequently did not show for morning pill line which consisted primarily of antihypertensives. Note that to other patients' MARs were entered into his record.

*This man received adequate psychopharmacologic treatment but nothing else. Fortunately, he did not have severe behavioral problems though his repeated requests for medical care likely represented a psychiatric problem. Some of his sick call request suggested somatic delusions. This was never addressed. This placed him at risk of inappropriate treatment for nonexistent medical conditions.*


**Patient 16**

I met this patient briefly during my October 2018 EMCF visit.  He did not display overt signs of mental illness, but I did not conduct an extended interview.

The record is from 1/4/18 to 9/19/18.  He was on HU-3C and level of care B.

On 1/4/18, he received an injection of Prolixin decanoate 37.5 mg.  The order was for 50 mg.

A PNP note from 1/10/18 reported that he stated he is having auditory hallucinations telling him to kill himself.  He asked for a shot.  The PNP noted that he was having substantial side effects including akathisia and Parkinsonian tremor.  He was restless but not agitated.  He was cooperative and by no means out of control.  Thus, an emergency injection of Prolixin was not indicated, but was ordered.  It also makes no sense that at the same time the PNP was giving him additional dose of antipsychotic, his standing antipsychotic was decreased from Prolixin decanoate 50 mg to 37.5 mg every two weeks. Lithium was also increased to 1200 mg, though the note does not indicate what his level was and it is not in the record.  Cogentin was also increased, presumably to target the side effects mentioned above. The plan was to obtain labs in three weeks.  An AIMS that day was scored as 10, but it may not have been scored correctly as akathisia and tremor are not to be scored.  There was an MHP note the same day reporting that the hallucinations were telling him to kill himself and that he was seen by the PNP. There was no plan to follow him up other than routinely, which is certainly odd considering that he was given an emergency injection of an antipsychotic and reported command hallucinations to kill himself.

In fact, he was not seen again until 2/4/18 by a different PNP.  There was a brief note that indicated he had no mental health symptoms whatsoever.  The previous command hallucinations to harm himself or not mentioned; the note only indicates that he had "no [suicidal ideation]" and no auditory hallucinations.  No medication changes were made.

2/7/18 labs showed a therapeutic lithium level of 1.1, normal TSH (thyroid function), and normal CMP . A PNP saw him that day and owing to continued side effects and convinced the patient to change from Prolixin to olanzapine.  The PNP also added Depakote because it was "likely to target moods/assist the

[olanzapine] in decreasing voices, the Depakote to calm his moods/target his anxiety, which likely to further jury crease the voices [sic]." This is not a proper justification for the use of Depakote. The olanzapine was started at 30 mg, three times the recommended starting dose. Similarly, Depakote was started at 1500 mg, twice the recommended starting dose. There were no baseline labs for olanzapine (lipid profile) or one additional required for Depakote (CBC). The only labs ordered were a Depakote level in one month.

He was admitted to the ACU on 2/14/18, the reason for this admission and discussion of possible admission had not been addressed in previous notes. The nursing admission note indicated that he denied any suicidal or homicidal ideation and had no hallucinations. However, he was anxious and "unable to sit still, shaking legs bilaterally." He said he had "just received a shot for that and it would pass soon." There was no note indicating why he would have been given an injection.

An MHP note the following day recorded a cell front meeting where the patient declined to come out for any activities. He was seen by a PNP that same day and complained of sedation from the olanzapine, asking to have it reduced. He was "mildly anxious" and "mildly pressured." Other than noting that he was distracted and had increased activity and racing thoughts, the mental status examination was normal. The plan was to decrease the olanzapine to 15 mg.

There was a brief psychiatric note on 2/20/18. The patient reported liking to be on the ACU because it was "very quiet." The mental status examination was completely within normal limits and the plan was to "continue current plan of treatment."

A 2/28/18 psychiatric note was brief, indicating that he was recently taken off Prolixin decanoate but remained on lithium, Zyprexa, Depakote, Cogentin, Benadryl, and Symmetrel. The plan was to consider discontinuing Symmetrel and Cogentin. The mental status examination was within normal limits.

On 3/1/18, there were brief MHP rounds.

There was a 3/1/18 PNP note. The patient reported he was ready to go back to his unit. The patient was wanting to reduce medications. Amantadine, benztropine, and lithium were reduced and the Depakote discontinued. He reportedly still had some symptoms of akathisia. The mental status examination was completely within normal limits.

A 3/2/18 PNP note reported normal mental status examination and a plan to discharge him from the ACU. It was by no means clear why he had come to the ACU or what was intended to be accomplished or what had been accomplished.

He attended the following groups while on the ACU:

- Social Skills: 2/20/18 – introduction. 2/21/18 – assessment. 2/22/18 – 30-minute group on basic communication. 2/23/18 – 22-minute group on conversational skills. 2/26/18 – 40-minute group on three styles of interaction and assertiveness skills. 2/28/18 – 29-minute group on assertiveness skills. 3/1/18 (new therapist) module five friendship skills.
- Daily Activity: 2/21/18. 2/22/18 – coloring Mandala. 2/23/18 – coloring Mandala. 2/26/18 – board/card games. 2/28/18 – board game. 3/2/18 – card games.
- Refused groups: 2/19/18

There was a Weekly Activity and Rounds Log from the ACU for 2/21/18-3/2/18. It was filled out by a combination of security, mental health, and medical staff. It is very incomplete and does not indicate whether blanks mean it wasn't done by staff or the patient did not participate, thus it is of no real value.

He was not seen again by mental health until a PNP visit on 3/16/18. The patient asked for an injection of Benadryl because he was "locking up." The PNP stated that there were "no [symptoms] of stiffness" noted during interview. There was no physical exam to evaluate this. Nonetheless the PNP gave him an injection of Benadryl.

A 3/19/18 valproic acid level came back as an undetected. The medication had been stopped but the lab was not discontinued. There was still no lipid profile or CBC done.

He was seen by a PNP on 4/1/18 following his request. He wanted to return to the Prolixin decanoate shot, claiming that the olanzapine was not helping, though also noting that he had not gotten it every day. He stated that he was having hallucinations again telling him to kill himself. He stated that the auditory hallucinations went away when he got an injection. This is highly unlikely. The PNP also spoke to him about his history of side effects. When the PNP offered an oral dose of olanzapine, he denied that he had any suicidal intent. Despite his expressed misgivings about being on olanzapine, it was increased to 20 mg. There was no indication that he consented to this.

On 4/4/18 there was a cursory MHP rounds note with security present.

A PNP saw him the following day and he initially expressed suicidal ideation and then later said that he was not suicidal. He had mildly pressured speech and racing thoughts. Other than that, the mental status examination was normal. No changes were made to his medications.

On 4/6/18 there was a cursory MHP rounds note with security present.

On 4/12/18, he was seen by a PNP and MHP owing to reports of having thoughts to hang himself. During the interview he noted that he owed peers for spice that he had been using "for a couple of weeks." He also asked to go to the ACU again. He again claimed that he was having auditory hallucinations telling him to kill himself and appeared somewhat anxious. He was placed in the infirmary with a suicide shroud and suicide blanket but with a mattress and shoes. He was not allowed utensils. 15-minute checks were ordered. The plan was to increase the olanzapine to 30 mg. However, other than his self-report of auditory hallucinations, there was no evidence of psychosis. He was not noted to be responding to internal stimuli.

He was next seen by mental health during brief MHP rounds on 4/16/18. He stated he was ready to return to the housing unit. The mental status examination was completely normal. There was no suicide risk assessment. The PNP saw him later that day and he stated that his hallucinations had decreased, and he denied any suicidal ideation. He was to be discharged from the infirmary back to HU-3.

He remained in the infirmary on 4/17/18 was seen in brief rounds by an MHP. He stated he was no longer suicidal. It appeared that he was moved back to his housing unit soon thereafter.

He reportedly was a no-show to a 4/22/18 PNP visit. The following day labs were canceled due to a facility lockdown.

On 4/30/18, a lithium level came back at 0.9, within therapeutic range.

He was next seen by mental health for a PNP visit on 5/7/18. The therapeutic lithium level was noted and he was said to be doing well with a completely normal mental status examination. The PNP ordered a CBC, lipid panel and hemoglobin A1C.

The labs came back on 5/15/18 and showed a normal lipid profile, normal CBC, and normal hemoglobin A1C.

There was a cursory MHP rounds note with security present from 5/24/18. He stated he was taking his medications no problems were noted. The plan was to monitor him.

He presented without problems during a 6/4/18 PNP visit. His level of care was changed from D to C. An AIMS that day was scored as zero, verifying that the previous AIMS had been scored incorrectly.

On 6/6/18 there was a cursory MHP rounds note with security present.

On 7/3/18 there was a cursory MHP rounds note with security present.

On 7/31/18, there is a notation that he requested to come off medications in a sick call request.

On 8/3/18 there was a cursory MHP rounds note with security present. There was no mention of his request to come off medications. In fact, the note indicated that he was "compliant with medications and they were working." This language is repeatedly used in these rounds notes. Thus, it is questionable whether he actually said this. This is especially doubtful given that there was an 8/8/18 nursing note where he said that he had not been taking his meds for 2 to 3 months.

On 8/10/18 response to the sick call request by the same MHP who did the 8/3/18 rounds reported on his request to come off medications. The plan was to refer to a psychiatric prescriber and monitor him. There was no real assessment of his current condition and, as usual, the mental status exam was completely within normal limits.

He was seen by a psychiatrist on 8/22/18. The patient reported that he had stopped medications for two months and reported on his history of ADHD. The psychiatrist evaluated the patient's reported history of mood symptoms and found no evidence of depression or mania. He also noted the "vague [history] of [auditory hallucinations] there were worse on meds and highly sporadic and vague." The mental status examination was completely within normal limits. All medications were discontinued. He was changed to level of care B. His diagnosis was changed from bipolar disorder to ADHD.

He attended a group entitled dealing with feelings on 9/7/18. There were no further groups before the end of the record.

There were brief MHP rounds with security present on 9/10/18. The patient denied problems with "mood swings, anger, depression, or paranoia." The MHP noted now that he was on no medications.

A psychiatrist saw him on 9/19/18 and he was stable.

The January MAR shows adherence to medications; it is complete.

The February 2018 MAR shows almost complete adherence to amantadine, benztropine, antacids, diphenhydramine, and stool softener. He received an injection of fluphenazine decanoate 2/1/18. He

was started on olanzapine and Depakote 2/8/18; the MAR shows adherence.  It is almost complete and shows lithium being out of stock for two days at the end of the month.

The March 2018 MAR is not complete.  The completed entries show that he was largely adherent to psychotropic medications.

The April, May, June, July and August 2018 MARs are largely complete and show continued adherence.  Note that he later said that he had discontinued taking all medications for at least July and August.  Given his report to others, it is unlikely that these MARs accurately reflect his medication taking behavior.

That is the end of the available record.

*This man never received a proper assessment.  He was treated with major medications for questionable reasons.  He suffered serious side effects and it is doubtful that antipsychotics were ever indicated.  When finally seen by a psychiatrist, who did a very limited assessment, he was seen as unlikely to require treatment for psychotic or mood disturbances.  His suicidality was never properly assessed and there was reason to believe that there were social issues driving his claims.  His behavior on the unit, including substance use, was never assessed or addressed.  He received no individual therapy.  He received a few groups while on the ACU, though it is highly questionable these were relevant to him as most were activities oriented.  The social skills may have been of some value.  Other than these few groups, he received no meaningful treatment.  Whether he has any significant mental health needs remains somewhat unclear, but only a proper assessment is able to determine this; psychological testing was indicated.  Failure to properly assess the need for medication put him at unreasonable risk of being treated inappropriately with medications he may not have needed.*

**Patient 17**

I met this older male patient during my October 2018 visit to EMCF.  He had a speech impediment but was understandable.  He was overtly delusional, talking about being in the FBI since 1967 and here at EMCF because of doing FBI work.  He spoke about helping to "bust Commissioner Epps."  He was also grossly thought disordered, making much of what he had to say unintelligible.  However, it was impossible to get him off the subject of the FBI.  He was disheveled and malodorous.  His shoes were largely destroyed with tattered and burned toe boxes.  He was unable to tell me how they got this way seemed to indicate he had something to do with burning them.

The current records are from 1/4/18 210/4/18.  He carried a diagnosis of schizophrenia.  He was on HU-3.

The record opens with a 1/4/18 MHP note.  The encounter was with security present, thus likely representing rounds.  The patient reportedly stated "he did not have any mental health concerns at this time."  The mental status examination was entirely within normal limits.  The plan was to monitor him

1/6/18 PNP note indicated that he was "very unclear and hard to understand" and "rambling."  He had reportedly not been a behavioral problem on the unit.  He reportedly did not believe he needed medications.  Despite this, mental status examination was entirely within normal limits except that his judgment and insight were poor and his affect flat and mood labile (which do not go together).  He was

noted to be level of care B. The plan was to continue him on no medications. There was no description of his self-care.

The next contact was a 2/16/18 MHP rounds with security present. There is another cursory note exactly the same verbiage as the previous MHP note.

The next visit was a PNP contact on 3/27/18. The brief note stated that he was not on medications and the mental status examination was completely within normal limits. The note stated that he was "not psychotic." There was nothing about his speech impediment, his flat affect, or any other findings that were almost certainly present that time.

A 3/29/18 MHP rounds note again had a normal mental status examination. No delusions were noted but he was "rambling on." He spoke about not wanting medications because of gastrointestinal side effects.

A Rule Violation Report dated 4/16/2018 states that he was writing on the wall inside cell number 202 on Unit Three, A pod. After being asked to stop by a sergeant, he responded that he could send her to jail for "violation [sic] his right."

A 4/25/18 MHP rounds note describes him as completely normal. The plan was to monitor him. There were similar notes on 5/11/18 and 6/12/18.

There was another brief PNP note on 6/27/18. He reportedly denied all symptoms and the mental status examination again was completely within normal limits. The plan was to get some routine labs, though the reason was unclear as he was not on any medications.

There was another cursory MHP note on 7/2/18, again with normal mental status examination.

On 7/18/18, lab results came back with a normal lipid profile, normal CBC (except slightly low platelets), and a normal CMP.

There was another brief MHP note from 8/9/18. The mental status examination was again completely within normal limits.

A 9/4/18 MHP note reported that he was "slightly bizarre" and had "loose associations." He denied any mental health problems. In addition to the above problems the MHP noted that he had "minor intrusive thinking present but it does not appear to be interfering with his ability to function."

On 9/12/18 he refused his two-year dental exam. There is no assessment of whether he was competent to refuse or discussion of why he refused.

A psychiatrist saw him on 9/25/18 and noted that he was stable but "does ramble some. He is also quite difficult to understand." He was also described as being delusional but was pleasant and cooperative. The psychiatrist noted that he "may have some underlying psychosis, but does not warrant involuntary meds." He also described negative symptoms, including flat affect. He was noted to be clean.

On 10/4/18 he refused to contact with an MHP. The record ends here.

*This was a grossly mentally ill man who was receiving no services because he was not a behavior management problem. There was no effort to engage him or work with him to take medications to address his evident psychotic symptoms, putting him at risk of continued psychosis and worsening*

*medication responsiveness.  Though he was not described as having poor self-care in the medical record, when I saw him, he was ill kempt and malodorous.  This man needed attention to medication adherence and psychosocial rehabilitation as well as training on activities of daily living.*

**Patient 18**

I interviewed this patient when I was at EMCF in October 2018.  He was floridly psychotic and had grandiose and paranoid delusions.  He believed that he was Jesus Christ and could control light and raise the dead.  He talked about the food being poisoned, a nurse injecting him with strychnine, and a nurse receiving a prison sentence of life without parole and being a member of the Ku Klux Klan.  He talked about being in the FBI and knowing magic.  He made reference to having shots forced on him, mentioning the CERT Team holding him down.  He talked about killing Vice Lords and killing other inmates since he had been locked up.  He was thought disordered and had moderately pressured speech.  He is frustrated with being on HU-5, saying he "can't take it."  He talked about swallowing pieces of things to try to go to the hospital in order to get off the unit.  He stated that he was waiting to go to the ACU.  Asked why he wanted to go there he said that he couldn't be moved anywhere else because he was in the FBI.

The record is from 1/1/18 to 9/23/18.

The record opens with him in the infirmary on psychiatric observation status.  He was given an injection of haloperidol decanoate.  He resisted but there were not enough CERT Team Members available to compel his taking the injection.  It was administered the following day; the nurse's note indicated that patient "began to curse and threatened staff stating, 'I'm FBI and I am not supposed to be here and I ain't going to take any shots.' … Patient attempted to spit on officers."  There was no evidence that a *Harper* hearing for involuntary treatment was held for this patient.

The first mental health note was from 1/3/18 and he was seen by a PNP.  He continued to express delusional ideas and the note clearly indicates that he has a history of dangerous behavior.  The plan was to continue haloperidol decanoate 200 mg by intramuscular injection every 14 days.  This is a very high dose but possibly warranted.  He was also on Benadryl 100 mg nightly.

A 1/4/18 PNP note indicated that the patient had historically done well on lithium and olanzapine, but he refused to consider either of these medications.  He remained agitated and psychotic.

While in the infirmary he had almost daily nursing notes.  There were occasional days that were missed.

The next mental health note was a 1/8/18 MHP rounds note. The patient continued to be overtly psychotic.  The plan was to monitor him.  These rounds continued on the following dates (during some of which he was sleeping or did not respond, though there was always a mental status examination included): 1/9/18, 1/10/18, 1/16/18, 1/18/18, 1/19/18, 1/22/18, 1/23/18, 1/25/18, 1/26/18, 2/6/18, 2/8/18, 2/9/18, 2/12/18, and 2/13/18.  He was visited by a PNP on the following dates: 1/9/18, 1/17/18, 1/22/18, 1/31/18, 2/6/18, 2/9/18, and 2/13/18.  Thus, he was not seen every day and not even every weekday by mental health while in the infirmary.

On 1/9/18 after trying to spit on a PNP he was given an injection of haloperidol and Benadryl.

He accepted his next dosage of haloperidol decanoate without hands-on being required.  However, he continued to threaten, saying things like staff was going to served 20 years in prison for giving him this injection.  He continued to express delusional ideation and agitation.

On 1/18/18, the MHP wrote a note that indicated some effort to work with him around medication adherence and trying to help goal set.

On 1/30/18, he allowed the haloperidol decanoate injection to be given without any need to compel him.

On 1/31/18 during a PNP visit, the patient requested a trial of olanzapine.  However, at this point the PNP declined.  They discussed Depakote with him which he initially declined but after "much encouragement, he agreed to start Depakote 1000 mg by mouth [twice daily]."  This is more than twice the recommended starting dose.  Labs were ordered, but for three weeks later.

The PNP discussed the possibility of going to the ACU during a 2/6/18 meeting.  PCP also noted that he was still on "long-term segregation."  While he was initially relatively calm, he steadily escalated and became more agitated and overtly psychotic as the interview proceeded.

During a 2/9/18 meeting with the PNP, the patient clearly stated that he did not want to take Depakote.  However, it was continued.  He remained psychotic and easily agitated.  He then refused the Depakote and it was discontinued by the PNP on 2/12/18.

On 2/13/18, following continued request by the patient, he was changed from haloperidol decanoate to olanzapine 30 mg nightly.  This is three times the recommended starting dose.  No lipid profile was ordered or in the record.

He was admitted to the ACU on 2/14/18.  There is a brief note by a psychiatrist that day that indicated he was grossly delusional and "talking nonstop."  The diagnosis was bipolar disorder.  The recommendations were to "continue to observe behavior.  Return to clinic in 1 week."

There was a generic nursing care plan from that day.  He remained on psychiatric observation status.

An ACU admission note from the same date noted problems of non-adherence to medications, instability and psychosis, need for stabilization, and "in need of ongoing mental health evaluation observation."  No such evaluation was ever done.  The plan was for individual and group sessions.  No individual therapy was undertaken.  There were no goals or specific interventions indicated.

An activity therapy assessment from 2/19/18 indicated his interests but there was no goal or target of treatment or how activities were going to assist him in stabilization.

