# Exhibit 14

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION


JERMAINE DOCKERY, ET AL.                        PLAINTIFFS

VS.                     CIVIL ACTION NO. 3:13CV326WHB-JCG

PELICIA HALL, ET AL.                            DEFENDANTS


**TRIAL TRANSCRIPT**
**VOLUME 15**


BEFORE THE HONORABLE WILLIAM H. BARBOUR, JR.
UNITED STATES DISTRICT JUDGE
MARCH 14, 2018
AFTERNOON SESSION
JACKSON, MISSISSIPPI


REPORTED BY:  CHERIE GALLASPY BOND

Registered Merit Reporter
Mississippi CSR #1012
_____

501 E. Court Street, Ste. 2.500
Jackson, Mississippi  39201
(601) 608-4186

1                        **APPEARANCES**

2

        FOR THE PLAINTIFFS:
3

            MR. JODY E. OWENS
4           MS. ANNA Q. HAN
            MR. CARL TAKEI
5           MS. ELISSA JOHNSON
            MR. RAVI DOSHI
6           MS. REKHA ELAINE ARULANANTHAM
            MR. BENJAMIN R. SALK
7           MS. CHELSEA K. CAVENY
            MS. SARAH D. BIDINGER
8

9       COUNSEL FOR DEFENDANTS:

10          MR. WILLIAM T. SILER, JR.
            MR. NICHOLAS F. MORISANI
11          MS. MOLLY MITCHELL WALKER
            MR. MICHAEL J. BENTLEY
12          MR. J. WILLIAM MANUEL
            MR. HOWARD DAVID CLARK III
13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                          TABLE OF CONTENTS

2


3       WITNESSES FOR THE PLAINTIFFS:
```

```
4       TONY DONALD                                            5

5         Continued Direct Examination By Ms. Johnson  .........5

6            Exhibit P-2650  ...................................8

7            Exhibit P-1006, P-1008, P-1012,  ..................19

8            P-1035, P-1048, P-1051, P-1052, P-1057,

9            P-1061, P-1062, P-2056, P-2608, P-1722,

10           P-1734, P-1737, P-1742, P-1750, P-1069,

11           P-1079, P-1106, P-1110, P-1131, P-1367,

12           P-1388, P-1402, P-1473, P-2537, P-2542,

13           P-2413, P-2768, P-2666, JTX-50, JTX-51

14           and JTX-52

15        Cross-Examination By Mr. Siler  .....................22

16        Redirect Examination By Ms. Johnson  ................25

17      BARRY MELTON                                           28

18        Direct Examination By Mr. Owens  ....................28

19           Exhibit P-0241  ..................................41

20           Exhibit P-2793  ..................................44

21        Cross-Examination By Mr. Manuel  ....................46

22           Exhibit P-501  ...................................54

23        Redirect Examination By Mr. Owens  .................55

24           Exhibit P-2826  ..................................62

25           Exhibit JTX-0121  ................................66
```

1          Recross-Examination by By Mr. Manuel  ...............67

2       BOBBY JOE MITCHELL                                  68

3          Direct Examination By Ms. Johnson  .................68

4          Cross-Examination By Mr. Clark  ....................92

5       TERRY KUPERS                                        94

6          Direct Examination By Mr. Salk  ....................94

7           Exhibit P-1497  ..................................96

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   A   Yes, sir, for about almost seven years, six years.

 2   Q   And what almost six or seven years were you housed at East

 3   Mississippi?

 4   A   From May of '11 until May of last year.

 5   Q   And what other facilities in the Mississippi Department of

 6   Corrections have you been housed?

 7   A   Wilkinson County present since about December 28th,

 8   Wilkinson County, and before that, I was at Rankin County for

 9   about nine months.

10   Q   Mr. Melton, what's your highest level of education?

11   A   Four years of military and two years of college.

12   Q   What branch have you served in the military?

13   A   Navy, sir.

14   Q   Now, where were you housed when you were -- the six of

15   seven years you were at East Mississippi?

16   A   I was on several of the zones.  I started out on zone -- on

17   Unit 4, then Unit 2, and then unit -- no, I started out on 6A

18   for about six or eight months, and then I was moved to Unit 4

19   for about two years and then to 2 Bravo for the remainder.

20   Q   Okay.  So, Mr. Melton, have you ever been assaulted while

21   at East Mississippi?

22   A   Yes, sir.

23   Q   When was that?

24   A   7/24 of '16.

25   Q   I'm sorry?
```

```
 1   A    7/24 of '16.

 2   Q    July 24th?

 3   A    Yes, sir.

 4   Q    Of 2016?

 5   A    Yes, sir.

 6   Q    Who assaulted you?

 7   A    Several of the organizational members there.

 8   Q    You say several organization -- gangs?

 9   A    Yes, sir.

10   Q    How many is several?

11   A    Four.

12   Q    And how were you assaulted?

13   A    I was tied up and beaten and was -- for about four hours.

14   And then I was sexually assaulted -- and I mean not really

15   traditional sexual assault.  I wasn't -- I was -- they thought

16   I had something inside of me.  They wanted to check inside of

17   me to see if I had something up my backside.

18   Q    So were you sodomized?

19   A    Yes, sir, but not with a -- not with a penis, but with --

20   Q    Could you tell the court how were you sodomized?

21   A    Well, first of all, he stuck a large Magic Marker --

22   Q    Speak into the mic.

23   A    He stuck a large Magic Marker up my rear end to see did I

24   have something that belonged to them, some drugs that had been

25   taken that my roommate was supposedly watching for them.  And
```

1   they didn't find anything.  Of course, there wasn't anything to

2   find.

3        But then again later in the assault, he did it again with

4   his -- just his hand and gloves and some hair grease.

5   Q   Now, Mr. Melton, you testified that you were sexually

6   assaulted or tied up for several hours.  Is that correct?

7   A   Yes, sir.

8   Q   And how many hours were you tied up?

9   A   The assault began I guess around 2:00 after visitation was

10  over with, and it lasted until about 6, 6:30 that evening.

11  Q   What were you tied with?

12  A   They took my sheets and cut them in strips with their

13  knives and tied me up with them.

14  Q   And did you -- did anyone see you being tied up?

15  A   Well, they made -- before they did that, when they first

16  discovered that the pillow that the drugs were supposed to be

17  in, when they discovered that it was missing, they made all the

18  other inmates lock down.  So nobody actually witnessed it

19  visually, but I'm sure they heard it.

20  Q   Why do you believe they heard it?

21  A   Screams.

22          THE COURT:  Who made the other prisoners lock down?

23          THE WITNESS:  The gang members.  They sent -- well, he

24  sent -- one of the gang members sent another gang member that

25  was cousins to the lady that was over our unit that day and let

1   her know what was happening, let her know what was going on so

2   that it wouldn't --

3           MR. MANUEL:  Objection, Your Honor, to hearsay.

4           THE COURT:  Sustained.  You can't say what somebody

5   else said.

6           THE WITNESS:  Okay.

7   BY MR. OWENS:

8   Q   Was there anything blocking the view of what was happening?

9   A   Yes, sir.  I was inside of my cell.  So the doors -- they

10  put a sheet over the door so that nobody could see -- that the

11  officers could see in there so it wouldn't incriminate them

12  when they came through.  They knew what was going on, was

13  informed what was going on, but they put the sheet up so that

14  they couldn't -- I guess the situation like this where I

15  couldn't say that they saw it.

