**IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

JERMAINE DOCKERY, *et al.*,

Plaintiffs,

        v.                                                            Civil Action No. 3:13-cv-326-WHB-JCG

PELICIA HALL, *et. al.*,

Defendants.

**PLAINTIFFS' POST-TRIAL MEMORANDUM BRIEF**

## TABLE OF CONTENTS

Table of Contents ............................................................................................................. i

Table of Authorities ....................................................................................................... iii

Exhibit List ...................................................................................................................... v

Introduction ..................................................................................................................... 1

I.      Factual Background ............................................................................................. 1

II.     Procedural History .............................................................................................. 2

Legal Standard ................................................................................................................. 3

I.      Eighth Amendment Standard .............................................................................. 3

II.     Plaintiffs Do Not Bear the Burden of Proving Continuing Violations ............. 4

Proposed Findings of Fact and Remedies ...................................................................... 7

I.      Claim One—Health Care .................................................................................... 7

        A.      Defendants Fail to Provide Plaintiffs Access to Urgent Care ............... 8

        B.      Defendants Fail to Provide Plaintiffs Access to Episodic,
                or Non-Urgent, Care ............................................................................ 10

        C.      Defendants Fail to Provide Plaintiffs Adequate Access
                to Chronic Care ..................................................................................... 12

        D.      Defendants Fail to Provide Critical Medications to Plaintiffs ............ 14

        E.      Defendants Fail to Meaningfully Review and Address Causes
                of Prisoner Deaths ................................................................................ 17

        F.      Defendants Fail to Perform Welfare Checks ........................................ 17

        G.      Defendants Fail to Provide Plaintiffs Adequate Access
                to Specialty Services ............................................................................ 18

        H.      Defendants Fail to Deliver Constitutionally Adequate Care
                to Plaintiffs ............................................................................................ 19

        I.      Remedies ............................................................................................... 20

II.     Claim Two—Mental Health Care ...................................................................... 21

        A.      Defendants Fail to Perform Adequate Intake Screenings
                for Mentally Ill Prisoners ..................................................................... 22

        B.      Defendants Provide Inadequate Assessments and Treatment Plans ... 24

        C.      Defendants Provide Inadequate Care for Mental Health Crises .......... 27

        D.      Defendants Fail to Provide Adequate Mental Health Treatment
                Services and Access to Care .................................................................. 32

        E.      Defendants Hold Mentally Ill Prisoners in Isolation in Lieu of Treatment ......... 35

F. Defendants Fail to Provide Appropriate Mental Health Housing ....................... 38

G. Defendants Employ Inadequate Involuntary Mental Health Treatment Practices .................................................................................. 41

H. Defendants Employ Dangerous Psychotropic Medication Practices .................. 42

I. Defendants' Suicide Prevention Practices are Dangerously Substandard ........... 44

J. Defendants Discipline Prisoners for Behavior that is the Product of Mental Illness ..................................................................... 46

K. Defendants Fail to Provide Adequate Access to Hospital-Level Care ................ 47

L. Defendants Fail to Provide Adequate Mental Health Staffing ........................... 48

M. Remedies ...................................................................................................... 49

III. Claim Three—Isolation ................................................................................. 50

A. Defendants Regularly Subject the Isolation Subclass to Long-Term Isolation ..................................................................................... 50

B. Defendants Fail to Provide the Isolation Subclass with Recreation and Hygiene ................................................................... 52

C. Defendants Fail to Maintain Adequate Staffing and Conditions in Isolation ................................................................................... 53

D. Remedies ...................................................................................................... 55

IV. Claim Four—Excessive Force ....................................................................... 56

A. Defendants' Policies and Practices Expose Plaintiffs to Excessive Force by Staff ............................................................... 56

B. Remedies ...................................................................................................... 58

V. Claim Five—Protection from Harm ............................................................... 58

A. Defendants Fail to Adequately Staff or Fill Mandatory Posts at EMCF ............. 58

B. Defendants' Inadequate Staffing Practices Cause Risks of Harm to Plaintiffs ................................................................... 62

C. Remedies ...................................................................................................... 67

VI. Claim Six—Environmental Conditions .......................................................... 67

VII. Claim Seven—Nutrition and Food Safety ...................................................... 69

## Table of Authorities

Page(s)

**Cases**

*Farmer v. Brennan*,
  511 U.S. 825 (1994).....................................................................................................3, 4

*Friends of the Earth, Inc. v. Laidlaw Envt'l Servs, Inc.*,
  528 U.S. 167 (2000)...........................................................................................................5

*Gates v. Cook*,
  376 F.3d 323 (5th Cir. 2004) ......................................................................................3, 4, 5

*In re Haas*,
  48 F.3d 1153 (11th Cir. 1995) ...........................................................................................6

*Hadix v. Johnson*,
  367 F.3d 513 (6th Cir. 2004) .............................................................................................4

*Harper v. Washington*,
  494 U.S. 210 (1990).........................................................................................................43

*Helling v. McKinney*,
  509 U.S. 25 (1993).............................................................................................................3

*Hinojosa v. Livingston*,
  516 F.3d 657 (5th Cir. 2015) .............................................................................................4

*Hudson v. Palmer*,
  468 U.S. 517 (1984)...........................................................................................................3

*Lawson v. Dallas Cty.*,
  286 F.3d 257 (5th Cir. 2002) .............................................................................................4

*Miller v. French*,
  530 U.S. 327 (2000)...........................................................................................................7

*Porter v. Clarke*,
  2016 WL 3766301 (E.D. Va. July 8, 2016) ...................................................................5, 6

*Porter v. Clarke*,
  290 F. Supp. 3d 518 (E.D. Va. 2018), *appeal docketed*, No. 18-6257 (4th Cir.
  Mar. 15, 2018)...............................................................................................................6, 7

*Porter v. Clarke*,
    852 F.3d 358 (4th Cir. 2017) ................................................................................6

*Sossamon v. Lone Star State of Tex.*,
    560 F.3d 316 (5th Cir. 2009) ................................................................................5

*Thomas v. Bryant*,
    614 F.3d 1288 (11th Cir. 2010) ..........................................................................6

*United States v. Concentrated Phosphate Exp. Ass'n*,
    393 U.S. 199 (1968) ............................................................................................5

*United States v. W.T. Grant Co.*,
    345 U.S. 629 (1953) ............................................................................................5

*Walling v. Helmerich & Payne*,
    323 U.S. 37 (1944) ..............................................................................................5

*Wilson v. Seiter*,
    501 U.S. 294 (1991) ........................................................................................3, 4

**Statutes**

18 U.S.C. § 3626 ........................................................................................................6

**EXHIBIT LIST**

| Ex. No. | Description |
| --- | --- |
| Ex. 1 | Tr. Vol. 2 Excerpts (Vail) |
| Ex. 2 | Tr. Vol. 3 Excerpts (Vail) |
| Ex. 3 | Tr. Vol. 4 Excerpts (Vail) |
| Ex. 4 | Tr. Vol. 5 Excerpts (Vail; Barrett) |
| Ex. 5 | Tr. Vol. 6 Excerpts (Hogans) |
| Ex. 6 | Tr. Vol. 7 Excerpts (Dykes) |
| Ex. 7 | Tr. Vol. 8 Excerpts (Clemons; Combs) |
| Ex. 8 | Tr. Vol. 9 Excerpts (Beasley; Pugh; Mata) |
| Ex. 9 | Tr. Vol. 10 Excerpts (Skipworth) |
| Ex. 10 | Tr. Vol. 11 Excerpts (Grogan; Brewer; Skipworth) |
| Ex. 11 | Tr. Vol. 12 Excerpts (Grogan; Thomas) |
| Ex. 12 | Tr. Vol. 13 Excerpts (Williams; Compton; Thomas) |
| Ex. 13 | Tr. Vol. 14 Excerpts (Donald) |
| Ex. 14 | Tr. Vol. 15 Excerpts (Michell; Melton; Kupers) |
| Ex. 15 | Tr. Vol. 16 Excerpts (Kupers) |
| Ex. 16 | Tr. Vol. 17 Excerpts (Hill; Kupers; Hale) |
| Ex. 17 | Tr. Vol. 18 Excerpts (Gage; Dockery; Jones) |
| Ex. 18 | Tr. Vol. 19 Excerpts (Stern) |
| Ex. 19 | Tr. Vol. 20 Excerpts (Stern) |
| Ex. 20 | Tr. Vol. 21 Excerpts (Shaw) |
| Ex. 21 | Tr. Vol. 22 Excerpts (Long; Hickman-Estes; Gage; Shaw) |
| Ex. 22 | Tr. Vol. 23 Excerpts (Perry) |
| Ex. 23 | Tr. Vol. 24 Excerpts (Perry) |
| Ex. 24 | Tr. Vol. 25 Excerpts (Hall; J.H.; Campbell) |
| Ex. 25 | Tr. Vol. 26 Excerpts (Gage) |
| Ex. 26 | Tr. Vol. 27 Excerpts (LaMarre) |
| Ex. 27 | Tr. Vol. 28 Excerpts (LaMarre) |
| Ex. 28 | Tr. Vol. 29 Excerpts (Gage) |
| Ex. 29 | Tr. Vol. 31 Excerpts (Shaw) |
| Ex. 30 | Tr. Vol. 32 Excerpts (Shaw) |
| Ex. 31 | Tr. Vol. 33 Excerpts (Roth) |
| Ex. 32 | Tr. Vol. 34 Excerpts (Dunn; Pickering; Stonehouse) |
| Ex. 33 | Tr. Vol. 35 Excerpts (Arnold) |
| Ex. 34 | Tr. Vol. 36 Excerpts (McGinnis) |
| Ex. 35 | Tr. Vol. 37 Excerpts (McGinnis) |
| Ex. 36 | PTX-440 (Dec. 2016 CQI) |
| Ex. 37 | PTX-441 (Nov. 2016 CQI) |
| Ex. 38 | PTX-616 (Aug. 19, 2014 email) |

| Ex. 39 | PTX-624 (Oct. 15, 2015 email) |
| Ex. 40 | PTX-625 (Oct. 12, 2015 email) |
| Ex. 41 | PTX-636 (July 31, 2015 email) |
| Ex. 42 | PTX-639 (July 6, 2015 email) |
| Ex. 43 | PTX-640 (July 15, 2015 email) |
| Ex. 44 | PTX-666 (July 2, 2015 email) |
| Ex. 45 | PTX-713 (May 5, 2015 email) |
| Ex. 46 | PTX-715 (Apr. 16, 2015 email) |
| Ex. 47 | PTX-716 (Sept. 22, 2014 email) |
| Ex. 48 | PTX-728 (Sept. 2, 2015 email) |
| Ex. 49 | PTX-735 (Feb. 4, 2016 email) |
| Ex. 50 | PTX-747 (Dec. 1, 2014 report) |
| Ex. 51 | PTX-887 (Feb. 2016 Centurion report) |
| Ex. 52 | PTX-442 (Oct. 2016 CQI) |
| Ex. 53 | PTX-968 (Nov. 20, 2015 email) |
| Ex. 54 | PTX-972 (Aug. 18, 2015 email) |
| Ex. 55 | PTX-995 (July 15, 2015 incident report) |
| Ex. 56 | PTX-998 (Oct. 3, 2015 incident report) |
| Ex. 57 | PTX-1000 (Jan. 29, 2016 incident report) |
| Ex. 58 | PTX-1002 (Feb. 2, 2016 incident report) |
| Ex. 59 | PTX-1003 (Feb. 27, 2016 incident report) |
| Ex. 60 | PTX-1005 (Jan. 21, 2016 report) |
| Ex. 61 | PTX-1018 (Feb. 29, 2016 report) |
| Ex. 62 | PTX-1022 (Mar. 4, 2016 report) |
| Ex. 63 | PTX-1027 (Apr. 4, 2016 report) |
| Ex. 64 | PTX-1030 (Apr. 12, 2016 incident report) |
| Ex. 65 | PTX-446 (July 2016 CQI) |
| Ex. 66 | PTX-1044 (May 30, 2016) |
| Ex. 67 | PTX-1052 (Jun. 15, 2016 incident report) |
| Ex. 68 | PTX-1238 (incident report) |
| Ex. 69 | PTX-1271 (Apr. 16, 2017 report) |
| Ex. 70 | PTX-1369 (incident report) |
| Ex. 71 | PTX-1371 (incident report) |
| Ex. 72 | PTX-1496 (Gage CV) |
| Ex. 73 | PTX-1505 (LaMarre 2016 Rpt.) |
| Ex. 74 | PTX-1501(a) (Stern 2016 Rpt) |
| Ex. 75 | PTX-1501(b) (Stern 2014 Rpt.) |
| Ex. 76 | PTX-1504 (Gage 2016 Rpt.) |
| Ex. 77 | PTX-1506 (Kupers 2016 Rpt.) |
| Ex. 78 | PTX-1507 (Vail 2016 Rpt.) |
| Ex. 79 | PTX-450 (Sept. 2016 CQI) |

| Ex. 80 | PTX-1509(A) (Skipworth 2014 Rpt.) |
| Ex. 81 | PTX-1509(B) (Skipworth 2016 Rpt.) |
| Ex. 82 | PTX-451 (Aug. 2016 CQI) |
| Ex. 83 | PTX-1497 (Kupers CV) |
| Ex. 84 | PTX-1499 (Vail CV) |
| Ex. 85 | PTX-1503 (Kupers 2014 Rpt.) |
| Ex. 86 | PTX-1767 (Feb. 2017 Unit 5 logbook) |
| Ex. 87 | PTX-1771 (Mar, 13, 2017 Unit 5 logbook) |
| Ex. 88 | PTX-1855 (patient treatment plan) |
| Ex. 89 | PTX-1876 (identical treatment plan) |
| Ex. 90 | PTX-1882 |
| Ex. 91 | PTX-444 |
| Ex. 92 | PTX-1934 (monitor's monthly worksheets – 2016) |
| Ex. 93 | PTX-1914 (patient treatment plan) |
| Ex. 94 | PTX-1919 |
| Ex. 95 | PTX-1935 (monitor's monthly reports – 2014) |
| Ex. 96 | PTX-1936 (monitor's weekly reports – 2014) |
| Ex. 97 | PTX-1939 (monitor's monthly reports – 2015) |
| Ex. 98 | PTX-2058 (Policies) |
| Ex. 99 | PTX-2074 (MDOC Use of Force Policy) |
| Ex. 100 | PTX-2078 |
| Ex. 101 | PTX-2173 |
| Ex. 102 | PTX-2176 (2017 Centurion report) |
| Ex. 103 | PTX-2288 (Sept. 29, 2016 rule violation report) |
| Ex. 104 | PTX-2289 (Sept. 30, 2016 rule violation report) |
| Ex. 105 | PTX-2290 (second Sept. 29, 2016 rule violation report) |
| Ex. 106 | PTX-2292 (Oct. 1, 2016 rule violation report) |
| Ex. 107 | PTX-2293 (Oct. 2, 2016 rule violation report) |
| Ex. 108 | PTX-2296 (second Oct. 1, 2016 rule violation report) |
| Ex. 109 | PTX-2300 (Nov. 9, 2016 RVR) |
| Ex. 110 | PTX-2082 (MDOC Offender Segregation Policy) |
| Ex. 111 | PTX-2315 (April 11, 2017 rule violation report) |
| Ex. 112 | PTX-2794 (MDOC Disciplinary Policy) |
| Ex. 113 | PTX-2319 (May 24, 2017 rule violation report) |
| Ex. 114 | PTX-2425 (June 16, 2015 report) |
| Ex. 115 | PTX-2460 (incident report) |
| Ex. 116 | PTX-2470 (incident report) |
| Ex. 117 | PTX-2478 (incident report) |
| Ex. 118 | PTX-2482 (incident report) |
| Ex. 119 | PTX-2486 (incident report) |
| Ex. 120 | PTX-2490 (incident report) |

| Ex. 121 | PTX-2519 (Aug. 23, 2016 report) |
| Ex. 122 | PTX-2546 (Mar. 6, 2016 report) |
| Ex. 123 | PTX-2570 (Sep. 14, 2016 incident report) |
| Ex. 124 | PTX-2583 (Nov. 10, 2016 incident report) |
| Ex. 125 | PTX-2608 (incident report) |
| Ex. 126 | PTX-2609 (incident report) |
| Ex. 127 | PTX-2647 (incident report) |
| Ex. 128 | PTX-2650 |
| Ex. 129 | PTX-2689 (incident report) |
| Ex. 130 | PTX-2691 (incident report) |
| Ex. 131 | PTX-2698 (incident report) |
| Ex. 132 | PTX-2701 (incident report) |
| Ex. 133 | PTX-2705 (May 31, 2017 report) |
| Ex. 134 | JTX-61 (compilations of monthly monitor reports by year) |
| Ex. 135 | PTX-2766 (incident report) |
| Ex. 136 | PTX-2767 (incident report) |
| Ex. 137 | PTX-2780 (compilation of rule violation reports ("RVRs")) |
| Ex. 138 | PTX-2783 (Sept. 2, 2016 RVR) |
| Ex. 139 | PTX-2784 (Aug. 27, 2016 RVR) |
| Ex. 140 | PTX-2785 (July 14, 2016 RVR) |
| Ex. 141 | PTX-2786 (Aug. 18, 2016 RVR) |
| Ex. 142 | PTX-2787 (Aug. 27, 2016 RVR) |
| Ex. 143 | PTX-2788 (Dec. 11, 2016 RVR) |
| Ex. 144 | PTX-2789 (Jul. 21, 2016 RVR) |
| Ex. 145 | PTX-2790 (Dec. 14, 2016 RVR) |
| Ex. 146 | PTX-2798 (demonstrative summary) |
| Ex. 147 | PTX-2799 (demonstrative exhibit) |
| Ex. 148 | PTX-2802 (contract monitor weekly report compilation) |
| Ex. 149 | PTX-2806 (demonstrative summary) |
| Ex. 150 | PTX-2809 (demonstrative exhibit) |
| Ex. 151 | PTX-2818 (CQI studies) |
| Ex. 152 | PTX-2867 (Townsend Dep. Tr.) |
| Ex. 153 | JTX-72 (Mar. 2017 CQI) |
| Ex. 154 | JTX-68 (Dec. 2017 audit) |
| Ex. 155 | JTX-70 (Jan. 2017 CQI) |
| Ex. 156 | JTX-71 (Feb. 2017 CQI) |
| Ex. 157 | JTX-74 (May 2017 CQI) |
| Ex. 158 | JTX-75 (Jul. 2017 CQI) |
| Ex. 159 | JTX-73 (Apr. 2017 CQI) |
| Ex. 160 | JTX-76 (July 2017 CQI) |
| Ex. 161 | JTX-77 (Oct. 2017 CQI) |

| Ex. 162 | JTX-78 (Nov. 2017 CQI) |
| Ex. 163 | JTX-79 (Dec. 2017 CQI) |
| Ex. 164 | JTX-145 (Aug. 2017 CQI) |
| Ex. 165 | JTX-146 (Sept. 2017 CQI) |

## INTRODUCTION

Plaintiffs seek declaratory and injunctive relief to remedy unconstitutional conditions at the East Mississippi Correctional Facility ("EMCF"). Based on evidence adduced at and after trial Plaintiffs are entitled to that relief, for the reasons stated herein.

## I.      Factual Background

EMCF is the facility designated by the Mississippi Department of Corrections ("MDOC") for its most seriously mentally ill prisoners. EMCF is privately operated by the Management & Training Corporation ("MTC"). MTC has subcontracted food services to another company, Trinity Services Group, Inc. ("Trinity"). MDOC has contracted with another company, Centurion of Mississippi, LLC ("Centurion"), to provide medical and mental healthcare services at EMCF.

Plaintiffs are the certified class of all persons who are currently, or will be, confined at EMCF. *See* Order, ECF No. 257, at 30 (Sept. 29, 2015). In addition, three subclasses have been certified: the Isolation Subclass, consisting of all persons who are currently, or will be, subjected to Defendants' policies and practices of confining prisoners in conditions amounting to solitary confinement; the Mental Health Subclass, consisting of all persons who are currently, or will be, subjected to Defendants' mental health care policies and practices; and the Units 5 and 6 Subclasses, consisting of all persons who are currently, or will be, housed in Units 5 and 6. *Id.*

Defendants are MDOC officials sued in their official capacities. Pelicia Hall is MDOC's Commissioner. Jerry Williams is MDOC's Deputy Commissioner for Institutions. Dr. Gloria Perry is MDOC's Chief Medical Officer. Jointly and severally, Defendants are responsible for ensuring that conditions at EMCF comply with constitutional standards.

Plaintiffs have asserted seven constitutional claims, each concerning a different condition or set of conditions that subject Plaintiffs and/or a Plaintiff subclass to a substantial risk of serious

harm in violation of the Eighth Amendment to the United States Constitution. Those seven claims concern: (1) health care, (2) mental health care, (3) isolation, (4) excessive force, (5) protection from harm, (6) environmental conditions, and (7) nutrition and food safety.

With respect to each claim, Plaintiffs seek (1) declaratory relief in the form of an order declaring, *inter alia*, that Defendants' acts, omissions, policies, and practices violate the rights of the Plaintiff class and subclasses under the Eighth Amendment (Compl. ¶ 328.B); (2) injunctive relief in the form of an order permanently enjoining Defendants from subjecting the Plaintiff class and subclasses to proven illegal and unconstitutional conditions, acts, omissions, policies, and practices (Compl. ¶ 328.C); (3) an order requiring Defendants to develop and implement, as soon as practical, a plan to eliminate the proven substantial risks of serious harm (Compl. ¶ 328.D); and (4) costs, attorneys' fees, and expenses (Compl. ¶ 328.E). Plaintiffs also seek the Court's continuing jurisdiction over the action "until Defendants have fully complied with the Orders of this Court, and there is a reasonable assurance that Defendants will continue to comply in the future absent continuing jurisdiction." Compl. ¶ 328.F.

## II.   Procedural History

Trial was held from March 5, 2018 to April 8, 2018. 32 fact witnesses and eight expert witnesses testified, 12 deposition transcripts were designated, and 335 exhibits were entered into the record. On August 24, 2018, the Court ordered the parties to submit additional expert reports concerning mental health, medical care, and security staffing. *See* Order, Aug. 24, 2018, ECF No. 767. Plaintiffs submitted four additional expert reports. *See* ECF No. 799-1 (Stern 2018 Rpt.); ECF No. 800-1 (LaMarre 2018 Rpt.); ECF No 801-1 (Vail 2018 Rpt.); ECF No. 807-2 (Gage 2018 Rpt.). Defendants submitted two additional expert reports from their security experts. *See* ECF No. 812-2 (Roth 2018 Rpt.); ECF No. 802-4 (McGinnis 2018 Rpt.). Defendants also submitted two

fact declarations from the EMCF Chief Psychiatrist, Steven Bonner, M.D., and the EMCF Medical Director, Patrick Arnold., M.D. *See* ECF No. 812-1 (Bonner Decl.); ECF No. 812-3 (Arnold Decl.).

LEGAL STANDARD

## I.      Eighth Amendment Standard

"[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Helling v. McKinney*, 509 U.S. 25, 31 (1993). Prison officials must thus provide prisoners with "adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (citing *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984)).

To prove an Eighth Amendment violation, a party must satisfy a two-part test. First, the party must make an "objective" showing: that the official's actions or omissions caused a prisoner, or class of prisoners, to be "incarcerated under conditions posing a substantial risk of serious harm." *Id.* at 834. The relevant inquiry is not whether the plaintiff has actually suffered harm but rather whether he faces a "substantial *risk* of harm." *Id.* at 842 (emphasis added); *see also Helling*, 509 U.S. at 32 ("It would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them."); *Gates v. Cook*, 376 F.3d 323, 333 (5th Cir. 2004) ("It is also important to note that the inmate need not show that death or serious illness has occurred."). Further, "[c]onditions of confinement may establish an Eighth Amendment violation 'in combination' . . . when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need." *Gates*, 376 F.3d at 333 (citing *Wilson v. Seiter*, 501 U.S. 294, 304 (1991)).

Second, the party must make a "subjective" showing: that the official displayed

3

"'deliberate indifference' to the substantial risk of harm to inmate health or safety." *Farmer*, 511 U.S. at 834 (quoting *Wilson*, 501 U.S. at 302–03). It is not necessary to prove that a defendant "believ[ed] that harm actually would befall an inmate," but only that "the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Id.* at 842. Deliberate indifference is "a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Id.* As such, it may be established by proof that unconstitutional conditions are "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past," or based on "the very fact that the risk was obvious." *Id.* at 842-43; *see, e.g.*, *Lawson v. Dallas Cty.*, 286 F.3d 257 (5th Cir. 2002) (deliberate indifference where risk was obvious); *Hinojosa v. Livingston*, 516 F.3d 657 (5th Cir. 2015) (deliberate indifference where conditions were pervasive). Prison officials may also be found deliberately indifferent by the simple fact that evidence of a serious risk has been adduced before a court and the officials thus cannot "plausibly persist in claiming lack of awareness" of the risk. *Farmer*, 511 U.S. at 846 n.9; *see also Hadix v. Johnson*, 367 F.3d 513, 526 (6th Cir. 2004) (evidence that is sufficient to satisfy the objective prong of the *Farmer* test "would also satisfy the subjective prong because the same information that would lead to the court's conclusion was available to the prison officials").

## II.     Plaintiffs Do Not Bear the Burden of Proving Continuing Violations

The Court asked Plaintiffs to provide a post-trial brief "identifying the conditions that continue to exist at EMCF" that violate the Eighth Amendment. ECF No. 830. Though each of the complained-of conditions persist at EMCF, Plaintiffs do not bear the burden of showing that proven violations continue to exist.

