# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### NORTHERN DIVISION

JERMAINE DOCKERY, et al.                                    **PLAINTIFFS**

VS.                              **CIVIL ACTION NO. 3:13-CV-00326-WHB-JCG**

PELICIA HALL, et al.                                        **DEFENDANTS**

### POST-TRIAL BRIEF OF DEFENDANTS
### <u>COMMISSIONER PELICIA HALL, ET AL.</u>

Harold E. Pizzetta, III, Bar No. 99867
Krissy Nobile, Bar No. 103577
Office of the Attorney General
Post Office Box 220
Jackson, Mississippi 39205
Telephone: (601) 359-3860
hpizz@ago.state.ms.us
knobi@ago.state.ms.us

Michael J. Bentley, Bar No. 102631
Molly M. Walker, Bar No. 100689
Bradley Arant Boult Cummings, LLP
188 East Capitol Street, Suite 1000
Jackson, Mississippi 39201
Telephone:  (601) 948-8000
mbentley@bradley.com
mmwalker@bradley.com

Gary E. Friedman, Bar No. 5532
W. Thomas Siler, Jr., Bar No. 6791
Nicholas F. Morisani, Bar No. 104970
Phelps Dunbar, LLP
4270 I-55 North
Jackson, Mississippi 39211-6391
Telephone: 601-352-2300
gary.griedman@phelps.com
tommy.siler@phelps.com
nick.morisani@phelps.com

**ATTORNEYS FOR DEFENDANTS**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... iv

INTRODUCTION ....................................................................................................1

RELEVANT BACKGROUND ...................................................................................2

LEGAL STANDARDS .............................................................................................3

    I.        Eighth Amendment – Deliberate Indifference Standard...........................................3

    II.      Eleventh Amendment Immunity – Ongoing Violations Requirement...........................................................................................4

    III.    Federal Rule 23 – Class Certification and Class Relief Standards .........................7

ARGUMENT .........................................................................................................8

    I.        Category One – Solitary Confinement....................................................9

          A.      Segregating dangerous prisoners is an accepted correctional practice, and EMCF's use of isolation does not violate the Eighth Amendment. ...............................................................9

          B.      The Court should enter judgment for MDOC on the Isolation Claims. ....................................................................12

                 1.      Prisoners in Unit 5 receive constitutionally adequate out-of-cell time.............................................................12

                 2.      The living conditions on Unit 5 are not foul or inhuman..................................................................13

                 3.      Guards do not beat or ignore prisoners on Unit 5..........................15

                 4.      Warden Shaw and his staff take reasonable and effective steps to prevent prisoner-on-prisoner assaults in Unit 5. .........................................................16

    II.      Category Two – Mental Health Care .....................................................18

          A.      Overview of EMCF's Mental Health Care System. ...............................18

          B.      The Court should enter judgment for MDOC on the Mental Health Claims.................................................................22

                 1.      Prisoners on the mental health caseload have regular contact with EMCF's psychiatrist and psychiatric nurse practitioners. .......................................23

                 2.      Prisoners have regular interactions with mental health professionals.............................................24

                 3.      Psychiatric staff consult with their patients when prescribing medication.................................................24

i

4.     EMCF provides adequate individual and group therapy..................................................25

5.     Prisoners are not overmedicated with tranquilizing injections. ...............................................................26

6.     The conditions at EMCF do not exacerbate prisoners' symptoms. ..................................................28

7.     EMCF's mental health staff uses medical judgment when determining whether a prisoner's mental illness is the root cause of misconduct..........................................28

C.     Plaintiffs have not identified a single-stroke remedy that satisfies Rule 23(b) and the Prison Litigation Reform Act's narrow-tailoring requirement. ....................................29

III.     Category Three – Medical Care ............................................31

A.     Overview of EMCF's Medical System..................................31

B.     The Court should enter judgment for MDOC on the Medical Care Claims........................................................33

1.     EMCF has sufficient medical staff to provide the basic medical care required by the Eighth Amendment...........................................................33

2.     Prisoners are not subjected to unconstitutional delays in accessing healthcare providers and outside specialists. .....................................................35

3.     Prisoners are receiving appropriate treatment by nurse practitioners. .............................................38

4.     Medication administration at EMCF satisfies constitutional requirements for timely provision of medical care. ..........................................................39

5.     Prisoners are not denied treatment for acute or chronic conditions...................................................42

6.     EMCF provides prisoners with adequate dental care. .......................................................................43

7.     Prisoners are not denied treatment recommended by specialists. .............................................................44

C.     Plaintiffs' proposed injunctive relief violates Rule 23 and the PLRA. ....................................................................44

IV.     Category Four – Excessive Force ..........................................45

A.     The Court should enter judgment for MDOC on the Excessive Force Claims.................................................46

B.     Plaintiffs' proposed injunctive relief violates Rule 23 and the PLRA. ...................................................................................51

V.     Category Five – Protection from Harm ........................................................52

A.     MDOC provides adequate security staff for EMCF. ................................52

B.     The Court should enter judgment for MDOC on the Protection from Harm Claims. ...............................................................57

1.     There is no continuing constitutional violation from assaults. ....................................................................................57

2.     There is no continuing constitutional violation from gangs. .........................................................................................59

3.     There is no continuing constitutional violation from cell door locks. ...............................................................................60

4.     There is no continuing constitutional violation from counts. ........................................................................................62

C.     Plaintiffs' proposed injunctive relief violates Rule 23 and the PLRA. ...................................................................................63

VI.     Category Six – Environmental Conditions ..............................................63

A.     The Court should grant judgment for MDOC on the Environmental Claims. .................................................................64

B.     Plaintiffs' proposed injunctive relief violates Rule 23 and the PLRA. ...................................................................................67

VII.     Category Seven – Nutrition and Food Safety .........................................68

A.     The Court should grant judgment for MDOC on the Nutrition and Food Safety Claims. ............................................68

B.     Plaintiffs' proposed injunctive relief violates Rule 23 and the PLRA. ...................................................................................69

CONCLUSION ....................................................................................................70

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adames v. Perez,*
    331 F.3d 508 (5th Cir. 2003) .................................................................58

*Adams v. Duke,*
    73 Fed. Appx. 766 (5th Cir. 2003) ..........................................................39

*Alberti v. Heard,*
    600 F. Supp. 443 (S.D. Tex. 1984) .........................................................59

*Alberti v. Klevenhagen,*
    790 F.2d 1220 (5th Cir. 1986) ...............................................................30

*Ayotte v. Barnhart,*
    973 F. Supp. 2d 70 (D. Me. 2013) ............................................................3

*Baze v. Rees,*
    553 U.S. 35 (2008)................................................................................48

*Beaton v. Tennis,*
    2010 WL 2696857 (M.D. Pa. May 10, 2010), *aff'd* 460 F. App'x 111 (3d Cir.
    2012) ...................................................................................................3

*Bell v. Wolfish,*
    441 U.S. 520 (1979)..............................................................................39

*Black v. Wilkinson,*
    2010 WL 793448 (W.D. La. Mar. 2, 2010) .............................................42

*Braggs v. Dunn,*
    317 F.R.D. 634 (M.D. Ala. 2016) ..........................................................48

*Brauner v. Coody,*
    793 F.3d 493 (5th Cir. 2015) ...........................................................23, 27

*Cantu Servs., Inc. v. Roberie,*
    535 F. App'x 342 (5th Cir. 2013) .............................................................5

*Carrigan v. State of Del.,*
    957 F. Supp. 1376 (D. Del. 1997)...........................................................26

*Cotton v. Taylor,*
    176 F.3d 479 (5th Cir. 1999) ...........................................................51, 67

*Cowart v. Erwin*,
   837 F.3d 444 (5th Cir. 2016) .........................................................................47

*Easter v. Powell*,
   467 F.3d 459 (5th Cir. 2006) ....................................................................16, 35

*Estelle v. Gamble*,
   429 U.S. 97 (1976)...........................................................................................29

*Estes v. Rahorst*,
   2013 WL 5422874 (N.D. Tex. Sept. 27, 2013)...............................................44

*Farmer v. Brennan*,
   511 U.S. 825 (1994) ................................................................................ *passim*

*Florence v. Bd. of Chosen Freeholders*,
   566 U.S. 318 (2012)..........................................................................................48

*Freeman v. Miller*,
   615 F. App'x 72 (3d Cir. 2015) ...............................................................10, 13

*Gates v. Cook*,
   376 F.3d 323 (5th Cir. 2004) ................................................................. *passim*

*Gibson v. Collier*,
   920 F.3d 212 (5th Cir. 2019) ....................................................................27, 38

*Gobert v. Caldwell*,
   463 F.3d 339 (5th Cir. 2006) ................................................................. *passim*

*Estate of Henson v. Wichita Cty., Tex.*,
   795 F.3d 456 (5th Cir. 2015) ....................................................................30, 35

*Hernandez v. Estelle*,
   788 F.2d 1154 (5th Cir. 1986) .........................................................................12

*Hernandez v. Velaquez*,
   522 F.3d 556 (5th Cir. 2008) ....................................................................12, 13

*Hudson v. McMillian*,
   503 U.S. 1 (1992)..........................................................................................3, 47

*Hurd v. Stanciel*,
   2015 WL 10889995 (N.D. Miss. Dec. 10, 2015)............................................41

*Hutto v. Finney*,
   437 U.S. 678 (1978).........................................................................................10

*Inmates of Occoquan v. Barry*,
    844 F.2d 828 (D.C. Cir. 1988) ...................................................................................11, 33

*Irby v. Cole*,
    2006 WL 2827551 (S.D. Miss. Sept. 25, 2006), *aff'd*, 278 F. App'x 315 (5th
    Cir. 2008) ...................................................................................................................42, 43

*Jackson v. Heer*,
    322 F. Supp. 3d 406 (S.D.N.Y. 2018) ..............................................................................10

*Jones v. Diamond*,
    636 F.2d 1364 (5th Cir. 1981) ..........................................................................................58

*Krivan v. Dallas Cty.*,
    2002 WL 83768 (N.D. Tex. Jan. 14, 2002) ......................................................................41

*Lakin v. Barnhart*,
    2013 WL 5407213 (D. Me. Sep. 25, 2013) ..............................................................3, 62, 64

*Legate v. Livingston*,
    822 F.3d 207 (5th Cir. 2016) ............................................................................................60

*Maldonado v. Ochsner Clinic Found.*,
    493 F.3d 521 (5th Cir. 2007) ........................................................................................7, 51

*Martin v. Scott*,
    156 F.3d 578 (5th Cir. 1998) ............................................................................................10

*Mayweather v. Foti*,
    958 F.2d 91 (5th Cir. 1992) ..............................................................................................11

*Mazzei v. Money Store*,
    829 F.3d 260 (2d Cir. 2016) ...............................................................................................8

*McCarthy v. Hawkins*,
    381 F.3d 407 (5th Cir. 2004) ..............................................................................................4

*McCormick v. Stalder*,
    105 F.3d 1059 (5th Cir. 1997) ..........................................................................................43

*McKune v. Lile*,
    536 U.S. 24 (2002) ..............................................................................................................9

*Mendoza v. Lynaugh*,
    989 F.2d 191 (5th Cir. 1993) ............................................................................................39

*Papasan v. Allain*,
    478 U.S. 265 (1986) ........................................................................................................5, 7

*Pinson v. United States*,
    2018 WL 1123713 (M.D. Penn. Feb. 26, 2018) ...................................................29

*Porter v. Clarke*,
    923 F. 3d 348 (4th Cir. 2019) .........................................................................4, 6, 7

*Presley v. Epps*,
    4:05-cv-148 (N.D. Miss.)......................................................................................19

*Rhodes v. Chapman*,
    452 U.S. 337 (1981)........................................................................................11, 18

*Riccardo v. Rausch*,
    375 F.3d 521 (7th Cir. 2004) ...............................................................................46

*Roy v. Lawson*,
    2018 WL 1054198 (S.D. Tex. Feb. 26, 2018), *aff'd*, 739 F. App'x 266 (5th
    Cir. 2018) ...............................................................................................................5

*Ruiz v. Johnson*,
    37 F. Supp. 2d 855 (S.D. Tex. 1999), *rev'd on other grounds*, 243 F.3d 941
    (5th Cir. 2001).....................................................................................................46

*Sandin v. Conner*,
    515 U.S. 472 (1995).......................................................................................10, 31

*Seminole Tribe v. Florida*,
    517 U.S. 44 (1996)................................................................................................5

*Shrader v. White*,
    761 F.2d 975 (4th Cir. 1985) ................................................................................3

*Street v. Corrections Corp. of America*,
    102 F.3d 810 (6th Cir. 1996) ..............................................................................54

*Tasby v. Cain*,
    2017 WL 4295441 (M.D. La. Sept. 12, 2017)...............................................10, 26

*Thompson v. Campos*,
    691 F. App'x 193 (5th Cir. 2017) ........................................................................50

*Turner v. Safley*,
    482 U.S. 78 (1987).........................................................................................1, 31

*Umondak v. Ginsel*,
    426 F. App'x 267 (5th Cir. 2011) ........................................................................13

*United States v. Carl Reddix*,
  No. 3:16-cr-00050-DJP-FKB (S.D. Miss. Dec. 22, 2017).......................................19

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011).............................................................................. *passim*

*Walker v. Livingston*,
  381 F. App'x 477 (5th Cir. 2010) ...............................................................5

*Weeks v. Warden*,
  2017 WL 3404965 (N.D. Ill. Aug. 7, 2017) .................................................46

*West v. Atkins*,
  487 U.S. 42 (1988)...............................................................................31

*White v. Napoleon*,
  897 F.2d 103 (3d Cir. 1990)....................................................................27

*Wilkinson v. Austin*,
  545 U.S. 209 (2005)...........................................................................9, 10

*Williams v. Hampton*,
  797 F.3d 276 (5th Cir. 2015) (en banc) ......................................................4

*Williams v. Wood*,
  223 F. App'x 670 (9th Cir. 2007) ............................................................69

*Yates v. Collier*,
  868 F.3d 354 (5th Cir. 2017) ........................................................8, 30, 67

## Statutes

Miss. Admin. Code Title 30, Part 2840 ............................................................38

Miss. Code § 73-15-20................................................................................38

## Other Authorities

Eighth Amendment ............................................................................ *passim*

Eleventh Amendment...........................................................................4, 5, 6, 7

Cruel and Unusual Punishments Clause ...............................................................4

Fed. R. 23 ................................................................................... *passim*

Fed. R. 23(a)(2)........................................................................................7

Fed. R. 23(b) ........................................................................................29

Fed. R. 23(b)(2)..........................................................................................................7, 51

Colorado Dep't of Corrections, *One Year Longitudinal Study of the Psychological
    Effects of Administrative Segregation* (Oct. 31, 2010) ...........................................10

## INTRODUCTION

After six years of litigation, over 18 months of post-certification discovery, a six week bench trial, additional post-trial discovery, and repeated admonitions by the Court that conditions have changed, Plaintiffs still refuse to acknowledge any improvements to the management and operations of the East Mississippi Correctional Facility ("EMCF").  Although Plaintiffs refuse to concede any of the claims that they pled six years ago, the Court does not need their concessions to see that the dire tale told by Plaintiffs simply does not match the reality of life at EMCF.

Commissioner Pelicia Hall, Warden Frank Shaw, Chief Psychiatrist Dr. Steven Bonner (and his predecessor Dr. Kim Nagel), and the Mississippi Department of Corrections ("MDOC") have made vast improvements in the delivery of medical and mental healthcare and in the overall safety and security of prisoners and staff alike.  This case remains about one thing: Plaintiffs' desire to control every aspect of EMCF's operations, from prisoner-housing decisions to medication administration to food preparation.  Rather than recognize MDOC's improvements in the last six years, which were apparent at trial and during the Court's inspection of EMCF, *see* Doc. 767 at 8-10, Plaintiffs and their public-interest lawyers from around the country remain determined to control operations at EMCF.

Running a prison, not to mention a healthcare system within a prison, is an "inordinately difficult undertaking," and federal courts have always afforded "deference and flexibility to state officials trying to manage a volatile environment" within a prison.  *Turner v. Safley*, 482 U.S. 78, 84-85 (1987).  While Plaintiffs offer a multitude of suggestions for running EMCF in their preferred fashion, they have not met their burden to prove that prison officials—to whom deference is owed—are deliberately indifferent to serious risks of harm or serious medical needs.

MDOC requests judgment in its favor on each of Plaintiffs' seven claims.

**RELEVANT BACKGROUND**

Located in Lauderdale County, Mississippi, EMCF was constructed in 1999 and expanded in 2008 to include two additional units, Unit 5 and Unit 6.[1]  Since July 2012, the safety and security operations at EMCF have been provided by Management & Training Corporation ("MTC").[2] Since July 2015, Centurion of Mississippi has provided medical and mental healthcare at EMCF.[3]

On May 30, 2013, Plaintiffs filed their Complaint, advancing seven "conditions of confinement" claims against MDOC.  Doc. 1 ¶¶ 313-325.  On September 29, 2015, the Court certified this case as a class action and identified several classes: a prison-wide "EMCF Class" and three subclasses—the "Isolation Subclass," the "Units 5 and 6 Subclass," and the "Mental Health Subclass."  Doc. 257 at 30. The case was tried as a class action from March 5, 2018 to April 9, 2018.  On August 24, 2018, the Court issued an Order describing the various improvements made by MDOC at EMCF and ordering the parties to submit supplemental reports on three specific issues: staffing, medical care, and mental healthcare.  Doc. 767 at 8-11.

On March 26, 2019, after obtaining those supplemental reports, the Court requested post-trial briefs.  *See* Doc. 830. The Court identified the bases underlying each of Plaintiffs' seven claims and instructed Plaintiffs to do three things:  (1) "expressly identify" which bases, if any, "continue to exist at EMCF, and . . . result in the constitutional violations about which [Plaintiffs] complain[,]" (2) cite evidence showing how each identified bases presents a continuing constitutional violation, and (3) identify the injunctive relief that Plaintiffs claim would remedy the alleged violation.  Doc. 830 at 5.

---

[1] Ex. D-178, 2017 Expert Report of Tom Roth and Ken McGinnis at 5.
[2] Ex. D-178, 2017 Expert Report of Tom Roth and Ken McGinnis at 5.
[3] Tr. Vol. 23, 48:3-4 (testimony of MDOC Chief Medical Officer Dr. Gloria Perry).

## LEGAL STANDARDS

Plaintiffs' recitation of the legal standard is seriously flawed.  Plaintiffs overlook the requirement that, to establish an Eighth Amendment violation, they must show constitutionally significant harm *and* that EMCF is deliberately indifferent to that harm.  Plaintiffs also ignore the requirement that they prove an ongoing violation of federal law to obtain prospective injunctive relief against Commissioner Hall and other state officials.  Lastly, Plaintiffs fail to propose any injunctive relief that would satisfy the requirements of class action rules that govern this suit.

## I.  Eighth Amendment – Deliberate Indifference Standard.

To comply with the Court's order to identify "constitutional-rights violations," Plaintiffs must satisfy two requirements under the Eighth Amendment: demonstration of a substantial risk of serious harm and deliberate indifference.  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

"Substantial risk of serious harm" is an objective inquiry that requires satisfaction of two components: (1) harm and (2) risk.  With respect to "harm," courts must consider whether the alleged harm is "sufficiently serious[.]"  *Hudson v. McMillian*, 503 U.S. 1, 21 (1992).  "This circuit has worded the test as requiring extreme deprivation of any minimal civilized measure of life's necessities."  *Gates v. Cook*, 376 F.3d 323, 332 (5th Cir. 2004) (internal quotation marks omitted)).  With respect to "risk," courts must consider whether there is a "substantial" risk that the alleged harm is likely to occur.  *Id*.  Courts equate "substantial risk" with a "pervasive" risk of harm.  *See Lakin v. Barnhart*, 2013 WL 5407213, *7 (D. Me. Sep. 25, 2013).  This "pervasive" risk or conduct must result in a real and proximate threat, as opposed to "isolated incidents."  *See id*. at *7 (citing *Shrader v. White*, 761 F.2d 975, 978 (4th Cir. 1985)); *see also Beaton v. Tennis*, 2010 WL 2696857, **5-6 (M.D. Pa. May 10, 2010), *aff'd* 460 F. App'x 111, 114-15 (3d Cir. 2012).  In the same vein, "[t]he possibility of harm is not equivalent to the substantial risk of harm."  *Ayotte v. Barnhart*, 973 F. Supp. 2d 70, 80 (D. Me. 2013).

