IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION


JERMAINE DOCKERY, ET AL.                          PLAINTIFFS


VS.                         CIVIL ACTION NO. 3:13-cv-326-WHB-JCG


PELICIA HALL, ET AL.                              DEFENDANTS



<u>OPINION AND ORDER</u>

     This cause is before the Court for ruling on the Section 1983
claims alleged by Plaintiffs in this class action challenging
multiple conditions of their confinement at East Mississippi
Correctional Facility.  After considering the evidence presented
at trial, which was supplemented with materials gathered during a
period of post-trial discovery, it is clear that many changes have
been made at the subject prison that pertain to the claims alleged
in this lawsuit.  The changes include, but are not limited to, new
administrators, new prison personnel, and new service providers.
Based on these changes, the Court concludes that the alleged
constitutional violations that may have existed at the time this
lawsuit was filed no longer exist and, therefore, that the
injunctive relief sought by Plaintiffs has not been shown
necessary.  Accordingly, judgment will be entered in favor of
Defendants on all claims.

## I.  Factual Background and Procedural History

Plaintiffs in this case are inmates at the East Mississippi Correctional Facility ("EMCF"), which is located near Meridian, Mississippi.  EMCF is designated to house inmates with psychological and/or mental illnesses, and approximately eighty percent of the exclusively male prison population has been so diagnosed.  At all times relevant to this lawsuit, EMCF was privately operated by Management and Training Corporation ("MTC") pursuant to a Residential Services Agreement ("Services Agreement") that was entered between the Mississippi Department of Corrections ("MDOC") and the East Mississippi Correctional Facility Authority.  The MDOC is charged with operating the Mississippi prison system.

In 2012, several individuals, who were later designated by Plaintiffs as experts in this case, toured the facility and reviewed prison records.  Based on the then-existing conditions, Plaintiffs filed a class action lawsuit alleging that the conditions under which they were being confined violated their Eighth Amendment right to be free from cruel and unusual punishment.  Through their lawsuit, Plaintiffs seek to correct the alleged constitutional violations by way of injunctive relief.

2

Plaintiffs' lawsuit was filed against several MDOC officials including Christopher Epps ("Epps"), in his then-official capacity as state-appointed Commissioner of the MDOC.[1]  After the lawsuit was filed, Epps was indicted on federal charges including money laundering and fraud.  These charges arose, in part, from allegations that Epps was receiving bribes and kickbacks in exchange for awarding MDOC contracts, including contracts related to EMCF.  See United States v. Epps, Criminal No. 3:14-cr-111 (S.D. Miss. 2014).  Epps pleaded guilty to several federal charges and is currently in prison.  Following Epps's departure from the MDOC, Pelicia Hall ("Hall") was appointed Commissioner, and she currently holds that position.

In addition to Epps, federal charges were filed against Doctor Carl Reddix ("Reddix"), charging, inter alia, that he had bribed Epps to obtain MDOC contracts.  See United States v. Reddix, Criminal No. 3:16-cr-50 (S.D. Miss. 2016).  Reddix was the owner of Health Assurance, LLC, which had been awarded a no-bid contract by Epps to provide healthcare-related services at EMCF, and that contract was in effect at the time this lawsuit was filed.  Reddix

---

[1]     The Complaint also named Dr. Gloria Perry, in her official capacity as Chief Medical Officer for the MDOC, and Archie Longley, in his official capacity as Deputy Commissioner for Institutions for the MDOC, as defendants.  The Deputy Commissioner position is currently held by Jerry Williams.

pleaded guilty to having bribed Epps and is currently in prison. After the MDOC learned of the bribery/kickback scheme, it rescinded the contract with Health Assurance, LLC, and entered a new contract with Centurion of Mississippi ("Centurion") to provide healthcare-related services at EMCF.  Centurion began providing both medical and mental health care services at the prison in July of 2015.

The allegations in the Complaint are divided into several categories, the first of which is "Solitary Confinement".  As regards this category, Plaintiffs allege that although prisoners who are placed in solitary confinement should be permitted one hour of out-of-cell time per day to shower or have yard time, they often go days, and sometimes weeks, without being permitted any out-of-cell time.  See Compl., ¶¶ 25-27.  Plaintiffs also complain that numerous problems exist in the solitary confinement units in which they are housed including: (1) non-functioning plumbing; (2) vermin infestation; (3) non-function lights in some cells, "bright artificial light around the clock" in others; and (4) deafening noise levels.  Id. at ¶¶ 29-35.  Plaintiffs further allege that prisoners in solitary confinement are beaten and/or ignored by EMCF personnel and are at risk of prisoner-to-prisoner violence. Id. at ¶¶ 36-37.  Finally, Plaintiffs complain that placement in solitary confinement exacerbates symptoms of pre-existing mental illnesses and can increase the risk of suicide.  Id. at ¶¶ 38-74.

4

The second category is "Mental Health Care".  As regards this category, Plaintiffs allege: (1) they receive little, if any, individual or group mental health treatment; (2)  they are over-medicated with tranquilizing anti-psychotic medications; (3) the symptoms of their mental diseases are exacerbated by the conditions under which they are housed; and (4) they are subjected to disciplinary action if they attempt to seek help from the medical staff.  Id. at ¶¶ 79-82.

The third category is "Medical Care".  As regards this category, Plaintiffs allege: (1) there is insufficient staff to provide adequate medical treatment; (2) there are long delays in being seen by healthcare providers; (3) prisoners are often treated by nurses regardless of the nature or seriousness of their medical problems; and (4) they do not receive prescribed medications as ordered.  Id. at ¶¶ 113-23.  Plaintiffs also allege that (1) they are denied treatment for chronic medical conditions and pain management; (2) they receive untimely and insufficient dental and other medical care; (3) they are required to wait extended periods of time to see outside specialists; and (4) treatment plans and corrective surgeries recommended by outside specialists are often denied by prison officials.  Id. at ¶¶ 124-89.

The fourth category is "Abuse and Excessive Force by Staff".  As to this category, Plaintiffs allege that security officers often

"use excessive force with impunity and with no oversight." Id. at ¶ 190. Plaintiffs further allege that EMCF security officers and staff (1) receive insufficient training; (2) frequently use chemical agents and physical force without warning and in the absence of immediate threat of danger or resistance from the prisoners; and (3) deny requests for medical care by prisoners who have been subjected to physical force or chemical agents. Id. at ¶¶ 191-202. According to Plaintiffs, EMCF personnel use chemical agents and other forms of force against prisoners regardless of pre-existing medical or psychiatric problems. Id. at ¶¶ 203-08.

The fifth category is "Failure to Protect Prisoners from Violence". As to this category, Plaintiffs allege that EMCF fails to protect prisoners from extortion, bodily and sexual assault, and other threats of violence from other inmates and, further, that prison staff has actively arranged/enabled such activities. Id. at ¶¶ 209-20. Plaintiffs further allege that EMCF has acted with deliberate indifference to the risk of prisoner-on-prisoner violence by failing to: (1) ensure the proper function of safety equipment; (2) maintain adequate staff; (3) remove weapons and dangerous objects from prisoners; and (4) remove prisoners from potentially dangerous situations. Id. at ¶¶ 221-32.

The sixth category is "Sanitation and Environmental Conditions". In this section, Plaintiffs allege: (1) there are

6

multiple broken toilets, sinks, and showers throughout EMCF; (2) food, excrement, and other debris litter prisoner cells and common areas; (3) there is soot, and often smoke, present from fires started by prisoners; (4) they are required to wear clothing and sleep on bedding that has become saturated because of faulty water pipes; and (5) there is poor ventilation throughout the facility in part because air ducts and vents are not routinely cleaned. Id. at ¶¶ 234-43.

The seventh category is "Nutrition and Food Safety". As to this category, Plaintiffs allege they are "deliberately underfed and malnourished", which has resulted in significant losses of weight following arrival at EMCF. Id. at ¶¶ 244-50.

