```
           IN THE UNITED STATES DISTRICT COURT
        FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
                   NORTHERN DIVISION


JERMAINE DOCKERY, ET AL.                        PLAINTIFFS

VS.                        CIVIL ACTION NO. 3:13CV326WHB-JCG

PELICIA HALL, ET AL.                            DEFENDANTS
```

**TRIAL TRANSCRIPT**
**VOLUME 38**

```
     BEFORE THE HONORABLE WILLIAM H. BARBOUR, JR.
            UNITED STATES DISTRICT JUDGE
                   APRIL 9, 2018
                  MORNING SESSION
                JACKSON, MISSISSIPPI


  REPORTED BY:  CHERIE GALLASPY BOND

                Registered Merit Reporter
                Mississippi CSR #1012
_____

          501 E. Court Street, Ste. 2.500
            Jackson, Mississippi  39201
                  (601) 608-4186
```

*** DAILY TRANSCRIPT ***

1                            **APPEARANCES**

2

    COUNSEL FOR PLAINTIFFS:
3
        MR. JODY E. OWENS
4       MS. ANNA Q. HAN
        MS. ERIN MONJU
5       MR. CARL TAKEI
        MS. ELISSA JOHNSON
6       MR. ERIC GORDON BALABAN
        MS. GRETCHEN ANN HOFF VARNER
7       MR. RAVI DOSHI
        MS. REKHA ELAINE ARULANANTHAM
8       MR. BENJAMIN R. SALK
        MS. CHELSEA K. CAVENY
9       MS. SARAH D. BIDINGER

10

    COUNSEL FOR DEFENDANTS:
11
        MR. WILLIAM T. SILER, JR.
12      MR. NICHOLAS F. MORISANI
        MS. MOLLY MITCHELL WALKER
13      MR. MICHAEL J. BENTLEY
        MR. J. WILLIAM MANUEL
14      MS. KRISSY C. NOBILE
        MR. HOWARD DAVID CLARK III

15

16

17

18

19

20

21

22

23

24

25

TABLE OF CONTENTS

Exhibit D-178 ....................................6

CLOSING ARGUMENTS:

Closing Argument by Ms. Johnson  ......................8

Closing Argument by Ms. Monju  ......................35

Closing Argument by Mr. Siler  .......................56

Closing Argument by Mr. Bentley  .....................82

Closing Argument by Ms. Johnson  ....................100

```
 1        (Court Called to Order)
 2             THE COURT:  Good morning, ladies and gentlemen.  We've
 3   got lots of people in the courtroom this morning.  I suspect
 4   spectators are going to be disappointed, but we'll see what the
 5   lawyers have to say.
 6             We're here today for closing arguments.  I gave both
 7   sides an hour and a half for those closings.  I assume that the
 8   plaintiffs want to split your arguments into two parts,
 9   retaining time for rebuttal after the defendants' argument.  Is
10   that what you're planning?
11             MS. JOHNSON:  Yes, Your Honor.  We would ask to
12   reserve remaining time for rebuttal.
13             THE COURT:  Who's going to argue first, and who's
14   going to finish, and who's -- and how are you going to split
15   your time?
16             MS. JOHNSON:  Your Honor, the argument will be split
17   between myself and Ms. Monju.  I will be beginning.  Our
18   collective argument initially will be about an hour and 15
19   minutes, and we would reserve the remaining time for rebuttal.
20             THE COURT:  All right.  Do you want a warning on your
21   time, Ms. Johnson?
22             MS. JOHNSON:  Do you mean --
23             THE COURT:  Are you going first?
24             MS. JOHNSON:  Yes, Your Honor.
25             THE COURT:  And how much of your hour and 15 minutes
```

```
 1   are you going to take?
 2        MS. JOHNSON:  I anticipate that my portion will be
 3   about 40 minutes, Your Honor.
 4        THE COURT:  Do you want a warning at that time?
 5        MS. JOHNSON:  Sure, Your Honor.  Actually, I can keep
 6   up with the time.
 7        THE COURT:  All right.  Any time that you use,
 8   Ms. Monju -- the two of you can use the whole hour and a half
 9   to begin with, but I'm just trying to see whether you want a
10   warning.  Ms. Monju, what about your time?  Do you want me to
11   call you at any time?
12        MS. MONJU:  Your Honor, I can also follow along with
13   the time.  Thank you.
14        THE COURT:  And then what's the -- what -- how's the
15   defense going to do your time?
16        MR. SILER:  Our intention is that I will handle half
17   the time, 45 minutes, and Mr. Bentley will handle 45 minutes.
18   I would like a warning at 35 minutes, Your Honor.
19        THE COURT:  Thirty-five?
20        MR. SILER:  Yes, sir.
21        THE COURT:  All right.  And --
22        MR. BENTLEY:  Thirty-five minutes would be good for me
23   as well, Your Honor.  Thank you.
24        THE COURT:  Okay.
25        MR. SILER:  Your Honor, we've got one final matter.
```

*** DAILY TRANSCRIPT ***

1    Exhibit D-178 was still remaining to be ruled upon.  The

2    parties have gotten together and agreed upon a redacted

3    version.  We have provided it to your deputy clerk, and at this

4    time we formally move for the admission of Exhibit D-178.

5         THE COURT:  All right.  Ms. Johnson, are you in

6    agreement with that?

7         MS. JOHNSON:  Yes, Your Honor.  We have no objection

8    to the redacted version.

9         THE COURT:  D-178 will be received into evidence.

10     (Exhibit D-178 marked)

11        THE COURT:  Yes, sir.

12        MR. BALABAN:  Good morning, Your Honor.  There was one

13   housekeeping matter from plaintiffs as well.  Eric Balaban for

14   the plaintiffs.

15        Your Honor, there was -- on April 5th the court

16   ordered that -- sustained the objection of defendants regarding

17   the rebuttal case and allowed the plaintiffs to produce offers

18   of proof from the experts who would have testified.  We've

19   given those to Ms. Lewis to be entered into the record, and

20   we've provided a copy to the defendants.  We simply ask that

21   they be entered into the record in this case.

22        THE COURT:  All right.  They may be offered into the

23   record.

24        MR. BALABAN:  Thank you, Your Honor.

25        MS. JOHNSON:  Your Honor, the only other outstanding

1   matter are deposition designations.  Plaintiffs have tendered

2   all of those to defendants, and defendant has reviewed most of

3   them.  We're still waiting on some of those, and we would just

4   ask the court if we could submit those to the court later this

5   week.  And Mr. Morisani will be able to speak to maybe a

6   deadline.

7            THE COURT:  Yes, sir.

8            MR. MORISANI:  Yes, sir.  We can submit it to them

9   this week.  We can try to submit it to them this afternoon

10  possibly.

11           THE COURT:  All right.  I probably am not going to be

12  here midweek.  I have probably had enough of you people, and

13  I'm going to take a little break.  But we can figure that out.

14  We can keep the record open to accommodate that.

15           MS. JOHNSON:  If it's acceptable to Your Honor, I'm

16  happy to give -- to bring Ms. Lewis hard copies of those

17  designations once they are complete.

18           THE COURT:  All right.  Are we ready for closing

19  arguments at this time now?

20           MS. JOHNSON:  Your Honor, I have a hard copy of the

21  presentation that plaintiffs intend to use during closing.

22  Could I hand it to Your Honor?

23           THE COURT:  Yes, ma'am.

24      (Document Tendered to the Court)

25           MS. JOHNSON:  And can we turn on the gallery monitors?

*** DAILY TRANSCRIPT ***

1          THE COURT:  Yes.  Ms. Johnson, you may proceed.

2                  CLOSING ARGUMENT FOR THE PLAINTIFFS

3          MS. JOHNSON:  Good morning, Your Honor.  May it please

4    the court.  Your Honor, plaintiffs have brought this action

5    because MDOC has failed to provide basic care to the 1200 men

6    who are incarcerated at the East Mississippi Correctional

7    Facility.  MDOC chose to house its most vulnerable prisoners,

8    those who are seriously mentally ill, at EMCF, then contracted

9    the daily operations to for-profit companies and abandoned its

10   responsibility to ensure minimal constitutional requirements

11   are met.  This court cannot allow these constitutional

12   violations to stand.

13         Throughout this trial, the court has heard testimony

14   from 19 prisoners, some of who have been at EMCF for years.

15   They have been housed at different pods -- on different pods at

16   different times, but their experience has been the same:  They

17   are not safe, the environmental conditions are dangerous, they

18   do not receive adequate medical and mental health care.  MDOC's

19   inaction puts them at substantial risk of serious harm.

20         As the Fifth Circuit noted in *Gates v. Cook*, the

21   constitution does not mandate comfortable prisons but neither

22   does it permit inhumane ones.  Prison officials must provide

23   humane conditions of confinement.  They must ensure inmates

24   receive adequate food, clothing, shelter, and medical care and

25   must take reasonable measures to ensure the safety of the

1    inmates.

2         Before we proceed to discuss the evidence related to

3    each of plaintiffs' claims in this matter, Your Honor, I would

4    first like to discuss the applicable legal standard.  The

5    standard in this case is governed by the Supreme Court decision

6    *Farmer v. Brennan*, 511 U.S. 825.

7         First, there is an objective component.  To satisfy

8    it, plaintiffs must show that prison officials' actions or

9    omissions have resulted in a substantial risk of serious harm.

10   The relevant inquiry under *Farmer* is not actual harm, Your

11   Honor.  It is the risk of harm.

12        Prisoners are entitled to relief when a substantial

13   risk of harm is known and ignored by officials.  In citing the

14   U.S. Supreme Court, *Gates* held that an Eighth Amendment

15   violation can be established by a combination of conditions of

16   confinement as long as they have a mutually enforcing effect

17   that produces a depravation of a single identifiable human need

18   such as safety.

19        Your Honor, the second component under *Farmer* is a

20   subjective component.  This component inquires into the prison

21   officials' state of mind in displayed deliberate indifference.

22   Your Honor, as you consider whether MDOC had the requisite

23   knowledge of the substantial risk of harm, it is a question of

24   fact that can be proven by inference through circumstantial

25   evidence.  For instance, the court can infer MDOC's knowledge

1    of these conditions based on the documented number of assaults.

2    In addition, in deciding deliberate indifference, the court can

3    conclude that prison officials knew of the substantial risk of

4    harm because the very risk was obvious.

5         During the past five weeks, Your Honor has heard

6    substantial evidence from plaintiffs' experts as well as from

7    prison witnesses.  The court does not need to solely rely on

8    plaintiffs' witnesses.  The testimony by defendant and its

9    agents and employees include admissions of MDOC's knowledge of

10   deliberate indifference to the substantial risk of serious

11   harm.

12        MDOC believes that it should be absolved of

13   responsibility to the extent that these issues are created by

14   prisoners.  However, the Fifth Circuit noted in *Beck v.*

15   *Lynaugh*, 842 F.2d 759, that is not the applicable standard.

16   Defendant will tell you that these problems happen everywhere,

17   but at EMCF, over the course of several years, these problems

18   have remained and even worsened with no intervention from MDOC.

19        Throughout this case, defendant has criticized

20   plaintiffs for what it has called a scattershot approach to

21   this case because of the multiple claims.  However, there is

22   nothing that prohibits plaintiffs from bringing multiple claims

23   in a single suit.  In here, the pervasive and systemic

24   unconstitutional conditions that exists at EMCF affect the

25   safety and well-being of the entire EMCF class.

1      This court certified the class in 2015 and then denied

2  defendants' motion to decertify because this is the very type

3  of case for which classwide injunctive relief is appropriate.

4      Your Honor, during the past few weeks, plaintiffs have

5  addressed nearly every aspect of prison operations, and it has

6  been necessary to give the court an accurate picture of the

7  depth of the failures and dysfunction at EMCF that create the

8  risk to the class.  Those details and components of day-to-day

9  prison operations go directly to plaintiffs' seven claims.

10      Your Honor, I'd like to move to discuss the individual

11  claims at issue related to the safety and security and the

12  evidence that plaintiffs have presented.  Following that,

13  Ms. Monju will discuss the medical and mental health claims.

14      Plaintiffs claims in this case are:  The protection

15  from harm, the excessive use of force, nutrition, environmental

16  and sanitation conditions, isolation, medical, and mental

17  health.

18      Your Honor, I'll begin by discussing protection from

19  harm.  As Your Honor sees on the screen, plaintiffs have

20  created this visual to depict each of plaintiffs' claims and

21  help the court understand the underlying conditions that relate

22  to them.  These conditions, taken alone or in combination,

23  support a systemic constitutional violation.  The court does

24  not need to find a constitutional violation of each of these

25  conditions individually to conclude plaintiffs have met their

1    burden on each claim.

2            Every prisoner at EMCF is subject to a substantial

3    risk of harm because of MDOC's failure to protect them.  EMCF

4    is dangerous as evidenced by the daily realities:  Assaults,

5    gang members who control daily operations, weapons, officers

6    who fail to perform their basic job functions, and inadequate

7    staffing levels.

8            Your Honor, at EMCF, the rate of assault is extremely

9    high.  They occur every day on every unit in hallways and

10   common areas.  Here Your Honor can see the statistics from 2016

11   and 2017 related to the rate of assaults at EMCF.  Even relying

12   on the assaults data that Your Honor heard from defendants'

13   expert Mr. McGinnis, which was incomplete, the rate of assaults

14   at EMCF in 2016 was ten times higher than the rate of assaults

15   that plaintiffs' corrections experts saw in his system.  Warden

16   Shaw and defendants' experts agreed that you cannot detect all

17   assaults.  So the actual number of prisoners and staff who are

18   assaulted at EMCF is higher than these numbers.

19           More than the risk of harm, Your Honor, at EMCF,

20   MDOC's failure to protect has resulted in actual harm.  Dozens

21   of prisoners have been stabbed, brutally beaten, and suffered

22   from broken bones.

23           Your Honor, next I'd like to talk about the control by

24   gang members.  The staff --

25           THE COURT:  Doesn't -- don't assaults happen in every

1  prison and particularly in prisons handling mental health

2  patients?

3        MS. JOHNSON:  Yes, Your Honor.

4        THE COURT:  You've got all these statistics, and I

5  don't know how to -- you went through lots of time explaining

6  and dividing up in what's an assault and what's not an assault

7  and all of the statistics.

8        Men confined in a jail are going to fight with each

9  other.  Those are assaults.  If there are violent men in

10  prison, the guards are going to have to control them some way.

11  They are going have to use pepper spray or else they're going

12  to have to wrestle them to put shackles on them.  Those happen

13  in every prison, good prisons, and bad prisons.

14        What is the difference in an assault for statistical

15  purposes and an assault which -- of some kind that is to be

16  expected in any prison?  That's -- the differences between the

17  two sides have been very sharp, and the plaintiffs seem to

18  claim that every time a prisoner has some kind of use of force,

19  whether it's violent -- that should not occur or whether it is

20  a matter of wrestling him and getting -- to put shackles on

21  him, where is the dividing line?

22        MS. JOHNSON:  Your Honor, just so -- assaults are when

23  prisoners may assault other prisons or staff members.  The use

24  of force incidents that we've discussed are when staff members

25  use physical force or a chemical agent against a prisoner.

1          And Your Honor is correct.  Assaults do happen in

2     every prison, but what is important at EMCF is the high number

3     of assaults that have happened year after year and the failure

4     of MDOC and the staff at EMCF to take action in order to reduce

5     those, as we discussed based on staffing concerns that other

6     prisoners control day-to-day functions at EMCF.  There is a

7     substantial risk of harm to prisoners presented by these

8     assaults, and there has been no action by MDOC in order to

9     address that risk.

10          THE COURT:  All right.

11          MS. JOHNSON:  Your Honor, the staff at EMCF have

12     abdicated their day-to-day functions to gang members and

13     prisoners.  An e-mail from the contract monitor, Ms. Thomas,

14     documented serious concerns about gang members who are allowed

15     to run the segregation units.  Your Honor, the segregation

16     units are considered what is called a sensitive work area.

17     Gang members should not even be allowed to work there, let

18     alone exert control over other prisoners.

19          Further, Ms. Thomas in 2015 sent three different

20     e-mails regarding specific prisoners that she noted had the

21     ability to control units throughout the prison.  And nearly

22     three years later, Your Honor, during this trial, one of those

23     prisoners still remained on the same unit she had identified

24     where he exerted control.

