IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION


JERMAINE DOCKERY, ET AL.                    PLAINTIFFS

VS.                    CIVIL ACTION NO. 3:13CV326WHB-JCG

PELICIA HALL, ET AL.                        DEFENDANTS


**TRIAL TRANSCRIPT**
**VOLUME 23**


BEFORE THE HONORABLE WILLIAM H. BARBOUR, JR.
UNITED STATES DISTRICT JUDGE
MARCH 21, 2018
MORNING SESSION
JACKSON, MISSISSIPPI


REPORTED BY:  CHERIE GALLASPY BOND

Registered Merit Reporter
Mississippi CSR #1012
_____

501 E. Court Street, Ste. 2.500
Jackson, Mississippi  39201
(601) 608-4186


*** DAILY TRANSCRIPT ***

**APPEARANCES**


FOR THE PLAINTIFFS:

    MR. JODY E. OWENS
    MS. ANNA Q. HAN
    MS. ERIN MONJU
    MS. ELISSA JOHNSON
    MR. ERIC GORDON BALABAN
    MR. RAVI DOSHI
    MS. REKHA ELAINE ARULANANTHAM
    MR. BENJAMIN R. SALK
    MS. CHELSEA K. CAVENY


COUNSEL FOR DEFENDANTS:

    MR. WILLIAM T. SILER, JR.
    MR. NICHOLAS F. MORISANI
    MS. MOLLY MITCHELL WALKER
    MR. MICHAEL J. BENTLEY
    MR. J. WILLIAM MANUEL
    MS. KRISSY C. NOBILE

```
1                    TABLE OF CONTENTS

2

3      WITNESSES FOR THE PLAINTIFFS:

4      DR. GLORIA PERRY                              4

5        Direct Examination By Ms. Monju  ....................4

6          Exhibit P-887  .................................17

7          Exhibit P-665  .................................19

8          Exhibit P-2173  ................................22

9          Exhibit P-728  .................................58

10         Exhibit P-2091  ................................66

11         Exhibit P-2176  ................................68

12         Exhibit P-735  .................................74

13         Exhibit P-2058  ................................86

14         Exhibit P-668  .................................93

15         Exhibit P-2823  ...............................107

16         Exhibit P-2840  ...............................111

17         Exhibit P-2818  ...............................113

18

19

20

21

22

23

24

25
```

1     (Court Called to Order)

2          THE COURT:  Ms. Monju, ready to proceed?

3          MS. MONJU:  Yes, Your Honor.  Plaintiffs call Gloria

4    Perry.

5          THE COURT:  Where is Ms. Perry?

6     (Witness Sworn)

7          THE COURT:  All right.  Ms. Monju, you may proceed.

8                    DR. GLORIA PERRY,

9     having first been duly sworn, testified as follows:

10                   DIRECT EXAMINATION

11   BY MS. MONJU:

12   Q    Good morning, Dr. Perry.

13   A    Good morning.

14   Q    Okay.  Could you state your name for the record.

15   A    Gloria Perry.

16   Q    You are MDOC's chief medical officer?

17   A    That's correct.

18   Q    You've been MDOC's Chief medical officer since 2008?

19   A    Yes, sir.

20   Q    You're also a medical doctor?

21   A    Yes.

22   Q    As chief medical officer, you report directly to the

23   commissioner?

24   A    Yes.

25   Q    And as chief medical officer, you were responsible for

1  overseeing all medical and mental health care that is provided

2  to MDOC prisoners?

3  A  That's correct.

4  Q  And that includes overseeing on site care provided by

5  private contractors in the prisons?

6  A  Yes.

7  Q  And that also includes coordinating specialty care with

8  offsite physicians like oncologists, for example?

9  A  That's correct.

10 Q  And you also monitor care that is provided when prisoners

11 are hospitalized?

12 A  Yes.

13 Q  I want to talk about your access to information in this

14 case for just a few minutes.  So, for example, you read a

15 report issued by a Dr. Terry Kupers in 2011 regarding

16 conditions at EMCF.  Is that right?

17 A  I don't recall reading a report from Dr. Kupers.  I read a

18 report from Dr. Stern and Dr. Gage.

19 Q  Do you recall testifying at your deposition in June 2017

20 that you had read a report by Dr. Terry Kupers back around

21 2011?

22 A  I don't recall that, no.

23 Q  You testified at your deposition and I'm just going to read

24 it to you quickly that, "I read a report by Dr. Kupers several

25 years ago.  I don't recall what year that was, but it was

1    several years ago."

2        And the question was, "Dr. Kupers has issued several

3    reports regarding MDOC.  Do you recall if that report was

4    related to EMCF or was it in 2014 or before 2014?"

5        And you responded, "It was before 2014?"

6        And the question was, "Would it sound right if I told you

7    it might have been a report that I he produced in 2011 about

8    the *Presley* litigation?"

9        And you said, "That sounds right, yes."

10   A   Okay.

11   Q   Do you recall testifying to that?

12   A   Yes.

13   Q   And so do you recall reading a report by Dr. Terry Kupers

14   around 2011?

15   A   Yes.  It was a long time ago.

16   Q   It was.  Okay.  Great.  I'd like to show you that report.

17   Just one moment.

18        MS. MONJU:  Your Honor, I just want to point out that

19   the screen appears to be having some difficulties this morning.

20   I don't know if that's the case on your screen as well.

21        I can proceed, Your Honor, while we're addressing

22   that, if you like.

23        THE COURT:  I would like for to you proceed.  That

24   would help us.

25        MS. MONJU:  Will, Your Honor.  Your Honor, permission

1    to approach the witness?

2           THE COURT:  Pardon?  Yes.

3           MR. BENTLEY:  Your Honor, Mike Bentley for the

4    defendants.  I'm going to object to questioning Dr. Perry about

5    Dr. Kupers' 2011 report.  If I recall, you sustained an

6    objection to Dr. Kupers testifying about his 2011 opinions

7    because they weren't relevant to this case, and I do not think

8    that they should be permitted to ask Dr. Perry to testify about

9    his opinions either.

10          MS. MONJU:  Your Honor, if I may respond?

11          THE COURT:  Yes.  I need to ask first is that where

12   your testimony is -- is that where your questioning is headed?

13          MS. MONJU:  We will ask Dr. Perry just a couple of

14   questions about what she read in this report, and that's

15   strictly for the purpose that Dr. Perry -- in Dr. Kupers' 2011

16   report, he included a number of findings about EMCF that are

17   still the same conditions plaintiffs assert are occurring

18   today.  And the point will be that Dr. Perry was aware of these

19   conditions as early as 2011.  It goes to notice.  And that will

20   be critical for the deliberate indifference claim.

21          THE COURT:  Anything further?

22          MR. BENTLEY:  No, Your Honor, other than even if

23   that's the purpose, I think the effect is to get Dr. Kupers'

24   opinions in through this witness which you've already sustained

25   an objection to.

1           THE COURT:  Overrule the objection.  I can handle the

2   effect myself.

3           MR. BENTLEY:  I understand.

4           MS. MONJU:  Thank you, Your Honor.

5   BY MS. MONJU:

6   Q   Dr. Perry, this is Dr. Kupers' 2011 report regarding EMCF.

7   Correct?

8   A   I'd have to take your word for it.  I don't know.

9   Q   Well, if I could, see it says "February 7, 2011" up here,

10  up top.

11  A   Yes.

12  Q   It says "Dr. Terry Kupers" at the top.

13  A   Yes.

14  Q   And the first line is, "Dear Deputy Commissioner Sparkman."

15  Would that be MDOC Deputy Commissioner Emmitt Sparkman?

16  A   Retired, yes.

17  Q   Retired.  Okay.  And then it says, "I'm writing to

18  summarize our discussion about EMCF."

19  A   Okay.

20  Q   So this is the report from Dr. Kupers you would have

21  reviewed?

22  A   I don't remember reading this report or this particular

23  letter, quite honestly.

24  Q   But you did testify that you read this report in your

25  June 20th, 2017, deposition?

 1  A   I said I read a report.  I don't know if this was the

 2  report.  I don't recall from my memory ever reading this.

 3  Q   Understood.  If I represent to you that there is no other

 4  report by Dr. Terry Kupers from 2011 about EMCF, would you have

 5  any reason to dispute that representation?

 6  A   No.

 7          MS. MONJU:  Your Honor, I move to admit Plaintiffs'

 8  Exhibit 2744 into evidence.

 9          MR. BENTLEY:  Your Honor, I object to the admission of

10  this exhibit into evidence.  This is Dr. Kupers' report, not

11  Dr. Perry's, and she said she has no recollection of reading

12  it.

13          THE COURT:  I sustain the objection.  Dr. Kupers'

14  report of 2011 is not material to this case.  It may be

15  material to what this lady knew at that time.

16          MS. MONJU:  Your Honor, if I may be heard on that

17  point very quickly.

18          THE COURT:  Pardon?

19          MS. MONJU:  If I may be heard on point -- on the

20  objection.

21          THE COURT:  Yes.

22          MS. MONJU:  The only point -- the reason we would want

23  to admit this report is not for the truth of the matter

24  asserted in Dr. Kupers' report.  We would like to admit this

25  exhibit because it shows what Dr. Perry was aware of in 2011.

1          THE COURT:  That's what I just said.

2          MS. MONJU:  So, your Honor, may we admit that exhibit

3    for that purpose?

4          THE COURT:  Ask her whether that's what she knew in

5    2011.  You don't have to admit an extraneous document to do

6    that.

7          MS. MONJU:  Yes, Your Honor.

8    BY MS. MONJU:

9    Q   So, Dr. Perry, you said this morning that you did read at

10   least two other expert reports filed in this case in

11   December 2016.  Is that right?

12   A   That's correct.

13   Q   That includes a report by Dr. Marc Stern?

14   A   Yes.

15   Q   And that also includes a report by Dr. Bruce Gage?

16   A   Yes.

17   Q   And do you recall you testified at your deposition that you

18   also reviewed the report by Dr. Terry Kupers?

19   A   You just read it to me so I guess I said it, but I don't

20   remember reading this.

21          THE COURT:  Will you speak up a little bit --

22          THE WITNESS:  Yes, sir.

23          THE COURT:  -- please.

24   BY MS. MONJU:

25   Q   And you believed that some of the findings -- some of the

1    findings in those reports were accurate.  Correct?

2    A   Some were accurate; some were not accurate.

3    Q   Okay.  Have you read the report by Dr. Marc Stern that he

4    filed in this case in 2014?

5    A   I don't recall reading that one.

6    Q   Were you aware that he filed a report in 2014?

7    A   I'm sure that I was, yes.

8    Q   You're sure you were aware of his 2014 report.  Were you

9    also aware of Dr. Kupers' 2014 report?

10   A   No.

11   Q   Were you not aware that Dr. Kupers filed a report in this

12   case in 2014?

13   A   Not that I'm aware of, no.

14   Q   Were you monitoring whether reports were filed in this

15   case?

16   A   No, I was not.

17   Q   Have you read any reports by Madeleine LaMarre in this

18   case?

19   A   I have not.  I read Dr. Stern's report that referred to her

20   report.

21   Q   But you did not read her report?

22   A   Correct.

23           THE COURT:  Ms. Monju, you are taking the same tack

24   that your colleagues have taken by trying to prove that a

25   witness is not telling the truth before you even ask what the

```
 1   witness' present testimony is.  You're asking did you read a

 2   report because you stated to me that you wanted to prove that

 3   she knew things that happened in -- that were -- about

 4   conditions that existed in 2011.

 5        Why don't you get first to what the conditions are now

 6   and then ask her.  What you are doing is impeaching testimony

 7   that she has not given.

 8        MS. MONJU:  Yes, Your Honor.

 9        THE COURT:  Ask her what her present knowledge is and

10   then you can ask her was that -- did that exist in 2011, and

11   then you can impeach her with these reports that are not

12   otherwise material to this case.

13        MS. MONJU:  Yes, Your Honor.  I will move it along,

14   and if I may just state for the record that we will have to

15   prove deliberate indifference in this case to succeed, and the

16   reason I was asking Dr. Perry about these reports is because if

17   Dr. Perry has been aware of these conditions for seven years

18   and they haven't changed which is --

19        THE COURT:  I know what you're doing.  You've already

20   told me what you're doing, but you're going at it in the wrong

21   direction.

22        MS. MONJU:  Understood, Your Honor.

23        THE COURT:  Ask her what the conditions are now, and

24   then ask her are these conditions any different from 2011 and

25   prove that they're not.
```

```
 1              MS. MONJU:  Absolutely, Your Honor.
 2              THE COURT:  What they were in 2011 is not relevant
 3    until you prove that what you say are current conditions.
 4              MS. MONJU:  Yes, Your Honor.
 5              THE COURT:  It's a waste of time to do it this way.
 6    All of you are making these things because you have gone in and
 7    dug out all of these records, and you say, Aha, I've got the
 8    witness.  Well, ask the witness.  The witness may agree with
 9    you.
10              MS. MONJU:  Yes, Your Honor.
11              THE COURT:  Without wasting a half a day's time.
12              MS. MONJU:  Yes, Your Honor.
13    BY MS. MONJU:
14    Q   Dr. Perry, as of June 2017, you had never visited EMCF.
15    Correct?
16    A   That's correct.
17    Q   Have you visited EMCF in the past year?
18    A   No.
19    Q   You've never been to EMCF?
20    A   I've never visited EMCF or several other prisons.
21    Q   Thank you, Dr. Perry.  Dr. Perry, you would agree that MDOC
22    is -- I apologize.  EMCF is MDOC's designated facility for
23    prisoners with mental health conditions?
24    A   It is, yes.
25    Q   Serious mental health conditions?
```

1    A    Mental health conditions.

2    Q    And you would agree that the number of prisoner at EMCF

3    that are on psychotropic medication for mental health

4    conditions is significantly higher than the number of prisoners

5    on psychotropic medications at other Mississippi hospitals.

6    A    I can't agree with that.  We have 3100 inmates on our case

7    load for mental health.  East Mississippi holds 1100 of those

8    inmates, and there are 2,800 inmates on psychotropics

9    throughout our system.  So the number of inmates on

10    psychotropic medications is not weighted more at East

11    Mississippi than any other facility.

12    Q    Dr. Perry, I'd like to show you an exhibit, Plaintiffs'

13    Exhibit 887.

14            MS. MONJU:  Your Honor, may I approach the witness?

15            THE COURT:  Yes, you may.

16    BY MS. MONJU:

17    Q    Dr. Perry, this is a report dated February 2016 that you

18    received from MDOC's current health care contractors,

19    Centurion.  Is that right?

20    A    That's right.

21    Q    And it is -- includes a number of data points about EMCF,

22    but one of those data points is the pharmacy utilization

23    report.  Is that right?

24    A    Yes.

25    Q    And if you look at the page that has the number 15968 at

1    the bottom, this is the pharmacy utilization report for EMCF.

2    Right?  That top line, and you can look on the screen if that

3    helps.

4    A   Yes, I see that.

5    Q   If you look at that last number, it says, "Percent of ADP

6    on psychotropics."  That means the percent of the average daily

7    population at EMCF that is on psychotropics.  Is that right?

8    A   That's right.

9    Q   And that percent is 76.3 percent?

10   A   That's what this says, yes.

11   Q   And so in February 2016, the percent of prisoners at EMCF

12   that were on psychotropic medications was 76.3 percent.

13   A   That's right.

14   Q   If you look at the next page, this says, "Overall."  Those

15   are the overall numbers for the Mississippi state prisons.  Is

16   that right?  And if it helps, as I understand it there are

17   about 17,400 prisoners in the Mississippi State prisons at that

18   time, and that's what the overall number for ADP is on this

19   row?

20   A   Yes.  That's what this page says.

21   Q   And at the end of that line it says that, "Across

22   Mississippi, the number of patients on psychotropic medications

23   was 15.6 percent"?

