IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION


JERMAINE DOCKERY, ET AL.                    PLAINTIFFS

VS.                    CIVIL ACTION NO. 3:13CV326WHB–JCG

PELICIA HALL, ET AL.                    DEFENDANTS




**TRIAL TRANSCRIPT**
**VOLUME** 25




BEFORE THE HONORABLE WILLIAM H. BARBOUR, JR.
UNITED STATES DISTRICT JUDGE
MARCH 22, 2018

MORNING SESSION
JACKSON, MISSISSIPPI




REPORTED BY:  BRENDA D. WOLVERTON, RPR, CRR, FCRR

_____

501 East Court Street, Suite 2.500
Jackson, Mississippi  39201
(601) 608-4188

1                              **APPEARANCES**

2

   FOR THE PLAINTIFFS:
3
         MR. JODY E. OWENS
4        MS. ANNA Q. HAN
         MS. ELISSA JOHNSON
5        MR. ERIC GORDON BALABAN
         MR. RAVI DOSHI
6        MS. REKHA ELAINE ARULANANTHAM
         MS. CHELSEA CAVENY
7        MS. SARAH BIDINGER
         MR. BENJAMIN R. SALK
8

9  COUNSEL FOR DEFENDANTS:

10
         MR. WILLIAM T. SILER, JR.
11       MS. MOLLY MITCHELL WALKER
         MR. MICHAEL J. BENTLEY
12       MR. J. WILLIAM MANUEL
         MR. NICHOLAS F. MORISANI
13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        TABLE OF CONTENTS
 2
 3
 4       ExhibitS PTX-440, PTX-441, PTX-442, PTX-446, PTX-450, PTX-451
 5       ExhibitS JTX-704 JTX-71, JTX-72, JTX-73, JTX-74, JTX-75, JTX-76, J
 6  DEXTER CAMPBELL
 7    Direct Examination By Ms. Johnson:
 8      Exhibit JTX-9231
 9    Cross-Examination 31 By Mr. Morisani:
10    Redirect Examination 52 By Ms. Johnson:
11  JH
12    Direct (Direct) Examination By Ms. Johnson:
13    Cross-Examination 61 By Mr. Manuel:
14    Redirect Examination 63 By Ms. Johnson:
15  PELICIA HALL
16    Direct Examination 65 By Mr. Owens:
17
18
19
20
21
22
23
24
25
```

```
 1
 2      (EXHIBITS PTX-440, PTX-441, PTX-442, PTX-446, PTX-450,
 3  PTX-451 MARKED)
 4      (EXHIBITS JTX-70, JTX-71, JTX-72, JTX-73, JTX-74, JTX-75,
 5  JTX-76, JTX-77, JTX-78, JTX-79, JTX-145, JTX-146 MARKED)
 6          THE COURT:  Ms. Johnson, are you going to handle the
 7  next witness?
 8          MS. JOHNSON:  Yes, Your Honor.  The plaintiffs call
 9  Dexter Campbell.  He is in the back, and so they will bring him
10  out.
11                          DEXTER CAMPBELL,
12  having first been duly sworn, testified as follows:
13          THE WITNESS:  Good morning.
14          THE COURT:  Good morning.  You're going to have to get
15  about that far from the end of the microphone.
16          THE WITNESS:  Yes, sir.  Can you hear me?
17          THE COURT:  All right.  And please speak up.
18                        DIRECT EXAMINATION
19  BY MS. JOHNSON:
20  Q   Good morning, Mr. Campbell.
21  A   Good morning.
22  Q   Could you please state your name for the record?
23  A   Dexter Jerome Campbell.
24  Q   And, Mr. Campbell, where do you live currently?
25  A   E.M.C.F.
```

```
1    Q    And what unit are you housed on?

2    A    Housing Unit 4 Charlie, Cell 204.

3    Q    And how long have you been housed on 4 Charlie?

4    A    Since January 13th, 2012.

5    Q    Okay.  And have you lived on any other units or any other

6    zones at E.M.C.F.?

7    A    Yes.  When I initially came to E.M.C.F. June 17th of 2011,

8    I went to Housing Unit 6 Bravo.  I went home on court order in

9    October of that year, and I came back from Rankin County and I

10   went to Housing Unit 4 Delta, and that was like the first of

11   December.

12        THE COURT:  Excuse me just a minute.

13      (SHORT PAUSE)

14        THE COURT:  All right.

15   BY MS. JOHNSON:

16   Q    So you have been at E.M.C.F. with the exception of this

17   short period of time you were on court order for about the last

18   seven years?

19   A    Yes, ma'am.

20   Q    Have you ever been housed at any other prisons in M.D.O.C.?

21   A    I have been housed at Parchman and I have been housed at

22   C.M.C.F.

23   Q    Okay.  Mr. Campbell, do you have any medical conditions?

24   A    Yes, ma'am, I do.

25   Q    What medical conditions do you have?
```

1    A    Mental is PTSD, bipolar with anxiety and depression,

2    insomnia.  The physical, I have had head, neck and back trauma

3    from a military accident and have degenerative disk disease,

4    bilateral chondromalacia patella, bad knees, both knees, due to

5    have surgery on both feet.  I have allergies, sinuses, asthma,

6    just pretty banged up all over head to toe basically.

7    Q    And, Mr. Campbell, do you take medications for those

8    disorders that you have listed?

9    A    Yes, I do.

10   Q    Can you tell us what medications you take for your mental

11   health diagnoses?

12   A    I take Minipress for the PTSD.  I take lithium for the mood

13   swings.

14   Q    And what medication do you take for your medical

15   conditions?

16   A    I take the Mobic for pain, more or less for joint pain.  I

17   take the Gabapentin or Neurontin for nerve pain.  I take the

18   Singulair for the asthma and bacterial infection in my lungs.

19   I take Claritin for allergies.

20   Q    Okay.  And at E.M.C.F. has there ever been an occasion

21   where you did not receive those medications as they were

22   prescribed to you?

23   A    Yes, several.

24   Q    What is the most recent time this happened?

25   A    Within about a week.  It's a couple of times within a week.

```
 1    The last few weeks, we didn't get medication on nights that
 2    there was only one nurse and we didn't get medications.  And
 3    then sometimes I just miss doses because I am out of a certain
 4    pill.
 5    Q   And just so I'm clear, when you say *We didn't get*
 6    *medications because there was only one nurse working,* do you
 7    mean that pill call did not happen on your zone at all?
 8    A   To my understanding, it didn't happen on the unit and some
 9    other units as well.  That's what they told us.
10    Q   And your zone where you live on, 4 Delta, you didn't
11    receive pill call?
12    A   No, ma'am.
13    Q   And this was evening pill call?
14    A   Yes.
15    Q   Okay.  And what time does evening pill call usually occur?
16    A   Sometimes it's early as around 7:00 p.m.  Sometimes it's
17    late as 12.
18    Q   Okay.  And what about morning pill call?  What time does
19    that usually happen?
20    A   It can be as early as around 8:00 a.m.  Sometimes it's as
21    late as around 12 noon or after.
22    Q   Okay.  And since pill call happens at different times every
23    day, how do you get notice of when the nurse is there to give
24    you your medication?
25    A   They will say *pill call.*  It's usually from the opposite
```

1    side of the door.  We can hardly hear it.  I'm one of the ones

2    because I have missed it so much that I will yell out pill call

3    and we will yell out pill call to one another or go to one

4    another's door, because it's hard to hear from the other side

5    when they call pill call.

6    Q    And when you say you have missed it, does that mean there

7    have been times where you didn't hear the announcement of pill

8    call?

9    A    That's correct.

10   Q    And if you don't hear the announcement, can you get your

11   medication late?

12   A    No.  They will say that it's too late to get it, and some

13   will say at 11 or 12 is too late.  If we wake up before then

14   and ask, we have trouble getting up the hallway to medical and

15   they say they can't send it back by an officer.

16          MR. MORISANI:  Your Honor, I just object.  He is

17   saying *they* will say.  I object to the hearsay.

18          THE COURT:  Sustained.

19   BY MS. JOHNSON:

20   Q    And, Mr. Campbell, you don't ever refuse your medications.

21   Is that true?

22   A    No, I don't.

23   Q    Okay.  I want to show you a medication administration

24   record from December of last year.  And you will see at the

25   bottom, is that your name and M.D.O.C. number?

1    A    Yes, it is.

2    Q    And are these the medications that you have listed for the

3    court that you take?  At least as of December?  I know they may

4    have changed.

5    A    Yes.  I don't -- they don't have all of, like, the -- they

6    don't have all of them on there, though.

7    Q    But you do take all of these medications that are listed on

8    this page?

9    A    Yes, I do.  They have some -- I see three have KOP.  Those

10   are keep on person, so those are not the ones that the pill

11   call nurse give us.

12   Q    Okay.  Those are the ones you are allowed to keep with you

13   and take as you need?

14   A    Yes, ma'am.

15   Q    Mr. Campbell, I just want to draw your attention to -- this

16   would have been December 10th, and it looks like there is a

17   blank.  If I look at the various medications, there is a blank

18   for that day for multiple medications.  Do you know why that

19   would be blank?

20   A    That means that we didn't get medications.

21   Q    Do you recall instances in December where you did not

22   receive any of your medications?

23   A    Yes, I do.

24   Q    And how often do you run out of a medication?

25   A    Myself, I tend to run out of my Claritin for allergies and

1    my Neurontin for pain quite often.  I would say in a month I'm

2    out of one of them -- one or both of them at least once a

3    month.

4    Q    And you sometimes run out of your other medications, too?

5    A    Yes.  There has been times I have been out of three or four

6    medicines at the same time.

7    Q    And, Mr. Campbell, do you know when your medications are

8    about to run out?

9    A    Sometimes the nurse will let us know.  They will show us

10   and say this is your last card and you need a new order so you

11   need to put in a sick call.  For the most part, we don't; we

12   just run out.

13   Q    And so you can't do anything in terms of putting in a sick

14   call or requesting a refill until after the medication has run

15   out?

16   A    That's correct.

17   Q    And when you put in a sick call for medications in those

18   instances, how long does it usually take the medication to come

19   in?

20   A    If it's an order, we have to see the sick call nurse who

21   routes us to the doctor, and then there is a waiting period to

22   see the doctor.  And then once the doctor reorders it, then

23   there is a waiting period to get it from pharmacy.

24   Q    And I know you may not remember each time, but on average,

25   about how long does that process take?

```
1    A    A week to two weeks.

2    Q    Okay.  And during that time you don't receive that

3    medication?

4    A    No.

5    Q    And the facility knows when an order is about to expire.

6    Is that right?

7    A    That's correct.  They tell me that --

8              MR. MORISANI:  Your Honor, I just object to the extent

9    this is speculation.  She is asking what the facility knows or

10   doesn't know.

11             THE COURT:  Sustained.

12   BY MS. JOHNSON:

13   Q    Mr. Campbell, when you go to the doctor and he puts in the

14   order for the medication, is that order good for a certain

15   amount of time?

16   A    The doctor will tell me that the order is good for whatever

17   amount of time it is.

18   Q    Okay.  Mr. Campbell, I want to show you another medication

19   administration record, and this one is from January of 2018.