While in the ACU he attended the following groups:

- daily activity: 2/19/18 – mandala coloring, 2/21/18 – coloring, 2/22/18 – coloring, 2/23/18 – coloring, 2/26/18 –games, 2/28/18 –games, 3/5/18 – games, 3/5/18 – exercise and music, 3/8/18 – games, 3/23/18 – games, 3/26/18 – games, 3/28/18 – games, 3/30/18 – games, 4/2/18 – games, 4/4/18 (apart from other clients) – games, 4/6/18 – games, 4/10/18 (apart from other clients) – games, 4/13/18 (apart from other clients) – games, 4/16/18 – games, 5/9/18 (apart from other clients), 5/11/18 – games, 5/14/18 – games;

- social skills: 2/21/18 (30 minutes) – module one, 2/22/18 (30 minutes) – module two, 2/23/18 (22 minutes) – group conversation, 2/26/18 (40 minutes) – three styles of interaction, 2/28/18 (29 minute) – conflict resolution skills, 3/1/18 – friendship skills, 3/2/18 – friendship skills, 3/5/18 – friendship skills, 3/6/18 – self-care, 3/12/18 – bingo, 3/19/18 – games, 3/21/18 – games;
- roundtable discussion:  3/7/18 (ending out certificates for completion of social skills modules);
- planning for a better life:  3/8/18 – module one, 3/19/18 – module three, 3/20/18 – module four, 3/21/18 – module five, 3/22/18 – graduation;
- depression:  3/27/18 – module one, 3/28/18 – module two, 4/13/18 – module four, 5/10/18 – stress, 5/11/18 in parenthesis apart from other clients) – taking care of myself;
- refused groups: 2/20/18, 3/9/18, 4/7/18

He was seen by a PNP (usually in conjunction with the treatment team) on the following dates while in the ACU:  2/15/18, 3/1/18, 3/6/18, 3/8/18, 3/13/18, 3/15/18, 3/16/18, 3/21/18, 3/29/18, 4/4/18, 4/12/18, 4/18/18, 4/25/18, 5/2/18, 5/15/18, 5/16/18.

MHP rounds were completed on the following dates on the ACU:  2/16/18 (incorrectly stating that he was in the infirmary), 3/1/18, 3/13/18, 3/20/18, 5/3/18.

The psychiatrist saw him again on 2/28/18.  The note is filled with typos.  It was clear that the patient complained of sedation.  However, he remained very delusional with pressured speech and flight of ideas.  The olanzapine was decreased to 10 mg twice daily, presumably because of the sedation.  However, this was a questionable decision given his clear symptomatology.  There was no consideration of a change to a different medication.

The PNP saw him the following day and apparently did not know this change and wrote an order for him to be on olanzapine 15 mg twice daily.  The patient also did not seem to know about the above change by the psychiatrist.  Despite the psychiatrist note, it appeared that the olanzapine was changed from olanzapine 30 mg at HS to 15 mg twice daily on 2/28/18.  Thus, the PNP's intention to change the dose was superfluous.  But then on 3/2/18, the dose shows up as olanzapine 10 mg twice daily.

On 3/8/18, an MHP note indicated that he was increasingly agitated.  He was very delusional.  The MHP indicated the need to "monitor compliance with medications" but did not review his medication taking behavior.  He was seen that same day by a PNP who increased the olanzapine back to 15 mg twice daily, also without reviewing his medication adherence.  There was still no lipid profile in the record.

Notes from a 3/13/18 treatment team meeting clearly showed that he was still grossly psychotic.  He talked about being "tired of being locked down."

On 3/14/18, he assaulted a peer.  The associated EOR stated that he was the aggressor in the altercation.  He was placed on lockdown for 48 hours but remained locked down for longer than this and was allowed to return to groups on 3/19/18.  The notes clearly indicate that his psychotic thinking was related to the altercation.  An associated 3/16/18 PNP note reported that he stated that he had been flushing the olanzapine down the toilet though a 3/19/18 olanzapine level was in the normal range.  An AIMS that day was scored as zero.

3/19/18 labs included a lipid profile that showed very high triglycerides and other concerning abnormalities.  A CMP was unremarkable.

The 3/21/18 PNP wrote a note from a treatment team meeting. However, the abnormal lab results above were not addressed nor was the olanzapine level and the plan was to continue on his current medications. He remained grossly psychotic.

A 3/29/18 PNP note from a treatment team meeting reported on the olanzapine level but did not report on the abnormal lipids. The plan was to continue the same medications.

A 4/3/18 treatment team note indicated that the patient was making limited progress and there were concerns that he might harm another inmate out of the misguided, likely delusional, notion that he himself would be harmed.

On 4/4/18, a psychiatrist and PNP evaluated him together. He remained grossly psychotic with delusions and thought disorder. He believed he had special powers and continue to speak about being an FBI agent and many other bizarre ideas, including having killed the warden. He continued to refuse lithium and Depakote. However, he was felt not to represent a danger to himself or others at the time and was to remain on the ACU. There was no discussion of changing antipsychotics or of the elevated lipids.

On 4/9/18, he was not allowed to participate in groups due to "hostile behavior."

A 4/25/18 PNP treatment team note indicated that the facility remained on lockdown and thus there were no activities on the ACU. The patient continued to express psychotic symptoms but was not noted to be agitated. No changes were made has medications. The lockdown continued as of 5/2/18.

On 5/5/18, he was not allowed out of his cell by security because the previous night he had refused to return to his cell and was uncooperative.

On 5/15/18, he was not allowed to come out of his cell for groups. A PNP note that same day indicated that he reported that he was not taking medications. He was told that if he did not take medications he would "not likely remain in the ACU." He continued to be grossly psychotic and was more hostile and agitated. There was no plan to address his medication adherence. The PNP met with him the following day but could not convince him to take medications and he remained psychotic and hostile. There was no discussion of involuntary medications.

On 5/17/18, he was transferred back to the infirmary on suicide observation, though there was no evidence that he was suicidal. He was reported to be severely agitated. A CERT Team "assisted with this transfer." He threatened to kill others. His history of stabbing and scolding peers was noted in the note. The PNP discussed the case with a psychiatrist. The PNP ordered emergent haloperidol and Benadryl injections and then long-standing haloperidol decanoate injections. While it is clear that consideration of involuntary antipsychotics was warranted, there was no evidence that a Harper hearing was held to authorize the long-acting haloperidol decanoate. The olanzapine was discontinued, there were still no discussion regarding his elevated lipids. He was made level of care E.

During his time in the ACU, there are also occasional nursing notes indicating some psychoeducation around things like handwashing and activities of daily living. He refused to attend the nursing group on medication education was reportedly given some med information by nursing staff, though it was not clear whether he reviewed this or discussed this with the nursing staff.

While in the infirmary he was seen by an MHP for brief rounds (during which he was often asleep or nonresponsive) on the following dates:  5/18/18, 5/21/18, 5/24/18, 5/25/18, 5/30/18, 5/31/18, 6/1/18, 6/4/18, 6/5/18, 6/8/18, 6/12/18, 6/20/18, 6/22/18, 6/25/18, 7/2/18, 7/3/18, 7/9/18, 7/10/18, 7/13/18, 7/16/18, 7/17/18, 7/23/18.

While in the infirmary he was seen by a psychiatric prescriber on the following dates:  5/18/18, 5/21/18, 5/25/18, 5/29/18, 6/1/18, 6/4/18, 6/8/18, 6/11/18, 6/12/18, 6/13/18, 6/15/18, 6/18/18, 6/19/18, 6/20/18, 6/25/18, 6/28/18, 7/3/18, 7/5/18, 7/9/18, 7/10/18, 7/11/18, 7/12/18, 7/16/18, 7/17/18, 7/18/18, 7/19/18.

On 6/1/18, he was given an emergency injection of haloperidol and Benadryl due to being agitated and aggressive.  He was threatening and hostile.  He was noted to be "a full psychotic rage/psychotic agitation that is further escalating."

An AIMS was reportedly done on 6/8/18 and scored as zero, however it is highly unlikely that a proper examination could have been done with the patient as he was described as uncooperative and the PNP noted that the meetings was "dominated by his delusions and paranoia."  It was not even clear that he was taken out of his cell for this assessment.

He received another emergency injection of haloperidol on 6/12/18.  That same day there was a treatment plan entitled "mental health crisis treatment plan – suicide watch."  Patient strategies to reduce risk are that the "patient will comply with recommendations/orders for suicide observation. Patient will report changes to mood/thoughts, to include suicidal thoughts, plans, or intents."  The staff interventions are "to monitor patient on suicide observation with informing [sic] the psychiatrist asked if any attempts to harm self [sic].  Will then downgrade to 1:1 suicide observation.  Psychiatry staff to adjust medications as needed.  The psychiatry staff/MHP/[nursing] staff to ask patient directly if he is exhibiting suicidal thoughts [sic], plans, or intents [sic].  Staff to ensure he has no personal property in his cell, the goals of preventing/decreasing reisk [sic] suicidal attempt [sic].  Staff to continue to offer redirection of thoughts, to include reorienting/redirecting his delusions.  Psychiatry staff/mental health staff to continue to collaborate with patient to improve insight regarding his mental illness and the highly recommended need for ongoing medications."

Some of these are reasonable long-term goals, but there was no direction on how to achieve these goals in the day-to-day interactions by the staff, which is the essential content a treatment plan needs to provide.  Much of the rest of it was not really interventions but part of a suicide risk assessment, for example inquiring about his suicidal thoughts.  There was no formulation regarding his behavior or the purposes that it served that are needed to guide a reasonable treatment plan.  It indicated that he was on suicide watch because of being manic and psychotic and this predisposing him to suicidality, though there was no real analysis of why this would be the case.  His danger to others was clear but not danger to himself.  And given that he did not express any suicidal ideation, it makes no sense that this was included as a goal.

The next day he was given another injection of haloperidol and Benadryl.  It was supposed to have been given the previous day but per the PNP, there reportedly was a "no-show from the security staff after two security staff had feces thrown on them by [the patient]."

Despite having no evidence of suicidality, he remained on suicide precautions until 6/18/18. On that date the PNP noted that he was calmer. He reportedly stated that he would be willing to take haloperidol injections every two weeks if that could help him get back to the ACU. He was changed to psychiatric observation status.

On 6/20/18, he received a new dose of olanzapine at 20 mg. He reportedly agreed to take haloperidol but there was none in stock for oral use.

On 7/3/18, he was seen by a psychiatrist. He continued to be manic and psychotic. The plan was to add olanzapine 10 mg to his regimen. There is no discussion of his previously elevated lipids. It was increased to 20 mg on 7/12/18.

In a 7/18/18 note, the psychiatrist notes that he may go back to the ACU. If he did, he would be shackled and have two officers with him when out of cell. He is also not be allowed to go to groups and would attend programing by himself, and if out of his cell he would be restrained for these treatments as well. It was noted that he remained a long-term segregation status individual. The possibility of returning to HU-5D was also noted, which the patient did not care to do.

He was transferred to the ACU 7/23/18. At that time, he was level of care D.

While in the infirmary, there were nursing notes virtually every day. He was not seen by mental health every day or even every weekday even while on suicide precautions.

On 7/24/18, a generic nursing care plan was entered into the record.

An ACU admission note from 7/25/18 indicated the need to stabilize "thoughts and moods … Severe delusions … Anger issues." It also spoke to the need for him to be compliant with medications. There were no individualized interventions indicated, just sessions. However, some of this form was covered up.

While on the ACU he was seen by a psychiatric prescriber on the following dates: 7/24/18, 7/27/18, 7/31/18, 8/1/18.

While on the ACU he was seen by an MHP for rounds on the following dates: 7/31/18 (with security present).

While on the ACU he had individual sessions as follows:

- Anger management: On 7/25/18, the patient was "given assignments behind locked cell doors because he could not come out with the other group." This continued on 7/26/18;
- Social skills: 7/26/18 (from inside his cell while others were in the dayroom);
- Dealing with feelings (the notes do not indicate whether he was by himself, in his cell or with others but was presumably not out with others): 7/27/18, 7/30/18

A PNP note from 7/27/18 reported that the patient was upset because he was not getting "enough time out of cell." He was reportedly only required to get one hour of recreation daily (presumably out of his cell alone). He was noted to be "severely agitated." He asked to be taken to restrictive housing. He was made level of care E.

Of note, he received dental care on 8/1/18.  There was no indication whether he was in restraints or not.

He was transferred to restrictive housing on 8/1/18.  A PNP note documents that he remained psychotic and needed to continue on haloperidol decanoate and olanzapine.  There was still no mention of his previously elevated lipids.  He was seen while in handcuffs, so it is not possible that the AIMS scored as zero that day was done correctly.

On 8/8/18, he received another injection of haloperidol decanoate.

He was next seen by mental health for an 8/9/18 PNP visit.  That day he insisted that he was not on long-term segregation.  He continued to express his long-standing delusional ideation.  The plan was to "follow him closely on the segregation unit."  There was no consideration of whether this setting was contraindicated for him.

The next note was another MHP note from 8/14/18.  He remained psychotic.

On 8/16/18 he saw a PNP.  He continued to express psychotic ideation.  However, he was reportedly not aggressive.  Similar to previous times, he made bizarre statements about being injected with a medication that they give monkeys that caused an infection of his fingers.

The PNP saw him again on 8/23/18.  There was no change in his status.  The same was true on another PNP visit 8/31/18.

A 9/4/18 MHP note was brief but indicated his ongoing psychosis.

On 9/5/18 he was referred by an MHP to the PNP and again sent to the infirmary owing to being severely agitated.  He expressed being "tired of being locked down."  He talked about having no soap or toothpaste, being unable to get recreation time to shower (stating he had not had one in three weeks).  He then expressed suicidal ideation and talked about cutting his jugular vein.  He was placed in the infirmary with a suicide shroud, suicide blanket, finger food (no utensils) but was allowed to have a mattress and shower shoes.  There is no change to medications. The plan included that "MHP staff to provide 1:1 individual counseling as needed."  This was never done.

He received another injection of haloperidol decanoate that day.

While in the infirmary he was seen by a psychiatric prescriber on the following dates:  9/6/18, 9/7/18, 9/10/18, 9/11/18, 9/12/18, 9/13/18, 9/14/18, 9/17/18, 9/19/18, 9/20/18.

While in the infirmary he was seen by an MHP for rounds on the following dates:  9/6/18, 9/7/18, 9/10/18, 9/11/18, 9/12/18, 9/13/18, 9/18/18.

On 9/6/18, the psychiatrist changed his diagnosis from bipolar disorder to schizophrenia; it appears this was primarily because the patient exhibited negative symptoms.  Given the record it is likely that he did have schizophrenic spectrum disorder, however there was likely an affective component as well.  Schizoaffective disorder may have been a more appropriate diagnosis, but it is likely that he was not bipolar.

During a PNP visit on 9/7/18, he spoke about killing himself if he is returned to restrictive housing.  He remained psychotic and agitated.

A psychiatrist saw him on 9/10/18 and spoke about him being "a bit calmer and stable before returning to [restrictive housing] for [long-term segregation] status. He has been doing fine there for a while, just has had a setback, but should return to baseline soon." There was no discussion of whether there were any contraindications to his placement in restrictive housing. However, in a subsequent note on 9/12/18 the psychiatrist wrote that the patient "really has no choice given his long-term [segregation] status -- despite his denial that he should have his status."

On 9/13/18, he was given an emergency injection of haloperidol owing to being very agitated.

He was given another emergency injection of haloperidol and Benadryl the following day following his request for an injection. Despite this, he was to be sent back to restrictive housing that day. However, he refused to leave the infirmary and became highly agitated when security showed up to move him to restrictive housing. He talked about having killed people and that he would kill more people have placed in restrictive housing, though he described killing them with magic. He remained in the infirmary on psychiatric observation.

On 9/18/18 a psychiatrist wrote that it was he would have to go back to restrictive housing in the next day or so and "it is unclear how he will react to this." In fact, he again resisted being placed in restrictive housing and became severely agitated and was retained in the infirmary.

On 9/21/18 he was given another emergency injection of haloperidol and Benadryl.

While in the infirmary, there were nursing notes from virtually every day. The last one was on 9/23/18; the patient remained on psychiatric observation. He remained clearly psychotic. He was also seen almost every day by mental health staff, primarily psychiatric prescribers.

MARs are frequently incomplete. However, where complete it demonstrated occasional non-adherence with oral medications, but not at the level described in the progress record. For instance, the day he reported flushing medications down the toilet, he was shown to be largely adherent.

*This seriously mentally ill man was never properly stabilized and should have been hospitalized until stabilized. Failure to adequately treat this seriously ill, continuously psychotic man represents a serious risk in terms of his future functional ability and likely response to treatment. While involuntary medications were appropriate for him, appropriate due process was not followed. This is a man who clearly was a candidate for Clozaril or at least trials of other antipsychotics besides haloperidol and olanzapine, to which he responded poorly. While there is some indication that he had some response to olanzapine, he had seriously elevated lipids on this medication and this was never addressed. Repeat lipids were never ordered. It is also clear that he did poorly in restrictive settings and yet this is where he remained almost all the time. During his extended periods of instability, hospital-level care was indicated. This case also clearly demonstrates the need for a more secure residential mental health unit that can serve the needs of highly behaviorally disordered and seriously psychotic individual such as this. Failure to control his symptoms also put others at risk.*

*He was also ordered initial starting doses of medications that were well above recommended starting doses on several occasions. The prescribing practices for this patient were poor.*

**Patient 19**

I interviewed this middle-aged patient during my October 2018 visit to EMCF. At that time, he was in the infirmary. This obviously mentally ill man was malodorous, missing teeth, and wearing a makeshift cross. He had a coarse bilateral upper extremity tremor worse on the right than the left and complained of the right hand tremor. He complained that he didn't have hypertension and that staff threatened him if he did not take his antihypertensive medications. He also talked about having had leukemia in the past and having been hit by a car with loss of consciousness and multiple traumas. He had been in special education while growing up as well. He stated that he was in the infirmary because he had been in an argument on HU-3. He had been there three days and spoke about having gotten injections. He stated that he had been "tricked" into taking the injection with the promise of being able to return to his housing unit if he did. When I met with him he was staring, rocking, and intense. He exhibited thought blocking. He talked about the importance of religion and having been a Christian for 22 years. He had magical thinking about getting out soon due to his prayers and added that maybe he would get out if he held himself to his word to get his GED. He went on to talk about getting a hundred million dollars if he prayed for it. He reported that he had been in no groups other than Bible study and had occasional visits with mental health.

The records are from 1/2/18 to 10/23/18.

The record opens with a 1/2/18 nurse note indicating that he was throwing things out of his cell and "had rambling speech."

A PNP note the following day clarifies that he is on psychiatric observation in the infirmary. He was reportedly "a little disorganized, but improvement is noted." He was also noted to be hyper religious, have religious delusions, and also spoke about auditory hallucinations of God and Satan. He was not being aggressive and was reportedly taking his psychotropic medications which consisted of injections of Prolixin decanoate 25 mg every 14 days and Benadryl 100 mg by mouth nightly. He was also on medications for high blood pressure and hyperlipidemia.

He was seen by another PNP 1/4/18. The note indicated that he had been admitted to the infirmary a week previously due to "exhibiting bizarre behaviors on the zone, to include aggressive body/verbal language, cursing staff. Staff and peers were concerned regarding his behaviors." He had been nonadherent with his medications after having done "well in general population for nearly 4 years." He had also been changed from Prolixin decanoate to oral medications four months before this decompensation. He continued to exhibit some evidence of mania but was deemed stable enough to return to the housing unit. The PNP also started Depakote 1500 mg daily (twice the recommended starting dose). Baseline labs were ordered, but for three weeks later.

He was returned to the infirmary the following day because he had continued to "exhibit bizarre behaviors on the zone." He was noted to have "rambling/loose conversations." He was placed on psychiatric observation with normal clothing, personal property, and utensils. He was to be on 30-minute checks. He was changed from level of care C to D.

He was next seen by mental health for MHP sheltered housing rounds on 1/8/18. He was singing in his cell. The mental status examination was completely within normal limits. The patient wanted to return

to his housing unit and get a job; he was told "to put in a request form for the [housing unit] manager for work." This was likely beyond this patient's capability.

He was seen the following day by a PNP, still obviously symptomatic. The patient wanted to decrease the Depakote, however it was actually increased and oddly the note stated that he "agrees to take prescribed medication." He had no valproic acid [for monitoring Depakote] level in the record, yet the Depakote was increased to 2500 mg daily in divided doses.

He was not seen for by mental health from 1/13/18 to 1/15/18.

ON 1/16/18, he was seen by an MHP in brief rounds (the note included a normal mental status exam) and by a PNP the following day. He continued to have manic symptoms and was continued in the infirmary.

He was seen again by mental health 1/18/18 during brief MHP rounds. Mental status examination was completely within normal limits once again.

The 1/19/18 MHP rounds note indicated the intention to provide daily rounds in the infirmary.

He was next seen on 1/22/18 by a PNP who noted that he had "loose rambling conversations that are dominated by delusions." He had not been taking the oral Depakote. The nursing staff reported that he had been flushing his medications down the toilet. He was disheveled and grossly psychotic.

An MHP rounds note that day included a completely normal mental status examination. An MHP rounds note from the following day reported on his "religious, grandiose delusions."

He was the subject of brief MHP rounds (during which he was sometimes sleeping or nonresponsive; there was a normal mental status examination in most notes) on the following dates: 1/25/18, 1/26/18, 2/6/18, 2/8/18, 2/9/18, 2/12/18, 2/13/18, 2/15/18, 2/20/18, 2/21/18, 2/23/18, 3/1/18, 3/5/18, 3/9/18, 3/13/18, 3/16/18, 3/20/18, 3/23/18, 3/26/18, 4/3/18, 4/9/18, 4/16/18, 4/19/18, 4/23/18, 4/24/18, 4/26/18, 4/30/18, 5/2/18, 5/3/18, 5/4/18, 5/8/18, 5/10/18, 5/11/18, 5/15/18, 5/17/18, 5/18/18, 5/21/18, 5/24/18, 5/29/18, 5/30/18, 5/31/18, 6/1/18, 6/4/18, 6/5/18, 6/12/18, 6/20/18, 6/25/18, 7/2/18, 7/3/18, and 7/10/18.