16  Q   And during the four hours of your attack, were there any

17  officers coming by the zone for any reason?

18  A   Yes, sir.  They did a shift change and the master count at

19  4:00 during the ordeal, which was about two hours into it.  And

20  that's -- the one gang member stayed with me and then sent my

21  roommate to his cell with another gang member to stay for

22  count, for master count.  And then they put the sheet over the

23  door again so the officer couldn't see in.  But she had already

24  been told -- I heard her -- I heard the head gang member --

25          MR. MANUEL:  Objection, Your Honor.

1     MR. OWENS:  Your Honor, I believe that the exception

2     here, Your Honor, is he's not going to -- he's not offering

3     this testimony -- he's not offering this presumably hearsay

4     testimony for the truth of the matter asserted but just the

5     effect it had on him, on the listener.  I don't think we're

6     arguing the accuracy of what was told.  I believe Mr. Melton is

7     going to testify what was going on with him at that time.  And

8     I also believe it will be an admission by a party opponent.

9     The statement is from MDOC, and it was MDOC staff members,

10    because Mr. Melton is testifying during a shift change what he

11    heard.

12    MR. MANUEL:  Your Honor, with regard to the admission

13    by a party opponent, as I've said several times, there's a lot

14    more you have to show with regard to being in a circle of

15    control for it to be an admission by an employee of a

16    corporation.  But beyond that, it seems to me if they're only

17    going to show what he did next, then we could just move along

18    to what he did next and not have to worry about what he was

19    told.

20    MR. OWENS:  Your Honor, I actually don't know the

21    testimony he was about to give.  Mr. Manuel preempted his

22    testimony.  So I'm not sure exactly what he was going to say.

23    I believe he was going to say something to the effect of what

24    was happening during count, because the count occurred during

25    the four hours of the assault.

1        THE WITNESS:  Right.

2        THE COURT:  All right.  I overrule the objection.

3   Mr. Melton, you may not say what was said by any of the prison

4   officials.  You may say what they did or what others did.

5   A   Okay.  I guess where I was going was I was -- during the

6   count, they see, and you have a count every hour or officers do

7   a security check every hour.  And then you have a count every

8   two hours.  But then you have two master counts.  You have one

9   in the morning and one in the evening.

10      The assault took place through the second master count from

11   2 to 6 to 6:30, around 2 to 6:30.  So the master count took

12   place and also there was a shift change in that particular

13   time.  And what I was saying was that the gang member -- I

14   heard the gang member tell the other gang member to go tell his

15   cousin to make sure that when they changed shifts --

16        MR. MANUEL:  Same objection for hearsay.  We have

17   already dealt about the one on the gang member time.  You

18   sustained that objection.

19        MR. OWENS:  Your Honor, I think we can move on to --

20   further.

21   BY MR. OWENS:

22   Q   Mr. Melton, what, if any, injuries did you receive as a

23   result of your assault?

24   A   The injuries?

25   Q   Yes, sir.

1   A   Both of my eyes were swollen shut.  I had several large

2   knots on my hands and bruises from my head to my toes.  Some of

3   them were actually full shoe-print bruises.

4   Q   Did you have any injuries related to being penetrated?

5   A   Yes, sir.  I bled from my rectum for almost three months.

6   The first month all the time and then after that only when I

7   would use the bathroom.

8   Q   And how did you escape being tied up?

9   A   They -- when it come time for feeding time, which was

10  between 6 and 6:30, I had worked my hands aloose behind my

11  back, and the head gang member came down and told the other --

12  Q   You can't say what someone said.

13  A   I heard this.

14  Q   Just tell me how you escaped.

15  A   Anyway, it was feeding time and they had to let these guys

16  come out of the cell to get their trays.  So they left me under

17  guard.  They put one of the gang members outside my door with a

18  sheet over my door.  He was sitting outside my door in a chair.

19  And I got my -- I already had my hands aloose, and so I got

20  untied my feet and slipped my pants on and ran out the door and

21  busted out the door.  And the officer that was feeding, they

22  tried to catch me and wouldn't let me leave, but she told them

23  that he's on camera now and y'all ain't going to cost me my

24  F-ing job.  So she's --

25  Q   You testified your hands were bound behind your back?

```
 1    A    Yes, sir.

 2    Q    Were you hogtied?

 3    A    Yes, sir.  I was hogtied.  My hands behind my back and my

 4    ankles and then my feet tied to my ankles, my wrists.

 5    Q    And as a result of your assault and your injuries, did you

 6    try to get medical treatment?

 7    A    Yes, sir, many, many times.

 8    Q    How did you try to get medical treatment?

 9    A    Medical requests and telling the staff members what was

10    going on and to no avail, but, yes, sir, I tried.

11    Q    You said to no avail?

12    A    Yes, sir.

13    Q    Did you do a sick call request?

14    A    Yes, sir, many of them.

15    Q    Did you do an ARP regarding the sick call request as well?

16    A    Yes, sir, many of them.

17              MR. MANUEL:  Can I see a copy of that?

18         (Short Pause)

19    BY MR. OWENS:

20    Q    Mr. Melton, is this the ARP you did regarding your previous

21    testimony about being sexually assaulted?

22    A    No, sir.  The ARP about me being sexually assaulted was

23    granted special sensitive issue status by Mr. Pennington of

24    MDOC, and so I never had a copy of it to turn in.  And then

25    when I asked for a copy of it, this is the response that they
```

```
 1              MR. MANUEL:  Both -- this and this?

 2              MR. OWENS:  Yes.

 3              MR. MANUEL:  No objection.

 4              THE COURT:  Okay.  That's an ARP?

 5              MR. OWENS:  Yes, Your Honor.  That's the ARP we

 6   just -- he identified on the screen.

 7              THE COURT:  0241 is received into evidence.

 8        (Exhibit P-0241 marked)

 9   BY MR. OWENS:

10   Q   Mr. Melton, I want to be clear about your testimony

11   regarding the timeline for treatment related to bleeding out of

12   your rectum.  Okay?

13   A   Yes, sir.

14   Q   Now, did I understand your testimony to be that you

15   actually filed ARPs to get treatment for -- when did you

16   actually get treatment for the rectal bleeding?

17   A   It would be two months to the day after the assault.  I saw

18   a nurse practitioner.  She -- it would be September 24th, two

19   months to the day after my assault when I actually saw a nurse

20   practitioner.  But that's about as far as you're going to get.

21   You're lucky to see them.

22   Q   Now, you said you're lucky to see them?

23   A   Yes, sir.

24   Q   With respect to any other injury that you might have had

25   outside of the rectal bleeding, did you have any other issues
```

1   related to the assault?

2   A   Physical issues?

3   Q   Any type of issues.

4   A   Other than the black eyes and other than that?

5   Q   Any type of mental issues or anything post assault?

6   A   Yes, sir.  I have started having, I guess you would say,

7   flashbacks or nightmares about what had happened.  And I sought

8   counseling for that.  And that was -- I -- almost eight months

9   requesting, requesting, requesting before I ever even got to

10  see somebody about that.