"It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *Gates*, 376 F.3d at

337. The Supreme Court has so held for at least 75 years. *See, e.g.*, *Walling v. Helmerich & Payne*, 323 U.S. 37, 43 (1944) ("Voluntary discontinuance of an alleged illegal activity does not operate to remove a case from the ambit of judicial power."); *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953) (defendants must meet "heavy" burden of proving "there is no reasonable expectation that the wrong will be repeated" to moot claim).

Rather, if Defendants wish to moot Plaintiffs' claims because they believe they have fixed the unconstitutional conditions, they bear the "heavy burden" of establishing not only that they have actually voluntarily ceased the unconstitutional conduct, but also that it "could not reasonably be expected to recur." *Gates*, 376 F.3d at 337 (citing *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs, Inc.*, 528 U.S. 167, 190 (2000)). This standard is "stringent," and the burden is "formidable." *Laidlaw*, 528 U.S. at 189-90. Defendants must prove that it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Id.* at 189 (quoting *United States v. Concentrated Phosphate Exp. Ass'n*, 393 U.S. 199, 203 (1968) (internal quotation marks omitted); *see also Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 325 (5th Cir. 2009) (same). Otherwise, a wrongdoer would be "free to return to his old ways." *W.T. Grant Co.*, 455 U.S. at 632.

The constraints on prospective relief created by the Prison Litigation Reform Act ("PLRA") do not alter this long-standing rule. Recently, the Eastern District of Virginia and the Fourth Circuit addressed this very issue. Prisoners on Virginia's death row alleged that the Virginia Department of Corrections ("VDOC") confined them in conditions that violated the Eighth Amendment. *See Porter v. Clarke,* 2016 WL 3766301, at *4 (E.D. Va. Jul. 8, 2016) ("*Porter I*"). On a motion for summary judgment, VDOC presented evidence that it had made "significant changes to plaintiffs' conditions of confinement." *Id.* at *5. The district court found that these changes had mooted the plaintiffs' claims, noting, in part, that the changes could not "be easily or

5

casually reversed." *Id.* at \*9-10. The Fourth Circuit reversed. *See Porter v. Clarke*, 852 F.3d 358, 365 (4th Cir. 2017) ("*Porter II*"). The Circuit found that despite VDOC's voluntary improvements, including policy changes and the alteration, at significant expense, of the prison's physical plant, VDOC "retain[ed] the authority and capacity" to return to its challenged behavior, would not "promise not to resume the prior practice," and "suggested that circumstances may require re-imposing the challenged policies." *Id.* at 366. Thus, VDOC did not meet its "heavy burden" of proving mootness via voluntary cessation. *Id.* (internal quotations and alterations omitted).

On remand, the district court considered the interaction of the voluntary cessation doctrine with the PLRA's restrictions on prospective relief. The court determined that "an ongoing violation of a constitutional right is not a prerequisite for the initial entry of injunctive relief under the PLRA." *Porter v. Clarke*, 290 F. Supp. 3d 518, 535-36 (E.D. Va. 2018) ("*Porter III*"), *appeal docketed*, No. 18-6257 (4th Cir. Mar. 15, 2018). The section of the PLRA applicable to the *termination* of an *existing* consent decree permits termination of a decree when there is no "current and ongoing" violation, but that "current and ongoing" language is conspicuously absent from the section of the PLRA applicable to the *initial entry* of prospective relief. *Id.* at 536-37; *compare* 18 U.S.C. § 3626(a) (PLRA requirements for initial entry of prospective relief) *with* 18 U.S.C. § 3626(b)(3) (PLRA requirements for termination of existing consent decree). *Porter III* is consistent with settled law holding that "[w]here Congress knows how to say something but chooses not to do so, its silence is controlling." *In re Haas*, 48 F.3d 1153, 1156 (11th Cir. 1995). Thus, Congress's inclusion of the "current and ongoing" language in Section 3626(b) and its exclusion of the same language from Section 3626(a) means that Plaintiffs need not prove a current and ongoing violation to prevail. *See Thomas v. Bryant*, 614 F.3d 1288, 1320 (11th Cir. 2010) (finding "current and ongoing" standard not applicable to initial entry of injunctive relief).

Deference to the PLRA's statutory silence is required because "the Supreme Court has counseled that courts 'should not construe a statute to displace courts' traditional equitable authority absent the clearest command or an inescapable inference to the contrary.'" *Porter III*, 290 F. Supp. 3d at 536 (quoting *Miller v. French*, 530 U.S. 327, 340 (2000)). The PLRA contains no clear command or inescapable inference displacing the voluntary cessation doctrine. *Id.* at 535.

Based on this precedent, once Plaintiffs have proven that Defendants have violated the Eighth Amendment, Defendants must carry the "heavy burden" of proving that they have ceased those violations and that those violations cannot reasonably be expected to recur. Defendants have not made this substantial showing as to the seven claims set forth herein.

## PROPOSED FINDINGS OF FACT AND REMEDIES

Defendants have violated the Eighth Amendment with respect to each of the following claims, and the Plaintiff class and subclasses are therefore entitled to relief.

## I.  Claim One—Health Care

EMCF's prisoners are substantially more reliant on the facility's health care system than is typical statewide.[1] Yet Defendants have for years failed to provide a health care system that can meet their serious medical needs. Instead, the deficiencies in EMCF's health care system place all prisoners at EMCF at substantial risk of serious harm—and many EMCF prisoners have in fact experienced harm, including likely preventable deaths.[2]

Madeleine LaMarre, M.N., FNP-BC, and Marc Stern, M.D., testified for Plaintiffs. The Court qualified Ms. LaMarre and Dr. Stern in the field of correctional health care.[3] Ms. LaMarre has over 30 years of experience in the field, including her role overseeing the provision and quality

---

[1] *See* Ex. 51, PTX-887 (Feb. 2016 Centurion report) (96.7 percent of EMCF prisoners receive medication compared to 64.7 percent of prisoners statewide).
[2] *See, e.g.*, ECF No. 799-1, at 1-3 (Stern 2018 Rpt.).
[3] *See* Ex. 27, Tr. vol. 28, 4:20-5:7 (LaMarre); Ex. 18, Tr. vol. 19, 30:4-10, 31:12-25 (Stern).

of medical care in Georgia's state prisons.[4] Dr. Stern has over 20 years of experience in the field, including serving as the medical director of the Washington State Department of Corrections.[5] Defendants did not present any expert testimony with respect to medical care, and Ms. LaMarre's and Dr. Stern's opinions and dozens of patient case studies are therefore unrebutted.

Defendants have been aware of these systemic problems for years via Plaintiffs' complaint; previous expert reports submitted in 2011, 2014, 2016, and 2018; their own continuous quality improvement ("CQI") reports and internal reviews; audits; and EMCF patients' medical records,[6] but have failed to take necessary corrective action—indeed, Defendants are so indifferent to the adequacy of health care at EMCF that, despite the allegations in this action, at the time of trial, Dr. Perry, MDOC's Chief Medical Officer, had never even stepped foot in the prison.[7]

A.    Defendants Fail to Provide Plaintiffs Access to Urgent Care

Access to urgent care is required when the time taken to respond to a medical need is of the essence.[8] Defendants admit that access to urgent care is an essential component of adequate correctional health care services.[9] Further, many Plaintiffs have serious medical needs requiring urgent care, including cardiac events, seizure disorder, bleeding, diabetes, respiratory disorders, shortness of breath, choking, loss of consciousness, bone fractures, and abscesses.[10]

---

[4] *See* Ex. 26, Tr. vol. 27, 14:11-19 (LaMarre).

[5] *See* ECF No. 799-1, at Att. 5 (Stern 2018 Rpt.).

[6] *See, e.g.*, Ex. 22, Tr. vol. 23, 10:9-14, 11:3-20, 21:10-18, 23:3-9, 29:1-2, 95:9-17, 102:1-2 (Perry) (admitting to reading Dr. Stern's 2016 report, being aware of Dr. Stern's 2014 report (including its references to Ms. LaMarre's report), reading a Centurion audit of health care at EMCF, and receiving CQI data regarding the same, and agreeing that the CQI results were "not" "very good"); Ex. 24, Tr. vol. 25, 72:4-23 (Hall) (MDOC Commissioner admitting she is aware of Plaintiffs' claims); *see also* Ex. 73, PTX-1505 (LaMarre 2016 Rpt.) (attaching 2011 and 2014 reports); ECF No. 800-1 (LaMarre 2018 Rpt.); Ex. 75, PTX-1501(b) (Stern 2014 Rpt.); Ex. 74, PTX-1501(a) (Stern 2016 Rpt); ECF No. 799-1 (Stern 2018 Rpt.).

[7] *See* Ex. 22, Tr. vol. 23, 13:19-20 (Perry).

[8] *See, e.g.*, ECF No. 799-1, at 4 (Stern 2018 Rpt.).

[9] Ex. 22, Tr. vol. 23, 60:24-61:13 (Perry).

[10] *See* ECF No. 799-1, at 4-5 (Stern 2018 Rpt.).

But access to urgent care at EMCF is systematically hindered by Defendants' failure to provide means for prisoners to notify staff of their urgent medical needs. For example, prisoners outside of Unit 5 have no means of alerting staff to urgent needs when they are locked in their cells, short of yelling and banging (which staff cannot always hear), and setting fires.[11] Typically, prisoners must wait for rounds to alert staff to an urgent need, but rounds may occur several minutes to hours later—enough time for a preventable injury or death to occur.[12]

Access to urgent care is also hindered by security staff failures to respond appropriately and promptly to prisoners' urgent medical needs—with officers often ignoring or not informing medical staff of those urgent needs.[13] Even when alerted to prisoners' urgent needs, nurses also hinder access to urgent care by conducting inadequate patient assessments and inconsistently referring prisoners with urgent needs to doctors, preventing access to necessary care.[14]

Defendants' failure to provide access to urgent care place Plaintiffs at substantial risk of

---

[11] *See, e.g.*, ECF No. 799-1, at 4-5 (Stern 2018 Rpt.) (admission by Warden Shaw that panic buttons are not operational outside of Unit 5); Ex. 74, PTX-1501(a), at 5-6 (Stern 2016 Rpt.) (noting problems with panic buttons); Ex. 7, Tr. vol. 8, 103:10-14 (Clemons) ("if there's an emergency, a lot of times . . . you just have to get a whole lot of inmates to beat and yell and scream and kick"); Ex. 21, Tr. vol. 22, 35:21-36:9 (Long) (similar); Ex. 24, Tr. vol. 25, 39:14-40:8 (J.H.) (cells for mental health observation do not have panic buttons).

[12] *See, e.g.*, ECF No. 799-1, at 4 (Stern 2018 Rpt.); Ex. 74, PTX-1501(a), at 5-6 (Stern 2016 Rpt.) (describing incidents where prisoners experiencing seizures, cardiac events, and lack of consciousness did not receive timely urgent care, and prisoners had to bang on doors and wait for scheduled rounds for staff attention).

[13] *See, e.g.*, ECF No. 799-1, at 4 (Stern 2018 Rpt.); Ex. 74, PTX-1501(a), at 6 (Stern 2016 Rpt.); Ex. 8, Tr. vol. 9, 48:7-50:15 (Beasley) (describing efforts of prisoners to get staff to respond to a blue, unmoving prisoner for 30 minutes); Ex. 21, Tr. vol. 22, 32:3-34:3 (Long) (fires are sometimes set by prisoners trying to get medical attention, but staff do not even respond to every fire); Ex. 21, Tr. vol. 22, 66:18-68:9 (Hickman-Estes) (he drank cleaning chemicals in front of an officer in an attempt to get medical attention; the officer "didn't do anything," left Mr. Hickman-Estes in his cell, and was later promoted).

[14] *See, e.g.*, Ex. 26, Tr. vol. 27, 40:20-41:5 (LaMarre) (no documentation of urgency of referral to doctor); ECF No. 799-1, at 8-11 (Stern 2018 Rpt.) (collecting cases of nurses' failure to provide access to urgent care to prisoners with symptoms of life-threatening conditions, such as stroke, seizure, heart attack, internal bleeding, and blunt force trauma); Ex. 74, PTX-1501(a), at 10-17 (Stern 2016 Rpt.) (similar).

serious harm.[15] Indeed, these failures may have contributed to preventable deaths. In one such case, a man died after staff was alerted to the fact that he was unresponsive on his cell floor, and staff did not initiate an emergency response for five hours.[16] In another case, a man with a seizure disorder died after his cellmate could not get staff to help him.[17] And in another case, officers walked back and forth past a choking prisoner, but ignored him; he collapsed and died.[18]

Defendants have known of and ignored this risk for at least five years.[19] Further, Defendants left this evidence unrebutted at trial, and while EMCF's Medical Director, Dr. Arnold, submitted a declaration in 2018 purporting to attest to the quality of care at EMCF, the declaration does not identify any steps taken to improve access to urgent care.[20]

B.    Defendants Fail to Provide Plaintiffs Access to Episodic, or Non-Urgent, Care

Episodic, or non-urgent, care includes any request for care that a prisoner submits through the "sick call" system.[21] Defendants admit that access to episodic, non-urgent care is an essential component of adequate correctional health care services.[22] Prisoners at EMCF have sought to access episodic, non-urgent care for such serious medical needs as chest pain, staff infection, leg swelling in a prisoner with heart disease, and loss of feeling in a prisoner with a history of strokes.[23]

Defendants systematically fail to provide access to episodic care. First, there is no confidential system for handling sick call requests, impeding access to care given that prisoners

---

[15] *See, e.g.*, ECF No. 799-1, at 4-5 (Stern 2018 Rpt.) (identifying risk posed by lack of access to urgent care as to Patients 13, 23, 28, 50, 54, 65, 66, 67, and 68); Ex. 74, PTX-1501(a), at 5-6 (Stern 2016 Rpt.) (Patients 3, 7, 8, 15, 17, 18, 26, 27, 36, and 37); ECF No. 800-1, at 26-29 (LaMarre 2018 Rpt.) (Patients 1, 5, and 11); Ex. 73, PTX-1505, at 23-25 (LaMarre 2016 Rpt.) (Patients 2 and 5).
[16] Ex. 74, PTX-1501(a), at 6 (Stern 2016 Rpt.).
[17] ECF No. 799-1, at 5 (Stern 2018 Rpt.).
[18] Ex. 16, Tr. vol. 17, 105:17-106:17, 107:11-20 (Hill).
[19] *See, e.g.*, *supra* n.6.
[20] *See* ECF No. 812-3 (Arnold Decl.).
[21] *See, e.g.*, Ex. 19, Tr. vol. 20, 5:6-6:2 (Stern); ECF No. 799-1, at 5-6 (Stern 2018 Rpt.).
[22] Ex. 22, Tr. vol. 23, 60:24-61:9 (Perry).
[23] *See, e.g.*, ECF No. 799-1, at 6-7 (Stern 2018 Rpt.).

will be reluctant to file requests for conditions that may be exposed to staff and other prisoners.[24]

Second, after submitting sick call requests, prisoners are subjected to "unacceptably long delays"

before receiving medical attention, often because of cancelled security escorts.[25] And, once

prisoners do see medical staff, providers fail to appropriately respond to their conditions.[26]

As a result, Plaintiffs face a substantial risk of serious harm that their episodic medical

needs will not be addressed.[27] Defendants have been on notice since at least 2014 of barriers to

accessing episodic care.[28] Indeed, Dr. Perry has admitted that security staff "constantly and

repeatedly refus[e] to bring inmates to clinics for scheduled sick call, dental, mental health and

chronic care appointments" and that the problem is "almost universal at EMCF."[29] She has also

admitted that EMCF has "difficulty with sick call, the process, and the inmates being seen with

sick call."[30] Defendants are aware, too, of a sick call backlog and that adherence to EMCF's policy

---

[24] *See, e.g.*, ECF No. 799-1, at 22-23 (Stern 2018 Rpt.); Ex. 19, Tr. vol. 20, 5:22-6:12 (Stern); Ex. 74, PTX-1501(a), at 23 (Stern 2016 Rpt.).

[25] *See, e.g.*, ECF No. 799-1, at 6-7, 31, 47 (Stern 2018 Rpt.) (noting two-month wait for prisoner reporting chest pain, four-month wait for prisoner reporting staph infection, and dangerously long waits of several days for prisoners reporting symptoms of heart failure and stroke; and also noting frequent sick call appointment cancellations due to facility lockdowns and other custody-related reasons); ECF No. 800-1, at 12-15 (LaMarre 2018 Rpt.) (describing sick call appointment cancellations due to custody-related reasons); Ex. 74, PTX-1501(a), at 7 (Stern 2016 Rpt.) (same); Ex. 19, Tr. vol. 20, 9:2-8 (Stern); Ex. 21, Tr. vol. 22, 71:16-72:14 (Hickman-Estes) (five-month wait for a replacement tooth after submitting numerous sick call requests).

[26] *See, e.g.*, ECF No. 799-1, at 6-7, 45-48 (Stern 2018 Rpt.) (repeated failures in care for prisoner experiencing stroke symptoms); Ex. 74, PTX-1501(a), at 66 (Stern 2016 Rpt.) (same for prisoner with chest pain).

[27] *See, e.g.*, ECF No. 799-1, at 5-7 (Stern 2018 Rpt.) (identifying risk posed by lack of access to episodic care for Patients 3, 4, 5, 10, 12, 13, 16, 25, 33, 35, 38, and 39); Ex. 74, PTX-1501(a), at 6-8 (Stern 2016 Rpt.) (Patients 5, 6, 11, 13, 26, 28, 31, 33, 34, 38, 39, 41, and 43); ECF No. 800-1, at 11-16 (LaMarre 2018 Rpt.) (Patients 5, 11, 14, and 17); Ex. 73, PTX-1505, at 13-17 (LaMarre 2016 Rpt.) (Patients 2, 3, 4, 5, 7, and 8); *see also* Ex. 74, PTX-1501(a), at 7 (Stern 2016 Rpt.) (lack of security escorts for medical purposes is dangerous); ECF No. 800-1, at 11-12 (LaMarre 2018 Rpt.) (noting delayed processing for 44 percent of the 39 sick call requests evaluated by Ms. LaMarre, "expos[ing] all [prisoners] to a risk that severe medical conditions may go unreviewed by medical staff and untreated for a long period of time").

[28] *See, e.g.*, *supra* n.6; Ex. 19, Tr. vol. 20, 12:13-15 (Stern).

[29] *See* Ex. 49, PTX-735 (Feb. 4, 2016 email); Ex. 22, Tr. vol. 23, 74:2-17 (Perry) (admitting writing email in PTX-735).

[30] Ex. 22, Tr. vol. 23, 29:17-30:21 (Perry).

of seeing prisoners for sick call within seven days of their request "has been a problem."[31]

Despite this knowledge, Defendants have not taken any steps to provide confidential means to submit sick call requests, nor have they established that delays in access to episodic care have been resolved. Instead, Dr. Arnold merely states in his 2018 declaration that Defendants hired three part-time nurses to improve sick call processing.[32] But Defendants presented no evidence that this step in fact improved access to care. And, as Dr. Arnold acknowledges, these new staff "are in addition to what [Centurion's] contract with MDOC requires,"[33] meaning Defendants are under no obligation to retain these staff after the conclusion of this case.

C.    Defendants Fail to Provide Plaintiffs Adequate Access to Chronic Care

Chronic care is treatment for chronic disease—such as diabetes, hypertension, seizures, or asthma—that involves assessments scheduled for set intervals based on how well the disease is managed, along with medications, routine testing, and disease education.[34] Defendants admit that access to chronic care is an essential component of adequate correctional health care services.[35]

However, problems with chronic care at EMCF abound. Not all EMCF prisoners with chronic conditions are enrolled in chronic care clinics.[36] Moreover, the same security staff failures that plague access to episodic care—delayed and cancelled appointments due to lack of security escorts—prevent access to chronic care.[37] And, medical staff at EMCF fail to schedule follow-up

---

[31] *Id.*

[32] *See* ECF No. 812-3 ¶ 5 (Arnold Decl.).

[33] *Id.*

[34] *See* ECF No. 799-1, at 5-6 (Stern 2018 Rpt.).

[35] Ex. 22, Tr. vol. 23, 60:24-61:11 (Perry).

[36] *See, e.g.*, Ex. 26, Tr. vol. 27, 66:19-67:12, 71:16-74:2 (LaMarre) (a proper chronic care clinic formally enrolls patients when they arrive at the prison, and sees patients for follow-up one to three months later, but EMCF's chronic care clinic does not do so); Ex. 73, PTX-1505 (LaMarre 2016 Rpt.) at 17 (two chronic disease patients "had never been seen by a physician or nurse practitioner for chronic disease management" despite having been at EMCF for one or two years).

[37] *See* Ex. 19, Tr. vol. 20, 9:2-8 (Stern); Ex. 74, PTX-1501(a), at 8-9 (Stern 2016 Rpt.); ECF No. 799-1, at 7-8 (Stern 2018 Rpt.).

appointments for chronic care patients, schedule the appointments at timely intervals, ensure that the appointments in fact take place, and provide appropriate care at appointments.[38] Each of these failings means patients with chronic, serious medical conditions do not receive timely care for those conditions, placing EMCF prisoners at a substantial risk of serious harm.[39]

Defendants are aware that chronic care is critical for preventing disease progression.[40] And Defendants have been on notice since at least 2014 of barriers to access to chronic care.[41] But Defendants have not rebutted the evidence of these persistent failings. Indeed, the sole response to these failings in Dr. Arnold's 2018 declaration is to recite the number of patients on the chronic care caseload and the number of patients he sees on a daily basis—but he does not address the foregoing failings, much less establish that Defendants have permanently resolved these systemic problems.[42]

---

[38] *See, e.g.*, ECF No. 799-1, at 7 (Stern 2018 Rpt.) (failure to schedule chronic care appointments for patient with severe diabetes led to a months-long gap in care; and despite later chronic care visits, the patient's "diabetes remain[ed] out of control" because medical staff did "little to bring his diabetes under control"); ECF No. 800-1, at 31, 35 (LaMarre 2018 Rpt.) (noting that "[w]ith some exceptions, the majority of provider examinations were not pertinent to the patient's disease" and describing patient with "multiple hypertensive emergencies requiring emergency department visits" who "was not adequately monitored and treated for his severe hypertension"); Ex. 19, Tr. vol. 20, 6:13-8:12 (Stern) (describing patient who was not seen for nearly ten months for his chronic lung disease, a "dangerous interval"); Ex. 26, Tr. vol. 27, 73:6-12 (LaMarre) (describing abnormal lab reports that should have triggered a follow-up chronic care appointment, but did not).

[39] *See, e.g.*, ECF No. 799-1, at 7-8 (Stern 2018 Rpt.) (examples of patients with chronic diseases that, if left unmonitored and untreated, could result in permanent organ damage, respiratory distress, or injury or death from seizures, including Patients 18, 19, 21, 24, 25, 26, 27, 39, 43, 64, 65, 66, 67, and 69); Ex. 74, PTX-1501(a), at 8-9 (Stern 2016 Rpt.) (examples of patients with chronic diseases that, if left unmonitored and untreated, could result in heart attacks, stroke, respiratory distress, hospitalizations, or even death, including Patients 2, 3, 4, 9, 16, 25, 38, and 41); ECF No. 800-1, at 30-35 (LaMarre 2018 Rpt.) (Patients 2, 6, 7, and 8); Ex. 73, PTX-1505, at 17-23 (LaMarre 2016 Rpt.) (Patients 2, 3, 4, 6, 7, 13, and 18); Ex. 26, Tr. vol. 27, 71:25-72:5 (LaMarre) (proper chronic care disease treatment must include regular clinical visits, and a physician must be available between visits should the need arise).

[40] Ex. 22, Tr. vol. 23, 71:13-23 (Perry).

[41] *See, e.g.*, *supra* n.6; Ex. 19, Tr. vol. 20, 12:13-15 (Stern); Ex. 49, PTX-735 (Feb. 4, 2016 email); Ex. 22, Tr. vol. 23, 73:10-74:17 (Perry).

[42] *See* ECF No. 812-3 ¶ 11 (Arnold Decl.).

13

D.   Defendants Fail to Provide Critical Medications to Plaintiffs

Nearly all EMCF prisoners are prescribed medications, including for a range of serious medical conditions, such as diabetes, hypertension, hypothyroidism, heart disease, and seizures, and Defendants admit that access to medications is an essential component of adequate health care services in a correctional setting.[43] However, Defendants fail to ensure that EMCF prisoners have access to medications at nearly every step in the medication administration process.

First, medical staff at EMCF do not ensure that prescribed medications remain in stock, preventing continuity of care.[44] Second, nurses routinely fail to administer medications to prisoners, and even when they do administer medications, they fail to do so properly.[45] For example, "pill call," the twice-daily time for medication administration, takes place at random hours, including when prisoners are sleeping, such that prisoners often do not receive their medications or do not receive them at the prescribed time.[46] Nurses also fail to adhere to generally accepted standards for medication administration, such as performing oral cavity checks to ensure that prisoners swallowed their medications, and fail to check identification to verify that the correct

---

[43] *See, e.g.*, ECF No. 799-1, at 18 (Stern 2018 Rpt.); Ex. 51, PTX-887 (Feb. 2016 Centurion report); Ex. 22, Tr. vol. 23, 60:24-61:17; 88:19-89:2 (Perry).

[44] *See, e.g.*, Ex. 16, Tr. vol. 17, 94:16-99:1 (Hill) (describing running out of epilepsy medication each month because EMCF does not reorder it, causing him "murderous thoughts, suicidal thoughts, pains in [his] head, [and] shaking," the latter of which was visible at trial); Ex. 8, Tr. vol. 9, 95:23-96:23 (Pugh) (noting that even when nurses identify that a medication is running low, they may not refill it before it runs out; when he is out of his medications, which has occurred multiple times for up to three weeks, he is "in agony"); *see also* Ex. 152, PTX-2867, at 91:6-13 (Townsend Dep. Tr.) (EMCF nurse admitting that being out of a medication during pill call is "something that happens most of the times that [she does] pill call").