"Deliberate indifference" likewise requires satisfaction of two components: (1) the defendant's awareness "of facts from which the inference could be drawn that a substantial risk of serious harm exists" and (2) the defendant actually "draw[ing] the inference." *Williams v. Hampton*, 797 F.3d 276, 281 (5th Cir. 2015) (en banc). These components cannot be met if the defendant "responds reasonably" to substantial risks to inmate health or safety, "even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844-45 ("Whether one puts it in terms of duty or deliberate indifference, prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause.").

The importance of both requirements—substantial risk of serious harm *and* deliberate indifference—cannot be understated. To comply with the Court's order requiring them to identify, explain, and support (with record evidence) the constitutional-rights violations about which they complain, Plaintiffs must address both requirements.

## II.     Eleventh Amendment Immunity – Ongoing Violations Requirement.

In their discussion of the legal standard, Plaintiffs argue they "do not bear the burden of proving continuing violations" and that MDOC bears a "heavy burden" of establishing that their claims are moot. This is not only incorrect, it is a telling admission that Plaintiffs cannot meet *their burden to prove* a current constitutional violation. Plaintiffs' reliance on *Porter v. Clarke*, 923 F. 3d 348 (4th Cir. 2019), is mistaken.

Prisoners *may not* obtain injunctive relief against state prison officials unless they prove a current violation of the Eighth Amendment. Because Plaintiffs have sued MDOC officers in their official capacities, their claims are treated as being advanced against the State of Mississippi. *McCarthy v. Hawkins*, 381 F.3d 407, 412 (5th Cir. 2004). Normally, such claims would be barred by the Eleventh Amendment's sovereign immunity rules, but the *Ex Parte Young* doctrine provides a narrow exception for prospective relief suits against individual officers. "[T]he *Ex parte Young*

4

doctrine allows federal jurisdiction over a suit against a state official in certain situations where that suit seeks only prospective injunctive relief in order to end a continuing violation of federal law." *Walker v. Livingston*, 381 F. App'x 477, 478 (5th Cir. 2010) (citing *Seminole Tribe v. Florida*, 517 U.S. 44, 73 (1996)). "Consequently, [*Ex parte*] *Young* has been focused on cases in which a violation of federal law by a state official is ongoing as opposed to cases in which federal law has been violated at one time or over a period of time in the past . . . ." *Papasan v. Allain*, 478 U.S. 265, 277-78 (1986).

To avail themselves of the *Ex Parte Young* exception, Plaintiffs must establish an ongoing violation of federal law that they seek to enjoin through prospective injunctive relief. *Papasan v. Allain*, 478 U.S. at 278; *accord Cantu Servs., Inc. v. Roberie*, 535 F. App'x 342, 345 (5th Cir. 2013) (noting that a plaintiff seeking to advance claims against state officials in their official capacity "must establish that it has a constitutionally protected interest that was continuing to be infringed by State officials"); *Roy v. Lawson*, 2018 WL 1054198, *19 (S.D. Tex. Feb. 26, 2018), *aff'd*, 739 F. App'x 266, 267 (5th Cir. 2018) (prisoner's deliberate indifference claims barred by Eleventh Amendment where the plaintiff did "not offer[] competent evidence to show an ongoing violation that would entitle him to prospective injunctive relief" because "the Eleventh Amendment bars claims against state officials for injunctive relief unless the plaintiff seeks only prospective injunctive relief and 'seeks to address a continuing violation of federal law.'").

This requirement of an ongoing violation also is consistent with the Supreme Court's decision in *Farmer*, 511 U.S. at 845-46. There, the Court explained that "[i]n a suit [seeking] injunctive relief to prevent a substantial risk of serious injury from ripening into actual harm, the subjective factor, deliberate indifference, should be determined in light of the prison authorities'

current attitudes and conduct [i.e.,] their attitudes and conduct at the time suit is brought and

persisting thereafter." *Id.* at 845 (citation omitted).  The Court further explained that:

> to survive summary judgment, [the inmate] must come forward with evidence from
> which it can be inferred that the defendant-officials were at the time suit was filed,
> and are at the time of summary judgment, knowingly and unreasonably
> disregarding an objectively intolerable risk of harm, and that they will continue to
> do so; and finally to establish eligibility for an injunction, the inmate must
> demonstrate the *continuance of that disregard during the remainder of the
> litigation and into the future*.

*Id.* at 845-46 (citations omitted) (emphasis added).

Despite these well-established Eighth and Eleventh Amendment rules, Plaintiffs insist that

they need not establish a current violation of federal law to obtain prospective injunctive relief.

They base this novel argument on *Porter v. Clarke*, 923 F. 3d 348 (4th Cir. 2019), which is

distinguishable and, in any event, does not address sovereign immunity concerns raised above.  In

*Porter*, the district court granted summary judgment to the prisoner-plaintiffs, finding it to be

*undisputed* that the prison conditions in that case violated the Eighth Amendment; the only

question to be resolved was what remedy should be employed.  *Id.* at 354.  In an effort to avoid

injunctive relief, prison officials argued that voluntary policy changes meant to address the

established Eighth Amendment violations had mooted the prisoners' claims.  *Id.* at 364-65.  The

Court rejected the defendants' mootness argument because prison officials would not commit to

retaining the policy changes if the lawsuit was dismissed on mootness grounds.  *Id.* at 365.

Quite unlike *Porter*, the Court has not found any constitutional violations at EMCF, which

is a question of fact that has been disputed through trial and to this date.  MDOC does not rely on

a mootness defense because there is no established violation to be mooted.  Instead, as detailed

below, Plaintiffs have not met their heavy burden to prove an Eighth Amendment violation in the

first place.  *Porter*'s mootness analysis for *established* violations does not apply here.

Moreover, the *Porter* decision does not acknowledge or address the Eleventh Amendment and the requirements for obtaining prospective injunctive relief against state officials. Rather, the *Porter* Court, applying an abuse of discretion standard of review, affirmed the district court's finding that an injunction was necessary to prevent prison officials from reverting back to what the district court held were *indisputably* unconstitutional conditions. *Id.* at 365-66. Unlike this Court and EMCF, the *Porter* Court was not confronting disputed violations of the Eighth Amendment. Accordingly, *Porter* had no cause to address the *Ex parte Young* exception to sovereign immunity, which is reserved for "cases in which the relief against the state official directly ends the violation of federal law as opposed to cases in which that relief is intended *indirectly to encourage compliance with federal law through deterrence . . . .*" *Papasan*, 478 U.S. at 277-78. *Porter* does not apply here on either the facts or the law.

## III.    Federal Rule 23 – Class Certification and Class Relief Standards.

The Court also instructed Plaintiffs to "identify the injunctive relief they claim would remedy the alleged violation(s)" of their Eighth Amendment rights. Doc. 830 at p. 5. Plaintiffs, however, fail to acknowledge the requirements placed upon them in their class-action suit.

The first requirement, "commonality," is found in Rule 23(a)(2) and mandates that Plaintiffs "affirmatively demonstrate," that their claims depend upon a "common contention" that will resolve an issue that is "central to the validity" of their claims in "one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349-56 (2011). Second, under Rule 23(b)(2)'s "cohesion" requirement, Plaintiffs must show that members of the class "have been harmed in essentially the same way." *Maldonado v. Ochsner Clinic Found.*, 493 F.3d 521, 524 (5th Cir. 2007). As a corollary to cohesion, Rule 23(b)(2) requires Plaintiffs to show that "the injunctive relief sought [is] specific." *Id*. That is, class treatment under Rule 23(b)(2) is proper "only when a single

7

injunction . . . would provide relief to each member of the class." *Wal-Mart*, 564 U.S. at 360; *see Yates v. Collier*, 868 F.3d 354, 367 (5th Cir. 2017) (applying *Wal-Mart* to prisoner class action).

Plaintiffs must identify injunctive relief complying with these requirements. *See Mazzei v. Money Store*, 829 F.3d 260, 266 (2d Cir. 2016) (noting Rule 23 permits decertification of a class after trial but prior to entry of final judgment and affirming district court's decision to do so).

## ARGUMENT

In its order requesting post-trial briefs, the Court identified several specific claims to be addressed under each of seven general categories. *See* Doc. 830.  The Court explained (again) that "numerous changes had been made at EMCF after the lawsuit was filed, and that many of the changes directly bear on Plaintiffs' claims." *Id.* at 5.  And the Court instructed Plaintiffs to address *current* conditions by stating whether any of the enumerated issues "continue to exist at EMCF, and continue to result in" constitutional violations. *Id.* at 5.  The order contemplated that Plaintiffs would concede some claims that clearly are not *current* Eighth Amendment violations, and focus on whatever serious constitutional issues that they argue remain at EMCF.

Plaintiffs did not follow the Court's instructions.  Instead, Plaintiffs deviated from the Court's outline, making it difficult to determine which claims Plaintiffs concede and which ones they re-urge; and Plaintiffs insist that they "need not prove a current and ongoing violation to prevail," Doc. 843 at 6, making it hard to know what conditions they believe *currently* exist.  What the Court intended to be a narrowing exercise, has been turned into a sprawling attempt at error-preservation.  Rather than tumbling down Plaintiffs' rabbit hole, MDOC's post-trial brief follows the Court's outline and addresses the Court's enumerated claims.

# I.     Category One – Solitary Confinement.

The Court certified an Isolation Subclass consisting of inmates who are housed in EMCF's segregated housing (or "isolation") unit and identified four conditions-of-confinement claims to be addressed by the subclass.  Doc. 830 at 1-2.  Rather than address those prison-specific claims, Plaintiffs would make this a test case on the use of isolation as a correctional practice in *any prison*.  Plaintiffs' expert on this topic, Dr. Terry Kupers, is a long-time advocate for ending the use of isolation and has published a book calling for its abolishment.[4]  Like their expert, Plaintiffs offer only one remedy for the Isolation Subclass—a total ban on the use of isolation for any period longer than 14 days no matter the security justifications.  Doc. 843 at 55-56.

## A.     Segregating dangerous prisoners is an accepted correctional practice, and EMCF's use of isolation does not violate the Eighth Amendment.

"It is well settled that the decision where to house inmates is at the core of prison administrators' expertise."  *McKune v. Lile*, 536 U.S. 24, 39 (2002).  Segregating dangerous prisoners from the general population is a long-standing correctional practice in America, and today the Federal Bureau of Prisons and at least 35 state prison systems maintain isolated housing units or prisons.[5]  Isolation is employed to protect prison staff and other prisoners from violent offenders (including gang members) and to promote order and discipline by punishing rule violators.[6]  Warden Frank Shaw testified that isolated housing is a "necessity" at EMCF because the prison houses "offenders that can be very, very dangerous to staff and other offenders."[7]

---

[4] Tr. Vol. 17, 27:16-24 (Dr. Kupers discussing his book "Solitary: The Inside Story of Supermax Isolation and How We Can Abolish It").
[5] Tr. Vol. 17, 28:14-29:11 (Dr. Kupers); *see also Wilkinson v. Austin*, 545 U.S. 209, 213-14 (2005) (discussing reasons for and prevalence of supermax prisons in federal and state correctional systems).
[6] Tr. Vol. 17, 33:16-34:6 (Dr. Kupers).
[7] Tr. Vol. 31, 79:23-80:1 (Shaw); *see also* Tr. Vol. 32, 47:8-48:5 (Shaw discussing dangers posed by inmate Bobby Mitchell and reasons why he is housed in long-term isolation); Tr. Vol. 34, 114:16-20 (Dunn).

While *conditions* in isolation units must meet constitutional standards, the Supreme Court has recognized that the Eighth Amendment does not prohibit the *use* of isolation even for indeterminate periods of time. *Sandin v. Conner*, 515 U.S. 472, 485-87 (1995); *Hutto v. Finney*, 437 U.S. 678, 685-87 (1978).[8] So long as a prisoner is afforded minimally decent conditions and medical care, his placement in isolated housing does not violate the Constitution. As the Fifth Circuit has explained, "absent extraordinary circumstances, administrative segregation as such, being an incident to the ordinary life of a prisoner, will never be a ground for a constitutional claim because it simply does not constitute a deprivation of a constitutionally cognizable liberty interest." *Martin v. Scott*, 156 F.3d 578, 580 (5th Cir. 1998); *see also Freeman v. Miller*, 615 F. App'x 72, 77 (3d Cir. 2015) ("Placing an inmate in restricted housing does not violate the Eighth Amendment as long as the conditions of confinement are not foul, inhuman or totally without penological justification."); *Jackson v. Heer*, 322 F. Supp. 3d 406, 412-13 (S.D.N.Y. 2018) (holding that conditions "normally associated with [isolated] confinement" to not give rise to a constitutional claim); *Tasby v. Cain*, 2017 WL 4295441, **9-10 (M.D. La. Sept. 12, 2017) (confinement of mentally ill prisoner in isolation for 15-18 years did not violate Eighth Amendment even though prisoner's mental health deteriorated in isolated housing).

While it is true that some experts, like Dr. Kupers, and some professional organizations, like the National Commission on Correctional Healthcare, advocate for limiting the use of isolation to very short periods, *see* Doc. 843 at 51-52, other professionals find no mental health justification for ending the practice.[9] In any event, professional preferences are not constitutional standards.

---

[8] While prisoners have a due process right to and contest their assignment to long-term isolation, the Supreme Court has never recognized an Eighth Amendment right to be free from isolation. *Wilkinson*, 545 U.S. at 221-30.

[9] Ex. D-503 (Colorado Dep't of Corrections, *One Year Longitudinal Study of the Psychological Effects of Administrative Segregation* (Oct. 31, 2010); Tr. Vol. 17, 48:22-51:22 (Dr. Kupers discussing Colorado report and related peer review articles); *see also* Ex. D-506 at 150-53 (Deposition of Dr. Kim Nagel (April 5, 2017)) (Dr. Kim Nagel, former chief psychiatrist at EMCF, testifying that segregation is not harmful to all patients and the impact on a prisoner's mental health is a case-by-case issue).

*Rhodes v. Chapman*, 452 U.S. 337, 348 n.13 (1981) ("[T]he District Court erred in assuming that opinions of experts as to desirable prison conditions suffice to establish contemporary standards of decency."); *Inmates of Occoquan v. Barry*, 844 F.2d 828, 837 (D.C. Cir. 1988) (rejecting reliance on "the standards of professional organizations as showing failings of purportedly constitutional significance"). Naturally, Dr. Kupers (and other professionals) view the issue from the standpoint of a doctor providing optimal care for his patients, as opposed to the warden who must maintain safety and order in his prison or state officials who must operate secure prisons with limited resources. Dr. Kupers refused to estimate the actual cost of building and operating a prison system without isolation units, though he acknowledged that the cost of "proper care"—of the type that he advocates—"might be beyond what the state can afford."[10]

This is not a prison reform case, and Plaintiffs are not entitled to "the best [treatment] that money could buy[.]" *Mayweather v. Foti*, 958 F.2d 91, 91 (5th Cir. 1992). The question before this Court is not best practices; it is constitutional minimums. Dr. Kupers's proposals for abolishing isolated housing should be addressed to the legislative branch, not to this Court. As the D.C. Circuit has noted: "[T]he line between discerning and remedying constitutional violations, on the one hand, and mandating reforms to improve the quality of life behind prison walls, on the other, is of pivotal importance to judicial legitimacy in a democratic society." *Inmates of Occoquan*, 844 F.2d at 837. Modern standards of decency do not regard isolated housing as cruel or unusual; the federal government and a majority of states continue to rely on it for recognized correctional purposes—safety, discipline, and rehabilitation.

The Court should reject Plaintiffs' proposed ban on isolation, a ban that would apply to all MDOC prisons and likely be used to advance a prison reform agenda beyond Mississippi.

---

[10] Tr. Vol. 17, 25:1-14 (Dr. Kupers).

**B.      The Court should enter judgment for MDOC on the Isolation Claims.**

The Court identified four claims by the Isolation Subclass, and it directed Plaintiffs to address whether any of the enumerated claims rise to the level of current constitutional violations at EMCF.  Doc. 830 at 1-2, 5.  MDOC addresses each claim below.

### *1.      Prisoners in Unit 5 receive constitutionally adequate out-of-cell time.*

The Isolation Subclass first argues that EMCF does not comply with its policy of providing prisoners in isolation with one hour per day of recreation and three showers per week.  To prevail on this constitutional claim, however, Plaintiffs must show more than a violation of prison policy.  *Hernandez v. Estelle*, 788 F.2d 1154, 1158 (5th Cir. 1986) (violation of a prison policy does not show an Eighth Amendment violation).  Plaintiffs must show such a long-term, grievous denial of out-of-cell recreation as to warrant a finding that prison officials are deliberately indifferent to the subclass's health or safety.  *Hernandez v. Velaquez*, 522 F.3d 556, 560-61 (5th Cir. 2008).

According to Dr. Kupers, Isolation Subclass members get "far less" recreation time and showers than EMCF policy provides, and prisoners may go for a week without any out-of-cell time, resulting in what Dr. Kupers describes as depression and "further disorganization of life" among some in the subclass.[11]  Of course, the fact that recreation is sometimes interrupted does not mean that prison officials are ignoring prisoners' health.  As Warden Shaw explained, providing out-of-cell recreation and showers to prisoners in Unit 5 is a "labor intensive" process, which requires two guards to escort each prisoner to and from the shower or outdoor recreation cell.[12]  On a typical day, eight security staff are assigned to Unit 5.[13]  Warden Shaw acknowledged that prison policies are not always strictly satisfied, explaining that inmates may refuse showers or

---

[11] Tr. Vol. 17, 8:1-10:6 (Dr. Kupers).
[12] Tr. Vol. 31, 83:21-84:13 (Shaw); *see also* Tr. Vol. 31, 17:3-15 (Shaw describing video of prisoner being escorted from his cell in the isolation unit); Tr. Vol. 31, 44:13-20 (describing staffing and activities on Unit 5).
[13] Doc. 812-2 (2018 Supplemental Report of Tom Roth at 9 (Dec. 20, 2018)).

recreation and incidents elsewhere in the prison may divert guards to more immediate issues.[14]

Notwithstanding these legitimate penalogical reasons for missed recreation time, guards do their

best to ensure that out-of-cell time is provided and documented for each prisoner on Unit 5.[15]

Ignoring prison realities, Dr. Kupers testified that even if EMCF could provide enough

guards to take *every prisoner* out of his cell for *two hours every day*—during which time the

prisoner would be fed, showered, and allowed outdoor recreation—this would not satisfy Dr.

Kupers's preferred conditions in isolation.[16]  But Dr. Kupers's preferences are not the controlling

standards, and one-week interruptions in out-of-cell time do not rise to the level of a constitutional

violation.  In *Hernandez*, the Fifth Circuit held that a thirteen-month denial of out-of-cell exercise

did not violate the Eighth Amendment even if the confinement caused the prisoner to suffer muscle

atrophy, stiffness, loss of range of motion, and depression.  522 F.3d at 561-62; *see also Umondak*

*v. Ginsel*, 426 F. App'x 267, 269 (5th Cir. 2011) (25-day denial of out-of-cell recreation does not

violate constitution).   Plaintiffs have not shown that Warden Shaw or EMCF's guards are

deliberately or recklessly denying recreation, much less that they are doing so for prolonged

periods of time that might implicate the Eighth Amendment.

## 2. *The living conditions on Unit 5 are not foul or inhuman.*

The Isolation Subclass also claimed that their cells are filthy and vermin-infested, and that

prisoners were not provided functional lights or plumbing.  As noted, isolation units do not violate

the Eighth Amendment "as long as the conditions of confinement are not foul, inhuman or totally

without penological justification."  *Freeman*, 615 F. App'x at 77.