Plaintiffs also allege that Mississippi prison officials have been indifferent to the problems that exist at EMCF. First, Plaintiffs allege that the officials have known about the existing problems at EMCF for several years but have failed to remedy them. Id. at ¶¶ 251-53. Second, Plaintiffs allege that prison officials have continued to renew and/or enter additional contracts with private prison vendors even though the services provided by those vendors have been criticized, and the contracts reduce the health care services provided to EMCF prisoners. According to Plaintiffs, prison officials do not monitor or engage in any oversight of the private prison vendors. Id. at ¶¶ 254-62. Third, Plaintiffs

7

allege that administrative grievances regarding the conditions at EMCF are generally either (1) answered with intimidation, coercion, obstruction, or threats from the staff; or (2) not answered at all. Id. at ¶¶ 263-83.

Based on these allegations, Plaintiffs filed suit seeking to redress the alleged violations of their Eight Amendment rights as one or more class of prisoners. Following a period of class action-related discovery, the Court certified the case to proceed as a class action consisting of one General Class, known as the "EMCF Class", and three Subclasses: the "Isolation Subclass", the "Mental Health Subclass", and the "Units 5 and 6 Subclass". See Opinion and Order [Docket No. 257]. Membership of the General Class and Subclasses is defined as follows:

1. The EMCF Class: All persons who are currently, or will be, confined at the East Mississippi Correctional Facility.

2. The Isolation Subclass: All persons who are currently, or will be, subjected to Defendants' policies and practices of confining prisoners in conditions amounting to solitary confinement at the East Mississippi Correctional Facility.

3. The Mental Health Subclass: All persons who are currently, or will be, subjected to Defendants' mental health care policies and practices at the East Mississippi Correctional Facility.

4. The Units 5 and 6 Subclass: All persons who are currently, or will be, housed in Units 5 and 6 at the East Mississippi Correctional Facility.

8

Id. at 43.   Defendants' Motion to appeal that decision was denied by the United States Court of Appeals for the Fifth Circuit.   See Dockery v. Fisher, Appeal No. 15-90110.

The specific claims alleged in their Complaint are as follows:

Claim One - The policies and practices at EMCF subject members of the EMCF Class to a substantial risk of serious harm and injury from inadequate medical care, including dental care, optical care, and other health-related services.

Claim Two - The policies and practices at EMCF subject members of the Mental Health Subclass to a substantial risk of serious harm and injury from inadequate mental health care.

Claim Three - The policies and practices at EMCF subject members of the Isolation Subclass to a substantial risk of serious harm and injury from housing them in conditions that amount to solitary confinement, including risks of harm from inadequate physical exercise, filthy and unsafe environmental conditions, inadequate nutrition, inadequate mental health treatment, and conditions of extreme social isolation and sensory deprivation.

Claim Four - The policies and practices at EMCF subject members of the EMCF Class to a substantial risk of serious harm and injury from the infliction of excessive force.

Claim Five - The policies and practices at EMCF subject members of the EMCF Class to a substantial risk of serious harm and injury by failing to protect them from violence, ignoring emergency situations, and enabling violent attacks on prisoners.

Claim Six - The policies and practices at EMCF subject members of the Units 5 and 6 Subclass to a substantial risk of serious harm and injury from dangerous environmental conditions, including vermin, exposure to smoke and other toxic substances, filthy cells and fixtures, broken plumbing, inoperable lighting, constant illumination, and inadequate ventilation.

Claim Seven - The policies and practices at EMCF subject members of the EMCF Class to a substantial risk of serious harm and injury by providing inadequate nourishment to maintain health, and by serving food in an unsanitary and unsafe manner.

Through these claims, Plaintiffs seek declarations, under 42 U.S.C. § 1983, that the policies and practices in use at EMCF at the time the lawsuit was filed violate their constitutional rights as protected by the Eighth Amendment. Plaintiffs also seek to enjoin the continued use of those policies and practices, and request that the named prison officials be required to implement prison reforms that eliminate the substantial risks of harm

resulting from (1) inadequate medical and mental health care; (2) unsanitary and dangerous environmental conditions; (3) the use of excessive force by staff; (4) prisoner-on-prisoner violence; (5) malnutrition and unsanitary food preparation; and (6) the use of isolated confinement.  At a minimum, Plaintiffs request that the court-ordered plan: (1) prohibit solitary confinement under conditions of social isolation and sensory deprivation; (2) provide timely and adequate treatment for both mental and physical illness; (3) protect prisoners from excessive force at the hands of staff and from harm from other prisoners; (4) require that prisoners be housed in safe, clean, and sanitary conditions; (5) provide prisoners nutritionally adequate, and safely prepared meals; and (6) require that prison officials monitor the performance of all private prison contractors.  Finally, Plaintiffs request costs and attorneys' fees under 42 U.S.C. § 1988.

During the course of pre-trial litigation, multiple discovery disputes arose between the parties that needed to be resolved by the Court.  The discovery disputes, and the time needed thereafter to complete discovery and prepare for trial resulted in several continuances being granted at the request of both parties.  The case was tried to the bench between March 6, 2018, and April 9, 2018.  In addition to hearing testimony and reviewing exhibits,

the Court toured the subject prison.  Following trial, an Order
was entered by which the case was stayed to allow the parties to
conduct additional post-trial discovery, which included permitting
the experts to again inspect EMCF and proffer supplemental reports
detailing the effects, if any, of the changes made at EMCF during
the course of litigation.  <u>See</u> Order [Docket No. 767].  As before,
discovery disputes arose between the parties that required
resolution by the Court and extensions of time to submit the
supplemental reports.  After the supplemental reports were filed,
the Court entered an Order by which the parties were permitted to
submit post-trial briefs.  <u>See</u> Order [Docket No. 830].  By this
Order, Plaintiffs were required to expressly identify the
remaining bases for their alleged constitutional violations and
were expressly notified that any basis that had been alleged in
the Complaint, but not again identified in post-trial briefing,
would be treated as withdrawn and/or abandoned.  <u>Id.</u> at 5.  The
Court has now considered all pleadings and evidence before it and
is prepared to rule on Plaintiffs' claims.

## II.  Standards

The United States Supreme Court has recognized that while the
Constitution "does not mandate comfortable prisons," <u>see</u> Rhodes v.
<u>Chapman</u>, 452 U.S. 337, 349 (1981), it does not permit the existence

of those that are inhumane.  Farmer v. Brennan, 511 U.S. 825, 832 (1994).  Thus, "the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment."  Helling v. McKinney, 509 U.S. 25, 31 (1993).  In prohibiting cruel and unusual punishment, the Eighth Amendment places restraints on prison officials, who, for example may not use excessive physical force against prisoners. See Hudson v. McMillian, 503 U.S. 1 (1992).  The Eighth Amendment also imposes duties on prison officials to provide humane conditions of confinement; ensure that inmates receive adequate food, clothing, shelter, and medical care; and "take reasonable measures to guarantee the safety of the inmates."  See Hudson v. Palmer, 468 U.S. 517, 526-527 (1984).

In determining whether prison officials have violated the Eighth Amendment, courts apply a two-pronged analysis.  The first consideration is whether there has been an objective showing that the complained of constitutional deprivation is of a "sufficiently serious" nature.  See Wilson v. Seiter, 501 U.S. 294, 298 (1991). To meet the "sufficiently serious" requirement, a prison official's act or omission must result in the denial of "minimal civilized measure of life's necessities," see Rhodes v. Chapman, 452 U.S 337, 347 (1981), or result in a prisoner's being incarcerated under conditions that pose a substantial risk of

serious harm.  <u>See</u> <u>Helling</u>, 509 U.S. at 35.  The second consideration bears on whether the prison official had a "sufficiently culpable state of mind" <u>see</u> <u>Wilson</u>, 501 U.S. at 298, i.e. that he or she acted with "deliberate indifference" to a prisoner's health or safety.  <u>Id.</u> at 302-303.  To satisfy the "deliberate indifference" requirement, it must be shown that a prison official "knows of and disregards an excessive risk to inmate health or safety [--] the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." <u>Farmer</u>, 511 U.S. at 837.