25          THE COURT:  The defendants are going to argue that

1   that has changed substantially since you collected your

2   depositions and videos and that the violence is down

3   considerably and that the guards are doing a much better job.

4   Where's -- where's the dividing line?

5          MS. JOHNSON:  Your Honor, the defendants have put

6   forward very little evidence to rebut the statistics and

7   evidence that plaintiffs have regarding the numbers and

8   practices at EMCF.  Further, as Ms. Monju will speak to in more

9   detail, this voluntary cessation that defendants may say or

10  these improvements that they cite are insufficient to avoid a

11  liability finding and an Eighth Amendment violation because of

12  those conditions could reoccur.

13         THE COURT:  Any instance can reoccur.  That's kind of

14  a statement without a whole lot of meaning.

15         MS. JOHNSON:  And, Your Honor, excuse me.  Not the

16  specific incidents but the systemic violations and problems

17  related to violence as we're speaking about now.

18         THE COURT:  All right.

19         MS. JOHNSON:  In fact, Your Honor, as you may recall,

20  the control of gang members at EMCF remains such a critical

21  issue that Ms. Thomas felt she could not identify those gang

22  members in open court because she feared for her safety when

23  she returned to work.  You've heard testimony from nearly every

24  prisoner that gangs control daily operations such as where

25  prisoners are housed and passing out food.

```
 1              Next, Your Honor, I'd like to discuss the weapons and
 2    contraband at EMCF.  You heard Warden Shaw talk at length about
 3    the measures that the facility has taken to interdict
 4    contraband:  Putting up netting around the perimeter, adding
 5    scanners at the front entry, a K-9 unit that's there twice a
 6    month.  But these additions were made in 2014, and if you look
 7    at the facility's own data, Your Honor, the number -- the
 8    amount of contraband remains extremely high.
 9              At some point, MDOC should have recognized that these
10    measures were woefully inadequate to address the risk of harm
11    and demanded further action.  The prisoners remain awash in
12    contraband.  The facility documents show that cell phones,
13    knives, hacksaw blades, marijuana, spice, and other drugs are
14    found frequently.  Here Your Honor can see statistics regarding
15    weapons and contraband that were found at EMCF in 2015, 2016
16    and 2017.
17              And as Your Honor has heard testimony, we do agree
18    that not all contraband can be found.  So the actual numbers at
19    EMCF are higher than even these reported statistics, and again
20    the risk of harm presented by this amount of contraband goes
21    directly to the injury to plaintiffs.
22              THE COURT:  Your illustration there says that the 2017
23    contraband is down almost 15 percent from 15 and 16.
24              MS. JOHNSON:  Your Honor --
25              THE COURT:  We've also heard what they've been doing.
```

1    We've also heard from all of your expert -- experts on prisons

2    that there's nothing that can be done about contraband.  It's

3    in every prison.  It's a matter of trying to control it.

4    What's -- where does it get to be unconstitutional?

5              MS. JOHNSON:  Well, Your Honor, just to point out, the

6    statistics from 2017 only include the first half of the year

7    because that's when discovery ended.  So those statistics

8    represent January through June.

9              THE COURT:  Well, that makes it about even then.  All

10   right.

11             MS. JOHNSON:  And, Your Honor, that while contraband

12   exists at every prison, these rates, as you've heard from

13   plaintiffs' experts, Mr. Vail, are extraordinarily high

14   compared to other prisons.  And while efforts can and should be

15   made -- they must be made to reduce contraband -- the efforts

16   that EMCF cites have been ineffective and yet they've done

17   nothing else to address the risk of harm.

18             And, Your Honor, I just want to note that these

19   weapons figures do not even take into account the weapons of

20   opportunity such as mops and broomsticks that Your Honor saw

21   used during a March 2017 riot.

22             Your Honor, the next thing I would like to discuss is

23   the failure of officers to perform their most basic job

24   functions.  This issues has been confirmed by EMCF's own

25   documents as well as testimony during this trial.  For

 1  instance, one repeated issue documented by the contract

 2  monitor, Ms. Thomas, is that officers failed to stay on their

 3  assigned posts.

 4          If officers are not where they are supposed to be, how

 5  can they ensure that prisoners are not engaged in misconduct

 6  and that prisoners are not being injured?  On multiple

 7  occasions, the contract monitor observed staff sitting around

 8  and socializing instead of observing prisoners.  And, Your

 9  Honor, imagine that you need assistance and you're locked in a

10  cell and you're having a medical emergency.

11          Do you know how Deputy Warden Hogans told you that you

12  would have to get a staff member's attention if you were in

13  your cell?  He told this court that you would have to make

14  enough noises to get the picket officer's attention.  That's

15  the same picket officer Your Honor saw that could be 30 to

16  40 yards away from a cell and through up to three locked steel

17  doors.

18          Defendants' expert, Tom --

19          THE COURT:  They're going to argue to me that that has

20  changed with the change of management at the prison,

21  specifically the new warden and that that should not have been

22  the way the prison was run and that it is much better now.

23  What do I believe?  How do I give them credit for making some

24  change?

25          If I agree with you, which I do to a large extent, it

1    was -- seems like in '16 and '17 the inmates were running the

2    prison with the old saw that you hear.  But it appears that

3    things either have changed or are changing.  How do I -- how

4    does a judge in my position handle that situation?

5        MS. JOHNSON:  Well, Your Honor, I'd like to note that

6    Warden Shaw is far from new.  He's been back at the prison

7    since December 2015.  And Warden Hogans' representation about

8    having to make noise to get an officer's attention is not

9    something he described as a former practice, Your Honor.

10   That's a current practice.  There is no way for prisoners to

11   get the attention of officers.

12        And as the court looks at the body of evidence, Your

13   Honor, the system of changes that plaintiffs have presented

14   evidence on cannot be changed in a week or a month.  These are

15   issues that have persisted for years.  And unless there are --

16   to the extent that the court has seen improvements, the court

17   can include those improvements and confirm that they will

18   continue in what it orders in the form of a remedy.  But, Your

19   Honor, the case law is settled that defendant cannot escape

20   liability by making changes on the eve of trial in order -- in

21   an attempt to show that these conditions have been addressed.

22        Your Honor, next I want to briefly talk about

23   defendants' expert, Tom Roth.  He identified EMCF as an

24   indirect supervision prison, but because of the routine

25   failures of staff that the court has heard about, the failure

1    of staff to remain on their posts, it virtually results in a

2    no-supervision prison.

3          You've heard testimony about the importance of

4    elementary security principles such as counts and security

5    checks.  And here, Your Honor, again for over two years the

6    contract monitor found the defendant in noncompliance with

7    being able to conduct counts.  And yet during that very same

8    time frame, Your Honor, the prison reduced its preservice

9    training on counts from an hour to 30 minutes.  They were not

10   doing counts well, and then offered even less training on them.

11         The court has also heard a lot of testimony about

12   locks in this case.  It's an important measure for officers to

13   be able to securely place somebody in their cell and know that

14   they are going to stay there.

15         Defendants' lock expert, Mr. Stonehouse, testified

16   that he inspected locks on Units 1, 5 and 6, and the locks

17   appeared to be installed and maintained properly.  But even

18   during his inspection, he found that some of the sliding doors

19   on 5 and 6 had been jammed by prisoners.  And, yes, he

20   testified and told this court that prisoners at other

21   facilities also jam doors, but when plaintiffs' counsel

22   inquired and asked, "So how is it that at every other prison in

23   America doesn't have inmates just running wild all the time,"

24   Mr. Stonehouse responded, "Their staff takes measures to

25   correct the problem."  At EMCF, they do nothing.

1          Your Honor, even more so, you've seen facility

2     documentation of routinely unsecured doors.  You saw the

3     March 2017 riot where dozens of prisons were out of their cells

4     during an MDOC mandated facilitywide lockdown.  And when Warden

5     Hogans testified about that incident and that there was an

6     investigation, that investigation did not include how so many

7     prisoners were able to exit their cells.

8          Your Honor, next I'd like to speak about the overall

9     staffing problem at EMCF.  Operating a prison requires enough

10    officers to perform the daily tasks.  On many days, EMCF does

11    not even have enough officers to fill the mandatory posts.

12    Your Honor has seen many examples like this shift roster on the

13    screen now.  And each of the red highlighted places shows a

14    mandatory position on this day that was vacant.  This is not an

15    anomaly, Your Honor.  This is an example of numerous shift

16    rosters in which mandatory posts are vacant.

17         In addition, as the court heard plaintiffs' expert,

18    Mr. Vail, testify, the staffing model at EMCF places officers

19    outside of the pods where they're unable to supervise and

20    directly interact with prisoners.  This adds to the

21    dangerousness of the prison.  It creates a substantial risk of

22    harm to prisoners whereas you have seen there are instances

23    where staff are delayed or failed to respond to assaults that

24    happened in plain site.

25         THE COURT:  Is it the plaintiffs' position that there

1    should be an officer or more than one officer inside the pods

2    at all times?

3         MS. JOHNSON:  Yes, Your Honor.  That was Mr. Vail's

4    recommendation that depending on the custody level, there may

5    need to be -- there should be at least one officer in the pods,

6    as is the practice at other prisons.  And as the court may

7    recall, defendants' own expert's only -- only comment as to why

8    that could not happen was that officers didn't have what he

9    called a work area in the pod.  Your Honor, that's something

10   defendants could easily create by putting an area in each pod

11   where officers could complete their paperwork and tend to their

12   other tasks while actively supervising prisoners.

13        THE COURT:  It would -- I did not understand this from

14   any of the experts as to what proper staffing would actually

15   be.  There's lots of discussion about it but not much in the

16   way of direct information.  As I understand it, the expert --

17   none of the experts argued with the fact that particularly

18   prisoners in Unit 5, the mentally disturbed, who need go to

19   medical or to mental health and so forth needed to be escorted

20   by guards, staff members, and that they needed to have two of

21   them take one person -- every one person down to another part

22   of the building.

23        Nobody was clear about whether those would be officers

24   on the floor of the pod or inside the locked doors.  The

25   pods -- each unit has four pods.  So that would take eight

1    full-time officers all the time plus escort officers.  Is that

2    what the plaintiffs are recommending to the court that is

3    proper staffing?

4         MS. JOHNSON:  That's part of the staffing issue, Your

5    Honor.  And I think --

6         THE COURT:  That's not my question.  I asked you a

7    direct question.  Is that the minimum amount of staffing for

8    each unit in the place, or is it different for Unit 5 from the

9    other units?

10        MS. JOHNSON:  It would vary, Your Honor, based on the

11   classification, and that was Mr. Vail's recommendation.

12        THE COURT:  Is two per pod in Unit 5 what the

13   plaintiffs are arguing is minimum staffing?

14        MS. JOHNSON:  Yes, Your Honor.  But there would need

15   to be additional officers that might be referred to as utility

16   or escort officers so that prisoners can go to appointments and

17   to showers and recreation.

18        THE COURT:  All right.  So it's a minimum of eight

19   officers on a four-pod unit plus escort officers.

20        MS. JOHNSON:  Yes, Your Honor.

21        THE COURT:  And, of course, the picket officers --

22   officer.  Is that correct?

23        MS. JOHNSON:  Yes, Your Honor.

24        THE COURT:  And how many more people does that add to

25   the shift -- the shift roster --

1        MS. JOHNSON:  Your Honor, if you see --

2        THE COURT:  -- for the whole prison?

3        MS. JOHNSON:  If you see on the right-hand side for

4   Unit 5, currently there are two officers assigned per pod, but

5   all of those posts are not filled, and the additional escort or

6   utility officers, that's not a mandatory post.  And so that

7   position may or may not be filled.

8        The staffing that plaintiffs are suggesting are all

9   mandatory.  And as you might recall, Mr. Donald said you need

10  eight or nine staff members on Housing Unit 5 to be able to run

11  it during at least the day shifts.

12       THE COURT:  All right.  I'm trying to get a direct

13  answer as to what the plaintiffs say is an absolute minimum for

14  Unit 5 for staffing on any shift.  And if it can be less for

15  the third shift, I want that answer.  But I'm not getting it.

16  What is the minimum number of staff that should be on the day

17  shift or the first shift for Unit 5?

18       MS. JOHNSON:  Two officers per pod plus additional

19  officers as floaters or escort officers and a picket officer.

20  And on the units that are less -- the classification is minimum

21  or medium, one officer per pod.  Housing Unit 5 because it has

22  segregation needs more officers than the other units.

23       THE COURT:  And this shift roster for November 1st of

24  2016 has how many -- how do I read this?  How do I -- if I were

25  to find for the plaintiffs and grant injunctive relief, how

1    would I go about trying to fill in the blanks here and order

2    that X number of employees should be in the prison for the

3    first shift of every shift?

4        MS. JOHNSON:  Your Honor, the beginning of that

5    analysis would be that based on the custody level there should

6    be a certain number of officers per pod.

7        THE COURT:  Custody level is going -- I said for the

8    whole first shift.  The custody level is going to be the same

9    today, tomorrow, and the next day.  They're going to be

10   different custody levels for different units in the prison, but

11   how do I add all of that up and say, "All right.  There needs

12   to be 20 employees in that building at all times, there need to

13   be 60, or there need to be 100 on the first shift"?  Have you

14   given me any information like that?

15       MS. JOHNSON:  Yes, Your Honor.  We believe that on

16   first shift based on the current population at EMCF, every

17   close custody unit zone pod would require two officers.  And so

18   based on this shift roster, Your Honor, that would be all of

19   Housing Unit 5, Housing Unit 6 Delta and Housing Unit 3

20   Charlie.  Those would require two officers in the pods.

21       For the other zones, Your Honor, there would need to

22   be at least one floor officer in each of the pods.  I don't --

23   in addition to the supervisory staff.  I don't have a total

24   number off the top my head, but that is a calculation that

25   plaintiffs could provide in our posttrial briefing.

```
 1              THE COURT:  I don't know how you expect me to produce
 2    a number out of the blue if you haven't produced it to me.
 3    That's what I'm asking.  You've also got to have workers in the
 4    kitchen.  You've got to have the people teaching classes.
 5    You've got to have -- as well as other guards.  All of that
 6    goes into it.
 7              MS. JOHNSON:  It does, Your Honor.  And to be clear,
 8    this shift roster reflects correctional officers, not teachers
 9    or program staff that are calculated separately.
10              And, Your Honor, part of the staffing problem at EMCF
11    is that there's not enough staff.  And then even the staff who
12    are there, they're not used or deployed properly throughout the
13    prison in order to cover mandatory posts and ensure that these
14    basic functions are happening on a regular basis.
15              THE COURT:  All right.  Well, I asked one of the
16    expert witnesses did he find anything right about the prison,
17    and he never did answer that question because he had lots of
18    prongs.  If I'm going to produce a -- something that moves from
19    constitutional to -- unconstitutional to constitutional, are
20    y'all going to give me a plan --
21              MS. JOHNSON:  Your Honor, that's --
22              THE COURT:  -- so that I can compare it with what's
23    there, or are you just going to say, "Well, there needs to be
24    two on the floor"?
25              MS. JOHNSON:  Well, Your Honor, that was a
```

1    recommendation by plaintiffs' expert.  But in addition, one of

2    the remedies the court can order is a proper staffing analysis

3    that would give the court that number from a subject matter

4    expert.

5         THE COURT:  So the answer is you are not going to give

6    me a specific number.

7         MS. JOHNSON:  Your Honor, the number I've given

8    related to the housing units.

9         THE COURT:  You can do whatever you wish.  I'm just

10   telling you that -- what would be helpful to me, and you

11   apparently are not going to do that, but go ahead.  Go ahead

12   with your argument.  Excuse me for interrupting you.

13        MS. JOHNSON:  Your Honor, related to the staffing

14   issue, I think the housing unit staffing is a place where

15   plaintiffs have provided the specific recommendation of at

16   least one officer in each pod.  And beyond that, plaintiffs

17   could provide --

18        THE COURT:  Don't repeat that to me.  I've heard that

19   about four times now, and I've asked you a specific question

20   about total number of employees that need to be there, and you

21   are not prepared to answer that.  So go ahead with your

22   argument somewhere else.