24   A   That's correct.

25   Q   So the number at EMCF was 60 percent higher?

1    A    That's an unfair comparison because this overall includes

2    community work centers who do not house inmates with mental

3    illness.  It also includes regional facilities who do not house

4    inmates taking psychotropics.  So the overall percentage of our

5    population that receives psychotropics is 15.6 percent, and

6    that includes inmates at East Mississippi.

7    Q    So, Dr. Perry, if you look at -- let me clarify.  This

8    report -- the numbers in this report are accurate.  Correct?

9    You're not disputing that?

10   A    That's correct.

11   Q    So if you look at that page, the first page we discussed,

12   it says "prisons," and there's 12,839 under ADP.  That's the

13   prison population in Mississippi?

14   A    The first page for --

15   Q    It's with the number 15968 at the bottom.  And we have it

16   highlighted on the screen, if that helps.

17        THE COURT:  If you'll look at your screen, it's up

18   there and might be easier.

19   A    Okay.  What is your question?

20   BY MS. MONJU:

21   Q    If you look at the end of the row, that says 21.2 percent

22   of the prison population in Mississippi is on psychotropics.

23   Is that right?

24   A    Okay.

25   Q    So the number of prisoners -- the rate of prisoner at EMCF

1   on psychotropics is more than 55 percent higher than the

2   Mississippi prison population as a whole?

3   A   Okay.

4   Q   So you would agree that the percentage of prisoners at EMCF

5   on psychotropics is higher than the prison population as a

6   whole?

7   A   Yes.

8            MS. MONJU:  Your Honor, I move to admit Plaintiffs'

9   Exhibit 887 into evidence.

10            THE COURT:  Hearing no objection, 887 will be received

11   into evidence.

12       (Exhibit P-887 marked)

13   BY MS. MONJU:

14   Q   So, Dr. Perry, we just talked about the fact that prisoners

15   at EMCF are on psychotropic medications at much higher rate

16   than other prisoners.  Would you agree that makes mental health

17   care an important service at EMCF?

18   A   It's an important service at all of our prisons that offer

19   mental health care.

20            THE COURT:  Ma'am, you're going to have to speak up so

21   that I can hear you.

22   BY MS. MONJU:

23   Q   Dr. Perry, is it right that Dennis Gregory is still your

24   mental health director for the state of Mississippi?

25   A   It's correct.

1    Q    Mr. Gregory is a licensed marriage and family therapist.

2    Is that right.

3    A    That's right.

4    Q    He's not a doctor?

5    A    That's right.

6    Q    Or a nurse?

7    A    He's a licensed marriage and family therapist.

8    Q    And you gave Mr. Gregory the role as mental health director

9    because he had a lot of passion for mental health?

10   A    Passion and understanding of the system.

11   Q    I'd like to talk just a moment about the mental health

12   services that are offered at EMCF.

13            MS. MONJU:  Your Honor, if I may approach the witness?

14            THE COURT:  Yes.

15   BY MS. MONJU:

16   Q    This is Plaintiffs' Exhibit 665.  This is an e-mail you

17   sent on November 5, 2015, regarding mental health services

18   available at MDOC prisons.  Is that right?

19   A    Okay.

20   Q    That's right?  Dr. Perry, I'm sorry.  Is that a yes or a

21   no?

22   A    I have to finish reading before I can answer.  Thank you.

23        (Short Pause)

24   A    Yes.

25   Q    In the highlighted section, you wrote, "There are

*** DAILY TRANSCRIPT ***

1    compliance mental health services available at several

2    prisons."  And that includes EMCF?

3    A   Yes.

4    Q   And you wrote that, "Mental health services include

5    formulation of individual treatment plans, therapeutic

6    treatment programs, group therapy, individual therapy,

7    psychiatric examination with prescribing and monitoring of

8    psychotropic medications, and crisis intervention."  Correct?

9    A   Correct.

10   Q   And these are the same services that are currently offered

11   at EMCF?

12   A   That's correct.

13           MS. MONJU:  Your Honor, I move to admit Plaintiffs'

14   Exhibit 665 into evidence.

15           THE COURT:  Hearing no objection, 665 is received into

16   evidence.

17      (Exhibit P-665 marked)

18   BY MS. MONJU:

19   Q   With respect to individual therapy, which we just

20   discussed, you'd agree, for instance, that it's not appropriate

21   for a mental health provider to have a clinical encounter with

22   a patient at the front of their cell.  Right?

23   A   Right.

24   Q   And that's because a session requires privacy?

25   A   Correct.

1    Q    And it is also your understanding that under MDOC policy

2    and the Centurion contract there should be individual treatment

3    at least every 30 days?

4    A    Correct.

5    Q    And, Dr. Perry, you would agree that EMCF needs adequate

6    staff in order to provide those services.  Correct?

7    A    Yes.

8    Q    Dr. Perry, I'd like to show you another exhibit.

9            MS. MONJU:  Your Honor, if I may approach?

10           THE COURT:  You may.

11   BY MS. MONJU:

12   Q    Dr. Perry, this is a report you received in early 2017

13   regarding mental health services at MDOC prisons.  Is that

14   right?

15           MR. BENTLEY:  Erin, do you mind taking that off?

16           MS. MONJU:  Absolutely, if you could take that off.

17   Your Honor, I understand that this report is marked "highly

18   confidential," but we do think it's important that it be shown

19   in open court.  One of the reasons that it should be shown in

20   open court is that the exact same version of this report, but

21   from a year later, was introduced into evidence yesterday and

22   shown in open court without objection.

23           And we believe that the data contained in this report

24   will be important to show in open court.  It concerns, for

25   example, the mental health care services that are currently

```
 1   being provided at EMCF and how adequately those services are

 2   being provided.

 3        THE COURT:  Do you agree that this is another annual

 4   version of the report that was introduced yesterday?

 5        MR. BENTLEY:  I do, Your Honor, and I forgot about

 6   that fact so I will withdraw the objection.

 7        THE COURT:  All right.  How are you describing this

 8   document?

 9   BY MS. MONJU:

10   Q   So, Dr. Perry, I believe we just said this is a report you

11   received in early 2017 about Centurion's provision of mental

12   health care services at MDOC prisons.

13   A   That's correct.

14   Q   On page 1, the report states that this review was conducted

15   in December 2016 to assess the mental health care services

16   delivered by Centurion and to identify areas that may require

17   improvement.  Is that right?

18   A   That's right.

19   Q   And if we go ahead and look at page 4, the report

20   identifies some areas of improvement or that need improvement,

21   and the report states, "Given the current vacancies and

22   staffing levels, staff work hard to provide necessary care to

23   patients throughout the facility but are not able to provide

24   all required services."  Is that right?

25   A   That's what the report says, yes.
```

1   Q   And if you look further down that page, the report makes

2   the recommendation that, "There may need" -- "there may be a

3   need to revisit the current staffing levels at EMCF."  Is that

4   right?

5   A   Yes.

6   Q   It also recommends that the regional office of Centurion

7   needs to continue to work with recruiting to fill necessary

8   vacancies?

9   A   Yes.

10  Q   I'd like to show you another exhibit that was entered

11  yesterday.

12          MS. MONJU:  And apologies, Your Honor.  Before I do

13  that, I move to admit Plaintiffs' Exhibit 2173 into evidence.

14          THE COURT:  2173?

15          MS. MONJU:  Yes, Your Honor.

16          THE COURT:  Hearing no objection, that will be

17  received into evidence.  Would you give me just a minute to

18  look at something?

19          MS. MONJU:  Yes, thank you, Your Honor.

20      (Exhibit P-2173 marked)

21          THE COURT:  All right.  You may continue.

22  BY MS. MONJU:

23  Q   Dr. Perry, I'd like to now show you what's been marked as

24  Joint Exhibit 68.

25          MS. MONJU:  Your Honor, may I approach?

```
 1              THE COURT:  You may.
 2    BY MS. MONJU:
 3    Q   Dr. Perry, this is the same type of report we just
 4    discussed.  It concerns Centurion's provision of mental health
 5    care services in MDOC prisons.  Is that right?
 6    A   Yes.
 7    Q   But this report is dated a year later.  It's from
 8    December 2017.  Is that right?
 9    A   Yes.
10    Q   And if we could look at page 4 of this report, it states
11    that, "MDOC mental health leadership reported significant
12    concerns about the services provided by Centurion."  Is that
13    right?
14    A   Yes.
15    Q   Now, it says MDOC mental health leadership.  Does that
16    refer to you or does it refer to Mr. Gregory?
17    A    Mr. Gregory.
18    Q   So Mr. Gregory believes that there are significant concerns
19    about the services provided by Centurion?
20    A   His concerns are for the treatment team meetings and
21    establishing the acute mental health unit and the residential
22    treatment unit.
23    Q   Well, Dr. Perry, I think this paragraph then goes on to
24    describe some of those significant concerns, and it states, "In
25    particular, challenges at EMCF were discussed, including the
```

```
 1   need to fill critical vacancies as well as provide more

 2   intensive clinical services for patients with serious mental

 3   illness."  Correct?

 4   A   The vacancy he's referring to is the psychiatrist, yes.

 5   Q   And that's a critical vacancy?

 6   A   Yes, it is.

 7   Q   So --

 8          THE COURT:  Excuse me just a minute.  Who is included

 9   in MDOC mental health leadership that did the reporting here?

10          THE WITNESS:  Mr. Dennis Gregory is the mental health

11   director for MDOC.  I believe that's who they spoke to -- or

12   spoke with when they wrote this report.

13          THE COURT:  You're not included in the mental health

14   leadership of MDOC?

15          THE WITNESS:  They did not talk to me, no, sir.

16          THE COURT:  Were you aware of this?

17          THE WITNESS:  I was aware -- Mr. Gregory gave me a

18   briefing after they spoke with him.

19          THE COURT:  Were you aware of the recommendation that

20   the amount of mental health providers was not in accordance

21   with the -- as I take this with the contract that Centurion had

22   agreed to provide?

23          THE WITNESS:  Yes, sir.  I was aware that the

24   psychiatrist at East Mississippi -- that position has not been

25   filled.  They are still heavily recruiting for a full-time
```

1    psychiatrist.  In the meantime, they have --

2              THE COURT:  How long has that been that they've been

3    recruiting and haven't found four or five psychiatrists?

4              THE WITNESS:  The psychiatrist at -- the full-time

5    psychiatrist at East resigned in November, and since

6    November 2017 they've been recruiting to replace him.

7              THE COURT:  Are there other psychiatrist positions

8    vacant at other prisons?

9              THE WITNESS:  Yes, sir.  The psychiatry -- psychiatry

10   is a difficult position to fill at all prisons in the United

11   States.  There are shortages of psychiatrists.  There's a

12   shortage of psychiatrists in our state, the state of

13   Mississippi outside of prisons.  So it's difficult to find a

14   psychiatrist.

15             THE COURT:  All right.

16   BY MS. MONJU:

17   Q   Dr. Perry, we're going to talk more about those vacancies

18   at EMCF as well, but let's keep talking about the mental health

19   care services described in this report, and then we can turn to

20   that.  And just to be clear, Dr. Perry, do you share Mr.

21   Gregory's concerns that there is a need to fill critical

22   vacancies add EMCF?

23   A   I share his opinion that we need a full-time psychiatrist,

24   yes.

25   Q   And do you share his concern that there needs to be more

1   intensive clinical services for patients there with serious

2   mental illness?

3   A    I'm not sure I share that opinion.  I see -- despite the --

4   there not being a full-time psychiatrist, they do are

5   psychiatrists filling in, and they offer treatment team

6   meetings, and they're offering services.

7   Q    So is your only concern with EMCF mental health care at the

8   moment, that there's no psychiatrist?

9   A    That's one of my concerns, yes.

10  Q    Let's go to page 13 of this report.  You mentioned that

11  individual treatments plans are something that happen at EMCF.

12  Is that right?

13  A    Yes.

14  Q    And if you look at page 13, this states that there's a

15  significant backlog in completing initial or reviewing

16  treatment plans at the majority of the sites but that

17  completion of these plans and reviews need significant

18  improvement at EMCF.  Is that right?

19  A    This redaction is misleading because there are other

20  facilities that have the same problem.  So it's not just

21  singled out at EMCF.

22  Q    And, Dr. Perry, just to be clear, your counsel included

23  these redactions on this report.  If we can go to page 15.

24  This report states that significant treatments in individual

25  therapy are needed at EMCF and patients receiving individual

1   treatment every 30 days?

2   A   I'm having trouble finding where you are.

3   Q   We're going to go ahead and find that for you.  Just one

4   moment.

5      (Short Pause)

6   Q   So, Dr. Perry, that top line, it says, "There's been an

7   increase by 20 percent of the 30-day contact percentage."  And

8   as we just discussed, that means seeing a mental health

9   provider every 30 days.  Right?

10  A   Right.

11  Q   So that's improved 20 percent statewide, but there's still

12  significant improvements needed at EMCF?

13  A   Yes.  That's what this report says.

14  Q   And then as we were looking at just a couple of minutes

15  ago, at the bottom of the page, for the records that were

16  sampled at EMCF, there's only evidence of 10 percent of the

17  patients at EMCF receiving group treatment.  Is that right?

18  A   Yes, there were 10 records reviewed.  That's a small sample

19  size, in my opinion.

20  Q   And, Dr. Perry this is a contract compliance review that

21  MDOC conducted.  Right?

22  A   No, this is conducted by Centurion.

23  Q   Dr. Perry, is it right that Centurion contracts with MDOC

24  to provide these services?

25  A   I'm sorry.  I don't understand your question.

```
1   Q    Is it right that Centurion is your contractor?

2   A    Is it right?

3   Q    Centurion is your contractor.  Correct?

4   A    Yes.

5   Q    You pay them.

6   A    Yes.

7   Q    And you can tell them how sampling methodologies should

8   work in their contract compliance review reports?

9   A    I could, but why would I?  This is an internal review

10  they're conducting for themselves.

11  Q    So you don't think there is important information in this

12  report for you as well?

13  A    I think there is important information, but I did not

14  sanction or tell them to do this review.  They do it themselves

15  annually as a checkup of their own compliance.

16  Q    And if you had a sampling problem as they were checking up

17  with their compliance, you wouldn't tell them to change that

18  sampling methodology?

19  A    I don't understand your question, because you're trying to

20  say that if I thought this sample size was too small I should

21  tell them to increase the sample size.  This is their internal

22  review.  They're conducting for the sake of their own staff.

23  It was not meant to be seen in court or seen by any other

24  person.  So I don't understand why I would interfere with their

25  internal review.
```

```
1           THE COURT:  Did you review this report?

2           THE WITNESS:  Yes, sir.

3           THE COURT:  You don't think it -- as the head of the

4     whole medical department if you saw something in a report that

5     you found to be inadequate that you should mention it and have

6     something done about it?

7           THE WITNESS:  When they conduct their review next year

8     or this year, they can increase their sample size.

9           THE COURT:  I'm not talking about sample size.  I'm

10    talking about whether the services are adequate -- being

11    adequately provided to the prisoner.

12          THE WITNESS:  Yes, sir.  We meet every other week to

13    discuss services, and we conduct our own -- MDOC conducts

14    audits regarding chart reviews and seeing if the inmates are

15    being seen adequately.  So we do that apart from this report.

16    This is in addition to what we do.

17          THE COURT:  Have you seen problems in any other

18    reports of the adequacy of mental health services to the

19    prisoners at East Mississippi?

20          THE WITNESS:  For the most part, they have difficulty

21    with sick call, the process and the inmates being seen with

22    sick call.  The sick call is a system where if an inmate

23    desires services from a physician or a nurse practitioner,

24    whether it is mental health or medical or dental, they submit a

25    slip or a form requesting that service.  That form is picked up
```

1    daily by the medical staff and reviewed, and then the inmate is

2    seen in the clinic.