20   And again, you see your name and M.D.O.C. number at the bottom?

21   A    That's correct.

22   Q    And, Mr. Campbell, if we look for your -- this is the

23   substitute for the Singulair that you had mentioned.  And if

24   you see here starting it looks like on January 13th through

25   January 18th, there are 6s as the code for the medication
```

1    administration.  Do you know what the 6 stands for?

2    A    No, I don't.

3    Q    Okay.  If we turn over here to the back, you will see here

4    that the code is the medication is out of stock.  Do you see

5    that?

6    A    Yes, ma'am.

7    Q    Do you recall not receiving your Singulair for about a week

8    in January?

9    A    Yes, I do.

10    Q    And during that time did you make a request to have that

11    medication refilled?

12    A    Yes, I did.

13    Q    How did you make that request?

14    A    To the pill call nurse.

15    Q    Do you recall if you put in a sick call?

16    A    And a sick call.

17    Q    And so you informed the nurse verbally and also put in a

18    sick call request?

19    A    Yes.  I usually ask them do I need to put in a sick call to

20    see the doctor or I will ask them is it a refill or a reorder,

21    because many times they will say we will refill it but I am

22    actually out.

23            MR. MORISANI:  Your Honor, again he is saying what

24    *they* will say.  I just object to the hearsay.

25            MS. JOHNSON:  Just on the effect on whether he needs

1    to fill out a sick call and the direction -- it's not being

2    offered for the truth of the matter asserted, Your Honor.

3          THE COURT:  Overruled.

4    BY MS. JOHNSON:

5    Q   Mr. Campbell, when you said they have to do a reorder, that

6    means you would not have to see a doctor to get your

7    medication.  Is that right?  I'm sorry.  A refill.

8          MR. MORISANI:  Objection.  Leading.

9          MS. JOHNSON:  I was just following up from his

10   testimony.  He talked about both refills and reorders.

11         THE COURT:  Sustained.  Restate your question.

12   BY MS. JOHNSON:

13   Q   Mr. Campbell, what is a refill?

14   A   A refill is when my order is good but my cards are out.

15   There is no medication on the card and they have to have some

16   more refilled or sent from the pharmacy.

17       A reorder is when my order is completely out, meaning they

18   can't refill it.  I have to get a new order from the doctor.

19   Q   Okay.  And based on policy at the facility, do you have to

20   ask for a refill or do those happen automatically?

21   A   Both.

22   Q   Okay.

23   A   We have to -- it's supposed to be refilled automatically,

24   but when it's not, then I will say, *Well, I don't have this in*

25   *my pill, where is this, where is that?*  And then they will look

1    on the MAR and see that it's good and they will say, *You are*

2    *out.* And then I will say, *Well, I need it.* So --

3    Q    Mr. Campbell, some of the medical and mental health

4    conditions you listed, as a result of those conditions, do you

5    go to the chronic care clinic?

6    A    Yes, I do.

7    Q    What is the chronic care clinic?

8    A    It consists of two to three nurse practitioners and now Dr.

9    Arnold. I understood that he does some of the chronic care,

10    but it is for whatever ailments that persist over six months or

11    so to my understanding that are longterm, not expected to go

12    away.

13    Q    What -- of the conditions you told us about earlier, which

14    of those conditions do you see -- are you in chronic care for?

15    Do you know?

16    A    For the pain, for asthma. They still following me up on --

17    for seizures, although I really haven't had a seizure in a few

18    years. That's basically it, but I mean they -- chronic care

19    pretty much, they are watching me for my blood pressure,

20    although they keep ruling that out. It still fluctuates, and

21    they are saying that it is because of the pain probably.

22    Q    Okay. And, Mr. Campbell, you mentioned Dr. Arnold. Do you

23    know how long he has been at the facility?

24    A    Only a few months, maybe four I guess.

25    Q    Before he came to the facility, was there a doctor at the

1   facility, a regular doctor?

2   A   We usually go spells without doctors.  I think the doctor

3   before Dr. Arnold was -- I forget his name.  We call him Dr. B

4   or something.  He had one of those strange names.

5   Q   Okay.

6   A   Brazier, I think, or something like that.

7   Q   Mr. Campbell, I'm going to show you part of your medical

8   record related to chronic care.  And, Mr. Campbell, do you see

9   at the top your name and date of birth?

10  A   Yes, ma'am.  Well, that's not my birthday.

11  Q   What is your birthday, Mr. Campbell?

12  A   My birthday is January 13th, '62, but the system had it

13  January 16th.  If I use my birthday, I almost didn't have my

14  hernia surgery, I can't order canteen, I can't use the phone.

15  I have to stick with January 13th.  So a lot of times I am

16  asked my birthday and I will slip and say 13th and it messes

17  things up.

18  Q   So to access canteen or for the surgery that you referenced

19  or to use the telephone, you have to use the 16th even though

20  it's not your birthday?

21  A   Correct.

22  Q   Have you brought this to the attention of M.D.O.C. or the

23  medical staff that your date of birth is incorrect?

24  A   I brought it to the attention of M.D.O.C. when I was at

25  C.M.C.F.  I brought it to the attention of E.M.C.F. when it was

1    GEO and since it has been MTC.

2    Q    Mr. Campbell, as we see here, this is a chronic care

3    scheduling request, and I want to draw your attention to the

4    schedule with chronic care neurology.  And do you recall seeing

5    neurology around August of last year for chronic care?

6    A    I haven't seen neurology at all.  I been waiting on the

7    consult to manifest.

8    Q    When was the last time you recall seeing neurology?

9    A    I haven't seen neurology at all.

10   Q    Okay.  So this request says that you should see them in six

11   months, and this was a note from August, but that would have

12   been February of this year and you have not seen neurology?  Am

13   I understanding you correctly?

14   A    No -- that's correct.  The last time I asked Dr. Arnold

15   about it, he said he didn't see anything in -- about a

16   neurology or any other consults that I had been awaiting.

17   Q    Thank you.  Mr. Campbell, just a couple more brief

18   questions about your medication and then we will move on to

19   another topic.  Have you ever received an incorrect medication

20   during pill call?

21   A    Several times, yes.

22   Q    And what was incorrect about the medication?

23   A    I have received the medication for David Campbell.  I knew

24   him because I got his magazines as well, his mail periodically.

25   I have gotten Demon Campbell who is on the pod with me on

1    several occasions.  I have gotten other inmates' medication

2    that I didn't know who it was, I just knew it wasn't mine as

3    soon as I looked at it.

4    Q    And, Mr. Campbell, have you ever gotten medications after

5    they had been discontinued?

6    A    Yes, I have.

7    Q    And what have you done in those instances?

8    A    I told them that I no longer get that medication.  They

9    looked at the MAR and said I get it and pushed the pill pack

10   back to me.  I said, *This is not mine, I don't take it anymore,*

11   *it's been dc'd*, and they will say, *Are you refusing your*

12   *medication*?

13           MR. MORISANI:  Objection, Your Honor.  Hearsay.

14           THE COURT:  Overruled.  This is an employee of the

15   defendant.

16   BY MS. JOHNSON:

17   Q    Go ahead, Mr. Campbell.  You can complete your answer.

18   A    When I'm saying *they*, I'm talking about the nurses who are

19   giving it to me.  I'm sorry about saying they, but the nurse

20   will ask me am I refusing the medication.  I will say, *No, I'm*

21   *not refusing; it has been dc'd*.  And it's kind of like an

22   argument ensue.  I will say, *I will take it but I am not going*

23   *to take this; I'm going to throw it away.*

24   Q    And you don't take it because your belief is that that

25   medication has been discontinued?

```
1    A    My knowledge is that it has been discontinued and the

2    doctor has told me he has discontinued it especially if I have

3    asked him because I'm having adverse reactions or something

4    like that and we come to an agreement that we are going to dc

5    this, I am going to start this.

6    Q    When was the last time you recall that you -- you said

7    recently there have been instances where the evening pill call

8    nurse did not come to the zone.  Has that happened within the

9    last two weeks?

10    A    Yes, it has.  Also in the morning in the last two weeks.

11    Q    Mr. Campbell, I want to talk to you a little bit about the

12    security staff at E.M.C.F.  On Housing Unit 4, do you know how

13    many officers are assigned to your unit during first shift?

14    A    I don't know how many are assigned.

15    Q    How many do you see?

16    A    There is usually one in the top picket.  There is usually

17    two assigned to the bottom picket.

18    Q    And is the bottom picket, would those be the floor

19    officers?

20    A    Yes, that's correct.

21    Q    And how often do floor officers come to your zone?

22    A    Usually -- now recently?

23    Q    Yes.  Say within the last couple of months.

24    A    Pretty much on the hour.

25    Q    On the hour?  And has that changed recently?
```

1    A    Yes.

2    Q    How has it changed?

3    A    Well, it's changed in a couple of ways as far as like the

4    frequency and how many.

5    Q    So let's start with the frequency.  Has their frequency

6    increased or decreased?

7    A    It has increased.

8    Q    So officers come to the zone more often?

9    A    Yes.

10   Q    Prior to this change, how often did officers come to your

11   zone?

12   A    Pretty much around every two hours for count.

13   Q    Okay.  So only for a scheduled activity?

14   A    Yes.

15   Q    And you said the number of officers has also changed?

16   A    Yes.

17   Q    And has that increased or decreased?

18   A    For the most part it has increased to two officers

19   counting.

20   Q    Prior to this last couple of months, there were not two

21   officers counting?

22   A    There would be but not consistently.

23   Q    Okay.  And were there times when during a certified count

24   there was only one officer?

25           MR. MORISANI:  Objection, Your Honor.  Leading.

```
 1              MS. JOHNSON:  I can rephrase, Your Honor.
 2              THE COURT:  All right.
 3   BY MS. JOHNSON:
 4   Q   Mr. Campbell, there is different types of counts.  Is that
 5   correct?
 6   A   That's correct.
 7   Q   And do you know what a certified count is?
 8   A   Yes, I do.
 9   Q   During a certified count, prior to this change you were
10   just talking about, how many officers would typically come to
11   your zone to count?
12   A   Typically it would be -- I would say the best way I can
13   answer this is 50/50.  It was sometimes one officer, sometimes
14   two.
15   Q   When it would be two officers, can you describe how they
16   would conduct the count?
17   A   One would go on the top tier where I live and come through
18   and count, and one would go downstairs on the bottom tier and
19   count.
20   Q   So neither officer counted the entire zone.  Is that
21   correct?
22   A   Training -- they would when they are training.  I have
23   noticed they normally do that.  And just certain instances I
24   guess they would do it where they would count the top and then
25   go to the bottom and the officer who counts the bottom would
```

```
1   come up to the top and count.
2   Q    But that wasn't the regular practice?
3   A    No.  That wasn't regularly done, no.
4   Q    And you said more recently there have been two officers
5   conducting count?
6   A    Yes.
7   Q    Do you know why that has increased?
8   A    The officers tell us that --
9            MR. MORISANI:  Objection, Your Honor.  This is
10  speculation asking why there is additional count.
11           MS. JOHNSON:  Your Honor, I asked him if he knows.  If
12  he doesn't know, I will move on.
13           THE COURT:  The only way he can know is for somebody
14  to tell him.
15           THE WITNESS:  That's correct.
16           THE COURT:  I sustain the objection.
17  BY MS. JOHNSON:
18  Q    Mr. Campbell, have you ever assisted officers with counts?
19  A    Assisted as in -- yes, I have.
20  Q    How have you assisted?
21  A    If I know a certain inmate like my cell next to me in 203,
22  he has a new cellmate, Orlando Thomas, he works out in the
23  hallway.  His roommate is asleep.  The officer only sees one
24  person and says where is the other person.  And I will say he
25  is at work.  And he or she will say where and I will say he
```

1    works in the main hallway.  And they will say so there is two?

2    And I will say yes.

3    Q    And how often do officers ask you these types of questions

4    regarding the whereabouts of other prisoners?

5    A    They don't just always ask.  I will volunteer because I

6    will hear them asking.  Sometimes they will ask out.  And it's

7    not just me; they will ask other inmates as well.

8    Q    Okay.  Have you ever seen prisoners be assaulted on your

9    zone?

10   A    Yes, I have.

11   Q    And how often does that occur?

12   A    Recently it's not as much, maybe once a month.

13   Q    And when you say prior to this recent change, how often was

14   it happening?

15   A    Two to three times a month.

16   Q    And when these assaults happen, are prisoners able to get

17   medical attention?

18   A    Sometimes.

19   Q    When a new prisoner comes to the zone, who determines where

20   that prisoner -- what cell that prisoner is housed on?  Housed

21   in.  Excuse me.

22   A    I have seen it where officers will enforce and place an

23   inmate in a cell.  I have seen it where they will ask what

24   cells are open.

25   Q    And have you ever seen instances where prisoners are

1   involved in where a prisoner is housed?

2   A   Yes, I have.

3   Q   And can you describe that for the court?

4   A   Oh, I was one when I first came here on 6 Bravo.  And when

5   I came to 6 Delta, they had to spray a guy to leave prior to me

6   coming, and there was a discussion.  But I went into the cell

7   that I was assigned to.  But there was a discussion about where

8   I should go.

9   Q   And since you have been on Unit 4, have you seen instances

10  where there were discussions about where prisoners should go?

11  A   Yes.

12  Q   And those discussions are among prisoners, not among staff?

13  A   Both.

14  Q   Have you ever seen staff ask prisoners to help enforce the

15  rules?

16  A   Yes.

17  Q   Can you tell us about that?

18  A   Yes.

19       MR. MORISANI:  Your Honor, I just object to these

20  discussions.  These are employees of MTC which is a nonparty to

21  this lawsuit.

22       MS. JOHNSON:  Your Honor, it's very convenient for

23  defendants' counsel to raise that MTC is a nonparty when it has

24  had the warden of the facility here for the past three weeks as

25  the party representative in this matter.  They are an agent of

1   the defendant.

2          MR. MORISANI:  I think she has to show a lot more to

3   establish that they are actually an agent for the purposes of

4   this hearsay exception.

5          THE COURT:  How did we get into this objection about

6   MTC?

7          MS. JOHNSON:  Your Honor, my question was regarding

8   whether Mr. Campbell has observed officers at E.M.C.F. use

9   prisoners to enforce the rules at E.M.C.F.  And he was

10  responding to that question when Mr. Morisani objected.

11         THE COURT:  Overruled.

12  BY MS. JOHNSON:

13  Q   So, Mr. Campbell, could you describe for the court

14  instances where you have seen officers ask prisoners to enforce

15  the rules?

16  A   Yes.  They will come in and say there may be inmates that

17  run out the hallway whenever an officer access the door to the

18  pod.  Certain inmates will run out into the hallway, you know.

19  Q   And then what happens?

20  A   The officers will come on the zone and inform the inmate

21  population that if this continues then they may call Major

22  Dykes or they will call someone to come in and say you guys are

23  going to get locked down and shook down if this continues; if

24  you do not get this pod in compliance, you're going to be

25  locked down and shook down; if you guys don't do something

```
1    about this, if you guys continue to allow these things to
2    happen, then they will tell us of repercussions that will
3    happen.
4    Q    And this is based on the actions of another prisoner?
5    A    Yes.
6    Q    Are you sometimes placed on lockdown on 4 Charlie?
7    A    Yes, we are.
8    Q    And can you give the court an idea of instances where you
9    may be placed on lockdown?
10   A    If there is a fight, if someone is -- the term catching out
11   meaning they want to leave the pod because they owe someone and
12   they fear for their life or for whatever reason they want to
13   leave, they will lock us down long enough for that person to be
14   packed up and left.
15        If there is a fight, they will come in to assess what
16   happened, and so we are locked down.  If there is a shakedown,
17   normally we are locked down, especially if they find whatever
18   they consider excessive amounts of contraband.
19   Q    And when those lockdowns happen, can they last more than a
20   day?
21   A    They normally do.
22   Q    And earlier you told the court that you have several mental
23   health diagnoses?
24   A    Yes.
25   Q    When those lockdowns occur, how does it affect your mental
```

1  health?

2  A   It affects it because there is no movement.  I have a lot

3  of medical just besides the mental health that limits me

4  getting medical attention whether it's mental health or

5  physical.  If I need to speak with mental health, if I need to

6  use the wall phone to call home, there is deaths in the family,

7  things like that, we can't get out of our cell to use the

8  phone.

9       I have, you know, cellmates with mental illnesses.  They

10  are lashing out, so I'm dealing with my issues and my

11  cellmates' issues and neither one of us can get help.  And

12  there is a lot of tension because a lot of people are upset

13  about being locked down continually for things that other

14  people are doing instead of them removing those problematic

15  people.

16  Q   And, Mr. Campbell, when you're locked down, does mental

17  health come around?

18  A   Yes, sometimes.

19  Q   Sometimes?  But if you need mental health because you're

20  having a tough day with your depression or your PTSD, how could

21  you request mental health when you're on lockdown?

22  A   The only way we can is to tell the floor officer when they

23  come around to count or with trays.  And normally we are

24  promised that they will relay the message or whatever.  Mental

25  health, when they do come and/or the officers tell us there is

```
 1    no movement, mental health do come around on lockdowns.  That's
 2    normally when they would come around and they will say, mental
 3    health, are you having any issues.  And most of us will say
 4    yeah, we are locked down.
 5         They will ask what's your issue.  And like I have explained
 6    to mental health myself, you have guys standing at the doors
 7    listening.  You have your cellmate listening.  These are things
 8    that they say don't discuss these things, you know, among
 9    anyone else, Mr. Campbell; write them down, discuss them with
10    me only.  But when they come around making their rounds, they
11    expect you to talk about whatever your issues are.  Sometimes
12    you can, but sometimes you can't because your cellmate is right
13    there, your nextdoor neighbor is listening.  When mental health
14    leave, they are blabbering out, Oh, Mr. Campbell is talking
15    this and such and such or whatever.  So it is no
16    confidentiality.
17    Q    Have there been instances where you wanted to tell a mental
18    health counselor something but did not for that reason?
19    A    Most of the time.
20    Q    Most of the time.  Mr. Campbell, have you ever seen
21    contraband on your zone?
22    A    Yes, I have.
23    Q    Have you ever observed prisoners to be under the influence
24    of drugs?
25    A    Yes, I have.
```

```
1    Q    How often do you observe that on your zone?