On 1/27/18, 1/28/18, and 1/31/18 the patient received intramuscular injections of haloperidol and Benadryl. There were only nursing notes indicating that he had been loud and disruptive, banging on the window, and throwing feces.

There were no nursing notes from 1/29/18, 1/30/18, 2/3/18, 2/4/18, 2/6/18, 2/9/18, 2/10/18, 2/11/18, 2/13/18, 2/14/18, 2/15/18, 2/16/18, 2/17/18, 2/18/18, 2/19/18, 2/21/18, 2/23/18, 2/24/18, 2/25/18, 2/26/18, 2/28/18, 3/1/18, 3/2/18, 3/3/18, 3/4/18, 3/5/18, 3/6/18, 3/7/18, 3/8/18, 3/9/18, 3/10/18, 3/11/18, 3/12/18, 3/13/18, 3/17/18, 3/24/18, 3/25/18, 3/26/18, 3/29/18, 3/30/18, 3/31/18, 4/1/18, 4/2/18, 4/3/18, 4/7/18, 4/8/18, 4/16/18, 4/21/18, 4/22/18, 4/25/18, 4/27/18, 4/29/18, 5/4/18, 5/6/18, 5/7/18, 5/14/18, 5/18/18, 5/19/18, 5/20/18, 5/26/18, 5/29/18, 5/30/18, 5/31/18, 6/1/18, 6/2/18, 6/3/18, 6/4/18, 6/6/18, 6/7/18, 6/8/18, 6/10/18, 6/12/18, 6/13/18, 6/14/18, 6/15/18, 6/16/18, 6/17/18, 6/18/18, 6/20/18, 6/22/18, 6/23/18, 6/25/18, 6/26/18, 6/27/18, 6/29/18, 6/30/18, 6/31/18, 7/4/18, 7/6/18, 7/7/18, 7/8/18, 7/9/18, and 7/10/18. Note that several of these were days on which he received emergency injections of psychotropic medications.

The next PNP note was from 1/31/18 and reported that he had "been flooding his cell, beating on the door and throwing feces." He was noted to be oppositional, unkempt agitated, pressured, labile, inappropriate, and tangential. He was also noted to have religious delusions. He was changed from Prolixin decanoate to haloperidol decanoate because of poor response. However, a dosage increase had not been considered, which would normally have been the course of action in order to complete a trial of medication, especially if changing to medication with a very similar pharmacologic profile.

He received additional emergency injections of an antipsychotic on the following dates: 2/1/18, 2/8/18, 2/20/18, 3/6/18, 3/8/18, 3/13/18, 3/30/18, 4/4/18, 4/12/18, 4/24/18, 4/30/18, 5/3/18, 5/10/18, 5/16/18, 5/21/18, 5/23/18, 5/24/18, 5/25/18, 6/13/18, 6/14/18, 6/15/18, 6/18/18, 6/19/18, 6/21/18, 6/26/18, and 7/1/18.

He was seen by a psychiatric prescriber on the following dates: 2/1/18, 2/6/18, 2/8/18, 2/12/18, 2/19/18, 2/27/18, 3/6/18, 3/8/18, 3/13/18, 3/21/18, 3/23/18, 3/26/18, 3/30/18, 4/2/18, 4/4/18, 4/9/18, 4/12/18, 4/16/18, 4/17/18, 4/23/18, 4/24/18, 4/30/18, 5/7/18, 5/10/18, 5/15/18, 5/16/18, 5/21/18, 5/23/18, 5/24/18, 5/25/18, 5/29/18, 6/1/18, 6/4/18, 6/8/18, 6/11/18, 6/13/18, 6/14/18, 6/15/18, 6/18/18, 6/19/18, 6/21/18, 6/25/18, 6/26/18, 7/5/18, 7/9/18, and 7/10/18.

On 2/22/18, he received a forced dose of haloperidol decanoate. There was no *Harper* hearing in the record.

On 3/2/18 there were finally laboratory results in the chart. The lipid profile was within normal limits, CBC showed a slightly low hematocrit but was otherwise unremarkable, and a CMP showed a low sodium, chloride, and potassium (which could reflect a serious problem such as psychogenic polydipsia). The valproic acid level was in the therapeutic range at 53.2 (indicating that he was at least partially adherent). A TSH was slightly elevated, but probably not significantly so.

The 3/6/18 PNP note did not address the abnormal labs and spoke to his "noncompliance with his Depakote," despite the lab results showing it being in the therapeutic range. Emergency haloperidol and Benadryl injections were ordered because he was agitated, yelling, and banging on the window of his cell. He remained grossly psychotic. There was no discussion of alternative medication regimens.

He was housed briefly on the ACU in mid-to-late March because there were insufficient beds in the infirmary. While there, he assaulted a peer.

The 4/2/18 PNP note continued to report on his decompensation. He was disheveled and grossly thought disordered. An AIMS that day was scored zero. The abnormal lab results had still not been addressed.

On 4/17/18, the PNP changed his pill form of Depakote to a liquid form at the same dose, to hopefully increase adherence, though again the previous labs showing a therapeutic valproic acid level was not noted, nor was a new one ordered.

A 6/11/18 PNP note indicated the hopes of stabilizing him sufficiently so that he could go to the ACU.

On 6/13/18, a PNP ordered labs, finally including a valproic acid level.

On 6/14/18, he was placed on suicide observation but not because he was suicidal, rather to remove items "to prevent harm to others by his acts of throwing items underneath the floor." The note goes on

to say that "less property will result in him becoming less activated/less stimulated." The justification for this was that he would "have less stimuli to keep him going and going." He was placed in a suicide shroud with a suicide blanket and no utensils. He was allowed to have a mattress and shower shoes. His cell was a mess and there was a strong odor coming from the cell.

6/22/18 labs showed a normal TSH, valproic acid level 88.4 (in the therapeutic range), and a CMP notable for slightly low chloride and potassium along with a slightly elevated $CO_2$. The CBC was improperly not run.

He was returned to psychiatric observation status on 7/3/18. He had been seen by a psychiatrist and PNP. A note that day reported on the valproic acid level. He remained manic but less intensely so.

He was transferred to the ACU on 7/10/18. He remained on psychiatric observation status with regular clothing, bedding and personal property. He was allowed to eat with normal utensils and have normal meals. Medications continue to be haloperidol decanoate 150 mg every 14 days, Depakote liquid 2500 mg in divided doses, and Benadryl liquid 100 mg at night. He was said to be "returning to his baseline." He had been in the infirmary for over seven months, essentially in isolation. While in the infirmary, he was frequently not seen for several days. No health rounds were far from daily even on normal working days. He was seen regularly by a psychiatric prescriber.

There was a generic nursing care plan 7/10/18. As with almost all of these, problem of communication barriers was included. The intervention was to "assess level of communication."

While on the ACU he attended the following groups:

- depression: 7/11/18 – module six
- roundtable discussion: 7/12/18 – depression
- activities: 7/9/18 – games, 7/13/18 – movie, 7/16/18 – bingo, 7/23/18 – movie, 7/25/18 – games and coloring, 7/27/18 – movie, 7/30/18 – bingo, 8/3/18 – games, 8/6/18 – bingo, 8/8/18 – games
- help coping: 7/13/18 – module six, 7/16/18 – module two, 7/17/18 – module three, 7/18/18 – module for, 7/19/18 – module five, 7/20/18 – module six, 7/24/18 – module seven
- social skills (conducted by activities therapists): 7/19/18, 8/2/18 (reportedly given a posttest "since they have learned all the modules out of the social skills group" but patient only attended one)
- social skills (conducted by an MHP and following a curriculum): 7/25/18 – coping with incarceration
- dealing with feelings: 7/27/18, 7/30/18, 7/31/18, 8/1/18, 8/2/18, 8/3/18, 8/6/18, 8/7/18, 8/8/18
- refused groups: 7/18/18, 7/23/18, 7/26/18

He was seen by a psychiatric prescriber on the following dates while in the ACU (all of which were treatment team meetings): 7/17/18, 7/24/18, 7/31/18, 8/7/18.

There were no MHP rounds for this patient while in the ACU.

On 7/17/18, he was seen by a psychiatrist. He was noted to be better but had a right upper extremity tremor greater than on the left. The psychiatric prescriber noted that medication tremors are usually

symmetrical.  While this is true, asymmetrical tremors are seen with side effects and sometimes may indicate an underlying neurological problem.  There was no discussion of changing him to a medication less likely to cause side effects.

On 8/6/18, an MHP was called to the unit because the patient was being loud.  The MHP and an officer escorted the patient to medical for his routine haloperidol decanoate injection, though given a day early.

And 8/7/18 psychiatric note indicated that he had been exhibiting "mild hyper religiosity and talkativeness."  The patient asked to leave the ACU and go to "a regular unit."  The plan was to move him to HU-3.

He was moved to HU-3C sometime after 8/7/18.  He was seen by a psychiatrist on 8/13/18 and was noted to be exhibiting some decompensation.  The unit had been on lockdown for a day.  The patient no longer wanted to be on the housing unit and the team discussed that HU-3C might not be a good fit for him.  He was moved to the infirmary on psychiatric observation.

While in the infirmary, he was seen by a psychiatric prescriber 8/14/18 and 8/15/18.

While in the infirmary, he was seen by an MHP for sheltered housing rounds 8/14/18.

On 8/15/18 he was moved back to the ACU pending a bed opening up onHU-3 pods A, B, or D.  He was level of care E but changed to D the following day.

There was an ACU admission note from 8/15/18.  It was filled out cursorily.  The mental status examination was completely within normal limits.  The section entitled "potential conditions which will likely increase risk" the following was entered: "anger issues, noncompliance with meds, bad attitude."  This is woefully nonspecific; language such as "bad attitude" should not appear in the record either.

While on the ACU he attended the following groups:

- dealing with feelings:  8/17/18, 8/20/18, 8/28/18 (final class celebration)
- activities groups:  8/20/18 – games
- refused groups on the following dates:  8/17/18

No groups were held 8/16/18 due to a lack of security staff.

He was seen by a psychiatric prescriber on the following dates:  8/21/18, 8/23/18, 8/27/18.

On 8/23/18, the psychiatrist changed him from liquid to pill forms of divalproex sodium (Depakote) and Benadryl.

He had treatment plan on 8/24/18.  The discharge plan, stated that patient "will be fully compliant with meds and he will stabilize and reach maximum benefit from activities, classes and counseling to progress [level of care] from D to C."  This is not a discharge plan and is entirely generic and nonspecific to the patient.  Under bipolar disorder, the goal was "reduction in depression and anger, reductions and symptoms of mania."  This makes no sense as the patient was not depressed.  There should also be specific symptoms that are targeted.  There were similarly generic objectives.  The interventions amounted basically to that the patient would take medications and attend appointments.  This was a meaningless treatment plan.

On 8/27/18, he was seen by an MHP because he was flooding his cell by stopping up his toilet. A psychiatrist saw him the same day noted that he had been exhibiting increasing behavioral problems and irritating others to the point that they were "threatening to harm him." He exhibited some inappropriate affect, but no delusions were noted.

He was moved back to the infirmary 8/29/18. He was agitated with pressured speech. He had been refusing medications.

While in the infirmary he was seen by a psychiatric prescriber on the following dates: 8/30/18, 8/31/18, 9/4/18, 9/5/18, 9/6/18, 9/10/18, 9/11/18, 9/12/18, 9/13/18, 9/14/18, 9/17/18, and 9/18/18.

While in the infirmary he was seen for brief MHP sheltered housing rounds in the following dates: 8/30/18, 9/4/18, 9/6/18, 9/10/18, 9/11/18, 9/12/18, 9/13/18, and 9/18/18.

While in the infirmary there were no notes by nursing staff on the following dates: 8/31/18, 9/5/18, 9/16/18, 9/19/18, 9/20/18, 9/21/18, 9/22/18, 9/23/18, 9/24/18, 9/25/18, 9/26/18, and 9/27/18.

On 8/30/18, he was refusing both his psychotropic and hypertensive medications. He claimed that he did not have hypertension and was said to have "no insight currently into his symptoms." He also denied having any mental health problems. He remained inconsistent with his medication taking behavior. He was not assessed for his competency to accept or refuse treatment.

He was apparently transferred back the ACU, possibly on 9/6/18, though there was no admission note. There are group notes from 9/6/18 and 9/7/18 though he reportedly did not participate in the latter.

A 9/9/18 nursing note indicated that he had been causing disruption in the ACU and "ran off of the zone twice today and once last night, he locked an officer in the zone, and has been aggravating the other offenders in the zone. I went down to the unit and offender was running around the unit being very loud and disruptive." The patient expressed his wish to go to HU-3A. He was given an emergency injection of haloperidol by telephone order from a PNP.

He was returned to the infirmary that same day. As he was only on the ACU for a few days, the above lists of contacts were continued.

9/11/18 psychiatric note indicates that the patient is still very ill and "needs a mood stabilizer, not just a Haldol shot." There was no discussion of different alternative antipsychotics or benzodiazepines.

Sometime after 9/18/18, he was transferred out of the infirmary to HU-3.

There was a brief MHP note from 9/25/18 described him as having completely normal mental status and no problems. The plan was to monitor him and have monthly contact, despite his long-standing and severe decompensation.

A 9/30/18 nursing note indicated that he had been transferred to the ACU on 9/28/18 after breaking a lightbulb on HU-3. He also been flooding and throwing feces. In that note it was reported that he was given an injection of haloperidol on 9/30/18, but it may have been on 9/28/18. He was back in the infirmary on 9/30/18.

A 10/1/18 psychiatry note indicated that though he had been on HU-3A, he was too unstable for the ACU. The psychiatrist noted that while he was listed as being on suicide watch, he had clothing and no

smock. However, the patient was not noted to have reported suicidal ideation. Rather, he was "quite loud, and hostile over the weekend. He has been beating and banging on the walls. He is been yelling. At one point he was smearing feces." The plan was to check a valproic acid level.

While in the infirmary on this occasion he was seen by a psychiatric prescriber on the following dates: 10/1/18, 10/2/18, 10/3/18, 10/4/18, 10/5/18, 10/8/18.

While in the infirmary on this occasion, he was seen by an MHP for sheltered housing rounds (during some of which the patient was asleep or nonresponsive) on the following dates: 10/2/18, 10/4/18, 10/5/18.

On 10/2/18, a CBC was within normal limits, a valproic acid level was therapeutic at 85, and a CMP was normal except for low potassium and chloride and slightly elevated $CO_2$.

He was moved to HU-3A again on 10/9/18. The next note was a nursing note on 10/12/18 where he had returned to the infirmary after being threatened by his cellmate and having been sprayed with OC after running off the unit. He also had toilet paper stuck in his ears, a behavior often exhibited by patients with auditory hallucinations. He was placed on psychiatric observation. On 10/13/18, he was given an emergency injection of haloperidol and Benadryl by telephone order from a PNP.

He was next seen by mental health on 10/15/18 during brief MHP rounds in the infirmary. The psychiatrist note that same day indicated that he had continued to have behavior problems on the unit including throwing feces and flooding his cell. The psychiatrist noted that he stops taking his medications once he is on the housing unit. He noted that the patient had "a combination of mental health and personality issues. He can do well and has done well with mood stabilization in the past, we just need to get him back to being more consistent with the med."

On 10/16/18, the psychiatrist noted that he had accidentally been given a shot of haloperidol decanoate instead of haloperidol lactate when given the previous emergency injection. The next dose of haloperidol decanoate was to be held.

During MHP rounds on 10/16/18, he was asleep.

He remained in the infirmary through the end of the record, seen regularly by a psychiatric prescriber and in cursory rounds occasionally by an MHP.

MARs are incomplete. The entries for doses that are completed show frequent medication refusal of both psychotropic and anti-hypertensive meds.

*This seriously ill man was never properly stabilized. Hospital-level psychiatric treatment was indicated for this man. Medications other than haloperidol and Depakote needed to be tried. There are a number of other long-acting injectable antipsychotic medications that could have been tried if he continued to refuse oral medications; Clozaril would've been a better choice if he were willing to take it but there is no evidence that this was offered. Further, he received numerous injections of haloperidol with virtually no effect. To control his agitation and mania, he should have had trials of benzodiazepines to try to break him out of his acute manic episodes. If he needed increased haloperidol at the level that he was getting his injections, he should have received an increase in a standing order which is the appropriate way to manage antipsychotic dosages; as-needed antipsychotics should be reserved for brief usage to control acute agitation and when that fails, alternatives must be considered. It is unconscionable that he did not*

*get proper pharmacologic treatment or psychiatric hospitalization. This man essentially remained in the infirmary for almost a whole year, largely in isolation with no activities, showing almost no improvement in his condition. This degree of isolation is extremely counterproductive and likely to worsen the patient's condition. Failure to control his psychosis put this patient serious long-term risk of poor function and poor future response to treatment. Failure to control his symptoms also put others at risk; he was assaultive.*

*Laboratory monitoring was poor. Baseline labs were not properly obtained prior to starting medications. Abnormal results were not followed up. The patient was also started on higher than recommended doses of medications. Here again, the prescribing practices for this patient were poor.*

**Patient 20**

I did not interview this patient but logbooks demonstrated that he had several instances of self-injurious behavior.

The medical records are from 1/4/18 to 9/30/18.

The patient was transferred to EMCF on 1/22/18. A cursory nursing screening from that date stated that he had no mental health complaints. It did not report whether he was on any psychotropic medications were needed a mental health referral. Past diagnoses included depressive disorder not otherwise specified in the record noted a history of "surgery for head injury at age 7." He was level of care A for mental health purposes.

On 3/4/18, a nursing note reported that the patient wanted to see a psychiatric prescriber "because they took me off my medication." The note reported that he denied suicidal ideation. The nurse made a routine mental health referral.

He was seen that day by a PNP. That note stated that a nurse requested that he be seen "as he had been asking questions regarding suicide process here at EMCF this morning. He discussed having a history of being 'on/off' of suicide [sic] in the past." He was reportedly not suicidal, but no suicide assessment was done. He reported having been on mood stabilizers in the past. The mental status examination was completely within normal limits. No medications were ordered.

On 3/6/18 he was seen by another PNP after having tied a string around his neck. The PNP noted that he uses suicidal behavior "to manipulate and get his way." He had a long history of criminal behavior and substance use. There was no mention of the history of head injury. The patient reported that he "thought you had to be on suicide to get back on meds." He reportedly denied any suicidal ideation and spoke about plans to move to Chicago after his release in 2019. He wanted to restart Depakote for "mood/anger." He was noted to be irritable, talkative, to have increased activity and esteem elevation, distractibility, racing thoughts, decreased sleep, and exhibiting risk-taking behavior. He was diagnosed as having bipolar disorder. He was started on Depakote 1000 milligrams nightly (above the recommended starting dose). A CBC, CMP, and valproic acid level were ordered, but for two weeks later.

On 3/22/18, a CBC and CMP were unremarkable. The valproic acid level was low at 26.6.

The MAR from March shows that the patient was non-adherent with taking the Depakote about one third of the time. Though the April and May MARs are incomplete (there are blanks where there should be entries), they continue to demonstrate frequent nonadherence.

On 4/4/18, there was a nursing note reporting that he had placed a sick call request complaining that the Depakote was not controlling mood swings. He was seen by an MHP on 4/9/18. The MHP note is cursory and simply refers him forward for a PNP evaluation. The MHP reported a completely normal mental status.

After not being seen, he submitted another sick call request reported on by a nurse on 4/27/18. He complained of mood swings, decreased sleep, side effects, paranoia, depression, anxiety, and suicidal thoughts.

On 5/15/18, he placed another sick call request, this time complaining of suicidality. He still had not been seen by a PNP. He was seen the following day by an MHP who did a brief assessment but did no crisis intervention but sent him to medical where he was seen by a PNP. He told the MHP that his mother had died and he was feeling suicidal. He had cut himself on the arm as well. He had also recently been assaulted by a peer. The PNP saw him that day and he stated that he planned to continue harming himself even if it resulted in his death. He reported trying to hang himself while incarcerated in 2017 and multiple other times previously. He reported being psychiatrically hospitalized starting at age 9. He reported past medications included antipsychotics as well as mood stabilizers and treatment for ADHD. He reported crying spells and difficulty sleeping. He also stated that he was using "spice and ice" most days. The mental status examination noted the presence of homicidal ideation, though this was not explored in the body of the note. No psychotic symptoms were identified, yet the PNP started him on olanzapine (an antipsychotic medication) 10 mg. The PNP also ordered nightly Benadryl. He was admitted to the infirmary on suicide precautions. No labs were ordered. His nonadherence to Depakote was never noted.