11  Q   And did you also have to do an ARP to get psychological

12  treatment?

13  A   Yes, sir.

14  Q   Why don't you look at the screen?  Is this the ARP that you

15  submitted -- the ARP you submitted for treatment or request

16  that you had related to the psychological effects of being

17  sexually assaulted?

18  A   Yes, sir.

19  Q   And I believe this document purports to say you've

20  requested multiple times to see Dr. Nagel?

21  A   13 times, yes, sir.

22  Q   13 times without seeing Dr. Nagel?

23  A   Yes, sir.

24  Q   When did you finally see Dr. Nagel?

25  A   The day before he got me transferred out of there, out of

1    EMCF.  I saw him -- I've got that.  You want to see that?  I

2    think it was the 29th of May.

3    Q    After your assault, did you still feel safe at East

4    Mississippi?

5    A    Actually only when I was in segregation.

6    Q    How long were you in segregation?

7    A    Almost nine months.

8    Q    Was that directly after your assault?

9    A    Right -- no, sir.  That came in the middle of -- middle of

10   August.  I think it was the 22nd of August when I was put in

11   segregation, for when one of the gang members from the gangs

12   that did the assault came to me and tried to make me give him

13   all of my belongings for repayment supposedly.  And I was

14   written up for assaulting an inmate and put in the hole, and he

15   was not even reprimanded or put in the hole or anything

16   himself.

17   Q    This is the second time you've testified about gangs in

18   East Mississippi.  Is there a large presence of gangs there?

19   A    Yes, sir.

20   Q    Now, have you ever been protected by the gangs at any point

21   in time?

22   A    Yes, sir.  At one time I was in what they -- what they call

23   in their security, which means that I couldn't be messed with

24   or touched or harmed by any of the other gangs or any of the

25   other inmates.

1    Q    What did you call that again?

2    A    In their security.  In their security.

3    Q    In security?

4    A    Right.  Like if Elissa was going to jump on you or

5    something, I would say, *You can't do that, he's in our*

6    *security.  So if you jump on him, you're going to jump on all*

7    *of us.*  You know?

8    Q    So the gangs were providing security at one point in time?

9    A    Yes, sir.

10   Q    And then the gangs also are the same group that assaulted

11   you?

12   A    Right, sir.

13            MR. OWENS:  Your Honor, I want to move Plaintiffs'

14   Exhibit 2793 into evidence which is the ARP that Mr. Melton

15   said that he submitted after his assault to get some mental

16   health treatment.

17            MR. MANUEL:  No objection.

18            THE COURT:  2793 is received into evidence.

19       (Exhibit P-2793 marked)

20   BY MR. OWENS:

21   Q    Mr. Melton, when you were at East Mississippi, did you ever

22   see any fires in the zones?

23   A    Yes, sir.

24   Q    How often?

25   A    Every day.

```
1    Q   Did you start any fires?

2    A   No, sir.

3            MR. MANUEL:  Your Honor, I object to the

4    cumulativeness of these -- of this testimony.  We've heard that

5    there are fires at certain times at East Mississippi.  If we're

6    going to go back through every single subject matter as to

7    whether there were fires, all those kind of things, it's all

8    been heard by the court and I'd object to it as being

9    cumulative.

10           MR. OWENS:  Your Honor, that was the only question I

11   have on this issue.

12           THE COURT:  Overruled.

13   BY MR. OWENS:

14   Q   Mr. Melton, you testified earlier that you were living on

15   Housing Unit 5.  Is that correct?

16   A   Yes, sir.

17   Q   How often did you see officers on your zone?

18   A   When they feed you, it would be basically it until they

19   come in to put out one of the fires.

20   Q   And when you were on Housing Unit 5, did you ever damage

21   the light in your cell?

22   A   No, sir.

23   Q   Did you ever have an instance where you were in a cell

24   without a working light?

25   A   Yes, sir.
```

1   Q   What's the longest you were without a working light?

2   A   I would say I think a couple of weeks.  Maybe -- maybe

3   more.

4   Q   Were you ever on -- in the zone without a working toilet?

5   A   Yes, sir.

6   Q   And did you damage your toilet?

7   A   No, sir.

8   Q   What's the longest you didn't have a working toilet?

9   A   About two weeks.

10          MR. OWENS:  I tender the witness, Your Honor.

11          MR. MANUEL:  May I proceed, Your Honor?

12          THE COURT:  You may.

13                        CROSS-EXAMINATION

14   BY MR. MANUEL:

15   Q   Mr. Melton, what were you convicted of that put you into

16   the Mississippi prison system?

17   A   Possession with intent to distribute.

18   Q   Of narcotics?

19   A   Yes, sir.

20   Q   Prior to -- well, let me ask you this.  Have you been

21   diagnosed -- it is true you've been diagnosed with major

22   depressive disorder.  Is that true?

23   A   Yes, sir.

24   Q   And is it true also that you were never diagnosed with

25   mental health conditions until you actually came to prison?  Is

```
 1    that correct?

 2    A    Right, sir.

 3    Q    And when you got to prison -- before you had been to

 4    prison, you had never sought any kind of mental health

 5    treatment.  Is that correct?

 6    A    No, sir.

 7    Q    And while you were in prison, you were put on several

 8    different drugs like Celexa and Remeron?  Is that how you say

 9    it?

10    A    Yes, sir.

11    Q    And you were put on those drugs for your mental health

12    condition while you were there?

13    A    Yes.

14    Q    And those drugs worked for you.  Is that correct?

15    A    Yes, sir.

16    Q    Now, you said -- when Mr. Owens asked you some questions, I

17    think I wrote down that you said you went actually eight months

18    without seeing a mental health professional.  Is that correct?

19    A    Yes, sir.

20         MR. OWENS:  Objection, Your Honor.  That wasn't his

21    testimony.

22         MR. MANUEL:  He just agreed with me, Your Honor.

23         THE COURT:  He may answer the question.  If it's

24    incorrect, he can say so.

25    BY MR. MANUEL:
```

1  Q   You said it was eight months without seeing a mental health

2  professional.  Is that correct?

3  A   Before I actually saw the psychologist, yes, sir, but we

4  would see the mental health nurse, as you call her.  She would

5  come through periodically from time to time.  And that was one

6  of my other ways that Mr. Owens didn't pursue when I testified

7  to that.  But we saw her -- she would come through about once

8  every ten days, and I would put in a request and tell her

9  verbally requests to no avail.

10 Q   But actually you would see -- do you recognize the name,

11 Nurse Dunn?

12 A   Yes, sir.

13 Q   And she's a psychiatric nurse practitioner.  Is that

14 correct?

15 A   That's who I was just speaking of.  Yes, sir.

16 Q   And you actually saw her several times a week while you

17 were at East.  Is that correct?

18 A   Not several times a week.  She may come through about once

19 a week.  Maybe once a week, maybe twice a week.

20 Q   Mr. Melton, do you remember giving a deposition in this

21 case?

22 A   Yes, sir, I do.

23        MR. MANUEL:  Your Honor, may I approach the witness?

24        THE COURT:  Yes, sir.

25 BY MR. MANUEL:

1  Q   Mr. Melton, I'd ask you to turn to page 28 of your

2  deposition.