[45] *See, e.g.*, ECF No. 799-1, at 19 (Stern 2018 Rpt.) (showing a sample of medication administration delays of up to 6.75 hours); ECF No. 800-1, at 19-20 (LaMarre 2018 Rpt.) (describing various problems, including unsanitary practices and failure to document medication administration in real-time).

[46] *See, e.g.*, ECF No. 799-1, at 19-21 (Stern 2018 Rpt.); Ex. 14, Tr. vol. 15, 89:10-90:6 (Mitchell) ("morning" pill call occurs between 9 a.m. and 3 p.m. and "evening" pill call occurs between 10 p.m. and 3 a.m.); Ex. 7, Tr. vol. 8, 102:23-103:9 (Clemons) (sometimes pill call does not happen at all, and prisoners are usually told that there are not enough nurses for pill call); Ex. 21, Tr. vol. 22, 53:22-54:5 (Hickman-Estes) (if a prisoner is asleep or otherwise misses pill call, he simply does not receive his medication); Ex. 24, Tr. vol. 25, 6:24-7:14 (Campbell) (housing pod did not receive evening pill call because there was only one pill call nurse working that night).

prisoner received the correct medication.[47] These failures increase the risk that a patient will not receive the right medication, and that—particularly in a facility focused on patients with mental illness, such as EMCF—patients will not take critically needed medication. Third, nurses fail to accurately document medication administration in prisoners' Medication Administration Records ("MARs"), resulting in a lack of critical information in the medical records—such as whether prisoners actually received and took their medications, when, and in what dose.[48]

Prisoners are thus routinely forced to go without prescribed medications,[49] not only placing them at substantial risk of serious harm, but also causing harm.[50] Most notably, Dr. Stern found that "each of the 6 patients who died in 2018 was subject to rampant missed medications," that "medication administration failures may have even contributed to the patient's death" in three of those cases, and that those failures *likely* played a causal role in at least two of the deaths.[51]

Defendants have been aware of these failings for years, including from Plaintiffs' expert reports;[52] Centurion's CQI reports, which found that medication administration at EMCF failed to meet minimum compliance standards month after month after month;[53] and prisoners'

---

[47] Ex. 73, PTX-1505, at 42-43 (LaMarre 2016 Rpt.).

[48] *See, e.g.*, Ex. 73, PTX-1505, at 43-44 (LaMarre 2016 Rpt.) (noting "widespread problems" in MARs, including failures to record whether medications were administered, incorrect transcription of new medication orders, and even false recording of medication administration).

[49] *See, e.g.*, Ex. 74, PTX-1501(a), at 18 (Stern 2016 Rpt.) (describing patient who did not receive seizure medications on numerous occasions, including for an entire month); Ex. 75, PTX-1501(b), at 12 (Stern 2014 Rpt.) (describing a patient who in one month did not receive 23 doses of one seizure medication and 22 doses of another and suffered a seizure on the first of the following month); Ex. 10, Tr. vol. 11, 87:21-88:7 (Grogan) (he misses medications for two to three days when they are out of stock, which causes him anxiety).

[50] *See, e.g.*, ECF No. 799-1, at 16-21 (Stern 2018 Rpt.) (identifying risk posed by medication administration failures for Patients 58, 64, 68, 69, and 70); Ex. 74, PTX-1501(a), at 12-13 (Stern 2016 Rpt.) (Patients 8, 18, and 22); ECF No. 800-1, at 17-20 (LaMarre 2018 Rpt.) (Patient 6); Ex. 73, PTX-1505, at 42-43 (LaMarre 2016 Rpt.) (Patients 1, 2, 3, 7, 9, 10, 11, 13, and 18).

[51] ECF No. 799-1, at 18-19 (Stern 2018 Rpt.).

[52] *See, e.g.*, *supra* n.6.

[53] *See* Ex. 36, PTX-440 (Dec. 2016 CQI); Ex. 37, PTX-441 (Nov. 2016 CQI); Ex. 52, PTX-442 (Oct. 2016 CQI); Ex. 65, PTX-446 (July 2016 CQI); Ex. 79, PTX-450 (Sept. 2016 CQI); Ex. 82, PTX-451 (Aug. 2016 CQI); Ex. 155, JTX-70 (Jan. 2017 CQI); Ex. 156, JTX-71 (Feb. 2017 CQI); Ex. 153, JTX-72 (Mar. 2017

complaints.[54] Yet Defendants have not remedied the failings in medication administration at EMCF—indeed, in the months since trial, medication administration at EMCF has worsened, with Dr. Stern's finding that, in 147 of the 173 MARs he reviewed from October 2018, prisoners "had not been given a *very significant portion* . . . of one or more medically necessary medications to treat a serious disease," with another 27 of the records also reflecting missed doses.[55]

Dr. Arnold claims that, despite these records, EMCF has in fact taken steps to improve its compliance with medication administration standards since trial.[56] But the handful of purported improvements do not address the vast majority of the foregoing concerns, and Defendants provide no *evidence* that any there has been any actual *improvement* in medication administration. While Dr. Arnold claims that Centurion's audits of medication administration improved from 39 percent in October 2017 to 93 percent compliance in October 2018, he does not provide any information as to *what* metrics were used, *how* they were measured, by *whom*, or whether those metrics are *at all* responsive to the foregoing failings, much less indicative of enduring improvements.[57] Further, Dr. Arnold's declaration cannot be squared with the medication administration failures documented by Dr. Stern and Ms. LaMarre in their 2018 reports.[58] Instead, the paucity of steps

---

CQI); Ex. 159, JTX-73 (Apr. 2017 CQI); Ex. 157, JTX-74 (May 2017 CQI); Ex. 158, JTX-75 (Jul. 2017 CQI); Ex. 160, JTX-76 (July 2017 CQI); Ex. 161, JTX-77 (Oct. 2017 CQI); Ex. 162, JTX-78 (Nov. 2017 CQI); Ex. 163, JTX-79 (Dec. 2017 CQI); Ex. 164, JTX-145 (Aug. 2017 CQI); Ex. 165, JTX-146 (Sept. 2017 CQI).

[54] *See, e.g.*, Ex. 8, Tr. vol. 9, 54:24-55:7, 56:1-8, 56:17-23 (Beasley) (noting administrative remedy program ("ARP") grievance regarding frequent failure to receive his insulin, which put him at risk for a diabetic coma and death, and the baffling response to Mr. Beasley's ARP that "the relief is beyond the power of ARP to grant"); Ex. 8, Tr. vol. 9, 96:24-97:11 (Pugh) (prisoners fill out medical request forms to notify staff when their medication has run out); Ex. 24, Tr. vol. 25, 10:9-11:7 (Campbell) (same).

[55] ECF No. 799-1, at 16 (Stern 2018 Rpt.) (emphasis added).

[56] ECF No. 812-3 ¶¶ 13-17 (Arnold Decl.).

[57] *Id.* ¶ 17.

[58] *Compare id.* ¶¶ 14-15 (describing marginal changes to EMCF's practices with respect to psychotropic medications and record-keeping); *with* ECF No. 799-1, at 16-21 (Stern 2018 Rpt.) (describing persistent problems with nurses' failure to administer medication orders, to deliver medications at the proper time of day, to verify that medications are taken by the right patient, and to document medication administration); *and* ECF No. 800-1, at 17-20 (LaMarre 2018 Rpt.) (describing similar failings).

Defendants have, by their own account, taken to improve medication administration at EMCF, and Defendants' failure to provide any evidence supporting the alleged improvements in medication administration, are themselves indicative of Defendants' indifference to this critical deficiency.

       E.     <u>Defendants Fail to Meaningfully Review and Address Causes of Prisoner Deaths</u>

The mortality reviews—or assessments of the causes of prisoner deaths—performed at EMCF are "cursory" and "ignore serious errors."[59] For example, the mortality reviews do not include autopsies or other clinical reports, do not identify significant deficiencies in care, fail to assess unacceptable delays in response time by medical staff, and fail to recommend corrective action in the rare instance a deficiency is identified.[60] As a result of the lack of meaningful mortality review, Defendants cannot identify potential reforms to prevent future deaths.[61]

Defendants are aware of the inadequacy of EMCF's mortality reviews.[62] But Defendants have proven indifferent to the risk they pose to prisoners. For example, Dr. Arnold asserts that "there was not any different treatment or care that could have been provided to each of the patients [who died in 2018] that would have prevented their deaths."[63] That self-serving conclusion is belied by the pattern of documented failures by medical staff preceding those deaths, and underscores the need for meaningful mortality reviews at EMCF.[64]

       F.     <u>Defendants Fail to Perform Welfare Checks</u>

Because segregation units, which house prisoners in solitary confinement, "are a high-risk environment resulting in a disproportionately high rate of morbidity and mortality due to the

---

[59] ECF No. 799-1, at 15 (Stern 2018 Rpt.).

[60] *See, e.g.*, *id.* at 15-16 (describing Dr. Arnold's failure to identify areas of concern in five of six deaths).

[61] *Id.* at 14.

[62] *See, e.g.*, *supra* n.6; Ex. 75, PTX-1501(b), at 3 (Stern 2014 Rpt.) ("In properly functioning health care systems, the leadership understands that it has a non-delegable duty to recognize and address these errors to prevent recurrences. Based on my review of this case, EMCF is incapable of doing so.").

[63] ECF No. 812-3 ¶ 20 (Arnold Decl.).

[64] *See* ECF No. 799-1, at 1, 14-16 (Stern 2018 Rpt.).

impact of injuries often associated with placement in isolation," EMCF staff are required to conduct welfare checks in these units daily.[65] Such checks are required to permit prisoners in these units the opportunity to file sick call requests, and to permit EMCF staff the chance to monitor the onset of serious medical and mental health conditions, including self-harm.[66] Nevertheless, EMCF medical staff fail to conduct such checks, and instead monitor prisoners in isolation only infrequently and irregularly, exposing prisoners to a substantial risk of serious harm.[67] Defendants have been aware of this failing since at least 2011, when Ms. LaMarre identified the problem in her first report.[68] Further, Defendants' own 2015 audit and an audit performed by Centurion in 2017 reported that these checks were not being conducted,[69] and yet the problem remains.[70]

G.     Defendants Fail to Provide Plaintiffs Adequate Access to Specialty Services

Specialty services include medical care beyond that provided by a primary care provider, such as cardiology, ophthalmology, and orthopedics.[71] Defendants admit that access to specialty services is an essential component of adequate correctional health care services.[72] Yet Defendants fail to provide timely access to specialty care and to timely implement specialist recommendations, placing prisoners at substantial risk of serious harm.[73] Defendants have known since at least 2014

---

[65] *See, e.g.*, ECF No. 799-1, at 21-22 (Stern 2018 Rpt.).

[66] *See infra* Section III.C.

[67] *See, e.g.*, ECF No. 799-1, at 21-22 (Stern 2018 Rpt.)*; Ex. 74, PTX-1501(a), at 51, 67 (Stern 2016 Rpt.).

[68] *See* Ex. 73, PTX-1505, at Ex. 2, 8 (LaMarre 2011 Rpt.).

[69] *See, e.g.*, Ex. 73, PTX-1505, at 46 (LaMarre 2016 Rpt.) ("in January 2015, MDOC performed a compliance audit, the results of which noted that medical was not documenting daily rounds in segregation" and six months later, "Centurion also noted zero compliance with documentation of medical rounds in segregation"); Ex. 22, Tr. vol. 23, 68:9-70:25 (Perry) (admitting that a February 2017 Centurion audit stated that segregation rounds were not being performed routinely, there was a shortage of custody staff to escort nurses on such rounds, and nurses were fabricating segregation logs, which is illegal); Ex. 102, PTX-2176 (2017 Centurion report).

[70] *See, e.g.*, ECF 799-1, at 22 (Stern 2018 Rpt.).

[71] Ex. 73, PTX-1505, at 25 (LaMarre 2016 Rpt.); Ex. 26, Tr. vol. 27, 76:3-8 (LaMarre).

[72] Ex. 22, Tr. vol. 23, 60:24-61:15 (Perry).

[73] *See, e.g.*, ECF No. 800-1, at 36-38 (LaMarre 2018 Rpt.) (describing cases in which Dr. Arnold failed to follow the recommendations of specialty physicians, including a case in which a urologist's recommendation for a prostate specific antigen test was ignored, placing the patient at risk of undiagnosed

of the risk of harm caused by the lack of access to specialty care, but the problem persists.[74]

H.   Defendants Fail to Deliver Constitutionally Adequate Care to Plaintiffs

EMCF medical staff consistently fail to provide care for EMCF prisoners' serious medical needs that is consistent with what is expected of a health care provider.[75] In his 2018 report alone, Dr. Stern identified more than two dozen instances of dangerously inadequate care by EMCF's licensed practical nurses, registered nurses, nurse practitioners, and physician.[76] In addition, EMCF medical staff routinely fail to have clinical encounters with patients in the medical unit, who required enhanced treatment, which Defendants admit puts patients at risk.[77] Even when providers do see patients in the medical unit, they provide "seriously inadequate care."[78] EMCF medical staff also practice outside the scope of their licensure and make clinically unjustifiable decisions.[79] Each of these practices places patients at substantial risk of serious harm.[80]

---

and untreated prostate cancer); Ex. 26, Tr. vol. 27, 76:9-19 (LaMarre) (noting that EMCF staff did not get reports from specialists or did not implement specialists' recommendations); Ex. 73, PTX-1505, at 26-27 (LaMarre 2016 Rpt.) (providing examples of patients who received specialty care but no follow-up from an EMCF doctor); Ex. 24, Tr. vol. 25, 16:2-16 (Campbell) (referred to neurologist in August 2017, but had still not been seen by a neurologist in March 2018); Ex. 19, Tr. vol. 20, 106:20-107:5 (Stern) (failure to provide timely specialty care where patient's symptoms suggested his eyesight was at risk); *see also* Ex. 26, Tr. vol. 27, 67:13-68:10 (LaMarre) (lack of access to medical records led to patients not receiving follow-up care after specialty services).

[74] *See* Ex. 73, PTX-1505, at 25-26 (LaMarre 2014 Rpt.) (failed access to specialty services in 11 out of 18 records).

[75] *See, e.g.*, ECF No. 799-1, at 8-14 (Stern 2018 Rpt.) (summarizing failures in care for prisoners suffering from cardiac events, seizures, choking, loss of consciousness, blunt force trauma, dangerously low blood pressure, and dangerously high blood sugar, with the inadequate care likely contributing to, and potentially causing, multiple deaths); Ex. 74, PTX-1501(a), at 10-18 (Stern 2016 Rpt.) (similar).

[76] *See* Ex. 74, PTX-1501(a), at 10-18 (Stern 2016 Rpt.).

[77] Ex. 22, Tr. vol. 23, 83:14-84:5 (Perry).

[78] ECF No. 800-1, at 23 (LaMarre 2018 Rpt.).

[79] Ex. 19, Tr. vol. 20, 14:1-15:5, 28:6-29:15 (Stern); Ex. 26, Tr. vol. 27, 40:6-13 (LaMarre); ECF No. 799-1, at 8-14 (Stern 2018 Rpt.); Ex. 74, PTX-1501(a), at 10-18 (Stern 2016 Rpt.).

[80] *See, e.g.*, ECF No. 799-1, at 8-14 (Stern 2018 Rpt.) (identifying risk posed by such failings in care for Patients 6, 8, 10, 12, 13, 15, 16, 19, 20, 24, 28, 42, 64, 65, 66, 67, 68, 69); Ex. 74, PTX-1501(a), at 10-17 (Stern 2016 Rpt.) (6, 7, 8, 16, 17, 19, 20, 22, 23, 24, 26, 27, 28, 30, 31, 33, 34, 38, 41, 42, 43, 45, 46, 47, 48, and 49); ECF No. 800-1, at 21-25 (LaMarre 2018 Rpt.) (Patient 11); Ex. 73, PTX-1505, at 27-37 (LaMarre 2016 Rpt.) (Patients 2, 3, 6, 19, and 21); Ex. 74, PTX-1501(a), at 11 (Stern 2016 Rpt.) ("Health care delivery by health care providers at EMCF has consistently fallen to a dangerously deficient state. This

Defendants have been aware of these problems for years.[81] Yet, they allowed a doctor whose practice they knew to be "persistently lacking and not acceptable" to treat patients at EMCF for years, a stark indictment of Defendant's oversight of medical care at EMCF.[82] Moreover, while EMCF hired a new physician—Dr. Arnold—in late 2017, he testified at trial that he does not supervise the nursing staff—and he therefore cannot speak to or correct the failings in their practice.[83] Further, Dr. Stern and Ms. LaMarre both identified serious failings in Dr. Arnold's own care of patients, establishing that despite Dr. Arnold's hiring, these problems persist.[84]

I.   Remedies

Ms. LaMarre primarily recommends that a qualified health care professional be appointed to develop measurable standards for assessing the adequacy of medical care at EMCF and to assess EMCF's compliance with those standards.[85] Ms. LaMarre also recommends that discrete, concrete steps be taken to remedy the foregoing failings—such as ensuring sufficient custody staffing to permit timely escorts to medical appointments; ensuring sufficient medical and custody staffing to permit the timely completion of medication administration; ensuring that newly arrived chronic disease patients are seen by medical staff within 30 days; addressing and implementing hospital and specialty service recommendations in a timely manner; revising policies and adopting practices to align care at EMCF with National Commission on Correctional Health Care standards; and developing and implementing strategies to correct root causes of systemic issues.[86]

Dr. Stern joins Ms. LaMarre's recommendation that an independent health care monitor

---

problem was described previously in my first report and two reports by Ms. LaMarre, and continues unabated.").

[81] *See supra* n.6.

[82] Ex. 48, PTX-728 (Sept. 2, 2015 email); *see also* Ex. 22, Tr. vol. 23, 51:11-53:6, 55:7-60:5 (Perry); Ex. 26, Tr. vol. 27, 96:9-97:11 (LaMarre).

[83] *See* Ex. 33, Tr. vol. 35, 30:1-31:7 (Arnold).

[84] *See, e.g.*, ECF No. 799-1, at 11-13 (Stern 2018 Rpt.); ECF No. 800-1, at 31 (LaMarre 2018 Rpt.).

[85] ECF No. 800-1, at 50-52 (LaMarre 2018 Rpt.).

[86] *Id.*

develop performance measures and assess EMCF's compliance with those measures.[87] In addition, Dr. Stern recommends that Defendants' contract with their health care vendor be amended to require the contractor's compliance with those same measures.[88] Dr. Stern also recommends that Defendants conduct a staffing analysis to determine the adequacy of health care staffing at EMCF and, likely, a salary analysis to determine EMCF's competitiveness in hiring in Mississippi.[89] Finally, Dr. Stern also recommends several discrete remedies, such as installing and responding to panic buttons in each cell and providing confidential means of submitting sick call requests.[90]

## II.   Claim Two—Mental Health Care

EMCF is designated to hold the most seriously mentally ill prisoners in the state.[91] Its mental health care system is inadequate to meet their mental health needs.[92] The deficiencies in EMCF's mental health care system, singly and in combination, cause unnecessary and avoidable suffering.[93] The resulting harm is substantial and systemic. Many prisoners with serious mental illness remain in psychotic, depressed, manic, and potentially assaultive conditions because they are not adequately treated or transferred to more intensive treatment programs or psychiatric hospitals.[94]

Bruce Gage, M.D. testified for Plaintiffs. The Court qualified Dr. Gage as an expert in the

---

[87] ECF No. 799-1, at 26-27 (Stern 2018 Rpt.).

[88] *Id.* at 27.

[89] *Id.*

[90] *See, e.g.*, *id.* at 5, 23.

[91] *E.g.*, Ex. 25, Tr. vol. 26, 35:14-20 (Gage).

[92] *See generally* Tr. vols. 26, 29 (Gage); Ex. 76, PTX-1504 (Gage 2016 Rpt.); ECF No. 807-2 (Gage 2018 Rpt.).

[93] *Id.* In his 2016 report, Dr. Gage found dangerously inadequate treatment for 20 of the 21 patients whose records he reviewed, resulting in serious clinical deterioration and associated medical complications (including death) for patients suffering from schizophrenia, psychotic disorders, depression, anxiety disorders, cognitive disorders, bipolar disorder, and psychiatric illness associated with self-injurious behavior, among other conditions. *See* Ex. 76, PTX-1504, App. 2 (Gage 2016 Rpt.) (record reviews); *see also* ECF No. 807-2, App. 1 (Gage 2018 Rpt.) (record reviews) (inadequate treatment and similar findings for 26 of the 30 patient records reviewed by Dr. Gage in 2018).

[94] *Id.*; Ex. 25, Tr. vol. 26, 35:21-36:17 (Gage).

field of correctional mental health care.[95] Dr. Gage has over 30 years of experience in the field.[96] Defendants did not present expert testimony regarding EMCF's mental health care system, so Dr. Gage's opinions are unrebutted, as are his findings as to the patients whose care he reviewed.

Defendants are aware of the pervasive and longstanding deficiencies in EMCF's mental health system from expert reports submitted in 2014, 2016, and 2018 in this case, a 2011 report on mental health services by Dr. Terry Kupers, their own CQI reports and internal reviews, and the medical records of EMCF patients.[97]

A.     Defendants Fail to Perform Adequate Intake Screenings for Mentally Ill Prisoners

Intake screenings are important to identify those at imminent risk of harm to themselves or others due to mental illness, to identify patients in need of mental health treatment, and to continue current treatment.[98] EMCF has an inadequate intake process that fails to promptly and reliably detect patients with mental health needs or ensure continuity of their treatment.[99]

EMCF does not conduct admission intakes to the MDOC system; prisoners are transferred there from other facilities. As such, a great deal of information should be available to the EMCF

---

[95] Ex. 25, Tr. vol. 26, 33:14-15 (Gage).

[96] Ex. 72, PTX-1496 (Gage CV); Ex. 25, Tr. vol. 26, 20:2-22:24 (Gage).

[97] *See generally* Ex. 76, PTX-1504 (Gage 2016 Rpt.); ECF No. 807-2 (Gage 2018 Rpt.); *see* Ex. 25, Tr. vol. 26, 43:22-44:2 (Gage); Ex. 22, Tr. vol. 23, 5:13-11:22 (Perry) (admitting she read Dr. Kupers' 2011 report and Dr. Gage's expert report); Ex. 22, Tr. vol. 23, 21:10-13; 28:20:29:2 (Perry) (admitting she reviewed 2016-2017 internal audits and quality improvement studies on mental health care); Ex. 24, Tr. vol. 25, 72:4-74:23 (Hall) (admitting she is aware of claims in this case). Defendants are aware that the EMCF population needs mental health treatment because it is the designated facility for seriously mentally ill prisoners. Ex. 22, Tr. vol. 23, 14:2-17:7 (Perry) (admitting she is aware that EMCF is the flagship mental health MDOC facility and that over 75 percent of EMCF prisoners are on psychotropic medications). Defendants' own data show many incidents and trips to the hospital because of self-injury and violence by mentally ill prisoners. Ex. 76, PTX-1504, at 7 (Gage 2016 Rpt.). Further, it is well-known that mental illness is associated with suicide, self-harm, and danger to others, especially when the mentally ill are in a decompensated (acutely ill or untreated) state. Failure to manage and treat this population is known to be associated with harmful outcomes. *Id.*

[98] Ex. 25, Tr. vol. 26, 55:2-14 (Gage); ECF No. 807-2, at 8-10 (Gage 2018 Rpt.).

[99] Ex. 76, PTX-1504, at 56-57 (Gage 2016 Rpt.); ECF No. 807-2, at 6, 8-10 (Gage 2018 Rpt.); Ex. 25, Tr. vol. 26, 46:24-49:6, 54:24-58:17, 73:11-81:20 (Gage).

intake team via the patient's existing medical record. However, EMCF staff does not consistently review the existing record as part of intake. Instead, they rely on patient self-reports, which leads staff to miss critical clinical information.[100] The mental health intake screening at EMCF is also inadequate, often inaccurate and not standardized.[101] As a result, seriously mentally ill patients do not receive adequate and timely treatment, or their treatment is disrupted, causing clinical deterioration.[102]

Defendants did not rebut Plaintiffs' evidence as to the inadequate intake process. EMCF psychiatric nurse practitioner Evelyn Dunn testified that every prisoner is initially screened at the Central Mississippi Correctional Facility ("CMCF") and then again on arrival at EMCF, and that prisoners at a level of care ("LOC") C, D, or E, representing higher acuity of illness, are seen by mental health staff and put on the EMCF caseload.[103] Steven Bonner, M.D, EMCF's chief psychiatrist, provided the same evidence.[104] However Plaintiffs do not dispute that every patient receives an intake screening at CMCF and another screening at EMCF—the problem is that these screenings are inadequate and place prisoners at a risk of harm, a fact that Defendants did not rebut. Further, though Ms. Dunn testified that the mental health screening at EMCF involves a suicide risk assessment,[105] the Suicide Potential Screening form that is used irregularly during EMCF screenings does not constitute adequate intake, as it does not capture other aspects of mental

---

[100] Ex. 76, PTX-1504, at 56 (Gage 2016 Rpt.); Ex. 25, Tr. vol. 26, 55:22-56:13 (Gage); ECF No. 807-2, at 10 (Gage 2018 Rpt.) (2018 intake screens based on self-reports, not on review of existing treatment records, resulting in inaccurate intake, as seen with Patients 4, and 5).

[101] ECF No. 807-2, at 10 (Gage 2018 Rpt.) ("Nursing and [Mental Health Professional] screens are unreliable, often containing erroneous information or lacking critical information.").