---

[14] Tr. Vol. 31, 84:2-85:25 (Shaw).
[15] Tr. Vol. 31, 84:17-87:16 (Shaw discussing switch from picket logs to individual prisoner "activity sheet" procedure for documenting out-of-cell time, medical, and mental health interactions with each prisoner).
[16] Tr. Vol. 16, 22:7-23:1 (Dr. Kupers responding to Court's questions regarding out-of-cell time).

Plaintiffs have abandoned any claim that conditions on Unit 5 are filthy and vermin-infested. Their post-trial motion makes no mention of these claims. *See* Doc. 843 at 50-56. EMCF contracts with a pest control company to treat the prison twice a month for insects, and provides additional insect and rodent control upon request.[17]  Plaintiffs do not claim that cells are filthy. They acknowledge, as Warden Shaw explained, that when unpleasant conditions do exist, they are created by prisoners who seek attention by damaging the facility.[18]  Prison staff correct these conditions as soon as possible, and EMCF spends over $700,000 annually repairing equipment or replacing clothing destroyed by prisoners.[19]  In addition to these regular repairs, the prison staff and prisoner work crews engage in continuous maintenance of the facility, including Unit 5.[20] MDOC is not deliberately indifferent to the conditions at EMCF, which—as the Court observed during its own inspection—is a well-maintained, modern prison.

As for cell lighting on Unit 5, Plaintiffs assert that prisoners sometimes "go for weeks without functioning lights." Doc. 843 at 54.  This is not, however, because the lighting system at EMCF is faulty.  Warden Shaw explained that lights are "non-functioning" only when prisoners damage the fixtures or unscrew, obstruct, or destroy the lightbulbs.[21]  No one denies that prisoners should be afforded adequate lighting.  But Plaintiffs cite no authority for the proposition that prison officials violate the Eighth Amendment if they cannot constantly thwart or immediately repair

---

[17] Tr. Vol. 31, 70:6-71:10 (Shaw).
[18] Tr. Vol. 31, 26:23-31:3, 69:12-70:5 (Shaw discussing prisoners practice of seeking attention by throwing food, feces, and urine through tray slots, as well as starting non-injurious fires); Tr. Vol. 32, 43:3-11 (Shaw explaining that prisoners destroy toilets); *see* Doc. 843 at 54 (Plaintiffs' post-trial brief discussing prisoner damage to facilities).
[19] Tr. Vol. 32, 43:12-22 (Shaw).
[20] Tr. Vol. 31, 67:4-19, 71:11-72:7 (Shaw discussing facility maintenance, including painting and floor waxing).
[21] Tr. Vol. 31, 61:12-23, 64:3-66:24 (Shaw explaining how prisoners destroy or manipulate light fixtures).  Plaintiffs' expert on environmental conditions, Dianne Skipworth, agreed, testifying that prisoners on Unit 5 damaged the light fixtures "on a very frequent basis."  Tr. Vol. 11, 20:20 -21:2 (Skipworth).

prisoner-caused damage.  MDOC invests significant time and money repairing light fixtures, and

Warden Shaw has begun installing an upgraded, more tamper-resistant light fixtures in Unit 5.[22]

EMCF takes reasonable steps to ensure that the cells on Unit 5 are adequately lit.  Plaintiffs

have not shown that short periods of dimness in some cells, attributable to prisoners damaging

their own light fixtures, pose a serious risk of harm or rise to the level of "extreme deprivation" of

a "minimal civilized measure of life's necessities."  *Gates v. Cook*, 376 F.3d 323, 332-33 (5th Cir.

2004).  In *Gates*, the outmoded lighting at Mississippi's oldest prison, Parchman, was found to be

"grossly inadequate for the purposes of sanitation, personal hygiene, and reading[.]"  376 F.3d at

342.  By contrast, EMCF is a modern facility with modern infrastructure, and its common areas,

hallways, and cells are well lit.  Even if a lightbulb is out in a Unit 5 cell, light enters the cell from

both an exterior window and an interior window on the cell door.  The prisoner is not left in total

darkness while EMCF's staff works to replace the lightbulb or repair the damaged fixture.

Warden Shaw and his staff are not deliberately indifferent to the need for adequate lighting

in Unit 5.  The Court should enter judgment for MDOC on this claim.

### 3.    Guards do not beat or ignore prisoners on Unit 5.

The Isolation Subclass also alleged that prisoners housed in isolation are beaten or ignored

by prison staff.  Plaintiffs offered no proof that prisoners on Unit 5 are beaten by guards, and their

post-trial brief does not address this claim.  *See* Doc. 843 at 50-56.  It should be deemed abandoned.

As for the claim that Unit 5 guards ignore prisoner requests for medical attention, Plaintiffs

must show that such conduct (if true) results in more than an occasional delay in medical or mental

health treatment.  Plaintiffs must show that prison officials have engaged in a pattern of refusing

to treat members of the Isolation Subclass, ignoring their complaints, intentionally treating them

---

[22] Tr. Vol. 31, 63:14-67:3 (Shaw discussing efforts to repair and replace light bulbs and fixtures).

incorrectly, or engaging in any similar conduct that would clearly evince a wanton disregard for

any serious medical needs.  *Easter v. Powell*, 467 F.3d 459, 464 (5th Cir. 2006).

To support this claim, Plaintiffs cite a single piece of dated evidence—Dr. Kupers's 2016

expert report.  Doc. 843 at 53 n.322.  That report, which is based on a three-year-old inspection, is

not proof that guards fail to acknowledge inmate concerns *today*.  Warden Shaw explained how

Tony Donald, the unit manager for Unit 5, works with mental health staff to address prisoners'

medical and mental health concerns on a daily basis.[23]  The prison's mental health team—Chief

Psychiatrist Dr. Steven Bonner, Nurse Practitioner Evelynn Dunn (a psychiatric nurse practitioner

responsible for Unit 5) and Mental Health Professional Charles Pickering (a licensed mental health

counselor assigned to Unit 5)—described at trial and in post-trial declarations how mental health

staff routinely monitor and provide treatment to prisoners housed in Unit 5.[24]  Dr. Bonner and

Nurse Practitioner Dunn also explained how the Acute Care Unit (Unit 7), which was opened in

February 2018 with assistance and support from Warden Shaw, has allowed EMCF to better treat

inmates who, in the past, might have been placed in isolation.[25]

There is no evidence that EMCF staff is ignoring the serious medical or mental health needs

of prisoners on Unit 5.  The Court should enter judgment for MDOC on this claim.

### 4.      *Warden Shaw and his staff take reasonable and effective steps to prevent prisoner-on-prisoner assaults in Unit 5.*

Finally, the Isolation Subclass claimed that prisoners housed in Unit 5 face a substantial

risk of prisoner-on-prisoner violence.  To prevail on this failure-to-protect claim, Plaintiffs must

show that prison officials are deliberately indifferent to a substantial risk of serious harm resulting

from prisoner attacks.  *Farmer*, 511 U.S. at 840-46.  "[A] prison official may be held liable under

[23] Tr. Vol. 31, 86:23-87:16 (Shaw).
[24] Doc. 812-1 (Dr. Bonner Dec. at 3-8, 14); Tr. Vol. 34, 96:6-98:6 (Dunn); Tr. Vol. 34, 47:18-54:16 (Pickering).
[25] Doc. 812-1 (Dr. Bonner Dec. at 7-8); Tr. Vol. 34, 93:8-96:3 (Dunn).

the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Id.* at 847.

Plaintiffs attempt to preserve this failure-to-protect claim with a single sentence in their post-trial brief: "Even in segregation, Plaintiffs are at constant risk of physical assault." Doc. 843 at 54. To support their assertion of a "constant risk," Plaintiffs cite two emails from 2015, three incident reports from 2016 and one from 2017, a prisoner's testimony regarding a 2016 assault, and a prisoner's testimony that he was assaulted in November 2017 and January 2018. Doc. 843 at 54 n.332. Such minimal proof of assaults (nine in four years on Unit 5) does not support Plaintiffs' contention that prisoners are at constant risk of assault, much less that prison officials are deliberately indifferent to the risk of prisoner-on-prisoner assaults in Unit 5.

EMCF is a prison that houses dangerous prisoners, and—as Warden Shaw explained— "assaults occur in prisons."[26] EMCF's staff is not ignorant of or indifferent to this reality. Warden Shaw testified that his staff takes the risk of prisoner assaults seriously and that two guards must accompany any Unit 5 prisoner who is permitted to leave his cell.[27] And ECMF has begun padlocking tray slots on Unit 5, which has reduced staff assaults and made the isolation unit more secure.[28] MDOC's safety-and-security expert, Kenneth McGinnis, confirmed that Warden Shaw's management has made EMCF significantly safer than it was in 2015—reducing the number of prisoner-on-prisoner assaults from 14.0 per month in 2016 to 9.3 per month in 2018 and, more importantly, reducing the serious prisoner-on-prisoner assaults to only 1.3 per month in 2018.[29]

---

[26] Tr. Vol. 31, 90:13 (Shaw).
[27] Tr. Vol. 31, 17:3-15, 83:21-84:6, 90:8-91:18 (Shaw).
[28] Tr. Vol. 31, 27:15-22 (Shaw).
[29] Doc. 812-4 (McGinnis 2018 Supplemental Report at 11-12 (Dec. 20, 2018)).

Warden Shaw and his staff may not have achieved perfection in halting assaults by dangerous inmates, but they have taken steps to ensure reasonable safety on Unit 5 and throughout the prison.  Those successful efforts preclude a finding of deliberate indifference.  *Farmer*, 511 U.S. at 844-45.  The Court should enter judgment for MDOC on this claim.

## II.      Category Two – Mental Health Care

The Court certified a "Mental Health Care" class to pursue seven claims of deficient mental health care.  Doc. 830 at 2.  As demonstrated at trial and in post-trial reporting, and as recognized by the Court, MDOC has made numerous changes to the delivery of psychiatric treatment and mental health care at EMCF since this suit was filed six years ago.  Yet Plaintiffs, relying on their expert witness Dr. Bruce Gage of Washington, insist that prison officials remain deliberately indifferent to prisoners' serious mental health needs.  Doc. 843 at 21-50.

Before addressing Plaintiffs' claims, the governing standard must be acknowledged.  This is not a prison reform case, and the question is not what level of care prisoners *deserve* under best practices or professional standards.   The question is what minimal level of care satisfies the Eighth Amendment's prohibition on cruel and unusual punishment.  "The Constitution does not mandate comfortable prisons," *Rhodes*, 452 U.S. at 349, and "deliberate indifference exists wholly independent of an optimal standard of care," *Gobert v. Caldwell*, 463 F.3d 339, 349 (5th Cir. 2006).  Plaintiffs must show that mental health care at EMCF is so deficient that it evinces a "deliberate indifference" by MDOC officials to the serious medical needs of all prisoners.  *Gobert*, 463 F.3d at 345-46.  This is an "extremely high standard to meet." *Id.* at 346.

### A.      Overview of EMCF's Mental Health Care System.

Like many large prison systems, MDOC contracts with a private correctional healthcare company to provide medical and mental healthcare for all prisoners, including the approximately 1,200 prisoners at EMCF.  When this suit was filed, a small company called Health Assurance,

LLC provided healthcare at EMCF.[30]  That company was owned by Dr. Carl Reddix, who—it was

later discovered—obtained his "no bid" contract by bribing then-Commissioner Christopher

Epps.[31]  After the Epps-Reddix bribery scheme was discovered and Epps was ousted (and later

imprisoned), MDOC cancelled Health Assurance's contract and put the system-wide healthcare

contract up for public bid.[32]  As a result of that public bid process, the contract was awarded to

Centurion of Mississippi, a subsidiary of the national healthcare company Centene Corporation.[33]

Centurion began providing medical and mental health care at EMCF in July 2015.[34]

In October 2015, Centurion hired Dr. Kim Nagel to serve as EMCF's chief psychiatrist.[35]

Dr. Nagel had experience turning around struggling prison mental health systems, having worked

with Plaintiffs' expert Dr. Kupers to successfully implement a consent decree governing mental

health care at the Mississippi State Penitentiary's isolation unit.[36]  Upon arriving at EMCF, Dr.

Nagel found things to be "rocky" and agreed that there "were a lot of changes that [he] felt needed

to be made" to the mental health care system.[37]  In Dr. Nagel's assessment, it would take about

two years to stabilize the population, improve the quality of care, and "get basic things settled

down."[38]  At his deposition in April 2017, Dr. Nagel detailed the improvements made under his

leadership and explained that EMCF had advanced to the point that it could "take yet another step

towards improving our quality"— creation of an Acute Care Unit to treat the most challenging

---

[30] Tr. Vol. 23, 47:17-25 (Dr. Perry).
[31] Tr. Vol. 23, 48:1-2 (Dr. Perry); *see also* Doc. 767 at 2-3 (discussing money laundering and fraud scheme perpetrated by Epps).  Dr. Reddix pled guilty to bribing Epps and was sentenced to six years in federal prison.  *See* Final Judgment (Doc. 73) in *United States v. Carl Reddix*, No. 3:16-cr-00050-DJP-FKB (S.D. Miss. Dec. 22, 2017).
[32] Tr. Vol. 23, 48:5-10 (Dr. Perry).
[33] Tr. Vol. 23, 48:5-10 (Dr. Perry).
[34] Tr. Vol. 23, 48:3-4 (Dr. Perry).
[35] Ex. D-506 at 16 (Dr. Nagel).
[36] Tr. Vol. 17, 47:10-48:8 (Dr. Kupers discussing work with Dr. Nagel in *Presley v. Epps*, 4:05-cv-148 (N.D. Miss.))
[37] Ex. D-506 at 61 (Dr. Nagel); *see id.* at 62-76 (discussing changes implemented under Dr. Nagel's leadership).
[38] Ex. D-506 at 75-76 (Dr. Nagel).

patients on the mental health caseload.[39]  Dr. Nagel left EMCF in November 2017 to take the chief

psychiatrist position at neighboring East Mississippi State Hospital, and he still assists EMCF's

staff with transferring prisoners to the state hospital when more intense treatment is required.[40]

Today, EMCF's mental health team is led by Chief Psychiatrist Dr. Steven Bonner.  Dr.

Bonner is supported by a team of fifteen mental health professionals:  a full-time psychologist,

five psychiatric nurse practitioners, seven licensed mental health professionals (masters-level

counselors), and two mental health activity therapists.[41]  As discussed in the Medical Care section,

below, the mental health providers are supported by a team of nurses and an administrative staff

led by a Health Services Administrator.  EMCF's mental health staff provides treatment much the

same as in the real world—getting to know their patients through regular visits, prescribing and

adjusting medications to treat their patients' mental illnesses, and offering individual and group

therapy when clinically indicated.[42]

Of the 1,200 prisoners at EMCF, approximately 820 have a diagnosed mental health

condition requiring treatment by the mental health team.[43]  The vast majority of those (about 750)

are designated as Level of Care C, meaning that they are stable, functioning adults when they

adhere to their medication regimen and attend monthly meetings with their mental health counselor

and quarterly meetings with psychiatric staff.[44]  Only about 30 prisoners are designated as Level

of Care D, meaning that the prisoner has a chronic mental illness that requires close monitoring

and monthly meetings with a psychiatric prescriber.[45]

---

[39] Ex. D-506 at 76 (Dr. Nagel); *see id.* at 62-76 (discussing changes implemented at EMCF).
[40] Tr. Vol. 34, 71:1-6, 100:14-01:9 (Dunn).
[41] Doc. 812-1 (Dr. Bonner Dec. at 3-6).
[42] Ex. D-506 at 29-38 (Dr. Nagel); Tr. Vol. 34, 82:17-83:23 (Dunn); Tr. Vol. 34, 47:11-50:9 (Pickering); Doc. 812-1 (Dr. Bonner).
[43] Doc. 812-1 (Dr. Bonner Dec. at 2-3).
[44] Doc. 812-1 (Dr. Bonner Dec. at 2-3); *see also* Tr. Vol. 34, 79:5-81:24 (Dunn discussing levels of care).
[45] Doc. 812-1 (Dr. Bonner Dec. at 2-3); *see also* Tr. Vol. 34, 79:5-81:24 (Dunn discussing levels of care).

Stable inmates live in EMCF's general population units, and each general population unit has a dedicated mental health professional who conducts private counseling sessions with prisoners on the mental health caseload at least once every 30 days.[46]  To avoid interruptions, psychotropic medications are now kept in stock at the prison's new pharmacy.[47]  And EMCF's mental health staff has developed a protocol for flagging missed medications and following up in-person if a mental health patient misses three consecutive medication administrations.[48]

EMCF has two units dedicated to providing more intense mental health treatment for prisoners who require it:  Unit 3, the mental health housing unit, and the Acute Care Unit ("ACU"), which houses prisoners with the most serious needs.[49]  Dr. Bonner provides psychiatric treatment for all patients in Unit 3 and the ACU, and he oversees the additional care provided by the psychologist, activity therapists, and mental health professionals in these units.[50]  As discussed in Dr. Bonner's declaration, these specialized treatment units function as follows:

> *Mental Health Unit (Unit 3)*:  EMCF operates a mental health unit that provides regular treatment and additional safety to inmates with a mental illness, who might be vulnerable in other housing units.  Inmates living on Unit 3 are seen regularly by Dr. Bonner, who also manages their medications.  In addition to seeing Dr. Bonner, inmates are seen at least once a month, and more often if necessary, by one of the two mental health professionals dedicated to Unit 3.  Activity therapists provide group therapy sessions multiple times a week.[51]

> *Acute Care Unit*:  In February 2018, EMCF opened an Acute Care Unit to provide the most difficult patients with intensive treatment, counseling, and group therapy. Mental health staff has "full control" over admissions and discharges in the ACU. Dr. Bonner uses the ACU to stabilize patients, so that they may successfully reenter a general population housing unit.  Dr. Bonner conducts weekly individual sessions with every patient in the ACU, and each receives one hour of clinical group therapy every day and four group activity sessions each week.[52]

---

[46] Doc. 812-1 (Dr. Bonner Dec. at 3).
[47] Tr. Vol. 34, 113:2-14:10 (Dunn)
[48] Tr. Vol. 34, 85:5-18, 106:16-09:14, 113:2-14:10 (Dunn)
[49] Doc. 812-1 (Dr. Bonner Dec. at 3-8).
[50] Doc. 812-1 (Dr. Bonner Dec. at 3-8).
[51] Doc. 812-1 (Dr. Bonner Dec. at 6-7); *see also* Tr. Vol. 34, 85:19-87:7 (Dunn).
[52] Doc. 812-1 (Dr. Bonner Dec. at 7-8); *see also* Tr. Vol. 34, 93:1-96:3 (Dunn).

Prisoners who are actively suicidal or suffering an acute mental health crisis are brought to the medical unit, where they are placed under close observation and the care of the chief psychiatrist.[53] EMCF's suicide prevention efforts have been effective: Only one inmate has committed suicide since Warden Shaw arrived at EMCF over three years ago.[54]

Mental health treatment does not stop when an inmate enters Unit 5 (segregated housing); it intensifies.[55] Every prisoner who enters Unit 5 has an individual mental health treatment plan tailored to his specific illnesses or concerns.[56] The prisoners on Unit 5 have a dedicated psychiatric nurse practitioner, Nurse Dunn, who has 14-years of correctional healthcare experience and (at the time of trial) was pursuing her doctorate in nursing practice, with an emphasis on long-term segregation.[57] There is also a dedicated mental health professional for Unit 5, who sees each prisoner once a week and conducts regular 30-day and 90-day segregation assessments to ensure that the patient's mental health status remains stable.[58]

Finally, any prisoner may request mental health care through the "sick call" process, which will prompt mental health staff to evaluate the prisoner's condition and concerns.[59]

### B. The Court should enter judgment for MDOC on the Mental Health Claims.

This Court identified seven claims made by the Mental Health Care Class, and it directed the parties to address whether any of those enumerated claims continue to result in constitutional violations at EMCF. Doc. 830 at 2, 5. Plaintiffs have largely ignored the Court's enumerated issues in their post-trial brief. MDOC will follow the Court's instructions.