Here, to remedy the alleged Eighth Amendment violations, Plaintiffs seek injunctive relief.  The Prison Litigation Reform Act ("PLRA"), greatly limits the ability of a court to fashion injunctive relief. Before an injunction can issue, a district court must find that "such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation." 18 U.S.C. § 3626(a)(1)(A).  The court must also "give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief." <u>Id.</u>

The Supreme Court has also held that in cases in which inmates seek injunctive relief to prevent substantial risks of serious

14

injury from ripening into actual harm, the Eighth Amendment deliberate indifference standard "should be determined in light of the prison authorities current attitudes and conduct", i.e. "their attitudes and conduct at the time suit is brought and persisting thereafter." Farmer, 511 U.S. at 841. (citation omitted). Further, a prisoner seeking injunctive relief on the grounds that there is "a contemporary violation of a nature likely to continue," must show both the existence of a violation and produce evidence "from which it can be inferred that the [prison] officials were at the time suit was filed ... knowingly and unreasonably disregarding an objectively intolerable risk of harm, and that they will continue to do so ... during the remainder of the litigation and into the future." Id. As regards this showing, "inmates may rely on developments that postdate the pleadings and pretrial motions, [and] defendants may rely on such developments to establish that the inmate is not entitled to an injunction." Id.

## II.  Discussion

### A.  Claim One - Medical Care

In order to prevail on an Eighth Amendment claim arising from the alleged deprivation of medical care, a prisoner must show that appropriate care has been denied, and that the denial has constituted "deliberate indifference to serious medical needs."

Thomas v. Carter, 593 F. App'x 338, 342 (5th Cir. 2014)(citing Estelle v. Gamble, 429 U.S. 97 (1976)).  A prisoner's belief that he should have received different treatment does not implicate the Eighth Amendment because a mere disagreement with the medical treatment that was provided, absent exceptional circumstances, does not support a claim of deliberate medical indifference. Gobert v. Caldwell, 463 F.3d 339, 346 (5th Cir. 2006).  Similarly, claims of negligence, medical malpractice, or unsuccessful medical treatment do not give rise to Section 1983 claims. See e.g. Zaunbrecher v. Gaudin, 731 F. App'x 340 (5th Cir. 2016). Rather, "subjective recklessness as used in the criminal law" is the appropriate definition of "deliberate indifference" under the Eighth Amendment.  Farmer v. Brennan, 511 U.S. 825, 839-30 (1994). A prison official acts with deliberate indifference only if the official (1) "knows that inmates face a substantial risk of serious bodily harm," and (2) "disregards that risk by failing to take reasonable measures to abate it."  Gobert, 463 F.3d at 346 (quoting Farmer, 511 U.S. at 847)). The deliberate indifference standard sets a very high bar.  To succeed on a Section 1983 claim, a prisoner must establish that the defendants "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." Domino v. Texas Dept.

16

of Criminal Justice, 239 F.3d 752, 756 (5th Cir. 2001)(quoting Estelle, 429 U.S. at 97). Further, a mere delay in providing medical treatment does not amount to a constitutional violation without both deliberate indifference and a resulting substantial harm. Easter v. Powell, 467 F.3d 459, 463 (5th Cir. 2006)(citations omitted).

Plaintiffs claim that the medical care they receive at EMCF is constitutionally inadequate for several reasons including that: (1) they are denied access to treatment for urgent, non-urgent, and chronic medical conditions because there is not a rapid and confidential means for alerting staff of medical problems; (2) they are subjected to "unacceptably long delays" in receiving medical treatment; and (3) the treatments they receive are below the standards set for medical health care providers. In support of these claims, Plaintiffs rely on evidence from their expert witnesses, Dr. Marc Stern ("Stern") and Madeleine LaMarre ("LaMerre"), both of whom testified as to the medical care provided at EMCF. While the testimony of these experts could support a finding of deficient medical treatment as regards certain prisoners, the Court finds it has not been shown to be applicable to all class members.

For example, Stern testified that his opinions were based on what he termed "purposeful" or "purposive" sampling, and that his

limited sample only included prisoners whose records established that they had complex medical histories, and who had sought treatment in complicated or difficult situations. See Tr. Vol. 19, at 48. Additionally, Stern testified that his opinions regarding the delivery and adequacy of medical care at EMCF were not based on accepted national or prison standards, including those promulgated by the American Correctional Association or the National Commission on Correctional Health Care but, instead, he based his opinions entirely on his training and experience in reviewing and working with prisons. See id. at 54. Stern's personal opinions regarding the adequacy of the medical care provided to prisoners at EMCF does not establish a standard for decency. See Rhodes, (explaining that expert opinions regarding desirable prison conditions do not "suffice to establish contemporary standards of decency."). Similarly, LaMarre's expert opinions and testimony were likewise based on a non-random sample consisting of only twenty prisoners at EMCF, see Tr. Vol. 28, at 11, and she did not know whether her opinions would be applicable to all class members. See id. At 14 (testifying, for example, that while one prisoner had not been medically screened within the first twenty-four hours following his transfer to    EMCF, she did not know how many other prisoners, if any, had not been screened).

18

Also relevant to the issue of medical care, the record shows that the MDOC cancelled the contract with Health Assurance, LLC, i.e. the company that had been providing health care services at EMCF at the time the lawsuit was filed, after the bribery scheme between its owner, Dr. Reddix, and then-MDOC Commissioner Epps, became known. Tr. Vol. 23, at 48. As of July of 2015, a new company, Centurion of Mississippi, has been providing medical and mental health care services at EMCF. Id. As of August of 2017, Patrick Arnold ("Arnold") has been the chief physician at the prison. In addition to Arnold, the medical care team at EMCF includes five nurse practitioners, eight registered nurses, seventeen licensed practical nurses, an infection control coordinator, a pharmacy technician, and a dental assistant. The prison also employs several part-time dentists and a part-time pharmacist. Arnold Dec. [Docket No. 812], 3. Prisoners request medical treatment by completing a "sick call" request form that is reviewed by medical staff within twelve to twenty-four hours. The healthcare system at EMCF is monitored and assessed through a Continuous Quality Improvement Program, see Tr. Vol. 24, at 52, and has been accredited by the American Correctional Association ("ACA").

After Centurion began providing healthcare services at EMCF, and since Arnold assumed the chief physician position, all sick

call requests are now being assessed within twenty-four hours by a nurse who conducts a face-to-face evaluation of the prisoner and then refers the prisoner for either urgent treatment with an in-house medical provider or schedules the prisoner for routine care. Tr. Vol. 35, at 28.  If it is determined that a prisoner needs urgent care, he is seen by a health care provider that day.  Id. at 29.  If it is determined that a prisoner needs routine care, he is generally seen within seven days of the sick call request. Approximately 150-200 prisoners who submit sick call requests are seen by medical providers each week.  Id., at 32.  Prisoners in need of emergent care are immediately transferred either to the prison medical unit or a local emergency room depending on the nature and severity of the emergency.  Id. at 33-34.

Having reviewed the evidence, the Court finds that Plaintiffs have failed to show that they, as members of a class or classes, are being denied constitutionally adequate medical care while housed at EMCF.  While Plaintiffs and their expert witnesses have presented evidence to show that there have been times when the provision of medical care at EMCF was delayed or may not have been adequate, they have not shown that Defendants have acted with deliberate indifference to their medical needs on a class-wide basis.  There is insufficient evidence that prisoners, as a class, are being refused treatment, having their medical problems

ignored, or are intentionally being mistreated as is required to succeed on a Section 1983 claim.

Plaintiffs also claim they are receiving constitutionally deficient medical care based on the manner that medications are administered at EMCF. In support of this claim, Plaintiffs argue that they do not timely receive prescribed medications (and sometimes do not receive them at all) because the prison does not ensure that required medications are properly stocked. Plaintiffs also argue that the nurses who administer medications fail to adhere to generally accepted standards and fail to properly document that medications were given and taken as prescribed.