23        MS. JOHNSON:  Thank you, Your Honor.  Your Honor, the

24   issues that have been discussed related to plaintiffs'

25   protection from harm claim and MDOC's failure to respond to

1   them demonstrated deliberate indifference by MDOC over the past

2   several years despite its knowledge of the risk of harm to the

3   prisoners at EMCF.  The contract monitor has addressed those

4   areas -- has identified these issues but nothing has been done

5   to address them.

6           Next, Your Honor, I'd like to discuss plaintiffs' use

7   of force claim.

8           THE COURT:  I believe you've got about five minutes

9   left, but I'm -- I don't know that I made correct notes on when

10  you started.

11          MS. JOHNSON:  That's about right, Your Honor.  I will

12  be moving quickly through the rest of the claims.  Your Honor,

13  as plaintiffs have presented evidence related to the use of

14  force, one of the key problems is staffs' failure to comply

15  with MDOC policy.  There's both unavoidable -- there's

16  avoidable and unnecessary use of force at EMCF, the prison that

17  houses most severely mentally ill prisoners.

18          One of the critical aspects of use of force, Your

19  Honor, must be deescalation.  And it means, as the court has

20  heard testimony, that mental health staff should come during a

21  planned use of force and attempt to speak to the prisoner.  As

22  Your Honor has heard from the warden and from Christopher

23  Dykes, that has not always happened.

24          Mental health counselors make a determination as to

25  whether or not a prisoner is suffering from mental health

 1    systems without ever laying eyes on them in many cases.  And as

 2    Your Honor heard mental health counselor Pickering testify,

 3    prisoners can deteriorate and decompensate while in

 4    segregation, even those that don't have preexisting mental

 5    health conditions, which is why deescalation is so critical in

 6    use of force.

 7         THE COURT:  Is the plaintiffs' position that solitary

 8    confinement is never proper?

 9         MS. JOHNSON:  That has not been our position, Your

10    Honor.  Our position related to isolation is that it does have

11    severe harmful effects and that it's un- -- it should be used

12    for a very limited amount of time.  And if it is needed for

13    lengthy periods of time -- Your Honor, at EMCF it's used for

14    months and even years -- that there should be units such as

15    Dr. Kupers discussed that are restrictive to meet the security

16    needs but also allow an environment where prisoners are not

17    subject to such severe isolation.

18         Additionally, Your Honor, the practice across the

19    country has been to move toward a trend where prisoners with

20    severe mental illness are categorically excluded from solitary

21    confinement.  You heard plaintiffs' experts testify about that

22    and defendants' experts Ken McGinnis also agreed that seriously

23    mentally ill prisoners should not be housed in segregation

24    units like Unit 5 at EMCF.  And this trend is happening in many

25    other systems because --

1      THE COURT:  For more than 30 days or less -- one of

2  the experts agreed that there's got to be a use of solitary

3  confinement for mental health people for some period of time.

4  I think he said a maximum -- he finally agreed to a maximum of

5  either 20 or 30 days.  I have forgotten which.

6      I never understood how you were going to work a

7  severely mentally deranged prisoner down enough in a relatively

8  short period of time to let him out of solitary.  It was not

9  clear to me, and I still don't know what the argument of

10  plaintiffs is as to whether there needs to be -- whether you

11  recognized that the prison has to have some solitary

12  confinement for -- particularly for these severely mentally

13  affected prisoners, or do you take them out after X number of

14  days if you're going to have it, and then what do you do with

15  them?  How do you control the ones that simply have to be

16  controlled, that are dangerous, as opposed to some that

17  probably everyone would agree that take them out after a

18  certain period of time and tell them to behave themselves and

19  if they don't -- you have to have some way to punish them and

20  you put them back in?  What's the solution?

21      MS. JOHNSON:  Well, Your Honor, prisoners who are

22  severe -- seriously mentally ill, the consensus is they should

23  not be placed in solitary confinement but they can be placed in

24  other restrictive housing which would allow the security

25  measures that Your Honor is referencing as necessary for safety

 1   but would ensure that there's programming and treatment and

 2   services so that they don't further decompensate.

 3           As Your Honor has heard, prisoners who are in solitary

 4   experience severe consequences such as paranoia, self-injurious

 5   behavior such as cutting, and those symptoms are worsened in

 6   solitary.

 7           THE COURT:  Yes, ma'am.  There are all kinds of horror

 8   stories.  But there are all kinds of horror stories in private

 9   facilities that people pay a lot of money for where the

10   people -- the patients are getting what you would classify as

11   supposedly much better care than they are in this prison or any

12   other prisons, for that matter.  Where -- how do you handle

13   these people?  You can't just turn them loose on the street.

14           MS. JOHNSON:  You provide programs and services and

15   treatment, Your Honor.  And that's what --

16           THE COURT:  It doesn't work in many cases.  Programs

17   and treatment and services do not work.  You've got to simply

18   be able to house them in humane conditions.  And I'm trying to

19   find the line, and I don't know how to find it.  That's what

20   I'm asking you.

21           MS. JOHNSON:  Part of those humane conditions would

22   include opportunities for interaction as appropriate, Your

23   Honor.  There are restrictive housing settings

24   in corrections --

25           THE COURT:  Is an hour in the cage by himself outside

1    of his cell every day adequate?  Is an hour and a half?  Is it

2    two hours?  Is it half the day?  How do you gage what's going

3    on in somebody's mind, particularly if they have severe mental

4    illness?  Where -- that's to be done?

5         MS. JOHNSON:  Your Honor, many systems because of the

6    need for an individual determination have a robust assessment

7    before prisoners are placed in segregation and assess them

8    throughout their time in segregation.  And so, Your Honor, at

9    EMCF that doesn't happen.  And so if a prisoner is placed in

10   segregation, there should be a comprehensive assessment, and

11   they should be monitored and checked by the appropriate mental

12   health and security staff to determine whether they've

13   exhibited and can be released from solitary or whether what

14   additional services may be needed to ensure that they're --

15        THE COURT:  Where does the state of Mississippi find

16   enough competent psychiatrists who are willing to come to a

17   rural area outside of a relatively small Mississippi town to

18   man a facility like this?

19        MS. JOHNSON:  Well, Your Honor, the department has

20   designated EMCF to be the prison, and it could change that

21   designation if it thought that a prison, per se, closer to

22   Jackson, such as the one in Rankin County, would be better able

23   to staff and provide adequate mental health services.  It

24   cannot hide behind and fail to provide those services simply

25   based on the location of the prison.  It has to make -- it has

```
1   to take steps.

2           THE COURT:  But suppose competent mental health

3   people, psychiatrists particularly, counselors of high quality,

4   nurses of high quality, we have problems throughout the state

5   in private facilities finding adequate doctors and nurses to

6   staff.  How does the state do this as a practical matter --

7           MS. JOHNSON:  Your Honor, as a practical --

8           THE COURT:  -- to get to the quality that you would

9   like to have which is arguably more than constitutional

10  requirements?

11          MS. JOHNSON:  Your Honor, states across the country

12  engage in recruiting practices, other incentives to maintain a

13  work force.  There is no constitutional exception to providing

14  basic care based on the work force.  MDOC would have to take

15  the necessary measures and by its contractor ensuring that

16  those positions are staffed and if not making the necessary

17  adjustments to ensure that it can provide basic care.

18          THE COURT:  All right.  I think you've used your time.

19          MS. JOHNSON:  I have, Your Honor.  If I could just

20  briefly close on the safety and security issues.  Your Honor,

21  in total, plaintiffs' safety and security issues include our

22  claims regarding protection from harm, excessive use of force,

23  nutrition, sanitary environment, as well as solitary

24  confinement.  As I've discussed, Your Honor, MDOC demonstrated

25  deliberate indifference as it relates to these issues.  They've
```

 1    been well documented for years and passed up the MDOC chain of

 2    command.  For instance, Tony Compton, the director of private

 3    and regional facilities, acknowledged that he's responsible for

 4    the safety and security operations at the private prison such

 5    as EMCF.  And at least as relates to counts, he admitted that

 6    he's done nothing with this information.

 7              Your Honor also heard from Jerry Williams, a named

 8    defendant who's the deputy commissioner of institutions, who

 9    had testified that problems should not go unfixed week after

10    weak or month after month as has been the case at EMCF.

11              THE COURT:  If you want Ms. Monju to testify, you had

12    better leave her some time.  Not testify; to argue.

13              MS. JOHNSON:  Your Honor, I would just assert that the

14    commissioner has also been aware of these issues.  The

15    litigation has existed since she has been in office, and MDOC

16    has acted with deliberate indifference to plaintiffs' safety

17    and security claims.

18              And I will turn the rest of my time to Ms. Monju.

19              THE COURT:  Thank you.  Ms. Monju, can we agree with

20    how much she has left you?

21              MS. MONJU:  Yes, Your Honor, we'll check that.  We

22    have 45 minutes remaining, Your Honor, out of the hour and a

23    half.  If I could have a warning at 35 minutes, that would be

24    appreciated.

25              THE COURT:  All right.

```
 1            CONTINUED CLOSING ARGUMENT FOR THE PLAINTIFFS

 2            MS. MONJU:  Good morning, Your Honor, and may it

 3    please the court.

 4            I'll be speaking about plaintiffs' final two claims

 5    regarding medical and mental health care at EMCF.  I'll be

 6    doing this in a fairly summary form so if there is anything I

 7    can elaborate on for Your Honor, please just let me know.

 8            With respect to plaintiffs' medical claim, plaintiffs

 9    seeks relief on behalf of the entire EMCF class.  The standard

10    is the same for plaintiffs' medical claims as it is for

11    plaintiffs' other claims.  Prison officials violate the Eighth

12    Amendment when they are deliberately indifferent to a

13    prisoner's substantial risk of serious harm.  That includes

14    deliberate indifference to serious medical needs.

15            Plaintiffs have provided overwhelming evidence that

16    satisfies this standard.  For example, plaintiffs' experts,

17    Dr. Marc Stern and Madeleine LaMarre, testified that the

18    medical system at EMCF is broken.  Plaintiffs also presented

19    substantial testimony from prisoners that they are routinely

20    denied access to medical care.

21            But you needn't take their word for it.  Plaintiffs

22    have introduced hundreds of defendants' own documents

23    corroborating this testimony.  For example, plaintiff submitted

24    continuous quality improvement, or CQI, reports, tracking

25    failings in care.  They've submitted medical records and
```

1    internal audits all showing that care at EMCF fails again and

2    again.

3         All of this testimony and all of these documents show

4    that deficiencies in medical care at EMCF are longstanding,

5    pervasive, and obvious and that they are well known to MDOC.

6         Before I discuss those specific deficiencies, Your

7    Honor, I would be remiss to ignore defendants' response to this

8    evidence.  Defendants did not designate a single expert to

9    respond to plaintiffs' allegations regarding the adequacy of

10   medical care at EMCF.  They did not submit a single document.

11        Instead, defendants' solely called their new

12   physician, Dr. Patrick Arnold, to testify about care at EMCF.

13   But Dr. Arnold admitted that he has no idea what care was like

14   at EMCF prior to August 2017.  He admitted that he doesn't

15   supervise nurses who provide the vast majority of care at EMCF.

16   And he admitted that he knows so little about the conditions at

17   EMCF that he's never even been to the housing units which are

18   quite literally down the hall from his office.  Dr. Arnold is

19   simply not a rebuttal to plaintiffs' evidence.

20        I'll now discuss the -- some of the systemic

21   deficiencies in the medical care at EMCF.  Your Honor, first,

22   MDOC denies prisoners timely access to episodic or nonurgent

23   care.  As Your Honor learned, prisoners access episodic care

24   through something called a sick call request form.  These forms

25   are supposed to be accessible and confidential, but at EMCF

1    they are neither.

2            MDOC's own contract monitor reports reflect that as a

3    general matter sick call forms are not available on all the

4    housing units.  And as Your Honor saw at EMCF, prisoners cannot

5    drop off their sick call request forms in the locked boxes

6    confidentially because those boxes are behind a locked door.

7    Prisoners have to give those forms to guards, destroying

8    confidentiality and making it more likely that prisoners won't

9    report their serious medical needs and won't get care.

10            After sick call forms are placed in the box, they are

11    supposed to be triaged within 24 hours.  That's because if

12    prisoners have serious medical needs, they need to be seen

13    quickly.  But, again, MDOC's own documents show this isn't

14    happening.

15            Once prisoner sick call requests are triaged, they are

16    supposed to be referred to a doctor or nurse practitioner for

17    more serious concerns and seen within seven days.  Again,

18    MDOC's own documents show this isn't happening.

19            In fact, the sick call process is so broken at EMCF

20    that despite the fact that there was a very brief improvement

21    in patients' abilities to see the doctor at EMCF, that

22    improvement had disappeared by the time of trial.

23            THE COURT:  What are you recommending?  I assume that

24    if somebody is attacked and beat up and is bleeding or has a

25    severe knife wound or something like that, that needs emergency

1    care.  And I assume -- I would agree with you.  It does and it

2    should be available on a reasonably prompt basis.  I know that

3    for my family to get to see -- get an appointment with a doctor

4    that we can and do pay for, there's no problem with that at

5    all, and we think that they are the best we can find, it

6    sometimes takes days or weeks to get an appointment with

7    somebody.  Hopefully we can get an appointment, but we can't

8    get an appointment usually with the doctor that we would like

9    on an emergency basis.  We have to use the emergency room.

10         What should happen in the prison?  What's wrong with

11   the doctor seeing the patient the next day on a non

12   life-threatening situation, even though he's uncomfortable or

13   has a headache or has even a wound that's not an emergency

14   situation?  What's the correct quality of medical care in a

15   prison?

16         MS. MONJU:  So, for example, Your Honor, when we talk

17   about episodic care, it actually includes life-threatening

18   situations as well.  For example, prisoners who have had

19   serious chest pains and histories of heart disease have had to

20   submit sick call request forms, and that's the only way they

21   can get to the doctor.

22         But if a nurse doesn't look at those forms within 24

23   hours like they're required to do by MDOC policy, frankly, Your

24   Honor, there's a chance that patients could die.  Even for less

25   serious concerns, patients -- still with quite serious concerns

1    for patients who have to see the doctor, they're not seeing the

2    doctor the next day.  They're not seeing him the next week.

3          MDOC's chief medical officer, Dr. Perry, testified

4    there's still a backlog of sick call requests forms for

5    doctors.  So this isn't a case where it's taking a few days to

6    see a doctor for a headache.  This is a case where patients

7    with life-threaten conditions that aren't openly bleeding are

8    taking days, weeks, and sometimes years to see a doctor.  And

9    so we would just --

10          THE COURT:  And I heard numerous instances where

11    prisoners were taken to the closest emergency room available

12    for emergency care.  And either -- and there was a lot of to-do

13    about whether they went in an ambulance or in a van, but they

14    got to an emergency -- their emergency needs seemed to be taken

15    care of.  What are you -- I have seen you introduce reams of

16    medical records that have to be produced by somebody.

17    Somebody's taking time to see the people.  What's the correct

18    balance here?  What's constitutional or what's not

19    constitutional?

20          MS. MONJU:  Absolutely, Your Honor.  I would make two

21    points.  The first is that I think as you've seen throughout

22    this trial, MDOC and EMCF write a lot down.  They write down

23    CQI reports.  They write down contract monitor reports.  They

24    write down clinical visits and medical records.  But what they

25    are not getting is results.  They're not responding to any of

1    the problems that are appearing in these records, and that's

2    where plaintiffs' concern is.

3          So, for example, Your Honor said that people are

4    getting care, and we're not denying that they are.  I mean, I

5    think if a prisoner is stabbed and they're openly bleeding,

6    sometimes they go to the emergency room.  But it's simply not

7    constitutional for prisoners to be subject to a game of luck

8    about whether they're going get medical care.

9          THE COURT:  You've introduced proof, I believe, of

10   only one death in four or five years worth of evidence

11   presented in this case.

12         MS. MONJU:  Oh, no, your Honor.  There was one

13   suicide, but there have been many, many deaths.  I can talk

14   about one where prisoners weren't able to get guards'

15   attention.  They were banging on their cells trying to get

16   guards' attention because a man was unconscious on the floor in

17   his own urine and feces, and guards ignored them for hours, and

18   he died later that day.

19         You heard testimony about guards walking past a

20   prisoner who was choking.  He died.  There have been five

21   deaths at EMCF in this year alone, and that's with the court

22   watching conditions at EMCF.  There are many, many deaths, and

23   there are deaths in Dr. Stern's and -- Dr. Stern's report where

24   he says he can't definitively say that EMCF caused the

25   prisoners' death -- he wasn't there -- but he said that EMCF

1    deprived the prisoners of every chance they had at life.