3           When they are seen in the clinic, they must be seen by

4    a professional RN.  And once they're seen by the RN, she

5    determines whether they can be treated with what we call

6    nursing protocol.  That means if they have some common problem

7    that she can take care of right then, they could go ahead and

8    get seen.  If there's something that is above the nursing scope

9    of practice, then they have to be referred to a physician or a

10   nurse practitioner, and they have to be seen within seven days.

11          That seven-day period compliance has been a problem

12   with this particular facility because initially they had a

13   physician that was lazy, in my opinion, and just didn't see the

14   inmate.  And following that, they had difficulty filling that

15   spot.

16          But now we have a full-time physician and two nurse

17   practitioners so that problem has been reduced and resolved.

18   But there is still a backlog so we're trying to fix that

19   problem and get it caught up.  So the problem with inmates

20   being seen for their requested medical conditions is improving,

21   and that resulted from our audit of their sick call practice.

22          THE COURT:  Have you considered or discussed with

23   Centurion that they might need to be replaced by another

24   provider?

25          THE WITNESS:  Well, they have a contract that ends in

```
 1   2019, and it will go out for procurement again.  So it has to
 2   be rebid, and they have to win that procurement again.  So yes,
 3   sir, that --
 4          THE COURT:  But if they are not providing the services
 5   as provided by the contract, they can be replaced, like any
 6   other contractor --
 7          THE WITNESS:  They can.
 8          THE COURT:  -- can they not?
 9          THE WITNESS:  Yes, sir, they can.
10          THE COURT:  That has not been considered or discussed
11   with them?
12          THE WITNESS:  It has been discussed actually.
13          THE COURT:  All right.  You may proceed, Ms. Monju.
14          MS. MONJU:  Thank you, Your Honor.
15   BY MS. MONJU:
16   Q   Dr. Perry, you said that two concerns you have at EMCF are
17   sick calls and you had concerns regarding mental health care
18   including vacancies at EMCF.  Do you have other concerns at
19   EMCF?
20   A   No, those are the two major concerns.  They have already
21   opened the acute care unit and the residential treatment unit.
22   So those concerns have been resolved.
23   Q   Let's talk briefly about that treatment unit you just
24   mentioned.  Is that Housing Unit 3?
25   A   Yes.
```

1    Q    And that's recently been set up as a residential mental

2    health unit for patients with serious mental illness?

3    A    That's correct.

4    Q    If we could look at page 26 of the same report we were

5    discussing.  So as you mentioned this is a brand new service at

6    EMCF.  Right?

7    A    Right.

8    Q    At page 26 -- we're going to get that highlighted for you.

9    You can see that it says "Staffing was not sufficient to ensure

10   that all patient have access to intensive service, including

11   individual and group therapy due to vacancies."  Is that right?

12   A    That's right.

13   Q    And this report states that Housing Unit 3 not all the

14   patients were seen every 30 days by a mental health

15   professional?

16   A    Is that on this page?

17   Q    I'm sorry.  That's page 28.  See it says, "Record review

18   indicated that patients on Housing Unit 3 were not seen by a

19   mental health professional every 30 days in accordance with

20   their treatment plans and policy requirements"?

21   A    That's correct.

22   Q    So this is a brand new service at EMCF, and even with this

23   service, there's insufficient staffing and prisoners are not

24   being seen every 30 days in accordance with policy and their

25   treatment plans"?

1   A    Since this report was written, they are fully staffed with

2   MHPs now.

3   Q    And this report was issued in December 2017?

4   A    Yes.

5   Q    Do you have documentation of that with you today?

6   A    I don't, no.

7   Q    Just a couple of more points in this report.  On page 17,

8   this report states that despite staff reports of backlogs,

9   patients appear to be seen by a psychiatric provider at least

10  every 90 days at all sites with the exception of EMCF?

11  A    That's correct.  That's because of the absence of a

12  full-time psychiatrist.  They do have a full-time psychiatric

13  nurse practitioner.

14  Q    So at every prison except EMCF, which has the most patient

15  on psychotropic medication, patients on psychotropic

16  medications were seeing psychiatric providers timely.  Correct?

17  A    Correct.

18  Q    But not at EMCF?

19  A    For this brief period, that's correct.

20  Q    For this annual report that was issued in December 2017?

21  A    Yes.  Between -- since the full-time psychiatrist was not

22  on staff, they did fall below their 90 percentile.

23  Q    You you've testified that there has not been a full-time

24  psychiatrist on staff at EMCF for at least five months?

25  A    Since November 2017.

1    Q    I'd like to talk about page 25 of the report.  So you

2    mentioned that crisis intervention occurs at MDOC prisons.

3    Correct?

4    A    Yes.

5    Q    And what that means is that prisoners may be placed on

6    suicide watch or psychiatric observation?

7    A    That's right.

8    Q    Okay.  And on page 25, this report states that EMCF had

9    long lengths of stay for patients on suicide watch or

10   psychiatric observation?

11   A    Yes.

12   Q    The report also states that, "If crises that are requiring

13   patients to be on watch are lasting more than two weeks, staff

14   should be referring patients to a more suitable treatment

15   location or giving them more intensive treatment than just

16   watching them."

17   A    That's what the purpose of the acute care unit is for.

18   BY MS. MONJU:

19   Q    Okay.  But this report state that if prisoners are being

20   held on watch for more than two weeks they need more intensive

21   treatment.  Is that right?

22   A    Yes.

23   Q    So, Dr. Perry, if we look at page 24 of this report, it

24   states that the average number of days that prisoners at EMCF

25   are held on watch is 22 days.  Do you see that?

```
 1   A    Yes.

 2             THE COURT:  Excuse me.  Is that suicide watch or --

 3             MS. MONJU:  Yes, Your Honor.

 4             THE COURT:  Or watch in general?

 5             MS. MONJU:  Suicide watch and psychiatric observation.

 6             THE COURT:  You can have -- Doctor, can you have

 7   psychiatric observation without it being suicide observation?

 8             THE WITNESS:  Yes, sir, you can.

 9             THE COURT:  Is this a -- does this combine the two?

10             THE WITNESS:  It does.

11             THE COURT:  I assume the suicide watch would be much

12   smaller than the -- smaller than the overall number.

13             THE WITNESS:  That's correct, yes, sir.

14             THE COURT:  All right.

15   BY MS. MONJU:

16   Q    So, Dr. Perry, this report, as we just discussed, said

17   patients need more intensive care if they are on suicide watch

18   or psychiatric observation for more than two weeks.  Correct?

19   That's what we just discussed?

20   A    Yes.

21   Q    This report says that EMCF patients are on average being

22   kept in watch for more than three weeks.  Is that correct?

23   A    Yes.  That's the reason we were intensely ready for this

24   acute care unit.

25   Q    Thank you, Dr. Perry.  So we're just going to look at one
```

```
1   number quickly from that 2016 report we were discussing.  And

2   that's going to be on page 24 of the 2016 report.  I believe

3   it's in front of you.

4            THE COURT:  Excuse me, how many patients do you

5   average in the acute care facility, if that's the correct word.

6            THE WITNESS:  We have five, an average of five.  We've

7   already had one -- it opened a month ago.  We've had five so

8   far, and one of them has stabilized and been rehoused at

9   another part of the facility.

10           THE COURT:  And how long has it been opened?

11           THE WITNESS:  About a month.

12  BY MS. MONJU:

13  Q   Dr. Perry, we were looking at the 2016 report about the

14  average number of days that prisoners at EMCF are on watch.

15  And you can see that the number in December 2016 was 12, 12

16  days?

17  A   I'm trying to find it.

18  Q   It's on the screen, if that helps.

19  A   Yes.

20  Q   So from 2016 to the end of 2017, the average number of days

21  that prisoners were being held on suicide or psychiatric

22  observation increased from 12 days to 22 days?

23  A   Well, it includes suicide and psychological.  I would

24  expect at a psychiatric for there to be psychological watch.

25  Q   I'm not disputing that, Dr. Perry.  But in this it says
```

1  people were being held for 12 days on watch and in next report

2  that it nearly doubled to 22 days.  Is that right?

3  A   Yes.

4  Q   And the 2017 report said that that shouldn't be happening

5  because patients shouldn't be held for more than 14 days on

6  watch?

7  A   On suicide, yes.

8  Q   And psychiatric observation.  Is this because there's no

9  psychiatrist at EMCF?

10          THE COURT:  Wait, wait.  Those don't necessarily mix,

11  to my understanding.  Suicide watch, they shouldn't be on watch

12  more than 14 days is one thing.  Psychiatric -- psychiatric

13  observation shouldn't be on more than 14 days could be a

14  completely different situation.  In other words, a patient who

15  is not suicidal might need --

16          THE WITNESS:  Additional care.

17          THE COURT:  -- psychiatric watch, if he's cutting

18  himself, for instance.  So can you maybe clarify that concept

19  for me?

20          MS. MONJU:  Absolutely, Your Honor.

21  BY MS. MONJU:

22  Q   And, Dr. Perry, feel free to chime in if I'm getting this

23  wrong.  But I'm going to summarize that 2017 report from the

24  court.  So as I understand it, suicide watch and psychiatric

25  observation occur when a patient is in an acute --

```
 1              THE COURT:  I think you should do it by question.
 2    BY MS. MONJU:
 3    Q   Dr. Perry, let me know if you agree.  So suicide watch and
 4    psychiatric observation occur when a prisoner is in an acute
 5    mental health crisis.  Is that right?
 6    A   That's correct.
 7    Q   Means they could be a danger to themselves, danger to
 8    others.  They need to be watched closely.
 9    A   Correct.
10    Q   And the purpose of watch is that it should be temporary
11    because that crisis needs to be addressed and we need to move
12    past it.  Is that right?
13    A   That's right.
14    Q   Okay.  So that's the reason that both people on suicide
15    watch and people on psychiatric observation, if they're held
16    for more than 14 days, the problem's not getting fixed.  Right?
17    A   It means that the problem still exists.
18    Q   And that means they, for instance, may need to be moved to
19    a more intensive treatment facility so they can get different
20    and sort of more thorough treatment?
21    A   More intense treatment, yes.
22    Q   Okay.  And you would agree with that?
23    A   I agree with that.
24    Q   Okay.
25              MS. MONJU:  Does that help, Your Honor?
```

```
1              THE COURT:  Yes.

2    BY MS. MONJU:

3    Q    And so, Dr. Perry, one of the things we were discussing

4    about suicide watch and psychiatric observation is that there's

5    a mental health unit at EMCF.  Is that right?

6    A    That's right.

7    Q    I'm sorry.  A medical unit.  I apologize.  And this medical

8    unit houses people who need to be closely observed.  Is that

9    right?

10   A    That's right.

11   Q    Sometimes in this medical unit there aren't sufficient beds

12   for all the patients who need to be there.  Is that right?

13   A    You're talking about the infirmary?

14   Q    I am.

15   A    Yes.

16   Q    And sometime as a result a patient either psych -- mental

17   health patients or medical patients have to be held in what we

18   call the intake unit.  Right?

19   A    I don't believe they utilize the intake unit for that

20   purpose, no.

21   Q    Okay.  Were you aware that there's a contract monitor at

22   EMCF that monitors the safety and security issues at the

23   prison?

24   A    Yes.

25   Q    And are you aware that she files weekly reports with MDOC?
```

```
 1   A   Yes.

 2   Q   And were you aware that in -- several times in 2017 she

 3   found that patients who were on suicide watch were being held

 4   in the intake unit?

 5   A   No, I had not seen those reports.  But since the acute care

 6   unit opened, that should not be a problem anymore, utilizing

 7   the intake for suicide watch or psychiatric watch.

 8   Q   But again you have no documentation today showing that that

 9   has improved?

10   A   No, I don't.

11           THE COURT:  How many beds are in this intake unit or

12   in the -- what did you call it?

13           THE WITNESS:  Acute care unit?  We're admitting five

14   patients.

15           THE COURT:  How many bed are there?  Five?

16           THE WITNESS:  There are 20 beds.  But just -- since it

17   opened a month ago, we're trying to make sure it's working

18   correctly so we're only admitting five at a time.

19           THE COURT:  You will have room for --

20           THE WITNESS:  For 20.

21           THE COURT:  -- 20 patients?

22           THE WITNESS:  Yes, sir.  Especially once the full-time

23   psychiatrist is at the facility.

24   BY MS. MONJU:

25   Q   So, Dr. Perry, just to be clear, we just discussed the
```

1    infirmary.  There are ten beds in the infirmary.  Correct?

2    A   Yes.

3    Q   And we just discussed there are too many patients to be in

4    those beds, and they have to be held in intake?

5    A   Right.

6    Q   And you're saying that there are only five beds in the

7    acute unit?

8    A   There are 20 beds, but there -- we're admitting five people

9    at a time initially --

10   Q   Okay.

11   A   -- to work out the kinks.

12   Q   So we were just discussing the fact that patients on

13   suicide watch are sometimes being held in intake.  Did you know

14   that in the MDOC contract monitor's report she also noted at

15   least a couple of instances where prisoners were not being

16   checked on every 15 minutes while they were on suicide watch?

17   A   No, I didn't notice that.  Didn't know that.

18   Q   And if we look at page 25 of the mental health report

19   again, there's a specific concern with respect to --

20   A   Which one is this?

21   Q   Page 25, and it's that 2017 report we were discussing.

22   A   Okay.

23   Q   So on page 25, it states that -- we're going to highlight

24   that for you.  It appeared that safety mattresses were not

25   being provided to patient on suicide watch.  Do you see that?

1   A   Yes.

2   Q   And so this is the 2016 report.  I apologize that we're

3   look at right now.  And this is advising that safety mattresses

4   need to be provided to all MDOC prisoners on suicide watch.  Is

5   that right?

6   A   Yes.

7   Q   And a safety mattress is just something that means the

8   prisoners can't harm themselves with the mattress?

9   A   Correct.

10  Q   And that's important because they're on suicide watch.

11  A   Correct.

12  Q   Okay.  So now we are going to look at page 25 of the 2017

13  report.  Sorry about that.  And while we pull that up -- so if

14  you look at the bottom of this, it says, "Reviewers noted that

15  the mattresses were not being provided to patients on suicide

16  watch at EMCF."  Do you see that?

17  A   You mean the one that says that the mattresses appear not

18  to be safety mattresses?

19  Q   Correct.

20  A   Correct.

21  Q   And that means that patients who are on suicide watch at

22  EMCF are being given mattresses that they can use to harm

23  themselves with?