2    A    Pretty much daily.

3    Q    Daily?

4    A    Yes.

5    Q    And that's daily even recently?

6    A    Yes.

7    Q    Mr. Campbell, just a few more questions for you.  I want to

8    talk to you a little bit about the food at E.M.C.F.  Do you

9    receive a regular diet or a special diet?

10   A    A regular diet.

11   Q    And have you ever received undercooked food on your tray?

12   A    Yes, I have.

13   Q    What was that?  What kind of food was undercooked?

14   A    It's been pretty much all of it at one given time or

15   another.  Sometimes it's more than one item.

16   Q    So you have had meat that was undercooked?

17   A    We have had meat that still had sheets of ice still on it.

18   Q    And you have had vegetables and potatoes or things of that

19   nature that have also not been cooked properly?

20   A    That's correct.

21   Q    Have you ever been served food that you believed was

22   spoiled or rotten?

23   A    Yes.

24   Q    What kind of food was that?

25   A    The meat.  Usually it's the meat.
```

1    Q    And how can you tell the meat is spoiled?

2    A    Because of the odor, because of the taste.  I have been

3    cooking since I was about seven.

4    Q    Okay.  And how often do you receive meat that's spoiled

5    based on the rancid odor?

6    A    How often?

7    Q    Uh-huh.

8    A    I would say once or twice a week.

9    Q    Once or twice a week?

10   A    Yes.

11   Q    And in those instances when you are served food that's

12   either undercooked or rotten, can you send your tray back to

13   get another tray?

14   A    You can.

15   Q    What happens if you do that?

16   A    Sometimes they send the same tray back.  There has been

17   times where you didn't get a tray back.  There have been a few

18   occasions where it appeared to be a new tray, new food rather.

19   Well, new tray and new food.

20   Q    And so most of the time you either don't get a tray back at

21   all or you just get the same tray back?

22   A    That's correct.

23   Q    And in those instances if you get a tray back that's the

24   same tray you sent, do you eat that tray?

25   A    No.  No.

```
1   Q    And so you go without for that meal?

2   A    Yes.

3   Q    Are you able to make canteen?

4   A    Sometimes.

5   Q    If you can make canteen, do you use canteen to supplement

6   your food?

7   A    Of course, yes.

8   Q    Are there prisoners who don't make canteen on your zone?

9   A    Yes.  Many of them.

10  Q    Have you ever observed prisoners eating from discarded

11  trays?

12  A    Every meal.

13  Q    Can you describe what you see?

14  A    Yeah.  They will wait for you to put your tray down.  They

15  will ask for it as you are on your way to put it up.  I usually

16  offer.  I don't like throwing away food.  But then they

17  actually pilfer through the trays, they just lift them up one

18  at a time and get food off of them.

19  Q    After you eat a meal at E.M.C.F., are you still hungry?

20  A    Yes.

21  Q    And has that happened the majority of meals?

22  A    Yes.

23       MS. JOHNSON:  No further questions, Your Honor.  I'm

24  sorry.  I would like to move Mr. Campbell's medical record,

25  it's Joint Exhibit 92, into evidence.
```

```
1              MR. MORISANI:  No objection, Your Honor.

2              THE COURT:  92 will be received into evidence.

3         (EXHIBIT JTX-92 MARKED)

4                           CROSS-EXAMINATION

5    BY MR. MORISANI:

6    Q    Mr. Campbell, a couple of questions.  You talked earlier

7    about -- you mentioned a hernia.  You did have the hernia

8    surgery.  Correct?

9    A    Yes, sir.

10   Q    And it was off-site.  Correct?

11   A    Yes, sir.

12   Q    And you're 6 feet tall.  Correct?

13   A    Yes, sir.

14   Q    And you weigh about 200 pounds.  Is that right?

15   A    195 the last time I was weighed, yes, sir.

16   Q    Okay.  And you mentioned lockdowns during your testimony.

17   You mentioned you couldn't get out of your cell during a

18   lockdown because your door was locked.  Correct?

19   A    Yes, sir.

20   Q    And what crime were you convicted of?

21   A    Possession with intent.

22   Q    And you were -- you're not scheduled to be released from

23   M.D.O.C. custody until 2070.  Is that correct?

24   A    Yes.  Well, I will be 109 if I get out, yes, sir.  I guess

25   that's -- I forget the date.
```

```
 1            MR. MORISANI:  Your Honor, I tender the witness.
 2            MS. JOHNSON:  Very brief redirect, Your Honor.
 3                      REDIRECT EXAMINATION
 4   BY MS. JOHNSON:
 5   Q   Mr. Campbell, have you seen other prisoners come out of
 6   their cells when they are supposed to be locked down?
 7            MR. MORISANI:  Your Honor, I object to that.  That's
 8   outside of the scope.
 9            THE COURT:  Sustained.
10   BY MS. JOHNSON:
11   Q   Mr. Morisani asked you about a hernia surgery.
12   A   Yes.
13   Q   And you did receive that surgery?
14   A   Yes.  That's correct.
15   Q   How long did it take for you to receive that surgery?
16   A   I have been complaining about right hip pain in that area
17   for about a year and a half.  Prior to the protrusion, once Dr.
18   Abangan saw the protrusion, he attributed it to the hernia, and
19   it was about another nine months before I had the actual hernia
20   surgery.
21   Q   So it was about two years that elapsed between you first
22   complaining about this problem and the actual surgery?
23   A   That's correct.
24            MS. JOHNSON:  No further questions, Your Honor.
25            THE COURT:  All right.  You may step down, Mr.
```

1    Campbell.  Who will you call?

2             MS. JOHNSON:  Your Honor, our next witness is the

3    witness that I mentioned to you yesterday, so we would ask that

4    the class reps are taken back to the holding cell.  And

5    plaintiffs will call JH as their next witness.  And we would

6    also ask for the instruction that the correctional officers who

7    are present are asked to wait outside of the courtroom.

8             THE COURT:  All right.  If the guards would move these

9    two prisoner representatives back into the holding area and

10   then I would ask the guards when that is tended to.

11       (SHORT PAUSE)

12            THE COURT:  Would the marshal please tell -- I think

13   they wanted the guards from the prison to stay out in the hall

14   out front.

15            COURT SECURITY OFFICER:  Yes, sir.

16            THE COURT:  Is there any other prison guard in the

17   audience?

18            MR. SILER:  I don't see one, Your Honor.

19            MS. JOHNSON:  Your Honor, we need them to bring the

20   witness.

21            THE COURT:  Excuse me just a minute.  Would the two of

22   you please stay out in the hall so you can't hear what's being

23   said in here.

24            MS. JOHNSON:  Your Honor, we need the witness.  He is

25   in the holding cell.

1          THE COURT:  All right.  Who has got the witness?  One

2     of you going to get this witness for us?  How many more

3     prisoner witnesses do you intend to call?

4          MS. JOHNSON:  Your Honor, this is actually our final

5     prisoner witness.

6          THE COURT:  Final one?

7          MS. JOHNSON:  Yes, sir.

8          THE COURT:  The testimony is getting to be pretty

9     repetitive.

10         MS. JOHNSON:  Yes, Your Honor.

11         THE COURT:  What's his name?

12         MS. JOHNSON:  JH, Your Honor.  He was listed on the

13    witness list that we gave you earlier this week with his full

14    name.

15                            **JH,**

16    having first been duly sworn, testified as follows:

17         THE COURT:  You have to -- sir, you have to be about

18    that far from that microphone.

19         THE WITNESS:  Is that good, sir?

20         THE COURT:  Yes, sir.  That's good.

21                    **DIRECT EXAMINATION**

22    BY MS. JOHNSON:

23    Q    Good morning, Mr. H.

24    A    Good morning.

25    Q    Throughout your testimony today we are just going to refer

```
 1   to you by your initials, JH.
 2   A    Okay.
 3   Q    How old are you?
 4   A    39.
 5   Q    And where do you currently live?
 6   A    I'm housed at East Mississippi Correctional Facility.
 7   Q    And what unit are you housed on?
 8   A    4 Bravo.
 9   Q    And how long have you been in prison?
10   A    I have been in prison off and on since 1998.
11   Q    During this particular incarceration, how long have you
12   been?
13   A    I have been back in since 2012.
14   Q    How long have you been housed at E.M.C.F.?
15   A    Since around November of 2015.
16   Q    And can you tell the court the units that you have been
17   housed on since being at E.M.C.F.?
18   A    Yes.  I have been housed in medical.  I stayed in medical
19   for about seven or eight months.  Then I went to 3 Charlie.
20   From 3 Charlie, I went to -- back to medical.  From medical
21   then, I went to camp support which is Unit 7.  From there to 4
22   Delta.  From 4 Delta to 5 Alpha.  From 5 Alpha to 5 Charlie,
23   from 5 Charlie to 1 Delta.  From 1 Delta to 4 Bravo.
24   Q    And you have been housed on 4 Bravo since when?
25   A    I have been on 4 Bravo for a year and a half now.
```

1  Q    Mr. H, do you have any medical conditions?

2  A    Yes, ma'am.

3  Q    What medical conditions do you have?

4  A    I have seizures, asthma.  I'm currently dealing with a

5  heart situation that we are still trying to get took care of

6  and I have mental health issues.  They got me diagnosed with

7  bipolar and depression.

8  Q    Do you take medications for those?

9  A    Yes, ma'am, I do.

10  Q    What medications are you currently prescribed?

11  A    I'm on Prozac, Benadryl, Zyprexa, two inhalers, Albuterol

12  and Alvesco.  I'm on Claritin, triamcinolone cream for a face

13  skin rash that I be having.  They have got it chronic care.

14  I'm on Minipress.

15  Q    And if you can't remember them all --

16  A    That's pretty -- that pretty much covers them all, I think.

17  Q    Okay.  You were transferred to E.M.C.F. in 2015?

18  A    Yes, ma'am.

19  Q    Do you know why you were transferred to E.M.C.F.?

20  A    I was transferred to E.M.C.F. after being sexually

21  assaulted at Central Mississippi Correctional Facility.  They

22  sent me there to get mental health treatment.

23  Q    When were you sexually assaulted?

24  A    In October of 2015.  No.  Yes.

25  Q    And were you transferred to E.M.C.F. about a month later in

1    November?

2    A    Right.  I actually think it was September.

3    Q    All right.  And you said that you were transferred because

4    you needed mental health treatment?

5    A    Yes, ma'am.  I was transferred from C.M.C.F. to Merit

6    Hospital where I stayed 14 days.  After I left Merit Hospital,

7    they sent me to Unit 42 in Parchman where I stayed about

8    another 30 days.  And from there, they sent me to E.M.C.F. for

9    further evaluation and treatment.

10   Q    Why were you at the hospital for 14 days?

11   A    Because I got sexually assaulted and I tried to kill my

12   self afterwards.

13   Q    So were you in the hospital based on the trauma from the

14   sexual assault?

15   A    Yes, ma'am.

16   Q    And then you went to the hospital at Parchman?

17   A    Yes, ma'am.

18   Q    And do you know why you were at the hospital at Parchman?

19   A    That's just where they sent me.

20        MR. MANUEL:  I object to the relevance of this.  I

21   think we need to talk about the time he got to E.M.C.F.

22        MS. JOHNSON:  Your Honor, if I may, this all happened

23   immediately preceding his transfer to E.M.C.F.  And the need

24   for mental health treatment was the basis of his transfer to

25   E.M.C.F.  I just have a few more questions and I promise that I

```
 1   will move on to his time at E.M.C.F.
 2             THE COURT:  I overrule the objection.
 3   BY MS. JOHNSON:
 4   Q    How did you try to kill yourself?
 5   A    I overdosed on pills.
 6   Q    Okay.  And when you arrived at E.M.C.F., where were you
 7   housed?
 8   A    I was housed in medical.
 9   Q    Why were you housed in medical?
10   A    Because Nurse Dunn thought I needed further evaluation
11   because I was really unstable at the time.
12   Q    And you mentioned that you were housed in medical for about
13   seven or eight months?
14   A    Yes, ma'am.
15   Q    And when you were housed in medical, my understanding is in
16   the back of medical, there are single cells?
17   A    Yes, ma'am.
18   Q    Is that where you were housed during that time?
19   A    Well, first I was up in the front in the holding tank for a
20   few days until they got a cell open.  Then they moved me back
21   to the back.
22   Q    Okay.  So let's -- let's start with the holding tank that
23   you described.  Is there a bed in it?
24   A    No.
25   Q    Is there a toilet in it?
```

1    A    No.

2    Q    Is there a shower?

3    A    No.

4    Q    And you were housed there overnight for two or three days?

5    A    Yes, ma'am.

6    Q    How did you use the restroom?

7    A    You would have to get the officer's attention through the

8    window and they would open the door and let you go in the main

9    hallway to use the restroom.

10    Q    Slow down just a little bit.

11    A    Okay.  I'm sorry, ma'am.  You have to get the officers'

12    attention, and they would open the door and allow you to use

13    the restroom.

14    Q    And you were in that holding cell for mental health

15    observation?

16    A    Yes, ma'am.

17    Q    Did you ever have an issue getting the officers' attention?

18    A    Sometimes.

19    Q    What would you do in those instances?

20    A    You would have to beat on a window.

21    Q    Until somebody responded?

22    A    Yes, ma'am.

23    Q    When you were placed in that holding cell, was there any

24    type of call button that you could push on the wall to get an

25    officer's attention?

1    A    No, ma'am.

2    Q    Was there any device or button you were given that you

3    could push maybe holding your hand and get the officers'

4    attention?

5    A    No.  You beat on the window or you kicked the door.

6    Q    And that was the only way you could get someone's

7    attention?

8    A    Yes, ma'am.

9    Q    And so a few days later you said that a cell opened up in

10   the back and you were moved to a cell in medical in the back of

11   the unit?

12   A    Yes, ma'am.  I was moved to 518 I think it was at first.

13   Q    Okay.  And in 518 did you have a toilet?

14   A    Yes, ma'am, I had a toilet and a bed.

15   Q    Okay.  But you still had to go somewhere else to shower?

16   A    Yes, ma'am.

17   Q    Okay.  And in 518 was there a call button in case you

18   needed assistance from the nurse or security?

19   A    No, ma'am.

20   Q    Did you receive any type of other way to contact the

21   officer, a button of any sort?

22   A    Beat the window or kick the door.

23   Q    And how long were you in 518?

24   A    I was there for about I want to say almost a month.  I'm

25   not for sure.  Then I went to 516 which had a shower inside the

```
1   cell.