A crisis plan was entered into the record on 5/16/18. It notes family deaths as a precipitating event. The signs of risk are thoughts of harming himself and inability to cope with losses. Some of this section is illegible. Inmate strategies are to notify staff of self-harm thoughts, ventilate feelings related to loss, and take medications as ordered. The staff strategies are to place him on suicide watch, review medications, and frequent contact for 1:1 counseling. This is a marginally adequate crisis plan. However, it was not followed through in the sense that his use of strategies was never monitored or reinforced and he was not provided any 1:1 counseling.

There were brief MHP rounds (during some of which there was no verbal interaction he was asleep yet all showed a normal mental status examination) on the following dates: 5/17/18, 5/18/18, 5/21/18.

He was next seen by a PNP on 5/21/18. He requested a change in housing unit. The mental status examination was completely within normal limits and he denied suicidal ideation. He was discharged from the infirmary.

He was seen daily by nursing while in the infirmary.

He was next seen by an MHP on 5/29/18 after writing on a sick call request that he was suicidal. The brief note reported that he told the MHP that he was not suicidal but there was no real evaluation or commentary on why he had put that on the sick call request. The plan was to monitor him.

On 6/1/18 there was a valproic acid level that was below therapeutic at 21.1. The previous low acid level had never been addressed. He was seen the following day by a PNP who did not report on the lab results. The mental status examination was within normal limits and the PNP continued current medications. A lipid panel was finally ordered. An AIMS was scored as zero.

On 6/6/18, a lipid profile was within normal limits.

On 6/15/18, he cut his arm superficially with a razor blade. A nursing note indicated that he was "placed into 541 by staff since no cells available."

He was seen that day by an MHP who reported that the patient was "in medical strip [sic] of all his clothes and possessions and put in a holding tank." He reportedly stated that he was not suicidal but was fearful that peers were going to kill him and he needed to get off the housing unit. He reported having auditory hallucinations to hurt himself. There was no crisis intervention, rather, the MHP stated "that was a security issue and [the housing unit manager] will be alerted" and he was referred to a PNP. There was no suicide risk assessment and no indication of whether he was to be placed on any sort of precautions, kept in the holding tank, returned to the housing unit.

There is an EOR for the same date, 6/15/2018. The EOR states that an officer found the patient cutting himself and that nurse cleaned his wounds at the EMCF medical department. The patient also advised security staff that two other inmates had pulled weapons on him, a potentially traumatic event that was not addressed by mental health staff.

He was seen the following day by a PNP reported a completely normal mental status examination except that his insight and judgment are poor. The PNP noted the self-harm but did no suicide risk assessment. There was no indication of precautions or where he was located. The patient reportedly had "no problems or side effects from his meds."

The next mental health note was a brief MHP note from 6/20/18. There is no discussion of his recent self-harm behavior. The mental status examination was completely within normal limits but the note reported that he "was incoherent several loose ideals [sic] or thoughts [sic]" and was paranoid. The plan was to monitor him.

A psychiatrist saw him on 7/16/18. The patient reported stopping the Depakote over a month previously, though the MARs for June and July show him to be largely adherent. The psychiatrist noted problems with impulse control and anger management and reported a completely normal mental status examination. There was no mention of the history of head injury. The plan was to discontinue the Depakote and Benadryl and increase the olanzapine to 15 mg "as it can have a positive effect is a mood stabilizer." However, the psychiatrist noted there was no history of bipolar disorder, or other mood symptoms, or psychosis. There was still no indication for an antipsychotic.

The following day, an MHP note reported a completely normal mental status though the patient complained of some depression, irritability, and agitation. Whether he exhibited objective evidence of these symptoms was not specifically reported but should have been.

On 7/23/18, he was placed in restrictive housing. Nursing notes indicate that he had been in a fight several days before, but it was unclear whether this was the reason for restrictive housing placement. He had also placed a sick call request and complained of suicidal ideation. The nursing note indicated

that he had spoken with two different mental health providers, but there was no note from any mental health staff. There was no evidence of mental health input into the decision to place him in restrictive housing, which is especially concerning given the sick call request and recent medication changes.

He was the subject of mental health segregation rounds weekly beginning 8/8/18 through August. There were no nursing segregation rounds in the record.

There was no mental health note until 8/15/18 when there was a very brief MHP note. Mental status examination is completely within normal limits. It was not clear where he was housed at that time. There was a similar brief note from 8/20/18.

He was seen by a PNP on 8/22/18 noted that he had been in restrictive housing for a month. A brief note indicated that he was not having any mental health problems and the mental status examination was within normal limits. The olanzapine 15 mg was continued.

On 8/27/18 there was another nursing note indicating that he was having suicidal ideation and complained of auditory hallucinations. A brief MHP note from that day reported on the auditory hallucinations and reportedly telling him to hurt himself. The plan was to monitor him. He was seen that day by a psychiatrist who noted that the patient's complaints of auditory hallucinations were "vague." He was not responding to internal stimuli and there was no evidence of psychosis.

The psychiatrist saw him again the following day and the patient asked to leave restrictive housing to go to a prerelease program on HU-2C. There was no evidence of psychosis reported. There was no change to his medications.

The next mental health note was from an MHP on 9/19/18. The patient had requested to be seen complained of being depressed and stated he wasn't taking his medication. The MHP identified that his feelings of depression increase when he was thinking of his family. The MHP spoke with him about "utilizing self talk to combat feeling of depression. The MHP also practice [sic] deep breathing techniques to decrease anxiety." The MHP also help the patient think through some ways of addressing challenging situations on the housing unit. The plan was to monitor him weekly or monthly. There was an accompanying treatment plan. Problems identified were depression and anxiety. The intervention for depression was that the patient would "learn to normalize his problems." The plan was for him to "learn the five steps to problem-solving." The MHP was to "elicit personal examples from the client and practice." For anxiety the MHP was going to "teach and role-play relaxation skills."

There were no further notes as of the closing the record on 9/30/18, so it is difficult to know whether or not any of this treatment plan was carried through. Clearly, the patient was not seen weekly following the previous contact.

*This patient never had an adequate assessment and there was no treatment plan until the very end of the record. A marginally adequate crisis plan was put in place but not followed. He was treated with antipsychotics with no justification, putting him at risk of known complications of these medications. Laboratory monitoring was inadequate. He received no groups or individual therapy, except one session with an MHP where some skills were discussed; individual therapy was necessary to address his self-injurious behavior. He was not seen per policy either in the infirmary or segregation, putting him at risk from lack of appropriate monitoring.*

**Patient 21**

I previously reviewed this patient's record covering care to June 8, 2017. There was no proper psychiatric assessment in the record. This patient received only psychopharmacologic treatment. His recurrent self-harm and other problematic behaviors including episodic nonadherence with medications were never addressed.

Records are from 1/1/18 to 2/22/18. He was at Wilkinson County for that time. He remained level of care C throughout the record.

There was a discharge note from 2/22/18 from Wilkinson County. He was informed that he should take Depakote 500 mg and Zyprexa 20 mg; there is no evidence he was given a supply of medications at release. A previous note showed these were discontinued due to noncompliance, though MARs show he was mostly compliant.

*There is no proper reentry plan for this man, putting him at risk of decompensation in the community and potentially putting others at risk as well.*


**Patient 22**

I reviewed this patient's care for my 2016 report. Records reviewed for this report are from 1/1/18 to 8/23/18.

He was at Wilkinson the whole time. He was seen occasionally by mental health staff. After being off medications for 90 days and remaining stable, he was changed from level of care C to A on 8/18/18. The record ends shortly thereafter. He was able to achieve medium custody while at this facility.

*This patient appeared to do much better at Wilkinson than he did while at EMCF.*


**Patient 23**

I interviewed this patient during my October 2018 EMCF visit. He was on the ACU. He exhibited no symptoms of mental illness at the time that I interviewed him. He talked about having used methamphetamine and having psychotic symptoms as a result. He reported being on no medications for a year. He stated that he had been on HU-2D where he was having problems with "gang issues" and having been forced "to live in somebody else's room" when on that housing unit. He stated that he told staff that he was having suicidal ideation in order to get off the unit. He noted that he had also cut his wrists in the past in order to get away from his housing unit. He reported that the psychiatrist asked him if he wanted to be on the ACU and he agreed. He told me that he had had some true suicidal ideation in the past related to losses in his family.

The patient told me that he met with the treatment team weekly while he was on the ACU. He noted that while there was not regular individual therapy, the MHP would speak with him individually if he asked. He reported participating in groups on almost all weekdays.

Medical records are from 2/8/18 to 10/18/18.

The patient was admitted to CMCF on 2/8/18. Upon admission he told the nurse that he was going to "kill myself if mental health does not come see me right now." When mental health came to see him, he reported that his mother had died three days before and he had been having suicidal ideation since then. He also reported that he had been on suicide precautions in 2014 and had a history of cutting his wrists. He reported being on lithium and risperidone. He exhibited depressed mood, was tearful when speaking about his mother's death, and was trembling. The brief mental status examination was otherwise normal. He was placed on suicide precautions. A brief psychiatric note the following day reported that his mother had committed suicide. The patient also reported auditory hallucinations, but these were not further characterized. Medications were Benadryl 50 mg nightly, risperidone 3 mg nightly (increased from 1 mg) and lithium carbonate 600 mg nightly. There were brief psychiatric notes every couple of days. He continued to report suicidal ideation and auditory hallucinations, but there was no other evidence of psychosis.

Laboratory results were returned on 2/19/18 and 2/22/18. These included a normal CMP, normal CBC, and normal TSH. On 2/27/18 a lithium level was 0.5, below therapeutic. No lipid profile was ordered.

On 2/22/18, he told a mental health intern that he was not really suicidal but was concerned about being killed by other inmates because he had testified against some people. However, he was also reporting being upset about his mother's death.

The psychiatrist changed him from risperidone to olanzapine on 2/26/18 because the risperidone was "not working" in terms of reducing complaints of auditory hallucinations. Other than paranoia and the patient's complaints of auditory hallucinations, there was no evidence of psychosis. No lipid profile was ordered.

On 3/3/18 he was changed to psychiatric observation status after denying suicidal ideation. Psychiatric observation status was discontinued on 3/9/18. Subsequent notes at CMCF show no symptoms of mental illness. He remained on olanzapine 10 mg, lithium 600 mg, and Benadryl 50 mg.

He was transferred to EMCF on 4/16/18. The brief nursing note indicated no complaints of any sort. The nurse did not utilize the usual form. There was no documentation of whether he had suicidal ideation or a history of suicide attempts. There was no mental health intake. It was unclear what unit he was placed on.

He was first seen by mental health for a PNP visit on 4/25/18. The PNP noted the lithium level and current medications. The patient reportedly denied any prior psychiatric treatment though spoke to having had treatment for his methamphetamine abuse. The mental status examination was completely within normal limits. The PNP ordered a lipid profile. Medications were unchanged. There were signed consents for olanzapine, lithium, and Benadryl that day. The MAR demonstrated that he had not been taking the lithium or olanzapine. This was not noted by the PNP however, subsequent MARs show resumed adherence initially but then, for entries that are complete, substantially reduced adherence from the middle of June.

He was next seen by an MHP on 5/2/18. The note stated that the patient "seems to be making progress towards us treatment goals of reducing anger, agitation and irritation." There was no foundation for this assertion in the note and there was no treatment plan indicating these being targets of treatment.

The next visit was a cell front PNP contact on 5/16/18. The brief note indicated no abnormalities on mental status and his medications were continued.

On 6/12/18, the patient stated that he had quit taking the olanzapine "a few days ago" due to sedation. The PNP reduced the olanzapine from 10 to 5 mg.

A PNP saw him on 6/21/18, reportedly after telling an MHP that he was having suicidal ideation. The patient reported not taking medications for some time. He reported feeling depressed because his father had cancer. There was no suicide risk assessment done. He reportedly had mildly pressured speech and mild symptoms of mania. No changes were made to medications. He was returned to HU-2D. Labs were ordered again. An AIMS was scored as zero.

An MHP visit with security present the following day did not even address his expression of suicidal ideation the previous day. He reportedly denied suicidal ideation. The mental status examination was completely within normal limits.

He saw the PNP again on 6/26/18. He stated he was still not taking olanzapine. In one place the note indicated that he had no auditory hallucinations, and in another it appears to suggest that he had continued auditory hallucinations. The olanzapine was discontinued and he was started on ziprasidone.

Laboratories from 7/5/18 showed and unremarkable lipid profile and undetected lithium level. The completed entries in the MAR from June and early July showed that he was taking lithium about half the time.

A7/14/18 PNP note indicated that he reported losing 10 pounds, now weighing 110. The brief note indicated that he had reduced appetite. The rest of the mental status examination was within normal limits. Lithium was discontinued because of his nonadherence, though the reasons for his nonadherence, or the need for this medication, were not discussed in the note.

A 7/26/18 MHP note with security present did not mention the weight loss and reported that he "did not have any mental health concerns at this time." However, he had submitted kites complaining of continued weight loss since the previous PNP note.

A note by a medical provider two days later reported that he was eating one meal a day and was depressed and anorexic. Medical provider made a mental health referral.

On 7/31/18, he was admitted to the infirmary on suicide watch. A psychiatric note that day indicated that he had told an MHP he was having suicidal ideation, though there was no MHP note. The patient reported that he was distressed by having lost his mother and brother to overdose and that his father had recently been hospitalized with cancer. He reported not taking medications for a month. The patient reported depression but did not exhibit depressed affect. There was no evidence of psychosis. He was noted to be irritable. The psychiatrist discontinued all medications and noted that it was unclear whether the patient needed any medications.

The psychiatrist saw him the following two days and indicated that there was no evidence of mental illness, commenting that it was more likely that he was wanting to get off of the unit but for unclear reasons. He was slated to be released from the infirmary on 8/3/18. The PNP note that day indicated he might be referred to the ACU, though it was not clear why, as this patient currently had only a

diagnosis of substance use disorders and antisocial personality disorder.  He remained in the infirmary for unclear reasons.

He was admitted to the ACU 8/8/18.

While on the ACU he attended the following groups:

- dealing with feelings:  8/9/18, 8/10/18, 8/13/18, 8/15/18, 8/16/18, 8/17/18, 8/20/18, 8/21/18, 8/22/18, 8/23/18, 8/24/18, 8/27/18, 8/28/18;
- activities groups:  8/10/18 – movie, 8/13/18 – games, 8/15/18 – games, 8/17/18 – coloring, 8/20/18 – games and coloring, 8/22/18 – bingo, 8/23/18 – public speaking, 8/24/18 – movie, 8/27/18 – coloring, 8/29/18 – coloring, 8/31/18 – games, 9/5/18 – bingo, 9/6/18 – public speaking, 9/7/18 – puzzles, 9/10/18 – games, 9/12/18 – games and coloring, 9/13/18 – public speaking, 9/14/18 – movie, 9/19/18 – painting, 9/28/18 – bingo, 10/3/18 – games, 10/5/18 – movie, 10/8/18 – games, 10/10/18 – coloring, 10/11/18 – public speaking 10/15/18 – decoration 10/18/18 – games;
- unknown group:  8/14/18 – relaxation, 9/12/18 – reward day;
- substance abuse:  8/30/18, 9/4/18, 9/5/18, 9/6/18, 9/7/18, 9/10/18, 9/11/18;
- accepting mental illness:  9/18/18, 9/19/18, 9/20/18, 9/25/18, 9/26/18, 9/27/18;
- adjustment to incarceration:  10/1/18, 10/2/18, 10/3/18, 10/4/18, 10/8/18, 10/9/18, 10/10/18, 10/11/18, 10/12/18;
- self-esteem:  10/15/18, 10/16/18

Groups were not held 9/17/18 or 9/24/18 due to a lack of custody staff.  The unit was locked down on 9/21/18.

He was seen by a psychiatric prescriber and the following dates (all in conjunction with a treatment team meeting): 8/14/18, 8/21/18, 8/28/18, 9/4/18, 9/11/18, 9/25/18, 10/4/18, 10/9/18, 10/16/18.

The psychiatric note from 8/21/18 indicated that the patient wanted to stay in the ACU because he felt safe on the unit and that "others were stealing from him on units 1 and 2."  The patient reportedly also stated that he had not talked to his family recently and did not seem concerned about them.  The psychiatrist concluded that "This furthers my belief that all of his [suicidal ideation] and reports of family issues (that vary depending on who he was talking to) are not the real reason he was in medical.  He is running from trouble on the units and was using [suicidal ideation] as a means to get out of these situations."  He concluded that no medications were indicated, but also noted that "He is working the program well and is benefiting from it."  There continued to be no diagnosis of a serious mental illness.

There was a treatment plan from 8/23/18.  The problems noted were antisocial personality and alcohol and substance abuse.  The interventions for antisocial personality were "ACU programming, individual counseling."  The interventions for alcohol and substance abuse were "medications, ACU programming, individual counseling."  The patient was to "be compliant with medications, attend all groups and programming in the ACU, and participate in individual counseling."  However, he remained on no medications.  No individual counseling was provided.

The 8/28/18 psychiatric note indicated that he had no mental health issues and was on no medications yet was to remain on the ACU for "a couple of weeks."

The 9/11/18 psychiatrist note reported that the patient revealed the problems on the unit to be gang related. The patient reported that "[h]e was forced out of his own room and made to stay on the floor in another cell. This went on for 2 months and he finally could not take it anymore and ran off the unit and said he was suicidal. He reveals he has had gang issues on unit 1 and 2." The plan was to try to find him unit with less gang trouble.

The 9/25/18 psychiatric note indicated the patient was angry about his potential discharge from the ACU. The patient reportedly started "fabricating symptoms of hallucinations and anger at others and states he needs site meds to treat these issues. He is not psychotic and has not demonstrated anger issues here, in fact the opposite, has been quite compliant and hopeful on the unit. He gets very angry and defensive when I point out all the inconsistent reports. He walks off angry." The plan was for him to process his release with the MHP.

The 10/4/18 psychiatric note indicated the plan for him to go to HU-3, despite having no evidence of mental illness and being made level of care B. The note indicated that this placement was primarily to provide a safe environment for the patient.

*Despite there being no evidence of a serious mental illness, this patient was treated in the ACU for an extended period of time. There is no evidence that he needed residential mental health services, let alone an acute care setting. He had minimal psychiatric needs. It is not clear that medications were indicated for this man. There was no adequate assessment in the record. Psychological testing could have clarified whether this patient had a mental illness requiring treatment. Treating patients with unneeded medications put them at unneeded risk of complications and adverse effects. This is another example of a patient being admitted to the ACU with less serious needs than patients on HU-3 and HU-5.*

**Patient 24**

I did not interview this younger male patient. Records are from 1/5/18 to 10/16/18.

The record opens within intake to CMCF on 1/5/18. A brief LPN screening that day indicated that he had a history of mental health problems. No comment was made regarding medications. He was placed in general population.

A psychiatric note from 1/10/18 reported that the patient had been at County jail and had not been receiving the mirtazapine but was getting quetiapine. The very brief mental status examination completely within normal limits. Despite the fact that he had not been on mirtazapine, he was started on 45 mg, well above the recommended starting dose. He carried diagnoses of generalized anxiety disorder, major depressive disorder, recurrent, moderate, and history of bipolar disorder not otherwise specified. He was level of care C.

The patient quit taking his Remeron and it was discontinued on 2/14/18. There was no assessment of whether or not he needed to remain on this medication and no effort to secure adherence, though the patient reportedly denied feeling depressed or anxious.

Despite this denial, he was placed in a weekly anxiety group from January to March. He was seen periodically by a psychiatric prescriber and reportedly remained stable. He was changed to level of care A on 4/19/18. However, the previous psychiatric diagnoses were retained in the medical record.

In July 2018 he complained of sleeplessness and mood swings, and reportedly refused to see mental health.

For unknown reasons, he was transferred to EMCF on 7/23/18. The brief nursing intake reported that he had no mental health complaints and was on no routine medications. He was not seen by mental health at that time.

He was seen by a PNP on 7/25/18 he was in restrictive housing because he refused housing on HU-1A. He complained of feeling depressed since being placed in restrictive housing. However, the mental status examination was completely within normal limits and he was not referred for further treatment or started on medications. This was not a complete assessment by any means.

A 7/31/18 MHP note reported that he wished to take Benadryl again. Unaccountably, the note also stated that he was to "continue to practice in use skills taught by therapist to help overcome depressive mood. Complete with [sic] medication regime and other forms of treatment. Complete sick call request as needed." He had never seen the MHP before and there were no skills to be practiced and no medications to be compliant with. It was clear that this was a boilerplate note. He was referred to the PNP.

A PNP saw him the following day and he complained of not getting medications, though had not been on any medications for six months. The mental status examination was again completely within normal limits. No treatment was ordered no mental health referral made. He was to remain in restrictive housing.

On 8/16/18, he set fire to his clothes in his cell in restrictive housing. He had second degree burns on both hands. He reportedly told the nurse that he "just needed to get out of his cell because of gang-related confrontation." He was placed on observation in the infirmary. A psychiatric note that same day indicated that the patient had "locked himself in his cell last night and then lit his clothes on fire." The patient reported that he did this to be placed on watch and that he was doing it to save his life. He reportedly feared for his life and was trying to get out of the facility and had spoken with CID about this. The mental status examination was completely within normal limits. The patient asked to stay on watch and this was allowed. The psychiatrist planned to ask CID to visit with him in the infirmary.