3          MR. OWENS:  Do you have a copy?

4          MR. MANUEL:  I only had two.

5  BY MR. MANUEL:

6  Q   Mr. Melton, I'll ask you to turn over to page 28.

7  A   Uh-huh.

8  Q   I said:  Since you've been on Unit 5 --

9          MR. OWENS:  What line are you reading now?

10          MR. MANUEL:  It's the last line, line 25 of page 28.

11  BY MR. MANUEL:

12  Q   Do you see that, Mr. Melton?

13  A   Yes, sir.

14  Q   It says, "Since you've been on Unit 5, have you met with

15  Nurse Dunn?"  And your response was:

16      "She comes around usually a couple of times a week.  She

17  comes through a couple of times a week."

18      And the question was:

19      "Where do you meet with her?"

20      "At your door.  She comes to the doors, to each door."

21      Did I read that correctly?

22  A   Yes, sir.

23  Q   And you also said that you didn't get to see Dr. Nagel who

24  is one of the psychiatrists.  Is that correct?

25  A   Right, sir.

1          (Exhibit P-2826 marked)

2     BY MR. OWENS:

3     Q    Mr. Manuel also asked you about your deposition testimony.

4     Is that correct?

5     A    Yes, sir.

6     Q    And do you still have that deposition testimony in front of

7     you?

8     A    Yes, sir.

9     Q    I want to turn your attention to page 23.  Isn't it true

10    that you testified in your deposition that -- I'm sorry.

11    Strike that, Your Honor.

12         On cross-examination when -- you were asked, "Does Ms. Dunn

13    come around," and you testified that she does.

14    A    Yes, sir.

15    Q    And that's not an individual meeting, is it?  That's a

16    meeting at your cell?

17    A    Right.

18    Q    And she's talking to you?

19    A    Yes, sir.

20    Q    And other people can hear the conversation?

21    A    Yes, sir.

22    Q    So it's not a private one-on-one consultation?

23    A    She usually makes it a point not to get into any sensitive

24    issues if she can help it while you are in that environment.

25    But, yes, sir, everybody can hear what's said.

```
 1   Q    So she's there and you can't even talk about sensitive

 2   issues --

 3   A    Right.

 4   Q    -- that might be bothering you?

 5   A    Right.

 6   Q    And also if you look at the screen, on page 23, line 18,

 7   you testified you've never -- you testified you have never

 8   refused medication.  That was the question, and you said, "No,

 9   sir?"

10   A    Yes, sir.

11   Q    Lastly, Mr. Melton, I'd like for you to look at the screen.

12   Let me switch it back.  Can you see that medical record,

13   Mr. Melton?

14   A    Yes, sir.

15   Q    Is that your name at the top of the record?

16   A    Yes, sir.

17   Q    Do you see the date of the -- on the record?

18   A    Yes, sir.

19              MR. OWENS:  The court's indulgence one second.

20        (Short Pause)

21              THE COURT:  Mr. Owens, are you through with this

22   witness?

23              MR. OWENS:  Your Honor, just two brief questions.

24   We're trying to locate the appropriate medical record that we

25   think speaks to whether or not this witness received the
```

1          THE COURT:  All right.  While he's coming, let's take

2     a very short five-minute break while you get the witness.

3        (Recess)

4          THE COURT:  All right.  Ms. Johnson, you may proceed.

5                     BOBBY JOE MITCHELL,

6      having first been duly sworn, testified as follows:

7                      DIRECT EXAMINATION

8     BY MS. JOHNSON:

9     Q   Mr. Mitchell, can you state your full name for the record?

10    A   Mr. Bobby Joe Mitchell.

11    Q   And where do you currently live at EMCF?

12    A   Housing Unit 5 Alpha, 110.

13    Q   Okay.  And how long have you been at EMCF?

14    A   Since 2015, September.

15    Q   Okay.  And you have been housed in any other prisons while

16    you were in MDOC custody?

17    A   Yes.

18    Q   What prisons were those?

19    A   Wilkinson County Correctional Facility, at Parchman and

20    Greene County.

21    Q   Okay.  And how long have you been on 5 Alpha?

22    A   Since January 2016.

23    Q   Okay.  And since you've been at EMCF and since 2015, have

24    you been on Housing Unit 5 the entire time?

25    A   Yes.

1    Q    And what zones have you lived on on Housing Unit 5?

2    A    Alpha, Bravo, Charlie and Delta pod.

3    Q    Mr. Mitchell, today is Wednesday.  And if you had been at

4    the facility today, when would you have been allowed -- or

5    would you have been allowed out of your cell during the day?

6    A    Yes.

7    Q    For what purpose?

8    A    Today is like shower and recreation day.

9    Q    And other than shower and recreation, you wouldn't come out

10   of your cell?

11   A    No.

12   Q    Mr. Mitchell, have you ever been without a light in your

13   cell?

14            THE COURT:  Excuse me just a minute.  That was the

15   cell you would have gotten out for shower and recreation?

16            THE WITNESS:  Yes, sir.

17            THE COURT:  Is that an hour for both, for each one of

18   those or an hour total?

19            THE WITNESS:  When you come out an hour for recreation

20   call, sometimes you'll be stuck in a shower for an hour, which

21   is only supposed to be 15 minutes.

22            THE COURT:  You want to get out of your cell some,

23   don't you?

24            THE WITNESS:  Yes.

25            THE COURT:  All right.

*** DAILY TRANSCRIPT ***

```
 1   BY MS. JOHNSON:

 2   Q    Do you always receive -- do you receive recreation every

 3   day, Monday through Friday, at EMCF?

 4   A    No.

 5   Q    When was the last time that you did not receive recreation

 6   on a Monday through Friday?

 7   A    Like last week.

 8   Q    Do you know why you didn't -- you didn't receive recreation

 9   that day?

10   A    Due to the fact they said they were short staffed.

11   Q    So other prisoners on your pod also didn't get recreation

12   that day?

13   A    Yes.  Correct.

14   Q    Have there been instances where you didn't receive your

15   shower on Monday, Wednesday, or Friday as the policy requires?

16   A    Yes.

17   Q    When was the last time you recall that happening?

18   A    January.

19   Q    And do you know why you didn't receive a shower?

20   A    Due to the fact that them saying they were short staffed

21   and didn't have enough staff for the night.

22   Q    And this is an officer said this to you?

23   A    Yes.

24   Q    You testified that you have been without a light in your

25   cell before?
```

1   A    Yes.

2   Q    What's -- how long have you been without a light?

3   A    A week was the longest.

4   Q    And you currently have a light in your cell?

5   A    Yes, ma'am.  Now, yes.

6   Q    To turn the light on and off -- how do you turn the light

7   on and off?

8   A    Got to screw my bulb in.

9   Q    Does the control tower -- can the control tower turn your

10  light on and off?

11  A    No.

12  Q    How does it affect you when you don't have a light in your

13  cell?

14  A    Be depressed, be feeling down, sad.

15  Q    When you don't have a light in your cell, are there certain

16  things you can't do?