[102] *See, e.g.*, Ex. 76, PTX-1504, at 57, App. 2 (Gage 2016 Rpt.) (noting inadequate and inaccurate screenings resulting in delayed and inadequate treatment for Patients 2, 4, 5, 8, 9, 16, 23, 24, 25 and 38); Ex. 25, Tr. vol. 26, 58:2-6; 73:16-81:20 (Gage); ECF No. 807-2, at 8, App. 1 (Gage 2018 Rpt.) ("every [2018] medical record that had an intake showed deficiencies," including for Patients 2, 4, 5, 23, 24, and 25).

[103] Ex. 32, Tr. vol. 34, 74:20-75:4 (Dunn).

[104] ECF No. 812-1, at 9 (Bonner Decl.).

[105] Ex. 32, Tr. vol. 34, 76:16-77:14 (Dunn).

illness that represent potential risks, including potential danger to others.[106]

> B.     Defendants Provide Inadequate Assessments and Treatment Plans

Assessments and treatment plans are critical aspects of EMCF's mental health care system: without an adequate assessment, Defendants cannot know a person's mental health treatment needs.[107] Without an individualized treatment plan based on such an assessment, that person cannot be given proper treatment.[108] But EMCF provides inadequate assessments and treatment planning.[109] Defendants know there are problems in this area.[110] As a result, Defendants place Plaintiffs at a risk of harm, and have caused actual harm in many cases.[111]

The contents of a proper assessment are standardized in the field. An assessment should typically include the patient's chief compliant, history of present illness, social and family history, psychiatric and medical history (including appropriate laboratory and ancillary studies), chemical dependency history, mental status examination, diagnosis, and a formulation that specifies what the person's needs are. From the assessment, a treatment plan is written.[112]

By policy, all patients admitted to the mental health caseload at EMCF should receive a treatment plan derived from such an assessment.[113] A treatment plan should be specific to the individual patient.[114] It should contain long- and short-term goals to address symptoms and

---

[106] Ex. 76, PTX-1504, at 57 (Gage 2016 Rpt.).
[107] ECF No. 807-2, at 11 (Gage 2018 Rpt.); Ex. 25, Tr. vol. 26, 64:22-65:18 (Gage).
[108] Ex. 25, Tr. vol. 26, 58:22-59:24 (Gage); Ex. 76, PTX-1504, at 57 (Gage 2016 Rpt.); Ex. 98, PTX-2058 (Policy G-02).
[109] *See* ECF No. 807-2, at 6, 10-15 (Gage 2018 Rpt.); Ex. 25, Tr. vol. 26, 39:2-16 (Gage).
[110] Ex. 154, JTX-68, at 26-29 (Dec. 2017 audit) (noting problems with treatment plan interventions, discharge criteria, non-compliance with treatment timelines, and lack of documentation of treatment progress).
[111] Ex. 76, PTX-1504 at 57-58, 64 (Gage 2016 Rpt.); Ex. 25, Tr. vol. 26, 39:2-16, 46:24-50:14, 58:22-72:25, 77:3-18, 84:16-85:19 (Gage); ECF No. 807-2, at 11-15, App. 1 (Gage 2018 Rpt.) (Patients 2, 3, 5, 7, 12, 16, 20, 23, 25, 28, and 29).
[112] Ex. 76, PTX-1504, at 58 (Gage 2016 Rpt.); Ex. 25, Tr. vol. 26, 58:22-59:19 (Gage).
[113] Ex. 98, PTX-2058 (Policy G-04c).
[114] *Id.*

treatment compliance and include treatment that will be rendered by each treatment team member, as well as outcome measures to assess progress towards each treatment goal.[115]

However, at EMCF, assessments and treatment plans are uniformly poor or absent.[116] Treatment plans at EMCF are generic and inadequate in almost all instances.[117] They almost universally lack any patient specificity: they fail to consistently identify symptoms targeted for treatment, set measurable goals, specify individualized interventions, address non-compliance, or set compliance measures.[118] In many cases, treatment plans are simply absent or not done at the intervals specified by policy.[119] In Dr. Gage's 2018 review, a quarter of the mental health patients reviewed had no treatment plans whatsoever.[120] Necessary testing is also not done, though there are EMCF patients with cognitive and other impairments who require such testing.[121]

Patients may be seen multiple times over weeks and months by multiple staff, but these contacts do not constitute adequate assessments because Mental Health Professionals ("MHPs"), who make up the bulk of mental health staff, make no effort to engage the patient in treatment, assess the patient, or develop treatment plans.[122] Instead, "MHP documentation [is] repetitive, inaccurate, and unreliable."[123] In some cases, different patients have identical treatment plans, even

---

[115] Ex. 25, Tr. vol. 26, 64:16-65:7 (Gage).

[116] Ex. 76, PTX-1504, at 58 (Gage 2016 Rpt.); Ex. 25, Tr. vol. 26, 62:8-11 (Gage); ECF No. 807-2 at 6, 10-15 (Gage 2018 Rpt.).

[117] ECF No. 807-2, at 13-14 (Gage 2018 Rpt.).

[118] Ex. 25, Tr. vol. 26, 67:14-25, 69:20-25, 70:1-16 (Gage); ECF No. 807-2, at 14-15 (Gage 2018 Rpt.).

[119] ECF No. 807-2, at 15 (Gage 2018 Rpt.) (showing only 36 percent of caseload patients had a treatment plan completed in 2018); Ex. 76, PTX-1504, at 59-60 (Gage 2016 Rpt.).

[120] ECF No. 807-2, at 11-12, 13 (Gage 2018 Rpt.) (Patients 5, 7, 9, 15, 16, 17, 24, and 26 had no plans whatsoever).

[121] Ex. 25, Tr. vol. 26, 61:11-62:7 (Gage); Ex. 76, PTX-1504, at 58, App. 2 (2016 Gage Rpt.) (Patients 4, 6, 7, 13 17, 19, and 22); ECF No. 807-2, at 11, App. 1 (Gage 2018 Rpt.) (Patients 2, 3, 5, 12, 16, 23, 28, 29); Ex. 98, PTX 2058 (Policy G-04f).

[122] Ex. 25, Tr. vol. 26, 39:2-16 (Gage).

[123] ECF No. 807-2, at 11 (Gage 2018 Rpt.).

though the odds of two patients appropriately having identical plans is virtually zero.[124] The treatment plans also fail to address progress or lack of progress in treatment.[125] The risks created by these deficiencies are evident from many specific examples seen in EMCF records, placing prisoners at a substantial risk of harm and in many cases causing actual harm.[126]

Defendants did not present credible evidence that they complete adequate assessments or devise adequate treatment plans for EMCF patients. Ms. Dunn testified that each prisoner on the mental health caseload has a mental health treatment plan, devised by a nurse practitioner or psychiatrist in conjunction with the prisoner.[127] Ms. Dunn did not testify as to the quality of those plans, and did not dispute the substantial evidence presented by Plaintiffs that they are lacking. Defendants' own internal reviews confirm that assessments and treatment plans are substandard or absent.[128] Dr. Bonner acknowledges there was a problem of patients not having treatment plans

---

[124] *See, e.g.*, Ex. 25, Tr. vol. 26, 70:17-72:17, 76:2-25 (Gage) (identifying treatment plans for different patients that are "word-for-word identical"); *compare* Ex. 88, PTX-1855 (excerpt) (patient treatment plan) *with* Ex. 89, PTX-1876 (excerpt) (identical treatment plan) *and* Ex. 93, PTX-1914 (excerpt) (same); *compare* Ex. 90, PTX-1882 (excerpt) (patient treatment plan) *with* Ex. 94, PTX-1919 (excerpt) (identical treatment plan).

[125] Ex. 76, PTX-1504, at 64 (Gage 2016 Rpt.); ECF No. 807-2, at 14 (Gage 2018 Rpt.) (finding "no evidence of charting on treatment plan goals" in 2018).

[126] *See, e.g.* Ex. 76, PTX-1504, at App. 2, 24, 26 (Gage 2016 Rpt.) (Despite history of manic and psychotic behavior and stating that "he was God," Patient 9's treatment plan was "Client will continue to be monitored;" plan had no treatment goals, or measurable targets other than he was to "take his pills daily." His subsequent medications refusals were not addressed, and inadequate assessment "almost certainly contributed to his deterioration and placement" in segregation.); ECF No. 807-2, at 58 (Gage 2018 Rpt.) (inadequate assessment and no treatment plan for Patient 2, a schizophrenic with history of self-injury who consequently moved between isolation in the medical unit and segregation without consideration of his underlying illness or ongoing assaultive and self-injurious behavior), 70 (inadequate assessment of Patient 5 to determine the potential causes of his impulse control problems and mood instability, and no treatment plan to address symptoms or repeated self-injury; patient eventually placed in segregation), 72-74 (Patient 7 was never provided an adequate assessment or treatment plan in response to his paranoid delusions and poor insight and judgment caused by his bipolar disorder and head trauma; contraindicated medication prescribed due to lack of full assessment; clinical deterioration not addressed via treatment plan).

[127] Ex. 32, Tr. vol. 34, 74:20-75:25 (Dunn).

[128] *See* Ex. 154, JTX-68 (Dec. 2017 audit) (40 percent of EMCF patients did not have a treatment plan; 50 percent did not have treatment plans indicating the level of functioning on the patient; 100 percent failed to have progress notes in their medical records that reflect goals of the treatment plans, or progress towards those goals, and concluding the plans "need significant improvement").

that EMCF has tried to rectify since June 2018, and asserts that now 18 percent of patients do not have treatment plans.[129] Defendants admit this level of non-compliance is unacceptable.[130] Dr. Bonner also did not comment on plan quality, a fundamental problem at EMCF.

> C.   Defendants Provide Inadequate Care for Mental Health Crises

Crisis care consists of mental health staff's immediate response to a prisoner's mental health crisis, as well as assessment and interventions to address the nature of the crisis.[131] Adequate crisis care is essential at EMCF because its population of seriously mentally ill prisoners are at a heightened risk of crisis.[132] The chaotic conditions at EMCF, coupled with the lack of treatment, further increase that risk of crisis.[133] Despite its importance, EMCF provides inadequate crisis care. Crisis responses are limited or absent, crisis plans are absent or not followed, and follow-up after a crisis is lacking. These flaws place EMCF patients at an unreasonable risk of harm.[134]

Defendants know that mental health crisis services "should include at a minimum: a structured assessment of patient's current risk of self-harm, violence, and psychiatric decompensation; a formal suicide risk assessment when clinically indicated; an individualized crisis treatment plan; daily behavioral health interventions for patients on suicide watch and per crisis treatment plan for patients on psychiatric observation; and an assessment of need for higher

---

[129] ECF No. 812-1, at 10 (Bonner Decl.).

[130] Ex. 23, Tr. vol. 24, 70:6-71:2 (Perry) (admits that she would expect there to be 90 percent and 100 percent scores in the CQI reports, because they measure basic requirements of health care at EMCF and Centurion should be providing all of the services that are measured). Dr. Bonner does not address whether the treatment plans include all necessary elements, a problem both Dr. Gage and Defendants themselves identify. Ex. 154, JTX-68 (Dec. 2017 audit) ("Improvement in the content and quality of treatment plans is needed."); ECF No. 807-2 at 13 ("treatment plans remained very generic and nonspecific; none were adequate.")).

[131] Ex. 25, Tr. vol. 26, 92:20-24 (Gage).

[132] Ex. 25, Tr. vol. 26, 93:14-20 (Gage).

[133] Ex. 28, Tr. vol. 29, 42:9-17 (Gage); ECF No. 807-2, at 15 (Gage 2018 Rpt.) ("lack of sufficient structured treatment contributes to the prisoner population deteriorating to the point of being in crisis or manufacturing a crisis . . . in order to secure . . contact with staff").

[134] Ex. 25, Tr. vol. 26, 93:14-20, 94:12-95:25, 97:4-98:20, 137:20-138:19 (Gage); Ex. 28, Tr. vol. 29, 5:10-6:18 (Gage);  ECF No. 807-2, at 15-17, App. 1 (Gage 2018 Rpt.) (Patients 2, 4, 5, 12, 18, 20, 27, 29).

level of care if suicide watch or psychiatric observation status continues for more than 72 hours."[135] At EMCF, Defendants fall short in every regard.[136]

Crisis response at EMCF is substantially deficient in terms of access, sufficiency of assessment, and service delivery. EMCF crisis response typically consists of placing the patient in isolation or referring him to a psychiatric prescriber, and virtually never includes a plan to address the underlying issues leading to the crisis.[137] EMCF patients placed in isolation after a crisis can and do remain in isolation for weeks and months.[138] Long-term placement in isolation exacerbates the crisis and underlying illness.[139] There is no reliable crisis intervention outside of working hours, when mental health staff is not present at the facility.[140] Though the Centurion contract requires "crisis assistance through an established on-call system," on-call services are not used for patients in crisis.[141]

The deficiencies of EMCF's crisis response are apparent in staff's response to instances of self-injurious behavior ("SIB"). EMCF prisoners engage in a high rate of repetitive, serious SIB,[142] a serious disorder that carries a high mortality rate but is usually treatable.[143] Prisoners may engage in self-harm for secondary gain, but staff must nonetheless treat the behavior because it has serious health effects and indicates a psychological problem.[144] Medications by themselves are not adequate in the vast majority of cases and, if effective, can take months to control symptoms.[145] In the interim, only support services, therapy, careful proactive monitoring, and, when necessary,

---

[135] Ex. 154, JTX-68 (Dec 2017 audit).
[136] ECF No. 807-2, at 15-20 (Gage 2018 Rpt.) (noting non-compliance with all elements).
[137] Ex. 76, PTX-1504, at 11-12, 58-89 (Gage 2016 Rpt.); ECF No. 807-2, at 15-16 (Gage 2018 Rpt.).
[138] Ex. 25, Tr. vol. 26, 98:5-11 (Gage).
[139] Ex. 25, Tr. vol. 26, 98:17-20 (Gage)); *see also infra* Section III.
[140] ECF No. 807-2, at 15 (Gage 2018 Rpt.).
[141] *Id.*
[142] *Id.* at 17.
[143] Ex. 25, Tr. vol. 26, 137:20-138:16 (Gage)
[144] Ex. 25, Tr. vol. 26, 138:8-138:19 (Gage); ECF No. 807-2, at 12 (Gage 2018 Rpt.).
[145] Ex. 76, PTX-1504, at 65 (Gage 2016 Rpt.).

limitations on belongings and movement are effective at treating patients.[146] However, treatment targeting SIB is provided in very few cases at EMCF.[147] As a result, EMCF patients engage in multiple, and in some cases life-threatening, episodes of SIB without receiving an adequate crisis response or subsequent treatment, and they unnecessarily suffer as a result.[148]

For example, Patient 38 was admitted to EMCF with a long history of hallucinations, paranoia, and psychosis. At EMCF, he had repeated bouts of suicidal and homicidal ideation escalating into serious, potentially deadly acts of SIB such as jumping from the top tier of his cell block. In February 2016, while housed in isolation, he threatened to harm himself, brandishing an object in his hand. No suicide assessment was performed. Staff told him he would be seen in two days, but he was not. Three days later, he cut himself to the tendons in his arm, requiring emergency surgery. While hospitalized, he was diagnosed with a previously undiscovered stoke that could have been contributing to his instability. Even after this episode and despite further acts of SIB and assaultive behavior, no behavioral treatment was ever offered to him, and he was kept in isolation, leading to his further deterioration.[149]

EMCF staff also regularly fail to follow policies that should improve their crisis response. Staff does not follow the policy requiring behavior management plans, which are used regularly in other correctional systems to treat patients with SIB and other behavioral problems.[150] EMCF policy also requires a crisis treatment plan for patients predisposed to crisis,[151] identifying

---

[146] *Id.*
[147] *Id.* at 64; Ex. 28, Tr. vol. 29, 6:2-9 (Gage); ECF No. 807-2, at 12 (Gage 2018 Rpt.); Ex. 13, Tr. vol. 14, 44:15-50:8 (Donald).
[148] ECF No. 807-2, at 16 (Gage 2018 Rpt.) (noting multiple examples of patients with repeated SIB where there was no crisis response and inadequate subsequent care).
[149] Ex. 76, PTX-1504, at 109-26 (Gage 2016 Rpt.).
[150] Ex. 28, Tr. vol. 29, 5:10-6:1 (Gage); Ex. 98, PTX-2058 (Policy G-04h); ECF No. 807-2, at 16 (Gage 2018 Rpt.).
[151] Ex. 76, PTX-1504, at 59 (Gage 2016 Rpt.); Ex. 25, Tr. vol. 26, 95:13-23 (Gage).

measures the patient and clinical staff are supposed to take to respond to crises.[152] But Defendants do not develop crisis treatment plans for patients who need them.[153]

Mental health staff are also required by policy to be involved prior to planned uses of force against prisoners, to de-escalate before security staff use force, but consistently fail to do so.[154] Mental health staff interventions are pro forma and rushed, and typically conclude with the mental health staff advising security staff that the plaintiff's actions are "behavioral," rather than the product of a mental illness—effectively a green light for security staff to use force.[155] The practice of mental health staff facilitating use of force against patients undermines the therapeutic alliance between mental health staff and patients that is fundamental to adequate care.[156] Often, mental health staff refuse to come to the scene of the use of force entirely, instead talking to the prisoner or staff over the phone before deeming the prisoner's actions "behavioral."[157] This is documented repeatedly on video.[158] In 14 out of 20 months for which MDOC's contract monitor made findings over two years, staff regularly failed to consult with medical or mental health staff for intervention

---

[152] Ex. 25, Tr. vol. 26, 95:15-20 (Gage).

[153] Ex. 25, Tr. vol. 26, 95:24-25 (Gage); ECF No. 807-2, at 16 (Gage 2018 Rpt.) (finding only two crisis plans in 2018, one of which "was not really a crisis plan but a set of goals," the other "was marginally adequate but was not followed"). There is almost no evidence that EMCF implements any of the reasonable alternatives for crisis intervention set out in the Centurion policies "Mental Health Crisis Intervention" and "Mental Health Watch Procedures." Ex. 76, PTX-1504, at 59 (Gage 2016 Rpt.). This includes "crisis intervention plans," "[c]onsultation with correctional staff regarding patient management," "exploration of options to resolve or ameliorate the crisis or distress," or an "[o]ffer of follow-up or short-term treatment focused on coping with the crisis." Ex. 76, PTX-1504, at 59 (Gage 2016 Rpt.); Ex. 25, Tr. vol. 26, 94:12-95:9 (Gage).

[154] ECF No. 807-2, at 16 (Gage 2018 Rpt.) (in most instances, MHP crisis interventions were absent or of poor quality).

[155] Ex. 3, Tr. vol. 4, 54:1-5 (Vail).

[156] Ex. 28, Tr. vol. 29, 16:9-13 (Gage); ECF No. 807-2, at 17 (Gage 2018 Rpt.) ("The appropriate role for mental health in planned uses of force is to attempt to defuse the situation. There is no role in determining a patient's intentions or the contribution of mental illness to behavioral problems during a crisis response.").

[157] *See* Ex. 6, Tr. vol. 7, 65:9-24 (Dykes); Ex. 121, PTX-2519 (Aug. 23, 2016 report); Ex. 131, PTX-2698 (June 1, 2017 report).

[158] Ex. 3, Tr. vol. 4, 55:16-56:7 (Vail).

prior to planned uses of force.[159] In at least one instance, staff also falsely reported that mental health staff had attempted to de-escalate a use-of-force situation, which video clearly shows did not occur, as EMCF Warden Frank Shaw admitted at trial.[160] Indeed, Defendants' senior security staff admit that staff frequently do not actually engage in de-escalation.[161] They also admit that involving mental health staff reduces the necessity of using force, and thus reduces the risk of harm to Plaintiffs.[162] These failures all create a risk of harm for EMCF patients.[163]

Defendants did not rebut this evidence. Dr. Bonner criticizes Dr. Gage for relying exclusively on chart reviews to determine that mental health staff did not consistently attempt to de-escalate planned uses of force.[164] This is not accurate. Dr. Gage reviewed "134 use of force incident reports and associated videos" of planned use of force incidents.[165] Dr. Bonner does not dispute a single instance of the "consistent pattern of substandard and dangerous practices where mental health staff fails to meaningfully engage patients in an effort to de-escalate planned uses of force."[166] Dr. Bonner states that mental health staff have "successfully de-escalated situation on a

---

[159] *See* Ex. 149, PTX-2806 (demonstrative summary); Ex. 96, PTX-1936 (monitor's weekly reports – 2014); Ex. 97, PTX-1939 (monitor's monthly reports – 2015); Ex. 92, PTX-1934 (monitor's monthly worksheets – 2016); Ex. 134, JTX-61 (compilations of monthly reports by year).

[160] Ex. 130, PTX-2691 (Feb. 21, 2019 report); Ex. 20, Tr. vol. 21, 72:13-76:13 (Shaw).

[161] Ex. 20, Tr. vol. 21, 72:13-76:13 (Shaw) (warden admits planned force used on prisoner without mental health staff intervention, and staff was dishonest in reporting), 73:03-20 (Shaw) (warden admits staff can use planned force on a prisoner before mental health staff speaks to him); Ex. 29, Tr. vol. 31, 97:12-21; 98:22-5 (Shaw) (similar); Ex. 6, Tr. vol. 7, 65:9-24 (Dykes) (security chief admits some planned uses of force occur without mental health staff involvement); Ex. 28, Tr. vol. 29, 65:16-21 (Gage); Ex. 130, PTX-2691 (Feb. 21, 2019 report).

[162] Ex. 6, Tr. vol. 7, 63:3-10 (Dykes); Ex. 12, Tr. vol. 13, 122:5-14, 122:24-124:4, 124:17-125:8 (Williams); Ex. 35, Tr. vol. 37, 6:24-7:11 (McGinnis).

[163] Ex. 28, Tr. vol. 29, 6:10-14 (Gage), ECF No. 807-2, at 16 (Gage 2018 Rpt.).

[164] ECF No. 812-1, at 10 (Bonner Decl.).

[165] ECF No. 807-2, at 15 (Gage 2018 Rpt.).

[166] *See, e.g.*, *id.* at 58 (After Patient 2 refused to let staff take off his restraints, staff engaged in a planned use of force. Staff contacted a nurse who stated that Patient 2's behavior was not a mental illness, a determination that did not involve any mental health staff), 141 (Staff executed a planned use of force, spraying Patient 29 with chemical spray, after he refused to allow his tray flap to be secure because he did not have his property from medical. Captured on video, Patient 29 was taken out of his cell covered in blood

regular basis"[167] but does not define what "a regular basis" means nor provide any supporting data. His claim is also undermined by the testimony of Defendants' security staff, who admit that de-escalation does not occur.

    D.    <u>Defendants Fail to Provide Adequate Mental Health Treatment Services and Access to Care</u>

There is a lack of essential treatment services at EMCF.[168] EMCF does not follow its own policies requiring the provision of clinically-indicated individual and group therapy to mentally ill patients.[169] Psychosocial and psychoeducational group therapy[170] is a necessary form of treatment to teach patients about mental illness and medications and is very effective with the seriously mentally ill.[171] Individual therapy is also a necessary part of treatment for certain EMCF patients to promote clinical engagement and address issues that cannot be addressed by medications or group therapy, particularly for patients with behavioral problems.[172] Yet there is virtually no individual therapy and extremely limited group therapy at EMCF.[173]

---

as a result of a deep laceration to his torso, one of many instances of self-injury. There was no indication of mental health staff present at the scene and no medical record regarding the incident.).

[167] ECF No. 812-1, at 11 (Bonner Decl.).

[168] *See* Ex. 22, Tr. vol. 23, 20:1-4; 27:6-28:25, 31:23-33:6; Ex. 25, Tr. vol. 26, 46:24-48:14, 86:8-10, 92:3-16, 108:22-25, 110:23-111:5, 113:14-120:25, 130:22-137:10 (Gage); Ex. 33, Tr. vol. 35:14-16 (Arnold); ECF No. 807-2 at 20-29,  App. 1 (Gage 2018 Rpt.) (Patients 2, 3, 6, 8, 12, 14, 16, 17, 18, 19, 27, 28, 29, and 31).

[169] Ex. 25, Tr. vol. 26, 116:23 (Gage); Ex. 76, PTX-1504 at 12, 59 (Gage 2016 Rpt.); ECF No. 807-2, at 22 (Gage 2018 Rpt.) ("no evidence of any patients receiving any psychotherapy").

[170] Treatment groups are targeted to be part of mental health care based on identified mental health needs of EMCF patients. Though correctional programs are offered to EMCF prisoners, including those with mental illness, they are not the equivalent of treatment groups. Ex. 76, PTX-1504, at 41 (Gage 2016 Rpt.); Ex. 25, Tr. vol. 26, 117:20-118:8 (Gage); Ex. 28, Tr. vol. 29, 61:6-8 (Gage).

[171] Ex. 25, Tr. vol. 26, 117:1-6 (Gage), Ex. 98, PTX-2058 (Policy G-04d & G-04e).

[172] Ex. 76, PTX-1504, at 12 (Gage 2016 Rpt.); Ex. 98, PTX-2058 (Policy G-04h) ("counselling/psychoeducation . . . can and often should be used in conjunction with behavioral interventions."); Ex. 25, Tr. vol. 26, 115:9-22 (Gage).

[173] Ex. 76, PTX-1504 at 12, 40 (Gage 2016 Rpt.); Ex. 25, Tr. vol. 26, 115:9-115:16, 117:12-117:13 (Gage); Ex. 154, JTX-68 (2017 audit) ("for many patients in correctional settings group treatment can be a very effective modality," but no groups were being offered by MHPs, and only 10 percent of patients reviewed had evidence of group therapy); Ex. 22, Tr. vol. 23, 27:14-28:25 (Perry) (admitting findings of December 2017 mental health audit); ECF No. 807-2, at 33 (Gage 2018 Rpt.) (many patients in need of "basic individual therapy, or, if willing, appropriate group therapy," none of whom received it).