---

[53] Doc. 812-1 (Dr. Bonner Dec. at 3, 8); *see also* Tr. Vol. 34, 87:8-88:4 (Dunn).
[54] Tr. Vol. 31, 87:17-21 (Shaw).
[55] Tr. Vol. 34, 96:6-98:18 (Dunn describing treatment approach to Unit 5 prisoners); *see also* Doc. 812-1 (Dr. Bonner Dec. at 5-6, 14).
[56] Doc. 812-1 (Dr. Bonner Dec. at 10).
[57] Tr. Vol. 34, 69:7-70:6, 96:6-98:6 (Dunn).
[58] Doc. 812-1 (Dr. Bonner Dec. at 3, 8); *see also* Tr. Vol. 34, 96:6-100:5 (Dunn).
[59] Tr. Vol. 34, 98:7-18 (Dunn).

### 1. Prisoners on the mental health caseload have regular contact with EMCF's psychiatrist and psychiatric nurse practitioners.

The first claim identified by the Court is that the Mental Health Care Class receives *de minimis* contact with psychiatrists. Plaintiffs do not address this claim in their post-trial brief, *See* Doc. 843 at 21-50, and it should be deemed abandoned. It should also be rejected on its merits.

As detailed above, EMCF has a full-time psychiatrist (Dr. Bonner) and five psychiatric nurse practitioners who share responsibilities for treatment of prisoners with mental health needs. Dr. Kim Nagel—who preceded Dr. Bonner as chief psychiatrist—explained how, working with the psychiatric nurse practitioners, he had improved caseload management so that prisoners with mental illnesses were seen at least every 90 days by a psychiatric provider and, in many cases, more frequently.[60] At trial, Plaintiffs' expert Dr. Gage testified that prisoners on the mental health caseload were seen regularly by psychiatric providers, and Dr. Gage found no evidence that psychiatric services were unreasonably delayed.[61] The Court has also been presented with prisoner testimony and thousands of pages of medical records demonstrating that prisoners are being seen and treated regularly by psychiatric providers. "Deliberate indifference is not established when medical records indicate that [the plaintiff] was afforded extensive medical care by prison officials[.]" *Brauner v. Coody*, 793 F.3d 493, 500 (5th Cir. 2015).

There is no proof that prisoners at EMCF are denied access to psychiatrists or that psychiatric care is unreasonably delayed. All evidence is to the contrary.

---

[60] Ex. 506 at 21-44, 171-72 (Dr. Nagel).
[61] Tr. Vol. 29, 52:3-53:21 (Dr. Gage). Specifically, Dr. Gage testified that psychiatric prescribers were "reasonably available" to see prisoners, that it was "rare" that a patient went longer than 90 days in between psychiatric contact, and that "many inmates were seen on a weekly or even more frequent basis when they were in crisis." *Id.*

### 2.      *Prisoners have regular interactions with mental health professionals.*

The Mental Health Care class's second claim is that they are given little opportunity to discuss their symptoms or problems with mental health care providers.  It is not clear that Plaintiffs continue to urge this claim, as it is not addressed directly in their post-trial brief.  *See* Doc. 843 at 21-50.  To the extent that Plaintiffs' access-to-care arguments indirectly address this claim, *see* Doc. 843 at 32-34, MDOC has addressed those arguments above, in Section II(A) (Overview of EMCF's Mental Health Care System) and Section II(B)(1), and just below, in Section II(B)(3), which provides additional details on how psychiatric staff consult with their patients when prescribing and adjusting medications.

There is no evidence EMCF's mental health staff is ignoring their patients' needs or that their practices for evaluating and treating their patients amounts to a reckless disregard for prisoners' serious mental health needs.  The Court should enter judgment for MDOC on this claim.

### 3.      *Psychiatric staff consult with their patients when prescribing medication.*

The Mental Health Care Class also claimed that they were prescribed medications without first being evaluated by an adequately trained mental health care provider.  Plaintiffs do not address this claim in their post-trial brief, *See* Doc. 843 at 21-50, and it should be deemed abandoned.  The claim should also be rejected on its merits.

Dr. Nagel testified at length about the steps he took, after starting as chief psychiatrist in October 2015, to correct what he viewed as problematic medication practices.  Dr. Nagel strictly limited Haldol injections (which were overused by Health Assurance's psychiatrists), eliminated the use of habit-forming drugs that were being abused by prisoners, and—with Nurse Practitioner Dunn's assistance—focused on counseling patients rather than simply medicating them.[62]  Dr.

---

[62] Ex. D-506 at 61-71 (Dr. Nagel Dep.).

Nagel also detailed his practices for prescribing, monitoring, and adjusting medications to ensure proper regimens for each patient, which always included an initial meeting to evaluate the patient and discuss the prescribed medications.[63]  At trial, Nurse Practitioner Dunn discussed her process of evaluating her mental health patients before prescribing medications, discussing prescribed medications with her patients, and conducting follow-up meetings to determine whether the regimen should be adjusted.[64]  Dr. Bonner has continued the changes implemented by Dr. Nagel, and has made further improvements in medication practices for EMCF's mental health patients— improving the *Harper* Hearing procedure for involuntary medications and updating the electronic medical records to improve lab monitoring for mental health patients.[65]

There is no proof that prisoners at EMCF are prescribed medications without an initial evaluation by a psychiatrist or psychiatric nurse practitioner.

### 4.    EMCF provides adequate individual and group therapy.

The Mental Health Care Class's fourth claim is that prisoners receive little, if any, individual or group mental health treatment.  Plaintiffs appear to address this in their access-to-care argument, asserting that "there is virtually no individual therapy and extremely limited group therapy at EMCF."  Doc. 843 at 32.  To support this assertion, Plaintiffs rely primarily on the opinion of their expert Dr. Gage that group therapy is desirable in prison settings.  Dr. Gage criticizes the amount of therapy provided at EMCF, but he offers no comparisons to other facilities with similar mental health caseloads and security concerns.

The Eight Amendment does not mandate that a prisoner receive any particular amount or type of mental health therapy.  "While inmates are entitled to medical and mental health treatment,

---

[63] Ex. D-506 at 59, 71-76, 92-111 (Dr. Nagel).
[64] Tr. Vol. 34, 83:1-85:18 (Dunn).
[65] Doc. 812-1 (Dr. Bonner Dec. at 12-13).

the Eighth Amendment does not require prison officials to comply with a prisoner's demands for a particular type of treatment, particularly where the inmate's psychological condition has been addressed." *Carrigan v. State of Del.*, 957 F. Supp. 1376, 1384 (D. Del. 1997); *accord Tasby*, 2017 WL 4295441 at **9-10 (failure to provide inmate with one-on-one counseling and group therapy for period of 15-18 years did not violate constitution because other mental health treatment was provided).  Even so, EMCF's mental health staff provides individual therapy as needed on all of the housing units, as well as regular individual and group therapy in Unit 4, the Mental Health Unit (Unit 3), and the Acute Care Unit.[66]  And EMCF has hired a full-time psychologist who is responsible for mental health programming (both group and individual treatment),[67] which is exactly what Dr. Gage told the Court was the best way to improve group therapy.[68]

MDOC is not deliberately indifferent to the counseling and treatment needs of the Mental Health Care Class.  MDOC agrees that individual and group therapy is a desirable *additional* treatment for certain mentally ill patients, which is why EMCF's mental health staff already provides such therapy and is working to increase the availability of individual and group therapy to prisoners who need it—particularly in the Mental Health Unit and the ACU.

The Court should grant judgment in favor of MDOC on this claim.

### 5. *Prisoners are not overmedicated with tranquilizing injections.*

Next, the Mental Health Class claimed that prisoners are over-medicated with tranquilizing anti-psychotic medications.  Plaintiffs do not address this claim in their post-trial brief, *See* Doc. 843 at 21-50, and it should be deemed abandoned.

---

[66] Doc. 812-1 (Dr. Bonner Dec. at 3-6).
[67] Doc. 812-1 (Dr. Bonner Dec. at 4).
[68] Tr. Vol. 29, pp.61-63 (Dr. Gage responding to Court's questions about designing group therapy at EMCF).

This claim should also be rejected on its merits.  While this might have been a valid concern before July 2015 (under Health Assurance's tenure), Plaintiffs' expert Dr. Kupers noted that by May 2016 Centurion's new mental health team had reduced the number of involuntary Haldol injections.[69]  Chief Psychiatrist Dr. Nagel recognized the overuse of tranquilizing medications to be an issue an EMCF and testified that, as of April 2017, he had essentially eliminated the use of Haldol injections, which are now administered only in "life-threatening situations."[70]  Dr. Bonner confirmed that, during his tenure as chief psychiatrist, the number of Haldol injections is appropriate for a facility that houses as many mentally ill prisoners as does EMCF.[71]

In his November 2018 Supplemental Report, Plaintiffs' expert Dr. Gage identified only eight prisoners out of over 800 on the mental health caseload who, in his opinion, were given antipsychotic injections "without sufficient clinical justification."[72]  Dr. Gage's disagreement with the diagnostic and treatment decisions of a qualified psychiatric provider (who determined that an injection was needed) does not prove a constitutional violation.  *See Gibson v. Collier*, 920 F.3d 212, 221 (5th Cir. 2019); *White v. Napoleon*, 897 F.2d 103, 110 (3d Cir. 1990) ("If a plaintiff's disagreement with a doctor's professional judgment does not state a violation of the Eighth Amendment, then certainly no claim is stated when a doctor disagrees with the professional judgment of another doctor.").

Moreover, the prisoners identified by Dr. Gage were not simply injected and ignored; Dr. Gage's case studies reflect that all eight prisoners received extensive mental health treatment, rebutting any claim of deliberate indifference.  *Brauner*, 793 F.3d at 500.  Finally, Dr. Gage offers no comparisons to other facilities with a similar population of mentally ill inmates, so there is no

---

[69] Tr. Vol. 17, 53:1-5 (Dr. Kupers).
[70] Ex. D-506 at 61-62, 165-67 (Dr. Nagel).
[71] Doc. 812-1 (Dr. Bonner Dec. at 13).
[72] Doc. 806-1 (Gage Supp. Report at 30).

basis to reject Dr. Bonner's assessment that the use of Haldol injections is appropriate at EMCF. The Court should enter judgment for MDOC on this claim.

### 6. The conditions at EMCF do not exacerbate prisoners' symptoms.

The sixth claim by the Mental Health Care Class is that the symptoms of their mental disorders are exacerbated by the conditions at EMCF. Plaintiffs appear to address this claim in a single sentence under the Environmental Conditions argument: "Deficient lighting also increases the risk of mental decompensation among mentally ill prisoners." Doc. 843 at 67. To support this claim, Plaintiffs cite Dr. Kupers's trial testimony and 2016 Report, along with the views of two inmates on lighting in Unit 5. Doc. 843 at 67 n.434.

These complaints about lighting in the segregation housing unit are addressed above, *see* Section I(B)(2), and Plaintiffs' complaints do not rise to the level of a constitutional violation. The Court should enter judgment for MDOC on this claim.

### 7. EMCF's mental health staff uses medical judgment when determining whether a prisoner's mental illness is the root cause of misconduct.

Finally, the Mental Health Class claimed that they are subjected to disciplinary actions if they attempt to seek medical help. Plaintiffs recast this claim in their post-trial brief as an allegation that EMCF punishes inmates who engage in self-injurious behavior. Doc. 843 at 46-47. Plaintiffs and their experts appear to take the position that a prisoner should *never* be disciplined for engaging in self-injurious behavior. Such a view ignores the realities of prison.

The Court heard substantial testimony about the phenomenon of self-injurious behavior in prison settings, some of which reflects suicidal tendencies and some of which is not a manifestation of mental illness at all. As Nurse Practitioner Dunn explained, prisoners "quite frequently" engage in self-harming behavior (e.g. cutting themselves) even though they are not suicidal.[73] The

---

[73] Tr. Vol. 34, 77:15-19 (Dunn).

prisoner does not intend to commit suicide, but aims to manipulate prions staff in order to obtain

something—new shoes, a new set of clothing, or something else unrelated to his mental health

issues.[74] Dr. Nagel also described prisoners who would claim to be suicidal in an attempt to obtain

preferred housing placements.[75]  Dr. Bonner explained why, in a prison setting, it is problematic

to assume that all rule violations stem from a mental illness:

> The bare fact that an inmate has a mental health diagnosis does not mean that all of
> his behavior stems from that diagnosis, and it would be harmful to create a culture
> at a prison that assumes all misconduct can be blamed on a mental health diagnosis.
> In my experience, the mental health professionals at EMCF approach each patient
> and each incident individually, and we use our medical judgment and clinical skills
> to assess each situation, determine the causative factors for each incident, and then
> act accordingly.[76]

Simply put, determining whether a prisoner's mental illness is at the root of any given misconduct

requires case-by-case medical judgment.

While Plaintiffs and their experts may make different judgment calls when presented with

a prisoner who is violating prison rules, they have offered no proof that Dr. Bonner, Nurse

Practitioner Dunn, or any of EMCF's mental health staff are failing to exercise their own medical

judgment.  Such judgment calls, even if subject to reasonable debate by medical professionals, are

not reviewable under the Eighth Amendment.  *Estelle v. Gamble*, 429 U.S. 97, 107 (1976).

The Court should grant judgment for MDOC on this claim.

### C.     Plaintiffs have not identified a single-stroke remedy that satisfies Rule 23(b) and the Prison Litigation Reform Act's narrow-tailoring requirement.

Plaintiffs have not shown that MDOC officials are deliberately indifferent to the serious

mental health needs of prisoners at EMCF.   Prison staff are not ignoring, refusing to treat,

---

[74] Tr. Vol. 34, 77:15-78:13 (Dunn); *see Pinson v. United States*, 2018 WL 1123713 (M.D. Penn. Feb. 26, 2018) (discussing inmate who continually used "threat of self-harm" to manipulate medical services and obtain what she wanted from prison staff).
[75] Ex. D-506 at 57-59 (Dr. Nagel).
[76] Doc. 812-1 (Dr. Bonner Dec. at 14).

intentionally treating incorrectly, or wantonly disregarding prisoners' serious psychiatric or mental health needs. *Gobert*, 463 F.3d at 346. There is no basis for liability under the Eighth Amendment.

Even if they had met their burden to prove deliberate indifference, Plaintiffs have not identified a single-stroke remedy that the Court could order to provide class-wide relief. "The district court may not provide a 'warranty of pleasant conditions,' but can only order relief sufficient to correct the violations discovered." *Alberti v. Klevenhagen*, 790 F.2d 1220, 1227 (5th Cir. 1986). In a prisoner class action, the class claims must rest on a common contention that, if proven, is susceptible of a single-stroke remedy—a specific injunctive remedy that will provide relief to every member of the class. *See Yates v. Collier*, 868 F.3d 354, 367 (5th Cir. 2017) (citing *Wal-Mart*, 564 U.S. at 360). In *Yates*, for example, a class of prisoners complaining of exposure to dangerously excessive heat proposed that the Court issue an injunction requiring that housing-unit temperatures be maintained at 88 degrees or lower, a single and specific remedy that would address every class member's complaint and could be easily implemented and enforced by the district court. 868 F.3d at 367-68.

Plaintiffs have identified no specific, single-stroke remedy for the Mental Health Care Class. Instead, they propose that the Court implement a litany of amorphous remedial concepts, including an "adequate intake process," a "thorough assessment of patients," "improved crisis response," "more rigorous standards for psychiatric prescribing," "better quality management," and the like. Doc. 843 at 49-50. Such general recommendations are not proper injunctive remedies in any case, much less the single-stroke class-action remedies required by *Yates* and *Wal-Mart*.

Plaintiffs' proposed remedies are an invitation for the Court to stand in as warden and chief medical officer of EMCF and become "enmeshed in the minutiae of prison operations" for years to come. *Estate of Henson v. Wichita Cty., Tex.*, 795 F.3d 456, 468 (5th Cir. 2015). Rather than

undertake to manage federal prisons, federal courts have always afforded "deference and flexibility to state officials trying to manage a volatile environment" within a prison. *Turner v*, 482 U.S. at 84-85; *see also Sandin v. Conner*, 515 U.S. 472, 482 (1995). Even if they could show a current constitutional violation, and they have not, Plaintiffs cannot identify a single-stroke remedy that respects that traditional deference, as required by *Yates*. No injunction should issue.

## III.   Category Three – Medical Care.

The Court also certified a prison-wide "Medical Care" class to try seven claims of deficient healthcare at EMCF. Doc. 830 at 2-3. As is the case with mental health treatment at the prison, MDOC has made numerous changes to the delivery of healthcare at EMCF since this suit was filed six years ago. Plaintiffs continue to insist that, notwithstanding these demonstrable improvements, "deficiencies in EMCF's healthcare system place all prisoners at EMCF at substantial risk of serious harm . . . ." Doc. 843 at 7. As noted above, Plaintiffs must show that medical care at EMCF is so deficient that it evinces a deliberate indifference on the part of MDOC officials to the serious medical needs of all prisoners. *Gobert*, 463 F.3d at 345-46.

### A.   Overview of EMCF's Medical System.

Like EMCF's mental health team, Centurion's medical staff delivers care in much the same way as does a modern clinic operating in the community, subject of course to the constraints of a prison setting. *See West v. Atkins*, 487 U.S. 42, 57 (1988) ("Unlike the situation confronting free patients, the nonmedical functions of prison life inevitably influence the nature, timing, and form of medical care provided to inmates . . . ."). Since August 2017, the EMCF medical team has been led by Dr. Patrick Arnold, a licensed physician with 15 years of experience providing care in a correctional setting.[77] As chief physician, Dr. Arnold is supported by a team of over 35 medical

---

[77] Tr. Vol. 35, 10:18-23 (Dr. Arnold).

providers: five nurse practitioners, a director of nursing, eight registered nurses, 17 licensed practical nurses, a phlebotomist, an infection control coordinator (a registered nurse), several part-time dentists and an on-site dental assistant, and a part-time pharmacist and an on-site pharmacy technician.[78]  The providers are supported by five medical administrative staff, who are supervised by a Health Services Administrator—a position akin to the administrator of a small hospital.[79]

The hub of the healthcare system at EMCF is the medical unit, a 10-bed medical clinic that is centrally located in the prison.  Prisoners come to the clinic for routine treatment, such as chronic care treatment and treatment for emergent medical conditions through the "sick call" process.[80]  In addition to routine treatment, prisoners may be held in the medical unit for observation or further care if their condition requires more constant attention.[81]  When emergency care is required, Dr. Arnold notifies a community hospital and arranges for the inmate to be transported to the hospital, either by ambulance or van depending on the nature of the condition.[82]

EMCF's nurses deliver medication to prisoners on their housing units.  Every day, over 3,000 doses of medication are distributed to prisoners across the facility.[83]

The medical staff at EMCF, with support from Centurion headquarters, uses a Continuous Quality Improvement Program ("CQI") to track and assess the delivery of care across many data points; the staff relies on monthly CQI Reports to identify problem areas and improve treatment.[84]  In addition to this regular self-assessment, EMCF's medical staffing and treatment practices are

---

[78] Tr. Vol. 35, 10:5-14:15 (Dr. Arnold); Doc. 812-3 (Dr. Arnold Dec. at 2 (Dec. 19, 2018)); Joint Ex.76 (EMCF healthcare staffing matrix).

[79] Doc. 812-3 (Dr. Arnold Dec. at 2).

[80] At EMCF, prisoners request medical care by completing a "sick call" request form, which is collected by medical staff and triaged within 24 hours.  The nurse either addresses minor problems (colds, sinus infections, headaches) or refers the prisoner to the physician or a nurse practitioner for treatment.  Tr. Vol. 35, pp.18-22 (Dr. Arnold).

[81] Tr. Vol. 35, 25:8-26:4 (Dr. Arnold).

[82] Tr. Vol. 35, 22:22-24:6 (Dr. Arnold).

[83] Tr. Vol. 35, 24:23-25:4 (Dr. Arnold).