In support of this claim, Plaintiffs rely on evidence including a sampling of Medication Administration Records ("MARs") that show that some prisoners had not received all doses of prescribed medication and some had not received medications as scheduled. To the extent the missed doses or untimely administration of medications evidenced on the MARs reflect human error or poor record keeping, they do not amount to constitutional violations. See e.g. Daniels v. Williams, 474 U.S. 327 (1986) (holding that negligent conduct does not rise to the level of constitutional violations). In addition, there is insufficient evidence that Plaintiffs, as a class, suffered substantial harm as a result of the missed doses or delays as is required to maintain

21

a Section 1983 claim. <u>See</u> <u>e.g.</u> <u>Mendoza v. Lynaugh</u>, 989 F.2d 191, 193 (5th Cir. 1993).

The missed doses and untimely administration of medication that resulted because of insufficient medication being available at the prison could, *arguendo*, rise to a class-wide harm. The record shows, however, that Defendants have not acted with deliberate indifference to the harms that could result because medications are not given as prescribed. First, after the lawsuit was filed and at the time of trial, EMCF had established its own on-sight pharmacy that permitted it to stock medications for prisoner use. EMCF has also obtained a pharmacy license that permits it to stock psychiatric medications on the premises. The prison also now has in place protocols to assess and monitor prisoners who have missed more than three doses of medication. Under this protocol, any prisoner who misses three consecutive doses of medication has a notice placed in his medication record, and that prisoner is automatically seen by a health care provider to determine the reason(s) the medications were missed. Tr. Vol. 34, 113-15. Based on the establishment of an in-house pharmacy, and the implementation of new medication administration policies, EMCF had a ninety-three percent compliance rating for medication administration as of October of 2018. The Court finds this

compliance rating is within reasonable limits.

In sum, the Court finds that Plaintiffs have not shown that their Eighth Amendment rights have been violated with respect to the provision of health care or medications at EMCF.  The Court notes that the record does show that there were instances when medical treatment was delayed, when medications were not timely administered, and when prisoners may have responded better had different medical care been provided.  The record does not, however, show that prisoners, as a class, are systematically being denied medical treatment or having their medical needs ignored.  The record also does not show that Defendants have acted with deliberate indifference to the medical needs of prisoners at EMCF.  Defendants have contracted with a new company to provide medical care at EMCF, they have established an in-house pharmacy and new protocols to ensure prisoners are receiving prescribed medication, and requests for medical care are now being timely triaged and answered.  Accordingly, judgment will be granted in Defendants' favor on Plaintiffs' Eight Amendment health care claim.

## B.  Claim Two - Mental Health Care

The standard for proving an Eighth Amendment claim for the deprivation of psychiatric care is the same as that used when

considering medical care claims, i.e. a prisoner must show that appropriate care has been denied, and that the denial constituted "deliberate indifference to serious medical needs." Thomas, 593 F. App'x at 342.  Again, a prisoner's disagreement with the care he has received, and allegations of negligence and unsuccessful treatment outcomes do not support a claim of deliberate medical indifference.  Instead, to be found to have acted with deliberate indifference, a prison official must (1) "know[] that inmates face a substantial risk of serious bodily harm," and (2) "disregards that risk by failing to take reasonable measures to abate it." Gobert, 463 F.3d at 346 (quoting Farmer, 511 U.S. at 847).  To succeed on a Section 1983 claim, a prisoner must be able to establish that the defendants "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs."  Domino, 239 F.3d at 752 (quoting Estelle, 429 U.S. at 97).  Further, a mere delay in providing medical treatment does not amount to a constitutional violation without both deliberate indifference and a resulting substantial harm.  Easter, 467 F.3d at 463.

Plaintiffs claim that the mental health care they are provided at EMCF violates the Eighth Amendment.  As discussed above, after the lawsuit was filed, Defendants contracted with a new company,

Centurion, to provide mental health care services at EMCF. In October of 2015, Centurion hired Dr. Kim Nagel ("Nagel") to the position of chief psychiatrist at the prison. Upon his hiring, Nagel made multiple changes with respect to the delivery of mental health care at the prison, including increasing the amount of counseling received by prisoners, limiting the use of tranquilizing medications, and eliminating the use of habit-forming medications. Currently, Dr. Steven Bonner ("Bonner") serves as the chief psychiatrist. Along with Bonner, the mental health team consists of a full-time psychologist, five psychiatric nurse practioners, seven licensed (masters-level) counselors, and two mental health activity therapists.

Approximately two-thirds of all prisoners at EMCF have mental illnesses/disorders that require treatment. The vast majority of these prisoners have what are termed "stable mental health problems", which are problems that are controlled with medication. These prisoners are seen by counselors each month and by psychiatric staff every three months. The few prisoners whose mental illnesses require closer monitoring are seen by the psychiatric staff at least once per month.

EMCF operates a separate unit, designated "Unit 3", which houses prisoners whose mental illnesses require additional treatment and safety measures and/or render them too vulnerable

for placement in other units.  See Bonner Dec. [Docket No. 812],
at 6-7.  After the lawsuit was filed, but before trial, EMCF also
created a new Acute Care Unit ("ACU"), in order to provide
intensive treatment, counseling, and therapy to prisoners with
difficult mental illnesses.  Id. at 7-8.  Dr. Bonner treats all
prisoners in Unit 3 and the ACU and oversees the mental health
therapies these prisoners are provided by other staff members.

Plaintiffs argue that the mental health care they receive is
deficient because EMCF has an inadequate intake process, which
fails to promptly and reliably detect mental health needs and/or
fails to insure the continuity of mental health treatment.
Plaintiffs do not dispute that every prisoner is twice-screened
upon his placement at EMCF but, instead, argue that those
screenings are inadequate or deficient.  In support of this claim,
Plaintiffs cite evidence from their correctional mental health
care expert, Dr. Bruce Gage ("Gage"), who testified that the
assessments performed at EMCF are inadequate because staff does
not consistently review the entire medical record as part of the
intake process.  See Tr. Vol. 26, at 55.  Gage also testified that
the assessments he reviewed contained erroneous information.  Gage
Rep. [Docket No. 807], at 10.  Plaintiffs also argue that
assessment and treatment plans for mentally ill prisoners at EMCF
are inadequate because they lack specificity, fail to consistently

identify symptoms for targeted treatment, and do not include behavior management plans like those used in other prisons.

As regards the provision of mental health care, Plaintiffs argue it is deficient and/or inadequate because they are provided infrequent or inappropriate access to mental health providers and are provided insufficient access to other structured mental health treatment programs such as group therapy and mental health activities. Plaintiffs also argue that the mental health staff at EMCF does not adequately respond to prisoners who are in mental health crises including transferring such prisoners to outside medical facilities.

As discussed above, after the lawsuit was filed, a new company was hired to provide mental health care services at the prison. Although Plaintiffs, through Gage, argue that the mental care they are receiving is inadequate and that they would likely respond better if different treatment was provided, they have not shown that they are being denied treatment, that their mental illnesses or disorders are being ignored, or that they are intentionally being mistreated. In other words, Plaintiffs' arguments that they should be screened differently, have different types of treatment plans, and be provided different forms of mental health treatment do not establish a constitutional violation. The record also shows that Defendants have not acted with deliberate indifference

27

with respect to the mental health needs prisoners at EMCF. Again, Defendants contracted with a new company to provide mental health care at EMCF and established an in-house pharmacy to decrease disruptions in administering medications. The prison also created the ACU for the purpose of housing, monitoring, and treating prisoners who have severe mental illnesses, and maintains a separate unit to house prisoners whose mental illnesses require more treatment or pose greater safety concerns. Although prisoners at EMCF are not getting the type and amount of mental health care that may be available to non-prisoners, the Court finds that the mental health care they are being provided has not been shown to be constitutionally deficient.