2         And those are the problems plaintiffs complain of,

3    Your Honor.  It's simply not fair.  It's simply not

4    constitutional that prisoners are subject to a game of luck of

5    whether they will live or die at EMCF.

6         THE COURT:  Has medical care improved with the setting

7    up of the infirmary or medical clinic or whatever we're calling

8    the new unit that has been organized within the last year?

9         MS. JOHNSON:  Right, your Honor.  So that's Housing

10   Units 7, and it's what defendants call their acute care unit.

11   So a couple of points to make about that.  First, it has

12   nothing to do with medical care.  There's no medical care

13   provided there.  It's had no impact whatsoever on the quality

14   of medical care.  It's a mental health unit.  It was

15   established 19 days before trial, 19 days.  It's barely even in

16   existence.  It's only treated --

17        THE COURT:  You'd rather have it than not have it.

18        MS. MONJU:  Absolutely, Your Honor.  Plaintiffs are

19   not denying that.  But it's treated five patients out of a case

20   load of over 1,000 with serious --

21        THE COURT:  Has medical care improvement?  We had the

22   doctor testify.  He didn't even have a doctor on site until he

23   came on.  I've forgotten when -- what day.

24        MS. MONJU:  August 2017, Your Honor.

25        THE COURT:  You certainly would agree that that is an

1   improvement.

2          MS. MONJU:  Your Honor, we would much prefer to have a

3   doctor on staff than to not have a doctor on staff.  But as

4   Dr. Arnold himself testified, he does not oversee the vast

5   majority of care at EMCF.  Plaintiffs' experts have identified

6   several deficiencies in care, including nursing -- nurses

7   practicing outside of the scope of their licensure, nurses

8   ignoring significant evidence that plaintiffs who had

9   life-threatening conditions in treating them inappropriately,

10  several problems with nurses that Dr. Arnold simply has nothing

11  to do with.

12         Just as an example, MDOC policy requires that a doctor

13  or nurse practitioner conduct rounds in the medical unit.

14  That's where the most ill patients are.  The doctor said

15  himself he doesn't do it.  He doesn't treat EMCF's most acutely

16  ill patients, and he leaves that to nurses who frankly,

17  Ms. LaMarre said, were extremely poor.

18         THE COURT:  Medical care, at least in my family's

19  experience in the last few years, is that you rarely see an

20  M.D. before you see a nurse practitioner.  And a lot of times

21  you never get to the doctor.

22         MS. MONJU:  And I think that supports our point, Your

23  Honor.

24         THE COURT:  Is that not the way this system is run?

25         MS. MONJU:  That is the way the system is run, and

1    that's not plaintiffs' complaint.  Not every prisoner needs to

2    see a doctor.  The problem is the nurses they are seeing aren't

3    doing their jobs, and it's putting patients at risk.

4         And, Your Honor, a really simple way to improve a lot

5    of conditions at EMCF with respect to medical care would be to

6    first, as you and I have discussed, there aren't enough staff

7    there, and MDOC frankly has no idea how many staff they need at

8    EMCF.  They've never done a staffing analysis.

9         Second, there are pretty good policies in place of

10   EMCF.  Nurse LaMarre would charge a few of them, but they're

11   pretty good.  And I think a huge issue is that the staff simply

12   aren't following those policies.  Care would improve quite a

13   bit if staff at MDOC were adequately staffed and if they

14   followed those policies.

15        THE COURT:  What is a judge in a case like this

16   supposed to do?  Tell the state of Mississippi and the medical

17   contractor to put "X" number of doctors on staff?

18        MS. MONJU:  So, Your Honor, we have actually proposed,

19   I think, numbers that would make a lot of sense because they

20   come directly from MDOC's health care vendor, Centurion.  As

21   can you see on this chart, Centurion proposed a staffing plan

22   in 2015 that MDOC rejected.  MDOC slashed the amount of

23   staffing in that plan.  We think this would be a great place to

24   start.

25        But, frankly, Your Honor, what EMCF really needs is an

1  expert to assess the needs of the facility and to tell MDOC how

2  many staff they need there, and that is certainly something

3  that's within Your Honor's power to order.

4        THE COURT:  All right.  Thank you.

5        MS. MONJU:  I'll just keep talking about a couple of

6  failings in access to care at EMCF.  As an example, plaintiffs'

7  expert, Ms. LaMarre, found patients with chronic disease likes

8  diabetes, asthma, and heart disease that weren't getting

9  chronic care.  They are also problems with patients not being

10  escorted to appointments because there are too few security

11  staff to bring them.  And because of this security

12  understaffing, patients aren't getting the care they need.

13        I can also talk about the medication administration

14  problems you've heard of.  It's called pill call.  MDOC's chief

15  medical officer says pill call needs to happen within the same

16  hour and a half window every single day because prisoners are

17  getting medications that they have to receive at the same time.

18  But as Your Honor heard from prisoners and have seen in medical

19  records, because there's such short staffing at EMCF, nurses

20  can only get pill call done at 9 a.m., noon, 3 a.m., 2 a.m.

21  It's all over the map.  And that's only when pill call occurs

22  at all.

23        You heard from Warden Shaw directly that sometime pill

24  call just doesn't happen.  That means prisoners who are

25  vulnerable and mentally ill, the sickest prisoners in the state

1    of Mississippi, aren't getting their medications and Your Honor

2    can see the results of that.  Prisoners are sick, they're

3    violent, they're not getting better, and it puts all prisoners

4    at risk.

5         You also received testimony about the fact that

6    medication administration is so broken at EMCF that there are

7    medications called stat and now medications.  Dr. Stern

8    testified these are medications like nitroglycerine that need

9    to be administered within minutes or even seconds.  But as Your

10   Honor can see on this chart, EMCF can't manage to get these

11   medications to prisoners within 24 hours.  That's outrageous.

12        And, Your Honor, the problems with medication

13   administration at EMCF were evident on that witness stand.

14   Mr. Merlin Hill testified that EMCF was not giving him his

15   medications for his fatal seizure disorder and as a result he

16   was racked with tremors while he was testifying.  Your Honor,

17   medication administration is so bad at EMCF that they couldn't

18   prevent Merlin Hill from tremoring in front of Your Honor while

19   he was testifying.

20        Mr. Merlin Hill is not unique in a population nearly

21   all of whom are on medication.  This is a massive problem at

22   EMCF, and MDOC has provided no rebuttal to it.

23        Those are some of the most glaring deficiencies in

24   medical care, Your Honor, but I will also briefly summarize

25   that you've heard the medical record system is poorly designed

1  and it's difficult to use and it results in inaccurate records

2  that endanger patient care.

3       You've also heard that EMCF lacks adequate clinic

4  space, equipment and supplies, and you've heard that EMCF's

5  dental care is deficient as are its transfer screening where

6  it's supposed to catch all of the diseases prisoners have when

7  they come in the door so they get adequate treatment, and MDOC

8  has provided no evidence to rebut those deficiencies.

9       Your Honor, as I've discussed, a common thread through

10  all of this is that there just isn't sufficient staffing at

11  EMCF to get the job done.  It's why pill call doesn't happen.

12  It's why they're not seeing the doctor in time.  It's why

13  they're not getting the care they need.  And a result, all of

14  these deficiencies that I've just discussed are subjecting

15  prisoners to a substantial risk of serious harm.  MDOC has been

16  aware of that risk for years, and it's done nothing.

17       If Your Honor doesn't have any more questions about

18  medical care, I can move on to mental health care.

19       THE COURT:  Thank you.

20       MS. MONJU:  Your Honor, with respect to plaintiffs'

21  mental health claim, plaintiffs bring that on behalf of the

22  mental health subclass.  Those are all the prisoners at EMCF

23  who have or may have mental illnesses.  As the Fifth Circuit

24  held in *Gates v. Cook*, mental health issues are just as serious

25  as physical ones.  Therefore, prisons officials violate the

1  Eighth Amendment if they are deliberately indifferent to

2  prisoners' mental health needs.

3          As Your Honor learned during trial, MDOC has placed

4  over 1,000 prisoners with mental illnesses at EMCF.  But

5  Dr. Bruce Gage, plaintiffs' expert, has testified that MDOC has

6  housed those prisoners at EMCF but it's failed to provide them

7  with even basic medical -- mental health care for their

8  illnesses.

9          Dr. Bruce Gage's testimony is supported by MDOC's own

10 CQI records, internal audits, and medical records, all

11 substantiating that patients at EMCF are not getting the mental

12 health care they need.

13         Again, as with medical, defendant has done so little

14 to rebut plaintiffs' overwhelming evidence that many of

15 plaintiffs' allegations remain entirely unrebutted.  For

16 example, MDOC again designated no mental health expert to

17 discuss care at EMCF.  MDOC couldn't even be bothered to call

18 it's own statewide mental health director to discuss mental

19 health care at EMCF.  And as far as documents go, defendant

20 submitted a single page from a single medical record regarding

21 a single encounter with a psychiatrist who is no longer on

22 staff at EMCF.

23         I'll talk about several of the deficiencies in mental

24 health care at EMCF now.  First, Your Honor, prisoners at EMCF

25 don't receive adequate treatment planing, if they receive

 1   treatment planning at all.  As Your Honor learned during trial,

 2   mental health treatment plans are fundamental to patient care

 3   because these are the road maps mental health care providers

 4   use to provide care to patients.  But MDOC's own documents show

 5   that significant improvements are needed at EMCF with respect

 6   to treatment plans.

 7        For example, an internal audit in December 2017 of

 8   mental health care at EMCF found that 40 percent of patients at

 9   EMCF, based on sampled records, did not have treatment plans.

10   And of the treatment plans that existed, 50 percent didn't have

11   crucial information for patient care.

12        MDOC's entire response to this is to ask Nurse Dunn

13   if, in fact, patients do have treatment plans.  Unsurprisingly,

14   Nurse Dunn said yes, but her response simply isn't credible,

15   when MDOC's own internal documents show that a vast number of

16   prisoners at EMCF do not have treatment plans.

17        EMCF staff also failed to provide timely, meaningful,

18   and confidential mental health therapy to prisoners.  Mental

19   health therapy is woefully inadequate at EMCF.  Dr. Gage

20   testified that he found no evidence of individual therapy at

21   EMCF and minimal evidence of group therapy, despite the fact

22   that MDOC policies and Centurion policies require individual

23   and group therapy.

24        THE COURT:  I thought some of the nurse practitioners

25   in the mental health unit were providing at least some therapy

1        to the prisoners.  Do you disagree with that?

2               MS. MONJU:  So there is very minimal therapy offered

3        to some prisoners erratically.  It's hard to say who gets it

4        when and why, but MDOC's own records cite significant

5        shortcomings in mental health care which go back to a lack of

6        staffing, inadequate staff training, and a lack of proper

7        policies requiring that care.

8               So, for example, I can talk about the residential

9        treatment unit at EMCF.  This is housing Unit 3.  And it's

10       where the most seriously ill mental health patients at EMCF are

11       supposed to be housed.

12              But as Your Honor can see from a December 2017 audit

13       of mental health care at EMCF, the residential treatment unit

14       is a residential treatment unit in name only.  The audit I

15       discussed from 2017 shows that zero percent of the sampled

16       records in Housing Units 3 show that patients received

17       individual therapy every 30 days, and only 25 percent of the

18       sampled records show any evidence whatsoever of group therapy.

19       MDOC essentially decided to warehouse the largest concentration

20       of its most seriously ill mental health patients in a single

21       unit and then deny them care altogether.  That is a critical

22       failing.

23              And if Your Honor -- I can refer you to *Brown v.*

24       *Plata*, Justice Kennedy's opinion affirming classwide relief in

25       a California case that said that such failure to provide care

1  is simply incompatible with the concept of human dignity and

2  has no place in a civilized society.

3          There are several other failings and care at EMCF,

4  Your Honor.  You've heard that EMCF consistently fails to take

5  precautions to prevent suicides and self-harm at EMCF.  For

6  example, EMCF -- you heard Dr. Perry admit that in 2016 EMCF

7  was told to provide safety mattresses to its prisoners.  These

8  are the mattresses you heard about that are harder to tear

9  apart.

10          THE COURT:  Ms. Monju, you and Ms. Johnson have been

11  arguing to me for well over an hour now about all of these

12  problems that I have heard five weeks about from the witness

13  stand, and you have not given me the first suggestion for a

14  remedy, even if I were to find for the plaintiffs on everything

15  that you have argued.  Are you going to argue a remedy to me?

16          MS. MONJU:  Absolutely, Your Honor.  So Your Honor

17  asked for broad guidance.

18          THE COURT:  You're running out of time.

19          MS. MONJU:  Yes, Your Honor.  So Your Honor asked for

20  broad guidance as to remedies, and there are several options we

21  believe would make a lot of sense in this case.  And we've said

22  Your Honor could order a staffing analysis at EMCF with respect

23  to both security and health care staffing.  It's something that

24  there is no evidence has ever happened at EMCF.  MDOC has

25  literally no idea how many staff are needed at EMCF, and this

1  would give MDOC the bare minimum staffing numbers it needs to

2  make EMCF a safe and adequate facility.

3        Your Honor could also order that EMCF revise its

4  policies with respect to prisoners there.  We've talked about

5  several policies like punishing prisoners who harm themselves

6  despite the fact that that's a product of their mental

7  illnesses that simply run afoul of the constitution.  Your

8  Honor could order an expert, for example, to propose revisions

9  to those policies and then require staff at EMCF to actually

10  follow those policies.  That would be a substantial improvement

11  in conditions at EMCF.

12        In addition, Your Honor, we've talked a lot about the

13  fact that the contract monitor identifies problem after problem

14  after problem in report after report.  And they're never

15  systemically addressed.  We've also talked about the fact that

16  medical records and CQI reports, same thing, identifying

17  problem after problem, never addressed.

18        Your Honor could order that an expert or MDOC devise

19  an oversight system that will not only identify problems at

20  EMCF but will actually ensure that they're solved at a systemic

21  level, and that's where the constitutional failing is.  They

22  are not solved.

23        But, Your Honor, frankly you also needn't take that

24  granular action.  As has been the case in dozens of courts

25  across the country and as have been the case in several courts

in this district, in just the last decade, Your Honor could

appoint a subject matter expert or monitor to devise remedies

that are mutually acceptable to the parties and that would fix

conditions at EMCF. That's frankly a very popular option, and

we think it is one that would be good here.

But we also would say, Your Honor, that the most

important thing you could do is to define the conditions at

EMCF that are unconstitutional and then either have the parties

come back to address remedies or, as I said, appoint that third

party to devise remedies that would fix the problems at EMCF.

Your Honor also raised a couple of questions about

what it should do with evidence of what defendants have

presented as so-called improvements at EMCF. I'd be happy to

address that in some more detail as well if that would be

helpful.

So we've heard MDOC say repeatedly that it's doing its

best and that EMCF is getting better and that it should

therefore escape liability. But, Your Honor, MDOC is sorely

mistaken. First, Your Honor heard testimony from 19 prisoners

that EMCF is as dangerous and unconstitutional as it ever was.

They are getting assaulted. They are not getting medical care.

They're not getting adequate nutrition. They're not getting

mental health care. Things haven't changed.

Next, the evidence that MDOC has presented of its

so-called improvements are essentially irrelevant to

53

 1    plaintiffs' claims, and I can give a few examples.  So, for

 2    instance, Your Honor, they talk about netting and body scanners

 3    to catch weapons coming into the facility.  But plaintiffs'

 4    allegations are that there are materials inside the prisons

 5    that can be used to make weapons, and contraband rates are

 6    soaring.  The problem isn't netting or body scanners.  It's

 7    that guards aren't doing their job to keep materials that can

 8    be used as weapons out of the hands of prisoners.

 9              In addition, they claim to have hired more

10    correctional officers.  But as you heard from Ms. Johnson,

11    that's entirely irrelevant if the number of officers on a pod

12    at any one time haven't changed.  As Your Honor and I

13    discussed, hiring a new doctor doesn't fix medical care at EMCF

14    if he's not providing the vast majority of care.  And as Your

15    Honor and I also discussed, opening an acute care unit on the

16    eve of trial that has served .4 percent of the mentally ill

17    population at EMCF isn't enough to address systemic

18    deficiencies where EMCF is failing to give all mentally ill

19    prisoners care.