24  A   They're given a regular mattress, correct.

25  Q   And that's despite a recommendation in the 2016 report that

*** DAILY TRANSCRIPT ***

```
 1   patients on suicide watch should be given safety mattresses?
 2   A   Correct.
 3           THE COURT:  What's the difference in a regular
 4   mattress and a safety mattress?
 5           THE WITNESS:  A safety mattress, if you put pressure
 6   on the thread, they break.  With a regular mattress, they don't
 7   break.  That's the only difference.  So if they're trying to
 8   hang themselves, if they pull the threads out of the safety
 9   mattress trying to hang themselves, when they put pressure on
10   that rope that they made, it will break.  And with a regular
11   mattress, it may not necessarily break.
12           THE COURT:  Okay.  Sometimes in my business you learn
13   something new every day.
14   BY MS. MONJU:
15   Q   So, Dr. Perry, I know one of the concerns you talked about
16   today was that EMCF -- they were having difficulties filling
17   vacancies.  Is that right?
18   A   That's right.
19   Q   And the minimum staffing levels at EMCF, those are set in
20   the contract with Centurion.  Is that right?
21   A   That's right.
22   Q   And you received monthly reports from Centurion that
23   reflect current staffing levels?
24   A   Yes.
25   Q   So you're able to track who's on staff at EMCF every month.
```

```
 1   Is that right?

 2   A   I track the FTE percentages.  I don't necessarily look at

 3   the individual positions.

 4   Q   Okay.  Just to break that down, FTE --

 5   A   Full-time equivalent.

 6   Q   Thank you, Dr. Perry.  And the minimum staffing at EMCF,

 7   essentially they have to have a set number of FTEs at any time.

 8   Right?

 9   A   Correct.

10   Q   But those FTEs are broken down by position.

11   A   Yes.

12   Q   So, for example, they need one doctor at EMCF.

13   A   Yes.

14   Q   But you don't monitor whether or not they have that

15   position filled.  You just look at the FTEs?

16   A   For key positions such as the psychiatrist and the

17   physician, yes, I look at those every month.

18   Q   But, for instance, you may not know if there are vacancies

19   with nurses?

20   A   Correct.

21   Q   And I know -- strike that.  So three important positions in

22   health care at EMCF are site medical director, health services

23   administrator, and director of nursing.  Is that right?

24   A   That's right.

25   Q   And just to clarify a couple of points of that terminology,
```

```
1   site medical director is the physician.  Right?
2   A   Yes.  That's the physician.  He manages the medical program
3   at the facility.
4   Q   And the health services administrator, that's the chief
5   health care administrator at the prison?
6   A   Yes.  That's the site manager.
7   Q   Right.  And he essentially makes sure all the trains are
8   running on time.
9   A   Correct.
10  Q   And the director of nursing, I think that's an obvious one.
11  That is the nurse who's in charge of all the other nurses?
12  A   The head nurse, yes.
13  Q   Great.  And it's your position that Centurion needs to be
14  successful in recruiting in order to be in compliance with its
15  contract.  Is that right?
16  A   That's right.
17  Q   But you've acknowledged that Centurion has had difficulty
18  recruiting and retaining staff at EMCF?
19  A   Yes.  It's a national problem with recruiting and retaining
20  medical staff in prisons.
21  Q   So let's talk about, I think, those problems as they relate
22  to EMCF.  Centurion's had problems keeping a doctor, a health
23  services administrator, a director of nursing, and a
24  psychiatrist at EMCF.  Is that right?
25  A   Yeah.  There is a full-time doctor there now.
```

```
 1   Q    Okay.  Let's talk about that.  So there has to be one

 2   physician at EMCF.  Is that right?

 3   A    Yes, at least -- we want a site medical director at each

 4   facility, yes.

 5   Q    Okay.  And that's one doctor for about 1200 prisons?

 6   A    Yes.

 7            THE COURT:  How many -- with how many prisons does

 8   Centurion contract?

 9            THE WITNESS:  They're in several states.  I don't know

10   how many prisons they actually contract with, but we have six

11   prisons in Mississippi and 15 regional facilities, and they

12   provide the staff for all of those.

13            THE COURT:  And that would include a doctor for every

14   prison?

15            THE WITNESS:  Yes, sir.

16            THE COURT:  And if they've got 25 contracts around the

17   country, where would a Mississippi prison stand as an

18   attractive job for a doctor compared to those over 15 or 25

19   places?

20            THE WITNESS:  Prisons in general are not really

21   attractive for doctors to work in.  We have trouble recruiting

22   physicians, nurses, psychiatrists.  Nationwide -- it's a

23   nationwide problem, including the Federal bureau of Prisons.

24   They also have staffing shortages.  So it's a problem.

25            THE COURT:  Are pay, type of work, and location, all
```

```
 1  three major issues?
 2          THE WITNESS:  Yes, sir.  And it's not very prestigious
 3  to work in a prison.
 4  BY MS. MONJU:
 5  Q   So Dr. Perry, we were just discussing the physician role at
 6  EMCF.  Dr. Rolando Abangan was the physician at EMCF for
 7  several years.  Is that right?
 8  A   That's right.
 9  Q   He was fired in January 2017?
10  A   Yes.
11  Q   And EMCF did not hire a replacement for him until around
12  October 2017?
13  A   Correct.
14  Q   So there was no permanent position at EMCF for ten months?
15  A   They used an agency locum tenens doctor, and the call was
16  taken by the other physicians in the state.
17  Q   So other physicians were traveling from other prisons in
18  order to provide care at EMCF?
19  A   Yes.
20  Q   And I think you testified in your deposition that that
21  could make the other doctors tired because their case load
22  would increase?
23  A   Yes.
24  Q   And so for ten months, there was no one who was permanently
25  providing care at EMCF to the prisoners?
```

```
1   A   I don't like the way you say that.

2   Q   Fair enough.

3   A   But it took ten months --

4   Q   Ten months?

5   A   -- to find a full-time.

6   Q   Understood.  And it's your position that not having a site

7   medical director was one of the instances in which Centurion

8   failed to meet its contract obligations?

9   A   Yes.

10  Q   And we've already discussed there's not been a permanent

11  psychiatrist at EMCF for about five months now.  Is that right?

12  A   That's right.

13  Q   And we talked about the role of health services

14  administrator.  That's one of the top three positions at EMCF?

15  A   Correct.

16  Q   So Mr. James Little was the health services administrator

17  at EMCF for several years?

18  A   Yes.

19  Q   He went by Ollie.

20  A   Right.

21  Q   And he was fired in January of 2017?

22  A   I don't know the circumstances of his vacancy, but he left

23  in January, yes.

24  Q   So you testified in June 2017 that he was fired because he

25  didn't have very good organizational skills.  Does that sound
```

```
 1   right?

 2   A   I don't know if he was fired for that reason, but he didn't

 3   have good organizational skills.

 4   Q   And Centurion did not hire a replacement for Mr. Little

 5   until about May of 2017.  Is that right?

 6   A   It took quite a few months, yes.

 7   Q   And the person that was hired was Eric Brisco.

 8   A   Yes.  And he worked there about a week and took another

 9   job.

10   Q   And at your deposition, you testified that Mr. Brisco

11   seemed perfect for his job at EMCF?

12   A   Yes.

13   Q   And he left after a week?

14   A   I believe it was a week.  He was recruited away by another

15   company.  So he took the better job.

16   Q   And Centurion did not hire a permanent health services

17   administrator at EMCF until October 2017?

18   A   Yes, it took quite a while to find a replacement.

19   Q   And so again from about January 2017 to October 2017, there

20   was no health services administrator at EMCF?

21   A   There was a person from the central office -- the regional

22   office filling in.

23   Q   But no permanent health services administrator?

24   A   No.

25   Q   And we also discussed the director of nursing at EMCF.  Are
```

1  you aware that there were three different directors of nursing

2  at EMCF in 2017?

3  A   Yes.

4  Q   And we were also discussing whether EMCF was an attractive

5  place to work.  Would it sound right to you that Dr. Abangan,

6  who was the physician we discussed who was at EMCF for several

7  years made about $200,000 a year?

8  A   That's a lot of money.

9  Q   It is.  I'd take that.  Okay.  Great.  So let's talk a

10 little bit more about Dr. Abangan.  So under Centurion's

11 contract, you have approval authority over senior health care

12 positions at EMCF.  Is that right?

13 A   That's right.

14 Q   Okay.  And that would include the medical director, the

15 physician, nurse practitioners, director of nursing, and the

16 health services administrators.  Does that sound right?

17 A   Yes.

18 Q   And so applications are sent to you for your review before

19 these people are hired.

20 A   Yes.  The -- what -- once the regional vice president or

21 the regional director of nurses or whoever is doing the

22 interviewing makes a selection, they send those applications to

23 me to review or resumés.

24 Q   Got it.  And if you for whatever reason didn't approve of a

25 candidate, Centurion wouldn't hire that person.

1   A   Yes.  Correct.

2   Q   So as of June 2017, you had never exercised that veto

3   power.  Right?

4   A   That's right.

5   Q   And in addition to hiring decisions, you can also recommend

6   that Centurion take disciplinary action against employees?

7   A   I don't usually interfere with their personnel issues, but

8   if there is a person causing a problem with health care or

9   providing services to the inmates, then I will make a

10  recommendation.

11  Q   Great.  So let's talk about Dr. Abangan.  Dr. Abangan had

12  joined EMCF with GEO.  Correct?  That the first contractor way

13  back in the day?

14  A   Yes.

15  Q   And he got there in 2008.  Does that sound right?

16  A   I suppose.  He's been there awhile or was there awhile.

17  Q   Got it.  And as we discussed, he was fired in January 2017.

18  Is that right?

19  A   Yes.

20  Q   And that's about nine years later?

21  A   Yes.

22  Q   Isn't it right, though, that MDOC had received

23  recommendations to fire Dr. Abangan as early as 2011?

24  A   I had not received any recommendation.  I read that in one

25  of those reports.  In 2016 I read about Dr. Abangan.  And

1    that's the first time I actually knew about that event in the

2    past.

3    Q    Got it.  So I think all the things we're about to discuss,

4    you weren't aware of any of these events until you read

5    plaintiffs' expert reports --

6    A    That's correct.

7    Q    -- in like January of 2017.  Did us that sound about right?

8    A    Yeah.

9    Q    So one of the reports we discussed was a report by

10   plaintiffs' expert named Madeleine LaMarre.  She's a nurse, and

11   she issued that report in 2011.  Are you familiar with that

12   report?

13   A    That's the report that was included in Dr. Gage's report.

14   So by that, yes.

15   Q    Okay.  And Nurse LaMarre --

16   A    Dr. Stern's report.  Sorry.  Dr. Stern.

17   Q    There's a lot of doctors floating around.

18   A    Yes.

19   Q    And in Nurse LaMarre's 2011 report, she actually said that

20   Dr. Abangan was dangerous to patients and that he should be

21   immediately removed from EMCF.  Does that sound familiar?

22   A    You know, I don't remember reading that, but that's really

23   bad.

24   Q    That's bad, yeah.  I think we're on the same page on that.

25   So you never saw that report?

1    A    No.

2    Q    You were not made aware of that report?

3    A    No, I want.

4    Q    Were you aware that the Warden of EMCF in 2011 also said

5    that Dr. Abangan should be immediately fired?

6    A    No.

7              THE COURT:  What's the relevance of the conduct or the

8    ability of a doctor in 2011 who was -- has since been fired?

9              MS. MONJU:  Your Honor, we're going to, I think,

10   quickly walk through a series of events that Dr. Abangan was

11   permitted to continue working as the doctor at EMCF for nearly

12   ten years or spread across ten years despite the fact that the

13   Warden, Nurse LaMarre, said he should be fired immediately in

14   2011, the deputy commissioner for MDOC said she should be fired

15   in 2011.  He got rehired after he was fired.  Dr. Perry herself

16   sent an e-mail in 2015 saying he's dangerous.

17             THE COURT:  You think we should swear her in?

18             MS. MONJU:  Apologies, Your Honor.

19             MR. BENTLEY:  I don't.  I do think, to Your Honor's

20   point, that it's been established Dr. Abangan has been

21   terminated by the current provider, and I don't know why we

22   have to cover ten years of his history as a doctor.

23             THE COURT:  When was he terminated?

24             MS. MONJU:  January 2017, Your Honor.  But if I may,

25   one of the central items plaintiffs will have to prove is

1    deliberate indifference, and we're going to show you that Dr.

2    Perry was aware that Dr. Abangan was dangerous to patients for

3    years before he was fired and that because Dr. Perry is still

4    in charge of health care at EMCF, there's frankly no reason to

5    believe that this won't happen again without outside

6    intervention.

7    A   Dr. Abangan was not my employee.  I could not fire him.  I

8    made a recommendation that he be fired, and he was.

9              MS. MONJU:  And, Your Honor, we're going to show that

10   Dr. Perry permitted Dr. Abangan to be rehired at EMCF several

11   times despite the fact that she sent an e-mail saying he was

12   dangerous?

13             THE WITNESS:  I didn't permit him to be rehired.

14             THE COURT:  Wait, wait, wait, wait, wait.  Any

15   comment?

16             MR. BENTLEY:  Your Honor, this case is about current

17   condition at East Mississippi Correctional Facility.  The

18   plaintiffs have been asking that Dr. Abangan be terminated.

19   Dr. Abangan has been terminated.  That has been established by

20   the testimony.  I suggest we move on.

21             MS. MONJU:  Your Honor, quickly I believe defense

22   counsel is somewhat misstating the legal standard in this case.

23   It does concern current conditions, but we also have to show

24   that MDOC is deliberately indifferent to those conditions.  And

25   one of the ways plaintiffs will have to prove that -- the

1   burden is on us -- is that we have to show that MDOC has been

2   repeatedly notified of concerns at EMCF and has not responded.

3   And this is one of those points.

4            THE COURT:  All right.  Overruled.

5            MS. MONJU:  Thank you, Your Honor.

6   BY MS. MONJU:

7   Q   So I think we'll keep this fast for the court.  So, Dr.

8   Abangan was, in fact, fired in 2011 by GEO.  Is that right?

9   A   I don't know.

10  Q   And Dr. Abangan was then hired to work at other MDOC

11  prisons while you were chief medical officer?

12  A   He was hired by Wexford when they were the provider.  He

13  was hired to work at Central Mississippi Correctional Facility.

14  Q   And you were chief medical officer at that time?

15  A   Yes, I was.

16  Q   And then he was rehired by another contractor at EMCF,

17  Health Assurance.  Is that right?

18  A   Yes.

19  Q   And he was permitted to stay on with Centurion when they

20  took over at EMCF.  Is that right?

21  A   Yes.  In the contract, when a vendor changes, the current

22  staff has six months to continue to work so that there is

23  continuity of care for the inmates and that the current staff

24  can feel secure that they have a job.

25        So those staff are automatically rehired by the new or

```
 1  incoming vendor.  I don't get any approval of those current
 2  staff.  I had no approval privileges with Health Assurance or
 3  with Wexford.  So they hired their own personnel.
 4  Q   Just to clarify the record Health Assurance didn't hold
 5  over Dr. Abangan during a grace period.  They heried him
 6  directly.  Correct?
 7  A   I don't know.
 8  Q   You don't know.  And do you know where in the contract this
 9  six-month grace period is?
10  A   It's usually with talking about the personnel.
11  Q   Okay.  And I just wanted to talk about one e-mail you sent
12  during this so-called grace period.  I'd like to show you
13  Plaintiffs' Exhibit 728.
14           MS. MONJU:  Your Honor, may I approach the witness?
15           THE COURT:  You may.  What's that number?
16           MS. MONJU:  728.
17  BY MS. MONJU:
18  Q   So, Dr. Perry, this is an e-mail that you sent to both
19  Centurion and MDOC officials on September 2, 2015.  Is that
20  right?
21  A   Yes.
22  Q   And looks like we're having some problems with the screen
23  so Your Honor I'm happy to bring this e-mail up to you if that
24  would help.
25           THE COURT:  If I need to see it you may certainly
```

1    bring it up.

2    BY MS. MONJU:

3    Q    In this e-mail exchange, a doctor on your staff Zein

4    Mohammed -- is that right?

5    A    Yes.

6    Q    He's expressing a concern that a prisoner with very high

7    blood sugar level hadn't been seen a provider at EMCF.  Is that

8    right?

9    A    Yes.

10    Q    And Dr. Mohammed had called EMCF and told them to do

11    something about it but they hadn't?

12    A    Correct.

13    Q    And Dr. Mohammed wrote, "This level of patient care is not

14    acceptable."  Is that right?

15    A    Yes.

16    Q    And you wrote in reply to that e-mail, "Dr. Abangan's

17    patient care is persistently lacking and not acceptable."

18    That's right?

19    A    Yes.

20    Q    And you believed that when you wrote it?

21    A    Yes.

22    Q    And you wrote this in September of 2015 as we discussed.

23    Is that right?

24    A    That's right.  So.

25    Q    So this is just a couple of months before Centurion took

1    over the contract?

2    A    Yes.

3    Q    And it's your position that you couldn't tell Centurion to

4    fire a doctor whose patient care was persistently lacking and

5    not acceptable?

6    A    I didn't say that.  I said that I was telling Mr. Jones,

7    who was the vice president of Mississippi and Deborah Crook,

8    the regional vice president, that they needed to ensure that

9    Dr. Abangan performed his patient care duties.  That was the

10    purpose of this response that I sent on that particular day.