2   Q    And when you were -- so you were in medical for about

3   another seven months?

4   A    Yes, ma'am.

5   Q    During that time were you ever on suicide watch?

6   A    Yes, ma'am.

7   Q    And when you were on suicide watch, did you still have your

8   property?

9   A    No.

10  Q    And was there ever a time when -- on suicide watch, how

11  often are officers or medical staff supposed to observe you?

12  A    I thought it was every 15 minutes.

13  Q    And when you were on suicide watch at that time, did

14  somebody come by and check on you every 15 minutes?

15  A    No, ma'am.

16  Q    Can you recall how long you went without seeing an officer

17  at that time?

18  A    It just really depends on what shift you're talking about,

19  Ms. Johnson.

20  Q    What about on first shift?

21  A    The 7 to 3 shift, you're going to see officers at least

22  every 30 minutes to an hour.

23  Q    What about second shift?

24  A    No.  You might see one at feeding time and maybe once or

25  twice within the shift.
```

```
 1   Q    And this is while you were in medical for mental health
 2   observation?
 3   A    Yes, ma'am.
 4   Q    Were you ever on a one-to-one watch while you were in
 5   medical?
 6   A    No, ma'am, not that I recall.
 7   Q    Did you receive any type of recreation while you were in
 8   medical?
 9   A    No, ma'am.
10   Q    You didn't have access to a recreation yard at all?
11   A    No, ma'am.
12   Q    Were you able to use the phone in medical?
13   A    If -- yes, ma'am, I was allowed to use the phone a couple
14   of times.  Warden Shaw and Warden Rice made sure that I was
15   able to call -- contact my family and let them know what
16   happened.  Nurse Dunn got me out --
17           THE COURT REPORTER:  I'm sorry.  You have to slow
18   down.
19   A    Warden Shaw and Warden Rice did approve me to use the phone
20   a few times.  They would get the unit manager to come get me
21   and take me to camp support to use the phone.  They would lock
22   everybody down in camp support and let me go in there and use
23   the phone.  I did get to use it three or four times in medical.
24   Q    And that's three or four times over eight months?
25   A    Yes, ma'am.
```

1    Q    And you weren't in medical -- your phone privileges weren't

2    restricted for any reason during this time?

3    A    No, ma'am.

4    Q    Did you receive cleaning supplies to clean your cell in

5    medical?

6    A    No, ma'am.  They have workers there that clean their cells

7    out as you -- before you move in, they are cleaned out.  And

8    then while you are in the shower, most of the time if you want

9    it cleaned, you tell them and they come in and clean it.

10   Q    During this time when you were in medical, how often would

11   you see a mental health professional?

12   A    Mental health would come around every morning.

13   Q    And did they ever take you out of the cell to talk to you

14   one on one?

15   A    No, ma'am.  Only ones that took me out of the cell would be

16   either Dr. Nagel or Nurse Dunn.

17   Q    And how often did they take you out of your cell?

18   A    When I needed them to.  They would get me out.

19   Q    But that was based on your requests?

20   A    Yes, ma'am.

21   Q    There was not a regular time every week or every month?

22   A    No.  When the nurse -- the mental health counselors come

23   around in the morning, if I had issues, I would tell them.  And

24   then I would tell them I really need to see Dr. Nagel or Nurse

25   Dunn and then I would get seen.

1   Q   Were you ever offered counseling?

2   A   No.

3   Q   And how were you feeling during this time?

4   A   I was very unstable at the time, a lot of suicidal

5   thoughts.  I didn't feel safe either because the security

6   didn't check on you like they should.  I didn't feel safe back

7   there because I knew how I was suicidal-wise.  But mental

8   health, I feel they did all right.  They helped me a lot, but

9   it took a long time.

10  Q   Did you -- were you housed in medical for so long because

11  of security concerns?

12  A   Some of it was security concerns.

13  Q   When were you finally moved out of the medical?

14  A   Around June or July of 2016.

15  Q   So you were locked down for about eight months straight?

16  A   Yes, ma'am.

17  Q   And where were you moved at that time?

18  A   To 3 Charlie.

19  Q   And is Housing Unit 3 sometimes referred to as the mental

20  health unit?

21  A   Yes, ma'am.

22  Q   And prisoners are housed there that have serious mental

23  health needs?

24  A   Yes, ma'am.

25  Q   And you were moved to 3 Charlie you said?

1    A    Yes, ma'am.

2    Q    What happened when you -- when you were moved to 3 Charlie,

3    can you describe that zone?

4    A    3 Charlie is made up of 33 cells.  It's got a lower tier

5    and an upper tier.  It's got a dayroom, windows, got a door

6    goes out to the outside rec yard and you got TVs.

7    Q    And when you were on 3 Charlie, did staff come around to

8    check on prisoners?

9    A    No, not like they should.

10    Q    Did you feel safe on 3 Charlie?

11    A    No.

12    Q    Did you ever tell anybody about your concerns on 3 Charlie?

13    A    Yes.

14    Q    Who did you tell?

15    A    I told Ms. Shavers, a mental health counselor, about some

16    guys getting sexually assaulted after I got moved on 3 Charlie.

17    I noticed some inmates that was very mentally ill getting

18    sexually assaulted, and I told Ms. Shavers about it.  I seen

19    Warden Shaw come around one day with Mr. Owens and I told him

20    also about inmates getting sexually assaulted.

21    Q    After you told Ms. Shavers that prisoners were getting

22    sexually assaulted, did you see anything happen on the zone

23    that addressed that?

24    A    No, ma'am.

25    Q    Prisoners weren't moved?

```
 1    A    No, ma'am.

 2    Q    Were you concerned for your own safety?

 3    A    Yes, ma'am.  I just got sexually assaulted myself.

 4    Q    Do you remember when you made that report to Ms. Shavers

 5    about witnessing prisoners be sexually assaulted?

 6    A    Yes, ma'am.

 7    Q    Around what time was it?

 8    A    It was in the morning time when she made her rounds.

 9    Q    And this was in 2016?

10    A    Yes, ma'am.

11    Q    I know this is difficult.  Do you remember what month it

12    was?

13    A    It had to have been June or July because I got sexually

14    assaulted myself on August 1st.

15    Q    On August 1st of 2016?

16    A    Yes, ma'am.

17    Q    You were sexually assaulted again?

18    A    Yes, ma'am.

19    Q    And where did this happen?

20    A    On 3 Charlie.

21    Q    Can you tell us what happened on 3 Charlie?

22    A    We was -- me and Michael Wilson, a guy I painted with, we

23    was on a painting crew.  We would go out and paint during the

24    day.  Me, him and my roommate was in a cell.  They was in there

25    getting high and smoking weed, we was.  And my roommate left
```

1    out and Michael Wilson closed the door and had a sheet over the

2    door and he rigged the door from the inside so he could open it

3    from the inside and nobody could open it from the out.

4        The next thing I know he was hitting me in the back of my

5    head really hard.  I kept saying, *What are you doing, what are*

6    *you doing?*  And he kept hitting me and he hit me until I

7    couldn't fight back.  I was on the ground really

8    semi-unconscious because I didn't really know what was going

9    on.  And he picked me up by the back of my neck and he throwed

10   me over the bed and he pulled my pants down and he -- that's

11   when he raped me.

12   Q   I'm sorry, Mr. H.  You said he had a sheet over the door at

13   this time?

14   A   Yeah, he had a big rock in a laundry bag and he kept

15   telling me if I made a sound he would beat me in the head with

16   it.

17   Q   About how long did this assault last?

18   A   Five to 15 minutes, maybe a little longer.  I was really

19   confused and lost.  I was scared.  I didn't know what to do.

20   Q   After the assault, what happened?

21   A   I went in my room and I locked my door.  It was right at

22   about between 8 and 10:00 p.m. when this happened when we had

23   to lock down at 11.  So right after it happened I went in my

24   room, locked my door and I got under the sheet and I cried.

25       And the next morning when the doors opened at 5:00, I went

1   straight to the phone and dialed the PREA number and reported

2   it, even put my name on the recorder and who assaulted me.

3   Q    And just to back up just a minute, Mr. H, were you able

4   to -- there is a night that happened between the assault and

5   the next morning?

6   A    Yes, ma'am.

7   Q    Did you see an officer during that time?

8   A    No.  I didn't.  The only time I seen an officer when they

9   come and did the 11:00 count but you don't trust them officers

10  there to report nothing like that.

11  Q    So the next morning you used the phone and called the PREA

12  hotline?

13  A    Yes, ma'am.

14  Q    And what happened after you made that phonecall?

15  A    I went to the door and Officer Ford was there.  I told

16  Officer Ford I needed to go to medical, that I had been

17  sexually assaulted.  And she made a joke of it and said, *What*

18  *did he do?  Rape you in your little booty?*

19          MR. MANUEL:  Objection.  Hearsay.

20          MS. JOHNSON:  Your Honor, I'm not offering it for the

21  truth of the matter asserted.  And, furthermore, it is a

22  hearsay objection.  Officer Ford is an agent of the defendant

23  and works at the facility as an officer.  Within the scope of

24  her duty, she should have taken Mr. H to medical.

25          THE COURT:  Overruled.

1  A   Anyway, Officer Ford told me, *What?  Did he rape you in*
2  *your little booty?*  And I told her no, I was serious.  And she
3  said -- she never said nothing.  I said, *Well I need to go get*
4  *a breathing treatment.*  And about that time, they brought the
5  law library list down, and I was on the list to go to the law
6  library that day.  So I got my stuff and went to the law
7  library.  On the way to the law library, I seen Mr. Little who
8  was the HSA at the time.  And I told him, I said, *Mr. Little, I*
9  *got raped last night.*  He said, *Jason, stay right here.*  And he
10  was with some people I think from Southern Poverty.  I'm not
11  sure but he was with some folks.  He said, *Stay right here.*  I
12  said, *Well, I have got to go to the library and then I will*
13  *just go back to medical.*
14      So I went to the law library, mailed by legal mail out and
15  then I went to medical and I reported it.
16  Q   Mr. H, so it was not your report of a sexual assault that
17  was able to get you out of the unit that day?
18  A   No.
19  Q   And when you went to medical, an exam was conducted?
20  A   When I went to medical, they did a body sheet on me, and I
21  talked to Ms. Valentine, which was a mental health counselor at
22  the time.  I talked to her for a few minutes and they sent me
23  out to the hospital to have a rape kit done.
24  Q   And when did you -- did you return to the facility the same
25  day?

```
 1   A    Yes, ma'am.

 2   Q    When you came back to the facility, did you speak to mental

 3   health again?

 4   A    Yes, ma'am.  I talked to Nurse Dunn.

 5   Q    Did you speak to an investigator?

 6   A    Yeah, Investigator Ruffin.  I would like to back up.  After

 7   I spoke with the nurses that morning in mental health and

 8   Investigator Ruffin come in, he told me I needed to put my

 9   clothes in a bag because I had not took a shower or changed

10   clothes.  So I took my clothes off in the bathroom and I told

11   him, I said, Investigator Ruffin, right there you can see,

12   there is the semen in my boxers along with a little blood.

13   That's the evidence you're going to need because I'm going to

14   press charges on this guy.  And he said, Okay, I will take care

15   of it.