He was changed to psychiatric observation the following day.

On 8/22/18, the psychiatrist told him that he would not be able to stay in the infirmary for an extended time pending a transfer. The note indicated that the transfer might take "weeks or months." He then "made superficial wounds to his arm minimal injury."

He was to be released from the infirmary the following day with property restriction. However, he refused to leave and a CERT team was called, taking a use of force to get him back to restrictive housing.

The next mental health note was a brief MHP note from 9/11/18. The mental status examination was completely within normal limits. The same verbiage noted above regarding continued practice of skills and taking medications was included in this boilerplate note as well. During the preceding weeks. He had complained of weight loss and rectal bleeding and was being evaluated medically. These issues were not mentioned. That same day, he passed out and had severe abdominal pain and blood in his stool. He was sent to the emergency room. He was admitted to the intensive care unit with a

gastrointestinal bleed. He was found to have ulcerative colitis. Upon return, findings from the hospital suggested possible tuberculosis as well. He was transferred to CMCF.

There is an EOR for 9/11/18 reflecting this event. An officer observed the patient laying on the floor of his cell, unresponsive. He was taken to EMCF medical via stretcher, evaluated by a nurse and physician for severe abdominal pain, and transported to Rush Medical Center via ambulance.

*This patient did not receive a mental health intake screening. He engaged in very dangerous and potentially lethal behavior, i.e., setting his clothes on fire. A thorough suicide risk assessment was not done, though it is likely that the conclusion was correct that he was concerned for his life. However, to engage in such behavior is nonetheless concerning and deserving of more careful mental health evaluation to ascertain whether there really was a risk of suicide or other conditions needing treatment. That the patient was willing to go to such ends is clearly a demonstration of the dangerousness of the EMCF units.*


**Patient 25**

This patient was part of the interview that I did on the ACU. He demonstrated no evidence of a serious mental illness during that interview.

Medical records were from 6/15/18 to 10/23/18.

He was admitted to CMCF on 6/15/18. He came in on no medications. A Suicide Potential Screening was completed by an LPN. He reported a psychiatric history and having been on psychiatric medications. He reported one psychiatric hospitalization. He denied any suicidal ideation and other than the mental health history screening was negative. He was referred routinely to mental health.

He was seen by an MHP on 6/19/18. He reported a history of having been sexually abused. No current symptoms were identified and the patient is not referred to psychiatry.

He was seen by a psychiatric provider on 9/18/18 for unclear reasons. The psychiatrist noted that he had been on antipsychotics and gabapentin in the past. The note was very brief. The patient was noted to be paranoid but not to have delusions or hallucinations. In one place it says the patient had no depressed mood and another place it said that he was depressed. However, there was no diagnosis.

He was seen by a psychiatrist the following day after having put a sheet around his neck. He stated he wasn't suicidal but that "other inmates were bullying him." He reported having auditory and visual hallucinations. The psychiatrist noted no evidence of hallucinations or psychosis. He noted some symptoms of depression. The diagnosis ruled out schizophrenia and ruled out major depressive disorder with psychotic features. He was started on mirtazapine 30 mg (above the recommended starting dose) and ziprasidone 60 mg. For unclear reasons, he was ordered emergency injections of haloperidol and Cogentin for three days in a row. He was placed on suicide precautions and made level of care C. An AIMS was scored as zero.

He was seen by a psychiatrist on 9/24/18 and now reportedly had no symptoms. He was removed from suicide precautions.

He was transferred to EMCF on 9/26/18. The nursing screening reported mental health diagnoses but for the one question on "current medical, mental health or dental complaint (including suicidal ideations)" the note simply said "yes." There was no discussion of whether this was yes to medical, mental health, dental, or suicidal ideation and no report of his recent suicide watch. The nurse indicated that he "will be followed by mental health." Presumably, this meant that there was a referral made.

There was an MHP intake assessment on 9/27/18. The mental status examination was completely within normal limits. The patient complained of mood swings and racing thoughts. He denied any suicidal ideation. The plan was to monitor him. There was no mention of his medications or recently being on suicide watch.

He was seen by a PNP on 10/2/18. He was concerned about his pending release on 10/31/18. The mental status examination was completely within normal limits and he was continued on the same medications. No labs were ordered and there were none in the record. An AIMS was scored as zero.

He was admitted to the infirmary on 10/8/18 for psychiatric observation. The MHP had been asked to see him because he was crying. The patient reported being paranoid. The MHP noted that he "rambled continuously and could not informed [sic] MHP where or not [sic] something was going on at the zone. MHP worked to calm the client down by deep breathing with the client." He was concerned about returning to the unit if he were crying and "acting strange." He was seen that same day by a PNP. Both the MHP and PNP reported that the patient was experiencing auditory hallucinations and that the voices told him "not to talk about them." He reported that others made fun of him because of talking to himself. He denied any suicidality or history of suicide attempts. The diagnosis was major depressive disorder with psychotic features.

A psychiatrist saw him the following day. The patient was feeling better and the psychiatrist noted that he was "just anxious and stressed. He has normal affect. He has no negative symptoms. He does not have a primary psychotic illness. Though he has vaguely reported voices, it is highly unlikely this is a true [mental health] issue, more likely a learned cultural phenomenon." The diagnosis was changed to major depressive disorder recurrent, mild and anxiety not otherwise specified. The plan was to increase the mirtazapine to 45 mg and taper and stop the ziprasidone. Orders reflect that ziprasidone was stopped, but mirtazapine was unchanged and citalopram added. He was released from the infirmary.

Later that day, he was again in emotional crisis and was seen by a PNP noted "overwhelming anxiety." The patient also reported hearing voices. He was also tearful. He was given an injection of haloperidol and Benadryl. He was placed on psychiatric observation.

The psychiatrist saw him again the following day and continued to find no evidence of psychosis. The plan was to "admit to ACU tomorrow and begin working on has anxiety issues in that format."

He was admitted to the ACU on 10/11/18.

The psychiatrist changed him from mirtazapine and citalopram to paroxetine to treat anxiety. Charting continued to reflect a patient with no serious mental illness.

*It is likely that this patient suffered from an anxiety disorder and possible mild depression. There is no evidence that he had a serious mental illness. Why he was placed on the ACU seems to have more to do with his concerns about conditions on his housing unit than the need for treatment of a serious mental*

*illness.  While it was fortunate that he was seen by the psychiatrist who likely correctly diagnosed his condition and took him off the antipsychotic, the failure to adequately assess and diagnose his condition prior to that put him at unreasonable risk and it resulted in him being placed on an antipsychotic medication with known health risks.  This is another example of a patient being admitted to the ACU with less serious needs than patients on HU-3 and HU-5.*

**Patient 26**

I met with this older male during my October visit to EMCF.  He was overtly mentally ill. He was malodorous, ill-kempt, and had long untrimmed fingernails.  He had obvious negative symptoms.  He spoke of auditory hallucinations of demons telling him to kill himself and others.  He stated that he did not follow these commands because it was "not right."  He was responding to internal stimuli during our meeting.  He complained that he had no groups or program activities and that he mainly slept.  He stated that he had occasional meetings with an MHP but then said that he didn't know him.  He stated he was rarely able to get off HU-3C, where he was housed.

The medical records are from 1/10/18 to 10/8/18.

The record opens with the 1/10/18 MHP note that has a completely normal mental status examination and reported that the patient "did not have any mental health concerns at this time."  He reportedly denied hallucinations.  Security was present during the contact.  The plan was to monitor him.

He was seen by a PNP on 1/21/18.  At that time his medications were olanzapine 20 mg nightly and Benadryl 50 mg nightly.  The patient reported that he was out of medications.  Other than being disheveled and unkempt, the PNP found no mental status abnormalities.  Medications were continued and appropriate laboratories were ordered.  The chart diagnosis was schizophrenia.

He was next seen by mental health by a PNP on 2/22/18.  The mental status examination was completely within normal limits.  The note was exceedingly brief.  It noted that he had refused labs on 1/28/17 and would not sign the refusal form.  There was no exploration about why he refused labs or the importance of monitoring in order to continue medications.  An AIMS was scored as zero.

There was another brief MHP note on 2/28/18.  Security was again present during the contact.  The mental status examination was again completely within normal limits.  The plan was to monitor him.

There was a similar MHP note on 3/28/18, 4/12/18, 5/11/18, 6/11/18, 7/11/18, 8/9/18, 9/6/18, and 10/8/18.

He refused a PNP contact on 5/28/18 but met with a PNP on 6/6/18.  He reportedly agreed to a lab draw the following week.  The mental status examination was again completely within normal limits except for being disheveled.  Medications were continued in labs ordered.

Lab results from 6/21/18 showed a normal lipid profile, CBC, and CMP.

He was seen by a psychiatrist on 8/30/18.  The psychiatrist elicited a history of psychotic symptoms, the patient denied symptoms that day.  The psychiatrist noted no symptoms other than his speech being slow and his affect flat.  There were no changes to his medications.

*This man received adequate psychotropic medication treatment. Other than that, he received absolutely no treatment. His poor hygiene was never addressed. This man essentially has been left to an indolent life, sitting on the housing unit and in his cell. There was no effort to engage him in any treatment or activities. He needed attention to activities of daily living and psychosocial rehabilitation to be able to have adequate independent function. His ability to function outside of an institution is seriously limited, putting him at risk of a number of untoward consequences including reincarceration, homelessness, and poor health outcomes.*

**Patient 27**

I interviewed this patient during my October 2018 site visit. He was in restrictive housing at the time and reported having been there for "a couple of months." He had been at EMCF for one year and in prison for about a year and a half. He stated that he did not know when he was getting out but that he was supposed already be out. He offered that he "stayed on the bus too long. Supposed to get out last summer." He was malodorous, his skin was flaking, and he was missing teeth. He stated that he was "put in the hole because I can't stay on the zone. I get crazy roommates. There's lots of drugs." He was overtly thought disordered and exhibited thought blocking as well. He endorsed auditory hallucinations telling him to harm himself and reported having done so in the past.. He also endorsed being able to read minds. He was perseverative and exhibited likely cognitive limitations. He reported that he had been on HU-3 prior to being placed in restrictive housing. He reported that he had been on medications at that time was now off medications. He stated that he had no groups and wasn't sure if he ever met with an MHP.

The medical record was from 1/2/18 to 10/16/18.

As the record opens, he is at EMCF in the infirmary on suicide precautions.

He was seen by a PNP on 1/3/18. He admitted that he was not taking medications but stated he would start doing so. He reportedly had "difficulty maintaining in general population. Continues to engage is [sic] disruptive behaviors on the unit. Peers now don't want him to return due to destructive behaviors included [sic] tearing up wall clock and microwave. He has poor coping skills and can be impulsive. Continues to request transfer to the state hospital and that he isn't supposed to be incarcerated. This has been discussed with him numerous times. He continues to bring it up when he is admitted. Encouraged to comply with medications. He is serving a life sentence, but continue stating that he is supposed to be at the state hospital." He reportedly denied suicidal ideation, commenting that he said it because he was mad. He was apologetic. Mental status examination was notable for labile mood, illogical thought, and poor insight and judgment. Despite his beliefs regarding his sentence, he was not noted to be delusional or paranoid. He was changed to psychiatric observation. The medication plan was to continue haloperidol decanoate 150 mg every two weeks, Benadryl 100 mg nightly, Depakote 2000 mg nightly, and lithium 600 mg nightly. However, given that he was reportedly nonadherent, this was an unreasonable dose, being over twice the recommended starting dose.

He continued to refuse medications. He was seen the following day by another PNP who noted his noncompliance. The PNP reported that he was taking haloperidol decanoate, though it was unclear whether he was being given the opportunity to refuse. The patient was to return to a housing unit but

did not want to go to HU-3. The mental status examination was consistent with psychosis including thought disorder and delusions.

While in the infirmary he was seen by an MHP for brief rounds (which almost always included a normal mental status examination, despite the fact that he was frequently nonresponsive or sleeping) on the following dates: 1/8/18, 1/9/18, 1/10/18, 1/11/18, 1/12/18, 1/16/18.

There were no nursing notes from the following days: 1/5/18, 1/8/18, 1/13/18.

There was another PNP visit on 1/9/18. He continued to refuse oral medications. The note reported that he was "receiving his Haldol Dec shot which is providing some coverage for his mood. He reports that he doesn't need any medication." This makes it clear that the haloperidol was involuntary. He was continued on psychiatric observation for unclear reasons though the note states that "he hasn't done well in general populations, exhibiting violent/aggressive behavior when he doesn't get his way, or something doesn't go his way." Later that day he was "banging/kicking on his cell door" and expressing suicidal thoughts though the same time "laughing/smiling." He was reportedly "asking to be on suicide observation due to wanting finger foods." He was labile and disheveled as well as psychotic. Lithium and Depakote were discontinued due to continued nonadherence. He was placed on suicide observation in a suicide smock with a suicide blanket, no personal property, and finger foods. He was allowed a mattress and shower shoes. Why these limitations were necessary was not documented.

He was next seen by a PNP on 1/17/18 at which time he was released from the infirmary. He was level of care D and the diagnosis was bipolar disorder.

On 1/24/18 he refused laboratories.

There was an EOR for 1/25/18. He was in a physical altercation with several other inmates. He was taken to the EMCF Medical Department for observation; no injuries were noted. He received an RVR for rule violation B8. There was no related progress note by mental health staff, and no evidence in the medical record that mental health staff was consulted about the RVR.

He was not seen again by mental health until a PNP visit on 1/29/18. He complained of suicidal thoughts and wanting to go home. He was also concerned about possibly hurting others. He complained that his roommate was keeping him up at night. He reported auditory hallucinations telling him to hurt himself and others. Despite this it indicated that he had no homicidal ideation, though this was not further described. He reportedly had no plan to harm himself. He was placed in the infirmary on suicide observation with the same restrictions as the previous time and 15-minute checks.

There was no nursing admission note to the infirmary.


There were no nursing notes on the following days: 1/31/18, 2/1/18.

A PNP saw him on the following dates: 1/31/18, 2/5/18.

On 2/5/18, the PNP noted that the patient reported that he only needed a "break" from his housing unit. He was released from the infirmary.

He was next seen by a PNP on 2/12/18 when being brought to medical after tying a string around his neck. He had been placed in restrictive housing and "didn't want to be in there so I tied a string around my neck to come to medical. I pretended I was choking myself." He reported having had problems with the cellmate on his previous housing unit and had been in a verbal altercation with an officer that resulted in his being placed in restrictive housing. He also flooded his cell in the infirmary. He was placed on suicide observation.

He was discontinued from suicide observation and released from the infirmary the following day by a PNP. He was to return to restrictive housing "to serve his time for pushing an officer a few days ago." There was no consideration of whether restrictive housing was contraindicated for him. The PNP was reportedly told by custody that the patient "would have to serve his time on the ad-segregation." The PNP noted a plan to return him to HU-3 once he had completed his time in restrictive housing. An AIMS that day was scored as zero.

At some point in the following days, he was returned to the infirmary after a suicide attempt that was not reported in the record. The medical record appears to show that he was readmitted to the infirmary on 2/14/18. There was a 2/15/18 MHP note entitled "Psych Observations Follow-Up" but with no content. A 2/16/18 nursing note stated that he was on suicide observation.

The next mental health note was a PNP note from 2/19/18 and reported that he remained "on suicide observation. He had been released from medical on 2/13/18 and return to [administrative segregation]. He reports today that his suicide gesture was because he did not want to be housed in 'the hole.' He reports today that if he is returned there, will kill himself, but he denies current suicidal thoughts and denies intent or plan to harm himself while he was housed in medical." His status was changed to psychiatric observation. Though he was not taking Benadryl 100 mg nightly, the order was continued. The order for haloperidol decanoate 150 mg every two weeks was also continued.

While in the infirmary he was seen by an MHP for brief rounds on the following dates: 2/19/18, 2/20/18.

He was not seen by nursing staff on the following days: 2/17/18, 2/18/18, 2/19/18.

He was seen by a PNP on 2/20/18 and once again discharged from the infirmary. The plan was to follow-up in two weeks. There was no plan to address his repeated expressions of suicidal ideation and self-harm behavior.

The following day there was an MHP note. The patient had been placed back in restrictive housing. He reportedly had a rope and razor blade in the cell and was going to kill himself. It was not clear how he had gotten these items in restrictive housing. The MHP note concludes that "this is a security issue and NP/Psych stated that he needs to go back to HU5 and stripped of close property. Client will continue to be monitored." A PNP note from that same day reported that the told he would be returned to restrictive housing the patient "began fighting officers," requesting to go to HU-3 or stay in the infirmary. He told the PNP that he was not suicidal. He continued to refuse mood stabilizers; there was no exploration of why he was refusing and whether he was competent to do so. The PNP concluded that he was not "suicidal or psychotic, but it [sic] using threats of suicide to manipulate housing." The PNP reiterated that custody required him to return to restrictive housing.

The following day he was seen by a PNP who reported that he had not in fact been returned to restrictive housing but had been left in a medical cell by custody. When escorted to restrictive housing on 2/22/18, the PNP spoke with him in the hallway and told him that he would be moved back to HU-3 the next day. He had blood on his forehead from banging his head on the door. He was disheveled with mildly pressured speech but was not described as having any psychotic symptoms. However, he was given an emergency haloperidol injection. This was an unreasonable decision. Either the patient was psychotic and needed haloperidol injection for psychosis or he was having a behavioral problem for which haloperidol injection is an inappropriate intervention.

A PNP note from 3/5/18 reported on his continued request to go home and delusional belief that he was not supposed to be incarcerated. He had apparently been moved to a housing unit. He complained of difficulty sleeping in part because of his cellmate's behavior. He reported auditory and visual hallucinations and express paranoid ideas of people being against him. He denied suicidal or homicidal ideation but wanted to get away from the cellmate. He was placed in a different cell.

On 3/8/18, he was assaulted by multiple peers on HU-3C and required treatment in an emergency room for a large cut to his upper lip. He also had multiple bruises reported that he had been "stomped on his back." He was found to have a rib fracture and required sutures to his lip. A PNP saw him that day and was reportedly told by the unit manager that he had been in a peer's room stealing. The patient stated that he had been in somebody else's room looking through pictures. He was thought disordered with pressured speech, which was said to be his baseline. The PNP noted his "[history] of extensive mental illness." There was no evidence of counseling related to his traumatic experience.

On 3/14/18, he was the subject of the use of force after he reportedly "attacked a male officer by making several attempts to kick officer with one successful kick to his knee. The inmate also attempted to bite and claw at several officers." He was placed in restrictive housing. He was not seen by mental health.

On 3/30/18 he was the subject of another use of force and placement in restrictive housing, again after assaulting an officer, this time on HU-3A. He was still not seen by mental health.

On 4/9/18, he refused a haloperidol decanoate injection.

He was next seen by mental health for a PNP visit on 4/13/18. He stated that he did not want any medications including an injection. He reportedly now said that he was happier in restrictive housing than on the housing unit. He exhibited thought disorder and pressured speech but again was reportedly "at his baseline." He was described as disheveled with pressured and rambling speech and loose associations. No delusions or hallucinations were noted, despite long-standing belief that he did not belong in prison. The PNP did not discontinue the haloperidol decanoate. An AIMS scored as zero. That same day he was seen by an MHP for a brief contact. It included the phrase that he made "no mention of problems with the medications being taken," though he was on no medication. The mental status examination was completely within normal limits, including that he was clean.

He again refused the injection of haloperidol decanoate on 4/23/18.

On 4/26/18, he was seen by a PNP. He had been released from administrative segregation three days previously and had reportedly bitten off the finger of a peer. The peer was reportedly "trying to take the picture off the wall." He was given injections of haloperidol decanoate 150 mg and haloperidol

lactate 10 mg with Benadryl 100 mg. Some symptoms of mental illness were noted, but no delusions or hallucinations. There was no *Harper* hearing. The mental status examination was no different than previous ones.

There was a brief MHP note on 4/27/18 with a completely normal mental status examination. There was no comment regarding the recent assaultiveness. No treatment was rendered. There were similar (sometimes identical) notes on the following dates: 5/3/18, 5/31/18, 6/8/18,

He was next seen by a PNP on 5/17/18. The mental status examination was similar. He stated that he was fine being in restrictive housing at that time.

During the 5/31/18 MHP contact, the patient stated that he needed medications for anxiety and wanted to be out of restrictive housing. The mental status examination was completely within normal limits except he was anxious. He was referred to a PNP.

A PNP saw him on 6/5/18 and the patient denied anxiety. There were no changes to his medications.

He was again seen by a PNP on 6/13/18. He was being released from restrictive housing. He was noted to present "with severe mental illness and in need of stabilization." The patient reportedly agreed to take an injection and spoke of being willing to take a mood stabilizer. He was admitted to the infirmary on psychiatric observation. The plan was to restart haloperidol to decanoate 150 mg every 14 days, continue Benadryl 100 mg nightly, start lithium 300 mg twice daily, and start Depakote 1000 mg twice daily. It is completely unreasonable to start all these medications at one time. Further the Depakote was started at over twice the recommended starting dose. There were no baseline laboratories in the record and they were ordered for three weeks later.