17  A    Yes.  I can't eat, can't write.

18  Q    At the other -- you testified that you've also be housed at

19  Parchman, Greene County, which is SMCI, and Wilkinson County

20  Correctional Facility?

21  A    Yes.  Correct.

22  Q    At any of those other prisons were you ever without a

23  light?

24  A    No.

25  Q    And at the other prisons did you have to screw and unscrew

1    your lightbulb to control the light in your cell?

2    A    No.

3    Q    Do you receive cleaning supplies to clean your cell on

4    Housing Unit 5?

5    A    No.

6    Q    How -- are you able to clean your cell?

7    A    No.

8    Q    Is there another way in which your cell is sanitized?

9    A    Yeah.  They said when you come out of shower and rec call,

10   they have to clean it.

11   Q    Who will clean it?

12   A    They will.  Like the pod orderlies.

13   Q    And the pod orderlies are other prisoners?

14   A    Yes.

15   Q    And so they would be in your cell cleaning it?

16   A    Yes.

17   Q    And when you've seen then on the zone, are they always

18   supervised by staff?

19   A    No.

20   Q    And so they would clean your cell without staff

21   supervision?

22   A    Yes.

23   Q    Have you allowed them to clean your cell?

24   A    No.

25   Q    How do you keep your cell clean?

```
 1    A    My own soap and a cleanup rag.

 2    Q    And is this the state-issued soap that you get every week?

 3    A    Yes.

 4    Q    And it's the same soap that you have to bathe with?

 5    A    Yes.

 6    Q    And is this -- you have -- you said you had a cleaning

 7   towel?

 8    A    Yes.

 9    Q    Do you have to use that towel for other purposes as well?

10    A    No, just clean.

11    Q    Have you ever had an issue with your toilet not working on

12   Housing Unit 5?

13    A    Yes.

14    Q    When was that?

15    A    Like last year.

16    Q    Okay.  Can you describe the problem?

17    A    My toilet was stopped up, wouldn't flush.

18    Q    Did you do something to stop it up?

19    A    No.

20    Q    And do you recall how long it took to get it fixed?

21    A    Probably about three days.

22    Q    And during that time, you remained in that same cell?

23    A    Yes.

24    Q    And can -- how did not having a working toilet affect you?

25    A    It affected me bad because I can't use the bathroom.  I had
```

1   to smell my own feces in my cell for a few days.

2   Q    And during that time did you tell officers that your toilet

3   was broken?

4   A    Yes.

5   Q    Did you do a verbal request?

6   A    Yes.

7   Q    Do you recall who you reported this to?

8   A    To the zone officer and the sergeant.

9   Q    Okay.  Would you consider the showers on Housing Unit 5 to

10  be clean?

11  A    No.

12  Q    Why not?

13  A    They have black gnats in them.  Sometimes it be inmate --

14  other inmate hair and stuff -- all that type of stuff in them.

15  Q    Based on your observations, how often are the showers

16  cleaned?

17  A    Maybe five or six times out of every month they may be

18  clean.

19  Q    So that's only about once a week?

20  A    Yeah.

21  Q    On Housing Unit 5, you have to eat in your cell.  Is that

22  right?

23  A    Yes.

24  Q    Where do you put your food tray after you're done with a

25  meal?

1   A    You have to keep it inside your cell.

2   Q    Has this always been the case?

3   A    Yes.

4   Q    When can you discard the trash from a previous meal?

5   A    When your food flap open for the next meal.

6   Q    And does that mean you have to keep food waste in your

7   cell?

8   A    Yes.

9   Q    So if you have a -- if you receive dinner, you may not be

10  able to get rid of that tray until breakfast?

11  A    Right.

12  Q    Have there ever been any issues with rodents or pests in

13  your cell?

14  A    Yes.

15  Q    Can you describe those for the court?

16  A    Yeah.  Black gnats flying around in your cell.  We had

17  rats, stuff like that also.

18  Q    You said rats?

19  A    Yes.

20  Q    When was the last time you saw a rat at EMCF?

21  A    Maybe like last week.

22  Q    Last week?

23  A    Yes.

24  Q    And was that rat in your cell?

25  A    Yes.

1   Q   And how often do you see rats come into your cell?

2   A   Like if I set a tray on my floor and leave it down there

3   too long, then it will come to my cell.

4   Q   Okay.  But you can't get rid of your tray until there's an

5   officer -- your tray flap is opened?

6   A   Yes.

7   Q   Do you see rats on the zone outside of your cell?

8   A   Yes.

9   Q   How often do you see that?

10  A   At least about every week.

11  Q   Are there any other bugs or anything that are in your cell?

12  A   No, beside black gnats.

13  Q   Have you ever seen a fire on Housing Unit 5?

14  A   Yes.

15  Q   When was the last time you saw a fire on 5 Alpha where you

16  currently are housed?

17  A   I didn't -- I didn't witness it, but I smelled the smoke.

18  A guy started a fire trying to get some more guys out of the

19  shower due to them being in the shower for around about two

20  hours.

21  Q   Okay.  And was this on your zone?

22  A   Yes.

23  Q   So you said you couldn't see the fire but you could smell

24  smoke?

25  A   Yes.

1    Q    And the fire was set because prisons had been left in the

2    shower --

3    A    Yes.

4    Q    -- as you testified about earlier?

5    A    Yes.

6    Q    Why are prisoners left in the shower for extended periods

7    of time?

8    A    Due to the officer being lazy doing their jobs.

9    Q    Okay.  Prior to this -- do you recall when this most recent

10   fire was?

11   A    Last week.

12   Q    Okay.  Do fires occur every week on 5 Alpha?

13   A    Yes.

14   Q    On the other pods that you've lived on on Housing Unit 5,

15   have fires also occurred regularly?

16   A    Yes.

17   Q    Why do you think prisoners set fires?

18        MR. CLARK:  Objection to speculation.  Objection, Your

19   Honor.  Calls for speculation.

20        THE COURT:  Sustained.

21   BY MS. JOHNSON:

22   Q    Mr. Mitchell, do you know why prisoners set fires?

23   A    Due to the fact staff not doing their job, being

24   unprofessional.

25   Q    And is the fire a way to get staff attention?

```
 1   A   Yes.

 2           MR. CLARK:  Same objection, Your Honor.

 3           THE COURT:  Sustained.  Leading.

 4           MS. JOHNSON:  Your Honor, his objection was

 5   speculation.

 6           MR. CLARK:  The first one was speculation, but she's

 7   right, she was leading as well, Your Honor.

 8   BY MS. JOHNSON:

 9   Q   Mr. Mitchell, do you have any trouble -- any breathing

10   issues?

11   A   Yes, I have asthma.

12   Q   You have asthma?

13   A   Yes.

14   Q   And do you have an inhaler for your asthma?

15   A   Yes.

16   Q   And when -- when fires are set, do you have to use that

17   inhaler?

18   A   Yes.

19   Q   When there aren't fires on the zone, do you have to use

20   your inhaler?

21   A   Maybe sometimes I will.  Sometimes not.

22   Q   And after a fire is put out, how do they clear the smoke

23   from the zone?

24   A   Sometimes they will turn a blower on, which is a ceiling

25   fan they have, and a lot of times they won't turn it on due to
```

```
 1   the fact of them trying to punish us.

 2   Q   Do they -- is there a door that they open?

 3   A   Yes.  Supposed to be a back door supposed to open.

 4   Q   Do they open that door after a fire?

 5   A   No.

 6   Q   Given your asthma, does a fire cause you any sort of pain

 7   or discomfort?

 8          MR. CLARK:  Objection.  Leading.

 9   A   Yes.

10          THE COURT:  Sustained.

11   BY MS. JOHNSON:

12   Q   When a fire is set, Mr. Mitchell, how do you feel?

13   A   I have trouble breathing.  Bad trouble breathing.  Burning

14   inside my lungs.

15   Q   How do you protect yourself when you're having trouble

16   breathing?

17   A   I got to wet a towel and wrap it around my face.

18   Q   And you testified that you have an inhaler?

19   A   Yes.

20   Q   Has there ever been an instance where you did not have --

21   where you did not have your inhaler, it had run out?

22   A   Yes.

23   Q   And has that occurred and there was also a fire set?

24   A   Yes.

25   Q   What did you do in that instance?
```