In addition, EMCF patients are not seen at intervals consistent with their clinical needs.[174] Other than psychiatric prescribers, few of the mental health staff at EMCF engage in any substantial treatment and they typically neglect the treatment needs of the population.[175] For example, "[m]any MHP notes were identical across time. Important errors of fact such as whether a patient was taking medications, history of suicide attempts, and past psychiatric hospitalization were in evidence," and "[t]here is no evidence of any attempt to understand why a patient was behaving the way they were let alone what to do about it other than the ubiquitous plan to 'monitor' the patient, which is clearly not treatment."[176] Defendants admit they do not consistently follow their own policies setting maximum intervals for treatment.[177] Instead, most contacts with mental health clinicians other than psychiatric prescribers are at cell front, in hallways or in common areas, often with custody present, precluding confidentiality.[178] Defendants admit that clinical encounters are not occurring in confidential areas,[179] which undermines treatment and is a violation

---

[174] Ex. 76, PTX-1504, at 12 (Gage 2016 Rpt.); Ex. 25, Tr. vol. 26, 92:3-7, 116:15-17 (Gage).

[175] Ex. 25, Tr. vol. 26, 86:8-10 (Gage); Ex. 76, PTX-1504, at 38 (Gage 2016 Rpt.).

[176] ECF No. 807-2, at 10-11 (Gage 2018 Rpt.).

[177] Ex. 155, JTX-70, Ex. 156, JTX-71, Ex. 153, JTX-72, Ex. 159, JTX-73, Ex. 157, JTX-74, Ex. 158, JTX-75, Ex. 160, JTX-76, Ex. 161, JTX-77, Ex. 162, JTX-78, Ex. 163, JTX-79, Ex. 164, JTX-145, Ex. 165, JTX-146, and Ex. 151, PTX-2818 (CQI reviews) showing that 42 percent of seriously mentally ill prisoners were not seen monthly per policy); Ex. 22, Tr. vol. 23, 20:1-4; 27:6-13 (Perry) (admitting December 2017 mental health audit states that "significant improvements" were still needed at EMCF concerning patients receiving individual treatment every 30 days); Ex. 154, JTX-68 (Dec. 2017 audit) (33 percent of EMCF patients were not seen by the psychiatric provider at the interval per the Centurion contract; EMCF the only facility where mental health caseload prisoners were not seen every 90 days by a provider; 70 percent of LOC-C patients not seen by an MHP every 45 days as required; and "significant improvements are required in conducting 30-day clinical contacts with patients at EMCF").

[178] Ex. 76, PTX-1504, at 10, 48 (Gage 2016 Rpt.); ECF No. 807-2, at 23 (Gage 2018 Rpt.).

[179] Ex. 154, JTX-68 (Dec. 2017 audit) (patients generally seen by psychiatric providers at cell front, rather than in a confidential clinical space, and Unit 3 patient appointments occur in offices, classrooms, hallways, or at tables within the common area); Ex. 32, Tr. vol. 34, 57:14-59:4 (Pickering) (former MHP conducted rounds and appointments cell-side and did not always accommodate prisoners who requested confidentiality).

of EMCF's own policies.[180]

The mere fact that EMCF patients prescribed psychotropic medications are seen by a provider every 90 days does not address the risks created by their not being timely seen at appropriate intervals by MHPs.[181] The MHPs conduct follow up "as needed," which is not "the standard of care for the seriously ill or those at risk of self-harm . . .who often are too ill to desire or ask for follow up, [and] places these patients at undue risk."[182]

A litany of other deficiencies also hinder provision of adequate care to EMCF prisoners: EMCF's "residential mental health treatment unit" (Unit 3) does not provide necessary services for this seriously ill population. Treatment staff does not have sufficient input into the housing of mental health caseload prisoners.[183] The newly-developed Acute Care Unit ("ACU") is too small to materially address the lack of adequate treatment services and mental health housing, and most of the more seriously ill patients at EMCF are not being treated on the ACU.[184]

EMCF patients unnecessarily suffer because of these inadequate services, placing themselves and others at substantial risk of serious harm.[185]

---

[180] Confidentiality is necessary for the open expression of highly personal information, without which it is impossible to identify and address a patient's problems. Ex. 76, PTX-1504, at 47-48 (Gage 2016 Rpt.). Patient privacy is to be maximized per the Centurion policy "Privacy of Care." *Id.* at 48.

[181] Ex. 76, PTX-1504, at 38 (Gage 2016 Rpt.).

[182] *Id.*; *see* Ex. 25, Tr. vol. 26, 92:8-16 (Gage).

[183] ECF No. 807-2, at 20-21 (Gage 2018 Rpt.).

[184] *Id.* at 23-26.

[185] *See, e.g.*, Ex. 22, Tr. vol. 23, 20:1-4; 27:6-31:9, 31:23-33:6 (Perry) (admitting knowledge of problems with mental health services at EMCF); Ex. 154, JTX-68, at 10-23, 26-29 (Dec. 2017 audit) (noting deficiencies in mental health treatment and recommending corrective action); Ex. 101, PTX-2173 (Dec. 2016 audit) (same); Ex. 151, PTX-2818 (demonstrative exhibit) (2017 CQI summary of non-compliance with metric regarding documentation of segregation of prisoners on mental health caseload); Ex. 2, Tr. vol. 3, 17:3-12 (Vail) ("if mentally ill [prisoners] are untreated, they will have a higher incident of assault on staff and on other [prisoners]"); Ex. 25, Tr. vol. 26, 46:24-48:18, 86:6-10, 92:3-16, 108:22-25, 110:22-111:5, 113:11-120:25, 130:19-137:10 (Gage) (discussing risk of harm and actual harm to patients due to failures to provide adequate mental health services); Ex. 76, PTX-1504, at App. 2 (Gage 2016 Rpt.) (identifying risk of harm posed by inadequate mental health services as to Patients 1, 2, 4, 5, 6, 9, 7, 10, 11, 13, 16, 17, 18, 19, 21, 31, and 38); ECF No. 807-2, at 20-29, App. 1 (Gage 2018 Rpt.) (Patients 2, 3, 4, 5, 6, 7, 8, 12, 14, 15, 16, 17, 18, 19, 26, 27, 28, 29, and 31); *see also* Ex. 155, JTX-70, Ex. 156, JTX-71, Ex.

E.    Defendants Hold Mentally Ill Prisoners in Isolation in Lieu of Treatment

Isolation at EMCF consists of housing a prisoner in a single cell for at least 22 hours per day with little or no interaction with other human beings, including mental health care staff. Isolation is used in the medical unit and in Unit 5.[186] Defendants admit that 99 percent of the prisoners in segregation are on the mental health caseload,[187] and 14 percent of the most seriously mentally ill at EMCF are housed in isolation.[188] Defendants also know that the effects of solitary confinement are especially harmful for seriously mentally ill people.[189] Moreover, some EMCF patients suffer from mental illnesses that contraindicate their placement into isolation. These are patients for whom isolation will make their illnesses worse and decrease the likelihood of a response to treatment. And there is a consensus[190] that seriously mentally ill prisoners should be excluded from long-term isolation.[191] Yet EMCF still houses them in isolation.[192]

EMCF also does not follow its own policy requiring mental health staff to be notified and to assess patients placed in segregation.[193] The policy is necessary to prevent prisoners who are

---

153, JTX-72, Ex. 159, JTX-73, Ex. 157, JTX-74, Ex. 158, JTX-75, Ex. 160, JTX-76, Ex. 161, JTX-77, Ex. 162, JTX-78, Ex. 163, JTX-79, Ex. 164, JTX-145, Ex. 165, JTX-146 (2017 CQI studies).

[186] Ex. 25, Tr. vol. 26, 100:15-25 (Gage).

[187] Ex. 154, JTX-68 (Dec. 2017 audit).

[188] ECF No. 807-2, at 33 (Gage 2018 Rpt).

[189] Ex. 32, Tr. vol. 34, 61:6-10 (Pickering).

[190] The American Bar Association Standard #23-2.8 states that "[n]o prisoner diagnosed with serious mental illness should be placed in [solitary confinement]." Ex. 77, PTX-1506, at 36 (Kupers 2016 Rpt.). The American Psychiatric Association states that "[p]rolonged segregation of adult [prisoners] with serious mental illness, with rare exceptions, should be avoided due to the potential for harm to such [prisoners]." *Id.* at 37.

[191] *See* Ex. 77, PTX-1506, at 32 (Kupers 2016 Rpt.); Ex. 15, Tr. vol. 16, 62:11-63:4 (Kupers).

[192] Ex. 15, Tr. vol. 16, 31:15-35:5, 46:20-48:7, 48:22-50:12, 61:2-62:12 (Kupers); Ex. 17, Tr. vol. 18, 74:22-77:10 (Dockery); Ex. 21, Tr. vol. 22, 51:12-68:9 (Hickman-Estes); Ex. 25, Tr. vol. 26, 50:15-51:22, 98:11-113:10 (Gage); Ex. 28, Tr. vol. 29, 10:6-16 (Gage); Ex. 76, PTX-1504, at App. 2 (Gage 2016 Rpt.) (Patients 8, 10, 30, and 38) (all acutely ill men placed in isolation for months despite being acutely ill and contraindicated for placement; clinical deterioration in isolation evidenced by increasing psychosis, hallucinations, delusions, and repeated assaultive and self-injurious behavior); ECF No. 807-2 at 33, App. 1 (Gage 2018 Rpt.) (Patients 3, 18, 27, and 29) (similar).

[193] Ex. 25, Tr. vol. 26, 104:16-105:17 (Gage).

contraindicated from going into segregation.[194] Even if it were followed, the itself is inadequate because it allows the assessment to occur up to 30 days after placement in isolation, exposing that patient to unreasonable risk.[195] The evaluations that do occur are non-confidential, cell-side interviews that are inadequate to determine if placement is contraindicated.[196]

Seriously mentally ill EMCF prisoners in restrictive housing are rarely properly assessed.[197] Mental health services in isolation are limited to crisis response, medication administration, and occasional visits with a psychiatric prescriber. Other forms of treatment, which are required by the Centurion contract and basic clinical standards, are not provided.[198] Most clinical contacts in isolation are brief rounds conducted by mental health staff at a patient's cell door. These are inadequate to assess patients for possible deterioration or to treat patients.[199] MHPs also spend very little time on the housing units.[200] Defendants' own internal studies document these systemic problems with mental health services in isolation.[201]

Due to these deficiencies, seriously mentally ill prisoners, including acutely ill prisoners,

---

[194] Ex. 25, Tr. vol. 26, 105:11-13 (Gage).

[195] Ex. 100, PTX-2078, at 2 (MDOC Offender Segregation Policy); Ex. 28, Tr. vol. 29, 66:14-22 (Gage) (beyond 72 hours, people in isolation begin to have deterioration of their mental health, even those without mental illness).

[196] Ex. 15, Tr. vol. 16, 64:12-66:23, 68:8-15 (Kupers).

[197] Ex. 76, PTX-1504, at 13 (Gage 2016 Rpt.); ECF No. 807-2, at 34 (Gage 2018 Rpt.).

[198] Ex. 76, PTX-1504, at 46 (Gage 2016 Rpt.).

[199] Ex. 11, Tr. vol. 12, 20:14-21:20 (Grogan); Ex. 14, Tr. vol. 15, 62:9-63:5 (Melton); Ex. 25, Tr. vol. 26, 101:1-12 (Gage).

[200] ECF No. 807-2, at 34 (Gage 2018 Rpt.) (MHPs spent on average seven minutes on the unit for a two-week survey period).

[201] Ex. 155, JTX-70, Ex. 156, JTX-71, Ex. 153, JTX-72, Ex. 159, JTX-73, Ex. 157, JTX-74, Ex. 158, JTX-75, Ex. 160, JTX-76, Ex. 161, JTX-77, Ex. 162, JTX-78, Ex. 163, JTX-79, Ex. 164, JTX-145, Ex. 165, JTX-146 (2017 CQI studies) (showing that mental health staff was not notified when caseload prisoners were placed in segregation 64 percent of the time; and segregation rounds were not performed thrice weekly 32 percent of the time); Ex. 154, JTX-68, at 22-25 (Dec. 2017 contract compliance review) (showing that EMCF MHPs were not consistently providing 30-day individual contacts, and EMCF patients were held in an acute setting "for extended periods of time"); *see also* Ex. 32, Tr. vol. 34, 47:18-49:3, 60:2-15; 60:22-61:10 (Pickering) (EMCF counselor admitting he conducted segregation rounds weekly cell-side, and that even prisoners who are not mentally ill might develop symptoms after being held in segregation for a long time).

are regularly housed in isolation conditions that exacerbate their illnesses.[202] In the past year, these patients include Patient 27, who has a history of psychosis and suicide attempts, and was routinely subject to use of force in isolation for violence against officers and other prisoners. On one occasion, he was placed in isolation with no clothing. On another occasion, while being transported to isolation, Patient 27 attempted to resist transfer by continuously banging his head on the cell door, resulting in injuries.[203] No consideration was ever given to whether isolation was contraindicated, and he "was allowed to simply languish with deteriorating self-care while in restrictive housing."[204] Another psychotic patient, Patient 3, refused to leave the medical unit to return to Unit 5 even after being sprayed three times with chemical spray. He was forcibly returned to Unit 5 even though he remained floridly ill after being involuntarily medicated. He "remained psychotic and [] refus[ed] medications" after returning to isolation.[205]

There is no evidence in EMCF records that a single patient has been diverted from isolation due to their mental illness, despite the fact that nearly every prisoner Plaintiffs' expert on isolation spoke with suffered from a mental illness and exhibited the signs and symptoms of mental decompensation associated with solitary confinement.[206] This failure to consistently conduct assessments, divert appropriately, and refer the mentally ill for assessment and treatment is a source of potential and actual harm.[207]

Defendants failed to present credible evidence rebutting Plaintiffs' evidence as to the

---

[202] ECF No. 807-2, at 34-35 (Gage 2018 Rpt.) (describing 11 patients placed in isolation during 2018, including two stripped of clothing and placed on suicide precautions in Unit 5); Ex. 76, PTX-1504, App. 2 (Gage 2016 Rpt.) (identifying risk of harm posed by isolation as to Patients 8, 10, 30, and 38).

[203] *See* ECF No. 807-2, at 127-33 (Gage 2018 Rpt.).

[204] *Id.* at 132.

[205] *Id.* at 34-35, 60-62.

[206] Ex. 15, Tr. vol. 16, 61:2-62:12 (Kupers); *see also* Ex. 77, PTX-1506, at 41-46 (summaries of Dr. Kupers' illustrative 2016 interviews with eight mentally ill prisoners in isolation).

[207] Ex. 15, Tr. vol. 16, 19:23 (Kupers) (the degree of self-harm by prisoners in isolation at EMCF is unheard of in a facility housing adult men).

deficient treatment of the Mental Health Subclass in isolation. Dr. Bonner provided no data or studies on the services by the MHP newly assigned to Unit 5,[208] nor did he dispute Plaintiffs' experts' findings as to any of the isolation patients whose care they found inadequate.

F.    Defendants Fail to Provide Appropriate Mental Health Housing

A residential treatment unit is a unit set aside for people with mental illness, intellectual disabilities, or dementia.[209] These units reduce the risk of victimization and facilitate treatment by aggregating seriously mentally ill patients.[210] Such units almost always require specialized programming to limit isolation and increase treatment adherence. This is expressly provided for in Centurion's policy "Basic Mental Health Services," but has not been implemented at EMCF.[211]

At EMCF, Unit 3 is called a "residential unit" and houses the largest percentage of patients in the state with serious mental illness, holding approximately 225 patients.[212] Unit 3 offers services that are virtually indistinguishable from those in other units and runs no differently.[213] The unit is bereft of any special services, such as basic rehabilitation or structured activities. Patients spend almost all of their time in their cells or in the dayroom. Defendants admit that Unit 3 does not provide necessary specialized services.[214] Staffing is not sufficient in Unit 3 to ensure

---

[208] ECF No. 812-1 ¶¶ 51-53 (Bonner Decl.).

[209] Ex. 25, Tr. vol. 26, 130:19-131:13 (Gage).

[210] *Id.*

[211] Ex. 76, PTX-1504, at 60 (Gage 2016 Rpt.).

[212] ECF No. 807-2, at 22 (Gage 2018 Rpt.); *see also* Ex. 154, JTX-68, at 26 (Dec. 2017 audit); ECF No. 812-1 ¶¶ 15(c) (Bonner Decl.).

[213] ECF No. 807-2, at 23 (Gage 2018 Rpt.) ("[M]ost patients receive nothing other than medications and occasional brief contacts with an MHP and live in a chaotic, unstructured, counter-therapeutic setting.").

[214] Ex. 25, Tr. vol. 26, 132:12-23, 133:5-8 (Gage); Ex. 76, PTX-1504, at 61 (Gage 2016 Rpt.); Ex. 154, JTX-68, at 27 (Dec. 2017 contract compliance review) (showing that none of the surveyed Unit 3 patients had an admission assessment confirming the need for placement in the unit; two-thirds did not have adequate treatment plans; none had individual counselling provided every 30 days, or out-of-cell clinical contacts; one-third of the clinical contacts failed to identify the interventions provided to the patient; three-quarters of progress notes failed to identify the patient's progress towards goals in the treatment plan; and three-quarters of patients were not participating in group therapy).

that all patients have access to intensive services including individual and group therapy.[215] Though Dr. Perry claims that the unit is now fully staffed with mental health professionals, she also could not produce documentation to substantiate that claim.[216]

Structured treatment programs, including group treatment and other programming and education, are effective in delivering useful treatment while reducing unstructured time.[217] But this service is not provided in Unit 3. Unstructured time in Unit 3 places both patients and staff at risk from assaults by other prisoners, and increases isolation, resulting in patients becoming steadily more preoccupied with their symptoms, leading to further deterioration and more problem behaviors including "altercations, stabbings, property destruction, and self-harm."[218]

The Acute Care Unit (ACU) opened in February 2018, has only fourteen beds, far too few to substantially impact the needs of seriously ill EMCF patients.[219] Many of the patients housed on Unit 3 meet the admission criteria for the ACU, and would benefit from the services that are supposed to be provided there, but have no access to them.[220] Because the ACU does not provide hospital-level care, Defendants also exclude from the ACU anyone who might require it, such as those who pose a danger to themselves or others.[221] While excluding those who are imminently dangerous is reasonable, these broad criteria also exclude patients who do not pose an imminent threat, instead condemning them to long-term placement in isolation in Unit 5 and the medical unit, where Defendants provide them "dangerously substandard care."[222] As a result, the ACU treats patients who have less severe illnesses, or who have stabilized, rather than the acutely ill

---

[215] Ex. 154, JTX-68, at 26, 28 (Dec. 2017 audit).
[216] Ex. 22, Tr. vol. 23, 31:23-33:6 (Perry).
[217] Ex. 25, Tr. vol. 26, 108:22-25, 110:22-111:5 (Gage).
[218] ECF No. 807-2, at 21-22 (Gage 2018 Rpt.); Ex. 76, PTX-1504, at 61 (Gage 2016 Rpt.).
[219] ECF No. 807-2, at 23 (Gage 2018 Rpt.).
[220] *Id.*
[221] *Id.*
[222] *Id.* at 24.

who need intensive treatment the most.[223] Nor is the ACU is providing the frequency or quality of services it was designed to provide: there is no individual therapy or psychoeducation programing and only half of the hours of structured therapy that is the national consensus for such programs.[224]

Finally, the medical unit is essentially run as a restrictive housing unit.[225] Many of those who are placed in the medical unit because they are suicidal and suffering acute decompensation from a psychotic or mood disorder will worsen under such conditions.[226] Some acutely ill patients stay in the medical unit for many months.[227] One acutely-ill patient (Patient 19) remained in the medical unit for a year, suffering from bouts of mania and severe agitation that were not relieved by repeated involuntary injections. He was isolated, without any structured treatment, which likely contributed to his deterioration and put him at "serous long term risk."[228] As of last October he remained in the medical unit, where he was malodorous, "staring, rocking, [and] intense," and "exhibited thought blocking [and] magical thinking."[229]

Exacerbating these problems, mental health staff spend very little time on the units and patients are almost always without any structured activities or direct supervision.[230] Mental health staff also does not have sufficient input over patient placement into mental health settings, specifically placement in Unit 3 and exclusion of contraindicated patients from isolation housing in Unit 5, resulting in many seriously mentally ill being housed in inappropriate and restrictive

---

[223] *Id.*

[224] *Id.* at 26.

[225] *Id.* at 27.

[226] Ex. 76, PTX-1504, at 61 (Gage 2016 Rpt.); ECF No. 807-2, at 36 (Gage 2018 Rpt.) ("While placement in . . . HU-5 is [] patently non-therapeutic . . . , the infirmary is, in some ways worse. Patients . . . are just as isolated or more so. They have no activities and [no] yard. . . . This is extremely counter-therapeutic.").

[227] ECF No. 807-2, at 35 (Gage 2018 Rpt.).

[228] *Id.* at 114.

[229] *Id.* at 107, 114.

[230] *See, e.g.*, ECF No. 807-2, at 24 (Gage 2018 Rpt.) (noting MHPs spending less than 11 minutes on average in Unit 3); Ex. 16, Tr. vol. 17, 5:15-6:12, 8:19-10:6, 18:13-17 (Kupers) (describing conditions on Unit 5); Ex. 21, Tr. vol. 22, 32:14-34:7, 34:13-35:17 (Long) (same); Ex. 10, Tr. vol. 11, 96:16-97:6, 98:1-99:7 (Grogan) (same).

settings.[231] Dr. Bonner states that since June 2018 mental health staff "have full control over admission to and discharges from the Acute Care Unit (ACU),"[232] but Plaintiffs have never claimed otherwise. Rather, Plaintiffs have shown, including through Defendants' admissions, that EMCF mental health staff does not control placement *into Unit 3* or *out of Unit 5*, not the ACU.[233]

In sum, mental health treatment requires clean, well-organized settings that function according to expectations; the conditions on EMCF's living units frustrate that need, placing the Mental Health Subclass at substantial risk of serious harm.[234]

G.   Defendants Employ Inadequate Involuntary Mental Health Treatment Practices

Involuntary treatment is essential to properly manage some with serious mental illness.[235] Involuntary treatment at EMCF is both not provided when needed and provided (without adequate safeguards) when it is not indicated.[236] In addition, though authorized by EMCF policy, clinical restraints are not used at EMCF.[237] The judicious use of clinical restraints is sometimes necessary to provide crisis services to dangerous patients who cannot be controlled by other treatments.[238]

---

[231] Ex. 25, Tr. vol. 26, 133:14-19 (Gage); Ex. 28, Tr. vol. 29, 7:17-8:4, 11:22-12:4 (Gage); Ex. 76, PTX-1504, at 10, 39-40 (Gage 2016 Rpt.); ECF No. 807-2, at 13, 22 (Gage 2018 Rpt.) (as of November 2018, 22 percent of LOC-D patients were not housed in Unit 3/ACU/Infirmary, though they are supposed to be housed there, and 14 percent are in isolation); *id.* at 21 ("Medical records continued to demonstrate that custody staff determine placement., even to residential treatment units . . . . [and] demonstrated that patients with acute psychosis who did very poorly in restrictive housing were nonetheless placed there."). Defendants admit this is a problem. Ex. 154, JTX-68, at 26 (Dec. 2017 contract compliance review) (patient movement into and off of Unit 3 is "typically determined by security staff often without input from the mental health providers;" further, "[a]lthough all patients with a LOC-D designation at EMCF should ideally be housed in Unit 3, this was not the case").
[232] ECF No. 812-1 ¶¶ 1, 41 (Bonner Decl.).
[233] *See, e.g.*, ECF No. 807-2, at 21-22 (Gage 2018 Rpt.).
[234] Ex. 15, Tr. vol. 16, 77:6-22 (Kupers); ECF No. 807-2, at 23 (Gage 2018 Rpt.). Living units, including Unit 3, remain chaotic, dangerous, and patently non-therapeutic. ECF No. 807-2, at 23 (Gage 2018 Rpt.) (describing Unit 3), 26 (ACU), 28 (infirmary), 36 (Unit 5), 123 (same), 141 (same); Ex. 13, Tr. vol. 14, 53:13-55:11 (Donald) (unit manager admits there were 66 fires set on Unit 5 in a two month period).
[235] Ex. 76, PTX-1504, at 11 (Gage 2016 Rpt.).
[236] *Id.* at 11, 26; ECF No. 807-2, at App. 1 (Gage 2016 Rpt.) (describing involuntary medication or medication without informed consent of Patients 3, 18, and 19).
[237] Ex. 76, PTX-1504, at 29-31 (Gage 2016 Rpt.); Ex. 25, Tr. vol. 26, 129:19-130:1 (Gage).
[238] *See, e.g.*, Ex. 25, Tr. vol. 26, 129:19-130:1 (Gage).

41

Because clinical restraints are not used at EMCF, acutely ill EMCF patients do not receive necessary crisis treatment, and harm themselves even when they are on watch.[239]

### H.   Defendants Employ Dangerous Psychotropic Medication Practices

EMCF employs substandard and dangerous medication practices.[240] This includes lack of a process for long-term involuntary antipsychotic administration, inappropriate use of emergency and routine antipsychotics, starting medications at excessively high doses, and poor medication monitoring.[241] These deficiencies have harmed and create a risk of harm for EMCF patients.[242] In addition, psychotropic medications are often distributed when prisoners are asleep, and no effort is made to wake the prisoners or distribute the medication at some other time.[243] And EMCF fails to reliably treat patients who refuse their psychotropic medications placing patients, other prisoners, and staff at risk of harm related to under-treated mental illness.[244] EMCF also fails to reliably monitor psychotropic medication adherence because MARs are "almost never complete" and "highly suspect."[245]

Defendants admit that medication non-compliance is not appropriately handled at

---

[239] *See, e.g.*, Ex. 25, Tr. vol. 26, at 130:11-130:14 (Gage).