[84] Tr. Vol. 24, 52:2-16 (Dr. Perry); *see also* Joint Exs. 70-79 (Centurion 2017 CQI Reports).

evaluated by the American Correctional Association (ACA), a national organization that develops

and promulgates standards for safe and effective correctional operations.[85]  The ACA reaccredited

EMCF's medical policies and operations in March 2018.[86]

> ### B.   The Court should enter judgment for MDOC on the Medical Care Claims.

This Court identified seven claims to be tried by the prison-wide Medical Care class, and

it directed the parties to address whether any of those enumerated claims continue to result in

constitutional violations at EMCF.  Doc. 830 at 2, 5.  Again, Plaintiffs have largely ignored the

Court's enumerated issues in their post-trial brief.

> #### 1.   EMCF has sufficient medical staff to provide the basic medical care required by the Eighth Amendment.

The Eighth Amendment does not dictate a particular staff-to-inmate ratio that must be

adhered to in all cases.  And staffing decisions are not judged against a medical malpractice

standard:  "Unsuccessful medical treatment, acts of negligence, or medical malpractice do not

constitute deliberate indifference[.]"  *Gobert*, 463 F.3d at 346.  Instead, corrections officials must

provide sufficient medical staff to ensure that minimally decent care is delivered.  *Inmates of*

*Occoquan*, 844 F.2d at 837 ("In [the prison] setting, it is decency—elementary decency—not

professionalism that the Eighth Amendment is all about.").

Plaintiffs appear to have abandoned their claim that EMCF does not have sufficient medical

staff to care for the inmate population.  Plaintiffs do not address staffing numbers or ratios in the

"Health Care" section of their post-trial brief, *see* Doc. 843 at 7-20, and neither of their medical

experts opine that EMCF is understaffed today.[87]  Ms. LaMarre testified at trial that she was "not

---

[85] Tr. Vol. 31, 11:25-13:6 (Shaw discussing ACA audit process and results).
[86] Tr. Vol. 31, 11:25-13:6 (Shaw discussing ACA audit process and results); Doc. 812-2 at 14 (Roth Supplemental Report discussing ACA audit and results).
[87] *See* Doc. 799 (Dr. Stern Report); Doc. 800 (LaMarre Report).

sure" if EMCF had enough staff,[88] and her supplemental report offers no recommendations on staffing numbers.[89]  Dr. Stern did not undertake a staffing analysis and acknowledges that he does not know if the medical staff is insufficient at EMCF; instead, he says that MDOC should "conduct a staffing analysis" to determine if medical staffing is adequate.[90]  Finally, Plaintiffs acknowledge in their Health Care recommendations that they have no proof that medical staffing is insufficient, and that MDOC should "conduct a staffing analysis to determine the adequacy of healthcare staffing at EMCF . . . ."  Doc. 843 at 21.

If they have not abandoned the claim, then Plaintiffs have surely failed to prove it.  As set forth above, EMCF employs 35 licensed medical providers (doctors, nurse practitioners, nurses, dentists, and pharmacists) to treat a population of 1100 inmates.  MDOC's Chief Medical Officer, Dr. Gloria Perry, testified that in the first two years of Centurion's contract, Centurion added 12 new positions, increasing the healthcare staff from 40 full time positions to 52 full time positions.[91]  In Dr. Perry's judgment, MDOC provided enough medical staff to treat the population at EMCF,[92] and Centurion has now increased those staffing levels.  Plaintiffs criticize Dr. Perry for not visiting EMCF in person, but they do not dispute that she has years of correctional healthcare experience— both as a treating physician and director of a prison healthcare system.[93]  The Court should not ignore Dr. Perry's views on proper medical staffing in Mississippi's prisons.

Dr. Arnold, EMCF's medical director, testified that the medical staff is able to manage EMCF's caseload of 600 chronic care patients, diagnose and treat the 150-200 sick call patients

---

[88] Tr. Vol. 27, 84:2-3 (LaMarre).

[89] *See* Doc. 800 (LaMarre Report at 50-53).

[90] Doc. 799 (Stern Report at 27).

[91] Tr. Vol. 24, 42:11-43:13 (Dr. Perry).

[92] Tr. Vol. 24, 12:89-13:20 (Dr. Perry explaining that MDOC developed the minimum staffing levels for EMCF and other facilities based on what they believed would be enough staff for each facility).

[93] Tr. Vol. 23, 4:15-21 (Dr. Perry).  At trial, Dr. Perry explained that she relies on her 18-member staff, including one of her health services administrators Paxton Paige, to visit the 15 prisons under her purview and keep her apprised of their healthcare operations.  Mr. Paige visits EMCF every month.  Tr. Vol. 24, 45:20-47:16 (Dr. Perry).

that are seen every week, prescribe, fill, and distribute over 3,000 doses of medication every day, and provide weekend care and 24-hour on-call coverage.[94]  Dr. Arnold also explained that, after the trial was concluded, EMCF has continued recruiting medical staff—adding two more nurse practitioners, a part-time registered nurse dedicated to handling weekend sick call requests, and a part-time pharmacist.[95]  The ACA re-accredited EMCF in March 2018, confirming that the facility was 100% compliant with professional standards for medical staffing.[96]

The proof does not support Plaintiffs' assertion that EMCF's medical staff is inadequate by Eighth Amendment standards.  The court should enter judgment against Plaintiffs on this claim.

### 2. Prisoners are not subjected to unconstitutional delays in accessing healthcare providers and outside specialists.

The Medical Class also alleged that *all prisoners* are required to wait long periods of time to see healthcare providers and receive specialty care.  Delays and interruptions in the delivery of medical care are a fact of life in prison, where security and safety concerns impact how and when care is provided.  That is why "[d]elay in medical care can only constitute an Eighth Amendment violation if there has been deliberate indifference that *results in substantial harm*."  *Easter*, 467 F.3d at 464 (emphasis in original).  Because this is a class-action suit seeking prison-wide injunctive relief, Plaintiffs must show more than isolated incidents of delay; they must show a pervasive pattern of delaying care for serious medical needs and that prison officials are deliberately indifferent to that pattern.  *See Estate of Henson*, 795 F.3d at 469.

Plaintiffs' post-trial brief does not address their delay claim directly, and the Court has not seen evidence that *all prisoners* are regularly subjected to long waits at EMCF today.  At EMCF,

---

[94] Tr. Vol. 35, 10:24-25:4 (Dr. Arnold).

[95] Doc. 812-3 (Dr. Arnold Dec. at 1-2).

[96] EMCF's adherence to ACA standards is not "*per se* evidence of constitutionality," but it is a "relevant consideration"—taken together with the other evidence on staffing—in the Court's analysis of whether EMCF employs adequate medical staff.  *See Gates v. Cook*, 376 F.3d 323, 337 (5th Cir. 2004).

as with other prisons, there are two ways to access care: (1) making a "sick call" request to see a medical provider, much like scheduling a doctor's appointment in the free world; and (2) visiting the clinic for regular chronic care appointments in the case of inmates suffering from a chronic condition such as diabetes, pulmonary disease, and the like.[97]  The evidence reflects that, as of today, these methods of accessing care are available to prisoners in a timely manner.

Dr. Perry testified that Dr. Arnold and the nurse practitioners had improved the sick call process and were working to clear the backlog of sick call requests.[98]  Dr. Arnold explained that, as of the time of his testimony on April 4, 2018, nurses were triaging all sick call requests within 24 hours by conducting a face-to-face evaluation of prisoners and either routing them immediately to a provider for urgent conditions or scheduling them to see a provider within seven days for routine care.[99]  Dr. Arnold confirmed that guards cooperate with medical staff in notifying prisoners of their medical appointments and transporting them to the clinic.[100]  Dr. Arnold also testified that the only occasions on which EMCF providers fall behind on the seven-day goal is when the prison is on "lockdown" and prisoners' movements are restricted for safety reasons or the number of sick calls overwhelms the system.[101]  Finally, Dr. Arnold explained in his December 2018 declaration that he personally examines 20-22 chronic care patients every day and that EMCF staff is caught up on all chronic care cases and appointments.[102]

Plaintiffs appear to address the "delay" issue indirectly in their post-trial brief sections I(A) (urgent care), (B) (non-urgent care), and (G) (specialty services).  *First*, Plaintiffs assert that access to urgent care is "hindered" by the failure to have "panic buttons" in all cells and failure of guards

---

[97] Tr. Vol. 35, 16:18-21:6 (Dr. Arnold).
[98] Tr. Vol. 23, 30:16-21 (Dr. Perry).
[99] Tr. Vol. 35, 19:1-21:18 (Dr. Arnold).
[100] Tr. Vol. 35, 21:25-22:3 (Dr. Arnold).
[101] Tr. Vol. 35, 21:4-18 (Dr. Arnold).
[102] Doc. 812-3 (Dr. Arnold Dec. at 3).

to respond "appropriately and promptly" to prisoners' urgent medical needs.  Doc. 843 at 8-10.  But prisoners regularly access urgent care through the sick call process or by requesting assistance from guards, and Dr. Arnold explained that medical staff responds by going to treat the prisoner in his housing unit when a guard calls in an emergency (or "man down").[103]  *Second*, Plaintiffs assert that the lack of a "confidential process" for handling sick call requests impedes access to routine care.  Doc. 843 at 10-12.  But the evidence defies any claim that confidentiality concerns impede use of the sick call process; every week, 150-200 prisoners use the sick call process to access medical and mental health care.  *Third*, Plaintiffs assert (without details) that EMCF fails to provide timely access to specialty care.  Doc. 843 at 18.  Dr. Arnold testified, however, that he uses MDOC's "Clear Coverage" system to schedule specialty care by outside providers when, in his medical judgment, it is required; and Dr. Arnold explained that, if the request for specialty care is taking too long, he makes sure that the prisoner is transported to a local emergency room to receive the necessary care.[104]

Not only are Plaintiffs' assertions rebutted by the evidence noted above, their claims rest primarily on prisoner testimony and the opinions of Plaintiffs' experts Dr. Stern and Ms. LaMarre.  The prisoner testimony was mixed—some prisoners had no problem accessing care—and certainly does not show that all prisoners are *systematically* denied care.  The opinions offered by Dr. Stern and Ms. LaMarre rely on a statistically insignificant, non-random sampling; both experts agreed that their methodology involved selecting a small number of the toughest medical cases at EMCF.[105]  These opinions, which are really just another professional's hindsight disagreement

---

[103] Tr. Vol. 35, 22:4-23:8 (Dr. Arnold).
[104] Tr. Vol. 35, 28:1-21 (Dr. Arnold).
[105] *See* Tr. Vol. 19, 34:11-37:15 (Dr. Stern explaining his "purposive sampling" process, which relies on case studies of prisoners with "complex or complicated situations, under rough situations, under difficult situations where there is medical care that has to be delivered"); Tr. Vol. 20, 70:12-72:12 (Dr. Stern testifying that sample sizes ranged from less than 1% to 5% of EMCF's population); Tr. Vol. 28, 8:23-9:7 (LaMarre testifying that her opinions were based on a non-random sampling of 21 inmates out of a population of 1,200).

with medical judgments made by EMCF's providers, might support a finding that negligent care was provided in particular cases.  But they do not establish that MDOC officials are ignoring, refusing to treat, intentionally treating incorrectly, or evincing a wanton disregard for the serious medical needs of *all* prisoners at EMCF.  *Gobert*, 463 F.3d at 346.

Whatever episodic or individual complaints of delay Plaintiffs may have identified, they have not proven that prison staff are deliberately indifferent—are in a state of mind equivalent to "subjective recklessness as used in the criminal law," *Farmer*, 511 U.S. 839-41—when it comes to providing urgent, routine, and specialty care.

### 3.       *Prisoners are receiving appropriate treatment by nurse practitioners.*

The Medical Class also alleged that prisoners are too often treated by nurse practitioners, rather than physicians, regardless of the nature or seriousness of their medical condition.  As noted above, EMCF employs licensed nurse practitioners who, under Dr. Arnold's supervision, provide care to inmates.  Under Mississippi law, a nurse practitioner may provide the same treatment and care as a physician with a compatible practice.  *See* Miss. Code § 73-15-20; Miss. Admin. Code Title 30, Part 2840.  As explained by Plaintiffs' expert Ms. LaMarre, nurse practitioners provide the same treatment as do doctors:

> A nurse practitioner is a registered nurse that has received additional training [and is] licensed to diagnose and treat common and serious medical conditions such as high blood pressure, diabetes, pneumonia, et cetera. . . .  A nurse practitioner can treat patients and prescribe medications as physicians do.[106]

There is nothing wrong from a community standard of care, much less a constitutional one, with nurse practitioners treating conditions that doctors may also treat—serious or otherwise.

The Eighth Amendment does not require that prisons "provide whatever care an inmate wants," *Gibson*, 920 F.3d at 216, and there is no constitutional "right" to be treated by a doctor

---

[106] Tr. Vol. 27, 13:20-14:3 (LaMarre); *see also* Tr. Vol 27, 78:23-79:5 (LaMarre).

when state law and community norms permit a nurse practitioner to provide treatment.  Plaintiffs appear to have abandoned this claim regarding improper reliance on nurse practitioners to provide treatment.  They do not address it in their post-trial brief, *see* Doc. 842 at 7-20, and neither Dr. Stern nor Ms. LaMarre identify instances—much less a pervasive practice—of nurse practitioners treating "serious" conditions that are better treated by a doctor.  In any event, the proof shows that EMCF is properly utilizing nurse practitioners, working under the chief physician's supervision, to increase access to care at the prison.

The Court should enter judgment against Plaintiffs on this claim.

### 4.    *Medication administration at EMCF satisfies constitutional requirements for timely provision of medical care.*

The Medical Class also alleged that prisoners do not always receive prescribed medications or do not receive them in a timely manner.  Plaintiffs allege that this problem persists, arguing that medications are not kept in stock, nurses fail to administer medication in a timely and appropriate manner, and nurses do not accurately document medication administration.  Doc. 843 at 14-17.

Delays and interruptions in the delivery of prescription medication are a fact of prison life, where conditions are imperfect and security concerns impact the delivery of care.  *Bell v. Wolfish*, 441 U.S. 520, 546-47 (1979) (describing the security and safety issues that impact prison operations).  That is why delays in treatment—even lengthy ones—do not rise to the level of deliberate indifference.  *See Mendoza v. Lynaugh*, 989 F.2d 191, 195 (5th Cir. 1993).  Only delays attributable to some deliberate or reckless act and which cause substantial harm may rise to the level of a constitutional violation.  *See id.*; *Adams v. Duke*, 73 Fed. Appx. 766, 767 (5th Cir. 2003) (delay caused by nurse's failure to order prescribed medications *and* refusal to schedule a follow-up appointment with the prescriber could be actionable).

While the administration of medication at EMCF is not perfect, it certainly satisfies the constitutional standard.  EMCF's medical staff is responsible for prescribing, stocking, and administering over 3,000 doses of medication every day.  As Dr. Arnold explained at trial, the vast majority of these prescriptions are properly filled and administered.[107]  Nurse Pennie Brookshire, an LPN whose duties include medication administration, confirmed this, explaining in testimony that the Court noted "was completely favorable to [MDOC]"[108] how nurses dispense medication and follow-up with inmates who missed "pill call" due to work assignments.[109]

Dr. Kim Nagel, EMCF's chief psychiatrist from October 2015 to November 2017, testified that the nurses were effectively administering medications to his patients based on his observations of pill call and his review of the MARs.[110]  Dr. Nagel acknowledged that "people make mistakes and medication errors do occur" in an institution with so many patients, and he explained how he and his staff addressed inmate complaints about missed doses.[111]  Dr. Nagel testified that, aside from occasional human error, he "[hadn't] seen any problems with [the distribution of medication]."[112]  He noted that, in his view, EMCF would benefit by having an on-site pharmacy where medications could be stocked, as does the Mississippi State Penitentiary.[113]

By the time of trial in April 2018, EMCF had the on-site pharmacy that Dr. Nagel preferred and had begun stocking critical psychiatric medications so that there would be less interruptions and missed doses.[114]  Nurse Practitioner Dunn testified that Dr. Nagel's follow-up protocol had been further improved: If a prisoner on the mental health caseload misses his medication, the nurse

---

[107] Tr. Vol. 35, 24:23-25:4 (Dr. Arnold).
[108] Tr. Vol 24, 113:12-14 (Court).
[109] Tr. Vol. 24, 80:17-112:24 (Nurse Brookshire).
[110] Ex. D-506 at 108-114 (Dr. Nagel).
[111] Ex. D-506 at 108-111 (Dr. Nagel).
[112] Ex. D-506 at 111 (Dr. Nagel).
[113] Ex. D-506 at 111-14 (Dr. Nagel).
[114] Tr. Vol. 34, 84:5-85:18, 113:2-114:10 (Dunn).

flags the missed dose and a psychiatric provider follows up with him.[115]  Since the trial was concluded, EMCF has obtained a pharmacy license permitting the prison to stock psychiatric medications on premises.[116]  As of October 2018, these changes have resulted in a 93% compliance for the medication administration data points tracked by Centurion's CQI program.[117]

As Plaintiff's expert Ms. LaMarre acknowledged when questioned by the Court, effective medication administration is primarily a function of having a sufficient number of nurses who are competent at their job.[118]  Plaintiffs have not shown that EMCF is understaffed, and there is no proof that EMCF is deliberately hiring incompetent nurses.  Dr. Perry explained that recruitment and retention of medical staff in prisons is a nationwide problem, affecting all state systems and the Federal Bureau of Prisons.[119]  The fact that good nurses are hard to find (and keep) is not unique to EMCF, and it surely is not a basis for deciding that MDOC officials—who are aware of this problem and are actively working to recruit qualified healthcare staff—are deliberately indifferent to the issues impacting medication administration at EMCF.

At bottom, Plaintiffs ask this Court to credit their experts' opinions (which are based on insignificant sampling skewed toward the most problematic cases) and ignore the proof that EMCF's medical staff has improved the administration of medication to prisoners under their care. Even if the Court accepts their testimony, Dr. Stern and Ms. LaMarre's prisoner-specific case studies have not identified the type of lengthy delays that would rise to the level of a constitutional violation,[120] much less pervasive delays that subject all prisoners at EMCF to a serious risk of harm.  The Court should enter judgment for MDOC on this claim.

---

[115] Tr. Vol. 34, 84:5-85:18, 113:2-114:10 (Dunn).
[116] Doc. 812-3 (Dr. Arnold Dec. at 3-4).
[117] Doc. 812-3 (Dr. Arnold Dec. at 4).
[118] Tr. Vol. 27, 43:22-45:14 (LaMarre).
[119] Tr. Vol. 24, 56:4-59:18 (Dr. Perry).
[120] *See Hurd v. Stanciel*, 2015 WL 10889995, *2 (N.D. Miss. Dec. 10, 2015) (40-day interruption of pain medication was not a constitutional violation); *Krivan v. Dallas Cty.*, 2002 WL 83768, **2-3 (N.D. Tex. Jan. 14, 2002) (50-day

### 5.    *Prisoners are not denied treatment for acute or chronic conditions.*

The Medical Class also alleged that prisoners are denied treatment for acute or chronic pain and other medical conditions.  Plaintiffs cannot prevail on a showing of negligent care for acute and chronic pain; they must demonstrate a subjective recklessness on the part of prison officials. *Farmer*, 511 U.S. 839-41.  "A prisoner is not entitled to the treatment that judges might prefer, or medical treatment or therapy equivalent to that provided by Medicaid or Medicare.  Moreover, [a prisoner] has no constitutional right to the best medical treatment available." *Irby v. Cole*, 2006 WL 2827551, *7 (S.D. Miss. Sept. 25, 2006), *aff'd*, 278 F. App'x 315 (5th Cir. 2008).

As discussed in Section B(2), above, there is no proof that EMCF's staff is *denying* treatment for acute conditions, or that such care is delayed so significantly that it violates the Eighth Amendment's prohibition on cruel and unusual punishment.  To be sure, there are delays and interruptions in care at EMCF, just as there are in any prison.  These delays are a fact of prison life, attributable to security-related concerns or human errors.  They are neither pervasive, nor the result of deliberate indifference on the part of EMCF's security and medical staff.