In sum, the evidence in the record shows that Plaintiffs, as a class, are receiving mental health care at EMCF, and that Defendants are not acting with deliberate indifference to their mental health needs or the risks of harm that could result if their needs were not addressed. Although Plaintiffs argue, through their expert Gage, that they should be given different types of mental health care and different types of medication, and that the security and mental health staff should interact with them in a different manner, they have not shown that their constitutional rights are being violated based on the manner in which they are now treated. In other words, the Court finds that Plaintiffs'

challenges regarding the frequency, adequacy, and appropriateness of the mental health care being delivered at EMCF do not arise to level necessary to violate the Eighth Amendment. Accordingly, judgment will be granted in Defendants' favor on Plaintiffs' Eight Amendment mental health care claims.

## C.  Claim Three - Isolation/Solitary Confinement

Although solitary confinement does not *per se* violate the Eighth Amendment, "there is a line where [its] conditions [can] become so severe that its use is converted from a viable prisoner disciplinary tool to cruel and unusual punishment." <u>Gates v. Collier</u>, 501 F.2d 1291, 1304 (5th Cir. 1974). Here, Plaintiffs claim that the length of time some prisoners are held in solitary confinement violates their Eighth Amendment rights. On this issue, several Plaintiffs testified that they had been held in solitary confinement/isolation for extended periods of time. <u>See e.g.</u> Tr. Vol. 11 (Plaintiff Grogan testifying he had been held in isolation since 2014); Tr. Vol. 15 (Mitchell testifying he had been held in isolation for two and one-half years). Plaintiffs argue that the isolation that results from the extended periods of solitary confinement harms their physical and mental health or places them at a substantial risk for such harm.

In support of this claim, Plaintiffs cite the

opinions/testimony of Dr. Terry Kupers ("Kupers"), who was qualified as an expert in the area of the psychological effects of isolation and solitary confinement.  In his expert report, Kupers opined that placing a prisoner in solitary confinement can result in his experiencing, *inter alia*, anxiety, depression, irrational anger, confused thinking, and increase the risk of suicide.  <u>See</u> Post Tr. Brief Ex. 77 Kuper Rep., 12-13.  According to Kupers, periods of solitary confinement should not exceed fifteen days. Tr. Vol. 16, at 35.  This opinion mirrors the position of the National Commission on Correctional Health Care that "[p]rolonged (greater than 15 consecutive days) solitary confinement is cruel, inhumane, and degrading treatment, and harmful to an individual's health."  <u>Id.</u>

The Court finds Kupers's testimony/opinion that a prisoner should not be held in solitary confinement for more than fifteen days does not create a benchmark for determining whether any constitutional rights have been violated.  <u>See</u> <u>Rhodes</u>, 452 U.S. at 348 (explaining that expert opinions regarding desirable prison conditions do not "suffice to establish contemporary standards of decency.").  In addition, Plaintiffs have not shown that their being placed in solitary confinement was not justified, or that the conditions under which they are being confined are inhumane. Although Plaintiffs complain that they often do not get the five-

hours-per-week recreation time, or the three showers-per-week as prescribed by EMCF policy, longer periods of continuous cell time have been found constitutional.  See e.g. Hernandez v. Valaquez 522 F.3d 556, 561-62 (5th Cir. 2008)(finding that the denial of recreation time for a thirteen-month period had not violated the prisoner's constitutional rights).

Plaintiffs also complain that the lights in solitary confinement cells do not function for extended periods of time. They have not shown, however, that Defendants are deliberately indifferent to the risks associated with no or limited lighting. The record shows that the main reason for non-functioning lights at EMCF is that prisoners tamper with and/or break light fixtures and bulbs.  Defendants have shown that EMCF has maintenance crews that routinely repair and replace equipment that has been damaged or destroyed by the prisoners, including light fixtures; that the prison annually spends over $700,000 on maintenance and repairs; and that the prison has begun installing an up-graded light fixture that is more tamper-resistant.

Having reviewed the evidence, the Court finds Plaintiffs have failed to show that their constitutional rights are being violated based on either the length of time they are housed in solitary confinement, or the conditions of that confinement.  Plaintiffs have likewise failed to show that Defendants have acted with

deliberate indifference to the risks posed by solitary confinement/isolation. Accordingly, judgment will be granted to Defendants on Plaintiffs' isolation claim.

## D. Excessive Force

The Supreme Court has held that the use of excessive force against prisoners may constitute cruel and unusual punishment in violation of the Eighth Amendment regardless of whether serious injury results. Hudson v. McMillian, 503 U.S. 1, 4 (1992). "In evaluating excessive force claims under the Eighth Amendment, the 'core judicial inquiry' is 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" Cowart v. Erwin, 837 F.3d 444, 452 (5th Cir. 2016)(quoting Hudson, 503 U.S. at 6-7). "This standard focuses on 'the detention facility official's subjective intent to punish.'" Waddleton v. Rodriguez, 750 F. App'x 248, 253 (5th Cir. 2018)(quoting Cowart, 837 F.3d at 542)(internal citations omitted). To determine a prison official's subjective intent, and thus whether the use of force was constitutionally permissible, see Cowart, 837 F.3d at 452-53, courts consider the following factors: (1) "the extent of injury suffered by an inmate", (2) "the need for application of force", (3) "the relationship between the need for force and the amount of force used", (4) "the threat

'reasonably perceived by the responsible officials'", and (5) "any efforts made to temper the severity of a forceful response." Waddleton, 750 F. App'x at 253 (quoting Hudson, 503 U.S. at 7).

Plaintiffs claim that the excessive force employed by security officers at EMCF subjects them to substantial risks of serious harm.  The policy of the MDOC regarding the use of force provides, *inter alia*, that the use of force should be planned, involve verbal intervention, and be used as a last possible resort when possible.  Pls.' Post Tr. Brief, Ex. 99.  In situations involving mentally ill prisoners, like the majority of those housed ay EMCF, planned use of force should incorporate intervention by mental health staff.  Id.

In support of their excessive force claim, Plaintiffs cite evidence presented by their correctional practices and security expert, Eldon Vail ("Vail"). Vail testified that security officers at EMCF engage in two types of force, either spontaneous uses of force ("SUOF") or planned uses of force ("PUOF").  Tr. Vol. 4, at 8-11.  According to Vail, SUOF should only be used when prisoners "presen[t] an immediate or imminent risk of harm."  Pls.' Post Tr. Brief, Ex. 78, at 34.  In all other instances, security officers should be required to use a PUOF, and the PUOF should include a requirement that mental health staff first attempt to de-escalate situations involving prisoners before any other method of force is

33

used.  Tr. Vol. 2, 135.  Thus, Vail's opinion seems to be that a SUOF in circumstances other than those in which a prisoner presents an immediate or imminent risk of harm, constitutes an excessive use of force and, therefore, is unconstitutional.

In arguing that they have been subjected to excessive force, Plaintiffs cite incident reports showing that security officers at EMCF used chemical spray against prisoners who had been locked in cells or confined in other secure areas. Pls.' Post Tr. Brief, Ex. 17.  According to Plaintiffs, because the prisoners were confined, and therefore did not pose an immediate/imminent risk of harm, the use of chemical spray constituted excessive force.

Although Vail testified to his opinion that a SUOF is excessive except in cases in which a prisoner's conduct could result in immediate/imminent harm, his opinion does not establish that the application of a SUOF in all other circumstances violates the Constitution.  See e.g. Green v. Farrell, 801 F.2d 765, 770 (5th Cir. 1986)("Expert recommendations do not create constitutional standards under the eighth amendment.")(citing Rhodes, 452 U.S. at 348 n.13)).  In addition, if adopted as a constitutional standard, Vail's opinion would divest the Court of its duty to measure the force used against the threat posed by the prisoner as "'reasonably perceived by the responsible officials'". Waddleton, 750 F. App'x at 253 (quoting Hudson, 503 U.S. at 7).