20              And I think one thing you've also heard that hasn't

21    been addressed yet is that MDOC has changed contractors during

22    the course of this lawsuit and that that somehow has fixed the

23    problems at EMCF.  But that has nothing to do with the core rot

24    at EMCF, which is that MDOC has decided to lock up its most

25    vulnerable prisoners there, has denied them basic necessities

1    and then has consistently slashed staffing for its contractors

2    at the facility without regard to the failure to address those

3    deficiencies.  If MDOC isn't forced to change, regardless of

4    who was operating the prison, EMCF wouldn't change.

5            And on that point, Your Honor, Ms. Johnson spoke

6    briefly about the fact that even if EMCF has somewhat improved

7    over the course of this litigation, it is settled Supreme Court

8    and Fifth Circuit precedent that that is not enough to avoid

9    constitutional liability if defendants cannot meet -- and I

10   quote -- the heavy burden of proving that unconstitutional

11   conditions cannot recur.

12           And, Your Honor, I'm happy to provide several

13   citations for that, including *Friends of the Earth v. Laidlaw*,

14   which is a Supreme Court case in 2000, and *Gates v. Cook*, a

15   leading Fifth Circuit case on prison conditions, which say that

16   this is because defendants can't make what essentially are

17   changes -- window dressing changing to avoid liability and then

18   be permitted to go right back to what they were doing before.

19           Your Honor has asked for examples of how defendant

20   might have met this burden.  They could have changed the

21   contracts.  They could have included increased staffing.  They

22   could have done several things to prove to Your Honor that

23   conditions at EMCF were permanently improved.  But as you have

24   repeatedly heard on the witness stand, the cosmetic changes

25   that have been made at EMCF are not required in any contract,

 1    and MDOC is not forcing its contractor to make any of these

 2    changes, and they can all be undone tomorrow.  And, therefore,

 3    we would say that regardless of the so-called improvements MDOC

 4    has made, which do not address the vast majority of plaintiffs'

 5    claims, MDOC cannot escape liability.

 6            So, finally, Your Honor, regardless of your approach

 7    to this case, we would say that it is clear that the more than

 8    1200 men at the East Mississippi Correctional Facility are

 9    entitled to relief.  MDOC chose to house its most vulnerable

10    mentally ill prisoners there.  They contracted the daily care

11    of those prisoners to for-profit vendors, and then it abandoned

12    its responsibility to provide basic necessities under the

13    constitution to those prisoners.

14            MDOC has been aware of the terrible conditions at EMCF

15    for years.  It received report after report about those

16    conditions, but it has failed to do anything.  That is the

17    definition of deliberate indifference, and these are precisely

18    the conditions under which the constitution requires the courts

19    intervene.  And, therefore, in light of the weight of

20    plaintiffs' evidence substantiating both the substantial risk

21    of harm to prisoners and MDOC's deliberate indifference to that

22    risk, we would ask the court to grant relief on all of

23    plaintiffs seven claims and provide the men at EMCF the relief

24    they desperately need.  Thank you, Your Honor.

25            THE COURT:  Thank you.  All right.  Mr. Siler, before

1    we begin your argument, we're going to take about a 15-minute

2    break.  We'll come back at 20 minutes after 11.

3       (Recess)

4          THE COURT:  Mr. Siler, you may proceed.

5             CLOSING ARGUMENT FOR THE DEFENDANTS

6          MR. SILER:  I am going to dispense with what I had

7    originally intended to start with about going through some of

8    the legal issues because, frankly, plaintiffs don't -- and

9    defendants don't disagree all that terribly about what the

10   legal standards are.  Our point of departure is is whether the

11   facts -- what the facts mean and how you interpret the facts in

12   light of those standards.

13          So I want to skip there.  You had you asked us that --

14   last week you had asked us to categorize all these shotgun

15   claims the plaintiffs have brought into claims that they had

16   clearly not met their burden of proof on and maybe claims that

17   they had done a little bit more on.  It probably goes without

18   saying that defendants believe plaintiffs have not met their

19   burden of proof on any of their claims, but certainly some of

20   them seem to be a little bit easier to dispose of than others.

21   And I'll start there.  And, obviously, if the court wants to

22   direct me to things of interest to you, I can move around very

23   easily.

24          The first claim I'm going to address is their

25   nutrition claim.  They had seven claims.  Basically nutrition,

1    there were two different environmental conditions claims, an

2    excessive use of force claim, and what I call innate-on-inmate

3    assaults claim, but I think they call it protection from harm.

4    Then they had two claims on the medical side.  And, of course,

5    I'm not addressing the medical side.  Mr. Bentley will be doing

6    that.

7           But seems to me like the first claim that's easy to

8    dispose of from the court's point of view to me is this

9    nutrition claim.  I feel like we spent the last five weeks

10   picking nits over a variety of things that don't have any

11   significance in anybody's mind other than plaintiffs, and I'll

12   come back to that in just a minute.

13          But we've spent a lot of time talking about caloric

14   intake and nutritious calories and failure to adhere to posted

15   diets when this expert was criticizing us for using bread

16   instead of hamburger buns on certain types of sandwiches and

17   weight loss and an unsanitary kitchen, distribution of food in

18   a mechanism that they did not find -- or she did not find

19   acceptable and criticized us over.

20          Just from a very common sense standpoint, there was

21   one inmate that I recall testifying that seemed he was on the

22   thin side of things.  Every other inmate that we talked to or

23   we saw on that witness stand, Your Honor, as I know recalls,

24   were people that were having no issues missing food, missing

25   calories, having any problems.

 1          There was at least one inmate that weighed over

 2     300 pounds.  There were several that were over 200 pounds.  We

 3     asked the height and weight of virtually every one of them to

 4     make certain the record was clear.  These people had no issues

 5     with respect to nutrition, and I think that's a very easy spot

 6     for the court the say they didn't meet a constitutional burden

 7     that their Eighth Amendment rights to cruel and unusual

 8     punishment have been violated in any way.

 9          They had an expert come in and talk about an

10     unsanitary kitchen.  This court has been through that kitchen.

11     Again, you don't need a monitor with white gloves or whatever

12     she was doing to look at that kitchen to see that that kitchen

13     looked good, it looked clean, things were well maintained, and

14     they passed all of their health inspections by the Mississippi

15     Department of Health.

16          There's just nothing to suggest that there's anything

17     approaching unsanitary about this kitchen.  Nobody had been

18     hurt, gotten ill, been sick, had any problems with anything

19     regarding that kitchen.  And to say that there was cruel and

20     unusual punishment going on as a result of the condition of

21     that kitchen to me is just the height of ridiculousness and

22     makes me wonder why we've been here for five weeks.

23          They talked about the distribution of food and the

24     fact that inmates were distributing food trays within the pods.

25     And every expert that came across this stand said that was

1    fine, there was no issue with inmates distributing food trays

2    within pods as long as they were being supervised by

3    correctional officers.  They all were.  Nobody said they saw

4    anything different.  It's just -- again, there's just no basis

5    to any of these claims regarding nutrition.

6          Second, two issues that I'll talk about a little bit

7    involved the combined claims regarding environmental

8    conditions.  Once again, to say that there's any substantive

9    issue to any of these things is just beyond ridiculous, in my

10   view.

11         Let's don't forget as I start this.  The court's been

12   to that facility and despite what you read in the press and the

13   horror stories and the dungeon and the supremely harsh and

14   terrible conditions of that prison, this court knows what the

15   prison looks like.  It is a 20 year old -- not quite 20 year

16   old building.  My house is older than 20 years old.  It's

17   painted, it's polished, it looks nice.  They keep up with it.

18         We showed the court videos that the plaintiffs put

19   into evidence that indicate this wasn't done in the last two

20   weeks.  We do this regularly.  We paint there every day.  The

21   place looks good.  It's an incredibly clean and well-run

22   physical plant.  It's climate controlled.  They have air

23   conditioning and heating.

24         THE COURT:  Mr. Siler, it did not look good in the

25   video clips that the plaintiffs introduced into evidence that

1   were probably the 2016 time.  It had been cleaned up

2   substantially from what -- where it started.

3           MR. SILER:  Well, I would disagree with you, but

4   that's -- I understand that's what the court feels.  I get

5   that.  But I'd urge the court to go back and look at them

6   because I don't think they look any different at all.

7           They have big screen TV sets.  They have headphones.

8   They have programs, educational, religious, substance abuse,

9   life skills.  They have -- even though they criticize health

10  care, Your Honor knows just like I do, 99 percent of the

11  inmates in that prison wouldn't have anywhere close to the

12  quality of health care if they were not in prison that they

13  have where they are.  Most of these men would not be on any

14  kind of health insurance.

15          It's just the fact of life in the area in which we

16  live.  Every one of them is on medications that the list of

17  which is as long as your arm.  I don't know that anybody that

18  came across the stand didn't say they were a diabetic or had

19  various other kinds of illnesses, and I doubt seriously whether

20  any of them would have been on those medications in the free

21  world.

22          And as you pointed out earlier in your questioning,

23  none of us are going to get in to see a doctor this afternoon

24  if we've got a problem unless it's an emergency and we go to an

25  emergency room.  But these gentlemen all have access to medical

1    care right there where they live.  They get three square meals

2    a day.  They have indoor/outdoor gymnasiums.

3         You know, we're talking about -- and all of us know

4    about prisoners living in tents in Arizona, things like that.

5    To think about the conditions in which these individuals live

6    is just -- it's -- I don't get it.  I don't understand where

7    cruel and unusual punishment comes in.

8         To get back to the particular specifics that they

9    raise, they talk about fires.  Of course, fires weren't set by

10   the prison.  They weren't set by the correctional officers.

11   They are set by the inmates.  They've -- as the warden said,

12   they've gotten control of that situation by shutting the food

13   slot because people aren't going to set fires in their cells.

14   That situation has improved.  It essentially taken care of.

15   It's not an issue anymore.

16        Does the prison have plumbing problems from time to

17   time?  Yes.  But virtually all the testimony was that the

18   plumbing problems were caused by inmates flushing things down

19   the toilets to keep them from being found or otherwise sabotage

20   things, not by anything the prison was doing.  We don't have

21   enough maintenance people to get in there and fix everything on

22   a moment's notice, but everything in that prison are well

23   managed and well maintained.

24        They talked about filthy living conditions.  They talk

25   about pests.  Again, I've been in that facility several teams.

1    I don't see any of that.

2          Their expert witness on sanitary conditions said that

3    a twice-a-month visit by the pest control should -- was a

4    reasonable response dealing with pests and that was a

5    reasonable way to do it.  Proof is that that's what we do.  We

6    have somebody come in twice a month.

7          They've talked about inadequate lighting.  Most --

8    you've been in that facility, Your Honor.  You've seen the

9    lighting.  Unless the inmates tear it up, there's nothing wrong

10   with that lighting, just from a pure common sense standpoint.

11         They talked about exposure to bodily fluids and

12   chemicals, and the -- Warden Shaw mentioned that every employee

13   who was -- rather every inmate who is employed there that does

14   cleaning and things of that nature is given training before

15   they begin those jobs to -- about how to avoid exposure to

16   bodily fluids and other chemicals, and they are given personal

17   protective equipment.  Now, whether they wear it or not,

18   whether they show up in tennis shoes rather than rubber boots

19   is up to those inmates.  But they are given all the equipment,

20   and that's done before they ever start the jobs.

21         They talk about lack of physical exercise, but they've

22   got all the facilities in the world, and there's no reason, no

23   excuse for them having -- not having enough physical exercise.

24         They also include under environmental conditions

25   information about inadequate mental health, and I presume that

 1   what they are addressing there is the -- what they call the

 2   extreme social isolation and sensory deprivation involved with

 3   isolated confinement, solitary confinement.  We've found no

 4   case -- and we'll cite to the court the cases in our posttrial

 5   briefs rather than me spend time dwelling on them here.  But

 6   we've found no case that's ever held that isolated confinement

 7   is a per se violation of the Eighth Amendment.

 8           And just to briefly touch on that a little bit more,

 9   the evidence and the proof in the record is that everyone in

10   isolated confinement in Housing Unit 5 is reviewed as a part of

11   a review process once a month.  One of the expert witnesses,

12   Mr. McGinnis, sat in on one of the review meetings.  Warden

13   Shaw sits in on all of those meetings.  And every 30 days,

14   every single resident of Housing Unit 5 is reviewed and the

15   staff discusses along with the input of MDOC whether people

16   need to be put in for those -- or needs to be -- needs to

17   remain in isolated confinement.

18           Just another common sense aspect of all that is that,

19   you know, prison is a lot like a community, and we have to take

20   dangerous people out of a community and put them in prison, and

21   in the community of prison we have people that are dangerous to

22   correctional officers and dangerous to other inmates.  We've

23   got to take them out.

24           Is that going to have some impact on their mental

25   health and degradation of their mental health?  Yes.  I suspect

1   being put in prison to begin with is going to have some impact

2   on their mental health, but it has to be done.  Everybody that

3   came across this witness stand said you've got -- that's a

4   crucial management tool within a prison.  You have to have it

5   available, both as a measure of punishment, as a measure of

6   protection for everyone else, and as a measure of some

7   motivation not to break rules and violate problems within that

8   prison.  If you don't have it, you know, coloring books and

9   timeouts are not going to work for hard criminals.

10          So to me the environmental conditions and the

11  nutrition are --

12          THE COURT:  Are you arguing that isolation might be

13  unconstitutional for one prison but not another?

14          MR. SILER:  No, I'm arguing -- there's no case out

15  there, to my knowledge, that says isolated confinement violates

16  the Eighth Amendment.  I'm sure you can find a case or two here

17  or there that -- an individual case.  There may be some facts

18  that would give rise to it.  But just as a general principle,

19  I've not seen a case anywhere saying isolated confinement is

20  violation -- per se a violation of Eighth Amendment.

21          THE COURT:  All right.

22          MR. SILER:  All right.  So those are my initial

23  thoughts on nutrition and environmental conditions.

24          The third grouping of claims that I'd like to address

25  to me fall right under those two in terms of the plaintiffs'

1    failure to prove their cause of action has to do with excessive

2    use of force.

3            First of all, no witness got on the stand that I

4    recall and criticized or complained in any way about any of the

5    policies that MDOC or MTC follow or utilize with respect to --

6    frankly I can't remember -- I can't remember much criticism of

7    policies in any respect, certainly not with respect to

8    excessive use of force.

9            They talk about -- they complained about the fact that

10    we have some spontaneous use of force incidents that should

11    have been planned use of force incidents.  And I'm sure we can

12    all sit around and argue about that and there probably are

13    occasions where correctional officers use spontaneous uses of

14    force as opposed to backing it up doing it in a planned and

15    more determined fashion.  And I'm certain anecdotally you can

16    come up with isolated incidents in which that happens.

17            But, as a matter of systemic issues or systemic

18    problems within the prison, there's no proof at all with that.

19    I think we saw a couple of videos in which handheld cameras

20    were used to deal with planned use of force incidents or to

21    depict planned use of force incidents.  And, you know, again,

22    I'm not very smart and maybe I don't understand all this.  But

23    they looked very professional to me, and the correctional

24    officers handled themselves appropriately, they handled

25    themselves well.  They weren't beating, kicking, snatching

1    inmates around.  I recall one where they were in the hallway

2    where they stopped to loosen up an inmate's handcuffs or leg

3    irons because the inmate was claiming that they were too tight.

4    And doing that kind of thing just indicates the height of

5    professionalism to me, not them treating inmates badly.

6         Plaintiffs complain that we don't use deescalation

7    enough.  I'm sure they can come up and complain about virtually

8    anything on any particular basis, but I'm not aware of any case

9    in which any court has held that it's a violation of the Eighth

10   Amendment -- anyone's Eighth Amendment rights that they weren't

11   put through some deescalation process before they were -- use

12   of force was utilized on them.

13        I think I mentioned in opening, and it bears repeating

14   here, that a lot of what this plaintiffs are asking this court

15   to do is not something that's required by the constitution.

16   It's not a constitutional minimum.  It's what they think is the

17   thing that should be done.  It's a best practices case.  It's

18   a, "We think you should do it this way instead of the way

19   you're doing it," not because the constitution requires it, but

20   because they feel like ate a better way to handle things, and

21   this is one of those instances.