11    Q    And Dr. Abangan was not fired for another year and a half.

12    Is that right?

13    A    That's right.

14    Q    And so I've just --

15          MS. MONJU:  Your Honor, if I could move to admit

16    Plaintiffs' Exhibit 728.

17          MR. BENTLEY:  No objection.

18          THE COURT:  728 will be received into evidence.

19      (Exhibit P-728 marked)

20    BY MS. MONJU:

21    Q    And so, Dr. Perry, you testified earlier today that you

22    believe Dr. Abangan was lazy.  Is that right?

23    A    Yes.

24    Q    And you believed he lacked the personal integrity to

25    perform at an adequate level with patients?

```
1   A    I believe he was lazy and needed prodding to see patients.

2   Q    And you had received several complaints, in fact, from

3   prisoners at EMCF and their families about Dr. Abangan's care.

4   Is that right?

5   A    Yes.

6   Q    And you found most of these complaints to be credible?

7   A    Yes.

8          THE COURT:  You have pretty well made a case that this

9   doctor was incompetent and needed to be fired and that he has

10  now been fired.

11         MS. MONJU:  We will move it along, Your Honor.

12         THE COURT:  How much longer are we going to go with

13  this firing process of something that the defendants agree with

14  you on?

15         MS. MONJU:  Three more questions, if I may?  I'll keep

16  them short.

17  BY MS. MONJU:

18  Q    So you said Centurion fired Dr. Abangan in January 2017

19  shortly after your recommendation that he be fired.  Right?

20  A    Right.

21  Q    So is it right that you could have recommended earlier that

22  he be fired?

23  A    I don't know if I could have or not.  I was at the point in

24  January where -- or December where I don't think they could

25  have done anything else to help him fulfill his duty as a
```

 1  physician.  So that was the only thing left to do.

 2  Q   And as we discussed, that was about ten years after he

 3  initially joined EMCF?

 4  A   I don't know.  That was after Centurion had been there

 5  since July 2015.

 6  Q   Thank you, Dr. Perry.  Your Honor, I know we've been at

 7  this for a little while.  I'm happy to keep going, or if you'd

 8  like to take a break.

 9          THE COURT:  I'd like to take's break.  How much longer

10  do you have with this witness?

11          MS. MONJU:  We have a bit longer, Your Honor.  And I

12  think just to make clear, Dr. Perry is the only, I think, MDOC

13  leadership person we're calling on the medical and mental

14  health care claim, which I think will explain the length of

15  this examination.

16          THE COURT:  "A bit" is a bit of an amorphous term.

17  Shorter than longer.

18          MS. MONJU:  I think we'll go after lunch, Your Honor.

19          THE COURT:  We'll stand in recess for 15 minutes until

20  15 minutes of 11.

21     (Recess)

22          THE COURT:  Ms. Monju, you may continue.

23  BY MS. MONJU:

24  Q   Dr. Perry, I'd now like to discuss some of the essential

25  elements of a correctional health care system.  And am I right

```
 1    in saying that's essentially all the different components a
 2    correctional health care system needs to provide adequate
 3    health care services?
 4    A    Yes.
 5    Q    One essential element of a correctional health care system
 6    is access to care.
 7    A    That's correct.
 8    Q    And that includes what's called episodic or nonurgent care?
 9    A    Yes.
10    Q    Care for chronic illnesses?
11    A    Yes.
12    Q    Access to urgent care?
13    A    Yes.
14    Q    Access to specialty care?
15    A    Yes.
16    Q    Access to medications?
17    A    Yes.
18    Q    Access to dental care?
19    A    Yes.
20    Q    And we've already discussed this, but access to mental
21    health care?
22    A    Yes.
23    Q    Caregivers should also operate within the scope of their
24    licenses?
25    A    Correct.
```

1  Q    There should also be an administrator to provide leadership

2  to the health care team?

3  A    Yes.

4  Q    And peer reviews of health care professionals are a

5  necessity?

6  A    Yes.

7  Q    And just to be clear for the court, peer review is a

8  process by which health care professionals evaluate each other

9  area performances to determine whether they've met accepted

10  standards of care?

11  A    That's correct.

12  Q    In addition, access to care should not be determined by a

13  patient's security level or length of sentence?

14  A    Correct.

15  Q    So that just means a prisoner in solitary confinement

16  should is a same access to care as a patient in minimum custody

17  has?

18  A    Correct.

19  Q    So would that be one reason that security staff and health

20  care staff have to work together?

21  A    Yes.

22  Q    And, for example, that's because security staff may need to

23  provide escorts for chronic care?

24  A    Yes.

25  Q    They may need to staff clinic operations for when there are

1    examinations?

2    A    Correct.

3    Q    And they may accompany nurses to pick up sick call forms or

4    provide medication?

5    A    Right.

6    Q    So let's discuss a few elements of those access to care.

7    So you've already discussed to that patients generally access

8    nonurgent care through sick call requests.  Is that correct?

9    A    That's right.

10    Q    And MDOC has a policy governing the use of sick call

11    requests?

12    A    Yes.

13    Q    I'm going to show that to you in just one moment.  So, Dr.

14    Perry, we're going to try to find that printed copy for you.

15    We're unable to find it, but as soon as we do -- great.  So,

16    Dr. Perry, we've put up the sick call policy on the screen.  Is

17    this MDOC's policy regarding sick calls?

18    A    Yes, it is.

19    Q    And according to this policy, if a patient has an emergent

20    issue -- and that means a really urgent issue -- like chest

21    pains, he should be seen immediately.  Right?

22    A    Right.

23    Q    He doesn't have to go through the sick call process.

24    A    Right.

25    Q    With patients with nonurgent issues, what they do is fill

1    out a sick call form.  Is that right?

2    A    Right.

3    Q    And those forms need to be on each house housing unit so

4    they can be filled out?

5    A    Yes.

6    Q    And then the patients put them in a locked box?

7    A    Correct.

8    Q    And it goes in that box because it's a medical request that

9    needs to be confidential?

10    A    Correct.

11    Q    And on segregation for sick calls -- let me back up a

12    little bit.  Nurses then go pick up those sick call requests.

13    Is that right?

14    A    Right.  Or nursing personnel.  Could be a certified nursing

15    assistant also.

16    Q    Got it.  For the segregation units, nurses then have to go

17    to those units and do what's called seg rounds because the

18    patients in those cells can't go drop off the sick call forms

19    themselves.  Is that right?

20    A    That's right.

21    Q    Sick call requests, because they concern medical

22    conditions, need to be collected every day.  Is that right?

23    A    That's right.

24    Q    And that includes weekends?

25    A    Yes.

```
 1   Q    And the forms when they're picked up, they have to be time

 2   and date stamped by medical?

 3   A    They should be or at least some way of tracking when they

 4   were received.

 5   Q    Got it.  And then a triage occurs within 24 hours by a

 6   registered nurse?

 7   A    Yes.

 8   Q    And that triage has to occur face to face, and that just

 9   means the nurse has to go talk to the patient?

10   A    Right.

11   Q    And if the nurse can't resolve the problem herself, she

12   would then refer that patient to a doctor or a nurse

13   practitioner.  Right?

14   A    That's right.

15   Q    And then that has to take place -- the patient has to see

16   the provider within seven days.  Is that right?

17   A    Correct.

18   Q    Great.  And I believe we just dug up those policies.

19          MS. MONJU:  So, Your Honor, if I may approach the

20   witness?

21          THE COURT:  Yes.

22   BY MS. MONJU:

23   Q    Dr. Perry, these are MDOC's health care policies.  Correct?

24   A    Yes.

25   Q    And as chief medical officer, you sign off on these.  Is
```

```
 1   that right?

 2   A   I review them.  Some that have been updated or revised, I

 3   sign off on.

 4           MS. MONJU:  Your Honor, I move to introduce

 5   Plaintiffs' Exhibit 2091.

 6           MR. BENTLEY:  No objection.

 7           THE COURT:  2091 will be received into evidence.

 8      (Exhibit P-2091 marked)

 9   BY MS. MONJU:

10   Q   So we just talked about sick call at EMCF and the policies

11   that govern sick call at EMCF.

12           THE COURT:  What is this you just introduced?

13           MS. MONJU:  These are MDOC's policies governing health

14   care in their prisons.

15   BY MS. MONJU:

16   Q   So, Dr. Perry, are you aware that not all these policy

17   requirements are being consistently followed at EMCF?

18   A   No, I'm not aware of that.

19   Q   So we've discussed the safety and security contract monitor

20   at EMCF.  Right?

21   A   Right.

22   Q   And she files monthly reports with MDOC?

23   A   Yes.

24   Q   And were you aware that she files reports on the

25   availability of sick call forms on the Housing Units?
```

```
 1   A    No.

 2   Q    So you weren't aware that from September 2014 to June 2017

 3   that contract monitor found in 75 percent of her reports that

 4   sick call forms were not on all of the housing units?

 5   A    I was not aware of that, no.

 6   Q    Were you aware that prisoners at EMCF have to give their

 7   sick call forms to officers to then go put into a locked box

 8   because the boxes are outside the housing units?

 9   A    I was not aware of that, no.

10   Q    And as we discussed, that's confidentiality problem.

11   Right?

12   A    It is.

13   Q    Did you know that information was disclosed in

14   Ms. LaMarre's 2016 expert report?

15   A    No.

16   Q    And that's because you didn't read that report?

17   A    Correct.

18   Q    Centurion itself also monitors its performance as to sick

19   calls.  Is that right?

20   A    Yes.

21   Q    I'd like to show you what's been marked as Plaintiffs'

22   Exhibit 2176.

23            MS. MONJU:  Your Honor, may I approach the witness?

24            THE COURT:  Yes.  What's that number.

25            MS. MONJU:  2176.
```

```
 1              THE COURT:  Hearing no objection, 2176 will be
 2    received into evidence.
 3        (Exhibit P-2176 marked)
 4              MS. MONJU:  Thank you, Your Honor, just to be clear,
 5    this has been admitted?
 6              THE COURT:  Yes?
 7              MS. MONJU:  Sorry about that.
 8    BY MS. MONJU:
 9    Q   So, Dr. Perry, this is a report about EMCF that was
10    prepared by Centurion.  Is that right?
11    A   Yes.
12    Q   And it's dated February 2017?
13    A   Yes.
14    Q   You've reviewed this report?
15    A   No, I have not.
16    Q   Dr. Perry, do you recall that this report was shared with
17    you at your June 2017 deposition and you testified about it
18    under oath there?
19    A   Okay.  Is this part of that same report?  I didn't get the
20    full report.  I just got pages.
21    Q   So, yeah, this is what they shared with you.  That sounds
22    right?
23    A   Yes.
24    Q   Okay.  So if we could look at page 14, this page of the
25    report deals with, as you can see at the top of the page, sick
```

```
 1   call.  Is that right?
 2   A   Yes.
 3   Q   And if we look at one of the findings about segregation
 4   rounds -- and that's where the nurses go and pick up the sick
 5   call slips from each of the patient in segregation as we
 6   discussed.  That's right?
 7   A   That's right.
 8   Q   It says that seg rounds at EMCF are not being performed
 9   routinely.  And it's on the screen too if that's easier for
10   you.
11   A   Okay.
12   Q   That's what it reports.  Correct?
13   A   Yes.
14   Q   And the report also states that nurses are signing seg logs
15   which just reports that they have completed their segregation
16   rounds even though they were not seeing each patient.  Do you
17   see where it says that on the report in red?
18   A   Yes, that was reported by the DON.
19   Q   Do you recall your position that this was a problem because
20   it's falsifying a medical record?
21   A   Correct.
22   Q   And that's illegal?
23   A   It is.
24   Q   If we also look on page 14 of this report, it states that
25   there is not adequate DOC staff for patient care.
```

*** DAILY TRANSCRIPT ***

```
 1    A    Is that at the bottom of page?

 2    Q    So we have it up on the screen for you if that helps.

 3    A    Yes, I see it.

 4    Q    Great.  And that is right next to the metric that says,

 5    "Staff report access to patients and security caption is

 6    appropriate to provide care."  Do you see that?

 7    A    Yes.

 8    Q    And the report said no to that metric?

 9    A    It does.

10    Q    And the reason is that because there is not adequate DOC

11    staff.  Is that right?

12    A    That's right.

13    Q    And what that means is there's not adequate security staff

14    for nurses to, for example, go pick up sick calls and conduct

15    segregation rounds?

16    A    That's right.

17    Q    You would agree that that's not a good situation?

18    A    It is not.

19    Q    And it's because sick calls and seg rounds are important?

20    A    Correct.

21    Q    And, for example, if nurses don't feel safe because there

22    isn't adequate security staff to go with them on their sick

23    call and seg rounds, they may just not conduct their sick call

24    and seg rounds?

25    A    That's right.
```

1    Q    If we look at the summary at the front of this report on

2    page 1, it states "With respect to sick calls, the slips are

3    not being stamped when received and not being triaged timely."

4    Do you see that?

5    A    Yes, I do.

6    Q    And what that means is that the nurses weren't reviewing

7    the sick call requests within 24 hours?

8    A    Correct.

9    Q    Thank you, Dr. Perry.  Let's move on to the next essential

10   element of a correctional health care system.  That's chronic

11   care.

12   A    Yes.

13   Q    So chronic care is when a patient has a disease that's not

14   going anywhere, like diabetes or heart disease or asthma.  Does

15   that sound right?

16   A    Yes.

17   Q    And the purpose of chronic treatment is to decrease the

18   frequency and severity of the symptoms of the disease?

19   A    Yes, to manage the disease, yes.

20   Q    Great.  And that is supposed to sort of, to the extent they

21   can, stop the disease progression and hopefully make the

22   patient feel better?

23   A    Correct.

24   Q    And so for patients to access chronic care at a prison and

25   at EMCF, typically the provider will diagnose their chronic

```
 1   condition first.  Is that right?

 2   A   That's right.

 3   Q   And then the patients are enrolled in something called a

 4   chronic care clinic.

 5   A   Correct.

 6   Q   And that CCC for short?

 7   A   Yes.

 8   Q   And then those patients will be seen in a clinic as much as

 9   needed based on the severity of their condition?

10   A   Absolutely.

11   Q   Great.  And patient care in the than chronic care clinics

12   at EMCF is tracked on spreadsheets called chronic care logs?

13   A   Right.

14   Q   And what that shows is when the patient had their last

15   appointment, when they're going to their next appointment, and

16   it's called a control of the disease, whether it's good or bad

17   or getting worse.

18   A   Right.

19   Q   Great.  And those logs, it's important for them to be

20   accurate because as we just discussed, the control of their

21   disease dictates how frequently they have appointments.  Is

22   that right?

23   A   That's right.

24   Q   Okay.  So let's go back to that report we were just

25   discussing.  And if you look at page 1, with respect to chronic
```

1    care, you can see at the bottom it says chronic care and

2    there's a colon, it says, "Chronic care lists did not appear to

3    be updated and there were omissions found during chart review."

4    Is that right?

5    A    Yes.

6    Q    And that would be a problem because, as we just discussed,

7    having accurate chronic care records is important for adequate

8    patient care.  Is that right?

9    A    Yes.

10   Q    Chronic care is also an area where medical and security

11   staff have to work together.  Right?

12   A    For clinic, yes.

13   Q    Right.  Exactly because we just discussed that security

14   staff have to escort patients to their appointments.

15   A    Right.

16   Q    Okay.  I'd like to show you an exhibit that's been marked

17   Plaintiffs' 735.

18        MS. MONJU:  Your Honor, may I approach?

19        THE COURT:  You may.

20   BY MS. MONJU:

21   Q    Dr. Perry, this is an e-mail you sent to Tony Compton on

22   February 3rd, 2016.  Is that right?

23   A    Okay, yes.

24   Q    And Tony Compton is the director of private and regional

25   facilities for MDOC?