16        So he put my clothes in a paper bag and he sent them to the

17   hospital with me.  But when we got to the hospital, the

18   Lauderdale County Sheriff's Department come talked to me and

19   took a report and I give them a report of what happened.  And

20   they kept telling me that the -- that my clothes had to be

21   tagged as evidence by the investigator from the prison, they

22   had to have a chain of evidence.  So Sergeant McCarty and

23   Officer Moore, the officers that escorted me to the hospital,

24   called the facility and Investigator Ruffin numerous times to

25   ask him to come tag the clothes as evidence so Lauderdale
```

1    County could take them into evidence with my rape kit.  But

2    they never come tagged my clothes as evidence.  The clothes was

3    sent back to the facility with me and give to Investigator

4    Ricks and Ricks said he was going to give them to the Sheriff's

5    Department.  But as of my knowledge, they never got to the

6    sheriff's department.

7    Q    When you returned to the facility that day, where were you

8    housed?

9    A    Investigator Ruffin was going to put me back on 3 Charlie

10   and I refused to go.  I talked to Nurse Dunn and she said she

11   was going to keep me up there and observe me for a while.

12   Q    To your knowledge when Investigator Ruffin was going to put

13   you back on 3 Charlie, do you know if the man who raped you was

14   still on 3 Charlie?

15   A    I didn't know where he was at.

16   Q    And you feared for your safety?

17   A    Yeah, I wasn't going back down there.

18   Q    And Nurse Dunn kept you in medical?

19   A    Yes, ma'am.

20   Q    Were you -- were you housed in one of the cells in the back

21   of medical again?

22   A    No, this time I was took to -- I was took to intake because

23   there was no cells open.

24   Q    And is intake part of medical?

25   A    No.

1    Q    Is intake across from medical?

2    A    It's like you have to go through the main hall and then go

3    to another little area on the other side of medical.  I mean

4    it's got holding cells and then you have got a main hallway and

5    another door to go through and intake, like seven or eight

6    cells down through intake.  I mean they used it a lot for

7    holding inmates that was on psyche or on suicide.

8    Q    And when you were in intake, how long were you housed in

9    intake?

10    A    Just a few days.  I was there three or four days, maybe

11    five at the most I think.

12    Q    Were you on psychiatric observation at this time?

13    A    Yes, ma'am.

14    Q    Was there an officer on intake?

15    A    No, there wasn't an officer.  The medical officers would

16    have to come over and do rounds but you never see them over

17    there hardly.

18    Q    How often when you were in intake did you see an officer?

19    A    It's just according to what shift again, Ms. Johnson.  Like

20    the day shift, 7 to 3 shift, you are going to see somebody

21    because you have got the intake officers doing intake.  But

22    from 3 to 11, you are not going to see no officers hardly.

23    Maybe once or twice within the shift.  And from 11 to 7, you

24    are definitely not going to see nobody.

25    Q    While you were in intake -- in your cell in intake, was

1    there a bed?

2    A    No.  No, ma'am.

3    Q    And did you have a toilet?

4    A    Yes, there is a toilet.

5    Q    Were you able to shower while were you housed in intake?

6    A    No.  I got to shower one time while I was in intake.

7    Q    How were you feeling when you came back to the facility?

8    A    Scared.  Scared.  Scared.  Very scared and emotionally

9    wrecked.  And I was in a lot of pain.

10    Q    Did you try to hurt yourself after this assault?

11    A    Yes, ma'am.

12    Q    What happened?

13    A    I took some pills and swallowed some batteries.

14    Q    When was this?

15    A    While I was in intake.  I can't recall the dates, but it

16    was around I want to say August 2nd or 3rd maybe.

17    Q    So a few days after the assault?

18    A    Yes, ma'am.

19    Q    And how were you able to have pills that you could -- extra

20    pills that you could swallow?

21    A    I hoarded them up.  The nurse would give me my morning

22    meds.  I wouldn't take them.  I would just act like I took them

23    and put them beside me or I would drop them on the floor and I

24    just kept them.

25    Q    Did the nurse watch you as you were supposed to take your

1   pills?

2   A    No.  One of the nurses I could even get extra pills from.

3   Q    Okay.  And you said you swallowed pills?

4   A    Yes, ma'am.

5   Q    Do you remember what kind of pills they were?

6   A    Lithium, Zyprexa, whatever I was on at the time.  I can't

7   recall because they have changed my meds so much since I have

8   been there.  But I know it was a bunch of lithium pills and a

9   battery that I had in my radio.

10  Q    After you did that, what happened?

11  A    They took me across to medical and give me some charcoal

12  stuff to drink.  Yeah, that time they give me some charcoal to

13  drink that time.  They didn't send me out that time I don't

14  recall.

15  Q    After they gave you the charcoal, did you go back to

16  intake?

17  A    Yes, ma'am.

18  Q    And were you placed on any higher level of watch?

19  A    Yeah, suicide.

20  Q    Were you on a one to one?

21  A    No.  Suicide.

22  Q    And once you were placed on suicide after you had swallowed

23  the pills, did you see an officer or anyone more often?

24  A    No, ma'am.

25  Q    What happened next?

1    A    Next I was moved back over to the holding cell, back to

2    539.  Yeah, 539 in medical.

3    Q    The holding cell is what we discussed earlier which doesn't

4    have a bed or a toilet?

5    A    Yes, ma'am.

6    Q    Were you housed there overnight?

7    A    Yes, ma'am, for a couple of days.

8    Q    Okay.  And eventually were you moved to a cell in medical?

9    A    No.  From there, I went to camp support, Unit 7.

10   Q    Okay.  Did you -- after you tried to hurt yourself, did you

11   start counseling of any sort?

12   A    Not that time, no.

13   Q    Did you have an opportunity to meet with a mental health

14   counselor to talk about the sexual assault that had happened?

15   A    I talked to Dr. Nagel and Nurse Dunn.  But other than that,

16   no.  I didn't get put on one-on-ones until just here recently.

17   Q    So at that time you -- Dr. Nagel and Nurse Dunn would see

18   you but that wasn't regularly scheduled?

19   A    No, ma'am.

20   Q    And you were on camp support for a little while?

21   A    Yes, ma'am.

22   Q    Was there any other time at E.M.C.F. that you have tried to

23   hurt yourself?

24   A    Back when I was on 5.

25   Q    What happened?

1    A    Some guys back there were setting fires a lot and I have

2    got asthma really bad.  I have to carry an inhaler with me

3    everywhere I go.  And I got where I couldn't breathe one time

4    because it was so smoky back there.  There was like two or

5    three fires set all at one time.  I couldn't hardly breathe and

6    I was trying to get to medical to get a breathing treatment

7    because I have an order for breathing treatments as needed.

8        I started cutting on myself to try to get them to take me

9    to medical because they kept telling me that medical was going

10    to call me up there, but they never come got me.  So I started

11    cutting on myself to try to go to medical and get a breathing

12    treatment.  And the officer said, *Well, you just scratched*

13    *yourself, you'll be all right.*  So I had to wrap it up myself

14    to make it stop bleeding because they wouldn't take me to

15    medical to get no attention.

16    Q    Back up for just a minute, Mr. H.  You said that there were

17    multiple fires on the unit at one time?

18    A    Yes.

19    Q    Before you cut yourself, how long had you been requesting a

20    breathing treatment?

21    A    Hours.

22    Q    And they hadn't come to get you to take you to medical?

23    A    No.  Back on 5, you don't see officers.  Only time you see

24    officers is maybe when they do a certified count or when they

25    are feeding and on shower day if you are lucky.

```
1    Q    And why did you cut yourself?

2    A    Because I wanted to get medical attention.

3    Q    Because you were having trouble breathing?

4    A    Yes, ma'am.  I couldn't breathe.

5    Q    Had you tried to use your inhaler?

6    A    Yes, and it wasn't working.  It wasn't working.  It wasn't

7    doing no justice for all the smoke.

8    Q    After you cut yourself did you go to medical eventually?

9    A    No.

10   Q    You said you had to wrap up the wounds yourself?

11   A    Yes, ma'am, with a towel.

12   Q    Were there other times on 5 where you needed a breathing

13   treatment because of the fires?

14   A    Several times.

15   Q    And were you able to get a breathing treatment?

16   A    Like I have got maybe one or two breathing treatments the

17   whole time I was back there.  For the whole month or month and

18   a half I was in 5, I only got maybe one or two breathing

19   treatments.

20             THE COURT REPORTER:  I'm sorry.

21             THE COURT:  Slow down.

22   A    So the whole month and a half that I was on 5, I maybe got

23   one or two breathing treatments.

24             THE COURT:  Let's finish up with this witness.  I have

25   gotten a full understanding of what his problems are and what
```

1  has been done with him, unless there is something different.

2  BY MS. JOHNSON:

3  Q    Mr. H, I just want to talk to you a little bit briefly

4  about current conditions at E.M.C.F.

5  A    Yes, ma'am.

6  Q    Have there been instances at E.M.C.F. where --

7        THE COURT:  I thought this was pretty current.  When

8  was all of this happening?

9        THE WITNESS:  This happened, Your Honor, back in 2017.

10  '16 and '17.

11  BY MS. JOHNSON:

12  Q    I want to draw your attention to just the last six months

13  or so, Mr. H.

14  A    Yes, ma'am.

15  Q    Have there been instances at E.M.C.F. on 4 Bravo where you

16  did not receive your medication?

17  A    Yes.

18  Q    What happened?

19  A    Sometimes you just get tired of waiting up late to get it

20  because it may be 11, 1, 2:00 in the morning before the nurses

21  ever show up and I just go to sleep.  Sometimes like Nurse

22  Brookshire, she will just refuse to give you your meds.

23  Q    What do you mean she refuses to give you your meds?

24  A    She will say last call and then she will look when she says

25  last call and see who all is in line.  And if you are not that

1  person that she sees at the last time, you won't get your meds.

2  She is going to shut the tray hole.  When she gets to whatever

3  guy she called the last call on, she is going to shut the tray

4  hole and walk off.

5  Q   Why aren't you just already in line?

6  A   Because there would be so many of us that have to take

7  meds.  They are really supposed to call last call three times.

8  But usually they call it one time and whoever is at the end of

9  the line, if you are not there when they call it, they are

10  going to shut the tray hole when they get to that person.

11  Q   And have there been times recently when the nurse didn't

12  come at all?

13  A   Yes.

14  Q   When was the last time that happened?

15  A   The last time we didn't get meds was when they walked Nurse

16  Robinson out.

17  Q   What do you mean they walked her out?

18  A   The captain and lieutenants come got her and walked her

19  out.

20  Q   And they walked her out during pill call?

21  A   Yes, ma'am.

22  Q   And no other nurse came and finished pill call?

23  A   No, ma'am.

24  Q   How long ago was that?

25  A   About two or three months ago maybe.

1    Q    And have there been instances where you were on lockdown
2    and saw other prisoners out of their cells?
3    A    Yes, ma'am.  I mean 4 Bravo, we don't do contraband, we
4    don't do drugs.  We are a volunteer program.  We are trying to
5    better ourselves and change.  We've got our own program that we
6    do.  We are in groups all day.  So we don't get locked down as
7    much as 4 Charlie and 4 Alpha, but we can see out the windows
8    to the other zones.  And 4 Charlie and 4 Alpha gets shook down
9    and locked down but you will see guys out running around
10   because they will be popping their cells and coming out.
11   Q    Has there ever been a time when you were on lockdown and
12   saw other prisoners out?
13   A    Yes, ma'am.
14   Q    When was that?
15   A    When we had that major shakedown.  When M.D.O.C. come
16   through, everybody was on lockdown and you could still see
17   inmates coming out on 4 Alpha and 4 Charlie.
18   Q    Have there been instances where you were put on lockdown
19   for a count and couldn't come back out because of staff?
20   A    Multiple times we have been put on lockdown for certified
21   count.  It would take them hours to get it clear.
22   Q    Mr. H, have you seen weapons at E.M.C.F. on your zone?
23   A    No, not on my zone.
24   Q    Have you seen evidence of weapons on any of the zones
25   around you?

```
 1    A    Yes, ma'am.

 2    Q    What has that been?

 3    A    We can see the rec yard and we can see 4 Alpha making

 4    weapons all the time out in the yard.

 5    Q    You actively see prisoners making weapons on the rec yard?

 6    A    Yes, ma'am.  I reported it to my unit manager and she just

 7    shut them down recently, and they are on lockdown as we speak I

 8    think right now.

 9    Q    And how often have you seen prisoners making weapons?

10    A    Daily basis.

11    Q    On a daily basis?

12    A    Yes, ma'am.

13         MS. JOHNSON:  No further questions, Your Honor.

14         THE COURT:  All right.

15         MR. MANUEL:  Very briefly, Your Honor.

16         THE COURT:  Yes, sir.

17                        CROSS-EXAMINATION

18    BY MR. MANUEL:

19    Q    Mr. H, my name is Will Manuel, and I'm one of the lawyers

20    who represents the defendants.  I just have very few questions

21    to ask you.

22    A    Yes, sir.

23    Q    First off, this recent time that you are in prison, what

24    are you serving time for?

25    A    I'm serving time for strong-armed robbery as a little
```

1    habitual offender.

2    Q    The two individuals that you mentioned several times about

3    receiving medical treatment from, one of them was Dr. Nagel.

4    Is that correct?

5    A    Yes, sir.

6    Q    And he was the psychiatrist there.  Is that correct?

7    A    Yes, sir.

8    Q    And you also talked about speaking numerous times with a

9    Nurse Dunn?

10    A    Yes, sir.

11    Q    And Nurse Dunn is a nurse practitioner with a specialty in

12    psychiatry.  Is that correct?

13    A    Yes, sir.

14    Q    I want to ask you a few questions about this unit that you

15    are on right now, which is 4 Bravo.  Is that correct?

16    A    Yes, sir.

17    Q    It's known as the Pathway to Change unit.  Is that correct?

18    A    Yes, sir.

19    Q    And you have been there for about a year and a half?  Did I

20    understand that correctly?

21    A    Yes, sir.  I have a position on that unit.

22    Q    You are a rule monitor on that unit.  Is that correct?

23    A    Yes, sir.

24    Q    You are one of the people that helps to make sure that

25    y'all keep that unit in line.  Is that correct?

 1  A    Yes, sir.

 2  Q    And you also said I think that you participate in group

 3  therapy there.  Is that correct?

 4  A    Yes, sir.  We have several groups throughout the day.  All

 5  day long we have NA, AA.  We're working on starting an SA,

 6  which is a sex anonymous group.  We also do like positive

 7  thinking, anger management, stuff like that.

 8  Q    How to cope with medications is another one that you have

 9  taken?

10  A    Yes, sir.  I have tooken a psychotropic medication class.

11  Q    And public speaking is another one as well?

12  A    Yes, sir.

13  Q    And as a matter of fact, you got your GED while you were at

14  E.M.C.F.  Is that correct?

15  A    Yes, sir.

16  Q    And you are also getting your bachelor's in theology as

17  well?

18  A    Yes, sir, and I'm doing MRT.

19          MR. MANUEL:  That's all the questions I have, Your

20  Honor.

21                    **REDIRECT EXAMINATION**

22  BY MS. JOHNSON:

23  Q    Just briefly, Mr. H.  On Pathway to Change, how many people

24  can be in that program?

25  A    66.

1  Q   If you are not housed on that zone, can you participate in

2  those programs?

3  A   You have to go through Mr. Lee, which is our substance

4  abuse counselor.  You have to meet the criteria to come to that

5  program.

6  Q   And do you know what the criteria is?

7  A   You have to have some kind of addiction problem.  Most of

8  the time you've got to have some kind of an addiction to drugs,

9  alcohol, sex, whatever it might be.

10 Q   And the groups that you referenced, are they run by a

11 counselor?

12 A   A counselor comes run it but most are inmate run.  We've

13 got group facilitators, group leaders.  They sit there and they

14 ask -- we've got pamphlets, workbooks we use and we go through

15 the workbooks and answer questions.  It gets -- real personal

16 stuff.

17        MS. JOHNSON:  No further questions, Your Honor.

18        THE COURT:  All right.  Is this witness finally

19 excused?

20        MS. JOHNSON:  Yes, Your Honor.  We do have one

21 request.  We would ask that Mr. H and Mr. Campbell be allowed

22 to sit in the courtroom for the duration of the day.  I spoke

23 with counsel opposite this morning and they had no objection if

24 the court is okay with it.

25        THE COURT:  And who are they?