There was no infirmary nursing admission note. He was not seen by a nurse on the following days: 6/15/18, 6/16/18, 6/17/18, 6/18/18, 6/20/18, 6/21/18, 6/22/18, 6/23/18, 6/25/18, 6/26/18, 6/27/18, 6/29/18, 6/30/18, 7/1/18, 7/3/18, 7/4/18, 7/5/18, 7/6/18, 7/7/18, 7/8/18, 7/9/18.

While in the infirmary he was seen by an MHP for brief rounds in the following dates:  6/20/18, 6/25/18, 7/2/18, 7/3/18, 7/9/18, 7/10/18.

He was seen by a psychiatric prescriber on the following dates:  6/18/18, 6/19/18, 6/25/18, 7/3/18, 7/5/18 (not cooperative), 7/9/18.

The 6/25/18 PNP note reported that nursing staff stated he was flushing medications down the toilet. This was reported in a 6/24/18 nursing note but not in other notes as there were no nursing notes for most days around this time. The patient reportedly agreed to take medications, but there was no formal treatment approach to securing his adherence.

He received an injection of haloperidol decanoate on 6/28/18.

He told a psychiatrist on 7/9/18 that he was not taking his medications. He was reported to have no insight into his mental illness. He was disheveled with blunted affect and poor insight and judgment. He was not noted to be delusional or have hallucinations. The Benadryl was discontinued because he was refusing it, however the haloperidol was not discontinued even though he was refusing it. No labs had ever been obtained; this was not addressed by any of the psychiatric prescribers thus far.

He was admitted to the ACU on 7/10/18. A psychiatric note that they reported that he was accepting the haloperidol decanoate but no other medications. He was noted to be "quite childlike and has a low IQ, so he will possibly need 1:1 programming initially in the ACU."

Later that day he was seen by a PNP when he reported suicidal ideation. He had been frustrated because he was asked to attend groups by an MHP but was told by custody that he could not. He attended one group the following day.

A PNP note on 7/12/18 reported that he was being discharged from the ACU because of his "ongoing refusal to continue his recommendations to the ACU [sic]." The patient did not want to stay in the ACU but reportedly changed his mind and returned. Two hours later, he was pacing and crying. He was preoccupied with going home or to a different facility. The note concluded that while he asked to be placed in medical, "there was no other options, except to be housed in [restrictive housing]." He was sent to restrictive housing the following day. There was no evidence in the record that mental health staff considered whether this placement was contraindicated.

The next mental health contact was a PNP encounter on 7/25/18. He did not want to return to the ACU. There was no change in his mental status examination. He was continued on haloperidol decanoate 150 mg IM every two weeks.

There was a similar PNP note from 8/7/18. The PNP noted that he may be being considered for long term restrictive housing.

He received an injection of haloperidol decanoate the following day.

There were generic MHP notes with completely normal mental status examinations on 8/15/18, 8/27/18.

An 8/17/18 PNP note continued to report the patient wishing to go back to the ACU but that "the warden has a hold on him at this time, and he is to remain in [restrictive housing], until further notice."

He cut himself again on 8/27/18 and was placed in the infirmary. The following day he was seen by a psychiatrist who noted that he was not suicidal but just wanted a break from restrictive housing. The psychiatrist noted that he was there "due to his own choice in the recent past has he refused other housing." The psychiatrist opined that his desire to be let go and be with his family was not due to psychosis but limited IQ "and inability to process this type of information." However, he was found to be illogical and dirty. Suicide precautions were discontinued and he was returned restrictive housing.

On 9/4/18, he was seen by a PNP after trying to hang himself and flooding the unit. He had been standing on his bed trying to place a ligature around his neck to the light fixture. He was told "that his housing at this point is controlled by the warden staff due to his [history] of danger to others." He was admitted to the infirmary on suicide observation.

There was no infirmary nursing intake note. There were no nursing notes on the following days: 9/5/18, 9/6/18.

He was seen the following day by a psychiatrist noted that the patient was frustrated. He was malodorous and exhibited thought disorder but reportedly no delusions or hallucinations. He was placed on psychiatric observation as he denied suicidal ideation.

He was seen by a psychiatric prescriber on the following dates:  9/6/18, 9/7/18.

He was discharged from the infirmary on 9/7/18.

He was seen by a PNP on 9/12/18.  The PNP continued to talk about housing alternatives and the plan to discuss these with custody.  The plan was to remain in restrictive housing.

There were brief MHP notes with a completely normal mental status examination on 10/3/18, 10/8/18.

A 10/11/18 PNP note indicated possible plan to return him to HU-3 in a single cell.  A treatment plan that day reported problems of noncompliance with medications, poor insight, and mood/thought disturbances.  The interventions included individual counseling "with focus on the importance of compliance with medications, 30-day monthly MHP visits, 30-day psychiatry visits, ongoing education to the importance of compliance with medications, to include benefits of medications and risk of refusing medications, with emphasis to the discussions of relapses, exacerbation of [symptoms], and/or worsening of [symptoms]."  There was no discussion of what might motivate him to be interested in taking medications.  The interventions for poor insight were:  "individual counseling, group counseling, 30-day MHP visits, 30-day psychiatry visits, ongoing education per the MHP/psychiatry staff regarding information to his mental health [diagnosis and treatment] option/recommendations."  There were similarly generic interventions for mood/thought disturbances.

He was seen again by a PNP on 10/15/18, the day he was moved to HU-3C.  He claimed he was suicidal.  He was malodorous and asking to return to restrictive housing.  He spoke about his roommate telling him to take a shower; it was clear that he was not housed individually.

A PNP note from the following day reported that he was back in restrictive housing after having threatened to break the microwave.  He was having problems with his cellmate.

The record ends here.

*This unfortunate intellectually challenged and mentally ill man was incapable of managing in housing settings available in EMCF without far more support.  His behavioral problems, continued poor hygiene, inability to navigate the interpersonal landscape of the prison, and limited coping skills prevented him from being able to maintain in an unstructured environment such as exists in EMCF housing units.  He was unable to manage in the ACU for unclear reasons.  It may be that the man's interpersonal limitations and/or the frustrations that he faced upon placement there were more than he was able to cope with.  This was likely the only setting where he could possibly have functioned in EMCF.  He never received anything like the kinds of structured services that he needed.  He needed assistance with activities of daily living, activity-oriented treatment rather than traditional therapy, and an environment that would not punish him for his serious limitations.  He was subject to mistreatment such as being placed in restrictive housing with no clothing.  He was allowed to simply languish with deteriorating self-care in restrictive housing.  This man is a clear example of the inability of EMCF to take care of seriously ill patients.*

**Patient 28**

I interviewed this middle-aged male patient during my site visit in October 2018. He had been at EMCF for about five years and prison for more than 25 years. He had been on the ACU for two months. He reported a history of depression and nightmares of being killed. He talked about peers having a plan to kill him in July because they believed that he was reporting rule violation behavior such as having mobile phones and drugs. He reported that in fact he was just using the PREA line. At that time, he had been on HU-4A. He reported having PTSD symptoms since this time and that he went to HU-3 to avoid being killed. He spoke about suicidal ideation at times due to depression. He reported that he got no groups while on HU-3, but did receive some correctional programming. He reported that most patients on HU-3 were discarding their meds and "just hiding out." This patient showed no evidence of serious mental illness.

The record is from 1/2/18 to 10/22/18.

The record opens with the patient attending module five of a depression group on 1/2/18. He did not attend the following session on 1/9/18. He attended on 1/16/18 and 2/6/18, at which time the group ended.

On 1/29/18, there was a brief MHP note of a contact with security present. The mental status examination was completely within normal limits. The plan was to monitor him. There were similar MHP notes, almost all with security present, on the following dates: 2/16/18,

As of 2/13/18 he was level of care C.

He attended a social skills group on the following dates: 2/13/18 and 2/27/18.

He was seen by a PNP on 2/22/18. He was on HU-3B. his mental health diagnosis was bipolar disorder. He was being treated with lithium 900 mg, olanzapine 30 mg (over the normal maximum dose), and lamotrigine 50 mg. He was also on levothyroxine for hypothyroidism, though was unclear if this was due to lithium. He described being "irritable and agitated." The mental status examination was normal then irritability, distractibility and some flight of ideas or racing thoughts. The plan was to increase the lamotrigine to 75 mg. An AIMS was scored as zero.

He was transferred to restrictive housing on 3/2/18.

He was not seen by mental health until a 4/26/18 brief cell front MHP contact. Mental status examination was completely within normal limits. Security was present. The plan was to monitor him. It was not clear where he was housed at this time. There was a virtually identical MHP note from 5/23/18.

On 5/30/18, a PNP note reported that he told a medical provider that he was having suicidal thoughts and was referred to the PNP. He complained of nightmares of other inmates beating him up and staff filming it on their phones. He reported actual threats against him as well, though was said to be paranoid. He had been "on lockdown and was forced to move to general population with a report that his request for protective custody was denied." The patient reported being nonadherent with medications except for olanzapine. He was placed on suicide observation in a suicide smock with a suicide blanket, no personal property, finger foods only, and 15-minute checks.

A 5/30/18 medical note reported a history of serious hyperlipidemia with the most recent triglycerides over 800, which had been about a year previously. The patient reported not taking medications for hyperlipidemia. Labs that day were consistent with severe hyperlipidemia and metabolic syndrome. A CBC was within normal limits. Despite the fact that olanzapine is a common cause of this and should not be used in patients with this degree of hyperlipidemia, this was never addressed by the psychiatric prescriber nor did medical raise the issue. This is a serious failure placing this patient that severe long-term risk.

There was no infirmary nursing admission note. There were also no nursing notes on the following dates: 5/31/18, 6/1/18, 6/2/18, 6/3/18, 6/4/18, 6/6/18, 6/7/18, 6/8/18, 6/9/18, and 6/12/18. There was no discharge note either.

While in the infirmary, the patient was seen for brief MHP rounds (virtually all showing a completely normal mental status examination) on the following dates: 5/30/18, 5/31/18, 6/1/18, 6/4/18, 6/5/18, 6/8/18, 6/12/18.

He was seen by a psychiatric prescriber on the following dates: 6/1/18, 6/4/18, 6/7/18, 6/8/18, 6/11/18.

A PNP changed him to psychiatric observation status on 6/7/18. He told the PNP that he had wanted to go on protective custody, which was why he was in lockdown. He was denied protective custody. Now he wanted to go back to HU-3B as he had had problems onHU-3D and was "tired of peanut butter sandwiches." He was noted to be paranoid, distractible, and to have mildly pressured speech but the mental status exam was otherwise negative.

A 6/8/18 PNP note indicated a plan to refer him to the ACU, despite the fact that he had an essentially normal mental status examination. Again, this appeared to be more in response to the housing problems than psychiatric need.

He was admitted to the ACU on 6/13/18 still on psychiatric observation status. The PNP note from that date shows a completely normal mental status examination, so again, it is unclear why he was transferred to the ACU. Despite his normal mental status examination, he was level of care D. An AIMS was scored as zero. There was still no mention of his severe hyperlipidemia in any of the psychiatric prescriber notes.

A 6/15/18 ACU admission note was very brief. Mental status examination was normal other than reporting poor eye contact and flat affect. The noted symptoms were that he was "angry, depressed."

An undated Activity Therapy Assessment indicated no identified problems and that he was currently involved in many activities. He was interested in activity therapy, but there were no goals for his involvement in these treatment activities.

While in the ACU he attended the following groups: activities therapy, nursing group (primarily consisting of educational handouts), anger management, personal hygiene, roundtable discussion, depression, hoping and coping, coping with incarceration, dealing with feelings, substance abuse and mental illness, accepting mental illness, adjustment to incarceration, and self-esteem.

While in the ACU he was seen by a psychiatric prescriber during weekly treatment team meetings on the following dates: 6/20/18, 6/26/18, 7/3/18, 7/10/18, 7/17/18, 7/24/18, 7/31/18, 8/7/18, 8/14/18, 8/21/18, 8/28/18, 9/4/18, 9/11/18, 9/18/18, 9/25/18, 10/4/18, 10/9/18.

He had brief contacts with an MHP (all of which showed a normal mental status examination) on the following dates: 6/22/18, 7/20/18, 8/14/18.

During a 6/17/18 chronic care follow-up for his hyperlipidemia and hypothyroidism, he had an elevated blood pressure of 150/100. This was never addressed. There was no discussion in this note about the possible contribution to his hyperlipidemia of being on a high dose of olanzapine.

On 6/26/18, a PNP added prazosin due to the patient's complaints of nightmares. However, there was no assessment of whether he actually had PTSD. He reported mood instability, however there is no evidence on mental status examination that he had any significant mood disturbance. Lamotrigine was nonetheless increased to 100. This is further problematic in that his primary complaints were related to depression but he was not on an antidepressant, though the documentation did not demonstrate that he met criteria for depression.

A lithium level from 6/28/18 was 0.2, well below therapeutic. The MAR from June shows him to be completely adherent with lithium, which is highly unlikely. MARs from before he came to the ACU demonstrate substantial nonadherence. This calls the previous change to lamotrigine into further question. Without optimizing the lithium dose, it makes no sense to increase the lamotrigine if mood disorder is the real problem, which was still not clear.

On 7/3/18, a PNP note reported that he was just sleeping an hour a night, though there was no report that he appeared to be so sleep deprived. He continued to report nightmares as the cause of his poor sleep. The mental status examination reported him to appear depressed yet also to have mildly pressured speech and low energy. He also stated that he wished to remain on the ACU because of being assaulted on the housing units. The PNP noted the low lithium level and a "[history] of noncompliance with medications" but that he reported being compliant. This was highly unlikely given the dose of lithium he was on. Yet, the PNP increased lithium to 1200 mg. This makes no sense. At the same time, the PNP wrote for a taper and discontinuation of lamotrigine of the reasons for this were not stated. In addition, the PNP added fluoxetine 20 mg. No change was made to the prazosin, despite the fact that nightmares were his chief complaint; however, there still remained no thorough assessment of whether he actually had PTSD. Behavioral reports from groups on the unit indicated that he was not having any problems. Making multiple medication changes like this at one time, especially in the light of such uncertainty about his medication adherence, was very unsound practice.

He was seen by a psychiatrist on 7/10/18 and noted to have some agitation. He continued to complain of nightmares and poor sleep. The plan was to have the "MHP worked closely with him this week to ensure she comes out of the feeling states he is in now." The psychiatrist went on to note that feeling this way was not an everyday problem. The psychiatrist did not discuss the history of hyperlipidemia, only the possibility of changing from fluoxetine to citalopram because of it being "more calming," which was later put into effect. Medical record shows no evidence of any MHP follow through on the preceding plan to work closely with him.

On 7/17/18, the patient's Benadryl was discontinued and replaced with mirtazapine 30 mg reportedly to help with sleep, however mirtazapine at this dosage is not as sedating as it is at lower doses. Further, this dose is twice the recommended starting dose.

The 7/20/18 MHP note reported on the patient's complaint that he was not getting his Benadryl. However, this had been discontinued which neither the patient nor the MHP seemed to know.

On 7/24/18, lithium level came back in the therapeutic range at 0.8. This likely reflects the fact that he began to take the medication more reliably rather than increase of 300 mg resulting in a level increase from 0.2 to 0.8.

On 7/24/18, the psychiatrist restarted the Benadryl. The indication for this was not clear as the patient was not having any side effects but only complaining of insomnia, which he reported was better. Other than depressed mood and decreased sleep, mental status examination was completely within normal limits. It remains unclear why he was in the ACU other than for housing reasons.

On 8/7/18, the psychiatrist made further changes in his medication regimen. The citalopram had already been increased to 40 mg. He now had a lithium tremor, likely because he was finally in the therapeutic range of lithium. Rather than reduce the lithium dose, the patient was changed to Depakote. No baseline labs were ordered. Depakote was started at 1000 mg, above the recommended starting dose.

The 8/14/18 MHP note reported that the patient spoke about having a kill on sight "on his head wherever unit [sic] that he goes."

On 8/21/18, the psychiatrist reduced the olanzapine to 20 mg, not because of the hyperlipidemia but because he was having some restlessness. The mental status examination was completely within normal limits. He was changed to level of care C, but there was no plan to discharge him from the ACU.

On 8/22/18, there was a generic treatment plan. The only problem identified was bipolar disorder for which the interventions were the usual "medications, ACU programming, individual counseling." The nightmares or PTSD were not even mentioned.

On 8/28/18, psychiatrist increased the olanzapine back to 30 mg for unclear reasons. There was no report of increase psychosis or evidence of mania. He continued to complain of sleep problems, but this is not an appropriate reason to increase olanzapine in the absence of appropriate indications. Further, his history of substantial lipid elevations was not considered.

On 10/4/18, a psychiatrist increased the prazosin to 4 mg owing to continued complaints of nightmares. Benadryl had previously been increased to 50 mg and was now increased to 100 and the mirtazapine discontinued. The reasons for these changes were not clearly documented. The note was appended with the same generic mental health treatment plan. For unclear reasons he was changed to level of care D.

On 10/9/18, a psychiatric note reported that the patient did not have a history of mania. Why this had not been previously explored is entirely unclear. He continued to complain of nightmares and poor sleep and to have some paranoia. However, other than depressed mood and low energy there were no abnormalities noted on mental status other than his chronic complaint of insomnia. The diagnosis was

changed to major depressive disorder, but there was no plan to discontinue the mood stabilizer or antipsychotic.

On 10/16/18, the psychiatrist restarted mirtazapine at 15 mg to help with mood, anxiety, and sleep. Note that mirtazapine is also associated with metabolic syndrome. Now this patient was on two medications causing metabolic syndrome and this was never addressed. No lipid profile was in the record after the one documented above.

*This patient never had a proper assessment. There were serious doubts about whether he had bipolar disorder from the beginning and though this was finally addressed to a limited extent, complicating factors such as PTSD and developmental issues were never addressed. His psychiatric condition was never clarified; psychological testing was likely indicated. However, it is clear that he was not seriously mentally ill, he was certainly much less ill than many people who were not on the ACU but on HU-3 and HU-5. In addition to poor prescribing, medication monitoring was not properly done. Psychiatric prescribers never noted serious elevations and lipids and in fact continue to prescribe and add medications known to increase this problem. He never received any individual therapy, despite this being recommended. He attended the groups that were available on the ACU, only some of which were applicable to him.*


**Patient 29**

I met with this patient when I was at EMCF in October 2018. At that time he had been in restrictive housing for three weeks. He had been in restrictive housing many times in the past, often for refusing housing. He also been on HU-3C, HU-6D, and HU-1A. He spoke about having his past be on the television, commenting that he thought mental health doctors were doing this. His explanation was that this was an attempt to "make people hurt others." However, he was not sure. He talked about having auditory hallucinations that were derogatory nature but at times also threatening. He expressed concern that somehow staff would know what we had been talking about. He also talked about fears of being killed and that this was why he sometimes refused housing. He talked about seeing people be stabbed on the units. He also stated that inmates could "only get help when they cut themselves or hang themselves. Staff come to the cell front but do not call you out unless you do something."

The record is from 1/2/18 to 10/21/18.

As the record opens on 1/2/18, early morning nursing notes report that he was being placed in the infirmary on suicide watch. He had cut himself on his right arm and was also trying to cut his left arm. The cuts were superficial, but he still had the blade in his mouth. He was given an emergency injection of Prolixin 5 mg and Benadryl 100 mg. There was no indication of psychosis, mania, or agitation warranting such an injection.

He was seen the following day by a PNP. The note indicated that he had been discharged from the infirmary to restrictive housing on 12/27/17. He refused an interview and remained on suicide observation. He was to continue on Prolixin decanoate 50 mg IM every 28 days and Benadryl 100 mg nightly. His diagnosis was bipolar disorder.

The day after that he was released from suicide observation. He reportedly stated that he had cut himself because he was cold on the restrictive housing unit. He reportedly denied any mental health problems. No abnormalities were noted on the mental status examination though the narrative was very brief. He went back to restrictive housing.

There was a brief MHP note from 1/8/18. The patient stated he had suicidal ideation, but the plan was to monitor him. Another MHP came to see him. The patient stated that he had tried to "burn himself and his cell." The MHP simply asked if he was taking his medications and then he was transferred to the infirmary. The following day he reported that he was no longer suicidal. He was seen by a PNP and released from the infirmary. The PNP noted that he had "limited housing due to red/white status and red tagging another offender. Offender brought to medical yesterday after setting two fires in cell and stating that he was suicidal." He initially refused to talk but later asked to return to the restrictive housing unit. There was no discussion of the risk posed by setting fires in his cell.

He was again admitted to the infirmary on 1/18/18 after cutting himself. In the associated PNP note, the patient had reportedly been smoking spice with peers in the infirmary. That this can happen in an infirmary setting is unconscionable. He was noted to be disheveled but other than having poor insight and judgment had a normal mental status examination. He was continued on the long-acting injectable antipsychotic and Benadryl. He was also placed on suicide status with a smock and suicide blanket and no utensils.