1    A    One time I had fell out.

2    Q    You said you fell out?

3    A    Yes.

4    Q    You mean like you passed out?

5    A    Yes.

6    Q    And did staff come to your aid?

7    A    No.

8    Q    How did you get treatment?

9    A    A nurse has came around and did pill call.

10    Q    So when the nurse came around for pill call, he or she saw

11    you in your cell?

12    A    Yes.

13    Q    Do you have any sense of how long that was?

14    A    No.

15    Q    Have you ever reported to staff that you have asthma and

16    it's difficult for you to breathe during fires?

17    A    Yes.

18    Q    How have you reported that?

19    A    Verbally by mouth.

20    Q    Okay.  Have you ever done a written request?

21    A    No.

22    Q    At the other prisons where you have lived, were fires set?

23    A    Yes, but not as much as I done seen fires set at East

24    Mississippi.

25    Q    And at the other prisons when fires were set, how did staff

```
1    respond?

2    A    They come on the zone for to put them out and see what the

3    problem is and address the problem.

4    Q    And at EMCF when there is a fire, do staff come on the zone

5    and see what the problem is and address the problem?

6    A    Yeah, they come on the zone and put the fires out, but they

7    don't address the problem.

8    Q    Okay.  Have you ever -- I want to talk to you about the

9    food that you receive at EMCF.  Have you ever received food

10   that you thought was spoiled?

11   A    Yes.

12   Q    When was the last time you recall this happening?

13   A    Probably about two or three days I had spoiled food on my

14   tray.

15   Q    Can you describe what kind of food it was?

16   A    Yes, a meat.  It was a bland meat I was supposed to get.

17   It was half cooked.

18   Q    You said it was bland?

19   A    Yeah.

20   Q    And do you receive a bland tray?

21   A    Yes.

22   Q    And that's based on a doctor order?

23   A    Yes.

24   Q    And you said your bland tray, the meat on the tray was not

25   cooked?
```

1    A    Yes.

2    Q    Did you eat that meat?

3    A    No, ma'am.

4    Q    Have there been other times where you've gotten meat that

5    looked raw?

6    A    Yes.

7    Q    About how often does this happen?

8    A    Sometime maybe out of a month, I'd say about six or seven

9    times out of a month.

10   Q    Okay.  Have you ever not received a meal tray while you've

11   been on Housing Unit 5?

12   A    Maybe once.

13   Q    And when did this happen?

14   A    Like when I first came back down to the facility in like

15   2015.

16   Q    Mr. Mitchell, you testified that you've been on Housing

17   Unit 5 since 2015, so almost three years?

18   A    Yes.

19   Q    On Housing Unit 5, are you able to make canteen?

20   A    No.

21   Q    So you can't buy any food outside of what's served to you

22   on the meal trays?

23   A    Right.

24   Q    You testified that other prisoners sometimes are left in

25   the shower longer than an hour.  Have you ever been left in the

1  shower?

2  A   Yes.

3  Q   When was the last time you recall this happening?

4  A   Last month.

5  Q   And about how long were you in the shower?

6  A   Maybe about two and a half hours.

7  Q   And do you know why you were left in the shower?

8  A   Due to the staff saying they had some more detail they have

9  to take care of for the captain.

10  Q   And during that two and a half hours, did you try to get

11  the staff's attention?

12  A   Yes.  By beating and banging on the shower walls.

13  Q   You said beating on the shower walls?

14  A   Yes.

15  Q   During that two and a half hours, did any officers come

16  onto the zone?

17  A   No.

18  Q   I want to talk to you a little bit about the staffing.  On

19  first shift, how often do you see an officer on your zone?

20  A   On the weekends, make a little count, they do a count like

21  7:00.  Then they come back on the zone, pill call.  Then they

22  feed, and then you don't see them no more for the rest of the

23  day.

24  Q   Okay.  So they only come on, you said, for to count when

25  they first get on shift, pill call and then to feed you lunch?

```
1    A    Right.

2    Q    What about second shift?  How often do you see officers on

3    second shift?

4    A    They come on the zone for feed and count, and you don't see

5    them no more.

6    Q    And that would be to feed you dinner and to conduct the

7    evening count?

8    A    Right.

9    Q    How do you get staff attention if they're not on the zone?

10   A    You have to beat and bang on the door or nine times out of

11   ten set a fire.

12   Q    Okay.  And have you ever set a fire?

13   A    Yes, I have.

14   Q    Why did you set a fire?

15   A    Because I was trying to get an officer's attention to come

16   on the zone.

17   Q    So do you recall why you wanted the officer to come on the

18   zone?

19   A    I was having a medical issue.  I was having bad chest

20   pains.

21   Q    You were having bad chest pains?

22   A    Yes.

23   Q    And before you set the fire, had you tried to communicate

24   with the officers in any other way?

25   A    Yes.  I tried yelling.  I tried to get the officer to the
```

1  picket in the tower.

2  Q   And do you recall about how long you waited before you set

3  the fire?

4  A   Probably about 30 or 40 minutes.

5  Q   And you didn't see an officer come onto the zone during

6  that time?

7         MR. CLARK:  Objection.  Leading.

8  A   No.

9         THE COURT:  Sustained.  Don't lead -- don't lead the

10  witness.

11  BY MS. JOHNSON:

12  Q   During that time, was there an officer on the zone?

13  A   No.

14  Q   Have you set a fire to get staff attention more than once?

15  A   Yes.

16  Q   Do you recall the specifics of why you set any of the other

17  fires?

18  A   No.  I can't just recall that right off my head.  I can't

19  recall.

20  Q   Have you ever been left on the recreation yard longer than

21  an hour?

22  A   Yes.

23  Q   When was the last time that happened?

24  A   Like two days ago.

25  Q   Do you know why you were left out there for longer than an

1  hour?

2          MR. CLARK:  Objection.  Calls for speculation.

3          MS. JOHNSON:  I'm asking him if he knows.  If he says

4  he doesn't --

5          THE COURT:  Overruled.

6  A   Due to the staff had to go -- they said they had another

7  detail they had to go attend to.

8  BY MS. JOHNSON:

9  Q   And when you say another detail, does that mean another

10 task?

11 A   Yes.

12 Q   About how many times a week are you -- have you been left

13 on the recreation yard longer than an hour?