[240] *See, e.g.*, ECF No. 807-2, at 30-34 (Gage 2018 Rpt.).

[241] Ex. 76, PTX-1504, at 13, 62-63 (Gage 2016 Rpt.); Ex. 25, Tr. vol. 26, 122:23-124:8 (Gage) (medications started at doses above industry standards and multiple medications begun at the same time in violation of community standards placed patients at risk of harm and caused actual harm); Ex. 25, Tr. vol. 26, 126:16-21 (Gage) (failure to detect and address medication non-compliance); ECF No. 807-2, at 30 (Gage 2018 Rpt.) (medications started at two and three times the industry recommendation).

[242] *E.g.,* ECF No. 807-2, App. 1 (Gage 2018 Rpt.) (identifying risk of harm posed by psychotropic medication practices as to Patients 2, 3, 4, 5, 7, 8, 12, 14, 16, 18, 19, 20, 25, 27, 28, and 30); Ex. 76, PTX-1504, App. 1 (Gage 2016 Rpt.) (Patients 1, 2,5, 6, 8, 9, 16, and 38).

[243] Ex. 14, Tr. vol. 15, 90:7-13 (Mitchell); Ex. 16, Tr. vol. 17, 90:15-91:16; 93:4-94:8; 96:17-97:11 (Hill); ECF No. 807-2, at 33 (Gage 2018 Rpt.) ("The psychiatrist confirmed that medications were sometimes coming late but rarely after midnight.").

[244] Ex. 76, PTX-1504, at 33, App. 1 (Patients 8, 9, and 17 grew more symptomatic and assaultive after medication non-compliance went unaddressed); Ex. 25, Tr. vol. 26, 77:19-78:9, 126:16-21 (Gage); ECF No. 807-2, at 15 (Gage 2018 Rpt.) ("There are well-established methods of working with this population of medication refusers. There was no evidence of any attempt to employ these methods.")

[245] ECF No. 807-2, at 33 (Gage 2018 Rpt.); *see also* Ex. 76, PTX-1504, at 32 (Gage 2016 Rpt.).

EMCF.[246] For example, psychotropic medications can cause serious side effects and adverse effects and need to be monitored.[247] But routine medication monitoring is inconsistent at EMCF, and not compliant with policy.[248] Monitoring is also very spotty for common adverse reactions. There were almost no instances where there was evidence of appropriate baseline laboratories and other studies (such as an EKG) being ordered prior to the inception of medication treatment.[249] Other standard laboratory studies necessary to diagnose EMCF patients are not performed.[250]

Finally, though EMCF policy provides a process for administering long-term involuntary psychotropic medications consistent with *Harper v. Washington*, 494 U.S. 210 (1990), that process is not utilized at EMCF.[251] Defendants admit EMCF patients receive long-acting psychotropic medications without their consent, and without a clear clinical rationale for the use of involuntary

---

[246] Ex. 155, JTX-70, Ex. 156, JTX-71, Ex. 153, JTX-72, Ex. 159, JTX-73, Ex. 157, JTX-74, Ex. 158, JTX-75, Ex. 160, JTX-76, Ex. 161, JTX-77, Ex. 162, JTX-78, Ex. 163, JTX-79, Ex. 164, JTX-145, Ex. 165, JTX-146 (2017 QI studies) (showing zero percent compliance with policy requirement that there is a documented provider notification after three refusals of medication); Ex. 22, Tr. vol. 23, 108:22-110:11 (Perry) (admitting that four of the metrics for medication administration in the December 2017 CQI report are below the required 90 percent, including all doses documented appropriately (4 percent) and missed doses documented appropriately (zero percent); *id.* at 110:7-9 (Perry) (admitting that overall compliance for medication monitoring is a "problem area.").

[247] Ex. 25, Tr. vol. 26, 121:1-24 (Gage).

[248] ECF No. 807-2, at 30-31 (Gage 2018 Rpt.) (inconsistent medication monitoring and policy non-compliance).

[249] Ex. 25, Tr. vol. 26, 123:4-23 (Gage); *see also* Ex. 76, PTX-1504, at 63 (Gage 2016 Rpt.) (Patients 1, 2, 5, 8, 13, 16, 18, 31, and 32 had inadequate laboratory monitoring); Ex. 25, Tr. vol. 26, 124:2-10, 125:5-19 (Gage) (discussing Patient 6). There was no follow-up when laboratories demonstrated abnormalities. These abnormalities can represent life-threatening reactions to certain medications. *See* Ex. 76, PTX-1504, at 63 (Gage 2016 Rpt.). Dr. Bonner asserts that EMCF has instituted a "recent change" to protocol to improve timely lab monitoring, but presents no evidence of its effectiveness. ECF No. 812-1 ¶ 48 (Bonner Decl.).

[250] These assessments are necessary in cases of cognitive decline of unknown etiology and in some cases of new onset psychosis, among other less common conditions. Failure to properly diagnose such conditions places patients at unreasonable risk, and may lead to inappropriate or ineffective pharmacological treatment. It also leads to failure to adopt appropriate behavioral measures to address associated dangerous or other problem behaviors. *See* Ex. 76, PTX-1504, at 33 (Gage 2016 Rpt.).

[251] *See, e.g.*, Ex. 25, Tr. vol. 26, 78:20-79:21, 129:13-18 (Gage); Ex. 76, PTX-1504, at 26 (Gage 2016 Rpt.); Ex. 154, JTX-68, at 26 (Dec. 2017 audit) (failure to comply with involuntary medications policy); ECF No. 812-1 ¶ 47 (Bonner Decl.) (admitting no *Harper* hearing process in place); ECF No. 807-2, at 30 (Gage 2018 Rpt.).

medications.[252] Meanwhile, other EMCF patients who require involuntary medications do not receive them, placing them and others at risk.[253]

    I.    <u>Defendants' Suicide Prevention Practices are Dangerously Substandard</u>

Dangerously substandard suicide prevention practices persist at EMCF. Suicide assessments and associated plans for reducing risk among suicidal prisoners, as is monitoring of suicidal patients.[254]  The prison is rife with obvious and readily available means for prisoners to harm themselves.  None of the living units are suicide-proof, and there are numerous anchor points (objects or fixtures that a prisoner could use to hang himself) and a variety of other hazards, including breakable fixtures.[255] Defendants fail to restrict access to potentially lethal objects even for patients on suicide watch, including one patient who had a 33-inch piece of rebar.[256] As a result there has been an abundance of preventable injury and at least one preventable suicide at EMCF.[257]

As noted, mental health clinicians do not conduct adequate suicide risk assessments.[258] Failing to complete such an assessment substantially increases the risk of harm, which is evident

---

[252] Ex. 154, JTX-68 (Dec. 2017 audit) (patients given involuntary medications without physician order or clear clinical rationale, and extending beyond 72 hours, in violation of policy)*; Ex. 25, Tr. vol. 26, 51:25-52:11, 53:19-54:5 (Gage) (improper involuntary medication use for Patient 9); ECF No. 807-2, at 30 (Gage 2018 Rpt.) (documenting eight patients who "received antipsychotic injections without sufficient clinical justification.").

[253] Ex. 76, PTX-1504 at 27-28, App. 1 (Gage 2016 Rpt.) (Patients 8 and 9 grew assaultive and clinically deteriorated after refusing medications); Ex. 25, Tr. vol. 26, 73:16-76:18, 80:6-81:20, 127:14-127:23 (Gage) (patient SIB and assaults after decompensating from medication non-compliance).

[254] ECF No. 807-2, at 18-21 (Gage 2018 Rpt.).

[255] Ex. 13, Tr. vol. 14, 66:21-67:17, 69:1-12, 71:20-72:3, 74:20-75:1 (Donald) (only one of 120 light fixtures in segregation unit replaced with suicide resistant model; prisoners regularly injure themselves in segregation but remain in that unit); Ex. 60, PTX-1005 (Jan. 21, 2016 report), Ex. 69, PTX-1271 (Apr. 16, 2017 report), Ex. 133, PTX-2705 (May 31, 2017 report) (prisoners injuring themselves in segregation with various hazards); ECF No. 807-2, at 20 (Gage 2018 Rpt.) (noting anchor points in both the old and new light fixtures, and exposed lightbulbs that have been used by prisoners to cut themselves).

[256] *See, e.g.*, ECF No. 807-2, at 20 (Gage 2018 Rpt.).

[257] *See id.*; Ex. 76, PTX-1504, at 65-70 (Gage 2016 Rpt.).

[258] Ex. 76, PTX-1504, at 65 (Gage 2016 Rpt.); Ex. 28, Tr. vol. 29, 33:7-8 (Gage); ECF No. 807-2, at 18 (Gage 2018 Rpt.).

in the profound degree of SIB seen at EMCF.[259] These substandard suicide prevention practices have placed EMCF prisoners at unreasonable risk. For example, last year, one patient told a nurse he had auditory hallucinations telling him to kill himself, but was not seen by a provider for more than three weeks; at that time, no suicide risk assessment was performed.[260] Another was placed on watch status in the medical unit after cutting himself, but did not receive a suicide risk assessment. Four days after he was released, he threatened to hang himself, but was placed back in restrictive housing, again with no suicide risk assessment or plan to address his suicidal ideation.[261] The risk of these gross deficiencies in suicide prevention manifested with a third prisoner who successfully committed suicide.[262] Staff documented his repeated instances of severe self-harm,[263] but there is no evidence he had any treatment other than medications, which were discontinued shortly before his suicide. The patient did not receive a careful suicide risk assessment, a thorough mental health assessment, or appropriate behavioral and therapeutic interventions. The care of this patient was grossly substandard in light of known serious risks.[264]

Defendants presented very limited rebuttal evidence regarding suicide prevention. Dr. Bonner asserts that "treatment plans . . . do address self-harming behavior."[265] But he presents no data or internal reviews supporting his testimony, how many such treatment plans exist, and how many patients who engage in SIB have such treatment plans.[266] Dr. Bonner admits that more work

---

[259] Ex. 76, PTX-1504, at 66 (Gage 2016 Rpt.); Ex. 28, Tr. vol. 29, 33:16-35:16 (Gage); ECF No. 807-2, at 18-21 (Gage 2018 Rpt.).

[260] ECF No. 807-2, at 93-97 (Gage 2018 Rpt.) (Patient 16).

[261] *Id.* at 138-43 (Gage 2018 Rpt.) (Patient 29).

[262] Ex. 28, Tr. vol. 29, 37:24-38:20 (Gage) (Patient 10).

[263] *E.g.*, Ex. 61, PTX-1018 (Feb. 29, 2016 report), Ex. 62, PTX-1022 (Mar. 4, 2016 report), Ex. 114, PTX-2425 (June 16, 2015 report), Ex. 122, PTX-2546 (Mar. 6, 2016 report).

[264] Ex. 28, Tr. vol. 29, 39:25-40:14 (Gage); Ex. 76, PTX-1504, at 69 (Gage 2016 Rpt.); Ex. 5, Tr. vol. 6, 94:19-99:10, 101:14-20 (Hogans) (deputy warden admitting that a suicide attempt "requires immediate action" but EMCF's response to a suicide took "more than five minutes"); Ex. 63, PTX-1027 (Apr. 4, 2016 report).

[265] ECF No. 812-1 ¶ 38 (Bonner Decl.).

[266] *See id.* ¶¶ 37-39.

needs to be done on treatment plans for SIB, and claims this will be the responsibility of a Clinical Director, who had not begun work at EMCF as of December 21, 2018.[267]

Dr. Bonner states that the medical unit has "sufficient beds to house all prisoners who should be on suicide watch," but does not dispute that Dr. Gage identified two patients who were both placed on watch outside the medical unit in 2018, demonstrating inadequate capacity.[268] Dr. Bonner also states that providers conduct mental health rounds in the medical unit,[269] but Dr. Gage acknowledges this in his report.[270] The problem is MHPs and nursing staff do not conduct rounds consistently, provider rounds are not consistently documented, and MHP rounds are "cursory and virtually never included any therapeutic interaction [and,] in the vast majority of cases," patients were examined as if they had normal mental states, "even for patients who had well documented grossly abnormal mental status exams."[271] Dr. Bonner does not dispute this evidence, or Dr. Gage's conclusion that MHP rounds are "unreliable and virtually worthless."[272]

J.     Defendants Discipline Prisoners for Behavior that is the Product of Mental Illness

Defendants continue to punish patients who engage in SIB. This acts as a deterrent to access to care and undermines the therapeutic alliance between mental health staff and patient, thus endangering the patient.[273] These practices have been condemned by correctional mental health

---

[267] *See id.* ¶¶ 14, 39.

[268] *Compare id.* ¶ 43-44 *with* ECF No. 807-2, at 29 (Gage 2018 Rpt.).

[269] ECF No. 812-1 ¶ 45 (Bonner Decl.).

[270] *See* ECF No. 807-2, at 29 (Gage 2018 Rpt.).

[271] *Id.*; *see also id.* at 113 (Patient 19's infirmary records lacked nursing notes for 12 days over a span of 29 days, including eight days in a row), 130 (Patient 27 was never seen by a mental health provider during a week-long stay in the infirmary), 136 (Patient 28's infirmary records lacked a nursing admission note, nursing notes for ten out of 14 days, and no discharge note).

[272] *See generally* ECF No. 812-1 (Bonner Decl.); ECF No. 807-2, at 29 (Gage 2018 Rpt.).

[273] *See, e.g.*, Ex. 21, Tr. vol. 22, 22:6-23:12 (Shaw) (admitting that prisoners at EMCF receive punitive rule violation reports for self-injurious behavior); Ex. 137, PTX-2780 (compilation of rule violation reports ("RVRs")) (several for self-mutilating and SIB; Ex. 138, PTX-2783 (Sept. 2, 2016 RVR), Ex. 139, PTX-2784 (Aug. 27, 2016 RVR), Ex. 140, PTX-2785 (July 14, 2016 RVR), Ex. 141, PTX-2786 (Aug. 18, 2016 RVR), Ex. 142, PTX-2787 (Aug. 27, 2016 RVR), Ex. 143, PTX-2788 (Dec. 11, 2016 RVR), Ex. 144, PTX-

bodies such as NCCHC and the American Psychiatric Association.[274]

Dr. Bonner says that EMCF patients are not punished for behavior that is the product of mental illness but presents no data, internal reviews, or records to support his assertion.[275] Dr. Bonner also does not dispute Plaintiffs' evidence of numerous disciplinary and segregation records that show no involvement of mental health staff in discipline of seriously mentally ill patients[276]

### K.   Defendants Fail to Provide Adequate Access to Hospital-Level Care

There is no access to hospital-level care for the most seriously ill EMCF patients.[277] EMCF does not provide that level of care, and does not transfer patients to off-site hospitals.[278] Defendants thus do not follow their own policy requiring "access to clinically indicated healthcare services that are not available in the facility" and that "[p]atients who meet mental health involuntary commitment criteria are recommended for transfer to an appropriate psychiatry hospital."[279]

EMCF also does not abide by its policy requiring patients on watch status for more than 72 hours be hospitalized unless there is a documented "clinical justification for continuing the patient's treatment at the institution."[280] Defendants admit this is a serious problem.[281]

---

2789 (Jul. 21, 2016 RVR), Ex. 145, PTX-2790 (Dec. 14, 2016 RVR), Ex. 109, PTX-2300 (Nov. 9, 2016 RVR), Ex. 110, PTX-2305 (Nov. 3, 2016 RVR) (showing discipline for self-harm).

[274] Ex. 76, PTX-1504, at 44 (Gage 2016 Rpt.); Ex. 28, Tr. vol. 29, 16:1-16 (Gage); ECF No. 807-2, at 36 (Gage 2018 Rpt.).

[275] *See* ECF No. 812-1 ¶ 53 (Bonner Decl.).

[276] *See, e.g.*, ECF No. 807-2, at 35 (Gage 2018 Rpt.).

[277] *See id.*

[278] Ex. 76, PTX-1504, at 39 (Gage 2016 Rpt.); Ex. 28, Tr. vol. 29, 20:8-11 (Gage); *id.* at 17:16-19:17 (Gage) (deficient EMCF mental health services result in patients deteriorating to the point where they need to be hospitalized); ECF No. 807-2, at 36 (Gage 2018 Rpt.).

[279] Ex. 76, PTX-1504, at 39 (Gage 2016 Rpt.); *see also* Ex. 98, PTX-2058, at D-05 (EMCF healthcare policies and procedures). This policy is not followed at EMCF. Acutely ill patients suffer at EMCF as a result, and place others at risk. *See* Ex. 76, PTX-1504, at 39 (Gage 2016 Rpt.); Ex. 28, Tr. vol. 29, 20:8-14 (Gage); Ex. 25, Tr. vol. 26, 46:24-47:8, 52:12-54:11 (Gage) (describing failure to hospitalize Patient 9, who later assaulted staff); Ex. 25, Tr. vol. 26, 81:11-83:6 (Gage) (failure to hospitalize Patient 8); Ex. 28, Tr. vol. 29, 21:17-22:4 (Gage) (discussing risks from failing to hospitalize).

[280] Ex. 76, PTX-1504, at 39 (Gage 2016 Rpt.).

[281] Ex. 22, Tr. vol. 23, 34:1-38:23 (Perry) (admitting patients at EMCF are held on watch or observation for an average of 22 days, without documented consideration for hospitalization); Ex. 154, JTX-68, at 24 (Dec.

As a result, acutely ill EMCF patients in need of hospitalization suffer needlessly. They grow more symptomatic, engage in violent altercations and acts of self-harm, are subject to multiple instances of emergency involuntary treatment after crises, and are housed in isolation that predictably makes them more ill.[282] As of last October, one of these men was housed in Unit 5, where he "remained floridly psychotic and had grandiose and paranoid delusions, . . . believ[ing] he was Jesus Christ and could control light and raise the dead,"[283] and threatened to "kill people . . . with magic."[284] EMCF's failure to hospitalize this patient "represents a serious risk in terms of his future functional ability and likely response to treatment."[285]

### L.   Defendants Fail to Provide Adequate Mental Health Staffing

Mental health staffing is inadequate to serve the needs of the Mental Health Subclass and many of the staff do not possess the skill needed to serve the seriously mentally ill.[286] Staffing should be based on a plan assessing the treatment needs of EMCF patients,  but no such staffing plan exists at EMCF.[287] The caseloads for MHPs assigned to Unit 3, the so-called residential treatment unit, are particularly unreasonable; they range up to 104 or 112 patients per MHP, where industry standard is only 30 patients.[288] Essential mental health services are virtually absent as a

---

2017 audit) (patients with three week stays on observation without hospitalization), 25 ("[i]f crises are lasting two weeks and beyond without stabilization, staff should be referring the patient to a more suitable treatment location or demonstrating attempts at intensive treatment interventions beyond 'observation'").

[282] ECF No. 807-2, at 36 (Gage 2018 Rpt.) (two "grossly psychotic and unstable" patients needing hospitalization who remained in isolation in medical unit for months "without being stabilized," ended up in segregation "because they were too out of control to be on residential mental health units.").

[283] *Id.* at 99.

[284] *Id.* at 106.

[285] *Id.*

[286] Ex. 28, Tr. vol. 29, 28:21-29:15 (Gage) (number of counselors is inadequate), 30:4-15 (counselors' performance uniformly inadequate); Ex. 76, PTX-1504, at 33-34 (Gage 2016 Rpt.) (training materials are of "mixed quality").

[287] Ex. 76, PTX-1504, at 21 (Gage 2016 Rpt.); Ex. 28, Tr. vol. 29, 28:9-20 (Gage); ECF No. 807-2, at 44 (Gage 2018 Rpt.) ("Mental health staffing is insufficient to provide adequate services.").

[288] ECF No. 807-2, at 46 (Gage 2018 Rpt.).

result of the understaffing and poorly performing staff.[289]

In addition, medical records demonstrate repeated changes in clinicians.[290] This undermines the patient-clinician relationship and, along with poor medical recordkeeping and charting, assures no reliable measurement of treatment progress and violates EMCF policy.[291]

In response, Dr. Bonner provides a summary of the services each staff member is supposed to provide in various housing units at EMCF.[292] None of the staff members he lists are new, and Dr. Bonner does not provide any data or evidence as to the quality of services they provide, or whether these services are actually being provided.[293] Thus, Plaintiffs' evidence and Defendants' own data showing that MHP performance is dangerously substandard are uncontroverted. Dr. Bonner does not dispute Dr. Gage's findings that the caseloads for the MHP staff are excessive and undermine their ability to provide adequate care.[294] Dr. Bonner merely states that the prison recently hired a psychologist.[295] While this is a positive development, it does not establish that Defendants have irrevocably remedied the serious shortcomings in staffing and staff performance.

M.    Remedies

Dr. Gage recommends that EMCF implement an adequate intake process that includes a more detailed nursing and mental health staff screen; a thorough assessment of patients; individualized and comprehensive treatment plans; improved crisis response that includes after-

---

[289] Ex. 76, PTX-1504, at 33-34 (Gage 2016 Rpt.); ECF No. 807-2, at 46 (Gage 2018 Rpt.) ("There is simply no way for an MHP with these caseloads to provide individual and group therapy, crisis response, intake, assessment, treatment team planning, and case management to this number of patients."). Defendants admit this. *See* Ex. 154, JTX-68, at 4, 28 (Dec. 2017 audit) ("MDOC mental health leadership reported significant concerns about the services provided by Centurion. In particular, challenges at EMCF were discussed including the need to fill critical vacancies as well as provide more intensive clinical services for patients with serious mental illness," and not every Unit 3 patient is able to attend groups due to understaffing.).
[290] ECF No. 807-2, at 44 (Gage 2018 Rpt.).
[291] Ex. 76, PTX-1504, at 60 (Gage 2016 Rpt.).
[292] ECF No. 812-1 ¶ 15 (Bonner Decl.).
[293] *Id.*
[294] *Id.*
[295] ECF No. 812-1 ¶ 14 (Bonner Decl.).

hours crisis response and crisis plans; mental health staff involvement deescalating an encounter with a patient before a planned use of force and in the disciplinary process; reducing the number of seriously mentally ill housed in restrictive settings; greater access to group and individual therapy; more rigorous standards for psychiatric prescribing and medication monitoring; better suicide prevention procedures; increased mental health involvement in housing placement decisions; availability of hospital-level care for SMI patients; better quality management; true residential treatment programs with structured treatment; and a revised staffing plan based on the population treatment needs.[296]

### III.   Claim Three—Isolation

Isolation, or solitary confinement, consists of conditions in which a prisoner is confined in his cell for 22 hours a day or more.[297] At EMCF, these conditions exist predominantly in Unit 5, but also exist in the Medical and Intake Units.[298] All prisoners held in such conditions are members of the Isolation Subclass.

Dr. Terry Kupers was qualified at trial as an expert in the "psychiatric effects of the conditions of solitary confinement on prisoners in general and at [EMCF]."[299] Dr. Kupers is a clinical psychiatrist with more than three decades of experience studying the psychiatric effects of solitary confinement, including in prisons in 20 states across the country.[300] The conditions in solitary confinement at EMCF are the worst Dr. Kupers has ever seen.[301] Defendants presented no expert testimony regarding isolation, and Dr. Kupers's testimony is therefore unrebutted.

### A.   Defendants Regularly Subject the Isolation Subclass to Long-Term Isolation

---

[296] ECF No. 807-2, at 47-49 (Gage 2018 Rpt.).
[297] Ex. 15, Tr. vol. 16, 19:19-20:2 (Kupers).
[298] Ex. 13, Tr. vol. 14, 18:6-18:8; 19:1-19:12 (Donald); Ex. 15, Tr. vol. 16, 20:8-25 (Kupers).
[299] Ex. 14, Tr. vol. 15, 119:15-120:22.
[300] *See* Ex. 14, Tr. vol. 15, 104:2-24, 105:16-109:6 (Kupers); Ex. 83, PTX-1497 (Kupers CV).
[301] Ex. 16, Tr. vol. 17, 18:13-19:8 (Kupers).

Solitary confinement causes "psychiatric symptoms such as severe anxiety, depression and aggression even in relatively healthy prisoners," as well as other symptoms such as "nervousness, headaches, troubled sleep, lethargy or chronic tiredness . . . nightmares, heart palpitations, obsessive ruminations confused thinking, irrational anger, chronic depression, and fear of impending nervous breakdowns." [302] In clinical research, "[n]early half of persons [in isolation] suffered from hallucinations and perceptual distortions, and a quarter experienced suicidal ideation."[303] Suicide is about twice as prevalent in solitary confinement as in general prison populations.[304] These are only some of the many serious symptoms caused by prolonged solitary confinement.[305] Defendants' witnesses agreed that isolation causes serious harm.[306]

Because of the well-known harm solitary confinement causes, the National Commission on Correctional Health Care has taken the position that "[p]rolonged (greater than 15 consecutive days) solitary confinement is cruel, inhumane, and degrading treatment, and harmful to an individual's health."[307] The 15-day limit is crucial, because the harm of isolation continues to increase with the length of time a person is held there; a prisoner in solitary confinement for months or years will continue to suffer increasingly worse harm.[308]

Members of the Isolation Subclass are routinely held in solitary confinement for months or years.[309] Often, they are not given a clear roadmap for how to get out of isolation and return to

---

[302] Ex. 77, PTX-1506, at 12-13 (Kupers 2016 Rpt.).

[303] *Id.* at 11.

[304] *Id.* at 15.

[305] *See generally* Ex. 85, PTX-1503 (Kupers 2014 Rpt.); Ex. 77, PTX-1506 (Kupers 2016 Rpt.).

[306] *See* Ex. 32, Tr. vol. 34, 45:7-11, 60:8-15 (Pickering) (former EMCF mental health professional agreeing that "segregation can have highly adverse effects on somebody's mental health").

[307] Ex. 77, PTX-1506 at 15.

[308] Ex. 15, Tr. vol. 16, 35:23-38:20 (Kupers).