Plaintiffs maintain that EMCF fails to provide access to chronic care, but their evidence is so thin that it cannot support a finding that EMCF engages in a pervasive and subjectively reckless practice of denying chronic disease care.  *See* Doc. 843 at 12-13.  Plaintiffs assert that some prisoners with chronic conditions are not enrolled in EMCF's chronic care clinic.  To support this assertion, Plaintiffs' cite Ms. LaMarre's two-and-a-half year old 2016 report, which identified two prisoners who were not seen for chronic disease management.  Doc. 843 at 12 n.36.  Plaintiffs also claim that EMCF's medical staff "fail to schedule follow-up appointments for chronic care patients, schedule the appointments at timely intervals, ensure that the appointments in fact take

---

delay in HIV medication was not a constitutional violation); *Black v. Wilkinson*, 2010 WL 793448, *4 (W.D. La. Mar. 2, 2010) (18-day interruption in glaucoma medication was only a "moderate delay," not a constitutional violation).

place, and provide appropriate care at appointments."  These sweeping accusations rest on four

patient case studies provided by Plaintiffs' experts.  *Id.* at 13 n.38.

Dr. Arnold testified that he and the nurse practitioners provide regular treatment for the

more than 600 prisoners on the chronic care caseload, seeing over 20 such patients every day and

ensuring that appointments are rescheduled the next day if a prisoner misses due to a security issue

(such as a prison lockdown).[121]  According to Dr. Arnold, as of December 2018, chronic care

appointments are caught up.[122]  It is apparent that ECMF is providing adequate chronic care in a

timely manner to the vast majority of chronic disease patients.  This type of "frequent and

continuous treatment," whether or not successful in every case, precludes a finding of deliberate

indifference.  *Irby*, 2006 WL 2827551 at **6-7.  Whatever failings their experts might have

identified in individual cases, Plaintiffs have not shown that Dr. Arnold's approach to chronic care

treatment amounts to "unnecessary and wanton infliction of pain repugnant to the conscience of

mankind."  *Id.* at *6 (citing *McCormick v. Stalder*, 105 F.3d 1059, 1061 (5th Cir. 1997)).

The Court should enter judgment for MDOC on this claim.

### 6.     *EMCF provides prisoners with adequate dental care.*

The Medical Class alleged that EMCF prisoners receive inadequate dental care, but

Plaintiffs do not re-urge this claim in their post-trial brief or cite to any proof that EMCF's dental

staff provides constitutionally deficient care.  As noted above, EMCF provides on-site dental care,

including 40-hour per week coverage by licensed dentists and on-site dental assistants.  Consistent

with this Court's order, whatever complaints Plaintiffs once had about dental care should be

deemed corrected and abandoned by Plaintiffs.  Doc. 830 at 5.

---

[121] Tr. Vol. 35, 16:1-18:19 (Dr. Arnold discussing chronic care procedures); Doc. 812-3 (Dr. Arnold Dec. at 2-3).
[122] Doc. 812-3 (Dr. Arnold Dec. at 2-3).

### 7. *Prisoners are not denied treatment recommended by specialists.*

Finally, the Medical Class claimed that prisoners at EMCF are denied treatment and corrective surgeries recommended by outside specialists. As already noted in Section B(2), above, Dr. Arnold's and the medical staff's practices for referring inmates to specialists and ensuring that the referral appointments are made satisfy constitutional standards.

Plaintiffs cite a handful of instances in which—according to Plaintiffs' experts—EMCF medical staff did not implement a specialist's recommendations. *See* Doc. 843 at 18 n.73. Of course, prisoners testified at trial that they were receiving specialty services.[123] These examples, even if credited, are not proof of pervasive indifference to prisoners' specialty-care needs.[124] Moreover, they appear to involve instances in which the medical staff at EMCF elected not to implement a specialist's proposed treatment. Such claims reflect a difference in medical judgment, not a constitutional violation. *Estes v. Rahorst*, 2013 WL 5422874, *10 (N.D. Tex. Sept. 27, 2013) ("[A] prison doctor who relies on his medical judgment to modify or disagree with an outside specialist's recommendation of how to treat an inmate is not said to act with deliberate indifference."). The Court should enter judgment against Plaintiffs on this claim.

### C. Plaintiffs' proposed injunctive relief violates Rule 23 and the PLRA.

Plaintiffs have not shown that MDOC officials are deliberately indifferent to the serious medical needs of prisoners at EMCF. Prison staff are not ignoring, refusing to treat, intentionally

---

[123] *E.g.*, Tr. Vol. 5, 87:14-25 (inmate John Barrett describing specialty treatment, including surgery, provided by MDOC for carpal tunnel syndrome); Tr. Vol. 25, 31:6-10 (inmate Dexter Campbell discussing hernia surgery provided by off-site specialist); Tr. Vol. 21, 6:20-7:20, 20:22-21:16 (inmate Kunta Gates discussing ongoing outside specialty care provided for his medical condition sarcoidosis).

[124] Dr. Stern's example of a delay in implementing a specialist's recommendation was limited to one instance in which a prisoner with macular degeneration waited two weeks for treatment after complaining of a headache. Tr. Vol. 20, 106:16-07:5. Ms. LaMarre explained her concerns as follows: "And when the specialist made recommendations such as medications for, you know, glaucoma, the staff didn't always implement those recommendations and patients didn't get their medications." Tr. Vol. 27, 76:14-17.

treating incorrectly, or wantonly disregarding prisoners' serious medical needs. *Gobert*, 463 F.3d at 346. There is no basis for liability under the Eighth Amendment.

Even if they had met their burden to prove deliberate indifference, Plaintiffs have again failed to identify a single-stroke remedy that would provide class-wide relief for the Medical Care class. Instead, their primary proposal is for the Court to appoint a monitor—another expert at taxpayers' expense—who would "develop measurable standards for assessing the adequacy of medical care at EMCF and assess EMCF's compliance with those standards." Doc. 843 at 20-21. Otherwise, Plaintiffs propose such things as ordering policy revisions and a salary analysis, "addressing and implement hospital and specialty service recommendations in a timely manner," and enjoining prison officials to "ensure sufficient medical and custody staffing" so that various types of care can occur in a "timely manner." *Id.* Such general recommendations do not afford the type of specific remedies suitable for an injunction under *Yates* and the PLRA.

The Court should reject Plaintiffs' request that it take over the administration of EMCF's healthcare system. No injunction should issue on the Medical Class claims.

## IV.    Category Four – Excessive Force

The Court identified the following four bases underlying Plaintiffs' excessive force claim: security staff at EMCF use excessive force with impunity and no oversight; receive insufficient training; use chemical agent and physical force unnecessarily, without warning, and without considering prisoners' medical or mental health condition; and deny prisoners' requests for medical care once they have been subjected to chemical agent. Doc. 830 at 3. In responding to the Court's Order, Plaintiffs do not expressly identify—and thus have withdrawn/abandoned—the following bases: security staff use excessive force with impunity and no oversight; receive insufficient training; use chemical agent without considering the prisoners' medical or mental health condition; and deny prisoners' requests for medical care after they have been subjected to

chemical agent.  *Compare* Doc. 843 at 56-58 *with* Doc. 830 at 5.  Rather, Plaintiffs complain that

force is used unnecessarily and without warning.  Doc. 843 at 56-58.[125]

### A.     The Court should enter judgment for MDOC on the Excessive Force Claims.

Turning to the bases identified in their post-trial brief, Plaintiffs contend security staff do

not use the "appropriate response" when prisoners violate particular rules and any attempts to

deescalate a situation by mental health staff are "done poorly . . . ."  Doc. 843 at 57-58.  Contrary

to the Court's instruction, Plaintiffs fail to explain how either of these allegations rises to the level

of a constitutional rights violation, much less one that continues to exist today.  *See* Doc. 830 at 5.

The analysis of these two bases must start from the fact that use of force is required in any

prison environment. "[P]risons are inherently dangerous places: Inmates get there by violent acts,

and many prisoners have a propensity to commit more.'"  *Weeks v. Warden*, 2017 WL 3404965,

*5 (N.D. Ill. Aug. 7, 2017) (quoting *Riccardo v. Rausch*, 375 F.3d 521, 525 (7th Cir. 2004)); *see*

*also Ruiz v. Johnson*, 37 F. Supp. 2d 855, 929 (S.D. Tex. 1999) (noting "the use of force is not

only a justified, but also a necessary, tool in the quest to maintain an institution's order, or a guard

or inmate's safety"), *rev'd on other grounds*, 243 F.3d 941, 943 (5th Cir. 2001).  Plaintiffs must

do more than merely critique the use of force at EMCF; Plaintiffs must point to specific facts

demonstrating that unconstitutionally excessive force is being used.

This, they have not done. To evaluate whether the requisite "substantial risk of serious

harm" exists, there must be an individualized inquiry into the circumstances underlying particular

uses of force to determine whether those uses of force rose to the level of unconstitutionally

---

[125] Insofar as Plaintiffs claim that Vail testified that MDOC's *policies* related to use of force "expose Plaintiffs to a substantial risk of serious harm[,]" this claim is untethered to any record evidence.  Doc. 843 at 56.  Vail made clear he was not present to "testify that there are problems or [that he] ha[d] issues with the policies of either MDOC or MTC regarding the management of" EMCF, and, in describing his criticism of EMCF, Vail added "[i]t's not an issue of policy.  It's an issue of practice." Just as during trial, neither MDOC's nor MTC's policies are at issue here. Tr. Vol. 5, 17:16-20 (Vail).

excessive force. *See Cowart v. Erwin*, 837 F.3d 444, 452 (5th Cir. 2016). "In evaluating excessive force claims under the Eighth Amendment, the 'core judicial inquiry' is 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" *Id*. (quoting *Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992)). This requires courts to consider the subjective intent of the particular staff-person utilizing force, and this subjective intent "is determined by reference to the well-known *Hudson* factors—'the extent of injury suffered, the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response.'" *Id*. at 452-53 (quoting *Hudson*, 503 U.S. at 9-10). Thus, before the Court can determine whether every member of the facility-wide class is subject to a substantial risk of being exposed to excessive force, the Court would have to evaluate each use of force cited by Plaintiffs, including the subjective intent of the guards involved, to determine whether a particular incident constitutes competent evidence of excessive force under the *Hudson* factors.

Plaintiffs, however, make no effort to evaluate whether force "was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Cowart*, 837 F.3d at 452 (quoting *Hudson*, 503 U.S. at 6-7). Plaintiffs merely cite a handful of anecdotal examples involving use of OC spray[126] on the segregation unit. Rather than attempt to conduct the requisite individualized inquiry, Plaintiffs simply rely on their expert's *ipse dixit* to claim the anecdotes show that staff do not use the "appropriate response" and perform de-escalation efforts "poorly." Doc. 843 at 57.

There are two primary problems with this approach. First, "excessive force" is a legal term of art, and neither expert nor lay witnesses can make the determination of whether the anecdotal

---

[126]Tr. Vol. 31, 96:5-14 (Shaw). OC spray is the abbreviation for "oleoresin capsicum."

incidents Plaintiffs cite were unconstitutionally excessive. *See, e.g.*, *Braggs v. Dunn*, 317 F.R.D. 634, 649-50 (M.D. Ala. 2016) (explaining that expert witness could not make the determination of whether there was a "substantial risk of serious harm"). Second, Plaintiffs' view of what is an "appropriate" response and what actions were "poorly" executed—articulated without any reference to the constitutional standard—is nothing more than a complaint that force is used in a way that Plaintiffs and their experts view as inconsistent with best practices. Of course, this does not translate to a constitutional violation. *See Baze v. Rees*, 553 U.S. 35, 51 (2008) (federal courts are charged with interpreting the Constitution, not "with determining 'best practices'").

Also, Plaintiffs' criticism of EMCF's use of OC spray as part of various efforts to maintain safety and order in the segregation unit when prisoners refuse to allow staff to close and secure their food tray slots ignores the level of discretion correctional officials must be afforded. "Maintaining safety and order at [correctional] institutions requires the expertise of correctional officials, who must have substantial discretion to devise reasonable solutions to the problems they face." *Florence v. Bd. of Chosen Freeholders*, 566 U.S. 318, 326 (2012). As Warden Shaw explained, "having those food slots open creates a real security issue."[127] This is because prisoners behind the cell door can reach through an open food tray slot to attempt to tamper with the cell door lock, to throw substances at staff, to pass contraband from cell to cell, or to run fishing lines from cell to cell.[128] One of MDOC's experts, Ken McGinnis, added, "the practice [at EMCF] is to secure those food [tray] slots. That's the practice across the nation. Inmates were blocking those food tray slots on a regular basis and it was resulting in confrontation with staff."[129]

---

[127] Tr. Vol. 31, 26:23-27:10 (Shaw).
[128] Tr. Vol. 31, 26:23-27:9 (Shaw).
[129] Tr. Vol. 36, 46:20-47:9 (McGinnis).

Plaintiffs simply disagree with how security staff handled the resulting confrontation, believing staff should spend additional time attempting to deescalate the situation rather than resorting to a short burst of OC spray to gain compliance.  Such a dispute over the nature, quality, and length of de-escalation efforts in anecdotal situations is a dispute over best practices, not over whether Eighth Amendment rights have been violated.  Plaintiff have failed to show that the use of force at EMCF gives rise to a substantial risk of serious harm.

Nevertheless, even if Plaintiffs could establish a substantial risk of serious harm created by use of force at EMCF, Plaintiffs have not shown that MDOC is deliberately indifferent to that risk. From the point they are hired, security staff are trained in the use of force, and this training is consistent with national standards.[130] Security staff continue training even after they start working and are required to obtain a minimum of forty (40) hours of annual in-service training, which includes use of force of training.[131] This is consistent with national standards.[132] Security staff are trained not only on the use of force[133] but also on mental health awareness given the population at EMCF includes prisoners with mental health diagnoses.[134]

As Warden Shaw acknowledged, staff do not always follow policy and procedure.  The EMCF management team does not simply ignore this fact: EMCF management monitors staff performance on a daily basis, and this includes reviewing camera footage.[135] Where problems are recognized, EMCF management continues to train security staff and will discipline security staff, anywhere from verbal discipline to termination.[136] Warden Shaw also reviews use of force reports,

---

[130] Tr. Vol. 31, 52:16-53:2 (Shaw); Tr. Vol. 33, 48:9-18, 49:12-50:19 (Roth).
[131] Tr. Vol. 33, 50:20-51:16 (Roth).
[132] Tr. Vol. 33, 50:20-51:16 (Roth).
[133] Tr. Vol. 31, 52:16-53:2 (Shaw);
[134] Tr. Vol. 32, 92:2-12 (Shaw).
[135] Tr. Vol. 31, 54:23-55:8 (Shaw).
[136] Tr. Vol. 31, 54:23-55:8 (Shaw).

which must be created anytime an officer uses force,[137] and has access to view any video recording accompanying the report, if necessary.[138] In addition to Warden Shaw, EMCF's deputy warden for operations and EMCF's chief of security also review the use of force reports.[139] Potentially excessive uses of force are subject to investigation,[140] and, where the investigation reveals that staff played a role in participating in or not reporting excessive force, staff are subject to discipline.[141] Further, EMCF management monitors the use of OC spray by issuing the OC spray canisters from the central control room, requiring that the canisters be weighed in central control at the time they are issued, and, once used during a particular shift, requiring that the canister be returned to central control for measurement to determine how much OC spray was dispensed.[142]

On this record, Plaintiffs cannot show deliberate indifference to a "substantial risk of serious harm" stemming from alleged exposure to excessive force. The "extremely high standard" of deliberate indifference cannot be met where a defendant "responds reasonably" to substantial risks to inmate safety. *Farmer*, 511 U.S. at 844-45; *see also Thompson v. Campos*, 691 F. App'x 193, 194 (5th Cir. 2017). MDOC, through training and operations at EMCF, has responded reasonably to the risks associated with the utilization of force at EMCF. Thus, Plaintiffs' excessive

---

[137] Tr. Vol. 6, 13:18-24 (Hogans) (deputy warden of operations); Tr. Vol. 7, 12:1-20 (Dykes) (chief of security).
[138] Tr. Vol. 32, 104:10-15 (Shaw).
[139] Tr. Vol. 6, 112:5-25 (Hogans).
[140] Tr. Vol. 6, 112:5-25 (Hogans).
[141] *See, e.g.*, Tr. Vol. 31, 54:21-55:8 (Shaw); Tr. Vol. 6, 113:5-25 (Hogans) (describing a use of force occurring in the medical unit prior to trial in 2018 that was investigated and found to be excessive; the officer was going to be disciplined but resigned prior to issuance of discipline); *and* Joint Exhibit 59, EMCF Disciplinary Record (Jan. 1, 2015 to May 11, 2017), at pp. 9 (March 4, 2016, officer issued notice of caution and five day suspension for failing to report excessive force); 14 (same); 34 (July 27, 2015, officer issued notice of caution and four day suspension for verbally abusing a prisoner in medical unit which led to spontaneous use of force); 40 (June 30, 2015, officer terminated for excessive force); 53 (March 7, 2016, officer issued notice of caution and 10 day suspension pending investigation for failure to report excessive force); 58 (March 4, 2016, officer issued a notice of caution and five day suspension for failing to report excessive force); 60 (March 7, 2016, officer issued notice of caution and ten days suspension pending investigation after officer witnessed excessive force but did not report); 70 (Dec. 16, 2015, officer terminated for using excessive force against prisoner); 103 (March 4, 2016, officer issued notice of caution and five day suspension for failing to report an excessive force).
[142] Tr. Vol. 31, 96:18-25 (Shaw).

force claim must fail.  *See Cotton v. Taylor*, 176 F.3d 479, 1999 WL 155652, *4 (5th Cir. 1999) (unpublished) (reversing deliberate indifference finding, where the district court listed alternatives the facility could have taken and criticized the facility's "inability to resolve the problem").

### B.     Plaintiffs' proposed injunctive relief violates Rule 23 and the PLRA.

As set forth above, Plaintiffs have not proven that use of force at EMCF subjects every member of the EMCF Class to unconstitutionally excessive force.  Even if they had, the injunctive relief Plaintiffs seek is not susceptible of a class-wide injunction in favor of the EMCF Class for whom the excessive force claim is brought.  Doc. 1 at ¶ 319.  "To qualify for class-wide injunctive relief, class members must have been harmed in essentially the same way . . . ."  *Maldonado*, 493 F.3d at 524 (citations omitted).  Plaintiffs have not established that every prisoner housed at EMCF has "been harmed in essentially the same way" in the form of excessive force: each of the 17 uses of force Plaintiffs cite as exemplifying the alleged substantial risk of harm occurred in the segregation unit.[143]  Plaintiffs do not cite any evidence from Units 1, 2, 3, or 4 showing that prisoners housed on those units have allegedly been harmed in the same way.  Thus, Plaintiffs have not shown entitlement to class-wide relief in favor of the EMCF Class.

Equally problematic, the injunctive relief Plaintiffs seek lacks the requisite specificity.  *See* Doc. 843 at 58.  Rule 23(b)(2) requires that "the injunctive relief sought must be specific."  *Maldonado*, 493 F.3d at 524 (reasoning that injunctive relief in the form of "mutually affordable health care" lacked the requisite specificity because the "amount that is 'reasonable' for the services [patients] received is necessarily an individual inquiry that will depend on the specific circumstances of each class member").  Here, Plaintiffs seek an injunction "mandating the use of

---

[143] In particular, 16 of the 17 uses of force occurred on Unit 5, which has been and remains the segregation unit.  The lone use of force that did not occur on Unit 5 occurred on Unit 6-D on December 1, 2014, at a time when Unit 6-D was a segregation unit.  *See* Doc. 841-24, Ex. 135 (describing use of force as occurring in segregation unit while recreation and showers were being conducted).

*effective* de-escalation . . . ."  Doc. 843 at 58 (emphasis added).  As their own expert says, however, use of force is predominated by individualized issues, and what may be "effective" de-escalation for one incident may not be for another—even with respect to the same prisoner.[144]  Consequently, Plaintiffs' request for injunctive relief is not sufficiently specific and should be denied.