For example, the record shows that chemical spray has been used on prisoners who have refused to permit security officers to close and secure the food tray slots on their cell doors.  Warden Shaw testified that allowing the food tray slots to remain open presents significant safety and security issues because prisoners reach through the open slots to tamper with the locking mechanisms on their cells, pass contraband, and throw things (including flaming debris) into the common area of the pods.  Tr. Vol. 31. The use of chemical spray on prisoners who refuse to allow their food tray slots to be secured does not, as a matter of law, constitute an excessive use of force.  See e.g. Poe v. Texas Dep't of Criminal Justice, 306 F. App'x 866, 867-68 (5th Cir. 2009).

Finally, even if the Court were to find that the SUOF incidents cited by Plaintiffs amounted to excessive force, they are still required to show that Defendants acted with deliberate indifference to the risks presented by that use.  They have not. The record shows that security officers are required to undergo training regarding the use of force against prisoners, and that all incidents involving the use of force are reviewed.

In sum, the Court finds that Plaintiffs have failed to show either that the SUOF at EMCF constitutes an application of excessive force, or that Defendants have acted with deliberate indifference to the risk of harm that could result when force is

used against prisoners.  Accordingly, Defendants will be granted judgment on Plaintiffs' excessive force claims.

## E.  Claim Five - Protection from Harm

The Eighth Amendment imposes a duty upon prison officials to protect prisoners from violence at the hand of other prisoners. <u>Farmer</u>, 511 U.S. at 831-32.  <u>See also</u> <u>Wilson</u>, 501 U.S. 300, 303 (classifying "the protection [an inmate] is afforded against other inmates" as a "conditio[n] of confinement" subject to the strictures of the Eighth Amendment); <u>Rhodes</u>, 452 U.S. at 347 (finding that being assaulted in prison is simply not part of the penalty that criminal offenders pay for the offenses against society).  "It is not, however, every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety." <u>Farmer</u>, 511 U.S. at 831.  Instead, to prove an Eighth Amendment violation based on prisoner-on-prisoner violence, an inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm, and that prison officials disregarded that risk by failing to take reasonable measures to abate it.  <u>Id.</u> at 833-34.

Plaintiffs claim they are not adequately protected from other prisoners, and that that inadequacy places them at a substantial

risk of serious harm from gang activity, assault, and violence. In support of this claim, Plaintiffs first argue that the security plan currently utilized by EMCF creates a systematic understaffing problem, which in turn, increases the probability that they will be subjected to prisoner-on-prisoner violence.

By way of background, EMCF is designed for indirect prisoner supervision, which means that security officers are not posted or working inside each prisoner living area (pod) at all times. Tr. Vol. 33, at 24. The staffing plan for the prison reflects that design. Id.; Tr. Vol. 31, at 47. The prison consists of six units, each of which is comprised of four pods. Tr. Vol. 31, at 48. Each pod contains prisoner cells and a common area. The pods and units are monitored by security guards called "floor officers". Each unit also has an elevated "picket tower" that is situated in its center. The picket tower is manned at all times by a "picket officer", who is able to see down into all of the pods in the unit, the hallways that connect the pods in the unit, and the hallway that connects the unit to the rest of the facility. Tr. Vol. 31, at 50. The picket officer also electronically controls access into and out of the prisoner cells, the pods in the unit, and the unit itself. Id. In addition to being monitored by floor officers and the picket officer, the pods/units as well as all other parts of the prison are monitored by cameras that feed into

"central control." Id. at 49.   The camera feeds are monitored by central control officers who can remotely move the position of cameras and "zoom in" or magnify images to assess particular activity.   Id. at 48.   Central control officers also have the ability to contact all security officers in the prison by radio. Id. at 48.

Plaintiffs argue that the staffing plan for indirect supervision at EMCF is inadequate to abate the risk of harm associated with prisoner-on-prisoner violence.   This argument is supported by the testimony of their expert witness, Vail, who opined and testified that there should be at least one officer assigned to each pod during the first and second shifts in units housing minimum or medium security inmates, i.e. four floor officers (one in each pod) in these units during the specified shifts.   Tr. Vol. 3, at 5.   Vail also testified that there should be at least two officers assigned to each pod during the first and second shifts in units that house close custody and segregated inmates, i.e. eight floor officers (two in each pod) in these units during the specified shifts.   Id.   According to Vail, to be minimally acceptable, the first and second shift staffing plan would have to require the posting of (1) four mandatory floor officers in each of the minimum/medium security units, (2) eight mandatory floor officers in the close custody unit, and (3) five

38

mandatory floor officers in the segregation unit. <u>See</u> Vail Rep. [Docket No. 801], 9.

During his testimony, Vail acknowledged that he was not an expert in the area of prison staffing, and that he did not have any experience regarding the management of prisons, like EMCF, which utilize an indirect supervision system. Tr. Vol. 5, at 34. Vail also testified that he disagrees with the use of indirect prisoner supervision at EMCF and would prefer that a direct supervision plan (i.e. four to eight floor officers posted in each pod) be implemented.

The fact, however, that Vail believes that a direct supervision plan would be better at EMCF, does not render the currently used indirect supervision plan unconstitutional. <u>See</u> <u>e.g.</u> <u>Green</u>, 801 F.2d at 770 ("Expert recommendations do not create constitutional standards under the eighth amendment.")(citations omitted). Additionally, the record shows that EMCF, including its staffing plan, received accreditation from the American Corrections Association ("ACA") in 2015, and again in 2018. <u>See</u> Roth Supp. [Docket No. 812], at 14. Based on this accreditation, the Court finds that the decision by Defendants to continue using an indirect prisoner supervision system at EMCF, as opposed to the direct supervision system advocated by Vail, does not show that they acted with deliberate indifference to a substantial risk of

harm posed by the manner in which EMCF is staffed. See e.g. Street v. Corrections Corp. of Am., 102 F.3d 810, 817 (6th Cir. 1996)(finding that even if the prisoner's claim of understaffing was true, there was no showing of deliberate indifference as the prison staffing levels were "consistent with the ... American Corrections Association.").

Second, Plaintiffs argue that even if the indirect prisoner supervision system used by EMCF is adequate, Defendants have acted with deliberate indifference to their safety by failing to appropriately staff that plan. In support of this argument Plaintiffs cite to evidence that shows that one or more mandatory staffing positions at the prison was unfilled approximately thirty percent of the time as recently as August of 2018. See Vail Supp. [Docket No. 801], at 12. In response, Warden Shaw testified that there are times when staff members who have been scheduled to work mandatory positions inform the prison that they will not be coming to work or fail to appear as scheduled. Tr. Vol. 31, at 44. Shaw also testified that the prison has made multiple changes to ensure that all mandatory staff positions are filled. First, the prison has increased the staffing level from 136 to 177 correctional officers. Id. Second, EMCF has created a list of corrections officers who can be called by the shift commander and are required to report to duty to fill mandatory positions. Id. Third, the

prison has a system whereby correctional officers who are assigned to nonmandatory posts can be reassigned to mandatory posts.  Id. at 46.

In sum, the Court finds that Plaintiffs have not shown that they, as a class, are at a substantial risk of harm based on the indirect prisoner supervision system used at EMCF.  The evidence likewise does not show that Defendants have acted with deliberate indifference to the risk of prisoner-on-prisoner violence either by utilizing the indirect prisoner supervision system, or by failing to fill mandatory staffing positions.  Judgement will be granted to Defendants on Plaintiffs' Eight Amendment protection from harm claim.


**F.  Claim Six - Environmental Conditions**

The Eighth Amendment requires that "inmates be furnished with ... basic human needs, one of which is reasonable safety." Deshay v. Winnebago Cnty. Dept. of Social Servs., 489 U.S. 189, 200 (1989).  Thus, "[i]t is cruel and unusual punishment to hold convicted criminals in unsafe conditions." Helling v. McKinney, 509 U.S. 25, 33 (1993)(internal citations omitted).  The United States Court of Appeals for the Fifth Circuit has long recognized that environmental prison conditions can violate the Eighth Amendment in cases in which those conditions "present a grave and

immediate threat to health or physical well-being." See Campbell v. Beto, 460 F.2d 765, 768 (5th Cir. 1972). The Constitution, however, "does not require that prisoners, as individuals or groups, be provided with any amenity which some person may think is needed to avoid mental, physical, and emotional deterioration." Newman v. State of Al., 559 F.2d 283, 291 (5th Cir. 1977). To succeed on a conditions-of-confinement claim, prisoners must show there was an "extreme deprivation" of one or more of the "minimal civilized measures of life's necessities." Davis v. Scott, 157 F.3d 1003, 1006 (5th Cir. 1998)(quoting Wilson, 501 U.S. at 304). Absent such showing, an Eighth Amendment violation will not be sustained.