22        Mental health inmates they claim are being sprayed

23   with OC spray, even if the reason they are being sprayed is

24   because their mental health condition prohibits them from

25   complying with orders or rules of the prison.  You know, that's

```
1    interesting to say on one point.  But on the other side of

2    things, even mental health patients, they can kill you just as

3    dead as somebody who's completely sane.  They can hurt you just

4    as bad.

5          And to say that just because somebody has a mental

6    health issue that a correctional officer doesn't have the right

7    to protect himself, to make sure things get done in a correct

8    way, again just to me that just seems ridiculous.  And there no

9    cases of which I'm aware -- and we'll cite in our briefs to the

10   court to a lot of cases that deal with chemical -- use of

11   chemical agents, and I'm not aware of a single case anywhere

12   that says that the use of chemical agents is a per se violation

13   of the Eighth Amendment.

14         And I might add that it's -- you know, from a

15   standpoint of reasonableness, again using chemical spray that

16   causes momentary irritation is a heck of a lot better than a

17   flashlight or night stick or three or four correctional

18   officers having to jump on somebody in a cell, much less

19   intrusive means of dealing with those individuals.

20         They complain about the fact that we don't have

21   sufficient supervisory review of use of force incidents, but

22   all those use of force incidents they put in the record -- and

23   there's dozens and dozens of them -- every one of them was

24   reviewed by a supervisor.  Every one of them talks about what

25   could we do better.  Every one of them was reviewed by someone
```

1    other than the officers involved.

2         They talked about the fact or claim that we have

3    deficiencies in staff discipline with respect to correctional

4    officers who were involved in excessive use of force.  I'd like

5    the court look at Joint Exhibit 59.  It's the 116 pages of an

6    exhibit that deals with staff discipline.  And it shows -- I

7    believe it demonstrates very well how much discipline goes on

8    with staff and how we try to train use incidents to better

9    people so that they'll handle things in a better way in the

10   future.

11        In my view, there's just no credible proof in this

12   record that the Eighth Amendment rights to the cruel and

13   unusual punishment have been violated with respect to the

14   excessive as you of force.  It's just -- it's just not there.

15        Well, what does that leave?  That leaves their

16   protection from harm or inmate-on-inmate assaults claim.  They

17   went to a great deal of effort to fly Mr. Vail in here to talk

18   about how we were such an extremely dangerous facility.  They

19   put on the information about assaults, and I think if you'll

20   look at what I believe is Plaintiffs' Exhibit 2849 where they

21   put in the statistical reports about assault, you'll see that

22   just simple math will tell you less than 15 percent of the

23   inmates in any given year have any issue with an assault.

24   It's -- when you look at it that way, it's a very rare thing.

25        As Mr. McGinnis continued to say over and over, the

1    sample sizes, when you looking at statistics, are so small that

2    even something that may look like a difference, if you start

3    looking at it over the course of the year and locations in

4    which those assaults allegedly take place, you're just looking

5    at such small numbers it's hard to really make anything out of

6    it.

7            And let me -- the court asked some I though insightful

8    questions a few minutes ago about how you compared, how do you

9    know.  Let's say we had 100 assaults in the facility in 2016 or

10   2017.  How does the court know through any objective evidence

11   that that's a big number, a small number, or about right number

12   given the circumstances?  And that's why I spent a little time

13   talking about the deficiencies or actually the problems with

14   definitions and defining what assaults are.

15           As Mr. McGinnis was testifying, there's just no -- and

16   actually Mr. Vail too.  You can't really compare assaults from

17   one prison to another, one state to another, because everybody

18   defines them differently.  And even if you look at a document

19   in which a particular event was described, just like we did

20   with Mr. McGinnis the other day, reasonable people could sit

21   there and use the same definition and say, "This is not an

22   assault.  This is an assault."

23           And when you look at things further from that -- so

24   somebody pushes somebody and it's an assault, is that that big

25   of a deal?  If somebody stabs someone and they have to go to

 1   the hospital, that is a big deal.  Where do you draw the line

 2   on that?  To make an objective analysis on assaults is a very,

 3   very difficult thing, and it's really hard to do much, although

 4   we tried to be as objective as we could in taking a look at it.

 5   It's just a hard thing to try to pin down when you get right to

 6   it.

 7         So where does that leave you?  It leaves you with

 8   trying -- looking at just from a common sense standpoint.  I

 9   asked a question earlier in the trial and I was serious about

10   it.  I grew up in a family of four boys.  We had more than 13

11   assaults a month amongst my brothers.  It's amazing we lived

12   through high school.

13         But 1200 men who are hardened criminals who are

14   murderers, rapists, and all that living next to each other

15   24/7, 365 days a year in close proximity, they are going to

16   have fights.  And 13.33 assaults per month, which is what the

17   plaintiffs claim happened in 2016, just doesn't seem to me to

18   be that big a number that excessive.

19         And Mr. McGinnis and Mr. Roth both who had 30 and 40

20   years plus in the Illinois and Michigan corrections system and

21   much experience throughout corrections -- throughout the

22   country, both testified that these numbers were not significant

23   and not out of line with any other facilities.  And I don't

24   believe they are either.

25         Now, they complained about locks.  Locks have been a

1  confounding subject for the prison management to deal with.  As

2  Mr. Stonehouse said, these were appropriate locks for this

3  level of security.  They were installed correctly.  They are

4  maintained correctly.  They operate and function correctly.

5          That doesn't mean they can't be defeated.  He

6  testified that they have been defeated and every prison

7  struggles with these same issues.  One of the lawyers somewhat

8  made light of the fact, well, how come we don't see prisoners

9  running around all over these jails if they can get out of the

10  cell doors?  The fact is, you don't see them running round East

11  Mississippi either.  There are occasions on which they were

12  able to defeat the locks, and we're not even sure if some of

13  those were inmates defeating them or whether it was

14  correctional officers defeating them.  That's one of the issues

15  of things that the prison management has to deal with.  They

16  get correctional officers that aren't good people either.

17  You've got to weed them out and deal with it and they create

18  problems.

19          But one of the inmates -- and I don't recall which

20  one, sat on the stand and said that the guards had about gotten

21  the lock situation figured out and that they didn't have as

22  many people getting out of these doors as they were.  The way

23  they defeat them, as Mr. Stonehouse testified and I think some

24  of the inmate did too, it's very easy to put something, glue

25  something in there on a track or in a door jam to keep the door

1    from closing altogether.  And it's just a matter, from the

2    correctional officer's standpoint, of going up and making sure

3    that those doors are closed every night.

4         They've gotten better at it.  They took a reasonable

5    step to try to cure that issue, and I'm not sure that we've

6    seen any proof, significant proof, of any issue with those

7    locks in the last year.

8         They complained about contraband and as the court

9    noted earlier, every prison everywhere has contraband.  I asked

10   Mr. McGinnis the other day, "Is there anything that they are

11   not doing at East Mississippi that they should be doing to keep

12   contraband out?"  And he said, "No, they just have to stay with

13   it, be deliberate and continue to do things they need to do."

14        Are there -- is there contraband that's inside the

15   facility that the inmates are making use of?  Yes.  And what

16   Mr. Shaw told us was that they are taking some of that out,

17   those light fixtures from which they were making contraband

18   weapons, taking those light fixtures out.  They have taken all

19   of those out or most of them out.

20        They are in the process of experimenting with a new

21   light fixture.  They have purchased, I can't remember how many,

22   but it was a number of light fixtures and they were just a

23   matter of now getting them installed that they thought would

24   even be better.

25        So they're taking steps.  They are not deliberately

 1  ignoring anything, and they've got to do things in a deliberate

 2  way.  They have to keep budgets and all of those kind of

 3  considerations in mind, but they are not ignoring anything.

 4        Can people get contraband in through magnetic

 5  resonance machines?  Yes, they can.  And do they have some

 6  motivation to do it?  Yeah.  You buy a telephone at Walmart for

 7  $25 and sell it in the facility for $600, which I think was one

 8  of the things that one of the inmates said that phones were

 9  going for within the facility.  People are going to be

10  motivated to try to bring things in.  You do your best.  They

11  are working on it, but I can tell you they will never keep all

12  of it out nor can any other prison.  But there's nothing

13  constitutional here about any of that.

14        They complained about counts and whether you believe

15  what people are saying about how the counts are being done or

16  believe how prison management contend the counts were being

17  done.  One question I have when I looked at that is:  Who's

18  being hurt?  Where's there been any injury from a count?

19        We can talk about it all day long.  You're supposed to

20  do face to photo.  You're supposed to have two people or one

21  people (sic), however you're supposed to do it.  But there's

22  never been an escape from that facility since 2012 when

23  Mr. Shaw first came into it.

24        No one testified that -- anything about a count

25  causing any harm to anyone, which isn't to say we're not going

1    to continue to be diligent about counts and change up the

2    attitude of the correctional officers and make sure things

3    happen the way they are supposed to.  But there's simply

4    nothing that rises to the level of an Eighth Amendment cruel

5    and unusual treatment about a count.  That doesn't subject

6    anyone to cruel and unusual treatment.

7            There's a lot of issues about gangs -- issues.

8    There's been a lot of discussion about gangs, more by the

9    lawyers than any of the witnesses.  Ms. Thomas, who testified,

10   talked about the fact that she thought during her time there

11   earlier on that gangs are been an issue.  Keep in mind

12   Ms. Thomas was not in that facility through most of 2016.  She

13   was on sick leave.

14           THE COURT:  You have about five minutes?

15           MR. SILER:  Thank you.  She wasn't there most of the

16   time.

17           Let me skip quickly to staffing which is the last

18   substantive thing I wanted to mention.  They showed you a few

19   minutes ago P-2431.  Look -- that's the roster.  Look on the

20   back of that roster, Your Honor.  They never show you the back

21   of it.  There's another 26, 28 people that are included on that

22   roster on the back of that, all of which are available to staff

23   all of those positions.  And it's just -- they know how to

24   manage their roster.  They don't have an issue on the roster.

25           Frank Shaw said 100 -- he now has 177 correctional

1  officers employed there.  He said that that's more than enough.

2  He can run his prison, run it safely and run it well with 177

3  officers.  He could run it well before that, but this has given

4  him a real cushion.  Both of our experts, Mr. Roth and

5  Mr. McGinnis, said that we could run that facility safely on

6  177 officers.

7        Plaintiffs -- let me finish with the roster thing real

8  quick.  If you'll go look, you asked the question about how

9  many people need to be in Housing Unit 5.  If you'll count

10 those spaces on that roster, they have 12 people assigned to

11 Housing Unit 5 as correctional officers, including a sergeant

12 and a lieutenant.  So they have 14 people assigned to Housing

13 Unit 5 already.  They don't need more.

14       They are like any other employer on any given day,

15 somebody may not show up for work.  They may not -- they may be

16 on vacation.  They may be training.  They may be off on

17 discipline.  They are having to move around and take care of

18 things, but they know how to staff this facility.

19       Their big problem with staffing is they say Mr. Vail

20 thinks there should be an officer on every pod.  Well, that is

21 Mr. Vail just saying, "I think this will help."  There is no

22 requirement by the Eighth Amendment that they have officers in

23 those pods.  They are staffed -- all that is is he thinks it's

24 best practice or better way to do it, and it's -- that's not an

25 Eighth Amendment violation.

 1          Two things quickly, and I'll get out of the way.  This
 2   court will have to deal with Prison Litigation Reform Act,
 3   18 USC Section 3626, if it decides to remedy anything.  As I
 4   told the court at the opening, the purpose of that statute when
 5   it was passed back in 1990s was to prevent or deter federal
 6   courts from micromanaging the prison system.  We'll deal with
 7   more of that at break -- within the brief rather, but that
 8   particular statutory provision places severe limitations and
 9   restrictions on what exactly the court can order as a remedy.
10          What the plaintiffs want, Your Honor -- there's an
11   agenda here.  They do not want private companies managing
12   prisons.  They want them out.  They couldn't get them out
13   through legislation so now they are trying to litigate them out
14   of business.  That's what's going on.
15          They want to run the ACLU, the SPLC, the National
16   Prison Project, whatever groups that they can pull under their
17   umbrella, they want to run this facility.  And they want you as
18   an accomplice to do that.
19          And when they talk about, as Ms. Monju did a few
20   minutes ago that they want a staffing analysis, they want a
21   revised policy, they want an oversight system, they want to
22   appoint monitors, what they are wanting is to let them run this
23   prison.  They don't know how to run this prison.  I don't know
24   how to run this prison.  And with all due respect, neither does
25   this court.

 1          That gentleman right there who's been doing this for

 2    30 years or more knows how to run this prison.  He's been

 3    working on it since he came back at the end of 2015, beginning

 4    of 2016.  He is the kind of person we need sitting there

 5    working on this prison.  He and his team need to be the ones

 6    doing this.  They've come a long way in their journey.  As the

 7    poet says, they've got miles to go before they sleep.  But we

 8    need to get out of their way and let them run this prison and

 9    not the ACLU and not the SPLC, because that's what they want to

10    do.

11          Thank you, Your Honor.

12          THE COURT:  Let me ask a question.  There was lots of

13    evidence during the plaintiffs' case about fires and torn up

14    lighting fixtures and filth and things of that nature.  My

15    observations from the -- from the tour of the prison was that

16    it was pretty well spit shined.  All of the Unit 5, the doors

17    had been repainted.  The floors, I think, had been repainted.

18    It was -- in there even, it was very clean.  It was clean as it

19    could be up and down the halls.  The kitchen was clean.  There

20    was substantial changes that had been made.

21          Should I take that as -- with a grain of salt and with

22    the plaintiffs' suggestion that the prison accreditation agency

23    was -- came in there three days before the court did and that I

24    can came in the day after they did and that the prison had been

25    cleaned up for those occasions?  How should I take that?

1          MR. SILER:  Your Honor, I've been in that prison a

2     lot, and I've never seen that prison look any different than it

3     did when you and I went in there.  Now, yeah, if you go in

4     there the day after somebody has started a fire and smoke has

5     smoked up a white wall or charred up a door, yes, it's going to

6     look a little different that day.

7          But as Mr. Shaw said and those videos pointed out,

8     that people are in there painting five days a week every week.

9     Once they get back through there, they get things painted.  I

10    don't recall looking in the video -- and Your Honor's memory

11    may be better than mine -- that the facility looked any

12    different in any of those videos than it did when you and I

13    went in there that day.

14         Now, it remember one day in Unit 5 -- one video in

15    Unit 5 we looked at that had the white styrofoam lunch trays on

16    the floor, and Warden Shaw testified that's how they deal with

17    things.  At the end of breakfast, it was an 8:30 video is my

18    recollection it was, and they had opened the food slots and

19    thrown the styrofoam trays on the floor, which the porters then

20    come around later at some point and pick them up.  But I don't

21    recall ever seeing -- that's why we showed some of those over

22    because I don't ever recall ever seeing a hallway that had

23    anything in it or any other photo.  I don't recall seeing a

24    cell door charred in Housing Unit 5 in those videos.

25         Now, I do remember we saw one fire, which was a pretty

1    good demonstration of how they do it.  They open those food

2    trays and set fire on something on that tray right outside the

3    door and once it gets to burning they push it out.  But I don't

4    recall -- I just -- your memory is probably better than mine.

5    I just don't recall that facility looking much different than

6    it does.

7         I'll say this.  Frank Shaw understands that the

8    physical plant needs to look good.  People need to have pride

9    in it, both your employees as well as these inmates.  I think

10   he and his staff do a wonderful job trying to keep that

11   facility up, given what they're fighting against with these

12   guys 24/7 with nothing to do except to create problems.  So

13   that's my thoughts on it, Your Honor.

14        THE COURT:  I frankly am surprised.  I'm certainly

15   aware of the recent history in the Mississippi prison system,

16   including this one, and the head of the prior health care

17   contractor I think got in some trouble with the commissioner,

18   and I'm surprised that you haven't been arguing that changes

19   were made after that and that Mr. Shaw was at the lead of those

20   changes, but you haven't made that argument.  Apparently you

21   don't think that there's been anything bad over there since we

22   started.

23        MR. SILER:  No, I wouldn't say that.  Mr. Shaw said

24   when he came in --

25        THE COURT:  Like plaintiffs' expert.  You don't think

1    there's anything bad, and he doesn't think there was anything

2    good.