1    A   Yes, correct.

2    Q   And you wrote that, "The medical staff at the private

3    prisons is complaining that MTC personnel is constantly and

4    repeatedly refusing to bring inmates to clinics for scheduled

5    sick call, dental, mental health and chronic care appointments

6    and that it's almost universal at EMCF and some other prisons."

7    Is that right?

8    A   Yes.

9    Q   And you also wrote that, "Medical staff are reporting that

10   MTC security and administration are telling them that they're

11   be escorted off the grounds if they continue to complain."  Is

12   that right?

13   A   Yes.

14   Q   So in e-mail reflects that there were problems with

15   security staff escorting patient to their appointments.  Is

16   that right?

17   A   Yes.

18         MS. MONJU:  Your Honor, I move to admit Plaintiffs'

19   Exhibit 735 into evidence.

20         THE COURT:  735 will be received into evidence.

21      (Exhibit P-735 marked)

22   BY MS. MONJU:

23   Q   So we touch on this a little bit, but let's briefly discuss

24   infirmary care at EMCF.  So EMCF has a unit that it refers to

25   as the infirmary, and that's where it keeps patients who need

1    closed observation but not hospitalization.  Is that right?

2    A    That's right.

3    Q    And MDOC also has a policy on infirmary care.  Is that

4    right?

5    A    Yes.

6    Q    That policy requires that patients have to be withing the

7    sight or sound of a staff member?

8    A    That's right.

9    Q    And that means that medical staff need to see or hear

10    patients at all times on the infirmary.  Is that right?

11    A    Yes.  If there's not a call light system, then they should

12    be within sight or sound.

13    Q    Got it.  Great.  And when we say -- sorry.  Strike that.

14    So a physician or a nurse practitioner under the policies, they

15    also have to do round at least once a day.  Is that right?

16    A    Yes.

17    Q    And then the other nursing staff, they go do rounds

18    depending on how severe the patients' condition is.  Is that

19    right?

20    A    Yes.

21    Q    Okay.  And then all of that needs to be recorded in the

22    medical record.

23    A    Correct.

24    Q    Great.  And just to clarify, is that because if something

25    isn't included in a medical record it's like it never happened?

```
 1   A    Correct.

 2   Q    And that's because doctors and nurses need to know what's

 3   happened to the patient's medical care.  Right?

 4   A    Right.

 5   Q    And if they don't know that, problems can happen or

 6   treatment can be incorrect.

 7   A    Treatment could be difficult, yes.

 8   Q    Great.  Okay.  So we've discussed that you've never been to

 9   EMCF.  Right?

10   A    Right.

11   Q    So you've never seen the medical unit at EMCF?

12   A    Correct.

13   Q    But as we've just discussed, you would agree that it

14   wouldn't be a good design if medical staff couldn't see into

15   the cells in the medical unit and there were no call buttons.

16   Is that right?

17   A    That's right.

18   Q    And that's because we just said there has to be direct

19   sight and sound.

20   A    Right.

21   Q    So are you aware that the medical unit at EMCF is arranged

22   such that medical staff don't look at all of the cells?

23   A    No, I heard that in my deposition in June.

24   Q    Okay.

25   A    But I didn't know that before.
```

1    Q   Okay.  So you were aware of that in June of 2017?

2    A   Yes.

3    Q   Okay.  We're going to go back to that report.  We're going

4    to go back just a couple of times.  So if you could turn to

5    page 8 of that report.  So if you look at page 8, it states

6    that patients were not in -- I'm sorry.  Thank you.  So it says

7    that, "The infirmary unit currently doesn't have a call system

8    that is operational.  And until the call system is repaired, it

9    should be classified as observation only and an infirmary-level

10   acuity patient should be transferred."  Is that right?

11   A   Where are you reading?

12   Q   So if you look at the blown-up piece of text on the screen.

13   A   Talking about the TB cells.

14   Q   Right.  If you look at the top of this page, it says, "This

15   portion of the report concerns infirmary care."

16   A   Okay.

17   Q   It says here that the call system is not operational in the

18   cells.  Do you see that?

19   A   Yes.

20   Q   And that's a problem because, as we just discussed, EMCF

21   medical staff can't see directly into the cells, and this says

22   that the call system is broken.

23   A   Yes.

24   Q   And you first read this report at your deposition in

25   June 2017.  Is that right?

1  A   That's right.

2  Q   And at that time, you hadn't been aware that the call

3  system was broken?

4  A   Not at EMCF, no.

5  Q   And you weren't aware at that time either whether the

6  acuity level patients had been moved?

7  A   Those cells that they're talking about, the TB cells, they

8  should not be used for infirmary.

9        THE COURT:  All right.  I don't understand what we're

10  talking about.  Is this some kind of punch button that's in the

11  shower that if the inmate taking the shower needs to call for

12  medical help he can punch the button and then tell what he

13  needs?  Is that what --

14        THE WITNESS:  That's part of it.  And it's when you

15  have the little light -- little button on the -- that you can

16  punch to call a nurse.  And when you punch it, the light on the

17  outside of your room lights up.  That system is broken at EMCF.

18        THE COURT:  Is that button -- does an inmate have the

19  button, or does he -- is the button on the wall?

20  A   The inmate has the button.

21        THE COURT:  So he's -- he's given a button if he has

22  some problem that requires emergency care?

23        THE WITNESS:  Yes, sir, yes.

24        THE COURT:  And he will have that with him all the

25  time?

*** DAILY TRANSCRIPT ***

1        THE WITNESS:  When he's in the room he will have that

2   button to punch or push if he needs assistance.

3        THE COURT:  In what room?

4        THE WITNESS:  In the infirmary room.

5        THE COURT:  In what room?

6        THE WITNESS:  Infirmary.

7        THE COURT:  Okay.  He's given it while he's waiting to

8   see the nurse or doctor.

9        THE WITNESS:  The infirmary is where -- it's almost

10  like a little mini hospital, accept they are not sick enough to

11  be in the hospital so they are placed in this infirmary.

12        THE COURT:  I see.  I see.

13        THE WITNESS:  So the call light system is just like in

14  a hospital.  If they need a nurse or a doctor, then they can

15  push the button and the light on the outside of the room lights

16  up so that the nurse can see if somebody needs assistance.

17        THE COURT:  Are those inmates in the infirmary in

18  segregated cells?  Are they locked up in the infirmary by

19  themselves?

20        THE WITNESS:  They are not necessarily locked in.  The

21  nurse has to have access to them.  So they either have an

22  officer there with the keys and then they may be locked in.  If

23  there's no officer with the keys, they're not locked in.

24        THE COURT:  All right.  Are all inmates who are placed

25  in the infirmary -- when they were operable were all of them

```
1    given a button to --
2              THE WITNESS:  Yes, sir.
3              THE COURT:  -- call the nurse?
4              THE WITNESS:  Yes, sir.
5              THE COURT:  All right.  How long has that been out of
6    order?
7              THE WITNESS:  I don't know.  It was out in June when
8    we did the deposition.  We also have it out at Parchman, our
9    hospital at Parchman too.  It's kind of difficult to get those
10   repaired, those systems.  The one at Parchman is to so old that
11   the parts don't exist anymore so we have to get it replaced,
12   and that's on the list.
13             THE COURT:  Okay.  Let's don't talk about Parchman.
14   We've got all we can handle.
15             THE WITNESS:  Yes, sir.
16   BY MS. MONJU:
17   Q  Dr. Perry, if I may, I just want to ask a couple of
18   clarifying --
19             THE COURT:  Excuse me.  Is the nurse call system --
20   whose responsibility is it to repair that, if it is essential?
21   A  That's part of the buildings and maintenance.  So it would
22   be probably -- for East it would be MDOC or MTC.
23             THE COURT:  All right.
24   BY MS. MONJU:
25   Q  Dr. Perry, if I could just ask a couple quick clarifying
```

1  questions about this.  Are you aware that the beds in the

2  infirmary are all in separate segregated cells behind locked

3  doors with a little window?

4  A   Yes, they are all separate sells, correct.

5  Q   And that so this report right here that we're looking at,

6  it's saying that there was no operational call system in those

7  individual cells.  Right?

8  A   Right.

9  Q   And just to be clear, inmates at EMCF are never given a

10 button.  Correct?

11 A   For the call system they are.  But since it's not working,

12 they wouldn't be given one.

13 Q   But they don't get like a physical button.  Is that right?

14 It's something that's built into the prison?

15 A   I thought they got a button.

16 Q   Okay.

17        THE COURT:  This -- are we now talking about the -- I

18 thought that's what we had been talking about.

19        MS. MONJU:  Yes, Your Honor.  We just -- I wanted to

20 clarify.

21 BY MS. MONJU:

22 Q   This piece of text we're showing you, this is talking about

23 the infirmary unit as a whole.  Right?  It's not talking about

24 just showers?

25 A   This is talking about the TB cells, which are

1    self-contained rooms to hold negative pressure to keep TB from

2    spreading.  So apparently they were using those cells since

3    they have full showers as part of the infirmary.

4    Q   Right.  So this is describing the infirmary, and it's just

5    that the infirmary used to be these TB cells.

6    A   Right.

7    Q   Got it.  Okay.  Great.

8           THE COURT:  What does TB stand for?

9           THE WITNESS:  Tuberculosis.

10          THE COURT:  Okay.

11   BY MS. MONJU:

12   Q   To be clear the court, asked who would be responsible for

13   fixing those call buttons.  If it's true that medical staff

14   couldn't have direct sight and sound into the medical units,

15   and you agree that it was, it would be Centurion's

16   responsibility to ensure that the patients in the infirmary

17   were receiving care that was adequate and in line with MDOC

18   policies.  Is that right?

19   A   That's right.

20   Q   Okay.  I'm going to look at a couple of more items on page

21   7, if we could look at that.  The report states that, "Provider

22   rounds completed and documented based on patient acuity or

23   contractual requirement."  And as we discussed, a provider

24   round in the infirmary has to happen at least once a day.  Is

25   that right?

```
 1   A   That's right.

 2   Q   And based on this contract review, it says that that

 3   happened in zero of the five cases that were reviewed?

 4   A   Yes.  That's right.

 5   Q   And that would -- that would be a bad thing.  Right?

 6   A   Right.

 7   Q   And that's because patients in the infirmary are very ill?

 8   A   Yes.

 9   Q   And a provider needs to see them every day to make sure

10   they don't get worse.

11   A   Correct.

12   Q   And, in fact, should help them get better.

13   A   Right.

14   Q   And on that same page, it says, "Nursing encounters

15   documented each shift per site policy and includes vital

16   signs."  And if I'm right, that just means that a nurse did

17   their rounds and they included vital signs to show that they

18   checked on the patients and to reflect what the patient's

19   current statistics were.  Is that right?

20   A   That's right.

21   Q   That that occurred in zero of the five cases reviewed

22   again?

23   A   Yes.

24   Q   And so if patients in the infirmary weren't being seen by

25   doctors and weren't being seen by nurses, would that place the
```

```
 1   patients in the infirmary at risk?

 2   A   It could.  Depends on their clinical condition.

 3   Q   Got it.  But as we discussed, you are in a serious clinical

 4   condition if you are being housed in the infirmary.  Right?

 5   A   More than likely.

 6   Q   Okay.  So let's move on to a completely different topic.

 7   You and I have discussed the fact that patients also need

 8   access to their prescribed medications.  Is that right?

 9   A   Right.

10   Q   And before we discuss medication, I just want to clear up

11   some terminology.  When nurses go around to the different units

12   and hand out medication, that's called pill call.  Right?

13   A   Right.

14   Q   Or medication administration?

15   A   Medication call, yes.

16   Q   And so one of the terms we're going to talk about is a

17   medication administrations record.  Does that sound familiar?

18   A   Yes.

19   Q   And that's called a MAR for short?

20   A   Correct.

21   Q   And that's just a record of which nurse distributed which

22   medication to which patient at which time.  Is that right?

23   A   That's right.

24   Q   Okay.  Great.  And all those requirements are covered in

25   the MDOC policy upon medication administration that's on your
```

*** DAILY TRANSCRIPT ***

```
 1   screen?

 2   A   Yes.

 3   Q   Okay.  And under this policy, patients have to receive

 4   their medications timely and appropriately?

 5   A   Yes.

 6   Q   And so to receive medication timely, as an example, if a

 7   patient is taking the same medication ever day, they would need

 8   to get that medication around the same time every day.  Right?

 9   A   Correct.

10   Q   You would say about an hour and a half window give or take.

11   A   Yes.

12   Q   Okay.  And when medication is given to a patient, that has

13   to be documented.  Right?

14   A   Yes.

15   Q   It's documented in that MAR we just discussed?

16   A   Correct.

17   Q   That's because it's important for caregivers to know what

18   medications patients have taken?

19   A   Right.

20   Q   Okay.  And Centurion also has its on policies governing

21   health care at EMCF.  Is that right?

22   A   That's right.

23   Q   And you reviewed those policies when Centurion became

24   MDOC's health care vendor?

25   A   Yes.
```

 1              MS. MONJU:  Your Honor, may I approach the witness?

 2              THE COURT:  You may.

 3    BY MS. MONJU:

 4    Q   Dr. Perry, these are Centurion's policies governing health

 5    care in Mississippi?

 6    A   Yes.

 7              MS. MONJU:  Your Honor, I move to introduce

 8    Plaintiffs' Exhibit 2058 into evidence.

 9              MR. BENTLEY:  Your Honor, I have no objection.  I

10    would ask that the policies not be displayed to the gallery.

11    A   Yes.  All right.  2058 will be received into evidence.

12        (Exhibit P-2058 marked)

13              MR. BENTLEY:  They're designated as confidential

14    business information.

15              MS. MONJU:  Your Honor, we would object to these as

16    confidential business information.  These are policies that

17    govern how a state contractor will provide care in state

18    prisons, and they've been approved by the state chief medical

19    officer, and we think the public interest in how a state vendor

20    is operating state prisons outweighs whatever plausible

21    business there is in keeping this information confidential.

22              THE COURT:  I will overrule the objection with the

23    provision that they not be shown to publicly.

24              MS. MONJU:  And that just mean publicly today, Your

25    Honor?  They won't be filed under seal I guess that's my

```
 1  question.
 2           THE COURT:  Yes.
 3           MS. MONJU:  Thank you, Your Honor.
 4           THE COURT:  They will not be shown on the public
 5  screens is what I meant.
 6           MS. MONJU:  Thank you, Your Honor.
 7  BY MS. MONJU:
 8  Q   So, Dr. Perry, under these policies, nurses working for
 9  Centurion have to work with security staff to distribute
10  medications.  Is that right?
11  A   Yes.
12  Q   Okay.  And you said yes?
13  A   Yes.
14  Q   Okay.  Great.  And when a nurse has given a patient their
15  medication, they have to look in their mouth to make sure
16  they've actually taken it.  Is that right?
17  A   They should, yes.
18  Q   And that's just an important precaution because you want to
19  make sure patients are actually taking their medications?
20  A   Correct.
21  Q   And they're not for example, hoarding them?
22  A   Right.
23  Q   And just to be clear, the security concerns about a patient
24  hoarding medication, might that be because it could be used to
25  actually harm a patient if he took all his medications at one
```

```
 1   time?

 2   A   Yes.

 3   Q   Or he could potentially sell those medications?

 4   A   Correct.

 5   Q   Or barter.  So finally, under Centurion's policies, nurses

 6   are supposed to document when a patient refuses medication.  Is

 7   that right?

 8   A   That's right.

 9   Q   And that's, as we said, important because you not only want

10   to know what medications the patient is taking, but you want to

11   know why they're refusing medication.  Right?

12   A   Yes.

13   Q   And that's because there could be a larger issue that a

14   doctor needs to address with a patient?

15   A   Yes.  After they refuse it twice, then the doctor has to

16   see them --

17   Q   Got it.

18   A   -- to find out why.

19   Q   Great, thank you.  So we looked at a report earlier today

20   called the pharmacy utilization report.

21   A   Uh-huh.

22   Q   And that showed that nearly all EMCF prisoners are on

23   medication.  Is that right?

24   A   Right.

25   Q   So medication administration is an important issue at EMCF.
```

1    Is that right?

2    A    It is.

3    Q    So given the importance of medication administration at

4    EMCF, were you aware that most of the policy requirements that

5    we just discussed are not consistently followed at EMCF?