```
 1          MS. JOHNSON:  I spoke with Mr. Morisani this morning.
 2   It would be Mr. H and Mr. Campbell, the two witnesses who
 3   testified in addition to the class reps.
 4          THE COURT:  The two men who were removed from the
 5   courtroom, you want them back in here?
 6          MS. JOHNSON:  Yes, Your Honor.  And I also would like
 7   to ask that the other prisoners that testified this morning be
 8   allowed to sit in the courtroom.
 9          THE COURT:  This man and one more?
10          MS. JOHNSON:  Yes, Your Honor.
11          THE COURT:  All right.
12          MS. JOHNSON:  Thank you.
13          THE COURT:  All right.  We will take our morning
14   recess at this time until 15 minutes of 11.  And if the guards
15   will have all of these prisoners back in the courtroom at a
16   quarter of 11, we can start on time.
17      (RECESS)
18          THE COURT:  All right.  Who will the plaintiffs call?
19          MR. OWENS:  Your Honor, plaintiffs call M.D.O.C.
20   Commissioner Pelicia Hall.
21                        PELICIA HALL,
22   having first been duly sworn, testified as follows:
23                     DIRECT EXAMINATION
24   BY MR. OWENS:
25   Q    Good morning.
```

1    A    Good morning.

2    Q    State your name for the record, please.

3    A    Pelicia E. Hall.

4    Q    And, Commissioner Hall, you currently are the M.D.O.C.

5    Commissioner for the Department of Corrections.  Is that

6    correct?

7    A    That is correct.

8    Q    And you were appointed by Governor Phil Bryant.  Is that

9    also correct?

10    A    That is correct.

11    Q    And you are responsible for the entire agency?

12    A    That's correct.

13    Q    And that's the operation of both the safety and security of

14    M.D.O.C.?

15    A    That is correct.

16    Q    And also the medical and mental health providing to the

17    inmates?  Is that correct?

18    A    That's correct, as well as many other functions of the

19    agency.

20    Q    And part of your responsibility is to manage your budget

21    effectively.  Is that correct?

22    A    As best I can, yes.

23    Q    And to be a good steward of taxpayer money.  Is that also

24    correct?

25    A    That is correct.

1    Q    And you have been the commissioner for approximately a

2    year?

3    A    That's right.

4    Q    So when did you first become commissioner?

5    A    I was appointed interim commissioner February 1st of 2017.

6    I was appointed by Governor Bryant finally as the permanent

7    commissioner March 6th, I believe, of 2017.

8    Q    And before you were commissioner, were you also chief of

9    staff for M.D.O.C.  Is that correct?

10   A    That is correct.

11   Q    And you were chief of staff for the previous commissioner,

12   Commissioner Fisher.  Is that correct?

13   A    Correct.

14   Q    And you were chief of staff for approximately two years?

15   A    Approximately, yes.

16   Q    So you have been an employee of the Mississippi Department

17   of Corrections for three years?

18   A    Almost to the letter.  Since March 1st of 2015.

19   Q    And by trade you are an attorney.  Is that correct?

20   A    That is also correct.

21   Q    And as an attorney, you understand the requirements of

22   running a constitutional facility.  Is that correct?  Prison

23   system?

24   A    I do.

25   Q    And you are responsible for maintaining facilities as well

1    in a constitutional compliant manner.  Is that correct?

2    A    Absolutely.  That as the commissioner of the Mississippi

3    Department of Corrections, I fully understand and appreciate

4    that we are duty-bound to operate our facilities in accordance

5    with the constitutional as well as any federal, state and other

6    regulations.

7    Q    And with that appreciation, you know you have to make sure

8    your prisons are safe?

9    A    We do our very best to ensure a safe environment in our

10   prisons.

11   Q    For your prisoners?

12   A    Absolutely, and for our staff as well.

13   Q    And also for your staff as well.  Correct?

14   A    Right.

15   Q    And you have attended this trial I think one day before

16   today?

17   A    That's correct.

18   Q    And you attended the testimony of your deputy commissioner,

19   Jerry Williams.  Is that correct?

20   A    That's correct, and there was another employee that

21   testified that day as well.

22   Q    And Jerry Williams is your Deputy Commissioner of

23   Institutions.  Is that correct?

24   A    That is correct.

25   Q    And you trust him to oversee the day-to-day operations of

1    the prison system.  Is that correct?

2    A    I do.

3    Q    And that includes six prisons.  Right?

4    A    Well, actually Deputy Commissioner Williams oversees all of

5    the institutions under the purview of the Mississippi

6    Department of Corrections.

7    Q    And that includes the private institutions as well.

8    Correct?

9    A    It does.

10    Q    And that includes the facility that we are here today

11    about, East Mississippi Correctional Facility.  Is that also

12    correct?

13    A    That is correct.

14         THE COURT:  Let me correct you on something or ask

15    you.  The term *private institutions* really means state

16    institutions operated by private companies.  Is that right?

17         THE WITNESS:  That's correct, Your Honor.

18         THE COURT:  So to name East Mississippi a private

19    institution is a misnomer?

20         THE WITNESS:  That's correct, Your Honor.  It is a

21    privately operated institution.

22         THE COURT:  All right.

23    BY MR. OWENS:

24    Q    You also are aware that Dr. Perry testified yesterday.  Is

25    that correct?

```
1    A    Yes, I am aware.

2    Q    And Dr. Perry is the Chief Medical Officer for the

3    Department of Corrections.  Is that correct?

4    A    She is.

5    Q    And she is responsible for ensuring --

6              THE COURT:  I know all of this.  If you are going to

7    ask her something about Dr. Perry, ask a direct -- going

8    through all this list of people and who they are, that's

9    already in the record.

10             MR. OWENS:  Yes, Your Honor.

11   BY MR. OWENS:

12   Q    Dr. Perry is your designee for providing medical and mental

13   healthcare throughout the prison system.  Is that correct?

14   A    Yes.  She is my chief medical officer, and she is in charge

15   of the medical operations.

16   Q    And you talk with her weekly.  Is that correct?

17   A    I talk to Dr. Perry as I need to, whether it's weekly,

18   daily.  I talk to her on an as-needed basis to inform me of

19   what I need to know.

20   Q    In your deposition you testified you talked to her at least

21   weekly.  Is that correct?

22   A    At least.

23   Q    And how often do you talk to Commissioner Williams?

24   A    Probably every day.  Like I say, every day or as needed.

25   Q    And you are aware that East Mississippi has the designation
```

1    of a mentally ill prison or houses mentally ill prisoners.  Is

2    that correct?

3    A    I am aware of that.

4    Q    And can you change that designation?

5    A    You said can I change the designation?

6    Q    Yes.  Can you change the designation?

7    A    Absolutely.  If there is a need to change the mission of

8    that facility, I can make that change.

9    Q    And you also are aware that East Mississippi is operated by

10   two private contractors.  Is that correct?

11   A    I'm sorry?

12   Q    It is operated by two private contractors.

13   A    You mean for the delivery of services at that facility?

14   Q    Yes, Commissioner.

15   A    That is correct.  I have a medical provider that functions

16   at East Mississippi and then I have the private provider that

17   operates the prison from a security standpoint.

18   Q    And the private provider that operates it from a security

19   standpoint is MTC.  Is that correct?

20   A    Correct.

21   Q    And the medical provider is Centurion.  Is that correct?

22   A    That is correct.

23   Q    And you have within your purview and control the ability to

24   be able to choose different providers.  Is that correct?

25   A    I can.

1    Q    You are familiar with this litigation that you are

2    testifying here today about.  Is that correct?

3    A    I am.

4    Q    And you first became aware of this litigation when you were

5    chief of staff for M.D.O.C.?

6    A    That is correct.

7    Q    And you are aware that it has several claims involved in

8    this litigation?

9    A    I am aware of that.

10    Q    And you are aware one of those claims is protection from

11    violence?

12    A    I am aware.

13    Q    And you are aware one of those claims is solitary

14    confinement?

15    A    I am aware.

16    Q    And you are aware that one of those claims is medical?

17    A    Yes.

18    Q    Mental health?

19    A    Yes.

20    Q    Nutrition?

21    A    Yes.

22    Q    And excessive use of force?

23    A    I am aware of those claims.

24    Q    And you also are aware this litigation has been going on

25    three years since you have been the chief executive officer --

```
 1              THE COURT:  Why don't you get -- she knows all of this
 2    background.  If she doesn't, she ought not to be in her
 3    position.  I know it because you have been over it with other
 4    witnesses several times.  Why don't you get to what you need to
 5    ask this lady about and help me out by getting this case out of
 6    the way?
 7              MR. OWENS:  Yes, Your Honor.
 8              THE COURT:  This is the same way you have examined
 9    every witness that you have handled is gone through a bunch of
10    already known stuff that was in the record and say, *Yes, I will
11    change my ways*, and you haven't done it.  Are you incapable of
12    understanding that?
13              MR. OWENS:  No, Your Honor.  If I may?
14              THE COURT:  Get on to what you are going to ask this
15    woman about and quit wasting everybody's time.
16              MR. OWENS:  Your Honor, may I briefly respond?
17              THE COURT:  No, sir.
18    BY MR. OWENS:
19    Q   Commissioner Hall, you do have the authority to settle this
20    lawsuit.  Is that correct?
21    A   The authority to settle the lawsuit?
22    Q   On behalf of M.D.O.C.
23              MR. SILER:  I object to this.  This has no relevance
24    to anything.
25              THE COURT:  Sustained.
```

1   BY MR. OWENS:

2   Q    You do have the authority to change staffing patterns at

3   M.D.O.C.?

4   A    If there is a need to, I can.

5   Q    And you can increase the staffing patterns at M.D.O.C.  Is

6   that correct?

7   A    If there is a need to, I can.

8   Q    And you testified that you also have the authority to bring

9   in additional contractors?

10  A    If I see there is a need to change contractors, yes, I can.

11  Q    And you routinely receive information regarding all your

12  prisoners.  Is that correct?

13  A    That is correct.

14  Q    You receive reports about the safety and security of those

15  prisons?

16  A    I receive reports about all things in the prisons

17  primarily.

18  Q    I want to briefly talk to you about the two contracts that

19  govern East Mississippi Correctional Facility.  And M.D.O.C.

20  actually contracts with the East Mississippi Authority.  Do

21  they not?

22  A    That's right.

23  Q    And that authority is authorized to contract with MTC?

24  A    That is correct.

25            MR. SILER:  Object.  Your Honor, we are just plowing

1    the same old ground again.

2            MR. OWENS:  Your Honor, I'm moving.  These questions

3    have not been asked.  If the court can give us a little leeway,

4    I promise it will have some insight to the deliberate

5    indifference and notice provisions of the contract that are the

6    very crux of our lawsuit here today.

7            THE COURT:  All right.  I overrule the objection.

8    BY MR. OWENS:

9    Q   First I would like to start with the MTC contract, what's

10   been previously marked into evidence as Exhibit 397.  Are you

11   aware of that contract?

12   A   I am aware, yes.  That contract existed before I came to

13   M.D.O.C.

14   Q   And it's been in existence since the last three years you

15   have been at the M.D.O.C. as well?

16   A   That's correct.

17           MR. OWENS:  Permission to approach the witness, Your

18   Honor?

19           THE COURT:  Pardon?

20           MR. OWENS:  Permission to approach the witness?

21           THE COURT:  Yes.

22   BY MR. OWENS:

23   Q   (Tenders document.)  Commissioner Hall, you said you are

24   aware of this contract?

25   A   Yes, sir.

```
1   Q    You have the authority to amend this contract.  Correct?
2   A    Yes, sir.
3   Q    And you have the authority to terminate this contract.  Is
4   that also correct?
5   A    Yes, sir.
6   Q    I want to discuss with you what goes to Page 14 on this
7   contract regarding employees.  It's Section 5.2.  If you could
8   turn there, please?  Are you there, Commissioner?
9   A    Yes, sir.
10  Q    Subsection B reads:  Effective 120 days following services,
11  commencement date, the authority shall provide staffing in
12  accordance with Exhibit B, staffing plan, mandatory and
13  nonmandatory positions will be subject to the following.
14       The first item discusses requirements related to mandatory
15  positions.  Commissioner, are you aware what a mandatory
16  position is at East Mississippi?
17  A    Yes.
18  Q    And for a prison to be safe and secure, mandatory positions
19  have to be filled.  Is that correct?
20  A    Well, I want to say -- yes and no.  The mandatory positions
21  are just what they say they are.  They are mandatory positions.
22  However, a mandatory position can be vacant, but the
23  requirements and responsibilities of that position can be
24  carried out through other means with that position still being
25  vacant.  So that's a yes and no answer.
```

1    Q    Okay.  Yes and no.  And with respect to your expectations

2    of M.D.O.C., do you expect MTC to fill every mandatory

3    position?

4    A    Well, it is our hope that the staffing pattern that has

5    been established will be followed.

6    Q    And that's for every shift?

7    A    Yes, sir.

8    Q    And that's for every day of the week?

9    A    Well, like I said, it is the goal always to fill and

10   maintain the level of staffing that is required under a

11   contract or operation of any facility.

12   Q    And the section where it discusses 5.2BI, do you see that,

13   Commissioner?

14   A    Yes.

15   Q    It states:  When a mandatory staff position vacancy occurs

16   that exceeds four hours, the authority shall remit to M.D.O.C.

17   the mandatory staffing credit for each hour vacant.  The

18   mandatory staffing credit should be calculated by multiplying

19   the actual hourly wage of the identified position by

20   125 percent.  Did I read that correctly, Commissioner?

21   A    You did.

22   Q    And to your knowledge, has M.D.O.C. ever received payment

23   for the mandatory staff position vacancy?

24   A    Well, I cannot say what -- I can only speak as to the time

25   that I have been there, and this contract was in existence

1    since 2012.  But since I have been at the agency since 2015,

2    I'm not aware that there was a staffing credit received for any

3    particular vacancies.

4    Q    And just to speak plain language, in the last three years

5    you have been there, you are unaware of M.D.O.C. receiving

6    money back from the contractor?

7    A    That's correct.  I am not aware of that.

8    Q    Now, are you aware that the mandatory positions at M.D.O.C.

9    remain vacant on a regular basis at East Mississippi

10   Correctional Facility?

11   A    You said the mandatory positions of M.D.O.C.

12   Q    The mandatory positions at East Mississippi.

13   A    Ask me the question again.  I'm sorry.

14   Q    Yes, ma'am.  Are you aware that the mandatory positions at

15   East Mississippi remain vacant on a regular -- routinely?

16   A    No.  I mean routinely, no, I am not aware of that.

17   Q    And who would be aware of that on your staff?

18   A    Well, if that condition existed, that information would be

19   available through my institutional department.  So my deputy

20   commissioner and his staff would be aware of that.  And if I

21   needed to be abreast and made aware of that, I would be.

22   Q    And your expectation, if you need to be aware of it, they

23   would tell you.  Is that correct?

24   A    Yes.

25   Q    Can we agree by virtue of this contract that if the

1    mandatory positions are vacant for four hours, the M.D.O.C. is

2    entitled to payment of the mandatory staffing credit?

3    A    Well, counsel, I will say this, that the contract language

4    says what it says.  And that is exactly what you have read.

5    Q    And as M.D.O.C. Commissioner, you are responsible -- you

6    are the person responsible for enforcing the provision of this

7    contract.  Is that correct?

8    A    That's correct.

9    Q    And as you testified earlier, you have the authority to

10   terminate and renegotiate the terms?

11           MR. SILER:  Objection.  Asked and answered about 20

12   times.

13           MR. OWENS:  We will move on, Your Honor.

14   Q    Have you required a new staffing analysis at East

15   Mississippi?

16   A    Well, we have actually looked at -- with my executive

17   staff, we have actually looked at the staffing.  That's part of

18   the original contract.  There has been no particular new

19   staffing analysis done, because, again, as I appreciate and

20   understand the current contract, the staffing analysis that was

21   in place was sufficient for up to 1500 inmates.

22   Q    Commissioner, I just want to make sure I appreciate your

23   answer, because I was a little confused.  It is your testimony

24   that your executive team has looked at the staffing analysis or

25   has not?