The following day he reported that he was "not quite ready to leave medical." The PNP went on to say that the patient "presents with [a history] staying on suicide observation for a few days, and then announces he is ready to return to the zone. Will not push him to leave medical, he is likely to return was self-injurious behaviors if he has his mind made up that he is not ready...." This charting clearly indicates the need for a behavioral management plan and appropriate psychotherapeutic treatment for this individual.

He agreed to go back to restrictive housing on 1/22/18. The PNP noted that he could not go to HU-3C because "he has a red tag on an inmate" on that unit.

He was readmitted on suicide watch the following day. He had cut his arm in the same area that he had previously and also reported that he had smoked spice. The PNP note from 1/24/18 details this as well as concerns about his use of self injury to "seek housing in medical." Mental status examination was completely normal. However, he was continued on Prolixin decanoate injections. He continued to carry the diagnosis of bipolar disorder, however there was no discussion of a mood stabilizer.

He was again released from the infirmary on 2/1/18 after being seen by a PNP. He reportedly denied any suicidality or mental health concerns but there was no suicide risk assessment. The note indicated that there was "limited housing for close custody inmates at EMCF."

He was returned to the infirmary the early morning of 2/5/18 after threatening to hang himself and "being very uncooperative to guards." There had been no note since leaving the infirmary.

He was discharged from the infirmary the morning of 2/5/18 after a PNP visit. He was reportedly "smiling and laughing. He states that he just wanted off the zone." He was returned to restrictive housing. There was again no suicide risk assessment and no plan to address his recurrent self injury expressions of suicidal ideation. No behavior management plan was put in place.

There were no mental health notes until he was again readmitted to the infirmary on 2/27/18. He had reportedly smoked spice and was admitted to the infirmary for observation. He was placed on vital sign checks to be monitored for mental status changes. The following day he admitted smoking spice to a PNP. He reportedly asked to return to restrictive housing. The PNP explained the risks of using spice to him.

The next mental health note was from a psychiatrist on 3/7/18. He was stating he had thoughts of self-harm. The note simply states that a PNP "was made aware of the situation. No distress noted." The diagnosis was bipolar disorder. The plan was to "continue to observe behavior" and return to the clinic in a month. There was no evaluation of his condition, suicide risk assessment, or even a mental status examination.

The following day, 3/8/18, he was brought to medical after trying to hang himself, being stopped by being sprayed with OC. He was reportedly guarded, agitated, loud, and irritable. He said that he was "tired of living." He again admitted to smoking spice. The MHP note from that day concluded "there is no room in medical so client is stripped of his property and clothes and put back in cell on HU5. MHP will alert [a psychiatric prescriber] to condition of the client and he will continue to be monitored." There was no suicide risk assessment, no indication of checks, and no 1 to 1 monitoring. He was found guilty of an RVR for because he reportedly swung his fists at staff when they were cutting off the rope. There was no evidence of mental health participation in the RVR process. The associated video as after the fact and reports on the preceding events. The patient is sitting quietly, bouncing his legs. He is taken by an office and there are some comments regarding his being suicidal. He was escorted to a holding cell in handcuffs where the video ends.

A PNP note from later that day indicated that he had been moved to HU-3. He admitted to putting "something around my neck today. They sprayed me. I'm not suicidal." He spoke about being frustrated while in restrictive housing. Staff reported that they had to use OC "to contain his behaviors, prevent him from harming self [sic] with placing [sic] a ligature around his neck." An AIMS that day was scored as zero.

An MHP note the following day, 3/9/18, indicated that the patient was concerned because "he was in his cell without any clothing or blanket and he wanted to be moved to unit 3." It appears that he had been moved back to restrictive housing. He was then moved back to HU-3.

The following day he was returned to restrictive housing. It was not clear from the medical record why this was done.

There was no mental health note until 4/6/18. This was a brief contact in restrictive housing with security present. The mental status examination was completely within normal limits and the patient reportedly denied any problems. The plan was to monitor him.

He was admitted to the infirmary 4/9/18. A PNP note indicated that he had staring eye contact. He denied using any drugs. He had paranoid idea that he was going to be stabbed by somebody, but it was unclear who. He also expressed suicidal ideation. He later admitted that he had smoked spice the previous day.

He was released from the infirmary the following day and returned to HU-3C.

On 4/16/18, he was in fact stabbed several times by another inmate. The wounds were not serious. He was placed in restrictive housing.

There were no mental health notes prior to an emergency room visit for self-inflicted lacerations to his arm and abdomen on 5/19/18. Upon return from the emergency room, he was placed in the infirmary on suicide observation.

On 5/30/18 a PNP reduced him to psychiatric observation status and given back personal property, regular meals, clothing, and bedding. There were no changes to his medications. A note the following day indicated that he was being considered for placement in the ACU.

However, on 6/4/18 a PNP note indicated that he was released from observation in the infirmary to be placed per custody. He was placed in restrictive housing.

The next mental health note was a PNP note from 6/19/18 after he had reopened wounds to his abdomen. He denied suicidality but stated that he was "tired of being on lockdown. I want to be housed in medical. They only bring you up here if you bleeding or suicidal." He also complained that officers would only talk to him when he was in medical but not when he was in restrictive housing.

A nursing note from that date indicated that the "facility [physician] was asked about [treatment] for wounds and nurse was told he wasn't sending him out again, this nurse was told could be cleaned and went to dry dressing applied daily until healed."

On 6/21/18, there was an MHP note that indicated some work with coping skills including thought stopping, substitution, and reframing. This was one of few notes that indicated any kind of attempt at therapeutic interaction.

There is a PUOF on 6/21/18. He refused to allow his tray flap to be secured because he didn't have his property from medical. Chemical agent was administered. There is no indication of mental health staff present. There is no mental health staff identified on the associated video, EMCF-PUOF-18-0107-EMCF-18-0427. The video shows him being taken out of his cell and to medical. A deep laceration is visible on his torso, and there is blood on his pants. He waits to be seen and becomes impatient. He tries to get up and is restrained by officers. 16:50 - In response to him saying, "You can't spray me again, I've already been sprayed," a female voice says, "Don't matter, you can be sprayed again." 20:30 - He slides to the floor and is restrained by officers, and at one point about 22:00, an officer's knee is on his neck, pinning him down. At 26:04, he repeats "let me kill myself" and wants to go back to housing unit. He is placed back in his cell.

Amazingly, there are no notes in the medical record regarding this incident or any treatment.

On 7/9/18, he was placed in restrictive housing again. A 7/12/18 PNP note reported that he stated he had been raped on HU-3. He had talked to an investigator and had been placed on administrative segregation following this. There was no evidence that he was offered counseling for the rape.

He was next seen by mental health on 7/24/18 by an MHP taught him relaxation skills.

On 8/1/18, still in restrictive housing, he put a cloth around his neck and kept tightening it and removed his jumpsuit and set it on fire. He was placed back in the infirmary on suicide watch.

A psychiatrist saw him on 8/2/18. The psychiatrist indicated that his self-harm was "manipulative behavior, not true [mental health] issue. He has no wish to die, he just wants to be in medical for an extended vacation from lockdown, and has been allowed to do this in the past. He does not understand why it is not okay now. We discussed the difference between true [mental health] crisis and symptoms and an intentional and willful behavior or using [suicidal ideation] as a mental manipulative tool to obtain something. Listened but just repeated that he was fine here and had no [suicidal ideation], but if he was returned to his unit he would have [suicidal ideation], unless he stayed here a couple of weeks."

He was placed on psychiatric observation the following day by a PNP.

On 8/6/18, the psychiatrist again noted the patient was being considered for ACU placement, despite the fact that he was not considered to be mentally ill.

There was no admission note entered until 8/10/18 that it appears that he was placed on the ACU on 8/8/18.

While on the ACU he attended the following groups:

- dealing with feelings: 8/9/18 – primary and secondary emotions, 8/10/18 – emotion waves, 8/13/18 – emotion waves, 8/14/18 – relaxation, 8/15/18 – emotion wildfires;
- activities group: 8/10/18 – movie, 8/13/18 – games, 8/15/18 – games;
- refused or did not participate in groups: 8/17/18

Groups were canceled 8/16/18 to the lack of security staffing.

He was the subject of cell front MHP rounds on the following dates: 8/10/18.

He was seen by a psychiatric prescriber on the following dates: 8/14/18, 8/16/18.

The 8/14/18 psychiatric note indicated no evidence of mental illness. He was confronted about intimidating a peer on the unit.

And 8/15/18 note indicated that his hygiene was" a big problem."

The 8/16/18 psychiatrist note indicated that he had been disruptive on the unit, stealing others food, and not participating in groups. The plan was to discharge him from the ACU. He was placed in restrictive housing. At some point he was transferred to HU-6, but when was not clear in the medical record.

The next mental health note was a psychiatric note from 9/10/18. He stated he was suicidal and was brought to medical. He stated that he was concerned about being harmed because he owed other inmates $100 buying drugs. He reported having been threatened. Other than poor insight and judgment, the mental status examination was completely normal. The psychiatrist concluded that "he needs to be housed on a less gang infested unit with less violent offenders than what are on the units in 6."

A9/12/18 MHP note indicated that he was back in restrictive housing. He was asleep.

A nurse did a Suicide Potential Screening on 9/13/18. He was planning to hang himself. He was seen that same day by a psychiatrist but stated that he was not suicidal and having difficulty managing

restrictive housing.  He was returned to restrictive housing.  The note concluded that he could "have boxers only."

He was returned to restrictive housing the following day.  A PNP note from that day indicated that he had refused to go to HU-3 because there were "too many drugs on [HU-3]."

He was back in the infirmary on 9/18/18 after having expressed suicidal ideation he stated that he had smoked some spice as well.  The plan was to return him to restrictive housing on "total property restriction."  Though the patient was identified as having a behavioral problem rather than mental illness, he remained on an antipsychotic and no behavioral plan was put in place.

After refusing housing, he was still in the infirmary the following day but was then sent to restrictive housing.  That same day he was brought to the medical clinic after putting a rope around his neck and trying to hang himself until sprayed with OC.  Despite being on property restrictions he was able to get a rope, stating that he was given the rope by somebody that he would not identify.  He suffered no discernible injury.

He was discharged from the infirmary on 9/21/18.  The plan was to house him on HU-6.  However, he was placed back in restrictive housing.

On 9/23/18, he again had a rope around his neck.  He was taken to medical and told the nurse that if he was sent back to restrictive housing, he would cut himself.  He was placed in the infirmary again on suicide watch.  A psychiatric note the following day indicated that he had been in a fight on HU-6, essentially right after he was placed there.  He was placed back in restrictive housing on 9/25/18.

He cut himself again on 10/8/18.  He was seen later that day by an MHP who did not mention his self-injurious behavior.

The last mental health note was a 10/11/18 PNP note.  He remained in restrictive housing.  His diagnosis at this point was substance-induced mood disorder and personality disorders.  However, he was continued on Prolixin decanoate 50 mg intramuscularly every 21 days and Benadryl 50 mg nightly.  There was an associated treatment plan.  The first problem identified with substance abuse interventions to be "individual/group counseling with emphasis to the negative effects of using drugs, participate in recommended A&D groups/classes."  Focusing on the negative effects of using drugs does not reflect current thinking on how to work with substance abuse.  The second problem identified was "substance induced mood/thought disturbances" with associated intervention of complying with medications and "individual/counseling, participate in A&D classes/groups."  The final problem identified was poor impulse control the interventions being "individual/group counseling, [follow-up] visits with MHP staff, [follow-up visits] with psychiatry providers, contacting mental health staff for assistance to [sic] difficult/challenging/stressful situations, by a mental health sick call or support/security staff to contact mental health."  The patient responsibilities were "to refrain from using drugs" and to "avoid negative situations/peers," "collaborate with mental health staff to develop improved coping skills," and "to comply with medications."  These are nonspecific interventions that did not focus on any identified treatment needs related to why this patient engaged in self-harm and substance abuse.

*This is another patient never had a proper assessment to analyze reasons for his problematic behavior. He exhibited both behavioral problems and some evidence of psychotic symptomatology.  There were*

*substantial differences of opinion about what was driving his behavior. A more thorough assessment and, likely, psychological testing were indicated to clarify his condition. If he did not need antipsychotic medication, he was placed at unreasonable risk as these medications have well-known health risks. There was no real justification in the record for ongoing antipsychotic treatment. He was not offered the kinds of medications that might have been helpful to him. He received no appropriate treatment in terms of either groups or individual therapy. Importantly, there was never any sort of behavior management plan put in place for this man with repeated and serious behavioral problems, including repetitive and dangerous self-injury.*

## Patient 30

This is a patient that I interviewed when I first visited EMCF. I later reviewed his medical record. He had numerous behavioral problems that were poorly characterized, especially in terms of the contribution of his mental illness to these problems. He spent a great deal of time in restrictive housing. He was often nonadherent with his medications and had received no other forms of treatment.

The current records are from 1/5/18 to 9/13/18.

As the record opens, he is on HU-5, where he remains for the entirety of the record. He had recently fractured his hand.

The first mental health contact in the record is from 1/18/18. He was seen by a PNP with an MHP to discuss his treatment plan. He requests a shot of an antipsychotic, a recurrent theme. He complains of auditory hallucinations. Problems identified include nonadherence with medications and anger. He is currently being treated with Depakote 1000 mg twice daily and Prolixin decanoate 25 mg every 14 days. He was also on Benadryl 100 mg nightly. There was no plan to offer anything other than medications. An AIMS was scored as zero.

There were brief MHP contacts on 1/30/18, 2/1/18, 2/16/18, 3/2/18, 3/26/18, 4/6/18, 5/3/18, 6/28/18, 7/31/18, 8/14/18, 9/6/18.

The PNP saw him on 1/30/18 owing to his complaint that his shot was overdue. He asked to be put on suicide watch, complained of auditory hallucinations, and reported being unstable. However, he denied suicidal ideation, plan or intent. He was noted to be irritable and rambling with some loose associations. The Prolixin was increased to 37.5 mg every 14 days.

A 2/7/18 treatment plan indicated problems of nonadherence and anger as noted above. Regarding his nonadherence, the objective was for him not to miss more than three medications in a six-month period. The intervention was to "monitor medication compliance on a monthly basis and reinforce consequences for noncompliance of meds." This is not a useful approach and was not followed. Regarding anger, he was to identify triggers and strategies of coping with anger. The interventions were to "learn and practice anger management skills in all situations right or wrong." This is not an intervention and does not constitute treatment.

On 2/22/18 there was a Planned Use of Force (PUOF) because he refused to allow staff to secure his tray flap. A PNP provided his history to a lieutenant. There was no indication of direct mental health staff involvement in de-escalation. After three verbal warnings, three bursts of chemical agent were

administered.  He was then taken to the EMCF medical department. The PUOF notes state the he refused decontamination.

On 3/7/8 there was a Risk Assessment Team (RAT) meeting, which was identified as a "collaboration of the mental health staff in the classification staff in identifying factors/obstacles that may be preventing [the patient] from progressing through long-term segregation process [sic]."  There was discussion of his problem behavior, including throwing materials from his cell. The plan was as follows:

> "The RAT discussed pathways to assisting [sic] him to moving to 5D/being released from long-term.  We discussed appropriate behaviors versus inappropriate behaviors.  The RAT will meet with [the patient] in May 2018 to review if eligible to move back to 5D.  Discussed the importance of compliance with medications.  Denies [side effects] to medications."

This is clearly not a treatment plan.  It shows no evidence of collaboration between mental health and custody.  There was clearly not a behavior management plan and there was not one in the medical record, nor reference to one.

During the 3/26/18 MHP brief contact, the patient stated he had swallowed 40 pills and was going to swallow razors.  The MHP was unable to get security to take the patient to medical.  The officers reportedly, "stated that they would take care of client and they were check on him."  The MHP spoke to the Health Services Authority who stated "that he would take care of the issue."  The plan was to monitor the patient.  A PNP came to see him and he continued to say that he had taken medications and had gotten some from others. Per the PNP, he clearly wanted to get off the unit due to difficulties with peers.  The PNP discontinued Depakote due to the patient's report he had overdosed on them, though he said he had gotten them from others.  No labs were ordered.  The patient remained in restrictive housing.

He was not seen again by a clinician until 4/5/18 when he received his Prolixin decanoate injection.

The PNP saw him again on 4/13/18 and stated that Depakote was discontinued "for safety precautions combined with [history] of noncompliance with oral medications."  However, there was no evidence that the PNP had reviewed the MAR (which showed him to be almost entirely adherent, when completed) and had not checked labs to determine whether there was actually any safety risk.  This appeared to not be a clinically-driven determination.

The PNP came to see him on the unit on 4/24/18 when he refused to close its tray flap.  He complained that he missed breakfast but staff was saying that it was a new shift and they didn't know whether he had gotten his breakfast or not and that it was going to be lunch time soon.  He was oppositional, irritable and rambling.  It was not clear from the note what the result of the contact was.

The PNP saw him again on 5/16/18 and noted continued problems with custody staff.  No changes were made to his medications.  He was agitated, loud and had loose associations.

There was a PUOF on 5/20/18.  He refused to close his tray slot after officers passed out lunch trays.  After 3 verbal directives were given to close his tray slot, a 1-second burst of chemical agent was administered.  There was no indication of mental health staff involvement.  He was taken to EMCF medical department for decontamination.  Afterwards he was returned to his assigned cell.

There was another PUOF on 6/18/18. He refused to remove his arm from the tray slot. He stated that the reason he would not remove his arm was because a lieutenant "wouldn't give him his issue." He was given three verbal warnings, then a burst of chemical agent was used. He was escorted to EMCF Medical Department. He refused decontamination. There was no indication of mental health staff involvement.

The next mental health visit was a PNP visit on 6/27/18. The PNP changed him from Prolixin to haloperidol decanoate, on which he was reportedly more stable. At that time, he was agitated, hostile, yelling, and inappropriate, and had loose associations.

The following day during an MHP visit, the MHP told him that he would get his food tray when he followed officer's instructions. The note states that he "taught client anger [management] strategies and encouraged client to follow all rules and directions." Clearly, this patient needed more than being briefly taught anger management strategies and being told to follow rules. This is not treatment.

The PNP saw him again on 7/11/18. He requested more Benadryl. He continued to be loud and irritable. The PNP stopped his morning dose of Benadryl. An AIMS was scored as zero.

He was seen by an MHP on 8/7/18 at his request. He stated that he had taken 44 pills and was feeling lightheaded and sick. He also reported being denied food and having suicidal and homicidal ideation as a result. He was seen by a PNP and continued to express suicidal ideation and made "vague reports of taking 44 pills." He was transferred to the infirmary on suicide observation. The Benadryl was decreased to 15 mg at night. The plan included "1:1 individual counseling as needed." He clearly needed this but never got it. Later that day he received an injection of haloperidol because of "increased agitation/banging on the door." There was no evidence of psychosis and the PNP did not diagnose mania. This was an inappropriate use of emergency injection of haloperidol.

The following day a psychiatrist discontinued the Benadryl completely, stating that he had no evidence of EPS, writing in the chart that "in fact most patients do not have this. Certain patients develop [extrapyramidal symptoms]." There was no evidence that the psychiatrist did a physical examination to assess the symptoms. While it is certainly very possible that the patient was desiring Benadryl for other reasons, proper evaluation was nonetheless indicated. He remained level of care C. He denied suicidal ideation and was returned to restrictive housing.

A PNP saw him on 8/14/18 after he complained of tremors. The PNP decreased the haloperidol, concerned that the tremors might be due to this medication and in the absence of Benadryl that he might have more side effects. The PNP discussed his history of psychotic symptoms and concomitant personality disorder. However, there was no plan to address either issue other than with antipsychotic medication.

The PNP saw him again in restrictive housing due to disruptive behaviors. The patient stated that he had swallowed razors but the PNP did not believe this and did not transfer him to the infirmary and made no changes to his treatment. There was no evidence that he had been evaluated by an MHP prior to his placement in restrictive housing.

On 9/5/18, he asked to see an MHP complained about problems asleep and also said he had swallowed something. A PNP came to see him. He asked for Cogentin and Benadryl. He complained of problems sleeping. He reportedly became "increasingly agitated to the point that he states he wants this provider

to take him off the shot if he is not going to get Cogentin and Benadryl." The PNP stopped the haloperidol. This is not a good reason to stop a medication.

On 9/13/18 the PNP sees him again. He requests to have a shot of Benadryl. He complains of auditory hallucinations. Despite finding no evidence of psychosis and disbelieving the reports of auditory hallucinations, the PNP started olanzapine and also started Depakote, the latter at 1000 mg, above the recommended starting dose. The PNP ordered labs in one month. No baseline labs were in the record.

The record ends here.

Review of mental health segregation rounds forms shows that they were not completed weekly for almost all weeks. The form entries were often only partially completed.

Nursing segregation rounds were completed most days (about 80%) initially but less than half from June and July (the last month the logs are in the record).

MARs were incomplete. The completed entries, which were the majority, showed him to be almost completely adherent with medications.