14 A   Several times.

15 Q   How does it affect you if you're left on the recreation

16 yard for longer than the hour?

17 A   It be making me mad sometimes due to the staff not doing

18 their job and I've got to be standing up all these hours.

19 Q   Have you ever been escorted out of your cell by only one

20 officer?

21 A   Yes.

22 Q   When was the most recent time you recall that happening?

23 A   Last week.

24 Q   Can you tell me -- can you describe for us what happened?

25 A   Yes.  I was being -- I was taken out of my cell for

1  haircut, and it was only one officer, a sergeant that took me

2  out of my cell to get my haircut when it was supposed to have

3  been two officers.

4  Q   And were you placed in restraints before you were taken out

5  of your cell?

6  A   Yes.

7  Q   Have there been any other times where you've only been

8  escorted by one officer?

9  A   Yes.  It's been plenty time where I have only been escorted

10 by only one officer.

11 Q   Have you seen other prisons on your zone be escorted by one

12 officer?

13 A   Yes.

14 Q   Mr. Mitchell, have you ever been assaulted at EMCF?

15 A   Yes.  In 2016, I was assaulted by an inmate who came out of

16 his cell and stabbed me.

17 Q   You said he came out of his cell?

18 A   Yes.

19 Q   And you were out of your cell?

20 A   Yes.  I was being taken out of my cell going to legal call

21 and an inmate came out of his cell and stabbed me.

22 Q   What did the staff do?

23 A   For about two or three minutes, the staff didn't do

24 nothing.

25 Q   And you said you were -- how many times were you stabbed?

```
 1   A   About six or seven times.

 2   Q   Did you have to go to medical for treatment?

 3   A   Yes.

 4   Q   Did you have to go off site?

 5   A   No.

 6   Q   And at this time, that offender came out of his cell

 7   without an officer escort?

 8   A   Yes, due to the fact of him having his cell door rigged up.

 9   Q   And when you came out of your cell because it was

10   authorized, were you in handcuffs?

11   A   Yes.

12   Q   And were you also in leg -- leg restraints?

13   A   No, I wasn't in leg restraints.  I was just handcuffed.

14   Q   And were you able to defend yourself?

15   A   No.

16   Q   Why is that?

17   A   Because I had the restraints on.

18   Q   Have you seen other prisoners come out of their cell while

19   you've been on Housing Unit 5?

20   A   Yes, I have.

21   Q   Do officers check the doors to make sure they're secure?

22   A   No.

23   Q   And you said you were assaulted in 2016?

24   A   Yes.

25   Q   Since you've been assaulted, do you fear that something
```

```
1    similar will happen again?

2    A   Yes, I do.

3    Q   Why is that?

4    A   Because it was a most recent incident where an inmate on

5    Housing Unit 1, some inmates broke into another inmate's cell

6    and stabbed him and he had to be put in ICU.  So I fear it

7    might happen again.

8    Q   Have you seen other prisons be assaulted on Housing Unit 5?

9    A   No.

10   Q   Have you ever -- strike that.  Do you take medication other

11   than your -- or have medication other than your asthma inhaler?

12   A   Yes.

13   Q   What medication do you take?

14   A   Depakote, Benadryl, and I take blood pressure medicine and

15   I take heart medicine.  And that's about it.

16   Q   Do you receive those medications morning and evening?

17   A   Yes.

18   Q   Can you describe how the pill call works on your housing

19   unit?

20   A   I do pill call in the morning time, which they have

21   different times they do it, and they do it at nighttime, which

22   they have different times doing it.

23   Q   What time does morning pill call happen?

24   A   They do it sometimes at different times.  About -- some

25   nurse might come at 9:00.  Some nurse might come at 10 or
```

1    11:00.  Some might come at 2 or 3:00.

2    Q    And that would be the -- for your morning pills?

3    A    Yes.

4    Q    And what time does evening pill call happen on Unit 5?

5    A    Some might do it at 10 or 11:00, and some might do it at 2

6    or 3:00 in the morning if they do it then.

7    Q    So if pill call happens at 2 or 3 in the morning, are you

8    still awake?

9    A    No.

10   Q    So how do you get your medication?

11   A    The next morning when I wake up.

12   Q    They leave it -- they just leave it in your cell?

13   A    Yes.

14   Q    Have you ever received medication that didn't belong to

15   you?

16   A    Yes, like maybe like two or three times.

17   Q    And did you try to notify anyone?

18   A    Yes, I did notify someone, but they still didn't take it

19   back.

20   Q    So you tried to notify the -- was it the nurse?

21   A    No, the officer.

22   Q    The officer that you had the wrong medication?

23   A    Yes.

24   Q    And you weren't allowed to give that medication to the

25   officer?

1   correctional context.  What is your background on that subject?

2   A   Well, I had a little background during my training.  I read

3   a certain amount of sociological literature about jails and

4   prisons, and I was aware that there were mental health issues

5   in jails and prisons, but I had -- very little attention was

6   paid to that through my training.

7        When I got out of -- done with my training and started

8   practicing and I was at the Charles Drew Medical School, I was

9   asked to be the expert witness in a lawsuit, *Rutherford v.*

10  *Pitchess*, which was -- the ACLU of Southern California was

11  bringing, and I toured the LA County Jail and gave opinions in

12  court about the conditions and the quality of mental health and

13  medical care at the LA County Jail.

14       That turned out to be a very prominent case.  It was a

15  class action.  It was appealed all the way up to the Supreme

16  Court and upheld.  Because of my participation in that case,

17  not because I was planning to be a forensic psychiatrist, I was

18  asked to do other cases.  So I did a series of cases involving

19  jail conditions and mental health care.  And this was in the

20  mid 70s through the early 80s.

21       And then I was asked to be in the same role in a litigation

22  involving prisons, and I started doing what became class action

23  lawsuits with the prisons in California at first and then

24  eventually nationwide.

25  Q   When did you first begin to study these issues outside of

1    California?

2    A    Well, I had been asked -- from my participation in the

3    *Rutherford* case, I had been invited to participate in lawsuits

4    around the country, and I refused because my children were

5    still at home and I didn't want to travel.  So when my children

6    grew up and left home, I said yes to a few national cases.

7         I had been a consultant out of state once before in the

8    early 80s with the Department of Justice, but other than that,

9    all my cases were in California.

10        Starting around 2000, I started participating as an expert

11   witness in litigation in various states.

12   Q    And as you sit here today, approximately how many states

13   have you been involved with?

14   A    I think I've been involved in one kind of case or another,

15   not always a class action lawsuit, in about 20 states.

16   Q    And when did you first become involved in studying the

17   effects of solitary confinement?

18   A    There is a case on my CV, which is the *Toussaint* case back

19   in California in the early '80s, and the issue in this case was

20   there were solitary confinement units in Southern California

21   and they were called SHUs, security housing unit.  And SHU

22   became the acronym for solitary confinement around the country.

23        The issue in the *Toussaint* case, the cells in California

24   typically at Folsom Prison or San Quentin were six foot by

25   eight foot, and the question was could the California

1  Department of Correction force two prisoners to be housed in

2  such a cell.  And that lawsuit, it was determined that would be

3  unconstitutional because of crowding.  And crowding was the

4  issue in those original cases.