[309] Ex. 15, Tr. vol. 16, 35:19-22 (Kupers); Ex. 10, Tr. vol. 11, 75:19-76:6 (Grogan) (in isolation from 2014 up to trial); Ex. 14, Tr. vol. 15, 68:14, 68:21 - 69:2 (Mitchell) (in isolation since arriving at EMCF two-and-a-half years before trial); Ex. 21, Tr. vol. 22, 31:19-25 (Long) (in isolation for about two-and-a-half years); Ex. 17, Tr. vol. 18, 70:9-70:22 (Dockery) (was in isolation for about one year).

general population. Prisoners are housed in segregation for months longer than appropriate for no reason.[310] Staff fail to regularly review their status and do not timely release them from isolation.[311] Defendants' contract monitor's monthly reports show that staff routinely fail to abide by policies requiring that prisoners receive written detention notices when placed in solitary confinement (non-compliant in 21 out of 27 months), that the status of those prisoners is timely reviewed (non-compliant in 25 out of 27 months); and that MDOC is notified when a prisoner is held in administrative segregation for more than 30 days (non-compliant in 27 out of 27 months).[312] As a result, Isolation Subclass members are needlessly subject to heightened risk of harm.

B.     Defendants Fail to Provide the Isolation Subclass with Recreation and Hygiene

Prisoners held in solitary confinement at EMCF are required to receive one hour per day of out-of-cell recreation time, five times per week, and three showers per week.[313] But in practice, "prisoners get far less than five hours of recreation, sometimes none, in a week, and far less than three showers a week, often none."[314] Defendants could not meaningfully rebut the evidence that recreation and showers are lacking. Ken McGinnis observed that segregation staff were "struggling with documentation of [recreation and showers] in the picket log,"[315] and Tom Roth was unable to verify the frequency of showers and recreation because of that poor documentation.[316] Prisoners who are held in isolation in the medical and intake units receive even less access to recreation and

---

[310] *See* Ex. 77, PTX-1506, at 27-28 (prisoners report not knowing how to get out of segregation); Ex. 38, PTX-616 (Aug. 19, 2014 email) (error resulted in no investigations conducted for months, with Isolation Subclass members languishing in isolation).

[311] Ex. 16, Tr. vol. 17, 12:10-13:12 (Kupers).

[312] Ex. 149, PTX-2806 (demonstrative summary); Ex. 96, PTX-1936 (monitor's weekly reports – 2014), Ex. 97, PTX-1939 (monitor's monthly reports – 2015), Ex. 92, PTX-1934 (monitor's monthly worksheets – 2016), Ex. 134, JTX-61 (compilations of monthly reports by year).

[313] *See* Ex. 16, Tr. vol. 17, 8:1-11 (Kupers); Ex. 110, PTX-2082, at 10, 12 (MDOC Offender Segregation Policy).

[314] Ex. 15, Tr. vol. 16, 22:1-3; Ex. 16, Tr. vol. 17, 8:22-6 (Kupers); *see also* Ex. 14, Tr. vol. 15, 70:2-70:21 (Mitchell); Ex. 10, Tr. vol. 11, 82:18-83:15 (Grogan).

[315] Ex. 34, Tr. vol. 36, 58:16-58:23 (McGinnis).

[316] Ex. 31, Tr. vol. 33, 110:25-112:7 (Roth).

are left with almost nothing to do, given their lack of access to television or reading material.[317]

Because Isolation Subclass members do not receive even this minimal access to out-of-cell recreation and showers, they are subjected to a heightened risk of psychological harm.[318] They also suffer from "further disorganization of life" due to deprivation of the limited privileges to which they are entitled, all of which worsen mental health symptoms of isolation.[319]

C.    Defendants Fail to Maintain Adequate Staffing and Conditions in Isolation

Maintaining the good mental health of prisoners requires clean, well-organized settings that function according to expectations.[320] Extraordinarily chaotic conditions in isolation at EMCF violate this precept. On cause of these conditions is that officers rarely enter the cell pods in Unit 5 except when physically required to, at the start of their shifts, when they are handing out meals or supervising medication administration, or when responding to some crisis like a fire.[321] Though the cells in Unit 5 generally have panic buttons, officers do not respond when they are pressed— either because the buttons do not work or because staff ignore them.[322]

As a result, Isolation Subclass members suffering from injury, illness, or some other emergency condition may go hours without staff noticing or taking action. When staff routinely fail to respond to such basic needs, the result is despair and psychological decompensation.[323] It also causes Isolation Subclass members to take "extreme" or "bizarre" actions to "seek[] some attention to their urgent mental health problems," including setting fires on a daily or near-daily

---

[317] Ex. 77, PTX-1506, at 56-59.
[318] Ex. 16, Tr. vol. 17, 9:9-18 (Kupers).
[319] Ex. 16, Tr. vol. 17, 9:19-10:6 (Kupers).
[320] Ex. 15, Tr. vol. 16, 77:6-22 (Kupers).
[321] Ex. 21, Tr. vol. 22, 34:13-35:17 (Long); Ex. 14, Tr. vol. 15, 83:18-84:8 (Mitchell); Ex. 14, Tr. vol. 15, 45:17-19 (Melton); Ex. 17, Tr. vol. 18, 74:3-74:16 (Dockery).
[322] Ex. 77, PTX-1506, at 24-25 (Kupers 2016 Rpt.). *See also supra* Section I.A.
[323] Ex. 16, Tr. vol. 17, 5:23-7:24 (Kupers).

basis in every pod on Unit 5.[324] Dr. Kupers has never seen so much evidence of fires in any

prison.[325] By way of example, in one 16-day period in February and March 2017, there were an

average of more than *four fires per day* on Unit 5.[326] Prisoners take other extreme actions, like

flooding the cell area by overflowing their toilets or sinks or throwing feces, to get attention.[327]

Even with these extreme actions, prisoners cannot be assured that staff will respond.[328]

Other conditions in isolation are also poor. Prisoners go days or weeks without functioning

lights, without which they cannot even read or write, which exacerbates the psychological harm of

isolation.[329] Defendants' staff agreed that prisoners should not be housed in cells without working

lights.[330] Yet the problem repeatedly appears in contract monitor reports.[331]

Prisoners in isolation are also placed at serious risk of physical injury, from others and

themselves. Even in segregation, Plaintiffs are at constant risk of physical assault.[332] In addition,

---

[324] Ex. 15, Tr. vol. 16, 49:5-12 (Kupers); Ex. 21, Tr. vol. 22, 32:2-23 (Long) (near-daily fires on Unit 5A); Ex. 8, Tr. vol. 9, 76:19-25, 109:25-110:4 (Pugh) (fires near-daily from 2015-17 on Unit 5); Ex. 14, Tr. vol. 15, 77:14-24 (Mitchell) (has seen fires on every Unit 5 pod); Ex. 14, Tr. vol. 15, 44:21-45:2 (Melton) (saw fires every day on Unit 5). "Nine times out of ten," prisoners must set fires in order to get staff attention for urgent needs. Ex. 14, Tr. vol. 15, 84:9-10 (Mitchell). *See also supra* Section I.A; *infra* Section VI.

[325] Ex. 15, Tr. vol. 16, 49:15-18 (Kupers).

[326] Ex. 150, PTX-2809 (demonstrative summary) (fires on Unit 6); Ex. 86, PTX-1767 (Feb. 2017 Unit 5 logbook).

[327] Ex. 15, Tr. vol. 16, 49:5-18 (Kupers); Ex. 21, Tr. vol. 22, 57:22-58:17 (Hickman-Estes).

[328] Ex. 87, PTX-1771, at 17 (Mar, 13, 2017 Unit 5 logbook) (fire was burning on Unit 5A and an officer declined to put it out).

[329] Ex. 10, Tr. vol. 11, 80:12-80:17 (Grogan) (has gone two weeks without a light); Ex. 14, Tr. vol. 15, 45:20-46:3 (Melton) (has gone up to two weeks without a light); Ex. 14, Tr. vol. 15, 70:24-71:24 (Mitchell) (has gone up to a week without a light); Ex. 17, Tr. vol. 18, 71:8-72:5 (Dockery) (has gone up to two weeks without a light); Ex. 21, Tr. vol. 22, 73:11-21 (Hickman-Estes) (has gone one-and-a-half weeks without a light); *see also supra* Section II.E-F

[330] Ex. 13, Tr. vol. 14, 85:23-88:8 (Donald); *see also* Ex. 12, Tr. vol. 13, 25:10-20 (Compton) (admitting he is responsible for ensuring prisoners have working lights).

[331] Ex. 146, PTX-2798 (demonstrative summary) (concerns related to lights).

[332] *See, e.g.*, Ex. 54, PTX-972 (Aug. 18, 2015 email); Ex. 53, PTX-968 (Nov. 20, 2015 email); Ex. 67, PTX-1052 (Jun. 15, 2016 incident report); Ex. 123, PTX-2570 (Sep. 14, 2016 incident report); Ex. 124, PTX-2583 (Nov. 10, 2016 incident report); Ex. 128, PTX-2650 (Apr. 11, 2017 incident report); Ex. 14, Tr. vol. 15, 87:14-88:17 (Mitchell) (stabbed in segregation in 2016 while he was restrained); Ex. 21, Tr. vol. 22, 36:12-42:10 (Long) (assaulted in segregation, by the same assailant, twice between November 2017 and January 2018).

the degree of self-harm at EMCF is unheard of in a facility housing adult men.[333] These self-harm incidents are provoked by severe mental anguish, anxiety, and the need to attract staff attention for urgent needs.[334] Isolation Subclass plaintiffs inflicted injuries on themselves so severe that they had to be taken to the hospital on numerous occasions.[335] The prevalence of self-harm among the Isolation Subclass is a manifestation of the psychological degradation and resulting risk of harm to prisoners in solitary confinement there. But even severe self-harm does not always trigger a prompt staff response.[336] Unit 5 manager Tony Donald admitted that Isolation Subclass members who harm themselves are only removed from solitary confinement if they need medical attention and are returned there after being treated.[337]

Finally, MDOC policy perpetuates the risk of self-harm from extended solitary confinement by punishing prisoners who set fires or commit acts of self-harm are with additional time in solitary confinement, likely to exacerbate the very conditions giving rise to that behavior.[338] Defendants' staff admitted that this contributes to a "continuous cycle" of self-harm amongst those Isolation Subclass members.[339] Defendants have known of all of these harms for years.[340]

D.    Remedies

Dr. Kupers recommends that no Plaintiff be held in conditions of isolation for more than

---

[333] Ex. 15, Tr. vol. 16, 49:2 (Kupers).

[334] Ex. 15, Tr. vol. 16, 49:19-52:6 (Kupers).

[335] Ex. 55, PTX-995 (July 15, 2015 incident report); Ex. 56, PTX-998 (Oct. 3, 2015 incident report); Ex. 60, PTX-1005 (Jan. 21, 2016 incident report); Ex. 57, PTX-1000 (Jan. 29, 2016 incident report); Ex. 58, PTX-1002 (Feb. 2, 2016 incident report); Ex. 59, PTX-1003 (Feb. 27, 2016 incident report); Ex. 64, PTX-1030 (Apr. 12, 2016 incident report); Ex. 69, PTX-1271 (Apr. 16, 2017 incident report); Ex. 133, PTX-2705 (May 31, 2017 incident report).

[336] *See, e.g.*, Ex. 21, Tr. vol. 22, 60:10-63:17 (Hickman-Estes) (Mr. Hickman-Estes cut himself while staff were performing a count, but staff ignored him; despite also setting a fire in his cell, Mr. Hickman-Estes was not removed from his cell until more than seven hours later when the next shift came in and called for a medical emergency).

[337] Ex. 13, Tr. vol. 14, 71:20-72:3 (Donald).

[338] Ex. 112, PTX-2794, at 11-12 (MDOC Disciplinary Policy).

[339] Ex. 13, Tr. vol. 14, 74:20-75:1 (Donald).

[340] *See, e.g.*, Ex. 85, PTX-1503 (Kupers 2014 Rpt.); Ex. 77, PTX-1506 (Kupers 2016 Rpt.).

14 days. Any Plaintiff placed in isolation must receive a prompt mental health evaluation sufficient to determine whether his mental health status means isolation is contraindicated; if it is contraindicated, the prisoner should be excluded from isolation.

## IV.   Claim Four—Excessive Force

Defendants subject Plaintiffs to a substantial risk of serious harm from excessive force wielded by EMCF staff. Eldon Vail, who testified about this claim, was qualified as an expert on correctional practices and security, including safety and security conditions and the use of force in prisons.[341] Mr. Vail has nearly 35 years of experience in corrections and headed the Washington State Department of Corrections from 2007 to 2011.[342] Mr. Vail testified that Defendants' policies and practices concerning the use of force expose Plaintiffs to a substantial risk of serious harm.

### A.   Defendants' Policies and Practices Expose Plaintiffs to Excessive Force by Staff

At EMCF, use of force by staff against prisoners is either spontaneous ("SUOF") or planned ("PUOF").[343] SUOFs are appropriate when an "inmate presents an immediate or imminent risk of harm," such as before an imminent assault.[344] Other uses of force should be planned, with one goal being to deescalate the situation to the extent possible and another being to avoid unnecessary risk of harm to both prisoners and staff.[345] This is particularly important at EMCF, since mentally ill prisoners may be unable to immediately conform their actions to staff orders.[346] For mentally ill prisoners, attempts by mental health staff to de-escalate may avert the need for force more than half the time.[347]

---

[341] Ex. 1, Tr. vol. 2, 108:19-109:21 (Vail).
[342] *See* Ex. 84, PTX-1499 (Vail CV).
[343] Ex. 3, Tr. vol. 4, 48:8-11 (Vail.)
[344] Ex. 78, PTX-1507, at 34 (Vail 2016 Rpt.).
[345] *Id.*
[346] Ex. 1, Tr. vol. 2, 132:12-133:1 (Vail).
[347] Ex. 1, Tr. vol. 2, 135:17-21 (Vail).

MDOC's policy regarding use of force provides that force should be used as a last resort, and that when possible, force should be planned, should involve verbal intervention, and should incorporate mental health staff intervention when used against mentally ill prisoners.[348] But EMCF staff does not follow these principles. As a result, the overall incidence of staff use of force at EMCF is extraordinarily high and has only increased further over time.[349] There are several specific shortcomings in EMCF staff's approach to use of force, each of which was corroborated by reports from Defendants' contract monitor.[350]

First, staff routinely engage in SUOFs in instances when the prisoner poses no imminent threat, including many cases in which the prisoner is locked behind a cell door.[351] Officers routinely spray chemical agents into cells for minor rule violations like refusing to close tray flaps.[352] In these situations, the appropriate response is for staff to treat the situation as a PUOF, allowing for the situation to be de-escalated.[353]  Second, when staff does use planned force, de-escalation by mental health staff is done poorly or not at all.[354]

Defendants know that staff use of excessive force against Plaintiffs at EMCF. Defendant Williams, MDOC's Deputy Commissioner, testified that he reviews, or should review, every use

---

[348] Ex. 99, PTX-2074 (MDOC Use of Force Policy).

[349] Ex. 3, Tr. vol. 4, 50:3-7 (Vail). Mr. Vail reviewed documentation and videos provided up until the close of discovery in mid-2017 and found that all of the conditions identified in this section continued at least through that time. Ex. 4, Tr. vol. 5, 16:14-16 (Vail).

[350] Ex. 78, PTX-1507, at 33-37 (Vail 2016 Rpt.).

[351] Ex. 3, Tr. vol. 4, 48:8-11,59:22-60:1 (Vail).

[352] Ex. 17, Tr. vol. 18, 51: 6-52:8 (Jones); Ex. 10, Tr. vol. 11, 99:10-100:23 (Grogan); Ex. 8, Tr. vol. 9, 42:15-21 (Beasley). Ex. 68, PTX-1238; Ex. 70, PTX-1369; Ex. 71, PTX-1371; Ex. 115, PTX-2460; Ex. 116, PTX-2470; Ex. 117, PTX-2478; Ex. 118, PTX-2482; Ex. 119, PTX-2486; Ex. 120, PTX-2490; Ex. 125, PTX-2608; Ex. 126, PTX-2609; Ex. 127, PTX-2647; Ex. 129, PTX-2689; Ex. 130, PTX-2691; Ex. 131, PTX-2698; Ex. 132, PTX-2701; Ex. 135, PTX-2766; Ex. 136, PTX-2767 (incident reports showing use of chemical spray against prisoners locked in cells or other confined areas between August 4, 2014 and April 3, 2017).

[353] Ex. 3, Tr. vol. 4, 56:13-18 (Vail).

[354] Ex. 3, Tr. vol. 4, 53:8-10 (Vail); *see also supra* Section II.C.

of force that happens at EMCF.[355] And the EMCF contract monitor routinely provides MDOC with statistics illustrating these systemic issues with use of force.[356]

      B.    <u>Remedies</u>

Mr. Vail recommends that Defendants should be required to establish policies and practices mandating the use of effective de-escalation, increase mandatory use-of-force training of staff, and enhance supervisory review of force incidents to enhance accountability and discipline of staff who violate policy, as well as the appointment of a monitor to oversee and ensure compliance.[357]

## V.    Claim Five—Protection from Harm

Defendants severely understaff EMCF. As a result, Plaintiffs are exposed to a substantial risk of serious harm arising from gang control of the prison, doors and locks that go unsecured, and assaults, among other risk threats. As Mr. Vail testified, these problems are fundamentally a matter of Defendants' decision to systematically understaff EMCF.

      A.    <u>Defendants Fail to Adequately Staff or Fill Mandatory Posts at EMCF</u>

There are two categories of staffing problems at EMCF. First, Defendants have implemented a staffing plan at EMCF that sets an inadequate number of "mandatory posts" on each shift—that is, roster positions that must always be filled by security staff.[358] Second, in practice, Defendants too frequently fail to fill even that inadequate number of posts.[359] The result is a prison so severely understaffed that Plaintiffs are at persistent risk of harm.

First, EMCF's staffing plan, which provides the minimum number of officers who are

---

[355] Ex. 12, Tr. vol. 13, 125:9-17; 126:1-6 (Williams).

[356] *See* Ex. 149, PTX-2806 (demonstrative summary); Ex. 96, PTX-1936 (monitor's weekly reports – 2014), Ex. 97, PTX-1939 (monitor's monthly reports – 2015), Ex. 92, PTX-1934 (monitor's monthly worksheets – 2016), Ex. 134, JTX-61 (monitor's monthly worksheets – 2017.

[357] Ex. 3, Tr. vol. 4, 69:8-70:1 (Vail).

[358] *See* ECF No. 801-1, at 5-10 (Vail 2018 Rpt.).

[359] *See id.* at 12-15.

mandated to work on any given shift and their positions, creates a problem of systematic understaffing at EMCF.[360] On first and second shifts,[361] there should be at least <u>one officer assigned to each of the four cell "pods"</u> on each housing unit that houses minimum or medium custody prisoners, and at least <u>two officers per pod</u> on each housing unit that houses close custody or segregation prisoners.[362] Such minimally adequate staffing is critical in a facility like EMCF that houses a large proportion of mentally ill people, who may tend to be more volatile and require closer supervision.[363] That is especially true in Units 5 and 6, which house close custody and segregation populations, and where inadequate staffing causes a substantial risk of serious harm because prisoners entirely rely on staff for showers, recreation, transport to other parts of the facility, food and medication delivery, protection from harm, and all other needs.[364]

Thus, a minimally acceptable staffing plan at EMCF would require four mandatory posts assigned to each of Units 1 through 4, eight mandatory posts on Unit 5, and five mandatory posts on Unit 6.[365]  Instead, Defendants staff EMCF at about half that level, requiring only two officers on Units 1 through 4 and three officers on each of Units 5 and 6.[366]

Defendants' own staff have stated that EMCF is systemically understaffed. The contract monitor, Vernell Thomas, wrote to Deputy Warden Tony Compton that staffing each housing unit with only two officers "is not only unsafe to the offenders but to the staf[f] as well," and asked, "**WHEN are we going to correct this serious matter[?]**"[367] Several months later, Ms. Thomas

---

[360] *See* Ex. 2, Tr. vol. 3, 5:25-6:3 (Vail); ECF No. 801-1, at 8-11 (Vail 2018 Rpt.).
[361] First shift lasts from 7 a.m. to 3 p.m., and second shift lasts from 3 p.m. to 11 p.m. *See* Ex. 78, PTX-1507, at 19 (Vail 2016 Rpt.).
[362] Ex. 2, Tr. vol. 3, 5:25-6:4; 22:20-25; 63:21-25 (Vail).
[363] Ex. 2, Tr. vol. 3, 23:3-7 (Vail).
[364] *See* ECF No. 801-1, at 9 (Vail 2018 Rpt.).
[365] *Id.* at 7.
[366] *Id*.
[367] Ex. 46, PTX-715 (Apr. 16, 2015 email).

specifically recommended to Mr. Compton that staffing levels be increased to levels similar to those identified above.[368] Tony Donald, EMCF Unit 5 Manager, testified that Unit 5 needed a minimum of seven or eight officers on each of the first and second shifts—well above current staffing levels and akin to the recommendation above—to run Unit 5 properly.[369] Tom Roth, Defendants' retained correctional expert witness, stated in 2015 that another MDOC facility— which had a substantially similar design to EMCF, housed fewer prisoners, and was not specially designated to house mentally ill prisoners—was appropriately staffed with a minimum of one officer per pod, precisely what should be required at EMCF.[370]

Defendants suggest the current staffing plan is adequate because EMCF is designed as an "indirect supervision" facility, allowing officers to supervise prisoners without being physically present on the housing pods.[371] Regardless of the merits of "indirect supervision" as a staffing principle, at EMCF its implementation has failed to keep prisoners safe, as shown by the many risks of harm and instances of actual harm Plaintiffs experience at EMCF.

Second, Defendants also consistently fail to staff even the limited number of mandatory posts required by their staffing plan.[372] Mr. Vail's post-trial review of staffing rosters indicated that, more than one-third of the time, one or more mandatory posts went unfilled from January to August 2018.[373] Even Defendants' expert Mr. Roth observed that a large number of mandatory posts appeared to be vacant in 2018.[374] At trial and in Mr. Roth's 2018 report, Defendants suggest

---

[368] Ex. 41, PTX-636 (Jul. 31, 2015 email).
[369] Ex. 13, Tr. vol. 14, 25:10-26:16 (Donald).
[370] *See* ECF No. 801-1, at 12 (Vail 2018 Rpt.).
[371] ECF No. 812-2, at 8 (Roth 2018 Rpt.).
[372] *See* ECF No. 801-1, at 12 (Vail 2018 Rpt).
[373] *Id.* at 13.
[374] ECF No. 812-2, at 20 (2018 Roth Rpt.).

that the staffing rosters do not reflect reality.[375] But that runs directly contrary to the testimony of EMCF's chief of security, Christopher Dykes, who when asked "with respect to [staffing] rosters" if the "post is left blank [on the roster], it reflects that the post is not filled," responded simply "Yes."[376] Moreover, as Defendant Williams testified, "mandatory posts should never go unfilled."[377] And Deputy Warden Compton acknowledged that the number of mandatory posts has "been deemed the minimum number of staff necessary to operate the prison safely."[378] Thus, it would be a serious problem in itself if Defendants' staffing rosters were so consistently wrong. But Defendants offered no evidence to support their contention that vacant posts are in fact being staffed.[379] Instead, the evidence, including staff testimony and the risks and manifestations of harm Plaintiffs suffer at EMCF, is consistent with a chronically understaffed prison.

Defendants also point to their voluntary addition of staff from the contractual minimum of 136 to 177 as a reason EMCF is not chronically understaffed.[380] But while there may be more names on the payroll, there is no evidence that these additional staff are being meaningfully *deployed* at EMCF. Mr. Vail found in 2018 that there are no more officers working at the prison on any given shift than before.[381] The number of mandatory posts remains unchanged, and they frequently continue to go unfilled.[382] Even if the extra staff did remedy EMCF's security problems (which they do not), there is nothing prohibiting Defendants from firing the additional staff at any

---

[375] ECF No. 801-1, at 14 (Vail 2018 Rpt.); Ex. 12, Tr. vol. 13, at 101:1-3 (Williams) (suggesting the rosters may not reflect reassignments of non-mandatory posts to mandatory ones); Ex. 20, Tr. vol. 21, at 97:22-98:8 (Shaw); ECF No. 812-2, at 20-21 (Roth 2018 Rpt.).
[376] Ex. 6, Tr. vol. 7, 15:22-25 (Dykes).
[377] Ex. 12, Tr. vol. 13, 102:7 (Williams).
[378] Ex. 12, Tr. vol. 13, 77:18-21 (Compton).
[379] ECF No. 801-1, at 14 (Vail 2018 Rpt.).
[380] Ex. 30, Tr. vol. 32, 72:17-21 (Shaw).
[381] ECF No. 801-1, at 10-11 (Vail 2018 Rpt.).
[382] *Id.*

time, since they are not mandated by MDOC's contract with MTC.[383]

B.     Defendants' Inadequate Staffing Practices Cause Risks of Harm to Plaintiffs

Defendants' inadequate staffing creates a substantial risk of serious harm to Plaintiffs that manifests in many ways, prompting the contract monitor to routinely identify "basic and rudimentary correctional issues that should only occur rarely as an exception" in her reports.[384]

First, in lieu of adequate staff, gangs have assumed control of EMCF.[385] Gang members decide where prisoners will be housed; they work in the kitchen and in isolation units, allowing them to control prisoners' access to nutrition; they seize control of showers, preventing other prisoners from using them.[386] Ms. Thomas noted repeatedly in weekly reports to MDOC that gang members work unsupervised on segregation pods, giving them unimpeded access to enemies.[387] She wrote on October 12, 2015 that prisoners had "take[n] over running the prison" and were able successfully to prevent staff from moving other prisoners into a new housing unit.[388] Not only do staff fail to prevent gangs from seizing control, but in fact they *depend* on the gangs to run the facility.[389] The risk of harm created by gang and prisoner control over EMCF has manifested many times in assaults and extortion. One prisoner was tied up and sodomized for four hours by gang members who thought he stole their drugs while officers did not intervene; later he was extorted

---

[383] *See* Ex. 30, Tr. vol. 32, 73:6-8. (Shaw) (acknowledging EMCF is operating above contractually required levels of staff and failing to identify any reason he could not reduce staff to those levels).