## V.      Category Five – Protection from Harm

The Court identified several bases underlying Plaintiffs' protection from harm claim, but the only basis Plaintiffs "expressly identify" is the alleged "failure to have adequate personnel." *Compare* Doc. 830 at 4, 5 *with* Doc. 843 at 58-62.  Plaintiffs argue there are two problems: MDOC does not have enough "mandatory" posts at EMCF and MDOC too frequently does not fill the existing mandatory posts.  Doc. 843 at 58-62.

In attempting to cite record evidence that they contend "shows the manner in which [the alleged failure to have adequate personnel] presents a continuing constitutional violation," Doc. 830 at 5, Plaintiffs contend that "gangs have assumed control of EMCF[,]" staff fail to ensure that locks on prisoners' cell doors close and lock properly, staff do not "properly conduct counts[,]" "staff are rarely present on the housing pods[,]" and that there is an "extreme rate of assaults" at EMCF.  Doc. 843 at 62-67.  As explained below, Plaintiffs have not demonstrated that the staffing at EMCF subjects them to cruel and unusual punishment or that their complaints about staffing could be remedied through class-wide injunctive relief.

### A.      MDOC provides adequate security staff for EMCF.

Looking first to Plaintiffs' argument that MDOC has not created enough mandatory posts at EMCF, Plaintiffs have yet to demonstrate what the constitutionally required number of mandatory posts would be at EMCF.  Instead, Plaintiffs continue to rely on the conclusory opinion

---

[144] Tr. Vol. 4, 62:19-63:2 (noting the "dynamic" nature of mental illness and that "[y]ou can't predict based on happened yesterday what's going to happen today").

testimony of their expert, Eldon Vail, who believes that EMCF simply does not have enough mandatory posts to operate the prison as he would. *See* Doc. 843 at 58-60. Vail, however, admits he is not "an expert in conducting [staffing] analysis . . . ."[145]

The design at EMCF is a key component to understanding how EMCF is staffed today. EMCF is designed in what is "commonly referred to as an indirect design."[146]  This means that the facility was not designed to have the security officers posted and working inside the prisoner living areas at all times.[147]  Rather, facilities such as EMCF that are designed for indirect supervision of prisoners are constructed, for example, with elevated observation towers—pickets as they are called at EMCF—in which staff can be posted 24 hours per day, 7 days per week and from which staff can monitor the prisoner living areas and control access to those areas.[148]

Disregarding EMCF's design to be operated through indirect supervision, Vail would prefer direct supervision at EMCF.[149]  Although he disagrees with the use of indirect supervision at EMCF, Vail admits that, in addition to not being "an expert in conducting [staffing] analysis[,]" he has no experience managing an indirect supervision facility.[150]  Rather, Vail would use direct supervision at EMCF, meaning he would place at least one security officer to be assigned to, posted in, and working from each of the 24 prisoner living areas—referred to as "pods" at EMCF—throughout their entire shift.  *See* Doc. 843 at 59 & n.362. Again, however, aside from Vail's criticism of EMCF for not staffing the facility as he would, Plaintiffs offer nothing to show what the Constitution requires by way of staffing at an indirect supervision facility such as EMCF.

---

[145] Tr. Vol. 5, 35:6-25 (Vail).
[146] Tr. Vol. 33, 23:15-24:8 (Roth); *see also* Tr. Vol. 31, 47:19-48:1 (Shaw).
[147] Tr. Vol. 33, 24:9-25:20 (Roth).
[148] Tr. Vol. 33, 23:15-24:3, 24:15-25:8 (Roth).
[149] Tr. Vol. 5, 34:9-14 (Vail).
[150] Tr. Vol. 5, 34:19-21, 35:6-25 (Vail).

*Farmer's* emphasis on reasonableness, however, is instructive.  Where, as here, a prison complies with correctional norms, it cannot be said that the prison has acted unreasonably for purposes of the deliberate indifference inquiry.  *See, e.g.*, *Street v. Corrections Corp. of America*, 102 F.3d 810, 817 (6th Cir. 1996) (no deliberate indifference where "staffing levels were maintained consistent with the requirements of . . . the American Corrections Association"). Just as the facility in *Street*, EMCF has remained accredited by the American Corrections Association continuously since 2015, having been audited and accredited in 2015 and again in 2018, and these facts make clear the reasonableness of MDOC's efforts to staff EMCF.[151]

EMCF is staffed in a way that reflects its design for indirect supervision.[152]  To that end, there are multiple levels of staff monitoring the prisoners throughout EMCF, day and night.  There are floor officers monitoring each of the four pods within each of the six units.[153]  There is also one officer housed in the top of the picket tower of each unit, which is an elevated control tower at the center of the four pods within each unit.[154]  From their secured,[155] elevated vantage point, these picket officers "can see all four pods as well as the hallway leading from the unit[,]"[156] and they control access for staff and prisoners to and from the unit and each of the four living pods.[157]  In addition to these officers, there is also central control, which operates as the "hub" of the facility.[158] The officers stationed in central control monitor cameras covering every part of the facility, and, from their seat in central control, these officers are not only connected via radio with

---

[151] *See* Doc. 812-2, 2018 Supplemental Expert Report of Tom Roth at 14. The ACA accreditation process involves a three day on-site audit, and once accreditation is awarded, it lasts for three years, hence EMCF being accredited in 2015 and again in 2018.  *Id.*
[152] Tr. Vol. 33, 24:4-25:15 (Roth); Tr. Vol. 31, 47:12-48:1 (Shaw).
[153] Tr. Vol. 31, 48:2-12 (Shaw).
[154] Tr. Vol. 31, 49:11-50:23 (Shaw).
[155] Tr. Vol. 31, 50:11-16 (Shaw).
[156] Tr. Vol. 31, 50:17-20 (Shaw).
[157] Tr. Vol. 31, 49:11-22 (Shaw).
[158] Tr. Vol. 31, 48:13-16 (Shaw).

every officer in the facility but also can move the cameras throughout the facility and zoom in or out when needed to observe activity.[159]  In criticizing MDOC for not operating EMCF through direct supervision, Plaintiffs make no effort to explain why the various levels of prisoner observation at EMCF do not pass constitutional muster.

In addition to their critique of staff deployment at EMCF, Plaintiffs complain that MDOC "consistently fail[s]" to fill the posts identified as "mandatory" posts in EMCF's existing staffing plan.  Doc. 843 at 60-62.  Any employer has to deal with employees calling in or simply not showing up for work, and prisons are no exception.[160]  As Warden Shaw explained, "[w]e can't close down the facility because we are short a man or two.  We have to keep going each day."[161]

In faulting MDOC over this reality, Plaintiffs ignore the various efforts made at EMCF when staff assigned to a shift fail to report to work as scheduled.  First, EMCF has increased its staffing level from 136 correctional officers to 177 correctional officers, a fact which Plaintiffs predictably attempt to downplay, *see* Doc. 843 at 61-62, but which Warden Shaw explained is the result of an annual review to ensure that on a day-to-day basis EMCF has sufficient staff to operate the facility efficiently and effectively.[162]  This increase to 177 officers has helped EMCF handle days when multiple staff members do not report to work as scheduled.[163]  Second, each shift has a shift commander, who is the shift supervisor responsible for the day-to-day operations reflected on the roster covering his or her particular shift, and once a shift commander learns that an officer will not be reporting to work a shift as scheduled, EMCF has created a mandate list of corrections officers who the shift commander can require to report to work and fill a position that would

---

[159] Tr. Vol. 31, 48:13-49:10 (Shaw).
[160] *See* Tr. Vol. 31, 44:21-45:12 (Shaw).
[161] Tr. Vol. 31, 44:21-45:12 (Shaw).
[162] Tr. Vol. 31, 42:22-43:4 (Shaw), Tr. Vol. 32, 72:3-21, 73:9-14 (Shaw).
[163] Tr. Vol. 31, 44:21-45:12 (Shaw).

otherwise be left vacant provided no other officer volunteers to work the position.[164]  Third, EMCF management can make operational adjustments to the particular shift based on staffing, including closing down nonmandatory posts and moving the officers assigned to those nonmandatory posts to any mandatory posts that need to be filled.[165]

Plaintiffs' complain that the shift rosters do not consistently reflect officers required to work overtime or officers who are shifted to cover mandatory positions through operational adjustments.  Doc. 843 at 60-61.  However, in addition to being responsible for making sure their shift is manned properly and that operations are recorded on the shift rosters, shift commanders are responsible for every issue that arises during their shift.[166] While shift commanders do not always go back and edit the roster for a particular shift to make certain it reflects each and every staff assignment throughout a shift,[167] Plaintiffs make no effort to explain how this operational reality subjects them to cruel and unusual punishment.

The flawed reasoning underlying Plaintiffs' attack on the staffing at EMCF is most apparent in what they don't say: the word "contraband" never appears in Plaintiffs' post-trial brief. Yet, for the more than five years leading up to their post-trial brief, Plaintiffs repeatedly claimed that EMCF was a facility "awash in contraband."[168]  Plaintiffs' quiet yet significant concession on contraband is a testament to the ongoing, reasonable efforts by MDOC to respond to concerns over protection from harm at EMCF.  These reasonable efforts are carried out each day by the staff at EMCF.[169]  The critical point that Plaintiffs fail to reconcile in attacking staffing at EMCF is that a

---

[164] Tr. Vol. 31, 44:21-45:12 (Shaw).
[165] Tr. Vol. 31, 46:1-15 (Shaw).
[166] Tr. Vol. 31, 46:9-25 (Shaw).
[167] Tr. Vol. 31, 46:9-15 (Shaw).
[168] *See, e.g.*, Eldon Vail's 2016 Report, Doc. 839-17 at ¶ 114 (ECF pp. 31-32 of 191) (Vail stating "[a]s I said in my report from 2014, "This is a prison awash in contraband . . . .") (citing Expert Report of Eldon Vail (June 16, 2014), at ¶21).
[169] Tr. Vol. 31, 56:3-63:3 (Shaw); *see also* Doc. 812-4, 2018 Supplemental Expert Report of Ken McGinnis at pp. 7-8 (describing in detail the additional measures being taken at EMCF in 2018).

facility so strapped for staff—as alleged by Plaintiffs and their expert—simply could not carry out the operations necessary to combat contraband as effectively as has been done at EMCF.[170]  Again, the picture Plaintiffs paint does not match reality.

**B.    The Court should enter judgment for MDOC on the Protection from Harm Claims.**

Plaintiffs claim that the purportedly inadequate staffing at EMCF causes a substantial risk of serious harm manifesting in the following ways: "gangs have assumed control of EMCF[,]" staff fail to ensure that locks on prisoners' cell doors close and lock properly, staff do not "properly conduct counts[,]" "staff are rarely present on the housing pods[,]" and an "extreme rate of assaults."  Doc. 843 at 62-67.  The record simply does not support the notion that any of these purported "manifestations" exist today.

*1.    There is no continuing constitutional violation from assaults.*

In yet another example of the stark contrast between the dire picture painted by Plaintiffs and the reality of life at EMCF, the rate of assaults at EMCF is anything but "extreme."  *See* Doc. 843 at 66.  As reported by Ken McGinnis, one of MDOC's safety and security experts, the rate of assault incidents at EMCF was 12.8 per month in 2015 and 14.0 per month in 2016.[171]  During the eleven-month period between January 2018 through November 2018, the rate of assault incidents at EMCF decreased to 9.45 per month.[172]

Even more illustrative of the improved safety at EMCF, the rate of assaults involving serious injury has consistently decreased since 2015.  As reported in McGinnis's 2018 Supplemental Expert Report, the rate of assaults involving serious injury has decreased as follows: 6.41 per month in 2015, 5.91 per month in 2016, and 1.5 per month between January through

---

[170] Doc. 812-4, 2018 Supplemental Expert Report of Ken McGinnis at pp. 8, 11.
[171] 2018 Supplemental Expert Report of Ken McGinnis, Doc. 812-4 at p. 8 (Table 4).
[172] *Id*. at p. 11.

November 2018.[173]   Based in large part on these decreases in both the overall total number of assaults at EMCF and the total number of assaults involving serious injury, McGinnis opines that "EMCF is significantly safer than it was in 2015."[174] As these statistics show, prisoners at EMCF are not subjected to cruel and unusual punishment. *See Jones v. Diamond*, 636 F.2d 1364, 1373 (5th Cir. 1981) ("Confinement in a prison where terror reigns is cruel and unusual punishment.")

Even if Plaintiffs could somehow show that prisoners at EMCF face a substantial risk of serious harm despite the decrease in assault rates at EMCF over the past four years, Plaintiffs cannot show that MDOC is deliberately indifferent to assaults at EMCF.   To establish a "continuing constitutional violation" in this area, *see* Doc. 830 at 5, Plaintiffs must present evidence of deliberate indifference to any purported substantial risk of serious harm. *Adames v. Perez*, 331 F.3d 508, 512 (5th Cir. 2003) ("Prison officials are not . . . expected to prevent all inmate-on-inmate violence. . . .   Prison officials can be held liable for their failure to protect an inmate *only when they are deliberately indifferent* to a substantial risk of serious harm.").

The record shows anything but deliberate indifference.  When assaults are reported, both prisoners and staff are subject to discipline if warranted.[175]  Where EMCF's management deems it necessary, the facility's investigation staff will investigate assaults and report those results to management in an effort to uncover the facts underlying particular assaults.[176]  Through incident debriefings and daily roll call briefings, Warden Shaw, his deputy wardens, and EMCF's chief of security continually educate staff on what to look out for in terms of potential assaults and reporting situations that could turn into an assault.[177]  Even if Plaintiffs could point to evidence that assaults

---

[173] *Id*. at p. 11.
[174] *Id*. at pp. 11, 12.
[175] Tr. Vol. 31, 90:8-91:7 (Shaw).
[176] Tr. Vol. 31, 91:19-92:17 (Shaw).
[177] Tr. Vol. 31, 91:8-18 (Shaw).

at EMCF have created a substantial risk of serious harm, they have not and cannot cite evidence that MDOC has been deliberately indifferent to assaults at EMCF.

## 2.     *There is no continuing constitutional violation from gangs.*

Gangs have *not* "assumed control of EMCF."  Doc. 843 at 62.  This allegation is predicated entirely on email communications from nearly four years ago and prisoner testimony.  With respect to the former, Plaintiffs make no effort to explain how the out-of-date emails sent prior to Warden Shaw's return to EMCF have any relevance to the Court's inquiry into "continuing constitutional violations."  Doc. 830 at 5.  With respect to the latter, this is anecdotal testimony from convicted prisoners—one of whom was Charlie Jones, a gang leader himself[178]—who courts recognize to be inherently untrustworthy.  *E.g.*, *Alberti v. Heard*, 600 F. Supp. 443, 450 (S.D. Tex. 1984) (acknowledging "the inherent credibility problems normally attached to inmate testimony").  In any event, the Court has personally observed EMCF and its staff at work, has seen the condition of the facility, and has been given the assault statistics showing a significant decrease in assaults at EMCF, and none of these independent indicia suggest that gangs control EMCF.

Although Plaintiffs are required to demonstrate deliberate indifference to establish a constitutional violation, they do not explain how MDOC has been deliberately indifferent to any purported substantial risk of serious harm created by gangs at EMCF.  Indeed, the record precludes such a showing. EMCF has an "STG Sergeant" and investigations division responsible for investigating and validating gang members,[179] keeping track of gangs and their members,[180] providing monthly reports regarding gangs at EMCF and their numbers,[181] working with MDOC's

---

[178] Tr. Vol. 32, 48:6-13 (Shaw).
[179] "STG" is the acronym for "security threat group."  *See* Tr. Vol. 31, 38:16-17 (Shaw).  The term "validating" gang members refers to the formal process pursuant to which EMCF determines whether a prisoner is an STG member.  Tr. Vol. 32, 6:10-23 (Shaw).
[180] Tr. Vol. 32, 5:5-15 (Shaw).
[181] *Id.*

corrections investigations unit,[182] maintaining an intelligence database for observing STG activity within EMCF,[183] and interviewing each prisoner coming to live at EMCF to identify those prisoners who may be affiliated with a particular STG.[184]   In addition, the STG sergeant and investigations division work closely with the warden, his deputy wardens, and case managers to review placement of STG members in particular pods to make sure there are not too many members of the same gang in one pod so as to allow that gang to take control of the pod.[185]

### 3.   There is no continuing constitutional violation from cell door locks.

The cell door locking mechanisms at EMCF are appropriately selected and operate as designed,[186] and Plaintiffs' newfound strategy to blame staffing at EMCF for Plaintiffs' own attempts to manipulate the locking mechanisms is a nonstarter.  *See Legate v. Livingston*, 822 F.3d 207, 210 (5th Cir. 2016) ("[A] prisoner cannot establish a[n Eighth Amendment] violation where he willingly participates in the conduct giving rise to his injury.").  Throughout this case, Plaintiffs (particularly the EMCF Class) have ignored the fact that they themselves are interfering with the locking mechanisms.  Rather, Plaintiffs consistently claimed the alleged problems with the cell doors was "one of design"[187] and that "it asks too much to rely on officers to check doors . . . ."[188]  At trial, however, MDOC offered unrefuted expert testimony from Steven Stonehouse that the cell doors and locks at EMCF are appropriate for the custody levels at EMCF,[189] well-maintained,[190]

---

[182] *Id*.
[183] Tr. Vol. 32, 6:24-7:3 (Shaw).
[184] Tr. Vol. 32, 33:13-21 (Shaw).
[185] Tr. Vol. 32, 7:13-8:3 (Shaw).
[186] Tr. Vol. 34, 24:20-25 (Stonehouse).
[187] Doc. 839-17, 2014 Report of Eldon Vail at ¶ 49 (ECF p. 129 of 191).
[188] Doc. 839-17, 2016 Report of Eldon Vail at ¶ 55 (ECF p. 15 of 191) (Vail opining that "it asks too much to rely on officers to check doors each time inmates are placed in their cells to ensure that the cell door lock has not been manipulated. Instead, the solution is to fix the doors.").
[189] Tr. Vol. 34, 41:9-12 (Stonehouse).
[190] Tr. Vol. 34, 20:4-17 (regarding the doors on units 5 and 6), 29:21-25 (regarding the doors on units 1 through 4) (Stonehouse).

and operate as designed provided prisoners do not tamper with the locking mechanisms.[191]  It was only after trial that Plaintiffs began blaming facility staffing for prisoners' efforts to manipulate the locking mechanisms, making the conclusory stretch that the purported "prevalence of unsecured doors and locks is fundamentally a staffing problem."  Doc. 843 at 64.  Of course, if the cell door locks at EMCF were as unsecure as described by Plaintiffs, one would have to wonder how and why there has been such a significant decrease in assaults at EMCF.

Even if Plaintiffs could establish a substantial risk of serious harm created by the cell door locks, they have not explained how MDOC has been deliberately indifferent. To the contrary, EMCF maintenance staff keep the doors and locking mechanisms well-maintained.[192]  When security staff learned that prisoners on Unit 1 were trying to pry cover plates off of doors on the unit, maintenance staff welded the plates to the doors to prevent those efforts.[193]  Warden Shaw and his management team also work with security staff to educate them, whether during pre-service training, in-service training, or during pre-shift roll call, regarding what to look for when they are placing prisoners in cells on Units 5 and 6 so that they can spot attempts to manipulate the door.[194]  When a prisoner is caught attempting to manipulate the cell door locks, staff will issue rule violation reports to the prisoner.[195]

---

[191] Tr. Vol. 34, 23:9-12 (regarding the doors on units 5 and 6), 32:17-33:3 (regarding the doors on units 1 through 4) (Stonehouse).  Plaintiffs completely mischaracterize Stonehouse's testimony when they claim that "staff deficiencies are the only reason EMCF suffers from this problem."  Doc. 843 at 64.  Stonehouse made clear that the locking mechanisms worked unless tampered with by the prisoners themselves, and this issue was not unique to EMCF.  Tr. Vol. 34, 21:18-23:12 (explaining how prisoners were tampering with sliding doors on Units 5 and 6), 23:22-25 (agreeing that the issues with door locks not fully engaging due to prisoners' tampering was not unique to EMCF), 30:4-24 (describing damage that facility staff discovered was done to cell doors in Unit 1 by a prisoner who was an electrical engineer and who made a tool that could be used to remove screws).