Plaintiffs argue that their right to a safe prison environment has been violated in three ways. First, Plaintiffs argue that lighting in the prison is deficient, and that that deficiency substantially increases both the risk of their being injured and/or assaulted, and the risk that their mental health will decline. In support of this argument, Plaintiffs cite opinions and testimony offered by their environmental expert, Diane Skipworth ("Skipworth"). During the course of her inspections, Skipworth measured the light levels of thirty-eight fixtures atEMCF and found them to be below standards adopted by the American Public Health Association ("APHA") for correctional institutions.

42

As to Skipworth's opinions, the record shows that the APHA is a non-profit organization that recommends standards to address health care concerns in prison.  Tr. Vol. 11, at 18.  The standards recommended by the APHA are not mandated by any federal or state law/agency.  Id.  Although Skipworth found lighting levels to be below APHA standards, her testimony does not show that there was a constitutional violation.  See e.g. Green, 801 F.2d at 770 ("Expert recommendations do not create constitutional standards under the eighth amendment.")(citations omitted).  Additionally, because Skipworth only tested a small fraction of the fixtures at the prison, the Court finds her testimony would not establish that light levels are deficient throughout the facility, or that all prisoners, as a class, are subjected to allegedly deficient lighting.

Assuming, arguendo, that light levels at EMCF resulted in a constitutional violation, the Court next considers whether EMCF was deliberately indifferent to that condition.  Evidence at trial established that most of the lighting problems at EMCF are attributable to prisoners who damage the light fixtures.  Maintenance records show that damage lighting fixtures are routinely repaired.  Tr. Vol. 11, a 21.  Although Skipworth testified that, in her opinion, it sometimes took "a significant amount of time" to effectuate requested repairs, she did not have

43

any knowledge regarding the frequency of repair requests made at the prison, or the repairs themselves. Id. Additionally, evidence showed that EMCF was in the process of installing alternate light fixtures that would be less susceptible to tampering or destruction by prisoners. Thus, having heard the evidence, the Court concludes that Plaintiffs have not shown either that they have been denied safe prison condition based on the lighting at the prison, or that Defendants have acted with deliberate indifference to the risks of harm associated with light levels.

Next, Plaintiffs argue that the failure of EMCF to maintain adequate fire protection and ventilation has resulted in constitutionally unsafe conditions, and places them at a substantial risk of physical and mental health problems. In support of this claim, Skipworth testified that during her tour of the facility, she witnessed evidence of prisoner-started fires including, soot, ash, and smoke marks in both cells and common areas of the prison. Tr. Vol. 10, at 58. Skipworth also testified that ventilation at the prison was impaired because prisoners would block intake and outflow air ducts with foreign objects.

The record clearly demonstrates the existence of prisoner-started fires at EMCF. The record also shows, however, that EMCF has taken several steps to address the risks associated with this

problem.  Warden Shaw testified that the food tray slots on cell doors are now locked when not in use thereby preventing prisoners from throwing burning materials into the hallways and common areas of the units.  Tr. Vol. 30, at 57.  EMCF also installed a new ventilation system to more quickly remove smoke generated by fires and has employed a certified technician who routinely inspects and repairs the ventilation system.  Id.  Having heard the evidence, the Court concludes that even if the smoke generated from prisoner-started fires had created unsafe condition of confinement, Plaintiffs have not shown that Defendants have acted with deliberate indifference to the risks caused by that condition.

Finally, Plaintiffs argue that they are at a substantial risk of physical and mental harm from other environmental conditions at EMCF including faulty plumbing, vermin, and general prison conditions.  In support of this claim, Plaintiffs cite to photographs that were taken in different areas of the prison before the lawsuit was filed.  These photographs show, *inter alia*, broken and/or over-flowing plumbing fixtures, smoke and soot residue in cells and hallways, broken light fixtures, and general neglect and decay.  Plaintiffs also cite their own testimony regarding conditions at the prison.

During the course of trial, the Court toured the prison and found that the then-existing environmental conditions were in

stark contrast to those depicted in the pre-lawsuit photographs. During its inspection, the Court found no evidence of the environmental problems either depicted in the subject photographs or described by the prisoners who testified at trial. The evidence also showed that prison officials have entered contracts by which twice-monthly pest control services are performed at the prison. Tr. Vol. 31, at 70. The kitchen is cleaned each evening and undergoes weekly sanitation inspections. Tr. Vol. 32, at 86. Additionally, some prisoners are assigned to the cleaning staff, and are provided protective clothing and cleaning supplies and receive training as to the proper use of the equipment/supplies.

In sum, the environmental conditions existing at EMCF in the past may have been intolerable. Those conditions have changed. The Court concludes, based on the evidence presented by the parties and its own observations, that Plaintiffs have not shown that the environmental conditions currently existing at EMCF are so unsanitary or unsafe that they either violate their constitutional right to humane housing conditions or place them at substantial risks of serious harm. The Court also concludes that Plaintiffs have not shown that Defendants have acted with deliberate indifference to the risks of harm associated with housing prisoners in unsanitary or unsafe facilities. Judgment will be granted to Defendants on Plaintiffs' Eighth Amendment environmental claims.

46

**G.  Claim Seven - Adequate Nutrition**

The Eighth Amendment requires that inmates be provided "'well-balanced meal[s], containing sufficient nutritional value to preserve health.'"  Green v. Ferrell, 801 F.2d 765, 770 (5th Cir. 1986).  See also Eason v. Thaler, 73 F.3d 1322, 1327 (5th Cir. 1996)("To comply with the Constitution, inmates must receive 'reasonably adequate' food.").  "The deprivation of food constitutes cruel and unusual punishment only if it denies a prisoner the 'minimal civilized measure of life's necessities.'"  Talib v. Gilley, 138 F.3d 211, 214 n.3 (quoting Wilson, 501 U.S. at 298).  "Whether the deprivation of food falls below this threshold depends on the amount and duration of the deprivation."  Id.  Plaintiffs argue that their Eighth Amendment right to adequate nutrition has been violated in three ways.

First, Plaintiffs argue that the meals they are served (1) deviate from the dietician-approved menus for the prison, and (2) contain "significantly less nutritious foods" than provided by those menus.  In support of this claim, Plaintiffs cite the report their expert dietician, Diane Skipworth ("Skipworth"), who opined: "[I]t appears that EMCF does not adhere to the dietician-approved menu, placing prisoners at risk of under-nutrition, weight loss, and malnutrition caused by an inadequate intake of vitamins and

minerals." Pls.' Post Trial Brief [Docket No. 836] Ex. 81, Skipworth Report, 13.

The record does show, and so the Court finds, that prisoners at EMCF were, at times, served food that differed from that listed on the daily menu. There was no evidence, however, regarding the nutritional impact of those substitutions. For example, when asked in her opinion as a nutritionist, "[H]ow significant were the discrepancies ... between the posted menus and the [meals] that were served?", Skipworth testified:

> It's extremely important for a facility to adhere to the dietician-approved menu. That's not to say that substitutions won't and can't occur, but the kitchen needs to take steps to ensure that if a substitution is made, it's equally nutritious... There are... times when substitutions will occur, but adhering to the dietician's menu plan is extremely important, especially in an environment like a prison where the prisoners don't have other options for meals. So they are reliant upon the nutrients and the calories and the protein provided by the facility meals to ensure their health and well-being.