3         MR. SILER:  I wouldn't go that far, Your Honor.  He

4    testified, Mr. Shaw did, when he first came to that facility in

5    2012 he almost got back on his plane and left.  It was in

6    terrible shape.  It was in lockdown mood.  They ran it with

7    tactical teams.  There was no programs.  It was bleak place in

8    2012.  At that point, that facility was run by another

9    contractor.

10        He came in, was there for a year for 2012 to 2013,

11   made a lot of changes, went out then for next two years, came

12   back in at the end of 2015 and started back dealing with that

13   facility again.  And if they'd be honest with you, they'll tell

14   you that that facility has changed dramatically since he came

15   back in late 2015 because that's -- he is -- that's -- because

16   of him.  And he didn't do it to try to help out a situation

17   that was going on or PR problem or whatever.  Frank Shaw did

18   that because that's the way he runs prisons, and we need to get

19   out of his way.

20        THE COURT:  Suppose I agree with Mr. Shaw that he has

21   made some substantial changes but that I agree with the

22   plaintiffs that there are certain things that they have

23   complained about that meet the test of being unconstitutional

24   and that need to be corrected?  I understand that I have the

25   option and the power to issue an injunction that says what

1   specifically needs to be done and on what basis or timetable or

2   tend to in some way require changes and have to monitor it in

3   some way.  Is that -- your position is it was -- nothing

4   unconstitutional is going on over there or has been, as I

5   understand your argument.

6           MR. SILER:  Yes, I would agree with that.  The

7   constitutional Eighth Amendment prohibition has not been

8   violated.  Now, somebody may find a better way to do it, think

9   they know a better way to do it.  But they don't know what

10  they're dealing with, Your Honor.

11          He's with those guys every day.  He knows the people

12  he's dealing with, the inmates he's dealing with, the issues

13  that they're dealing with.  It's a lot more complex and

14  complicated than you know, the ACLU knows, I know.  And, yeah,

15  could somebody armchair quarterback and say, yeah, you should

16  have three more people on this shift, should you put people in

17  a pod.  You can do that.  But all that is is using

18  constitutionalizing requirements that you don't even give.  The

19  constitution doesn't require that.

20          THE COURT:  I can't get the plaintiffs to say anything

21  good about that prison, and I can't get the defendants to say

22  anything wrong.  So thank you.

23          MR. SILER:  Thank you.

24          THE COURT:  All right.  Mr. Morisani.

25          THE CLERK:  Mr. Bentley.

1          THE COURT:  Did I get the wrong person?

2          MR. BENTLEY:  That's okay, Your Honor.  I take it as a

3   compliment.

4          THE COURT:  Mr. Bentley, I do apologize.

5          MR. BENTLEY:  No apology necessary, Your Honor.

6          THE COURT:  I've been sitting here looking at you for

7   six weeks.  All right, sir.

8          CONTINUED CLOSING ARGUMENT FOR THE DEFENDANTS

9          MR. BENTLEY:  I think it's time for me to say good

10  afternoon, Your Honor, and may it please the court.  Your

11  Honor, from your -- I want to start where you left off with Mr.

12  Siler because you do have our theory of the case.

13          This case is about current conditions.  It's not about

14  East as it existed in 2014, 2015 or 2016.  And the evidence

15  that you have received shows a steady course of improvement at

16  East led by the commissioner who is the courtroom today,

17  Commission Pelicia Hall, led by Warden Shaw, led by the medical

18  staff at East Mississippi Correctional Facility.

19          So this case is about current conditions.  But you're

20  right.  What does the court do?  This is a question you've been

21  asking.  What does the court do when it is confronted with the

22  inevitable situation that changes are made and conditions are

23  improved at a facility over the course of litigation that is

24  carried on for this long?

25          What you do and where would I direct you first to look

1    is a decision by the Middle District of Florida, *Hughes v.*

2    *Judd*, 108 F.Supp. 3d 1167.  This was a case brought by the

3    Southern Poverty Law Center against a facility in Florida.  And

4    the judge in that case noted that the sheriff -- this was a

5    sheriff's department -- had engaged in a steady course of

6    improvement throughout the life of the litigation.  The

7    district judge said, "What I have to do" -- and this is at page

8    1175 of that opinion -- "is look at the evidence."  And this

9    judge looked at the evidence and said, "Nothing in the credible

10   evidence supports the notion that any improvement that has

11   occurred was motivated by an attempt to evade liability in the

12   litigation or that any improvement will disappear when the

13   litigation terminates."

14           I'm going to talk to you about the proof in this case,

15   Your Honor, and I think that is what our evidence shows just as

16   the district court in that case found that that was what the

17   evidence showed in Florida.

18           What Your Honor asked to us do on Thursday is take --

19   try to distill the plaintiffs' claims which, as Ms. Johnson

20   noted this morning, really do go to all aspects of prison

21   administration.  Try to distill -- try to identify the claims

22   that were actually tried by the classes, determine whether the

23   plaintiffs offered sufficient proof of systemic and persuasive

24   constitutional violations on any one of those claims that were

25   tried, and then help the court sort out a remedy, if one is

1   necessary, that avoids dragging the court down into what the

2   Fifth Circuit has called the minutiae, becoming enmeshed in the

3   minutiae of prison administration.

4          I'm going to talk specifically about the mental health

5   and medical subclass, and I'll also talk about the isolation

6   class.  But I think -- and I'm not going to go back over the

7   deliberate indifference standard but do want to highlight the

8   underpinnings of that standard.  Why is it such a strict

9   standard?

10         Well, there's two reasons.  First, this case deals

11  with prisoners and prisoners' complaint about their conditions

12  of confinement.  Prisoners have to be confined because they

13  have committed crimes that require their imprisonment for the

14  protection of the public.  So the question is not community

15  standards, it's not professional standards or best practices.

16  The question is elemental decency and whether the jailers when

17  they are brought into court are meeting that standard.

18         And the second underpinning is what we've been

19  discussion all day long that managing a prison is an enormously

20  trying and complex task.  And before the court steps into that

21  task, it has to have clear and specific remedies it can impose

22  if it finds that there's a constitutional violation.

23         I do want to talk just briefly about the standards

24  that do not govern his case, and these are deviations from

25  prison policies.  We've heard a lot about prison policies.

1    We've heard concessions that they are good policies.  We've

2    heard proof that they are tied to national correctional --

3    national commission on correctional health care standards and

4    ACA standards, and then we've heard testimony that -- from

5    experts that those policies are being deviated from.

6          The Supreme Court has said that prison policies

7    naturally do not create rights for inmates.  They cannot

8    demonstrate an Eighth Amendment violation by demonstrating that

9    despite best efforts, the commissioner, the warden, and the

10   medical staff do not always achieve the policy requirements.

11   Contracts terms are not the standard.  Continuous quality

12   improvement efforts.  Again proof that prison officials are

13   engaged in a robust monitoring effort is not proof that they're

14   violating the Eighth Amendment.

15         Your Honor, I do want to turn now to the claims, and

16   with your permission I will approach.

17     (Document Tendered to the Court)

18       MR. BENTLEY:  So what we did on the defense side when

19   you asked us to try to distill these claims into something

20   manageable, we went back to Your Honor's published opinion in

21   2012 which certified this class.  And what I provided you --

22   and I'm not going to walk through every one of these claims

23   that Your Honor identified as what we took to be the claims as

24   understood by everyone in September of 2015.

25         I'm going to talk -- the ones that were highlighted

1    this morning, I'm going to walk through those and we can

2    address the others in posttrial briefing.  But I want to start

3    by confronting the suggestion that the Mississippi Department

4    of Corrections did not put on any proof to rebut the

5    testimony -- the opinion testimony of the plaintiffs' experts,

6    which is really what the medical case and mental health care

7    case comes down to.

8            Your Honor heard from five witnesses, Dr. Kim -- six

9    witnesses:  Dr. Gloria Perry, the chief medical officer.

10   Dr. Kim Nagel, whose deposition testimony is in the record.

11   He's the chief psychiatrist.  Nurse Practitioner Evelyn Dunn,

12   who is the chief psychiatric nurse practitioner at East right

13   now.  Dr. Patrick Arnold.  And two nurses, all whom testified

14   about the current delivery of care at East Mississippi

15   Correctional Facility.

16           And, notably, Dr. Nagel in his deposition said, of

17   course, there were two years of rockiness when we came in after

18   Dr. Reddix's firm was booted out.  But changes have been made.

19   There's been a steady course of improvement.

20           Plaintiffs said we didn't introduce a single document.

21   Well, the plaintiffs introduced all the documents that we would

22   have relied on and much more, including the CQI reports and

23   thousands of pages of medical record.  And this is important,

24   Your Honor.  Thousands of pages of medical records that show

25   continuous ongoing contact by patients with their doctors and

1    medical providers in this prison.

2         There's simply no proof in these medical records that

3    anyone is indifferent to the conditions that the inmates are

4    experiencing at this facility.

5         Finally -- and this goes to what I take to be a pretty

6    significant concession from plaintiffs, that their remedy in

7    this case, as they have said to Your Honor, is not -- they did

8    not offer Your Honor any help with what to do, assuming there's

9    a violation.  They said the remedy on staffing is to direct

10   MDOC to a point -- an expert to conduct a staffing analysis.

11   The remedy on policies is to direct MDOC to hire an expert to

12   review policies and make recommendations about changes.  The

13   remedy on continuous quality improvement is to appoint an

14   expert and let them look at an implementation system and direct

15   MDOC if one is required to implement any changes.

16        This is a concession that the plaintiffs -- that was

17   their job.  That was their expert's job was to come into this

18   court, identify deficiencies and if there are any deficiency

19   identify remedies.  They have not done that, and the fact that

20   they are asking this court to do that for them simply

21   demonstrates that they have not satisfied their burden under

22   the Eighth Amendment because these things are intertwined.

23        The court cannot know if the isolated incidents that

24   it has heard about or that the experts have identified are

25   evidence of systemic and pervasive indifference without knowing

1  whether the prison is adequately staffed.  And there's been no

2  proof, no proof, that it is inadequately staffed on the medical

3  and mental health side or any other side, for that matter.  And

4  I want to go directly to the staffing point.

5       The only evidence of staffing analysis at this prison

6  is evidence that MDOC itself did an analysis in the competitive

7  bid process, and MDOC determined that 43 medical and mental

8  health care staff would be the minimally sufficient number to

9  serve this prison population.  Working with its vendor,

10  Commissioner Hall, Dr. Perry, Centurion have approved 52

11  full-time positions at this facility.  Over eight above the

12  minimal staffing requirements.  They've figured out a way to do

13  that with no additional costs to the state.

14       And 48 -- you heard testimony that 48 of those

15  current -- those authorized positions are filled.  So the proof

16  as it stands today is that staffing is 113 percent of the

17  minimally sufficient number at that facility, and that's just

18  filled positions.

19       There's also testimony in the record by Dr. Nagel.  I

20  would encourage you to read his deposition at pages 27 through

21  35 that, in his opinion, as of April 2017 he did have

22  sufficient mental health care staff to care for the population.

23       There's testimony by Nurse Townsend, a nurse that

24  works at East Mississippi or did work at East Mississippi.  Her

25  deposition is in the record, and I would encourage you to look

1    at pages 17 and 18 where she testifies that in her experience

2    the nursing numbers are sufficient to provide the care that

3    nurses are required to provide.

4         The second thing that was focused on this morning and

5    that has been focused on roundly at trial is what's been called

6    the sick call process.  This is the process by which inmates

7    access care when they have episodes or acute situations that

8    need to be addressed.  The plaintiffs' proof on this was 19

9    inmates who testified, some of whom had no concerns at all

10   about the sick call process.  Some did.  That's not surprising.

11        Experts who offered opinions about the process as it

12   existed in 2016, and CQI data, which, of course, based on the

13   small sample size shows some fluctuation, but also shows that

14   MDOC is monitoring the sick call process and making

15   improvements where required.

16        Now, what was the defendants' proof?  Dr. Arnold

17   testified that 150 to 200 inmates are seen every week in the

18   clinic through the sick call process.  That's not deliberate

19   indifference.  That's delivery of care as required in the

20   judgment of medical professionals.  And Dr. Arnold testified

21   that as far as he knew, the nurses and doctors and nurse

22   practitioners at that facility were caught up on the sick call

23   requests.

24        And when there are delays -- remember this, Your

25   Honor.  The CQI data that you've been shown, 24 hour triage and

seven day requirement to be seen by a provider, if someone is
seen in 25 or 26 hours, that's noncompliant pursuant to the
policy.  That's not deliberate indifference.  If someone is
seen in eight, nine or ten days instead of seven, that's
noncompliance under the policy.  But that's not deliberate
indifference.

         And as Dr. Arnold testified, the reason that someone
may not fall within the seven-day period is that if the system
gets overwhelmed -- and in that case medical professionals are
making medical judgment about which cases have to be
prioritized and which cases are nonurgent and that can be seen
immediately outside of a seven-day period but certainly no way
approaching the constitutional requirement that an inmate
request for care be ignored or mistreated.

         The third thing that was focused on this morning and
has been focused on at trial is what's called the pill call
process, the medication administration process.  And the
plaintiffs' proof on this, again, is inmates, some of whom
testified they had misses in medication for various reasons,
human error by nurses, no shows or refusals by inmates, and
some of whom inmates testified are -- raised no issue at all
with medication administration.

         And then you had an expert, Ms. LaMarre, who testified
that in her opinion in 2016, policies were being deviated from,
and the gaps in -- the periodic gaps in medication

1    administration were -- based on her sampling were not meeting

2    community standards.

3           Your Honor, no one denies that in a prison health care

4    system of this nature there will be interruptions in medication

5    because of lockdowns or no shows or human error.  Dr. Arnold

6    testified that there are 3,000 doses of medication administered

7    at this facility every day.  That's over 1 million doses a

8    year.  Of course there will be periodic interruptions.  There

9    would be in any mental health care system that's dealing with

10   that volume of medication and that number of patients who

11   require care.

12          But when interruptions do occur, there is followup.

13   Nurse Practitioner Dunn testified to Your Honor about her

14   followup practices if she has a patient that has missed three

15   or more -- three consecutive doses of medication.  Nurse

16   Brookshire testified about the procedures she follows in the

17   pill call process.  And in her view, that most every occasion

18   of missed medication is a refusal or a no show by an inmate.

19          Nurse Townsend in her deposition at pages 65 to 85

20   testifies at length about the medication administration

21   process, including her process for charting refusals and no

22   shows and following up with providers when a medication is

23   missed.

24          There is no proof in this record that any nurse, any

25   doctor, any nurse practitioner, any mental health provider, is

1    ignoring situations when an inmate misses his medication.  The

2    proof is just the contrary, that they are responding to those

3    situations.  The medical record confirms this, that inmates are

4    receiving significant amounts of medication as required in the

5    judgment of their medical professionals to treat their

6    condition.

7           And, again, I'm going to skip to the mental health

8    issue rather than going through all of the medical issues that

9    Your Honor identified.  But suffice it to say that I do not

10   think there is any proof, certainly not proof sufficient to

11   meet the strict deliberate indifference standard on any one of

12   the eight medical claims that Your Honor identified.

13          So turning to mental health.  The primary complaints

14   that I understood the plaintiffs to raise, the first one that

15   was discussed was lack of access to group or individual therapy

16   at East.  Well, I have not -- first of all, Your Honor, I think

17   you saw a graphic this morning that showed in Unit 3 at least

18   25 percent of the inmates were receiving some form of group

19   therapy, and that is in addition to the medications that treat

20   and stabilize their conditions and to the individual meetings

21   that they have with their psychiatric providers.

22          Now, I have not found any cases that say under the

23   constitution an inmate who is otherwise stable on medication

24   and is otherwise receiving individual treatment by a

25   psychiatrist or a psychiatric nurse practitioner is entitled on

1    top of that to group therapy.  I just have not seen those

2    cases.  In fact, the cases are to the contrary.

3         If an inmate -- and these inmates in this case are,

4    and the medical records confirm it, if an inmate is receiving

5    medication to stabilize his condition so that he can function

6    in the prison -- and you've heard testimony that the vast

7    majority of inmates at East are stable, they're level of care C

8    as the agency defines them -- they are stable on their

9    medications and they can function within the prison.  And I've

10   not seen any cases that say that if that is the case, there is

11   some additional burden on prison officials to provide

12   additional therapy that in the medical professional's judgment

13   may or may not be required.