6    A    No.

7    Q    Okay.  So, for example, are you aware that logbooks at EMCF

8    reflect that medication administration doesn't occur at the

9    same time every day?

10   A    No.

11   Q    Were you aware that that contract monitor we discussed who

12   monitors safety and security, she identified problems with pill

13   hoarding and nurses not making sure that patients were taking

14   their medications in over one third of her weekly reports from

15   September 2014 through June 2016?

16   A    Was not aware of that, no.

17   Q    And were you aware that nurses at EMCF are consistently

18   failing to meet standards regarding MAR documentation?

19   A    No.  We have.

20        MR. BENTLEY:  Your Honor, I'm going to object to this.

21   I'm not sure what this information is from, and I have no -- I

22   don't think Dr. Perry's testified that she has any knowledge of

23   the documents from which this information is coming.

24        MS. MONJU:  Your Honor, I was just about to ask about

25   a document.

1          THE COURT:  Well, ask her if she's aware of this

2    document and so forth.  Lay your foundation, and then you may

3    ask your question.

4          MS. MONJU:  Yes, Your Honor.

5    BY MS. MONJU:

6    Q    I was actually going to ask about that February report

7    we've been looking at.

8    A    Okay.

9    Q    And so if you look at the first page of that report, it

10   states that, "This contract compliance review noted many

11   missing documentation for medication administration."  Is that

12   right?

13   A    Where are you reading?

14   Q    So it highlighted on your screen.  It's that first line in

15   the bullet regarding medication management and MAR review.  It

16   states that, "Review noted many missing documentation for

17   administration."  Is that right?

18   A    Yes.

19   Q    It also lists several other problems that expired

20   medications were found in medication room.  Is that right?

21   A    Yes.

22   Q    There were loose narcotics found in a refrigerator.  Is

23   that right?

24   A    Yes.

25   Q    There were controlled substances that were placed for

1    destruction in a sealed envelope, but they were not maintained

2    on the count.  Is that right?

3    A   Yes.

4    Q   So we discussed how it's important for medical and security

5    staff to work together.  That's also important for medication

6    administration.  Is that right?

7    A   Yes.

8    Q   And that's because security staff accompany nurses on pill

9    call?

10   A   Correct.

11   Q   But limited security staffing has been an issue at EMCF

12   with respect to pill call as well.  Is that right?

13   A   Not in recent months.

14   Q   Okay.  Well, for starters, let's look at this February 2017

15   report again, and it's on the first page.  And this states

16   that -- I'm going to get that highlighted for you.  "It was

17   reported that security staff is very short and impacts medical

18   staff safety as well as ability to have access to patients for

19   provision of care.  At times there is no officer at the med

20   cart during med pass in the pods."  Is that right?

21   A   Yes, that's what this report says.

22   Q   And so this report says two different things.  This is

23   saying that because of the shortage of staff, medical staff

24   safety was an issue.

25   A   Yes.

1    Q    And also that officers were not at the med cart during med

2    pass.  Does that mean that officers weren't on pill call?

3    A    Right.

4    Q    Okay.  So let's look at Plaintiffs' Exhibit of 668.  Your

5    Honor, may I approach the witness?

6            THE COURT:  You may.  Is this 668?

7            MS. MONJU:  Yes, Your Honor.

8    BY MS. MONJU:

9    Q    So, Dr. Perry, this is an e-mail Paxton Paige sent to you

10   on July 6, 2015.  Is that right?

11   A    Yes.

12   Q    And Paxton Paige at least at the time was an employee in

13   your office who monitored contract compliance at EMCF.  Is that

14   right?

15   A    Yes.  He's health service administrator in my office.

16   Q    Great.  So does he still monitor EMCF?

17   A    Yes, he does.

18   Q    Okay.  And what does he do when he monitors EMCF?

19   A    You mean --

20   Q    What are his job responsibilities?

21   A    He ensured or inspects the clinic to ensure that they're

22   following correct protocols and policies.

23   Q    And to -- does that -- strike that.  Let's talk about this

24   e-mail.  So in this e-mail, Paxton Paige wrote that he and

25   Dennis Gregory -- and that's your mental health director.

1    Right?

2    A    Correct.

3    Q    He and Dennis Gregory had visited EMCF on July 3rd, 2015,

4    and they wrote that, "The nurses voiced concerns about the lack

5    of security staff during med pass on segregated units and that

6    this has been on ongoing problem.  Is that right.

7    A    Yes.

8    Q    So Mr. Paige wrote in a July 2015 e-mail that security

9    staff -- limited security staff for pill call had been an

10   ongoing problem as of July 2015.  Is that right?

11   A    That's what the nurses reported to him, yes.

12   Q    And that continued to be an issue in the February 2017

13   report we just reviewed?

14   A    Yes.

15   Q    Thank you.  Just one last e-mail to look at about pill

16   call, Your Honor, if I may approach the witness.

17            THE COURT:  Yes.

18            MS. MONJU:  Apologies, your Honor.  I need to move to

19   admit Plaintiffs' Exhibit 668.

20            THE COURT:  668 will be received in evidence.

21        (Exhibit P-668 marked)

22            MS. MONJU:  Thank you, Your Honor.

23   BY MS. MONJU:

24   Q    Dr. Perry, this is an e-mail that already been entered into

25   evidence, but it's an e-mail that Tony Compton sent to you and

1  Warden Hogans and others on July 2, 2015.  Is that right?

2  A   Yes.

3  Q   And Mr. Compton wrote, "I was just informed that while

4  conducting pill call on the segregation unit at EMCF the

5  offenders popped their cell doors and came out while nurses

6  from Centurion medical were passing out medication."  Is that

7  right?

8  A   Yes, that's what this says.

9  Q   And so that means that prisoners could unlock their doors

10  while nurses are on the unit?

11        MR. BENTLEY:  Objection, Your Honor.  I don't think

12  Dr. Perry can testify what the sender of this e-mail meant.

13        THE COURT:  I think it's pretty clear what it meant.

14  I sustain the objection.

15        MS. MONJU:  Your Honor, just to be clear, Dr. Perry is

16  allowed to testify that this seems to mean that plaintiffs --

17  prisoners were come out of their doors and unlocking their

18  cells?  Apologies.  I missed the ruling.

19        THE COURT:  Doesn't the e-mail say that they unlocked

20  their doors and came out on the unit?  That's what it says.

21  She doesn't know any more than that.

22        MS. MONJU:  Understood, Your Honor.

23  BY MS. MONJU:

24  Q   Dr. Perry, if prisoners were able to unlock their doors and

25  come out onto the unit, that could be something that would

```
 1   frighten the nurses, I imagine.  Is that right?

 2   A   I imagine it would, yes.

 3   Q   And that would be a problem because if the nurses are

 4   scared, they may not want to conduct pill call in the

 5   segregation units?

 6   A   Yes.

 7   Q   Thank you, Dr. Perry.  Okay.  Dr. Perry, did we just

 8   discuss various elements -- or essential elements of a

 9   correctional health system?  Isn't it right that Centurion send

10   you monthly reports about the adequacy of its provision of

11   these essential elements of a correctional health care system?

12   A   They send me daily reports.

13   Q   Great.  And those reports are called continuous quality

14   improvement reports?

15   A   Yes.

16   Q   And they are sent to you once a month?

17   A   Yes.

18   Q   By a Centurion employee named Kathy Hogue?

19   A   Kathy or Brenda Scott.

20   Q   Kathy or Brenda.  Okay.  And those reports are broken down

21   by facility.  So you can see individual information for EMCF.

22   Is that right?

23   A   Right.

24   Q   I'd like to show you these CQI reports.  And, Dr. Perry,

25   just to be clear, "CQI" is short for continuous quality
```

```
 1  improvement.  Is that right?

 2  A   Yes.

 3  Q   And I'm going to show you several of the CQI reports that

 4  cover July 2016 to December 2017.

 5          MS. MONJU:  Your Honor, if I may approach the witness?

 6          THE COURT:  You may.

 7          MS. MONJU:  Thank you.

 8  BY MS. MONJU:

 9  Q   So, Dr. Perry, I just handed you 18 CQI reports.  These are

10  CQI reports for July 2016 through December 2017.

11  A   Okay.

12  Q   This is the data you received from Centurion?

13  A   Yes.

14          MS. MONJU:  Your Honor, I move to admit Plaintiffs'

15  Exhibit -- and it's a bit of a list -- 440, 441 --

16          THE COURT:  Excuse me.  This is another one of those

17  instances where you do not need all of this in the record, and

18  there's no need in burdening the clerk for it.

19          MS. MONJU:  Your Honor, I think if defendant would

20  agree, we are happy to confer with defendants close to or at

21  the end of trial to determine what pages can be removed from

22  the record, and I think that would make the pile of documents

23  we've fortunate dumped on you a lot smaller.

24          THE COURT:  You can do that after you interrogate the

25  witness during the noon hour.  And let me know, and I'll admit
```

 1   whatever is necessary into the record.  But there's no need in

 2   backwards -- for me to admit all of these pages in the record.

 3        MS. MONJU:  Your Honor, if I may --

 4        THE COURT:  How many pages are in each report?

 5        MS. MONJU:  It's about 50 page a report.  But if I

 6   may, these are the sole monthly data --

 7        THE COURT:  How many pages are in each report?

 8        MS. MONJU:  It's about 40 to 50 pages, Your Honor.

 9        THE COURT:  And how many pages are necessary to the

10   point that you're going to make?

11        MS. MONJU:  So, Your Honor, we actually have several

12   summary exhibits which will show you a lot of the data that is

13   spread across these reports because it's the only sort of

14   broken-down data that MDOC receives every month from Centurion,

15   and it's going to show you that across the year of 2017 a lot

16   of the metrics are very bad.  And we do need, unfortunately, a

17   good bit of those reports to show that to the court.  But we

18   plan to summarize it in exhibits so it's easier to see.  But it

19   would be the underlying information for the exhibits.

20        THE COURT:  Under those condition, there's no need for

21   me to admit all of this into the record now or at any time.

22   But you may summarize it and pull out particular pages or

23   something.  But this witness is not going to testify about

24   every one of those pages, and I'm not going to look at every

25   one of those pages so there's no need to introduce them into

 1    evidence.

 2              MS. MONJU:  Your Honor --

 3              THE COURT:  You may continue with that comment.

 4              MS. MONJU:  Okay.  Understood.  Your Honor, just to be

 5    clear, when we come back with fewer pages, I should just move

 6    to admit these exhibits after lunch?

 7              THE COURT:  Yes.

 8              MS. MONJU:  Thank you, Your Honor.

 9    BY MS. MONJU:

10    Q    So, Dr. Perry, these reports measure Centurion's delivery

11    of health care at EMCF.  Is that right?

12    A    The CQI, continuous quality improvement, does not measure

13    the overall health care.  It measures problem areas --

14    Q    I see.

15    A    -- and tracks those problem areas.

16    Q    So these reports show essentially areas that Centurion may

17    need to fix at EMCF.  Is that right?

18    A    Yes.

19    Q    And this concerns data that Centurion -- or issues that

20    Centurion has needed to fix in 2016 and 2017.  Is that right?

21    A    Yes.

22    Q    And that's as recently as December 2017.  Is that right?

23    A    Yeah, I think there's one for December, yes.

24    Q    Okay.  So I'd like to discuss the report for November 2017.

25              MS. MONJU:  And, Your Honor, these documents, like

1    several of the documents we received from defense counsel, is

2    also marked as confidential.  For the same reasons we don't

3    believe the other reports that have been admitted into evidence

4    are confidential, these contain data about a public contractor

5    providing public services at a public prison, and we do think

6    the public right of access to that information trumps any

7    confidentiality interest Centurion could have.

8            MR. BENTLEY:  Your Honor, these are Centurion's

9    proprietary continuous quality improvement reports.  They've

10   developed these reports.  They're the type of thing that a

11   competitor would like to see, and we would object.  I

12   understand the open court issue.  I object to these being shown

13   on the public monitors.

14           THE COURT:  I've already said we're not going to show

15   them on the monitors.  Then you can raise your objections when

16   she has culled out the pages that she wishes to admit into

17   evidence.

18           MR. BENTLEY:  Thank you, Your Honor.

19           MS. MONJU:  Thank you, Your Honor.

20   BY MS. MONJU:

21   Q   So, Dr. Perry, just to be clear, these reports cover some

22   of the things we just discussed such as sick call, prisoner

23   access to care in segregation, mental health care and

24   medication administration.  Is that right?

25   A   Yes.

```
1   Q    And if we look at this cover page of the November 2017

2   report, and you can look at line 1, and it says, "Threshold for

3   each indicator is 90 percent or above.  Please strive for

4   100 percent."  Is that right?

5   A    Yes.

6   Q    And that means that a passing grade is 90 percent, but you

7   should aim for 100 percent?  Is that right?

8   A    That's correct.

9   Q    Great.  And just to be clear since you're looking at the

10  reports, all the reports include that same language.  Is that

11  right?

12  A    That's right.

13  Q    Okay.  So let's turn to some of these metrics.  If you look

14  at page 2 of this report, this states that the number of days

15  in November of 2017 was 30.  Is that right?

16  A    Yes.

17  Q    And it states that the number of days in November 2017 in

18  which sick calls were picked up was eight days.  Is that right?

19  A    Yes.

20  Q    And so we discuss that sick calls need to be picked up

21  every single day.  Is that right?

22  A    That's right.

23  Q    That's because if patients have serious concerns, the

24  doctor needs to seem them.  Is that right?

25  A    Yes.
```

1  Q   For 22 days in November 2017, it appears that sick call

2  were not picked up and logged?

3  A   It appears so.

4  Q   So if we turn to page 5 and 6 of this report, this shows

5  several metrics for measuring sick call.  Is that right?

6  A   Yes.

7  Q   And again we discussed that a passing grade is 90?

8  A   Yes.

9  Q   But this shows several metrics below 90 percent.  Is that

10  right?

11  A   Yes.

12  Q   For example, sick calls picked up and logged daily is only

13  at 27 percent.

14  A   Correct.

15  Q   Whether a sick call is triaged face to face with a nurse in

16  one day of receipt is just at 84 percent?

17  A   Yes.

18  Q   And whether inmates being referred to providers for sick

19  call are seen -- within seven calendar days, that's just at

20  60 percent.  Right?

21  A   Right.

22  Q   And that means that patients who are filing sick call

23  requests at EMCF are frequently not being seen as quickly as

24  they're supposed to be seen.  Is that right?

25  A   That's right.

1    Q    These results aren't very good, are they?

2    A    They are not.

3    Q    Dr. Perry, I will represent to you that this report is not

4    an outlier.  There are similar results from Centurion in a

5    number of these CQI reports, and I'm going to show you an

6    exhibit summarizing those results.

7            MS. MONJU:  Your Honor, if I may approach the witness?

8            THE COURT:  You may.

9            MR. BENTLEY:  Your Honor, before there are any

10   questions about this exhibit, I'd like to make an objection.

11   As I understand this -- well, maybe, Erin, you can describe it.

12           MS. MONJU:  Sure.

13           MR. BENTLEY:  Then I'll make my objection.

14           MS. MONJU:  So in the interest of efficiency, Your

15   Honor, because we are trying to streamline this as much as

16   possible, we have looked at all of the 2017 CQI reports that

17   Dr. Perry just testified that she received.  And for several of

18   the metrics, we've simply compiled the results for those CQIs.

19           So, for example, we discussed with Dr. Perry several

20   times today that it's required that patients who are referred

21   to a doctor for sick call see him within seven days.  Instead

22   of trooping through every single one of the CQI reports, we

23   just compiled the results here.  And under 1006, we believe

24   that's an appropriate summary exhibit so we don't have to talk

25   about all 12 reports.