```
 1   A   Well, absolutely that we have looked at it from the

 2   standpoint that the number of inmates that we have at East

 3   Mississippi Correctional Facility, that the current contract

 4   and the staffing pattern that's there allows for -- the

 5   staffing pattern is sufficient for up to 1500 inmates.

 6   Q   So is it your testimony you looked at it and you found it

 7   to be sufficient?

 8   A   That's correct, based on the current population at East

 9   Mississippi.

10   Q   And, Commissioner, when did that review of your executive

11   team occur?

12   A   Well, we talk -- I have monthly staff meetings, so we talk

13   all the time.  There is always a shift in our institutions.

14   There might be a population change at any one of my facilities.

15   And I will give you a for instance.  For instance, at my South

16   Mississippi Correctional Institution, I found that I did not

17   have enough staff to be able to run a particular unit.

18         MR. OWENS:  Your Honor, I would like to strike any

19   testimony about another facility being relevant to the question

20   I asked the commissioner.

21         THE COURT:  She may use an example if she wants to in

22   answer to your question.

23   BY MR. OWENS:

24   Q   Continue.

25   A   In talking about staffing analysis, and I was providing a
```

1    basis by which we analyze our staffing patterns all the time,

2    we looked at a facility at South Mississippi Correctional

3    Institution and found that I did not have an appropriate level

4    of staffing at that particular facility.  And as a result of

5    that, Your Honor, what we did was we closed that particular

6    unit because I didn't have the appropriate level of staff, and

7    I had to shift those inmates to other institutions.

8        So when I say that there might be a change in the makeup of

9    my population all the time, we are continuously looking at the

10   makeup.

11   Q   You saw there was a problem in your staffing at another

12   facility and you did something to fix it.  Is that correct?

13   A   That's correct.

14   Q   All right.  Regarding the contract that's still on your

15   screen, Tony Compton has testified in this trial.  Are you

16   aware of that?

17   A   Yes.

18   Q   And Tony Compton is -- what's his position?

19   A   He is a director of regionals and privates.

20   Q   Which would include East Mississippi?

21   A   It would.

22   Q   All right.  Have you ever spoken with Director Compton

23   about terminating this contract?

24   A   No, not directly.

25   Q   Indirectly?

```
1   A    No.  What I'm saying is, like I said, I speak with my

2   executive staff with regard to whether or not a contract is

3   appropriate or not.  I have monthly staff meetings with my

4   executive team, and Tony Compton works under the purview of

5   Deputy Commissioner Williams.

6   Q    So have you ever spoken to Deputy Commissioner Williams

7   about terminating this contract?

8   A    We have talked about whether there needs to be a shift in

9   contractual services for all operations at M.D.O.C.  And MTC's

10  contract is no different from any other contract I would

11  review.

12  Q    You were not with M.D.O.C. when this contract was first

13  negotiated.  Is that correct?

14  A    I was not.

15  Q    You actually joined M.D.O.C. after Commissioner Epps was

16  indicted.  Is that correct?

17  A    I did.

18  Q    And are you aware that this current contract per the

19  indictment that is on the screen was the contract that's listed

20  in Mr. Epps' indictment which would be on Page 7?

21         MR. OWENS:  Your Honor, permission to approach the

22  witness?

23         MR. SILER:  Objection to the relevance of this, Your

24  Honor.

25  BY MR. OWENS:
```

1    Q    (Tenders document.)

2         MR. OWENS:  Your Honor, may I be heard in response to

3    counsel?

4         THE COURT:  What's the relevance of whether this

5    contract was the subject of or mentioned in the indictment of

6    Mr. Epps?

7         MR. OWENS:  The commissioner, I believe, Your Honor,

8    has testified that she has the authority and purview to

9    terminate and renegotiate contracts.  This contract -- the

10   State of Mississippi is currently -- not only has Mr. Epps been

11   prosecuted about this same contract, they are currently

12   litigating about this same contract.  And for the commissioner

13   to testify that she has looked at the contract and had

14   conversations with her executive team yet has not made a

15   decision on the termination that she needs to terminate it or

16   change it, Your Honor, I think that's certainly relevant to

17   this line of questioning.  And that's the only question I had

18   about that, Your Honor, just that one question that the

19   commissioner is aware that the same contract in question is --

20   was in the indictment.

21        THE COURT:  I don't see where that is relevant.  I

22   sustain the objection.

23        MR. OWENS:  Yes, Your Honor.

24        THE COURT:  She can review this contract, she can

25   discuss it with her team, she can change it if she thinks it

1  needs to be.  Whether it was under Epps or not is not material.

2         MR. OWENS:  Yes, Your Honor.  We can move on.

3  BY MR. OWENS:

4  Q   Commissioner, you can just put that indictment to the side.

5  Commissioner, since you have been at M.D.O.C., MTC has not been

6  required to rebid the contract.  Have they not?

7  A   I have not required -- under my purview as commissioner, I

8  have not required the private prison operator, the services to

9  be rebid.

10  Q   And currently MTC provides services for three prisons

11  throughout Mississippi.  Is that correct?

12  A   Yes.

13  Q   Okay.  I will set this aside, Commissioner.

14      Commissioner, I would like to show you what's been

15  previously entered into evidence as Plaintiffs' Exhibit 2803.

16  (Tenders document.)

17      Commissioner, I would purport to tell you that this is a

18  summary of a --

19         THE COURT REPORTER:  I'm sorry?

20         MR. OWENS:  A summary of mandatory post positions not

21  filled during November 2016.

22         MR. SILER:  Actually just for the record it says it

23  has to do with July --

24         MR. OWENS:  It was the first page of the exhibit,

25  Counsel.

```
1              THE COURT:  All right.  If the court reporter can

2    understand that with both of you talking at the same time, she

3    is better than I am, because I did not understand.  Mr. Owens,

4    you interrupted Mr. Siler and whatever he was saying.  So, Mr.

5    Siler, would you repeat what you were saying?

6              MR. SILER:  Since he turned the page, Your Honor, I

7    will withdraw the objection.

8              THE COURT:  All right.

9    BY MR. OWENS:

10   Q    Commissioner, can you see the document that says afternoon

11   shift, November 2016?

12   A    I see it.

13   Q    There are large numbers of vacancies each day on these

14   mandatory posts.  Do you see November 5th?

15   A    I do see November 5th.

16   Q    Do you see there were five unfilled mandatory positions

17   that day?

18             MR. SILER:  I object to this, Your Honor, as he is

19   representing this to the witness as being something that is

20   accurate and that they have a source for, and if the witness

21   has never seen this document, I mean she would have no way of

22   being able to answer any questions about it.

23             MR. OWENS:  Your Honor, if I may be heard?  This

24   document has been admitted into evidence.  Defendants had no

25   objections at that time.  As I informed the witness, it is
```

1   admitted into evidence and I am purporting to explain to her

2   what the document is.  It's in evidence.  They did not object

3   to it at that time.  I can lay a foundation if she doesn't

4   understand it.

5           THE COURT:  Did you just offer it into evidence?

6           MR. OWENS:  No, Your Honor.  It has already been

7   admitted into evidence.

8           THE COURT:  It has already been placed in evidence?

9           MR. OWENS:  Yes, Your Honor.

10          THE COURT:  All right.  I overrule the objection.

11  BY MR. OWENS:

12  Q   Commissioner, you see November 5th.  Do you not?

13  A   I see the date, November 5th.  I do.

14  Q   And do you see the five under there?

15  A   I do.

16  Q   I will represent to you, Commissioner, that stands for the

17  number of unfilled mandatory positions that day.

18          MR. SILER:  I'll object to that as not being an

19  accurate representation, Your Honor.

20          THE COURT:  What's not accurate about it?

21          MR. SILER:  These, the best I know of, were taken off

22  of these rosters, and they have continually misinterpreted

23  rosters.  And so it's inaccurate as to what he is contending

24  that it is.

25          THE COURT:  Well, I have not understood this mandatory

```
1    position and the count and the number rating or whatever those
2    numbers were supposedly equaling people that don't equal
3    people.  So I will tell both sides that I need somebody who
4    knows what it is and who can explain that to me to do so before
5    this trial is over.
6              MR. OWENS:  Yes, Your Honor.
7              THE COURT:  All right.  I overrule the objection.
8    Proceed.
9    BY MR. OWENS:
10   Q    Commissioner?
11   A    Yes, sir.
12   Q    Do you know what a mandatory post is for East Mississippi,
13   what that means?
14   A    Well, my understanding of what a mandatory post is those
15   posts that are basically the security posts that are required
16   to be staffed.  And those are the posts that are not optional.
17        For instance, a nonmandatory post, Your Honor, would be a
18   programming post, for instance, where I have individuals who
19   are receiving maybe alcohol and drug treatment or they are in
20   some alcohol anonymous class or they are in some anger
21   management class.  That would be from a programming standpoint
22   a nonmandatory post.
23        The mandatory posts would be those safety and security
24   posts that are required to have someone fulfilling those
25   functions all the time.
```

```
1        And what we do in corrections, Your Honor, when we don't
2   have sufficient staff to fill our mandatory post, we will shut
3   down the nonmandatory posts and pull correctional officers or
4   pull staff from nonmandatory posts to make sure those mandatory
5   posts are manned for that purpose, if that makes sense.
6              THE COURT:  Thank you.
7   BY MR. OWENS:
8   Q   So again, Commissioner, you acknowledge that you see that
9   there are numbers here purporting to represent mandatory posts
10  to go unfilled.  Do you know how much a correctional officer
11  starting salary is at East Mississippi?
12  A   I can't tell you what their starting salary is.  I would
13  have to defer to the warden to say what their starting salary
14  is, but I know our correctional officer starting salary is
15  $24,900 approximately.
16  Q   And when you distinguish between ours and theirs, you mean
17  staff who are under the Department of Corrections that are not
18  operated by private prisons?
19  A   That's right.
20  Q   Operators?
21  A   That's right.  MTC's correctional officers are not
22  employees of the Mississippi Department of Corrections.
23  Q   Now, for the sake of conversation, can we -- if an MTC
24  staff officer made $10 an hour and a position was not filled as
25  is represented in the exhibit that we are looking at, would you
```

```
 1   agree that per the contract that we talked about earlier, the
 2   125 percent here, that is reimbursable to the department, that
 3   if a salary was $10 an hour that M.D.O.C. would be eligible for
 4   reimbursement at $12.50 times eight hours for each shift?
 5   A    Counsel, I haven't done that math.  If you are representing
 6   that's your interpretation of that provision of the contract, I
 7   have not done the analysis to know what it is.
 8   Q    Who would do that analysis?
 9   A    If it needs to be done, myself and my executive team, my
10   chief financial officer would really be the one doing the
11   analysis for me.
12   Q    And who would determine if it needs to be done?
13   A    Myself along with my executive staff.
14   Q    And you would agree that if M.D.O.C. is able to be
15   reimbursed money for a contractor not meeting their end of the
16   contract that that's something that needs to be done?
17   A    I would agree that if the Department of Corrections found
18   that it was entitled to a credit for breach of the terms of the
19   contract, then we would pursue that.
20   Q    And that would be money going back to the taxpayers of
21   Mississippi.  Is that correct?
22   A    Sure.
23   Q    I want to briefly talk to you about the contract monitor
24   reports.  Do you know what a contract monitor is, Commissioner?
25   A    I do.
```

```
1    Q    What's a contract monitor?

2    A    Well, that's basically the eyes and ears for the Department

3    of Corrections from a monitoring standpoint to monitor the

4    conditions in any particular facility and report back what

5    those conditions are.

6    Q    And M.D.O.C. actually has a contract monitor for East

7    Mississippi Correctional Facility.  Is that correct?

8    A    We do.

9    Q    And that contract monitor is an employee of M.D.O.C.?

10   A    That's correct.

11   Q    And that person monitors compliance, as you said, eyes and

12   ears with the policies of M.D.O.C. and also the contract

13   itself.  Is that correct?

14   A    Right.

15   Q    And contractors must apply all M.D.O.C. policies.  Is that

16   correct?

17   A    That's correct.  The private prison operator is bound under

18   the policies and procedures of the Mississippi Department of

19   Corrections.

20   Q    And would you agree a failure to comply with M.D.O.C.

21   policies can constitute a material breach in some instances?

22   A    I would have to know what the situation is.  It can, but I

23   would have to know without saying specifically what we are

24   talking about.

25   Q    Well, because M.D.O.C. policies are in place to ensure the
```

```
1    safety and security of the prison, they dictate the minimum
2    necessary.  Correct?
3    A    The minimum necessary?
4    Q    To be safe and secure.
5    A    Sure.  I could agree in some regard with that.
6    Q    And have you seen the contract monitor reports that speak
7    to East Mississippi's compliance or noncompliance?
8    A    I don't see the monitors' reports.
9    Q    Who does?
10   A    That would be the institutional side of my agency.  They
11   would see those reports.  I believe Tony Compton and his staff
12   would see those reports and report to the deputy commissioner
13   who in turn would report to me about conditions that I needed
14   to be aware of.
15   Q    And, Commissioner, I know you said you don't see those
16   reports and you explained who does, but is there any report you
17   can't see if you want to see it?
18   A    No.
19   Q    You can request access to all reports?
20   A    If I needed to see them, sure.
21   Q    If you were interested in what was happening at a
22   particular place or time.  Right?
23   A    I'm always interested in what's happening in my facilities
24   which is why I have assembled an executive staff to report to
25   me.
```

```
1   Q   (Tenders document.)  Commissioner, I just passed you what's
2   up on the monitor's screen as an exhibit that has already been
3   introduced into evidence, Exhibit 2799, Plaintiffs' Exhibit
4   2799.  This is another summary of findings from your contract
5   monitor regarding MTC's compliance with the count policies.
6   And the court inquired earlier regarding count.  Do you know
7   what count means?
8   A   Sure.
9   Q   What does count mean in terms of correctional practices?
10  A   Well, counts are very important to determine, for one, the
11  placement of the offenders in our institutions so that we have
12  a regular accounting of where people are.
13  Q   So, in short, counts are important for safety and security?
14  A   Absolutely.
15  Q   To have a safe prison, you need to know where people are.
16  Right?
17  A   Among other things, yes, you do.
18  Q   It is a basic security function.  Your DCI, Jerry Williams,
19  testified that noncompliance with count is a material breach.
20  Would you agree with that?
21  A   Would I agree with Deputy Commissioner's testimony?
22  Q   I will ask it another way.  Do you agree that noncompliance
23  with count is a material breach to the contract that governs
24  East Mississippi?
25  A   Well, what I would say to that is that we always want to
```

```
1    make sure we are conducting counts properly and that, you know,

2    when you say material breach, I wouldn't necessarily say

3    material breach.  What I would say is that we have some work to

4    do if counts are not conducted properly and that we need to

5    look at whether or not there needs to be more training in that

6    regard.