*This patient was the subject of repeated uses of force. There was no effort to create a behavior management plan. This patient with clear severe personality disorder never received any treatment appropriate for this condition. He received only antipsychotics and mood stabilizers. It is unclear whether antipsychotics were ever indicated for him. He never received a proper assessment in order to determine what was really going on with him. His treatment was poor. Failure to address his problems presented both a danger to himself and to others.*

# APPENDIX   2

# Bruce C. Gage, M.D.
## *Curriculum Vitae*

Born:  January 8, 1957 in Seattle, Washington
Washington License:  252-09 0027632, expires 1/8/19
Drug Enforcement Agency Number:  BG0377742, expires 9/30/19
National Provider Identifier:  1619942489
Specialty Certification: Board Certified in Adult Psychiatry, June 1989 (No. 32747) – no recertification required
   Board Certified in Forensic Psychiatry, initial certification October 1994, recertified 2003, 2013 (No. 078)

**Home:**  7802 Cody Street West
Lakewood, WA  98499

**Work:**  Chief of Psychiatry
Washington State Department of Corrections, Health Services Department
Clinical Associate Professor, University of Washington Department of Psychiatry and
   Behavioral Sciences
Street: 7345 Linderson Way SW
   Tumwater, WA  98501
Mail:  PO Box 41123  MS: 41123
   Olympia, WA  98504-1123
(360) 725-8693 (DOC business)
(360) 507-1374 (DOC cell)
(360) 586-9060 (DOC FAX)
bcgage@doc1.wa.gov (DOC business)
gage@u.washington.edu (UW business)

Private Practice of General and Forensic Psychiatry
Puget Sound Mental Health PS, Inc. (EIN 46-4608592)
6108 Community Place S.W., Suite 3
Lakewood, WA  98499
(253) 653-6683 (private practice)
(253) 581-1425 (private practice FAX)
Gage@PugetSoundMentalHealth.com (private practice)

**Previous employment:**
The Center for Forensic Services at Western State Hospital
The Washington Institute for Mental Illness Research and Training & University of Washington
Tacoma, WA  98498-7213, 1990-2008
Positions held:  Program Director, Center for Forensic Services (1990-2003); Director,
   Electrophysiology Laboratory (1992-2003); Program Director, UW/WSH Forensic
   Psychiatry Fellowship, University of Washington School of Medicine (1998-2008);
   Supervising Psychiatrist, CFS (2003-2006); Forensic Psychiatrist (2006-2008)

UCLA and Sepulveda Veterans Administration Medical Center
Los Angeles, California, 1988-1990
Assistant Clinical Professor, Department of Psychiatry & Staff Psychiatrist

**Education:**  B.S. (Chemistry) 1979; Massachusetts Institute of Technology; Cambridge, MA
M.D. 1983; University of Washington; Seattle, WA
Postdoctoral Fellow 1983-1984; Cardiovascular Physiology; University of Washington;
   Seattle, WA
Medical Intern 1984-1985; Cambridge Hospital; Harvard Medical School; Cambridge, MA
Psychiatry Resident 1985-1988; Cambridge Hospital; Harvard Medical School; Cambridge, MA
Chief Psychiatric Resident 1987-1988; Metropolitan State Hospital; Waltham, MA;
   Instructor in Psychiatry; Harvard Medical School; Cambridge, MA

Bruce C. Gage, M.D.                                                                    Page 2

**Experience:**

Medical school thesis project on the impact of alexithymia on hypertension. 1982-1983

Post-doctoral research: influence of behavior on the CNS control of blood pressure. 1983-1984

Teaching Assistant for physiology and biophysics graduate course in neuroanatomy. 1983-1984

Research during residency on the prediction of violence and clinical criteria used for commitment. Included grant writing and questionnaire development. 1987-1991

Forensic psychiatry evaluations of fitness for duty, dangerousness, disability, malpractice, competency, criminal responsibility (both insanity and *mens rea*), conditional release, and other matters: Cambridge Court Clinic, Metropolitan State Hospital, Western State Hospital, and private practice. 1987-present

Multi-center research project on the D2-selective antipsychotic savoxepine. 1989-1990

Research through the Washington Institute on assessment of violence and recidivism in the mentally ill offender population. August 1990-2004

Neuropsychiatric and forensic consultant to the Alaska Psychiatric Institute and Harborview Developmental Center. March 1991-1998

Private forensic practice in criminal, civil, and correctional matters. 1993-present

Psychiatric consultant to the Washington State Department of Corrections through a contract with the University of Washington. 1993-2003

Expert for APA Expert Opinion Survey of Psychiatric Evaluation of Adults. 2011

Mental Health Expert, Farrell v. Beard. 2011-2016

Mental Health Expert, US v. County of Los Angeles and Los Angeles County Sheriff Jim McDonnell. February 2015-present

Mental Health Expert, Gray v. County of Riverside. March 2015-present

Mental Health Consultant to Pew Charitable Trusts. June 2016-October 2017

Correctional Psychiatry Consultant to the California Department of Corrections and Rehabilitation. May 2018-present

**Awards and Honors:**

Chapter author for Confidentiality Versus the Duty to Protect, Guttmacher award winner, 1991
Outstanding Employee Award, Department of Social and Health Services, 1994 & 1995
Newcomers Award, Community Action for the Mentally Ill Offender, 1996
Delbert M. Kole Outstanding Public Psychiatrist Award, Washington State Association of Community Psychiatrists, 2002
Washington Governor's Award for Leadership in Management, 2010
Chapter author for The Oxford Textbook of Correctional Psychiatry, Guttmacher award winner, 2016
Fellow of the American Psychiatric Association, 2018

**Grants:**

Site Coordinator, MacArthur Foundation research project on competency to stand trial assessment instrument (MacCAT-CA). 1995-1997
Site Coordinator, HRSA grant: *Integrated Mental Health: IPE Infrastructure Development in DNP Education*, 2014-2017

**Affiliations:**

American Psychiatric Association
American Academy of Psychiatry and the Law
  Psychopharmacology Committee member
  Grant reviewer

Bruce C. Gage, M.D.                                                                                          Page 3
   Washington Psychiatric Association

**Teaching Responsibilities:**
   Seminars for post-doctoral fellows in forensic psychiatry and psychology on forensic psychiatry
   Seminars for residents on ethics and on clinical, forensic, correctional, and emergency psychiatry

**Invited Lectures and Teaching Responsibilities:**
   Degenerative Diseases of the Brain—UCLA medical student lectures, 1989-1990

   A History of Psychological Theory from the Enlightenment to Freud—UCLA psychiatric residents' didactic, September 1989

   Neuroanatomy of Cognition—UCLA geropsychiatry lecture series, February 1990

   Forensic Psychiatry—Lecture for Community Psychiatry Seminar at the University of Washington and Alaska Psychiatric Institute, November 1991 and August 1992

   Psychiatrists as Cops—Lecture for senior psychiatric residents at the University of Washington and students and faculty at Washington State University, February 1991, March 1992, December 1992, May 1993

   Sub-Cortical Dementias—Alaska Psychiatric Institute/Harborview Developmental Center Continuing Medical Education, March 1991

   Late Onset Schizophrenia—Alaska Psychiatric Institute Continuing Medical Education, August 1991

   Character Disorders—Western State Hospital Continuing Medical Education, November 1991

   Geriatric Psychopharmacology—Alaska Psychiatric Institute/Harborview Developmental Center Continuing Medical Education, November 1991

   Delirium—Western State Hospital and Alaska Psychiatric Institute/Harborview Developmental Center Continuing Medical Education, December 1991 and February 1992

   The Right to Die—panel for Western State Hospital Continuing Medical Education, May 1992

   Prediction of Dangerousness—lecture at the National Association of State Mental Health Attorneys Annual Conference, September 1992

   Tourette's Syndrome—Alaska Psychiatric Institute/Harborview Developmental Center Continuing Medical Education, February 1993

   Fetal Alcohol Syndrome—Alaska Psychiatric Institute/Harborview Developmental Center Continuing Medical Education, May 1993

   Genetic Causes of Mental Retardation—Alaska Psychiatric Institute/Harborview Developmental Center Continuing Medical Education, August 1993

   Monothematic Delusions: Phenomenology and Management—UW CME Lecture Series, October 1995

   Risk Assessment/Risk Management—American Academy of Psychiatry and the Law annual meeting, October 1996

   Forensic Mental Health Evaluations—Seattle University Law School, November 1998, October 1999

   Mental Disease and Defect in Adults: Causation, Diagnosis, and Treatment—State Superior Court Judges' Conference, April 1999

   Antisocial Behavior:  A Neuropsychiatric Perspective—DOC In-Service, November 1999

   Mental Health Courts—Alaska Psychiatric Association annual meeting (with Judge Stephanie Rhoades), April 2000

   Aesthetics and the Human Psyche—Alaska Psychiatric Association annual meeting, April 2000

   Risk Assessment/Risk Management—Presentation to providers, judges, and law enforcement in Clatsop County, OR, September 2000

Bruce C. Gage, M.D.                                                                                                    Page 4

Basic Anatomy and Physiology of the Brain Related to the Dream State—Presentation to the American Academy of Forensic Sciences, February 2001

Risk Assessment—Presentation to the Washington State Bar Association (CLE), April 2001

Unusual Psychiatric Defenses—Presentation to the Washington State Bar Association (CLE), April 2001

Overview of DSM-IV—Presentation to case managers and masters clinicians, April 2001

Mental Health Experts in Criminal Cases, Including Commentary Relating to the Juvenile Court System—Presentation at the Washington Criminal Justice Institute (with Lynne Sullivan, Ph.D.), September 2001

Competency, Diminished Capacity, and Intentionality in Forensic Assessments—Presentation to Pacific Northwest Neuropsychological Society, September 2002

Integrating Risk Assessment/Risk Management Procedures into a Clinical Forensic Program—Presentation to National Association of State Mental Health Program Director's Forensic Division's annual meeting, September 2002

Competency to Stand Trial—Presentation to Alaska Public Defenders Training Conference, October 2002

Psychiatric and Psychological Issues & Neurological Issues—Presentations at "Through the Looking Glass: Mental Illness and the Law", a University of Washington Continuing Legal Education program, October 2002

Research Methodology—Presentation at the annual meeting of the American Academy of Psychiatry and the Law, October 2002

Civil Commitment—Presentation to the Seattle Forensic Institute, April 2003

How to Identify a Client with Mental Illness—Presentation at the Tenth Annual Washington Criminal Justice Institute, September 2003

Competency & Informed Consent; Legal Liabilities for the Professional—Presentation at Mental Health and the Law in Washington, January 2004

Primer on Conducting Involuntary Medication Hearings—Presentation at the Fall Conference of the Washington State Association of Municipal Attorneys (with Mike Finkle, J.D.), October 2004

Competency and Informed Consent:  The Law and the Role of the Clinician—CME for Franciscan Health System, June 2006

Is Evil Good for Psychiatry—Grand Rounds, UW Department of Psychiatry and Behavioral Sciences (with Lorna Rhodes, Ph.D.), June 2006

Competency and Informed Consent:  Passive Acceptors and Incompetent Refusal of Treatment—CME for Franciscan Health System, November 2007

Dim Rea:  Mental Health Evaluations of Diminished Capacity and *Mens Rea*—CLE, Department of Assigned Counsel, December 2007

Diminished Capacity:  Approaches to the Evaluation of *Mens Rea*—Presentation at the Symposium on Diminished Capacity Sponsored by The Washington Institute for Mental Health Research and Training, May 2008

Sentencing Policy for Mentally Ill Offenders—Panel at the National Association of Sentencing Commissions Annual Conference, August 2008

Youth in Corrections—Diverse Youth in Transition: Navigating a difficult Passage, presentation and Panel for the American Psychiatric Association's OMNA on Tour, September 2009

Correctional Psychiatry—Washington Department of Corrections Continuing Medical Education, October 2009

Leston Havens—for the Luminaries of Psychiatry lecture series sponsored by the University of

Bruce C. Gage, M.D.                                                                                     Page 5

Washington Department of Psychiatry and Behavioral Sciences, December 2009

Involuntary Psychotropic Administration: The Harper Solution—American Correctional Health Services Association Professional Development Conference, March 2010

Securing the Body, Freeing the Mind: Risk Oriented Treatment of the Mentally Ill Offender—Washington Behavioral Health Care Conference, May 2010

Risk Assessment—Co-Occurring Disorders and Treatment Conference, October 2010

Depression and Chronic Pain—Washington Department of Corrections Continuing Medical Education, October 2010

Effective Use of Older Psychotropic Medications—Washington Physician's Assistants Continuing Medical Education, November 2010

Changing Personality or Changing Behavior: Treating Cluster B Personality Disorder—Washington Behavioral Healthcare Conference (with Jude Bergkamp, PsyD, MA), June 2011

Interaction of Psychotherapy and Psychopharmacology—Washington Behavioral Healthcare Conference (with Bart Abplanalp, PhD & Julie Shinn, MA), June 2011

Delirium Is a Syndrome—Washington Department of Corrections Continuing Medical Education, September 2011

Setting Up an Involuntary Antipsychotic Administration Mechanism – The Harper Solution—National Correctional Health Care Conference, October 2011

Don't Panic: Panic Disorder in Medical Settings—Washington Department of Corrections Continuing Medical Education, September 2012

Reducing Liability When Using Physical and Chemical Restraint—Webinar for OmniSure Consulting Group, LLC, December 2012

Involuntary Administration of Antipsychotic Medication: The Harper Solution—American Jail Association Annual Meeting, May 2013

Risk-Need-Responsivity and the Abandonment of the "One Size Fits All" Approach in Corrections and Offender Reentry—Panelist for Seattle University Criminal Justice Department conference entitled "Rethinking Criminal Justice and Mental Health: Evolving Policy in an Era of Risk Assessment and Evidence-Based Practice", May 2013

Personality Disorders—Washington Department of Corrections Continuing Medical Education (with Bart Abplanalp, PhD), September 2013

Personality Disorders—"HIV/AIDS in the Correctional Setting", continuing education sponsored by the Northwest AIDS Education and Training Center (with Bart Abplanalp, Ph.D.), February and March 2014

Working with the Potentially Violent Client—CLE for King County Public Defenders, July 2014

Competency and Informed Consent— Washington Department of Corrections Continuing Medical Education, October 2014

Personality Disorders: A Developmental Perspective—Primary Care Conference CNE hosted by the University of Washington School of Nursing, October 2014

Prescribing Controlled Substances in Correctional Settings: Ethics and the Standard of Care—American Academy of Psychiatry and the Law annual meeting, October 2014

Mental Health in the Washington Department of Corrections—NAMI Washington annual meeting, August 2015

Working with Challenging Personalities in the Primary Care Setting—Primary Care Conference CNE hosted by the University of Washington School of Nursing, November 2015

Borderline Personality Disorder in the Medical Setting: Creating and Maintaining an Alliance—Primary

Bruce C. Gage, M.D.                                                                                  Page 6

Care Conference CNE hosted by the University of Washington School of Nursing, October 2016

Violence Risk Assessment—Washington State Psychiatric Association Fall University of Washington Series, September 2017

The Elderly in Correctional Settings—American Academy of Psychiatry and the Law annual meeting, October 2017

Individuals with Neurodevelopmental Disorders in Forensic and Correctional Settings—workshop at the American Academy of Psychiatry and the Law annual meeting, October 2018 (with Drs. Pinals, Wall, and King)

Forensic Considerations of Treatment When You Haven't Seen the Patient—workshop at the American Academy of Psychiatry and the Law annual meeting, October 2018 (with Drs. Greenspan, Cooke, Levin, and Hall)

Annual didactics to fellows and residents on the following topics:  criminal responsibility, competency, risk assessment/risk management, right to treatment/right to refuse treatment, civil commitment, ethics, treatment of the violent patient, conditional release, psychopathy, correctional psychiatry and other topics.


**Publications:**

Refereed Journals:

Gage, B.C. and Egan, K.J. The Effect of Alexithymia on Morbidity in Hypertensives.  Psychotherapy and Psychosomatics 41(3):136-144 (1984).

White, K.A.; Beck, J.C.; Gage, B.C. Emergency psychiatric assessment of violence.  American Journal of Psychiatry 148(11):1562-1565 (1991).

Kruh, I.P., Whittemore, K., Arnaut, G.L.Y., Manley, J., Gage, B., Gagliardi, G. The concurrent validity of the psychopathic personality inventory and its relative association with past violence in a sample of insanity acquittees. International J Forensic Mental Hlth 4(2):135-145 (2005).

Book Chapters:

Gage, B.C. The Violent Inpatient.  In Confidentiality Versus the Duty to Protect.  Beck, JC (Ed.). American Psychiatric Association press, Washington, D.C. (1991).

Gage, B.C. Working Inside the Walls.  In Oxford Textbook of Correctional Psychiatry. Trestman, R; Appelbaum, K; Mtezner, J (Eds.). Oxford University Press, New York (2015).


Other Publications:

Gage, B.C. and Smith, O.A.  Cardiovascular Responses to Microinjection of a Neuroexcitatory Amino Acid into Discrete Loci of the Rat Brain.  The Anatomical Record 208(3):58-59A (1984)

Gage, B.C. Book review:  Insanity:  The Idea and Its Consequences, Thomas Szasz.  Theoretical Medicine 12:183-185 (1991).

Gage, B.C., Harris, V., and Tomko, R.  Criminal Recidivism, Rehospitalization and Revocation of Release in Conditionally Released Insanity Acquittees.  AAPL Abstract, 10/95 meeting.

Kruh, I.P.; Arnaut; G.L. Y.; Gage, B.; Gagliardi, G. The psychopathic personality inventory:  a validation study with insanity acquittees. Presentation at the Biennial Conference of the American Psychology-Law Society meeting, 3/00.

Gage, B.C. Book review:  Principles and Practice of Forensic Psychiatry (2nd Ed.), Richard Rosner (ed.). Journal of Forensic Sciences 50(1):257 (2005).

Gage, B.C. The Growing Problem of Cognitive Disorders in Corrections. Iceberg 19(2) (2009). www.fasiceberg.org/newsletter.htm.

Gage, B.C.; Stern, M.  Setting Up an Involuntary Antipsychotic Administration Mechanism – The

Bruce C. Gage, M.D.                                                                 Page 7

Harper Solution.  DVD through MHM production grant. 2010

Gage, B.C.  Reducing liability when using physical and chemical restraints.  Omnisure Risk
Management Bulletin. 2014

Gage, B.C.  More on *Volk v. Demeerleer*.  Letter to the editor.  NW Lawyer 72(4):4 (2018).

**Testimony and Depositions**
Bruce C. Gage, M.D.

**Testimony**
2018
Jermaine Dockery, et al., v. Pelicia Hall, et al. (U.S. District Court for the Southern
    District of Mississippi, Northern Division)

2017
State of Alaska v. Oscar Andrew (Superior Court of Alaska, Third Judicial District)

2015
State of Alaska v. Karan Clifton (Superior court of Alaska, Third Judicial District)
Menefee v. Franciscan Health system – arbitration testimony (Pierce County Superior
    Court, Washington)

2014
State of Washington v. Isaac Zamora (Skagit County Superior Court, Washington)
Sheard v. Daniel Habeeb and Robert Polakoff (King County Superior Court,
    Washington)

2013
Lashawn Jones, et al., and the United States of America v. Marlin Gusman, Sheriff (U.S.
    District Court, Eastern District of Louisiana)
In re the Estate of Akagi, (Snohomish County Superior Court, Washington)

2007
State of Alaska v. Cynthia Lord (Anchorage Superior Court, Alaska)

2004
State of Washington v. Lawrence Lofton (King County Superior Court, Washington)
State of Washington v. Thomas Martin (King County Superior Court, Washington)
State of Alaska v. Mark Rocereta (Anchorage Superior Court, Alaska)

2002
State of Washington v. Bruce Rowan (Clallam County Superior Court, Washington)

2000
State of Alaska v. Mark Edwards (Anchorage Superior Court, Alaska)

**Depositions**
2017
Estate of Ruben Nunez v. County of San Diego, et al. (U.S. District Court for the
    Southern District of California)

2016
James Joshua Mayfield, et al. v. Ivan Orozco, et al.

2015
In re the Estate of Bernard (King County Superior Court, Washington)

2014
Sheard v. Daniel Habeeb and Robert Polakoff (King County Superior Court,
        Washington)

2013
In re the Estate of Akagi, (Snohomish County Superior Court, Washington)
Watson v. Dyncorp International and The Continental Insurance Company (U.S.
        Department of Labor, Office of Administrative Law Judges)

2011
Williams v. McDonnel Douglas Corp, et al. (King County Superior Court, Washington)

2010
Kono v. Kitsap Mental Health (Kitsap County Superior Court, Washington)

2004
Pierce County v. Department of Social and Health Services (Pierce County Superior
        Court, Washington)
Tepei v. Michelin (Lewis County Superior Court, Washington)

2001
Rosalie Stevenson v. State of Washington (King County Superior Court, Washington)
Richard Rahn v. State of Washington (Pierce County Superior Court, Washington)

# APPENDIX   3