5      So I -- in order to serve competently as a witness, I

6  started studying everything that had been written, all of the

7  research about solitary confinement.  And there were a series

8  of cases.  In the beginning of my career, I testified a lot

9  about crowding and the ill effects of prison crowding, for

10 instance, an increase in violence or mental breakdown.  But in

11 the '80s, the prisons were pretty out of control around the

12 country.  There were a lot of riots.  There was a lot of

13 crowding, and it was just difficult to manage the prisons.

14     A lot of administrators turned to solitary confinement as a

15 possible answer to the problem of mayhem in the prisons, and

16 they started building solitary confinement units.  As they did

17 that, prisoners started suing that the conditions were

18 unconstitutional for one reason or another, and as they did

19 that, they started asking me to be an expert in their case.

20     And I would go and investigate.  Meanwhile, my expertise

21 was growing because there was a growing body of literature

22 about research, some that I was conducting.  And I just

23 continued to accept cases about solitary confinement.

24 Q   Let's talk for just a moment about that *Toussaint* case as

25 an example of how you go about your business.  How did you

1    conduct your investigation in that case?

2    A    I believe *Toussaint* was about Folsom and San Quentin.  And

3    those were the two highest level solitary confinement units in

4    the state of California at the time.  San Quentin is no longer

5    a maximum security prison, but it was the -- it was the most

6    intense maximum security prison at the time.

7         So I made site visits to both prisons.  I interviewed quite

8    a few prisoners and spoke with them about how they were doing

9    under the conditions that they were being held under.  I

10   reviewed documents.  There were at the time various legislative

11   audits, there was budget proposals, there was -- there were

12   policies.  I looked at the medical charts of the individuals

13   that I was examining.  I interviewed staff to a certain extent,

14   but generally I was limited by the defense in talking with

15   staff, so I would read depositions of the staff's opinions

16   about what was going on.  And I would put all of that together

17   and formulate opinions.

18   Q    Since that *Toussaint* case, you've indicated you had some

19   further substantial experience with solitary confinement

20   issues.

21   A    I'm sorry.  Can you say that again?

22   Q    You had substantial further experience after that first

23   case on solitary?

24   A    Yes.

25   Q    In about how many cases have you served as an expert?

1    A    I would say cases of this type about 30.  I've had 100 or

2    200 forensic cases, but I'm talking about doing an evaluation

3    for some legal purpose.  But cases of the kind that this case

4    is, about 30.

5    Q    When you say of the kind that this case is, what

6    specifically do you mean by that?

7    A    A class action involving entire institutions or prison

8    systems.  And while they haven't always been focused on

9    solitary confinement, there has been other issues, but about

10   conditions and about mental health care.

11   Q    And in approximately how many of those cases have you

12   testified either in a deposition or in a courtroom setting?

13   A    I think about two-thirds of them, about 20 of them.  And

14   the reason I didn't testify in the others, of course, is they

15   settled.

16   Q    And what parts of the country have those cases taken place

17   in?

18   A    They've been all over the country.  I've been in 20 states

19   doing litigation.  I've been -- name some states if you want.

20   Q    Maybe you can name some regions instead.

21   A    All right.  I've been in the south, in Mississippi, Texas

22   and Georgia.  I've been in the northeast in Connecticut,

23   Massachusetts, New York.  I've been in the midwest in Michigan,

24   Illinois, Ohio.  I've been in the west in Washington, Idaho,

25   Utah.  I've been in the southwest.  California I've done a lot

1    of cases, Arizona, New Mexico.  I did some work in Nevada but I

2    don't think it came to -- it did not come to a court event.

3    Q    So in that capacity, you examined conditions in each of

4    those state's prison systems or at least certain facilities

5    within those states?

6    A    Yes.

7    Q    Have you published on correctional issues?

8    A    Yes, I have.

9    Q    Have you published books?

10   A    Yes, I have.  I've published five books that are single

11   author that I wrote myself.  Two of them are about prison.  One

12   is *Prison Madness*, which is about the mental health crisis

13   behind bars.  The subtitle is *Mental Health Crisis Behind Bars*

14   *and What We Must Do About It*.  And another book, last Fall of

15   2017, I published *Solitary, the Inside Story of Supermax*

16   *Isolation and How We Can Abolish It.*

17       I was also a coeditor of *Prison Masculinities* about gender

18   issues in prison, and then I wrote three other books about

19   various clinical subjects.

20   Q    Now, you've indicated one of your books relates to solitary

21   confinement specifically?

22   A    Yes.

23   Q    Have you published other, for example, journal articles on

24   that topic?

25   A    Yes.  I've published dozens of journal articles and book

1          THE WITNESS:  Your Honor, my answer has to be

2    partially.  In other words, I'm going to spend a short time

3    with this individual.  I'm spending usually 30 minutes, 45

4    minutes.  I haven't in many cases seen the clinical chart yet

5    and I haven't done a thorough assessment of this patient.  So I

6    wouldn't venture to offer a diagnosis.  For instance, if I have

7    a different opinion about diagnosis than is in this chart, I

8    would not insist on my diagnosis.

9          More what I am doing is taking into account the

10   psychological foibles of the prisoner which I'm perceiving as I

11   interview them and using that to weigh the value of the story

12   they're telling me.  So I'm doing a partial psychiatric

13   examination.

14         THE COURT:  Thank you.

15         MR. SALK:  Your Honor, plaintiffs tender Dr. Terry

16   Kupers as an expert on the topic of the psychiatric effects of

17   the conditions of solitary confinement on prisoners in general

18   and at the East Mississippi Correctional Facility.

19         THE COURT:  All right.  Any comment?

20         MR. BENTLEY:  Your Honor, I do have a comment, not an

21   objection.  As I understand Dr. Kupers' report, his testimony

22   will be limited to conditions in the segregated housing units

23   and in the medical unit and I think the intake unit also.  With

24   that understanding, we have no objection to his -- the

25   expertise he's being offered.

```
 1              THE COURT:  All right.

 2              MR. SALK:  Your Honor, if I may be heard for one

 3   moment on that?

 4              THE COURT:  Yes, sir.

 5              MR. SALK:  What Mr. Bentley has articulated is almost

 6   correct.  I think Dr. Kupers would also offer the opinion that

 7   solitary confinement may exist in other parts of the facility

 8   other than what Mr. Bentley has articulated under certain

 9   circumstances such as, for example, when the facility is on a

10   lockdown and prisoners are not permitted to leave their cells.

11   However, generally speaking, I think Mr. Bentley is accurate,

12   what he has said.

13              THE COURT:  Any further comment?

14              MR. BENTLEY:  All I would say is I'll just reserve an

15   objection if I think something is outside of his report on that

16   last bit that Mr. Salk mentioned.

17              THE COURT:  All right.  The court will recognize

18   Dr. Terry Kupers -- is it Ku-pers?

19              THE WITNESS:  It's Koo-pers.

20              THE COURT:  Kupers as an expert in the effect of

21   solitary confinement on prisoners, specifically at East

22   Mississippi.

23              All right.  It is almost right at 5:00, so we will

24   stop for the day and come back with Dr. Kupers' testimony

25   tomorrow.  And this will go off the record.
```