[384] Ex. 1, Tr. vol. 2, 120:24-121:8 (Vail).

[385] *See* Ex. 4, Tr. vol. 5, 78:13-20 (Barrett); Ex. 7, Tr. vol. 8, 51:6-51:11 (Combs) (as of trial, gang control was the worst it had ever been).

[386] Ex. 16, Tr. vol. 17, 79:5-22 (Hale); Ex. 17, Tr. vol. 18, 41:16-42:6 (Jones); Ex. 17, Tr. vol. 18, 87:14-88:08 (Dockery); Ex. 24, Tr. vol. 25, 22:19-23:13 (Campbell).

[387] Ex. 11, Tr. vol. 12, 81:16-97:6 (Thomas); Ex. 45, PTX-713 (May 5, 2015 email) (gang members "have been here at EMCF so long, that they seem to be running things, even though some are in the seg units"); Ex. 43, PTX-640 (Jul. 15, 2015 email) (gangs control EMCF, noting "these issues are all over EMCF but the seg units are the worst").

[388] Ex. 40, PTX-625 (Oct. 12, 2015 email).

[389] *See* Ex. 17, Tr. vol. 18, 26:23-27:3 (Jones).

by gang members and had to be moved to segregation.[390] Many others had similar experiences.[391]

Defendants know about gang control of EMCF. Ms. Thomas informed them repeatedly of the problem, though she seemed to know her efforts to fix this issue would fall on deaf ears, writing in a July 15, 2015 email, "You advised [we] would meet today about some of these issue[s], but you and I both know it's not going to happen."[392] In an October 15, 2015 email, Ms. Thomas listed specific prisoners who were "calling the shots" and "running the offenders [and] staff."[393] At the time of trial, one of the prisoners identified in that email was still living in the same unit.[394]

Second, staff fail to ensure that locks on prisoners' cell doors close and lock properly. Prisoners routinely come in and out of their cells at will.[395] The problem is "pervasive and longstanding" and affects all housing units at EMCF.[396] It persists: between late 2017 and January 2018, one prisoner was assaulted twice by the same inmate who both times was supposed to be locked in his cell.[397] Another witness recounted that, just the night before he testified at trial, another prisoner defeated the lock on his cell.[398] This chronic problem causes a risk of assaults.[399]

---

[390] Ex. 14, Tr. vol. 15, 29:20-36:4, 43:3-16 (Melton).

[391] Ex. 17, Tr. vol. 18, 79:18-81:23 (Dockery) (in 2017, assaulted on Unit 1C by three gang members, who forced him to stay in his cell for three days, while staff failed to intervene); Ex. 8, Tr. vol. 9, 23:13-19 (Mata) (Jan. 2018 gang standoff resulted in stabbing; gay prisoners routinely robbed and assaulted by gangs); Ex. 16, Tr. vol. 17, 76:3-78:2 (Hale) (told by gang members to move off of Unit 1C or he and his roommate would be assaulted).

[392] Ex. 43, PTX-640 (July 15, 2015 email).

[393] Ex. 39, PTX-624 (Oct. 15, 2015 email).

[394] Ex. 11, Tr. vol. 12, 95:7-17 (Thomas).

[395] *See* Ex. 4, Tr. vol. 5, 80:23-81:16 (Barrett); Ex. 8, Tr. vol. 9, 90:1-10 (Pugh) (doors not locked on units 1-4); Ex. 8, Tr. vol. 9, 15:20-17:17, 34:12-20 (Mata) (locks on Unit 1 can be manipulated even after being fixed); Ex. 24, Tr. vol. 25, 60:11-21 (J.H.) (has seen prisoners come out on Unit 4 during lockdowns).

[396] Ex. 3, Tr. vol. 4, 33:9-13 (Vail); *see also* Ex. 21, Tr. vol. 22, 72:15-73:10 (Hickman-Estes) (from August 14 to December 6, 2015, the doors on Unit 1 never locked, which allowed prisoners to assault Mr. Hickman-Estes on September 11, 2015).

[397] Ex. 21, Tr. vol. 22, 36:16-42:10 (Long).

[398] Ex. 10, Tr. vol. 11, 69:19-71:8 (Brewer).

[399] On September 29, 2016 (twice); September 30, 2016, October 1, 2016 (twice), October 2, 2016, April 11, 2017, May 22, 2017, and May 24, 2017, prisoners were written up for coming out of their cells during lockdowns, when the entire population should be secure behind cell doors. Ex. 111, PTX-2315 (April 11, 2017 rule violation report); Ex. 112, PTX-2318 (May 22, 2017 rule violation report); Ex. 113, PTX-

Following a September 2014 incident in which a prisoner manipulated his cell door, exited, and assaulted another prisoner, Warden Shaw assured MDOC officials that EMCF staff would be disciplined for the incident and briefed about ensuring doors are locked.[400] But similar issues continued to recur for years, with regular notifications to Defendants and their staff.[401]

The prevalence of unsecured doors and locks is fundamentally a staffing problem. Steven Stonehouse, Defendants' expert witness in detention and correctional locks and doors,[402] testified that the way to ensure doors close and lock properly is to have "staff take measures to correct that problem."[403] The doors and locks at EMCF are standard in similar prisons nationwide; staff deficiencies are the only reason EMCF suffers from this problem.[404]

Third, Defendants fail to ensure that staff properly conduct counts. Counts—the routine practice of verifying that prisoners are where they are supposed to be—are critical to the safe and secure operation of a prison. Defendants' senior staff agreed.[405] Defendants do have adequate policies in place concerning prisoner counts,[406] and senior staff appear to know how to perform counts properly.[407] Nevertheless, in 29 out of 32 months, Ms. Thomas observed that counts were

---

2319 (May 24, 2017 rule violation report); Ex. 103, PTX-2288 (Sept. 29, 2016 rule violation report); Ex. 104, PTX-2289 (Sept. 30, 2016 rule violation report); Ex. 105, PTX-2290 (second Sept. 29, 2016 rule violation report); Ex. 106, PTX-2292 (Oct. 1, 2016 rule violation report); Ex. 107, PTX-2293 (Oct. 2, 2016 rule violation report); Ex. 108, PTX-2296 (second Oct. 1, 2016 rule violation report).

[400] Ex. 47, PTX-716 (Sept. 22, 2014 email).

[401] *See* Ex. 44, PTX-666 (Jul. 2, 2015 email) (informing Dr. Perry of nurse complaints about prisoners freely coming out of their cells); Ex. 54, PTX-972 (Aug. 18, 2015 email) (prisoner opened a locked door on a recreation cage in the segregation unit and assaulted another prisoner); Ex. 66, PTX-1044 (May 30, 2016) Unit 5B prisoner breached his locked door, barricaded the entrance to the pod area, and assaulted another prisoner).

[402] *See* Ex. 32, Tr. vol. 34, 14:8-15 (Stonehouse).

[403] Ex. 32, Tr. vol. 34, 41:19-25 (Stonehouse).

[404] *See id.*

[405] Ex. 12, Tr. vol. 13, 41:11-22 (Compton) (counts are the "number one" priority in corrections); Ex. 5, Tr. vol. 6, 41:5-7 (Hogans) (accurate counts are vital to the safe operation of EMCF).

[406] Ex. 3, Tr. vol. 4, 7:12-16 (Vail).

[407] Ex. 5, Tr. vol. 6, 38:1-42:16 (Hogans) (testifying about proper count procedure).

not being conducted properly once per shift as required.[408] She also noted in *every one* of those 32 months that, when performing counts, staff failed to verify that the person in the cell was the person who was supposed to be there by using bed rosters, checking IDs, or removing cell window coverings to verify prisoners' identities.[409] Witnesses corroborated that EMCF staff conduct counts inconsistently and improperly.[410] Staff often delegate the task to prisoners.[411]

The risk to prisoners created by these failures is apparent. Prisoners are often housed in the wrong cells, creating the opportunity for assaults—a problem that Mr. Vail has never encountered at any other prison.[412] Prisoners are "held hostage" and assaulted in their cells.[413] And prisoners at EMCF are permitted to cover their cell windows with impunity, impeding staff from knowing what is occurring in their cells.[414]

Ms. Thomas has told Mr. Compton that "counts are not being done even though [staff] report they are being done.'"[415] For seven straight months at the end of 2016, she reported the problem, "Offender decides where he wants to sleep/be housed."[416] For 32 straight months, she reported that counts were performed improperly.[417] Ms. Thomas also directly wrote Mr. Compton

---

[408] Ex. 147, PTX-2799 (demonstrative summary); Ex. 92, PTX-1934 (monitor's monthly worksheets – 2016), Ex. 95, PTX-1935 (monitor's monthly reports – 2014), Ex. 97, PTX-1939 (monitor's monthly reports – 2015), Ex. 134, JTX-61 (monitor's monthly worksheets – 2017).

[409] *Id.*

[410] Ex. 8, Tr. vol. 9, 72:20-73:22, 74:13-74:21, 120:10-12 (Pugh) (officers do not verify who is in the cells, often only one officer conducts counts instead of two, officers often do not check IDs or use the bed roster); Ex. 7, Tr. vol. 8, 57:2-10 (Combs) (officers perform counts inconsistently).

[411] Ex. 7, Tr. vol. 8, 104:19-20 (Clemons) (inmates perform counts); Ex. 17, Tr. vol. 18, 32:22-33:19 (Jones) (personally assisted in counts on a daily basis); Ex. 24, Tr. vol. 25, 21:18-22:7 (Campbell) (personally assisted in counts).

[412] Ex. 3, Tr. vol. 4, 30:5-13 (Vail).

[413] Ex. 8, Tr. vol. 9, 89:3-89:17 (Pugh).

[414] Ex. 3, Tr. vol. 4, 17:21-18:12 (Vail).

[415] Ex. 42, PTX-639 (July 6, 2015 email).

[416] Ex. 3, Tr. vol. 4, 29:16-24 (Vail).

[417] Ex. 12, Tr. vol. 13, 83:3-20 (Thomas); Ex. 147, PTX-2799 (demonstrative summary); Ex. 92, PTX-1934 (monitor's monthly worksheets – 2016), Ex. 95, PTX-1935 (monitor's monthly reports – 2014), Ex. 97, PTX-1939 (monitor's monthly reports – 2015), Ex. 134, JTX-61 (monitor's monthly worksheets – 2017).

several times when she determined that counts were not being done.[418] Yet Mr. Compton admitted that he "ha[sn't] done anything with" any of this information.[419] Warden Shaw is also aware of Ms. Thomas's repeated entreaties to fix the count process.[420] But in 2018, Defendants' expert observed that EMCF continued to be found in non-compliance with count policies.[421]

Fourth, EMCF security staff are rarely present on the housing pods. This problem is pronounced in the segregation units, but it is also true elsewhere in the prison.[422] Mr. Roth noted in December 2018 that the contract monitor continued to document routine instances of staff congregating in hallways and foyers instead of in their assigned areas.[423] EMCF supervisors pay lip-service to the issue in their written responses to the monitor's observations,[424] but Defendants have failed meaningfully to address this problem.

All of these EMCF staffing failures manifest in an extreme rate of assaults. Assaults are ten times more common at EMCF than in the Washington correctional system, even though the average prisoner in the Washington system is more violent and the Washington system uses a broader definition of "assaults."[425] This issue was unchanged from 2016 to 2017, based on documents and information Mr. Vail reviewed prior to the close of discovery in this case.[426] Though there was a slight decrease in the number of assaults in the first part of 2018, Mr. Vail found that all of the factors placing Plaintiffs at risk remain in place: for example, staff deployment has not increased, the locks on the cell doors have not been fixed, and counts continue to be

---

[418] Ex. 42, PTX-639 (July 6, 2015 email); Ex. 50, PTX-747 (Dec. 1, 2014 report).

[419] Ex. 12, Tr. vol. 13, 83:3-24 (Compton).

[420] Ex. 20, Tr. vol. 21, 48:20-49:18 (Shaw).

[421] ECF No. 812-2, at 13 (Roth 2018 Rpt.).

[422] *See* ECF No. 801-1, at 16-17 (Vail 2018 Rpt.); Ex. 16, Tr. vol. 17, 100:14-19 (Hill); Ex. 17, Tr. vol. 18, 32:17-32:19 (Jones); Ex. 8, Tr. vol. 9, 45:15-46:10 (Beasley); *see supra* Section III.C.

[423] ECF No. 812-2, at 7-8 (Roth 2018 Rpt.).

[424] *See id.*

[425] Ex. 4, Tr. vol. 5, 37:11-12; 37:18-38:1; 39:5-9; 40:13-15; 64:8-65:7 (Vail).

[426] *Id.*

conducted improperly. [427] Defendants have made no permanent fixes that will prevent dire safety problems from recurring because they have not addressed their staffing deficiencies.

      C.    <u>Remedies</u>

      Mr. Vail offered a roadmap for remedying Defendants' chronic and persistent understaffing of EMCF. First, Defendants should be ordered to retain independent outside experts to develop a comprehensive staffing analysis for the facility. [428] Second, Defendants should be ordered to revise their policies and post orders to require minimum staffing levels consistent with those described herein. [429] Third, the Court should appoint an independent monitor to oversee staffing changes at EMCF that are consistent with the staffing analysis. [430]

## VI.    Claim Six—Environmental Conditions

      Defendants fail to maintain adequate lighting at EMCF. This failure presents risks to Plaintiffs' physical safety and mental health and exacerbates unsanitary living conditions. Lighting levels in dozens of cells and showers fall below American Public Health Association Standards for Health Services in Correctional Institutions. [431] Such deficiencies substantially increase the risks of injury and assault, particularly in common areas such as showers. [432] Moreover, the failure to maintain lighting fixtures in safe operating condition creates fire and shock hazards. [433] Deficient lighting also increases the risk of mental decompensation among mentally ill prisoners. [434]

---

[427] *See* ECF No. 801-1, at 26-27 (Vail 2018 Rpt.).

[428] ECF No. 801-1, at 28 (Vail 2018 Rpt.).

[429] *Id.* at 29.

[430] *Id.* at 31.

[431] *See* Ex. 81, PTX-1509(B), at 6-7 (Skipworth 2016 Rpt.).

[432] *See* Ex. 9, Tr. vol. 10, 25:6-18 (Skipworth); *see also* Ex. 5, Tr. vol. 6, 69:14-19 (Hogans) (agreeing that functioning lights are important to the safety of the prison).

[433] *See* Ex. 9, Tr. vol. 10, 47:4-25 (Skipworth) (noting shock hazard created by lights operated by screwing and unscrewing the bulb), Ex. 9, Tr. vol. 10, at 49:6-25 (Skipworth) (noting fire hazard created by bare light bulbs, which can ignite paper and other items); ECF No. 799-1, at 24 (Stern 2018 Rpt.) (noting that light fixtures installed after trial present risk of electrocution due to exposed 120-volt wires).

[434] *See* Ex. 77, PTX-1506, at 18 (Kupers 2016 Rpt.) ("Depression and paranoid thinking are severely exacerbated by excessive darkness."); Ex. 15, Tr. vol. 16, 72:11-74:18 (Kupers) (noting the mental health

Defendants also fail to maintain adequate fire protection and ventilation at EMCF. Fires and the smoke they produce pose substantial risks to prisoners.[435] Poor ventilation within EMCF exacerbates the problem.[436] Fires are frequent. Poorly ventilated smoke presents health risks, particularly for asthmatics. Fires also present mental health risks.[437]

Finally, Defendants fail to maintain adequate cleanliness at EMCF. Unsanitary living conditions at EMCF put prisoners at a substantial risk of harm. Their physical health is endangered by pest infestations and substandard responses to biohazards, such as spilled blood, may expose them to communicable diseases.[438] Such conditions also present mental health risks and frustrate mental health treatment.[439] Prisoners also frequently lack even basic cleaning supplies.[440]

Defendants are aware of their obligation to provide functioning lights, adequate fire protection, and minimum levels of sanitation, and that they have failed to meet that obligation,

risks created by fires, lack of sanitation, lack of functioning lights, and other environmental conditions); Ex. 14, Tr. vol. 15, 70:24-71:17 (Mitchell) (describing depression connected to segregation of up to a week without adequate light); Ex. 10, Tr. vol. 11, 81:14-17 (Grogan) (describing depression during periods without working lights).

[435] See Ex. 5, Tr. vol. 6, 73:24-25 (Hogans); Ex. 13, Tr. vol. 14, 53:3-53:7 (Donald).

[436] *See* Ex. 9, Tr. vol. 10, 58:1-60:23 (Skipworth) (noting that staff failure to control the common problem of blocked air vents negatively inhibits ventilation of smoke).

[437] Ex. 15, Tr. vol. 16, 72:11-74:18 (Kupers); *see also supra* Sections II.F, III.C.

[438] Ex. 81, PTX-1509(B) at 11-12 (describing communicable disease risk presented by vermin); Ex. 9, Tr. vol. 10, 64:21-68:23 (Skipworth) (prisoner arrived to clean up spilled blood without proper protective equipment); Ex. 8, Tr. vol. 9, 44:20-45:7 (Beasley) (required to clean prisoners' blood from cells without cleaning chemicals).

[439] Ex. 15, Tr. vol. 16, 77:6-22 (Kupers) (noting that "littered" or "filthy" environments impede mental health treatment).

[440] *See* Ex. 10, Tr. vol. 11, 13:20-24 (Skipworth) (prisoners' access to cleaning equipment and cleaning agents is "limited, if . . . [any] at all"); Ex. 14, Tr. vol. 15, 74:21-76:6 (Mitchell) (trash and rats in cell); Ex. 17, Tr. vol. 18, 75:11-75:19 (Dockery) (same); Ex. 15, Tr. vol. 16, 72:21-73:4 (Kupers) (lack of cleanliness in solitary confinement).

[440] Ex. 80, PTX-1509(A), at 6-12, 15-18 (Skipworth 2014 Rpt.); *see also* Ex. 12, Tr. vol. 13, 17:18-18:11 (Thomas) (contract monitor recommended light fixtures be replaced in June 2015); Ex. 11, Tr. vol. 12, 52:10-53:4 (Thomas) (repeatedly notified Defendants of "nasty" conditions within the facility in weekly reports submitted from 2015-2017); Ex. 12, Tr. vol. 13, 25:10-20 (Compton, regarding light); Ex. 5, Tr. vol. 6, 73:24-25 (Hogans) (admitting that "[f]ires on the housing unit put staff and prisoners at risk"); Ex. 13, Tr. vol. 14, 53:5-7 (Donald) (admitting that fires can be dangerous to both prisoners and staff).

since, at the latest, their receipt of Plaintiffs' expert's 2014 report.[441] Defendants have consistently failed, however, to timely address these well-documented problems.[442] They have offered no evidence of permanent steps taken to ensure the problems will not recur.

To permanently resolve these problems, Plaintiffs' expert Diane Skipworth recommends addressing broken light fixtures and missing light bulbs, eliminating fire hazards presented by exposed light bulbs, removing blockages over air vent grilles, and eliminating unsanitary, pest-harboring conditions throughout EMCF.[443]

## VII.   Claim Seven—Nutrition and Food Safety

Defendants fail to deliver adequate nutrition to plaintiffs and fail to meet minimum food safety standards.[444] First, prisoners receive meals that deviate from the approved menus and contain significantly less nutritious foods.[445] Second, prisoners receive inadequate quantities of food, in part because staff direct kitchen workers to dilute food with water or decrease serving sizes.[446] Prisoners, left hungry, rummage for food in the trash.[447] Third, prisoners receive food that has been exposed to pests, is prepared using unsafe food handling practices, or contains spoiled or unwashed ingredients.[448] Each failing places Plaintiffs' health at risk because many prisoners have

---

[441] *See supra* n.440.

[442] *See* Ex. 13, Tr. vol. 14, 69:1-13 (Donald) (testifying that although prisoners tampered with light fixtures throughout his three years working on Unit 5, only one light fixture was replaced); *see also* Ex. 9, Tr. vol. 10, 74:14-76:13 (Skipworth) (noting that deficiencies observed in 2014 persisted in 2016); ECF No. 799-1, at 24 (Stern 2018 Rpt.) ("fires still occur in Housing Unit 5 and elsewhere"); Ex. 148, PTX-2802 (contract monitor weekly report compilation) (findings regarding cleanliness and sanitation from Sept. 2014 to June 2017).

[443] *See* Ex. 81, PTX-1509(B), at 15 (Skipworth 2016 Rpt.).

[444] *See, e.g.*, Ex. 9, Tr. vol. 10, 83:5-20, 85:12-87:8 (Skipworth).

[445] *See, e.g.*, *id.* at 77:10-80:10, 81:22-82:11, 82:12-83: 20.

[446] Ex. 10, Tr. vol. 11, 56:21-57:19, 58:1-58:17 (Brewer).

[447] Ex. 10, Tr. vol. 11, 66:4-67:3 (Brewer); Ex. 10, Tr. vol. 11, 103:4-21 (Grogan); Ex. 16, Tr. vol. 17, 81:11-81:22 (Hale); Ex. 17, Tr. vol. 18, 54:23-55:17 (Jones); Ex. 24, Tr. vol. 25, 30:10-22 (Campbell).

[448] *See* Ex. 8, Tr. vol. 9, 67:10-14; 69:8-11 (Pugh) (describing roach infestation), 67:16-69:5 (kitchen utensils and equipment not sanitized); Ex. 8, Tr. vol. 9, 14:18-15:4 (Mata) (describing roaches and mouse droppings); Ex. 10, Tr. vol. 11, 61:11-62:17 (Brewer) (roaches and rodent droppings sighted regularly in kitchen; food served that had been chewed on by rodents), 53:16-56:9 (unwashed produce and rancid-

no other options to meet their nutritional needs,[449] exposing them to potential disease.[450]

Defendants have known of the risks posed by these conditions for years and have failed to fix them. In 22 out of 32 monthly reports between September 2014 and June 2017, Ms. Thomas noted EMCF did not properly maintain and log appropriate food service and storage temperatures.[451] Ms. Skipworth identified other deficiencies in her 2014 report that she continued to find two years later.[452] Thus, though Defendants temporarily improve conditions when under scrutiny,[453] the record makes clear that deficient conditions quickly recur.

Ms. Skipworth recommends that Defendants should remove sources of food, water, and harborage that support vermin and seal the outside of the building to prevent the entry of rodents.[454] Defendants must enact policies and practices that ensure adherence with applicable food safety rules, regulations, and guidelines, ensure that meals are consistent with dietician-approved menus; and ensure that prisoners are actually served adequate meals at appropriate times.[455]

---

smelling meat served; trash regularly in food preparation bins), 67:4-69:12 (served dirty lettuce and pink, undercooked meat); Ex. 14, Tr. vol. 15, 81:8-17; 82:4-9 (Mitchell) (served spoiled or undercooked meat several times per month); Ex. 24, Tr. vol. 25, 28:11-30:2 (Campbell) (served frozen or spoiled food).

[449] *See, e.g.*, Ex. 9, Tr. vol. 10, 83:5-20 (Skipworth) ("they are reliant upon the nutrients and the calories and the protein provided by the facility meals to ensure their health and well-being").

[450] Ex. 9, Tr. vol. 10, 90:1-6 (Skipworth); Ex. 10, Tr. vol. 11, 7:2-18 (Skipworth).

[451] *See* Ex. 12, Tr. vol. 13, 16:14-17:11 (Thomas).

[452] *See* Ex. 9, Tr. vol. 10, 74:14-17, 89:7-14 (Skipworth); Ex. 10, Tr. vol. 11, 7:2-18 (Skipworth).

[453] *E.g.* Ex. 10, Tr. vol. 11, 63:10-64:15 (Brewer) (kitchen cleaned before scheduled tours).

[454] *See* Ex. 80, PTX-1509(A), at 12-14 (Skipworth 2014 Rpt.).

[455] *See id.*

                                                      s/ Benjamin R. Salk

Mark P. Gimbel (admitted *pro hac vice)*          Jody E. Owens, II, MS Bar # 102333
Erin Monju (admitted *pro hac vice)*              Elissa Johnson, MS Bar # 103852
Covington & Burling LLP                           Benjamin R. Salk, MS Bar # 105869
The New York Times Building                       Southern Poverty Law Center
620 Eighth Avenue                                 111 E. Capitol Street, Suite 280
New York, NY 10018                                Jackson, MS 39201
Phone: 212-841-1000                               Phone: 601-948-8882; Fax: 601-948-8885


Gretchen Hoff Varner (admitted *pro hac vice)*    Eric G. Balaban (admitted *pro hac vice*)
Covington & Burling LLP                            Jennifer Wedekind (admitted *pro hac vice*)
One Front Street                                   National Prison Project of ACLU
San Francisco, CA 94111                            915 15th Street, NW, 7th Floor
Phone: 415-591-6000                                Washington, DC 20005
                                                   Phone: 202-393-4930; Fax: 202-393-4931

Ravi Doshi (admitted *pro hac vice)*
Anna Q. Han (admitted *pro hac vice)*              Elizabeth Alexander *(*admitted *pro hac vice*)
Covington & Burling LLP                            Law Offices of Elizabeth Alexander
850 Tenth Street, NW Washington, DC 20001          1416 Holly Street NW
Phone: 202-662-6000                                Washington, DC 20012
                                                   Phone: 202-291-3774

                                                   *Attorneys for Plaintiffs*