[192] Tr. Vol. 34, 20:4-17 (doors on units 5 and 6), 29:21-25 (doors on units 1 through 4) (Stonehouse).

[193] Tr. Vol. 34, 30:4-24 (Stonehouse); *see also* Tr. Vol. 31, 26:2-22 (Shaw).

[194] Tr. Vol. 31, 26:2-22, 89:20-90:7 (Shaw).

[195] Tr. Vol. 31, 26:2-10 (Shaw).

#### 4.    *There is no continuing constitutional violation from counts.*

The flaw in Plaintiffs' "counts" argument is that they cannot demonstrate the pervasiveness required for a risk to be considered "substantial."  The anecdotal testimony from four prisoners will not establish the requisite pervasiveness.  *See Lakin*, , 2013 WL 5407213 at *7 (noting that courts equate "substantial risk" with "pervasive" conduct that must result in a "real and proximate threat," as opposed to "isolated incidents").  Similarly, Plaintiffs' mischaracterization of the 2018 Supplemental Expert Report of Tom Roth will not get them where they want to go.  *Id*.  Plaintiffs argue that Roth "observed that EMCF continued to be found in noncompliance with count policies[,]" but they neglect to include the remainder of what Roth noted: security staff at EMCF are trained to conduct the counts required by MDOC policy and procedure, and nothing in the MDOC's count policy and procedure requires either of the two benchmarks that Roth noticed the contract monitor was marking as noncompliant.[196]

Even if Plaintiffs could establish a substantial risk of serious harm based on counts at EMCF, they cannot establish deliberate indifference.  As Roth noted, the disciplinary records of security staff contain six (6) occasions between January 1, 2018, and October 16, 2018 in which officers were disciplined—including one officer's termination—for failure to conduct counts properly.[197]  The subject of proper counts is covered in pre-service officer training, annual in-service officer training, and "constantly" during pre-shift roll call meetings.[198]  Roth's review of shift rosters confirmed the "constant[]" discussion of proper count procedure has continued into 2018.[199]  In addition to staff training and constant discussion, EMCF's management conduct

---

[196] Doc. 812-2, 2018 Supplemental Expert Report of Tom Roth at pp. 12-13; *see also* Tr. Vol. 31, 37:11-22 (Shaw) (explaining that the MDOC policies do not require face-to-photo counts).
[197] Doc. 812-2, 2018 Supplemental Expert Report of Tom Roth at p. 13.
[198] Tr. Vol. 31, 39:20-40:3 (Shaw).
[199] Doc. 812-2, 2018 Supplemental Expert Report of Tom Roth at pp. 13 (observing that "[o]ver (50) daily shift rosters referenced inmate counts during the pre-shift employee briefing").

"video audits" of counts, particularly those counts on second and third shifts, to see how counts are being conducted.[200]   EMCF has a detailed count room staffed by a dedicated "count room officer" who keeps track of the assigned cell location of every inmate in the facility.[201]

### C.   Plaintiffs' proposed injunctive relief violates Rule 23 and the PLRA.

Even assuming Plaintiffs could establish that, with respect to their protection from harm claim, MDOC has been deliberately indifferent to a substantial risk of serious harm, they have failed to identify specific injunctive relief that would resolve the staffing and other issues in "one stroke." *See Wal-Mart*, 564 U.S. at 349-56.  Instead, Plaintiffs propose that the Court order MDOC to "retain independent outside experts to develop a comprehensive staffing analysis" for EMCF. Such an order would be anything but a single stoke remedy and would require extensive additional proceedings, all at taxpayer expense.  The time for Plaintiffs to have a staffing analysis conducted is long past. As their expert Eldon Vail noted,[202] there are experts who can conduct staffing analyses.  While he admits he is not one, Plaintiffs could have hired one, timely disclosed him, and presented his opinions to the Court.  They did not do so, and they cannot now use non-specific, class-wide injunctive relief to carry out such a process.

## VI.   Category Six – Environmental Conditions

The Court identified five bases underlying Plaintiffs' environmental conditions claim, and although Plaintiffs have abandoned/waived two of those five,[203] Plaintiffs argue that fires, ventilation, and uncleanliness render the environmental conditions at EMCF unconstitutional.  *See* Doc. 843 at 68-69.

---

[200] Tr. Vol. 31, 40:4-10 (Shaw).
[201] Tr. Vol. 31, 37:23-38:19 (Shaw).
[202] Tr. Vol. 5, 35:6-25 (Vail).
[203] *Compare* Doc. 830 at 4 (identifying Plaintiffs' allegations that the environmental conditions at EMCF violate their Eighth Amendment rights because of "multiple broken toilets, sinks, and showers throughout EMCF" and because "prisoners are required to wear clothing and sleep on bedding that has become saturated because of faulty water pipes") with Doc. 843 at 67-69 (making no mention of either of these allegations identified by the Court).

**A.      The Court should grant judgment for MDOC on the Environmental Claims.**

Plaintiffs' argument that the environmental conditions at EMCF subject them to cruel and unusual punishment is a product of their inability to concede anything.  The Court toured the facility on March 29, 2018, and observed firsthand the clean, well-kept, and well-lit condition of EMCF.  Doc. 745 at 1.  Given the Court's tour and the evidence and testimony admitted at trial, it made sense that Plaintiffs did not attempt to bring their environmental conditions and nutrition expert, Diane Skipworth, back to EMCF during post-trial expert inspections.

Nevertheless, Plaintiffs include a half-hearted argument on environmental conditions, addressing first the level of cleanliness at EMCF based on prisoner testimony of isolated incidents and Skipworth's observations.  *See* Doc. 843 at 67-69.  Skipworth, however, acknowledged she had not been to EMCF since April 2016 and had no knowledge of what it looked like at the time of trial.[204]  Moreover, the isolated alleged incidents related to pests, response to biohazards, and cleaning supplies do not give rise to a substantial risk of serious harm.  *See Gates*, 376 F.3d at 332 ("substantial risk of serious harm" "require[es] extreme deprivation of any 'minimal civilized measure of life's necessities'") (quoted case omitted); *see also Lakin*, 2013 WL 5407213 at *7 (noting that courts equate "substantial risk" with "pervasive conduct" that must result in a "real and proximate threat[,]" as opposed to "isolated incidents").

Even if this were not so, Plaintiffs have not proven MDOC has been deliberately indifferent to issues of cleanliness at EMCF.  For example, the facility is providing pest control pursuant to a contract with a pest control vendor, and the vendor comes twice per month to spray the facility and also provides treatment on an as-needed basis.[205]  Consistent with Skipworth's view as to what

---

[204] Tr. Vol. 11, 15:5-18 (Skipworth).
[205] Tr. Vol. 31, 70:6-24 (Shaw).

64

was reasonable,[206] EMCF does not rely on pest control spray alone: the "kitchen [is] well cleaned" each evening, if it's a night that pest control is being sprayed, the pest control is not sprayed until the floors have been cleaned and are completely dry,[207] and the kitchen also undergoes a weekly sanitation inspection.[208]  In addition, prisoners who perform cleaning jobs around the facility are provided personal protective equipment and annual training on how to protect themselves (though some prisoners fail to bring their personal protective equipment to a particular job).[209]  As the condition of EMCF reflected during the Court's tour and in the various videos from February 10, 2017,[210] February 14, 2017,[211] and June 1, 2017,[212] "cleaning is 24/7" at EMCF, with the floors being cleaned each night, safety and sanitation inspections occurring weekly, and offenders cleaning on the pods on a daily basis.[213]  MDOC has responded reasonably to the challenges of keeping EMCF clean, precluding any finding of deliberate indifference.  *See Farmer*, 511 U.S. at 844-45 (deliberate indifference standard cannot be met if the defendant "responds reasonably" to substantial risks to inmate health or safety, "even if the harm ultimately [i]s not averted.").

Addressing their allegations related to fires and ventilation at EMCF, Plaintiffs also claim that fires and the smoke they produce pose substantial risks to prisoners and that poor ventilation within EMCF exacerbates the situation.  Doc. 843 at 68.  This argument ignores the body of proof that fires have decreased at EMCF because of steps taken by EMCF's management to eliminate

---

[206] Tr. Vol. 11, 30:9-20 (Skipworth) (describing "the best practice for pest control" as including "sanitation, making sure that it's clean . . . also plays an important role" and that "[j]ust spraying chemicals alone is not going to alleviate pest problems").
[207] Tr. Vol. 31, 70:6-24 (Shaw).
[208] Tr. Vol 32, 86:20-87:1 (Shaw).
[209] Tr. Vol. 32, 35:8-36:10 (Shaw).
[210] Tr. Vol. 31, 13:10-18:11 (Shaw) (playing incident video associated with PTX-2608, which portrays the cleanliness of Units 5 and 6, the Green Mile hallway, and the Medical Unit as of February 2017, more than one year prior to trial).
[211] Tr. Vol. 31, 18:12-19:16 (Shaw) (playing incident video associated with PTX-2698, which portrays the cleanliness of Unit 5 and an inmate painting in Unit 5-C in June 1, 2017).
[212] Tr. Vol. 31, 19:17-21:10 (Shaw) (playing incident video associated with PTX-2609, which portrays the cleanliness and order of the EMCF main hallway and medical unit as of February 14, 2017).
[213] Tr. Vol. 31, 11:9-24, 62:2-13 (Shaw).

the opportunity to start a fire,[214] the ventilation system installed to remove from the unit the smoke from fires, if any,[215] and the fact that EMCF has also hired an HVAC certified individual who is specifically responsible for that system.[216] Plaintiffs neither have shown that fires at EMCF are so pervasive as to create a substantial risk of serious harm, nor have they shown that MDOC has not responded reasonably to the possibility that prisoners may try to set fires.

Although not identified by the Court as a basis to be argued, Plaintiffs suggest that MDOC has failed to maintain "adequate lighting" at EMCF, claiming light illumination levels are too low, these lower levels of light increase the risk of inmate injury in the showers, and that EMCF has failed to maintain lighting fixtures in safe operating condition.  Doc. 843 at 67.  As to illumination levels, Skipworth acknowledged she only measured a total of 38 light levels, 32 of which were from cells or showers in Unit 5 and Unit 6,[217] and admits the standards against which she measured the light levels are not mandatory.[218]  As to the purported increased risk of injury due to light levels in the showers, there is no evidence of a "pervasive" risk: Skipworth only took light illumination level readings in 32 of the 144 showers at EMCF and admits she does not know what the light levels were in the remaining 112 showers at EMCF.[219]  The speculative nature of Skipworth's opinion is borne out by her admission that she is not aware of any EMCF prisoners who have either refused to use the showers or been assaulted or injured due to light levels in the showers.[220]

---

[214] Tr. Vol. 31, 26:23-27:22 (Shaw) (using a padlock to keep cell door tray slots closed when not in use has cut back on fires, among other things), 28:18-29:12 (locking the food tray slots removes one potential means by which a fire can set because inmates will not set a fire in their own cell); Tr. Vol. 32, 68:5-70:5 (Shaw) (discussing the decrease in fires set by prisoners within EMCF, the ventilation system used to rid a pod of smoke once a fire is started, and the relatively limited nature of fires actually set due to the fact the physical premises of EMCF are not combustible); 83:21-84:2.

[215] Tr. Vol. 32, 53:23-86:5 (Shaw).

[216] Tr. Vol. 31, 67:4-12 (Shaw).

[217] Tr. Vol. 11, 17:3-12 (Skipworth).

[218] Tr. Vol. 11, 17:13-18:13 (Skipworth).

[219] Tr. Vol. 11, 19:14-18 (Skipworth).

[220] Tr. Vol. 11, 23:4-24 (Skipworth).

Skipworth also acknowledges the damages to light fixtures she observed were caused by prisoners, and EMCF staff were taking a reasonable step in removing and replacing certain types of fixtures that prisoners often destroyed and used as weapons.[221]

In sum, Plaintiffs have failed to show that environmental conditions at EMCF amount to an "extreme deprivation of any minimal civilized measure of life's necessities" as is required to demonstrate a "substantial risk of serious harm." *Gates*, 376 F.3d at 332.  In arguing that MDOC has "offered no evidence of permanent steps taken to ensure the problems will not recur[,]" Plaintiffs misunderstand the deliberate indifference inquiry: "reasonableness," not ultimate success, is the focal point. *See Cotton*, 1999 WL 155652 at *4 (reversing deliberate indifference finding, where district court based its decision on facility's "inability to resolve the problem"). Plaintiffs' environmental conditions claim must fail.

### B.    Plaintiffs' proposed injunctive relief violates Rule 23 and the PLRA.

Because they misunderstand the deliberate indifference inquiry, Plaintiffs identify steps—such as "eliminating unsanitary . . . conditions"—they say are needed to "permanently resolve" the allegedly problematic environmental conditions. *See* Doc. 843 at 69.  These steps, however, are not prone to a single-stroke remedy that will provide relief to every class member. *See Yates*, 868 F.3d at 367 (citing *Wal-Mart*, 564 U.S. at 360).  Rather, this relief would require subjective determinations as to what amounts to an "unsanitary condition" and what steps must be taken to "eliminate" the particular condition. Plaintiffs thus have failed to identify an injunction consistent with Rule 23's requirements related to the environmental conditions claim.

---

[221] Tr. Vol. 11, 20:20-24, 22:15-23 (Skipworth).

VII.    **Category Seven – Nutrition and Food Safety**

As the Court noted, Plaintiffs' claim that they are being subjected to cruel and unusual punishment through the lack of nutrition and food safety at EMCF is based on allegations that they are "deliberately underfed and malnourished" and that the "food in the prison is prepared and served in an unsanitary manner."  Doc. 830 at 5.  In their post-trial brief, however, Plaintiffs offer very little evidence in support of their nutrition claim.  *See* Doc. 843 at 69-70.  This is not surprising given that the Court advised Plaintiffs' counsel at trial that, based on the proof submitted, it was going to find for MDOC on the nutrition claim.[222]

A.    **The Court should grant judgment for MDOC on the Nutrition and Food Safety Claims.**

Citing prisoner testimony and Skipworth's stale opinions,[223] Plaintiffs respond to the Court's Order by arguing that prisoners do not receive the meals scheduled on the menu, do not receive enough food, and receive unsafe food.  *See* Doc. 843 at 69. In support of their argument that prisoners do not receive enough food, Plaintiffs rely on prisoner testimony from Jimmy Brewer that kitchen staff member "Ms. Taylor" would instruct him to "add water" to make the food "stretch"[224] and to not put as much food on a meal tray if the kitchen began to run low on food.[225]  However, Brewer admitted he had not worked in the kitchen since October 2016 and that, as of the time of trial, Ms. Taylor no longer worked in EMCF's kitchen.[226]

Plaintiffs' claim that the meals served at EMCF are "less nutritious" than the dietician-approved menu and that prisoners are given food that has been exposed to pests, prepared in an unsafe environment, and contains spoiled or uncooked ingredients, *see* Doc. 843 at 69, is yet

---

[222] Tr. Vol. 40, 100:10-15 (exchange between Plaintiffs' counsel and the Court during closing argument).
[223] Tr. Vol. 11, 15:5-18 (Skipworth) (admitting she had not been to EMCF since 2016).
[224] *See* Doc. 836-10 at 57:3-7
[225] *See id*. at 58:1-17.
[226] Doc. 836-10 at 73:16-22.

another example of the disconnect between the tale told by Plaintiffs and reality.  For example, when Skipworth was asked whether she was testifying that "the amount of food that the [prisoners] receive at [EMCF] is insufficient to meet . . . their daily nutritional requirements[,]" Skipworth testified that "wasn't [her] testimony[,]" adding that variations from the dietician-approved menu "can have negative nutritional effects" but she did not "have the full amount of information [she] need[ed] to better formulate an opinion."[227]  Skipworth added that she was not aware of any prisoner who had gotten sick because of the food and its alleged uncleanliness or presence of roaches at EMCF, thus rendering these concerns nothing more than "generalized fears of harm."[228] *See Williams v. Wood*, 223 F. App'x 670, 671 (9th Cir. 2007) (explaining that "generalized fears of harm" do not constitute a substantial risk of serious harm).

The disconnect between Plaintiffs' allegations and reality is evidenced by the consistently positive results of the Mississippi Department of Health's ("MDH") inspections of EMCF's kitchen.  The MDH has graded EMCF's kitchen as either an "A" or "B" in every inspection between 2012 and October 2016 except one, the June 2013 inspection.[229] In fact, EMCF's kitchen received the same grades from the MDH as Jackson, Mississippi's Char restaurant.[230]  Put simply, EMCF's nutrition and food services do not deprive prisoners of the "minimal civilized measure of life's necessities."  *Gates*, 376 F.3d at 332.

### B.    Plaintiffs' proposed injunctive relief violates Rule 23 and the PLRA.

Even if Plaintiffs had met their burden to prove deliberate indifference to a substantial risk of serious harm, they have not offered a "one stroke" remedy that this Court could extend to the entire EMCF Class in whose name the nutrition claim was brought.  Rather, Plaintiffs propose

---

[227] Tr. Vol 11, 31:13-32:13 (Skipworth).
[228] Tr. Vol 11, 31:6-12 (Skipworth).
[229] Tr. Vol 11, 37:17-38:21 (Skipworth); *see also* Ex. D-159 and D-160.
[230] *See* Tr. Vol 11, 40:14-42:4 (Skipworth); *see also* Ex. D-161.

various, non-specific injunctions based upon subjective determinations about such issues as what potential "source[s] of food, water, and harborage" were sufficient to "support vermin" so that those "sources" can be eliminated, what constitutes a sufficient "seal" throughout the various buildings and structures at EMCF to prevent rodent entry to any part of the facility, what policy and procedure language is sufficient to "ensure adherence" to various food safety rules and regulations, what food substitutions can be considered "consistent" with the food menu items for which they were being substituted, and what constitutes an "adequate meal[]" at an "appropriate time[]" for every individual prisoner in the EMCF Class.  *See* Doc. 843 at 70.  Far from a single stroke remedy aimed at an Eighth Amendment violation, Plaintiffs request that the Court take control of the food services provided at EMCF and substitute their subjective judgment for the professional judgment of MDOC and those contracted to operate the prison.

## CONCLUSION

MDOC respectfully requests that the Court enter judgment in its favor on each of Plaintiffs' seven claims.

Dated: June 4, 2019.

Respectfully submitted,

BY:   JIM HOOD, ATTORNEY GENERAL
        STATE OF MISSISSIPPI

BY:   *s/ Krissy Nobile*
        Harold E. Pizzetta, III, Bar No. 99867
        Krissy Nobile, Bar No. 103577
        Office of the Attorney General
        Post Office Box 220
        Jackson, Mississippi 39205
        Telephone: (601) 359-3860
        hpizz@ago.state.ms.us
        knobi@ago.state.ms.us

BY:    *s/ Nicholas F. Morisani*       
      Gary E. Friedman, Bar No. 5532
      W. Thomas Siler, Jr., Bar No. 6791
      Nicholas F. Morisani, Bar No. 104970
      Phelps Dunbar, LLP
      4270 I-55 North
      Jackson, Mississippi 39211-6391
      Telephone: 601-352-2300
      gary.griedman@phelps.com
      tommy.siler@phelps.com
      nick.morisani@phelps.com


BY:    *s/ Michael J. Bentley*       
      Michael J. Bentley, Bar No. 102631
      Molly M. Walker, Bar No. 100689
      Bradley Arant Boult Cummings, LLP
      Post Office Box 1789
      Jackson, Mississippi 39215-1789
      Phone:  (601) 948-8000
      mbentley@babc.com
      mmwalker@babc.com

**ATTORNEYS FOR THE DEFENDANT**

## <u>CERTIFICATE OF SERVICE</u>

I, *Michael J. Bentley*, certify that the foregoing document has been filed with the Clerk of Court using the Court's ECF system, which provides service of the foregoing to all counsel of record who have entered an appearance in this case as of the date below.

Dated: June 4, 2019.

*/s/ Michael J. Bentley*
Michael J. Bentley

72