Tr. Vol. 10 at 83. Similarly, in her expert report, Skipworth details substitutions that were made to several dietician-approved menus at the prison, but does not detail the nutritional effects of those substitutions. See 839, Ex. 81, 78-86. Based on the lack of expert opinion or testimony, the Court finds Plaintiffs have not shown that they had been served nutritionally-deficient meals for any extended period of time while housed at EMCF. Thus,

having heard the evidence and arguments, the Court concludes that Plaintiffs have not shown that substitutions made to the dietician-approved menus at EMCF resulted in inmates' being either denied well-balanced, nutritionally sufficient meals, or being at a substantial risk of such denial.

Second, Plaintiffs claim they receive inadequate quantities of food because kitchen workers/servers are instructed to dilute food with water and/or decrease serving sizes. In support of this argument, Plaintiffs cite the testimony of Jimmie Brewer ("Brewer"), an inmate who worked as a cook and food server at EMCF until October of 2016. At trial, Brewer testified that he was instructed by a member of the kitchen staff, "Mrs. Taylor", to add water while cooking meals, and to decrease serving sizes to insure there was enough food for all the inmates. Tr. Vol 11, 57-58. Later testimony showed that Mrs. Taylor no longer works in the kitchen at EMCF, and that Brewer had not worked in the kitchen for approximately two years before trial. Id. at 73.

There was no evidence, however, regarding the nutritional effect of the practices about which Brewer testified, or whether the amount of food received by inmates was insufficient to meet their daily nutritional needs. When asked directly whether the amount of food being served to inmates was inadequate, Skipworth testified that the focus of her expert opinions was not amount

49

but, rather, substitutions that were made to the dietician-approved menus. For example, when asked: "[W]ould it be fair to say [that inmates] may be getting sufficient amounts of food to fulfill their dietary needs or they may not? You just don't know one way or the other?" Trans 11, at 32. Skipworth responded: "I have major concerns based on what I saw ... My concern is the changes to the menu. But the changes that I saw ... are very concerning. But I don't have the full amount of information I need to better formulate an opinion." Id. As discussed above, there was no evidence regarding the nutritional effect of substitutions that were made to the dietician-approved menus.

The Court also notes that approximately twenty inmates testified at trial, and each complained about the quality and quantity of the food they are served. The Court observed that despite their complaints, the inmates who testified did not appear underweight and, indeed, most appeared to be somewhat overweight. The undersigned also saw the food that inmates would be served when he toured EMCF during trial. The food was no more nor less than that which would be expected to be prepared/served in a large institutional setting.

Having heard the evidence and arguments, the Court concludes that Plaintiffs have not shown that dilutions and/or decreases in serving sizes resulted in inmates' being either denied well-

50

balanced, nutritionally sufficient meals, or being at a substantial risk of such denial.

Plaintiffs' final adequate nutrition claim is that food is either improperly prepared or prepared using unsafe food handling procedures and in unsanitary conditions. As regards this claim, Plaintiffs cite the testimony of several inmates who testified they saw insects and vermin excrement in food storage/preparation areas at EMCF; had been asked to prepare food that appeared spoiled; and had been served under-cooked meat and unwashed produce. Tr. Vol. 11, 25-81.

The undersigned toured the food storage and preparations areas when he inspected the prison. During this tour, the undersigned was also apprised of the food preparation practices and procedures used at the prison. It was observed that the food storage and preparations areas were clean, and that food was prepared and distributed in a sanitary manner.

The evidence at trial showed that ECMC is under contract with an outside vendor to provide pest control services, and that those services are provided on a monthly basis. Trans. vol. 11, at 30. Although Skipworth testified that weekly pest control service is "recommended" for kitchen and food service areas, and that the "best practice for pest control" is "integrated pest management", this testimony does not create constitutional standards. See e.g.

Green v. Farrell, 801 F.2d 765, 770 (5th Cir. 1986)("Expert recommendations do not create constitutional standards under the eighth amendment)(citing Rhodes v. Chapman, 452 U.S. 337, 348 n.13 (1981)).  The evidence also showed that the kitchen and food storage areas at EMCF generally received grades of "A" or "B" during annual inspections by the Mississippi Department of Health. Trans. vol. 11, at 38.  Finally, there was no evidence that any inmate had become ill because of the food he was served, or the manner in which the food was stored and/or prepared.  Id. at 31.

Having heard the evidence, the Court concludes that Plaintiffs have not shown they are being denied well-balanced, nutritionally sufficient meals based on the manner or environment in which those meals are prepared.

In sum, the Court finds Plaintiffs have not shown that the meals served at EMCF are calorically or nutritionally inadequate. The evidence likewise does not show either that the quantity and/or quality of food served to inmates has resulted in their being underweight, malnourished, or subject to food-born illnesses, or that they are at a substantial risk of such nutrition-related harms.  Finally, the record does not show that Defendants have acted with deliberate indifference to the nutritional needs of prisoners at EMCF.  Judgment will be granted to Defendants on Plaintiffs' Eight Amendment adequate nutrition claim.

52

## Conclusion

In conclusion, The Court having granted judgment as to each claim by Plaintiffs hereby finally dismisses this case. However, the Court believes that some additional explanation will be helpful. This case was filed in May of 2013, after Plaintiffs' attorneys had investigated this case, hired and consulted their expert witnesses and evaluated their prospects of a successful result. The pretrial phase of this litigation was long based on the multiple requests for extensions of time that were granted to each side during the discovery and pre-trial stages of this case, and the multiple complex matters that were raised and needed to be resolved by the Court for the case to proceed. As the case neared trial, the Court encouraged the parties to explore settlement possibilities. The attorneys met on multiple occasions with the magistrate judge to try to settle the case without success. A bench trial was held beginning in Spring of 2018. Following trial, the Court again allowed the parties to conduct discovery for the purpose of examining the current status in the prison, and to provide post-trial briefing detailing that status. During all of this time, the manner in which the prison was being operated did not remain stagnant. Instead, multiple changes were made at the prison that impacted staffing, physical and mental health care,

53

and environmental conditions.  The prison that existed at the time of trial was not the same as the one that had existed when this lawsuit was filed.

The Court is of the belief that the bribery and kickbacks in which then-MDOC Commissioner Epps participated, including those that also involved Dr. Reddix whose company was providing medical and mental health care at EMCF, likely affected the quality of care that was being provided to prisoners as well as other conditions at that facility.  After Epps's illegal conduct came to light, multiple changes were made at EMCF including (1) the contracting with a new company for the provision health-care related services; (2) the creation of an in-house medical unit for the purpose of monitoring and treating acute mental health problems; and (3) the establishment of an in-house pharmacy to increase the ready availability medications.  The prison also saw the hiring of a very experienced new warden, an increase in the number and availability of security staff throughout the facility, and the cleaning/repairing/improving of the prison.  The changes made at the prison are evident from the record, and from the tour of the facility that was made during trial.  The Court was surprised with respect to the cleanliness and condition of the prison in particular after seeing photographs of facility that were taken prior to the lawsuit's having been filed before trial,

and hearing the anecdotal evidence presented by the prisoners who testified at trial.

It is not for the Court to speculate as to what the outcome of this case would have been if the conditions that existed at the prison when the lawsuit was filed continued to exist at the time of trial or thereafter. It is for the Court to say that after the lawsuit was filed and the administrative corruption was discovered, multiple changes were made at EMCF that directly pertain to Plaintiffs' claims. While Plaintiffs and their expert witnesses argue that the environment and healthcare services at the prison could and should be better, those arguments do not establish that the conditions under which they are currently housed, as a class, are cruel and unusual. For this reason, the Court finds no bases for either declaring that the conditions at EMCF violate the Eighth Amendment or awarding injunctive relief to remedy existing constitutional violations.

For these reasons:

IT IS THEREFORE ORDERED that judgment be entered in Defendants' favor on all claims alleged by Plaintiffs in this case.

SO ORDERED this the 31 day of December, 2019.


                                    s/ William H. Barbour, Jr.
                                    UNITED STATES DISTRICT JUDGE