14        Now --

15        THE COURT:  What about being locked up in isolation?

16        MR. BENTLEY:  Your Honor, I'll turn to the isolation

17   subclass because, again, this is an area where I think we are

18   stepped firmly into the area of prison reform.  This subclass

19   challenges their placement.  And as I heard Dr. Kupers testify,

20   that any confinement in isolation longer than 14 days is

21   inappropriate, in his medical opinion, and should be abolished

22   under the constitution.  This class starts -- runs up against

23   the fundamental principle as is stated by the United States

24   Supreme Court and the Fifth Circuit "that a prison inmate does

25   not have a protectable liberty interest in his custodial

1  classification, and his disagreement with the classification is

2  insufficient to establish a constitutional violation."  That's

3  *Neals v. Norwood*, 59 F.3d 530 (5th Cir. 1995).

4        But the fundamental principle here, Your Honor, is

5  that inmates cannot demand that they be housed in any

6  particular facility or any particular unit within the facility.

7  Cases have rejected claims by inmates -- I'll cite you one this

8  morning -- this afternoon "that long-term confinement to a

9  solitary housing unit violates the Eighth Amendment."  *Tasby v.*

10 *Cain*.  This is a recent decision from the Middle District of

11 Louisiana.  The citation is 2017 WL 4295441.  It was issued in

12 September.  And that case involved an inmate who had been in

13 solitary confinement for 15 to 18 years.  And he brought it --

14 a claim saying that this had caused deterioration of his mental

15 state that was -- amounted to an unconstitutional violation.

16       And the court determined in that case that the inmate

17 who had received continuous mental health treatment, who had

18 received medications that stabilized his condition, and was

19 otherwise appropriately seen by mental health professionals,

20 could not state a claim based purely on his placement in

21 segregated housing even if that placement caused mental

22 deterioration.

23       And so that's what we have in this case, Your Honor.

24 Yes, plaintiffs' own expert, Dr. Kupers, testified that 35 to

25 40 state systems used solitary housing unit for various

1    reasons.  The federal government, Federal Bureau of Prisons,

2    uses it.  Dr. Kupers acknowledged, and Warden Shaw testified,

3    that there are custodial security reasons that you would have

4    to place an inmate in long-term or short-term solitary

5    confinement.

6           And what happens to inmates that are on Unit 5 at

7    East?  Nurse Practitioner Dunn testified at length about this.

8    She prescribes, monitors, and adjusts their medications on a

9    regular basis.  She has individual meetings with every patient

10   on Unit 5 as required by their level of care, either 30 or 90

11   days.  The inmates there have the ability to obtain more

12   immediate care, if they need it, through the sick call process,

13   and there is now an acute mental health unit where she can

14   use -- transfer an inmate to be stabilized if that becomes

15   necessary.

16          Again, that's not necessary in the vast majority of

17   cases, even those on isolation.  The inmates are stable.

18   They're taking their medication.  They are seeing their

19   therapist, and they are -- Mr. Pickering, the mental health

20   professional, testified at length that even when an inmate is

21   placed on Unit 5 for custodial reasons, he receives regular

22   rounds from a mental health professional.  The opportunity for

23   private meetings if, in the inmate's judgment and the mental

24   health professional's judgment, is appropriate -- and Dr. --

25   Mr. Pickering, I'm sorry, testified at length about the

```
1    deescalation process to avoid unnecessary uses of force on

2    inmates at East.  And I think he said that in his view

3    90 percent of the time the deescalation effort was successful

4    and use of force was not required.

5           So the proof is that -- when you turn to Unit 5, that

6    inmates do receive continuous mental health care.  This proof

7    is in the testimony here.  It's in the medical records before

8    the court.  And this challenge comes down to a bare request

9    that the court eliminate a widely used and custodially

10   appropriate condition of confinement which is segregated

11   housing units.  I do not think this is the proper forum for

12   that sort of bare prison reform claim, and neither did the

13   court in Tasby v. Cain in the Middle District of Louisiana.

14          Finally I want to turn briefly, Your Honor, back to

15   remedies because I do think that the plaintiffs in the

16   prisonwide class action have a double burden in this case, that

17   is to demonstrate that there has been a violation of the

18   deliberate indifference standard, which is very strict, and to

19   demonstrate that there is a specific single-stroke remedy that

20   the court -- if there has been a violation that the court could

21   impose to remedy that violation.

22          And the standard is -- here is not mootness, which was

23   discussed this morning, and the Gates v. Cook case from the

24   Fifth Circuit in 2004 was cited.  That involved a case where a

25   district court had made an initial determination that the
```

1    constitution had been violated, and on appeal the agency argued

2    that in the interim their efforts had mooted the injunctive

3    relief ordered by the court.

4           That is not what we have here, and the plaintiffs

5    cannot flip their burden onto the department.  What we have

6    here is plaintiffs still attempting -- and we don't think they

7    can do it -- but attempting to meet their strict burden of

8    proof.  Certainly there is no burden of proof on the defendants

9    in this case.

10          But their burden again requires not just proof of

11   deliberate indifference but identifying for this court a

12   single-stroke remedy like the remedy imposed in the recent

13   Fifth Circuit decision of *Yates v. Collier* that we discussed on

14   judgment -- motion for judgment as a matter of law.  In that

15   case, the court identified a single-stroke remedy -- lowering

16   temperatures in a unit that was overheated -- that prison

17   officials could understand and implement and that the court

18   could enforce, if necessary.

19          Here we have no remedy offered at all other than

20   further proceedings:  The appointment of experts, paid for by

21   MDOC to undertake analysis that may confirm that MDOC is

22   compliant with the constitution.  That is not a single-stroke

23   remedy.  That is a very, very, very late request to bifurcate

24   these proceedings, to turn this into a liability followed by a

25   remedy proceeding.

1           That is not how this case was tried, Your Honor.  This

2    case was tried as a combined proceeding at the end of which

3    plaintiffs are asking Your Honor to retire to chambers and

4    draft an injunction that addresses the complaints that they

5    have.  The injunction that they've asked you to draft is to

6    order further proceedings, appointment of further experts that

7    inevitably they'll probably find some reason to disagree with,

8    and the proliferation of these proceedings well beyond today or

9    any point at which you might issue an injunction.

10          It's not appropriate to do that at this late stage,

11   and it's not the type of relief required by Rule 23, which is

12   again a precise single-stroke remedy that this court can

13   implement, the prison officials can understand, and that this

14   court can enforce later.

15          Your Honor, I want to conclude by briefly returning to

16   the *Hughes v. Judd* decision which I cited at the beginning of

17   my discussion about what do you do in a case like this where

18   conditions inevitably change.  And in that case, the court

19   found that conditions had changed and it sized up the proof and

20   found no evidence that simply because -- that the changes were

21   made simply -- as an effort to avoid liability or that they

22   would disappear after this litigation ended.

23          And I think the same is true here.  Of course, you've

24   heard proof that the prison has changed.  The prison -- the

25   department has brought this facility -- Commissioner Hall,

 1   Warden Shaw, and others have brought this facility out of a

 2   situation where it was dominated by Christopher Epps and his

 3   confederate, Dr. Carl Reddix, into a situation where it is

 4   greatly exceeding constitutional minimums.  And there is no

 5   proof that that's been done as some sort of trick.  It's been

 6   done over the steady course of two, two and a half years, and

 7   it's going to continue.  I think all the proof is to that

 8   effect.

 9         So the plaintiffs have not carried their burden in

10   this case, Your Honor.  They have not carried their burden

11   under the Eighth Amendment to demonstrate to you that inmates

12   at East are subject to cruel and unusual punishment, either in

13   the delivery of health care or in their conditions of

14   confinement.  And they've not satisfied their burden to

15   demonstrate that Your Honor has any remedy, even if there are a

16   few things that you might think should be remedied.  I just --

17   there's no proof, no suggestion, of how you might do that.

18         For these reasons, we think the only option the court

19   has is to enter a judgment for the Mississippi Department of

20   Corrections finding that there is no violation of the United

21   States Constitution.

22         THE COURT:  All right.  Thank you.  All right.  Ms.

23   Johnson, you don't have much time in rebuttal.  How much do you

24   think you -- you've run over your time.  How much do you think

25   I should give you to finish up?

1    MS. JOHNSON:  Your Honor, if you would be so generous

2    to give me 10 to 15 minutes.

3    THE COURT:  That's too much.

4    MS. JOHNSON:  Okay.

5    THE COURT:  I'll give you eight minutes.

6    MS. JOHNSON:  Yes, sir, Your Honor.

7    THE COURT:  All right.  That will give you until 17

8    minutes of 1:00.

9    MS. JOHNSON:  Thank you, Your Honor.

10    REBUTTAL ARGUMENT FOR THE PLAINTIFFS

11    MS. JOHNSON:  First, Your Honor, I'd like to start

12    with defendants' discussion of plaintiffs' nutrition claim.

13    Defendants offered no evidence to rebut our expert witness,

14    Diane Skipworth, regarding the nutrition claim.

15    THE COURT:  Excuse me.  Skip the nutrition.  I'm

16    already going to find for them on the nutrition claim.

17    MS. JOHNSON:  Yes, Your Honor.  The next claim in

18    which Mr. Siler discussed was the environmental and sanitation

19    claim, and I think that there's been some confusion as to the

20    scope of that claim.  There is a subclass in that claim that

21    applies to the Housing Units 5 and 6, and particularly the

22    lighting, maintenance, sanitation, and fires that relate to the

23    conditions.

24    Mr. Siler's discussion of polished hallways and gyms

25    and the like are irrelevant to that claim to the extent that

1    they are outside of Housing Units 5 and 6.  The environmental

2    and sanitation claim does not apply to the prison as a whole.

3    I just wanted to make that clarification.

4          Further, Your Honor, as it relates to solitary, Mr.

5    Siler and Mr. Bentley have misconstrued plaintiffs' request as

6    a per se violation or categorical bar of all use of solitary.

7    And as I indicated this morning, that's not what plaintiffs

8    have asked, and there have been instances in other states in

9    other courts where they have found that solitary confinement

10   can -- the conditions in solitary can constitute an Eighth

11   Amendment violation.

12         One of those cases includes *Ruiz v. Johnson*,

13   37 F.Supp. 2d 855, out of the Southern District of Texas.

14   Coleman v. Wilson, 912 F.Supp. 2d 975, from California.  And

15   just last week, Your Honor, the Eleventh Circuit in a case

16   found that prolonged placement in solitary confinement can

17   violate the Eighth Amendment.  That case is *Quintanilla v.*

18   *Bryson*.  It's number 17-14141 (11th Cir.), and that decision

19   was issued on April 5th.

20         Next, Your Honor, related to the use of force that

21   Mr. Siler also discussed, there is a case out of the

22   Eleventh Circuit that has -- for the Eleventh Circuit that

23   has -- for the Eleventh Circuit found that "the district court

24   did not err in concluding that the policy permitting

25   nonspontaneous use of force with chemical agents against

1    mentally ill prisoners violates the constitution."  That case

2    is *Thomas v. Bryant*, 614 F.3d 1288.

3          Your Honor, defendant has misconstrued some of

4    plaintiffs' claims.  And as I said, as the court looks at this

5    case, it has to consider the Mississippi Department of

6    Corrections has elected to place the seriously mentally ill at

7    EMCF and the considerations and risk of harm associated with

8    that population in making its determination.

9          Your Honor, as it relates to the medical and mental

10   health staffing, Mr. Bentley pointed out that the staffing

11   numbers were developed during a competitive bid process.  Well,

12   Your Honor, as a result of that competitive bid, the staffing

13   numbers were 64, but the current contractual staffing numbers

14   are 44.1.

15         And, Your Honor, as you heard Dr. Perry testify,

16   there's nothing that prevents Centurion from decreasing the

17   staffing at the conclusion of this trial.  And, in fact, Warden

18   Shaw also testified that to the extent the correctional

19   officers have been increased, there's nothing that guarantees

20   that those officers will remain in place next week, next month,

21   or at any time in the future, and we contend that the

22   inadequate staffing constitutes a substantial risk of harm to

23   the prisoners at EMCF.

24         THE COURT:  Do you have any explanation as to why the

25   contract was apparently negotiated on a higher number and a

1   lower number of employees has been used?

2          MS. JOHNSON:  The testimony from Dr. Perry, Your

3   Honor, is that the department did not want to pay -- did not

4   want to pay for the 64 staffing.  It would have been an

5   additional 88 cents per prisoner, and the department, after

6   awarding the contract, stated that it would not.  And as Your

7   Honor may recall, there was a series of e-mails and

8   negotiations of that staffing that ultimately led it to the

9   44.1 number pictured on the screen, if Your Honor may recall.

10          THE COURT:  But was the cost of the contract reduced

11   or is the state paying full contract price for 60 employees and

12   only getting 40?

13          MS. JOHNSON:  The state -- the price that the state

14   pays is based on 44 positions at EMCF, even though it awarded

15   the contract based on Centurion's bid that 64.6 positions were

16   needed at EMCF to provide the appropriate basic care.

17          THE COURT:  All right.  I remember those figures, but

18   I did not understand them.

19          MS. JOHNSON:  Your Honor, in closing I would just ask

20   the court to consider the plaintiffs' seven claims and that the

21   substantial risk of harm that exists at EMCF we have discussed

22   and we will more fully provide to the court.  To the extent

23   that defendants urge that we have not provided the court with

24   remedies, the court is able to ask the parties, once a

25   liability finding is made, to look at remedies.  They can

 1   appoint a monitor as has been done in several PLRA cases,

 2   including cases that have -- regarding the Walnut Grove

 3   Correctional Facility, the Forrest County Juvenile Detention

 4   Center and the Henley-Young Juvenile Justice Center.  It is

 5   typical for judges to appoint a monitor or use a subject matter

 6   expert.

 7         Your Honor, I'm not trying to run EMCF.  I don't have

 8   a desire to.  But I do recognize that it needs to be operated

 9   by someone with the expertise to reduce the substantial risk of

10   harm that currently faces all of the prisoners who are housed

11   there.  Thank you, Your Honor.

12         THE COURT:  All right.  Thank you.  If the lawyers

13   would like to provide the court with a list of cases which you

14   have cited here today in your arguments with a one-sentence

15   synopsis of what you think the case means or at least what you

16   think you want to get out of the case, you may do by Friday of

17   this week.

18         All right.  Is there anything further that the court

19   needs to address this morning?  I will -- I'm planning on

20   writing a written opinion.  It will take me several days to get

21   that done.  I do not need briefs on this.  I think both sides

22   have done an ample job of briefing the issues, and it's just a

23   matter that the court's going to have to pull a substantial

24   record into an opinion.  I know that each side will be happy to

25   do that for me, but I guess I had better do it myself.

 1          Is there anything further that the court needs to

 2     address here today?

 3          MS. JOHNSON:  Your Honor, we would just ask that the

 4     record be held open until Friday to allow the parties to

 5     complete the deposition designations and submit those to the

 6     court.

 7          THE COURT:  That's fine.  Yes.

 8          MR. BALABAN:  Good afternoon, Your Honor, I began the

 9     day and it looks like I'm going to be ending it.  I would like

10     to be heard briefly with regard to posttrial briefing, if we

11     could, Your Honor.

12          THE COURT:  No, sir.

13          MR. BALABAN:  Thank you Your Honor.

14          THE COURT:  I don't need any more briefing.  Thank

15     you.  All right.  If there is nothing else for the court, we

16     will stand in recess and I will have an opinion as soon as I

17     can get it completed.

18      (Trial Concluded)

19

20

21

22

23

24

25

1                    CERTIFICATE OF REPORTER

2

3         I, CHERIE GALLASPY BOND, Official Court Reporter, United

4    States District Court, Southern District of Mississippi, do

5    hereby certify that the above and foregoing pages contain a

6    full, true and correct transcript of the proceedings had in the

7    aforenamed case at the time and place indicated, which

8    proceedings were recorded by me to the best of my skill and

9    ability.

10        I certify that the transcript fees and format comply

11   with those prescribed by the Court and Judicial Conference of

12   the United States.

13

14        This the 9th day of April, 2018.

15

16                    s/ *Cherie G. Bond*
                         Cherie G. Bond
17                       Court Reporter

18

19

20

21

22

23

24

25

*** DAILY TRANSCRIPT ***