1          MR. BENTLEY:  And I understand the need for

2    efficiency, Your Honor.  I have two concerns with this.  First

3    is, as I understand it, it's been prepared by attorneys.  So

4    there's no one here who can testify about the methods and the

5    accuracy of the information that's in here, which is required,

6    as I understand it under Rule 1006.

7          And, second, this is not an accurate summary.  This is

8    a pullout of one piece of these large reports with no

9    information about the sample size, which is quite small.  And

10   it suggests to this court -- and I mean small whether you're

11   talking about 100 percent or 10 percent.  It suggesting to this

12   court in a misleading way that this particular metric is not

13   being met.

14         MS. MONJU:  Your Honor, if I may.

15         THE COURT:  Just a minute.  My understanding is

16   lawyers have pulled out the same information from each of these

17   15 reports and has -- whatever that is and has put the results

18   of that in here rather than having to pull it out with the

19   testimony in each instance.  It's in effect asking the defense

20   to agree to this summary exhibit.  Not to agree to it, but to

21   agree that the summary exhibit correctly summarizes what is

22   being shown and it has come out of these 15 different reports.

23   Is that correct?

24         MS. MONJU:  Yes, Your Honor.

25         THE COURT:  It would save an awful lot of time to do

```
 1    it that way.  I suggest that if you are concerned about
 2    accuracy of it, we can let you during the noon recess have the
 3    exhibits and have this summary exhibit and go over it.
 4          MR. BENTLEY:  Well, I guess what -- I would modify my
 5    objection then and not object to the use of this as a
 6    demonstrative.  I was object to it coming in as evidence
 7    because I do not think it's proper under Rule 1006.  But I
 8    understand Your Honor's point.  You don't want to wade through
 9    report after report, and I can examine the witness about the
10    sample size.
11          THE COURT:  All right?
12          MS. MONJU:  Your Honor, if I may, I think defense
13    counsel just made the best argument for admitting these
14    exhibits as possible.  1006 permits the entry of exhibits that
15    summarize the contents of voluminous writings.  As we just
16    discussed, that's several hundreds pages of records, and that's
17    why we prepared this report both so we would not have to troop
18    through each of those reports and so the court would not have
19    to go through all of them in reviewing the record in this case.
20          THE COURT:  I'm going to overrule the objection.  I
21    will, however, allow the defendant during the noon hour to
22    check however you wish on -- what number do you plan to give
23    this document entitled, "Patients Not Timely Seen by Provider
24    After Submitting Sick Call Requests"?
25          MS. MONJU:  Your Honor, we do anticipate giving a few
```

1    of these to the court.  But for this one, it would be 2823.

2          THE COURT:  I don't understand what -- what's -- what

3    are the numbers you just gave me?

4          MS. MONJU:  Plaintiffs' Exhibit 2823.

5          THE COURT:  All right.  Yes, sir.

6          MR. BENTLEY:  Your Honor, just to be clear, my

7    objection is not -- I'm not questioning the accuracy of these

8    statistics.  I'm challenging on the misleading presentation

9    that is being made to the court through this demonstrative

10   exhibit.  If you were looking at the report itself, you was see

11   statistics, and you would see sample size, and you would

12   appreciate the insignificant sample size, I guess is what I

13   would say.  But that's my objection.  I'm not saying that they

14   inaccurately compiled it.

15         THE COURT:  All right.  Hand me one of the monthly

16   reports --

17         MS. MONJU:  Yes, Your Honor.

18         THE COURT:  -- please.  Do you have the one

19   corresponding to the -- it's a year-long compilation.

20         MS. MONJU:  Your Honor, I've just handed up the

21   December 2017 CQI report, which is the most recent report

22   defense counsel produced to plaintiffs.

23         THE COURT:  All right.  I've been handed the one

24   complete report for that particular month.  My initial

25   assessment of it is that it contains an enormous amount of

1    information for each month which would take me hours to try to

2    understand and process.  And a lot of the information would not

3    be useful to this case.

4            I can see that the summaries reduce what that would

5    require to one-page documents on certain of the information,

6    included, I presume, in each of the monthly reports.  I do not

7    see where that summary of the information is misleading at all

8    or not properly drawn out of the total exhibits themselves.

9    The total exhibits are available to the -- to the defense to

10   add anything to the discussion of the issue that you wish.

11           I this think is a reasonable way to present the

12   information to the court so I will overrule the defendant's

13   exhibit -- objection to -- how are you going -- are you going

14   to -- are you going to give me one, or are you going to give me

15   15 of these summaries?

16           MS. MONJU:  I think it will be somewhere in between,

17   single digits Your Honor.  I think about seven of these.

18           THE COURT:  All right.  As far as the exhibits on the

19   screen which is what?

20           MS. MONJU:  Plaintiffs' Exhibit 2823.

21           THE COURT:  Which is the summary for --

22           MS. MONJU:  Whether patients were seen by a provider

23   for sick call within seven days.

24           THE COURT:  And on what date?

25           MS. MONJU:  And this covers January 2017 through

```
 1   December 2017.

 2            THE COURT:  It covers a whole year?

 3            MS. MONJU:  It does.

 4            THE COURT:  All right.  I'm going to allow the

 5   information to be presented in this form to the court.  If you

 6   want to introduce all of the underlying -- the defendants want

 7   to introduce all of the underlying exhibits, you may do so.  I

 8   hope you don't, but you may.  All right.

 9            MS. MONJU:  Should I go ahead, Your Honor?

10            THE COURT:  Excuse me?

11            MS. MONJU:  Should I move on, Your Honor, to

12   discussing the exhibit.

13            THE COURT:  Yes.  Have you moved 2823, the summary

14   exhibit, into evidence?

15            MS. MONJU:  I will do so now, Your Honor.  I move to

16   admit.

17            THE COURT:  All right.  That exhibit is received into

18   evidence with the provisions and exceptions -- not exceptions,

19   but with the accommodation to the defendants if he wants to do

20   that.

21            MS. MONJU:  Thank, Your Honor.

22            THE COURT:  All right.

23        (Exhibit P-2823 marked)

24   BY MS. MONJU:

25   Q   So, Dr. Perry, we just discussed that Centurion did not
```

```
1   have a very good score for patients seeing a provider within

2   seven days for a sick call for November 2017.  And I represent

3   to you that this exhibit summarizes the scores that Centurion

4   received on that metric from January 2017 to December 2017.

5          MR. BENTLEY:  Your Honor, I'm going to object to

6   characterization of scores received.  I do not think that's

7   what this document is doing.

8          THE COURT:  Sustained.

9   BY MS. MONJU:

10  Q   Dr. Perry, I'll rephrase.  As we discussed on the first

11  page of this report, the thresholds for each indicator is

12  90 percent or above.  That's right?

13  A   Yes.

14  Q   And so for each indicator here regarding providers seeing

15  patients within seven days, based on this exhibit, Centurion

16  scored lower than 50 percent on these indicators for half of

17  2017.  Is that right?

18  A   Yes.

19  Q   And it met the 90 percent threshold in only one month,

20  December 2017.  Is that right?

21  A   Yes.

22  Q   Thank you, Dr. Perry.  So we're going to look at the

23  December 2017 CQI reports that I handed you, and we're going to

24  look at pages 36 and 37 of that report.  So, Dr. Perry, these

25  are indicators for medication administration at EMCF.  Is that
```

1  right?

2  A   Yes, it is.

3  Q   These indicators show that four are under the 90 percent

4  threshold.  Is that right?

5  A   Yes.

6  Q   So, for example, are all doses documented appropriately is

7  at 4 percent?

8  A   Correct.

9  Q   And that's an important indicator because, as we've

10  discussed, it's important to document medication patients are

11  receiving appropriately.  Right?

12  A   Yes.

13  Q   And that's because doctors need to know what medication

14  their patients have taken?

15  A   Correct.

16  Q   And if you look at if there are missed doses, is the back

17  of the MAR documented appropriately, that's at zero percent.

18  Is that right?

19  A   Yes.

20  Q   And as we discussed, that's important because, again,

21  medication records need to be accurate.  Is that right?

22  A   Yes.  That just tells -- the nurse tells who she is and why

23  the dose was missed on the back.

24  Q   As we discussed, doctors need to know those reasons because

25  they need to know if after two times a patient has missed a

1  dose why that's happening, and they need to see them.

2  A   Right.

3  Q   And so, Dr. Perry, the overall compliance on medication

4  administration in this December 2017 report is 49 percent.  Is

5  that right?

6  A   That's right.

7  Q   That's not a very good performance, is it?

8  A   That's why that's included in this report.  The CQI is for

9  problem area.

10  Q   Because they need to get better at this.  Correct?

11  A   Correct.

12  Q   So, Dr. Perry, I will represent to you that similar scores

13  also appear in other CQI reports, and I'm going to show you an

14  exhibit marked Plaintiffs' 2840.

15       MR. BENTLEY:  Your Honor, if I may just reiterate and

16  ask for a continuing objection with the understanding that

17  you've already ruled on all of these demonstratives that are

18  pulled from these reports.

19       THE COURT:  You may have a continuing objection to

20  them.  Thank you.

21       MR. BENTLEY:  Thank you.

22  BY MS. MONJU:

23  Q   So, Dr. Perry, this exhibit summarizes all of the scores

24  for -- all of the indicators for 2017 for whether missed doses

25  were documented appropriately on a MAR.  And as you can see,

 1   Centurion has failed to meet the 90 percent threshold on

 2   every -- on this indicator every single month that it was

 3   documented.  Is that right?

 4   A   According to this, yes.

 5   Q   And it's right that the highest performance Centurion

 6   posted was 17 percent in April 2017?

 7   A   Yes.

 8        MS. MONJU:  Your Honor, I move to admit this exhibit

 9   as Plaintiffs' 2840.

10        THE COURT:  With the objections previously voiced,

11   2840 is received into evidence.

12        MS. MONJU:  Thank, you, Your Honor.

13      (Exhibit P-2840 marked)

14   BY MS. MONJU:

15   Q   So, Dr. Perry, we're going to look back at that 2017

16   report, pages 16 and 17.  These are metrics related to access

17   to health care in segregation.  Is that right?

18   A   Yes.

19   Q   This report also shows three metrics under the 90 percent

20   threshold.

21   A   It does.

22   Q   And, for example, one of those metrics is medical services

23   completed and documented segregation rounds at least three

24   times per week.  Is that right?

25   A   Yes.

1  Q   And that just means, as we discussed, that seg rounds

2  weren't being completed.  Is that right?

3  A   That means they -- a nurse went through the segregation

4  unit to ensure that the inmates in the unit didn't need any

5  medical assistance.

6  Q   Right.  And this report shows that those segregation round

7  were only being performed at least three times per week

8  32 percent of the time.  Is that right?  And we have that

9  highlighted on the screen for you if it's easier to see.

10  A   Okay.  Yes.

11  Q   And, Dr. Perry, just to clarify, we discussed that

12  segregation round actually need to happen every day.  Is that

13  right?

14  A   Yes.

15  Q   And so, Dr. Perry, there are similar scores in other CQI

16  reports.  I'm going to show you an exhibit listing all of the

17  scores for this indicator for 2017.  So, Dr. Perry, as

18  summarized on this exhibit, in 2017 EMCF met this indicator

19  requiring medical round in segregation at least three time per

20  week in only two months.  Is that right?

21  A   Above the 90 percentile, yes.

22  Q   Thank, Dr. Perry.

23          MS. MONJU:  I move to admit Plaintiffs' Exhibit 2818.

24          THE COURT:  2818.  What does CQI mean?

25          MS. MONJU:  It stand for continuous quality

1  improvement, and that's just the name these reports have.

2          THE COURT:  2818 will be received into evidence.

3      (Exhibit P-2818 marked)

4  BY MS. MONJU:

5  Q   And, Dr. Perry we're going to go back to that December 2017

6  report, page 32.  These show metrics for mental health care.

7  Is that right?

8  A   Yes.

9  Q   This report shows two metrics under 90 percent?

10  A   It's difficult to tell.  It look like -- okay, thank you.

11  Q   I apologize Your Honor.  Dr. Perry, this actually only

12  shows one metric as it relates to EMCF under 90 percent, and

13  that's whether inmates on the case load log are seen by mental

14  health professionals in group or office visit every month.  Is

15  that right?

16  A   That's right.

17  Q   And that's at 46 percent?

18  A   Yes.

19  Q   And that just measures whether or not prisoners who are on

20  the mental health case load are receiving group or individual

21  therapy every month.  Is that right?

22  A   Right, whether they're seen by the mental health

23  professional at least monthly or every 30 days.

24  Q   And that's required under MDOC policy and the Centurion

25  contract.  Is that right?

```
 1   A   That's right.

 2   Q   And, Dr. Perry, I will represent to you that similar scores

 3   also appear in other CQI reports.  I'm going to show you

 4   Exhibit 2818.  This is a compilation of scores for 2017

 5   concerning whether prisoners on the mental health case load

 6   were seen by a mental health professional every month.  And,

 7   Dr. Perry, as you can see Centurion failed to meet the

 8   90 percent threshold every single month in 2017 that it was

 9   measured for whether patients were being seen every month.  Is

10   that right?

11   A   Yes.

12            MS. MONJU:  Your Honor, I move to admit this exhibit

13   into evidence.

14            THE COURT:  Is there any way that the defendants could

15   stipulate this line of documents?

16            MS. MONJU:  Your Honor, I'm actually at a good

17   breaking point, if that just -- to just put that on the record.

18            THE COURT:  I'm not talking about a breaking point.

19   I'm trying to get some stuff entered into by agreement so we

20   don't have to do it page by page.

21            MS. MONJU:  Understood.

22            THE COURT:  Any way to -- recognizing you have

23   objections to it, is there any way that you could stipulate

24   subject to those objections that all of this, in effect,

25   statistical data can be received?
```

1          MR. BENTLEY:  Yes, Your Honor.  I've reviewed all the

2    demonstratives that Ms. Monju plans to enter.  And subject to

3    my objection, I don't have any difficulty stipulating to those

4    documents.

5          THE COURT:  Why don't we take a lunch recess and see

6    if you can't just get all this stuff in one stack and present

7    it to the clerk and have a stipulation that exhibits so and so

8    are received into evidence and the doctor does not have to

9    testify and I don't have to listen to all of that --

10         MS. MONJU:  Yes, Your Honor.

11         THE COURT:  -- foundation for these exhibits.

12         MS. MONJU:  Absolutely, Your Honor.  If I may --

13    obviously we will do whatever the court requires.  But because

14    we would like to go through these CQI reports and take the

15    pages out and also consult with defense counsel about those

16    exhibits, if it would be possible to have a slight longer lunch

17    break, I think that would be helpful in getting that done.  But

18    we'll do obviously whatever the court requires.

19         THE COURT:  We're going to recess for an hour.  Y'all

20    used up an hour and a half of my time yesterday --

21         MS. MONJU:  Absolutely, Your Honor.

22         THE COURT:  -- by recessing early so --

23         MS. MONJU:  Yes, Your Honor.

24         THE COURT:  -- you will have to get it done.

25         MS. MONJU:  We will.

1          THE COURT:  All right.  We'll stand in recess until 15

2    minutes after 1.

3       (Lunch Recess)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE OF REPORTER

     I, CHERIE GALLASPY BOND, Official Court Reporter, United

States District Court, Southern District of Mississippi, do

hereby certify that the above and foregoing pages contain a

full, true and correct transcript of the proceedings had in the

aforenamed case at the time and place indicated, which

proceedings were recorded by me to the best of my skill and

ability.

     I certify that the transcript fees and format comply

with those prescribed by the Court and Judicial Conference of

the United States.


     This the 21st day of March, 2018.


                    s/ *Cherie G. Bond*
                    Cherie G. Bond
                    Court Reporter