7              MR. OWENS:  The court's indulgence.

8         (SHORT PAUSE)

9    BY MR. OWENS:

10   Q    Commissioner, pertaining to more work to do, in front of

11   you is the counts for noncompliance findings by the monitor.

12   If you look at Chart 1, which is the one here on the top of the

13   screen -- can you see that okay, Commissioner?

14   A    I can.

15   Q    Do you see that the monitor has found that staff conduct

16   formal counts at least once per eight-hour shift three times a

17   day as in noncompliance for the entirety which you have been

18   the commissioner and chief of staff at East Mississippi?

19             MR. SILER:  Objection because he is misrepresenting

20   what this information is to this witness, and it's misleading

21   to the witness and I object in that regard.

22   BY MR. OWENS:

23   Q    I actually apologize, Commissioner.  To your lawyer's

24   point, you were compliant in May and June, not the entirety.

25             MR. SILER:  Well, just for the record, that was not my
```

1    point.  They are misrepresenting the entire chart, and it's --

2    they are confusing things in this record that don't mean what

3    they claim they mean, Your Honor.

4          MR. OWENS:  Your Honor, counsel opposite will have an

5    opportunity on redirect to clarify anything that's confusing.

6    This has been entered into evidence and undisputed and the

7    court has accepted it.

8          THE COURT:  All right.  Why don't you ask the witness

9    what this chart represents so she can explain to me what you

10   are asking her to testify about, what the chart is supposed

11   to -- I don't understand what the chart is supposed to show.  I

12   don't know any of the basics about this issue, and nobody has

13   explained it to me.

14         MR. SILER:  Your Honor, just for the record, this

15   witness -- this chart is allegedly based on some reports this

16   witness has already testified she does not get.  So how can she

17   do anything other than just speculate as to what this means?

18         MR. OWENS:  Your Honor, a lot of testimony that has

19   been here today is that counts are important.  They determine

20   the safety and security of the prison.  This witness has

21   testified that she has access to all reports and she also

22   testified that there is a monitor who reports on what happens

23   at M.D.O.C.  This summary which has already been accepted into

24   evidence is a summarization of the noncompliance of the various

25   safety and security counts that she has testified to.

```
1              THE COURT:  I thought she also testified that she had

2    not -- that she does not keep up with the reports of the

3    compliance officer and that that's done by one of her staff,

4    unless something is brought to her attention that she doesn't

5    know anything about it.  Was that a correct understanding of

6    your testimony?

7              THE WITNESS:  That's correct, Your Honor.

8              THE COURT:  So how can she discuss these charts if she

9    has never seen the underlying information?

10             MR. OWENS:  Your Honor, I am not trying to proffer any

11   testimony whether or not she has seen the charts or the

12   underlying information.  As the commissioner, she has already

13   taken a position that it could be a material breach of the

14   contract in the event that counts are not being conducted.

15             THE COURT:  But you are not taking the steps -- she

16   has to know the individual or the specific alleged breach of

17   contract, and if she has not had that brought to her attention

18   through the chain of command, she says she doesn't know

19   anything about it.  She is not a competent witness to even

20   discuss this.

21             MR. OWENS:  Briefly, Your Honor, may I respond?

22             THE COURT:  Yes, sir.

23             MR. OWENS:  This evidence was entered in the record

24   under her Deputy Commissioner of Institutions, Mr. Williams.

25   He has testified that, you know, the counts are a material
```

```
1    breach.  What we are trying to offer to the court is if that's

2    where it stops, that's fine.  But as the head of the

3    department, either she knows or she doesn't, but she is the

4    one -- Williams can't terminate the contract, Williams can't

5    modify the contract; she can.

6              THE COURT:  She might have the power to void this

7    contract.  She might if she had this brought to her attention

8    think it to be a breach and the breach is serious enough to --

9    for her to void the contract.  But you haven't closed the gap.

10   She has said she has not reviewed or received the monthly

11   reports of the auditor.

12             MR. OWENS:  I will move on to a different line of

13   questioning to lay the foundation, Your Honor.

14             THE COURT:  All right.

15   BY MR. OWENS:

16   Q   Commissioner, if there was a routine monthly or even yearly

17   lack of compliance with counts at one of your facilities, would

18   you expect that to be brought to your attention?

19   A   Yes.  And what I will say to that is that my deputy

20   commissioner stays in constant contact with the facilities.

21   And if there is an issue or concern that needs to be addressed,

22   he can do that.  He is my designee, but he can do that and have

23   in his meetings with his staff about offender counts.  And if

24   there is a problem, they can address it.

25             THE COURT:  And are the counts the prisoner counts
```

1    supposed to be taken three times a day, is that what you are

2    referring to as the count?

3            MR. OWENS:  Yes, Your Honor.

4            THE COURT:  All right.

5    BY MR. OWENS:

6    Q    And I believe your testimony was that you would expect it

7    to be brought to your attention.  Is that correct?

8    A    Sure.  If it needed to be, absolutely.

9    Q    All right.  Commissioner, I'm showing you the previous

10   contract, Exhibit 397, that's in front of you that we looked

11   at.  You have a hard copy.  I'm showing you Page 21 if you

12   would like to look at it.

13       I would like to turn your attention to Article 8, default

14   and termination.  Do you see that, Commissioner?

15   A    Uh-huh.

16   Q    Section 8.2 outlines what constitutes a default by

17   authority.  I believe you just testified when I asked you about

18   counts and material breaches that you were aware of that

19   process.

20       It states:  Present failure or refusal by the authority to

21   substantially fulfill its obligation under the agreement is an

22   event for default on the party of the authority unless

23   justified by force majeure or excused by contract or by default

24   of M.D.O.C.  Did I read that correctly, Commissioner?

25   A    Under Section B?

1    Q    Yes.

2    A    Okay.

3    Q    All right.  If you look at that section above, it defines

4    what constitutes a breach by M.D.O.C.  Could you review it,

5    please?

6            THE COURT:  Where are you reading?

7            MR. OWENS:  Your Honor, Article 8 here.  Right now I

8    just asked the commissioner to look at other material breach

9    and what's a breach.  That was the section I just read right

10   there, Your Honor.  And this is 8.2, the default authority

11   there, Your Honor.  We can push it up.

12           THE WITNESS:  I have read Section A.

13   BY MR. OWENS:

14   Q    Okay.  To your knowledge, Commissioner, has MTC done

15   anything that would constitute an event of default under this

16   contract?

17   A    An event of default?

18   Q    Yes.

19   A    No, not that I'm aware of.

20   Q    And has M.D.O.C. done anything that would consider to be a

21   default in this contract?

22   A    No.

23   Q    I will turn the page next, Commissioner, to Page 22.

24   Please look at Section 8.4 that outlines a time to cure, which

25   is here.  Can you see that, Commissioner?

```
 1    A    Uh-huh.

 2              MR. SILER:  Your Honor, I object to this whole line of

 3    questioning.  It is not relevant to anything.  And she has

 4    already said she can end this contract if she thinks it needs

 5    to be ended.  But to just keep repeating over and over

 6    something she has already testified to is not helpful.  It is

 7    not even relevant to the issue before the court which is

 8    whether cruel and unusual treatment has been going on.  They

 9    violated the contract, that's not even a relevant issue.  So I

10    object to it.

11              THE COURT:  What's the relevance of this inquiry?

12              MR. OWENS:  Your Honor, I have a few more questions on

13    the issue, and the relevance --

14              THE COURT:  That's not what I asked you.  I asked you

15    what's the relevance of the inquiry.

16              MR. OWENS:  The services that are being provided, to

17    Mr. Siler's point and to the court's point, M.D.O.C. has

18    contractually allowed MTC to perform what the plaintiffs allege

19    are unconstitutional conditions of confinement in the prison.

20    This contract governs what has to be done at the prison with

21    respect to the specific performance.  And when it speaks to

22    things like staffing, which the court is aware from Eldon

23    Vail's testimony, our conditions expert and others, that that's

24    critical.  It is in the contract purposely because M.D.O.C. has

25    acknowledged that --
```

```
1              THE COURT:  Why don't you ask a direct question?  You
2    are asking all around the block about what's in the contract
3    but I don't know what you are trying to ask whether it's a
4    breach.  Some action has to be a breach before the breach of
5    contract provisions come into effect, and you haven't asked the
6    lady anything about what would be a breach.
7              MR. OWENS:  Yes, Your Honor.
8              THE COURT:  Are you going to ask her something?
9              MR. OWENS:  Well, Your Honor, my previous questioning
10   to the witness was what was a material breach of the contract
11   where it pertains to counting.  And for the plaintiffs to
12   prevail, Your Honor, we have to show that there is notice that
13   the commissioner or her executive team was aware of deliberate
14   indifference.  So when I asked her about the material breach
15   previously and what was a material breach, I asked her
16   specifically about staffing and counts.
17             So it's our hope, Your Honor, to provide the court
18   with questionings to this witness to show that they were aware
19   that their breach was occurring.  And that's the basis of this
20   line of questioning.
21             THE COURT:  All right.  I am not following your
22   proposition.  If there has been a breach, the question to her
23   is why did you not cancel the contract, not all of these
24   obscure provisions that could be put in if a breach is called
25   for.  If there is a breach, the contract says it can be set
```

```
1   aside.  You haven't mentioned a breach to her, you haven't -- a
2   specific breach.  You haven't set that out.  You haven't asked
3   her why did you not cancel the contract.
4          I don't know where all of this winding is going.  I
5   sustain the objection.  I'm trying to tell you that your
6   examination is not making any sense to me.  I don't know where
7   you are trying to go.  And if you can't tell me where you are
8   trying to go, I can't find for you.
9          MR. OWENS:  Let me try a different roadmap, Your
10  Honor.
11  BY MR. OWENS:
12  Q   Commissioner, you previously testified that you know what a
13  material breach of the contract is.  Is that correct?
14  A   Well, what I said was if there is a material breach of the
15  contract, then we will look at it and determine whether or not
16  there is a need to -- whether we need to address that.
17  Q   And if there was a material breach for several months and
18  several years, you would address that.  Is that correct?
19  A   Yes.
20  Q   And why haven't you addressed the material breaches that
21  have occurred in the contract to date?
22  A   What are you contending are those material breaches?
23  Q   Well, what constitutes a material breach?
24  A   Well, it has to be put in context.  I can't just say what a
25  material breach is.  If you ask me if there is something that
```

```
1    you have -- plaintiffs have made allegations in this case

2    against defendants.  And so if you are saying the allegations

3    that you have made, if you can tell me what those are and if

4    you ask me do I consider that to be a material breach, I can

5    answer that question.  But just saying what a material breach

6    is, I can't answer that for you without some context.

7    Q   So as the person who is aware of this contract and is in

8    charge of the entire M.D.O.C., you can't give me any examples

9    of what a material breach would be?

10   A   Well, what I'm saying to you is --

11            THE COURT:  That's an abstract question that is -- I

12   make an objection myself.  If you want her to discuss something

13   that is -- you think is a material breach, ask her whether that

14   particular subject is a material breach.  She can say yes, it

15   is, or no, it isn't.  If she says yes, it is, then you can ask

16   her why she hasn't considered canceling the contract.

17   BY MR. OWENS:

18   Q   Commissioner, you previously testified that you thought

19   that not following counts is a material breach.  Is that

20   correct or not correct?

21   A   That's not correct.  What I said was that it could be, it

22   depends on the circumstances.  What I said, that counts are

23   very important to our operations -- to corrections operations.

24   Q   So is it your testimony that failure to properly do counts

25   is a material breach or not?
```

```
1    A   I wouldn't necessarily say that without more.  I think
2    failure to conduct counts along with other things if you are
3    failing your obligations for operating the facility in other
4    regards combined with other things, then it could be a material
5    breach.  But that alone, I would not say that that would be a
6    material breach.
7    Q   You testified that that alone is not a material breach, but
8    if you don't conduct counts properly for a year, is that a
9    material breach?
10   A   Again, coupled with more, it depends.  It depends on the
11   frequency in which those counts were not conducted properly.
12   Are we talking about one day a month?  Are we talking about 365
13   days in a year?  So again, it has to be contextual.
14   Q   We are talking about several years, Commissioner.
15   A   Okay.  So you are telling me for several years -- 365 days
16   for several years I didn't have counts conducted properly?  Is
17   that what you are asking me?
18   Q   I'm not asking you.  I'm asking you if several years, would
19   that be a material breach?
20   A   For several years, if that was the case, if I was talking
21   about 365 days a year for several years, then that would be a
22   problem.
23   Q   Would it be a material breach?
24   A   If that were the case.
25   Q   All right.  Would it be a material breach to failure to
```

1    staff the facility appropriately?

2         MR. SILER:  Judge, he is just arguing with the witness

3    over abstract questions when she has told him that it takes

4    context, it takes knowing a lot of information, and it is just

5    argumentative and I object to it.

6         THE COURT:  I sustain the objection.  The question in

7    this case is not whether there has been a material breach.  The

8    question in this case is whether the purported conduct or

9    failure to do something that's in the contract or otherwise is

10   something that causes a major problem to the safety of the

11   prisoners.  It doesn't make any difference whether there is a

12   material breach of the contract.  She has the authority to

13   renegotiate the contract.  She has the authority to void the

14   contract.  She has the authority to overlook these things.  You

15   are trying to build something around a nonissue in the case.

16        MR. OWENS:  May I continue, Your Honor?

17        THE COURT:  Yes, sir.  We're going to stop at this

18   time.  I have a lunch engagement, and it might help my attitude

19   to get out of here.

20        I suggest you look at what you are trying to do.  It

21   is the wrong way to approach it, and you are not going to get

22   what you think you are going to get, because it's the wrong

23   approach with your line of questioning, and it's wasting

24   everybody's time.

25        We will stand in recess until about 1:00.

1        (RECESS)
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

CERTIFICATE OF REPORTER

I, BRENDA D. WOLVERTON, Official Court Reporter, United States District Court, Southern District of Mississippi, do hereby certify that the above and foregoing pages contain a full, true and correct transcript of the proceedings had in the aforenamed case at the time and place indicated, which proceedings were recorded by me to the best of my skill and ability.

I certify that the transcript fees and format comply with those prescribed by the Court and Judicial Conference of the United States.

This the 22nd day of March, 2018.

s/ Brenda D. Wolverton_____
BRENDA D. WOLVERTON, RPR-CRR